**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Case No. 23-90020 (DRJ)** |
| *et al.,* | § | |
| | § | **(Joint Administration Requested)** |
| | § | **(Emergency Hearing Requested)** |
| Debtors.[1] | § | |
| | § | |

**EMERGENCY MOTION OF DEBTORS FOR INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING DEBTORS TO**
**(A) CONTINUE INSURANCE PROGRAMS AND SURETY BOND PROGRAM,**
**(B) PAY ALL OBLIGATIONS WITH RESPECT THERETO, AND (C) MODIFY**
**AUTOMATIC STAY TO PERMIT EMPLOYEES TO PROCEED WITH**
**WORKERS' COMPENSATION CLAIMS; AND (II) GRANTING RELATED RELIEF**

> **EMERGENCY RELIEF HAS BEEN REQUESTED. RELIEF IS REQUESTED NOT LATER THAN 1:00 P.M. (CENTRAL PREVAILING TIME) ON JANUARY 24, 2023.**
>
> **IF YOU OBJECT TO THE RELIEF REQUESTED OR YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU MUST APPEAR AT THE HEARING IF ONE IS SET, OR FILE A WRITTEN RESPONSE PRIOR TO THE DATE THAT RELIEF IS REQUESTED IN THE PRECEDING PARAGRAPH. OTHERWISE, THE COURT MAY TREAT THE PLEADING AS UNOPPOSED AND GRANT THE RELIEF REQUESTED.**
>
> **A HEARING WILL BE CONDUCTED ON THIS MATTER ON JANUARY 24, 2023 AT 1:00 P.M. (CENTRAL PREVAILING TIME) IN COURTROOM 400, 4TH FLOOR, 515 RUSK AVENUE, HOUSTON, TX 77002.**
>
> **PARTICIPATION AT THE HEARING WILL ONLY BE PERMITTED BY AN AUDIO AND VIDEO CONNECTION.**
>
> **AUDIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL-IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. ONCE CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE JONES' CONFERENCE ROOM NUMBER IS 205691. VIDEO**

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

> COMMUNICATION WILL BE BY USE OF THE GOTOMEETING PLATFORM. CONNECT VIA THE FREE GOTOMEETING APPLICATION OR CLICK THE LINK ON JUDGE JONES' HOME PAGE. THE MEETING CODE IS "JUDGEJONES". CLICK THE SETTINGS ICON IN THE UPPER RIGHT CORNER AND ENTER YOUR NAME UNDER THE PERSONAL INFORMATION SETTING.
>
> HEARING APPEARANCES MUST BE MADE ELECTRONICALLY IN ADVANCE OF BOTH ELECTRONIC AND IN-PERSON HEARINGS. TO MAKE YOUR APPEARANCE, CLICK THE "ELECTRONIC APPEARANCE" LINK ON JUDGE JONES' HOME PAGE. SELECT THE CASE NAME, COMPLETE THE REQUIRED FIELDS AND CLICK "SUBMIT" TO COMPLETE YOUR APPEARANCE.

Serta Simmons Bedding, LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Background

1.      On the date hereof (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases. The Debtors have filed a motion requesting joint administration of their chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and Rule 1015-1 of the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Local Rules**").

2.      The Debtors, together with their non-debtor affiliates (collectively, the "**Company**"), are a leading manufacturer and marketer of bedding products in North America, operating various bedding manufacturing facilities across the United States and Canada. The Company and its predecessors have been developing innovative products and technologies to

2

provide their consumers a better night's sleep since 1876.  The Company's headquarters are located in Doraville, Georgia.

3.      On January 23, 2023, the Debtors entered into a Restructuring Support Agreement (as amended from time to time and including all exhibits thereto, the "**RSA**"), with (a) holders representing approximately (i) 81% of the aggregate outstanding principal amount of Class 3 (FLFO Claims), and (ii) 77% of the aggregate outstanding principal amount of Class 4 (FLSO Claims) under the Plan (collectively, the "**Consenting Creditors**"), and (b) Dawn Holdings, Inc., as the sole member, and holder of interests in, Dawn Intermediate, LLC; and funds managed by Advent International Corporation, as holder of interests in Dawn Holdings, Inc. (collectively, the "**Consenting Equity Holders**" and, together with the Consenting Creditors, the "**Consenting Parties**").  Under the RSA, each of the Consenting Parties have been granted certain consent and consultation rights, as applicable, and the Consenting Parties have agreed to support and/or vote in favor of the restructuring of the Company pursuant to the prearranged *Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (the "**Plan**") filed contemporaneously herewith.  Among other things, the Plan provides for the (i) equitization and discharge of approximately $1.59 billion of total debt, (ii) assumption of significant unsecured trade, customer and employee liabilities, (iii) recoveries to out of the money creditors, and (iv) resolution of prepetition litigation relating to the Company's 2020 recapitalization transaction.  Upon approval of the Plan, the Company will be in a position to implement its long term business plan unburdened by its overleveraged capital structure.

4.      Additional information regarding the Debtors' business and capital structure and the circumstances leading to the commencement of these chapter 11 cases is set forth in the *Declaration of John Linker in Support of the Debtors' Chapter 11 Petitions and First Day*

WEIL:\98896066\19\40416.0004

*Relief* (the "**First Day Declaration**"),[2] which has been filed with the Court contemporaneously herewith and is incorporated by reference herein.

### Jurisdiction

5.      The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Relief Requested

6.      By this Motion, the Debtors request authority pursuant to sections 362(d), 363(b), 503(b), and 105(a) of the Bankruptcy Code and Bankruptcy Rules 4001, 6003, and 6004, and Bankruptcy Local Rule 9013-1(b), the Debtors request entry of interim and final orders, (i) authorizing, but not directing them to (a) continue to maintain and renew, amend, supplement, place, or extend, if necessary, in their sole discretion, the Insurance Programs and Surety Bond Program (each as defined below) in accordance with their applicable insurance policies and indemnity and reimbursement agreements and to continue to perform their obligations with respect thereto during these chapter 11 cases, and (b) pay, in their sole discretion, any premiums, deductibles, compensation claims related to the Workers' Compensation Program, Broker Fees, and all other obligations (each as defined below, and collectively, the "**Insurance Obligations**") arising under or related to the Insurance Programs or Surety Bond Program, as applicable, whether incurred before or after the Petition Date, (ii) modifying the automatic stay to the limited extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below); and (iii) granting related relief.  The Debtors

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

further request that the Court authorize financial institutions to receive, process, honor, and pay all checks presented for payment and to honor all funds transfer requests related to such obligations.

7.     A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit B** (the "**Proposed Interim Order**") and, pending a final hearing on the relief requested herein, on a final basis as **Exhibit C** (the "**Proposed Final Order**").

### Debtors' Insurance Programs and Related Obligations

8.     In connection with the operation of their business, the Debtors maintain several workers' compensation programs (the "**Workers' Compensation Programs**") and various property, automobile, directors and officers and other insurance programs (the "**General Insurance Programs**" and, together with the Workers' Compensation Programs, the "**Insurance Programs**") through several different insurance carriers (the "**Insurance Carriers**"). The Insurance Programs include those identified on **Exhibit A** annexed hereto.[3]

9.     The Debtors have posted irrevocable letters of credit in the aggregate amount of approximately $21.7 million to secure their obligations under the Workers' Compensation Programs. These letters of credit serve as collateral in the event that the Debtors default on their obligations under the Workers' Compensation Programs and the casualty-type (*i.e.*, general liability and automobile) General Insurance Programs.

10.     As of the Petition Date, the estimated outstanding prepetition amounts for Insurance Programs are summarized in the following chart and are described in further detail below:

---

[3]     In addition to the Insurance Programs listed on **Exhibit A**, the Debtors maintain numerous Insurance Programs with respect to employee health, dental, disability, and life insurance benefits. These policies are addressed in a separate motion filed contemporaneously herewith pertaining to the Debtors' employees' wage and benefits programs, filed contemporaneously herewith.

| Obligation | Description | Approx. Amount Outstanding as of the Petition Date |
|---|---|---|
| Workers Compensation Program | Obligations relating to workers' compensation insurance | $13.2 million |
| General Insurance Programs | Obligations relating to other, general insurance liabilities, including, but not limited to property & casualty, automobile and utilities, as well as various umbrella policies | $0.9 million |
| **Total Estimated Insurance Programs Obligations** | | **$14.1 million** |

### A.      Workers' Compensation Programs

11.      Under the laws of the various states in which they operate, the Debtors are required to maintain workers' compensation coverage for their employees with respect to claims arising from or related to employment with the Debtors.  The Debtors' Workers' Compensation Program covers claims asserted by employees of the Debtors based in the United States.[4]

### 1.      Current Workers' Compensation Program

12.      The Debtors maintain their Current Workers' Compensation Program through an insurance policy with Safety National Casualty Corporation ("**Safety National**") as well as coverage under the monopolistic state funds in Ohio and Washington.  As of the Petition Date, the Debtors have posted $650,000 in an escrow account with Sedgwick Claims Management Services to cover the claims arising out of the policy with Safety National.  Sedgwick Claims Management Services serves as the claims administrator under the Workers' Compensation Program.

---

[4]      The Debtors' non-U.S. non-Debtor affiliates maintain their own workers' compensation policies, which are not covered by the relief in this Motion.

WEIL:\98896066\19\40416.0004

13.     The Debtors' current workers' compensation obligations arise under the Safety National insurance policy, which renews on October 1st of each year, and the Debtors pre-pay the annual premiums such renewed policy at that time.  For the period from October 2022 to September 2023, the premiums (including incidental taxes and fees) under the Safety National policy were approximately $760,000.  These premiums are calculated based upon the Debtors' projected payroll and historic loss rates.  At the end of each policy period, the Insurance Carriers for the foregoing Workers' Compensation Programs perform a true-up to determine whether the Debtors owe additional premiums retrospectively or are entitled to a refund of pre-paid premiums.

14.     The Debtors also pay quarterly premiums for their Workers' Compensation Program.  The Debtors estimate that they owe $0.7 million on account of unpaid premiums to Safety National for the Workers' Compensation Program entered into prepetition.

15.     Under the Safety National policy, the Debtors are responsible for paying a deductible (the "**Workers' Compensation Deductibles**") of $500,000 per claim.  Safety National is obligated to pay any claim amount above the Workers' Compensation Deductible, up to the statutory limit for statutory claims and/or up to the applicable employer's liability policy limit $1.0 million per claim for employer's liability claims.  Employer liability claim amounts in excess of the employer's liability policy limit are covered under the applicable umbrella policy.

16.     Under the Debtors' Current Workers' Compensation Program, there are approximately 113 open workers' compensation claims (the "**Current Workers' Compensation Claims**") as of December 31, 2022.  As of the Petition Date, the Debtors estimate that the accrued, but unpaid prepetition Current Workers' Compensation Claims plus premiums owed on account of the Workers' Compensation Program and to the monopolistic state funds are approximately $12.8 million.

### 2. Legacy Workers' Compensation Program

17.     Prior to obtaining coverage from Safety National, the Debtors maintained workers compensation policies with the following providers:  American International Group, Inc. ("**AIG**"), Travelers Indemnity Company ("**Travelers**"), and Sentry Insurance Company ("**Sentry**").

18.     The Debtors maintained a policy with AIG from September 2001 to May 2012 (the "**AIG Policy**") under which four claims remain outstanding.  In connection with the AIG Policy, the Debtors have posted approximately $870,000 to serve as collateral to cover these obligations.  As of the Petition Date, the Debtors estimate that $0.1 million of fees & deductibles are owed to AIG under the AIG Policy.

19.     The Debtors maintained a policy with Travelers in the late 1990s (the "**Travelers Policy**") under which two claims remain outstanding.  In connection with the Travelers Policy, the Debtors have posted a $50,000 letter of credit to serve as collateral to cover these obligations.  As of the Petition Date, the Debtors estimate that less than $0.1 million of fees & deductibles are owed to Travelers under the Travelers Policy.

20.     The Debtors maintained a policy with Sentry from May 1999 to May 2009 (the "**Sentry Policy**" and, together with the AIG Policy and the Travelers Policy, the "**Legacy Workers Compensation Program**") under which two claims remain outstanding.  In connection with the Sentry Policy, the Debtors have posted approximately $250,000 to serve as collateral to cover these obligations.  As of the Petition Date, the Debtors estimate that $0.3 million of fees & deductibles are owed to Sentry under the Sentry Policy.

21.     Under the Debtors' Legacy Workers' Compensation Program, there are approximately 8 open workers' compensation claims (the "**Legacy Workers' Compensation**

WEIL:\98896066\19\40416.0004

Claims") as of December 31, 2022.  As of the Petition Date, the Debtors estimate that the accrued, but unpaid prepetition Legacy Workers' Compensation Claims are approximately $0.4 million.

22.     The Debtors request authority, but not direction, to pay all amounts in connection with the Workers' Compensation Program that the Debtors believe are necessary to maintain the Workers' Compensation Program, including any brokers' fees related thereto, in the ordinary course of business.  Additionally, the Debtors request authority, but not direction, (i) to enter into any renewal or extension of the of the Workers' Compensation Program, and (ii) to pay any related expenses, whether incurred before or after the Petition Date, including those that come due within twenty-one (21) days of the Petition Date, to the extent necessary during these chapter 11 cases.

**B.     General Insurance Programs**

23.     The Debtors also maintain general insurance programs that provide coverage to the Debtors and certain of their non-Debtor affiliates for general liabilities and casualty damages, including, but not limited to, liabilities associated with personal injury, crime (including employee theft), directors and officers, employment practices, property, automobile, aircraft, cybersecurity, as well as umbrella and excess coverage (the "**General Insurance Programs**"). Continuation of these General Insurance Programs is essential to the ongoing operation of the Debtors' businesses.

24.     The Debtors are required to pay premiums (the "**General Insurance Premiums**") under the General Insurance Programs based upon a fixed rate established and billed by each Insurance Carrier.  The General Insurance Premium for each of the respective General Insurance Programs is reflected on **Exhibit A** annexed hereto.  Annual General Insurance Premiums for all of the General Insurance Programs total approximately $8.0 million in the aggregate, including incidental taxes and fees.  Certain of the General Insurance Premiums are

paid in advance; however, others are paid quarterly (i.e. Auto and General Liability). The Debtors estimate that they owe approximately $0.4 million on account of General Insurance Premiums for policies entered into prepetition.

25.     The Debtors are also required to pay various deductible and co-insurance obligations (the "**General Insurance Deductibles**") based on the amount of claims made against the General Insurance Programs. The Debtors have a general liability deductible of $250,000 per occurrence and auto liability deductible of $250,000. The Debtors estimate that the aggregate accrued, but unpaid prepetition General Insurance Deductibles is approximately $0.5 million.

**C.     Broker Fees**

26.     The Debtors employ Marsh USA Inc. ("**Marsh**") and Aon PLC ("**Aon**" and, together with Marsh, the "**Brokers**") as their insurance brokers to assist them with the procurement and negotiation with certain of their Insurance Programs. Pursuant to their contract with the Debtors, Marsh is paid only a commission, which is paid as part of the Debtors' premium payments and Aon is paid an annual fee in the amount of $176,000 (the "**Broker Fees**"). As of the Petition Date, there are no accrued and unpaid Broker Fees.

**Debtors' Surety Bond Program**

27.     In the ordinary course of business, as part of standard import practices, the Debtors are required to post customs surety bonds to the U.S. Customs and Border Protection Agency ("**CBPA**"). Customs surety bonds are required by the CBPA to guarantee that importers pay duties, taxes and charges in a timely manner and operate in accordance with the regulations of the CBPA and allows the CBPA to clear a shipment without having to wait for additional payments. If an importer is delinquent on its obligations to the CBPA, the CBPA will collect from the surety company that issued the bond, and the surety company can then use legal means to

collect from the importer.  When a bond is required, the CBPA will not release the goods until the bond is posted and regulatory requirements are met.

28.     The issuance of a surety bond shifts the risk of the Debtors' nonperformance or nonpayment from the Debtors to a surety.  Unlike an insurance policy, if a surety incurs a loss on a surety bond due to such nonperformance or nonpayment, the surety is entitled to recover the full amount of that loss from the principal.  Moreover, statutes or ordinances often require the Debtors to post surety bonds to secure payment and enforcement of the various obligations discussed above.  Failing to provide, maintain, or timely replace their surety bonds may prevent the Debtors from undertaking essential functions related to their operations.  In every case, the Debtors have either (i) entered into an indemnity agreement that sets forth the surety's rights to recover from the Debtors (collectively, the "**Surety Indemnity Agreements**") or (ii) partially collateralized the surety bonds by cash or letters of credit.  Under each Surety Indemnity Agreement, the Debtors agree to indemnify the surety from any loss, cost, or expense that the surety may incur on account of the issuance of any surety bonds on behalf of the Debtors (the "**Indemnity Obligations**").

29.     In order to comply with CBPA regulations, the Debtors post surety bonds for the benefit of the CBPA (the "**Surety Bond Program**"), with Avalon Risk Management Insurance Agency ("**Avalon**") serving as the surety.  The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis and payment is remitted by the Debtors when the surety bonds are issued and annually upon each renewal.

30.     In the twelve months preceding the Petition Date, the Surety Premiums totaled approximately $2,750.  As of the Petition Date, the Debtors have $1.5 million in

outstanding surety bonds, which obligations are partially collateralized by (i) letters of credit in the approximate amount of $250,000 issued for the benefit of Avalon; and (ii) a letter of credit in the approximate amount of $500,000 issued for the benefit of Avalon.

31.     Certain surety bonds in the Surety Bond Program are scheduled to expire and be renewed within the next two months.  The Debtors anticipate the Surety Bond Obligations over the next two months will amount to approximately $2,750, of which $500 will come due within twenty-one (21) days after the Petition Date.

32.     The Debtors request authority, but not direction, to pay all amounts in connection with the Surety Bond Obligations that the Debtors' believe are necessary to maintain the Surety Bond Program, including any brokers' fees related thereto, in the ordinary course of business.  Additionally, the Debtors request authority, but not direction, to enter into any renewal or extension of the surety bonds, to issue new surety bonds, and to pay any related Surety Bond Obligations, whether incurred prior to or after the Petition Date, including those that come due within twenty-one (21) days after the Petition Date, to the extent necessary during these chapter 11 cases.

**<u>Relief Requested Should Be Granted</u>**

**A.     Maintaining Certain of the Insurance Programs and the Surety Bond Program is Required by Law, Bankruptcy Code, and U.S. Trustee Operating Guidelines**

33.     The nature of the Debtors' business and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs and Surety Bond Program on an ongoing and uninterrupted basis.  If the Debtors fail to pay the Insurance Obligations, the Insurance Carriers may seek to terminate the existing Insurance Programs, or they may decline to renew such Insurance Programs or refuse to insure the Debtors in the future.  The Debtors would then be required to obtain replacement policies on an expedited basis at a significantly increased cost to

WEIL:\98896066\19\40416.0004

their estates.  Moreover, the Debtors could be exposed to substantial liability for damages resulting

to persons and property of the Debtors and others absent insurance coverage, and such exposure

could have an extremely negative impact on the Debtors' ability to successfully reorganize.

34.     The Debtors could also be fined substantial amounts by various state

workers' compensation boards if the Workers' Compensation Programs are not maintained.

Without sufficient workers' compensation coverage, there is a significant risk that eligible

workers' compensation claimants will not receive timely payments for employment-related

injuries, which could also have a devastating effect on the financial well-being and morale of the

Debtors' employees.  Departures by employees at this critical time would undoubtedly result in a

severe disruption of the Debtors' business and have an adverse impact on the Debtors, the value

of their assets and business, and their ability to reorganize.

35.     Similarly, the retention of the Debtors' qualified and dedicated senior

management is also linked to the continued effectiveness of the directors' and officers' liability

insurance policies.  Departure of these key employees at this critical time, which would likely

occur if such key employees were not covered by liability insurance policies, would undoubtedly

result in a severe disruption of the Debtors' business and have an adverse impact on the Debtors,

the value of their assets and business, and their ability to reorganize.

36.     Under section 1112(b)(4)(C) of the Bankruptcy Code, a "failure to maintain

appropriate insurance that poses a risk to the estate or to the public" is "cause" for mandatory

conversion or dismissal of a chapter 11 case.  11 U.S.C. § 1112(b)(4)(C).  In addition, in many

instances, the coverage provided under the Insurance Programs is required by the regulations, laws,

and contracts that govern the Debtors' commercial activities, including the operating guidelines

(the "**U.S. Trustee Operating Guidelines**") issued by the Office of the United States Trustee for

WEIL:\98896066\19\40416.0004

Region 7 (the "**U.S. Trustee**"), which includes the Southern District of Texas.   Given this backdrop, it is essential to the Debtors' estates, and consistent with the Bankruptcy Code and the U.S. Trustee Operating Guidelines, that the Debtors be permitted to maintain and continue making all payments required under their Insurance Programs and Surety Bond Program.   It is similarly critical that the Debtors have the authority to supplement, place, amend, extend, renew, or replace their Insurance Programs and Surety Bond Program, as needed, in their business judgment, without further order of the Court.

37.     Likewise, all of the jurisdictions in which the Debtors operate their business require the Debtors to maintain the Workers' Compensation Program in accordance with applicable law.   If the Debtors fail to maintain the Workers' Compensation Program, applicable law may prohibit the Debtors from operating in those states.   Maintaining the Workers' Compensation Program and the payment of all Workers' Compensation Claims are therefore crucial to the Debtors' continued operations and the success of the Debtors' ongoing chapter 11 process.

**B.     Payments Made to Maintain Insurance Programs and Surety Bond Program Are Ordinary Course Transactions Authorized by Bankruptcy Code Section 363(c)(1)**

38.     The Debtors believe that payments made to maintain the Insurance Programs and the Surety Bond Program (including any payments of Insurance Obligations and Surety Bond Obligations in connection therewith) fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code.   The purpose of section 363(c)(1) is to provide a debtor in possession with the flexibility to engage in the ordinary transactions required to operate its business without unneeded oversight by its creditors or the court.   *See Med. Malpractice Ins. Ass'n v. Hirsch (In re Lavigne)*, 114 F.3d 379, 384 (2d Cir.

WEIL:\98896066\19\40416.0004

1997); *Chaney v. Off. Comm. of Unsecured Creditors of Crystal Apparel, Inc. (In re Crystal Apparel, Inc.)*, 207 B.R. 406, 409 (S.D.N.Y. 1997).

39.     Here, maintaining the Insurance Programs and Surety Bond Programs and honoring certain obligations arising thereunder, including undertaking renewals or extensions as they expire, or entering into new insurance arrangements through the Insurance Carriers or surety, indemnity, or reimbursement agreements, are the type of ordinary course transactions contemplated by section 363(c)(1).   Accordingly, section 363(c)(1) of the Bankruptcy Code authorizes continuation of the Insurance Programs and the Surety Bond Program in the ordinary course of business without the Court's approval.

**C.     Continuation of Payments for Insurance Programs and Surety Bond Program, and Payment of Any Amounts Owed with Respect Thereto Is Necessary to Protect and Preserve the Debtors' Estates**

40.     As discussed above, the Debtors believe that payments made to maintain the Insurance Programs and Surety Bond Program, as well as the payments of any Insurance Obligations made in connection therewith, fall within the ordinary course of business and are therefore authorized pursuant to section 363(c)(1) of the Bankruptcy Code.   To the extent any such actions do not constitute ordinary course transactions, the Debtors request that the Court authorize the Debtors to continue payments for the Insurance Programs and Surety Bond Program, as well as to pay necessary prepetition amounts owed with respect thereto if any come to light postpetition, pursuant to sections 363(b), 503(b) and 105(a) of the Bankruptcy Code.

41.     The Court may grant the relief requested herein pursuant to section 363 of the Bankruptcy Code, which provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate[.]" 11 U.S.C. § 363(b)(1).   Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the

WEIL:\98896066\19\40416.0004

Bankruptcy Code upon a finding that such use is supported by sound business reasons.  *See, e.g.*, *Black v. Shor (In re BNP Petroleum Corp.)*, 642 F. App'x 429, 435 (5th Cir. 2016); *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or the debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale[.]"); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

42.     In addition, under section 1107(a) of the Bankruptcy Code, a debtor has, among other things, the "implied duty of the debtor-in-possession to 'protect and preserve the estate, including an operating business' going-concern value.'"  *In re CEI Roofing, Inc.*, 315 B.R. 50, 59 (Bankr. N.D. Tex. 2004) (quoting *In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002)).  Under section 105(a) of the Bankruptcy Code, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a); *see CoServ*, 273 B.R. at 497 (holding that sections 105 and 1107 of the Bankruptcy Code provide authority for a debtor-in-possession to pay prepetition claims); *see also In re Tusa-Expo Holdings, Inc.*, Case No. 08-45057-DML-11, 2008 WL 4857954, at *1 (Bankr. N.D. Tex. Nov. 7, 2008); *CEI Roofing*, 315 B.R. at 56; *In re Mirant Corp.*, 296 B.R. 427 (Bankr. N.D. Tex. 2003).  Moreover, Bankruptcy Rule 6003 itself implies that the payment of prepetition obligations may be permissible within the first twenty-one (21) days of a case where doing so is "necessary to avoid immediate and irreparable harm."  Fed. R. Bankr. P. 6003.  Accordingly, the

WEIL:\98896066\19\40416.0004

Bankruptcy Code authorizes the postpetition payment of prepetition claims where, as here, such payments are critical to preserving the going-concern value of a debtor's estate.

43.    The Debtors' use of estate funds to pay obligations arising from the Insurance Programs is justified because such obligations are necessary costs of preserving the Debtors' estates.  The Insurance Programs are essential to the Debtors' operations, as the Debtors would be exposed to significant liability if the Insurance Programs were allowed to lapse or terminate.  Such exposure could detrimentally impact the success of these chapter 11 cases.  In addition, failure to timely pay the outstanding premium amount could expose the Debtors to potential penalties or termination of the policy.

44.    The Insurance Programs are also vital to the Debtors' continued operations. Applicable law mandates that certain Debtors maintain workers' compensation coverage for their employees.  The Debtors' failure to pay their obligations under the Workers' Compensation Program could jeopardize their coverage and expose the Debtors to significant liability in fines by state workers' compensation boards.  In addition, the risk that eligible workers' compensation claimants would not receive timely payments for prepetition employment-related injuries could negatively impact the financial well-being and morale of those claimants and, in turn, the Debtors' entire employee base.  This could result in employee departures, causing a significant disruption in the Debtors' business with a materially adverse impact on the Debtors' operations, the value of their estates, and the interests of all parties in these chapter 11 cases.

45.    Similarly, to continue their business operations during the chapter 11 cases, the Debtors must also be able to provide financial assurances to their contract counterparties and the regulatory agencies that oversee certain aspects of the Debtors' business.  This requires the Debtors to maintain their existing Surety Bond Program in the ordinary course of business,

WEIL:\98896066\19\40416.0004

including the payment of surety bond premiums as and when they come due, providing the sureties with collateral, renewing or potentially acquiring additional bonding capacity as needed in the ordinary course of the Debtors' business, and executing other indemnity agreements, as needed, in connection with the Surety Bond Program.  Accordingly, approval of the relief requested herein with respect to Surety Bond Obligations should be granted.

46.    For the foregoing reasons, payment of the obligations in connection with Insurance Programs and Surety Bond Program is necessary, appropriate, and in the best interests of the Debtors, their estates, and all other parties-in-interest in these cases.  Courts in this district have permitted chapter 11 debtors to continue their insurance programs and surety bond programs and to pay obligations, including prepetition obligations, related thereto as a routine matter in similar cases.  *See, e.g.*, *In re Basic Energy Servs., Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2021) (Docket No. 341) (authorizing debtors to maintain insurance and surety bond programs and to pay prepetition obligations in connection with such programs); *In re Fieldwood Energy LLC*, No. 20-33948 (MI) (Bankr. S.D. Tex. Sept. 14, 2020) (Docket No. 340) (same); *In re NPC Int'l, Inc.*, No. 20-33353 (DRJ) (Bankr. S.D. Tex. July 2, 2020) (Docket No. 104) (same); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 4, 2019) (Docket No. 61) (same); *In re Gavilan Res., LLC,* No. 20-32656 (MI) (Bankr. S.D. Tex. July 6, 2020) (Docket No. 154) (authorizing debtors to maintain insurance programs and to pay prepetition obligations in connection with such programs); *In re SpeedCast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 18, 2020) (Docket No. 212) (same); *In re Whiting Petroleum Corp.,* No. 20-32021 (DRJ) (Bankr. S.D. Tex. Apr. 1, 2020) (Docket No. 43) (same).  Similar relief is also appropriate here.

WEIL:\98896066\19\40416.0004

47.     Accordingly, based on the foregoing, the Court should authorize the Debtors to maintain all of their Insurance Programs and Surety Bond Program, and to pay all obligations, including any prepetition obligations, related thereto.

**D.     A Waiver of the Automatic Stay Related to Workers' Compensation Claims Is Appropriate**

48.     Section 362(a)(1) of the Bankruptcy Code, operates to stay

> the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . .

11 U.S.C. § 362(a)(1).

49.     Section 362(d), however, permits a debtor or other parties in interest to request a modification or termination of the Automatic Stay for "cause." *Id.* § 362(d)(1).  To the extent that any of the Debtors' employees hold claims under the Workers' Compensation Programs, the Debtors seek to modify the Automatic Stay to permit these employees to proceed with their claims in the appropriate judicial or administrative forum.  This modification of the Automatic Stay pertains solely to claims under the Workers' Compensation Programs.  Any claims relating to any of the General Insurance Programs or otherwise will remain subject to the Automatic Stay.

50.     Cause exists to modify the Automatic Stay because a stay of the Workers' Compensation Claims could have a detrimental effect on the financial well-being and morale of the Debtors' employees and could lead to the departure of certain employees who are needed at this critical juncture.  Such departures would disrupt the Debtors' business to the detriment of all parties in interest.  To this end, the Debtors seek to waive both the Automatic Stay as it relates to Workers' Compensation Claims, and the corresponding notice requirements under Bankruptcy

WEIL:\98896066\19\40416.0004

Rule 4001(d).  The Court should also authorize the Debtors, as necessary, and to the extent required by law or under the Workers' Compensation Program, to pay all or part of a claim related thereto directly to an employee, any of his or her medical providers, or any of his or her heirs or legal representatives, as set forth in the applicable law or policy.

51.     Courts in this district have granted similar relief in other complex chapter 11 cases.  *See, e.g.*, *In re Core Scientific, Inc.,* Case No. 22-90341 (DRJ) (Bankr. S.D. Tex., Dec. 22, 2022) (Docket No. 118); *In re Talen Energy Supply, LLC*, Case No. 22-90054 (MI) (Bankr. S.D. Tex. June 8, 2022) (Docket No. 461); *In re Basic Energy Servs., Inc.*, No. 21-90002 (DRJ) (Bankr. S.D. Tex. Sept. 13, 2021) (Docket No. 341); *In re UTEX Indus., Inc.,* No. 20-34932 (DRJ) (Bankr. S.D. Tex. Oct. 9, 2020) (Docket No. 72); *In re Fieldwood Energy LLC*, No. 20-33948 (MI) (Bankr. S.D. Tex. Sept. 14, 2020) (Docket No. 340) (same); *In re SpeedCast Int'l Ltd.*, No. 20-32243 (MI) (Bankr. S.D. Tex. May 18, 2020) (Docket No. 212) (same); *In re EP Energy Corp.*, No. 19-35654 (MI) (Bankr. S.D. Tex. Oct. 4, 2019) (Docket No. 61) (same).  Similar relief is also appropriate here

**Applicable Financial Institutions Should Be Authorized to
Receive, Process, Honor, and Pay Checks Issued and Transfers
Requested to Insurance Obligations and Surety Bond Obligations**

52.     The Debtors further request that the Court authorize applicable financial institutions (the "**Banks**") to receive, process, honor, and pay any and all checks issued, or to be issued, and electronic funds transfers requested, or to be requested, by the Debtors relating to the Insurance Obligations, Surety Bond Obligations, and Workers' Compensation Claims, to the extent that sufficient funds are on deposit in available funds in the applicable bank accounts to cover such payment.  The Debtors also seek authority to issue new postpetition checks or effect new postpetition electronic funds transfers in replacement of any checks or fund transfer requests on account of prepetition Insurance Obligations, Surety Bond Obligations, and Workers'

WEIL:\98896066\19\40416.0004

Compensation Claims dishonored or rejected as a result of the commencement of the Debtors' chapter 11 cases.

## Bankruptcy Rule 6003(b) Has Been Satisfied

53.     Pursuant to Bankruptcy Local Rule 9013-1, the Debtors respectfully request emergency consideration of this Motion under Bankruptcy Rule 6003, which provides that the Court may grant relief within the first twenty-one (21) days after the Petition Date to the extent such relief is necessary to avoid immediate and irreparable harm.  As described herein and in the First Day Declaration, the Debtors are under a legal obligation to maintain many of their Insurance Programs and their Surety Bond Program.  In addition, the termination, suspension, or nonrenewal of any of the Insurance Programs or the Surety Bond Program as a result of nonpayment could subject the Debtors to substantial administrative liability as well as a potential cessation of operations, to the detriment of all parties in interest.  The relief requested is essential to avoid the immediate and irreparable harm that would be caused by the Debtors' inability to transition smoothly into chapter 11.  Accordingly, the Debtors submit that the requirements of Bankruptcy Rule 6003 are satisfied.

## Compliance with Bankruptcy Rule 6004(a)
## and Waiver of Bankruptcy Rule and 6004(h)

54.     To implement the foregoing successfully, the Debtors request that the Court find that notice of the Motion satisfies Bankruptcy Rule 6004(a) and that the Court waive the 14-day period under Bankruptcy Rule 6004(h).

## Reservation of Rights

55.     Nothing contained herein is intended to be or shall be deemed as (i) an implication or admission as to the validity of any claim against the Debtors, (ii) a waiver or limitation of the Debtors' or any party in interest's rights to dispute the amount of, basis for, or

WEIL:\98896066\19\40416.0004

Case 23-90020   Document 16   Filed in TXSB on 01/24/23   Page 22 of 24


validity of any claim, (iii) a waiver of the Debtors' or any other party in interest's rights under the Bankruptcy Code or any other applicable nonbankruptcy law, (iv) a waiver of the obligation of any party in interest to file a proof of claim, (v) an agreement or obligation to pay any claims, (vi) a waiver of any claims or causes of action which may exist against any creditor or interest holder, (vii) an admission as to the validity of any liens satisfied pursuant to this Motion, or (viii) an approval, assumption, adoption, or rejection of any agreement, contract, lease, program, or policy under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or a waiver of the Debtors' or any other party in interest's rights to dispute such claim subsequently.

## **<u>Notice</u>**

56.    Notice of this Motion will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Bankruptcy Local Rule 9013-1(d).

WEIL:\98896066\19\40416.0004

WHEREFORE the Debtors respectfully request entry of the Proposed Interim Order and Proposed Final Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated:  January 23, 2023
   Houston, Texas

           Respectfully submitted,

           */s/ Gabriel A. Morgan*
           WEIL, GOTSHAL & MANGES LLP
           Gabriel A. Morgan (24125891)
           Stephanie N. Morrison (24126930)
           700 Louisiana Street, Suite 1700
           Houston, Texas 77002
           Telephone:  (713) 546-5000
           Facsimile:  (713) 224-9511
           Email:   Gabriel.Morgan@weil.com
              Stephanie.Morrison@weil.com

           -and-

           WEIL, GOTSHAL & MANGES LLP
           Ray C. Schrock (*pro hac vice* pending)
           Alexander W. Welch (*pro hac vice* pending)
           767 Fifth Avenue
           New York, New York 10153
           Telephone:  (212) 310-8000
           Facsimile:  (212) 310-8007
           Email:   Ray.Schrock@weil.com
              Alexander.Welch@weil.com

           *Proposed Attorneys for Debtors*
           *and Debtors in Possession*

## Certificate of Service

I hereby certify that on January 23, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


    _/s/  Gabriel A. Morgan_
Gabriel A. Morgan