**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **In re:** | § | **Chapter 11** |
| | § | |
| **SERTA SIMMONS BEDDING, LLC, *et al.*,** | § | **Case No. 23-90020 (DRJ)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | |
| | § | |

**DECLARATION OF JOHN LINKER IN SUPPORT OF**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, John Linker, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct:

1. I am Chief Financial Officer of Serta Simmons Bedding, LLC ("**Serta Simmons Bedding**"). Serta Simmons Bedding, together with certain of its affiliates, including Dawn Intermediate, LLC ("**Dawn Intermediate**" and, collectively, the "**Company**" or the "**Debtors**") is one of the leading manufacturers and marketers of bedding products in North America, operating various bedding manufacturing facilities across the United States and Canada. I am knowledgeable about and familiar with the Company's business and financial affairs. I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief and motions filed concurrently herewith (the "**First Day Motions**")[2]. I am authorized to submit this Declaration on behalf of the Debtors.

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2662); Tuft & Needle, LLC (2158); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

[2] Capitalized terms used but not defined herein shall have the meaning given such terms in the Plan (as defined below).

2. Before joining Serta Simmons Bedding, I served as Executive Vice President and Chief Financial Officer of JELD-WEN Holding, Inc., a leading global manufacturer of windows and doors, from November 2018 through March 2022. Prior to that from 2012 to November 2018, I held other leadership roles at JELD-WEN Holdings, Inc. in investor relations, corporate development, and treasury. Prior to that, I held corporate development and finance leadership roles in the Aerospace Systems Division of United Technologies Corporation (and its predecessor, Goodrich Corporation), and earlier in my career, as an investment banker with Wells Fargo Securities and a consultant for Accenture. I have a Bachelor of Arts in Economics and Comparative Area Studies from Duke University, and a master's degree in business administration from Duke University's Fuqua School of Business.

3. Commencing on January 23, 2023 (the "**Petition Date**"), the Debtors filed in this Court voluntary cases under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable about and familiar with the Company's business and financial affairs since joining the company in 2022 and my reasonable inquiry into periods prior to 2022. Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees working under my supervision, my opinion based upon experience, knowledge, and information concerning the Company's operations and financial condition, my own reasonable inquiry, and/or my discussions with the Company's other officers, directors, and restructuring advisors, including professionals at Weil, Gotshal & Manges LLP ("**Weil**"), Evercore Group L.L.C. ("**Evercore**"), and FTI Consulting, Inc. (together with Weil and Evercore, the "**Advisors**"). If called upon to testify, I would testify to the facts set forth in this Declaration.

4. This Declaration has been organized into four (4) sections. The **first** provides an overview of the Debtors and their chapter 11 cases, including the general framework for the Debtors' restructuring. The **second** describes the Company's business, its organizational and capital structure, its history and its current operations. The **third** describes the events leading to the filing of these chapter 11 cases and the Debtors' prepetition restructuring efforts. The **fourth** section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

## I. Overview

5. As stated above, the Company is one of North America's leading manufacturers and marketers of bedding products. The Company and its predecessors have been developing innovative products and technologies to provide their customers a better night's sleep since 1876. Today, the Company manufactures and markets mattresses, foundations, and bedding-related products through four primary brands: Beautyrest®, Serta®, Simmons®, and Tuft & Needle®. The Company is headquartered in Doraville, Georgia.




The first Simmons manufacturing facility opened in 1870 in Kenosha, Wisconsin to produce cheese boxes before expanding operations to mattresses in 1876.



Workers in a Simmons factory produce mattresses utilizing Simmons' revolutionary Pocketed Coil® ca. 1925

6. Together with their non-debtor affiliates, the Debtors operate twenty-one (21) bedding manufacturing facilities across the United States and Canada, as shown in the map below:




The Debtors manufacture, sell and distribute their bedding products to individual consumers through a number of channels. The Debtors primarily sell their products in the United States through dealers which, in 2022, included approximately 2,200 authorized independent retailers, including one or more mattress specialty stores, as well as furniture stores, department stores, furniture rental stores, mass merchandisers, and juvenile specialty stores. The Debtors also sell their products (i) to hospitality customers, such as hotels, casinos and resort properties, through SSB Hospitality, LLC; (ii) to third party resellers, who purchase overstock and discontinued models through four (4) warehouses operated by World of Sleep Outlets, LLC; and (iii) directly to consumers through their e-commerce platforms and retail stores.

7. The Debtors also license their intellectual property for use by third party manufacturers of bedding products. The Debtors' key trademarks are as follows:

Debtor Dreamwell, Ltd. licenses the Beautyrest® and Simmons® trademarks for the manufacture of mattresses and foundations both within the United States for use on Beautyrest® and Simmons® branded bedding-related products and home textiles and outside of the United States to licensees who manufacture Beautyrest® and Simmons® branded mattress and bedding-related products. Serta, Inc. ("**Serta**"), a non-Debtor entity, licenses the Company's Serta® trademarks for the manufacture of mattresses and foundations in the United States to the Minority Licensees (as defined herein), who also hold minority equity stakes in Serta, as well as to licensees who manufacture bedding-related products and home textiles in the United States and to licensees outside of the United States who manufacture Serta® branded mattress and bedding-related products.

8. The Debtors have commenced these chapter 11 cases to implement a prearranged restructuring (the "**Restructuring**"), supported by (a) holders representing approximately (i) 81% of the aggregate outstanding principal amount of Class 3 (FLFO Claims) under its prepetition PTL Facility, and (ii) 77% of the aggregate outstanding principal amount of Class 4 (FLSO Claims) under its prepetition PTL Facility (collectively, the "**Consenting Creditors**"), and (b) Dawn Holdings, Inc., as the sole member, and holder of interests in, Dawn Intermediate, and funds managed by Advent International Corporation, as holder of interests in Dawn Holdings, Inc. (collectively, the "**Consenting Equity Holders**" and, together with the Consenting Creditors, the "**Consenting Parties**"), in each case, that are party to that certain *Restructuring Support Agreement* dated as of January 23, 2023, annexed hereto as **Exhibit A** (as

amended from time to time and including all exhibits thereto, the "**Restructuring Support Agreement**"). Subject to the terms and conditions of the Restructuring Support Agreement, the Restructuring will be implemented pursuant to the *Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors* (the "**Plan**") filed contemporaneously herewith. Upon its implementation, the Plan will substantially delever the Company by reducing its balance sheet liabilities from approximately $1.9 billion in total debt to approximately $300 million (plus original issue discount) in total debt upon emergence and result in the resolution of certain pending claims against the Debtors brought by certain of its Non-PTL Lenders (defined below).

9. As set forth in greater detail in the Plan, the Restructuring provides that:

(a) each holder of an Allowed FLFO Claim (as defined in the Plan) under the PTL Facility has agreed to exchange its claims for its *pro rata* share of $195,000,000 in aggregate principal amount of New Term Loans;

(b) each holder of an Allowed FLSO Claim (as defined in the Plan) under the PTL Facility has agreed to exchange its claims for its *pro rata* share of (x) one hundred percent (100%) of the equity in the Reorganized Debtors (less any such equity distributed to holders of Class 5 Non-PTL Claims (defined below) and subject to dilution by equity distributed pursuant to the Management Incentive Plan), and (ii) $105,000,000 in aggregate principal amount of takeback debt in the form of the New Term Loans;

(c) each holder of an Allowed Non-PTL Term Loan Claim will receive:

(i). If Class 5 votes to accept the Plan: Its Pro Rata Share of 4% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan;

(ii). If Class 5 votes to reject the Plan: Its Pro Rata Share of 1% of New Common Interests issued on the Plan Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan;

(d) each holder of an Allowed Ongoing General Unsecured Claim shall receive, in exchange for executing a trade agreement providing for the continuation of goods or services on the same or better terms as existed prior to the Petition Date, no more than four (4) Cash installments, which payments

shall result in full payment in the Allowed amount of such Ongoing General Unsecured Claim on no better terms than payment in the ordinary course of business;

(e) each holder of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table; and

(f) a settlement shall be approved among the Debtors, the Consenting Creditors, and the Consenting Equity Holders resulting in the contribution of non-Debtor entity Dawn Holdings, Inc. into the restructuring.

10. Under the Plan, the Debtors will also enter into (a) a new term loan credit facility in the aggregate principal amount of $300,000,000.00 (plus original issue discount), and (b) a first lien asset-backed revolving credit facility, which, as of the Effective Date, will roll up or replace the DIP Facility, to provide the Company with working capital to fund its business post-emergence.

11. The effects of the Restructuring can be summarized as follows[3]:

| | Status Quo |
|---|---|
| $200mm ABL | $ - |
| FLFO Tranche | 195 |
| FLSO Tranche | 832 |
| **ABL + PTL Facility** | **$1,027** |
| Non-PTL Term Loan | $862 |
| **Total Debt** | **$1,889** |

| | Pro Forma |
|---|---|
| $125mm ABL | $ - |
| New Term Loan | 300 |
| **ABL + New Term Loan** | **$300** |
| **Total Debt** | **$300** |

12. As described more fully below, the Restructuring is the culmination of a years-long effort on the part of the Debtors to right-size their balance sheet. Since 2019, in conjunction with operational initiatives designed to grow its sales, the Company has been seeking a transaction that would reduce its debt and provide the working capital necessary to carry out its

[3] New Term Loan amount shown excludes original issue discount. Exit ABL Facility will be subject to a minimum draw to be determined. Excludes capital lease obligations.

long term plans. As for many companies, the onset of the COVID-19 pandemic put significant pressure on this process and the Company's business at large, threatening to derail its efforts. In response to these challenges, in June 2020, the Company closed a recapitalization transaction with certain of its existing secured lenders. Referred to herein as the "**2020 Transaction**," upon closing, the Company received an infusion of $200 million in new money through a new, super-priority PTL Facility, which allowed the Company to weather the economic downturn.

13. However, I understand that the various macroeconomic and operational headwinds the Debtors continued to face, along with the Debtors' leverage profile, remained a hindrance to long term healthy growth. In addition, certain of the Company's existing lenders that were not party to the 2020 Transaction have sued the Company and certain of the PTL Lenders (referred to collectively herein as the "**2020 Transaction Litigation**"), two of which are currently pending. In one action, pending in the United States District Court for the Southern District of New York, plaintiffs seek damages for alleged breaches of the Non-PTL Term Loan Agreement and the implied covenant of good faith and fair dealing, among other causes of action. In the second, pending in New York State Supreme Court, plaintiffs likewise seek damages for alleged breach of the Non-PTL Term Loan Agreement and the implied covenant of good faith and fair dealing, and additionally seeks to unwind the 2020 Transaction entirely. Under threat from the 2020 Transaction Litigation, and with significant maturities looming in 2023, the Company redoubled its efforts to find a strategic partner, including engagement with plaintiffs in the state court action to attempt to negotiate the terms of a settlement. While settlement discussions were ultimately unsuccessful, in January 2023, the Company and the PTL Lenders reached agreement with respect to the terms of a recapitalization transaction, culminating in the Restructuring Support Agreement and the Plan.

14. The Company's ability to restructure its balance sheet and emerge from chapter 11 is inextricably tied to the resolution of the disputes raised in the 2020 Transaction Litigation. Accordingly, contemporaneously with the filing of the petitions, the Debtors are initiating an adversary proceeding (the "**Adversary Proceeding**") to comprehensively resolve the claims against the Debtors—and by extension, the PTL Lenders—arising from the 2020 Transaction Litigation and any future litigation related to the 2020 Transaction. The Adversary Proceeding seeks a declaratory judgment that the 2020 Transaction was valid under the terms of the Non-PTL Term Loan Agreement (as defined below). In conjunction with the Adversary Proceeding, the Debtors have filed the *Debtors' Motion for Entry of Order (I) Scheduling Certain Hearing Dates and Deadlines, (II) Establishing Certain Protocols in Connection with the Confirmation of the Debtors' Plan of Reorganization, and (III) Granting Related Relief* (the "**Scheduling Motion**"). The Scheduling Motion requests a timetable for the Adversary Proceeding to ensure that it is resolved on the same timetable as confirmation of the Debtors' chapter 11 plan of reorganization. I understand that the Debtors believe, upon discussion with their advisors, that this relief will ensure that the Debtors' reorganization can proceed and be resolved in one consolidated proceeding before the Bankruptcy Court.

## II. Background

### A. History, Corporate Structure, and Management

15. The Company's main operating entity, Serta Simmons Bedding, was formed in 2010 following the combination of two highly recognizable brands in bedding: Serta® and Simmons®. Today, Serta Simmons Bedding employs over 3,600 employees and accounts for approximately 19% of the annual bedding sales in the United States through a diverse portfolio of

brands, including the premium Simmons® Beautyrest® line, Serta®, the value-oriented Simmons®, and most recently mattress-in-a-box brand Tuft & Needle®, acquired in 2018.




The Company's Tuft & Needle brand first began marketing its signature mattress-in-a-box in 2012, among the first of its kind.

**1. Simmons**

16. The Company that would become Simmons Bedding (together with its affiliates, "**Simmons**") was founded in 1870 when Zalmon G. Simmons began manufacturing wooden cheese boxes and telegraph insulators in a factory on the shores of Lake Michigan in Kenosha, Wisconsin. In 1876, Zalmon G. Simmons developed an automated process for the manufacture of coil spring mattresses that were both more comfortable and less expensive to purchase. Over the ensuing century, Simmons pioneered a number of innovations in bedding, including an individually-wrapped coil spring unit, called the Pocketed Coil® spring, that would lead to the development of the iconic Beautyrest mattress in the 1920s.



In 1995, Simmons' iconic "The Bowling Ball Mattress" ad debuted, demonstrating the power of the Pocketed Coil® to resist motion transfer.

17. In the ensuing years, Simmons had expanded its operations worldwide and domestically to new businesses such as hospital beds and furniture. By the 1990s, it disposed of most of its foreign and non-bedding domestic operations. In connection with such sales, Simmons entered into licensing arrangements with third parties who now produce and distribute Simmons-branded products within certain designated territories internationally. Simmons also entered into licensing arrangements domestically, pursuant to which third parties manufacture and distribute juvenile furniture, crib mattresses, sheets, pillows, and other bedding-related products and home textiles under the Simmons brand. In 2010, in connection with its chapter 11 cases, Simmons was acquired by Ares Capital Management, LLC ("**Ares**") and the Ontario Teacher's Pension Plan ("**OTPP**").

**2. Serta**

18. Serta was formed in 1931 by a group of independent mattress manufacturers that wanted to sell throughout the United States under the Serta® brand, each of which became a licensee and stockholder of Serta. Over the course of nearly a century since its founding, Serta

has gained recognition both for the quality and comfort of its mattresses, foundations, and other bedding-related products and its prominence in the consumer imagination, in part owing to the antics of its iconic mascot, the Counting Sheep:



Serta's "Counting Sheep" have been delighting audiences since their debut in Serta television spots in the year 2000.

19. In 2003, one Serta licensee, Debtor NBC, acquired a majority of the outstanding common stock of Serta through a series of acquisitions of other Serta licensees and stockholders. In 2005, NBC was acquired by Ares and OTPP, and NBC was combined with Simmons in 2010 under ultimate parent Serta Simmons Bedding. Today, NBC owns approximately 82% of the outstanding common stock of Serta, alongside five (5) remaining minority licensees who collectively control the other approximately 18% of the outstanding common stock of Serta (the "**Minority Licensees**"). Pursuant to Serta's governing documents, NBC is entitled to elect four (4) of the seven (7) directors on Serta's board, each with three (3) votes, and the Minority Licensees are entitled to elect the remaining three (3) directors, each with one (1) vote.

20. The rights and obligations of NBC and the Minority Licensees with respect to the license and marketing of the Serta® brand are governed by a series of agreements, including,

among others: (i) a separate *Standard License Agreement* entered into between Serta and each of the Minority Licensees; (ii) the charter and bylaws of Serta; (iii) that certain *Restructuring Agreement*, dated as of September 10, 2004, by and among NBC and the Minority Licensees, which sets forth the services to be provided by NBC on behalf of Serta and the Minority Licensees; and (iv) those certain *2018 Amended and Restated Rules and Regulations*, dated as of December 29, 2018, which, among other things, govern the brand management standards to be maintained by NBC on behalf of the Minority Licensees.

21. In addition to its equity interests, among other things, each Minority Licensee has been granted a territory within the United States in which to manufacture Serta®-branded mattresses and foundations and each Minority Licensee pays certain fees for brand-management and other shared services provided by NBC, including manufacturing assistance, research and development, national advertising, and management of intellectual property. Fees payable on account of such services are generally structured as a percentage of the preceding year's sales. In addition, NBC has exclusive rights to (i) manufacture Serta® branded mattresses domestically within NBC's own area of primary responsibility; (ii) manage domestic national customer accounts (such as sales to retail stores with a national reach and hospitality customers like hotel chains); and (iii) license the Serta® brand to other companies that make bedding-related and textile products (including pillows, mattress toppers, pet products, and bathroom textiles, among others) both domestically and internationally, with a portion of the profits from such licensing agreements owed to the Minority Licensees.

**3. Serta Simmons Bedding**

22. As mentioned above, in 2010, NBC combined with Simmons to become the Company's main operating entity, Serta Simmons Bedding. In 2012, Ares and OTPP sold their

majority stake in Serta Simmons Bedding to Advent International (“**Advent**”). In 2018, the Company acquired Tuft & Needle, Inc. (“**Tuft & Needle**”), a mattress-in-a-box manufacturer that now operates as a wholly-owned subsidiary of Serta Simmons Bedding. Today, Serta Simmons Bedding is a significant player in the North American bedding industry, with $2.4 billion in sales for the twelve (12) months ending June 2022, accounting for approximately 19% U.S. bedding share.



Serta Simmons Bedding’s Houston manufacturing facility, opened in 2017.

#### 4. COVID-19 Pandemic and the 2020 Transaction

23. In April 2020, the COVID-19 pandemic spread throughout the United States and its impact forced the Company to curtail its operations and its customers to quarantine. During this time, I understand that Serta Simmons Bedding solicited proposals from and entered into discussions with potential lenders, including certain of its existing lenders, to explore alternatives to raise liquidity and reduce its debt and interest expense. In the course of its review process, I understand that the Company, with the guidance of an independent finance committee comprised of newly-appointed independent managers at Dawn Intermediate, Joan Hilson and Harvey Tepner (the “**Finance Committee**”), analyzed multiple proposals and negotiated with numerous lender groups in search of a strategic partner.

24. On June 8, 2020, Serta Simmons Bedding announced it had entered into a transaction support agreement to recapitalize the Company. In connection with this transaction, (i) certain parties to the transaction support agreement, including certain of the Debtors' then-existing first lien and second lien lenders, made available to the borrowers a new "first lien first out" term loan in the aggregate principal amount of $200 million (the "**FLFO Term Loans**"), and (ii) second, certain of the Debtors' then-existing first lien and second lien lenders sold to Serta Simmons Bedding and the other borrowers approximately $1 billion of outstanding term loans under the Non-PTL Term Loan Facility and $300 million outstanding under the Debtors' second lien term loan facility[4] in exchange for "first lien second out" term loans under the PTL Credit Agreement (the "**FLSO Term Loans**", and together with the FLFO Term Loans, the "**PTL Facility**"). The issuance of the FLFO Term Loans and exchange of outstanding first lien and second lien term loans for FLSO Term Loans is referred to collectively herein as the "**2020 Transaction**." I understand that the 2020 Transaction resulted in a reduction in the Company's debt and interest expense.

### 5. Corporate Governance & Management

25. The Debtors are controlled by the board of managers of Dawn Intermediate, LLC (the "**Board**"). Each separate Debtor is either a member-managed limited liability company or a corporation. The current Board consists of nine (9) members, shown below alongside their respective affiliations:

| **Name** | **Position** |
|---|---|
| Jefferson Case | Director (Advent) |
| George David | Director (Advent) |
| Joan Hilson | Director (Independent) |
| Shelley Huff | Director & Chief Executive Officer, Serta Simmons Bedding |

4 The second lien term loan facility has since been repaid in full.

| Name | Position |
|---|---|
| Glenn Murphy | Director (Advent) |
| David Porter | Chairman of the Board |
| Harvey Tepner | Director (Independent) |
| Brandi Thomas | Director (Independent) |
| Judith Toland | Director (Independent) |

26. The Finance Committee was appointed by the Board on March 11, 2020 by unanimous written consent to consider, evaluate, and recommend to the Board to pursue a restructuring transaction on behalf of the Company, including to oversee discussions with the Company's stakeholders and the implementation and execution of any transaction that has been approved by the Board. On June 3, 2020, the Board unanimously voted to delegate additional transaction authority to the Finance Committee with respect to a restructuring transaction process, including with respect to:

- Approval of any transaction, action or agreement or transaction in furtherance thereof on behalf of the Board;
- Discussions and negotiations with stakeholders of Dawn Intermediate and its subsidiaries in respect of a transaction;
- The implementation and execution of a transaction and all related documentation thereto, including with respect to the marketing of Dawn Intermediate's assets and any bids or proposals submitted in connection with the transaction;
- The analysis and, if applicable, resolution of claims or causes of action in favor of Dawn Intermediate in connection with a transaction;
- Authorize or instruct the Company's advisors to discuss and negotiate the terms of a transaction with potential counter-parties and Dawn Intermediate's stakeholders; and
- Such other actions as the Finance Committee considers necessary or desirable in order to carry out its mandate.

27. The Debtors' current senior management team consists of the following individuals:

| Name | Position |
|---|---|
| Shelley Huff | Chief Executive Officer |
| John Linker | Chief Financial Officer |
| Kristen McGuffey | Chief Legal Officer and Secretary |
| Esther Ni | Chief Human Resources Officer |

The Company has recently bolstered its management team through recent senior additions, including Shelley Huff, who joined the Company in 2020 and was ultimately appointed to her current role as Chief Executive Officer in December 2021. Shelley came to Serta Simmons Bedding after spending more than 15 years in the retail industry, most recently serving as President and CEO of Hayneedle.com, a Walmart-owned online home furnishings destination. Prior to that, Shelley held a variety of leadership roles within Walmart's U.S. division and at Walmart eCommerce, including serving as the Vice President of Operations at Walmart eCommerce, General Manager of Home and Apparel at Walmart.com and Vice President of Housewares at Walmart U.S.

**B. Capital Structure**

28. The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements. The following

table provides a summary of the approximate outstanding principal amounts of the Debtors' funded debt obligations, as described in more detail below. [5]

| | |
|---|---|
| $200mm ABL | $ - |
| FLFO Tranche | 195 |
| FLSO Tranche | 832 |
| **ABL + PTL Facility** | **$1,027** |
| | |
| Non-PTL Term Loan | $862 |
| | |
| **Total Debt** | **$1,889** |

### 1. ABL Facility

29. The Debtors are party to that certain *ABL Credit Agreement*, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition ABL Agreement**"), by and among Dawn Intermediate, as holdings; Serta Simmons Bedding, SSB Manufacturing Company ("**SSB Manufacturing**"), and NBC, as borrowers; the lenders from time to time party thereto (the "**ABL Lenders**"); and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacity, the "**ABL Agent**"). Pursuant to the Prepetition ABL Agreement, the ABL Lenders made available to the borrowers revolving credit loans, subject to borrowing base availability, in an aggregate principal amount up to $200 million with a $40 million letter of credit sublimit. The Prepetition ABL Facility is secured, subject to certain exceptions and permitted liens, by (i) a first-priority security interest in the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below)) of each of the Debtors, which includes, among other things, cash, deposit accounts, accounts receivable, and inventory, and (ii) a second-priority security interest in the Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement) of each of the

[5] Excludes capital lease obligations.

Debtors junior to the PTL Facility and the Non-PTL Facility, which includes all material assets of the Debtors other than the ABL Priority Collateral, including all real estate, equipment, intellectual property, and equity interests in their direct subsidiaries.

30. As of the Petition Date, there were approximately $28 million in issued and outstanding letters of credit under the Prepetition ABL Facility, plus any applicable interest, fees, and other amounts outstanding under the ABL Credit Agreement.

**2. Super-Priority Term Loans**

31. Each of the Debtors is an obligor under the PTL Facility pursuant to that certain *Super-Priority Term Loan Agreement*, dated as of June 22, 2020 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**PTL Credit Agreement**"), by and among Dawn Intermediate, as holdings; Serta Simmons Bedding, SSB Manufacturing, and NBC, as borrowers; the lenders from time to time party thereto (the "**PTL Lenders**"); and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacity and including any successors thereto, the "**PTL Agent**"). The PTL Facility is guaranteed by each of the other Debtors that is not a borrower thereunder, including Dawn Intermediate (the "**Guarantors**"), and the obligations thereunder are secured, subject to certain exceptions and permitted liens, by (i) a first-priority lien on the Term Loan Priority Collateral of each of the Debtors, and (ii) a second-priority lien on the ABL Priority Collateral. As of the Petition Date, (i) the aggregate principal amount of FLFO Term Loans outstanding under the PTL Credit Agreement is approximately $195,000,000 million and (ii) the aggregate principal amount of FLSO Term Loans outstanding under the PTL Credit Agreement is approximately $832,012,999 million.

### 3. Non-PTL Term Loan

32. Each of the Debtors is an obligor under that certain *First Lien Term Loan Agreement*, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Non-PTL Credit Agreement**", and the credit facility issued thereunder, the "**Non-PTL Facility**"), by and among Dawn Intermediate, as holdings; Serta Simmons Bedding, SSB Manufacturing, and NBC, as borrowers; the lenders from time to time party thereto (the "**Non-PTL Lenders**", and together with the PTL Lenders, the "**Term Loan Lenders**"); and UBS AG, Stamford Branch, as administrative agent and collateral agent (in such capacity and including any successors thereto, the "**Non-PTL Agent**"). The Non-PTL Facility is guaranteed by each of the Guarantors, and the obligations thereunder are secured by the same collateral as, and on a *pari passu* basis with, the obligations under the PTL Facility. As of the Petition Date, the Debtors had outstanding indebtedness of approximately $862 million under the Non-PTL Facility.

### 4. Intercreditor Agreements

33. The relative rights and priorities of the PTL Lenders and the Non-PTL Lenders in the collateral securing the obligations under the PTL Facility and Non-PTL Facility are governed by that certain First Lien Intercreditor Agreement, dated as of June 22, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Intercreditor Agreement**"), by and among each of the Debtors, the PTL Agent, the Non-PTL Agent, and each other person party thereto from time to time.

34. The relative priorities and rights in the collateral of the PTL Lenders and the Non-PTL Lenders, on the one hand, and the ABL Lenders, on the other, are governed by that certain ABL Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated,

amended and restated, supplemented or otherwise modified from time to time, the "**ABL Intercreditor Agreement**" and, together with the First Lien Intercreditor Agreement, the "**Intercreditor Agreements**"), by and among each of the Debtors, UBS AG, Stamford Branch, as the ABL Agent, the PTL Agent, and the Non-PTL Agent, and each other person party thereto from time to time.

35. The Intercreditor Agreements control the lenders' rights and obligations with respect to, among other things, priority of interests in collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection. The ABL Intercreditor Agreement provides, among other things, that subject to certain requirements, no PTL Lender or Non-PTL Lender may object to debtor in possession financing secured by, or the use of cash collateral constituting, ABL Priority Collateral (as defined in the ABL Intercreditor Agreement). *See* ABL Intercreditor Agreement, § 6.1.

### 5. Other Debtor Obligations

#### i. Surety Bonds

36. Surety bonds provide financial performance assurance to third parties on behalf of certain subsidiaries for obligations including, but not limited to, the U.S. Customs and Border Protection Agency ("**CBPA**") to secure the Debtors' payment or performance of obligations in connection with its customs bonds (i.e., contracts between the Debtors (as importer), a surety, and the CBPA (the "**Surety Bond Program**"). Customs bonds govern importer compliance with CBPA regulations, guarantees that the CBPA receives payment of any potential duties, taxes and fees that may accrue, and allows the CBPA to clear a shipment without having to wait for additional payments. The Debtors have two continuous customs bonds with the CBPA.

37. The Company's liability with respect to any surety bond is released once the obligations secured by the surety bond are performed. Surety bond providers generally have the right to request additional collateral or request that such bonds be replaced by alternate surety providers, in each case upon the occurrence of certain events. As of the Petition Date, the Debtors have $1.5 million in outstanding surety bonds, which obligations are partially collateralized by (i) letters of credit in the approximate amount of $250,000 issued for the benefit of Avalon Risk Management Insurance Agency; and (ii) a letter of credit in the approximate amount of $500,000 issued for the benefit of Avalon Risk Management Insurance Agency.

ii. **Ongoing General Unsecured Claims**

38. In the ordinary course of business, the Debtors utilize certain vendors and service providers who supply essential raw materials used in manufacturing their bedding products, and services used in selling and distributing their bedding products, including raw materials, shipping services, and IT services (the "**Ongoing General Unsecured Creditors**"). The Ongoing General Unsecured Creditors are a vital part of the Debtors' ongoing business, and an interruption in the flow of goods and services from such creditors would have an immediate impact on the Debtors' ability to continue operating. As of the Petition Date, the Debtors owe approximately $150 million in respect of trade debt and other potential liabilities.

iii. **Other General Unsecured Claims**

39. As of the Petition Date, the Debtors also owe approximately $30 million in respect of general unsecured claims and other potential liabilities not owed to creditors vital to the operation of the Debtors' business, including certain rejection damages claims.

iv. **Equity**

40. As discussed above, Advent owns approximately 60% of the equity interests in Dawn Holdings, Inc., the Debtors' ultimate parent. The remaining equity is owned by, among other holders, Ares, OTPP, certain current and former employees and directors of the Company, and the founders and other prior owners of Tuft & Needle.

## C. Ongoing Litigation

41. The Debtors are subject to a number of prepetition lawsuits, including among others:

42. <u>2021 Non-PTL Federal Court Litigation</u>. In July 2020, I understand that Non-PTL Lenders LCM XXII LTD and certain related funds advised by LCM Asset Management LLC (the "**LCM Plaintiffs**") sued Serta Simmons Bedding, among others, in the United States District Court for the Southern District of New York, asserting that the 2020 Transaction constituted a breach of contract and a breach of the implied covenant of good faith and fair dealing. In March 2021, the court dismissed the plaintiffs' suit for lack of subject matter jurisdiction.

43. In May 2021, I understand that the plaintiffs refiled their suit in the United States District Court for the Southern District of New York, naming Serta Simmons Bedding as the sole defendant to resolve the prior jurisdictional issue (the "**Non-PTL Federal Court Litigation**"). In the re-filed lawsuit, the plaintiffs alleged, among other things, that entry into the 2020 Transaction violated the terms of the Non-PTL Term Loan Agreement and the implied covenant of good faith and fair dealing. In March 2022, the motion to dismiss was granted in part and denied in part. The Non-PTL Federal Court Litigation is currently pending in the United States District Court for the Southern District of New York but is stayed as a result of the automatic stay.

44. Non-PTL State Court Litigation. In June 2020, I understand that certain of the Company's Non-PTL Lenders, including funds managed by Angelo, Gordon Management LLC, and Gamut Capital Management LP, sued Serta Simmons Bedding and certain of the PTL Lenders in the Supreme Court of the State of New York, seeking to enjoin Serta Simmons Bedding from completing the 2020 Transaction. I also understand that North Star Debt Holdings, L.P., an affiliate of funds managed by Apollo Global Management, Inc. ("**Apollo**") was also a party to the lawsuit, despite a dispute as to whether Apollo is a "disqualified institution" under the Non-PTL Term Loan Agreement and whether it holds any loans under the Non-PTL Term Loan Agreement and is therefore disallowed from holding loans issued under the Non-PTL Term Loan Facility. The court denied the injunction, allowing the closing and consummation of the 2020 Transaction. I understand that the plaintiffs were subsequently permitted to discontinue their lawsuit in state court without prejudice.

45. In November 2022, certain of the Company's Non-PTL Lenders, including funds managed by Angelo, Gordon Management LLC, Apollo Management Holdings, L.P., Gamut Capital Management LP, Contrarian Capital Management, L.L.C., Alcentra NY LLC, and Z Capital Group L.L.C., refiled their lawsuit against Serta Simmons Bedding and certain of the PTL Lenders, alleging, among other things, that Serta Simmons Bedding and certain such PTL Lenders breached the terms of the Non-PTL Credit Agreement and the implied covenant of good faith and fair dealing when they entered into the 2020 Transaction (the "**Non-PTL State Court Litigation**", and together with the Non-PTL Federal Court Litigation, the "**2020 Transaction Litigation**"). Entities affiliated with Apollo are also a party to the litigation against the Debtors, joining in all claims and also seeking a declaratory judgment to resolve the dispute over its status as a "disqualified institution" and require Serta Simmons Bedding to execute assignments of loans

under the Non-PTL Term Loan Agreement The Non-PTL State Court Litigation is currently pending in New York state court but is stayed as to Serta Simmons Bedding as a result of the automatic stay. Serta Simmons Bedding has moved in the Bankruptcy Court to extend the automatic stay to its co-defendants, the PTL Lenders.

46. Minority Licensee Arbitration. As explained above, Serta Simmons Bedding and NBC own approximately 82% of Serta. The remaining approximately 18% is owned by the Minority Licensees. Several disputes have arisen between the parties in recent years, driven by claims that Serta Simmons Bedding's and NBC's management of the Serta® brand has allegedly favored Serta Simmons Bedding's other mattress brands over the Serta® brand. Serta Simmons Bedding and NBC deny those allegations.

47. In December 2020, I understand that the Minority Licensees named Serta Simmons Bedding and NBC as respondents in an arbitration alleging, among other things, breach of fiduciary duty, antitrust violations, breach of contract, and tortious interference with contracts and prospective business relationships. The Minority Licensees seek monetary relief in an amount to be determined and certain non-monetary forms of relief. The arbitration, styled *AW Industries, Inc. et al. v. Serta Simmons Bedding LLC, et al.* Case No. 01200093145, is before the American Arbitration Association. To be clear, Serta Simmons Bedding and NBC deny each of the allegations made by the Minority Licensees in full.

48. In January 2021, the parties agreed to stay the arbitration to attempt to resolve their disputes through mediation; however, these negotiations ultimately proved unsuccessful, and a definitive agreement was never reached. On September 8, 2022, the Minority Licensees notified the American Arbitration Association that they intended to recommence the arbitration. On November 14, 2022, the Minority Licensees filed an amended arbitration demand

asserting most of the same claims (excluding the antitrust and tortious interference claims), which are disputed by the Company.

49. The arbitration is currently pending, and if the arbitration proceeds, Serta Simmons Bedding and NBC expect to file an answering statement to the Minority Licensees' amended demand as well as counterclaims against the Minority Licensees. I understand that the arbitration with the Minority Licensees is stayed during the pendency of these Chapter 11 Cases.

## III. Key Events Leading to Chapter 11

### A. Challenges Facing Debtors' Business

50. In addition to its looming maturities and unsustainable capital structure, the Debtors face financial challenges as a result of the downturn of the mattress industry generally. The U.S. bedding industry has been subject to significant disruptions recently, including a decline in industry demand beginning in 2022 as a result of slower economic growth caused by recent geopolitical and macroeconomic uncertainty, as well as reduced consumer spending as a result of higher interest rates. Prior to the demand headwinds, the industry faced significant inflation in raw materials costs, supply chain disruptions, and the adverse market effects created by the COVID-19 pandemic. While the fundamentals of the Debtors' business remain strong, the Debtors are facing significant debt maturities in 2023. Accordingly, the Debtors have filed these chapter 11 cases to implement a comprehensive financial restructuring that will result in a reduction of the Company's funded debt by approximately $1.59 billion and allow it to continue operating as a going concern with a substantially healthier balance sheet.

### B. Prepetition Strategic Efforts

51. Prior to filing these chapter 11 cases, I understand that the Debtors attempted to address their capital structure and liquidity needs without the need for an in-court restructuring. At the outset of its strategic review process, in 2019, the Company found itself over-

levered and in need of additional liquidity to fund its operations. Despite what I understand was an exhaustive marketing process and outreach to third parties, the most compelling terms came from certain of the Company's existing lenders, who were willing to provide new money financing on a super-priority basis. When the 2020 Transaction closed in June 2020, the Company received an infusion of $200 million in new money, providing it with the breathing space necessary to avoid an unplanned restructuring process that would not have maximized enterprise value. However, given the Company's substantial debt burden, I understand that it remained in need of a comprehensive solution to right-size its balance sheet.

52. The COVID-19 pandemic exacerbated this reality. I understand that supply chain disruptions and reduced consumer demand resulted in a significant contraction of the Company's business, and while the Debtors were able to weather the difficulties in 2020 and 2021, in April 2022, the Debtors, through Evercore, initiated outreach to approximately twenty (20) potential third-party financing parties seeking proposals to refinance its existing capital structure. Ultimately, however, I understand that the Debtors did not receive any proposals through this competitive financing process and, as a result, shifted their focus to engagement with their current lenders regarding the terms of a comprehensive restructuring.

53. In September 2022, the Company and Advisors began actively engaging in discussions and negotiations regarding restructuring alternatives with (i) an ad hoc group of PTL Lenders (the "**PTL Lender Group**"), represented by Gibson, Dunn & Crutcher LLP, as legal counsel, and Centerview Partners LLC, as investment banker (the "**PTL Advisors**"), (ii) an ad hoc group of Non-PTL Lenders under the Non-PTL Term Loan Facility (the "**Non-PTL Term Loan Lender Group**") represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal counsel, and PJT Partners, Inc., as investment banker (the "**Non-PTL Advisors**" and, together with the

PTL Advisors, the "**Lender Group Advisors**"). In October 2022, the Lender Group Advisors executed non-disclosure agreements and received access to a virtual data room maintained by the Company containing over 19,000 pages for the purpose of assessing a potential restructuring transaction.

54. Shortly thereafter, in November 2022, the Non-PTL Term Loan Lender Group filed a complaint commencing renewed litigation against Serta Simmons Bedding and the PTL Lender Group with respect to the 2020 Transaction—*i.e.*, the Non-PTL State Court Litigation—and, on the same day, sent a restructuring proposal to the Company and the PTL Lender Group that the Company and the PTL Lender Group ultimately deemed was unactionable and out of proportion with the Non-PTL Lenders' rights. In light of the Non-PTL State Court Litigation, the Company revoked data room access for the Non-PTL Advisors.

55. With the 2020 Transaction Litigation in the background, the Debtors continued to have constructive discussions with the PTL Lender Group. In November 2022, certain members of the PTL Lender Group executed non-disclosure agreements (the "**PTL Holder NDAs**") and attended in-person meetings in New York with the Debtors' management team to discuss the Debtors' financial performance and go-forward business plan. Such discussions ultimately led to the exchange of term sheets between the Debtors and PTL Lender Group setting forth indicative terms of a potential restructuring transaction, including potential treatment of the Non-PTL Claims. In December 2022, four (4) members of the Non-PTL Term Loan Lender Group signed non-disclosure agreements with the Company to receive diligence in connection with settlement discussions. In subsequent meetings among the Advisors, PTL Advisors, Non-PTL Advisors, and certain principals from the PTL Lender Group and the Non-PTL Term Loan Lender Group, the parties negotiated further and exchanged multiple settlement proposals.

56. The Company's business-plan diligence with the PTL Advisors and PTL Lender Group continued for nearly five (5) months, from September 2022 through January 2023. The Debtor held several diligence sessions with the PTL Lender Group and PTL Advisors to elaborate on, among other topics: (i) expected views of the bedding market in 2023-24, (ii) the Company's 2023 budget and long-range business plan, (iii) pricing, product mix, and channel engagement strategies, (iv) ongoing and planned cost-saving actions, and (v) value-accretive capital expenditure projects. The Company and its Advisors also comprehensively addressed over one hundred (100) diligence questions by the PTL Lender Group and PTL Advisors in an effort to instruct them on various aspects of the Debtors' financial performance and go-forward business plan.

**C. Restructuring Support Agreement and Plan**

57. On January 23, 2023, following months of extensive, arm's-length negotiations, the Debtors reached an agreement with certain members of the PTL Lender Group on the Restructuring Support Agreement, including the Plan, pursuant to which the Consenting Creditors (representing approximately 78% of the PTL Facility) and the Consenting Equity Holders have agreed to support the Restructuring as set forth in the Plan, which will result in a reduction of the Company's funded indebtedness by approximately $1.59 billion. The Plan and the Restructuring Support Agreement are the culmination of the Company's years-long effort to right-size its balance sheet for the go-forward health of the Company. The reduced debt burden and exit financing anticipated under the Plan will provide the Debtors with sufficient liquidity, not only to continue funding their operations, but to make the necessary capital expenditures and investments to ensure that the Company will remain an industry leader in mattresses and other sleep products.

58. While discussions with the Non-PTL Term Loan Lender Group have not yet resulted in a consensual settlement (as of the Petition Date), the Debtors and the PTL Lender Group intend to continue constructive discussions with the Non-PTL Lenders during these chapter 11 cases. Ultimately, the Debtors and Advisors view the 2020 Transaction Litigation as the sole remaining impediment to a comprehensive restructuring of the Company's balance sheet, and accordingly intend to resolve such litigation during the pendency of these chapter 11 cases so that the Debtors and their management can re-focus their efforts on the operation of their business.

**D. DIP to Exit Financing**

59. To fund operations during these chapter 11 cases, pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (the "**DIP Motion**"), the Debtors have secured postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession asset-based loan ("**ABL**") credit facility in an aggregate principal amount of $125,000,000 (the "**DIP Facility**"), to be provided by Eclipse Business Capital, LLC, as administrative agent (in such capacity, the "**DIP Agent**"), and the lenders from time to time party thereto (the "**DIP Lenders**" and each a "**DIP Lender**").o be led by Eclipse Business Capital, LLC.

60. As set forth more fully in the *Declaration of Brent T. Banks in Support of Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status, (B) Adequate Protection to Certain*

*Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*, the Debtors determined to enter into the DIP Facility following an extensive prepetition marketing process during which Evercore contacted existing lenders, traditional lenders, and alternative lenders. In total, Evercore contacted twenty-two (22) parties, of which eleven (11) parties executed non-disclosure agreements. Ultimately, the DIP Lenders provided the most favorable terms, and on the Effective Date, claims under the DIP Facility will be indefeasibly paid in full in Cash upon the Effective Date, and all letters of credit issued under the DIP Credit Agreement shall be cash collateralized in accordance with the terms of the DIP Credit Agreement, unless otherwise agreed to by the Debtors, DIP Agent, and DIP Lenders.

## IV. The First Day Motions

61. The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession. I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in the success of these chapter 11 cases, and best serves the Debtors' estates and creditors' interests. The facts set forth in each First Day Motion are incorporated herein by reference. Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions. Below is an overview of each of the First Day Motions.

### A. Joint Administration Motion

62. Pursuant to the *Emergency Motion of Debtors Pursuant to Bankruptcy Rule 1015(b) and Bankruptcy Local Rule 1015-1 for Order Directing Joint Administration of Chapter 11 Cases* filed concurrently herewith, the Debtors request entry of an order directing consolidation of these chapter 11 cases for procedural purposes only. The Debtors are all under common

ownership under Dawn Intermediate. I believe joint administration of the Debtors' chapter 11 cases will save the Debtors and their estates substantial time and expense by removing the need to prepare, replicate, file, and serve duplicative notices, applications, and orders. Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee for the Southern District of Texas (the "**U.S. Trustee**") and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

63. I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these chapter 11 cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**B. Scheduling Motion**

64. Pursuant to the terms of the Restructuring Support Agreement, the Consenting Creditors have agreed to support the Plan, provided that certain terms, conditions and milestones are satisfied, including that the Confirmation Hearing commence no later than May 22, 2023 and that the order confirming the Plan be entered no later than June 5, 2023. To ensure that the Plan is timely confirmed, the Debtors seek to resolve a number of outstanding litigation issues related to the 2020 Transaction pursuant to the Adversary Proceeding. I understand that the outcome of the Adversary Proceeding will dictate how distributions under the Plan are made and is therefore central to confirmation of the Plan. Accordingly, to confirm the Plan on the four-month timeline set forth in the Restructuring Support Agreement, with the

Scheduling Motion, the Debtors are requesting that the Court enter an order scheduling certain dates in connection with the confirmation of the Plan and the Adversary Proceeding, including:

i. a hearing on March 23, 2023 to consider approval of the Disclosure Statement and certain deadlines related thereto;

ii. a hearing on May 8, 2023 to consider confirmation of the Plan;

iii. certain dates and deadlines in connection with the Confirmation Hearing and all related discovery; and

iv. scheduling certain dates and deadlines in connection with the Adversary Proceeding.

65. I believe that the delay associated with an unnecessarily extended discovery and confirmation schedule would risk erosion of business value and that an efficient schedule is in the best interest of all stakeholders. Based on the foregoing, I believe that the relief requested in the Scheduling Motion is reasonable under the circumstances, is in the best interests of the Debtors, their estates, and all other parties in interest, and should be granted in all respects.

**C. Cash Management Motion**

66. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue their Existing Cash Management System, (B) Maintain Existing Business Forms and Intercompany Arrangements, (C) Continue Intercompany Transactions, and (D) Continue Utilizing Employee Credit Cards and P-Card Programs; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the Debtors request authority to: (i) continue participating in the Debtors' existing cash management system (the "**Cash Management System**"), including, without limitation, to continue to maintain the Debtors' existing bank accounts and business forms; (ii) implement changes to the Cash Management System in the ordinary course of business insofar as such changes relate to the Debtors' participation in or control of the Cash Management System,

including, without limitation, opening new or closing existing bank accounts owned by the Debtors; (iii) continue utilizing the Amex Employee Credit Cards and Amex P-Cards (as defined below) and pay all obligations related thereto; (iv) continue to perform under and honor intercompany transactions in the ordinary course of business, and make certain payments on behalf of certain non-debtor affiliates; (v) provide administrative expense priority for postpetition intercompany claims against the Debtors; and (vi) honor and pay all prepetition and postpetition Bank Fees (as defined below) payable by the Debtors. The Debtors are also requesting that the Court authorize the Banks to continue to charge bank fees, if any, and to charge back returned items to the bank accounts, whether such items are dated before, on, or after the commencement of these chapter 11 cases.

67. As described more fully in the Cash Management Motion, in the ordinary course of their business, the Debtors have historically used the Cash Management System to collect receipts and to fund their operations, as well as the operations of certain non-debtor affiliates. It is my understanding that the Cash Management System is tailored to meet the Debtors' needs. The Cash Management System allows the Debtors to efficiently collect and transfer the cash generated by their business and pay their financial and other obligations. It also enables the Debtors to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control over the administration of the Debtors' approximately 21 bank accounts (together with any other bank accounts the Debtors may open in the ordinary course of their business, the "**Bank Accounts**") owned by the Debtors and maintained with multiple banks (each a "**Bank**" and collectively, the "**Banks**"). All of the Bank Accounts are maintained with authorized depositories under the Operating Guidelines and Reporting Requirements for Debtors in Possession and

Trustees (the "**UST Operating Guidelines**") published by the Office of the United States Trustee for Region 7.

68. The Debtors' primary Bank is Wells Fargo Bank, N.A. ("**Wells Fargo**"), where the Debtors maintain 17 of the 21 Bank Accounts. The Debtors also maintain Bank Accounts with 3 other Banks in addition to Wells Fargo: Citibank, N.A. ("**Citibank**"), JPMorgan Chase Bank, N.A. ("**JPMorgan**"), and BMO Harris Bank, N.A. ("**BMO Harris**"), as listed on Schedule 1 annexed to the Cash Management Motion.

69. As described more fully in the Cash Management Motion, the Debtors engage in intercompany transactions with each other and with certain of their Non-Debtor Affiliates in the ordinary course of their business (collectively, the "**Intercompany Transactions**" and each intercompany receivable and payable generated pursuant to an Intercompany Transaction, an "**Intercompany Claim**"). The Intercompany Transactions are documented and the Debtors can ascertain, trace, and account for the transactions at all times. Because there may be Intercompany Claims as a result of these transactions, and in order to ensure that each Debtor will not fund, at the expense of its creditors, the operations of another entity, the Debtors have requested that all postpetition Intercompany Transactions occurring in the ordinary course of business be accorded administrative expense status. As a result of such administrative expense status, each entity utilizing the funds flowing through the Cash Management System will continue to bear ultimate repayment responsibility for these ordinary course transactions.

70. The Debtors are further requesting that the Court authorize the Banks to receive, process, honor, and pay, at the Debtors' direction and to the extent of funds on deposit, any and all checks drawn or electronic funds transfers requested or to be requested by the Debtors

relating to the relief sought in the First Day Motions. Without the ability to transfer funds through banks and financial institutions, the Debtors will not be able to operate or reorganize.

71. I believe that any disruption to the Debtors' Cash Management System would have a severe and adverse impact upon the Debtors' reorganization efforts. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and all parties in interest and should be granted.

**D. Vendor Motion**

72. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay (A) Critical Vendor Claims, (B) Lien Claims, (C) 503(B)(9) Claims, and (D) Certain Royalties; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Vendor Motion**"), the Debtors are requesting (i) authority, but not direction, to pay in the ordinary course of business, based on their sound business judgment, (a) prepetition amounts owed to (1) Critical Vendors (as defined below), (2) Lien Claimants (as defined below), and (3) certain vendors that have delivered goods to the Debtors in the ordinary course of business within twenty (20) days before the Petition Date and whose prepetition claims are thus entitled to administrative expense priority status under section 503(b)(9) of the Bankruptcy Code (the "**503(b)(9) Claimants**", and such 503(b)(9) Claimants' prepetition claims, the "**503(b)(9) Claims**") and (b) certain royalties that are payable to the Minority Licensees (as defined below) of Serta, Inc. ("**Serta Royalties**") and (ii) related relief.

73. The Debtors' senior management and financial advisors undertook a thorough analysis using certain criteria described more fully in the motion to determine which of the Debtors' vendors are critical to their ability to continue manufacturing and distributing bedding

products (the "**Critical Vendors**", and such Critical Vendors' prepetition claims, the "**Critical Vendor Claims**"). Based on this criteria, the Debtors identified the Critical Vendors, which include, but are not limited to: (a) raw material suppliers, (b) marketing and advertising providers, and (c) providers of certain essential services such as information technology and fire, safety, and security.

74. Because the Debtors' employ a "just-in-time" manufacturing process whereby they manufacture and ship the majority of their bedding products within several days of their receipt of an order and the Debtors typically maintain only minimal levels of raw materials needed to manufacture their finished products, it is crucial that the Debtors have continued and uninterrupted access to the goods, materials and services provided by the Critical Vendors.

75. While the Debtors seek authority to pay their Critical Vendors, the Debtors do not propose to pay all amounts outstanding immediately. Instead, the Debtors propose to determine, in the exercise of their business judgment and based upon the liquidity available to them at the time such determination is made, which Critical Vendor Claims, and in what amounts, will be paid, and the schedule for any such payments. I believe that payment of the Critical Vendor Claims will not create an imbalance in the Debtors' cash flow because payment of these claims will allow the Debtors to continue manufacturing and selling their products, which, in turn, will generate additional revenues from which the Debtors and their creditors will benefit.

76. In addition to payment of the Critical Vendor Claims, the Debtors seek authority to pay certain third parties, including warehousemen, transporters, shippers, and other vendors (collectively, the "**Lien Claimants**" and the Lien Claimants' prepetition claims, the "**Lien Claims**") that the Debtors believe have created, or could give rise to, a lien against the Debtors' property, regardless of whether the particular Lien Claimant has already perfected its interests.

The Lien Claimants provide a number of key goods and services for the Debtors in the maintenance and operation of their manufacturing facilities, including manufacturing, transportation services, construction services, inventory management, and other services that are vital to the Debtors' enterprise. I believe that payment of the Lien Claims will not create an imbalance in the Debtors' cash flow because payment of these claims will allow the Debtors to continue to fully operate their businesses and maintain their business operations as they transition into chapter 11, without the risk of such claimants asserting statutory liens against the Debtors' equipment and/or materials in their possession.

77. Furthermore, the Debtors seek authority to grant administrative expense status to all undisputed 503(b)(9) Claims. In the ordinary course of the Debtors' business, numerous vendors and suppliers, including the Critical Vendors, provide the Debtors with materials that are necessary to operate their business. The Debtors may have outstanding orders with these vendors for goods ordered prepetition but not yet delivered or performed. As a result of the chapter 11 cases, these vendors may be concerned that postpetition delivery of goods pursuant to a prepetition outstanding order will render the vendor a general unsecured creditor and may, therefore, refuse to ship or deliver materials to the Debtors. In order to avoid disruption in the delivery of goods, the Debtors seek (a) authorization to grant such 503(b)(9) Claims administrative expense status under section 503(b) of the Bankruptcy Code for undisputed obligations arising from the postpetition delivery or performance of outstanding orders, and (b) out of an abundance of caution, authorization to satisfy such undisputed obligations to vendors in the ordinary course of business under section 363(c) of the Bankruptcy Code. Absent such relief, the Debtors may be required to expend substantial time and effort reissuing or reaffirming the Outstanding Orders to provide the vendors with assurance of administrative priority.

78. Lastly, the Debtors seek authority to pay all amounts owed to the Minority Licensees on account of the domestic and international royalties, whether arising pre-petition or postpetition, pursuant to the governing agreements. Specifically, the Debtors make annual payments to the Minority Licensees in the amount of approximately 18% of international royalties net of international licensing costs, fees, and expenses, while approximately 18% of gross domestic royalties are typically remitted quarterly to the Minority Licensees.

79. Based upon the foregoing, I believe that the relief requested is essential, appropriate and in the best interests of the Debtors, their creditors and all parties in interest.

**E. Customer Related Programs Motion**

80. In the ordinary course of their business, the Debtors engage in certain customary activities to develop and sustain positive relationships with their Customers. To that end, the Debtors have implemented various customer-related programs designed to ensure their satisfaction and loyalty, increase sales, respond to competitive pressures, improve profitability, and generate goodwill for the Debtors and their products. These programs, are necessary to ensure Customer and consumer satisfaction, increased sales, responsiveness to competitive pressures, maintenance of Customer loyalty, improved profitability, and goodwill for the Debtors and their products. The Customer Related Programs are also integral to the Debtors' efforts to stabilize their businesses, promote the continuity and continued vitality of the Debtors' businesses, and ultimately deliver the most value to all stakeholders in the chapter 11 cases.

81. Accordingly, the Debtors seek authority to continue the Customer Related Programs in the ordinary course of business and to perform and honor their prepetition obligations thereunder. Many of the Customer Related Programs are standard practice in the bedding industry and the Customers have come to expect these types of programs to be offered. The Debtors'

inability to honor their Customer Related Programs would place them at a severe disadvantage relative to their competitors. Moreover, the Debtors must continue the Customer Related Programs in order to reassure their customers of the ongoing viability of the Debtors, preserve goodwill, and to maintain critical business relationships.

82. I believe that continuing the Customer Related Programs in the ordinary course of the Debtors' business and performing and honoring prepetition obligations arising under such Customer Related Programs is in the best interests of the Debtors, their estates, and their creditors.

**F. Insurance and Surety Bond Motion**

83. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Insurance Programs and Surety Bond Program, and (B) Pay Certain Obligations with Respect Thereto; (II) Granting Relief from Automatic Stay with Respect to Workers' Compensation Claims; and (III) Granting Related Relief* filed contemporaneously herewith (the "**Insurance and Surety Bond Motion**") the Debtors request entry of interim and final orders (i) authorizing, but not directing them to (a) continue to maintain and renew, amend, supplement, place, or extend (if necessary) their Insurance Programs and Surety Bond Program in accordance with their applicable insurance policies and indemnity and reimbursement agreements and to continue to perform their obligations with respect thereto during these chapter 11 cases, and (b) pay certain prepetition obligations arising under the Insurance Programs or Surety Bond Program; (ii) modifying the automatic stay to the limited extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Program (as defined below); and (iii) granting related relief.

84. In the ordinary course of their operations, I understand that the Debtors maintain workers' compensation, third-party liability, property, and other insurance programs (the "**Insurance Programs**") and incur obligations to pay premiums and other obligations related thereto, including, but not limited to, any broker, advisor or third-party administrator fees, taxes, other fees, collateral, and deductibles, in accordance with, or relating to, their respective insurance policies through several insurance carriers (each, an "**Insurance Carrier**"), including those listed on Exhibit A annexed to the Insurance and Surety Bond Motion.

85. The Debtors are obligated to make premium payments related to General Insurance Programs based upon a fixed rate established and billed by each Insurance Carrier (collectively, the "**Insurance Premiums**"). The Debtors pay approximately $8.0 million in General Insurance Premiums each year, incidental taxes and fees.

86. The Debtors' Insurance Programs include: (i) coverage of workers' compensation and employer's liability (the "**Workers' Compensation Program**"); (ii) coverage of potential third-party liability in connection with the Debtors' business; (iii) coverage of the Debtors' vehicles and related third-party liability; (iv) coverage for property losses; (v) coverage for risks and damages arising from data breaches and other data losses; (vi) coverage for losses arising from acts of terrorism; (vii) coverage of management and directors' and officers' liability; (viii) excess coverage for various Insurance Policies (items (ii) through (viii), the "**General Insurance Programs**"). The Debtors also retain the services of various insurance service providers in connection with maintaining the Debtors' Insurance Programs. Each of these is described more fully in the Insurance and Surety Bond Motion.

87. I understand that, in the ordinary course of business, the Debtors maintain the Workers' Compensation Program for claims arising from, or related to, employment by the

Debtors (the "**Workers' Compensation Claims**"). Sedgwick Claims Management Services serves as the claims administrator under the Workers' Compensation Program. It is my understanding that all jurisdictions in which the Debtors operate require that the Debtors maintain the Workers' Compensation Program. The Workers' Compensation Program covers, among other things, statutory workers' compensation and employer liability claims generally arising from accidents, death, or disease sustained by employees in the course of their employment with the Debtors. Obligations under the Workers' Compensation Program are collateralized by a commercial letter of credit in the amount of approximately $21.7 million. These letters of credit serve as collateral in the event that the Debtors default on their obligations under the Workers' Compensation Programs and the casualty-type (i.e., general liability and automobile) General Insurance Programs.

88. It is my understanding that, under applicable workers' compensation laws, the Debtors may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her medical providers, or his or her heirs or legal representatives. Accordingly, the Debtors seek to waive both the automatic stay as it relates to Workers' Compensation Claims, the corresponding notice requirements under Bankruptcy Rule 4001(d), and authorization, as necessary, and to the extent required by law or under the Workers' Compensation Program, to pay all or part of a claim related thereto directly to an employee, any of his or her medical providers, or any of his or her heirs or legal representatives, as set forth in the applicable law or policy.

89. In the ordinary course of business, as part of standard import practices, the Debtors are required to post certain surety bonds to the U.S. Customs and Border Protection Agency ("**CBPA**") to secure the Debtors' payment or performance of obligations in connection with its customs bonds (i.e., contracts between the Debtors (as importer), a surety, and the CBPA)

(the "**Surety Bond Program**"). Customs bonds govern importer compliance with CBPA regulations, guarantees that the CBPA receives payment of any potential duties, taxes and fees that may accrue, and allows the CBPA to clear a shipment without having to wait for additional payments. The Debtors have two continuous customs bonds with the CBPA.

90. The premiums for the surety bonds (the "**Surety Premiums**" and, together with the Indemnity Obligations, the "**Surety Bond Obligations**") are generally determined on an annual basis. Payment is remitted by the Debtors when the bonds are issued and annually upon each renewal. In the twelve months preceding the Petition Date, the Surety Premiums totaled approximately $2,750. As of the Petition Date, the Debtors have $1.5 million in outstanding surety bonds, which obligations are partially collateralized by (i) letters of credit in the approximate amount of $250,000 issued for the benefit of Avalon Risk Management Insurance Agency; and (ii) a letter of credit in the approximate amount of $500,000 issued for the benefit of Avalon Risk Management Insurance Agency.

91. I understand that the Debtors maintain the Insurance Programs and Surety Bond Program to help manage and limit the various risks associated with operating their business, which is essential to the preservation of the value of the Debtors' business and properties. I believe it essential that the Debtors maintain the Insurance Programs and the Surety Bond Program, and that they obtain authority to pay certain obligations related thereto, including payments to the insurance service providers. Furthermore, I understand that the Debtors must maintain most or all of the Insurance Programs and the Surety Bond Program to comply with the UST Operating Guidelines, applicable state and federal laws, and other prepetition contracts. Based on the foregoing, I believe that the relief requested in the Insurance and Surety Bond Motion is in the best

interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**G. Wages Motion**

92. Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) Maintain Employee Benefits Programs and Pay Related Obligations, and (C) Pay Prepetition Employment Expenses, and (II) Granting Related Relief* filed concurrently herewith (the "**Wages and Benefits Motion**"), the Debtors request entry of an order (i) authorizing but not directing them to (a) pay all Employee Compensation Obligations and Employee Benefit Obligations and related fees, costs, and expenses incident to the foregoing, including amounts owed to third-party service providers and administrators and taxing authorities, and (b) maintain, and continue to honor and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect prior to the Petition Date and as such may be modified, amended, or supplemented from time to time in the ordinary course of business, and (ii) granting related relief.

93. As described more fully in the Wages and Benefits Motion, the Debtors' employ approximately 3,600 employees in the United States (each, an "**Employee**"). The Employees perform a number of critical functions, including sales, customer service, plant operations, legal, financial, human resources, and other services necessary to operate the enterprise effectively. Certain of the Debtors' Employees are represented by unions and covered by collective bargaining agreements. Without the Employees' continued, uninterrupted services, an effective reorganization of the Debtors will not be possible. In the ordinary course of their operations, the Debtors incur a number of obligations to, or on account of their Employees,

including relating to compensation (the "**Employee Compensation Obligations**"), and benefits ("**Employee Benefits Obligations**", and, together with the Employee Compensation Obligations, the "**Employee Obligations**").

94. The Debtors' Employees are among the most important parts of their business. I believe that any delay in paying or failure to pay prepetition Employee Obligations could irreparably impair the morale of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial. Failure to pay the Employee Obligations could also inflict a significant financial hardship on the families of the Employees. The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship. Without the relief requested in the Wages and Benefits Motion, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise. Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.

95. In the ordinary course of business, the Debtors incur and pay obligations relating to salaries, wages and other compensation owed to Employees, independent contractors, and staffing firms that provide the Debtors with contingent workers. Additionally, Employees are entitled to reimbursement of certain reasonable and necessary expenses incurred while performing their employment duties, including job related travel and other business related expenses (the "**Expenses**"). I believe that payment of prepetition Expenses is necessary because any other treatment of Employees would be highly inequitable and risk alienation of the Debtors' workforce. Employees who have incurred reimbursable Expenses should not be forced personally to bear the cost of the Expenses, especially because those Employees incurred such Expenses for the Debtors'

benefit, in the course of their employment by the Debtors, and with the understanding that they would be reimbursed for doing so.

96. In the ordinary course of business, the Debtors are required by law to deduct from Employees' gross pay including without limitation, garnishments, child support, spousal support, service charges, and other similar deductions and other pre- and after tax deductions payable pursuant to certain employee benefits plans discussed in the Wages and Benefits Motion (collectively, the "**Deductions**"). In addition to the Deductions, certain laws require the Debtors to withhold amounts from the Employees' gross pay related to federal, state, and local income taxes, Social Security and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority (collectively, the "**Withholdings**"), which the Debtors must match, from their own funds, amounts for Social Security and Medicare taxes and pay, based on a percentage of gross payroll, additional amounts for federal and state unemployment insurance (collectively with the Withholdings, the "**Payroll Taxes**"). I believe that disbursement of the Deductions and payment of the Payroll Taxes would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a) of the Bankruptcy Code.

97. As a part of their Employee Compensation Obligations, the Debtors also maintain, in the ordinary course, a variety of employee bonus programs (the "**Employee Bonus Programs**") and have a general practice of paying severance to certain non-insider Employees (the "**Employee Severance Obligations**"). The Employee Bonus Programs and the Employee Severance Obligations are necessary for maintaining positive Employee morale and loyalty, and failure to honor obligations under these programs could cause severe hardship to the Debtors' workforce in a critical time; the programs are integral and necessary for maintaining a stable

workforce and the ultimate successful operation of the Debtors' business. While the Debtors do not seek to pay any prepetition Employee Severance Obligations, the Debtors do seek relief to continue the Employee Severance Obligations on a postpetition basis. The Debtors are not seeking authority to pay or honor any prepetition obligations on account of any severance payments or any severance payments to insiders.

98. The Debtors also make employee benefits available to eligible Employees. The benefits fall within the following categories: (i) employee leave benefits, including personal time off and holidays; (ii) medical, dental, vision, and prescription drug benefits, life insurance, accidental death and dismemberment insurance, disability insurance, and health savings accounts; (iii) retirement savings plans including three 401(k) plans, and (iv) certain other benefits (collectively, the "**Employee Benefits**"). I believe that maintaining the Employee Benefits are critical for maintaining Employee morale during these chapter 11 cases, and to prevent Employees from seeking employment from other companies that offer similar benefits.

99. As described in the Wages and benefits Motion, the Debtors pay fees to third-party administrators and servicers of Employee Compensation Obligations and Employee Benefits Obligations. Third-party administrators assist the Debtors with, among other things, administering of the Employee Benefits, and also assist with payroll servicing and payroll transfer administration in connection with Employee Obligations. I believe that continued payment to third-party administrators is necessary, and without the continued service of these administrators, the Debtors will be unable to continue honoring their obligations to Employees in an efficient and cost-effective manner.

100. The Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee or Contractor in excess of the $15,150 cap imposed by section

507(a)(4) of the Bankruptcy Code. I believe that the total amount sought to be paid by the Wages and Benefits Motion is modest compared to the magnitude of the Debtors' overall business. Furthermore, the Debtors have sufficient funds to pay the Employee Obligations in the ordinary course using cash maintained by the Debtors and cash generated through operations. Accordingly, I believe the relief requested in the Wages and Benefits Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

### H. Taxes Motion

101. Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments Owed to Taxing Authorities and (II) Granting Related Relief* (the "**Taxes Motion**") filed concurrently herewith, the Debtors request entry of an order (i) authorizing, but not directing, the Debtors to satisfy all Taxes (as defined below) due and owing to various federal, state, and local taxing and regulatory authorities (collectively, the "**Taxing and Regulatory Authorities**") that arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date, and to pay any postpetition amounts that become due and owing to the Taxing and Regulatory Authorities in the ordinary course during these cases.

102. I understand that the taxes and regulatory assessments the Debtors typically incur generally fall into the following categories: Sales and Use Taxes, Property Taxes, Income Taxes, Franchise and Other Taxes, and Regulatory Assessments (each as defined in the Taxes Motion and, collectively, the "**Taxes**"). I understand that approximately $3,102,000 in Taxes relating to periods prior to the Petition Date will come due and owing to the Taxing and Regulatory Authorities after the Petition Date.

103. As more fully described in the Taxes Motion, I understand that failure to pay the Taxes and the Regulatory Assessments, as applicable, may cause the Taxing and Regulatory Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the ordinary course in the applicable jurisdictions in which they operate, and potentially holding directors and officers personally liable, all of which would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize. Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interest of the Debtors, their estates, and all parties in interest and should be approved.

### I. Utilities Motion

104. Pursuant to the *Emergency Motion of Debtors for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies From Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* filed concurrently herewith (the "**Utilities Motion**"), the Debtors request entry of an order (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies, (ii) establishing procedures for resolving objections by the Utility Companies relating to the adequacy of the Debtors' proposed adequate assurance, (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these chapter 11 cases or outstanding prepetition invoices, and (iv) granting related relief.

105. As more fully described in the Utilities Motion, in the ordinary course of business, the Debtors incur expenses for, among other things, electricity, telecommunications, natural gas, water, waste disposal, and other similar services. I believe that preserving utility services on an uninterrupted basis is essential to the Debtors' ongoing operations.

106. Based on their monthly average for the twelve months prior to the Petition Date, the Debtors estimate that on average, they spend approximately $1,000,000 per month on utility services. To provide additional assurance of payment, the Debtors propose to deposit cash into a segregated account in an amount equal to approximately two weeks' cost of utility services (less any amounts guaranteed pursuant to a letter of credit issued in favor of any such Utility Company that have not been applied to outstanding prepetition amounts), (the "**Adequate Assurance Deposit**"), calculated, where practicable, using the historical average for such payments during the twelve months prior to the Petition Date. The Debtors estimate that the Adequate Assurance Deposit would total approximately $491,000. Such Adequate Assurance Deposit will further assure the Utility Companies of payment for postpetition services.

107. Furthermore, I believe the Adequate Assurance Procedures are necessary for the Debtors to effectuate their chapter 11 strategy without unnecessary and costly disruptions on account of discontinued utility services. If the Adequate Assurance Procedures are not approved, the Debtors likely will be confronted with and forced to address numerous requests by their utility providers at a critical time for their business. I understand that the Debtors' utility providers could unilaterally decide that they are not adequately protected and, therefore, may make exorbitant demands for payment to continue providing service or discontinue providing service to the Debtors altogether. Such an outcome could seriously jeopardize the Debtors' operations and their ability to maximize the value of their estates.

108. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion is in the best interests of the Debtors' estates, and should be granted.

**J. Schedules and Statements Extension Motion**

109. Pursuant to *the Emergency Motion of Debtors for an Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Current Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Reports* filed contemporaneously herewith (the "**Schedules and Statements Motion**") the Debtors seek entry of an order extending the deadline by which the Debtors must file their (a) schedules of assets and liabilities, (b) schedules of current income and current expenditures, (c) schedules of executory contracts and unexpired leases, and (d) statements of financial affairs (collectively, the "**Schedules and Statements**") by 45 days, for a total of 59 days from the Petition Date, through and including March 9, 2023 without prejudice to the Debtors' ability to request additional extensions for cause shown.

110. I am advised that section 521 of the Bankruptcy Code and Bankruptcy Rule 1007(c) generally requires debtors to file Schedules and Statements within 14 days after their petition date. I am also advised that under Bankruptcy Rule 1007(c), the Court has the authority to extend the time required for filing the Schedules and Statements "for cause." I believe cause exists for granting the extensions requested in the Schedules and Statements Motion because of the voluminous information the Debtors must compile to complete the Schedules and Statements. Collecting the necessary information requires a significant expenditure of time and effort on the part of the Debtors, their employees, and their professional advisors in the near term, when these resources would be best used to address the immediate needs of the Debtors' business operations.

111. Additionally, pursuant to the Schedules and Statements Motion, the Debtors request the Court grant them an extension of the time until the later of (i) 15 days after the initial meeting of creditors to be held pursuant to section 341 of the Bankruptcy Code (the "**341 Meeting**") and (ii) 45 days from the Petition Date, for the Debtors to either file their initial reports of financial information with respect to entities in which their chapter 11 estates hold a controlling or substantial interest, as set forth in Bankruptcy Rule 2015.3 (the "**2015.3 Reports**"), or file a motion with the Court seeking a modification of such reporting requirements for cause.

112. I have been advised that Bankruptcy Rule 2015.3 requires a debtor, by no later than seven days prior before the date set for the 341 Meeting and no less than every six months thereafter, to file periodic financial reports of the value, operations and profitability of each entity that is not a publicly traded corporation or a debtor in the chapter 11 cases, and in which the estate holds a substantial or controlling interest. I am also advised that pursuant to Bankruptcy Rule 9006(b)(1), the Court has the authority to enlarge the period of time to file the 2015.3 Reports "for cause" and that under Bankruptcy Rule 2015.3(d), the Court can modify the reporting requirements for cause, including that the debtor is "not able, after a good faith effort, to comply with those reporting requirements, or that the information . . . is publicly available."

113. The Debtors consist of 14 separate entities, some of which have non-debtor affiliates that are not publicly traded corporations and in which there is a presumption that the Debtors hold a "substantial or controlling" equity interest. Thus, I believe cause exists to extend the deadline for filing the Rule 2015.3 Reports based on (a) the size and complexity of the Debtors' business and (b) the substantial burdens imposed by compliance with Bankruptcy Rule 2015.3 in the early days of these chapter 11 cases. Extending the deadline for the initial 2015.3 Reports also will enable the Debtors to work with their financial advisors and the U.S. Trustee to determine the

appropriate nature and scope of the 2015.3 Reports and any proposed modifications to the reporting requirements established by Bankruptcy Rule 2015.3.

**K. Creditor List Motion**

114. Pursuant to the *Emergency Motion of Debtors for Order (I) Authorizing Debtors to (A) File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors and (B) Redact Certain Personal Identification Information and (II) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information* filed contemporaneously herewith (the "**Creditor List Motion**"), the Debtors are seeking entry of an order (i) authorizing the Debtors to (a) file a consolidated creditor matrix (the "**Consolidated Creditor Matrix**") and a consolidated list of the Debtors' thirty (30) largest unsecured creditors (the "**Consolidated Top 30 Creditors List**") and (b) redact certain personal identification information of the Debtors' employees and independent contractors and (ii) approving the form and manner of notifying creditors of the commencement of these chapter 11 cases and other information.

115. I am advised that Bankruptcy Rule 1007(a) requires each debtor to file a separate mailing matrix, each containing names and addresses of all creditors, including individuals, as well as a separate list of top unsecured creditors for each debtor. Because the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome, the Debtors request authority to file one Consolidated Creditor Matrix for all Debtors. Further, because a significant number of creditors may be shared among the Debtors, the Debtors request authority to file the Consolidated Top 30 Creditors List for all Debtors, rather than file separate top 20 creditor lists for each Debtor. I understand that the

Consolidated Top 30 Creditors List will help alleviate administrative burden, costs, and the possibility of duplicative service.

116. I also believe that cause exists to authorize the Debtors to redact address information of the Debtors' current and former employees and independent contractors from the Consolidated Creditor Matrix because such information could be used to perpetrate identity theft. Further, the Debtors propose to provide, upon request, an unredacted version of the Consolidated Creditor Matrix to the Court, the U.S. Trustee, and counsel to any official committees appointed in these chapter 11 cases.

117. Finally, I am advised that, in compliance with the requirements of Bankruptcy Rule 2002(a), of which I have been advised, the Debtors, through Epiq Corporate Restructuring, LLC ("**Epiq**"), their proposed claims and noticing agent, propose to serve the Notice of Commencement (as defined in the Creditor List Motion) on all parties entitled to notice of commencement of these chapter 11 cases, to advise them of commencement of these chapter 11 cases and the section 341 meeting of creditors. I believe service of the Notice of Commencement on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix, but will also preserve judicial resources and prevent creditor confusion through the efficient service of critical information.

118. Based on the foregoing, I believe that the relief requested in the Creditor List Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

## L. NOL Motion

119. Pursuant to the *Emergency Motion of Debtors Pursuant to Sections 362 And 105(A) of the Bankruptcy Code for Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on (A) Certain Transfers of Interests in, and Claims Against, Debtors, and (B) Claiming of Certain Worthless Stock Deductions* filed contemporaneously herewith (the "**NOL Motion**"), the Debtors are seeking to establish procedures to protect (i) the potential value of the Debtors' carryforwards of net operating losses ("**NOLs**"), disallowed and deferred business interest expense, and certain other tax benefits (including certain state tax attributes) (collectively, the "**Tax Attributes**") for use during the chapter 11 cases and in connection with the reorganization of the Debtors. The Procedures (as defined in the NOL Motion) include separate procedures applicable to (i) the beneficial ownership (including direct and indirect ownership) of membership interests in Dawn Intermediate, LLC ("**Dawn Stock**") and any options or similar rights (within the meaning of applicable U.S. Treasury regulations) to acquire beneficial ownership of such interests, as well as to any claim (for U.S. federal income tax reporting purposes) of a worthless stock deduction under section 165 of title 26 of the United States Code (the "**Tax Code**") by a Majority Holder (as defined in the NOL Motion) with respect to the beneficial ownership of Dawn Stock (a "**Worthless Stock Deduction**").

120. The Debtors have certain Tax Attributes, which I understand include, as of the Petition Date, estimated available NOL carryforwards of approximately $75 million, estimated business interest expense carryforwards of approximately $290 million and certain other favorable Tax Attributes (including certain state tax attributes). I believe the Procedures with respect to transfers in the beneficial ownership (including directly or indirectly) of, and claiming a worthless stock deduction with respect to the beneficial ownership of, the Dawn Stock will allow the Debtors

to monitor the transfer of, and the claiming of a Worthless Stock Deduction by any Majority Holder with respect to, beneficial ownership of the Dawn Stock and thereby preserve their ability to seek the necessary relief if it appears that any such transfer(s) or claim(s) may jeopardize the Debtors' ability to utilize their Tax Attributes.

121. Accordingly, I believe that the relief requested in the NOL Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### M. Claims Agent Retention Application

122. Pursuant to the *Emergency Ex Parte Application for Entry of an Order Authorizing Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent* filed concurrently herewith (the "**Claims Agent Retention Application**"), the Debtors request entry of an order appointing Epiq as the claims, noticing, and solicitation agent (the "**Claims and Noticing Agent**") for the Debtors in their chapter 11 cases, effective as of the Petition Date.

123. As more fully described in the Claims Agent Retention Application, the Claims and Noticing Agent will, among other tasks, (i) serve as the noticing agent to mail notices to creditors, equity security holders, and other parties in interest, (ii) provide computerized claims, objection, solicitation, and balloting database services, and (iii) provide expertise, consultation, and assistance in claim and ballot processing and other administrative services with respect to these chapter 11 cases, pursuant to the provisions of the Engagement Agreement (as defined in the Claims Agent Retention Application).

124. The Debtors' counsel has informed me that, pursuant to noticing requirements, the Debtors will be required to provide notice to thousands of persons and entities

during the pendency of these chapter 11 cases. The appointment of Epiq as the Claims and Noticing Agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing Epiq as the Claims and Noticing Agent in these chapter 11 cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing. Accordingly, I believe the Claims Agent Retention Application should be granted in all respects.

### N. Request for Emergency Consideration

125. Pursuant to the *Request for Emergency Consideration of Certain "First Day" Matters* filed concurrently herewith, the Debtors request emergency consideration of the Joint Administration Motion; the Scheduling Motion; the DIP Motion; the Cash Management Motion; the Vendor Motion; the Customer-Related Programs Motion; the Insurance and Surety Bond Motion; the Wages Motion; the Taxes Motion; the Utilities Motion; the Schedules and Statements Motion; the Creditor List Motion; the NOL Motion; and the Claims Agent Retention Application. I believe that, based on the complexity of these chapter 11 cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

## V. Conclusion

126. The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of these chapter 11 cases, and the critical need for the Debtors to restructure their financial affairs and operations. The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a

healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated: January 23, 2023
Houston, Texas

Name: John Linker
Title: Chief Financial Officer, Treasurer, and Assistant Secretary

**Certificate of Service**

I hereby certify that on January 23, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.

*/s/ Gabriel A. Morgan*
Gabriel A. Morgan