> **THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF TEXAS, HOUSTON DIVISION.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE.  THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | § | |
| In re: | § | **Chapter 11** |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** *et al.,* | § | **Case No. 23-90020 (DRJ)** |
| | § | |
| | § | **(Joint Administration Requested)** |
| **Debtors.**[1] | § | |

**DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN**
**OF SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS**

Gabriel A. Morgan (24125891)
Stephanie N. Morrison (24126930)
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  gabriel.morgan@weil.com
Email:  stephanie.morrison@weil.com

Ray C. Schrock (*pro hac vice* pending)
Alexander W. Welch (*pro hac vice* pending)
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  ray.schrock@weil.com
Email:  alexander.welch@weil.com

*Proposed Attorneys for the Debtors*
*and Debtors in Possession*

Dated:  January 23, 2023
Houston, Texas

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

**DISCLOSURE STATEMENT, DATED JANUARY 23, 2023**
**Solicitation of Votes on the**
**Plan of Reorganization of**

**SERTA SIMMONS BEDDING, LLC**, *ET AL.*

**from the holders of outstanding**

**FLFO CLAIMS, FLSO CLAIMS, NON-PTL TERM LOAN CLAIMS, ONGOING GENERAL UNSECURED CLAIMS, AND OTHER GENERAL UNSECURED CLAIMS**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS [●] [A.M./P.M.] (CENTRAL PREVAILING TIME) ON [●], 2023, UNLESS EXTENDED BY THE DEBTORS IN WRITING. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS [●], 2023 (THE "VOTING RECORD DATE").**

---

**RECOMMENDATION BY THE DEBTORS**

The board of managers of Dawn Intermediate, LLC, as sole member of Serta Simmons Bedding, LLC, and the board of directors, managers, members, or partners, as applicable, of each of its affiliated Debtors (as of the date hereof) have unanimously approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

Subject to the Restructuring Support Agreement (as defined below), holders of approximately 81% of the outstanding principal amount of the FLFO Term Loans (as defined below) and 77% of the outstanding principal amount of FLSO Term Loans (as defined below) (the "**Consenting Creditors**") have agreed to vote in favor of, or otherwise support, the Plan.

In addition, subject to the Restructuring Support Agreement, the Plan is supported by Dawn Holdings, Inc., as the sole member, and holder of interests in Dawn Intermediate, LLC, and funds managed by Advent International Corporation ("**Advent**"), as holder of Interests in Dawn Holdings, Inc. (together, the "**Consenting Equity Holders**").

HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND ARE URGED TO CONSULT WITH THEIR OWN ADVISERS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

NO HOLDERS OF CLAIMS, ANY CONSENTING CREDITOR, OR ANY OF THEIR RESPECTIVE LEGAL OR FINANCIAL ADVISORS MAKES ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AS TO THE FUTURE PERFORMANCE OF THE DEBTORS (AS DEFINED BELOW) OR THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR IN THE PLAN, NOR HAS ANY SUCH PERSON INDEPENDENTLY VERIFIED THE INFORMATION HEREIN.

THE ISSUANCE, AND THE DISTRIBUTION UNDER THE PLAN, OF THE NEW COMMON INTERESTS WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE REQUIRING REGISTRATION FOR THE OFFER, ISSUANCE OR DISTRIBUTION OF SECURITIES. THESE SECURITIES MAY BE RESOLD WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR OTHER FEDERAL SECURITIES LAWS PURSUANT TO THE EXEMPTION PROVIDED BY SECTION 4(a)(1) OF THE SECURITIES ACT, UNLESS THE HOLDER IS AN "UNDERWRITER" WITH RESPECT TO SUCH SECURITIES, AS THAT TERM IS DEFINED IN SECTION 1145(b) OF THE BANKRUPTCY CODE. IN ADDITION, SUCH SECTION 1145 EXEMPT SECURITIES GENERALLY MAY BE RESOLD WITHOUT REGISTRATION UNDER STATE SECURITIES LAWS PURSUANT TO VARIOUS EXEMPTIONS PROVIDED BY THE RESPECTIVE LAWS OF THE SEVERAL STATES.

THE AVAILABILITY OF THE EXEMPTION UNDER SECTION 1145 OF THE BANKRUPTCY CODE OR ANY OTHER APPLICABLE SECURITIES LAWS WILL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE.

THE NEW COMMON INTERESTS HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS AND ARE NECESSARILY SPECULATIVE. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE

ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

THE PLAN PROVIDES THAT THE FOLLOWING PARTIES ARE DEEMED TO GRANT THE RELEASES PROVIDED FOR THEREIN: (I) THE HOLDERS OF ALL CLAIMS THAT VOTE TO ACCEPT THE PLAN, (II) THE HOLDERS OF ALL CLAIMS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT THAT DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN, (III) THE HOLDERS OF ALL CLAIMS OR INTERESTS THAT VOTE, OR ARE DEEMED, TO REJECT THE PLAN OR THAT ARE PRESUMED TO ACCEPT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH HEREIN, (IV) THE HOLDERS OF ALL CLAIMS AND INTERESTS THAT WERE GIVEN NOTICE OF THE OPPORTUNITY TO OPT OUT OF GRANTING THE RELEASES SET FORTH HEREIN BUT DID NOT OPT OUT, AND (V) THE RELEASED PARTIES EVEN IF SUCH RELEASED PARTY PURPORTS TO OPT OUT OF THE RELEASES SET FORTH HEREIN.

HOLDERS OF CLAIMS IN VOTING CLASSES 3, 4, 5, 6A, AND 6B HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR BALLOT. HOLDERS OF CLAIMS IN NON-VOTING CLASSES (1, 2, 7, 8, 9, AND 10) HAVE RECEIVED A RELEASE OPT-OUT FORM ATTACHED TO THEIR NOTICE OF NON-VOTING STATUS AND NOTICE OF RIGHT TO OPT OUT OF CERTAIN RELEASES. SEE EXHIBIT G FOR A DESCRIPTION OF THE RELEASES AND RELATED PROVISIONS.

I. INTRODUCTION ........................................................................................................... 1

II. SUMMARY OF PLAN TREATMENT ....................................................................... 4

III. OVERVIEW OF THE DEBTORS' OPERATIONS ................................................... 6

    A.      Overview of the Debtors' Business ................................................................ 6

    B.      History and Corporate Structure .................................................................... 7

          1.      Simmons .......................................................................................... 7

          2.      Serta, Inc. ........................................................................................ 8

          3.      Serta Simmons Bedding, LLC ........................................................ 8

          4.      COVID-19 Pandemic and the 2020 Transaction ............................ 8

          5.      AI Dream Joint Venture .................................................................. 9

    C.      Recent Operational Initiatives ....................................................................... 9

          1.      Grow with Omni Retailers and Regional & Independents Channel and Drive Premium Assortment .................................................... 9

          2.      Accelerate Direct to Consumer Sales ........................................... 10

          3.      Value Engineering and Product Simplification ............................. 10

          4.      Quality Improvement ..................................................................... 10

          5.      Facility Network Optimization ...................................................... 10

          6.      Enhanced Management ................................................................... 10

    D.      Board of Managers and Officers .................................................................. 10

    E.      Capital Structure .......................................................................................... 11

          1.      Prepetition Indebtedness ............................................................... 11

           2.      Equity Ownership .......................................................................... 13

           3.      Cash and Cash Equivalents ........................................................... 14

    F.      Litigation ..................................................................................................... 14

          1.      Arbitration with Minority Licensees ............................................ 14

          2.      2021 LCM Litigation ..................................................................... 14

          3.      2022 Non-PTL Term Loan Lenders Litigation ............................. 15

          4.      Other Litigation ............................................................................. 15

IV. KEY EVENTS LEADING TO  THE COMMENCEMENT OF CHAPTER 11 CASES ................... 15

    A.      Challenges Facing Debtors' Business .......................................................... 15

    B.      Finance Committee Appointed to Oversee Strategic Process ...................... 16

    C.      2020 Transaction .......................................................................................... 16

    D.      Prepetition Strategic Efforts ........................................................................ 16

          1.      Refinancing Efforts ....................................................................... 16

          2.      Restructuring Negotiations ............................................................ 17

          3.      Debtor-in-Possession Financing Negotiations .............................. 18

          4.      Prepetition Compensation Program ............................................... 18

E.       Restructuring Support Agreement and Plan.........................................................18

F.       Implementation and Potential Transaction Structures ......................................19

**V. ANTICIPATED EVENTS DURING THE CHAPTER 11 CASES .....................................19**

A.       Commencement of the Chapter 11 Cases and First Day Motions ....................19

      1.      Cash Management System...................................................................20

      2.      Debtor-in-Possession Financing ........................................................20

      3.      Critical Vendor ...................................................................................20

      4.      Taxes...................................................................................................20

      5.      Utilities ...............................................................................................21

      6.      Insurance.............................................................................................21

      7.      Employee Wages and Benefits ...........................................................21

      8.      Customer Programs.............................................................................21

      9.      Carryforwards of Net Operating Losses ............................................22

      10.     Other Procedural Motions and Retention of Professionals.................22

B.       Retention of Chapter 11 Professionals.............................................................22

C.       Confirmation Hearing .......................................................................................22

D.       Commencement of Adversary Proceedings......................................................22

E.       Timetable for the Chapter 11 Cases .................................................................23

**VI. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAW ..................................................................................................................23**

**VII. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ...........24**

B.       Consequences to U.S. Holders of FLFO Claims, FLSO Claims, Non-PTL Term Loan Claims, and Other General Unsecured Claims ........................................28

      1.      Security Status of FLFO Claims, FLSO Claims, Non-PTL Term Loan Claims and New Term Loans ..............................................................29

      2.      U.S. Holders of FLFO Claims ...........................................................30

**VIII. CERTAIN RISK FACTORS TO BE CONSIDERED.....................................................37**

A.       Certain Bankruptcy Law Considerations .........................................................37

      1.      General................................................................................................37

      2.      Risk of Material Adverse Effect on Operations.................................38

      3.      Risk Related to Obtaining First Day Relief .......................................38

      4.      Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases ....................................................................38

      5.      Non-Consensual Confirmation ..........................................................38

      6.      Risk Related to Classification of Claims and Interests.......................39

      7.      Risks Related to Possible Objections to the Plan................................39

      8.      Releases, Injunctions, and Exculpation Provisions May Not Be Approved........39

      9.      Risk of Non-Confirmation of the Plan ...............................................39

|        | 10. | Risk of Non-Occurrence of the Effective Date | 39 |
|        | 11. | Risk of Termination of the Restructuring Support Agreement | 40 |
|        | 12. | Conversion into Chapter 7 Cases | 40 |
| B.     |     | Additional Factors Affecting the Value of the Reorganized Debtors | 40 |
|        | 1.  | Claims Could Be More than Projected | 40 |
|        | 2.  | Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary | 40 |
|        | 3.  | Debtors' Business and Industry | 40 |
|        | 4.  | Post-Effective Date Indebtedness | 42 |
| C.     |     | Factors Relating to Securities to Be Issued Under the Plan, Generally | 42 |
|        | 1.  | No Current Public Market for Securities | 42 |
|        | 2.  | Potential Dilution | 42 |
| D.     |     | Risks Related to an Investment in the New Common Interests | 43 |
|        | 1.  | Significant Holders | 43 |
|        | 2.  | Equity Interests Subordinated to the Reorganized Debtors' Indebtedness | 43 |
|        | 3.  | Implied Valuation of New Common Interests Not Intended to Represent the Trading Value of the New Common Interests | 43 |
|        | 4.  | No Intention to Pay Dividends | 43 |
| E.     |     | Additional Factors | 43 |
|        | 1.  | Debtors Could Withdraw Plan | 43 |
|        | 2.  | Debtors Have No Duty to Update | 44 |
|        | 3.  | No Representations Outside this Disclosure Statement Authorized | 44 |
|        | 4.  | No Legal or Tax Advice Is Provided by this Disclosure Statement | 44 |
|        | 5.  | No Admission Made | 44 |
|        | 6.  | Certain Tax Consequences | 44 |

| IX. CONFIRMATION OF THE PLAN | | | 44 |
| A. | | Confirmation Hearing | 44 |
| B. | | Objections to Confirmation | 44 |
| C. | | Requirements for Confirmation of the Plan | 46 |
|    | 1. | Requirements of Section 1129(a) of the Bankruptcy Code | 46 |
|    | 2. | Additional Requirements for Non-Consensual Confirmation | 49 |

| X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | | | 50 |
| A. | | Alternative Plan of Reorganization | 50 |
| B. | | Sale Under Section 363 of the Bankruptcy Code | 50 |
| C. | | Liquidation Under Chapter 7 of the Bankruptcy Code | 51 |

| XI. CONCLUSION AND RECOMMENDATION | | | 51 |

## <u>EXHIBITS</u>

**EXHIBIT A**          Plan

**EXHIBIT B**          Restructuring Support Agreement (attachments omitted)

**EXHIBIT C**          New Term Loan Credit Facility Agreement Term Sheet

**EXHIBIT D**          Organizational Chart

**EXHIBIT E**          Liquidation Analysis

**EXHIBIT F**          Valuation

**EXHIBIT G**          Release Provisions

**EXHIBIT H**          Financial Projections

**EXHIBIT I**          Voting Procedures and Requirements

# I.
## INTRODUCTION

Serta Simmons Bedding, LLC ("**SSB**") and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" and, together with their non-Debtor affiliates, the "**Company**"), submit this disclosure statement (as may be amended, the "**Disclosure Statement**") in connection with the solicitation of votes (the "**Solicitation**") on the *Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors*, dated January 23, 2023 (the "**Plan**") attached hereto as **Exhibit A**.[2]

The Debtors under the Plan include Dawn Intermediate, LLC ("**Dawn Intermediate**"), SSB, and certain of its subsidiaries and affiliates that are borrowers and guarantors under (i) the Super-Priority Term Loan Agreement, dated as of June 22, 2020, by and among Dawn Intermediate ("**Dawn Intermediate**"), as holdings, SSB, as top borrower, National Bedding Company L.L.C. ("**NBC**") and SSB Manufacturing Company ("**SSB Manufacturing**") as borrowers, UBS AG, Stamford Branch, as administrative agent (the "**PTL Agent**"), and the lenders from time to time party thereto (the "**PTL Lenders**") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**PTL Credit Agreement**" and the credit facility issued thereunder, the "**PTL Facility**"); (ii) that certain First Lien Term Loan Agreement, dated as of November 8, 2016, by and among Dawn Intermediate, as holdings, SSB, SSB Manufacturing, and NBC, as borrowers, UBS AG, Stamford Branch, as administrative agent and collateral agent (the "**Non-PTL Term Loan Agent**"), and the lenders from time to time party thereto (the "**Non-PTL Term Loan Lenders**") (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Non-PTL Term Loan Agreement**" and the credit facility issued thereunder, the "**Non-PTL Term Loan Facility**"); and (iii) that certain ABL Credit Agreement, dated as of November 8, 2016, by and among Dawn Intermediate, as holdings; SSB, SSB Manufacturing, and NBC, as borrowers, the lenders from time to time party thereto, and UBS AG, Stamford Branch, as administrative agent (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**Prepetition ABL Agreement**" and the credit facility issued thereunder, the "**Prepetition ABL Facility**"; the Prepetition ABL Agreement together with the PTL Credit Agreement and the Non-PTL Term Loan Agreement, the "**Credit Agreements**").

The Debtors commenced voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**") on or about January 23, 2023 (the "**Petition Date**"). During these Chapter 11 Cases, the Debtors continue to operate their businesses in the ordinary course and have obtained authorization from the Bankruptcy Court to make payment in full on a timely basis to certain critical trade creditors, taxing authorities, customers, insurance providers, and employees of amounts due prior to and during the Chapter 11 Cases.

The Debtors are commencing this Solicitation to implement a comprehensive financial restructuring to deleverage the Company's balance sheet to ensure the long-term viability of the Company's enterprise. As a result of extensive negotiations with their secured creditors, the Debtors entered into a restructuring support agreement (including any amendments, modifications and joinders thereto, the "**Restructuring Support Agreement**"), a copy of which is attached hereto as **Exhibit B** (attachments omitted), with the Consenting Creditors party thereto, who hold, in the aggregate, approximately 81% of the outstanding principal amount of the FLFO Term Loans (as defined below) and 77% of the outstanding principal amount

---

[2]   Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

of FLSO Term Loans the outstanding indebtedness under the PTL Credit Agreement, and the Consenting Equity Holders.

Under the terms of the Restructuring Support Agreement, the parties agreed, subject to the terms and conditions of the Restructuring Support Agreement, to support a deleveraging transaction to restructure the Company's balance sheet, to be effectuated out-of-court or, if necessary, in chapter 11 through the Plan (the "**Restructuring**") pursuant to, among other things, the following agreements:

- the credit agreement (the "**New Term Loan Credit Facility Agreement**"), providing for a new term loan facility (the "**New Term Loan**") in the aggregate principal amount of $300 million (plus original issue discount), a copy of the term sheet for the New Term Loan Credit Facility Agreement is attached hereto as **Exhibit C**;

- an asset-backed revolving credit facility (the "**Exit ABL Facility**"), which will roll up or replace the DIP Facility (as defined herein) on the Effective Date.[3]

The Restructuring will leave the Company's businesses intact and substantially deleverage the Debtors' capital structure. The Company's balance sheet liabilities will be reduced from greater than approximately $1.9 billion[4] in total debt to approximately $300 million in total debt upon emergence and result in the resolution of certain pending claims against the Debtors brought by certain of Non-PTL Term Loan Lenders (as defined herein). This deleveraging will enhance the Company's long-term growth prospects and competitive position and allow the Debtors to emerge from the Chapter 11 Cases as a stronger, reorganized group of entities better able to invest in the business, drive innovation, deliver value to customers, and withstand a challenging market environment.

The Restructuring will be effectuated pursuant to the Plan, which provides for, in relevant part, the following treatment of Claims and Interests:

- Holders of an Allowed Other Secured Claim and an Allowed Priority Non-Tax Claim will be unimpaired under the Plan.

- Holders of an Allowed FLFO Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of $195 million in aggregate principal amount of New Term Loans.

- Holders of an Allowed FLSO Claim shall receive, in full and final satisfaction of such Claim, such holder's Pro Rata share of (i) one hundred percent (100%) of the New Common Interests issued on the Effective Date, *less* any New Common Interests distributed to holders of Class 5 Non-PTL Claims under the Plan and subject to dilution by the New Common Interests distributed pursuant to a post-emergence equity-based management incentive plan as described in Section 5.12 of the Plan (the "**Management Incentive Plan**"), and (ii) $105 million in aggregate principal amount of New Term Loans. Receipt of such consideration shall be effected as described in the Restructuring Transactions Exhibit.

- Holders of Allowed Non-PTL Term Loan Claims shall receive, in full and final satisfaction of such Claim:

---

[3]   Letters of credit in the amount of approximately $28,014,282 will be deemed issued under the Exit ABL Facility or cash collateralized on the Effective Date.

[4]   Calculation excludes capital lease obligations in the approximate amount of $77,945,909.

1. **If Class 5 votes to accept the Plan**: such holder's Pro Rata share of 4% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan.

2. **If Class 5 votes to reject the Plan**: such holder's Pro Rata share of 1% of New Common Interests issued on the Effective Date, subject to dilution by any New Common Interests distributed pursuant to the Management Incentive Plan.

- If a holder of an Allowed Ongoing General Unsecured Claim executes a trade agreement providing for the continuation of goods or services on the same or better terms as existed as most favorable terms provided to the Debtors in the six (6) months prior to the Petition Date (the form and terms of such agreement to be determined by the Debtors), such holder of an Allowed Ongoing General Unsecured Claim shall receive no more than four (4) Cash installments, which payments shall result in full payment in the Allowed amount of such Ongoing General Unsecured Claim on no better terms than payment in the ordinary course of business.

- Holders of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table.

- Holders of Allowed Intercompany Claims and Allowed Intercompany Interests will be either impaired or unimpaired under the Plan and therefore presumed to either accept or reject the Plan.

- Holders of Other Intercompany Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit.

- Holders of Intermediate Equity Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit.

Cash on the balance sheet of the reorganized Debtors as reorganized from the Effective Date ("**Reorganized Debtors**") and, to the extent necessary, the proceeds issued or deemed issued under the Exit ABL Facility shall be used to (i) pay the Professional Fee Claims, in full in accordance with Section 2.2 of the Plan, (ii) fund other distributions, costs, and expenses contemplated by the Plan, and (iii) fund general working capital and for general corporate purposes of the Reorganized Debtors.

There are five (5) creditor groups whose votes for acceptance of the Plan are being solicited: (i) holders of FLFO Claims, (ii) holders of FLSO Claims, (iii) holders of Non-PTL Term Loan Claims, (iv) holders of Ongoing General Unsecured Claims, and (v) holders of Other General Unsecured Claims.  An overview of the voting procedures and related requirements are attached hereto as **Exhibit I**.

Section II hereof contains a summary of the treatment of various creditor groups under the Plan.

**WHO IS ENTITLED TO VOTE:**  Under the Bankruptcy Code, only "impaired" holders of claims or interests are entitled to vote on the Plan (unless, for reasons discussed in more detail below such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under the Plan unless: (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof; or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), and reinstates the maturity of such claim or interest as it existed before the default.

**II.**
**SUMMARY OF PLAN TREATMENT**

The following table summarizes: (i) the treatment of Claims and Interests under the Plan; (ii) which Classes are impaired by the Plan; (iii) which Classes are entitled to vote on the Plan; and (iv) the estimated recoveries for holders of Claims and Interests.[5]  The table is qualified in its entirety by reference to the full text of the Plan.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Valuation attached hereto as **Exhibit F**.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, (i) each such holder shall receive payment in Cash in an amount equal to such Claim, (ii) such holder's Allowed Other Secured Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No – Presumed to Accept | **100%** |
| 2 | Priority Non-Tax Claims | Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the option of the Debtors or the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, (i) each such holder shall receive payment in Cash in an amount equal to such Claim, (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code. | Unimpaired | No – Presumed to Accept | **100%** |
| 3 | FLFO Claims | Except to the extent that a holder of an Allowed FLFO Claim agrees to a less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim and in accordance with Section 5.5 of the Plan, on the Effective Date or as soon as reasonably practicable thereafter, such holder's Pro Rata share of $195 million in aggregate principal amount of New Term Loans. | Impaired | Yes – Entitled to Vote | **100%** |

---

[5]   Any Claim or Interest in a Class that is considered vacant under Section 3.5 of the Plan will receive no Plan Distribution.

4

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|-------|--------------------------|-----------|------------------------|---------------------|-----------------------------|
| 4 | FLSO Claims | Except to the extent that a holder of an Allowed FLSO Claim agrees to a less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim and in accordance with Section 5.5 of the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, such holder's Pro Rata share of (i) one hundred percent (100%) of the New Common Interests issued on the Effective Date, less any New Common Interests distributed to holders of Class 5 Non-PTL Claims under the Plan and subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan, and (ii) $105 million in aggregate principal amount of New Term Loans.  Receipt of such consideration shall be effected as described in the Restructuring Transactions Exhibit. | Impaired | Yes – Entitled to Vote | [●]% |
| 5 | Non-PTL Term Loan Claims | On the Effective Date, all Non-PTL Term Loan Claims will be cancelled, released, and extinguished and will be of no further force and effect.  Each Holder of such Allowed Non-PTL Term Loan Claims will receive:<br><br>1.  **If Class 5 votes to accept the Plan**: Its Pro Rata share of 4% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan.<br><br>2.  **If Class 5 votes to reject the Plan**: Its Pro Rata share of 1% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan. | Impaired | Yes – Entitled to Vote | [●]% |
| 6A | Ongoing General Unsecured Claims | Except to the extent that a holder of an Allowed Ongoing General Unsecured Claim agrees to less favorable treatment, if a holder of an Allowed Ongoing General Unsecured Claim executes a trade agreement providing for the continuation of goods or services on the same or better terms as existed as most favorable terms provided to the Debtors in the six (6) months prior to the Petition Date (the form and terms of such agreement to be determined by the Debtors), on and after the Effective Date, or as soon as reasonably practical thereafter, such holder of an Allowed Ongoing General Unsecured Claim shall receive no more than four (4) Cash installments, which payments shall result in full payment in the Allowed amount of such Ongoing General | Impaired | Yes – Entitled to Vote | [100]% |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote | Approx. Percentage Recovery |
|-------|--------------------------|-----------|------------------------|---------------------|----------------------------|
| | | Unsecured Claim on no better terms than payment in the ordinary course of business. | | | |
| 6B | Other General Unsecured Claims | Except to the extent that a holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table. | Impaired | Yes – Entitled to Vote | [●]% |
| 7 | Intercompany Claims | Except as provided for in Section 5.4 of this Plan, on the Effective Date, or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, Reinstated, or discharged (each without any distribution) to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors and the Requisite Consenting Creditors, as applicable. | Either Unimpaired or Impaired | No – Either: Presumed to Accept Deemed to Reject | [●]% |
| 8 | Intercompany Interests | Except as provided for in Section 5.4 of the Plan, on the Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests shall be unaffected by the Plan and continue in place following the Effective Date, solely for the administrative convenience of maintaining the existing corporate structure of the Debtors. | Either Unimpaired or Impaired | No – Either: Presumed to Accept Deemed to Reject | [●]% |
| 9 | Other Intercompany Interests | On the Effective Date, Other Intercompany Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit. | Impaired | No – Deemed to Reject | [●]% |
| 10 | Intermediate Equity Interests | On the Effective Date, Intermediate Equity Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit. | Impaired | No – Deemed to Reject | [●]% |

## III.
## OVERVIEW OF THE DEBTORS' OPERATIONS

### A.    Overview of the Debtors' Business

The Company is a leading manufacturer and marketer of bedding products.  Together with their non-debtor affiliates, the Debtors operate twenty-one (21) bedding manufacturing facilities across the United States and Canada.  The Debtors and its non-debtor affiliates have a portfolio of iconic brands including Simmons Bedding Company (together with its affiliates, "**Simmons**"), Serta, Inc., and Tuft & Needle, LLC.

The Debtors manufacture, sell and distribute their bedding products to retailers and to individual consumers through a number of channels. The Debtors primarily sell their products in the United States through dealers which, in 2022, included approximately 2,200 authorized individual retailers in the United States, including one or more mattress specialty stores, as well as furniture stores, department stores, furniture rental stores, mass merchandisers, and juvenile specialty stores. The Debtors also sell their products (i) to hospitality customers, such as hotels, casinos and resort properties, through SSB Hospitality, LLC; (ii) to third party resellers, who purchase overstock and discontinued models through four (4) warehouses operated by World of Sleep Outlets, LLC; and (iii) directly to consumers through their e-commerce platforms and retail stores.

The Debtors also license their intellectual property for use by third party manufacturers of bedding products. Debtor Dreamwell, Ltd. licenses the Beautyrest®, Simmons®, and other trademarks for the manufacture of mattresses and foundations both within the United States for use on Beautyrest® and Simmons® branded bedding-related products and home textiles and outside of the United States to licensees who manufacture Beautyrest® and Simmons® branded mattress and bedding related products. Serta, Inc., a non-Debtor entity, licenses the Serta® trademarks for the manufacture of mattresses and foundations in the United States to the Minority Licensees (as defined herein), who also hold minority equity stakes in Serta, Inc., as well as to licensees who manufacture bedding-related products and home textiles in the United States and to licensees outside of the United States who manufacture Serta® branded mattress and bedding-related products.

### B.     History and Corporate Structure

The Company's main operating entity, SSB, was formed in 2010 following the combination of two highly recognizable brands in bedding: Serta® and Simmons®. Today, SSB employs approximately 3,600 employees and accounts for approximately 19% of the annual bedding sales in the United States through a diverse portfolio of brands, including the premium Simmons® Beautyrest® line, the tech-forward Arctic® and iComfort® lines by Serta®, the value-oriented Simmons®, and most recently mattress-in-a-box brand Tuft & Needle®, acquired in 2018.

### 1.     Simmons

The Company that would become Simmons was founded in 1870 when Zalmon G. Simmons began manufacturing wooden cheese boxes and telegraph insulators in a factory on the shores of Lake Michigan in Kenosha, Wisconsin. In 1876, Zalmon G. Simmons acquired the patent to automate the process for the manufacture of coil spring mattresses that were both more comfortable and less expensive to purchase. Over the ensuing century, Simmons pioneered a number of innovations in bedding, including an individually-wrapped coil spring unit, called the Pocketed Coil® spring, that would lead to the development of the iconic Beautyrest mattress in the 1920s

In the ensuing years, Simmons had expanded its operations worldwide and domestically to new businesses such as hospital beds and furniture. By the 1990's, it disposed of most of its foreign and non-bedding domestic operations and, in connection with such sales, entered into licensing arrangements with third parties who now produce and distribute Simmons-branded products within certain designated territories internationally. Simmons also entered into licensing arrangements domestically, pursuant to which third parties manufacture and distribute juvenile furniture, crib mattresses, sheets, pillows, and other bedding-related products and home textiles under the Simmons brand. In 2010, in connection with its chapter 11 cases, Simmons was acquired by Ares Capital Management, LLC ("**Ares**") and the Ontario Teacher's Pension Plan ("**OTPP**").

2.      **Serta, Inc.**

Serta, Inc. was formed in 1931 by a group of independent mattress manufacturers that wanted to sell throughout in the United States under the Serta® brand, each of which became a licensee and stockholder of Serta, Inc.  In 2003, one such licensee, Debtor NBC, acquired a majority of the outstanding common stock of Serta, Inc. through a series of acquisitions of other Serta Inc. licensees and stockholders.  In 2005, NBC was acquired by Ares and OTPP, and NBC was combined with Simmons in 2010 under ultimate parent SSB.  Today, NBC owns approximately 82% of the outstanding common stock of Serta, Inc., alongside five (5) remaining minority licensees who collectively control the other approximately 18% of the outstanding common stock of Serta, Inc. (the "**Minority Licensees**").  Pursuant to Serta Inc.'s governing documents, NBC is entitled to elect four (4) of the seven (7) directors on Serta Inc.'s board, each with three (3) votes, and the Minority Licensees are entitled to elect the remaining three (3) directors, each with one (1) vote.

The parties' rights and obligations with respect to the license and marketing of the Serta, Inc. brand are governed by a series of agreements, including, among other agreements: (i) a *Standard License Agreement* entered into between Serta, Inc. and each of the licensees, respectively; (ii) the charter and bylaws of Serta, Inc.; (iii) that certain *Restructuring Agreement*, dated as of September 10, 2004, by and among NBC and the Minority Licensees, which sets forth the services to be provided by NBC on behalf of Serta, Inc. and the Minority Licensees; and (iii) those certain *2018 Amended and Restated Rules and Regulations*, dated as of December 29, 2018, which, among other things, govern the brand management standards to be maintained by NBC on behalf of the Minority Licensees.

In addition to its equity interests, among other things, each Minority Licensee has been granted a territory within the United States in which to manufacture Serta®-branded mattresses and foundations and pays certain fees for brand-management services provided by NBC, including manufacturing assistance, research and development, national advertising, and management of intellectual property.  Fees payable on account of such services are generally structured as a percentage of the preceding year's sales.  In addition, NBC has exclusive rights to (i) manufacture Serta® branded mattresses domestically within NBC's own area of primary responsibility; (ii) manage domestic national customer accounts (such as sales to retail stores with a national reach and hospitality customers, such as national hotel chains); and (iii) license the Serta® brand domestically to other companies who make bedding-related and textile products (including pillows, mattress toppers, pet products, and bathroom textiles, among others) as well as internationally, from which licensing agreements the Minority Licensees receive certain fees.

3.      **Serta Simmons Bedding, LLC**

In 2010, NBC combined with Simmons to become the Company's main operating entity, SSB.  In 2012, Ares and OTPP sold their majority stake in SSB to Advent.  In 2018, the Company acquired Tuft & Needle, LLC, a mattress-in-a-box manufacturer that now operates as a wholly-owned subsidiary of SSB.  Today, SSB is a significant player in the North American mattress industry, with $2.4 billion in sales for the twelve (12) months ending June 2022 and accounting for approximately 19% of U.S. bedding sales.

4.      **COVID-19 Pandemic and the 2020 Transaction**

In April 2020, as the impact of the COVID-19 pandemic spread throughout the United States forcing businesses to halt operations and customers to quarantine, SSB solicited proposals from and entered into separate discussions with potential lenders, including the New Money Lenders (as defined herein), to explore alternatives for raising liquidity and reducing its debt and interest expense.  The Company analyzed multiple proposals and negotiated with numerous lender groups before ultimately selecting, with the approval of the Finance Committee (as defined herein), the transaction discussed below.

On June 8, 2020, SSB announced it had entered into a transaction support agreement to recapitalize the Company.  In connection with this transaction, (i) certain of the lenders from time to time party to the transaction support agreement, including certain of the Debtors' then-existing first-lien and second-lien lenders (the "**New Money Lenders**") made available to the borrowers a new "first lien first out" term loan in the aggregate principal amount of $200 million under the PTL Credit Agreement (the "**FLFO Term Loans**") and (ii) certain of the Debtors' then-existing first-lien and second-lien lenders (the "**Exchanging Existing Lenders**") sold to SSB and the other borrowers approximately $1 billion of outstanding term loans under the Non-PTL Term Loan Facility and $300 million of outstanding term loans under the Debtors' second lien term loan facility (which has since been paid off in full) (such outstanding term loans, the "**Relevant Existing Term Loans**") to the relevant borrowers in exchange for "first lien second out" term loans under the PTL Credit Agreement (the "**Initial FLSO Term Loans**" and, together with any subsequently exchanged loans, the "**FLSO Term Loans**").  The issuance of the FLFO Term Loans and the sale of the Relevant Existing Term Loans to the relevant borrowers in exchange for the FLSO Term Loans is referred to collectively as the "**2020 Transaction**."  The PTL Facility is guaranteed by each of the guarantors party thereto, and is secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Non-PTL Term Loan Facility (and together with the PTL Facility, the "**Term Facilities**") by (i) a first-priority lien on the Term Loan Priority Collateral of each of the Debtors, and (ii) a second-priority lien on the ABL Priority Collateral of each of the Debtors that is junior to the liens securing the Prepetition ABL Facility.

### 5.    AI Dream Joint Venture

In 2021, Serta, Inc. sold its minority interest in AI Dream 1 (Cayman) Limited ("**AI Dream**"), the exclusive licensee of the Serta® brand in Greater China.  Serta, Inc. initially entered the Chinese market in 1998, when it began to license the Serta® brand to a number of licensees for the manufacture and marketing of mattresses, foundations, and other bedding related products in China.  In 2009, Serta, Inc. granted an exclusive license to Airland Group in China, and by 2018, Airland Group was a leader in the Chinese mattress market with more than 1,400 retail outlets in over 400 cities.  In 2018, Advent formed AI Dream with King Koil Shanghai Sleep System Co., Ltd., an entity which was majority owned by Advent, and the Serta®-branded business in Greater China that was acquired from Airland Holding Company Ltd.  As part of that transaction, Serta, Inc. entered into an exclusive license with AI Dream in return for a minority stake in AI Dream.  By 2021, AI Dream had grown to one of the largest mattress manufacturers in the greater Chinese market, with multi-branded outlets in more than six hundred (600) cities in China and Hong Kong.  In 2021, Serta, Inc. sold its minority interest in AI Dream as part of a larger transaction in which Advent sold its majority interest to Hillhouse Investment Management and AI Dream remains the exclusive licensee of the Serta® brand in China under the new majority owner.  Prior to the sale of AI Dream, the interests in the shares entitled to receive the proceeds in AI Dream were owned exclusively by NBC.  Accordingly, upon the sale of AI Dream, the proceeds of the sale were provided to NBC in the form of a dividend in 2021.

### C.    Recent Operational Initiatives

The Company has undertaken certain strategic initiatives to profitably grow the Company's sales as well as improve its cost structure, including:

### 1.    Grow with Omni Retailers and Regional & Independents Channel and Drive Premium Assortment

With the aim of growing its sales, the Company has made strategic investments in innovation, sales force coverage and training, increased brand awareness through strategic investments in media, advertising, and branding, and new premium product offerings while maintaining superior customer service and experience.

### 2. Accelerate Direct to Consumer Sales

In addition to the acquisition of Tuft & Needle, LLC in 2018, the Company has improved its position with direct-to-consumer offerings by deploying a refreshed e-commerce platform, with additional e-commerce platforms forthcoming for the Beautyrest® and Serta® brands.

### 3. Value Engineering and Product Simplification

The Company has delivered margin improvement by containing costs and executing a value engineering approach to optimize material content, resulting in enhanced unit economics and cost competitiveness, while maintaining the features, comfort, and quality of the product.

### 4. Quality Improvement

A reduction in the total cost of quality has occurred through a disciplined approach to product quality, improving the standard work instructions for mattress assembly, enhancing quality assurance training to ensure quality design for manufacturability, developing effective supplier partners to reduce material waste, and eliminating excess customer accommodations and returns.

### 5. Facility Network Optimization

The Company has taken steps to permanently reduce fixed cost structure while optimizing customer delivery performance by rationalizing and upgrading its manufacturing facility network. The Company continues to look for opportunities to rationalize its manufacturing footprint to deliver best-in-class service and increased flexibility for demand changes while reducing operational overhead.

### 6. Enhanced Management

The Company has bolstered its management team through key senior additions, including a new Chief Executive Officer in December 2021, and a new Chief Financial Officer in April 2022.

### D. Board of Managers and Officers

The Company is indirectly controlled by the board of managers of Dawn Intermediate (the "**Board**"). Each Debtor (other than Dawn Intermediate) is either a member-managed limited liability company or a corporation with its own board of directors. The current Board consists of nine (9) members:

| Name | Position |
| --- | --- |
| Jefferson Case | Director |
| George David | Director |
| Joan Hilson | Director |
| Shelley Huff | Director & Chief Executive Officer |
| Glenn Murphy | Director |
| David Porter | Chairman of the Board |
| Harvey Tepner | Director |
| Brandi Thomas | Director |
| Judith Toland | Director |

As discussed more fully below, on March 11, 2020, the Board established an independent finance committee of newly appointed independent managers of Dawn Intermediate (the "**Finance Committee**"). Members of the Finance Committee include managers Joan Hilson and Harvey Tepner.  Additional information regarding circumstances for establishing the Finance Committee and delegation of authority is discussed more fully in Section IV, below.

The composition of the Board of the Reorganized Parent (the "**New Board**") will be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code.  The initial New Board will be comprised of (i) the current chief executive officer of SSB, and (ii) additional members the number and identity of whom will be selected by the Requisite Consenting Creditors in consultation with the Company.

The Company's current senior management team consists of the following individuals:

| Name | Position |
|------|----------|
| Shelley Huff | Chief Executive Officer |
| John Linker | Chief Financial Officer |
| Kristen McGuffey | Chief Legal Officer and Secretary |
| Esther Ni | Chief Human Resources Officer |

###### E.   Capital Structure

###### 1.   Prepetition Indebtedness

The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.  The following table provides a summary of the Debtors' total debt, as described in more detail below.

| Facility | Maturity | Principal |
|----------|----------|-----------|
| Prepetition ABL Facility | Aug. 2023 | $0[6] |
| PTL Facility | Aug. 2023 | $1,027,012,999 |
| Non-PTL Term Loan Facility | Nov. 2023 | $862,297,855 |
| **Total Funded Debt:** | | **$1,889,310,854[7]** |

*Prepetition ABL Agreement*

Certain of the Debtors are party to the Prepetition ABL Agreement, pursuant to which the lenders from time to time party thereto (the "**ABL Lenders**") made available to the borrowers revolving credit loans, subject to a borrowing base availability, in an aggregate principal amount up to $200 million with a $40 million letter of credit sublimit.  The Prepetition ABL Facility is guaranteed by each of the guarantors party thereto and is secured, subject to certain exceptions and permitted liens, by (i) a first-priority security interest in the ABL Priority Collateral (as defined in the ABL Intercreditor Agreement (as defined below)) of each of the Debtors, which includes, among other things, cash, deposit accounts, accounts receivable, and inventory, and (ii) a second-priority security interest in the Term Loan Priority Collateral (as defined in the ABL Intercreditor Agreement) of each of the Debtors that is junior to the liens securing the Term

---

[6]   Calculation does not include the approximately $28,014,282 of issued but undrawn letters of credit.

[7]   Calculation excludes capital lease obligations in the approximate amount of $77,945,909.

Facilities (as defined below), which includes all material assets of the Debtors other than the ABL Priority Collateral, including all material real estate, equipment, intellectual property, and equity interests in their direct subsidiaries.

As of the Petition Date, under the ABL Credit Agreement, there are approximately $28,014,282 of issued but undrawn letters of credit, plus any applicable interest, fees, and other amounts outstanding, and no outstanding revolving credit loans.

*PTL Credit Agreement*

Certain of the Debtors are party to the PTL Credit Agreement, pursuant to which (i) the New Money Lenders made available to the borrowers the FLFO Term Loans, and (ii) the Exchanging Existing Lenders sold the Relevant Existing Term Loans to the relevant borrowers in exchange for the Initial FLSO Term Loans. The PTL Facility is guaranteed by each of the guarantors party thereto, and is secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the Non-PTL Term Loan Facility by (i) a first-priority lien on the Term Loan Priority Collateral of each of the Debtors, and (ii) a second-priority lien on the ABL Priority Collateral of each of the Debtors that is junior to the liens securing the Prepetition ABL Facility. As of the Petition Date, (i) the aggregate principal amount of FLFO Term Loans outstanding under the PTL Credit Agreement is approximately $195 million and (ii) the aggregate principal amount of FLSO Term Loans outstanding under the PTL Credit Agreement is approximately $832 million.

*Non-PTL Term Loan Agreement*

Certain of the Debtors are party to the Non-PTL Term Loan Agreement, pursuant to which the lenders from time to time party thereto made available to the borrowers term loans in an aggregate principal amount of $1.95 million. The Non-PTL Term Loan Facility is guaranteed by each of the guarantors party thereto, and is secured, subject to certain exceptions and permitted liens, on a *pari passu* basis with the PTL Facility by (i) a first-priority lien on the Term Loan Priority Collateral of each of the Debtors, and (ii) a second-priority lien on the ABL Priority Collateral of each of the Debtors that is junior to the liens securing the Prepetition ABL Facility. As of the Petition Date, the aggregate principal amount outstanding under the Non-PTL Term Loan Agreement was approximately $862.3 million.

*Intercreditor Agreements*

The relative rights and priorities of the PTL Lenders and the Non-PTL Term Loan Lenders in the collateral securing the obligations under the PTL Facility and the Non-PTL Term Loan Facility are governed by (i) that certain First Lien Intercreditor Agreement, dated as of June 22, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**First Lien Intercreditor Agreement**"), by and among each of the Debtors, the PTL Agent, the Non-PTL Term Loan Agent, and each other person party thereto from time to time, and (ii) the relative priorities and rights in the collateral of the PTL Lenders, the Non-PTL Term Loan Lenders, and the ABL Lenders are governed by that certain ABL Intercreditor Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**ABL Intercreditor Agreement**" and, collectively with the First Lien Intercreditor Agreement, the "**Intercreditor Agreements**").

The Intercreditor Agreements control the rights and obligations of the aforementioned holders with respect to, among other things, priority of interests in collateral, matters of debtor-in-possession financing, the use of cash collateral, and adequate protection. The ABL Intercreditor Agreement provides, among other things, that subject to certain requirements, no PTL Lender or Non-PTL Term Loan Lender may object to debtor-in-possession financing secured by, or the use of cash collateral constituting, ABL Priority Collateral (as defined in the ABL Intercreditor Agreement). *See* ABL Intercreditor Agreement, § 6.1.

*Capital Lease Obligations*

Certain of the Debtors are parties to certain capital leases.  The majority of such capital leases relate to real estate leases for the Company's headquarters and manufacturing plants, with the remaining capital leases relating to the Company's information technology business needs.  As of the Petition Date, the aggregate amount of obligations related to capital leases was approximately $77,945,909.

*Surety Bonds*

Surety bonds provide financial performance assurance to third parties on behalf of certain subsidiaries for obligations including, but not limited to, continuous customs bonds with the U.S. Customs and Border Protection Agency.  In the event of nonperformance by the applicable subsidiary, the beneficiary would make a claim to the surety, and the Company would be required to reimburse any payment by the surety. The Company's liability with respect to any surety bond is released once the obligations secured by the surety bond are performed. Surety bond providers generally have the right to request additional collateral or request that such bonds be replaced by alternate surety providers, in each case upon the occurrence of certain events.  As of the Petition Date, the aggregate amount of surety bonds outstanding was approximately $1.5 million, which obligations are partially collateralized by letters of credit in the approximate amount of $750,000.

*Ongoing General Unsecured Claims*

As of the Petition Date, the Debtors owe approximately $150 million in respect of trade debt and other potential liabilities.  As noted above, except to the extent that a holder of an Allowed Ongoing General Unsecured Claim agrees to less favorable treatment, if a holder of an Allowed Ongoing General Unsecured Claim executes a trade agreement providing for the continuation of goods or services on the same or better terms as existed as most favorable terms provided to the Debtors in the six (6) months prior to the Petition Date (the form and terms of such agreement to be determined by the Debtors), on and after the Effective Date, or as soon as reasonably practical thereafter, such holder of an Allowed Ongoing General Unsecured Claim shall receive no more than four (4) Cash installments, which payments shall result in full payment in the Allowed amount of such Ongoing General Unsecured Claim on no better terms than payment in the ordinary course of business.

*Other General Unsecured Claims*

As of the Petition Date, the Debtors owe approximately $30 million in respect of general unsecured claims and other potential liabilities, exclusive of Ongoing General Unsecured Claims.  As noted above, except to the extent that a holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table.

## 2.      Equity Ownership

The Debtors' direct or indirect parent is Dawn Holdings.  Advent owns approximately 60% of the equity in Dawn Holdings.  The remaining equity is owned by, among other holders, Ares, OTPP, certain current and former employees and directors of the Company, and the founders and other prior owners of Tuft & Needle, LLC.  As of the Petition Date, Dawn Holdings has 334,939 issued and outstanding shares of common stock.

A chart illustrating the Debtors' organizational structure is attached to this Disclosure Statement as **Exhibit D**.

> ### 3.      Cash and Cash Equivalents

As of the Petition Date, the Debtors hold approximately $159.6 million in cash in their bank accounts, and substantially all of the Debtors' cash is secured by a first priority lien in favor of ABL Lenders.

> ### F.      Litigation

> ### 1.      Arbitration with Minority Licensees

As discussed above, SSB and NBC own approximately 82% of non-Debtor affiliate Serta, Inc.  The remaining approximately 18% is owned by the Minority Licensees.  Several disputes have arisen between the parties in recent years, driven by claims that SSB and NBC's management of the Serta, Inc. brand has allegedly favored SSB's Simmons' other mattress brands over the Serta® brands.  SSB and NBC deny those allegations.

In December 2020, SSB and NBC were named as respondents in an arbitration by the Minority Licensees, alleging, among other things, breach of fiduciary duty, antitrust violations, breach of contract, tortious interference with contracts and prospective business relationships, and certain violations of the Sherman Antitrust Act.  The Minority Licensees seek monetary relief in an amount to be determined and certain non-monetary forms of relief.  The case styled *AW Industries, Inc. et al. v. Serta Simmons Bedding LLC*, et al. Case No. 01200093145 is currently before the American Arbitration Association.  As noted, SSB and NBC deny the allegations made.

In January 2021, the parties agreed to stay the arbitration to attempt to resolve their claims through mediation; however, these negotiations ultimately proved unsuccessful, and a definitive agreement was never reached.  On September 8, 2022, the Minority Licensees notified the American Arbitration Association that they intended to recommence the arbitration.  On November 14, 2022, the Minority Licensees filed an amended arbitration demand asserting most of the same claims (excluding the antitrust and tortious interference claims), which are disputed by the Company.

The arbitration is currently pending, and if the arbitration proceeds, SSB and NBC expect to file an answering statement to the Minority Licensees' amended demand as well as counterclaims against the Minority Licensees.  The arbitration with the Minority Licensees is stayed during the pendency of these Chapter 11 Cases.

> ### 2.      2021 LCM Litigation

In July 2020, SSB and certain of the PTL Lenders were sued by Non-PTL Term Loan Lenders LCM XXII LTD and certain related funds advised by LCM Asset Management LLC in the United States District Court for the Southern District of New York, asserting that the 2020 Transaction constituted a breach of contract and a breach of the implied covenant of good faith and fair dealing.  In March 2021, the United States District Court for the Southern District of New York dismissed the plaintiffs' suit on lack of subject matter jurisdiction.

In May 2021, the LCM plaintiffs refiled their claims in federal court, naming SSB as the sole defendant to resolve the jurisdictional issue.  In the re-filed lawsuit, the plaintiffs alleged, among other things, that entry into the 2020 Transaction violated the terms of the Non-PTL Term Loan Agreement and the implied covenant of good faith and fair dealing (the "**2021 LCM Litigation**").  In March 2022, the defendants'

motion to dismiss was denied.  The lawsuit is currently pending in the United States District Court for the Southern District of New York but is stayed as a result of the automatic stay.

### 3.    2022 Non-PTL Term Loan Lenders Litigation

In June 2020, SSB and certain of the PTL Lenders were sued by certain of the Company's Non-PTL Term Loan Lenders, including funds managed by Angelo, Gordon Management LLC, and Gamut Capital Management LP in the Supreme Court of the State of New York, seeking an injunction to prohibit SSB from completing the 2020 Transaction.  Apollo Management Holdings, L.P. ("**Apollo**") was also a party to the litigation against the Debtors, despite there being a dispute as to whether Apollo is considered a disqualified institution and therefore disallowed to hold a loan under the Non-PTL Term Loan Agreement.  The Supreme Court of the State of New York denied this request and the 2020 Transaction was effectuated.  The plaintiffs were subsequently allowed to dismiss their lawsuit in state court without prejudice.

In November 2022, SSB and certain of the PTL Lenders were again sued by certain of the Company's Non-PTL Term Loan Lenders, including funds managed by Angelo, Gordon Management LLC, Gamut Capital Management LP, Contrarian Capital Management, L.L.C., Alcentra NY LLC, and Z Capital Group L.L.C., alleging, among other things, that entry into the 2020 Transaction violated the terms of the Non-PTL Credit Agreement and the implied covenant of good faith and fair dealing (the "**2022 Non-PTL Term Loan Lenders Litigation**").  Apollo was also a party to the litigation against the Debtors, joining in all claims and also seeking a declaratory judgment requiring SSB to execute assignments of loans under the Non-PTL Term Loan Agreement.  The lawsuit is currently pending in New York state court but is stayed as to SSB as a result of the automatic stay.  SSB has moved in the Bankruptcy Court to extend the automatic stay to its co-defendants, the PTL Lenders.

### 4.    Other Litigation

Certain Debtors are named as defendants from time to time in other routine litigation proceedings.  The Debtors, however, cannot predict with certainty the outcome or effect of the resolution of claims arising from pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from their current estimates.

**IV.**
**KEY EVENTS LEADING TO**
**THE COMMENCEMENT OF CHAPTER 11 CASES**

### A.    Challenges Facing Debtors' Business

Many of the Debtors' financial challenges mirror those in the downturn of the mattress industry generally.  The U.S. bedding industry has been subject to significant disruptions recently, including a decline in industry demand beginning in 2022 as a result of slower economic growth caused by recent geopolitical and macroeconomic uncertainty as well as reduced consumer spending from higher interest rates.  Prior to the demand headwinds, the industry faced significant inflation in raw material costs, supply chain disruptions, as well as the adverse market effects created by the COVID-19 pandemic.  While the fundamentals of the Debtors' business remain strong, the Debtors are facing significant debt maturities in 2023.  Accordingly, the Debtors filed these chapter 11 cases to implement a comprehensive financial restructuring that will result in a reduction of the Company's total debt of approximately $1.59 billion and allow it to continue operating as a going concern with a substantially healthier balance sheet.

**B.**      **Finance Committee Appointed to Oversee Strategic Process**

On March 11, 2020, the Board established the Finance Committee to (i) consider, evaluate, and recommend to the Board to pursue a restructuring transaction on behalf of the Company, and (ii) oversee discussions with the Company's stakeholders and the implementation and execution of any transaction that has been approved by the Board.  On June 3, 2020, the Board delegated additional transaction authority to the Finance Committee with respect to a restructuring transaction process, including with respect to: (i) approval of any transaction, action or agreement or transaction in furtherance thereof on behalf of the Board; (ii) discussions and negotiations with stakeholders of Dawn Intermediate and its subsidiaries in respect of a transaction; (iii) implementation and execution of a transaction and all related documentation thereto, including with respect to the marketing of Dawn Intermediate's assets and any bids or proposals submitted in connection with the transaction; (iv) analysis and, if applicable, resolution of claims or causes of action in favor of Dawn Intermediate in connection with a transaction; (v) authorizing or instructing the Company's advisors to discuss and negotiate the terms of a transaction with potential counterparties and Dawn Intermediate's stakeholders; and (vi) such other actions as the Finance Committee considers necessary or desirable in order to carry out its mandate.

**C.**      **2020 Transaction**

In April 2020, SSB solicited proposals from and entered into separate discussions with potential lenders, including the New Money Lenders, to explore alternatives for raising liquidity and reducing its debt and interest expense.  The Company analyzed multiple proposals and negotiated with numerous lender groups before ultimately selecting, with the approval of the Finance Committee, the transaction discussed below. On June 8, 2020, SSB announced it had entered into the 2020 Transaction.

**D.**      **Prepetition Strategic Efforts**

Prior to filing these Chapter 11 Cases, the Company explored and evaluated potential strategic transactions, including potentially developing and implementing a comprehensive plan to restructure the Company's balance sheet, whether in-court or out-of-court, with the help of advisors Weil, Gotshal & Manges LLP ("**Weil**") as counsel, Evercore Group, L.L.C. ("**Evercore**"), as investment banker, and FTI Consulting, Inc. ("**FTI**"), as financial advisor (collectively, the "**Advisors**").  The Finance Committee did not retain additional financial advisors or additional legal counsel.

As a result of the challenges discussed above (among other factors), the Debtors determined they would not be able to generate sufficient earnings to service its debt and maintain operations without additional liquidity and/or reducing its debt burden.  The Company and its Advisors began to evaluate balance sheet restructuring options.

**1.**      **Refinancing Efforts**

Prior to filing these Chapter 11 Cases, the Debtors attempted to address their capital structure and upcoming debt maturities without a comprehensive in-court restructuring.  In April 2022, the Debtors, through their investment banker, Evercore, initiated outreach to approximately twenty (20) potential third-party financing parties seeking a maturity extension transaction to refinance its existing capital structure.  The Debtors did not receive any proposals through this competitive financing process.  Accordingly, the Company shifted its focus to engagement with its current lenders regarding the terms of a comprehensive restructuring.

## 2.    Restructuring Negotiations

In the months preceding the Chapter 11 Cases, the Company and its advisors engaged in extensive negotiations with members of an ad hoc group of PTL Lenders (the "**PTL Lender Group**") and its advisors regarding a go-forward business plan and restructuring transaction, which ultimately culminated in the execution of the Restructuring Support Agreement, pursuant to which the Debtors, Consenting Creditors and the Consenting Equity Holders (collectively, the "**Consenting Parties**") have agreed to support the Restructuring.

In September 2022, the Company and its Advisors began actively engaging in discussions and negotiations regarding restructuring alternatives with (i) the PTL Lender Group, which is represented by Gibson, Dunn & Crutcher LLP, as legal counsel, and Centerview Partners LLC, as investment banker (the "**PTL Advisors**"), (ii) an ad hoc group of Non-PTL Term Loan Lenders under the Non-PTL Term Loan Facility (the "**Non-PTL Term Loan Lender Group**") represented by Paul, Weiss, Rifkind, Wharton & Garrison LLP, as legal counsel, and PJT Partners, Inc., as investment banker (the "**Non-PTL Advisors**", and together with the PTL Advisors, the "**Lender Group Advisors**").

In October 2022, the Lender Group Advisors executed non-disclosure agreements and received access to a virtual data room maintained by the Company containing over 19,000 pages for the purpose of assessing a potential restructuring transaction.

On November 1, 2022, certain members of the PTL Lender Group executed non-disclosure agreements (the "**PTL Holder NDAs**") with the Debtors.  On November 2, 2022, the Debtors held in-person meetings in New York attended by certain members of the PTL Lender Group and the PTL Advisors for the purpose of, among other things, meeting with the Debtors' management team and discussing the Debtors' recent and projected financial performance.

On November 3, 2022, the Non-PTL Term Loan Lender Group filed a complaint commencing the 2022 Non-PTL Term Loan Lenders Litigation against SSB and the PTL Lender Group.  On the same day that this litigation was commenced, the Non-PTL Term Loan Lender Group sent a restructuring proposal to the PTL Lender Group.  This restructuring proposal was not deemed actionable by the PTL Lender Group.  In light of the 2022 Non-PTL Term Loan Lenders Litigation, the Company revoked the data room access of the Non-PTL Advisors.

Upon the commencement of the 2022 Non-PTL Term Loan Lenders Litigation, the Debtors focused their restructuring efforts with the PTL Lender Group.

Following the November 2, 2022, meeting with the PTL Lender Group, the Debtors and their Advisors continued working with the PTL Lender Group and the PTL Advisors to respond to information and diligence requests regarding the Debtors and their business plan, so as to inform the framework for a potential restructuring.  The Company received and exchanged several term sheets with the PTL Lender Group regarding the Company's potential restructuring and plans regarding upcoming maturities.  During this time, the Debtors and PTL Lender Group engaged in ongoing negotiations and discussions regarding the terms of a potential settlement with the Non-PTL Term Loan Lenders.  To that end, in December 2022, the PTL Lender Group delivered a settlement counterproposal to the Non-PTL Term Loan Lender Group, following which four (4) of the Non-PTL Term Loan Lender Group holders signed non-disclosure agreements with the Company to receive diligence in connection with such proposal.

The Company's business-plan diligence with the PTL Advisors and PTL Lender Group continued for nearly five (5) months, from September 2022 through January 2023.  The Debtor held several diligence sessions with the PTL Lender Group and PTL Advisors to elaborate on, among other topics: (i) expected views of

the bedding market in 2023 to 2024, (ii) the Company's 2023 budget and long-range business plan, (iii) pricing, product mix, and channel engagement strategies, (iv) ongoing and planned cost-saving actions, and (v) value-accretive capital expenditure projects. The Company and its Advisors also comprehensively addressed over one hundred (100) diligence questions by the PTL Lender Group and PTL Advisors in an effort to instruct them on various aspects of the Debtor's go-forward business plan.

On January 17, 2023, an approximate $11.9 million interest payment became due under the PTL Credit Agreement. The Company elected not to pay such interest and instead utilized the five (5) day grace period under the PTL Credit Agreement in order to preserve liquidity and continue negotiations with stakeholders.

### 3. Debtor-in-Possession Financing Negotiations

In parallel with the restructuring transaction negotiations, and as further detailed in the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting (A) Liens and Providing Claims with Superpriority Administrative Expense Status and (B) Adequate Protection to Certain Prepetition Lenders, (III) Modifying Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* (Docket No. 11) (the "**DIP Motion**"), in November 2022 the Debtors launched a solicitation process to obtain debtor-in-possession financing and the consensual use of cash collateral to fund these Chapter 11 Cases.

Over the course of the solicitation process, the Debtors and its Advisors contacted existing lenders, traditional lenders, and alternative lenders. In the outreach, twenty-two (22) parties were contacted, of which eleven (11) parties executed non-disclosure agreements.

The Debtors were able to secure postpetition financing (the "**DIP Financing**") in the form of a superpriority senior secured debtor-in-possession credit facility in an aggregate principal amount of $125 million (the "**DIP Facility**"), to be led by Eclipse Business Capital LLC ("**Eclipse**"). On the Effective Date, claims under the DIP Facility will be converted on a dollar-for-dollar basis into obligations under or refinanced by the Exit ABL Facility, to be used by the reorganized Company to fund its working capital needs.

### 4. Prepetition Compensation Program

Upon the recommendation of the Finance Committee and the compensation committee of Dawn Holdings (the "**Compensation Committee**"), the Board approved the implementation of a Key Employee Retention Program (the "**KERP**") on July 18, 2022, for two hundred and ten (210) employees of SSB, with a capped discretionary pool for any other employees whose roles were significantly expanded as a result of any potential restructuring of SSB. The KERP was designed to retain key employees of SSB in their current roles over the near term while providing them with financial stability. Pursuant to the KERP, these key employees must continue their employment with SSB for approximately twelve (12) months after executing an agreement under the KERP (the "**Retention Date**") or they will forfeit the full amount of the retention payment. If, before the Retention Date, a KERP participant is terminated for cause or voluntarily terminates their employment with SSB without good reason (other than as a result of death or disability), such participant must repay their KERP payment in full.

### E. Restructuring Support Agreement and Plan

As noted above, following months of extensive, arms' length negotiations, the Debtors reached an agreement with the Consenting Parties and memorialized their support for the Restructuring in the Restructuring Support Agreement.[8] The terms of the Restructuring are reflected in the Plan. Upon its full

---

[8]   The Restructuring Support Agreement is attached hereto as **Exhibit B**.

implementation, the Plan will effect a significant deleveraging of the Debtors' capital structure by reducing the Company's total debt by approximately $1.59 billion.  The reduced debt burden and exit financing anticipated under the Plan will provide the Debtors with sufficient liquidity, not only to continue funding their operations, but to make the necessary capital expenditures and investments to ensure that the Company will remain an industry leader in mattresses, as well as resolve pending disputes and ongoing litigation with certain of its significant creditors.

Upon the Effective Date, the provisions of the Plan, including the settlement of all Claims, Interests, and controversies among the Debtors and the Consenting Parties given in consideration of the value provided to the Estates by the Consenting Parties (the terms of which are set out in the Restructuring Support Agreement and incorporated by reference in the Plan), shall constitute an integrated and global good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest, including pursuant to the transactions set forth in the Restructurings Transactions Exhibit.  Specifically, in relation to matters relating to the Consenting Equity Holders, the Restructuring Support Agreement provides for certain treatment and consideration in exchange for their support for the Restructuring, as part of a global settlement and waiver of their claims or interests, and if the Restructuring Transactions Exhibit includes the Redemption (as defined herein), agreement that the Debtors will pay the Consenting Equity Holders Cash in the amount of $1.7 million, including the Consenting Equity Holder Fees and Expenses, subject to the terms of the Restructuring Support Agreement; *provided*, that if the debtors do not pursue the Redemption (as defined herein), the Debtors will still pay the Consenting Equity Holder Fees and Expenses also subject to the terms of the Restructuring Support Agreement.

### F.    Implementation and Potential Transaction Structures

Subject to the outcome of negotiations with certain parties in interest, including the Consenting Creditors and holders of Intermediate Equity Interests, the Plan will be implemented in the most favorable transaction structure as set forth in the Restructuring Transactions Exhibit.  Such potential structures may include:

- Redemption or distribution on equity: a cash distribution by SSB in complete redemption of its existing equity held by Dawn Intermediate (with Dawn Intermediate in turn distributing the proceeds to its existing equity holder, Dawn Holdings) concurrently with SSB issuing the New Common Interests.

- Asset sale transaction: an actual or deemed sale of the assets of SSB and its subsidiaries to an unrelated corporation (to be indirectly owned by certain holders of Claims).

### V.
### ANTICIPATED EVENTS
### DURING THE CHAPTER 11 CASES

The Debtors are operating their businesses in the ordinary course during the pendency of the Chapter 11 Cases, which are being jointly administered for procedural purposes only pursuant to section 1015(b) of the Bankruptcy Code.  As described more fully below, on the Petition Date, the Debtors filed various motions seeking important and urgent relief from the Bankruptcy Court.

### A.    Commencement of the Chapter 11 Cases and First Day Motions

On the Petition Date, the Debtors filed multiple motions seeking various relief from the Bankruptcy Court and authorizing the Debtors to maintain their operations in the ordinary course.  Such relief is designed to

ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations.  The following is a brief overview of the substantive relief the Debtors are seeking on the Petition Date to maintain their operations in the ordinary course.

### 1.    Cash Management System

The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the various Debtors (and non-Debtors).  On the Petition Date, the Debtors intend to seek authority to continue the use of their existing cash management system, bank accounts, and related business forms, as well as to continue their intercompany arrangements to avoid disruption in the Debtors' operations and facilitate the efficient administration of the Chapter 11 Cases.  Among other things, the Debtors are seeking relief to continue their credit card and P-Card programs which, on average, the Debtors expect to incur approximately $1.4 million per month.  The Debtors also seek to allow to continue cash management arrangements among the Minority Licensees and NBC, which manages invoicing and cash collections from sales of Serta® branded product to national account customers, including sales of mattresses that are made by the Minority Licensees for distribution to locations in their respective territories.

### 2.    Debtor-in-Possession Financing

To address their working capital needs and fund their reorganization efforts, on the Petition Date, the Debtors are seeking approval of an agreement with Eclipse, as administrative agent (in such capacity, the "**DIP Agent**"), to provide a postpetition superpriority senior secured asset-based revolving loan facility (the "**DIP Facility**") in an aggregate principal amount of up to $125 million.  The interim order seeking approval of the DIP Facility reflects an agreement between and among the Debtors and the Prepetition Secured Creditors regarding the use of Cash Collateral (as defined in section 363(a) of the Bankruptcy Code), and the terms of adequate protection to be provided to certain parties.

### 3.    Critical Vendor

In the ordinary course of business, the Debtors rely upon a variety of vendors and service providers. Pursuant to the Plan, the Debtors intend to continue paying vendors and service providers who execute a trade agreement for the continuation of goods or services, in the ordinary course on the same or better terms as existed prior to the Petition Date.  To avoid the detrimental effects of potential actions taken by the Debtors' vendors and service providers, and to minimize any disruption to the Debtors' operations, the Debtors are seeking authority to pay the prepetition amounts owed to certain vendors and service providers who execute such trade agreements.  Additionally, the Debtors are also seeking authority to pay in the ordinary course certain domestic and international royalties payable to Minority Licensees on account of each of their respective portions of the royalties in accordance with the relevant governing documents.

### 4.    Taxes

Pursuant to the Plan, the Debtors intend to pay all taxes and fees in full to various taxing and regulatory authorities.  To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date, the Debtors are seeking authority to pay all taxes, fees, and similar charges and assessments, whether arising pre- or postpetition, to the appropriate taxing authorities in the ordinary course of the Debtors' businesses.

### 5.        Utilities

In the ordinary course of business, the Debtors incur certain expenses related to the essential utility services, such as electricity, telecommunications, natural gas, water, waste disposal, and other similar services.  On the Petition Date, the Debtors are seeking authority to provide such utility providers with adequate assurance in the amount of approximately $491,000 to be held in a segregated account and approval of procedures for resolving objections relating to the adequacy of the proposed adequate assurance.

### 6.        Insurance

In connection with the operation of the Debtors' businesses, the Debtors maintain various insurance policies designed to protect their property, assets, key personnel, and business operations.  The types of insurance policies maintained by the Debtors include general liability, excess liability, directors' and officers' liability, fiduciary liability, workers' compensation, property, and crime.  The Debtors are also obligated to provide certain surety bonds to the U.S. Customs and Border Patrol Agency.  The maintenance of certain insurance coverage and provision of surety bonds is essential to the Debtors' operations and is required by laws, various regulations, financing agreements, and contracts.  The Debtors believe that the satisfaction of their insurance and surety obligations, whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with their insurance providers and ensure the continued availability and commercially-reasonable pricing of such insurance coverage and surety bonds.  Accordingly, on the Petition Date, the Debtors are seeking authority to continue to honor their insurance obligations in the ordinary course.

### 7.        Employee Wages and Benefits

The Debtors' businesses rely upon approximately 3,600 employees throughout the United States. Generally, members of the Debtors' workforce rely upon their compensation to meet their daily living expenses and various healthcare and other benefits to access ordinary and critical healthcare needs. Additionally, the Debtors engage with various third-parties to administer the payment of wages and payroll taxes, and the maintenance of employee benefits.  To minimize the uncertainty and potential distractions associated with their Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, on the Petition Date, the Debtors are seeking authority to continue to honor their obligations to their workforce in the ordinary course of business, including (i) the payment of pre- and postpetition wages, salaries, and reimbursable employee expenses, (ii) the payment of pre- and postpetition wages of independent contractors and their supplemental workforce, (iii) the payment of pre- and postpetition accrued and unpaid employee benefits, and (iv) the continuation of certain of the Debtors' benefit and incentive programs and policies.  The Debtors are not seeking authority to pay or honor any prepetition obligations on account of any severance payments or any severance payments to insiders.

### 8.        Customer Programs

In connection with the operation of the Debtors' businesses, the Debtors engage in certain customary activities to develop and sustain positive relationships with their customers.  The Debtors have implemented various customer-related programs designed to ensure their satisfaction and loyalty, increase sales, respond to competitive pressures, improve profitability, and generate goodwill for the Debtors and their products. The customer programs are integral to the Debtors' efforts to stabilize their businesses, promote the continuity and continued vitality of the Debtors' businesses, and ultimately deliver the most value to all stakeholders in the Chapter 11 Cases.  Accordingly, on the Petition Date, the Debtors are seeking authority to continue the customer programs in the ordinary course of business and to perform and honor their prepetition obligations thereunder.

### 9. Carryforwards of Net Operating Losses

On the Petition Date, the Debtors are seeking approval of procedures to protect the potential value of the Debtors' carryforwards of net operating losses ("**NOLs**"), disallowed and deferred business interest expense, and certain other tax benefits (including certain state tax attributes) (collectively, the "**Tax Attributes**") for use during the Chapter 11 Cases and in connection with the reorganization of the Debtors.

### 10. Other Procedural Motions and Retention of Professionals

The Debtors have filed various motions regarding procedural matters that are common to chapter 11 cases of similar size and complexity as these Chapter 11 Cases, seeking authority to, among other things:

- Jointly administer the Debtors' estates;

- File a consolidated creditor matrix and list of thirty (30) largest unsecured creditors; and

- Establish a schedule of key dates and hearings in these chapter 11 cases.

### B. Retention of Chapter 11 Professionals

The Debtors have filed, or intend to file, several applications and obtained authority to retain various professionals to assist the Debtors in carrying out their duties under the Bankruptcy Code during the Chapter 11 Cases. These professionals include: (i) Evercore, as investment banker, (ii) FTI, as financial advisors, (iii) PricewaterhouseCoopers, LLP ("**PWC**"), as audit and tax services advisor, (iv) Epiq Corporate Restructuring, LLC ("**Epiq**"), as claims, noticing and solicitation agent, and (v) Weil, as legal counsel.

### C. Confirmation Hearing

Subsequently to filing the Plan, the Debtors will seek an order of the Bankruptcy Court (i) conditionally approving the Disclosure Statement, (ii) scheduling a combined hearing to consider the adequacy of this Disclosure Statement and the Solicitation in connection herewith and confirmation of the Plan, and (iii) granting other related relief. The Debtors anticipate that notice of these hearings will be published and mailed to all known holders of Claims and Interests as ordered by the Bankruptcy Court before the date by which objections must be filed with the Bankruptcy Court.

### D. Commencement of Adversary Proceedings

Concurrently with the commencement of these Chapter 11 Cases, the Debtors and certain PTL Lenders are commencing an adversary proceeding (the "**2020 Transaction Adversary Proceeding**") with the aim of comprehensively resolving the claims against the Debtors and PTL Lenders arising from pending or future litigation related to the 2020 Transaction, including any claims alleged within the 2021 LCM Litigation and the 2022 Non-PTL Term Loan Lenders Litigation. The 2020 Transaction Adversary Proceeding seeks a declaratory judgment that the 2020 Transaction was valid under the terms of the Non-PTL Term Loan Agreement, that the 2020 Transaction was completed as an open market purchase, and that the 2020 Transaction was not entered into in bad faith. A ruling in the 2020 Transaction Adversary Proceeding should provide issue preclusion in the pending and any future litigation over the validity of the 2020 Transaction.

In addition to the 2020 Transaction Adversary Proceeding and concurrently with the commencement of these Chapter 11 Cases, the Debtors are filing (i) an adversary complaint against the plaintiffs in the 2022 Non-PTL Term Loan Lenders Litigation, and (ii) an emergency motion seeking to extend the automatic stay to certain non-Debtor parties, including the PTL Lenders, in the 2022 Non-PTL Term Loan Lenders

Litigation and to enjoin the litigation (collectively, the "**Automatic Stay Extension Adversary Proceeding**").

        E.        **Timetable for the Chapter 11 Cases**

In accordance with the Restructuring Support Agreement and DIP Facility, the Debtors have agreed to proceed with the implementation of the Plan through the Chapter 11 Cases. Among the Milestones contained in the Restructuring Support Agreement and DIP Facility is the requirement that the Bankruptcy Court enter the order confirming the Plan no later than June 5, 2023. The Restructuring Support Agreement and DIP Facility also requires that the Effective Date occur no later than June 6, 2023. Although the Debtors will request that the Bankruptcy Court approve a timetable consistent with the Restructuring Support Agreement and DIP Facility, there can be no assurance that the Effective Date will occur on such timetable. In accordance with these documents, on the Petition Date the Debtors filed a motion seeking establish a schedule of key dates and hearings in these chapter 11 cases.

**VI.**
**TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAW**

The issuance of, and distribution under, the Plan of New Common Interests will be issued without registration under the Securities Act or any similar federal, state, or local law. The issuance, and distribution of the New Common Interests to holders of FLFO Claims, FLSO Claims, and Non-PTL Term Loan Claims, as applicable, under Article IV of the Plan shall be exempt, without further act or actions by any legal entity, from registration under the Securities Act and all rules and regulations promulgated thereunder to the fullest extent permitted by section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale pursuant to a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the New Common Interests will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to the New Common Interests such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Resales of New Common Interests by holders deemed to be "underwriters" (which includes controlling persons of the issuer) are not exempted by Section 1145 of the Bankruptcy Code from registration under the Securities Act or other applicable law, even though such securities are not "restricted" securities. Notwithstanding the foregoing, under certain circumstances, control person underwriters may be able to

23

sell securities without registration pursuant to the resale limitations of Rule 144 under the Securities Act which permits the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions. Whether any particular person would be deemed to be an "underwriter" (including whether the person is a control person of the issuer) with respect to the New Common Interests would depend upon various facts and circumstances applicable to that person. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisors as to the availability of the exemption provided by Rule 144.

To the extent certificated, certificates evidencing the New Common Interests held by holders of 10% or more of the outstanding New Common Interests, or who are otherwise underwriters as defined in Section 1145(b) of the Bankruptcy Code, will bear a legend substantially in the form below:

**THE SECURITIES REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED IN ACCORDANCE WITH THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER AND, IN EACH CASE, IN COMPLIANCE WITH APPLICABLE FEDERAL AND STATE SECURITIES LAWS.**

Recipients of New Common Interests issued under the Plan are advised to consult with their own legal advisors as to the availability of any such an exemption from registration requirements under state law in any given instance and as to any applicable requirements or conditions to such availability.

Upon the Effective Date of the Plan, the New Common Interests will not be publicly traded or listed on any national securities exchange. Accordingly, no assurance can be given that a holder of such securities will be able to sell such securities in the future or as to the price at which any sale may occur.

Should the Reorganized Debtors elect on or after the Effective Date to reflect any ownership of the New Common Interests through the facilities of the DTC, the Reorganized Debtors need not provide any further evidence other than the Plan or the Confirmation Order with respect to the treatment of the New Common Interests under applicable securities laws.

Notwithstanding anything to the contrary in the Plan, no entity (including, for the avoidance of doubt, DTC) shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including, for the avoidance of doubt, whether the New Common Interests is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services. The Confirmation Order shall provide that DTC shall be required to accept and conclusively rely upon the Plan or Confirmation Order in lieu of a legal opinion regarding whether the New Common Interests is exempt from registration and/or eligible for DTC book-entry delivery, settlement, and depository services.

## VII.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Claims. This summary does not address the U.S. federal income tax consequences to holders of Claims whose Claims are entitled to payment in full in Cash, or holders of Claims who are deemed to have accepted or rejected the Plan.

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed U.S. Treasury Regulations thereunder (the "**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**") all as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis. Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  The Debtors have not requested a ruling from the IRS with respect to any of the tax aspects of the Plan.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position from any position discussed herein.

This summary does not address foreign, state, local, gift or estate tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders of Claims in light of their individual circumstances or to a holder that may be subject to special tax rules (such as any person who is not a U.S. Holder (as defined below), as well as broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement, and other tax-deferred accounts, S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, U.S. Holders whose functional currency is not the U.S. dollar, and persons who use the accrual method of accounting and report income on an "applicable financial statement"). Additionally, this discussion does not address the Foreign Account Tax Compliance Act, U.S. federal taxes other than income taxes, the alternative minimum tax, or the "Medicare" tax on net investment income, nor does it apply to any person that acquires the New Common Interests or the New Term Loans in the secondary market or otherwise not pursuant to the Plan.

The discussion assumes that all FLFO Claims, FLSO Claims, Non-PTL Term Loan Claims, and Other General Unsecured Claims are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the Tax Code (unless otherwise indicated), and that such Claims will be respected as debt for U.S. federal income tax purposes in accordance with their form.

The Debtors currently contemplate, and the following discussion assumes, that (i) Reorganized Parent will be the existing SSB limited liability company entity (and not a reincorporated entity or a new entity) and will be the common parent of the post-emergence consolidated tax group, and (ii) each of the Reorganized Debtors that are currently treated as entities disregarded as separate from SSB for U.S. federal income tax purposes will continue to be disregarded as separate from SSB following the Effective Date (the "**Current Structure**").  However, under the Plan, the definition of "Reorganized Parent" allows for alternative structures, including the possibility that Reorganized Parent could be a different entity that acquires the assets or equity of the existing SSB.  Any deviations from the Current Structure could materially change the U.S. federal income tax consequences of the Plan to the Debtors and holders of Claims described herein.

***The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon a holder's individual circumstances.  Holders of Claims are urged to consult their own tax advisor with respect to the U.S. federal, state, local, and other tax consequences applicable under the Plan.***

A.      **Consequences to the Debtors**

Each of the Debtors is either a member of an affiliated group of corporations that files consolidated U.S. federal income tax returns with Dawn Holdings as the common parent (such group, the "**Dawn Group**") or an entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Dawn Group.  The Debtors estimate that, as of January 1, 2023, the Dawn Group has consolidated U.S. federal NOL carryforwards of approximately $75.0 million, among other tax attributes (including tax basis in assets), and disallowed business interest expense carryovers under Section 163(j) of the Tax Code ("**Section 163(j) Carryforwards**") of approximately $290.0 million.   However, the amount of any NOL carryforwards, Section 163(j) Carryforwards and other U.S. federal tax attributes, as well as the application of any limitations on the use thereof, remain subject to review and adjustment by the IRS. Further, as discussed below, in connection with and as a result of the implementation of the Plan, it is anticipated that the Debtors' remaining NOLs and certain other tax attributes (other than Section 163(j) Carryforwards) will be significantly reduced or eliminated.

1.      **The Restructuring Transactions**

Pursuant to the Plan, the Debtors will engage in certain restructuring transactions set forth in the Restructuring Transactions Exhibit.  As a result of such transactions, which are expected to include (and herein assumed to include, unless otherwise indicated) (1) the issuance of New Common Interests and (2) a distribution of cash and/or other property by SSB in complete redemption of its equity interests held by Dawn Intermediate (the "**Redemption**"), SSB and the members of the Dawn Group owned directly or indirectly by SSB will cease to be members of the Dawn Group (and the taxable years of such entities will end) effective at the end of the day on the Effective Date, and will become members of a new SSB consolidated tax group.

As a result of the Redemption, Dawn Holdings is expected to recognize taxable loss equal to the difference between the amount of consideration received in the Redemption and Dawn Holdings' adjusted basis in the equity interests of SSB. Such loss is expected to be a capital loss that, to the extent not used in the current taxable year, is generally eligible to be carried back to the three taxable years of the Dawn Group preceding the taxable year in which the loss is recognized and carried forward to each of the five taxable years of the Dawn Group succeeding the taxable year in which the loss is recognized.  The amount of such capital loss will first be carried to the earliest of the taxable years to which it may be carried, and any remaining portion will be carried successively to subsequent taxable years to which such loss may be carried.  It is expected that the Dawn Group will carry back such capital loss to offset capital gain that the Dawn Group recognized in its 2021 taxable year, which is expected to result in a substantial refund of U.S. federal income tax previously paid with respect to such gain.

It is possible that the Restructuring Transactions Exhibit will not include the Redemption, and instead may contemplate alternative restructuring transactions.  For example, the Restructuring Transactions Exhibit may include an actual or deemed sale of the assets of SSB and its subsidiaries to an unrelated corporation (to be indirectly owned by certain holders of Claims).  If the Restructuring Transaction Exhibit includes such an actual or deemed asset sale or one or another alternative transactions, the U.S. federal income tax consequences to the Debtors and holders of Claims would be materially different from those discussed herein.

### 2.   Cancellation of Debt Income

In general, absent an applicable exception, a taxpayer will realize and recognize any cancellation of debt ("**COD**") income upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The amount of COD income is generally the excess of (a) the "adjusted issue price" (within the meaning of the Treasury Regulations) of the indebtedness satisfied, over (b) the sum of (i) the amount of cash paid, (ii) the issue price of any new indebtedness issued by the taxpayer, and (iii) the fair market value of any other non-cash consideration (including, for this purpose, New Common Interests), in each case, given in satisfaction of such indebtedness at the time of the exchange.  Unless an exception or exclusion applies, COD income constitutes taxable income like any other item of taxable income.

Under section 108 of the Tax Code, however, a taxpayer is not required to include any amount of COD income in gross income if the taxpayer is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, a taxpayer must reduce certain of its tax attributes—such as NOL carryforwards and current year NOLs, capital loss carryforwards, tax credits, and tax basis in assets (but, in the case of tax basis in assets, not below the amount of liabilities to which the taxpayer remains subject immediately after the discharge)—by the amount of any COD income incurred pursuant to a confirmed chapter 11 plan.  If advantageous, the debtor can elect to reduce the basis of depreciable property prior to any reduction in its NOLs or other tax attributes.  Where the debtor joins in the filing of a consolidated U.S. federal income tax return, applicable Treasury Regulations require, in certain circumstances, that the tax attributes of the consolidated subsidiaries of the debtor and other members of the group must also be reduced.  Any reduction in tax attributes in respect of COD income does not occur until after the determination of the Debtors' income or loss for the taxable year in which the COD income is incurred.  The taxable year of the Debtors is expected to end on the Effective Date.  In the absence of contrary guidance, it appears that Section 163(j) Carryforwards are not subject to reduction under these rules.  Any excess COD income over the amount of available tax attributes described above will generally not give rise to U.S. federal income tax and will generally have no other U.S. federal income tax impact.

As a result of the implementation of the Plan as provided in the Restructuring Transactions Exhibit, the Debtors expect to incur a substantial amount of COD income for U.S. federal income tax purposes, with an attendant reduction in tax attributes (but, in the case of tax basis, only to the extent such tax basis exceeds the amount of the respective Debtor's liabilities, as determined for these purposes, immediately after the Effective Date).  The ultimate amount of COD income and resulting attribute reduction is primarily dependent on the fair market value of the New Common Interests and the issue price of the New Term Loans; it is currently expected that attribute reduction will completely eliminate the Debtors' NOL carryforwards, and will reduce but not eliminate the tax basis in the Debtors' assets.

### 3.   Limitation on Use of Tax Attributes

Following the Effective Date, any NOL carryforwards and certain other tax attributes (including any Section 163(j) Carryforwards) allocable to periods on or prior to the Effective Date ("**Pre-Change Losses**") may be subject to certain limitations.  Any such limitations apply in addition to, and not in lieu of, the reduction of tax attributes that results from COD income arising in connection with the Plan.  As described above, although it is expected that attribute reduction will completely eliminate Debtors' NOL carryforwards, the Section 163(j) Carryforwards are not anticipated to be subject to attribute reduction and (in addition to any other Pre-Change Losses that attribute reduction does not eliminate) are expected to be subject to limitation under section 382 of the Tax Code as further described below.

Under section 382 of the Tax Code, if a corporation undergoes an "ownership change" and the corporation does not qualify for (or elects out of) the special bankruptcy exception in section 382(l)(5) of the Tax Code

discussed below, the amount of its Pre-Change Losses that may be utilized to offset future taxable income generally is subject to an annual limitation. The Debtors anticipate that the Redemption and the issuance of the New Common Interests pursuant to the Plan will result in an ownership change of SSB and its subsidiaries.

The amount of the annual limitation to which a corporation that undergoes an ownership change will be subject is generally equal to the product of (A) the fair market value of the stock of the corporation immediately before the ownership change (with certain adjustments) multiplied by (B) the "long term tax exempt rate" in effect for the month in which the ownership change occurs (3.29% for ownership changes occurring in February 2023). For a corporation in bankruptcy that undergoes an ownership change pursuant to a confirmed bankruptcy plan, the fair market value of the stock of the corporation is generally determined immediately *after* (rather than before) the ownership change, giving effect to the discharge of creditors' claims, but subject to certain adjustments; in no event, however, can the stock value for this purpose exceed the pre-change gross value of the corporation's assets. In addition, as discussed below, the annual limitation potentially may be increased in the event the corporation has an overall "built-in" gain in its assets at the time of the ownership change. Any portion of the annual limitation that is not used in a given year may be carried forward, thereby adding to the annual limitation for the subsequent taxable year.

If a loss corporation has a net unrealized built-in gain at the time of an ownership change (taking into account most assets and items of "built-in" income, gain, loss and deduction), any built-in gains recognized (or, according to a current IRS notice, treated as recognized) during the following five (5) years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation would be permitted to use its Pre-Change Losses against such recognized built-in gain income in addition to its regular annual allowance. Alternatively, if a loss corporation has a net unrealized built-in loss at the time of an ownership change, then any built-in losses recognized during the following five (5) years (up to the amount of the original net unrealized built-in loss) generally will be treated as Pre-Change Losses and similarly will be subject to the annual limitation.

The Debtors estimate that, upon emergence from chapter 11 and at the time of the resultant ownership change, SSB and its subsidiaries would have a significant net unrealized built-in gain, the ultimate amount of which cannot be determined at this time.

If a corporation does not continue its historic business or use a significant portion of its historic assets in a new business for at least two years after the ownership change, the annual limitation resulting from the ownership change is reduced to zero, thereby precluding any utilization of the corporation's Pre-Change Losses (absent any increases due to the recognition of any built-in gains as of the time of the ownership change).

Under section 382(l)(5) of the Tax Code, an exception to the foregoing annual limitation rules generally applies where qualified creditors of a debtor corporation receive, in respect of their claims, at least fifty percent (50%) of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in bankruptcy) pursuant to a confirmed chapter 11 plan. The Debtors expect that such exception will either not apply to the present case or, if the exception would otherwise apply, that the Debtors will elect not to apply such exception, and the Plan is not premised on the application of such exception.

### B.    Consequences to U.S. Holders of FLFO Claims, FLSO Claims, Non-PTL Term Loan Claims, and Other General Unsecured Claims

As used in this section of the Disclosure Statement, the term "**U.S. Holder**" means a beneficial owner of FLFO Claims, FLSO Claims, Non-PTL Term Loan Claims, and Other General Unsecured Claims that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds such Claims, the tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  Partnerships and U.S. Holders, who are partners in a partnership holding any such Claims, are urged to consult their own tax advisors regarding the U.S. federal income tax consequences of the Plan.

As discussed above in A.1 —"The Restructuring Transactions," this discussion assumes that the Restructuring Transactions Exhibit includes the Redemption.  If the Restructuring Transactions Exhibit includes alternative transactions, the U.S. federal income tax consequences to the Debtors and holders of Claims would be materially different from those described herein.

The following discussion is based in part on the preliminary terms of the New Term Loans, which are subject to change in whole or in part.

      **1.**      **Security Status of FLFO Claims, FLSO Claims, Non-PTL Term Loan Claims and New Term Loans**

The U.S. federal income tax consequences of the Plan to a U.S. Holder of FLFO Claims, FLSO Claims or Non-PTL Term Loan Claims depends, in part, on whether such Claims and the New Term Loans constitute "securities" of SSB for U.S. federal income tax purposes.  The term "security" is not defined in the Tax Code or in the Treasury Regulations and has not been clearly defined by judicial decisions.  The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not.  One of the most significant factors considered in determining whether a particular debt obligation is a security is its original term. In general, debt obligations issued with a weighted-average maturity at issuance of less than five (5) years do not constitute securities, whereas debt obligations with a weighted-average maturity at issuance of ten (10) years or more constitute securities.  The FLFO Claims were issued with a weighted-average maturity of approximately three (3) years and the remainder of this discussion assumes that the FLFO Claims do not constitute "securities" for U.S. federal income tax purposes.  The Non-PTL Term Loan Claims were issued with a weighted-average maturity of approximately seven (7) years and the New Term Loans will be issued with a weighted-average maturity of approximately five (5) years; it is therefore uncertain whether the Non-PTL Term Loan Claims or the New Term Loans constitute "securities" for U.S. federal income tax purposes.

The IRS has ruled that where the original debt instrument qualified as a security, a new debt instrument received in an exchange for that original debt instrument may, under certain circumstances, be treated as a security based on the status of the original debt instrument even if the remaining term of the new debt

instrument is less than five years.  As discussed in III.G.2 — "COVID-19 Pandemic and the 2020 Transaction," the Exchanging Existing Lenders sold to SSB and the other borrowers the Relevant Existing Term Loans in exchange for the Initial FLSO Term Loans.  The Relevant Existing Term Loans were issued with a weighted-average maturity of approximately seven (7) years and the FLSO Claims received in exchange for such Relevant Existing Term Loans were issued with a weighted-average maturity of approximately three (3) years.  Accordingly, the FLSO Claims may be "securities" for U.S. federal income tax purposes although the issue is subject to significant uncertainty.

Although approximately 22% of the funds drawn under the FLSO Term Loans and the Non-PTL Term Loans were drawn by SSB Manufacturing (as reflected in the borrowing requests under the FLSO Term Loans and the Non-PTL Term Loans) and SSB and SSB Manufacturing have been separately accounting for their respective drawn portions of the FLSO Term Loans and the Non-PTL Term Loans on their internal books and records, because SSB and SSB Manufacturing are, and at all relevant times have been, co-obligors under the FLSO Term Loans and the Non-PTL Term Loans, the Allowed FLSO Claims and/or the Non-PTL Term Loans might be treated as being issued by SSB (the issuer of the New Common Interests) for U.S. federal income tax purposes.  SSB and SSB Manufacturing are also expected to be co-obligors under the New Term Loans.

The remainder of this discussion assumes that the FLSO Term Loans, the Non-PTL Term Loans and the New Term Loans are treated as issued by SSB for purposes of the tax-free recapitalization provisions of the Code and Treasury Regulations.  Alternatively, if for such purposes any such Claims are treated as issued by SSB only in part, the U.S. federal income tax consequences of the Plan to the holders of any such Claims are uncertain.  *U.S. Holders of FLFO Claims, FLSO Claims or Non-PTL Term Loan Claims are urged to consult their own tax advisors regarding the appropriate status of such Claims and of the New Term Loans for U.S. federal income tax purposes*.

## 2.  U.S. Holders of FLFO Claims

Pursuant to the Plan, as detailed above, the holders of FLFO Claims will receive New Term Loans in full and final satisfaction of the FLFO Claims.

A U.S. Holder of an Allowed FLFO Claim should generally recognize gain or loss in an amount equal to the difference, if any, between (i) the issue price (as defined below) of the New Term Loans received (other than any consideration received in respect of an Allowed Claim for accrued but unpaid interest and possibly accrued original issue discount, "**OID**"), and (ii) the holder's adjusted tax basis in the Allowed Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* B.7 — "Character of Gain or Loss," below.  In addition, a U.S. Holder of an Allowed FLFO Claim will have ordinary interest income to the extent of any exchange consideration allocable to accrued but unpaid interest (or accrued OID) not previously included in income.  *See* B.6 — "Distributions in Discharge of Accrued Interest or OID," below.

The "issue price" of the New Term Loans for U.S. federal income tax purposes depends on whether, at any time during the 31-day period ending fifteen (15) days after the Effective Date, the New Term Loans, the FLFO Term Loans or the FLSO Term Loans (which are also being exchanged for New Term Loans) are considered traded on an "established market."  Pursuant to applicable Treasury Regulations, an "established market" need not be a formal market.  It is sufficient if there is a readily available sales price for an executed purchase or sale of the New Term Loans, the FLFO Term Loans or the FLSO Term Loans, or if there are one or more "firm quotes" or "indicative quotes" with respect to the New Term Loans, the FLFO Term Loans or the FLSO Term Loans, in each case as such terms are defined in applicable Treasury Regulations.  If the New Term Loans received are considered traded on an established market, the issue price of the New Term Loans for U.S. federal income tax purposes will equal their fair market value as of the Effective Date.

If the New Term Loans received are *not* considered traded on an established market, but either of the FLFO Term Loans or the FLSO Term Loans *are* considered traded on an established market, the issue price of the New Term Loans for U.S. federal income tax purposes will depend on the fair market value of the FLFO Term Loans and/or the FLSO Term Loans as of the Effective Date (with appropriate adjustments for any other consideration received), as determined by the Debtors.  If none of the New Term Loans, the FLFO Term Loans or the FLSO Term Loans are considered traded on an established market, the issue price of the New Term Loans generally will be their stated principal amount.  If the Debtors determine that the New Term Loans, FLFO Term Loans or FLSO Term Loans are traded on an established market, such determination and the determination of issue price will be binding on a U.S. Holder unless such holder discloses, on a timely-filed U.S. federal income tax return for the taxable year that includes the Effective Date, that such holder's determination is different from the Debtors' determination, the reasons for such holder's different determination and, if applicable, how such holder determined the fair market value.

A U.S. Holder of an Allowed FLFO Claim will have a tax basis in the New Term Loans received equal to their issue price.  The U.S. Holder's holding period in such New Term Loans received should begin on the day following the Effective Date.

### 3.      U.S. Holders of FLSO Claims

Pursuant to the Plan, as detailed above, the holders of FLSO Claims will receive New Term Loans and New Common Interests in full and final satisfaction of the FLSO Claims.

If Allowed FLSO Claims do *not* constitute "securities" for U.S. federal income tax purposes, the receipt of New Common Interests and New Term Loans in satisfaction of such Claims will generally be a fully taxable transaction.  If Allowed FLSO Claims and New Term Loans constitute "securities" for U.S. federal income tax purposes, the receipt of New Common Interests and New Term Loans in the transaction would generally qualify for "recapitalization" treatment for U.S. federal income tax purposes.  If the Allowed FLSO Claims constitute "securities" for U.S. federal income tax purposes, but the New Term Loans do not, the receipt of New Common Interests and New Term Loans in the transaction would generally qualify for "recapitalization" treatment for U.S. federal income tax purposes, with the New Term Loans generally treated as taxable "boot."

Each of the alternative treatments for holders of Allowed FLSO Loan Claims receiving New Term Loans and New Common Interests—that is, a fully taxable transaction or "recapitalization"—is discussed below.

### (a)      Fully Taxable Transaction

In a fully taxable transaction, a U.S. Holder of an Allowed FLSO Claim should generally recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the fair market value of any New Common Interests received and the "issue price" (as defined above, *see* B.2 — "U.S. Holders of FLFO Claims") of the New Term Loans received (other than any consideration received in respect of an Allowed Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the holder's adjusted tax basis in the Allowed Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* B.7 — "Character of Gain or Loss," below.  In addition, a U.S. Holder of an Allowed FLSO Claim will have ordinary interest income to the extent of any exchange consideration allocable to accrued but unpaid interest (or accrued OID) not previously included in income. *See* B.6 — "Distributions in Discharge of Accrued Interest or OID," below.

In a fully taxable transaction, a U.S. Holder of Allowed FLSO Claims will have a tax basis in any New Term Loans received equal to their issue price and a tax basis in any New Common Interests received equal

to its fair market value. The U.S. Holder's holding period in such New Term Loans and/or New Common Interests received should begin on the day following the Effective Date.

(b)        **Recapitalization Treatment**

In a "recapitalization," a U.S. Holder of an Allowed FLSO Claim generally will not recognize gain or loss (except for "boot" gain in the circumstances described below). Even within an otherwise tax-free exchange, however, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest (or OID) not previously included in income. *See* <u>B.6</u> — "Distributions in Discharge of Accrued Interest or OID," below.

If the Allowed FLSO Claims constitute securities for U.S. federal income tax purposes, but the New Term Loans do *not* constitute securities and are treated as "boot," a U.S. Holder of an Allowed FLSO Claim generally will not recognize loss, but will recognize gain (computed as described above in the case of a fully taxable transaction) to the extent of such "boot" received. In the present case, the boot received would equal the "issue price" (as defined above, *see* <u>B.2</u> — "U.S. Holders of FLFO Claims") of the New Term Loans received.

In a "recapitalization," a U.S. Holder's aggregate tax basis in any New Common Interests or New Term Loans received generally will equal such holder's aggregate adjusted tax basis in its Allowed FLSO Claim exchanged therefor, increased by any gain or interest income recognized in the exchange and decreased by the amount of "boot" received and any deductions claimed in respect of any previously accrued but unpaid interest or OID. The U.S. Holder's holding period in the New Common Interests and New Term Loans (if such New Term Loans are not treated as "boot") will include its holding period in the Allowed FLSO Claim exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest (and possibly OID, depending on whether the increase in a holder's adjusted basis for recently accrued OID retains its short-term character for holding period purposes).

If the New Term Loans are treated as "boot," a U.S. Holder will have a tax basis in the New Term Loans received equal to the amount taken into account as boot with respect to the New Term Loans. The holding period in the New Term Loans received generally will begin on the day following the Effective Date.

4.        **U.S. Holders of Non-PTL Term Loan Claims**

Pursuant to the Plan, as detailed above, all Non-PTL Term Loan Claims will be cancelled, released, and extinguished, with each holder of Allowed Non-PTL Term Loan Claims receiving New Common Interests.

If Allowed Non-PTL Term Loan Claims do *not* constitute "securities" for U.S. federal income tax purposes, the receipt of New Common Interests in satisfaction of such Claim will generally be a fully taxable transaction. Alternatively, if the Non-PTL Term Loan Claims constitute "securities," the receipt of New Common Interests in the transaction would generally qualify for "recapitalization" treatment for U.S. federal income tax purposes.

Each of the alternative treatments for holders of Allowed Non-PTL Term Loan Claims receiving New Common Interests—that is, a fully taxable transaction or a "recapitalization"—is discussed below.

(a)        **Fully Taxable Transaction**

In a fully taxable transaction, a U.S. Holder of an Allowed Non-PTL Term Loan Claim will recognize gain or loss in an amount equal to the difference, if any, between (i) the fair market value of any New Common Interests received (other than any consideration received in respect of a Claim for accrued but unpaid

interest and possibly accrued OID) and (ii) the holder's adjusted tax basis in the Claim exchanged (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID). *See* B.7 — "Character of Gain or Loss," below.  In addition, a U.S. Holder of an Allowed Non-PTL Term Loan Claim will have ordinary interest income to the extent of any exchange consideration allocable to accrued but unpaid interest (or accrued OID) not previously included in income.  *See* B.6 — "Distributions in Discharge of Accrued Interest or OID," below.

In a fully taxable transaction, a U.S. Holder of Allowed Non-PTL Term Loan Claims will have a tax basis in the New Common Interests received equal to its fair market value. A U.S. Holder's holding period in any such New Common Interests generally will begin the day following the Effective Date.

### (b)      Recapitalization Treatment

In a "recapitalization," a U.S. Holder of an Allowed Non-PTL Term Loan Claim generally will not recognize gain or loss.  Even within an otherwise tax-free exchange, however, a U.S. Holder will have interest income to the extent of any exchange consideration allocable to accrued but unpaid interest (or OID) not previously included in income.  *See* B.6 — "Distributions in Discharge of Accrued Interest or OID," below.

In a "recapitalization," a U.S. Holder's aggregate tax basis in the New Common Interests generally will equal such holder's aggregate adjusted tax basis in its Allowed Non-PTL Term Loan Claim exchanged therefor, increased by any gain or interest income recognized in the exchange and decreased by any deductions claimed in respect of any previously accrued but unpaid interest or OID.  The U.S. Holder's holding period in the New Common Interests will include its holding period in the Allowed Non-PTL Term Loan Claim exchanged therefor, except to the extent of any exchange consideration received in respect of accrued but unpaid interest (and possibly OID, depending on whether the increase in a holder's adjusted basis for recently accrued OID retains its short-term character for holding period purposes).

### 5.       U.S. Holders of Other General Unsecured Claims

Pursuant to the Plan, as detailed above, each holder of an Allowed Other General Unsecured Claim will receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table.

In general, a U.S. Holder of Allowed Other General Unsecured Claims should recognize gain or loss in an amount equal to the difference, if any, between (i) the aggregate amount of cash received in respect of its Claims (other than any consideration received in respect of a Claim for accrued but unpaid interest and possibly accrued OID), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest and possibly accrued OID).  *See* B.7 — "Character of Gain or Loss," below.  A U.S. Holder will have ordinary interest income to the extent of any consideration allocable to accrued but unpaid interest or accrued OID not previously included in income.  *See* B.6 — "Distributions in Discharge of Accrued Interest or OID," below.

In the event of the subsequent disallowance of any Disputed Other General Unsecured Claim, it is possible that a U.S. holder of a previously Allowed Other General Unsecured Claim may receive additional distributions in respect of its Claim; any such additional distributions received by such a holder would be treated as additional amount realized in satisfaction of the Claim, except to the extent of any portion treated as an interest income under the imputed interest provisions of the Tax Code.  Accordingly, it is possible that the recognition of any loss realized by a U.S. holder with respect to an Allowed Other General Unsecured Claim may be deferred until all Other General Unsecured Claims are Allowed or Disallowed. Alternatively, it is possible that a U.S. holder will have additional gain in respect of any additional

distributions received due to the disallowance of a Disputed Other General Unsecured Claim. *See also* <u>B.10</u> —"Tax Treatment of Disputed Claims Reserve," below.

**6.       Distributions in Discharge of Accrued Interest or OID**

In general, to the extent that any consideration received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that, except as otherwise required by law (as reasonably determined by the Reorganized Debtors), consideration received in respect of an Allowed Claim is allocable first to the principal portion of the Allowed Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remaining portion of the Allowed Claim. *See* Section 6.18 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. Holders are urged to consult their tax advisors regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in income for U.S. federal income tax purposes.

**7.       Character of Gain or Loss**

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the FLFO Claim, FLSO Claim, Non-PTL Term Loan Claim, or Other General Unsecured Claim constitutes a capital asset in the hands of the U.S. Holder and how long it has been held, whether the FLFO Claim, FLSO Claim, Non-PTL Term Loan Claim or Other General Unsecured Claim was acquired at a market discount, and whether and to what extent the U.S. Holder previously claimed a bad debt deduction.

A U.S. Holder that purchased its FLFO Claim, FLSO Claim, Non-PTL Term Loan Claim or Other General Unsecured Claim from a prior holder at a "market discount" (relative to the principal amount of the FLFO Claim, FLSO Claim, Non-PTL Term Loan Claim or Other General Unsecured Claim at the time of acquisition) may be subject to the market discount rules of the Tax Code. A U.S. Holder that purchased its Claim from a prior holder will be considered to have purchased such Claim with "market discount" if the U.S. Holder's adjusted tax basis in its Claim immediately after its acquisition is less than the adjusted issue price of such Claim by at least a statutorily defined *de minimis* amount. Under these rules, gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the holder, on a constant yield basis) during the holder's period of ownership, unless the holder elected to include the market discount in income as it accrued. If a U.S. Holder of Claims did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

In the case of an exchange of any Allowed Non-PTL Term Loan Claims for New Common Interests that qualifies as a "recapitalization," the Tax Code indicates that any accrued market discount in respect of such Claims should only be currently includible in income to the extent of any gain recognized in the recapitalization exchange. However, any accrued market discount that is not included in income should carry over to such New Common Interests, such that any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Interests would be treated as ordinary income to the extent of any accrued market discount not previously included in income. To date, specific Treasury Regulations implementing this rule have not been issued.

### 8.      Ownership and Disposition of the New Term Loans

In general, payments of stated interest on the New Term Loans should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received, in accordance with the holder's regular method of tax accounting.

In addition, depending on the issue price, some or all New Term Loans may be treated as issued with OID. A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" (as defined above, see B.2 — "U.S. Holders of FLFO Claims") by more than a statutorily defined de minimis amount. The "stated redemption price at maturity" of each series of New Term Loans would include all principal and interest payable over the term of such New Term Loans, other than qualified stated interest (i.e., other than stated interest that is unconditionally payable at least annually at a constant rate in cash or property other than debt of the issuer). The stated interest payable on the New Term Loans should be considered qualified stated interest for this purpose.

A U.S. Holder will be required to include any OID in income for U.S. federal income tax purposes as it accrues, regardless of its regular method of accounting, in accordance with a constant-yield method, before the receipt of cash payments attributable to this income. Under this method, a U.S. Holder generally will be required to include in income increasingly greater amounts of OID in successive accrual periods.

Upon the sale or other taxable disposition of a New Term Loan, a U.S. Holder will recognize taxable gain or loss equal to the difference between the amount realized on the sale or other taxable disposition and its adjusted tax basis in the New Term Loan. A U.S. Holder's adjusted tax basis in a New Term Loan generally will equal its initial tax basis in the New Term Loan, increased by any OID previously included in income with respect to the New Term Loan and decreased by payments on the New Term Loan other than payments of qualified stated interest. For these purposes, the amount realized does not include any amount attributable to accrued interest, which will be taxable as interest if not previously included in income. Gain or loss recognized on the sale or other taxable disposition of a New Term Loan will generally be capital gain or loss and will be long-term capital gain or loss if, at the time of sale or other taxable disposition, the New Term Loan is treated as held for more than one (1) year.

Each holder of a New Term Loan is urged to consult its tax advisor regarding the application of the OID rules to the New Term Loans.

### 9.      Ownership and Disposition of the New Common Interests

#### (a)      Distributions

Any distributions made on account of the New Common Interests will constitute a dividend for U.S. federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Parent as determined under U.S. federal income tax principles. To the extent that a U.S. Holder receives distributions that would otherwise constitute dividends for U.S. federal income tax purposes but that exceed

such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the U.S. Holder's basis in its New Common Interests (determined on a share-by-share basis). Any such distributions in excess of the U.S. Holder's basis in its New Common Interests (determined on a share-by-share basis) generally will be treated as capital gain from the sale or exchange thereof, as described below under "Sale, Exchange, Redemption, Repurchase or Other Taxable Disposition." Under current law, dividends received by non-corporate U.S. Holders on the New Common Interests may be subject to U.S. federal income tax at lower rates than other types of ordinary income if certain conditions, including holding period requirements, are met. Dividends received by corporate U.S. Holders on the New Common Interests may be eligible for a dividends received deduction (the benefits of which may be mitigated by the extraordinary dividend rules). As further described in VIII.D.4 — "No Intention to Pay Dividends," the Reorganized Parent does not anticipate paying any dividends on the New Common Interests.

    (b)    **Sale, Exchange, Redemption, Repurchase or Other Taxable Disposition**

Subject to the discussion below, U.S. Holders generally will recognize capital gain or loss upon the sale, exchange, redemption, repurchase or other taxable disposition of New Common Interests in an amount equal to the difference, if any, between (i) the U.S. Holder's adjusted tax basis in New Common Interests disposed of and (ii) the sum of the cash and the fair market value of any other consideration received from such disposition. Any such gain or loss generally should be long-term capital gain or loss if the U.S. Holder's holding period for its New Common Interests disposed of is more than one year at that time. A reduced tax rate on long-term capital gain may apply to non-corporate U.S. Holders. The deductibility of capital loss is subject to significant limitations.

Any gain recognized by a U.S. Holder upon a disposition of New Common Interests (or any stock or property received for such New Common Interests in a later tax-free exchange) received in exchange for an FLSO Claim or Non-PTL Term Loan Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of any ordinary loss incurred upon exchange of its FLSO Claim or Non-PTL Term Loan Claim for New Common Interests or any ordinary bad debt deduction previously claimed as a result of the write-down of the FLSO Claim or Non-PTL Term Loan Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the FLSO Claim or Non-PTL Term Loan Claim. With respect to a cash-basis U.S. Holder, proper adjustment to the amount treated as ordinary income pursuant to the previous sentence shall be made for any amounts which would have been included in its gross income if such U.S. Holder's FLSO Claim or Non-PTL Term Loan Claim had been satisfied in full but which was not included by reason of the cash method of accounting.

In addition, in the case of an exchange of any Allowed Non-PTL Term Loan Claims for New Common Interests that qualifies as a "recapitalization," any accrued market discount in respect of such Claims that is not included in income should carry over to such New Common Interests, such that any gain recognized by a U.S. Holder upon a subsequent disposition of such New Common Interests would be treated as ordinary income to the extent of any accrued market discount not previously included in income.

    **10.**    **Tax Treatment of the Disputed Claims Reserve**

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.

Accordingly, the Disputed Claims Reserve will be subject to tax annually on a separate entity basis. All distributions from such assets (which distributions will be net of the expenses, including taxes, of the

Disputed Claims Reserve) will be treated as received by holders in respect of their Allowed Other General Unsecured Claims as if distributed directly by the Debtors.

All parties (including, without limitation, the Debtors and the holders of Other General Unsecured Claims) will be required to report for tax purposes consistently with the foregoing.

### 11. Information Reporting and Backup Withholding

Payments of interest (including accruals of OID) or dividends and any other reportable payments, possibly including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement, or other disposition of the New Term Loans and New Common Interests, may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information, and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally should be allowed as a credit against that recipient's U.S. federal income tax, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally should not apply with respect to payments made to certain exempt recipients, such as corporations and financial institutions. Information also may be required to be provided to the IRS concerning payments, unless an exemption applies. U.S. Holders are urged to consult their own tax advisors regarding their qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

**The foregoing summary has been provided for informational purposes only and does not discuss all aspects of U.S. federal income taxation that may be relevant to a particular holder of an FLFO Claim, FLSO Claim, Non-PTL Term Loan Claim, or Other General Unsecured Claim. All holders of such Claims are urged to consult their own tax advisors concerning the U.S. federal, state, local, and other tax consequences applicable under the Plan.**

### VIII.
### CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Debtors' business, the Plan, or its implementation.

### A. Certain Bankruptcy Law Considerations

### 1. General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties-in-interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers, vendors, suppliers, and employees. The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2. Risk of Material Adverse Effect on Operations

The commencement of these Chapter 11 Cases could adversely affect the relationship between the Debtors and their customers, employees, vendors, lenders, partners and others.  There is a risk, due to uncertainty about the Company's future, that: (i) customers could seek alternative providers; (ii) customers' confidence in the Debtors' ability to provide products could erode and, as a result, there could be a significant and precipitous decline in revenues, profitability, and cash flow; (iii) it may be more difficult to attract or replace employees; (iv) employees could be distracted from performance of their duties or more easily attracted to other career opportunities; (v) suppliers, vendors, and service providers could terminate their relationship with the Debtors or require financial assurances or enhanced performance; and (vi) additional involvement by regulatory, taxing, and other authorities may increase the administrative burden on the Debtors and their operations.  These factors could adversely affect the Debtors' ability to obtain confirmation of the Plan.

### 3. Risk Related to Obtaining First Day Relief

The Debtors have tried to address potential concerns of key customers, vendors, employees, and other key parties in interest that might arise through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate court orders to ensure a seamless transition between the Debtors' prepetition and postpetition business operations.  However, there can be no guaranty that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such relief, and as a result, the Debtors' business might suffer.

### 4. Ongoing Litigation and Other Contingencies Could Affect the Outcome of the Chapter 11 Cases

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims.  For example, the Debtors cannot predict with certainty the outcome or effect of the resolution of claims arising from pending litigation, including with respect to the 2021 LCM Litigation, the 2022 Non-PTL Term Loan Lenders Litigation and the 2020 Transaction Adversary Proceeding, and an adverse outcome against the Debtors with respect to such litigation (including the invalidation of the 2020 Transaction) could materially affect the ability for the Debtors to consummate the Plan and would result in protracted Chapter 11 Cases.  Further, in such an event, the Consenting Parties may terminate the Restructuring Support Agreement.  The occurrence of such contingencies could affect distributions to holders of Claims and Interests under the Plan, resulting in protracted Chapter 11 Cases, and could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, employees, and major customers.

### 5. Non-Consensual Confirmation

In the event that an impaired class of claims does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one (1) impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements; however, there can be no assurances that the Bankruptcy Court will reach the same conclusion.

6.      **Risk Related to Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

The Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

7.      **Risks Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

8.      **Releases, Injunctions, and Exculpation Provisions May Not Be Approved**

Article X of the Plan provides for certain releases, injunctions, and exculpations, for claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

9.      **Risk of Non-Confirmation of the Plan**

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite votes for acceptance to confirm the Plan.  Even if the voting class votes in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.  Furthermore, if the Plan is not confirmed, the Restructuring Support Agreement could be terminated, and if the Restructuring Support Agreement were to be terminated, the Debtors' efforts to reorganize would be delayed and possibly jeopardized.  Additionally, should the Plan fail to be approved, confirmed, or consummated, non-debtor parties-in-interest may file alternative plans of reorganization pursuant to section 1121 of the Bankruptcy Code.

10.     **Risk of Non-Occurrence of the Effective Date**

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the

Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

### 11. Risk of Termination of the Restructuring Support Agreement

The Restructuring Support Agreement contains certain provisions that give the Consenting Parties the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  Termination of the Restructuring Support Agreement would result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with, among others, vendors, suppliers, employees, and major customers.

### 12. Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  See Section X.C hereof, as well as the Liquidation Analysis attached hereto as **Exhibit E**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### B. Additional Factors Affecting the Value of the Reorganized Debtors

### 1. Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which in turn, could cause the value of distributions to be reduced substantially.   Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Financial Projections attached hereto as **Exhibit H** and feasibility analysis herein, and the variation may be material.

### 2. Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions, which might ultimately prove to be incorrect, and projections, which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 3. Debtors' Business and Industry

The risks associated with the Debtors' businesses and industry include, but are not limited to, the following:

In deteriorating economic conditions including an economic recession or other adverse economic conditions, as well as prolonged market volatility, customers and vendors may be more likely to fail to meet contractual terms or their payment obligations;

The ongoing impact of the COVID-19 pandemic, or a similar pandemic, or even a perceived threat of such an outbreak, could cause significant disruptions to the Reorganized Debtors' supply chain, manufacturing capability, corporate support infrastructure, or distribution system that could adversely impact the ability to produce and deliver products, as well as negatively impact consumer confidence and consumer demand generally;

Some of the Reorganized Debtors' principal competitors may be less highly-leveraged, have greater access to financial or other resources, have lower cost operations, and/or be better able to withstand changing market conditions;

The Company's products are and will continue to be subject to regulation in the United States and Canada by various federal, state, provincial, and local regulatory authority, and other governments and agencies in other jurisdictions regulate the sale and distribution of such products, which may negatively impact the Reorganized Debtors' businesses;

The Reorganized Debtors' marketing and advertising practices could become the subject of proceedings before regulatory authorities or the subject of claims by other parties which could require the Company to alter or end such practices or adopt new practices that are not as effective or are more expensive;

Operations are subject to federal, state, provincial, and local laws and regulations relating to pollution, environmental protection, occupational health and safety and labor and employee relations, and the Reorganized Debtors may be held liable for the costs of ensuring compliance and/or remediation efforts;

The Debtors' businesses are subject to a number of risks inherent in new product introductions, including development delays, failure of new products to achieve anticipated levels of market acceptance, and costs associated with failed product introductions, and any failure of new product introductions may reduce the Reorganized Debtors' ability to sell their products at appropriate price levels;

The Debtors have historically experienced and expect to continue to experience seasonal and quarterly fluctuations in net sales and operating income, and therefore a sequential quarter to quarter comparison may not be a good indication of how the Reorganized Debtors' businesses will perform in the future;

The Debtors have relied on a small number of suppliers for a large percentage of their raw materials, and any disruptions in their relations with their suppliers could negatively impact the manufacturing process of the Reorganized Debtors' businesses;

The Debtors depend on relatively few large retailers for a significant proportion of their sales, and any disruptions in their relations with these retailers could negatively impact the marketing, sales, competitive viability, cost structure, financial condition, and other aspects of the Reorganized Debtors' businesses;

The price and availability of the raw materials used in the Debtors' products, as well as the cost of fuel to transport the products to market, are subject to market conditions affecting supply and demand, and such fluctuation may impair the financial condition of the Reorganized Debtors' business to the extent that they are unable to pass those higher costs on to their customers; and

To compete effectively with other companies, the Reorganized Debtors must maintain the proprietary nature of the Debtors' owned and licensed intellectual property, which may be subject to the following risks: (i) it may be possible for others to circumvent their trademarks, service marks, patents and other rights; (ii) their products and promotional materials, including trademarks, service marks, may now or in the future violate the proprietary rights of others; (iii) the Reorganized Debtors may be prevented from using their own trademarks, service marks, product designs, or manufacturing technology, if challenged;

(iv) it may be cost prohibitive to enforce or defend their trademarks, service marks, patents, and other rights; (v) pending applications regarding trademarks, service marks and patents may not result in marks being registered or patents being issued; and (vi) the Reorganized Debtors may be unable to protect their technological advantages when their patents expire.

### 4.      Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors will have outstanding secured indebtedness of approximately $300 million (plus original issue discount) under the New Term Loans.  The Reorganized Debtors' ability to service their debt obligations will depend, among other things, on their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### C.      Factors Relating to Securities to Be Issued Under the Plan, Generally

### 1.      No Current Public Market for Securities

There is currently no market for the New Common Interests, and there can be no assurance as to the development or liquidity of any market for any such securities.

The Reorganized Debtors are under no obligation to list any of the above securities on any national securities exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors. In addition, holders of New Common Interests may be subject to certain restrictions contained in a limited liability company agreement or other similar equityholder agreement (as applicable) which may include restrictions on the ability to transfer, as well as other limitations associated with, the New Common Interests.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

### 2.      Potential Dilution

The ownership percentage represented by the New Common Interests distributed on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with the Management Incentive Plan, any other equity interests that may be issued post-emergence, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other equity issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Interests issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

### D.   Risks Related to an Investment in the New Common Interests

#### 1.   Significant Holders

Holders of FLSO Claims are expected to acquire a significant ownership interest in the New Common Interests.  If such holders were to act as a group, such holders would be in a position to control the outcome of all actions requiring equityholder approval, including the election of a new board of managers, without the approval of other equityholders.  This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Interests.

#### 2.   Equity Interests Subordinated to the Reorganized Debtors' Indebtedness

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Interests would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Common Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied, including obligations under the New Term Loans and the Exit ABL Facility.

#### 3.   Implied Valuation of New Common Interests Not Intended to Represent the Trading Value of the New Common Interests

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities.  The actual market price of the New Common Interests is likely to be volatile.  Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Common Interests to rise and fall.  Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Common Interests in the public or private markets.

#### 4.   No Intention to Pay Dividends

The Reorganized Parent does not anticipate paying any dividends on the New Common Interests as it expects to retain any future cash flows for debt reduction and to support its operations.  As a result, the success of an investment in the New Common Interests will depend entirely upon any future appreciation in the value of the New Common Interests.  There is, however, no guarantee that the New Common Interests will appreciate in value or even maintain their initial value.

### E.   Additional Factors

#### 1.   Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2. Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside this Disclosure Statement Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.

Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each creditor or equity interest holder is urged to consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Equity Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 5. No Admission Made

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### 6. Certain Tax Consequences

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Section VII hereof.

### IX.
### CONFIRMATION OF THE PLAN

#### A.  Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties. Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

#### B.  Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party-in-interest may object to the confirmation of a plan. Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of the Claims

held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order.

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice addressed as follows:

a) **The Debtors** at
Serta Simmons Bedding, LLC
2451 Industry Avenue
Doraville, GA 30360
Attn:    Kristen McGuffey, Chief Legal Officer & Secretary
Email:  SSBLegalDept@sertasimmons.com

b) **Office of the U.S. Trustee** at
Office of the U.S. Trustee for the Southern District of Texas
515 Rusk, Suite # 3516
Houston, TX 77002

c) **Counsel to the Debtors** at
Weil, Gotshal & Manges LLP
700 Louisiana Street, Suite 1700
Houston, TX 77002
Attn:    Gabriel A. Morgan
        Stephanie N. Morrison
Telephone:  (713) 546-5000
Facsimile:  (713) 224-9511
Email:  gabriel.morgan@weil.com
        stephanie.morrison@weil.com

    -and-

767 Fifth Avenue
New York, NY 10153
Attn:    Ray C. Schrock
        Alexander W. Welch
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Email:  ray.schrock@weil.com
        alexander.welch@weil.com

d) **Counsel to the PTL Advisors** at
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attn:    Scott J. Greenberg, Esq.
        Michael Cohen, Esq.

Jason Zachary Goldstein, Esq.

Telephone:  (212) 403-1000
Email:  sgreenberg@gibsondunn.com
        mcohen@gibsondunn.com
        jgoldstein@gibsondunn.com

e) **Consenting Equity Holders** at
   Advent International Corporation
   Prudential Tower
   800 Boylston Street, Suite 3300
   Boston, MA 02199
        Jefferson Case
        Amanda McGrady Morrison

Facsimile:  (617) 951-0566

-and-

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attn:   Gregg M. Galardi, Esq.
        Jeramy D. Webb, Esq.
        Amanda C. Glaubach, Esq.

Telephone:  (212) 403-1000
Email:  gregg.galardi@ropesgray.com
        jeramy.webb@ropesgray.com
        amanda.glaubach@ropesgray.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.     **Requirements for Confirmation of the Plan**

    1.     **Requirements of Section 1129(a) of the Bankruptcy Code**

*General Requirements*.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

        (i)     the Plan complies with the applicable provisions of the Bankruptcy Code;

46

(ii)     the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)     any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)      the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)     with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Equity Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Equity Interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)   except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five (5) years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix)     at least one Class of impaired Claims has accepted the Plan, determined without including any vote for acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

***Best Interests Test***

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (i) accept the plan; or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on: (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests; and (ii) the Liquidation Analysis attached hereto as **Exhibit E.**

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit E** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

***Feasibility***

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the Financial Projections attached hereto as **Exhibit H**. Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, Section VIII hereof sets forth certain risk factors that could impact the feasibility of the Plan.

*Equitable Distribution of Voting Power*

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code: (i) a provision prohibiting the issuance of non-voting equity securities; and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

## 2.    Additional Requirements for Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code. Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

The Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

*Unfair Discrimination Test*

The "no unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test. Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

*Fair and Equitable Test*

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receives more than 100% of the allowed amount of the claims in such class. As to dissenting classes, the test sets different standards depending on the type of claims in such class. The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

(i)    Secured Creditors

The Bankruptcy Code provides that each holder of an impaired secured claim either: (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim; or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof); or (iii) receives the "indubitable equivalent" of its allowed secured claim.

(ii)      Unsecured Creditors

The Bankruptcy Code provides that either: (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim; or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.  Accordingly, the Plan meets the "fair and equitable" test with respect to unsecured Claims.

(iii)      Equity Interests

The Bankruptcy Code requires either (a) each holder of an impaired interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (b) the holders of interests that are junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

**X.**
**ALTERNATIVES TO CONFIRMATION**
**AND CONSUMMATION OF THE PLAN**

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties-in-interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are: (i) the preparation and presentation of an alternative reorganization; (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code; or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.      Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party-in-interest) could attempt to formulate a different plan.  Such a plan might involve either: (i) a reorganization and continuation of the Debtors' businesses; or (ii) an orderly liquidation of their assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.  In addition, if the Plan is not confirmed under the terms of the Restructuring Support Agreement, the Consenting Parties have the right to terminate the Restructuring Support Agreement and all obligations thereunder.

### B.      Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  In addition, the security interests in the Debtors' assets held by holders of Claims in Class 3, Class 4, and Class 5 would attach to the proceeds of any sale of the Debtors' assets.  After these Claims are satisfied, the remaining funds, if any, could be used to pay holders of Claims and Interests in Class 6A, Class 6B, Class 7, Class 8, Class 9, and Class 10.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims under the Plan.

C. **Liquidation Under Chapter 7 of the Bankruptcy Code**

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit E.**

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan due to, among other reasons, the delay resulting from the conversion of the Chapter 11 Cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

## XI.

## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Class 3, Class 4, Class 5, Class 6A, and Class 6B to vote in favor thereof.

Dated:  January 23, 2023
Houston, Texas

Respectfully submitted,

By:        _____

Name:     John Linker

Title:     Chief Financial Officer, Treasurer and
           Assistant Secretary

on behalf of

DAWN INTERMEDIATE, LLC
SERTA SIMMONS BEDDING, LLC
SERTA INTERNATIONAL HOLDCO, LLC
NATIONAL BEDDING COMPANY L.L.C.
SSB MANUFACTURING COMPANY
THE SIMMONS MANUFACTURING CO., LLC
DREAMWELL, LTD.
SSB HOSPITALITY, LLC
SSB LOGISTICS, LLC
SIMMONS BEDDING COMPANY, LLC
TUFT & NEEDLE, LLC
TOMORROW SLEEP LLC
SSB RETAIL, LLC
WORLD OF SLEEP OUTLETS, LLC
.

*[Signature Page to Disclosure Statement]*

**EXHIBIT A**

Plan

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| | § | |
| **In re:** | § | **Chapter 11** |
| | § | |
| **SERTA SIMMONS BEDDING, LLC,** | § | **Case No. 23-90020 (DRJ)** |
| *et al.,* | § | |
| | § | **(Joint Administration Requested)** |
| Debtors.[1] | § | |
| | § | |

> THIS PLAN IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN.  ACCEPTANCE OR REJECTION MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THE INFORMATION IN THE PLAN IS SUBJECT TO CHANGE.  THIS PLAN IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY SECURITIES.

## JOINT CHAPTER 11 PLAN OF
## SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS

**WEIL, GOTSHAL & MANGES LLP**
Gabriel A. Morgan (24125891)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511

**WEIL, GOTSHAL & MANGES LLP**
Ray C. Schrock (*pro hac vice* pending)
Alexander W. Welch (*pro hac vice* pending)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Proposed Counsel for the Debtors
and Debtors in Possession*

Dated:  January 23, 2023
        Houston, Texas

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

Table of Contents

Page

**ARTICLE I.**  DEFINITIONS AND INTERPRETATION. ....................................................................... 1

**ARTICLE II.**  ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS,
DIP CLAIMS, AND PRIORITY TAX CLAIMS .......................................................... 16
2.1.   *Administrative Expense Claims* ................................................................... 16
2.2.   *Professional Fee Claims.* ............................................................................. 16
2.3.   *Priority Tax Claims.* .................................................................................... 16
2.4.   *DIP Claims.* ................................................................................................. 16
2.5.   *Restructuring Fees and Expenses* ............................................................... 17
2.6.   *Professional Fee Escrow.* ............................................................................ 17

**ARTICLE III.** CLASSIFICATION OF CLAIMS AND INTERESTS. ........................................... 17
3.1.   *Classification in General.* ........................................................................... 17
3.2.   *Formation of Debtor Groups for Convenience Only.* .................................. 18
3.3.   *Summary of Classification.* .......................................................................... 18
3.4.   *Special Provision Governing Unimpaired Claims.* ..................................... 18
3.5.   *Elimination of Vacant Classes.* ................................................................... 18
3.6.   *No Waiver.* ................................................................................................... 19

**ARTICLE IV.** TREATMENT OF CLAIMS AND INTERESTS. ................................................... 19
4.1.   *Other Secured Claims (Class 1).* ................................................................. 19
4.2.   *Priority Non-Tax Claims (Class 2).* ............................................................ 19
4.1.   *FLFO Claims (Class 3).* ............................................................................... 20
4.2.   *FLSO Claims (Class 4).* ............................................................................... 20
4.3.   *Non-PTL Claims (Class 5).* .......................................................................... 20
4.4.   *Ongoing General Unsecured Claims (Class 6A).* ....................................... 21
4.5.   *Other General Unsecured Claims (Class 6B).* ............................................ 21
4.6.   *Intercompany Claims (Class 7).* .................................................................. 21
4.7.   *Intercompany Interests (Class 8).* ............................................................... 22
4.8.   *Other Intercompany Interests (Class 9).* ..................................................... 22
4.9.   *Intermediate Equity Interests (Class 10).* ................................................... 22

**ARTICLE V.**  MEANS FOR IMPLEMENTATION. ........................................................................ 22
5.1.   *Compromise and Settlement of Claims, Interests, and Controversies.* ........ 22
5.2.   *Intercreditor Agreements.* ........................................................................... 23
5.3.   *Continued Corporate Existence; Effectuating Documents; Corporate Action;*
*Restructuring Transactions.* ........................................................................ 23
5.4.   *Intercompany Interests; Corporate Reorganization.* .................................. 24
5.5.   *New Term Loan.* ........................................................................................... 24
5.6.   *Exit ABL Facility.* ........................................................................................ 25
5.7.   *New Intercreditor Agreement.* ..................................................................... 25
5.8.   *Section 1145 Exemption.* ............................................................................. 26
5.9.   *Cancellation of Existing Securities and Agreements.* .................................. 26
5.10.  *Cancellation of Liens.* ................................................................................. 27
5.11.  *Officers and Boards of Directors.* ............................................................... 27
5.12.  *Management Incentive Plan.* ....................................................................... 28
5.13.  *Authorization, Issuance, and Delivery of New Common Interests.* ............. 28
5.14.  *Nonconsensual Confirmation.* ..................................................................... 28
5.15.  *Closing of the Chapter 11 Cases.* ............................................................... 28
5.16.  *Notice of Effective Date.* ............................................................................. 29

Table of Contents
(continued)

| 5.17. | *Separate Plans*. | 29 |
| | | |
| **ARTICLE VI.** DISTRIBUTIONS. | | 29 |
| 6.1. | *Distributions Generally*. | 29 |
| 6.2. | *Distributions Subject to Intercreditor Agreements*. | 29 |
| 6.3. | *Distribution Record Date*. | 29 |
| 6.4. | *Date of Distributions*. | 29 |
| 6.5. | *Disbursing Agent*. | 30 |
| 6.6. | *Rights and Powers of Disbursing Agent*. | 30 |
| 6.7. | *Expenses of Disbursing Agent*. | 30 |
| 6.8. | *No Postpetition Interest on Claims*. | 30 |
| 6.9. | *Delivery of Distributions*. | 31 |
| 6.10. | *Distributions after Effective Date*. | 31 |
| 6.11. | *Unclaimed Property*. | 31 |
| 6.12. | *Time Bar to Cash Payments*. | 31 |
| 6.13. | *Manner of Payment under Plan*. | 31 |
| 6.14. | *Satisfaction of Claims*. | 31 |
| 6.15. | *Fractional Stock*. | 32 |
| 6.16. | *Minimum Cash Distributions*. | 32 |
| 6.17. | *Setoffs*. | 32 |
| 6.18. | *Allocation of Distributions between Principal and Interest*. | 32 |
| 6.19. | *No Distribution in Excess of Amount of Allowed Claim*. | 32 |
| 6.20. | *Withholding and Reporting Requirements*. | 32 |
| | | |
| **ARTICLE VII.** | PROCEDURES FOR DISPUTED CLAIMS. | 33 |
| 7.1. | *Disputed Claims Generally*. | 33 |
| 7.2. | *Objections to Claims*. | 33 |
| 7.3. | *Estimation of Claims*. | 34 |
| 7.4. | *Adjustment to Claims Register Without Objection*. | 34 |
| 7.5. | *Disallowance of Claims*. | 34 |
| 7.6. | *No Distributions Pending Allowance*. | 34 |
| 7.7. | *Distributions after Allowance*. | 34 |
| 7.8. | *Disputed Claims Reserve*. | 35 |
| 7.9. | *Claim Resolution Procedures Cumulative*. | 36 |
| | | |
| **ARTICLE VIII.** | EXECUTORY CONTRACTS AND UNEXPIRED LEASES. | 36 |
| 8.1. | *General Treatment*. | 36 |
| 8.2. | *Determination of Cure Disputes and Deemed Consent*. | 36 |
| 8.3. | *Payments Related to Assumption or Assignment of Contracts and Leases*. | 37 |
| 8.4. | *Rejection Claims*. | 37 |
| 8.5. | *Survival of the Debtors' Indemnification Obligations*. | 38 |
| 8.6. | *Employee Arrangements*. | 38 |
| 8.7. | *Insurance Policies*. | 39 |
| 8.8. | *Intellectual Property Licenses and Agreements*. | 39 |
| 8.9. | *Assignment*. | 39 |
| 8.10. | *Modifications, Amendments, Supplements, Restatements, or Other Agreements*. | 40 |
| 8.11. | *Reservation of Rights*. | 40 |

Table of Contents
(continued)

Page

**ARTICLE IX.** CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
EFFECTIVE DATE ................................................................................. 40
9.1. *Conditions Precedent to the Effective Date.* .................................. 40
9.2. *Timing of Conditions Precedent.* .................................................. 41
9.3. *Waiver of Conditions Precedent.* .................................................. 42
9.4. *Effect of Failure of a Condition* ................................................... 42

**ARTICLE X.** EFFECT OF CONFIRMATION OF PLAN. ................................ 42
10.1. *Vesting of Assets in the Reorganized Debtors* ............................. 42
10.2. *Binding Effect.* ............................................................................... 43
10.3. *Discharge of Claims and Termination of Interests.* ..................... 43
10.4. *Term of Injunctions or Stays.* ....................................................... 43
10.5. *Injunction.* ..................................................................................... 43
10.6. *Releases.* ........................................................................................ 45
10.7. *Exculpation.* ................................................................................... 47
10.8. *Retention of Causes of Action/Reservation of Rights* .................. 47
10.9. *Ipso Facto and Similar Provisions Ineffective.* ............................ 48
10.10. *Solicitation of Plan.* ...................................................................... 48
10.11. *Corporate and Limited Liability Company Action* ...................... 48

**ARTICLE XI.** RETENTION OF JURISDICTION. ....................................... 49
11.1. *Retention of Jurisdiction.* .............................................................. 49
11.2. *Courts of Competent Jurisdiction* ................................................. 50

**ARTICLE XII.**                MISCELLANEOUS PROVISIONS ....................... 50
12.1. *Payment of Statutory Fees.* ........................................................... 50
12.2. *Substantial Consummation of the Plan.* ....................................... 51
12.3. *Request for Expedited Determination of Taxes.* ........................... 51
12.4. *Exemption from Certain Transfer Taxes* ...................................... 51
12.5. *Amendments* .................................................................................. 51
12.6. *Effectuating Documents and Further Transactions.* ..................... 52
12.7. *Revocation or Withdrawal of the Plan.* ......................................... 52
12.8. *Severability of Plan Provisions* .................................................... 52
12.9. *Governing Law* .............................................................................. 52
12.10. *Time*. 52
12.11. *Dates of Actions to Implement the Plan* ...................................... 53
12.12. *Immediate Binding Effect* ............................................................ 53
12.13. *Deemed Acts.* 53
12.14. *Successor and Assigns.* ................................................................. 53
12.15. *Entire Agreement.* ......................................................................... 53
12.16. *Exhibits to Plan.* ........................................................................... 53
12.17. *Notices*. 53

Each of Serta Simmons Bedding, LLC ("*Serta Simmons Bedding*"); Dawn Intermediate, LLC ("*Dawn Intermediate*"); Serta International Holdco, LLC; National Bedding Company L.L.C.; SSB Manufacturing Company; The Simmons Manufacturing Co., LLC; Dreamwell, Ltd.; SSB Hospitality, LLC; SSB Logistics, LLC; Simmons Bedding Company, LLC; Tuft & Needle, LLC; Tomorrow Sleep LLC; SSB Retail, LLC; and World of Sleep Outlets, LLC (each, a "*Debtor*" and, collectively, the "*Debtors*") propose the following joint chapter 11 plan of reorganization pursuant to section 1121(a) of the Bankruptcy Code. Capitalized terms used herein shall have the meanings set forth in Article I.A. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan, the settlements and transactions contemplated thereby, and certain related matters. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. The Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth herein shall apply separately to each of the Debtors.

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.      DEFINITIONS AND INTERPRETATION**.

A.      **Definitions.** The following terms shall have the respective meanings specified below:

*1.1* "*2020 Transaction*" means the issuance of the FLFO Term Loans and exchange of outstanding first lien and second lien term loans for FLSO Term Loans that closed on June 22, 2020.

*1.2* "*ABL Intercreditor Agreement*" means that certain *ABL Intercreditor Agreement*, dated November 8, 2016 (as amended, restated, amended and restated, supplemented and otherwise modified from time to time), by and among, *inter alios*, the PTL Agent, Prepetition ABL Agent, the Non-PTL Agent, and acknowledged and agreed to by Dawn Intermediate, Serta Simmons Bedding, a Delaware limited liability company, the other borrowers party thereto and each of the other obligors party thereto.

*1.3* "*Administrative Expense Claim*" means any Claim for a cost or expense of administration incurred during the Chapter 11 Cases pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for good and other services and leased premises) and (b) Professional Fee Claims.

*1.4* "*Adversary Complaint*" means the complaint filed by the Debtor and certain of the PTL Lenders commencing an adversary proceeding against certain of the Non-PTL Lenders seeking a declaratory judgment to resolve the claims arising from any pending or future litigation related to the 2020 Transaction.

*1.5* "*Adversary Proceeding*" means the proceeding commenced by the Adversary Complaint.

*1.6* "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code

*1.7* "*Allowed*" means, with reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed prior to the Effective Date, or (ii) as to which any

objection has been determined by a Final Order to the extent such objection is determined in favor of the respective holder, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, (c) any Claim or Interest as to which the liability of the Debtors or Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (d) any Claim or Interest expressly allowed hereunder; *provided*, *however*, that notwithstanding the foregoing, (x) unless expressly waived by the Plan, the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

1.8    "***Apollo Action***" has the meaning set forth in the Restructuring Support Agreement.

1.9    "***Bankruptcy Code***" means title 11 of the United States Code, 11 U.S.C. § 101, *et seq.*, as amended from time to time, as applicable to the Chapter 11 Cases.

1.10    "***Bankruptcy Court***" means the United States Bankruptcy Court for the Southern District of Texas Houston Division having jurisdiction over the Chapter 11 Cases, and to the extent of any reference made under section 157 of title 28 of the United States Code or the Bankruptcy Court is determined not to have authority to enter a Final Order on an issue, the District Court having jurisdiction over the Chapter 11 Cases under section 151 of title 28 of the United States Code.

1.11    "***Bankruptcy Rules***" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

1.12    "***Business Day***" means any day other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

1.13    "***Cash***" means legal tender of the United States of America.

1.14    "***Causes of Action***" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including, without limitation, under any state or federal securities laws).  Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

1.15    "***Chapter 11 Cases***" means the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court in which this Plan was filed.

1.16     "***Claim***" has the meaning set forth in section 101(5) of the Bankruptcy Code, as against any Debtor.

1.17     "***Class***" means any group of Claims or Interests classified as set forth in Article III of the Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

1.18     "***Commitment Letter***" means that certain Commitment Letter dated as of the Petition Date by the Exit ABL Facility Agent committing to provide the Exit ABL Commitment subject to the conditions contained therein.

1.19     "***Confirmation Date***" means the date on which the Clerk of the Bankruptcy Court enters the Confirmation Order.

1.20     "***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

1.21     "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, in form and substance (i) acceptable to the Requisite Consenting Creditors and the Company and (ii) reasonably acceptable to the DIP Agent and Exit ABL Facility Agent (as to this clause (ii), solely as related to or in connection with the DIP Facility, the Exit Facility, the Exit ABL Facility Agent, the Exit Facility Lenders, the DIP Agent, and the DIP Lenders), and otherwise subject to the applicable consent rights set forth in the Restructuring Support Agreement.

1.22     "***Consenting Creditor Consent Rights***" means any applicable consent, approval, and/or consultation right of the Requisite Consenting Creditors as set forth in the Restructuring Support Agreement.

1.23     "***Consenting Creditors***" means the PTL Lenders that are party to the Restructuring Support Agreement, together with their respective successors and permitted assigns and any subsequent Lender that becomes party to the Restructuring Support Agreement in accordance with the terms of the Restructuring Support Agreement.

1.24     "***Consenting Equity Holders***" means Dawn Holdings, Inc., as the sole member, and holder of interests in, Dawn Intermediate; and funds managed by Advent International Corporation, as holder of interests in Dawn Holdings, Inc.

1.25     "***Consenting Equity Holder Fees and Expenses***" means the reasonable and documented fees, costs and expenses of Ropes & Gray LLP, as counsel to certain of the Consenting Equity Holders, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Restructuring Support Agreement, this Plan, and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing, in an amount not to exceed $200,000.

1.26     "***Consenting Parties***" means, collectively, the Consenting Creditors and the Consenting Equity Holders.

1.27     "***Cure***" means the payment of Cash by the Debtors, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtors in accordance with the terms of an executory contract or unexpired lease of the Debtors and

(b) permit the Debtors to assume such executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.28    "*Cure Dispute*" means a pending objection relating to assumption or assumption and assignment of an executory contract or unexpired lease pursuant to section 365 of the Bankruptcy Code.

1.29    "*D&O Policy*" means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

1.30    "*Debtor or Debtors*" has the meaning set forth in the introductory paragraph of the Plan.

1.31    "*Debtors in Possession*" means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a) and 1108 of the Bankruptcy Code.

1.32    "*Definitive Documents*" has the meaning set forth in the Restructuring Support Agreement.  Each Definitive Document shall be consistent with the Restructuring Support Agreement and, in each case, subject to the Consenting Creditor Consent Rights.

1.33    "*DIP Agent*" means Eclipse Business Capital, LLC, solely in its capacity as administrative agent and collateral trustee under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

1.34    "*DIP Claims*" means all Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Loan Documents, which, for the avoidance of doubt, shall include all "DIP Obligations" as such term is defined in the DIP Orders.

1.35    "*DIP Commitment*" means the commitment to provide the amounts contemplated under the DIP Facility.

1.36    "*DIP Credit Agreement*" means that certain Senior Secured Super-Priority Debtor-in-Possession ABL Credit Agreement, dated as of January, 23, 2023, by and among Serta Simmons Bedding, as top borrower, the other borrowers party thereto, the DIP Agent, and the DIP Lenders, as approved by the DIP Orders, as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms which, for the avoidance of doubt, shall be in form and substance reasonably acceptable to the Requisite Consenting Creditors.

1.37    "*DIP Loan Documents*" has the meaning set forth in the DIP Orders. Each DIP Loan Document shall be consistent with the Restructuring Support Agreement and, in each case, subject to the Consenting Creditor Consent Rights.

1.38    "*DIP Facility*" means an asset-based revolving credit facility with aggregate commitments of $125,000,000, including a letter of credit sub-facility in an aggregate amount of up to $10,000,000 to issue new letters of credit, as approved by the DIP Orders.

1.39    "*DIP Lenders*" means the lenders and, if applicable, the issuing lenders from time to time party to the DIP Credit Agreements.

1.40    "*DIP Orders*" means, collectively, the Interim DIP Order and the Final DIP Order.

*1.41* "***Disallowed***" means, with respect to any Claim or Interest, that such Claim or Interest has been determined by a Final Order or specified in a provision of the Plan not to be Allowed.

*1.42* "***Disbursing Agent***" means any Entity (including any applicable Debtor if it acts in such capacity) in its capacity as a disbursing agent under Article VI of the Plan.

*1.43* "***Disclosure Statement***" means the disclosure statement for the Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

*1.44* "***Disclosure Statement Approval Order***" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

*1.45* "***Disputed***" means with respect to a Claim, (a) any Claim, which Claim is disputed under Section 7.1 of the Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be filed by order of the Bankruptcy Court but as to which a Proof of Claim was not timely or properly filed; (c) any Claim that is listed in the Schedules, if any are filed, as unliquidated, contingent, or disputed, and as to which no request for payment or Proof of Claim has been filed; or (d) any Claim that is otherwise disputed by any of the Debtors or the Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

*1.46* "***Disputed Claims Reserve***" means the reserve established pursuant to and governed by Section 7.8 of the Plan.

*1.47* "***Distribution Record Date***" means the Effective Date of the Plan, or such other time as agreed between the Debtors and the Requisite Consenting Creditors.

*1.48* "***Effective Date***" means the date determined by the Debtors, in consultation with the Requisite Consenting Creditors, and on which all conditions to the effectiveness of the Plan set forth in Article IX hereof have been satisfied or waived in accordance with the terms of the Plan.

*1.49* "***Employee Arrangements***" means all employment or employee-related arrangements, agreements, programs, and policies, and all compensation and benefits plans, policies, award letters, key employee retention agreements, and programs of the Debtors applicable to their respective employees, retirees, consultants, contractors, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans (including equity and equity-based plans), welfare benefits plans, and life and accidental death and dismemberment insurance plans.

*1.50* "***Entity***" means an individual, corporation, partnership, limited liability partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

*1.51* "***Estate or Estates***" means individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

1.52 "**_Exchange Agreement_**" means that certain Open Market and Cashless Exchange Agreement, dated as of June 22, 2020, by and among Dawn Intermediate, Serta Simmons Bedding LLC, National Bedding Company, L.L.C., SSB Manufacturing Company and each of the institutions party thereto as lenders.

1.53 "**_Exculpated Parties_**" means each of the following in their capacity as such and, in each case, to the maximum extent permitted by law: (i) the Debtors and their Estates, and (ii) each director, manager, or officer of any Debtor entity.

1.54 "**_Exit ABL Commitment_**" means the commitment to provide the amounts contemplated under the Exit ABL Facility, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.55 "**_Exit ABL Facility_**" means a $125,000,000 asset-based revolving credit facility, with a letter of credit sub-facility in an aggregate amount of up to $10,000,000.00 to be provided by the Exit ABL Facility Lenders to the Reorganized Debtors upon the Effective Date.

1.56 "**_Exit ABL Facility Agent_**" means Eclipse Business Capital LLC or another agent reasonably acceptable to the Requisite Consenting Creditors, in its capacity as administrative agent under the Exit ABL Facility Credit Agreement.

1.57 "**_Exit ABL Facility Credit Agreement_**" means that certain credit or loan agreement, in form and substance acceptable to the Exit ABL Facility Agent and Exit ABL Facility Lenders, pursuant to which the Exit ABL Facility shall be provided, to be dated as of the Effective Date, by and among _inter alios_ the Reorganized Debtors, as borrower and/or guarantor (as applicable), certain other subsidiaries as guarantors thereto, the Exit ABL Facility Agent and each Exit ABL Facility Lender, consistent with the Commitment Letter and the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.58 "**_Exit ABL Facility Lenders_**" means the lenders from time to time party to the Exit ABL Facility Credit Agreement or any other lenders reasonably acceptable to the Requisite Consenting Creditors.

1.59 "**_Exit ABL Facility Loans_**" means the revolving loans to be issued under the Exit ABL Facility.

1.60 "**_Final DIP Order_**" means the order entered by the Bankruptcy Court approving the motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Debtors to use cash collateral and enter into the DIP Financing on a final basis.

1.61 "**_Final Order_**" means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; _provided_, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another

court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

1.62    "**First Lien Intercreditor Agreement**" means that certain *First Lien Intercreditor Agreement*, dated June 22, 2020, by and among, *inter alios*, the PTL Agent, the Non-PTL Agent, and acknowledged and agreed to by Dawn Intermediate, Serta Simmons Bedding, the other borrowers party thereto and each of the other obligors party thereto.

1.63    "**FLFO Claim**" means any Claim arising from, derived from, or in connection to first lien first out term loans held under the PTL Credit Agreement, including any accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, and all Claims or Causes of Action relating thereto.

1.64    "**FLSO Claim**" means any Claim arising from, derived from, or in connection to first lien second out term loans under the PTL Credit Agreement, including any accrued and unpaid interest, fees, and other amounts arising and payable with respect thereto, and all Claims or Causes of Action relating thereto.

1.65    "**Governmental Unit**" has the meaning set forth in section 101(27) of the Bankruptcy Code.

1.66    "**GUC Recovery Allocation Table**" means the table attached hereto as **Exhibit A**.

1.67    "**Impaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.68    "**Indemnification Obligation**" means any existing or future obligation of any Debtor to indemnify (i) current directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date or (ii) the PTL Lenders and the PTL Agent under the PTL Credit Agreement.

1.69    "**Intercompany Claim**" means any Claim against a Debtor held by another Debtor.

1.70    "**Intercompany Interest**" means an Interest in a Debtor held by another Debtor, other than an Interest in Dawn Intermediate or Serta Simmons Bedding.

1.71    "**Intercreditor Agreements**" means, collectively, the First Lien Intercreditor Agreement and the ABL Intercreditor Agreement.

1.72    "**Interests**" means any equity in a Debtor as defined in section 101(16) of the Bankruptcy Code, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instruments evidencing an ownership interest, or equity security (as defined in section 101(16) of the Bankruptcy Code) in any of the Debtors, whether or not transferable, and any option, warrant or right, contractual or otherwise, including, without limitation, equity-based employee incentives, grants, stock options, stock appreciation rights, restricted stock, restricted stock units, performance shares/units, incentive awards, or other instruments issued to employees of the Debtors, to acquire any such interests in a Debtor that existed immediately before the Effective Date (in each case whether or not arising under or

in connection with any employment agreement; *provided*, that the foregoing shall not apply to any entitlement to participate in or receive any Interests of the Reorganized Debtors).

1.73   "*Interim DIP Order*" means the order entered by the Bankruptcy Court approving the motion pursuant to sections 363 and 364 of the Bankruptcy Code to authorize the Debtors to use cash collateral and enter into the DIP Financing, in each case, on an interim basis.

1.74   "*Intermediate Equity Interests*" means any outstanding Interests in Dawn Intermediate that existed immediately prior to the Effective Date.

1.75   "*LCM Action*" has the meaning set forth in the Restructuring Support Agreement.

1.76   "*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

1.77   "*Management Incentive Plan*" means a post-emergence equity-based management incentive plan under which up to eight percent (8%) (or such higher amount as mutually agreed between the Debtors and the Requisite Consenting Creditors on or before the Plan Supplement Date) of the New Common Interests outstanding on a fully diluted basis issued on the Effective Date may be issued to members of the Reorganized Debtors' management on the terms described in Section 5.12 of the Plan.

1.78   "*New Board*" means the board of directors or managers of Reorganized Parent.

1.79   "*New Common Interests*" means the new common equity of Reorganized Parent to be issued (a) on the Effective Date or (b) as otherwise permitted pursuant to the Plan and the New Corporate Governance Documents.

1.80   "*New Corporate Governance Documents*" means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement or other similar organizational or formation documents, as applicable, of the Reorganized Debtors, in each case, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.81   "*New Intercreditor Agreement*" means that certain intercreditor agreement, to be entered into on the Effective Date, in form and substance acceptable to the Exit ABL Facility Agent and Exit ABL Facility Lenders, by and between the New Term Loan Agent and the Exit ABL Facility Agent, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.82   "*New Term Loan*" means new first lien term loans in an aggregate principal amount of $300,000,000.00 pursuant to the New Term Loan Credit Facility Agreement.

1.83   "*New Term Loan Agent*" means an Entity in its capacity as administrative agent under the New Term Loan Credit Facility Agreement the identity of which shall be reasonably acceptable to the Requisite Consenting Creditors.

1.84   "*New Term Loan Credit Facility Agreement*" means that certain credit or loan agreement pursuant to which the New Term Loan shall be provided, to be dated as of the Effective Date, by and among *inter alios* the Reorganized Debtors, as borrowers and/or guarantors (as applicable), certain other subsidiaries as guarantors thereto, the New Term Loan Agent and the New Term Loan Lenders, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.85    "**Non-PTL Agent**" means UBS AG, Stamford Branch, solely in its capacities as administrative agent and collateral agent under the Non-PTL Term Loan Agreement.

1.86    "**Non-PTL Claims**" means any Claim arising from or in connection to principal obligations under the Non-PTL Term Loan Agreement, including all accrued and unpaid interest, fees, and other amounts payable pursuant to, and all claims or Causes of Action arising under or in connection with.

1.87    "**Non-PTL Lenders**" means the lenders from time to time party to the Non-PTL Term Loan Agreement.

1.88    "**Non-PTL Term Loan Agreement**" means that certain *First Lien Term Loan Agreement*, dated as of November 8, 2016 (as amended by that certain Amendment No. 1 to First Lien Term Loan Agreement, dated as of June 22, 2020 and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Dawn Intermediate, as holdings, Serta Simmons Bedding, National Bedding Company L.L.C., an Illinois limited liability company, and SSB Manufacturing Company, a Delaware corporation, as borrowers; the Non-PTL Lenders and the Non-PTL Agent.

1.89    "**Ongoing General Unsecured Claims**" means certain designated Unsecured Claims that are not Other General Unsecured Claims or Intercompany Claims, which are fixed, liquidated, and undisputed payment obligations to a third-party provider of goods or services to the Company that facilitates the Company's operations in the ordinary course of business and will continue to do so after the Effective Date that are neither secured by collateral or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court.

1.90    "**Other General Unsecured Claim**" means any Unsecured Claim against the Debtors that is not an Ongoing General Unsecured Claim, Intercompany Claim, or Non-PTL Claim.

1.91    "**Other General Unsecured Claim Recovery Pool**" means a Cash pool of $1,000,000 apportioned by Debtor in the manner set out in the GUC Recovery Allocation Table.

1.92    "**Other Intercompany Interests**" means Serta Simmons Bedding Equity Interests and any other Intercompany Interests identified as such in the Restructuring Transactions Exhibit filed with the Plan Supplement.

1.93    "**Other Secured Claim**" means a Secured Claim, other than an Administrative Expense Claim, a Priority Tax Claim, a FLFO Claim, or a FLSO Claim.  For the avoidance of doubt, Non-PTL Claims are not Other Secured Claims.

1.94    "**Person**" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, governmental unit (as defined in section 101(27) of the Bankruptcy Code), or other Entity.

1.95    "**Petition Date**" means, with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Case.

1.96    "**Plan**" means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including, without limitation, any appendices, schedules, and supplements to the Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof, consistent with the

Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights and any other applicable consent rights set forth in the Restructuring Support Agreement.

1.97    "**Plan Distribution**" means the payment or distribution of consideration to holders of Allowed Claims and Allowed Interests under the Plan.

1.98    "**Plan Supplement**" means a supplemental appendix to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (a) the New Corporate Governance Documents; (b) the New Term Loan Credit Facility Agreement; (c) the New Intercreditor Agreement; (d) the Exit ABL Facility Agreement; (e) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (f) the Restructuring Transactions Exhibit; (g) the Schedule of Retained Causes of Action, (h) the Schedule of Rejected Contracts; and (i) any Management Incentive Plan allocation and related documents, if applicable, solely to the extent agreed by the Company and the Requisite Consenting Creditors by the Plan Supplement Date; *provided,* that the foregoing shall be consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights and any other applicable consent rights set forth in the Restructuring Support Agreement; *provided further,* that through the Effective Date, the Debtors shall have the right to amend the Plan Supplement and any schedules, exhibits, or amendments thereto, in accordance with the terms of the Plan and the Restructuring Support Agreement, in each case, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.99    "**Plan Supplement Date**" means the Business Day that is at least 10 days before the Voting Deadline or such other later date determined by the Debtors (in consultation with the Consenting Creditors).

1.100   "**Prepetition ABL Agent**" means UBS AG, Stamford Branch, in its capacities as administrative agent and collateral agent under the Prepetition ABL Agreement.

1.101   "**Prepetition ABL Agreement**" means that certain ABL Credit Agreement, dated as of November 8, 2016 (as amended by that certain Amendment No. 1 to ABL Credit Agreement, dated as of June 30, 2020 and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Dawn Intermediate, as holdings, Serta Simmons Bedding, National Bedding Company L.L.C., an Illinois limited liability company, and SSB Manufacturing Company, a Delaware corporation, as borrowers; the Prepetition ABL Lenders and the Prepetition ABL Agent.

1.102   "**Prepetition ABL Lenders**" means the several banks and other financial institutions from time to time party to the Prepetition ABL Agreement.

1.103   "**Prerequisite Condition**" shall have the meaning ascribed to such term in Section 9.2 of the Plan.

1.104   "**Priority Non-Tax Claim**" means any Claim other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment as specified in section 507(a) of the Bankruptcy Code.

1.105   "**Priority Tax Claim**" means any Secured Claim or unsecured Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

*1.106* "**Professional**" means an Entity (i) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (ii) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code that are not Restructuring Fees and Expenses.

*1.107* "**Professional Fee Claims**" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

*1.108* "**Professional Fee Escrow**" means an escrow account established and funded pursuant to Section 2.6 of the Plan.

*1.109* "**Pro Rata Share**" means the proportion that an Allowed Claim or Interest in a particular Class bears to the aggregate amount of Allowed Claims or Interest in that Class, or the proportion that Allowed Claims or Interests in a particular Class bear to the aggregate amount of Allowed Claims and Disputed Claims or Allowed Interests and Disputed Interests in a particular Class and other Classes entitled to share in the same recovery as such Class under the Plan.

*1.110* "**PTL Agent**" means UBS AG, Stamford Branch, solely in its capacities as administrative agent and collateral agent under the PTL Credit Agreement and Wilmington Savings Society, FSB solely in its capacities as successor administrative agent and collateral agent under the PTL Credit Agreement.

*1.111* "**PTL Credit Agreement**" means that certain *Super-Priority Term Loan Agreement*, dated as of June 22, 2020 (as amended by that certain Amendment No. 1 to Super-Priority Term Loan Agreement, dated as of October 19, 2020 and by that certain Amendment No. 2 to Super-Priority Term Loan Agreement, dated as of November 12, 2020, and as may be further amended, restated, amended and restated, supplemented or otherwise modified from time to time), by and among Dawn Intermediate, as holdings, Serta Simmons Bedding, National Bedding Company L.L.C., an Illinois limited liability company, and SSB Manufacturing Company, a Delaware corporation, as borrowers; the PTL Lenders, and the PTL Agent.

*1.112* "**PTL Group**" means that certain ad hoc group of PTL Lenders represented by the PTL Group Advisors.

*1.113* "**PTL Group Counsel**" means Gibson, Dunn & Crutcher LLP, as legal advisors to the PTL Group, and one local counsel to the PTL Group in each relevant jurisdiction, solely to the extent each local counsel has been approved in advance by the Company Parties.

*1.114* "**PTL Group Advisors**" means, collectively, (i) the PTL Group Counsel, (ii) Centerview Partners LLC, (iii) one local counsel to the PTL Group in each relevant jurisdiction, and (iv) any other professionals, advisors, consultants, testifying witnesses, and/or experts retained by the PTL Group solely to the extent approved in advance by the Company Parties.

*1.115* "**PTL Lenders**" means the several banks and other financial institutions from time to time party to the PTL Credit Agreement holding PTL Obligations.

*1.116* "**PTL Obligations**" means the Obligations, as defined in the PTL Credit Agreement.

*1.117* "**Proof of Claim**" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

*1.118* "*Reinstate, Reinstated, or Reinstatement*" means leaving a Claim Unimpaired under the Plan.

*1.119* "*Related Parties*" means with respect to a Person, that Person's predecessors, successors, assigns, subsidiaries, affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, investment advisors, sub-advisors, collateral managers, and such Persons respective heirs, executors, estates, and nominees, in each case in their capacity as such.

*1.120* "*Released Parties*" means, collectively: (a) the Debtors; (b) the Reorganized Debtors; (c) the PTL Agent; (d) the Consenting Creditors; (e) the DIP Agent; (f) the DIP Lenders; (g) the Consenting Equity Holders; and (h) with respect to each of the foregoing Persons in clauses (a) through (g), all Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in Section 10.6(b) of the Plan shall not be deemed a Released Party thereunder.

*1.121* "*Releasing Parties*" means collectively, and in each case solely in their capacity as such, (a) the Debtors; (b) the Reorganized Debtors; (c) the PTL Agent; (d) the Consenting Creditors; (e) the DIP Agent; (f) the DIP Lenders; (g) the Consenting Equity Holders; (h) with respect to each of the foregoing Persons in clauses (a) through (g), all Related Parties; (i) the holders of all Claims or Interests that vote to accept the Plan, (j) the holders of all Claims or Interests whose vote to accept or reject the Plan is solicited but that do not vote either to accept or to reject the Plan, (k) the holders of all Claims or Interests that vote, or are deemed, to reject the Plan or that are presumed to accept the Plan but do not opt out of granting the releases set forth herein, (*l*) the holders of all Claims and Interests that were given notice of the opportunity to opt out of granting the releases set forth herein but did not opt out, and (m) any other Released Party, even if such Released Party purports to opt out of the releases set forth herein.

*1.122* "*Reorganized Debtors*" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

*1.123* "*Reorganized Parent*" means, from and after the Effective Date, the Entity or Entities serving as the parent or parents of the Reorganized Debtors, identified in and consistent with the Restructuring Transactions Exhibit and as reorganized pursuant to the Plan.

*1.124* "*Requisite Consenting Creditors*" means, as of the date of determination, Consenting Creditors holding at least a majority in aggregate principal amount outstanding under the PTL Credit Agreement held by all of the Consenting Creditors.

*1.125* "*Restructuring Fees and Expenses*" means (i) the Consenting Equity Holder Fees and Expenses; and (ii) all reasonable and documented fees, costs and expenses of each of the PTL Group Advisors and the PTL Agent, in each case, (i) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of the Restructuring Support Agreement, this Plan, and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, (ii)(A) consistent with any engagement letters or fee reimbursement letters entered into between the Company, on the one hand, and the applicable PTL Group Advisors, on the other hand (as supplemented and/or modified by this Agreement), or (B) as provided in the DIP Orders and/or the Confirmation Order.

1.126   "**Restructuring Support Agreement**" means that certain Restructuring Support Agreement, dated as of January 23, 2023, by and among the Debtors, the Consenting Creditors, and the Consenting Equity Holders (as may be amended, supplemented or modified from time to time in accordance with the terms thereof).

1.127   "**Restructuring Transactions**" means one or more transactions premised on a debt-for-equity exchange to occur on the Plan Effective Date or as soon as reasonably practicable thereafter, that may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, in each case, subject to the applicable Consenting Creditor Consent Rights, including: (i) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (iii) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law; (iv) such other transactions that are required to effectuate the Restructuring Transactions Exhibit in the most tax efficient manner for the Debtors and Reorganized Debtors, including any mergers, consolidations, restructurings, conversions, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (v) the execution, delivery, and filing, if applicable, of the Definitive Documents; (vi) the issuance of securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order or rule; (vii) pursuing, litigating, adjudicating, diligently prosecuting, resolving, and taking all other necessary actions with respect to the Adversary Proceeding, the Apollo Action, and the LCM Action consistent with the Plan and this Agreement; and (viii) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

1.128   "**Restructuring Transactions Exhibit**" means a memorandum setting forth the transactions that are required to effectuate the Restructuring Transactions contemplated by the Plan and included in the Plan Supplement, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights, and solely with respect to the Redemption Transaction, acceptable to the Consenting Equity Holders.

1.129   "**Serta Simmons Bedding Equity Interests**" means any outstanding Interests in Serta Simmons Bedding that existed immediately prior to the Effective Date.

1.130   "**Schedule of Rejected Contracts**" means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.131   "**Schedule of Retained Causes of Action**" means a schedule of Causes of Action to be retained by the Reorganized Debtors a set forth in the Plan Supplement, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights.

1.132   "**Schedules**" means any schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy code.

1.133   "**Secured Claim**" means a Claim (a) secured by a Lien on collateral to the extent of the value of such collateral as (i) set forth in the Plan, (ii) agreed to by the holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code exceeds the value of the Claim, or (b) secured by the amount of any right of setoff of the holder thereof in accordance with section 553 of the Bankruptcy Code.  For the avoidance of doubt, the Non-PTL Claims are not Secured Claims.

1.134   "**Security**" means any Security, as such term is defined in section 101(49) of the Bankruptcy Code.

1.135   "**Solicitation Materials**" means materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, the Disclosure Statement Approval Order, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan, consistent with the Restructuring Support Agreement and, in each case, subject to the Consenting Creditor Consent Rights.

1.136   "**Subsequent Condition**" shall have the meaning ascribed to such term in Section 9.2 of the Plan.

1.137   "**Tax Code**" means the Internal Revenue Code of 1986, as amended from time to time.

1.138   "**Trading Order**" means the order entered by the Bankruptcy Court, related to, among other things, certain transfers and rights to purchase or sell Interests in the Debtors.

1.139   "**U.S. Trustee**" means the United States Trustee for Region 7.

1.140   "**Unimpaired**" means, with respect to a Claim, Interest, or Class of Claims or Interests, not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

1.141   "**Unsecured Claim**" means all Claims that are not a Secured Claim, Other Secured Claims, Priority Tax Claim, Priority Non-Tax Claim, Professional Fee Claim, DIP Claim, or an Administrative Expense Claim. For the avoidance of doubt, deficiency claims in respect of the FLSO Claims are not Unsecured Claims.

1.142   "**Voting Deadline**" means the date and time as may be set by the Bankruptcy Court pursuant to the Solicitation Materials.

B.   **Interpretation; Application of Definitions and Rules of Construction**.

Unless otherwise specified, all section or exhibit references in the Plan are to the respective section in, or exhibit to, the Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in the Plan," "of the Plan," "to the Plan," and "under the Plan," respectively.  The words "includes" and "including" are not limiting.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) unless otherwise specified,

14

all references herein to "Sections" are references to Sections hereof or hereto; (4) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (5) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.      **Computation of Time**

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day.

D.      **Reference to Monetary Figures**.

All references in the Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

E.      **Controlling Document**.

In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document).  In the event of an inconsistency between the Plan and any other instrument or document created or executed pursuant to the Plan, or between the Plan and the Disclosure Statement, the Plan shall control.  The provisions of the Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effect the purposes of each; *provided*, *that*, if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of the Plan.

F.      **Consultation, Information, Notice, and Consent Rights**.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement set forth in the Restructuring Support Agreement (without enhancement or expansion thereof), including any Consenting Creditor Consent Rights, with respect to the form and substance of the Plan, all exhibits to the Plan, the Plan Supplement, the Disclosure Statement, and all other Definitive Documents, including any amendments, restatements, supplements, or other modifications to such agreements and documents, and any consents, waivers, or other deviations under or from any such documents, shall be incorporated herein by this reference (including to the applicable definitions in Article I.A hereof) and fully enforceable as if stated in full herein.  In case of a conflict between the consent rights of the Consenting Creditors or other applicable parties that are set forth in the Restructuring Support Agreement with those parties' consent rights that are set forth in the Plan or the Plan Supplement, unless otherwise set forth in this Plan, the consent rights in the Restructuring Support Agreement shall control.  Any and all consent rights of the Requisite Consenting Creditors referenced in the Plan or the Restructuring Support Agreement, to the extent given, not given, or otherwise withheld, may be communicated by email transmission by counsel.

**ARTICLE II.     ADMINISTRATIVE EXPENSE CLAIMS, PROFESSIONAL FEE CLAIMS, DIP CLAIMS, AND PRIORITY TAX CLAIMS.**

2.1.     *Administrative Expense Claims*.

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to different treatment, each holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, *however*, Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors, as Debtors in Possession, shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders, course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2.     *Professional Fee Claims*.

(a)     All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall (i) file, on or before the date that is forty-five (45) days after the Effective Date (unless extended by the Reorganized Debtors), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claims.

(b)     The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

2.3.     *Priority Tax Claims*.

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtors, as applicable, in consultation with the Requisite Consenting Creditors, Cash in an amount equal to such Allowed Priority Tax Claim on, or as soon thereafter as is reasonably practicable, the later of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course; *provided that*, the Debtors and the Reorganized Debtors, as applicable, reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

2.4.     *DIP Claims*.

Subject to the DIP Orders, on the Effective Date, each DIP Claim will be indefeasibly paid in full in Cash upon the Effective Date, and all letters of credit issued under the DIP Credit Agreement shall be cash collateralized in accordance with the terms of the DIP Credit Agreement, unless otherwise agreed to by the Debtors, DIP Agent, and DIP Lenders, subject in all respects to the terms of the Commitment Letter.

2.5. ***Restructuring Fees and Expenses***.

The Restructuring Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date, including, without limitation, in connection with or related to the Adversary Proceeding, the Apollo Proceeding, the LCM Proceeding, and/or any other claims, proceedings, actions, or causes of action in connection with or related to the PTL Credit Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or the 2020 Transaction), shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid or satisfied during the course of the Chapter 11 Cases) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.  All Restructuring Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least two (2) Business Days before the anticipated Effective Date; *provided*, *however*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Fees and Expenses.  On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.

2.6. ***Professional Fee Escrow***.

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims, and no Liens, Claims, or interests shall encumber the Professional Fee Escrow in any way (whether on account of the New Reorganized Debt, or otherwise).  The Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors or the Reorganized Debtors and (ii) shall be held in trust for the Professionals; *provided that* funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full shall revert to the Reorganized Debtors.  Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; *provided that* the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly funded to the Professional Fee Escrow from the Debtors' Estates without any further action or order of the Bankruptcy Court.

**ARTICLE III.   CLASSIFICATION OF CLAIMS AND INTERESTS**.

3.1. ***Classification in General***.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

3.2.     ***Formation of Debtor Groups for Convenience Only***.

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making distributions in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

3.3.     ***Summary of Classification***.

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, and Priority Tax Claims have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Priority Non-Tax Claims | Unimpaired | No (Presumed to Accept) |
| 3 | FLFO Claims | Impaired | Yes |
| 4 | FLSO Claims | Impaired | Yes |
| 5 | Non-PTL Claims | Impaired | Yes |
| 6A | Ongoing General Unsecured Claims | Impaired | Yes |
| 6B | Other General Unsecured Claims | Impaired | Yes |
| 7 | Intercompany Claims | Unimpaired/Impaired | No (Presumed to Accept/Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired/Impaired | No (Presumed to Accept/Deemed to Reject) |
| 9 | Other Intercompany Interests | Impaired | No (Deemed to Reject) |
| 10 | Intermediate Equity Interests | Impaired | No (Deemed to Reject) |

3.4.     ***Special Provision Governing Unimpaired Claims***.

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

3.5.     ***Elimination of Vacant Classes***.

Any Class of Claims against or Interests in a Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of

determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

3.6.    *No Waiver*.

Nothing contained in the Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

## ARTICLE IV.    TREATMENT OF CLAIMS AND INTERESTS.

4.1.    *Other Secured Claims (Class 1)*.

(a)    *Classification*:  Class 1 consists of the Other Secured Claims.  To the extent that Other Secured Claims are secured by different collateral or different interests in the same collateral, such Claims shall be treated as separate subclasses of Class 1 for purposes of voting to accept or reject the Plan and receiving distributions under the Plan.

(b)    *Treatment*:  The legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Secured Claim, at the option of the Debtors or the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, (i) each such holder shall receive payment in Cash in an *amount* equal to such Claim, (ii) such holder's Allowed Other Secured Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)    *Impairment and Voting*:  Class 1 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Other Secured Claims.

4.2.    *Priority Non-Tax Claims (Class 2)*.

(a)    *Classification*:  Class 2 consists of Priority Non-Tax Claims.

(b)    *Treatment*:  The legal, equitable, and contractual rights of the holders of Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim agrees to a less favorable treatment, in full and final satisfaction of such Allowed Priority Non-Tax Claim, at the option of the Debtors or the Reorganized Debtors, in consultation with the Requisite Consenting Creditors, (i) each such holder shall receive payment in Cash in an amount equal to such Claim, (ii) such holder's Allowed Priority Non-Tax Claim shall be Reinstated, or (iii) such holder shall receive such other treatment so as to render such holder's Allowed Priority Non-Tax Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code.

(c)    *Impairment and Voting*:  Class 2 is Unimpaired, and the holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, holders of Priority Non-*Tax* Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to Priority Non-Tax Claims.

4.1.        ***FLFO Claims (Class 3)***.

(a)        *Classification*:  Class 3 consists of FLFO Claims.

(b)        *Allowance*:  The FLFO Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in the aggregate amount of no less than $195,000,000.  Holders of FLFO Claims and the PTL Agent shall not be required to file proofs of Claim on account of their FLFO Claims.

(c)        *Treatment*:  Except to the extent that a holder of an Allowed FLFO Claim agrees to a less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim and in accordance with Section 5.5 of the Plan, on the Effective Date or as soon as reasonably practicable thereafter, such holder's Pro Rata share of $195,000,000 in aggregate principal amount of New Term Loans.

(d)        *Impairment and Voting*:  Class 3 is Impaired, and the holders of FLFO Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.2.        ***FLSO Claims (Class 4)***.

(a)        *Classification*:  *Class* 4 consists of FLSO Claims.

(b)        *Allowance*:  The FLSO Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code in the aggregate amount of no less than $832,012,999.  Holders of FLSO Claims and the PTL Agent shall not be required to file proofs of Claim on account of their FLSO Claims.

(c)        *Treatment*:  Except to the extent that a holder of an Allowed FLSO Claim agrees to a less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim and in accordance with Section 5.5 of the Plan, on the Effective Date, or as soon as reasonably practicable thereafter, such holder's Pro Rata share of (i) one hundred percent (100%) of the New Common Interests issued on the Effective Date*, less* any New Common Interests distributed to holders of Class 5 Non-PTL Claims under the Plan and subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan, and (ii) $105,000,000 in aggregate principal amount of New Term Loans.  Receipt of such consideration shall be effected as described in the Restructuring Transactions Exhibit.

(d)        *Impairment and Voting*:  Class 4 is Impaired, and the holders of FLSO Claims in Class 4 are entitled to vote to accept or reject the Plan.

4.3.        ***Non-PTL Claims (Class 5)***.

(a)        Classification: Class 5 consists of Non-PTL Claims.

(b)        *Treatment*: On the Effective Date, all Non-PTL Claims will be cancelled, released, and extinguished and will be of no further force and effect.  Each Holder of such Allowed Non-PTL Claims will receive:

(i)        **If Class 5 votes to accept the Plan**: Its Pro Rata share of 4% of New Common Interests issued on the Effective Date, subject to dilution by the New Common Interests distributed pursuant to the Management Incentive Plan.

(ii)     **If Class 5 votes to reject the Plan**: Its Pro Rata share of 1% of New Common Interests issued on the Effective Date, subject to dilution by any New Common Interests distributed pursuant to the Management Incentive Plan.

(c)     *Impairment and Voting*:  Class 5 is Impaired, and the holders of Non-PTL Claims in Class 5 are entitled to vote to accept or reject the Plan.

### 4.4.     *Ongoing General Unsecured Claims (Class 6A)*.

(a)     *Classification*:  Class 6A consists of Ongoing General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Ongoing General Unsecured Claim agrees to less favorable treatment, if a holder of an Allowed Ongoing General Unsecured Claim executes a trade agreement providing for the continuation of goods or services on the same or better terms as existed as most favorable terms provided to the Debtors in the six (6) months prior to the Petition Date (the form and terms of such agreement to be determined by the Debtors), on and after the Effective Date, or as soon as reasonably practical thereafter, each holder of an Allowed Ongoing General Unsecured Claim shall receive no more than four (4) Cash installments, which payments shall result in full payment in the Allowed amount of such Ongoing General Unsecured Claim on no better terms than payment in the ordinary course of business.

(c)     *Impairment and Voting*.  Class 6A is Impaired, and the holders of Ongoing General Unsecured Claims are entitled to vote to accept or reject the Plan.

### 4.5.     *Other General Unsecured Claims (Class 6B)*.

(a)     *Classification*:  Class 6B consists of Other General Unsecured Claims.

(b)     *Treatment*:  Except to the extent that a holder of an Allowed Other General Unsecured Claim agrees to less favorable treatment, each holder of an Allowed Other General Unsecured Claim shall receive, in full and final satisfaction of such Claim, its Pro Rata Share of the Other General Unsecured Claims Recovery Pool as set forth in the GUC Recovery Allocation Table.

(c)     *Impairment and Voting*:  Class 6B is Impaired, and the holders of Other General Unsecured Claims in Class 6A are entitled to vote to accept or reject the Plan.

### 4.6.     *Intercompany Claims (Class 7)*.

(a)     *Classification*:  Class 7 consists of Intercompany Claims.

(b)     *Treatment*:  Except as provided for in Section 5.2 of this Plan, on the Effective Date, or as soon as practicable thereafter, all Intercompany Claims shall be adjusted, Reinstated, or discharged (each without any distribution) to the extent reasonably determined to be appropriate by the Debtors or Reorganized Debtors and the Requisite Consenting Creditors, as applicable.

(c)     *Impairment and Voting*:  Holders of Class 7 Claims are either (i) Unimpaired and such holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or (ii) Impaired and such holders are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Claims.

21

4.7.     ***Intercompany Interests (Class 8)***.

(a)     *Classification*:  Class 8 consists of Intercompany Interests.

(b)     *Treatment*:  Except as provided for in Section 5.2 of this Plan, on the Effective Date, and without the need for any further corporate or limited liability company action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, all Intercompany Interests shall be unaffected by the Plan and continue in place following the Effective Date, solely for the administrative convenience of maintaining the existing corporate structure of the Debtors.

(c)     *Impairment and Voting*:  Class 8 are either (i) Unimpaired and such holders are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code or (ii) Impaired, and such holders are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Intercompany Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited with respect to such Intercompany Interests.

4.8.     ***Other Intercompany Interests (Class 9)***.

(a)     *Classification*:  Class 9 consists of Other Intercompany Interests.

(b)     *Treatment*:  On the Effective Date, Other Intercompany Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit.

(c)     *Impairment and Voting*:  Other Intercompany Interests are Impaired.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Other Intercompany Interests are conclusively deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Other Intercompany Interests.

4.9.     ***Intermediate Equity Interests (Class 10).***

(a)     Classification:  Class 10 consists of Intermediate Equity Interests.

(b)     *Treatment*:  On the Effective Date, Intermediate Equity Interests shall receive the treatment afforded in the Restructuring Transactions Exhibit.

(c)     *Impairment and Voting*:  Intermediate Equity Interests are Impaired, subject solely to the Restructuring Transactions Exhibit.  In accordance with section 1126(g) of the Bankruptcy Code, holders of Intermediate Equity Interests are conclusively deemed to reject this Plan and are not entitled to vote to accept or reject this Plan, and the votes of such holders will not be solicited with respect to Intermediate Equity Interests.

**ARTICLE V.     MEANS FOR IMPLEMENTATION.**

5.1.     ***Compromise and Settlement of Claims, Interests, and Controversies***.

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan, including the settlement of all Claims, Interests, and controversies among the Debtor and the Consenting Parties given in consideration of the value provided to

the Estates by the Consenting Parties, the terms of which are set out in the Restructuring Support Agreement and incorporated by reference herein, shall constitute an integrated and global good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, and subordination rights that a creditor or an Interest holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest, including pursuant to the transactions set forth in the Restructuring Transactions Exhibit.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's integrated and global approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies, as well as a finding by the Bankruptcy Court that such compromise, settlement, and transactions are in the best interests of the Debtors, their Estates, and holders of Allowed Claims, Allowed Interests, and is fair, equitable, and is within the range of reasonableness.  Subject to the provisions of this Plan governing distributions, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

5.2.    *Intercreditor Agreements*.

Except as expressly provided in the Plan, all rights, entitlements, and distributions shall be subject to the Intercreditor Agreements, the priorities and payment waterfalls of which shall be incorporated, preserved, and enforced by the Plan, the Debtors, the Consenting Creditors, and, as applicable, the Reorganized Debtors, pursuant to section 510 of the Bankruptcy Code.

5.3.    *Continued Corporate Existence; Effectuating Documents; Corporate Action; Restructuring Transactions*.

(a)    Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the New Corporate Governance Documents or other applicable corporate governance documents.

(b)    Notwithstanding anything herein to the contrary, on or about the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall take all actions set forth in and contemplated by the Restructuring Transactions Exhibit, and enter into any transaction and may take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary or appropriate to effectuate the Plan, including the Restructuring Transactions.

(c)    Upon the Effective Date, subject to the Consenting Creditor Consent Rights, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the assumption of executory contracts and unexpired leases as provided herein, (ii) the selection of the managers, directors, or officers for the Reorganized Debtors, (iii) the distribution of the New Common Interests, (iv) the entry into or execution of the Exit ABL Facility Credit Agreement and the New Term Loan Credit Facility Agreement, in each case, including definitive documentation related thereto, (v) any necessary action with respect to the Management Incentive Plan in accordance with Section 5.12 hereof, and (vi) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.

(d)    The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, authorize and direct parties, as applicable, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring Transactions.

(e)     Each officer, member of the board of directors, or manager of the Debtors is (and each officer, member of the board of directors, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the stockholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

(f)     All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors or by any other stakeholder, and with like effect as though such action had been taken unanimously by the stockholders, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors.

5.4.     ***Intercompany Interests; Corporate Reorganization.***

To the extent Reinstated under the Plan, on the Effective Date, the Intercompany Interests (a) shall be Reinstated for the ultimate benefit of the holders of Claims that receive New Common Interests under the Plan, and shall receive no recovery or distribution, and (b) without the need for any further corporate action or approval of any board of directors, board of managers, management, or stockholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Intercompany Interests shall be deemed to be in full force and effect.

5.5.     ***New Term Loan***.

(a)     On the Effective Date, in accordance with, and subject to, the terms and conditions of the New Term Loan Credit Facility Agreement, the Debtors will enter into the New Term Loan Credit Facility Agreement.  All Liens and security interests granted pursuant to the New Term Loan Credit Facility Agreement shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law and as provided for in the New Intercreditor Agreement, and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law, the Plan or the Confirmation Order.

(b)     On or before (as applicable) the Effective Date, the Debtors shall be authorized to execute, deliver, and enter into and perform under the New Term Loan Credit Facility Agreement without further (a) notice to or order or other approval of the Bankruptcy Court, (b) act or omission under applicable law, regulation, order, or rule, (c) vote, consent, authorization, or approval of any Person, or (d) action by the holders of Claims or Interests.  The New Term Loan Credit Facility Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order.  The New Term Loan Facility Agreement (and other definitive documentation related thereto) are reasonable and are being entered into in good faith.

(c)     The Reorganized Debtors and the Persons granted Liens and security interests under the New Term Loan are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.6.     *Exit ABL Facility*.

(a)     On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit ABL Facility Agreement without further (a) notice to or order or other approval of the Bankruptcy Court, (b) act or omission under applicable law, regulation, order, or rule, (c) vote, consent, authorization, or approval of any Person, or (d) action by the holders of Claims or Interests. The Exit ABL Facility Agreement shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with its terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, the Plan or the Confirmation Order. The financial accommodations to be extended pursuant to the Exit ABL Facility Agreement (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

(b)     On the Effective Date, subject in all respects to the terms of the Commitment Letter, (a) all letters of credit issued under the DIP Credit Agreement, shall be either (i) cash collateralized, or (ii) with the consent of the DIP Agent and DIP Lenders, deemed issued under the Exit ABL Facility Agreement in accordance with the terms and conditions of the Exit ABL Facility Agreement, and (b) All Liens and security interests granted pursuant to the Exit ABL Facility Agreement shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law and as provided for in the New Intercreditor Agreement and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law, the Plan, or the Confirmation Order.

(c)     The Reorganized Debtors and the Persons granted Liens and security interests under the Exit ABL Facility are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.7.     *New Intercreditor Agreement*.

On the Effective Date, the New Term Loan Agent and the Exit ABL Facility Agent shall enter into the New Intercreditor Agreement. Each lender under the New Term Loan Agreement and the Exit ABL Facility Credit Agreement shall be deemed to have directed the New Term Loan Agent or the Exit ABL Facility Agent, as applicable, to execute the New Intercreditor Agreement and shall be bound to

the terms of the New Intercreditor Agreement from and after the Effective Date as if it were a signatory thereto.

5.8.     ***Section 1145 Exemption.***

(a)     The offer, issuance, and distribution of the New Common Interests hereunder shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and (ii) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

(b)     The New Common Interests may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, subject to: (i) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (ii) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; and (iii) applicable regulatory approval.

5.9.     ***Cancellation of Existing Securities and Agreements.***

Except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Reorganized Debtors, on the Effective Date, all agreements, instruments, notes, certificates, mortgages, security documents, and any other instruments or documents evidencing any Claim or Interest (other than Intercompany Interests that are not modified by the Plan) and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.  Notwithstanding such cancellation and discharge, (a) the PTL Credit Agreement and Intercreditor Agreements shall continue in effect solely (i) to the extent necessary to allow the holders of Allowed FLFO Claims and Allowed FLSO Claims to receive distributions under the Plan, (ii) to the extent necessary to allow the Debtors, Reorganized Debtors, and/or PTL Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of Allowed FLFO Claims and Allowed FLSO Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims, and (iii) to appear in the Chapter 11 Cases; and (b) the Non-PTL Term Loan Agreement shall continue in effect (i) to the extent necessary to allow the holders of Allowed Non-PTL Claims to receive distributions under the Plan, (ii) to the extent necessary to allow the Debtors, Reorganized Debtors, and/or Non-PTL Agent to make post-Effective Date distributions or take such other action pursuant to the Plan on account of Allowed Non-PTL Claims and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims, and (iii) to appear in the Chapter 11 Cases, *provided*, *however*, that nothing in the foregoing shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors. Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors or their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in this section shall be deemed null and void and shall be of no force and effect, and the Debtors shall be entitled to continue to use (in accordance with the remaining provisions of such document, instrument, lease, or other agreement) any land, facilities, improvements, or equipment financed with the proceeds of the PTL Credit Agreement and/or the Non-PTL Term Loan Agreement, as applicable. Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or lease to the extent such executory

contract or lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.

5.10. *Cancellation of Liens*.

(a)     Except as otherwise specifically provided herein, including pursuant to Section 5.5(a) of the Plan, all notes, instruments, certificates evidencing debt of the Debtors and Intermediate Equity Interests will be cancelled and obligations of the Debtors thereunder will be discharged and of no further force or effect, except for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under the Plan and to make any further distributions to the applicable holders on account of their Claims and Interests.

(b)     Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or the Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(c)     After the Effective Date, the distributions to holders on account of Allowed FLFO Claims and Allowed FLSO Claims, and the payment of the Restructuring Fees and Expenses (including, without limitation, attorneys' and financial advisors' reasonable and documented fees and expenses), the Debtors or the Reorganized Debtors, at their expense, may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the FLFO Claims and FLSO Claims, including, without limitation, the preparation and filing, in form, substance, and content acceptable to the Requisite Consenting Creditors, as applicable, of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the PTL Agent and/or PTL Lenders, including, without limitation, UCC-3 termination statements.

5.11. *Officers and Boards of Directors*.

(a)     On or after the Effective Date, subject to the Consenting Creditor Consent Rights, the members of the New Board shall be appointed to serve pursuant to the terms of the applicable New Corporate Governance Documents.  The current chief executive officer of Serta Simmons Bedding shall serve as a member of the New Board.  The composition of each board of directors or managers of a Reorganized Debtor, as applicable, and, to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

(b)     The selection of the initial members of the board of directors or managers of the Reorganized Debtors, as applicable, shall be provided for and subject to the New Corporate Governance Documents, subject to the express provisions of the Plan and the Consenting Creditor Consent Rights.  The initial New Board will be comprised of (i) the current chief executive officer of Serta Simmons Bedding, and (ii) additional members the number and identity of whom will be selected by the Requisite Consenting Creditors in consultation with the Company.

(c)     The officers of the respective Debtors immediately before the Effective Date, as applicable, shall serve as the initial officers of each of the respective Reorganized Debtors on and after

the Effective Date and in accordance with any employment agreement with the Reorganized Debtors and applicable non-bankruptcy law. After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

(d)    Except to the extent that a member of the board of directors or a manager, as applicable, of a Debtor continues to serve as a director or manager of such Debtor on and after the Effective Date, the members of the board of directors or managers of each Debtor prior to the Effective Date, in their capacities as such, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such director or manager will be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date. Commencing on the Effective Date, each of the directors and managers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

### 5.12.    *Management Incentive Plan*.

No later than 120 days following the Effective Date, the New Board shall adopt the Management Incentive Plan. Up to eight percent (8%) (or such higher amount as mutually agreed between the Debtors and the Requisite Consenting Creditors on or before the Plan Supplement Date) of the New Common Interests on the Effective Date, on a fully diluted basis (including shares issuable under any employee incentive plan), will be reserved for issuance under the Management Incentive Plan.

### 5.13.    *Authorization, Issuance, and Delivery of New Common Interests.*

On the Effective Date, Reorganized Parent is authorized to issue or cause to be issued and shall issue the New Common Interests for distribution in accordance with the terms of the Plan without the need for any further board, stockholder or other corporate action. All of the New Common Interests issuable under the Plan, when so issued, shall be duly authorized and validly issued. Reorganized Parent shall issue or reserve for issuance a sufficient number of common equity issuances to effectuate all issuances of New Common Interests contemplated by the Plan, including the Management Incentive Plan. Each holder of New Common Interests shall be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended form time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents shall be binding on all Entities receiving New Common Interests (and their respective successors and assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to any New Corporate Governance Document.

### 5.14.    *Nonconsensual Confirmation*.

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

### 5.15.    *Closing of the Chapter 11 Cases*.

After an Estate has been fully administered, the Reorganized Debtors shall promptly seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case in accordance with the Bankruptcy Code and Bankruptcy Rules.

5.16.    *Notice of Effective Date*.

As soon as practicable, but not later than three (3) Business Days following the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

5.17.    *Separate Plans*.

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

## ARTICLE VI.    DISTRIBUTIONS.

6.1.    ***Distributions Generally***.

The Disbursing Agent shall make all distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

6.2.    ***Distributions Subject to Intercreditor Agreements***.

Except as expressly provided in Section 4.3 of this Plan, distributions under the Plan to holders of FLFO Claims, FLSO Claims, and Non-PTL Claims shall be made subject to and in accordance with the Intercreditor Agreements.

6.3.    ***Distribution Record Date***.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure amounts or disputes over any Cure amounts, neither the Debtors nor the Disbursing Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease as of the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure amount.

6.4.    ***Date of Distributions***.

Except as otherwise provided in this Plan (including payments made in the ordinary course of the Debtors' business) or as paid pursuant to a prior Bankruptcy Court order, on the Effective Date or, if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, or as otherwise determined in accordance with the Plan and Confirmation Order, including, without limitation, the treatment provisions of Article IV of the Plan, each holder of an Allowed Claim shall receive the full amount of the distributions that the Plan provides for Allowed Claims in the applicable class provided in the Plan.

6.5.     *Disbursing Agent*.

All distributions under the Plan shall be made by the applicable Reorganized Debtor, as Disbursing Agent, on or after the Effective Date or as otherwise provided herein.  A Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable fees and expenses incurred by such Disbursing Agents directly related to distributions hereunder shall be reimbursed by the Reorganized Debtors.

6.6.     *Rights and Powers of Disbursing Agent*.

(a)     From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent. No holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action vested in a Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by such Disbursing Agent to be necessary and proper to implement the provisions hereof.

(b)     Powers of Disbursing Agent.  The Disbursing Agent shall be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(c)     Expenses Incurred on or After the Effective Date.  Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.7.     *Expenses of Disbursing Agent*.

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable and documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.8.     *No Postpetition Interest on Claims*.

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on any Claims, and no holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

6.9.     *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made to a Disbursing Agent, who shall transmit such distribution to the applicable holders of Allowed Claims.  In the event that any distribution to any holder is returned as undeliverable, no further distributions shall be made to such holder unless and until such Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing herein shall require the Disbursing Agent to attempt to locate holders of undeliverable distributions and, if located, assist such holders in complying with Section 6.20 of the Plan.

6.10.    *Distributions after Effective Date*.

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

6.11.    *Unclaimed Property*.

One year from the Effective Date, all distributions payable on account of such Claim shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall revert to the Reorganized Debtors or their successors or assigns, and all claims of any other person (including the holder of a Claim in the same Class) to such distribution shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's filings.

6.12.    *Time Bar to Cash Payments*.

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary.  Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

6.13.    *Manner of Payment under Plan*.

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.14.    *Satisfaction of Claims*.

Except as otherwise specifically provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

6.15.    ***Fractional Stock***.

No fractional New Common Interests shall be distributed.  If any distributions of New Common Interests pursuant to the Plan would result in the issuance of a fractional share of New Common Interests, then the number of shares of New Common Interests to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down).  The total number of shares of New Common Interests to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in this Section 6.15.  No consideration shall be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Interests.

6.16.    ***Minimum Cash Distributions***.

The Disbursing Agent shall not be required to make any distribution of Cash less than one hundred dollars ($100) to any holder of an Allowed Claim; *provided*, *however*, that if any distribution is not made pursuant to this Section 6.16, such distribution shall be added to any subsequent distribution to be made on behalf of the holder's Allowed Claim.

6.17.    ***Setoffs***.

The Debtors and the Reorganized Debtors, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided*, *however*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

6.18.    ***Allocation of Distributions between Principal and Interest***.

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

6.19.    ***No Distribution in Excess of Amount of Allowed Claim***.

Notwithstanding anything in the Plan to the contrary, no holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

6.20.    ***Withholding and Reporting Requirements***.

(a)    *Withholding Rights*.  In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan or payment in connection therewith shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash issuance or distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the

withholding tax (or reimburse the distributing party for any advance payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property. Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any governmental unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)     *Forms*. Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Entity designated by the Reorganized Debtors (which Entity shall subsequently deliver to the Disbursing Agent any applicable Internal Revenue Service ("**IRS**") Form W-8 or Form W-9 received) an appropriate IRS Form W-9 or (if the payee is a foreign Entity) an appropriate IRS Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority. If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Entity designated by the Reorganized Debtors or Disbursing Agent and such party fails to comply before the date that is 180 days after the request is made, the amount of such distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

## ARTICLE VII.     PROCEDURES FOR DISPUTED CLAIMS.

### 7.1.     *Disputed Claims Generally*.

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or Final Order, including the Confirmation Order (when it becomes a Final Order) Allowing such Claim. Except insofar as a Claim is Allowed under the Plan or was Allowed prior to the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall have and retain any and all rights and defenses such Debtor has with respect to any Disputed Claim, including the Causes of Action retained pursuant to Section 10.8. Any objections to Claims shall be served and filed on or before: (a) the one hundred twentieth (180th) day following the later of (i) the Effective Date and (ii) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim; or (b) such later date as may be fixed by the Bankruptcy Court. All Disputed Claims not objected to by the end of such one hundred eighty (180) day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

### 7.2.     *Objections to Claims*.

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, shall be entitled to object to Claims. Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (a) to file, withdraw, or litigate to judgment objections to Claims; (b) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Debtors'

claims register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.

### 7.3.  *Estimation of Claims*.

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated.

### 7.4.  *Adjustment to Claims Register Without Objection*.

Any duplicate Claim or Interest or any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or the Reorganized Debtors upon stipulation between the parties in interest without a Claims objection having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

### 7.5.  *Disallowance of Claims.*

Any Claims held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Reorganized Debtors.

### 7.6.  *No Distributions Pending Allowance*.

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 7.7.  *Distributions after Allowance*.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in Article IV of the Plan.

7.8.     ***Disputed Claims Reserve.***

(a)     The Disputed Claims Reserve (which relates only to the Other General Unsecured Claims) shall be determined prior to the Confirmation Hearing, based on the Debtors' good faith estimates, and shall be established on or about the Effective Date.

(b)     To the extent applicable, there shall be withheld Cash from the General Unsecured Claims Recovery in an amount that would be distributable to any Disputed Claims had such Disputed Claim been Allowed on the Effective Date (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve).

(c)     Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat any cash and other property held in the Disputed Claims Reserve as held by a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, without limitation, the Debtors, the Reorganized Debtors, the Disbursing Agent and the holders of Disputed Claims) will be required to report for tax purposes consistently with the foregoing.  The Disbursing Agent may request, if necessary, an expedited determination of any unpaid tax liability of the Disputed Claims Reserve under Bankruptcy Code section 505(b) for all taxable periods of the Disputed Claims Reserve through the dissolution of the Disputed Claims Reserve as determined under applicable tax laws.

(d)     The Disbursing Agent shall hold in the Disputed Claims Reserve all payments and other distributions made on account of, as well as any obligations arising from, property held in the Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such payments, or other distributions shall be held for the benefit of, as applicable, holders of Disputed Convenience Claims against the Debtors whose Claims are subsequently Allowed, and (ii) other parties (if any) entitled thereto hereunder.  The Disbursing Agent shall be responsible for payment, out of the assets of the Disputed Claims Reserve, of any taxes imposed on the Disputed Claims Reserve or its assets.  In the event, and to the extent, any Cash in the Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of the Disputed Claims Reserve (including any income that may arise upon the distribution of the assets in the Disputed Claims Reserve), assets of the Disputed Claims Reserve may be sold to pay such taxes.

(e)     To the extent that a Disputed Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof the distribution, if any, of Cash to which such holder is entitled hereunder out of the Disputed Claims Reserve.  No interest shall be paid with respect to any Disputed Claim that becomes an Allowed Claim after the Effective Date.

(f)     If applicable, in the event the remaining withheld Cash from the General Unsecured Claims Recovery is insufficient to satisfy all the Disputed Claims that have become Allowed, such Allowed Claims shall be satisfied Pro Rata from such remaining Cash.  After all Cash has been distributed, no further distributions shall be made in respect of Disputed Claims.  At such time as all Disputed Claims have been resolved, any remaining withheld Cash from the General Unsecured Claims Recovery issued in the Disputed Claims Reserve shall revert to the Reorganized Debtors.

7.9.     *Claim Resolution Procedures Cumulative*.

All of the Claims, objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

## ARTICLE VIII.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.     *General Treatment*.

As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure amount, and subject to Section 8.6 of the Plan, consistent with the Restructuring Support Agreement and subject to the Consenting Creditor Consent Rights and any other applicable consent rights set forth in the Restructuring Support Agreement, all executory contracts and unexpired leases to which any of the Debtors are parties, and which have not expired by their own terms on or prior to the Confirmation Date shall be deemed assumed except for any executory contract or unexpired lease that (a) with the reasonable consent of the Requisite Consenting Creditors, previously has been assumed, assumed or assigned, or rejected pursuant to a Final Order of the Bankruptcy Court, (b) with the reasonable consent of the Requisite Consenting Creditors, is the subject of a separate (i) assumption motion filed by the Debtors, or (ii) rejection motion filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date, (c) with the reasonable consent of the Requisite Consenting Creditors, is specifically designated as a contract or lease to be rejected on the Schedule of Rejected Contracts, or (d) is the subject of a pending Cure Dispute.  Subject to the occurrence of the Effective Date, entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of the assumptions or rejections provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.  Each executory contract and unexpired lease assumed or assumed and assigned pursuant to the Plan shall vest in and be fully enforceable by the applicable Reorganized Debtor or assignee in accordance with its terms, except as modified by the provision of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment, or applicable law.

To the maximum extent permitted by law, to the extent any provision in any executory contract or unexpired lease assumed pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption of such executory contract or unexpired lease (including any "change of control" provision), then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such executory contract or unexpired lease or to exercise any other default-related rights with respect thereto.

8.2.     *Determination of Cure Disputes and Deemed Consent*.

(a)     Subject to the Consenting Creditor Consent Rights, the Debtors shall file, as part of the Plan Supplement, the Schedule of Rejected Contracts.

(b)     Prior to the Confirmation Hearing, the Debtors shall serve a notice on parties to executory contracts and unexpired leases to be assumed or assumed and assigned, as applicable, reflecting the Debtors' intention to assume or assume and assign, as applicable, the contract or unexpired lease in connection with the Plan and setting forth the proposed Cure amount (if any).  If a counterparty to any executory contract or unexpired lease that the Debtors or Reorganized Debtors, as applicable, intend to assume or assume and assign is not listed on such a notice, the proposed Cure amount for such executory contract or unexpired lease shall be deemed to be Zero Dollars ($0).

(c)       If there is a Cure Dispute pertaining to assumption or assumption and assignment of an executory contract or unexpired lease, such dispute shall be heard by the Bankruptcy Court prior to such assumption or assumption and assignment, as applicable, being effective, *provided*, *however*, before the Effective Date, the Debtors or the Reorganized Debtors, as applicable (with the reasonable consent of the Requisite Consenting Creditors), may settle any dispute regarding the Cure amount or the nature thereof without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

(d)       Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption or assumption and assignment, as applicable, of such executory contract or unexpired lease or the relevant Cure amount within ten (10) days of the service thereof, (i) shall be deemed to have assented to (A) such Cure amount and the nature thereof, (B) assumption or assumption and assignment, as applicable, of the applicable executory contract or unexpired lease notwithstanding any provision thereof that purports to (1) prohibit, restrict, or condition the transfer or assignment of such contract or lease, or (2) terminate or permit the termination of a contract or lease as a result of any direct or indirect transfer or assignment of the rights of the Debtors under such contract or lease or a change, if any, in the ownership or control to the extent contemplated by the Plan, and shall forever be barred and enjoined from asserting such objection against the Debtors or terminating or modifying such contract or lease on account of transactions contemplated by the Plan, and (ii) shall be forever barred, estopped, and enjoined from challenging the validity of such assumption or assumption and assignment, as applicable, or the Allowed amount of such Cure amount thereafter.

8.3.       ***Payments Related to Assumption or Assignment of Contracts and Leases***.

Subject to resolution of any Cure Dispute, all Cures shall be satisfied promptly, or otherwise as soon as practicable, by the Debtors or Reorganized Debtors, as the case may be, upon assumption or assumption and assignment, as applicable, of the underlying contracts and unexpired leases. Assumption or assumption and assignment, as applicable, of any executory contract or unexpired lease pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure amount, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time before the effective date of the assumption or assumption and assignment, as applicable. Any proofs of Claim filed with respect to an executory contract or unexpired lease that has been assumed shall be deemed disallowed and expunged, without further notice to or action, order or approval of the Bankruptcy Court or any other Entity, upon the deemed assumption of such contract or unexpired lease.

8.4.       ***Rejection Claims***.

In the event that the rejection of an executory contract or unexpired lease by any of the Debtors results in damages to the other party or parties to such contract or lease, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors or the Reorganized Debtors or their respective properties or interests in property as agents, successors, or assigns, unless a Proof of Claim is filed with the Bankruptcy Court and served upon counsel for the Debtors and the Reorganized Debtors no later than thirty (30) days after the later of (i) the Effective Date or (ii) the effective date of rejection of such executory contract or unexpired lease. Any such Claims, to the extent Allowed, shall be classified in Class 6B (Other General Unsecured Claims).

8.5.    ***Survival of the Debtors' Indemnification Obligations***.

(a)     Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify current officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (a) remain in full force and effect, (b) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (c) not be limited, reduced or terminated after the Effective Date, and (d) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date, *provided*, that the Reorganized Debtors shall not indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.  Any obligation to indemnify former officers, directors, members, managers, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall be discharged and all such obligations shall be deemed and treated as executory contracts to be rejected by the Debtors under the Plan.

(b)     Notwithstanding anything in the Plan (including Section 10.3 of the Plan), any Indemnification Obligation to indemnify the PTL Lenders with respect to all present and future actions, suits, and proceedings against the PTL Lenders or their respective Related Parties in connection with or related to the Adversary Proceeding, the Apollo Proceeding, the LCM Proceeding, and/or any other claims, proceedings, actions, or causes of action in connection with or related to the PTL Credit Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or the 2020 Transaction shall (a) remain in full force and effect, (b) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (c) not be limited, reduced or terminated after the Effective Date, and (d) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors.  Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection.

8.6.    ***Employee Arrangements***.

(a)     Notwithstanding anything to the contrary herein, on the Effective Date, Employee Arrangements in effect as of the Petition Date shall be deemed to be, and shall be treated as if they were, executory contracts that are to be assumed under the Plan; *provided* that if an Employee Arrangement (other than key employee retention agreements) provides in part for a payment, premium, or other award upon the occurrence of a change of control, change in control, or other similar event, then such Employee Arrangement shall only be assumed to the extent that the restructuring, including consummation of the Plan, shall not be treated as a change of control, change in control, or other similar event under such Employee Arrangement.

(b)     Any Interest (or right to obtain or receive any Interest) granted to a current or former employee, officer, director or contractor under an Employee Arrangement or otherwise, shall

be deemed cancelled on the Effective Date. For the avoidance of doubt, if an Employee Arrangement provides in part for an award or potential award of Interests or consideration based on the value of Interests that have not vested as of the Petition Date, such Employee Arrangement shall be assumed in all respects other than the provisions of such agreement relating to Interest awards.

8.7.    *Insurance Policies*.

(a)    All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as executory contracts and shall be assumed by the applicable Debtors or the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms, and all such insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)    In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies.

(c)    In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

8.8.    *Intellectual Property Licenses and Agreements*.

All intellectual property contracts, licenses, royalties, or other similar agreements to which the Debtors have any rights or obligations in effect as of the date of the Confirmation Order shall be deemed and treated as executory contracts pursuant to the Plan and shall be assumed by the respective Debtors and Reorganized Debtors and shall continue in full force and effect unless any such intellectual property contract, license, royalty, or other similar agreement otherwise is specifically rejected pursuant to a separate order of the Bankruptcy Court or is the subject of a separate rejection motion filed by the Debtors (with the reasonable consent of the Requisite Consenting Creditors) in accordance with the Plan. Unless otherwise noted hereunder, all other intellectual property contracts, licenses, royalties, or other similar agreements shall vest in the Reorganized Debtors and the Reorganized Debtors may take all actions as may be necessary or appropriate to ensure such vesting as contemplated herein.

8.9.    *Assignment*.

To the extent provided under the Bankruptcy Code or other applicable law, any executory contract or unexpired lease transferred and assigned hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such executory contract or unexpired lease (including, without limitation, those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment. To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such executory contract or unexpired lease or that terminates or modifies such executory contract or unexpired lease or allows the counterparty to such

39

executory contract or unexpired lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

8.10.    ***Modifications, Amendments, Supplements, Restatements, or Other Agreements***.

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each executory contract and unexpired lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such agreement, instrument, or other document is listed in the notice of assumed contracts.

8.11.    ***Reservation of Rights***.

(a)    Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as otherwise provided in the Plan, nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, Claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(c)    Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-executory contract or any unexpired or expired lease.

(d)    If there is a Cure Dispute or a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under the Plan, the Debtors or Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such Cure Dispute to alter their treatment of such contract or lease by filing a notice indicating such altered treatment.

**ARTICLE IX.    CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE**.

9.1.    ***Conditions Precedent to the Effective Date***.

The following are conditions precedent to the Effective Date of the Plan:

(a)    each document or agreement constituting the applicable Definitive Documents shall have been executed and/or effectuated and remain in full force and effect, shall be in form and substance acceptable or reasonably acceptable (as applicable, as set forth in the Restructuring Support Agreement) to the Debtors and the Requisite Consenting Creditors and consistent with the Restructuring Support Agreement, and any conditions precedent related thereto or contained therein shall have been satisfied prior to or contemporaneously with the occurrence of the Effective Date or otherwise waived;

(b)        all conditions precedent to the effectiveness of the Exit ABL Facility Credit Agreement shall have been satisfied or waived in accordance with the terms thereof, and the Exit ABL Facility Credit Agreement shall be in full force and effect and binding on all parties thereto;

(c)        all conditions precedent to the effectiveness of the New Term Loan Agreement shall have been satisfied or waived in accordance with the terms thereof, and the New Term Loan Agreement shall be in full force and effect and binding on all parties thereto;

(d)        the New Common Interests shall have been issued by the Reorganized Parent;

(e)        the Bankruptcy Court shall have entered an order granting the relief sought by the Debtors in the Adversary Proceeding;

(f)        the Professional Fee Escrow shall have been established and funded in Cash;

(g)        the Bankruptcy Court shall have entered the Confirmation Order in form and substance acceptable to the Requisite Consenting Creditors, and such order shall not have been reversed, stayed, amended, modified, dismissed, vacated or reconsidered;

(h)        no court of competent jurisdiction (including the Bankruptcy Court) or other competent governmental or regulatory authority shall have issued a final and non-appealable order making illegal or otherwise restricting, limiting, preventing, prohibiting, or materially affecting the consummation of any of the Restructuring Transactions, including, without limitation, any order, judgment, ruling, finding or other determination denying, dismissing, or otherwise adverse to the relief sought in the Adversary Proceeding or adverse to the defendants in the Apollo Action or the LCM Action;

(i)        the Restructuring Support Agreement shall be in full force and effect, no termination event or event that would give rise to a termination event under the Restructuring Support Agreement upon the expiration of the applicable grace period shall have occurred, and the Restructuring Support Agreement shall not have been validly terminated prior to the Effective Date;

(j)        the Restructuring Fees and Expenses shall have been paid in full;

(k)        the Debtors shall have implemented the Restructuring Transactions in a manner consistent in all respects with the Plan and the Restructuring Support Agreement; and

(l)        all governmental and third-party approvals and consents necessary, if any, in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

9.2.        ***Timing of Conditions Precedent.***

Notwithstanding when a condition precedent to the Effective Date occurs, unless otherwise specified in the Plan or any Plan Supplement document, for the purposes of the Plan, such condition precedent shall be deemed to have occurred simultaneously upon the completion of the applicable conditions precedent to the Effective Date; *provided that* to the extent a condition precedent (the "**Prerequisite Condition**") may be required to occur prior to another condition precedent (a "**Subsequent Condition**") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred

immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.3.     ***Waiver of Conditions Precedent.***

(a)      Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action.  Each of the conditions precedent of the Plan may be waived in writing by the Debtors with the prior written consent of (i) the Requisite Consenting Creditors, and (ii) solely with respect to the condition set forth in Section 9.1(b), the DIP Agent.  If the Plan is confirmed for fewer than all of the Debtors as provided for in Section 5.17 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.4.     ***Effect of Failure of a Condition***.

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, the PTL Agent, or any other Entity.

**ARTICLE X.      EFFECT OF CONFIRMATION OF PLAN**.

10.1.     ***Vesting of Assets in the Reorganized Debtors***.

Except as otherwise provided herein, or in any agreement, instrument, or other documents incorporated into the Plan (including with respect to the transactions contemplated by the Restructuring Transactions Exhibit), on the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under the Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by the Plan or Confirmation Order.  In addition, all rights, benefits, and protections provided to any of the Debtors or their Estates pursuant to the Plan, the Plan Supplement, or the Confirmation Order including, but not limited to, the release, exculpation, and injunction provisions provided in Article X of the Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by the Plan or the Confirmation Order.  On and after the Effective Date, except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.  Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

10.2.    ***Binding Effect***.

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

10.3.    ***Discharge of Claims and Termination of Interests***.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, the Plan or in a contract, instrument, or other agreement or document executed pursuant to the Plan, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the holder of such a Claim or Interest has voted to accept the Plan.  Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by the Plan.  The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

10.4.    ***Term of Injunctions or Stays***.

Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.  For the avoidance of doubt, the Trading Order shall remain enforceable beyond the Effective Date. The Trading Order has no applicability or effect with respect to the trading of New Common Interests.

10.5.    ***Injunction***.

**Except as otherwise expressly provided in the Plan or for distributions required to be paid or delivered pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 10.6(a) or Section 10.6(b), shall be discharged pursuant to Section 10.3 of the Plan, or are subject to exculpation pursuant to Section 10.7, and all other parties in interest are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, and/or the Exculpated Parties (to the extent of the exculpation provided pursuant to Section 10.7 with respect to the Exculpated Parties): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against**

such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such claims or interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a Claim or Interest or otherwise that such entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, settled, and/or treated, entitled to a distribution, or cancelled pursuant to the Plan; provided that such persons who have held, hold, or may hold Claims against, or Interests in, a Debtor, a Reorganized Debtor, or an Estate shall not be precluded from exercising their rights and remedies, or obtaining the benefits, solely pursuant to and consistent with the terms of the Plan.

Subject in all respects to Section 11.1, no entity or person may commence or pursue a Claim or Cause of Action of any kind against any Released Party or Exculpated Party that arose or arises from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Restructuring Support Agreement, the Definitive Documents, the Non-PTL Term Loan Agreement, the PTL Credit Agreement, the Intercreditor Agreements, the Exchange Agreement, the 2020 Transaction, and any and all related agreements, instruments, and/or other documents (including, without limitation, any and all related agreements, instruments, and/or other documents to the 2020 Transaction), the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, the Adversary Proceeding, the Apollo Action, the LCM Action, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Exit ABL Facility, the New Term Loan, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action represents a claim of  willful misconduct, fraud or gross negligence against a Released Party or Exculpated Party and (ii) specifically authorizing such Entity or Person to bring such Claim or Cause of Action against any such Released Party or Exculpated Party.  The Bankruptcy Court shall have sole and exclusive jurisdiction to determine whether a Claim or Cause of Action is colorable and, only to the extent legally permissible and as provided for in Section 11.1, shall have jurisdiction to adjudicate the underlying colorable Claim or Cause of Action.

10.6.    *Releases*.

(a)    **Releases by the Debtors**.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally and irrevocably, released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Restructuring Support Agreement, the Definitive Documents, the Non-PTL Term Loan Agreement, the PTL Credit Agreement, the Intercreditor Agreements, the Exchange Agreement, the 2020 Transaction, and any and all related agreements, instruments, and/or other documents (including, without limitation, any and all related agreements, instruments, and/or other documents to the 2020 Transaction), the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, the Adversary Proceeding, the Apollo Action, the LCM Action, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Exit ABL Facility, the New Term Loan, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 10.6(a) (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(b)     **<u>Releases by Holders of Claims and Interests</u>**.

**Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Restructuring Support Agreement, the Definitive Documents, the Non-PTL Term Loan Agreement, the PTL Credit Agreement, the Intercreditor Agreements, the Exchange Agreement, the 2020 Transaction, and any and all related agreements, instruments, and/or other documents (including, without limitation, any and all related agreements, instruments, and/or other documents to the 2020 Transaction), the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, the Adversary Proceeding, the Apollo Action, the LCM Action, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Exit ABL Facility, the New Term Loan, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in this Section 10.6(b) (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these third-party releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

10.7.     *Exculpation*.

**Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby released and exculpated from, any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out, in whole or in part, from the Petition Date through the Effective Date (and following the Effective Date solely with respect to any issuance or distribution of securities, the distribution of any property, or the implementation of the Restructuring, each pursuant to and in accordance with the Plan), of the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Restructuring Support Agreement, the Definitive Documents, and related agreements, instruments, or other documents, the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, the Adversary Proceeding, the Apollo Action, the LCM Action, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Exit ABL Facility, the New Term Loan, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other related agreement, except for Claims or Causes of Action arising from an act or omission that is judicially determined in a Final Order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects, such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with all applicable laws with regard to the solicitation and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the exculpations set forth in this Section 10.7 (i) shall only be applicable to the maximum extent permitted by law; and (ii) shall not be construed as (a) exculpating any Exculpated Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these exculpations any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) exculpating any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.**

10.8.     *Retention of Causes of Action/Reservation of Rights*.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to this Article X, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the

Effective Date. **The Debtors or the Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to the Plan.**

### 10.9.    *Ipso Facto and Similar Provisions Ineffective.*

Any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that shall occur as a result of such consummation; or (d) the restructuring.

### 10.10.    *Solicitation of Plan*.

As of and subject to the occurrence of the Confirmation Date:  (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation and (b) the Debtors and each of their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any securities under the Plan.

### 10.11.    *Corporate and Limited Liability Company Action*.

Upon the Effective Date, all actions contemplated by the Plan, subject to the applicable Consenting Creditor Consent Rights, shall be deemed authorized and approved in all respects, including (a) the assumption of all employee compensation and Employee Arrangements of the Debtors as provided herein, (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the distribution of the New Common Interests, (d) the entry into the Exit ABL Facility Credit Agreement and the New Term Loan Credit Facility Agreement, (e) the approval of the Restructuring Support Agreement, and (f) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof and the Restructuring Support Agreement. All matters provided for in the Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with the Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Security holders, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, but not limited to, (w) the New Corporate Governance Documents, (x) the Exit ABL Facility Credit Agreement, (y) the New Term Loan Credit Facility Agreement, and (z) any and all other agreements, documents, securities, and instruments relating to the foregoing.  The authorizations and approvals contemplated by this Section 10.11 shall be effective notwithstanding any requirements under non-bankruptcy law.

**ARTICLE XI.    RETENTION OF JURISDICTION**.

11.1.    *Retention of Jurisdiction*.

On and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)    to hear and determine motions and/or applications for the assumption, assumption and assignment, or rejection of executory contracts or unexpired leases, including Cure Disputes, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)    to determine any motion, adversary proceeding (including, without limitation, in connection with or related to the Adversary Proceeding, the Apollo Action, and/or the LCM Action), proceeding, application, contested matter, and/or other litigated matter pending on or commenced after the Confirmation Date, including, without limitation, any proceeding, application, contested matter, and/or other litigated matter related to or in connection with the Adversary Proceeding, the Apollo Proceeding, the LCM Proceeding, the PTL Credit Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or the 2020 Transaction or the res judicata, estoppel, preclusive, or other similar effect on any claims of any nature in connection with or related to the Adversary Proceeding, the Apollo Action, the LCM Action, the PTL Credit Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or the 2020 Transaction, including, without limitation, any action intended to provide declaratory or other relief as to the application (including as an affirmative defense) of res judicata, estoppel, any preclusion doctrine, or any other similar doctrine as to any matters in connection with or related to the Adversary Proceeding, the Apollo Action, the LCM Action, the PTL Credit Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or the 2020 Transaction;

(c)    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

(d)    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

(e)    to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)    to hear and determine all Professional Fee Claims;

(i)       to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)       to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)       to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)       to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)       to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)       to resolve disputes concerning Disputed Claims or the administration thereof;

(o)       to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(p)       to enter a final decree closing the Chapter 11 Cases;

(q)       to recover all assets of the Debtors and property of the Debtors' Estates, wherever located; and

(r)       to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

### 11.2.       *Courts of Competent Jurisdiction*.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII.       MISCELLANEOUS PROVISIONS.

### 12.1.       *Payment of Statutory Fees*.

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

### 12.2. *Substantial Consummation of the Plan*.

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3. *Request for Expedited Determination of Taxes*.

The Debtors and the Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

### 12.4. *Exemption from Certain Transfer Taxes*.

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (c) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, assignment or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan and Restructuring Transactions Exhibit (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the New Term Loan Credit Facility Agreement, and (e) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

### 12.5. *Amendments*.

(a)      *Plan Modifications*.  Subject to the applicable consent rights of the Requisite Consenting Creditors and the Consenting Equity Holders as set forth in the Restructuring Support Agreement, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law without additional disclosure pursuant to section 1125 of the Bankruptcy Code; provided, that any modifications or amendments to this Plan that materially adversely affect the treatment of the DIP Agent, DIP Lenders, Exit Facility Agent, and/or Exit Facility Lenders shall require the consent of the DIP Agent, DIP Lenders, Exit Facility Agent, and/or Exit Facility Lenders, as applicable.

(b)      *Other Amendments*.  Subject to the consent rights of the Requisite Consenting Creditors and the Consenting Equity Holders as set forth in the Restructuring Support Agreement, before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

12.6.     ***Effectuating Documents and Further Transactions***.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

12.7.     ***Revocation or Withdrawal of the Plan***.

The Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors with the consent of the Requisite Consenting Creditors; *provided, however*, that the Debtors may revoke or withdraw the Plan without such consent in the exercise of the Debtors' fiduciary duty or as otherwise permitted under the Restructuring Support Agreement.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission of any sort by any Debtor, any of the Consenting Creditors, the PTL Agent, or any other Entity.

12.8.     ***Severability of Plan Provisions***.

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

12.9.     ***Governing Law***.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

12.10.     ***Time***.

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

12.11.    ***Dates of Actions to Implement the Plan***.

In the event that any payment or act under the Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12.12.    ***Immediate Binding Effect***.

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

12.13.    ***Deemed Acts***.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

12.14.    ***Successor and Assigns***.

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.15.    ***Entire Agreement***.

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

12.16.    ***Exhibits to Plan.***

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full herein.

12.17.    ***Notices***.

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or addressed as follows:

(a)    if to the Debtors or the Reorganized Debtors:

Dawn Intermediate, LLC
2451 Industry Avenue
Doraville, GA 30360

Attn:  Kristen McGuffey
Email: SSBLegalDept@sertasimmons.com

- and -

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Ray C. Schrock
        Alexander W. Welch
Telephone:  (212) 310-8000
Email:  ray.schrock@weil.com
        alexander.welch@weil.com

- and -

700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attn:   Gabriel A. Morgan
        Stephanie N. Morrison
Telephone: (713) 546-5000
Email:  gabriel.morgan@weil.com
        stephanie.morrison@weil.com

(b)     if to the Consenting Creditors:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attn:   Scott J. Greenberg, Esq.
        Michael Cohen, Esq.
        Jason Zachary Goldstein, Esq.
Telephone:  (212) 403-1000
Email:  SGreenberg@gibsondunn.com
        MCohen@gibsondunn.com
        JGoldstein@gibsondunn.com

(c)     if to the Consenting Equity Holders:

Advent International Corporation
Prudential Tower
800 Boylston Street, Suite 3300
Boston, MA 02199
Attn:   Jefferson Case
        Amanda McGrady Morrison

- and -

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036

Attn:  Gregg M. Galardi
Jeramy D. Webb
Amanda C. Glaubach
Email:  Gregg.Galardi@ropesgray.com
Jeramy.Webb@ropesgray.com
Amanda.Glaubach@ropesgray.com

(d)      if to the DIP Agent:

Eclipse Business Capital LLC
333 W. Wacker Drive, Suite 950
Chicago, Illinois 60606
Attn:   Jim Gurgone
Email:  jgurgone@eclipsebuscap.com

- and -

Choate, Hall & Stewart LLP
Two International Place, 34th Floor
Boston, Massachusetts 02110
Attn:  Kevin Simard
Seth Mennillo
Email:  ksimard@choate.com
smennillo@choate.com

After the Effective Date, the Debtors have authority to send a notice to Entities providing that, to continue to receive documents pursuant to Bankruptcy Rule 2002, they must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have filed such renewed requests.

[*Remainder of page intentionally left blank*]

Dated:  January 23, 2023
          Houston, Texas

Respectfully submitted,

By:  _____

Name:  John Linker
Title:   Chief Financial Officer, Treasurer and
          Assistant Secretary

On behalf of Serta Simmons Bedding, LLC
and each of its Debtor affiliates

*[Signature Page for Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors]*

**EXHIBIT A**

**GUC Recovery Allocation Table**

**[TO COME]**

**EXHIBIT B**

Restructuring Support Agreement

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES OF A CHAPTER 11 PLAN WITHIN THE MEANING OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL COMPLY WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, this "**Agreement**") dated January 23, 2023, is entered into by and among:

(a)     Dawn Intermediate, LLC ("**Dawn**") and the direct and indirect wholly owned subsidiaries listed on **Exhibit A** to this Agreement (collectively, the "**Company**", and each, a "**Company Party**");

(b)     the undersigned PTL Lenders holding PTL Obligations, in the aggregate, of approximately $798,524,957, comprised of holdings of FLFO Claims and FLSO Claims, each in the aggregate of approximately $157,743,576 and $640,781,381, respectively (collectively, the "**Initial Consenting PTL Lenders**," and together with any PTL Lenders that subsequently become party to this Agreement, solely in their capacity as PTL Lenders, the "**Consenting Creditors**"); and

(c)     Dawn Holdings, Inc., as the sole member, and holder of interests in, Dawn; and funds managed by Advent International Corporation, as holders of Interests in Dawn Holdings, Inc. (together, "**Consenting Equity Holders**", each a "**Consenting Equity Holder**").

The Company and each Consenting Creditor, and any subsequent Person that becomes a party hereto in accordance with the terms hereof are collectively referred to herein as the "**Parties**" and each, individually as a "**Party**." Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan (as defined below). The terms of the Plan are hereby incorporated and included in the terms of this Agreement. In the event of any inconsistencies between the terms of this Agreement and the Plan, the terms of the Plan shall govern.

## RECITALS

WHEREAS, the Parties consent to (as applicable) and have agreed to consummate and support the Restructuring Transactions (as defined herein), on the terms set forth in this Agreement and as specified in the chapter 11 plan of reorganization attached as **Exhibit B** hereto (as may be amended, supplemented, or otherwise modified from time to time in accordance with the terms of this Agreement, the "**Plan**") setting forth the terms and conditions of the Restructuring Transactions; and

WHEREAS, the Company will implement the Restructuring Transactions through commencement by the Company Parties of voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**"); and

WHEREAS, this Agreement, including the Plan, is the product of arm's-length, good faith negotiations among the Parties and each of their respective advisors and sets forth the material terms and conditions of the Restructuring (as defined herein); and

WHEREAS, as of the date hereof, the Initial Consenting PTL Lenders, in the aggregate, hold, own, or control approximately: (i) 81% of the aggregate outstanding principal amount of FLFO Claims, and (ii) 77% of the aggregate outstanding principal amount of the FLSO Claims; and

WHEREAS, the Parties desire to express to each other their mutual support and commitment in respect of the matters set forth in this Agreement, including the Plan.

NOW, THEREFORE, in consideration of the foregoing and the covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, on a several but not joint basis, agree as follows:

1.    **Certain Definitions.**

As used in this Agreement, the following terms have the following meanings:

(a)    "**2020 Transaction**" has the meaning set forth in the Plan.

(b)    "**Adversary Complaint**" means the complaint filed by the Debtor and certain of the PTL Lenders commencing an adversary proceeding against certain of the Non-PTL Lenders seeking a declaratory judgment to resolve the claims arising from any pending or future litigation related to the 2020 Transaction.

(c)    "**Adversary Proceeding**" means the proceeding commenced by the Adversary Complaint.

(d)    "**Agreement**" has the meaning set forth in the preamble to this Agreement.

(e)    "**Alternative Restructuring**" means any reorganization, merger, consolidation, tender offer, exchange offer, business combination, joint venture, partnership, sale of all or any material portion of assets, financing (debt or equity), plan proposal, recapitalization, restructuring of the Company Parties, or other transaction of similar effect, other than the Restructuring.

(f)    "**Apollo Action**" means that certain action commenced by AG Centre Street Partnership L.P., AG Credit Solutions Non-ECI Master Fund, L.P., AG Super Fund Master, L.P., AG SF Master (L), L.P., et al. in the Supreme Court of the State of New York, County of New York, Index No. 654181/2022.

(g)    "**Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

(h)    "**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas.

(i)      "**Bar Date**" means a general bar date by which all creditors must file proofs of claim in the Chapter 11 Cases and a governmental bar date by which all governmental units must file proofs of claim in the Chapter 11 Cases.

(j)      "**Business Day**" means any day, other than a Saturday, a Sunday, or any other day on which banking institutions in New York, New York are required or authorized to close by law or executive order.

(k)      "**Chapter 11 Cases**" has the meaning set forth in the recitals to this Agreement.

(l)      "**Company**" has the meaning set forth in the preamble to this Agreement.

(m)      "**Company Parties**" has the meaning set forth in the preamble to this Agreement.

(n)      "**Company Termination Event**" has the meaning set forth in Section 7.03.

(o)      "**Confirmation Order**" has the meaning set forth in the Plan.

(p)      "**Consenting Claims**" means all Claims against any Company Party held by Consenting Creditors from time to time.

(q)      "**Consenting Creditors**" has the meaning set forth in the preamble to this Agreement.

(r)      "**Consenting Creditor Termination Event**" has the meaning set forth in Section 7.02.

(s)      "**Consenting Equity Holder**" has the meaning set forth in the preamble to this Agreement.

(t)      "**Consenting Equity Holder Fees and Expenses**" means the reasonable and documented fees, costs and expenses of Ropes & Gray LLP, as counsel to certain of the Consenting Equity Holders, in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement, the Plan, and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing, in an amount not to exceed $200,000.

(u)      "**Consenting Equity Holder Retainer**" has the meaning set forth in Section 5(f).

(v)      "**Consenting Equity Holder Support Period**" means the period commencing on the latest of (a) the Support Effective Date, (b) the date on which Ropes & Gray, LLP receives the Consenting Equity Holder Retainer, and (c) the date on which the Debtors and Requisite Consenting Creditors determine to effectuate the Restructuring pursuant to the Redemption Transaction and ending on the Termination Date.

3

(w)     "**Dawn**" has the meaning set forth in the preamble to this Agreement.

(x)     "**Definitive Documents**" means all of the definitive documents implementing the Restructuring, including, without limitation: (i) the Plan and the Plan Supplement, (ii) the Disclosure Statement and the Solicitation Materials, (iii) the Disclosure Statement Approval Order, (iv) the Confirmation Order, (v) the DIP Credit Agreement; (vi) the DIP Orders; (vii) the DIP Loan Documents; (viii) the Exit ABL Commitment Letter; (ix) the Exit ABL Facility Credit Agreement; (x) the New Term Loan Credit Facility Agreement; (xi) the Adversary Complaint, Scheduling Motion, and Scheduling Order; (xii) New Corporate Governance Documents; (xiii) the New Corporate Governance Documents of Reorganized Parent; (xiv) any Management Incentive Plan allocation and related documents, if applicable; (xv) the New Intercreditor Agreement; (xvi) the Takeback Debt Terms; and (xvii) the First Day Orders; and in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).

(y)     "**DIP Credit Agreement**" means the senior secured super-priority debtor-in-possession ABL credit agreement attached hereto as **Exhibit F**.

(z)     "**DIP Financing**" means the financing by the use of cash collateral and a postpetition senior secured superpriority debtor-in-possession credit facility to the Company Parties on the terms and conditions consistent with the DIP Credit Agreement.

(aa)    "**DIP Loan Documents**" has the meaning set forth in the DIP Orders.

(bb)    "**DIP Orders**" means, collectively, the Interim DIP Order and the Final DIP Order.

(cc)    "**Disclosure Statement**" means the disclosure statement in respect of the Plan, including all exhibits and schedules thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code, substantially in the form attached hereto as **Exhibit C**.

(dd)    "**Disclosure Statement Approval Order**" means the order of the Bankruptcy Court approving the Disclosure Statement and solicitation procedures in connection thereto.

(ee)    "**Evercore**" means Evercore Group, L.L.C.

(ff)    "**Exit ABL Commitment Letter**" means the commitment letter attached hereto as **Exhibit G** setting forth the terms and conditions of the Exit ABL Facility.

(gg)    "**Exit ABL Facility**" has the meaning set forth in the Plan.

(hh)    "**Exit ABL Facility Credit Agreement**" has the meaning set forth in the Plan.

(ii)    "**Fiduciary Out**" has the meaning set forth in Section 7.03(f).

4

(jj)     **"Final DIP Order"** means the final order entered in the Chapter 11 Cases authorizing the Company's entry into the DIP Financing.

(kk)     "**First Day Orders**" means any interim or final orders of the Bankruptcy Court granting the relief requested in the first-day pleadings that the Company Parties determine are necessary or desirable to file in the Chapter 11 Cases.

(ll)     "**First Lien Intercreditor Agreement**" means that certain *First Lien Intercreditor Agreement*, dated June 22, 2020, by and among, *inter alios*, the PTL Agent, the Non-PTL Loan Agent, and acknowledged and agreed to by Dawn Intermediate, Serta Simmons Bedding, LLC, a Delaware limited liability company, the other borrowers party thereto and each of the other obligors party thereto.

(mm)     "**Initial Consenting PTL Lenders**" has the meaning set forth in the preamble to this Agreement.

(nn)     **"Interim DIP Order"** means the interim order entered in the Chapter 11 Cases authorizing the Company's entering into the DIP Financing.

(oo)     "**Joinder Agreement**" has the meaning set forth in Section 4.03.

(pp)     "**LCM Action**" means that certain action commenced by LCM XXII LTD., LCM XXIII LTD., et al. in the United States District Court for the Southern District of New York, Civil Action No. 1:21-cv-03987.

(qq)     "**Management Incentive Plan**" has the meaning set forth in the Plan.

(rr)     "**Milestones**" means the "Milestones" set out in **<u>Exhibit E</u>.**

(ss)     "**New Corporate Governance Documents**" means the certificate of incorporation, certificate of formation, bylaws, limited liability company agreements, shareholder agreement (if any), operating agreement or other similar organizational or formation documents, as applicable, of the Reorganized Debtors.

(tt)     "**New Intercreditor Agreement**" has the meaning set forth in the Plan.

(uu)     "**New Term Loan Credit Facility Agreement**" has the meaning set forth in the Plan.

(vv)     "**Outside Date**" has the meaning set forth in **<u>Exhibit E</u>**.

(ww)     "**Outside Petition Date**" has the meaning set forth in **<u>Exhibit E</u>**.

(xx)     "**Party**" or "**Parties**" has the meaning set forth in the preamble to this Agreement.

(yy)     "**Permitted Transferee**" has the meaning set forth in Section 4.03.

(zz)     "**Petition Date**" has the meaning set forth in **<u>Exhibit E</u>**.

(aaa)   "**Plan**" has the meaning set forth in the recitals to this Agreement.

(bbb)   "**Plan Effective Date**" means the date on which the conditions to effectiveness of the Plan have been satisfied or waived in accordance with its terms and the Restructuring is consummated.

(ccc)   "**Plan Supplement**" has the meaning set forth in the Plan.

(ddd)   "**PTL Credit Agreement**" has the meaning set forth in the Plan.

(eee)   "**PTL Group**" has the meaning set forth in the Plan.

(fff)   "**PTL Group Counsel**" has the meaning set forth in the Plan.

(ggg)   "**PTL Group Advisors**" has the meaning set forth in the Plan.

(hhh)   "**PTL Lenders**" has the meaning set forth in the Plan.

(iii)   "**PTL Loan Documents**" means the "Loan Documents" as defined in the PTL Credit Agreement.

(jjj)   "**PTL Obligations**" has the meaning set forth in the Plan.

(kkk)   "**Qualified Marketmaker**" has the meaning set forth in Section 4.03.

(lll)   "**Qualified Marketmaker Joinder Date**" has the meaning set forth in Section 4.03.

(mmm) "**Redemption Transaction**" means a distribution of cash and/or other property by Serta Simmons Bedding in complete redemption of its equity interests held by Dawn Intermediate, as set forth in the Restructuring Transactions Exhibit, if applicable.

(nnn)   "**Reorganized Debtors**" has the meaning set forth in the Plan.

(ooo)   "**Reorganized Parent**" has the meaning set forth in the Plan.

(ppp)   "**Requisite Consenting Creditors**" means, as of the date of determination, Consenting Creditors holding over 50% in aggregate outstanding principal amount of the PTL Obligations.

(qqq)   "**Restructuring Fees and Expenses**" means (i) the Consenting Equity Holder Fees and Expenses; and (ii) all reasonable and documented fees, costs and expenses of each of the PTL Group Advisors, in each case, (A) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement of this Agreement, the Plan, and/or any of the other Definitive Documents, and/or the transactions contemplated hereby or thereby, and/or any amendments, waivers, consents, supplements or other modifications to any of the foregoing and, to the extent applicable, and (B)(1) consistent with any engagement letters or fee reimbursement letters entered into between the Company, on the one

6

hand, and the applicable PTL Group Advisors, on the other hand (as supplemented and/or modified by this Agreement), or (2) as provided in the DIP Orders and/or the Confirmation Order.

(rrr)   "**Restructuring**" or "**Restructuring Transactions**" has the meaning set forth in the Plan.

(sss)   "**Restructuring Transactions Exhibit**" has the meaning set forth in the Plan.

(ttt)   "**Scheduling Motion**" means a motion requesting a schedule for the conduct of the Adversary Proceeding.

(uuu)   "**Scheduling Order**" means the order entered by the Bankruptcy Court approving the schedule requested by the Company in relation to the schedule for the Adversary Proceeding.

(vvv)   "**Securities Act**" means the U.S. Securities Act of 1933, as amended and any rules and regulations promulgated thereby.

(www) "**Solicitation Materials**" m has the meaning set forth in the Plan.

(xxx)   "**Support Effective Date**" means the date on which counterpart signature pages to this Agreement shall have been executed and delivered by (i) the Company and (ii) Initial Consenting PTL Lenders holding at least 66⅔% of the aggregate outstanding principal of PTL Obligations.

(yyy)   "**Support Period**" means the period commencing on the Support Effective Date and ending on the Termination Date.

(zzz)   "**Takeback Debt Terms**" means the term sheet setting forth indicative terms of the New Term Loan attached hereto as **Exhibit H**.

(aaaa)  "**Termination Date**" means the date on which termination of this Agreement is effective as to a Party in accordance with Section 7.01, Section 7.02, Section 7.03, or Section 7.04 of this Agreement.

(bbbb)  "**Transfer**" has the meaning set forth in Section 4.03.

(cccc)  "**Voting Deadline**" has the meaning set forth in the Plan.

(dddd)  "**Weil**" means Weil, Gotshal & Manges LLP, as legal advisors to the Company Parties.

2.    **Passage of Time**

With respect to any Milestone or other reference of time herein, if the last day of such period falls on a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure, such Milestone or other reference of time shall be

extended to the next such day that is not a Saturday, Sunday, or a "legal holiday," as defined in Rule 9006(a) of the Federal Rules of Bankruptcy Procedure; *provided*, for the avoidance of doubt, that any Milestone with respect to a hearing date shall be subject to the Bankruptcy Court's availability.

3.    **Restructuring.**

Section 3.01    Plan and Restructuring Transactions.

(a)    Confirmation of the Plan.  Subject to the terms of this Agreement, the Company Parties will use commercially reasonable efforts to obtain confirmation of the Plan as soon as reasonably practicable after the Petition Date in accordance with the Bankruptcy Code and on terms consistent with this Agreement.  Each Consenting Creditor shall use commercially reasonable efforts to cooperate fully and coordinate amongst each other and with the Company in connection therewith.  Further, each of the Parties shall take such action (including executing and delivering any other agreements) as may be reasonably necessary or as may be required by order of the Bankruptcy Court, to carry out the purpose and intent of this Agreement (including, without limitation, to provide any information reasonably necessary, or information requested from federal, state, or local regulators, to obtain required regulatory approvals necessary for confirmation of the Plan or consummation of the Restructuring).

(b)    Redemption Transaction.  If the Restructuring is effectuated pursuant to the Redemption Transaction, the Debtors agree to make a distribution of Cash in the aggregate amount of $1,500,000 to the Consenting Equity Holders and any other holders of Interests in Dawn Holdings, Inc. pursuant to the Plan and in accordance with, and as set forth in, the Restructuring Transactions Exhibit.

Section 3.02    Definitive Documents.

(a)    Each of the Definitive Documents and related motions and orders remain subject to negotiation and completion and shall contain terms and conditions consistent in all material respects with this Agreement and the Plan.  Upon completion, the Definitive Documents and every other document, deed, agreement, filing, notification, letter, or instrument related to the Restructuring Transactions shall reflect and contain terms, conditions, representations, warranties, and covenants consistent with the terms of this Agreement (including the exhibits and annexes hereto), as they may be modified, amended, or supplemented in accordance with Section 11.

(b)    The following Definitive Documents shall otherwise be in form and substance acceptable to the Requisite Consenting Creditors and the Company:  (a) the Plan; (b) the Restructuring Transactions Exhibit; (c) the Confirmation Order; (d) the Exit ABL Commitment Letter; (e) the Exit ABL Facility Credit Agreement; (f) the New Term Loan Credit Facility Agreement; (g) the Takeback Debt Terms; (h) the Disclosure Statement Approval Order; (i) the New Corporate Governance Documents; (j) the New Corporate Governance Documents of Reorganized Parent; (k) the Scheduling Order; (l) the New Intercreditor Agreement; (m) the Schedule of Retained Causes of Action; (n) any Management Incentive Plan allocation and related documents, if applicable; and in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).

The Definitive Documents other than those referenced in the preceding sentence shall contain terms and conditions consistent in all material respects with this Agreement and the Plan and shall otherwise be in form and substance reasonably acceptable to the Requisite Consenting Creditors and the Company.

(c)     The following Definitive Documents shall be consistent with the settlement contemplated herein with respect to the Consenting Equity Holders and the Redemption Transaction (if applicable) and otherwise in form and substance acceptable to the Requisite Consenting Creditors, the Company, and Consenting Equity Holders (but as to the Consenting Equity Holders, only insofar as they relate to the treatment or release of the Consenting Equity Holders thereunder): (a) the Plan; (b) the Restructuring Transactions Exhibit; (c) the Confirmation Order; and in each case, any amendments, modifications, and supplements thereto and any related notes, certificates, agreements, documents, and instruments (as applicable).

4.     **Agreements of the Consenting Creditors.**

Section 4.01   <u>Support.</u>   Each Consenting Creditor, with respect to each of its respective Consenting Claims, hereby covenants and agrees, severally and not jointly, during the Support Period, that it shall:

(a)     cooperate and coordinate activities (to the extent practicable and subject to the terms hereof) with the Company Parties and to use commercially reasonable efforts to support and consummate the Restructuring, including, for the avoidance of doubt, using commercially reasonable efforts to obtain any necessary federal, state, and local regulatory approvals required to obtain confirmation of the Plan or consummate the Plan and the Restructuring contemplated thereby and herein by the Outside Date, on a timeline consistent with the Milestones;

(b)     timely vote or cause to be voted, consistent with the Solicitation Materials, all of its Claims (or Claims under its control), including all Claims that are impaired under the Plan, to accept the Plan and not change or withdraw (or cause to be changed or withdrawn) any such vote; *provided* that each Consenting Creditor may change or withdraw its vote following termination of this Agreement;

(c)     grant and, if applicable, not opt-out of the release of third-party claims pursuant to the Plan and Confirmation Order;

(d)     not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, DIP Financing, or acceptance, confirmation, implementation of the Plan, or the Restructuring Transactions, (ii) propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any entity regarding, any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report or comparable public statement, or filing with respect to any Alternative Restructuring, or (iii) otherwise take any action that would interfere with, delay or postpone the consummation of the Restructuring; *provided* that, the Consenting Creditors shall not be required to give any notice, order, instruction, or direction to any administrative agent, or collateral agent (as applicable) or other such agent or

9

trustee, if the Consenting Creditors are required to incur any out-of-pocket costs or provide any indemnity in connection therewith;

(e)     (i) not direct any administrative agent or collateral agent (as applicable) to take any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, and (ii) if any applicable administrative agent or collateral agent takes any action inconsistent with such Consenting Creditor's obligations under this Agreement or the Plan, such Consenting Creditor will use its commercially reasonable efforts to direct such administrative agent  or collateral agent (A) to cease, desist, and refrain from taking any such action, and (B) to take such action as may be necessary to effect the Restructuring, including, but not limited to, enforcement of the First Lien Intercreditor Agreement, and joining and supporting the Debtors in enforcing the First Lien Intercreditor Agreement should the Debtors determine that it is necessary to do so to implement the Restructuring;

(f)     complete, enter into, and effectuate the agreed Definitive Documents (as applicable) within the timeframes contemplated herein;

(g)     promptly inform, subject to its confidentiality obligations or applicable law, Weil in writing (email being sufficient) as soon as reasonably practicable after becoming aware (and in any event within three (3) Business Days after becoming so aware) of the threat or commencement of any material lawsuit, investigation, hearing or enforcement action from or by any person or entity in respect of any Company Party or any subsidiary or affiliate of a Company Party;

(h)     timely vote (or cause to be voted) its Claims against any Alternative Restructuring;

(i)     act in good faith with regard to the Restructuring consistent with this Agreement;

(j)     to the extent any legal, regulatory, or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring, negotiate in good faith appropriate additional or alternative provisions to address any such impediment, which additional or alternative provisions shall be reasonably acceptable to the Requisite Consenting Creditors; *provided* that the recoveries and economic outcome for such Consenting Creditor and other material terms of this Agreement are preserved in any such provisions; and

(k)     refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or interfere with the Restructuring (including encouraging another person to undertake any action prohibited by this Agreement).

Section 4.02     Additional Provisions Regarding the Consenting Creditors Agreements.

(a)     Nothing in this Agreement shall: (i) affect the ability of any Consenting Creditor to consult with any other Consenting Creditor, the Company Parties, or any other party in interest, subject to applicable confidentiality obligations; (ii) impair or waive the rights of any Consenting Creditor to assert or raise any objection not prohibited under this Agreement or any

Definitive Document in connection with the Restructuring Transactions; (iii) prevent any Consenting Creditor from (A) enforcing this Agreement or any Definitive Documents, (B) contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Documents, or (C) exercising any rights or remedies under this Agreement or any Definitive Documents, except as provided by Section 4.01 hereof; (iv) limit the rights of a Consenting Creditor under the Chapter 11 Cases (if any), including appearing as a party in interest in any matter to be adjudicated in order to be heard concerning any matter arising in the Chapter 11 Cases, in each case, so long as the exercise of any such right is not inconsistent with such Consenting Creditor's obligations hereunder or under applicable Law; (vi) constitute a waiver or amendment of any term or provision of the First Lien Credit Agreement, except as provided by this Agreement and the Definitive Documents; (vii) require any Consenting Creditor to incur, assume, or become liable for any financial or other liability or obligation other than as expressly described in this Agreement; (viii) prevent any Consenting Creditor from taking any customary perfection step or other action as is necessary to preserve or defend the validity, existence, and priority of its claims against or interests in the Company Party or any lien securing any such claims or interests (including the filing of proofs of claim); or (ix) affect any rights or obligations of the PTL Agent and the DIP Agent (as defined in the DIP Loan Documents), each in their capacities as such under the respective credit facility for which they are agent; or (x) require that any Consenting Creditor give any notice, order, instruction, or direction to any administrative agent or collateral agent (as applicable) or other such agent if the Consenting Creditors are required to incur any out-of-pocket costs or provide any additional indemnity in connection therewith.  For the avoidance of doubt, if there if there is ambiguity between any First Day Orders and the consultation rights set out herein, this document shall control.

Section 4.03   Transfers.  Each Consenting Creditor agrees that during the Support Period, it shall not sell, assign, transfer, or otherwise dispose of ("**Transfer**"), directly or indirectly, any Claims, option thereon, or right or interest therein or any other Claims against in the Company Parties (including by granting any proxies, depositing any Claims into a voting trust or entering into a voting agreement with respect to such Claims), and any purported Transfer shall be void and without effect unless the transferee thereof:

(a)      is a Consenting Creditor;

(b)      before such Transfer, agrees in writing for the benefit of the Parties to become, effective prior to or upon the consummation of such Transfer, a Consenting Creditor for all purposes hereunder and to be bound by all of the terms of this Agreement applicable to a Consenting Creditor (including with respect to any and all Claims it already may hold before such Transfer) by executing a joinder agreement in the form attached hereto as **Exhibit D** (a "**Joinder Agreement**") and delivering an executed copy of such Joinder Agreement to Weil and the PTL Group Counsel as promptly as practicable, but in no event later than three (3) Business Days following, consummation of such Transfer.

Each Consenting Creditor agrees that any Transfer of any Claim that does not comply with the terms and procedures set forth herein shall be deemed void *ab initio*, and each other Party shall have the right to enforce the voiding of such Transfer.

11

(c)      Notwithstanding anything to the contrary in this Agreement, a Consenting Creditor may Transfer Claims to an entity that is acting in its capacity as a Qualified Marketmaker (as defined below) without the requirement that the Qualified Marketmaker be or become an entity identified in Section 4.03(a) or (b) hereof (a "**Permitted Transferee**"); *provided* that (i) any such Qualified Marketmaker may only subsequently Transfer the right, title or interest to such Claims to a transferee that is or becomes a Permitted Transferee at the time of such Transfer, (ii) such transferor shall be solely responsible for the Qualified Marketmaker's failure to comply with the requirements of this Section 4.03, (iii) subject to 4.02(d), such Qualified Marketmaker must subsequently Transfer the right, title or interest to such Claims within five (5) Business Days of its acquisition to a transferee described in the foregoing clause (i) that is not an affiliate, affiliated fund, or affiliated entity with a common investment advisor of such Qualified Marketmaker or sign a Qualified Marketmaker Joinder (as defined below) on or before the Qualified Marketmaker Joinder Date (as defined below), and (iv) the Transfer documentation between such Consenting Creditor and such Qualified Marketmaker shall contain a covenant providing for the requirement in the preceding clause (i); *provided*, *further*, that if a Consenting Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Claims that it acquires that are not Consenting Claims (*i.e.*, received by such Qualified Marketmaker from a holder that is not a Consenting Creditor) without such Transfer being subject to this Section 4.03.

(d)      If at the time of a proposed Transfer of any Claims to a Qualified Marketmaker, such Claims: (i) may be voted or consent solicited with respect to the Restructuring, then the proposed transferor must first vote or consent such Claims in accordance with Section 4.01, or (ii) have not yet been and may yet be voted or consent solicited with respect to the Plan and/or the Restructuring and such Qualified Marketmaker does not Transfer such Claims to a Permitted Transferee before the third Business Day before the expiration of an applicable voting or consent deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the Transfer documentation to the Qualified Marketmaker shall have provided it shall), on the first Business Day immediately after the Qualified Marketmaker Joinder Date, become a Consenting Creditor with respect to such Claims in accordance with the terms hereof (such signed Joinder, the "**Qualified Marketmaker Joinder**"); *provided*, *further*, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Consenting Creditor with respect to such Claim or Interest at such time as such Claim or Interest has been Transferred by such Qualified Marketmaker to a transferee that is a Permitted Transferee in accordance with this Agreement.

For these purposes, "**Qualified Marketmaker**" means an entity that (i) holds itself out to the market as standing ready in the ordinary course of business to purchase from and sell to customers Consenting Claims (including debt securities or other debt), or enter with customers into long and/or short positions in Consenting Claims (including debt securities or other debt), in its capacity as a dealer or market maker in such Consenting Claims (including debt securities or other debt) and (ii) is in fact regularly in the business of making a market in claims, interest, or securities of issuers or borrowers.

Section 4.04      Additional Claims.      To the extent any Consenting Creditor (i) acquires additional Claims entitled to vote on the Plan or (ii) Transfers any Claims, then, in each case, each such Consenting Creditor shall promptly notify Weil and the PTL Group Counsel and each such Consenting Creditor hereby agrees that such additional Claims shall be subject to

this Agreement, and that, for the duration of the Support Period, it shall vote (or cause to be voted) any such additional Claims entitled to vote on the Plan (to the extent still held by it or on its behalf at the time of such vote), in a manner consistent with Section 4.01(a) hereof.

Section 4.05   Forbearance.  The Consenting Creditors agree to forbear during the Support Period from the exercise of (and to direct any agent or trustee to forebear from the exercise of) any and all rights and remedies in contravention of this Agreement, including under the PTL Credit Agreement, any agreement contemplated thereby or executed in connection therewith, as applicable, and under applicable U.S. or foreign law or otherwise, in each case, with respect to any breaches, defaults, events of default or potential defaults by the Company or any other Loan Party (as defined in the PTL Credit Agreement), whether at law, in equity, by agreement or otherwise, which are or become available to them in respect of the PTL Obligations, or any other Claims. Additionally, during the Support Period, the Consenting Creditors agree not to support, join, or otherwise assist any person in litigation against the Company Parties in connection with the Chapter 11 Cases, Restructuring, the PTL Obligations, or any other Claims.

Section 4.06   Additional Disclosures.   Upon written request (including by electronic mail) by the Company, Weil, each Party shall promptly identify, in writing, to the Company and Weil the nature and amount of the "disclosable economic interest" (as that term is defined by Rule 2019 of the Federal Rules of Bankruptcy Procedure) held in relation to the Company by all entities represented by the Consenting Creditor in connection with the Company as of the date of such request; *provided* that the Company and Weil agree to not make such written request more than two (2) times in any calendar month.

5.    **Agreements of the Company Parties.**

The Company Parties agree during the Support Period to use commercially reasonable efforts to do all things in furtherance of the Restructuring, including:

(a)    to (i) act in good faith and use commercially reasonable efforts to support and successfully complete solicitation of the Plan and the Restructuring Transactions, (ii) pursue any necessary federal, state, and local regulatory approvals to enable confirmation of the Plan, including, without limitation, approvals from any regulatory body whose approval or consent is determined by the Company Parties to be necessary to consummate the Restructuring Transactions, and (iii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with and within the time frames contemplated by this Agreement and the Plan;

(b)    complete, enter into, and effectuate the agreed Definitive Documents (as applicable);

(c)    provide draft copies of all material motions or applications, the Plan, the Disclosure Statement, any proposed amended version of the Plan or Disclosure Statement, all first day pleadings, and all other material pleadings that the Company Parties intend to file with the Bankruptcy Court to the PTL Group Counsel and counsel to the Consenting Equity Holders, if practicable, at least five (5) Business Days before the date of filing of any such pleading or other document (and, if not practicable, as soon as practicable before filing);

(d)      except as otherwise expressly set forth in this Agreement, operate its businesses and operations in the ordinary course in a manner that is consistent with its past practices and this Agreement, use commercially reasonable efforts to preserve intact the Company Parties' business organization and relationships with third parties (including, without limitation, suppliers, distributors, customers, and governmental and regulatory authorities and employees) consistent with this Agreement and the Restructuring Transactions, and to the extent reasonably practicable, timely consult with and provide prior notice and updates to, the PTL Group Advisors with respect to any material development in connection with any Company Party, including, without limitation, businesses, operations (including, without limitation, material changes to the cash management system, employee benefit programs, and insurance programs), material expenditures (including, without limitation, any payments on account of pension withdrawal liabilities or increased funding obligations of non-Debtor affiliates to the extent not provided for in the Approved Budget (as defined in the DIP Orders)), and relationships with material third parties (including, without limitation, co-owners, vendors, and customers);

(e)      promptly inform, subject to its confidentiality obligations or applicable law, the PTL Group Advisors in writing (email sent by Weil being sufficient) as soon as reasonably practicable after becoming aware (and in any event within three (3) Business Days after becoming so aware) of the threat or commencement of any material lawsuit, investigation, hearing or enforcement action from or by any person or entity in respect of any Company Party or any subsidiary or affiliate of a Company Party;

(f)      from the Support Effective Date through and including the Plan Effective Date, promptly pay (but in any event, within five (5) Business Days) in full and in cash all Restructuring Fees and Expenses when properly incurred and invoiced in accordance with the relevant engagement letters, fee arrangements, and/or DIP Orders, and continue to pay such amounts as they come due, and otherwise in accordance with the applicable engagement letters, and/or fee arrangements of the PTL Group Advisors and/or the DIP Orders (and not terminate such engagement letters and/or fee arrangements or seek to reject them in the Chapter 11 Cases), and unless the Bankruptcy Court orders otherwise, without further order of, or application to, the Bankruptcy Court by such professional or advisor or the Company Parties; *provided* that (x) all accrued and unpaid Restructuring Fees and Expenses as of the Plan Effective Date including any reasonable estimate of such Restructuring Fees and Expenses, shall be paid by the Company on the Plan Effective Date; and (y) in the event a Termination Date (as defined herein) occurs with respect to the Company Parties, the Company Parties shall remain obligated to pay all Restructuring Fees and Expenses accrued and unpaid as of and up to such Termination Date; *provided*, *further*, that on or before the Petition Date, the Debtors shall pay to Ropes & Gray LLP, as counsel to certain of the Consenting Equity Holders, $200,000 to hold as a retainer against which all Consenting Equity Holder Fees and Expenses shall be applied (the "**Consenting Equity Holder Retainer**"); and

(g)      not to directly or indirectly (i) take any action that would be inconsistent with this Agreement, the Plan, or interfere with the Restructuring (including encouraging another person to undertake any action prohibited by this Agreement), (ii) propose, solicit, file, support, seek, pursue, or vote for any Alternative Restructuring; *provided* that the foregoing does not affect the Company Parties' right to exercise the Fiduciary Out, or (iii) otherwise take any action that would interfere with, delay, or postpone the consummation of the Restructuring.

6. **Agreements of the Consenting Equity Holders**

Section 6.01   Support.   Each Consenting Equity Holder covenants and agrees, severally and not jointly, during the Consenting Equity Holder Support Period, that it shall use commercially reasonable efforts to:

(a)      (i) act in good faith and use commercially reasonable efforts to support and successfully complete solicitation of the Plan and the Restructuring Transactions, (ii) pursue any necessary federal, state, and local regulatory approvals to enable confirmation of the Plan, including, without limitation, approvals from any regulatory body whose approval or consent is determined by the Company Parties to be necessary to consummate the Restructuring Transactions, and (iii) do all things reasonably necessary and appropriate in furtherance of confirming the Plan and consummating the Restructuring in accordance with and within the time frames contemplated by this Agreement and the Plan;

(b)      distribute the Cash payment described in Section 3.01(b) pursuant to the Restructuring Transactions Exhibit in a manner that effectuates the Redemption Transaction;

(c)      complete, enter into, and effectuate the agreed Definitive Documents (as applicable) within the timeframes contemplated herein;

(d)      grant and, if applicable, not opt-out of the release of third-party claims pursuant to the Plan and Confirmation Order;

(e)      refrain from, directly or indirectly, taking any action that would be inconsistent with this Agreement or interfere with the Restructuring (including encouraging another person to undertake any action prohibited by this Agreement);

(f)      promptly inform, subject to its confidentiality obligations or applicable law, the PTL Group Advisors in writing (email being sufficient) as soon as reasonably practicable after becoming aware (and in any event within three (3) Business Days after becoming so aware) of the threat or commencement of any material lawsuit, investigation, hearing or enforcement action from or by any person or entity in respect of any Company Party or any subsidiary or affiliate of a Company Party;

(g)      not cause any Company Party, directly or indirectly, except as otherwise expressly set forth in this Agreement, to operate its businesses and operations in the ordinary course in a manner that is consistent with its past practices and this Agreement; or

(h)      not directly or indirectly (i) object to, delay, impede, or take any other action to interfere with the Chapter 11 Cases, DIP Financing, or acceptance, confirmation, or implementation of the Plan or the Restructuring Transactions, (ii) propose, support, vote for, encourage, seek, solicit, pursue, initiate, assist, join in, participate in the formulation of or enter into negotiations or discussions with any entity regarding, any Alternative Restructuring, including, for the avoidance of doubt, making or supporting any filings with the Bankruptcy Court or any regulatory agency, or making or supporting any press release, press report or comparable public statement, or filing with respect to any Alternative Restructuring, or (iii) otherwise take any action that would interfere with, delay or postpone the consummation of the Restructuring.

7.      **Termination of Agreement.**

Section 7.01    <u>Generally</u>.   This Agreement will automatically terminate upon (i) the Plan Effective Date (as to all Parties) or (ii) three (3) Business Days following the receipt of written notice, delivered in accordance with <u>Section 21</u> hereof, from (a) the Requisite Consenting Creditors (which for the avoidance of doubt, may be delivered by e-mail by PTL Group Counsel on behalf of any or all entities constituting the Consenting Creditors) to the other Parties at any time after the occurrence of any Consenting Creditor Termination Event (as defined below) or (b) the Company Parties (which for the avoidance of doubt, may be delivered by e-mail by Weil on behalf of any or all entities constituting the Company Parties) to the other Parties at any time after the occurrence of any Company Termination Event (as defined below).   No Party may terminate this Agreement based on a Consenting Creditor Termination Event or Company Termination Event, as applicable, caused by such Party's failure to perform or comply in all material respects with the terms and conditions of this Agreement (unless such failure to perform or comply arises as a result of another Party's prior failure to perform or comply in all material respects with the terms and conditions of this Agreement).

Each of the dates and time periods in this <u>Section 7</u> may be extended by mutual agreement (which may be evidenced by e-mail confirmation, including from respective counsel) among the Company Parties and the Requisite Consenting Creditors.

Section 7.02    A "**Consenting Creditor Termination Event**" will mean any of the following:

(a)      failure to meet a Milestone;

(b)      the Company withdraws or modifies the Plan or Disclosure Statement or files any motion or pleading with the Bankruptcy Court that is in any material respect inconsistent with this Agreement or the Plan and such withdrawal, modification, motion, or pleading has not been revoked before the earlier of (i) two (2) Business Days after the Company Parties receives written notice from the Requisite Consenting Creditors that such withdrawal, modification, motion, or pleading is materially inconsistent with this Agreement or the Plan and (ii) entry of an order of the Bankruptcy Court approving such withdrawal, modification, motion, or pleading;

(c)      the material breach by the Company of any of the representations, warranties, covenants, or other obligations of the Company set forth in this Agreement, which breach has not been cured (if curable) within three (3) Business Days of written notice from the Requisite Consenting Creditors;

(d)      (i) entry of a DIP Order that is not reasonably acceptable to the Requisite Consenting Creditors (except as a result of any terms or conditions imposed by the Bankruptcy Court), (ii) the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Requisite Consenting Creditors), vacating or modifying the DIP Orders, or (iii) the termination of the DIP Credit Agreement and/or the DIP Financing;

(e)      a Company Party files or directly or indirectly supports another party in filing any motion, application, or adversary proceeding challenging the validity, enforceability, perfection, or priority of, or seeking avoidance or subordination of, any Consenting Claims, the

16

PTL Credit Agreement or any of the PTL Loan Documents, or the prepetition liens securing the Consenting Claims;

(f)     any Company Party loses the exclusive right to file a chapter 11 plan or to solicit acceptances thereof pursuant to section 1121 of the Bankruptcy Code;

(g)     a Company Party fails to maintain their good standing under the laws of the state or other jurisdiction in which they are incorporated or organized, except to the extent that any failure to maintain such Company Party's good standing arises solely from the filing of the Chapter 11 Cases;

(h)     the Company enters into any settlement in connection with or related to the Adversary Proceeding, the Apollo Action, or the LCM Action without the consent of the Requisite Consenting Creditors;

(i)     the Bankruptcy Court enters an order denying confirmation of the Plan or disallowing any material provision thereof (without the consent of the Requisite Consenting Creditors) and such order remains in effect for seven (7) calendar days after entry of such order

(j)     the Company proposes or supports an Alternative Restructuring pursuant to a pleading filed in the Bankruptcy Court or publicly announces its intention to pursue an Alternative Restructuring, which proposal, support, or announcement has not been withdrawn after three (3) Business Days' written notice from the Requisite Consenting Creditors;

(k)     the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any final ruling, judgment or non-appealable order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) fifteen (15) Business Days after such issuance the Company Parties provides written notice to the other Parties that such final ruling, judgment, or non-appealable order is materially inconsistent with this Agreement;

(l)     the Bankruptcy Court or a court of competent jurisdiction enters an order (i) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, (ii) dismissing one or more of the Chapter 11 Cases, (iii) rejecting this Agreement, or (iv) appointing a trustee for the Chapter 11 Cases, which order in each case has not been reversed, stayed, or vacated by the later of (a) the Confirmation Date and (b) three (3) Business Days after the Requisite Consenting Creditors provide written notice to the other Parties that such order is materially inconsistent with this Agreement; *provided* that the foregoing does not affect the Company Parties' right to exercise the Fiduciary Out;

(m)     the Bankruptcy Court or a court of competent jurisdiction enters an order, judgment, ruling, finding or other determination denying, dismissing, or otherwise adverse to the relief sought in the Adversary Proceeding or adverse to the defendants in the Apollo Action or the LCM Action;

17

(n)      the Exit ABL Commitment Letter terminates, expires, or is no longer in full force and effect for any reason, in each case, absent the consent or waiver of the Requisite Consenting Creditors; or

(o)      failure of the Company Parties to pay the Restructuring Fees and Expenses, as and when required.

Section 7.03     A "**Company Termination Event**" will mean any of the following:

(a)      the Consenting Creditors entitled to vote on the Plan will have failed to timely vote their Claims in favor of the Plan or at any time change their votes to constitute rejections to the Plan, in either case in a manner inconsistent with this Agreement; *provided* that this termination event will not apply if sufficient Consenting Creditors have timely voted (and not withdrawn) their Claims to accept the Plan in amounts necessary for each applicable impaired class under the Plan to "accept" the Plan consistent with section 1126 of the Bankruptcy Code;

(b)      if, as of the time of entry of the Interim DIP Order, the Support Effective Date has not occurred;

(c)      if the Requisite Consenting Creditors give notice of termination of this Agreement pursuant to this <u>Section 7</u>;

(d)      one or more of the Consenting Creditors file or support any Alternative Restructuring, modification, motion, or pleading with the Bankruptcy Court that is materially inconsistent with this Agreement or the Plan and such Alternative Restructuring, modification, motion, or pleading has not been revoked before the earlier of (i) three (3) Business Days after the filing or supporting party receives written notice from the Company or Weil that such Alternative Restructuring, modification, motion, or pleading is inconsistent with this Agreement or the Plan, and (ii) entry of an order of the Bankruptcy Court approving such Alternative Restructuring, modification, motion, or pleading;

(e)      the material breach by one or more of the Consenting Creditors of any of the representations, warranties, covenants, or other obligations of the Company set forth in this Agreement, which breach would result in non-breaching Consenting Creditors holding less than (x) 66.67% of the aggregate outstanding principal amount, or (y) 50% of holders, of PTL Obligations and has not been cured (if curable) within three (3) Business Days of written notice from the Company Parties;

(f)      the board of directors, board of managers, or such similar governing body of any Company Party determines in good faith after consultation with outside counsel that continued performance under this Agreement would be inconsistent with the exercise of its fiduciary duties under any applicable law (the "**Fiduciary Out**"); or

(g)      the issuance by any governmental authority, including any regulatory authority or court of competent jurisdiction, of any ruling, judgment or order enjoining the consummation of or rendering illegal the Restructuring, and such ruling, judgment or order has not been reversed or vacated by the later of (i) the Confirmation Date and (ii) fifteen (15) Business

18

Days after the Company provides written notice to the other Parties that such ruling, judgment, or order is materially inconsistent with this Agreement.

Section 7.04    Mutual Termination.  This Agreement may be terminated by mutual written agreement of the Company and the Requisite Consenting Creditors.  The Company will deliver written notice of any such termination to all Parties in accordance with Section 21 hereof.

Section 7.05    Effect of Termination.  Upon the termination of this Agreement in accordance this Section 7, this Agreement will be void and of no further force or effect and each Party will, except as provided in this Section 7.05 and in Section 15, be immediately released from its liabilities, obligations, commitments, undertakings and agreements under or related to this Agreement and will have all the rights and remedies that it would have had and will be entitled to take all actions, whether with respect to the Restructuring or otherwise, that it would have been entitled to take had it not entered into this Agreement, including all rights and remedies available to it under applicable law, the PTL Obligations, and any ancillary documents or agreements thereto; *provided* that in no event will any such termination relieve a Party from liability for its breach or non-performance of its obligations hereunder before the date of such termination.

Section 7.06    No Waiver. If the Restructuring is not consummated, nothing herein shall be construed as a waiver by any Party of any or all of such Party's rights, and the Parties expressly reserve any and all of their respective rights as if the Parties had not entered this Agreement.  Pursuant to Federal Rule of Evidence 408 and any other applicable rules of evidence, this Agreement and all negotiations relating hereto shall not be admissible into evidence in any proceeding other than a proceeding to enforce the Agreement's terms.

## 8.    **Additional Documents.**

Each Party hereby covenants and agrees to cooperate with each other in good faith in connection with, and will exercise commercially reasonable efforts with respect to, the negotiation, drafting and execution and delivery of the Definitive Documents.  In the case of any conflict or inconsistency between the Plan and any form of or term sheet for a Definitive Document attached as an exhibit hereto, the terms of the Plan shall control.

## 9.    **Representations and Warranties.**

Section 9.01    Each Party, severally (and not jointly), represents and warrants to the other Parties that the following statements are true, correct and complete as of the date hereof (or such later date that such Party first becomes bound by this Agreement) and solely with respect to the Company, subject to any limitations or approvals arising from or required by the commencement of the Chapter 11 Cases:

(a)    such Party is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization, and has all requisite corporate, partnership, limited liability company or similar authority to enter into this Agreement and carry out the transactions contemplated hereby and perform its obligations contemplated hereunder; and the execution and delivery of this Agreement and the performance of such Party's obligations hereunder have been duly authorized by all necessary corporate, limited liability company, partnership or other similar action on its part;

(b)      the execution, delivery and performance by such Party of this Agreement does not and will not (i) violate any provision of law, rule or regulation applicable to it or its charter or bylaws (or other similar governing documents) or (ii) in the case of the Consenting Creditors, conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any material contractual obligation to which it is a party;

(c)      the execution, delivery and performance by such Party of this Agreement does not and will not require any registration or filing with, consent or approval of, or notice to, or other action to, with or by, any federal, state or governmental authority or regulatory body, except such filings that may be necessary in connection with the Chapter 11 Cases and such filings as may be necessary or required for disclosure any applicable regulatory body whose approval or consent is determined by the Company Parties to be necessary to consummate the Restructuring Transactions; and

(d)      this Agreement is the legally valid and binding obligation of such Party, enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws relating to or limiting creditors' rights generally or by equitable principles relating to enforceability or a ruling of a court.

Section 9.02    Each Consenting Creditor severally (and not jointly), represents and warrants to the other Parties that as of the date hereof (or such later date that such Party first becomes bound by this Agreement), such Consenting Creditor:

(a)      is not a Qualified Marketmaker with respect to the PTL Obligations set forth below its name on the signature page to this Agreement;

(b)      does not own or control any other "claims", "equity security" or "security" in respect of the Company Parties (including as such terms are defined in section 101 of the Bankruptcy Code) other than as set forth below its name on the signature page to this Agreement;

(c)      is not a party to any other agreement, arrangement, or understanding with respect to the subject matter hereof with another Consenting Creditor; and

(d)      (i) is the beneficial owner (including with respect to any PTL Obligations subject to an agreed assignment where such assignment is not reflected in the Register (as defined in the PTL Credit Agreement)) of the PTL Obligations set forth below its name on the applicable signature page of this Agreement or (ii) has, with respect to such beneficial ownership of such PTL Obligations, (A) sole investment or voting discretion with respect to such PTL Obligations, (B) full power and authority to vote on and consent to matters concerning such PTL Obligations, and (C) full power and authority to bind or act on the behalf of, such beneficial owners.

10.    **Disclosure; Publicity.**

Section 10.01    The Company shall deliver drafts to the PTL Group Counsel of any press releases that constitute disclosure of the existence of the existence or terms of this Agreement or any amendment to the terms of this Agreement to the general public (each, a "**Public Disclosure**") at least two (2) Business Days before making any such disclosure (if practicable, and if two (2) Business Days before is not practicable, then as soon as practicable), and PTL Group

20

Counsel shall be authorized to share such Public Disclosure with its clients.  Any such disclosure shall be reasonably acceptable to the Requisite Consenting Creditors.  Except as required by law or otherwise permitted under the terms of any other agreement between the Company and any Consenting Creditor, no Party or its advisors will disclose to any person (including, for the avoidance of doubt, any other Consenting Creditor), other than to Weil and Evercore, the principal amount or percentage of any PTL Obligations, or any other securities of the Company Parties held by any Consenting Creditor without such Consenting Creditor's prior written consent; *provided* that (i) if such disclosure is required by law, subpoena, or other legal process or regulation, to the extent permitted by applicable law, the disclosing Party will afford the relevant Consenting Creditor a reasonable opportunity to review and comment in advance of such disclosure and will take all reasonable measures to limit such disclosure and (ii) the foregoing will not prohibit the disclosure of the aggregate percentage or aggregate principal amount of PTL Obligations held by all the Consenting Creditors collectively.  Notwithstanding the provisions in this <u>Section 10</u>, if consented to in writing by a Consenting Creditor, any Party hereto may disclose such Consenting Creditor's individual holdings.

11.   **Amendments and Waivers.**

Except as otherwise expressly set forth herein, the provisions of this Agreement, including the exhibits hereto, may not be waived, modified, amended or supplemented except in a writing signed by (a) the Company Parties, (b) the Requisite Consenting Creditors, (c) any individual Consenting Creditor disproportionally and adversely affected by such waiver, modification, amendment, or supplement, and (d) to the extent any such waiver, modification, amendment, or supplement, including to any exhibit hereto, would materially and adversely affect any Consenting Equity Holder, each such Consenting Equity Holder (it being understood that any modification or amendment to (i) the treatment of any such Consenting Equity Holder or (ii) the release in favor of any such Consenting Equity Holder, in each case, under the Plan shall be deemed to materially and adversely affect such Consenting Equity Holder).

The definition of Requisite Consenting Creditors in this Agreement shall not be waived, modified, amended, or supplemented, except in a writing signed by the Company Parties and all non-defaulting Consenting Creditors.

12.   **Effectiveness.**

This Agreement will become effective and binding (i) as to the Company and Initial Consenting PTL Lenders, on the Support Effective Date and after all outstanding Restructuring Fees and Expenses properly incurred and invoiced in accordance with the relevant engagement letters and fee arrangements shall be paid in full and in cash by the Company; (ii) as to any Consenting Creditor that enters into a Joinder Agreement on or following the Support Effective Date, upon delivery to the Company of such validly completed Joinder Agreement; and (iii) as to any Permitted Transferee, upon delivery of a validly completed Joinder Agreement; *provided* that signature pages executed by Consenting Creditors will be delivered to (a) the Company, other Consenting Creditors, and the PTL Group Counsel in a redacted form that removes such Consenting Creditor's holdings of the PTL Obligations and (b) Weil and Evercore in an unredacted form (to be held by Weil and Evercore on a professionals' eyes only basis).

13.    **GOVERNING LAW; JURISDICTION; WAIVER OF JURY TRIAL.**

THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO ANY CONFLICTS OF LAW PROVISIONS WHICH WOULD REQUIRE THE APPLICATION OF THE LAW OF ANY OTHER JURISDICTION.  BY ITS EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ANY LEGAL ACTION, SUIT OR PROCEEDING AGAINST IT WITH RESPECT TO ANY MATTER UNDER OR ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT RENDERED IN ANY SUCH ACTION, SUIT OR PROCEEDING, MAY BE BROUGHT IN ANY FEDERAL OR STATE COURT IN DELAWARE, AND BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH OF THE PARTIES HEREBY IRREVOCABLY ACCEPTS AND SUBMITS ITSELF TO THE NONEXCLUSIVE JURISDICTION OF EACH SUCH COURT, GENERALLY AND UNCONDITIONALLY, WITH RESPECT TO ANY SUCH ACTION, SUIT OR PROCEEDING. EACH PARTY HERETO IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE RESTRUCTURING CONTEMPLATED HEREBY. NOTWITHSTANDING THE FOREGOING, DURING THE PENDENCY OF THE CHAPTER 11 CASES, ALL PROCEEDINGS CONTEMPLATED BY THIS SECTION 13 SHALL BE BROUGHT IN THE BANKRUPTCY COURT.

14.    **Remedies/Specific Performance.**

All remedies that are available at law or in equity, including specific performance and injunctive or other equitable relief, to any Party for a breach of this Agreement by another Party shall be available to the non-breaching Party (and for the avoidance of doubt, it is agreed by the other Parties that money damages would not be a sufficient remedy for any breach of this Agreement by any Party and each non-breaching Party will be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach); *provided* that in connection with any remedy for specific performance, injunctive or other equitable relief asserted in connection with this Agreement, each Party agrees to waive the requirement for the securing or posting of a bond in connection with any remedy and to waive the necessity of proving the inadequacy of money damages.  All rights, powers, and remedies provided under this Agreement or otherwise available at law or in equity will be cumulative and not alternative, and the exercise of any remedy, power, or remedy by any Party will not preclude the simultaneous or later exercise of any other such right, power, or remedy by such Party or any other Person.

15.    **Survival.**

Notwithstanding the termination of this Agreement pursuant to Section 7 hereof, Section 7.06, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24 and 25 (and, to the extent applicable to the interpretation of such surviving sections, Section 1) will survive such termination and will continue in full force and effect for the benefit of the Parties in accordance with the terms hereof.

16.    **Headings.**

The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and will not affect the interpretation hereof or, for any purpose, be deemed a part of this Agreement.

17.    **Successors and Assigns; Severability; Several Obligations.**

This Agreement is intended to bind and inure to the benefit of the Parties and their respective successors and permitted assigns.  The rights or obligations of any Party under this Agreement may not be assigned, delegated, or transferred to any other Person except as expressly permitted herein.  If any provision of this Agreement, or the application of any such provision to any person or circumstance, will be held invalid or unenforceable in whole or in part, such invalidity or unenforceability will attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement will continue in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon any such determination of invalidity, the Parties will negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.  The agreements, representations and obligations of the Parties are, in all respects, ratable and several and neither joint nor joint and several.

18.    **No Third-Party Beneficiaries.**

Unless expressly stated herein, this Agreement will be solely for the benefit of the Parties and no other person or entity will be a third-party beneficiary hereof.

19.    **Prior Negotiations; Entire Agreement.**

This Agreement, including the exhibits and schedules hereto, constitutes the entire agreement of the Parties, and supersedes all other prior negotiations, with respect to the subject matter hereof, except that the Parties acknowledge that any confidentiality agreements or agreements with respect to shared or common interest heretofore executed between the Company and any Consenting Creditor (or the PTL Group Advisors) will continue in full force and effect in accordance with the terms thereof.

20.    **Counterparts.**

This Agreement may be executed in several counterparts, each of which will be deemed to be an original, and all of which together will be deemed to be one and the same agreement.  Execution copies of this Agreement may be delivered by electronic mail, which will be deemed to be an original for the purposes of this <u>Section 20</u>.

21.   **Notices.**

All notices hereunder will be deemed given if in writing and delivered, if contemporaneously sent by electronic mail, courier or by registered or certified mail (return receipt requested) to the following addresses and electronic mail addresses:

(1)   If to the Company Parties, to:

Dawn Intermediate, LLC
2451 Industry Avenue
Doraville, GA 30360
Attention:   Kristen McGuffey, Chief Legal Officer and Secretary
            (SSBLegalDept@sertasimmons.com)

with a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:   Ray C. Schrock, P.C. (Ray.Schrock@weil.com)
            Alexander Welch, Esq. (Alexander.Welch@weil.com)

            and

700 Louisiana Street, Suite 1700
Houston, Texas 77002
Attention:   Gabriel A. Morgan, Esq. (Gabriel.Morgan@weil.com)
            Stephanie N. Morrison, Esq. (Stephanie.Morrison@weil.com)

(2)   If to the Consenting Creditors, to the addresses or electronic mail addresses set forth below the Consenting Creditor's signature, with a copy (which will not constitute notice) to:

Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:   Scott J. Greenberg, Esq. (sgreenberg@gibsondunn.com)
            Michael J. Cohen, Esq. (mcohen@gibsondunn.com)
            Jason Zachary Goldstein, Esq. (jgoldstein@gibsondunn.com)

(3)   If to the Consenting Equity Holders, to:

Advent International Corporation
Prudential Tower
800 Boylston Street, Suite 3300
Boston, MA 02199
Attention:      Jefferson Case and Amanda McGrady Morrison

24

Facsimile:       (617) 951-0566]

with a copy (which will not constitute notice) to:

Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
Attention:       Gregg M. Galardi (Gregg.Galardi@ropesgray.com)
                 Jeramy D. Webb (Jeramy.Webb@ropesgray.com)
                 Amanda C. Glaubach (Amanda.Glaubach@ropesgray.com)

Any notice given by delivery, mail, or courier will be effective when received.  Any notice given by electronic mail will be effective upon confirmation of transmission.

22.    **Reservation of Rights; No Admission.**

Except as expressly provided in this Agreement, nothing herein is intended to, or does, in any manner waive, limit, impair, or restrict the ability of each of the Parties (i) to protect and preserve its rights, remedies and interests, including its claims against any of the other Parties (or their respective affiliates or subsidiaries), (ii) purchase, sell, or enter into any transactions in connection with the PTL Obligations, (iii) enforce any right under the PTL Obligations, subject to the terms hereof, (iv) consult with other Consenting Creditors, other holders of PTL Obligations, or any other Party regarding the Restructuring (and not any other Alternative Restructuring), or (v) enforce any right, remedy, condition, consent or approval requirement under this Agreement or in any of the Definitive Documents.  Without limiting the foregoing, if this Agreement is terminated in accordance with its terms for any reason (other than consummation of the Restructuring), the Parties each fully and expressly reserve any and all of their respective rights, remedies, claims, defenses and interests, subject to Sections 7, 13, and 14 in the case of any claim for breach of this Agreement arising before termination.  Each of the Parties denies any and all wrongdoing or liability of any kind and does not concede any infirmity in the claims or defenses which it has asserted or could assert.

23.    **Relationship Among Parties.**

It is understood and agreed that no Consenting Creditor has any duty of trust or confidence in any kind or form with any other Consenting Creditor, and, except as expressly provided in this Agreement, there are no commitments between them as a result of this Agreement.  In this regard, it is understood and agreed that any Consenting Creditor may acquire PTL Obligations, or other debt or equity securities of the Company Parties without the consent of the Company Parties or any other Consenting Creditor, subject to applicable securities laws and the terms of this Agreement; *provided* that no Consenting Creditor will have any responsibility for any such acquisition to any other entity by virtue of this Agreement.

24.    **No Solicitation; Representation by Counsel; Adequate Information.**

(a)    This Agreement is not and shall not be deemed to be an offer with respect to any securities or solicitation of votes for the acceptance of a plan of reorganization for purposes of sections 1125 and 1126 of the Bankruptcy Code or otherwise.

(b)      Each Party acknowledges that it has had an opportunity to receive information from the Company and that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby.  Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel will have no application and is expressly waived.

(c)      Each Consenting Creditor acknowledges, agrees, and represents to the other Parties that it (i) is an "accredited investor" as such term is defined in Rule 501(a) of the Securities Act, (ii) is a "qualified institutional buyer" as such term is defined in Rule 144A of the Securities Act, (iii) understands that (a) any securities to be acquired by it pursuant to the Restructuring have not been registered under the Securities Act and (b) that such securities are being offered and sold pursuant to an exemption from registration contained in the Securities Act, based in part upon such Consenting Creditor's representations contained in this Agreement and cannot be sold unless subsequently registered under the Securities Act or an exemption from registration is available, and (iv) has such knowledge and experience in financial and business matters that such Consenting Creditor is capable of evaluating the merits and risks of the securities to be acquired by it pursuant to the Restructuring and understands and is able to bear any economic risks with such investment.

25.    **Fiduciary Duties.**

Nothing in this Agreement will require the Company Parties or any directors, officers, managers, or members of the Company Parties, each in its capacity as a director, officer, manager, or member of the Company Parties, to take any action, including the Fiduciary Out, or to refrain from taking any action, to the extent inconsistent with its or their fiduciary duties under applicable law (as determined by them in good faith after consultation with outside legal counsel).

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed and delivered by their respective duly authorized officers, solely in their respective capacity as officers of the undersigned and not in any other capacity, as of the date first set forth above.

[SIGNATURE PAGES OMITTED]

## **Exhibit A**

### **Company Parties**

1.      Dawn Intermediate, LLC
2.      Serta Simmons Bedding, LLC
3.      Serta International Holdco, LLC
4.      National Bedding Company L.L.C.
5.      SSB Manufacturing Company
6.      The Simmons Manufacturing Co., LLC
7.      Dreamwell, Ltd.
8.      SSB Hospitality, LLC
9.      SSB Logistics, LLC
10.     Simmons Bedding Company, LLC
11.     Tuft & Needle, LLC
12.     Tomorrow Sleep LLC
13.     SSB Retail, LLC
14.     World of Sleep Outlets, LLC

**<u>Exhibit B</u>**

**Plan**

[OMITTED]

**Exhibit C**

**Disclosure Statement**

[OMITTED]

**<u>Exhibit D</u>**

**Joinder**

## FORM OF JOINDER AGREEMENT FOR CONSENTING CREDITORS

      This joinder agreement to the *Restructuring Support Agreement*, dated as of January 23, 2023 (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "**Agreement**"), between the Company Parties and the Consenting Creditors, each as defined in the Agreement, is executed and delivered by _____ (the "**Joining Party**") as of _____, 2023. Each capitalized term used herein but not otherwise defined shall have the meaning set forth in the Agreement.

      1.  <u>Agreement to be Bound</u>.  The Joining Party hereby agrees to be bound by all of the terms of the Agreement, a copy of which is attached to this Joinder Agreement as **<u>Annex I</u>** (as the same has been or may be hereafter amended, restated or otherwise modified from time to time in accordance with the provisions thereof).

      2.  <u>Effectiveness</u>.  Upon (i) delivery of a signature page for this joinder and (ii) written acknowledgement by the Company Parties, the Joining Party shall hereafter be deemed to be a "Subsequent Consenting Creditor" and a "Party" for all purposes under the Agreement and with respect to any and all Claims  held by such Joining Party.

      3.  <u>Representations and Warranties</u>.  With respect to the aggregate principal amount of Claims set forth below its name on the signature page hereto, the Joining Party hereby makes the representations and warranties of the Consenting Creditors, as set forth in <u>Sections 9</u> and <u>23</u> of the Agreement to each other Party to the Agreement.

      4.  <u>Governing Law</u>.  This joinder agreement shall be governed by and construed in accordance with the internal laws of the State of New York, without regard to any conflict of laws provisions which would require the application of the law of any other jurisdiction.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the Joining Party has caused this joinder to be executed as of the date first written above.

**[JOINING PARTY]**


By:_____
Name:
Title:


| Claims (principal amount) | |
|---|---|
| -    PTL Obligations | FLFO: US$ |
| | FLSO: US$ |
| -    Non-PTL Loan Obligations | US$ |
| -    ABL Obligations | US$ |
| -    Existing Equity Interests | |
| -    Other (please describe) | |


Notice Address:

_____
_____
_____
Fax: _____
Attention: _____
Email: _____


                                        Acknowledged:

                                        **DAWN INTERMEDIATE, LLC**
                                        **(on behalf of the Company Parties)**


                                        By:_____
                                        Name:
                                        Title:


_____

[*Signature Page to Joinder to Restructuring Support Agreement*]

**Exhibit E**

**Milestones**

## Exhibit E

### Milestones

The Consenting Creditors' support for the Transaction shall be subject to the timely satisfaction of the following milestones (the "**Milestones**"), which may be extended with the prior written consent (email shall suffice, including from respective counsel) of the Company and the Requisite Consenting Creditors:

1.  <u>Commencement of the Chapter 11 Cases</u>. The Company hereby agrees that, as soon as reasonably practicable, but in no event later than 11:59 p.m. prevailing Central Time on January 24, 2023 (the "**Outside Petition Date**", and the date on which such filing actually occurs, the "**Petition Date**"), shall commence the Chapter 11 Cases.

2.  <u>Filing of the Plan and Disclosure Statement</u>. The Company shall file the Plan, Disclosure Statement, and the motion for approval of the Disclosure Statement and Solicitation Materials on or contemporaneously with the Petition Date.

3.  <u>Filing of the Adversary Complaint and Scheduling Motion</u>. The Company shall file the Adversary Complaint and Scheduling Motion on or contemporaneously with the Petition Date.

4.  <u>Disclosure Statement Approval Order</u> At or prior to 11:59 p.m. prevailing Central Time on April 6, 2023, the Bankruptcy Court shall have entered the Disclosure Statement Approval Order.

5.  <u>Confirmation Hearing and Adversary Proceeding</u>. At or prior to 11:59 p.m. prevailing Central Time on May 22, 2023, the hearing to approve the Plan and to consider the relief sought in the Adversary Proceeding shall have commenced.

6.  <u>Confirmation Order and Adversary Proceeding</u>. At or prior to 11:59 p.m. prevailing Central Time on June 5, 2023, the Confirmation Order shall have been entered and the Bankruptcy Court shall have entered an order granting the relief sought in the Adversary Proceeding.

7.  <u>Occurrence of Plan Effective Date</u>. At or prior to 11:59 p.m. prevailing Central Time on June 6, 2023 (the "**Outside Date**"), the Plan Effective Date shall have occurred.

## Exhibit F

**DIP Credit Agreement**

[OMITTED]

**<u>Exhibit G</u>**

**Exit ABL Facility Commitment Letter**

*Execution Version*

**ECLIPSE BUSINESS CAPITAL LLC**

**CONFIDENTIAL**

January 23, 2023

Serta Simmons Bedding, LLC
One Concourse Parkway
Atlanta, Georgia 30328
Attention:  Lisa Wyn

<u>$125 Million Senior Secured Revolving Exit Facility</u>
<u>Commitment Letter</u>

Ladies and Gentlemen:

Eclipse Business Capital LLC ("***Eclipse***" or the "***Commitment Party***", "***we***" or "***us***") understands that Dawn Intermediate, LLC, a Delaware limited liability company ("***Holdings***") and certain of its subsidiaries, including Serta Simmons Bedding, LLC, a Delaware limited liability company (the "***Top Borrower***" and together with Holdings, "***you***"; and together with Holdings and such subsidiaries, the "***Debtors***") anticipate filing voluntary petitions to commence cases (the "***Chapter 11 Cases***") under Title 11 of the United States Code (the "***Bankruptcy Code***") in the United States Bankruptcy Court for the Southern District of Texas (the "***Bankruptcy Court***") in order to implement a restructuring of the Debtors (collectively, the "***Transactions***").

In connection therewith, you have requested that we commit to provide a senior secured, asset-based revolving credit exit facility (the "***Exit Facility***") on substantially the terms described in, and subject to the conditions precedent set forth in, the Exit Facility Term Sheet attached hereto as <u>Exhibit A</u> (the "***Exit Facility Term Sheet***"; and the credit agreement evidencing the Exit Facility, the "***Exit Facility Credit Agreement***") in an aggregate principal amount of $125 million.

Capitalized terms used but not defined herein are used with the meanings assigned to them in the Exit Facility Term Sheet.

1.      Commitments and Undertakings

In connection with the Transactions, subject to the terms and conditions set forth in this Commitment Letter (this "***Commitment Letter***"), the Commitment Party is pleased to advise you of its commitment to provide the entire principal amount of the Exit Facility.

2.      Titles and Roles

It is agreed that Eclipse will act as lead arranger and bookrunner for the Exit Facility (acting in such capacities, the "***Lead Arranger***") and as administrative agent and collateral agent for the Exit Facility.  You further agree that the Lead Arranger shall not have any other responsibilities except as otherwise mutually agreed.  You agree that no other agents, co-agents, arrangers, co-arrangers, bookrunners, co-bookrunners, managers or co-managers will be appointed, no other titles will be awarded and no compensation (other than that expressly contemplated by the Exit Facility Credit Agreement) will be paid in connection with the Exit Facility unless you and we shall so reasonably agree.

3.      Information

You hereby represent that (a) all written information concerning the Top Borrower and its subsidiaries (other than (i) financial projections, financial estimates, other forward-looking and/or projected information (the

"*Projections*"), (ii) information of a general economic or industry-specific nature ("*Economic and Industry Information*") and/or (iii) third party reports and/or memoranda ("*Third Party Materials*"; it being understood that Third Party Materials shall not be deemed to include written information (other than Projections and Economic and Industry Information) on which such Third Party Materials are based) that has been or will be made available to us by the Top Borrower or any of their representatives on your behalf in connection with the Transactions contemplated hereby (collectively, and excluding, for the avoidance of doubt, the Projections, Economic and Industry Information and the Third Party Materials, the "*Information*"), when taken as a whole, does not or will not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time) and (b) the Projections have been or will be prepared in good faith based upon assumptions believed by you to be reasonable at the time furnished (it being recognized by Eclipse that such Projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond your control, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material).  You agree that if, at any time during the term of this letter, you become aware that any of the representations in the preceding sentence would be incorrect in any material respect if the Information or the Projections were being furnished and such representations were being made at such time, you will promptly supplement the Information and the Projections so that the representations in the preceding sentence remain true in all material respects; provided, that any such supplementation shall cure any breach of such representations.  You understand that in arranging the Exit Facility, we may use and rely on the Information and Projections without independent verification thereof and we do not assume responsibility for the accuracy and completeness of the Information or the Projections.

4.      Conditions

The Commitment Party's commitment and agreements hereunder are subject to the conditions set forth in the Exit Facility Term Sheet under the heading "Conditions to Exit ABL Facility Closing Date", it being understood and agreed that there are no conditions (implied or otherwise) to the commitments hereunder, including compliance with the terms of this Commitment Letter, other than those expressly stated in this Section 4.

5.      Indemnification and Expenses

You agree (a) to indemnify and hold harmless the Commitment Party, the Lead Arranger and any other arrangers or agents in respect of the Exit Facility appointed pursuant to this Commitment Letter, their affiliates and their respective directors, officers, employees, advisors, agents and other representatives (each, an "*indemnified person*") from and against any and all losses, claims, damages and liabilities to which any such indemnified person may become subject arising out of or in connection with this Commitment Letter, the Exit Facility, the use of the proceeds thereof, the use of the proceeds thereof, or the Transactions or any claim, litigation, investigation or proceeding relating to any of the foregoing (including in relation to enforcing the terms of this paragraph) (each, a "*Proceeding*"), regardless of whether any indemnified person is a party thereto, whether or not such Proceedings are brought by you, your equity holders, affiliates, creditors or any other person, and to reimburse each indemnified person upon written demand for any reasonable and documented out-of-pocket legal or other documented out-of-pocket expenses incurred in connection with investigating or defending any of the foregoing (limited, in the case of counsel, to the reasonable and documented out-of-pocket fees, disbursements and other charges of a single firm of outside counsel to the indemnified persons and, if necessary, one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons), provided that the foregoing indemnity will not, as to any indemnified person, apply (i) to losses, claims, damages, liabilities or related expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from the willful misconduct, bad faith or gross negligence of such indemnified person or its controlled affiliates, directors, officers or employees, advisors or agents (collectively, the "*Related Parties*"), (ii) to losses, claims, damages, liabilities or related

2

expenses to the extent they are found by a final, nonappealable judgment of a court of competent jurisdiction to arise or result from a material breach of the obligations of such indemnified person or control affiliate of such indemnified person under this Commitment Letter or (iii) to the extent arising from any dispute solely among indemnified persons (other than a Proceeding against any indemnified person in its capacity or in fulfilling its role as the Lead Arranger, administrative agent, collateral agent, bookrunner, lender, letter of credit issuer or any other similar role in connection with this Commitment Letter, the Exit Facility, or the use of the proceeds thereof) not arising out of any act or omission on the part of you or your affiliates; and (b) regardless of whether the Exit ABL Facility Closing Date occurs, to reimburse the Commitment Party and its affiliates for all reasonable and documented out-of-pocket expenses (including, without limitation, due diligence expenses, syndication expenses, financial advisor's fees, consultant's fees, travel expenses, and the fees, charges and disbursements of counsel) incurred in connection with the Exit Facility and any related documentation (including this Commitment Letter, and the definitive financing documentation in connection with the Exit Facility) or the administration, amendment, modification or waiver thereof (limited, in the case of counsel, to the reasonable and documented out-of-pocket fees, disbursements and other charges of a single firm of outside counsel to the indemnified persons and, if necessary, one local counsel in each relevant jurisdiction and solely in the event of a conflict of interest, one additional counsel (and if necessary, one local counsel in each relevant jurisdiction) to each group of similarly situated affected indemnified persons). No indemnified person shall be liable for any damages arising from the use by others of Information or other materials obtained through electronic, telecommunications or other information transmission systems, including an Electronic Platform or otherwise via the internet, or for any special, indirect, consequential or punitive damages in connection with the Exit Facility or in connection with its activities related to the Exit Facility and you agree, to the extent permitted by applicable law, not to assert any claims against any indemnified person with respect to the foregoing. None of the indemnified persons or you or any of your or their respective Related Parties of the foregoing shall be liable for any indirect, special, punitive or consequential damages in connection with this Commitment Letter, the Exit Facility, or the transactions contemplated hereby, *provided* that nothing contained in this sentence shall limit your indemnity obligations to the extent set forth in this Section 5.

You shall not, without the prior written consent of an indemnified person (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such indemnified person unless (a) such settlement includes an unconditional release of such indemnified person in form and substance reasonably satisfactory to such indemnified person from all liability on claims that are the subject matter of such Proceedings and (b) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any indemnified person or any injunctive relief or other non-monetary remedy. You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to Eclipse and the other indemnified persons.

6.      Sharing of Information, Affiliate Activities, Absence of Fiduciary Relationship.

You acknowledge that the Commitment Party and its affiliates may be providing debt financing, equity capital or other services to other companies with which you may have conflicting interests. You acknowledge that the Commitment Party and its affiliates have no obligation to use in connection with the transactions contemplated hereby, or to furnish to you, confidential information obtained from other companies or other persons. The Commitment Party may have economic interests that conflict with your economic interests. You acknowledge and agree that (a)(i) the arrangement and other services described herein regarding the Transactions are arm's-length commercial transactions between you and your affiliates, on the one hand, and the Commitment Party, on the other hand, that do not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of the Commitment Party, (ii) the Commitment Party has not provided any legal, accounting, regulatory or tax advice to you with respect to any of the Transactions and you are not relying on the Commitment Party for such advice, (iii) you have consulted your own legal, accounting, regulatory and tax advisors to the extent you have deemed appropriate and you are not relying on the Commitment Party for such advice and (iv) you are capable of evaluating, and understand and accept, the terms, risks and conditions of the transactions contemplated hereby; and (b) in connection with the transactions contemplated hereby, (i) the Commitment Party

has been, is, and will be acting solely as a principal and, except as otherwise expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for you or any of your affiliates and (ii) the Commitment Party has no obligation to you or your affiliates, except those obligations expressly set forth in this Commitment Letter and any other agreement with you or any of your affiliates.

7.      Confidentiality

This Commitment Letter is delivered to you on the understanding that neither this Commitment Letter nor any of its terms or substance shall be disclosed by you, directly or indirectly, to any other person, except (a) to you and your subsidiaries and your officers, directors, employees, affiliates, members, partners, stockholders, attorneys, accountants, agents and advisors, in each case on a confidential and need-to-know basis, (b) as may be required by or in any legal, judicial or administrative proceeding or as otherwise required by law or regulation or as requested by a governmental or regulatory authority (in which case you agree, (i) to the extent practicable and to the extent permitted by law, to inform us promptly in advance thereof and (ii) to use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) if the Commitment Party consents in writing to such proposed disclosure, (d) in connection with the enforcement of your rights hereunder, (e) this Commitment Letter, including the existence and contents thereof may be disclosed to any rating agency or (f) this Commitment Letter and the existence and contents hereof may be disclosed to the parties to the Restructuring Support Agreement filed in the Chapter 11 Cases on the date hereof and any other party required by the Bankruptcy Court.  Notwithstanding anything to the contrary in the foregoing, you shall be permitted to file this Commitment Letter with the Bankruptcy Court under seal in form and substance reasonably satisfactory to Eclipse or in a redacted manner in form and substance reasonably satisfactory to Eclipse and provide an unredacted copy of this Commitment Letter to the Bankruptcy Court, the Office of the United States Trustee for the Southern District of Texas and any other party required by the Bankruptcy Court and advisors to any official committee appointed in the Chapter 11 Cases.

The Commitment Party shall use all information received by it in connection with the Exit Facility and the related transactions solely for the purposes of providing the services that are the subject of this Commitment Letter and shall treat confidentially all such information; *provided*, *however*, that nothing herein shall prevent the Commitment Party from disclosing any such information (a) to any Lenders or participants or prospective Lenders or participants, (b) in any legal, judicial, administrative proceeding or other compulsory process or as required by applicable law or regulations (in which case the Commitment Party shall promptly notify you, in advance, to the extent permitted by law), (c) upon the request or demand of any regulatory authority (including any self-regulatory authority) or other governmental authority purporting to have jurisdiction over the Commitment Party or any of its affiliates (in which case such person agrees (except with respect to any audit or examination conducted by bank accountants or any self-regulatory authority or governmental or regulatory authority exercising examination or regulatory authority), to the extent practicable and not prohibited by applicable law or regulation, to inform you promptly thereof prior to disclosure), (d) to the employees, legal counsel, independent auditors, professionals and other experts or agents of the Commitment Party (collectively, "**_Representatives_**") who are informed of the confidential nature of such information and are or have been advised of their obligation to keep information of this type confidential, (e) to any of its affiliates (*provided* that any such affiliate is advised of its obligation to retain such information as confidential, and the Commitment Party shall be responsible for its respective affiliates' compliance with this paragraph) solely in connection with the Transactions, (f) to the extent any such information becomes publicly available other than by reason of disclosure by the Commitment Party, its affiliates or Representatives in breach of this Commitment Letter, (g) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Commitment Letter or the Exit Facility and (h) pursuant to customary disclosure about the terms of the financing contemplated hereby in the ordinary course of business to market data collectors and similar service providers to the loan industry for league table purposes; *provided* that the disclosure of any such information to any Lenders or prospective Lenders or participants or prospective participants referred to above shall be made subject to the acknowledgment and acceptance by such Lender or prospective Lender or participant or prospective participant that such information is being disseminated on a confidential basis in accordance with the standard syndication processes of the Commitment Party or customary market standards for dissemination of such type of information.

4

The provisions of this paragraph shall automatically terminate on the earlier of (a) the Exit ABL Facility Closing Date and (b) two years following the date of this Commitment Letter.

8.       Assignments

This Commitment Letter shall not be assignable by you without the prior written consent of the Commitment Party (and any purported assignment without such consent shall be null and void), is intended to be solely for the benefit of the parties hereto and the indemnified persons and is not intended to and does not confer any benefits upon, or create any rights in favor of, any person other than the parties hereto and the indemnified persons to the extent expressly set forth herein.

From the date hereof until the Exit Facility Expiration Date (as defined below), the Commitment Party agrees not to assign the commitments and agreements hereunder, in whole or in part, without the prior written consent of the Top Borrower; provided, that, to the extent the Top Borrower consents to any assignment, the proposed new Commitment Party shall execute a joinder agreement in form and substance acceptable to the Top Borrower.

9.       Miscellaneous

The Commitment Party reserves the right to employ the services of its affiliates in providing services contemplated hereby and to allocate, in whole or in part, to its affiliates certain fees payable to the Commitment Party in such manner as the Commitment Party and its affiliates may agree in its sole discretion. This Commitment Letter may not be amended or waived except by an instrument in writing signed by you and the Commitment Party. This Commitment Letter may be executed in any number of counterparts, each of which shall be an original, and all of which, when taken together, shall constitute one agreement. Delivery of an executed signature page of this Commitment Letter by facsimile or electronic transmission (e.g., "pdf" or "tif") shall be effective as delivery of a manually executed counterpart hereof. This Commitment Letter is the only agreement that has been entered into among us and you with respect to the Exit Facility and sets forth the entire understanding of the parties with respect thereto. This Commitment Letter and any claim or controversy arising hereunder or related hereto shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York and, to the extent applicable, the Bankruptcy Code.

You and we hereby irrevocably and unconditionally submit to the exclusive jurisdiction of the Bankruptcy Court or any other Federal court having jurisdiction over the Chapter 11 Cases, and, to the extent that the Bankruptcy Court or Federal court do not have jurisdiction, any state or Federal court sitting in the Borough of Manhattan in the City of New York, over any suit, action or proceeding arising out of or relating to the Transactions or the other transactions contemplated hereby or this Commitment Letter or the performance of services hereunder. You and we agree that service of any process, summons, notice or document by registered mail addressed to you or us shall be effective service of process for any suit, action or proceeding brought in any such court. You and we hereby irrevocably and unconditionally waive any objection to the laying of venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding has been brought in any inconvenient forum. You and we hereby irrevocably agree to waive trial by jury in any suit, action, proceeding, claim or counterclaim brought by or on behalf of any party related to or arising out of the Transactions or this Commitment Letter or the performance of services hereunder.

The Commitment Party hereby notifies you that, pursuant to the requirements of the USA PATRIOT Act, Title III of Pub. L. 107-56 (signed into law on October 26, 2001) (the "*PATRIOT Act*"), it is required to obtain, verify and record information that identifies each Borrower and each Guarantor, which information includes names, addresses, tax identification numbers and other information that will allow such Lender to identify each Borrower and each Guarantor in accordance with the PATRIOT Act. This notice is given in accordance with the requirements of the PATRIOT Act and is effective for the Commitment Party and each Lender.

Section headings used herein are for convenience of reference only and are not to affect the construction of, or to be taken into consideration in interpreting, this Commitment Letter.

The indemnification, expense, jurisdiction, information, governing law and confidentiality provisions contained herein shall remain in full force and effect regardless of whether definitive financing documentation for the Exit Facility shall be executed and delivered and notwithstanding the termination of this Commitment Letter or the commitments hereunder; *provided* that your obligations under this Commitment Letter (other than your obligations with respect to confidentiality) shall automatically terminate and be superseded, to the extent comparable, by the provisions of the Exit Facility Credit Agreement upon the occurrence of the effectiveness thereof.

This Commitment Letter shall become effective as of the date each of the parties hereto shall have duly executed this Commitment Letter, concurrently with (and subject to) the effectiveness of the DIP ABL Credit Agreement (as defined in the Term Sheet) pursuant to Section 4.01 thereof.  Thereafter, the commitments hereunder with respect to the Exit Facility shall automatically terminate on the Exit Facility Expiration Date (as defined below) unless the Commitment Party shall, in its discretion, agree to an extension.  You may terminate this Commitment Letter with respect to the Exit Facility hereunder at any time subject to the provisions of the preceding sentence and payment of the applicable Exit Fee (as defined in the DIP ABL Credit Agreement).

For purposes of this Commitment Letter, "***Exit Facility Expiration Date***" means the date upon which either of the following occurs:  (i) the termination of the DIP ABL Credit Agreement pursuant to Section 4.01 thereof or (ii) the maturity or termination of the DIP ABL Facility (as defined in the Term Sheet) prior to the Exit ABL Facility Closing Date.

*[Signature Pages Follow]*

[SIGNATURE PAGES OMITTED]

Exhibit A

CONFIDENTIAL

SERTA SIMMONS BEDDING, LLC
$125 MILLION EXIT ABL FACILITY
SUMMARY OF PRINCIPAL TERMS AND CONDITIONS

   This term sheet (the "Term Sheet") sets forth a summary of the principal terms and conditions for the Exit ABL Facility (as defined below).  Unless specifically defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in (i) that certain ABL Credit Agreement, dated as of November 8, 2016 (as amended, restated, amended and restated, supplemented or otherwise modified prior to the Petition Date, the "Prepetition ABL Facility"), by and among, *inter alios*, Holdings, the Borrowers, the lenders from time to time party thereto and UBS AG, Stamford Branch, as administrative agent, or (ii) the Commitment Letter to which this Exhibit A is attached, as applicable.

| | |
|---|---|
| Holdings: | Dawn Intermediate, LLC, a Delaware limited liability company or the parent entity of the Top Borrower to be mutually agreed by the Borrowers and the Exit ABL Agent ("Holdings"). |
| Borrowers: | Serta Simmons Bedding, LLC, a Delaware limited liability company (the "Top Borrower"), National Bedding Company L.L.C., an Illinois limited liability company ("National Bedding"), and SSB Manufacturing Company, a Delaware corporation ("SSB Manufacturing" and together with National Bedding and the Top Borrower, the "Borrowers"). |
| Guarantors: | The Borrowers' obligations under the Exit ABL Facility (the "Exit ABL Obligations"), will be guaranteed (the "Guaranty") on a joint and several basis by (x) Holdings and (y) each of the Top Borrower's existing and subsequently acquired or organized wholly-owned domestic restricted subsidiaries other than any Borrower (collectively, the "Subsidiary Guarantors"; and the Subsidiary Guarantors, together with Holdings, the "Guarantors"; and the Guarantors, together with the Borrowers, the "Loan Parties"); provided, that certain subsidiaries (including Excluded Subsidiaries) will not be required to be Subsidiary Guarantors consistent with the Documentation Principles. |
| Exit ABL Lenders: | On the Exit ABL Facility Closing Date (as defined below), the debtor-in-possession asset-based revolving credit facility (the "DIP ABL Facility") contemplated under the Senior Secured Super-Priority Debtor-in-Possession ABL Credit Agreement (the "DIP ABL Credit Agreement") dated as of the date of the Commitment Letter by and between, *inter alios*, the Borrowers and Eclipse Business Capital LLC ("Eclipse") will, subject to the terms and conditions set forth herein, be refinanced with a senior secured, asset-based revolving credit facility subject to a Borrowing Base (as defined below) and with commitments in an aggregate principal amount of $125 million from Eclipse or its affiliates. The lenders making commitments under the Exit ABL Facility are collectively referred to as "Exit ABL Lenders" and, together with the Exit ABL Agent and the Exit ABL Issuing Lender (each as defined below), the "Exit ABL Secured Parties"). |

| | |
|---|---|
| Exit Administrative Agent and Exit Collateral Agent: | Eclipse will act as the sole and exclusive administrative agent and collateral agent for the Exit ABL Lenders (in such capacities, the "Exit ABL Agent") and will perform the duties customarily associated with such roles. |

## SENIOR SECURED ASSET-BASED REVOLVING LOAN FACILITY

| | |
|---|---|
| Type and Amount: | A senior secured, asset-based revolving credit facility (the "Exit ABL Facility"), made available to the Borrowers in an initial aggregate principal amount of $125 million (the "Exit ABL Commitments" and loans thereunder, the "Exit ABL Loans").   The Total Exit ABL Outstandings (as defined below) shall exceed $20 million at all times, provided that Exit ABL Loans shall exceed $10 million at all times. |
| Availability: | The Exit ABL Facility shall be available on a revolving basis during the period commencing on the Exit ABL Facility Closing Date, subject to the limitations set forth under "Use of Proceeds" below and ending on the Exit ABL Termination Date (as defined below); provided that the aggregate amount of the Exit ABL Loans, unreimbursed Exit ABL Letter of Credit (as defined below) drawings and Exit ABL Letters of Credit outstanding under the Exit ABL Facility at any time (collectively, the "Total Exit ABL Outstandings") shall not in total exceed an amount equal to the lesser of (a) the Exit ABL Commitments and (b) the then applicable Borrowing Base (such lesser amount, the "Line Cap" and the amount by which the Line Cap at any time exceeds the Total Exit ABL Outstandings, the "Availability"). |
| Borrowing Base: | The "Borrowing Base" shall, at any time, equal the sum of the following as set forth in the most recently delivered Borrowing Base Certificate (as defined below):[1] |
| | (a)   90% of the Loan Parties' Eligible Trade Receivables (as described below) (provided, that if dilution exceeds 5%, the Exit ABL Agent may, at its option in its Permitted Discretion, (i) reduce such advance rate by the number of full or partial percentage points comprising such excess or (ii) establish a reserve on account of such excess); plus |
| | (b)   (i) prior to the establishment of the net recovery percentage, the lesser of (A) $15 million and (B) 15% of the lower of cost (determined on a FIFO basis) or market value of the Loan Parties' Eligible Inventory (as described below) and Eligible In-Transit Inventory (as described below); or |
| | (ii) after the establishment of the net recovery percentage, the lesser of (A) $30 million and (B) the lower of (x) 65% of the lower of cost (determined on a FIFO basis) or market value of |

---

[1] Canadian Borrowing Base option (and Canadian Loan Parties) to be determined, subject to business and legal diligence.

the Loan Parties' Eligible Inventory and Eligible In-Transit Inventory and (y) 85% of the net recovery percentage of such Eligible Inventory and Eligible In-Transit Inventory, multiplied by the cost of each such category of inventory;

provided that the aggregate amount of availability generated by Eligible In-Transit Inventory (after applying advance rates set forth above) pursuant to this clause (b) shall not exceed $7.5 million; plus

(c)      up to $40 million of unrestricted cash of the Loan Parties maintained in a deposit account at Wells Fargo (or another institution acceptable to the Exit ABL Agent in its sole discretion) that is subject to the Exit ABL Agent's first-priority security interest and a fully blocked account control agreement in favor of the Exit ABL Agent (pursuant to which the Exit ABL Agent is granted sole dominion and control over such account), it being agreed that any withdrawals from such account shall be subject to restrictions substantially similar to those for withdrawals from the "QC Blocked Account" set forth in the DIP ABL Facility); minus

(d)      the Availability Block (as defined below); minus

(e)      such reserves as the Exit ABL Agent may establish in its Permitted Discretion (as defined below).

The components of the Borrowing Base shall be defined in a manner substantially similar to the definitions of such terms in the Prepetition ABL Facility, with dollar amounts and percentage caps and other changes to be mutually agreed by the Borrowers and the Exit ABL Agent (including certain ineligibility criteria to be mutually agreed in connection with the DIP ABL Facility by the parties thereto, to the extent such criteria are not related to the Chapter 11 Cases).

"Availability Block" means an amount equal to the greater of (i) $5 million and (ii) 10% of the Borrowing Base (calculated without giving effect to clauses (d) and (e) of the definition thereof).

The Borrowing Base will be computed on a monthly basis pursuant to a monthly borrowing base certificate (the "Borrowing Base Certificate") to be delivered by the Top Borrower to the Exit ABL Agent.   The Borrowing Base Certificate shall be delivered within 15 days after the end of each month; provided, that, during any period during which a Weekly Reporting Condition (as defined below) exists, the Top Borrower will be required to compute the Borrowing Base weekly, with the applicable Borrowing Base Certificate to be delivered within 3 business days after the end of each week.   The Top Borrower will be required to deliver related collateral reports and documents in scope and frequency to be mutually agreed by the Borrowers and the Exit ABL Agent (which collateral reporting, for the avoidance of doubt, may not be limited to the collateral reporting required under the Prepetition ABL

Facility).

In addition, notwithstanding anything to the contrary contained herein, in the event that, since the most recent delivery of a Borrowing Base Certificate, the Loan Parties (or any of them) consummate any transaction (including, without limitation, any investment, restricted payment or other disposition, or any designation of a restricted subsidiary as an Unrestricted Subsidiary (as defined below), but excluding dispositions in the ordinary course of business or to a Loan Party) that result in the disposition of, subordination of the Exit ABL Agent's liens on, or release of a Loan Party owning, ABL Priority Collateral (as defined below) (whether as part of a sale of capital stock or other equity interests or otherwise) with a value (as reasonably determined by the Top Borrower), individually for such transaction or in the aggregate for all such transactions since the most recent delivery of a Borrowing Base Certificate, in excess of the lesser of (x) $5 million and (y) 5% of the Borrowing Base at such time, as a condition to the permissibility of the consummation of such transaction pursuant to any provision of Exit ABL Credit Documents (as defined below), (x) the Top Borrower shall have provided to the Exit ABL Agent an updated Borrowing Base Certificate (giving pro forma effect to such transaction) prior to the consummation of such transaction and (y) no overadvance shall exist after giving effect to such transaction (the foregoing, the "Updated BBC Condition").

"Permitted Discretion" means reasonable (from the perspective of a secured asset-based lender) credit judgment exercised in good faith in accordance with customary business practices of the Exit ABL Agent for comparable asset-based lending transactions.

"Weekly Reporting Condition" means (a) each period during which an Event of Default has occurred and is continuing and (b) each period from the date on which Availability is less than $10 million to the date on which Availability has been at least equal to $10 million for each day during a period of 20 consecutive calendar days.

The establishment or increase of any reserve against the Borrowing Base shall be limited to such reserves against the Borrowing Base as the Exit ABL Agent from time to time determines in its Permitted Discretion as being necessary to reflect items that could reasonably be expected to adversely affect (i) the value of the Eligible Trade Receivables, Eligible Inventory and/or Eligible In-Transit Inventory or (ii) the applicable ABL Priority Collateral, including without limitation the value, enforceability, perfection or priority of the Exit ABL Agent's Liens (as defined below) thereon or the Exit ABL Agent's access thereto (including customary rent reserves, in the absence of collateral access agreements and landlord waivers, with respect to locations in a landlord lien "priming" jurisdiction and other material inventory locations to be agreed); provided that no reserve may be taken after the Exit ABL Facility Closing Date based on any circumstance, condition, event or contingency known to the Exit ABL Agent as of the Exit ABL Facility Closing Date and for which no reserve was imposed on the Exit ABL Facility Closing Date, unless such circumstance, condition, event or

contingency has changed in any material adverse respect since the Exit ABL Facility Closing Date.  After the Exit ABL Facility Closing Date, the Exit ABL Agent reserves the right to establish or modify any reserve against the Borrowing Base, acting in its Permitted Discretion, upon at least 2 business days' prior written notice to the Top Borrower (which notice shall include a reasonably detailed description of the reserve being established).  During such 2-business day period, (x) the Exit ABL Agent shall, upon request, discuss any such reserve or change with the Top Borrower, and the Top Borrower may take any action that may be required so that the event, condition or matter that is the basis for such reserve or change no longer exists or exists in a manner that would result in the establishment of a lower reserve or result in a lesser change, in each case, in a manner and to the extent reasonably satisfactory to the Exit ABL Agent, and (y) such reserve or change shall be deemed to be in effect for purposes of determining availability for additional borrowings or other extensions of credit.  Notwithstanding anything to the contrary herein, (a) the amount of any such reserve or change shall have a reasonable relationship to the event, condition or other matter that is the basis for such reserve or such change, (b) no reserve or change shall be duplicative of any reserve or change already accounted for through eligibility criteria (including collection/advance rates) and (c) no dilution reserve shall be imposed with respect to dilution other than as set forth in clause (a) of the definition of "Borrowing Base".

|                              |                                                                                                                                                                                                                                                                                                                                                                                                                                                                           |
|------------------------------|---|
| Maturity:                    | The Exit ABL Commitments shall terminate and the Exit ABL Loans will mature on the date (the "<u>Exit ABL Termination Date</u>") that is 4 years after the Exit ABL Facility Closing Date. |
| Exit ABL Letters of Credit:  | $10 million of the Exit ABL Facility shall be available for the issuance of letters of credit, including documentary letters of credit (the "<u>Exit ABL Letters of Credit</u>"), by Wells Fargo Bank, National Association (in such capacity, the "<u>Exit ABL Issuing Lender</u>"); <u>provided</u> that the Exit ABL Issuing Lender shall not be required to issue documentary or trade Exit ABL Letters of Credit without its consent.<br><br>The Exit ABL Credit Documents will contain terms for Exit ABL Letters of Credit substantially similar to those set forth in the DIP ABL Facility. |
| Use of Proceeds:             | The Exit ABL Loans shall be made available to the Borrowers: (i) on the Exit ABL Facility Closing Date to (a) refinance all outstanding obligations and replace commitments under the DIP ABL Facility, including rolling the letters of credit outstanding thereunder, and (b) to pay the fees, costs and expenses incurred in connection with the transactions contemplated hereby (including fees and expenses related to the Loan Parties' emergence from the Chapter 11 Cases); and (ii) on and/or after the Exit ABL Facility Closing Date (a) to finance the working capital needs and other general corporate purposes of Holdings and its subsidiaries (including for capital expenditures, working capital and/or purchase price adjustments, the payment of transaction fees and expenses (in each case, including in connection with the transactions), acquisitions and other investments, restricted payments and any other purpose not prohibited by the Exit ABL Credit Documents), (b) for |

payments contemplated by the Approved Plan (as defined below), and (c) payment of all reasonable and documented out-of-pocket costs, fees and expenses required by the Exit ABL Credit Documents and other fees and expenses in connection with the transactions on the Exit ABL Facility Closing Date.

ABL Incremental Facilities:     None.

CERTAIN PAYMENT
PROVISIONS

Fees and Interest Rates:        As set forth on Annex I to this Exhibit A.

Optional Prepayments and        Exit ABL Loans may be prepaid and Exit ABL Commitments may be
Commitment Termination:         terminated (but may not be partially reduced), subject to payment of the applicable Early Termination Fee (as defined below), at the option of the Top Borrower at any time, subject to the concurrent cash collateralization (or, to the extent acceptable to the Exit ABL Issuing Lender, "backstop" or other replacement) of outstanding Exit ABL Letters of Credit at 103% of the face amount thereof and repayment of all other outstanding Exit ABL Obligations.

Mandatory Prepayments:          To the extent that the Total Exit ABL Outstandings exceed the Line Cap, the Top Borrower shall, within 1 business day thereafter, repay the outstanding Exit ABL Loans (and, if there are no Exit ABL Loans outstanding, cash collateralize (or, to the extent acceptable to the Exit ABL Issuing Lender, "backstop" or replace) outstanding Exit ABL Letters of Credit at 103% of the face amount thereof) under the Exit ABL Facility in an amount equal to such excess.

COLLATERAL                      The Exit ABL Obligations and the obligations of each other Loan Party under the Guaranty shall be secured by:

(a) a perfected first-priority security interest (subject to customary ordinary course permitted prior liens to be mutually agreed) in substantially all now owned or hereafter acquired personal property of each Loan Party that consists of "ABL Priority Collateral" (to be defined substantially similar to the Prepetition Intercreditor Agreement referred to below); and

(b) a perfected second-priority security interest (subject to customary ordinary course permitted prior liens to be mutually agreed) in substantially all now owned or hereafter acquired personal property and material real property of each Loan Party that consists of "Term Loan Priority Collateral" (to be defined substantially similar to the Prepetition Intercreditor Agreement);

in each case, excluding Excluded Assets (as defined consistent with the Documentation Principles; provided, that in no event shall any property included in the Borrowing Base constitute an Excluded Asset) (collectively, the "Collateral").

"Exit First Lien Term Facility" means the term loan credit facility to be provided pursuant to the New Term Loan Credit Facility Agreement (as defined in the Restructuring Support Agreement to be entered into on the date hereof).

The Exit ABL Facility will be secured on a first-priority basis with respect to the ABL Priority Collateral and a second-priority basis with respect to the Term Loan Priority Collateral.  The Exit ABL Facility will be *pari passu* in right of payment with the Exit First Lien Term Facility.

The lien priority, relative rights and other creditors' rights issues in respect of the Exit ABL Facility and the Exit First Lien Term Facility will be set forth in an intercreditor agreement (the "Exit ABL Intercreditor Agreement") that will be based upon and substantially similar to the ABL Intercreditor Agreement with respect to the Prepetition ABL Facility (the "Prepetition Intercreditor Agreement"), with such changes thereto as are reasonably agreed by the Top Borrower, the agent with respect to the Exit First Lien Term Facility and the Exit ABL Agent.

## CERTAIN CONDITIONS

Conditions to Exit ABL Facility Closing Date:

Each Exit ABL Lender's obligation to provide its share of the initial extension of credit on the to Exit ABL Facility Closing Date shall be subject to the satisfaction (or waiver by Exit ABL Lenders) of the conditions precedent to be set forth in the Exit ABL Credit Documents and limited to the below (collectively, the "Exit ABL Facility Conditions Precedent" and the date on which such Exit ABL Facility Conditions Precedent are satisfied, the "Exit ABL Facility Closing Date"):

(a) The Bankruptcy Court shall have entered an order, in form and substance reasonably satisfactory to the Exit ABL Agent and the Exit ABL Lenders, confirming an "Acceptable Plan" under (and as defined in) the DIP ABL Facility (an "Approved Plan") including approval of the Exit ABL Facility and the Exit First Lien Term Facility and releases and exculpation (the "Confirmation Order"), and the Confirmation Order shall have become a final order and shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that would reasonably be expected to adversely affect the interests of the Exit ABL Agent or the Exit ABL Lenders and authorizing the Top Borrower and its restricted subsidiaries to execute, deliver and perform under the Exit ABL Credit Documents;

(b) The Exit ABL Credit Documents (i) shall be in form and substance consistent with this Term Sheet and otherwise reasonably satisfactory to each of the Top Borrower and the Exit ABL Agent (such approval not to be unreasonably withheld, delayed or conditioned), and (ii) shall have been executed and delivered by each party thereto;

(c) The "Effective Date" of the Approved Plan (the "Plan Effective Date") and all material transactions contemplated in the Approved Plan or in the Confirmation Order to occur on the Plan Effective Date shall have occurred on the Exit ABL Facility Closing Date (or concurrently with the occurrence of Exit ABL Facility Closing Date, shall occur) in accordance with the terms thereof and in compliance with applicable law, the applicable orders of the Bankruptcy Court and material regulatory approvals;

(d) All obligations under the DIP ABL Facility shall have been (or concurrently with the Exit ABL Facility Closing Date shall be) repaid in full in cash (or, with respect to letters of credit outstanding thereunder, deemed issued under the Exit ABL Facility);

(f) The Exit ABL Agent shall have received satisfactory evidence that immediately after the consummation of the Approved Plan, total outstanding third party debt for borrowed money outstanding (excluding letters of credit or drawn amount under the Exit ABL Facility or any capital leases) and net of unrestricted cash and cash equivalents of the Top Borrower and its restricted subsidiaries shall not exceed $350 million;

(g) The Exit ABL Agent shall have received satisfactory evidence that immediately after the consummation of the Approved Plan, total unrestricted cash and cash equivalents of the Top Borrower and its restricted subsidiaries shall be no less than $50 million;

(h) All fees, costs and expenses that are due with respect to the Exit ABL Facility and payable prior to or on such date (including legal fees, costs and expenses, to the extent invoiced at least two business days prior to the Exit ABL Facility Closing Date), shall have been paid or reimbursed;

(i) Delivery of customary documents and certificates (including organizational documents, evidence of corporate authorization and specimen signatures) and customary legal opinions dated as of the Exit ABL Facility Closing Date and such other documentation that the Exit ABL Agent may reasonably request in order to effectuate the Exit ABL Facility; and

(j) Eclipse shall be a lender under the DIP ABL Facility, and no Event of Default (as defined thereunder) shall have occurred and be continuing thereunder on the Exit ABL Facility Closing Date (or, if earlier, the date upon which the DIP ABL Facility was terminated).

| | |
|---|---|
| Conditions to all Extensions of Credit: | The Exit ABL Lenders' obligation to provide any extensions of credit on and after the Exit ABL Facility Closing Date (other than any amendment, modification, renewal or extension of an Exit ABL Letter of Credit which does not increase the face amount of such Exit ABL |

Letter of Credit) shall be subject to the satisfaction of the conditions set forth in the Exit ABL Credit Documents and limited to:

(a) the accuracy in all material respects of all representations and warranties in the Exit ABL Credit Documents as of the date of the relevant extension of credit, except to the extent any such representation and warranty expressly relates to an earlier date, in which case such representation and warranty shall be required to be accurate in all material respects as of such earlier date,

(b) there being no default or Event of Default in existence at the time of, or after giving effect to the making of, such extension of credit,

(c) delivery of a customary borrowing notice or request for issuance of an Exit ABL Letter of Credit, as applicable, and

(d) the Total Exit ABL Outstandings not exceeding the Line Cap.

DOCUMENTATION

As used herein, the "Exit ABL Credit Documents" means, collectively, the credit agreement (the "Exit ABL Credit Agreement") and other credit documents (including the Exit ABL Intercreditor Agreement), and all other related agreements and documents creating, evidencing, or securing indebtedness or obligations of any of the Loan Parties to any Exit ABL Secured Parties on account of the Exit ABL Facility or granting or perfecting liens or security interests by any of the Loan Parties in favor of and for the benefit of the Exit ABL Agent, for itself and for and on behalf of the Exit ABL Secured Parties, as same now exists or may hereafter be amended, modified, supplemented, ratified, assumed, extended, renewed, restated, or replaced, and any and all of the agreements, certificates and documents currently executed and/or delivered or to be executed and/or delivered in connection therewith or related thereto, by and among any of the Loan Parties, the Exit ABL Agent and the other Exit ABL Secured Parties.

The Exit ABL Credit Agreement will be based upon the Prepetition ABL Facility with such changes thereto as are appropriate to reflect (i) terms customary and usual for exit financings of this type (with materiality qualifications, thresholds, exceptions and baskets to be mutually agreed) and the terms and conditions and other provisions set forth in this Term Sheet, (ii) reasonable administrative agency and operational requirements of the Exit ABL Agent and (iii) changes in applicable law (the "Documentation Principles"). The Credit Documentation shall contain customary "J.Crew" and "Chewy" protections as reasonably agreed by the Top Borrower and the Exit ABL Agent.

Representations and Warranties:

Each of the Loan Parties will make all representations and warranties set forth in the Prepetition ABL Facility, subject to the Documentation Principles.

| | |
|---|---|
| Affirmative Covenants: | Consistent with the Documentation Principles and limited to the following: delivery of (a) monthly financial statements within 30 days after the end of each fiscal month, (b) annual audited financial statements within 120 days after the end of each fiscal year accompanied by an opinion of a nationally-recognized independent accounting firm that is not subject to (i) a "going concern" qualification (but not a "going concern" explanatory paragraph or like statement) (other than a "going concern" qualification resulting from (A) the maturity of any indebtedness within the 4 fiscal quarter period following the relevant audit opinion or (B) the breach or anticipated breach of any financial covenant) or (ii) a qualification as to the scope of the relevant audit, (c) quarterly unaudited financial statements (for each of the first 3 fiscal quarters of each fiscal year) within 60 days after the end of each fiscal quarter, (d) an annual budget within 60 days after the end of each fiscal year, (e) officers' certificates and other information reasonably requested by the Exit ABL Agent, (f) concurrently with the delivery of annual and quarterly financial statements, a compliance certificate, and (g) notices of default, certain events that would reasonably be expected to have a Material Adverse Effect, and certain information regarding Collateral; maintenance of books and records; maintenance of existence; compliance with laws (including, without limitation, ERISA, environmental laws, FCPA, OFAC and the PATRIOT Act); environmental matters; maintenance of property and insurance (including, maintenance of flood insurance on all mortgaged property that is in a special flood hazard zone, from such providers, on such terms and in such amounts as required by the Flood Disaster Protection Act (where applicable) as amended from time to time); payment of taxes; right of the Exit ABL Agent to inspect property and books and records (subject, absent a continuing Event of Default, to frequency and cost reimbursement limitations); use of proceeds; designation of Unrestricted Subsidiaries; cash management; further assurances, including without limitation on guaranty and Collateral matters (including, without limitation, with respect to (A) additional guarantees and security interests in after-acquired property and (B) the mortgage of material real property, subject to the parameters set forth under "COLLATERAL" above); delivery of the Borrowing Base Certificates required above under the heading "Borrowing Base" and other customary asset-based lending reporting requirements; and right of the Exit ABL Agent and its representatives to conduct, at the Borrowers' expense, (A)(x) one field examination in each consecutive 9-month period after the Exit ABL Facility Closing Date at the Exit ABL Agent's discretion and (y) one appraisal in each consecutive 12-month period after the Exit ABL Facility Closing Date at the Exit ABL Agent's discretion, and (B) unlimited field examinations and appraisals after the occurrence and during the continuance of any Event of Default). |
| Financial Covenant: | None. |
| Cash Management/Cash Dominion: | During a Cash Dominion Period (as defined below), upon delivery of a written notice by the Exit ABL Agent to the Top Borrower, the Exit ABL Agent shall have the right to require that any amount on deposit in any such controlled account (subject to customary exceptions and thresholds to be mutually agreed in the Exit ABL Credit Documents |

(including, for the avoidance of doubt, exceptions for Tax and Trust Funds)) be swept on a daily basis into a core concentration account maintained under the sole dominion and control of the Exit ABL Agent. The Exit ABL Agent shall have the right during any Cash Dominion Period to cause all amounts on deposit in the core concentration account to be applied on a daily basis to reduce loans outstanding under the Exit ABL Facility and then to cash collateralize any outstanding Exit ABL Letters of Credit (in each case, subject to a cash release mechanic upon the termination of such Cash Dominion Period); it being understood that the Exit ABL Credit Documents shall provide for the turnover of Tax and Trust Funds during a Cash Dominion Period.

"Cash Dominion Period" means (a) each period from the date on which Availability is less than $10 million to the date on which Availability has been at least equal to $10 million for each day during a period of 20 consecutive calendar days or (b) each period during which any Specified Default has occurred and is continuing.

"Specified Default" shall mean any payment or bankruptcy Event of Default, a failure to deliver a Borrowing Base Certificate (subject to a 5 business days grace period (or a 3 business day grace period when weekly delivery of Borrowing Base Certificates is required)), or any Event of Default arising from a breach of the "Cash Management" provisions set forth above during a Cash Dominion Period.

|  |  |
|---|---|
| Negative Covenants: | The negative covenants shall be substantially similar to (and limited to) those negative covenants set forth in the Prepetition ABL Facility, subject to the Documentation Principles, including baskets and exceptions subject to Payment Conditions (as defined substantially similar with the Prepetition ABL Facility) and other baskets and exceptions to be mutually agreed. |
|  | No investment or other disposition of intellectual property that is material to the business or operations of any Loan Party or the sale or other disposition of any ABL Priority Collateral ("Material Intellectual Property") may be made from any Loan Party or any other restricted subsidiary to any Unrestricted Subsidiary. |
|  | In the event of any disposition of Material Intellectual Property (other than to a Loan Party), the purchaser, assignee or other transferee thereof shall agree in writing to be bound by a non-exclusive, royalty-free worldwide license of such intellectual property in favor of the Exit ABL Agent for use in connection with the exercise of its rights and remedies under the Exit ABL Documents. |
| Unrestricted Subsidiaries: | The Exit ABL Credit Documents will contain provisions pursuant to which the Top Borrower will be permitted to designate (or re-designate) any existing or subsequently acquired or organized restricted subsidiary as an "unrestricted subsidiary" (each, an "Unrestricted Subsidiary") and designate (or re-designate) any such Unrestricted Subsidiary as a restricted subsidiary; provided, that after giving effect to any such designation or re-designation, no Event of Default shall exist (including after giving effect to the reclassification of any investment in, |

indebtedness of, and/or any lien on the assets of, the relevant subsidiary). Unrestricted Subsidiaries (and the sale of any equity interests therein or assets thereof) will not be subject to the mandatory prepayment, representations and warranties, affirmative or negative covenants, or Event of Default provisions of the Exit ABL Credit Documents, and the results of operations and indebtedness of Unrestricted Subsidiaries will not be taken into account for purposes of determining compliance with any financial ratio set forth in the Exit ABL Credit Documents. No subsidiary may be, or be designated as, an Unrestricted Subsidiary under the Exit ABL Facility if (i) it is a restricted subsidiary under the Exit First Lien Term Facility, (ii) it is a Borrower, or (iii) it owns, directly or indirectly, any capital stock or other equity interests in a Loan Party or any other restricted subsidiary, holds any debt or any lien on any property of any Loan Party or any other restricted subsidiary or holds any Material Intellectual Property. For the avoidance of doubt, the designation of a restricted subsidiary as an Unrestricted Subsidiary shall be deemed to be an investment in such Unrestricted Subsidiary in an amount equal to the fair market value of such subsidiary at the time of designation.

| | |
|---|---|
| Events of Default: | The Exit ABL Credit Documents will contain events of default (the "Events of Default") customary for facilities of this size, type and purpose and limited to (and with qualifications and exceptions, where applicable, substantially similar to) those set forth in the Prepetition ABL Facility, subject to the Documentation Principles. |
| Amendments: | Subject to the consent of the Required Exit ABL Lenders, with certain customary amendments subject to the consent of each Exit ABL Lender, each Exit ABL Lender directly and adversely affected thereby, the Exit ABL Agent or the Exit ABL Issuing Lender, as applicable. |
| | "Required Exit ABL Lenders" shall mean the Exit ABL Lenders holding a majority in amount of aggregate Exit ABL Loans and Exit ABL Commitments. |
| Defaulting Exit ABL Lenders: | The Exit ABL Credit Documents will contain customary limitations on and protections with respect to "defaulting" Exit ABL Lenders substantially similar to those set forth in the Prepetition ABL Facility. |
| Assignments and Participations: | The Exit ABL Lenders shall be permitted to assign all or a portion of their commitments to any person (other than to (a) any Disqualified Institution, (b) any natural person and (c) the Top Borrower (or any affiliate thereof)) with the consent of (i) the Top Borrower (not to be unreasonably withheld or delayed) and such consent not to be required during the continuance of any payment or bankruptcy Event of Default (with respect to any Loan Party) and (ii) the Exit ABL Agent (not to be unreasonably withheld or delayed). In the case of partial assignments (other than to another Exit ABL Lender or an affiliate of an Exit ABL Lender), the minimum assignment amount shall be $5.0 million unless otherwise agreed by the Top Borrower and the Exit ABL Agent. The Exit ABL Agent shall receive a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Exit |

ABL Agent) in connection with all assignments.

The Exit ABL Lenders shall also have the right to sell participations in their Exit ABL Loans to other persons (other than to any Disqualified Institutions). Participants shall have the same benefits as the Exit ABL Lenders with respect to yield protection and increased cost provisions subject to customary limitations and restrictions. Voting rights of participants shall be limited to those matters with respect to which the affirmative vote of each Exit ABL Lender or each Exit ABL Lender directly and adversely affected thereby, as applicable, is required.

Pledges of Exit ABL Loans in accordance with applicable law shall be permitted without restriction other than to Disqualified Institutions.

The Exit ABL Agent shall be permitted to make the list of Disqualified Institutions available to any Lender who specifically requests a copy thereof. The Exit ABL Agent shall not have any liability for assignments or participations made to Disqualified Institutions or affiliated Lenders (regardless of whether the consent of the Exit ABL Agent is required thereto), and none of the Top Borrower, any Exit ABL Lender nor any of their respective affiliates will bring any claim to such effect but, for the avoidance of doubt, the Exit ABL Agent shall not be (i) obligated to ascertain, monitor or inquire as to whether any lender is a Disqualified Institution or (ii) have any liability with respect to any assignment of Exit ABL Loans to any Disqualified Institution (other than for gross negligence or willful misconduct if the Top Borrower has not consented in writing to an assignment to a Disqualified Institution).

| | |
|---|---|
| Expenses and Indemnification: | The Exit ABL Credit Documents will contain expense reimbursement and indemnification provisions customary for facilities of this size, type and purpose and substantially similar to the DIP ABL Facility. |
| Governing Law and Forum: | New York |
| Counsel to the Exit ABL Agent: | Choate, Hall & Stewart LLP. |

<u>Annex I to Exit ABL Facility Term Sheet</u>

<u>INTEREST AND CERTAIN FEES</u>

Interest Rates:

The Exit ABL Loans comprising each borrowing shall bear interest at a rate per annum equal to the Adjusted Term SOFR Rate (as defined below) <u>plus</u> the Applicable Margin (as defined below), subject to limited circumstances (to be set forth in the Exit ABL Credit Documents) in which the Exit ABL Loans comprising each borrowing shall bear interest at a fallback rate per annum equal to the ABR (as defined below) <u>plus</u> the Applicable Margin.  Notwithstanding the foregoing, if an Event of Default has occurred and is continuing, at the election of the Exit ABL Agent or the Required Exit ABL Lenders, the Exit ABL Loans comprising each borrowing shall bear interest at a rate per annum equal to the ABR (as defined below) <u>plus</u> the Applicable Margin.

For purposes of computing interest on the Exit ABL Loans, and solely to the extent a Cash Dominion Period is then continuing, all payments and collections shall be deemed applied by the Exit ABL Agent 1 business day after the Exit ABL Agent's receipt of advice of deposit thereof at the Exit ABL Agent's bank.

As used herein:

"<u>ABR</u>" means the highest of (a) the rate announced by Wells Fargo Bank, National Association, at its principal office in San Francisco, as its "prime rate", (b) the federal funds rate plus 50 basis points, (c) the Adjusted Term SOFR Rate plus 1.00% and (d) 2.00%.

"<u>ABR Loans</u>" means Exit ABL Loans bearing interest based upon the ABR.  ABR Loans will be made available on same day notice.

"<u>Adjusted Term SOFR Rate</u>" means the higher of (a) the Term SOFR Rate plus the Term SOFR Adjustment and (b) 1.00% per annum.

"<u>Term SOFR Adjustment</u>" means 0.11448%.

"<u>Term SOFR Rate</u>" means, for any calendar month, the Term SOFR Reference Rate for a tenor of one month at approximately 5:00 p.m., New York time, two U.S. government securities business days prior to the commencement of such calendar month, as such rate is published by the CME Term SOFR Administrator.

"<u>Term SOFR Rate Loans</u>" means Exit ABL Loans bearing interest based upon the Adjusted Term SOFR Rate.  Term SOFR Rate Loans will be made available on same day notice.

"<u>Term SOFR Reference Rate</u>" means the forward-looking term rate based on SOFR.

"<u>SOFR</u>" means a rate equal to the secured overnight financing rate as administered by the CME Term SOFR Administrator.

"CME Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Exit ABL Agent in its reasonable discretion).

"Applicable Margin" shall be (i) until the nine-month anniversary of the Exit ABL Facility Closing Date (x) with respect to Term SOFR Rate Loans, 4.50% and (y) with respect to ABR Loans, 3.50% and (ii) thereafter, as set forth in the pricing grid below.

| Level | Fixed Charge Coverage Ratio ("FCCR") and Availability | Applicable Margin for Term SOFR Rate Loans | Applicable Margin for ABR Loans |
|---|---|---|---|
| I | FCCR: ≥ 2.00x and Availability: ≥ 30% | 4.00% | 3.00% |
| II | FCCR: ≥ 1.50x and < 2.00x and Availability: ≥ 20% *or* FCCR: ≥ 2.00x and Availability: ≥ 20% and < 30% | 4.25% | 3.25% |
| III | FCCR: < 1.50x *or* Availability: < 20% | 4.50% | 3.50% |

Fixed Charge Coverage Ratio (to be defined in a manner to be mutually agreed) and Availability will be determined based on the most recent compliance certificate delivered after the Exit ABL Facility Closing Date.

Interest Payment Date:    The first day of each calendar month.

Minimum Interest:    For purposes of computing interest on the Exit ABL Loans on any day, if the aggregate principal amount of Exit ABL Loans actually outstanding on such day is less than the result (the "Minimum Borrowing Amount") of (i) $20 million minus (ii) the aggregate amount (not to exceed $10 million) of Exit ABL Letters of Credit then outstanding, then such interest shall be computing as if Exit ABL Loans were outstanding in such Minimum Borrowing Amount.

ABL Facility Commitment Fee:    The Top Borrower shall pay a commitment fee (the "Exit ABL Facility Commitment Fee") calculated at a rate per annum equal to 0.50% on the actual daily unused portion of the Exit ABL Commitments of non-defaulting Exit ABL Lenders, payable monthly in arrears. For purposes of the commitment fee calculations, the Total Exit ABL Outstandings shall

be deemed to be a utilization of the Exit ABL Facility.

Letter of Credit Fees:

The Top Borrower shall pay a fee on all outstanding Exit ABL Letters of Credit at a per annum rate equal to the Applicable Margin then in effect with respect to Term SOFR Rate Loans under the Exit ABL Facility on the face amount of each such Exit ABL Letter of Credit.  Such fee shall be shared ratably among the Exit ABL Lenders and shall be payable monthly in arrears.

A fronting fee in an amount equal to 0.25% per annum on the then-available face amount of each Exit ABL Letter of Credit shall be payable monthly in arrears to the Exit ABL Issuing Lender for its own account.  In addition, the Top Borrower shall pay customary issuance and administration fees to the Exit ABL Issuing Lender.

Collateral Monitoring Fee:

The Top Borrower shall pay a collateral monitoring fee, for the sole benefit of the Exit ABL Agent, equal to 0.05% of the average daily used portion of the Exit ABL Commitments.  Such fee shall be fully earned as it accrues and due and payable in arrears on the first day of each calendar month.

Early Termination Fee:

If, before the Exit ABL Termination Date, the Exit ABL Commitments are terminated for any reason (including any voluntary, mandatory or automatic termination, regardless of whether an Event of Default has occurred and is continuing, and including by reason of acceleration, automatic acceleration or otherwise), then the Top Borrower shall pay a fee (the "Early Termination Fee"), as liquidated damages and compensation for the cost of the Exit ABL Lenders being prepared to make funds available under the Exit ABL Commitments during the scheduled term of the Exit ABL Facility, in an amount equal to the applicable percentage set forth below of the amount of the Exit ABL Commitments so terminated:

(i) 2.0% if on or before the first anniversary of the Exit ABL Facility Closing Date;

(ii) 1.5% if after the first anniversary of the Exit ABL Facility Closing Date and on or before the second anniversary of the Exit ABL Facility Closing Date;

(iii) 1.0% if after the second anniversary of the Exit ABL Facility Closing Date and on or before the third anniversary of the Exit ABL Facility Closing Date; and

(iv) 0.5% if after the third anniversary of the Exit ABL Facility Closing Date; and

provided, that no Early Termination Fee shall be due and payable with respect to any voluntary termination of all of the Exit ABL Commitments by the Top Borrower on or after the date that is 60 days prior to the Exit ABL Termination Date, so long as the Top Borrower has given Exit ABL Agent written notice of such termination at least 90 days prior to the date

of such termination.

| | |
|---|---|
| Default Rate: | At any time when an event of default under the Exit ABL Facility exists, at the election of the Exit ABL Agent or the direction the Required Exit ABL Lenders, all overdue amounts shall bear interest, to the fullest extent permitted by law, at (i) in the case of principal or interest, 2.00% per annum above the rate then borne by (in the case of principal) such borrowings or (in the case of interest) the borrowings to which such interest relates or (ii) in the case of all other overdue amounts, 2.00% per annum in excess of the rate otherwise applicable to Exit ABL Loans maintained as ABR Loans from time to time. |
| Rate and Fee Basis: | All per annum rates shall be calculated on the basis of a year of 360 days (or 365/366 days, in the case of ABR Loans the interest payable on which is then based on the prime rate) for actual days elapsed. |

**<u>Exhibit H</u>**

**Takeback Debt Terms**

[OMITTED]

**EXHIBIT C**

New Term Loan Credit Facility Agreement Term Sheet

# DAWN INTERMEDIATE, LLC
## NEW TERM LOAN TERM SHEET[1]

### January 23, 2023

| Term | Description |
|---|---|
| **Type** | • Senior Secured Term Loans |
| **Principal Amount** | • $300,000,000 |
| **Maturity Date** | • 5 years after the effective date of the Plan |
| **Security** | • Second priority lien on all assets of the Reorganized Debtors that would constitute ABL Priority Collateral (as defined in the ABL Intercreditor Agreement)<br>• A first priority lien on all assets of the Reorganized Debtors that would constitute Term Priority Collateral (as defined in the ABL Intercreditor Agreement) |
| **Interest Rate** | • SOFR + 750bps<br>• SOFR floor of 1.00% |
| **Amortization** | • No amortization in 2023 or 2024<br>• 1.0% per annum beginning in 2025 |
| **Call Protection** | • 102, 101, par, which shall also be payable upon maturity, acceleration, termination, conversion, payment, prepayment, or repayment (excluding certain mandatory prepayments) and to include bankruptcy protections |
| **Original Issue Discount** | • 1.0% |
| **Financial Covenants** | • Minimum liquidity of $25mm tested monthly |

---

[1] Capitalized terms used herein and not defined herein shall have the meanings set forth in the Restructuring Support Agreement to which this term sheet is attached (including in any annexes or exhibits thereto).

| | |
|---|---|
| **Other Terms** | • The New Term Loan Credit Facility Agreement shall be based on the same precedent as the Exit ABL Credit Agreement and provide for other affirmative and negative covenants, representations, warranties, mandatory prepayments, events of default and other terms that shall be based on the corresponding provisions set forth in the Prepetition ABL Facility , but to include changes to reflect a term loan facility rather than an ABL facility, baskets and exceptions and other modifications, acceptable to the Requisite Consenting Creditors and Company, including (without limitation):<br><br>   o Limitations on incurrence of indebtedness and liens, restricted payments, investments, asset sales, restrictive agreements, fundamental changes and affiliate transactions;<br><br>   o Affirmative covenant to use commercially reasonable efforts to maintain public corporate credit rating and public corporate family rating; and<br><br>   o Elevated voting thresholds for subordination of the New Term Loan in right of payment or lien priority, J. Crew protection and Chewy protection. |

**EXHIBIT D**

Organizational Chart



**Organizational Chart**



**EXHIBIT E**

Liquidation Analysis


(Omitted)

**EXHIBIT F**

Valuation


(Omitted)

**EXHIBIT G**

Release Provisions

(a)      **Releases by the Debtors**.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, including the obligations of the Debtors under the Plan and the contributions of the Released Parties to facilitate and implement the Plan, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, on and after the Effective Date, the Released Parties are deemed conclusively, absolutely, unconditionally and irrevocably, released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Restructuring Support Agreement, the Definitive Documents, the Non-PTL Term Loan Agreement, the PTL Credit Agreement, **the Intercreditor Agreements, the Exchange Agreement, the 2020 Transaction,** and any and all related agreements, instruments, and/or other documents (including, without limitation, any and all related agreements, instruments, and/or other documents to the 2020 Transaction), the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, the Adversary Proceeding, the Apollo Action, the LCM Action, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Exit ABL Facility, the New Term Loan, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything to the contrary in the foregoing, the releases set forth in Section 1.1.A(a) of the Plan (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these Debtor releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, the Confirmation Order, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

(a)      **Releases by Holders of Claims and Interests**.

Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, except (i) for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remain in effect or become effective after the Effective Date or (ii) as otherwise provided in the Plan or in the Confirmation Order, to the fullest extent permissible under applicable law, as such law may be extended or integrated after the Effective Date, each Releasing Party, shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released, and discharged the Debtors, the Reorganized Debtors, and the Released Parties from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtors or their Estates, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, based on or relating to, or in any manner arising from, in whole or in part, any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including any Claims or Causes of Action based on or relating to, or in any manner arising from, in whole or in part, the Chapter 11 Cases, the Debtors, the governance, management, transactions, ownership, or operation of the Debtors, the purchase, sale or rescission of any security of the Debtors or the Reorganized Debtors, the DIP Facility, the Restructuring Support Agreement, the Definitive Documents, the Non-PTL Term Loan Agreement, the PTL Credit Agreement, **the Intercreditor Agreements, the Exchange Agreement, the 2020 Transaction,** and any and all related agreements, instruments, and/or other documents (including, without limitation, any and all related agreements, instruments, and/or other documents to the 2020 Transaction), the formulation, preparation, dissemination, solicitation, negotiation, entry into, or filing of the Plan (including the Plan Supplement), the Disclosure Statement, the Restructuring Support Agreement, the Adversary Proceeding, the Apollo Action, the LCM Action, or any Restructuring Transaction, contract, instrument, release, or other agreement or document (including any legal opinion requested by any Entity regarding any transaction, contract instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Restructuring Support Agreement, the Plan, the Plan Supplement, the Disclosure Statement, the Exit ABL Facility, the New Term Loan, the Chapter 11 Cases, the pursuit of confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan, or any other agreement, act or omission, transaction, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything to the contrary in the foregoing, the releases set forth in Section 1.1.A(a) of the Plan (i) shall only be applicable to the maximum extent permitted by law; (ii) shall not be construed as (a) releasing any Released Party from Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud (provided that actual fraud shall not exempt from the scope of these third-party releases any Claims or Causes of Action arising under sections 544 or 548 of the Bankruptcy Code or state laws governing fraudulent or otherwise avoidable transfers or conveyances), willful misconduct, or gross negligence, or (b) releasing any post-Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, any Definitive Document, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan.

**EXHIBIT H**

Financial Projections


(Omitted)

**EXHIBIT I**

Voting Procedures and Requirement


(Omitted)