IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | § § § | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, *et al.,* | § § § | Case No. 23-90020 (DRJ) |
| Debtors.[1] | § § § | Jointly Administered Re: Docket Nos. 588, 667, 692, 869, 873, 977 |

**NOTICE OF FILING OF FIFTH AMENDED PLAN
SUPPLEMENT IN CONNECTION WITH JOINT CHAPTER 11
PLAN OF SERTA SIMMONS BEDDING, LLC AND ITS AFFILIATED DEBTORS**

**PLEASE TAKE NOTICE THAT**:

1.      On January 23, 2023, Serta Simmons Bedding, LLC and its debtor affiliates in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**") each commenced a voluntary case under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").

2.      On March 23, 2023, the Bankruptcy Court entered the *Order (I) Approving Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing; (II) Establishing Solicitation and Voting Procedures; (III) Establishing Notice and Objection Procedures for Confirmation of Proposed Plan; (IV) Approving Notice Procedures for the Assumption or Rejection of Executory Contracts and Unexpired Leases; and (V) Granting Related*

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957). The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

*Relief* (Docket No. 540) (the "**Disclosure Statement Order**"), authorizing the Debtors to solicit acceptances for the *Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 544) (the "**March Plan**"), and approving procedures for soliciting, receiving, and tabulating votes on the March Plan and for filing objections to the March Plan.

3.         On March 29, 2023, the Debtors filed the *Notice of Filing of Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 588) (including any exhibits and schedules thereto and as modified, amended, or supplemented, the "**Plan Supplement**").

4.         On April 14, 2023, the Debtors filed the *Notice of Filing of Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 667).

5.         On April 21, 2023, the Debtors filed the *Notice of Filing of Second Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 692).

6.         On May 13, 2023, the Debtors filed the *Notice of Filing of Third Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 869).

7.         On May 14, 2023, the Debtors filed the *Notice of Filing of Fourth Amended Plan Supplement in Connection with Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 873).

8.     On May 23, 2023, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and Its Affiliated Debtors* (Docket No. 977) (including any exhibits and schedules thereto and as may be modified, amended, or supplemented, the "**Plan**").[2]

9.     In accordance with the Plan and Disclosure Statement Order, the Debtors hereby file the following exhibits to the Plan Supplement, which replace and supersede all prior-filed versions of such documents, as applicable:

| Exhibit B | New Term Loan Credit Facility Agreement |
|-----------|------------------------------------------|
| Exhibit D | Exit ABL Facility Agreement |
| Exhibit I | Schedule of Assumed Contracts |

10.    As defined in the Plan, the Plan Supplement means a supplemental appendix to the Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended, modified, or supplemented from time to time in accordance with the terms hereof and the Bankruptcy Code and Bankruptcy Rules, which shall include, but not be limited to: (a) the New Corporate Governance Documents; (b) the New Term Loan Credit Facility Agreement; (c) the New Intercreditor Agreement; (d) the Exit ABL Facility Agreement; (e) to the extent known, information required to be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code; (f) the Restructuring Transactions Exhibit; (g) the Schedule of Retained Causes of Action, (h) the Schedule of Rejected Contracts, (i) the Schedule of Assumed Contracts, (j) the Tax Matters Agreement, (k) the Class 6B Trust Agreement, (l) Equipment Lease, (m) Class 6B Tax Disclosures, and (n) any Management Incentive Plan allocation and related documents, if applicable, solely to the extent agreed by the Company and the Requisite Consenting Creditors by the Plan Supplement Date.

---

[2]     Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

11.     The documents contained in the Plan Supplement, including this amendment, are integral to, and are considered part of, the Plan.  These documents have not yet been approved by the Bankruptcy Court.  If the Plan is confirmed, the documents contained in this Plan Supplement will be approved by the Court pursuant to the Confirmation Order.

12.     The Plan Supplement documents attached hereto remain subject to (a) further review, negotiations, and modifications, and (b) final documentation in a manner consistent with the Plan.  The Debtors reserve all rights to amend, modify, or supplement the Plan Supplement, and any of the documents contained therein, in accordance with the terms of the Plan. If material amendments or modifications are made to any of these documents, the Debtors will file a redline with the Court marked to reflect the same.

13.     Copies of the exhibits contained in this Plan Supplement, and all documents filed in these chapter 11 cases, including the March Plan, Plan and Disclosure Statement, are available free of charge by visiting https://dm.epiq11.com/sertasimmons.  You may also obtain copies of the pleadings by visiting the Court's website at https://ecf.txsb.uscourts.gov in accordance with the procedures and fees set forth therein.

Dated: May 24, 2023
    Houston, Texas

/s/ Gabriel A. Morgan

WEIL, GOTSHAL & MANGES LLP
Gabriel A. Morgan (24125891)
Stephanie N. Morrison (24126930)
700 Louisiana Street, Suite 1700
Houston, Texas 77002
Telephone: (713) 546-5000
Facsimile:  (713) 224-9511
E-mail:   Gabriel.Morgan@weil.com
        Stephanie.Morrison@weil.com

-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock (admitted *pro hac vice*)
Alexander Welch (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
E-mail:   Ray.Schrock@weil.com
        Alexander.Welch@weil.com

*Attorneys for Debtors*
*and Debtors in Possession*

[*Signature Page to Notice of Plan Supplement*]

**<u>Certificate of Service</u>**

I hereby certify that on May 24, 2023, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' claims, noticing, and solicitation agent.


　　　　　　　　　　　　　　　　　　　　 */s/ Gabriel A. Morgan*　　　　　　
　　　　　　　　　　　　　　　　　　　　 Gabriel A. Morgan

## <u>Exhibit B</u>

**New Term Loan Credit Facility Agreement**

TERM LOAN CREDIT AGREEMENT


Dated as of [●], 2023

among

SERTA SIMMONS BEDDING, LLC,
as the Top Borrower,

THE OTHER BORROWERS PARTY HERETO,

THE FINANCIAL INSTITUTIONS PARTY HERETO,
as Lenders,

and

WILMINGTON SAVINGS FUND SOCIETY FSB,
as Administrative Agent

# TABLE OF CONTENTS

Page

ARTICLE 1 DEFINITIONS ........................................................................................................ 2

Section 1.01.        Defined Terms ................................................................................ 2
Section 1.02.        Classification of Loans and Borrowings ..................................... 56
Section 1.03.        Terms Generally ......................................................................... 56
Section 1.04.        Accounting Terms; GAAP ........................................................ 57
Section 1.05.        Emergence Restructuring Transactions ...................................... 58
Section 1.06.        Timing of Payment or Performance ........................................... 58
Section 1.07.        Times of Day .............................................................................. 58
Section 1.08.        Currency Equivalents Generally ................................................ 58
Section 1.09.        [Reserved] ................................................................................... 59
Section 1.10.        Certain Calculations and Tests ................................................... 59
Section 1.11.        Guarantees and Collateral .......................................................... 60
Section 1.12.        Divisions ..................................................................................... 61

ARTICLE 2 THE CREDITS ...................................................................................................... 61

Section 2.01.        Commitments .............................................................................. 61
Section 2.02.        Loans and Borrowings ............................................................... 61
Section 2.03.        Requests for Borrowings ............................................................ 62
Section 2.04.        [Reserved] ................................................................................... 62
Section 2.07.        Funding of Borrowings .............................................................. 62
Section 2.08.        Type; Interest Elections ............................................................. 63
Section 2.09.        Termination of Commitments .................................................... 64
Section 2.10.        Repayment of Loans; Evidence of Debt ..................................... 64
Section 2.11.        Prepayment of Loans .................................................................. 65
Section 2.12.        Fees ............................................................................................. 68
Section 2.13.        Interest ........................................................................................ 69
Section 2.14.        Alternate Rate of Interest ........................................................... 70
Section 2.15.        Increased Costs ........................................................................... 72
Section 2.16.        [Reserved] ................................................................................... 73
Section 2.17.        Taxes .......................................................................................... 73
Section 2.18.        Payments Generally; Allocation of Proceeds; Sharing of Payments............ 77
Section 2.19.        Mitigation Obligations; Replacement of Lenders ...................... 79
Section 2.20.        Illegality ..................................................................................... 80
Section 2.21.        Defaulting Lenders ..................................................................... 80
Section 2.22.        Incremental Credit Extensions ................................................... 81

ARTICLE 3 REPRESENTATIONS AND WARRANTIES ...................................................... 83

Section 3.01.        Organization; Powers ................................................................. 83
Section 3.02.        Authorization; Enforceability .................................................... 84
Section 3.03.        Governmental Approvals; No Conflicts ..................................... 84
Section 3.04.        Financial Condition; No Material Adverse Effect ...................... 84

i

Section 3.05.        Properties.................................................................................... 84
Section 3.06.        Litigation and Environmental Matters ........................................ 85
Section 3.07.        Compliance with Laws ................................................................ 85
Section 3.08.        Investment Company Status ........................................................ 85
Section 3.09.        Taxes ............................................................................................ 85
Section 3.10.        ERISA ........................................................................................... 85
Section 3.11.        Disclosure .................................................................................... 86
Section 3.12.        Solvency ....................................................................................... 86
Section 3.13.        Subsidiaries .................................................................................. 86
Section 3.14.        Security Interest in Collateral...................................................... 86
Section 3.15.        Labor Disputes ............................................................................. 87
Section 3.16.        Federal Reserve Regulations ....................................................... 87
Section 3.17.        OFAC; PATRIOT ACT and FCPA.............................................. 87

ARTICLE 4 CONDITIONS ...................................................................................... 87

Section 4.01.        Closing Date ................................................................................. 87

ARTICLE 5 AFFIRMATIVE COVENANTS ............................................................. 90

Section 5.01.        Financial Statements and Other Reports ..................................... 90
Section 5.02.        Existence ...................................................................................... 93
Section 5.03.        Payment of Taxes ......................................................................... 93
Section 5.04.        Maintenance of Properties ........................................................... 93
Section 5.05.        Insurance ...................................................................................... 93
Section 5.06.        Inspections.................................................................................... 94
Section 5.07.        Maintenance of Book and Records .............................................. 94
Section 5.08.        Compliance with Laws ................................................................ 94
Section 5.09.        Environmental .............................................................................. 95
Section 5.10.        Designation of Subsidiaries......................................................... 95
Section 5.11.        [Reserved] ....................................................... **Error! Bookmark not defined.**
Section 5.12.        Covenant to Guarantee Obligations and Provide Security ......... 96
Section 5.13.        [Reserved] ....................................................... **Error! Bookmark not defined.**
Section 5.14.        Further Assurances ...................................................................... 98
Section 5.15.        Post-Closing Covenant ................................................................ 98
Section 5.16.        Holdings Joinder ......................................................................... 98
Section 5.17.        Actual Liquidity ........................................................................... 99

ARTICLE 6 NEGATIVE COVENANTS ................................................................... 99

Section 6.01.        Indebtedness ................................................................................. 99
Section 6.02.        Liens ........................................................................................... 104
Section 6.03.        [Reserved] .................................................................................. 108
Section 6.04.        Restricted Payments; Restricted Debt Payments....................... 108
Section 6.05.        Burdensome Agreements ........................................................... 112
Section 6.06.        Investments................................................................................. 113
Section 6.07.        Fundamental Changes; Disposition of Assets ........................... 117
Section 6.08.        Sale and Lease-Back Transactions ............................................ 120

Section 6.09.     Transactions with Affiliates ................................................................ 121
Section 6.10.     Conduct of Business .......................................................................... 123
Section 6.11.     Amendments or Waivers of Organizational Documents........................... 123
Section 6.12.     Amendments of or Waivers with Respect to Restricted Debt.................... 123
Section 6.13.     Fiscal Year....................................................................................... 123
Section 6.14.     Permitted Activities of Holdings ......................................................... 123

ARTICLE 7 EVENTS OF DEFAULT ............................................................................... 124

Section 7.01.     Events of Default............................................................................... 124

ARTICLE 8 THE ADMINISTRATIVE AGENT .................................................................. 128

ARTICLE 9 MISCELLANEOUS ...................................................................................... 133

Section 9.01.     Notices ............................................................................................ 133
Section 9.02.     Waivers; Amendments ....................................................................... 137
Section 9.03.     Expenses; Indemnity ......................................................................... 139
Section 9.04.     Waiver of Claim ............................................................................... 142
Section 9.05.     Successors and Assigns ...................................................................... 142
Section 9.06.     Survival ........................................................................................... 148
Section 9.07.     Counterparts; Integration; Effectiveness ............................................... 148
Section 9.08.     Severability...................................................................................... 149
Section 9.09.     Right of Setoff.................................................................................. 149
Section 9.10.     Governing Law; Jurisdiction; Consent to Service of Process .................... 149
Section 9.11.     Waiver of Jury Trial .......................................................................... 150
Section 9.12.     Headings.......................................................................................... 150
Section 9.13.     Confidentiality.................................................................................. 150
Section 9.14.     No Fiduciary Duty.............................................................................. 151
Section 9.15.     Several Obligations ........................................................................... 152
Section 9.16.     USA PATRIOT Act ........................................................................... 152
Section 9.17.     Disclosure of Agent Conflicts ............................................................. 152
Section 9.18.     Appointment for Perfection................................................................. 152
Section 9.19.     Interest Rate Limitation...................................................................... 152
Section 9.20.     Intercreditor Agreement ..................................................................... 153
Section 9.21.     Conflicts ......................................................................................... 153
Section 9.22.     Release of Guarantors ........................................................................ 153
Section 9.23.     Acknowledgement and Consent to Bail-In of Affected Financial
                  Institutions....................................................................................... 153
Section 9.24.     Joint and Several Liability................................................................... 154
Section 9.25.     Top Borrower ................................................................................... 154
Section 9.26.     [Reserved] ....................................................................................... 154
Section 9.27.     Certain ERISA Matters ...................................................................... 154
Section 9.28.     Recognition of U.S. Special Resolution Regimes. .................................... 155

SCHEDULES:

Schedule 1.01(a)     –     Commitment Schedule
Schedule 1.01(b)     –     Dutch Auction Schedule
Schedule 1.01(c)     –     Mortgages
Schedule 1.05        –     Emergence Restructuring Transactions
Schedule 3.05        –     Fee Owned Real Estate Assets
Schedule 3.13        –     Subsidiaries
Schedule 4.01(b)     –     Local Counsel Opinions
Schedule 5.10        –     Unrestricted Subsidiaries
Schedule 5.15        –     Post-Closing Obligations
Schedule 6.01        –     Existing Indebtedness
Schedule 6.02        –     Existing Liens
Schedule 6.06        –     Existing Investments
Schedule 6.07        –     Specified Dispositions
Schedule 6.08        –     Existing Sale Leasebacks
Schedule 9.01        –     Borrower's Website Address for Electronic Delivery

EXHIBITS:

Exhibit A       –     Form of Assignment and Assumption
Exhibit B-1     –     Form of Borrowing Request
Exhibit B-2     –     Interest Election Request
Exhibit C       –     Form of Intellectual Property Security Agreement
Exhibit D       –     Form of Compliance Certificate
Exhibit E       –     [Reserved]
Exhibit F       –     Form of Intercompany Note
Exhibit G       –     Form of ABL Intercreditor Agreement
Exhibit H       –     Form of Holdings Joinder Agreement
Exhibit I       –     Form of Term Loan Guaranty
Exhibit J       –     Form of Perfection Certificate
Exhibit K       –     Form of Joinder Agreement
Exhibit L       –     Form of Promissory Note
Exhibit M       –     Form of Term Loan Pledge and Security Agreement
Exhibit N       –     [Reserved]
Exhibit O-1     –     Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are
                      Not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit O-2     –     Form of U.S. Tax Compliance Certificate (For Foreign Participants That
                      Are Not Partnerships for U.S. Federal Income Tax Purposes)
Exhibit O-3     –     Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are
                      Partnerships for U.S. Federal Income Tax Purposes)
Exhibit O-4     –     Form of U.S. Tax Compliance Certificate (For Foreign Participants That
                      Are Partnerships for U.S. Federal Income Tax Purposes)
Exhibit P       –     Form of Solvency Certificate

WEIL:\99124112\10\40416.0005

TERM LOAN CREDIT AGREEMENT

TERM LOAN CREDIT AGREEMENT, dated as of [●], 2023 (this "Agreement"), by and among SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company ("National Bedding"), and SSB MANUFACTURING COMPANY, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party hereto, and Wilmington Savings Fund Society FSB ("WSFS"), in its capacities as administrative agent and collateral agent for the Lenders (in such capacities and together with its successors and assigns, the "Administrative Agent").

RECITALS

A.      On January 23, 2023 (the "Petition Date"), the Top Borrower and certain Affiliates of the Top Borrower (in such capacity, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") for relief under Title 11 of the United States Code (the "Bankruptcy Code").

B.      During the pendency of the Chapter 11 Cases, the Debtors continued to operate their businesses and manage their properties as debtors-in-possessions under sections 1107 and 1108 of the Bankruptcy Code.

C.      On the Petition Date, the Debtors, the lenders party thereto (collectively, the "DIP ABL Lenders") and Eclipse Business Capital LLC ("Eclipse") entered into that certain Senior Secured Super-Priority Debtor-In-Possession ABL Credit Agreement (as amended, restated, amended and restated, supplemented or otherwise modified, the "DIP ABL Credit Agreement"), by and among Dawn Intermediate, LLC, a Delaware limited liability company ("Dawn"), as holdings, the Borrowers, the DIP ABL Lenders and Eclipse, as administrative agent and collateral agent (in such capacities, the "DIP ABL Agent").

D.      On [●], 2023, the Bankruptcy Court entered an order (the "Confirmation Order") confirming Debtors' Joint Chapter 11 Plan of Reorganization (the "Plan of Reorganization"), which Confirmation Order, *inter alia*, authorized the Borrowers' entry into and performance under this Agreement and the ABL Credit Agreement (as defined below).

E.      Pursuant to and upon the effective date of the Plan of Reorganization and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and adequacy of which are hereby acknowledged), the Administrative Agent and Lenders have agreed to enter into this Agreement, pursuant to which the Lenders will make available (or be deemed to have made available) Initial Term Loans in the aggregate principal amount of $315,000,000 [(including original issue discount, if any)] in accordance with the Plan of Reorganization, subject to the terms and conditions of this Agreement.

ARTICLE 1

DEFINITIONS

Section 1.01.    <u>Defined Terms</u>.  As used in this Agreement, the following terms have the meanings specified below:

"<u>ABL Credit Agreement</u>" means the ABL Credit Agreement, dated as of the Closing Date, among, *inter alios*, the Borrowers, Wells Fargo Bank National Association, a national banking association ("<u>Wells Fargo</u>"), as administrative agent and collateral agent and the lenders from time to time party thereto.

"<u>ABL Credit Agreement Collateral Agent</u>" has the meaning set forth in the ABL Intercreditor Agreement.

"<u>ABL Facility</u>" means the credit facility pursuant to the ABL Credit Agreement and one or more debt facilities or other financing arrangements (including indentures) providing for loans and/or commitments or other long-term indebtedness that replace or refinance such credit facility, including any such replacement or refinancing facility (including any indenture) that increases or decreases the amount permitted to be borrowed thereunder or alters the maturity thereof and whether by the same or any other agent, trustee, lender or group of lenders, and any amendments, supplements, modifications, extensions, renewals, restatements, amendments and restatements or refundings thereof or any such credit facilities or other debt facilities (including under indentures) that replace or refinance such credit facility or other Indebtedness.

"<u>ABL Intercreditor Agreement</u>" means the ABL Intercreditor Agreement dated as of [●], 2023, among, *inter alios*, Wells Fargo, as agent for the ABL Claimholders referred to therein, WSFS, as agent for the Term Loan Claimholders referred to therein, and the Loan Parties from time to time party thereto.

"<u>ABL Priority Collateral</u>" has the meaning set forth in the ABL Intercreditor Agreement.

"<u>ABR</u>" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"<u>Acceptance Period</u>" has the meaning assigned to such term in Section 2.22(a)(ii).

"<u>Acceptable Intercreditor Agreement</u>" means:

(a)        with respect to any Indebtedness that is secured on a *pari passu* basis with the Liens securing the ABL Facility, (i) if the ABL Facility is outstanding on the relevant date of determination, the ABL Intercreditor Agreement or (ii) if the ABL Facility is not outstanding on the relevant date of determination, an intercreditor agreement substantially in the form of the ABL Intercreditor Agreement, with any changes thereto as the Top Borrower and the Administrative Agent may agree in their respective reasonable discretion; and/or

(b)        with respect to any Indebtedness, any other intercreditor or subordination agreement or arrangement (which may take the form of a "waterfall" or similar provision), as applicable, the terms of which are (i) consistent with market terms (as determined by the Top Borrower and the Administrative Agent in good faith) governing arrangements for the sharing and/or subordination of liens and/or arrangements relating to the distribution of payments, as applicable, at the time the relevant intercreditor

agreement is proposed to be established in light of the type of Indebtedness subject thereto and/or (ii) reasonably acceptable to the Top Borrower and the Administrative Agent.

"ACH" means automated clearing house transfers.

"Actual Liquidity" means, as of any date of determination, the sum of (i) the actual amount of unrestricted U.S. Bank Cash of the Loan Parties, (ii) the actual amount of unrestricted Canadian Bank Cash of the Loan Parties, and (iii) amounts available for borrowing under the ABL Credit Agreement.

"Additional Agreement" has the meaning assigned to such term in Article 8.

"Additional Lender" has the meaning assigned to such term in Section 2.22(b).

"Adjusted Term SOFR" means, for purposes of any calculation, the higher of (a) the Term SOFR Rate plus the Term SOFR Adjustment and (b) 1.0% per annum.

"Administrative Agent" has the meaning assigned to such term in the preamble to this Agreement.

"Administrative Questionnaire" means a customary administrative questionnaire in the form provided by the Administrative Agent.

"Adverse Proceeding" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings, the Top Borrower or any of its Restricted Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claim), whether pending or, to the knowledge of Holdings, the Top Borrower or any of its Restricted Subsidiaries, threatened in writing, against or affecting Holdings, the Top Borrower or any of its Restricted Subsidiaries or any property of Holdings, the Top Borrower or any of its Restricted Subsidiaries.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person. None of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings, the Top Borrower or any of its subsidiaries.

"Affiliated Lender" means Holdings, the Top Borrower and/or any subsidiary of the Top Borrower.

"Agreement" has the meaning assigned to such term in the preamble to this Term Loan Credit Agreement.

"All-in Yield" means, as to any Loans, the yield thereon payable to all Lenders providing such Loans, whether in the form of interest rate, margin, original issue discount, up-front fees, rate floors or otherwise; provided that, original issue discount and up-front fees shall be equated to interest rate assuming a 4-year life to maturity (or, if less, the life of such Loans); and provided further that, "All-in Yield" shall not include arrangement, commitment, underwriting structuring or similar fees and customary consent fees for an amendment paid generally to consenting lenders.

"Alternate Base Rate" means, for any day, the greatest of (a) 2.00%, (b) the Federal Funds Effective Rate in effect on such day plus ½%, (c) Adjusted Term SOFR in effect on such day, plus one percent

(1.0%), provided, that this clause (c) shall not be applicable during any period in which Adjusted Term SOFR is unavailable or unascertainable, and (d) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate" in effect on such day, with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as the Administrative Agent may select in its reasonable discretion).

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Administrative Agent" means, at any time of determination, (i) with respect to ABL Priority Collateral, the ABL Credit Agreement Collateral Agent (as defined in the ABL Intercreditor Agreement) (or other analogous term in another Acceptable Intercreditor Agreement, as applicable), (ii) with respect to Term Loan Priority Collateral, if the ABL Intercreditor Agreement is in effect at such time, the Term Loan Agreement Collateral Agent (as defined in the ABL Intercreditor Agreement) (or other analogous term in another Acceptable Intercreditor Agreement, as applicable) or (iii) with respect to Term Loan Priority Collateral, if the ABL Intercreditor Agreement is not in effect at such time, the Administrative Agent.

"Applicable Percentage" means, with respect to any Lender, a percentage equal to a fraction the numerator of which is the aggregate outstanding principal amount of the Term Loans of such Lender and the denominator of which is the aggregate outstanding principal amount of the Term Loans of all Lenders.

"Applicable Rate" means with respect to any Term SOFR Rate Loan, 7.50% per annum and with respect to any ABR Loan, 6.50% per annum.

"Approved Electronic Communication" means each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by e-mail, facsimile, or any other equivalent electronic service, whether owned, operated or hosted by the Administrative Agent, any of its Affiliates or any other Person, that any party is obligated to, or otherwise chooses to, provide to the Administrative Agent pursuant to this Agreement or any other Loan Document, including any financial statement, financial and other report, notice, request, certificate and other information or material; provided, that Approved Electronic Communications shall not include any notice, demand, communication, information, document or other material that the Administrative Agent specifically instructs a Person to deliver in physical form.

"Approved Fund" means, with respect to any Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) any Affiliate of such Lender or (c) any entity or any Affiliate of any entity that administers, advises or manages such Lender.

"Approved Plan" means the Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors filed with the Bankruptcy Court on [____], 2023, with such amendments, supplements or other modifications as are reasonably acceptable to Administrative Agent.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.05), and accepted by the Administrative Agent in the form of Exhibit A or any other form approved by the Administrative Agent and the Top Borrower.

"Auction Purchase" shall mean a purchase of any Loans pursuant to a Dutch Auction in the case of a Permitted Auction Purchaser.

"Available Amount" means, at any time, an amount equal to, without duplication:

(a)    the sum of:

(i)    the greater of $75,000,000 and [●]% of Consolidated Adjusted EBITDA; plus

(ii)    an amount equal to the Excess Cash Flows of the Top Borrower and its Restricted Subsidiaries which are not required to be used for mandatory prepayments as the result of the Required Excess Cash Flow Percentage pursuant to Section 2.11(b) hereof; plus

(iii)    the amount of the Net Proceeds of any capital contribution in respect of Qualified Capital Stock or the proceeds of any issuance of Qualified Capital Stock after the Closing Date (other than any amounts (w) constituting an Available Excluded Contribution Amount, (x) received directly or indirectly from the Top Borrower or any Restricted Subsidiary, (y) consisting of the proceeds of any loan or advance made pursuant to Section 6.06(h)(ii) or (z) otherwise expressly excluded from the calculation of the Available Amount pursuant to the terms of this Agreement or otherwise included in the calculation of amounts of Indebtedness permitted hereunder) received as Cash equity by the Top Borrower or any of its Restricted Subsidiaries, plus the fair market value, as reasonably determined by the Top Borrower, of Cash Equivalents, marketable securities or other property received by the Top Borrower or any Restricted Subsidiary as a capital contribution in respect of Qualified Capital Stock or in return for any issuance of Qualified Capital Stock (other than any amounts (x) constituting an Available Excluded Contribution Amount, (y) received from the Top Borrower or any Restricted Subsidiary or (z) otherwise expressly excluded from the calculation of the Available Amount pursuant to the terms of this Agreement), in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

(iv)    the Net Proceeds from the aggregate principal amount of any Indebtedness (including any Disqualified Capital Stock) of the Top Borrower or any Restricted Subsidiary incurred or issued after the Closing Date (other than Indebtedness arising from funds provided directly or indirectly by the Top Borrower or any Restricted Subsidiary or such Disqualified Capital Stock issued to the Top Borrower or any Restricted Subsidiary), which has been converted into or exchanged for Capital Stock of the Top Borrower, any Restricted Subsidiary or any Parent Company that does not constitute Disqualified Capital Stock, together with the fair market value of any Cash Equivalents and the fair market value (as reasonably determined by the Top Borrower) of any assets received by the Top

Borrower or such Restricted Subsidiary upon such exchange or conversion, in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

(v)     the Net Proceeds received by the Top Borrower or any Restricted Subsidiary during the period from and including the day immediately following the Closing Date through and including such time in connection with the Disposition to any Person (other than the Top Borrower or any Restricted Subsidiary) of any Investment made pursuant to Section 6.06(r)(i); plus

(vi)     to the extent not already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment (pursuant to the definition thereof), the Net Proceeds received by the Top Borrower or any Restricted Subsidiary during the period from and including the day immediately following the Closing Date through and including such time in connection with cash returns, cash profits, cash distributions and similar cash amounts, including cash principal repayments and interest payments of loans, in each case received in respect of any Investment made after the Closing Date pursuant to Section 6.06(r)(i); plus

(vii)     an amount equal to the sum of (A) the amount of any Investments by the Top Borrower or any Restricted Subsidiary pursuant to Section 6.06(r)(i) in any Unrestricted Subsidiary (in an amount not to exceed the original amount of such Investment) that has been re-designated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or is liquidated, wound up or dissolved into, the Top Borrower or any Restricted Subsidiary to the extent of any Net Proceeds received by the Top Borrower or any other Loan Party as a result thereof and (B) the fair market value (as reasonably determined by the Top Borrower) of the assets of any Unrestricted Subsidiary that have been transferred, conveyed or otherwise distributed (in an amount not to exceed the original amount of the Investment in such Unrestricted Subsidiary) to the Top Borrower or any Restricted Subsidiary (less any consideration transferred by the Top Borrower or any Restricted Subsidiary in exchange for such assets), in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

(viii)     the amount of any Declined Proceeds; minus

(b)     an amount equal to the sum of (i) Restricted Payments made pursuant to Section 6.04(a)(iii)(A), plus (ii) Restricted Debt Payments made pursuant to Section 6.04(b)(vi)(A), plus (iii) Investments made pursuant to Section 6.06(r)(i), in each case, after the Closing Date and prior to such time or contemporaneously therewith.

"Available Excluded Contribution Amount" means the aggregate amount of Cash or Cash Equivalents or the fair market value of other assets (as reasonably determined by the Top Borrower) received by the Top Borrower or any of its Restricted Subsidiaries (less any consideration transferred by Top Borrower or any Restricted Subsidiary in exchange for such assets) after the Closing Date from:

(a)     contributions in respect of Qualified Capital Stock of the Top Borrower (other than any amounts (i) received from any Restricted Subsidiary of the Top Borrower or (ii) otherwise expressly excluded from the calculation of the Available Excluded Contribution Amount pursuant to the terms of this Agreement), and

6

(b)       the sale of Qualified Capital Stock of the Top Borrower (other than (i) to any Restricted Subsidiary of the Top Borrower, (ii) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan, (iii) with the proceeds of any loan or advance made pursuant to <u>Section 6.06(h)(ii)</u> or (iv) as otherwise expressly excluded from the calculation of the Available Excluded Contribution Amount pursuant to the terms of this Agreement),

in each case, designated as an Available Excluded Contribution Amount pursuant to a certificate of a Responsible Officer on or promptly after the date on which the relevant capital contribution is made or the relevant proceeds are received, as the case may be, and which are excluded from the calculation of the Available Amount.

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Banking Services</u>" means each and any of the following bank services:  commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with Cash management and Deposit Accounts.

"<u>Banking Services Obligations</u>" means any and all obligations of any U.S. Loan Party, whether absolute or contingent and however and whenever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor), under any arrangement in connection with Banking Services that is (a) in effect on the Closing Date between any U.S. Loan Party and a counterparty that is (or is an Affiliate of) the Administrative Agent, any Lender or any Arranger as of the Closing Date or (b) entered into after the Closing Date by any U.S. Loan Party with any counterparty that is (or is an Affiliate of) the Administrative Agent or any Lender at the time such arrangement is entered into, in each case, that have been designated to the Administrative Agent in writing by the Top Borrower as being Banking Services Obligations for the purposes of the Loan Documents, it being understood that each counterparty thereto shall be deemed (A) to appoint the Administrative Agent as its agent under the applicable Loan Documents and (B) to agree to be bound by the provisions of <u>Article 8</u>, <u>Section 9.03</u> and <u>Section 9.10</u> and each Intercreditor Agreement as if it were a Lender.

"<u>Bankruptcy Code</u>" has the meaning assigned to such term in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the Recitals.

"<u>Benchmark</u>" means, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current

Benchmark, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to Section 2.14(b).

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Top Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar-denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that if such Benchmark Replacement as so determined would be less than 1.00%, such Benchmark Replacement shall be deemed to be 1.00% for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)        in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b)        in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative or non-compliant with or non-aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided that such non-representativeness, non-compliance or non-alignment will be determined by reference to the most recent statement or publication referenced in such clause (c) and even such Benchmark (or such component thereof) continues to be provided on such date.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b)        a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the FRB, the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c)        a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that such Benchmark (or such component thereof) is not, or as of a specified future date will not be, representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14(b) and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14(b).

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Bona Fide Debt Fund" means any debt fund, investment vehicle, regulated bank entity or unregulated lending entity that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business for financial investment purposes which is managed, sponsored or advised by any Person controlling, controlled by or under common control with (a) any competitor of the Top Borrower and/or any of its subsidiaries or (b) any Affiliate of such competitor, but, in each case, with respect to which no personnel involved with any investment in such Person or the management, control or operation of such Person (i) directly or indirectly makes, has the right to make or participates with others in making any investment decisions, or otherwise causing the direction of the investment policies, with respect to such debt fund, investment vehicle, regulated bank entity or unregulated entity or (ii) has access to any information (other than information that is publicly available) relating to Holdings, the Top Borrower or its subsidiaries or any entity that forms a part of any of their respective businesses; it being understood and agreed that the term "Bona Fide Debt Fund" shall not include any Person that is a Disqualified Lending Institution.

"Borrowers" means, collectively, SSB, National Bedding and SSB Manufacturing.

"Borrower Materials" has the meaning assigned to such term in Section 9.01(d).

"Borrowing" means any Loans of the same Type made, converted or continued on the same date and, in the case of Term SOFR Rate Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by any Borrower for a Borrowing in accordance with Section 2.03 and, if required by the Administrative Agent to be in writing, substantially in the form attached hereto as Exhibit B-1 or such other form that is reasonably acceptable to the Administrative Agent and such Borrower.

"Business Day" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such state are authorized or required by law to close.

"Calculation Period" means an Excess Cash Flow Period.

"Canadian Bank Cash" means unrestricted Cash of the Borrower and its Restricted Subsidiaries deposited in depository institutions located in Canada and unrestricted Cash Equivalents of the Borrower and its Restricted Subsidiaries deposited in depository institutions or securities intermediaries located in Canada.

"Cancellation" or "Cancelled" shall mean the cancellation, termination and forgiveness by Permitted Auction Purchaser of all Loans, Commitments and related Obligations acquired in connection with an Auction Purchase or other acquisition of the Loans.

"Capital Expenditures" means, with respect to the Top Borrower and its Restricted Subsidiaries for any period, the aggregate amount, without duplication, of all expenditures (whether paid in cash or accrued as liabilities and including in all events all amounts expended or capitalized under Capital Leases) that would, in accordance with GAAP, are, or are required to be included as, capital expenditures on the consolidated statement of cash flows for the Top Borrower and its Restricted Subsidiaries for such period.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" is classified as a "capital lease".

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding for the avoidance of doubt any Indebtedness convertible into or exchangeable for any of the foregoing.

"Cash" means money, currency or a credit balance in any Deposit Account, in each case determined in accordance with GAAP.

"Cash Equivalents" means, as at any date of determination, (a) readily marketable securities (i) issued or directly and unconditionally guaranteed or insured as to interest and principal by the U.S. government or (ii) issued by any agency or instrumentality of the U.S. the obligations of which are backed by the full faith and credit of the U.S., in each case maturing within one year after such date and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (b) readily marketable direct obligations issued by any state of the U.S. or any political subdivision of any such state or any public

10

instrumentality thereof or by any foreign government, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); (d) deposits, money market deposits, time deposit accounts, certificates of deposit or bankers' acceptances (or similar instruments) maturing within one year after such date and issued or accepted by any Lender or by any bank organized under, or authorized to operate as a bank under, the laws of the U.S., any state thereof or the District of Columbia or any political subdivision thereof or any foreign bank or its branches or agencies and that has capital and surplus of not less than $100,000,000 and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (e) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank having capital and surplus of not less than $100,000,000 and (f) shares of any money market mutual fund that has (i) substantially all of its assets invested in the types of investments referred to in underline(clauses (a)) through underline(e) above, (ii) net assets of not less than $250,000,000 and (iii) a rating of at least A-2 from S&P or at least P-2 from Moody's.  "Cash Equivalents" shall also include (x) Investments of the type and maturity described in underline(clauses (a)) through underline(g) above of foreign obligors, which Investments or obligors (or the parent companies thereof) have the ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (y) other short-term Investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in Investments that are analogous to the Investments described in underline(clauses (a)) through underline(g) and in this paragraph.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"CFC Holdco" means any direct or indirect Domestic Subsidiary that has no material assets other than the Capital Stock or Indebtedness of one or more CFCs or CFC Holdcos.

"Change of Control" means the earliest to occur of:

(a)      any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) becomes the beneficial owner of Capital Stock of Holdings (or prior to the date Holdings becomes a party hereto, the Top Borrower) representing more than 50% of the total voting power of all outstanding voting stock of Holdings (or prior to the date Holdings becomes a party hereto, the Top Borrower); provided that, no Persons will be deemed to be part of a group as a result of any shareholder agreement or similar arrangements in place at the Closing Date, as the same may be amended, restated or otherwise modified from time to time (including the Restructuring Support Agreement);

(b)      there is a "Change of Control" under the ABL Credit Agreement or any other Indebtedness of the Top Borrower or its Subsidiaries which such Indebtedness has a principal amount outstanding in excess of the Threshold Amount; and

(c)      on or after the date Holdings becomes a party hereto, the Top Borrower ceasing to be a direct or indirect Wholly-Owned Subsidiary of Holdings.

"Change in Law" means (a) the adoption of any law, treaty, rule or regulation after the Closing Date, (b) any change in any law, treaty, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of

11

Section 2.15(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date (other than any such request, guideline or directive to comply with any law, rule or regulation that was in effect on the Closing Date).  For purposes of this definition and Section 2.15, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or US regulatory authorities, in each case pursuant to Basel III, shall in each case described in clauses (a), (b) and (c) above, be deemed to be a Change in Law, regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Cases" has the meaning assigned to such term in the Recitals.

"Charge" means any fee, loss, charge, expense, cost, accrual or reserve of any kind.

"Charged Amounts" has the meaning assigned to such term in Section 9.19.

"Class", when used with respect to (a) any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are Initial Term Loans, Incremental Loans of any series established as a separate "Class" pursuant to Section 2.22, (b) any Commitment, refers to whether such Commitment is an Initial Term Commitment, an Incremental Commitment of any series established as a separate "Class" pursuant to Section 2.22 and (c) any Lender, refers to whether such Lender has a Loan or Commitment of a particular Class.

"Closing Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Closing Date Refinancing" has the meaning assigned to such term in Section 4.01(l).

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" means any and all property of any Loan Party subject (or purported to be subject) to a Lien under any Collateral Document and any and all other property of any Loan Party, now existing or hereafter acquired, that is or becomes subject (or purported to be subject) to a Lien pursuant to any Collateral Document to secure the Secured Obligations.  For the avoidance of doubt, in no event shall "Collateral" include any Excluded Asset.

"Collateral and Guarantee Requirement" means, at any time, subject to (a) the applicable limitations set forth in this Agreement and/or any other Loan Document and (b) the time periods (and extensions thereof) set forth in Section 5.12, the requirement that the Administrative Agent shall have received in the case of any Restricted Subsidiary that is required to become a Loan Party after the Closing Date (including by ceasing to be an Excluded Subsidiary) or otherwise becomes a Loan Party after the Closing Date:

(a)    in the case of any Domestic Subsidiary, (A) (1) a Joinder Agreement, (2) if the respective Restricted Subsidiary required to comply with the requirements set forth in this definition pursuant to Section 5.12 owns registrations of or applications for U.S. Patents, Trademarks and/or Copyrights that constitute Collateral, an Intellectual Property Security Agreement, (3) a completed Perfection Certificate, (4) UCC financing statements in appropriate form for filing in such jurisdictions as the Administrative Agent may reasonably request, (5) an

executed joinder to the ABL Intercreditor Agreement in substantially the form attached as an exhibit thereto, and (6) a joinder to the Intercompany Note (if applicable), and (B) each item of Collateral that such Restricted Subsidiary is required to deliver under Section 4.02 of the Security Agreement (which, for the avoidance of doubt, shall be delivered within the time periods set forth in <u>Section 5.12(a)</u>);

(b)      in the case of any subsidiary that has been designated as a Discretionary Guarantor, (A) in the case of any Domestic Subsidiary, the documents described in <u>clause (a)</u> above and (B) in the case of any Foreign Subsidiary, (1) a Joinder Agreement, (2) an executed joinder to the ABL Intercreditor Agreement in substantially the form attached as an exhibit thereto, (3) a joinder to the Intercompany Note (if applicable) and (4) such other documentation relating to such categories of assets (other than Excluded Assets) as the Top Borrower and the Administrative Agent may reasonably agree; and

(c)      the Administrative Agent shall have received with respect to any Material Real Estate Assets, a Mortgage and any necessary UCC fixture filing in respect thereof, in each case together with, to the extent customary and appropriate (as reasonably determined by the Administrative Agent and the Top Borrower):

(i)      evidence that (A) counterparts of such Mortgage have been duly executed, acknowledged and delivered and such Mortgage and any corresponding UCC or equivalent fixture filing are in form suitable for filing or recording in all filing or recording offices that the Administrative Agent may deem reasonably necessary in order to create a valid and subsisting Lien on such Material Real Estate Asset in favor of the Administrative Agent for the benefit of the Secured Parties, (B) such Mortgage and any corresponding UCC or equivalent fixture filings have been duly recorded or filed, as applicable, and (C) all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(ii)      one or more fully paid policies of title insurance (the "<u>Mortgage Policies</u>") in an amount reasonably acceptable to the Administrative Agent (not to exceed the fair market value of the Material Real Estate Asset covered thereby (as reasonably determined by the Top Borrower)) issued by a nationally recognized title insurance company in the applicable jurisdiction that is reasonably acceptable to the Administrative Agent, insuring the relevant Mortgage as having created a valid subsisting Lien on the real property described therein with the ranking or the priority which it is expressed to have in such Mortgage, subject only to Permitted Liens, together with such endorsements, coinsurance and reinsurance as the Administrative Agent may reasonably request to the extent the same are available in the applicable jurisdiction;

(iii)      customary legal opinions of local counsel for the relevant Loan Party in the jurisdiction in which such Material Real Estate Asset is located, and if applicable, in the jurisdiction of formation of the relevant Loan Party, in each case as the Administrative Agent may reasonably request; and

(iv)      surveys and appraisals (if required under the Financial Institutions Reform Recovery and Enforcement Act of 1989, as amended) and "Life-of-Loan" flood certifications and any required borrower notices under Regulation H (together with evidence of federal flood insurance for any such Flood Hazard Property located in a flood hazard area); <u>provided</u> that the Administrative Agent may in its reasonable discretion

13

accept any such existing certificate, appraisal or survey so long as such existing certificate or appraisal satisfies any applicable local law requirements.

Notwithstanding any provision of any Loan Document to the contrary, if any mortgage tax or similar tax or charge is owed on the entire amount of the Obligations evidenced hereby, then, to the extent permitted by, and in accordance with, applicable Requirements of Law, the amount of such mortgage tax or similar tax or charge shall be calculated based on the lesser of (x) the amount of the Obligations allocated to the applicable Material Real Estate Assets and (y) the fair market value of the applicable Material Real Estate Assets at the time the Mortgage is entered into and determined in a manner reasonably acceptable to Administrative Agent and the Top Borrower, which in the case of clause (y) will result in a limitation of the Obligations secured by the Mortgage to such amount.

"Collateral Documents" means, collectively, (i) the Security Agreement, (ii) each Mortgage, (iii) each Intellectual Property Security Agreement, (iv) any supplement to any of the foregoing delivered to the Administrative Agent pursuant to the definition of "Collateral and Guarantee Requirement", (v) any Perfection Certificate and (vi) each of the other instruments and documents pursuant to which any Loan Party grants (or purports to grant) a Lien on any Collateral as security for payment of the Secured Obligations.

"Commercial Tort Claim" has the meaning set forth in Article 9 of the UCC.

"Commitment" means, with respect to each Lender, such Lender's Initial Term Loan Commitment and Incremental Commitment, as applicable, in effect as of such time.

"Commitment Schedule" means the Schedule attached hereto as Schedule 1.01(a).

"Company Competitor" means any competitor of the Top Borrower and/or any of its subsidiaries.

"Compliance Certificate" means a Compliance Certificate substantially in the form of Exhibit D.

"Confirmation Order" has the meaning assigned to such term in the Recitals.

"Confidential Information" has the meaning assigned to such term in Section 9.13.

"Conforming Changes" means, with respect to either the use or administration of the Term SOFR Rate or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate", the definition of "Business Day", the definition of "U.S. Government Securities Business Day" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of Section 2.14(b) and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"Consenting Creditors" means the PTL Lenders (as defined in the Plan of Reorganization) that are party to the Restructuring Support Agreement, together with their respective successors and permitted assigns and any subsequent lender that becomes party to the Restructuring Support Agreement in accordance with the terms of the Restructuring Support Agreement.

"Consenting Equity Holders" mean Dawn Holdings, Inc., as the sole member, and holder of interests in, Dawn; and funds managed by Advent International Corporation, as holder of interests in Dawn Holdings, Inc.

"Consolidated Adjusted EBITDA" means, with respect to any Person on a consolidated basis for any period, the sum of:

(a)    Consolidated Net Income for such period; plus

(b)    to the extent not otherwise included in the determination of Consolidated Net Income for such period, the amount of any proceeds of any business interruption insurance policy in an amount representing the earnings for the applicable period that such proceeds are intended to replace (whether or not then received so long as such Person in good faith expects to receive such proceeds within the next four Fiscal Quarters (it being understood that to the extent such proceeds are not actually received within such Fiscal Quarters, such proceeds shall be deducted in calculating Consolidated Adjusted EBITDA for such Fiscal Quarters)); plus

(c)    without duplication, those amounts which, in the determination of Consolidated Net Income for such period, have been deducted for:

(i)    Consolidated Interest Expense;

(ii)    Charges related to any de novo facility, including any construction, pre-opening and start-up period prior to opening, until such facility has been open and operating for a period of 18 consecutive months;

(iii)    Taxes paid and any provision for Taxes, including income, capital, state, franchise and similar Taxes, property Taxes, foreign withholding Taxes and foreign unreimbursed value added Taxes (including penalties and interest related to any such Tax or arising from any Tax examination, and including pursuant to any Tax sharing arrangement or as a result of any intercompany distribution) of such Person paid or accrued during such period;

(iv)    (A) all depreciation and amortization (including, without limitation, amortization of goodwill, software and other intangible assets), (B) all impairment Charges and (C) all asset write-offs and/or write-downs;

(v)    any earn-out and contingent consideration obligations (including to the extent accounted for as bonuses, compensation or otherwise) incurred in connection with any acquisition and/or other Investment permitted under Section 6.06 which is paid or accrued during such period and in connection with any similar acquisition or other Investment completed prior to the Closing Date and, in each case, adjustments thereof;

(vi)    any non-cash Charge, including the excess of GAAP rent expense over actual cash rent paid during such period due to the use of straight line rent for GAAP purposes (provided that to the extent that any such non-cash Charge represents an accrual

15

or reserve for any potential cash item in any future period, (A) such Person may elect not to add back such non-cash Charge in the current period and (B) to the extent such Person elects to add back such non-cash Charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated Adjusted EBITDA to such extent);

(vii)     any non-cash compensation Charge and/or any other non-cash Charge arising from the granting of any stock option or similar arrangement (including any profits interest), the granting of any stock appreciation right and/or similar arrangement (including any repricing, amendment, modification, substitution or change of any such stock option, stock appreciation right, profits interest or similar arrangement);

(viii)     (A) Transaction Costs, (B) Charges incurred (1) in connection with any transaction (in each case, regardless of whether consummated, and whether or not permitted under this Agreement), including any incurrence or issuance of Indebtedness and/or any issuance and/or offering of Capital Stock (including, in each case, by any Parent Company), any Investment (including any acquisition), any Disposition, any recapitalization, any merger, consolidation or amalgamation, any option buyout or any repayment, redemption, refinancing, amendment or modification of Indebtedness (including any amortization or write-off of debt issuance or deferred financing costs, premiums and prepayment penalties) or any similar transaction, and/or (2) in connection with any Qualifying IPO, (C) [reserved] and/or (D) Public Company Costs;

(ix)     any Charge or deduction that is associated with any Restricted Subsidiary and attributable to any non-controlling interest and/or minority interest of any third party;

(x)     the amount of (A) any Charge to the extent that a corresponding amount is received in cash by such Person from an unaffiliated third party under any agreement providing for reimbursement of such Charge or (B) any Charge with respect to any liability or casualty event, business interruption or any product recall, (i) so long as such Person has submitted in good faith, and reasonably expects to receive payment in connection with, a claim for reimbursement of such amounts under its relevant insurance policy (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within the next four Fiscal Quarters) or (ii) without duplication of amounts included in a prior period under clause (B)(i) above, to the extent such Charge is covered by insurance proceeds received in cash during such period (it being understood that if the amount received in cash under any such agreement in any period exceeds the amount of Charge paid during such period such excess amounts received may be carried forward and applied against any Charge in any future period);

(xi)     the amount of management, monitoring, consulting, transaction and advisory fees and related indemnities and expenses (including reimbursements) pursuant to any sponsor management agreement and payments made to any Investor (and/or its Affiliates or management companies) for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities and payments to outside directors of a Parent Company, the Top Borrower or any of its Restricted Subsidiaries actually paid by or on behalf of, or accrued by, such Person or any of its subsidiaries; provided that such payment is permitted under this Agreement;

(xii)     any Charge attributable to the undertaking and/or implementation of new initiatives, business optimization activities, cost savings initiatives, cost rationalization programs, operating expense reductions and/or synergies and/or similar initiatives and/or

programs (including in connection with any integration, restructuring or transition, any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternative uses, any facility opening and/or pre-opening, any inventory optimization program and/or any curtailment), any business optimization Charge, any restructuring Charge (including any Charge relating to any tax restructuring), any Charge relating to the closure or consolidation of any facility (including severance, rent termination costs, moving costs and legal costs), any systems implementation Charge, any severance Charge, any Charge relating to entry into a new market, any Charge relating to any strategic initiative, any signing Charge, any retention or completion bonus, any expansion and/or relocation Charge, any Charge associated with any modification to any pension and post-retirement employee benefit plan, any software development Charge, any Charge associated with new systems design, any implementation Charge, any project startup Charge, any Charge in connection with new operations, any Charge in connection with unused warehouse space or manufacturing facilities, any Charge relating to a new contract, any consulting Charge and/or any corporate development Charge; provided, that the amount of Charges added back in reliance on this clause (c)(xii) in any period may not exceed an amount equal to (x) the greater of $[●] and 25.0% of Consolidated Adjusted EBITDA for such period (calculated before giving effect to any add-backs or adjustments pursuant to this clause (c)(xii)) (other than any pro forma adjustment that is consistent with Regulation S-X under the Securities Act (other than add-backs or adjustments that are only permitted under such Regulation S-X as "Management's Adjustments" by virtue of the amendments adopted on May 21, 2020 by the SEC)) plus (y) Charges incurred in connection with the integration of the "Serta" and "Simmons" businesses; plus

(xiii)    any Charge incurred or accrued in connection with any single or one-time event, including in connection with (A) any acquisition or similar Investment consummated after the Closing Date and/or (B) the closing, consolidation or reconfiguration of any facility during such period; plus

(d)    [reserved]; plus

(e)    the full pro forma "run rate" cost savings, operating expense reductions, operational improvements and synergies (collectively, "Expected Cost Savings") (net of actual amounts realized) that are reasonably identifiable and factually supportable (in the good faith determination of such Person, as certified by a Responsible Officer of such Person in the Compliance Certificate required by Section 5.01(d) to be delivered in connection with the financial statements for such period) related to (A) the Transactions, (B) the integration of the "Serta" and "Simmons" businesses and (C) any Investment, Disposition, operating improvement, restructuring, cost savings initiative, any similar initiative (including the renegotiation of any contract and/or other arrangement) and/or specified transaction (any such operating improvement, restructuring, cost savings initiative and/or similar initiative or specified transaction, a "Cost Saving Initiative"), in each case, prior to, on or after the Closing Date; provided, that with respect to Cost Saving Initiatives under this sub clause (C) of this clause (e), (1) substantial steps toward the action necessary to realize any such cost savings, operating expense reduction, operating improvement and/or synergy added back in reliance on this clause (e) with respect to any Investment, Disposition, operating improvement, restructuring, cost savings initiative, any similar initiative (including the renegotiation of any contract and/or other arrangement) and/or specified transaction are expected to be taken within 18 months following the date on which the relevant Person determines to take such action and (2) the amount of such Cost Saving Initiatives added back in reliance on this clause (e) in any period shall not exceed an amount equal to (i) the greater of $[●] and 25.0% of Consolidated Adjusted EBITDA for such period (calculated (x) before giving effect to any add-

17

backs or adjustments pursuant to this clause (e), and (y) after giving effect to all other permitted pro forma adjustments) plus (ii) the amount of any pro forma adjustment that is consistent with Regulation S-X under the Securities Act (other than addbacks or adjustments that are only permitted under such Regulation S-X as "Management's Adjustments" by virtue of the amendments adopted on May 21, 2020 by the SEC); plus

(f)        [reserved]; minus

(g)        any amount which, in the determination of Consolidated Net Income for such period, has been added for any non-cash income or non-cash gain, all as determined in accordance with GAAP (provided that if any non-cash income or non-cash gain represents an accrual or deferred income in respect of potential cash items in any future period, such Person may determine not to deduct the relevant non-cash gain or income in the then-current period); minus

(h)        the amount of any cash payment made during such period in respect of any noncash accrual, reserve or other non-cash Charge that is accounted for in a prior period which was added to Consolidated Net Income to determine Consolidated Adjusted EBITDA for such prior period and which does not otherwise reduce Consolidated Net Income for the current period.

It is agreed that Consolidated Adjusted EBITDA for (a) the Fiscal Quarter ended on or about June 30, 2022 shall be $[●], (b) the Fiscal Quarter ended on or about September 30, 2022 shall be $[●], (c) the Fiscal Quarter ended on or about December 31, 2022 shall be $[●] and (d) the Fiscal Quarter ended on or about March 31, 2023 shall be $[●], in each case, as adjusted on a Pro Forma Basis, as applicable.

"Consolidated First Lien Debt" means, as to any Person at any date of determination, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a First Priority Lien on the Collateral.

"Consolidated Interest Expense" means, with respect to any Person for any period, the sum of (a) consolidated total interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation (and without duplication), amortization of any debt issuance cost and/or original issue discount, any premium paid to obtain payment, financial assurance or similar bonds, any interest capitalized during construction, any non-cash interest payment, the interest component of any deferred payment obligation, the interest component of any payment under any Capital Lease (regardless of whether accounted for as interest expense under GAAP), any commission, discount and/or other fee or charge owed with respect to any letter of credit and/or bankers' acceptance, any fee and/or expense paid to the Administrative Agent in connection with its services hereunder, any other bank, administrative agency (or trustee) and/or financing fee and any cost associated with any surety bond in connection with financing activities (whether amortized or immediately expensed)) plus (b) any cash dividend paid or payable in respect of Disqualified Capital Stock during such period other than to such Person or any Loan Party, plus (c) any net losses or obligations arising from any Hedge Agreement and/or other derivative financial instrument issued by such Person for the benefit of such Person or its subsidiaries, in each case determined on a consolidated basis for such period.  For purposes of this definition, interest in respect of any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease in accordance with GAAP.

"Consolidated Net Income" means, in respect of any period and as determined for any Person (the "Subject Person") on a consolidated basis, an amount equal to the sum of net income, determined in accordance with GAAP, but excluding:

(a)      the income (or loss) of any Person (other than a Restricted Subsidiary of the Subject Person) accounted for by the equity method of accounting and Unrestricted Subsidiaries, except to the extent of dividends or distributions or other payments that are actually paid in Cash or Cash Equivalents to the Subject Person or a Restricted Subsidiary thereof (or subsequently converted into Cash or Cash Equivalents), whether paid in respect of income, return of capital or dividend for such period or any prior periods,

(b)      any gain or Charge attributable to any asset Disposition (including asset retirement costs and including any abandonments of assets) or of returned surplus assets, in each case, outside the ordinary course of business,

(c)      (i) any gain or Charge from (A) any extraordinary item (as determined in good faith by such Person) and/or (B) any nonrecurring or unusual item (as determined in good faith by such Person) and/or (ii) any Charge associated with and/or payment of any actual or prospective legal settlement, fine, judgment or order,

(d)      any net gain or Charge with respect to (i) any disposed, abandoned, divested and/or discontinued asset, property or operation (other than, at the option of the Top Borrower, any asset, property or operation pending the disposal, abandonment, divestiture and/or termination thereof), (ii) any disposal, abandonment, divestiture and/or discontinuation of any asset, property or operation (other than, at the option of such Person, relating to assets or properties held for sale or pending the divestiture or termination thereof) and/or (iii) any facility that has been closed during such period,

(e)      any net income or write-off or amortization made of any deferred financing cost and/or premium paid or other Charge, in each case attributable to the early extinguishment of Indebtedness (and the termination of any associated Hedge Agreement),

(f)      (i) any Charge incurred pursuant to any management equity plan, profits interest or stock option plan or any other management or employee benefit plan or agreement, any pension plan (including any post-employment benefit scheme which has been agreed with the relevant pension trustee), any stock subscription or shareholder agreement, any employee benefit trust, any employment benefit scheme or any similar equity plan or agreement (including any deferred compensation arrangement) and (ii) any Charge incurred in connection with the rollover, acceleration or payout of Capital Stock held by management of Holdings (or any other Parent Company), the Top Borrower and/or any Restricted Subsidiary, in each case, to the extent that any cash Charge is funded with net cash proceeds contributed to relevant Person as a capital contribution or as a result of the sale or issuance of Qualified Capital Stock (and which proceeds are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount),

(g)      any Charge that is established, adjusted and/or incurred, as applicable, (i) within 12 months after the Closing Date that is required to be established, adjusted or incurred, as applicable, as a result of the Transactions in accordance with GAAP, (ii) within 12 months after the closing of any other acquisition that is required to be established, adjusted or incurred, as applicable, as a result of such acquisition in accordance with GAAP or (iii) as a result of any change in, or the adoption or modification of, accounting principles and/or policies in accordance with GAAP,

(h)      (i) the effects of adjustments (including the effects of such adjustments pushed down to the relevant Person and its subsidiaries) in component amounts required or permitted by

19

GAAP (including in the inventory, property and equipment, lease, rights fee arrangements, software, goodwill, intangible asset, in-process research and development, deferred revenue, advanced billing and debt line items thereof), resulting from the application of purchase accounting in relation to the Transactions or any consummated acquisition or recapitalization accounting or the amortization or write-off of any amounts thereof, net of Taxes, and (ii) the cumulative effect of changes (effected through cumulative effect adjustment or retroactive application) in, or the adoption or modification of, accounting principles or policies made in such period in accordance with GAAP which affect Consolidated Net Income (except that, if the Top Borrower determines in good faith that the cumulative effects thereof are not material to the interests of the Lenders, the effects of any change, adoption or modification of any such principles or policies may be included in any subsequent period after the Fiscal Quarter in which such change, adoption or modification was made),

(i)      solely for the purpose of calculating Excess Cash Flow, the income or loss of any Person accrued prior to the date on which such Person becomes a Restricted Subsidiary of such Person or is merged into or consolidated with such Person or any Restricted Subsidiary of such Person or the date that such other Person's assets are acquired by such Person or any Restricted Subsidiary of such Person

(j)      (i) any realized or unrealized gain or loss in respect of (A) any obligation under any Hedge Agreement as determined in accordance with GAAP and/or (B) any other derivative instrument pursuant to, in the case of this clause (B), Financial Accounting Standards Board's Accounting Standards Codification No. 815-Derivatives and Hedging, and (ii) any realized or unrealized foreign currency exchange gain or loss (including any currency re-measurement of Indebtedness, any net gain or loss resulting from Hedge Agreements for currency exchange risk resulting from any intercompany Indebtedness, any foreign currency translation or transaction or any other currency-related risk) provided, that notwithstanding anything to the contrary herein, any realized gain or loss in respect of any Designated Operational FX Hedge shall be included in the calculation of Consolidated Net Income, and

(k)      any deferred Tax expense associated with any tax deduction or net operating loss arising as a result of the Transactions, or the release of any valuation allowance related to any such item.

"Consolidated Secured Debt" means, as to any Person at any date of determination, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a Lien on the Collateral.

"Consolidated Total Assets" means, at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of the applicable Person at such date.

"Consolidated Total Debt" means, as to any Person at any date of determination, the aggregate principal amount of all third party debt for borrowed money (including LC Disbursements (as defined in the ABL Credit Agreement) that have not been reimbursed within three Business Days and the outstanding principal balance of all Indebtedness of such Person represented by notes, bonds and similar instruments and excluding, for the avoidance of doubt, undrawn letters of credit) and Capital Leases and purchase money Indebtedness, as such amount may be adjusted to reflect the effect (as determined by the Top Borrower in good faith) of any Debt FX Hedge; provided that "Consolidated Total Debt" shall be calculated (i) net of the Unrestricted Cash Amount, and (ii) excluding any obligation, liability or indebtedness of such Person if, upon or prior to the maturity thereof, such Person has irrevocably deposited with the proper

Person in trust or escrow the necessary funds (or evidences of indebtedness) for the payment, redemption or satisfaction of such obligation, liability or indebtedness, and thereafter such funds and evidences of such obligation, liability or indebtedness or other security so deposited are not included in the calculation of the Unrestricted Cash Amount.

"Consolidated Working Capital" means, as at any date of determination, the excess of Current Assets over Current Liabilities.

"Contractual Obligation" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have meanings correlative thereto.

"Copyright" means the following:  (a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, copyright registrations and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing.

"Cost Saving Initiative" has the meaning assigned to such term in the definition of "Consolidated Adjusted EBITDA".

"Covered Entity" has the meaning assigned to such term in Section 9.28(c)(ii).

"Covered Party" has the meaning assigned to such term in Section 9.28(b).

"Credit Extension" means the making of any Loan.

"Current Assets" means, at any date, all assets of the Top Borrower and its Restricted Subsidiaries which under GAAP would be classified as current assets (excluding any (i) Cash or Cash Equivalents (including Cash and Cash Equivalents held on deposit for third parties by the Top Borrower and/or any Restricted Subsidiary), (ii) permitted loans to third parties, (iii) deferred bank fees and derivative financial instruments related to Indebtedness, (iv) the current portion of current and deferred Taxes and (v) management fees receivables).

"Current Liabilities" means, at any date, all liabilities of the Top Borrower and its Restricted Subsidiaries which under GAAP would be classified as current liabilities, other than (i) current maturities of long term debt, (ii) outstanding revolving loans and letter of credit exposure, (iii) accruals of Consolidated Interest Expense (excluding Consolidated Interest Expense that is due and unpaid), (iv) obligations in respect of derivative financial instruments related to Indebtedness, (v) the current portion of current and deferred Taxes, (vi) liabilities in respect of unpaid earnouts or unpaid acquisition, disposition or refinancing related expenses and deferred purchase price holdbacks, (vii) accruals relating to restructuring reserves, (viii) liabilities in respect of funds of third parties on deposit with the Top Borrower and/or any Restricted Subsidiary, (ix) management fees payables, (x) the current portion of any Capital Lease Obligation, (xi) the current portion of any other long term liability for Indebtedness, (xii) accrued settlement costs, (xiii) non-cash compensation costs and expenses and (xiv) any other liabilities that are not

Indebtedness and will not be settled in Cash or Cash Equivalents during the next succeeding twelve month period after such date.

"Customary Bridge Loans" means customary bridge loans with a maturity date of not longer than one year; provided that the final maturity date of any loan, note, security or other Indebtedness which is exchanged for or otherwise replaces such bridge loans is not earlier than the Maturity Date on the date of the issuance or incurrence thereof.

"Dawn" has the meaning assigned to such term in the Recitals.

"Debt FX Hedge" means any Hedge Agreement entered into for the purpose of hedging currency-related risks in respect of any Indebtedness of the type described in the definition of "Consolidated Total Debt".

"Debtors" has the meaning assigned to such term in the Recitals.

"Debtor Relief Laws" means the Bankruptcy Code of the U.S., and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S. or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Declined Proceeds" has the meaning assigned to such term in Section 2.11(b)(v).

"Default" means any event or condition which upon notice, lapse of time or both would become an Event of Default.

"Default Right" has the meaning assigned to such term in Section 9.26(c)(iii).

"Defaulting Lender" means any Person that has (a) defaulted in (or is otherwise unable to perform) its obligations under this Agreement, including to make a Loan within two Business Days of the date required to be made by it hereunder, (b) notified the Administrative Agent or the Top Borrower in writing that it does not intend to satisfy or perform any such obligation or has made a public statement to the effect that it does not intend to comply with its funding or other obligations under this Agreement or under agreements in which it commits to extend credit generally (unless such writing indicates that such position is based on such Person's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan cannot be satisfied), (c) failed, within two Business Days after the request of the Administrative Agent or the Top Borrower, to confirm in writing that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; provided that such Person shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent, (d) become (or any parent company thereof has become) insolvent or been determined by any Governmental Authority having regulatory authority over such Person or its assets, to be insolvent, or the assets or management of which has been taken over by any Governmental Authority or (e)(i) become (or any parent company thereof has become) the subject of (A) a bankruptcy or insolvency proceeding or (B) a Bail-In Action, (ii) has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or (iii) has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in, any such proceeding or appointment, unless in the case of any Person subject to this clause (e), the Top Borrower and the Administrative Agent have each determined that such Person intends, and has all approvals required to enable it (in form and substance satisfactory to the Top Borrower and the Administrative Agent), to continue to perform its obligations hereunder; provided that no Person shall be deemed to be a Defaulting Lender solely by virtue of the

ownership or acquisition of any Capital Stock in such Lender or its parent by any Governmental Authority; provided that such action does not result in or provide such Lender with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contract or agreement to which such Person is a party.

"Deposit Account" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"Derivative Transaction" means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted), (b) any exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks, (c) any equity derivative transaction, including any equity-linked swap, any equity-linked option, any forward equity-linked contract, and any other instrument linked to equities that gives rise to similar credit risk and (d) any commodity (including precious metal) derivative transaction, including any commodity-linked swap, any commodity-linked option, any forward commodity-linked contract, and any other instrument linked to commodities that gives rise to similar credit risks; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management, managers or consultants of the Top Borrower or its subsidiaries shall be a Derivative Transaction.

"Designated Non-Cash Consideration" means the fair market value (as determined by the Top Borrower in good faith) of non-Cash consideration received by the Top Borrower or any Restricted Subsidiary in connection with any Disposition pursuant to Section 6.07(h) and/or Section 6.08 that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Top Borrower, setting forth the basis of such valuation (which amount will be reduced by the amount of Cash or Cash Equivalents received in connection with a subsequent sale or conversion of such Designated Non-Cash Consideration to Cash or Cash Equivalents).

"Designated Operational FX Hedge" means any Hedge Agreement entered into for the purpose of hedging currency-related risks in respect of the revenues, cash flows or other balance sheet items of the Top Borrower, any of its subsidiaries and designated at the time entered into (or on or prior to the Closing Date, with respect to any Hedge Agreement entered into on or prior to the Closing Date) as a Designated Operational FX Hedge by the Top Borrower in a writing delivered to the Administrative Agent.

"DIP ABL Agent" has the meaning assigned to such term in the Recitals.

"DIP ABL Credit Agreement" has the meaning assigned to such term in the Recitals.

"DIP ABL Lenders" has the meaning assigned to such term in the Recitals.

"Discretionary Guarantor" has the meaning assigned to such term in the definition of "Subsidiary Guarantor".

"Disposition" or "Dispose" means the sale, lease, sublease, or other disposition of any property of any Person.

"<u>Disqualified Capital Stock</u>" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than for Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued (it being understood that if any such redemption is in part, only such part coming into effect prior to 91 days following the Maturity Date shall constitute Disqualified Capital Stock), (b) is or becomes convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock that would constitute Disqualified Capital Stock, in each case at any time on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued, (c) contains any mandatory repurchase obligation or any other repurchase obligation at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, which may come into effect prior to 91 days following the Maturity Date at the time such Capital Stock is issued (it being understood that if any such repurchase obligation is in part, only such part coming into effect prior to 91 days following the Maturity Date shall constitute Disqualified Capital Stock) or (d) provides for the scheduled payments of dividends in Cash on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued; <u>provided</u> that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of any change of control or any Disposition occurring prior to 91 days following the Maturity Date at the time such Capital Stock is issued shall not constitute Disqualified Capital Stock if such Capital Stock provides that the issuer thereof will not redeem any such Capital Stock pursuant to such provisions prior to the Termination Date.

Notwithstanding the preceding sentence, (A) if such Capital Stock is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants or by any such plan to such directors, officers, employees, members of management, managers or consultants, in each case in the ordinary course of business of Holdings, the Top Borrower or any Restricted Subsidiary, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by the issuer thereof in order to satisfy applicable statutory or regulatory obligations, and (B) no Capital Stock held by any future, present or former employee, director, officer, manager, member of management or consultant (or their respective Affiliates or Immediate Family Members) of the Top Borrower (or any Parent Company or any subsidiary) shall be considered Disqualified Capital Stock because such stock is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time.

"<u>Disqualified Institution</u>" means:

(a)      (i) any Person identified in writing to the Administrative Agent on April 18, 2023, (ii) any Affiliate of any Person described in <u>clause (i)</u> above that is reasonably identifiable as an Affiliate of such Person on the basis of such Affiliate's name or (iii) any other Affiliate of any Person described in <u>clauses (i)</u> or <u>(ii)</u> above that is identified in a written notice to the Administrative Agent (each such person, a "<u>Disqualified Lending Institution</u>"),

(b)      [reserved], or

(c)      (i) any Person that is or becomes a Company Competitor and is identified as such in writing the Administrative Agent, (ii) any Affiliate of any Person described in <u>clause (i)</u> above (other than any Affiliate that is a Bona Fide Debt Fund) that is reasonably identifiable as an Affiliate of such person on the

basis of such Affiliate's name and (iii) any other Affiliate of any Person described in clauses (i) and/or (ii) above that is identified in a written notice to the Administrative Agent (it being understood and agreed that no Bona Fide Debt Fund may be designated as Disqualified Institution pursuant to this clause (iii)),

it being understood and agreed that no written notice delivered pursuant to clause (a)(ii), (a)(iii), (c)(i) and/or (c)(iii) above shall apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in any Loan; provided that any such assignment or participation shall be subject to the Top Borrower's consent to the extent required under Section 9.05(b).

"Disqualified Lending Institution" has the meaning assigned to such term in the definition of "Disqualified Institution".

"Disqualified Person" has the meaning assigned to such term in Section 9.05(f)(ii).

"Document" has the meaning set forth in Article 9 of the UCC.

"Dollars" or "$" refers to lawful money of the U.S.

"Domestic Subsidiary" means any Restricted Subsidiary incorporated or organized under the laws of the U.S., any state thereof or the District of Columbia.

"Dutch Auction" has the meaning assigned to such term on Schedule 1.01(b).

"ECF Prepayment Amount" has the meaning assigned to such term in Section 2.11(b)(i).

"Eclipse" has the meaning assigned to such term in the recitals to this Agreement.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means (a) any Lender, (b) any commercial bank, insurance company, or finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), (c) any Affiliate of any Lender, and (d) any Approved Fund of any Lender; provided that in any event, "Eligible Assignee" shall not include (i) any natural person, (ii) any Disqualified Institution, (iii) any Defaulting Lender or (iv) except as permitted under Section 9.05(g), the Holdings, the Top Borrower or any of its Subsidiaries.

"Emergence Restructuring Transactions" means, collectively, (a) the "Restructuring Transactions" made in accordance with (and as defined in) [●] of the Plan of Reorganization (subject to the consent

requirements set forth therein) and (b) the transactions set forth on the Schedule attached hereto as <u>Schedule 1.05</u>.

"<u>Employee Benefit Plan</u>" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code, or (c) any Person whose assets include (for purposes of the Plan Asset Regulations) the assets of any such "employee benefit plan" or "plan".

"<u>Environment</u>" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata & natural resources such as wetlands, flora and fauna.

"<u>Environmental Claim</u>" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to the Environment.

"<u>Environmental Laws</u>" means any and all current or future applicable foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other applicable requirements of Governmental Authorities and the common law relating to (a) environmental matters, including those relating to any Hazardous Materials Activity; or (b) the generation, use, storage, transportation or disposal of or exposure to Hazardous Materials, in any manner applicable to the Top Borrower or any of its Restricted Subsidiaries or any Facility.

"<u>Environmental Liability</u>" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) that is under common control with the Top Borrower or any Restricted Subsidiary and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"<u>ERISA Event</u>" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of Withdrawal Liability on the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate, notification of the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA or is in "reorganization" within the meaning of Section 4241 of ERISA;

(d) the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to terminate a Pension Plan or the receipt by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate, with respect to the termination of any Pension Plan; or (g) the conditions for imposition of a Lien under Section 303(k) of ERISA have been met with respect to any Pension Plan.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Article 7.

"Excess Cash Flow" means, for any Calculation Period, any amount (if positive) equal to:

(a)     Consolidated Adjusted EBITDA for such Calculation Period (without giving effect to clauses [(b), (e) and (g)] of the definition thereof, the amounts added back in reliance on which shall be deducted in determining Excess Cash Flow); plus

(b)     any extraordinary, unusual or non-recurring cash gain during such Calculation Period (whether or not accrued in such Calculation Period) to the extent not otherwise included in Consolidated Adjusted EBITDA (including any component definition used therein); plus

(c)     any foreign currency exchange gain actually realized and received in cash in U.S. Dollars (including any currency re-measurement of Indebtedness, any net gain or loss resulting from Hedge Agreements for currency exchange risk resulting from any intercompany Indebtedness, any foreign currency translation or transaction or any other currency-related risk), net of any loss from foreign currency translation; plus

(d)     [reserved]; plus

(e)     an amount equal to all Cash received for such period on account of any net non-Cash gain or income from any Investment deducted in a previous period pursuant to clause (s)(ii) of this definition; plus

(f)     the decrease, if any, in Consolidated Working Capital from the first day to the last day of such Calculation Period, but excluding any such decrease in Consolidated Working Capital arising from (i) the acquisition or Disposition of any Person by the Top Borrower or any Restricted Subsidiary, (ii) the reclassification during such period of current assets to long term assets and current liabilities to long term liabilities, (iii) the application of purchase and/or recapitalization accounting and/or (iv) the effect of any fluctuation in the amount of accrued and contingent obligations under any Hedge Agreement; minus

(g)     the amount, if any, which, in the determination of Consolidated Adjusted EBITDA (including any component definitions used therein) for such Calculation Period, has been included in respect of income or gain from any Disposition outside of the ordinary course of business (including

Dispositions constituting covered losses or taking of assets referred to in the definition of "Net Insurance/Condemnation Proceeds") of the Top Borrower and/or any Restricted Subsidiary; minus

(h)        cash payments actually made in respect of the following (without duplication):

(i)        any Investment permitted by Section 6.06 (other than Investments (i) in Cash or Cash Equivalents or (ii) in any Loan Party and/or any Restricted Payment permitted by Section 6.04(a) and actually made in cash during such Calculation Period or, at the option of the Top Borrower, made prior to the date the Top Borrower is required to make a payment of Excess Cash Flow in respect of such Excess Cash Flow Period, (A) except to the extent the relevant Investment and/or Restricted Payment is financed with the proceeds of long term funded Indebtedness (other than revolving Indebtedness) and (B) without duplication of any amounts deducted from Excess Cash Flow for a prior Calculation Period;

(ii)        any realized foreign currency exchange losses actually paid or payable in cash (including any currency re-measurement of Indebtedness, any net gain or loss resulting from Hedge Agreements for currency exchange risk resulting from any intercompany Indebtedness, any foreign currency translation or transaction or any other currency-related risk);

(iii)        the aggregate amount of any extraordinary, unusual or non-recurring cash Charge (whether or not incurred in such Calculation Period) excluded in calculating Consolidated Adjusted EBITDA (including any component definitions used therein);

(iv)        consolidated Capital Expenditures actually made in cash during such Calculation Period or, at the option of the Top Borrower, in the case of any Excess Cash Flow Period, made prior to the date the Top Borrower is required to make a payment of Excess Cash Flow in respect of such Excess Cash Flow Period, (A) except to the extent financed with the proceeds of long term funded Indebtedness (other than revolving Indebtedness) and (B) without duplication of any amounts deducted from Excess Cash Flow for a prior Calculation Period;

(v)        any long-term liability, excluding the current portion of any such liability (other than Indebtedness) of the Top Borrower and/or any Restricted Subsidiary;

(vi)        any cash Charge added back in calculating Consolidated Adjusted EBITDA pursuant to clause (c) of the definition thereof or excluded from the calculation of Consolidated Net Income in accordance with the definition thereof;

(vii)        the aggregate amount of expenditures actually made by the Top Borrower and/or any Restricted Subsidiary during such Fiscal Year (including any expenditure for the payment of financing fees) to the extent that such expenditures are not expensed; minus

(i)        the amount of any Tax refund (including interest thereon) resulting from of the Emergence Restructuring Transactions received by or paid to Holdings, the Borrowers or any of their subsidiaries; minus

(j)        Consolidated Interest Expense actually paid or payable in cash by the Top Borrower and/or any Restricted Subsidiary during such Calculation Period; minus

(k)        Taxes (inclusive of Taxes paid or payable under tax sharing agreements or arrangements and/or in connection with any intercompany distribution) paid or payable by Borrower and/or any Restricted Subsidiary with respect to such Calculation Period; minus

WEIL:\99124112\10\40416.0005

(l)       the increase, if any, in Consolidated Working Capital from the first day to the last day of such Calculation Period, but excluding any such increase in Consolidated Working Capital arising from (i) the acquisition or Disposition of any Person by the Top Borrower or any Restricted Subsidiary, (ii) the reclassification during such period of current assets to long term assets and current liabilities to long term liabilities, (iii) the application of purchase and/or recapitalization accounting and/or (iv) the effect of any fluctuation in the amount of accrued and contingent obligations under any Hedge Agreement; minus

(m)      the amount of any Tax obligation of the Top Borrower and/or any Restricted Subsidiary that is estimated in good faith by the Top Borrower as due and payable (but is not currently due and payable) by the Top Borrower and/or any Restricted Subsidiary as a result of the repatriation of any dividend or similar distribution of net income of any Foreign Subsidiary to the Top Borrower or any Restricted Subsidiary; minus

(n)       without duplication of amounts deducted from Excess Cash Flow in respect of a prior period, at the option of the Top Borrower, the aggregate consideration (i) required to be paid in Cash by the Top Borrower or its Restricted Subsidiaries pursuant to binding contracts entered into prior to or during such period relating to Capital Expenditures, acquisitions or Investments and Restricted Payments described in clause (h)(i) above and/or (ii) otherwise committed or budgeted to be made in connection with Capital Expenditures, acquisitions or Investments and/or Restricted Payments described in clause (h)(i) above (clauses (i) and (ii), the "Scheduled Consideration") (other than Investments in (A) Cash and Cash Equivalents and (B) the Top Borrower or any of its Restricted Subsidiaries) to be consummated or made during the period of four consecutive Fiscal Quarters of the Top Borrower following the end of such period (except, in each case, to the extent financed with long term funded Indebtedness (other than revolving Indebtedness)); provided that to the extent the aggregate amount actually utilized to finance such Capital Expenditures, acquisitions or Investments or Restricted Payments during such subsequent period of four consecutive Fiscal Quarters is less than the Scheduled Consideration, the amount of the resulting shortfall shall be added to the calculation of Excess Cash Flow at the end of such subsequent period of four consecutive Fiscal Quarters; minus

(o)       amounts added to Consolidated Net Income, in each case to the extent paid in cash, under clause [(h)] of the definition of "Consolidated Adjusted EBITDA"; minus

(p)       cash payments (other than in respect of Taxes, which are governed by clause (k) above) made during such Calculation Period for any liability the accrual of which in a prior Calculation Period resulted in an increase in Excess Cash Flow in such prior period (provided that there was no other deduction to Consolidated Adjusted EBITDA or Excess Cash Flow related to such payment), except to the extent financed with long term funded Indebtedness (other than revolving Indebtedness); minus

(q)       cash expenditures made in respect of any Hedge Agreement during such period to the extent (i) not otherwise deducted in the calculation of Consolidated Net Income or Consolidated Adjusted EBITDA and (ii) not financed with long term funded Indebtedness (other than revolving Indebtedness); minus

(r)       amounts paid in Cash (except to the extent financed with long term funded Indebtedness (other than revolving Indebtedness)) during such period on account of (i) items that were accounted for as non-Cash reductions of Consolidated Net Income or Consolidated Adjusted EBITDA in a prior period and (ii) reserves or amounts established in purchase accounting to the extent such reserves or amounts are added back to, or not deducted from, Consolidated Net Income; minus

(s)       an amount equal to the sum of (i) the aggregate net non-Cash loss on any non-ordinary course Disposition by the Top Borrower, any Restricted Subsidiary during such period (other than any

29

Disposition among the Top Borrower, any Restricted Subsidiaries during such period) to the extent included in arriving at Consolidated Net Income and (ii) the aggregate net non-Cash gain or income from any non-ordinary course Investment to the extent included in arriving at Consolidated Adjusted EBITDA.

"Excess Cash Flow Period" means each Fiscal Year of the Top Borrower, commencing with the Fiscal Year of the Top Borrower ending on or about December 31, 2024.

"Excluded Accounts" means accounts (a) established (or otherwise maintained) by the Loan Parties that do not have cash balances with an average weekly balance exceeding $5,000,000 in the aggregate for all such accounts, (b) [reserved], (c) any Trust Fund Account, (d) disbursement accounts used by the Loan Parties exclusively for payroll or similar payments in the ordinary course of business, (e) that are zero balance accounts or (f) that are located outside of the United States.

"Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations of the SEC promulgated thereunder.

"Excluded Assets" means each of the following:

(a)     any asset the grant or perfection of a security interest in which would (i) be prohibited by enforceable anti-assignment provisions set forth in any contract that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than assets subject to Capital Leases and purchase money financings), (ii) violate (after giving effect to applicable anti-assignment provisions of the UCC or other applicable Requirements of Law) the terms of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of Capital Leases and purchase money financings), or (iii) trigger termination of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement pursuant to any "change of control" or similar provision (to the extent such contract  is binding on such asset at the time of its acquisition and not incurred in contemplation thereof); it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any contract described in this clause (a) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or other applicable Requirements of Law notwithstanding the relevant prohibition, violation or termination right,

(b)     the Capital Stock of any (i) Unrestricted Subsidiary, (ii) not-for-profit subsidiary and/or (iii) special purpose entity used for any permitted securitization facility,

(c)     any intent-to-use (or similar) Trademark application prior to the filing and acceptance of a "Statement of Use", "Declaration of Use", "Amendment to Allege Use" or similar filing with respect thereto, only to the extent, if any, that, and solely during the period if any, in which, the grant of a security interest therein may impair the validity or enforceability of such intent-to-use (or similar) Trademark application under applicable federal law,

(d)     any asset (including Capital Stock), the grant or perfection of a security interest in which would (i) be prohibited under applicable Requirements of Law (including rules and regulations of any Governmental Authority) or (ii) require any governmental or regulatory consent, approval, license or authorization, except to the extent such requirement or prohibition would be rendered ineffective under the UCC or other applicable Requirements of Law notwithstanding such requirement or prohibition; it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any asset described in clauses (d)(i) or (d)(ii) to the extent

30

that the assignment of such proceeds or receivables is effective under the UCC or other applicable Requirements of Law notwithstanding the relevant requirement or prohibition or (iii) result in material adverse tax consequences to any Loan Party as reasonably determined by the Top Borrower and the Administrative Agent,

(e)     (i) any leasehold Real Estate Asset, except to the extent a security interest therein can be perfected by the filing of a UCC-1 financing statement, any other leasehold interests and (ii) any owned Real Estate Asset that is not a Material Real Estate Asset,

(f)     the Capital Stock of any Person that is not a Wholly-Owned Subsidiary (other than the Capital Stock of Serta),

(g)     any Margin Stock,

(h)     to the extent such Foreign Subsidiary or CFC Holdco is not a first-tier Subsidiary of, a Loan Party, the Capital Stock of (i) any Foreign Subsidiary and (ii) any CFC Holdco,

(i)     the Capital Stock of any first-tier Foreign Subsidiary or CFC Holdco of a Loan Party, that is formed or acquired after the Closing Date, the grant or perfection of a security interest in which would reasonably be expected to result in material adverse tax consequences to any Loan Party,

(j)     any Commercial Tort Claim with a value (as reasonably estimated by the Top Borrower) of less than $1,000,000,

(k)     any Tax and Trust Funds,

(l)     any lease, license or agreement, or any property subject to a purchase money security interest, Capital Lease obligations or similar arrangement, in each case, that is permitted or otherwise not prohibited by the terms of this Agreement and to the extent the grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money or similar arrangement or create a right of termination in favor of any other party thereto (other than Holdings, the Top Borrower or any Subsidiary of the Top Borrower) after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Requirements of Law; it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any asset described in this clause (k) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or other applicable Requirements of Law notwithstanding the relevant violation or invalidation, and

(m)     any asset with respect to which the Administrative Agent and the Top Borrower have reasonably determined in writing that the cost, burden, difficulty or consequence (including any effect on the ability of the Top Borrower and its subsidiaries to conduct their operations and business in the ordinary course of business) of obtaining or perfecting a security interest therein outweighs, or is excessive in light of, the practical benefit of a security interest to the relevant Secured Parties afforded thereby.

"Excluded Subsidiary" means:

(a)     any Restricted Subsidiary that is not a Wholly-Owned Subsidiary,

(b)     any Immaterial Subsidiary,

(c)     any Restricted Subsidiary (i) that is prohibited or restricted from providing a Loan Guaranty by (A) any Requirement of Law or (B) any Contractual Obligation that exists on the Closing Date or at the time such Restricted Subsidiary becomes a subsidiary (which Contractual Obligation was not entered into in contemplation of such Restricted Subsidiary becoming a subsidiary (including pursuant to assumed Indebtedness)), (ii) that would require a governmental (including regulatory) or third party consent, approval, license or authorization (including any regulatory consent, approval, license or authorization) to provide a Loan Guaranty (in each case, at the time such Restricted Subsidiary became a Subsidiary) or (iii) with respect to which the provision of a Loan Guaranty would result in material adverse tax consequences as reasonably determined by the Top Borrower, where the Top Borrower notifies the Administrative Agent in writing of such determination,

(d)     any not-for-profit subsidiary,

(e)     [reserved],

(f)     any special purpose entity used for any permitted securitization or receivables facility or financing,

(g)     any Foreign Subsidiary,

(h)     (i) any CFC Holdco and/or (ii) any Domestic Subsidiary that is a direct or indirect subsidiary of any Foreign Subsidiary that is a CFC,

(i)     any Unrestricted Subsidiary,

(j)     any Restricted Subsidiary acquired by the Top Borrower that, at the time of the relevant acquisition, is an obligor in respect of assumed Indebtedness permitted by Section 6.01 to the extent (and for so long as) the documentation governing the applicable assumed Indebtedness prohibits such subsidiary from providing a Loan Guaranty (which prohibition was not implemented in contemplation of such Restricted Subsidiary becoming a subsidiary in order to avoid the requirement of providing a Loan Guaranty), and/or

(k)     any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Top Borrower, the burden or cost of providing a Loan Guaranty outweighs, or would be excessive in light of, the practical benefits afforded thereby.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party of (including by virtue of the joint and several liability provisions of Section 9.24), or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan

32

Document, (a) any Taxes imposed on (or measured by) such recipient's net or overall gross income or franchise Taxes, (i) imposed as a result of such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, the taxing jurisdiction or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a), (c) any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of such Lender (other than a Lender that became a Lender pursuant to an assignment under Section 2.19) with respect to an applicable interest in a Loan or Commitment pursuant to a Requirement of Law in effect on the date on which such Lender (i) acquires such interest in the applicable Commitment or, if such Lender did not fund the applicable Loan pursuant to a prior Commitment, on the date such Lender acquires its interest in such Loan or (ii) designates a new lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Tax were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it designated a new lending office, (d) any Tax as a result of a failure by the Administrative Agent, such Lender to comply with Section 2.17(f) or (j) and (e) any U.S. federal withholding Tax imposed under FATCA and any U.S. federal backup withholding Tax.

"Expected Cost Savings" has the meaning assigned to such term in the definition of "Consolidated Adjusted EBITDA".

"Facility" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or, except with respect to Articles 5 and 6, previously owned, leased, operated or used by the Top Borrower or any of its Restricted Subsidiaries or any of their respective predecessors or Affiliates.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the FRB, as published on the next succeeding Business Day by the FRB of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means the Fee Letter, dated as of even date with this Agreement, among the Borrowers and Administrative Agent.

"First Lien Leverage Ratio" means the ratio, as of any date of determination, of (a) Consolidated First Lien Debt as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted EBITDA for the Test Period then most recently ended, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"<u>First Priority</u>" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that, subject to any applicable Intercreditor Agreement, such Lien is senior in priority to any other Lien to which such Collateral is subject, other than any Permitted Lien.

"<u>Fiscal Month</u>" means each period ending on the later of (i) the last day of each calendar month and (ii) the last day of each retail month.

"<u>Fiscal Quarter</u>" means a fiscal quarter of any Fiscal Year.

"<u>Fiscal Year</u>" means the fiscal year of the Top Borrower.

"<u>Fixed Amounts</u>" has the meaning assigned to such term in <u>Section 1.10(c)</u>.

"<u>Flood Hazard Property</u>" means any parcel of any Material Real Estate Asset subject to a Mortgage located in the U.S. in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"<u>Foreign Lender</u>" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"<u>Foreign Subsidiary</u>" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"<u>FRB</u>" means the Board of Governors of the Federal Reserve System of the U.S.

"<u>GAAP</u>" means generally accepted accounting principles in the U.S. in effect and applicable to the accounting period in respect of which reference to GAAP is made.

"<u>Governmental Authority</u>" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with the U.S., a foreign government or any political subdivision thereof.

"<u>Governmental Authorization</u>" means any permit, license, authorization, approval, plan, directive, consent order or consent decree of or from any Governmental Authority.

"<u>Granting Lender</u>" has the meaning assigned to such term in <u>Section 9.05(e)</u>.

"<u>Guarantee</u>" of or by any Person (the "<u>Guarantor</u>") means any obligation, contingent or otherwise, of the Guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation of any other Person (the "<u>Primary Obligor</u>") in any manner and including any obligation of the Guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other monetary obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness or other monetary obligation, (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or monetary obligation, (e) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (f) secured by any

34

Lien on any assets of such Guarantor securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Guarantor (or any right, contingent or otherwise, of any holder of such Indebtedness or other monetary obligation to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition, Disposition or other transaction permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Hazardous Materials" means any chemical, material, substance or waste, or any constituent thereof, which is prohibited, limited or regulated under any Environmental Law or by any Governmental Authority or which poses a hazard to the Environment or to human health and safety, including without limitation, petroleum and petroleum by-products, asbestos and asbestos-containing materials, polychlorinated biphenyls, medical waste and pharmaceutical waste.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Material, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Material, and any corrective action or response action with respect to any of the foregoing.

"Hedge Agreement" means any agreement with respect to any Derivative Transaction between any Loan Party or any Restricted Subsidiary and any other Person.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under any Hedge Agreement.

"Holdings" shall mean any entity that becomes the direct Parent Company of the Top Borrower and executes and delivers to the Administrative Agent a Holdings Joinder Agreement substantially in form of Exhibit H hereto, and for the avoidance of doubt shall include any Successor Holdings.

"IFRS" means international accounting standards within the meaning of the IAS Regulation 1606/2002, as in effect from time to time (subject to the provisions of Section 1.04), to the extent applicable to the relevant financial statements.

"Immaterial Subsidiary" means, as of any date, any Restricted Subsidiary of the Top Borrower; the assets of which, when taken together with the assets of all other Restricted Subsidiaries that are Immaterial Subsidiaries, do not exceed 5.00% of Consolidated Total Assets of the Top Borrower and its Restricted Subsidiaries and the contribution to Consolidated Adjusted EBITDA of which, when taken together with the contribution to Consolidated Adjusted EBITDA of all other Immaterial Subsidiaries, does not exceed 5.00% of Consolidated Adjusted EBITDA of the Top Borrower and its Restricted Subsidiaries, in each case, as of the last day of the most recently ended Test Period.

"Immediate Family Member" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and/or daughter-in-law and/or (including any adoptive relationship), any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals, such

35

individual's estate (or an executor or administrator acting on its behalf), heirs or legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Incremental Commitment" means any commitment provided pursuant to an Incremental Facility Agreement.

"Incremental Facility Agreement" means an agreement between, *inter alios*, the Borrowers and any incremental Lender, and subject to the requirements of this Agreement, in respect of the issuance of any Incremental Term Facility.

"Incurrence-Based Amounts" has the meaning assigned to such term in Section 1.10(c).

"Indebtedness" as applied to any Person means, without duplication:

(a)     all indebtedness for borrowed money;

(b)     that portion of obligations with respect to Capital Leases to the extent recorded as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(c)     all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(d)     any obligation of such Person owed for all or any part of the deferred purchase price of property or services (excluding (i) any earn out obligation or purchase price adjustment until such obligation (A) becomes a liability on the statement of financial position or balance sheet (excluding the footnotes thereto) in accordance with GAAP and (B) has not been paid within 30 days after becoming due and payable, (ii) any such obligations incurred under ERISA, (iii) accrued expenses and trade accounts payable in the ordinary course of business (including on an inter-company basis) and (iv) liabilities associated with customer prepayments and deposits), which purchase price is (A) due more than six months from the date of incurrence of the obligation in respect thereof or (B) evidenced by a note or similar written instrument);

(e)     all Indebtedness of others secured by any Lien on any asset owned or held by such Person regardless of whether the Indebtedness secured thereby have been assumed by such Person or is non-recourse to the credit of such Person;

(f)     the face amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings;

(g)     the Guarantee by such Person of the Indebtedness of another;

(h)     all obligations of such Person in respect of any Disqualified Capital Stock; and

(i)     all net obligations of such Person in respect of any Derivative Transaction, including any Hedge Agreement, whether or not entered into for hedging or speculative purposes;

provided that (i) in no event shall obligations under any Derivative Transaction be deemed "Indebtedness" for any calculation of the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio,

the Interest Coverage Ratio or any other financial ratio under this Agreement, and (ii) the amount of Indebtedness of any Person for purposes of clause (e) that is non-recourse to such Person with the only recourse of the holder of the Lien being to the assets to secure such amounts shall be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venture) to the extent such Person would be liable therefor under applicable Requirements of Law or any agreement or instrument by virtue of such Person's ownership interest in such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor; provided that notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, (x) the effects of Accounting Standards Codification Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose hereunder as a result of accounting for any embedded derivatives created by the terms of such Indebtedness (it being understood that any such amounts that would have constituted Indebtedness hereunder but for the application of this proviso shall not be deemed an incurrence of Indebtedness hereunder) and (y) the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivative created by the terms of such Indebtedness (it being understood that any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed to be an incurrence of Indebtedness under this Agreement).

"Indemnified Taxes" means all Taxes, other than Excluded Taxes or Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Indemnitee Related Parties" means with respect to a Person, such Person's current and former (a) subsidiaries, (b) Affiliates, (c) managed accounts, funds, funds managed by a common investment manager, officers, directors, principals, shareholders, members, partners, managers, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, other professionals, investment advisors, sub-advisors, collateral managers, in each case in their capacity as such.

"Initial Lender Indemnitee" has the meaning assigned to such term in Section 9.03(c).

"Initial Term Lender" has the meaning assigned to such term in the definition of "Lender".

"Initial Term Loans" means the Loans issued on the Closing Date.

"Initial Term Loan Commitment" means, with respect to each Lender, the commitment of such Lender to make Initial Term Loans hereunder in an aggregate amount not to exceed the amount set forth opposite such Lender's name on the Commitment Schedule, as the same may be (a) reduced from time to time pursuant to Section 2.09 and (b) reduced or increased from time to time pursuant to (i) assignments by or to such Lender pursuant to Section 9.05 or (ii) increased from time to time pursuant to Section 2.22.  The aggregate amount of the Initial Term Lenders' Initial Term Loan Commitments on the Closing Date is $315,000,000.

WEIL:\99124112\10\40416.0005

"Intellectual Property Security Agreement" means any agreement, or a supplement thereto, executed on or after the Closing Date confirming or effecting the grant of any Lien on IP Rights owned by any Loan Party to the Administrative Agent, for the benefit of the Secured Parties, in accordance with this Agreement and the Security Agreement, including an Intellectual Property Security Agreement substantially in the form of Exhibit C.

"Intercompany Note" means a promissory note substantially in the form of Exhibit F.

"Intercreditor Agreements" means the ABL Intercreditor Agreement and any Acceptable Intercreditor Agreement.

"Interest Coverage Ratio" means, as of any date of determination, the ratio of (a) Consolidated Adjusted EBITDA for the most recently ended Test Period to (b) Ratio Interest Expense for such Test Period, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"Interest Election Request" means a request by the relevant Borrower in the form of Exhibit B-2 or another form reasonably acceptable to the Administrative Agent to convert or continue a Borrowing in accordance with Section 2.08.

"Interest Payment Date" means (a) as to any ABR Loan, the first Business Day of each January, April, July and October (commencing with [●], 2023) and the Maturity Date and (b) as to any SOFR Loan, the last day of each Interest Period therefor and, in the case of any Interest Period of more than three months' duration, each day prior to the last day of such Interest Period that occurs at three-month intervals after the first day of such Interest Period, and the Maturity Date.

"Interest Period" means, as to any Borrowing, the period commencing on the date of such Loan or Borrowing and ending on the numerically corresponding day in the calendar month that is one, three or six months thereafter (in each case, subject to the availability thereof), as specified in the applicable Borrowing Request or Interest Election Request; provided that (i) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period, (iii) no Interest Period shall extend beyond the Maturity Date and (iv) no tenor that has been removed from this definition pursuant to Section 2.20(d) shall be available for specification in such Borrowing Request or Interest Election Request. For purposes hereof, the date of a Loan or Borrowing initially shall be the date on which such Loan or Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Loan or Borrowing.

"Investment" means (a) any purchase or other acquisition by the Top Borrower or any of its Restricted Subsidiaries of any of the Securities of any other Person (other than any Loan Party), (b) the acquisition by purchase or otherwise (other than any purchase or other acquisition of inventory, materials, supplies and/or equipment in the ordinary course of business) of all or a substantial portion of the business, property or fixed assets of any other Person or any division or line of business or other business unit of any other Person and (c) any loan, advance (other than any advance to any current or former employee, officer, director, member of management, manager, consultant or independent contractor of the Top Borrower, any Restricted Subsidiary, or any Parent Company for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by the Top Borrower or any of its Restricted Subsidiaries to any other Person. Subject to Section 5.10, the amount of any Investment shall be the original cost of such Investment, plus the cost of any addition thereto that

38

otherwise constitutes an Investment, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto, but giving effect to any repayments of principal in the case of any Investment in the form of a loan and any return of capital or return on Investment in the case of any equity Investment (whether as a distribution, dividend, redemption or sale but not in excess of the amount of the relevant initial Investment).

"Information" has the meaning assigned to such term in Section 3.11(a).

"Investors" means the investors that, directly or indirectly, beneficially own Capital Stock in the Top Borrower on the Closing Date.

"IP Rights" has the meaning assigned to such term in Section 3.05(c).

"IP Separation Transaction" means (a) any Disposition by the Top Borrower or any Restricted Subsidiary of any Material Intellectual Property to any Unrestricted Subsidiary (other than any non-exclusive licenses for legitimate business purposes) and/or (b) any Investment by the Borrower or any Restricted Subsidiary in the form of a contribution of Material Intellectual Property to any Unrestricted Subsidiary.

"IRS" means the U.S. Internal Revenue Service.

"Joinder Agreement" means a Joinder Agreement substantially in the form of Exhibit K or such other form that is reasonably satisfactory to the Administrative Agent and the Top Borrower.

"Junior Indebtedness" means any Indebtedness (other than Indebtedness among Holdings, the Top Borrower and/or its subsidiaries) of the Top Borrower or any of its Restricted Subsidiaries that is expressly subordinated in right of payment to the Obligations with an individual outstanding principal amount in excess of the Threshold Amount.

"Junior Lien Indebtedness" means any Indebtedness (other than Indebtedness among Holdings, the Top Borrower and/or its subsidiaries) that is secured by a security interest on the Collateral that is expressly junior or subordinated to the Lien securing the Term Loan Facility with respect to the Collateral, with an individual outstanding principal amount in excess of the Threshold Amount. For the avoidance of doubt, Indebtedness outstanding under the ABL Credit Agreement that is secured by a Lien that is junior to the Liens securing the Term Loan Facility is not Junior Lien Indebtedness.

"Legal Reservations" means the application of relevant Debtor Relief Laws, general principles of equity and/or principles of good faith and fair dealing.

"LLC Division" has the meaning assigned to such term in Section 1.12.

"Lender" means each financial institution listed on Schedule 1.01(a) (each, an "Initial Term Lender", as well as any Person that becomes a "Lender" hereunder.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; provided that in no event shall an operating lease in and of itself be deemed to constitute a Lien.

"<u>Liquidity Reporting Period</u>" means each period from the date on which a Compliance Certificate is delivered reporting, as of the most recently ended Fiscal Mouth, Actual Liquidity as less than $75,000,000 to the date on which a Compliance Certificate is delivered reporting, as of the most recently ended Fiscal Mouth, Actual Liquidity as more than $75,000,000.

"<u>Loan</u>" means any Initial Term Loans and any Incremental Loans.

"<u>Loan Account</u>" has the meaning assigned to such term in <u>Section 2.10(d)</u>.

"<u>Loan Documents</u>" means this Agreement, any Promissory Note, the Loan Guaranty, the Collateral Documents, the ABL Intercreditor Agreement, each other Intercreditor Agreement to which the Borrowers are a party, and any other document or instrument designated by the Top Borrower and the Administrative Agent as a "Loan Document."  Any reference in this Agreement or any other Loan Document to any Loan Document shall include all appendices, exhibits or schedules thereto.

"<u>Loan Guarantor</u>" means (a) Holdings, (b) any Subsidiary Guarantor and (c) each Borrower (but only with respect to the Obligations of each other Borrower in connection with Secured Hedging Agreements and Banking Services Obligations).

"<u>Loan Guaranty</u>" means the Term Loan Guaranty Agreement, substantially in the form of <u>Exhibit I</u>, executed by each Loan Guarantor and the Administrative Agent for the benefit of the Secured Parties, as supplemented in accordance with the terms of <u>Section 5.12</u>.

"<u>Loan Parties</u>" means Holdings, each Borrower and each Subsidiary Guarantor.

"<u>Margin Stock</u>" has the meaning assigned to such term in Regulation U.

"<u>Material Adverse Effect</u>" means a material adverse effect on (a) the business, assets, financial condition or results of operations, in each case, of the Top Borrower and its Restricted Subsidiaries, taken as a whole, (b) the rights and remedies (taken as a whole) of the Administrative Agent under the applicable Loan Documents or (c) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the applicable Loan Documents.

"<u>Material Debt Instrument</u>" means any physical instrument evidencing any Indebtedness for borrowed money which is required to be pledged and delivered to the Administrative Agent (or its bailee) pursuant to the Security Agreement.

"<u>Material Intellectual Property</u>" means any IP Rights of any Loan Party that are material to the business or operations of any Loan Party.

"<u>Material Real Estate Asset</u>" means (a) on the Closing Date, each Real Estate Asset listed on <u>Schedule 1.01(c)</u> and (b) any "fee-owned" Real Estate Asset acquired by any Loan Party after the Closing Date having a fair market value (as reasonably determined by the Top Borrower after taking into account any liabilities with respect thereto that impact such fair market value) in excess of $15,000,000 as of the date of acquisition thereof.

"<u>Maturity Date</u>" means the five-year anniversary of the Closing Date.

"<u>Maximum Rate</u>" has the meaning assigned to such term in <u>Section 9.19</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc.

"<u>Mortgage</u>" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Administrative Agent, for the benefit of the Administrative Agent and the relevant Secured Parties, on any Material Real Estate Asset constituting Collateral, which shall contain such terms as may be necessary under applicable local Requirements of Law to perfect a Lien on the applicable Material Real Estate Asset.

"<u>Mortgage Policies</u>" has the meaning assigned to such term in the definition of Collateral and Guarantee Requirement.

"<u>Multiemployer Plan</u>" means any employee benefit plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA that is subject to the provisions of Title IV of ERISA, and in respect of which the Top Borrower or any of its Restricted Subsidiaries, or any of their respective ERISA Affiliates, makes or is obligated to make contributions or with respect to which any of them has any ongoing obligation or liability, contingent or otherwise.

"<u>National Bedding</u>" has the meaning assigned to such term in the preamble.

"<u>Net Insurance/Condemnation Proceeds</u>" means an amount equal to:  (a) any Cash payments or proceeds (including Cash Equivalents) received by the Top Borrower or any of its Restricted Subsidiaries (i) under any casualty insurance policy in respect of a covered loss thereunder of any assets of the Top Borrower or any of its Restricted Subsidiaries or (ii) as a result of the taking of any assets of the Top Borrower or any of its Restricted Subsidiaries by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking, minus (b) (i) any actual out-of-pocket costs and expenses incurred by the Top Borrower or any of its Restricted Subsidiaries in connection with the adjustment, settlement or collection of any claims of the Top Borrower or the relevant Restricted Subsidiary in respect thereof, (ii) payment of the outstanding principal amount of, premium or penalty, if any, and interest and other amounts on any Indebtedness (excluding the Loans, Indebtedness that is pari passu with or expressly subordinated to the Lien on the Term Loan Priority Collateral securing any other Indebtedness, any Indebtedness under the ABL Facility and any Indebtedness secured by a Lien on the Term Loan Priority Collateral that is *pari passu* with or expressly subordinated to the Lien on the Term Loan Priority Collateral securing any Secured Obligation) that is secured by a Lien on the assets in question and that is required to be repaid or otherwise comes due or would be in default under the terms thereof as a result of such loss, taking or sale, (iii) in the case of a taking, the reasonable out-of-pocket costs of putting any affected property in a safe and secure position, (iv) any selling costs and out-of-pocket expenses (including reasonable broker's fees or commissions, legal fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith transfer and similar Taxes and the Top Borrower's good faith estimate of income Taxes paid or payable (including pursuant to Tax sharing arrangements or any intercompany distribution)) in connection with any sale or taking of such assets as described in clause (a) of this definition, (v) any amounts provided as a reserve in accordance with GAAP against any liabilities under any indemnification obligation or purchase price adjustments associated with any sale or taking of such assets as referred to in clause (a) of this definition (provided that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Insurance/Condemnation Proceeds) and (vi) in the case of any covered loss or taking from any non-Wholly-Owned Subsidiary, the pro rata portion thereof (calculated without regard to this clause (vi)) attributable to minority interests and not available for distribution to or for the account of the Top Borrower or a Wholly-Owned Subsidiary as a result thereof.

"<u>Net Proceeds</u>" means (a) with respect to any Disposition (including any Prepayment Asset Sale), the Cash proceeds (including Cash Equivalents and Cash proceeds subsequently received (as and when

received) in respect of non-cash consideration initially received), net of (i) selling costs and out-of-pocket expenses (including reasonable broker's fees or commissions, legal fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith and transfer and similar Taxes and the Top Borrower's good faith estimate of income Taxes paid or payable (including pursuant to any Tax sharing arrangement and/or any intercompany distribution) in connection with such Disposition), (ii) amounts provided as a reserve in accordance with GAAP against any liabilities under any indemnification obligation or purchase price adjustment associated with such Disposition (provided that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Proceeds), (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness (excluding Indebtedness under any ABL Facility and any other Indebtedness secured by a Lien on the ABL Priority Collateral that is *pari passu* with or expressly subordinated to the Lien on the ABL Priority Collateral securing any "Secured Obligation" (as defined in the ABL Credit Agreement)) or any Indebtedness hereunder or any other Indebtedness that is pari passu with or expressly subordinated to the Lien on the Term Loan Priority Collateral securing any other Indebtedness) which is secured by the asset sold in such Disposition and which is required to be repaid or otherwise comes due or would be in default and is repaid (other than any such Indebtedness that is assumed by the purchaser of such asset), (iv) Cash escrows (until released from escrow to the Top Borrower or any of its Restricted Subsidiaries) from the sale price for such Disposition and (v) in the case of any Disposition by any non-Wholly-Owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this clause (v)) attributable to any minority interest and not available for distribution to or for the account of the Top Borrower or a Wholly-Owned Subsidiary as a result thereof; and (b) with respect to any issuance or incurrence of Indebtedness or Capital Stock, the Cash proceeds thereof, net of all Taxes and customary fees, commissions, costs, underwriting discounts and other fees and expenses incurred in connection therewith.

"Non-Loan Party Debt Cap" has the meaning assigned to such term in Section 6.01(w).

"Non-U.S. Loan Party" means any other Loan Party other than a U.S. Loan Party.

"NYFRB" means the Federal Reserve Bank of New York.

"Obligations" means all unpaid principal of and accrued and unpaid interest (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, all accrued and unpaid fees and all expenses (including fees and expenses accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), reimbursements, indemnities and all other advances to, debts, liabilities and obligations of any Loan Party to the Lenders or to any Lender, the Administrative Agent or any indemnified party arising under the Loan Documents in respect of any Loan, whether direct or indirect (including those acquired by assumption), absolute, contingent, due or to become due, now existing or hereafter arising.

"Obligations Derivative Instrument" has the meaning assigned to such term in Section 9.05(d)(ii).

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Offered Debt" has the meaning assigned to such term in Section 2.22(a)(ii).

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation or organization and its by-laws, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership

agreement, (d) with respect to any limited liability company, its articles of organization or certificate of formation, and its operating agreement, and (e) with respect to any other form of entity, such other organizational documents required by local Requirements of Law or customary under such jurisdiction to document the formation and governance principles of such type of entity.  In the event that any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any Lender or the Administrative Agent, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or other excise or property, or similar Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, but excluding (i) any Excluded Taxes, and (ii) any such Taxes that are Other Connection Taxes imposed with respect to an assignment or participation (other than an assignment made pursuant to Section 2.19).

"Parent Company" means (a) Holdings and (b) any other Person of which the Top Borrower is an indirect Wholly-Owned Subsidiary.

"Participant" has the meaning assigned to such term in Section 9.05(c).

"Participant Register" has the meaning assigned to such term in Section 9.05(c).

"Patent" means the following: (a) any and all patents and patent applications; (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, which the Top Borrower or any of its Restricted Subsidiaries, or any of their respective ERISA Affiliates, maintains or contributes to or has an obligation to contribute to, or otherwise has any liability, contingent or otherwise.

"Periodic Term SOFR Determination Day" has the meaning assigned to such term in the definition of "Term SOFR Rate".

"Perfection Certificate" means a certificate substantially in the form of Exhibit J.

"Perfection Requirements" means (a) with respect to any U.S. Loan Party, the filing of appropriate financing statements with the office of the Secretary of State or other appropriate office of the location (as

determined by Section 9-307 of the UCC) of each U.S. Loan Party, the filing of Intellectual Property Security Agreements or other appropriate instruments or notices with the U.S. Patent and Trademark Office and the U.S. Copyright Office, the proper recording or filing, as applicable, of Mortgages and fixture filings with respect to any Material Real Estate Asset constituting Collateral, in each case in favor of the Administrative Agent for the benefit of the Secured Parties, the delivery to the Administrative Agent of any stock certificate, instrument, tangible chattel paper or promissory note, together with instruments of transfer executed in blank, in each case, to the extent required by the applicable Loan Documents and (b) with respect to any Non-U.S. Loan Party, any recording, filing, registration, notification or other action required to be taken in the applicable jurisdiction, in each case, to the extent required by the applicable Loan Documents.

"Permitted Acquisition" means any acquisition made by the Top Borrower or any of its Restricted Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, or any business line, unit or division or product line (including research and development and related assets in respect of any product) of, any Person or of a majority of the outstanding Capital Stock of any Person that is engaged in a Similar Business (and, in any event, including any Investment in (x) any Restricted Subsidiary the effect of which is to increase the Top Borrower's or any Restricted Subsidiary's equity ownership in such Restricted Subsidiary or (y) any joint venture for the purpose of increasing the Top Borrower's or its relevant Restricted Subsidiary's ownership interest in such joint venture) if (A) such Person becomes a Restricted Subsidiary or (B) such Person, in one transaction or a series of related transaction, is amalgamated, merged or consolidated with or into, or transfers or conveys substantially all of its assets (or such division, business unit or product line) to, or is liquidated into, the Top Borrower or any Restricted Subsidiary as a result of such Investment.

"Permitted Liens" means Liens permitted pursuant to Section 6.02.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"Petition Date" has the meaning assigned to such term in the Recitals.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) maintained by the Top Borrower and/or any Restricted Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of its ERISA Affiliates, other than any Multiemployer Plan.

"Plan Effective Date" means the date the Plan of Reorganization becomes effective pursuant to the Confirmation Order.

"Plan of Reorganization" has the meaning assigned to such term in the Recitals.

"Platform" has the meaning assigned to such term in Section 5.01.

"Prepayment Asset Sale" means any Disposition (other than a Disposition of assets to the extent constituting ABL Priority Collateral) by the Top Borrower or its Restricted Subsidiaries made pursuant to Section 6.07(s) and/or 6.07(aa);.

"Prepayment Premium" means, (i) on or prior to the one (1) year anniversary of the Closing Date, a premium in an amount equal to 2% of the amount of principal the Initial Term Loans being prepaid, (ii) after the one (1) year anniversary of the Closing Date but on or prior to the two (2) year anniversary of the

Closing Date, a premium in an amount equal to 1% of the amount of principal of the Initial Term Loans being prepaid and (iii) thereafter, 0%.

"Primary Obligor" has the meaning assigned to such term in the definition of "Guarantee".

"Pro Forma Basis" or "pro forma effect" means, with respect to any determination of the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio, Consolidated Adjusted EBITDA or Consolidated Total Assets (including component definitions thereof), that:

(a)      (i) in the case of (A) any Disposition of all or substantially all of the Capital Stock of any Restricted Subsidiary or any division and/or product line of the Top Borrower or any Restricted Subsidiary, (B) any designation of a Restricted Subsidiary as an Unrestricted Subsidiary or (C) the implementation of any Cost Saving Initiative, income statement items (whether positive or negative and including any Expected Cost Savings) attributable to the property or Person subject to such Subject Transaction, shall be excluded as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made and (ii) in the case of any Permitted Acquisition, Investment and/or designation of an Unrestricted Subsidiary as a Restricted Subsidiary described in the definition of the term "Subject Transaction", income statement items (whether positive or negative) attributable to the property or Person subject to such Subject Transaction shall be included as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made,

(b)      any retirement or repayment of Indebtedness shall be deemed to have occurred as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made,

(c)      any Indebtedness incurred by the Top Borrower or any of its Restricted Subsidiaries in connection therewith shall be deemed to have occurred as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made; provided that, (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable Test Period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness at the relevant date of determination (taking into account any interest hedging arrangements applicable to such Indebtedness), (y) interest on any obligation with respect to any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Top Borrower to be the rate of interest implicit in such obligation in accordance with GAAP and (z) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen by the Top Borrower,

(d)      the acquisition of any asset included in calculating Consolidated Total Assets (including the amount of Cash or Cash Equivalents), whether pursuant to any Subject Transaction or any Person becoming a subsidiary or merging, amalgamating or consolidating with or into the Top Borrower or any of its subsidiaries, or the Disposition of any asset included in calculating Consolidated Total Assets described in the definition of "Subject Transaction" shall be deemed to have occurred as of the last day of the applicable Test Period with respect to any test or covenant for which such calculation is being made; and

(e)      each other Subject Transaction shall be deemed to have occurred as of the first day of the applicable Test Period (or, in the case of Consolidated Total Assets, as of the last day of such Test Period) with respect to any test or covenant for which such calculation is being made.

"<u>Projections</u>" means the financial projections of the Top Borrower and its subsidiaries provided to the Administrative Agent on or prior to the Closing Date.

"<u>Promissory Note</u>" means a promissory note of the Borrowers payable to any Lender or its registered assigns, in substantially the form of <u>Exhibit L</u>, evidencing the aggregate outstanding principal amount of Loans of the Borrowers to such Lender resulting from the Loans made by such Lender.

"<u>PTE</u>" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"<u>Public Company Costs</u>" means Charges associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and Charges relating to compliance with the provisions of the Securities Act and the Exchange Act (and, in each case, similar Requirements of Law under other jurisdictions), as applicable to companies with equity or debt securities held by the public, the rules of national securities exchange companies with listed equity or debt securities, directors' or managers' compensation, fees and expense reimbursement, Charges relating to investor relations, shareholder meetings and reports to shareholders or debtholders, directors' and officers' insurance and other executive costs, legal and other professional fees (including auditors' and accounts' fees), listing fees and filing fees associated with being a public company.

"<u>Public Lender</u>" has the meaning assigned to such term in <u>Section 9.01(d)</u>.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"<u>QFC Credit Support</u>" has the meaning assigned to such term in <u>Section 9.28(a)</u>.

"<u>Qualified Capital Stock</u>" of any Person means any Capital Stock of such Person that is not Disqualified Capital Stock.

"<u>Qualifying IPO</u>" means (i) the issuance and sale by the Top Borrower or any Parent Company of its common Capital Stock in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering), (ii) any merger by the Top Borrower or any Parent Company with a publicly traded entity and/or (iii) any other transaction or series of related transactions that results in any of the common Capital Stock of the Top Borrower or any Parent Company (and/or any permitted successor thereto) being publicly traded on any U.S. national securities exchange or over-the-counter market or analogous public exchange in any other jurisdiction.

"<u>Ratio Interest Expense</u>" means, with respect to any Person for any period, (a) the sum of consolidated total interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized, (i) including (A) the interest component of any payment under any Capital Lease (regardless of whether accounted for as interest expense under GAAP), (B) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (C) any commission, discount and/or other fee or charge owed with respect to any letter of credit and/or bankers'

acceptance and (D) any net payment arising under any interest rate Hedge Agreement with respect to Indebtedness and (ii) excluding (A) amortization of deferred financing fees, debt issuance costs, discounted liabilities, commissions, fees and expenses, (B) any expense arising from any bridge, commitment and/or other financing fee (including fees and expenses associated with the Transactions and annual agency fees), (C) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization accounting or, if applicable, acquisition accounting, (D) any fee or expense associated with any Disposition, acquisition, Investment, issuance of Capital Stock or Indebtedness (in each case, whether or not consummated), (E) any cost associated with obtaining, or breakage costs in respect of, any Hedge Agreement or other derivative instrument other than any interest rate Hedge Agreement or interest rate derivative instrument with respect to Indebtedness, (F) any penalty and/or interest relating to Taxes and (G) for the avoidance of doubt, any non-cash interest expense attributable to any movement in the mark to market valuation of any obligation under any Hedge Agreement or any other derivative instrument and/or any payment obligation arising under any Hedge Agreement or derivative instrument other than any interest rate Hedge Agreement or interest rate derivative instrument with respect to Indebtedness <u>minus</u> (b) interest income for such period.  For purposes of this definition, interest in respect of any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease in accordance with GAAP.

Notwithstanding anything in this Agreement to the contrary, (i) for the four fiscal quarters ending on or about [●], Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about [●], on the basis of a 365 day year for the actual days elapsed, (ii) for the four fiscal quarters ending or about [●], Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about [●], on the basis of a 365 day year for the actual days elapsed, (iii) for the four fiscal quarters ending on or about [●], Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about [●], on the basis of a 365 day year for the actual days elapsed and (iv) for the four fiscal quarters ending on or about [●], Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about [●], on the basis of a 365 day year for the actual days elapsed.

"<u>Real Estate Asset</u>" means, at any time of determination, all right, title and interest (fee, leasehold or otherwise) of any U.S. Loan Party in and to real property (including, but not limited to, land, improvements and fixtures thereon).

"<u>Refinancing Indebtedness</u>" has the meaning assigned to such term in <u>Section 6.01(p)</u>.

"<u>Refunding Capital Stocks</u>" has the meaning assigned to such term in <u>Section 6.04(a)(viii)</u>.

"<u>Register</u>" has the meaning assigned to such term in <u>Section 9.05(b)</u>.

"<u>Relevant Governmental Body</u>" means the FRB or the NYFRB, or a committee officially endorsed or convened by the FRB or the NYFRB, or any successor thereto.

"<u>Regulation D</u>" means Regulation D of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation H</u>" means Regulation H of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation U</u>" means Regulation U of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Related Funds</u>" means with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the respective directors, managers, officers, trustees, employees, partners, agents, advisors and other representatives of such Person and such Person's Affiliates.

"<u>Release</u>" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the Environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"<u>Reportable Event</u>" means, with respect to any Pension Plan or Multiemployer Plan, any of the events described in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period is waived under PBGC Reg. Section 4043.

"<u>Representatives</u>" has the meaning assigned to such term in <u>Section 9.13</u>.

"<u>Required Excess Cash Flow Percentage</u>" means, as of any date of determination, (a) if the First Lien Leverage Ratio is greater than [●][1]:1.00, 50%, (b) if the First Lien Leverage Ratio is less than or equal to [●][2]:1.00 and greater than [●][3]:1.00, 25% and (c) if the First Lien Leverage Ratio is less than or equal to [●][4]:1.00, 0%; it being understood and agreed that, for purposes of this definition as it applies to the determination of the amount of Excess Cash Flow that is required to be applied to prepay the Loans under <u>Section 2.11(b)(i)</u> for any Excess Cash Flow Period, the First Lien Leverage Ratio shall be determined on the scheduled date of prepayment.

"<u>Required Lenders</u>" means, at any time, Lenders having Loans and unused Commitments representing more than 50% of the sum of the total Loans and such unused Commitments of all Lenders at such time; <u>provided</u> that Loans and unused Commitments of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time.

"<u>Requirements of Law</u>" means, with respect to any Person, collectively, the common law and all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case

---

[1] NTD: To be [0.5x] inside closing date level.

[2] NTD: To be [0.5x] inside closing date level.

[3] NTD: To be [1.0x] inside closing date level.

[4] NTD: To be [1.0x] inside closing date level.

whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means, with respect to any Person, the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, any executive vice president, any senior vice president, any vice president or the chief operating officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement, and, as to any document delivered on the Closing Date, shall include any secretary or assistant secretary or any other individual or similar official thereof with substantially equivalent responsibilities of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer of the applicable Loan Party so designated in writing by the Top Borrower to the Administrative Agent.  Any document delivered hereunder that is signed by a Responsible Officer of any Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Responsible Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of a Responsible Officer of the Top Borrower that such financial statements fairly present, in all material respects, in accordance with GAAP, the consolidated financial condition of the Top Borrower as at the dates indicated and its consolidated income and cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"Restricted Debt" has the meaning set forth in Section 6.04(b).

"Restricted Debt Payments" has the meaning set forth in Section 6.04(b).

"Restricted Payment" means (a) any dividend or other distribution on account of any shares of any class of the Capital Stock of the Top Borrower, except a dividend payable solely in shares of Qualified Capital Stock to the holders of such class; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of any shares of any class of the Capital Stock of the Top Borrower and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of the Capital Stock of the Top Borrower now or hereafter outstanding.

"Restricted Subsidiary" means, as to any Person, any subsidiary of such Person that is not an Unrestricted Subsidiary.  Unless otherwise specified, "Restricted Subsidiary" shall mean any Restricted Subsidiary of the Top Borrower.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of January 23, 2023, by and among the Debtors, the Consenting Creditors, and the Consenting Equity Holders, including any exhibits attached thereto (as may be amended, supplemented or modified from time to time in accordance with the terms thereof).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of the McGraw-Hill Companies, Inc.

"Sale and Lease-Back Transaction" has the meaning assigned to such term in Section 6.08.

"Sanctioned Entity" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, (as of the date of this Agreement, the Crimea region of Ukraine, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, Cuba, Iran, North Korea, and Syria).

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) His Majesty's Treasury of the United Kingdom, and (e) any other Governmental Authority with jurisdiction over any member of Lender Group or any Loan Party or any of their respective Subsidiaries or Affiliates.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of its functions.

"Secured Hedging Obligations" means all Hedging Obligations (other than any Excluded Swap Obligations) under each Hedge Agreement that (a) is in effect on the Closing Date between any Loan Party and a counterparty that is (or is an Affiliate of) the Administrative Agent or a Lender as of the Closing Date or (b) is entered into after the Closing Date between any Loan Party and any counterparty that is (or is an Affiliate of) the Administrative Agent or a Lender at the time such Hedge Agreement is entered into, in each case for which such Loan Party agrees to provide security and in each case that has been designated to the Administrative Agent in writing by the Top Borrower as being a Secured Hedging Obligation for purposes of the Loan Documents, it being understood that each counterparty thereto shall be deemed (A) to appoint the Administrative Agent as its agent under the applicable Loan Documents and (B) to agree to be bound by the provisions of Article 8, Section 9.03 and Section 9.10 and any Intercreditor Agreement as if it were a Lender.

"Secured Leverage Ratio" means the ratio, as of any date of determination, of (a) Consolidated Secured Debt as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted EBITDA for the Test Period then most recently ended, in each case of the Top Borrower, its Restricted Subsidiaries on a consolidated basis.

"Secured Obligations" means all Obligations together with (a) all Banking Services Obligations and (b) all Secured Hedging Obligations.

"Secured Parties" means (i) the Lenders, (ii) the Administrative Agent, (iii) each counterparty to a Hedge Agreement with a Loan Party the obligations under which constitute Secured Hedging Obligations, (iv) each provider of Banking Services to any Loan Party the obligations under which constitute Banking Services Obligations and (v) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document.

"Securities" means any stock, shares, units, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing; provided that the term "Securities" shall not include any earn-out agreement or obligation or any employee bonus or other incentive compensation plan or agreement.

"Securities Act" means the Securities Act of 1933 and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means the Term Loan Pledge and Security Agreement, substantially in the form of Exhibit M, among the U.S. Loan Parties and the Administrative Agent for the benefit of the Secured Parties.

"Serta" means Serta, Inc., a Delaware corporation and an indirect, non-Wholly-Owned Subsidiary of the Top Borrower.

"Similar Business" means any Person the majority of the revenues of which are derived from a business that would be permitted by Section 6.10 if the references to "Restricted Subsidiaries" in Section 6.10 were read to refer to such Person.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SPC" has the meaning assigned to such term in Section 9.05(e).

"Specified Default" means an Event of Default arising under Section 7.01(a), Section 7.01(f) or Section 7.01(g).

"SSB" has the meaning assigned to such term in the preamble.

"SSB Manufacturing" has the meaning assigned to such term in the preamble.

"Subject Person" has the meaning assigned to such term in the definition of "Consolidated Net Income".

"Subject Proceeds" has the meaning assigned to such term in Section 2.11(b)(ii).

"Subject Transaction" means, with respect to any Test Period, (a) the Transactions, (b) any Permitted Acquisition or any other acquisition or similar Investment, whether by purchase, merger or otherwise, of all or substantially all of the assets of, or any business line, unit or division of, any Person or of a majority of the outstanding Capital Stock of any Person (and, in any event, including any Investment in (x) any Restricted Subsidiary the effect of which is to increase the Top Borrower's or any Restricted Subsidiary's respective equity ownership in such Restricted Subsidiary or (y) any joint venture for the purpose of increasing the Top Borrower's or its relevant Restricted Subsidiary's ownership interest in such joint venture), in each case that is permitted by this Agreement, (c) any Disposition of all or substantially

WEIL:\99124112\10\40416.0005

all of the assets or Capital Stock of any subsidiary (or any business unit, line of business or division of the Top Borrower or a Restricted Subsidiary) not prohibited by this Agreement, (d) the designation of a Restricted Subsidiary as an Unrestricted Subsidiary or an Unrestricted Subsidiary as a Restricted Subsidiary in accordance with Section 5.10, (e) any incurrence of Indebtedness (other than revolving Indebtedness), (f) any repayment of Indebtedness, (g) any capital contribution in respect of Qualified Capital Stock or any issuance of Qualified Capital Stock, (h) the implementation of any Cost Saving Initiative and/or (i) any other event that by the terms of the Loan Documents requires pro forma compliance with a test or covenant hereunder or requires such test or covenant to be calculated on a pro forma basis.

"subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof, in each case to the extent the relevant entity's financial results are required to be included in such Person's consolidated financial statements under GAAP; provided that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interests in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding.  Unless otherwise specified, "subsidiary" shall mean any subsidiary of the Top Borrower.

"Subsidiary Guarantor" means (a) on the Closing Date, each subsidiary of the Top Borrower that is not a Borrower (other than any such subsidiary that is an Excluded Subsidiary on the Closing Date) and (b) thereafter, each subsidiary of the Top Borrower (or after the execution and delivery of the Holdings Joinder Agreement, each subsidiary of Holdings) that becomes a guarantor of the Secured Obligations pursuant to the terms of this Agreement, in each case, until such time as the relevant subsidiary is released from its obligations under the Loan Guaranty in accordance with the terms and provisions hereof. Notwithstanding the foregoing, the Top Borrower (or after the execution and delivery of the Holdings Joinder Agreement, each subsidiary of Holdings) may, in its sole discretion, elect to cause any Restricted Subsidiary that is not otherwise required to be a Subsidiary Guarantor to provide a Loan Guaranty by causing such Restricted Subsidiary (such Restricted Subsidiary, a "Discretionary Guarantor") to execute a Joinder Agreement, and, upon the execution of such Joinder Agreement, any such Restricted Subsidiary shall be a Loan Party and Subsidiary Guarantor hereunder for all purposes hereunder.

"Successor Holdings" has the meaning assigned to such term in Section 6.14(c).

"Successor Borrower" has the meaning assigned to such term in Section 6.07(a).

"Supported QFC" has the meaning assigned to such term in Section 9.28(a).

"Swap Obligations" means, with respect to any Loan Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Tax and Trust Funds" means Cash, Cash Equivalents or other assets that are comprised solely of (a) funds used for payroll and payroll Taxes and other employee benefit payments to or for the benefit of the employees of Holdings, the Top Borrower and/or any subsidiary, (b) Taxes required to be collected, remitted or withheld (including, federal and state withholding Taxes (including the employer's share thereof)) and (c) other funds which any Loan Party holds in trust or as an escrow or fiduciary for another Person which is not a Loan Party in the ordinary course of business.

"<u>Taxes</u>" means all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"<u>Term Loan Facility</u>" means the facility offered pursuant to this Agreement, as the same may be amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"<u>Term Loan Priority Collateral</u>" has the meaning set forth in the ABL Intercreditor Agreement.

"<u>Term SOFR Adjustment</u>" means a percentage equal to 0.11448% (11.448 basis points).

"<u>Term SOFR Administrator</u>" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"<u>Term SOFR Rate</u>" means, for any calendar month, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "<u>Periodic Term SOFR Determination Day</u>") that is two (2) U.S. Government Securities Business Days prior to the commencement of such calendar month, as such rate is published by the Term SOFR Administrator; <u>provided</u>, however, that if as of 5:00 p.m. on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for a tenor of one month has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then the Term SOFR Rate will be the Term SOFR Reference Rate for a tenor of one month as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for a tenor of one month was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day.

"<u>Term SOFR Rate Loan</u>" means any Loan that bears interest at a rate determined by reference to Adjusted Term SOFR (other than pursuant to clause (c) of the definition of "Alternate Base Rate").

"<u>Term SOFR Reference Rate</u>" means the forward-looking term rate based on SOFR.

"<u>Term Yield Differential</u>" has the meaning assigned to such term in <u>Section 2.22(a)(v)</u>.

"<u>Termination Date</u>" has the meaning assigned to such term in the lead-in to <u>Article 5</u>.

"<u>Test Period</u>" means, as of any date, the period of four consecutive Fiscal Quarters then most recently ended for which financial statements of the type described in <u>Section 5.01(b)</u> or <u>Section 5.01(c)</u>, as applicable, have been delivered (or are required to have been delivered) or, if earlier, are internally available.

"<u>Threshold Amount</u>" means $40,000,000.

"<u>Top Borrower</u>" has the meaning assigned to such term in the preamble.

"<u>Total Leverage Ratio</u>" means the ratio, as of any date of determination, of (a) Consolidated Total Debt outstanding as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted EBITDA for the Test Period then most recently ended, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"<u>Trademark</u>" means the following:  (a) all trademarks (including service marks), common law marks, trade names, trade dress, and logos, slogans and other indicia of origin under the Requirements of Law of any jurisdiction in the world, and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (d) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all rights corresponding to any of the foregoing.

"<u>Transaction Costs</u>" means fees, premiums, expenses and other transaction costs (including original issue discount or upfront fees) payable or otherwise borne by any Parent Company and/or its subsidiaries in connection with the Transactions and the transactions contemplated thereby.

"<u>Transactions</u>" means, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the Borrowing of Loans hereunder on the Closing Date, (b) the consummation of the Closing Date Refinancing, (c) the consummation of the Plan of Reorganization (including the execution, delivery and performance by the Loan Parties of the ABL Credit Agreement to which they are a party and the incurrence of Indebtedness thereunder on the Closing Date), (d) the Emergence Restructuring Transactions and (e) the payment of Transaction Costs.

"<u>Treasury Capital Stock</u>" has the meaning assigned to such term in <u>Section 6.04(a)(viii)</u>.

"<u>Treasury Regulations</u>" means the U.S. federal income tax regulations promulgated under the Code.

"<u>Trust Fund Account</u>" means any account containing Cash and Cash Equivalents consisting solely of Tax and Trust Funds.

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Alternate Base Rate.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the creation or perfection of security interests.

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Resolution Authority</u>" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Unadjusted Benchmark Replacement</u>" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"<u>Unrestricted Cash Amount</u>" means, as to any Person on any date of determination, the amount of (a) unrestricted Cash and Cash Equivalents of such Person and (b) Cash and Cash Equivalents of such Person that are restricted in favor of the ABL Facility, the Term Loan Facility and/or other permitted *pari*

*passu* or junior secured Indebtedness (which may also include Cash and Cash Equivalents securing other Indebtedness that is secured by a Lien on Collateral along with the ABL Facility, the Term Loan Facility and/or other permitted *pari passu* or junior secured indebtedness).

"Unrestricted Subsidiary" means any subsidiary of the Top Borrower designated by the Top Borrower as an Unrestricted Subsidiary after the Closing Date pursuant to Section 5.10 and any subsidiary of any Unrestricted Subsidiary.

"U.S." means the United States of America.

"U.S. Bank Cash" means unrestricted Cash of the Borrower and its Restricted Subsidiaries deposited in depository institutions located in the United States and unrestricted Cash Equivalents of the Borrower and its Restricted Subsidiaries deposited in depository institutions or securities intermediaries located in the United States.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association (or any successor thereto) recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Lender" means any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Loan Party" means any Loan Party that is incorporated or organized under the laws of the U.S., any state thereof or the District of Columbia.

"U.S. Special Resolution Regime" has the meaning assigned to such term in Section 9.28(a).

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(f).

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing:  (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness; provided that the effect of any prepayment made in respect of such Indebtedness shall be disregarded in making such calculation.

"Wells Fargo" has the meaning assigned to such term in the definition of "ABL Credit Agreement".

"Wholly-Owned Subsidiary" of any Person means a subsidiary of such Person, 100% of the Capital Stock of which (other than directors' qualifying shares or shares required by Requirements of Law to be owned by a resident of the relevant jurisdiction) shall be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability to any Multiemployer Plan as the result of a "complete" or "partial" withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02.    Classification of Loans and Borrowings.  For purposes of this Agreement, Loans may be classified and referred to by Class (*e.g.*, a "Term Loan") or by Type (*e.g.*, a "SOFR Rate Loan") or by Class and Type (*e.g.*, a "SOFR Term Rate Loan").  Borrowings also may be classified and referred to by Class (*e.g.*, a "Term Loan Borrowing") or by Type (*e.g.*, a "SOFR Rate Borrowing") or by Class and Type (*e.g.*, a "SOFR Rate Term Loan Borrowing").

Section 1.03.    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document (including any Loan Document and the ABL Credit Agreement) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified or extended, replaced or refinanced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications or extensions, replacements or refinancings set forth herein), (b) any reference to any Requirement of Law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law, (c) any reference herein or in any Loan Document to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "herein," "hereof" and "hereunder," and words of similar import, when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision hereof, (e) all references herein or in any Loan Document to Articles, Sections, clauses, paragraphs, Exhibits and Schedules shall be construed to refer to Articles, Sections, clauses and paragraphs of, and Exhibits and Schedules to, such Loan Document, (f) in the computation of periods of time in any Loan Document from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" mean "to but excluding" and the word "through" means "to and including" and (g) the words "asset" and "property", when used in any Loan Document, shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including Cash, securities, accounts and contract rights.  For purposes of determining compliance at any time with Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.07 and 6.09, in the event that any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Investment, Disposition or Affiliate Transaction, as applicable, meets the criteria of more than one of the categories of transactions or items permitted pursuant to any clause of such Sections 6.01 (other than Sections 6.01(a), (x) and (y)), 6.02 (other than Sections 6.02(a) and (t)), 6.04, 6.05, 6.06, 6.07 and 6.09, the Top Borrower, in its sole discretion, may, from time to time, classify or reclassify such transaction or item (or portion thereof) under one or more

clauses of each such Section and will only be required to include the amount and type of such transaction (or portion thereof) in any one category; provided that, any transaction or item (or portion thereof) originally permitted by reference to one or more clauses in Section 6.04(a) may not be reclassified across or between other Sections, but, for the avoidance of doubt, may be reclassified within Section 6.04(a); provided further that no such transaction or item (or portion thereof) may, after the initial classification thereof in connection with the incurrence or consummation thereof, be reclassified under Section 6.04(a)(xi), 6.04(b)(vii) or 6.06(bb).  It is understood and agreed that any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Burdensome Agreement, Investment, Disposition and/or Affiliate transaction need not be permitted solely by reference to one category of permitted Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Burdensome Agreement, Investment, Disposition and/or Affiliate transaction under Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.07 or 6.09, respectively, but may instead be permitted in part under any combination thereof; provided that, upon delivery of any financial statements pursuant to Section 5.01(b) or (c) following the initial incurrence of any portion of any Indebtedness incurred under Section 6.01(a) through (gg) (other than Section 6.01(a) or (x)) (such portion of such Indebtedness, the "Subject Indebtedness"), if any such Subject Indebtedness could, based on such financial statements, have been incurred in reliance on Section 6.01(w), such Subject Indebtedness shall automatically be reclassified as having been incurred under the applicable provisions of Section 6.01(w) (in each case, subject to any other applicable provision of Section 6.01(w) and, in the case of any Subject Indebtedness incurred by any Restricted Subsidiary that is not a Loan Party, to availability under the Non-Loan Party Debt Cap).

Section 1.04.     Accounting Terms; GAAP.

(a)     All financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP (including the impact of "fresh start" accounting under Accounting Standards Codification 852) as in effect from time to time and, except as otherwise expressly provided herein, all terms of an accounting nature that are used in calculating the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio, Consolidated Adjusted EBITDA or Consolidated Total Assets shall be construed and interpreted in accordance with GAAP, as in effect from time to time; provided that if the Top Borrower notifies the Administrative Agent that the Top Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date of delivery of the financial statements described in Section 3.04(a) in GAAP or in the application thereof (including the conversion to IFRS as described below) on the operation of such provision (or if the Administrative Agent notifies the Top Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change becomes effective until such notice have been withdrawn or such provision amended in accordance herewith; provided, further, that if such an amendment is requested by the Top Borrower or the Required Lenders, then the Top Borrower and the Administrative Agent shall negotiate in good faith to enter into an amendment of the relevant affected provisions (without the payment of any amendment or similar fee to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof; provided, further, that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Top Borrower or any subsidiary at "fair value," as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof.  If the Top Borrower notifies the Administrative Agent that the Top Borrower (or its applicable

Parent Company) is required to report under IFRS or has elected to do so through an early adoption policy, "GAAP" shall mean international financial reporting standards pursuant to IFRS (<u>provided</u> that after such conversion, the Top Borrower cannot elect to report under GAAP).

(b)        Notwithstanding anything to the contrary herein, but subject to <u>Section 1.10</u> hereof, all financial ratios and tests (including the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio and the amount of Consolidated Total Assets and Consolidated Adjusted EBITDA) contained in this Agreement that are calculated with respect to any Test Period during which any Subject Transaction occurs shall be calculated with respect to such Test Period and such Subject Transaction on a Pro Forma Basis.  Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Subject Transaction has occurred or (y) any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Top Borrower or any of its Restricted Subsidiaries or any joint venture since the beginning of such Test Period has consummated any Subject Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Subject Transaction had occurred at the beginning of the applicable Test Period.

(c)        Notwithstanding anything to the contrary contained in <u>paragraph (a)</u> above or in the definition of "Capital Lease," in the event of an accounting change (whether before or after the Closing Date) requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on November 8, 2016) that would constitute Capital Leases in conformity with GAAP on November 8, 2016 shall be considered Capital Leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

Section 1.05.        <u>Emergence Restructuring Transactions</u>.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, neither this Agreement nor any other Loan Document shall prohibit the consummation of the Emergence Restructuring Transactions, and no Emergence Restructuring Transaction (or any action or intermediate transaction necessary to implement any such Emergence Restructuring Transaction) shall constitute a Default or Event of Default under this Agreement or any other Loan Document.

Section 1.06.        <u>Timing of Payment or Performance</u>.  When payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

Section 1.07.        <u>Times of Day</u>.  Unless otherwise specified herein, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

Section 1.08.        <u>Currency Equivalents Generally</u>.

(a)        For purposes of any determination under <u>Article 5</u>, <u>Article 6</u> (other than the calculation of compliance with any financial ratio for purposes of taking any action hereunder) or <u>Article 7</u> with respect to the amount of any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Investment, Disposition, Sale and Lease-Back Transaction, affiliate transaction or other transaction, event or circumstance, or any determination under any other provision of this Agreement, (any of the foregoing, a "<u>specified transaction</u>"), in a currency other than Dollars, (i) the Dollar equivalent amount of a specified transaction in a currency other than Dollars shall be calculated based on the rate of exchange quoted by the Bloomberg Foreign Exchange Rates & World Currencies Page (or any successor page thereto, or in the event such rate does not appear on any Bloomberg Page, by reference to such other publicly available

service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Top Borrower) for such foreign currency, as in effect at 11:00 a.m. (London time) on the date of such specified transaction (which, in the case of any Restricted Payment, shall be deemed to be the date of the declaration thereof and, in the case of the incurrence of Indebtedness, shall be deemed to be on the date first committed); provided, that if any Indebtedness is incurred (and, if applicable, associated Lien granted) to refinance or replace other Indebtedness denominated in a currency other than Dollars, and the relevant refinancing or replacement would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing or replacement, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing or replacement Indebtedness (and, if applicable, associated Lien granted) does not exceed an amount sufficient to repay the principal amount of such Indebtedness being refinanced or replaced, except by an amount equal to (x) unpaid accrued interest and premiums (including tender premiums) thereon plus other reasonable and customary fees and expenses (including upfront fees and original issue discount) incurred in connection with such refinancing or replacement, (y) any existing commitments unutilized thereunder and (z) additional amounts permitted to be incurred under Section 6.01 and (ii) for the avoidance of doubt, no Default or Event of Default shall be deemed to have occurred solely as a result of a change in the rate of currency exchange occurring after the time of any specified transaction so long as such specified transaction was permitted at the time incurred, made, acquired, committed, entered or declared as set forth in clause (i). For purposes of calculating compliance with any financial ratio for purposes of taking any action hereunder, on any relevant date of determination, amounts denominated in currencies other than Dollars shall be translated into Dollars at the applicable currency exchange rate used in preparing the financial statements delivered pursuant to Sections 5.01(b) or (c), as applicable, for the relevant Test Period and will, with respect to any Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of any Hedge Agreement permitted hereunder in respect of currency exchange risks with respect to the applicable currency in effect on the date of determination for the Dollar equivalent amount of such Indebtedness; provided that the amount of any Indebtedness that is subject to a Debt FX Hedge shall be determined in accordance with the definition of "Consolidated Total Debt".

(b)     Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Top Borrower's consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

Section 1.09.     [Reserved].

Section 1.10.     Certain Calculations and Tests.

(a)     Notwithstanding anything to the contrary herein, to the extent that the terms of this Agreement require (i) compliance with any financial ratio or test (including any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and any Interest Coverage Ratio test) and/or any cap expressed as a percentage of Consolidated Adjusted EBITDA or Consolidated Total Assets and/or (ii) the absence of a Default, Specified Default or Event of Default (or any type of Default, Specified Default or Event of Default) as a condition to the consummation of any transaction in connection with any acquisition or similar Investment (including the assumption or incurrence of Indebtedness), but in any event excluding the making of any Restricted Payment and/or the making of any Restricted Debt Payment, the determination of whether the relevant condition is satisfied may be made, at the election of the Top Borrower, at the time of (or on the basis of the financial statements for the most recently ended Test Period at the time of) either (x) the execution of the definitive agreement with respect to such acquisition or Investment or (y) the consummation of such acquisition or Investment, in each case, after giving effect, on a Pro Forma Basis, to (I) the relevant acquisition, Investment and/or any related Indebtedness (including the intended use of proceeds thereof) and (II) to the extent definitive documents in respect thereof have

59

been executed (which definitive documents have not terminated or expired without the consummation thereof), any additional acquisition, Investment and/or any related Indebtedness (including the intended use of proceeds thereof) that the Top Borrower has elected to be determined as set forth in this clause (a)). Notwithstanding the foregoing, (1) the provisions of this clause (a) shall not apply in connection with any such transaction, the relevant date of determination may be the date described in clause (x) above only if the date of the consummation of such acquisition or other Investment is not more than 120 days after the execution of the definitive agreement with respect to such acquisition or Investment.

(b)        For purposes of determining the permissibility of any action, change, transaction or event that requires a calculation of any financial ratio or test (including, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test, and/or any Interest Coverage Ratio test and/or the amount of Consolidated Adjusted EBITDA or Consolidated Total Assets), such financial ratio or test shall be calculated at the time such action is taken (subject to clause (a) above), such change is made, such transaction is consummated or such event occurs, as the case may be, and no Default or Event of Default shall be deemed to have occurred solely as a result of a change in such financial ratio or test occurring after such calculation.

(c)        Notwithstanding anything to the contrary herein, with respect to any amount incurred or transaction entered into (or consummated) in reliance on a provision of this Agreement (including Section 6.01(x), as it relates to the incurrence of any "fixed" or similar amount available under any ABL Facility) that does not require compliance with a financial ratio or test (including, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and/or any Interest Coverage Ratio) (any such amount, a "Fixed Amount") substantially concurrently with any amount incurred or transaction entered into (or consummated) in reliance on a provision of this Agreement (including Section 6.01(x), as it relates to the incurrence of any "incurrence-based" or similar amount available under any ABL Facility) that requires compliance with a financial ratio or test (including, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and/or any Interest Coverage Ratio) (any such amount, an "Incurrence-Based Amount"), it is understood and agreed that any Fixed Amount shall be disregarded in the calculation of the financial ratio or test applicable to the relevant Incurrence-Based Amount.

(d)        The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Top Borrower dated such date prepared in accordance with GAAP.

(e)        The increase in any amount secured by any Lien by virtue of the accrual of interest, the accretion of accreted value, the payment of interest or a dividend in the form of additional Indebtedness, amortization of original issue discount and/or any increase in the amount of Indebtedness outstanding solely as a result of any fluctuation in the exchange rate of any applicable currency will not be deemed to be the granting of a Lien for purposes of Section 6.02.

Section 1.11.    Guarantees and Collateral.  Notwithstanding any provision of any Loan Document to the contrary:

(a)        For purposes of any determination relating to the Term Loan Priority Collateral as to which the Administrative Agent is granted discretion hereunder or under any other Loan Document (including any determination with respect to any waiver or extension or any opportunity to request that is permitted or required under the definition of "Collateral and Guarantee Requirement," under this Agreement or under any other Loan Document), the Administrative Agent shall be deemed to have agreed and accepted any determination in respect thereof by the Applicable Administrative Agent; it being understood and agreed

60

that as of the Closing Date, the Administrative Agent is the Applicable Administrative Agent with respect to the Term Loan Priority Collateral; and

(b)      For purposes of any determination relating to the ABL Priority Collateral as to which the Administrative Agent is granted discretion hereunder or under any other Loan Document (including any determination with respect to any waiver or extension or any opportunity to request that is permitted or required under the definition of "Collateral and Guarantee Requirement," under this Agreement or under any other Loan Document), the Administrative Agent shall be deemed to have agreed and accepted any determination in respect thereof by the Applicable Administrative Agent.

Section 1.12.    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under the Delaware Limited Liability Company Act (each, an "LLC Division"): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Capital Stock at such time.

ARTICLE 2

THE CREDITS

Section 2.01.    Commitments.

(a)      Subject to the terms and conditions herein set forth, to give effect to the refinancing and conversion of the obligations under the Pre-Petition Credit Agreement into the term loans owing to each Initial Term Lender hereunder, each Initial Term Lender severally agrees to make the Initial Term Loans to the Borrowers hereunder and such Initial Term Loans shall be deemed to have been made hereunder to the Borrowers, on the Closing Date, in a single term loan borrowing in a principal amount equal to such Lender's Initial Term Loan Commitment on the Closing Date, and the obligations owing to the Initial Term Lenders under the Pre-Petition Credit Agreement shall be substituted with and exchanged for (and reevidenced and refinanced by) such Initial Term Loans hereunder.  The Initial Term Loans deemed made or issued pursuant to this Section 2.01 shall be deemed made on a cashless basis without any actual funding. Upon the effectiveness of this Agreement, all Initial Term Loan Commitments of the Initial Term Lenders shall be deemed fully-funded and Initial Term Loan Commitments shall be deemed to be reduced to $0 and interest shall begin to accrue on the full amount thereof as of such date.  As of the Closing Date, all Loans shall be SOFR Rate Loans with an Interest Period of [●].  Amounts paid or prepaid in respect of the Initial Term Loans may not be reborrowed.

(b)      Subject to the terms and conditions set forth herein and any Incremental Facility Agreement, each Lender with an Incremental Commitment, severally and not jointly, agrees to make Incremental Loans to the Borrowers, which Loans shall not exceed for any such Lender at the time of any incurrence thereof the Incremental Commitment of such Lender as set forth in the applicable Incremental Facility Agreement.

Section 2.02.    Loans and Borrowings.

(a)      Each Loan shall be made by the Lenders ratably in accordance with their respective Commitments.

(b)      Subject to Section 2.14, each Borrowing shall be comprised entirely of ABR Loans or Term SOFR Rate Loans as the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may

request in accordance herewith.  Each Lender at its option may make any Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

Section 2.03.    Requests for Borrowings.  Each Term Loan Borrowing, each conversion of Loans from one Type to the other, and each continuation of Term SOFR Rate Loans shall be made upon irrevocable notice by the Top Borrower on behalf of the Borrowers to the Administrative Agent.  Each such notice must be in the form of a written Borrowing Request, appropriately completed and signed by a Responsible Officer of the Top Borrower on behalf of the Borrowers or by telephone (and promptly confirmed by delivery of a written Borrowing Request, appropriately completed and signed by a Responsible Officer of the Top Borrower on behalf of the Borrowers) and must be received by the Administrative Agent (by hand delivery, fax or other electronic transmission (including ".pdf" or ".tif")) not later than (i) 1:00 p.m. three Business Days prior to the requested day of any Borrowing, conversion or continuation. If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be a Term SOFR Rate Borrowing.  If no Interest Period is specified with respect to any requested Term SOFR Rate Borrowing, then the relevant Borrower shall be deemed to have selected an Interest Period of one month's duration.  The Administrative Agent shall advise each Lender of the details and amount of any Loan to be made as part of the relevant requested Borrowing no later than one Business Day following receipt of a Borrowing Request in accordance with this Section.

Section 2.04.    [Reserved].

Section 2.05.    [Reserved].

Section 2.06.    [Reserved].

Section 2.07.    Funding of Borrowings.

(a)    Other than with respect to the Initial Term Loans, each Lender shall make each Loan to be made by it hereunder not later than 1:00 p.m. on the Business Day specified in the applicable Borrowing Request in accordance with Section 2.03 by wire transfer of immediately available funds to the account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders in an amount equal to such Lender's respective Applicable Percentage.  The Administrative Agent will make such Loans available to the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) by promptly crediting the amounts so received on the same Business Day, in like funds, to the account designated in the relevant Borrowing Request or as otherwise directed by the Top Borrower (provided, that such account must be approved by the Administrative Agent as an account to be used for funding of Loan proceeds).

(b)    Unless the Administrative Agent has received notice from any Lender that such Lender will not make available to the Administrative Agent such Lender's share of any Borrowing prior to the proposed date of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with paragraph (a) of this Section and may, in reliance upon such assumption, make available to the relevant Borrower (or the Top Borrower as agent for the relevant Borrower) a corresponding amount.  In such event, if any Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand (without duplication) such corresponding amount with interest thereon, for each day from and including the date such amount is made available to the relevant Borrower to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Effective Rate and a rate determined by the

Administrative Agent in accordance with banking industry rules on interbank compensation or (ii) in the case of any Borrower, the interest rate applicable to Loans comprising such Borrowing at such time.  If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Loan included in such Borrowing and the obligation of the relevant Borrower to repay the Administrative Agent such corresponding amount pursuant to this Section 2.07(b) shall cease.  If any Borrower pays such amount to the Administrative Agent, the amount so paid shall constitute a repayment of such Borrowing by such amount.  Nothing herein shall be deemed to relieve any Lender from its obligation to fulfill its Commitment or to prejudice any rights which the Administrative Agent or the Top Borrower or any other Loan Party may have against any Lender as a result of any default by such Lender hereunder.

Section 2.08.    Type; Interest Elections.

(a)    The Loans comprising each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a SOFR Rate Term Loan Borrowing, shall have the Interest Period specified in such Borrowing Request.  Thereafter, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may elect to convert such Borrowing to a Borrowing of a different Type or to continue such Borrowing as a Borrowing of the same Type and, in the case of a SOFR Rate Term Loan Borrowing, may elect the Interest Period therefor, all as provided in this Section.  The relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)    Each such election pursuant to this Section shall be made upon the relevant Borrower's (or the Top Borrower's on behalf of the relevant Borrower's) irrevocable notice to the Administrative Agent.  Each such notice shall be in the form of a written Interest Election Request, appropriately completed and signed by a Responsible Officer of the Borrower, or may be given by telephone to the Administrative Agent (if promptly confirmed in writing by delivery of such a written Interest Election Request consistent with such telephonic notice) and must be received by the Administrative Agent not later than the time that a Borrowing Request would be required under Section 2.03 if the Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election.

(c)    The Administrative Agent shall advise each applicable Lender of the details of an Interest Election Request and such Lender's portion of such resulting Borrowing no less than one Business Day before the effective date of the election made pursuant to such Interest Election Request.

(d)    If the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) fails to deliver a timely and complete Interest Election Request with respect to a SOFR Rate Term Loan Borrowing prior to the end of the Interest Period therefor, then, unless such SOFR Rate Term Loan Borrowing is repaid as provided herein, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall be deemed to have selected that such SOFR Rate Term Loan Borrowing shall automatically be converted to a SOFR Rate Term Loan Borrowing at the end of such Interest Period, with an Interest Period of one month.  Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower), then, so long as such Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Rate Term Loan Borrowing and (ii) unless repaid as provided herein, each SOFR Rate Term Loan Borrowing shall automatically be converted to an ABR Borrowing at the end of the Interest Period therefor.

WEIL:\99124112\10\40416.0005

Section 2.09.    Termination of Commitments.  Unless previously terminated, (i) the Initial Term Loan Commitments shall automatically terminate upon the making of the Initial Term Loans on the Closing Date and (ii) the Incremental Loans shall automatically terminate upon the making of the Incremental Loans and, if any such Incremental Commitment is not drawn on the date that such Incremental Commitment is required to be drawn pursuant to the applicable Incremental Facility Agreement, the undrawn amount thereof shall automatically terminate.

Section 2.10.    Repayment of Loans; Evidence of Debt.

(a)    (i) (x) The Borrowers hereby jointly and severally unconditionally promise to repay in Dollars the outstanding principal amount of the Initial Term Loans to the Administrative Agent for the account of each applicable Lender (i) commencing January 1, 2025, on the first Business Day of each January, April, July and October prior to the Maturity Date (each such date being referred to as a "Loan Installment Date"), in each case in an amount equal to 0.25% of the original principal amount of each of the Loans (as such payment may be reduced from time to time as a result of the application of prepayments in accordance with Section 2.11), and (y) on the Maturity Date, in an amount equal to the remainder of the principal amount of each of the Initial Term Loans outstanding on such date, together in each case with accrued and unpaid interest on the principal amount to be paid to but excluding the date of such payment.

(ii)    The Borrowers, jointly and severally, shall repay the Incremental Loans in such scheduled amortization installments and on such date or dates as shall be specified therefor in the applicable Incremental Facility Agreement (as such payments may be reduced from time to time as a result of the application of prepayments in accordance with Section 2.11 or increased as a result of any increase in the amount of such Incremental Loans pursuant to Section 2.22(a)).

(b)    [Reserved].

(c)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)    The Administrative Agent shall maintain a loan account for the Borrowers reflecting all outstanding Loans, along with interest accrued thereon and such other items reflected therein (the "Loan Account"), and shall provide the Top Borrower with a monthly accounting reflecting the activity in the Loan Account, viewable by the Top Borrower on the Platform.  Each accounting shall be deemed correct, accurate and binding on the Borrowers and an account stated (except for reverses and reapplications of payments made and corrections of errors discovered by the Administrative Agent), unless the Top Borrower notifies the Administrative Agent in writing to the contrary within thirty days after such account is rendered, describing the nature of any alleged errors or omissions.  However, the Administrative Agent's failure to maintain the Loan Account or to provide any such accounting shall not affect the legality or binding nature of any of the Obligations.  Interest, fees and other monetary Obligations due and owing under this Agreement may, in the Administrative Agent's discretion, be charged to the Loan Account, and will thereafter be deemed to be Loans and will bear interest at the same rate as other Loans.

(e)    The entries made in the accounts and Loan Account maintained pursuant to paragraphs (c) or (d) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein (absent manifest error); provided that the failure of any Lender or the Administrative Agent to maintain such accounts or Loan Account or any manifest error therein shall not in any manner affect the obligation of any Borrower to repay the Loans in accordance with the terms of this Agreement; provided,

64

further, that in the event of any inconsistency between the Loan Account maintained by the Administrative Agent pursuant to paragraph (d) of this Section and any Lender's accounts, the Loan Account shall govern.

(f)        Any Lender may request that any Loan made by it be evidenced by a Promissory Note.  In such event, the relevant Borrower shall prepare, execute and deliver a Promissory Note to such Lender payable to such Lender and its registered permitted assigns; it being understood and agreed that such Lender (and/or its applicable permitted assign) shall be required to return such Promissory Note to the Top Borrower in accordance with Section 9.05(b)(iii) and upon the occurrence of the Termination Date (or as promptly thereafter as practicable).  If any Lender loses the original copy of its Promissory Note, it shall execute an affidavit of loss containing an indemnification provision reasonably satisfactory to the Top Borrower.

Section 2.11.        Prepayment of Loans.

(a)        Optional Prepayments.

(i)        Upon prior notice in accordance with paragraph (a)(ii) of this Section 2.11, any Borrower (or the Top Borrower on behalf of any Borrower) shall have the right at any time and from time to time to prepay any Borrowing of Loans of any Class in whole or in part (but subject, to Section 2.12(c)).  Each such prepayment shall be paid to the Lenders in accordance with Section 2.18(b).

(ii)        The relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall notify the Administrative Agent in writing of any prepayment under this Section 2.11(a) not later than 11:00 a.m. on the day of prepayment (or such later time as to which the Administrative Agent may agree).  Each such notice shall be irrevocable (except as set forth in the proviso to this sentence) and shall specify the prepayment date and the principal amount of each Borrowing or portion of each relevant Class to be prepaid; provided that any notice of prepayment delivered by the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may be conditioned upon the effectiveness of other transactions, in which case such notice may be revoked by the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Promptly following receipt of any such notice relating to any Borrowing, the Administrative Agent shall advise the applicable Lenders of the contents thereof.   Each partial prepayment of any Borrowing shall be in an amount at least equal to the amount that would be permitted in the case of a Borrowing of the same Type and Class as provided in Section 2.02(c), or such lesser amount that is then outstanding with respect to such Borrowing being repaid (and in increments of $100,000 in excess thereof or such lesser incremental amount that is then outstanding with respect to such Borrowing being repaid). Each prepayment of Loans shall be applied to the Class or Classes of Term Loans specified in the applicable prepayment notice, and each prepayment of Term Loans of such Class or Classes made pursuant to this Section 2.11(a) shall be applied against the remaining scheduled installments of principal due in respect of the Loans of such Class or Classes in the manner specified by the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) or, in the absence of any such specification on or prior to the date of the relevant optional prepayment, in direct order of maturity.

(b)        Mandatory Prepayments.

(i)        No later than the fifth Business Day after the date on which the financial statements with respect to each Fiscal Year of the Top Borrower are required to be delivered pursuant to Section 5.01(b), commencing with the Fiscal Year ending on or about December 31, 2024, the Top

Borrower shall prepay the outstanding principal amount of Initial Term Loans and Incremental Loans then subject to ratable prepayment requirements in accordance with Section 2.18(b) in an aggregate principal amount (the "ECF Prepayment Amount") equal to (A) the Required Excess Cash Flow Percentage of Excess Cash Flow of the Top Borrower and its Restricted Subsidiaries for the Excess Cash Flow Period then ended, minus (B) at the option of the Top Borrower, (x) the aggregate principal amount of any Loans prepaid pursuant to Section 2.11(a) prior to such date, (y) the aggregate principal amount of any Revolving Loans (as defined in the ABL Credit Agreement) prepaid pursuant to Section 2.11(a) of the ABL Credit Agreement (or equivalent provision under any other document governing any ABL Facility) prior to such date (to the extent accompanied by a permanent reduction in the relevant commitment); provided that no prepayment under this Section 2.11(b) shall be required unless and to the extent the amount thereof would exceed $15,000,000.

(ii)     [Subject to Section 2.11(b)(vi), no later than the fifth Business Day following the receipt of Net Proceeds in respect of any Prepayment Asset Sale or Net Insurance/Condemnation Proceeds (excluding, for the avoidance of doubt Prepayment Asset Sale or Net Insurance/Condemnation Proceeds (i) constituting ABL Priority Collateral or (ii) received in connection with the any Disposition listed on Schedule 6.07), the Top Borrower shall apply an amount equal to one hundred percent (100%) of the Net Proceeds or Net Insurance/Condemnation Proceeds received with respect thereto (collectively, the "Subject Proceeds") to prepay the outstanding principal amount of Loans then subject to ratable prepayment requirements in accordance with Section 2.18(b); provided that (A) if prior to the date any such prepayment is required to be made, the Top Borrower notifies the Administrative Agent of its intention to reinvest the Subject Proceeds in the business of the Top Borrower or any of its subsidiaries, then the Top Borrower shall not be required to make a mandatory prepayment under this clause (ii) in respect of the Subject Proceeds to the extent (x) the Subject Proceeds are so reinvested within 365 days following receipt thereof, or (y) the Top Borrower or any of its subsidiaries has committed to so reinvest the Subject Proceeds during such 365-day period and the Subject Proceeds are so reinvested within 180 days after the expiration of such 365 day period; it being understood that if the Subject Proceeds have not been so reinvested prior to the expiration of the applicable period, the Top Borrower shall promptly prepay the Loans with the amount of Subject Proceeds not so reinvested as set forth above (without regard to the immediately preceding proviso); and provided further that, (x) no such prepayment shall be required with Net Proceeds realized in a single transaction or series of related transactions unless such Net Proceeds exceed $5,000,000 (and only Net Proceeds in excess of such amount shall be required to be applied pursuant to this clause (ii)) and (y) no such prepayment shall be required until the aggregate amount of such Net Proceeds in any fiscal year shall exceed $15,000,000 (and only Net Proceeds in excess of such amount shall be required to be applied pursuant to this clause (ii)).]

(iii)     Subject to Section 2.11(b)(vi), in the event that the Top Borrower or any of its Restricted Subsidiaries receives Net Proceeds from the issuance or incurrence of Indebtedness by the Top Borrower or any of its Restricted Subsidiaries (other than Indebtedness that is permitted to be incurred under Section 6.01), the Top Borrower shall, promptly upon (and in any event not later than two Business Days thereafter) the receipt thereof of such Net Proceeds by the Top Borrower or its applicable Restricted Subsidiary, apply an amount equal to 100% of such Net Proceeds to prepay the outstanding principal amount of the Loans in accordance with Section 2.18(b).

(iv)     Notwithstanding anything in this Section 2.11(b) to the contrary:

(A)     the Borrowers shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Sections 2.11(b)(i) or (ii) above to the extent that if the Top Borrower determines in good faith the relevant Excess Cash Flow is

generated by any Foreign Subsidiary, the relevant Prepayment Asset Sale is consummated by any Foreign Subsidiary or the relevant Net Insurance/Condemnation Proceeds are received by any Foreign Subsidiary, as the case may be, for so long as the repatriation to the Borrowers of any such amount would be, in the good faith determination of the Top Borrower, prohibited or delayed under any Requirement of Law or conflict with the fiduciary duties of such Foreign Subsidiary's directors, or result in, or could reasonably be expected to result in, a material risk of personal or criminal liability for any officer, director, employee, manager, member of management or consultant of such Foreign Subsidiary (it being understood and agreed that (i) solely within 365 days following the end of the applicable Excess Cash Flow Period or the event giving rise to the relevant Subject Proceeds, the Borrowers shall take all commercially reasonable actions required by applicable Requirements of Law to permit such repatriation and (ii) if the repatriation of the relevant affected Excess Cash Flow or Subject Proceeds, as the case may be, is permitted under the applicable Requirement of Law and, to the extent applicable, would no longer conflict with the fiduciary duties of such director, or result in, or be reasonably expected to result in, a material risk of personal or criminal liability for the Persons described above, in either case, within 365 days following the end of the applicable Excess Cash Flow Period or the event giving rise to the relevant Subject Proceeds, the relevant Foreign Subsidiary will promptly repatriate the relevant Excess Cash Flow or Subject Proceeds, as the case may be, and the repatriated Excess Cash Flow or Subject Proceeds, as the case may be, will be promptly (and in any event not later than two Business Days after such repatriation) applied (net of additional Taxes payable or reserved against such Excess Cash Flow or such Subject Proceeds as a result thereof) to the repayment of the Loans pursuant to this Section 2.11(b) to the extent required herein (without regard to this clause (iv))),

(B)     the Borrowers shall not be required to prepay any amount that would otherwise be required to be paid pursuant to Sections 2.11(b)(i) or (ii) to the extent that the relevant Excess Cash Flow is generated by any joint venture or the relevant Subject Proceeds are received by any joint venture, in each case, for so long as the distribution to the Top Borrower of such Excess Cash Flow or Subject Proceeds would, in the good faith determination of the Top Borrower, be prohibited under the Organizational Documents governing such joint venture; it being understood that if the relevant prohibition ceases to exist within the 365-day period following the end of the applicable Excess Cash Flow Period or the event giving rise to the relevant Subject Proceeds, the relevant joint venture will promptly distribute the relevant Excess Cash Flow or the relevant Subject Proceeds, as the case may be, and the distributed Excess Cash Flow or Subject Proceeds, as the case may be, will be promptly (and in any event not later than two Business Days after such distribution) applied to the repayment of the Loans pursuant to this Section 2.11(b) to the extent required herein (without regard to this clause (iv)), and

(C)     if the Top Borrower determines in good faith that the repatriation (or other intercompany distribution) to the Top Borrower, directly or indirectly, from a Foreign Subsidiary as a distribution or dividend of any amounts required to mandatorily prepay the Loans pursuant to Sections 2.11(b)(i) or (ii) above would result in the Top Borrower or any Restricted Subsidiary incurring a material and adverse Tax liability (including any withholding Tax) (such amount, a "Restricted Amount"), the amount that the Borrowers shall be required to mandatorily prepay pursuant to Sections 2.11(b)(i) or (ii) above, as applicable, shall be reduced by the Restricted Amount; provided that to the extent that the repatriation (or other intercompany distribution) of the relevant Subject Proceeds or Excess Cash Flow, directly or indirectly, from the relevant Foreign Subsidiary would no longer

67

have a material adverse tax consequence within the 365-day period following the event giving rise to the relevant Subject Proceeds or the end of the applicable Excess Cash Flow Period, as the case may be, an amount equal to the Subject Proceeds or Excess Cash Flow, as applicable, and to the extent available, not previously applied pursuant to this clause (C), shall be promptly applied to the repayment of the Loans pursuant to Section 2.11(b) as otherwise required above;

(v)     Any Lender may elect, by notice to the Administrative Agent at or prior to the time and in the manner specified by the Administrative Agent, prior to any prepayment of Loans required to be made by the Borrowers pursuant to this Section 2.11(b), to decline all (but not a portion) of its Applicable Percentage of such prepayment (such declined amounts, the "Declined Proceeds"), in which case such Declined Proceeds shall be retained by the Borrowers.  If any Lender fails to deliver a notice to the Administrative Agent of its election to decline receipt of its Applicable Percentage of any mandatory prepayment within the time frame specified by the Administrative Agent, such failure will be deemed to constitute an acceptance of such Lender's Applicable Percentage of the total amount of such mandatory prepayment of Loans.

(vi)     Except as otherwise contemplated by this Agreement, each prepayment of Loans pursuant to Section 2.11(b) shall be applied to the Loans.  All accepted prepayments under this Section 2.11(b) shall be applied against the remaining scheduled installments of principal due in respect of such Term Loans as directed by the Top Borrower (or, in the absence of direction from the Top Borrower, to the remaining scheduled amortization payments in respect of such Loans in direct order of maturity), and each such prepayment shall be paid to the Lenders in accordance with their respective Applicable Percentage.

(vii)     Prepayments made under this Section 2.11(b) shall be (A) accompanied by accrued interest as required by Section 2.13 and (B) the Prepayment Premium required pursuant to Section 2.12(c).

Section 2.12.     Fees.

(a)     [The Top Borrower agrees to pay to the Administrative Agent, for its own account, the fee described in the [Agent Fee Letter].]

(b)     [Reserved].

(c)     In the event that, on or prior to the date that is two (2) years after the Closing Date, the Top Borrower prepays (other than any such Initial Term Loans prepaid pursuant to Sections 2.11(b)(i) and (b)(ii)), repays, refinances, substitutes or replaces any Initial Term Loans or any such Initial Term Loans otherwise becomes due for any reason (including the acceleration of such Initial Term Loans by operation of law or any automatic acceleration pursuant to the terms of this Agreement), the relevant Borrower (or the Top Borrower on the relevant Borrower's behalf) shall pay to the Administrative Agent, for the ratable account of each of the applicable Lenders, the Prepayment Premium on the aggregate principal amount of such Initial Term Loans.  Such Prepayment Premium shall be due and payable on the date of effectiveness of such prepayment, repayment, refinancing, substitution or replacement.

(d)     [Reserved].

(e)     [Reserved].

(f)     [Reserved].

(g)     [Reserved].

(h)     General.  All fees payable hereunder shall be paid on the dates due, in Dollars and in immediately available funds, to the Administrative Agent.  Fees payable hereunder shall accrue through and including the last day of the month immediately preceding the applicable fee payment date.

(i)     Computation.  Unless otherwise indicated herein, all computations of fees shall be made on the basis of a 360-day year and shall be payable for the actual days elapsed (including the first day but excluding the last day).  The determination by the Administrative Agent of the amount of any fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

Section 2.13.     Interest.

(a)     Interest Rate.

(i)     The Loans comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Rate.

(ii)     The Loans comprising each Term SOFR Rate Borrowing shall bear interest at Adjusted Term SOFR plus the Applicable Rate.

(b)     [Reserved].

(c)     Default Rate. Notwithstanding the foregoing but in all cases subject to Section 9.05(f), if an Event of Default has occurred and is continuing, at the election of the Administrative Agent or the direction of the Required Lenders, any overdue Obligations shall bear interest, to the fullest extent permitted by applicable Requirements of Law, after as well as before judgment, at a rate per annum equal to (i) in the case of principal or interest of any Term Loan, 2.00% plus the rate otherwise applicable to such Loan [or (ii) in the case of any other overdue amount, 2.00% plus the rate applicable to Loans that are ABR Loans]; provided that no amount shall accrue pursuant to this Section 2.13(c) on any amount, reimbursement obligation in respect of any amount that is payable to any Defaulting Lender so long as such Lender is a Defaulting Lender.

(d)     Interest Payment Dates. Accrued interest on each Loan shall be payable in arrears (i) on each Interest Payment Date and (ii) on the Maturity Date; provided that (A) interest accrued pursuant to paragraph (d) of this Section shall be payable on demand and (B) in the event of any repayment or prepayment of any Loan or accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment.

(e)     Computation. All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the "prime rate" shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day).  The applicable Alternate Base Rate or Term SOFR Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.  Interest shall accrue on each Loan for the day on which the Loan is made and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall bear interest for one day.

(f)     Term SOFR Conforming Changes. In connection with the use or administration of the Term SOFR Rate, the Administrative Agent will have the right to make Conforming Changes from time to

time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.  The Administrative Agent will promptly notify the Top Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of the Term SOFR Rate.

(g)      Rates. The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR, the Term SOFR Rate or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative, successor or replacement rate thereto (including any then-current Benchmark or any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement), as it may or may not be adjusted pursuant to Section 2.14, will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Adjusted Term SOFR, the Term SOFR Rate or any other Benchmark, prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes.  The Administrative Agent and its affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Adjusted Term SOFR, the Term SOFR Rate, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto and such transactions may be adverse to a Borrower.  The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Adjusted Term SOFR or the Term SOFR Rate, or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

Section 2.14.      Alternate Rate of Interest.

(a)      Inability to Determine Rate, Etc. Subject to Section 2.14(b), if:

(i)      the Administrative Agent determines (which determination shall be conclusive absent manifest error) that, by reason of circumstances affecting the interbank market or otherwise, adequate and reasonable means do not exist for ascertaining Adjusted Term SOFR or the Term SOFR Rate (including because the Term SOFR Reference Rate is not available or published on a current basis); or

(ii)      the Administrative Agent is advised by the Required Lenders that Adjusted Term SOFR will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan);

then the Administrative Agent shall give notice thereof to the Top Borrower and the Lenders as promptly as practicable thereafter and, so long as such circumstances shall continue, (x) the Administrative Agent and the Lenders shall be under no obligation to make any Term SOFR Rate Loans [and (y) on the last day of the current calendar month, each Term SOFR Rate Loan shall, unless repaid in full, automatically convert to an ABR Loan.

(b)      Benchmark Replacement Setting.

(i)      Benchmark Replacement.  Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Top Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Top Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.14(b) will occur prior to the applicable Benchmark Transition Start Date.

(ii)      Benchmark Replacement Conforming Changes.  In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)      Notices; Standards for Decisions and Determinations.  The Administrative Agent will promptly notify the Top Borrower and the Lenders of (A) the implementation of any Benchmark Replacement and (B) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement.  The Administrative Agent will promptly notify the Top Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.14(b)(iv).  Any determination, decision or election that may be made by the Administrative Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.14(b), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.14(b).

(iv)      Unavailability of Tenor of Benchmark.  Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (2) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks, then the Administrative Agent may modify the definition of "Term SOFR Rate" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks for a Benchmark (including a Benchmark Replacement), then the Administrative

71

Agent may modify the definition of "Term SOFR Rate" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

        (v)    <u>Benchmark Unavailability Period</u>.  Upon the Top Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (A) the Top Borrower may revoke any pending request for a Borrowing of Term SOFR Rate Loans to be made during any Benchmark Unavailability Period and, failing that, the Top Borrower will be deemed to have converted any such request into a request for a borrowing of ABR Loans and (B) any outstanding affected Term SOFR Rate Loans will be deemed to have been converted to ABR Loans at the end of the applicable calendar month.  During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an available tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

Section 2.15.    <u>Increased Costs</u>.

(a)    If any Change in Law:

        (i)    imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender (except any such reserve requirement reflected in the Term SOFR Rate);

        (ii)    subjects any Lender to any Taxes (other than (A) Indemnified Taxes and Other Taxes indemnifiable under <u>Section 2.17</u> and (B) Excluded Taxes) on or with respect to its loans, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

        (iii)    imposes on any Lender any other condition (other than Taxes) affecting this Agreement or Term SOFR Rate Loans made by any Lender;

and the result of any of the foregoing is to increase the cost to the relevant Lender of making or maintaining any Term SOFR Rate Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender (whether of principal, interest or otherwise) in respect of any Term SOFR Rate Loan in an amount deemed by such Lender to be material, then, within 30 days after the Top Borrower's receipt of the certificate contemplated by <u>paragraph (c)</u> of this Section, the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered; <u>provided</u> that the Borrowers shall not be liable for such compensation if (x) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto, (y) such Lender invokes <u>Section 2.20</u> or (z) in the case of any request for reimbursement under <u>clause (iii)</u> above resulting from a market disruption, (A) the relevant circumstances do not generally affect the banking market or (B) the applicable request has not been made by Lenders constituting Required Lenders.

        (b)    If any Lender determines that any Change in Law regarding liquidity or capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law other than due to Taxes (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then within 30 days of receipt by the Top Borrower of the certificate contemplated by <u>paragraph (c)</u> of this <u>Section 2.15</u>

the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     Any Lender requesting compensation under this <u>Section 2.15</u> shall be required to deliver a certificate to the Top Borrower that (i) sets forth the amount or amounts necessary to compensate such Lender or the holding company thereof as specified in <u>paragraph (a)</u> of this <u>Section 2.15</u>, (ii) sets forth, in reasonable detail, the manner in which such amount or amounts were determined and (iii) certifies that such Lender is generally charging such amounts to similarly situated borrowers, which certificate shall be conclusive absent manifest error.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; <u>provided</u>, <u>however</u> that the Borrowers shall not be required to compensate any Lender pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; <u>provided</u>, <u>further</u>, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16.     [Reserved].

Section 2.17.     <u>Taxes</u>.

(a)     Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Requirements of Law.  If any applicable Requirement of Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment, then (i) if such Tax is an Indemnified Tax and/or Other Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or withholdings have been made (including deductions or withholdings applicable to additional sums payable under this <u>Section 2.17</u>) each Lender (or, in the case of any payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions or withholdings and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)     The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     The Borrowers shall jointly and severally indemnify the Administrative Agent and each Lender within 30 days after receipt of the certificate described in the succeeding sentence, for the full amount of any Indemnified Taxes or Other Taxes payable or paid by the Administrative Agent or such Lender, as applicable (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.17</u>), other than any penalties determined by a final and non-appealable judgment of a court of competent jurisdiction (or documented in any settlement agreement) to have resulted from the gross negligence, bad faith or willful misconduct of the Administrative Agent or such Lender, and, in each case, any reasonable expenses arising therefrom or with respect thereto, whether or not correctly or legally imposed or asserted; <u>provided</u> that if the Top Borrower reasonably believes that such Taxes were not correctly or legally asserted, the Administrative Agent or such Lender, as applicable,

73

will use reasonable efforts to cooperate with the Top Borrower to obtain a refund of such Taxes (which shall be repaid to the Top Borrower in accordance with <u>Section 2.17(g)</u>) so long as such efforts would not, in the sole determination of the Administrative Agent or such Lender, result in any additional out-of-pocket costs or expenses not reimbursed by such Loan Party or be otherwise materially disadvantageous to the Administrative Agent or such Lender, as applicable.  In connection with any request for reimbursement under this <u>Section 2.17(c)</u>, the relevant Lender or the Administrative Agent, as applicable, shall deliver a certificate to the Top Borrower setting forth, in reasonable detail, the basis and calculation of the amount of the relevant payment or liability.  Notwithstanding anything to the contrary contained in this <u>Section 2.17</u>, no Borrower shall be required to indemnify the Administrative Agent or any Lender pursuant to this <u>Section 2.17</u> for any amount to the extent the Administrative Agent or such Lender fails to notify the Top Borrower of such possible indemnification claim within 180 days after the Administrative Agent or such Lender receives written notice from the applicable taxing authority of the specific tax assessment giving rise to such indemnification claim.

(d)     [Reserved].

(e)     As soon as practicable after any payment of any Taxes pursuant to this <u>Section 2.17</u> by any Loan Party to a Governmental Authority, the Top Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued, if any, by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment that is reasonably satisfactory to the Administrative Agent.

(f)     <u>Status of Lenders</u>.

(i)     Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments made under any Loan Document shall deliver to the Top Borrower and the Administrative Agent, at the time or times reasonably requested by the Top Borrower or the Administrative Agent, such properly completed and executed documentation as the Top Borrower or the Administrative Agent may reasonably request to permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by the Top Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Top Borrower or the Administrative Agent as will enable the Top Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (A), (B) and (D) of <u>Section 2.17(f)(ii)</u>) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Each Lender hereby authorizes the Administrative Agent to deliver to the Top Borrower and to any successor Administrative Agent any documentation provided to the Administrative Agent pursuant to this <u>Section 2.17(f)</u>.

(ii)     Without limiting the generality of the foregoing,

(A)     each U.S. Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), two executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding;

(B)      each Foreign Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of any Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party, two executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable, establishing any available exemption from, or reduction of, U.S. federal withholding Tax;

(2)      two executed copies of IRS Form W-8ECI or W-EXP (or any successor forms);

(3)      in the case of any Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the Code, (x) two executed copies of a certificate substantially in the form of Exhibit O-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Top Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments payable to such Lender are effectively connected with the conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) two executed copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor forms); or

(4)      to the extent any Foreign Lender is not the beneficial owner (*e.g.*, where the Foreign Lender is a partnership), two executed copies of IRS Form W-8IMY (or any successor forms), accompanied by IRS Form W-8ECI, IRS Form W-8EXP, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit O-2 or Exhibit O-4, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if such Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit O-3 on behalf of each such direct or indirect partner(s);

(C)      each Foreign Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), two executed copies of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Top Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the

Top Borrower and the Administrative Agent at the time or times prescribed by applicable Requirements of Law and at such time or times reasonably requested by the Top Borrower or the Administrative Agent such documentation as is prescribed by applicable Requirements of Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and may be necessary for the Top Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

For the avoidance of doubt, if a Lender is an entity disregarded from its owner for U.S. federal income tax purposes, references to the foregoing documentation are intended to refer to documentation with respect to such Lender's owner and, as applicable, such Lender.

Each Lender agrees that if any documentation (including any specific documentation required above in this Section 2.17(f)) it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall deliver to the Top Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Top Borrower or the Administrative Agent) or promptly notify the Top Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

Notwithstanding anything to the contrary in this Section 2.17(f), no Lender shall be required to provide any documentation that such Lender is not legally eligible to deliver.

(g)     If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Borrower or with respect to which any Borrower has paid additional amounts pursuant to this Section 2.17, it shall pay over such refund to the Top Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the relevant Borrower under this Section 2.17 with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); provided that the Top Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or any Lender be required to pay any amount to the Top Borrower pursuant to this paragraph (g) to the extent that the payment thereof would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the position that the Administrative Agent or such Lender would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.17 shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the relevant Loan Party or any other Person.

(h)     Survival. Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, any Lender, the termination of the Commitments, and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)     [Reserved].

(j)        On or before the Closing Date, the Administrative Agent shall confirm to the Top Borrower that whichever of the following is applicable has previously been provided to the Top Borrower and has not expired or become obsolete or invalid: (i) if the Administrative Agent is a United States person (as defined in Section 7701(a)(30) of the Code), two executed copies of IRS Form W-9 certifying that such Administrative Agent is exempt from US federal backup withholding or (ii) if the Administrative Agent is not a United States person (as defined in Section 7701(a)(30) of the Code), (A) with respect to payments received for its own account, two executed copies of IRS Form W-8ECI and (B) with respect to payments received on account of any Lender, two executed copies of IRS Form W-8IMY (together with all required accompanying documentation) certifying that the Administrative Agent is a U.S. branch and may be treated as a United States person for purposes of applicable U.S. federal withholding Tax. At any time thereafter, the Administrative Agent shall provide updated documentation previously provided (or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Top Borrower.

Section 2.18.        Payments Generally; Allocation of Proceeds; Sharing of Payments.

(a)        Unless otherwise specified, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall make each payment required to be made by it hereunder (whether of principal, interest or fees or of amounts payable under Section 2.15 or 2.17, or otherwise) prior to 2:00 p.m. on the date when due, in immediately available funds, without set-off or counterclaim.  Any amount received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  Each such payment shall be made to the Administrative Agent to the applicable account designated by the Administrative Agent to the Top Borrower, except that any payment made pursuant to Sections 2.05(e)(i), 2.15, 2.17 or 9.03 shall be made directly to the Person or Persons entitled thereto.  The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof.  Except as provided in Sections 2.19(b) and 2.20, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest in respect of the Loans of a given Class and each conversion of any Borrowing to, or continuation of any Borrowing as, a Borrowing of any Type (and of the same Class) shall be allocated pro rata among the Lenders in accordance with their respective Applicable Percentages of the applicable Class.  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole Dollar amount.  All payments hereunder shall be made in Dollars.  Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)        Subject in all respects to the provisions of the ABL Intercreditor Agreement and Section 5.13(g), all proceeds of Collateral and any proceeds realized with respect to guarantees by any Loan Party received by the Administrative Agent while an Event of Default exists and all or any portion of the Loans have been accelerated hereunder pursuant to Section 7.01, shall be applied: *first*, to the payment of all costs and expenses then due incurred by the Administrative Agent in connection with any collection, sale or realization on Collateral or otherwise in connection with this Agreement and any other Loan Document, *second*, on a pro rata basis, to pay any fees, indemnities, or expense reimbursements then due to the Administrative Agent from the Borrowers constituting Secured Obligations, *third*, on a pro rata basis, to pay any fees or expense reimbursements then due to the Lenders from the Borrowers constituting Secured Obligations, *fourth*, to pay interest due and payable in respect of any Loan, on a pro rata basis, *fifth*, to prepay principal on the Loans, on a pro rata basis, *sixth*, to the payment of any other Secured Obligation

due to the Administrative Agent or any Lender by the Borrowers on a pro rata basis and _seventh_, to, or at the direction of, the Top Borrower or as a court of competent jurisdiction may direct.

(c)     If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans of any Class held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans of such Class and accrued interest thereon than the proportion received by any other Lender with Loans of such Class, then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans of other Lenders of such Class at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders of such Class ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans of such Class; provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with Sections 2.22 and/or 9.05.  Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise rights of set-off and counterclaim against such Borrower with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.  The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this Section 2.18(c) and will, in each case, notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this Section 2.18(c) shall, from and after the date of such purchase, have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased.  For purposes of subclause (c) of the definition of "Excluded Taxes", any Lender that acquires a participation pursuant to this Section 2.18(c) shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(d)     Unless the Administrative Agent has received notice from the Top Borrower prior to the date on which any payment is due to the Administrative Agent for the account of any Lender hereunder that the Top Borrower will not make such payment, the Administrative Agent may assume that the Top Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lender the amount due.  In such event, if the Top Borrower has not in fact made such payment, then each Lender severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(e)     If any Lender fails to make any payment required to be made by it pursuant to Section 2.07(b) or Section 2.18(d), then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19.    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under Section 2.15 or determines it can no longer make or maintain Term SOFR Rate Loans pursuant to Section 2.20, or any Loan Party is required to pay any additional amount to or indemnify any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder, or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as applicable, in the future or mitigate the impact of Section 2.20, as the case may be, and (ii) would not subject such Lender to any unreimbursed out-of-pocket cost or expense and would not otherwise be disadvantageous to such Lender in any material respect.  The Top Borrower hereby agrees to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)    If (i) any Lender requests compensation under Section 2.15 or determines it can no longer make or maintain Term SOFR Rate Loans pursuant to Section 2.20, (ii) any Loan Party is required to pay any additional amount to or indemnify any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, (iii) any Lender is a Defaulting Lender or (iv) in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender directly affected thereby" (or any other Class or group of Lenders other than the Required Lenders) with respect to which Required Lender consent (or the consent of Lenders holding loans or commitments of such Class or lesser group representing more than 50% of the sum of the total loans and unused commitments of such Class or lesser group at such time) has been obtained, as applicable, any Lender is a non-consenting Lender, then the Top Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, (x) terminate the applicable Commitments of such Lender, and repay all Obligations of the relevant Borrower owing to such Lender relating to the applicable Loans and participations held by such Lender as of such termination date or (y) replace such Lender by requiring such Lender to assign and delegate (and such Lender shall be obligated to assign and delegate), without recourse (in accordance with and subject to the restrictions contained in Section 9.05), all of its interests, rights and obligations (other than its existing rights to payments pursuant to Section 2.15 or Section 2.17) under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if any Lender accepts such assignment); provided that (A) such Lender has received payment of an amount equal to the outstanding principal amount of its Loans of such Class of Loans and/or Commitments accrued interest thereon, accrued fees and all other amounts payable to it under any Loan Document with respect to such Class of Loans and/or Commitments, (B) in the case of any assignment resulting from a claim for compensation under Section 2.15 or payment required to be made pursuant to Section 2.17, such assignment would result in a reduction in such compensation or payment and (C) such assignment does not conflict with applicable Requirements of Law.  No Lender (other than a Defaulting Lender) shall be required to make any such assignment and delegation, and the Top Borrower may not repay the Obligations of such Lender or terminate its Commitments, in each case, if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Top Borrower to require such assignment and delegation cease to apply.  Each Lender agrees that if it is replaced pursuant to this Section 2.19, it shall execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such sale and purchase and deliver to the Administrative Agent any Promissory Note (if the assigning Lender's Loans are evidenced by one or more Promissory Notes) subject to such Assignment and Assumption (provided that the failure of any Lender replaced pursuant to this Section 2.19 to execute an Assignment and Assumption or deliver any such Promissory Note shall not render such sale and purchase (and the corresponding assignment) invalid), such assignment shall be recorded in the Register and any such Promissory Note shall be deemed cancelled.  Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact, with full

79

authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior written notice to such Lender, to take any action and to execute any such Assignment and Assumption or other instrument that the Administrative Agent may deem reasonably necessary to carry out the provisions of this <u>clause (b)</u>.

Section 2.20.    <u>Illegality</u>.  If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for such Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Top Borrower through the Administrative Agent and, so long as such circumstances shall continue, (x) the Administrative Agent and the Lenders shall be under no obligation to make any Term SOFR Rate Loans and (y) on the last day of the current calendar month (or immediately upon demand by such Lender, if necessary to avoid such illegality), [each Term SOFR Rate Loan shall, unless repaid in full, automatically convert to an ABR Loan.]  If such notice asserts the illegality of such Lender making or maintaining [ABR Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Alternate Base Rate, the interest rate on all ABR Loans, shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Top Borrower that the circumstances giving rise to such determination no longer exist (which notice such Lender agrees to give promptly)].  Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the determination of such Lender, otherwise be materially disadvantageous to such Lender.

Section 2.21.    <u>Defaulting Lenders</u>.  Notwithstanding any provision of this Agreement to the contrary, if any Person becomes a Defaulting Lender, then the following provisions shall apply for so long as such Person is a Defaulting Lender:

(a)    [Reserved].

(b)    The Loans and Commitments of such Defaulting Lender shall not be included in determining whether all Lenders, each affected Lender, the Required Lenders or such other number of Lenders as may be required hereby or under any other Loan Document have taken or may take any action hereunder (including any consent to any waiver, amendment or modification pursuant to <u>Section 9.02</u>); <u>provided</u> that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately and adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(c)    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to <u>Section 2.11</u>, <u>Section 2.15</u>, <u>Section 2.17</u>, <u>Section 2.18</u>, <u>Article 7</u>, <u>Section 9.05</u> or otherwise, and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to <u>Section 9.09</u>), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Top Borrower as follows:  <u>first</u>, to the payment of any amount owing by such Defaulting Lender to the Administrative Agent hereunder; <u>second</u>, so long as no Default or Event of Default exists, as the Top Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; <u>third,</u> as the Administrative Agent or the Top Borrower may elect, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; <u>fourth</u>, to the payment of any amount owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>fifth</u>, to the payment of any amount owing to any Borrower as a result

of any judgment of a court of competent jurisdiction obtained by such Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction.  Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by any Defaulting Lender shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

Section 2.22.    Incremental Credit Extensions.

(a)    The Borrowers may, at any time, on one or more occasions pursuant to an Incremental Facility Agreement (i) add one or more new tranches of term facilities and/or increase the principal amount of the Loans (which in either case, may be in the form of delayed draw term loans) by requesting new commitments to provide such Loans (any such new tranche or increase, an "Incremental Term Facility" and any loans made pursuant to an Incremental Term Facility, the "Incremental Loans") in an aggregate outstanding principal amount not to exceed $[75],000,000 during the term of this Agreement; provided that:

(i)    no Incremental Commitment may be less than $[5,000,000] (or such lesser amount to which the Administrative Agent may agree),

(ii)    except as Top Borrower and any Lender may separately agree, no Lender shall be obligated to provide any Incremental Commitment, and the determination to provide such commitments shall be within the sole and absolute discretion of such Lender,

(iii)    no Incremental Facility Agreement, Incremental Commitment or Incremental Loan (nor the creation, provision or implementation thereof) shall require the approval of any existing Lender other than in its capacity, if any, as a lender providing all or part of any Incremental Commitment or Incremental Loan,

(iv)    except as otherwise provided herein, the terms of any Incremental Term Facility shall be the same as the Initial Term Loans,

(v)    with respect to any Incremental Loans that is secured by Liens on the Collateral that are *pari passu* in right of security with the Liens securing the Initial Term Loans, the All-in Yield shall be the same as that applicable to the Initial Term Loans on the Closing Date, except that the All-in Yield in respect of such Incremental Loans may exceed the All-in Yield in respect of such Initial Term Loans by no more than 0.50%, or if it does so exceed such All-in Yield by more than 0.50% (such difference, the "Term Yield Differential") then the Applicable Rate (or the "SOFR floor" as provided in the following proviso) applicable to such Initial Term Loans shall be increased such that after giving effect to such increase, the Term Yield Differential shall not exceed 0.50%; provided that, to the extent any portion of the Term Yield Differential is attributable to a higher "SOFR floor" being applicable to such Incremental Loans, such floor shall only be included in the calculation of the Term Yield Differential to the extent such floor is greater than the Adjusted Term SOFR in effect for an Interest Period of three months' duration at such time, and, with respect to such excess, the "SOFR floor" applicable to the outstanding Initial Term Loans shall be increased to an amount not to exceed the "SOFR floor" applicable to such Incremental Loans prior to any increase in the Applicable Rate applicable to such Initial Term Loans then outstanding;

(vi)    the final maturity date with respect to any Incremental Loans shall be no earlier than the Maturity Date,

(vii)     the Weighted Average Life to Maturity of any Incremental Term Facility shall be no shorter than the remaining Weighted Average Life to Maturity of any then-existing Loans (without giving effect to any prepayments thereof),

(viii)    any Incremental Term Facility may not have an amortization schedule providing for amortization at a rate higher than for the Initial Term Loans,

(ix)     subject to clause (v) above, to the extent applicable, any fees payable in connection with any Incremental Loan shall be determined by the Borrowers and the arrangers and/or lenders providing such Incremental Loan;

(x)     (A) any Incremental Term Facility shall rank pari passu with any then-existing Loans, in right of payment and/or security and (B) no Incremental Loan may be (x) guaranteed by any Person which is not a Loan Party or (y) secured by any assets other than the Collateral,

(xi)     any Incremental Term Facility may participate (A) in any voluntary prepayment of Loans as set forth in Section 2.11(a) on a pro rata basis or less than a pro rata basis with the then-outstanding Term Loans and (B) in any mandatory prepayment of Loans as set forth in Section 2.11 on a pro rata basis or less than a pro rata basis with the then-outstanding Loans, in each case, to the extent provided in such Sections,

(xii)    no Event of Default shall exist immediately prior to or after giving effect to such Incremental Facility Agreement,

(xiii)   the proceeds of any Incremental Loan may be used for any purpose not prohibited by the terms of this Agreement, and

(xiv)    on the date of the Borrowing of any Incremental Loans that will be of the same Class as any than existing Class of Loans, and notwithstanding anything to the contrary set forth in Section 2.13 above, such Incremental Loans shall be added to (and constitute a part of, be of the same Type as and, at the election of the Borrowers, have the same Interest Period as) each Borrowing of outstanding Loans of such Class on a pro rata basis (based on the relative sizes of such Borrowings), so that each Lender providing such Incremental Loans will participate proportionately in each then-outstanding Borrowing of Loans of such Class; it being acknowledged that the application of this clause (a)(xiv) may result in new Incremental Loans having Interest Periods (the duration of which may be less than one month) that begin during an Interest Period then applicable to outstanding Term SOFR Rate Loans of the relevant Class and which end on the last day of such Interest Period.

(b)     Subject to clause (a)(ii) above, Incremental Commitments may be provided by any existing Lender or by any other Eligible Assignee (any such other lender being called an "Additional Lender"); provided that the Administrative Agent shall have a right to consent (such consent not to be unreasonably withheld or delayed) to the relevant Additional Lender's provision of Incremental Commitments if such consent would be required under Section 9.05(b) for an assignment of Loans to such Additional Lender; provided, further, that any Additional Lender that is an Affiliated Lender shall be subject to the provisions of Section 9.05(g), mutatis mutandis, to the same extent as if the relevant Incremental Commitments and related Obligations had been acquired by such Lender by way of assignment.

(c)     Each Lender or Additional Lender providing a portion of any Incremental Commitment shall execute and deliver to the Administrative Agent and the Borrowers all such documentation (including the relevant Incremental Facility Agreement) as may be reasonably required by the Administrative Agent

to evidence and effectuate such Incremental Commitment. On the effective date of such Incremental Commitment, each Additional Lender shall become a Lender for all purposes in connection with this Agreement.

(d)      As conditions precedent to the effectiveness of any Incremental Facility Agreement or the making of any Incremental Loans, (i) upon its request, the Administrative Agent shall be entitled to receive customary written opinions of counsel, as well as such reaffirmation agreements, supplements and/or amendments as it shall reasonably require, (ii) the Administrative Agent shall be entitled to receive, from each Additional Lender, an Administrative Questionnaire, in the form provided to such Additional Lender by the Administrative Agent and such other documents as it shall reasonably require from such Additional Lender, (iii) the Administrative Agent and the relevant Additional Lenders shall be entitled to receive all fees required to be paid in respect of such Incremental Facility Agreement or Incremental Loans, (iv) the Administrative Agent shall have received a Borrowing Request as if the relevant Incremental Loans were subject to Section 2.03 or another written request the form of which is reasonably acceptable to the Administrative Agent (it being understood and agreed that the requirement to deliver a Borrowing Request shall not result in the imposition of any additional condition precedent to the availability of the relevant Incremental Loans) and (v) the Administrative Agent shall be entitled to receive a certificate of the Borrower signed by a Responsible Officer thereof:

(i)      certifying and attaching a copy of the resolutions adopted by the governing body of the Borrowers approving or consenting to such Incremental Facility Agreement or Incremental Loans, and

(ii)      to the extent applicable, certifying that the condition set forth in clause (a)(xii) above has been satisfied (which may be in the form of the Borrowing Request).

(e)      The Lenders hereby irrevocably authorize the Administrative Agent to enter into any Incremental Facility Agreement and such technical amendments to any Loan Document as may be necessary or appropriate in the reasonable opinion of the Administrative Agent and the Borrower in connection with such Incremental Facility Agreement, in each case on terms consistent with this Section 2.22, and as may be necessary or advisable in order to create a fungible tranche of loans (including by increasing the amortization on existing tranches of loans) so long as any such amendments do not adversely affect Lenders holding the existing loans.

(f)      This Section 2.22 shall supersede any provision in Section 2.18 or 9.02 to the contrary.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES

On the Closing Date (or, with respect to Holdings, on the date upon which Holdings becomes a party to this Agreement), Holdings (solely with respect to Sections 3.01, 3.02, 3.03, 3.07, 3.08, 3.09, 3.13, 3.14, 3.16 and 3.17) and the Borrowers hereby represent and warrant to the Lenders that:

Section 3.01.      Organization; Powers. Holdings, the Top Borrower and each of its Restricted Subsidiaries (a) is (i) duly organized and validly existing and (ii) in good standing (to the extent such concept exists in the relevant jurisdiction) under the Requirements of Law of its jurisdiction of organization, (b) has all requisite organizational power and authority to own its assets and to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdiction) in, every jurisdiction where the ownership, lease or operation of its properties or conduct of its business requires such qualification, except, in each case referred to in this Section 3.01

(other than clause (a)(i) and clause (b), in each case, with respect to the Top Borrower) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02.    Authorization; Enforceability.  The execution, delivery and performance by each Loan Party of each Loan Document to which it is a party are within such Loan Party's corporate or other organizational power and have been duly authorized by all necessary corporate or other organizational action of such Loan Party.  Each Loan Document to which any Loan Party is a party has been duly executed and delivered by such Loan Party and is a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to the Legal Reservations.

Section 3.03.    Governmental Approvals; No Conflicts.  The execution and delivery of each Loan Document by each Loan Party thereto and the performance by such Loan Party thereof (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) in connection with the Perfection Requirements and (iii) such consents, approvals, registrations, filings, or other actions the failure to obtain or make which could not be reasonably expected to have a Material Adverse Effect, (b) will not violate any (i) of such Loan Party's Organizational Documents or (ii) Requirement of Law applicable to such Loan Party which violation, in the case of this clause (b)(ii), could reasonably be expected to have a Material Adverse Effect and (c) will not violate or result in a default under (i) the ABL Credit Agreement or (ii) any other material Contractual Obligation to which such Loan Party is a party which violation, in the case of this clause (c), could reasonably be expected to result in a Material Adverse Effect.

Section 3.04.    Financial Condition; No Material Adverse Effect.

(a)    The financial statements most recently provided pursuant to Section 5.01(b) or (c), as applicable, present fairly, in all material respects, the financial condition and results of operations and cash flows of the Top Borrower on a consolidated basis as of such dates and for such periods in accordance with GAAP, (i) except as otherwise expressly noted therein and/or (ii) subject, in the case of quarterly financial statements, to the absence of footnotes and normal year-end adjustments.

(b)    Since the Closing Date, there have been no events, developments or circumstances that have had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.05.    Properties.

(a)    As of the Closing Date, Schedule 3.05 sets forth the address of each Real Estate Asset (or each set of such assets that collectively comprise one operating property) that is owned in fee simple by any Loan Party.

(b)    The Top Borrower and each of its Restricted Subsidiaries have good and valid fee simple title to or rights to purchase, or valid leasehold interests in, or easements or other limited property interests in, all of their respective Real Estate Assets and have good title to their personal property and assets, in each case, except (i) for defects in title that do not materially interfere with their ability to conduct their business as currently conducted or to utilize such properties and assets for their intended purposes or (ii) where the failure to have such title would not reasonably be expected to have a Material Adverse Effect.

(c)    The Top Borrower and its Restricted Subsidiaries own or otherwise have a license or right to use all rights in Patents, Trademarks, Copyrights and other rights in works of authorship (including all copyrights embodied in software) and all other intellectual property rights ("IP Rights") used to conduct

their respective businesses as presently conducted without, to the knowledge of the Top Borrower, any infringement or misappropriation of the IP Rights of third parties, except to the extent the failure to own or license or have rights to use would not, or where such infringement or misappropriation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.06.    Litigation and Environmental Matters.

(a)    There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Top Borrower, threatened in writing against or affecting the Top Borrower or any of its Restricted Subsidiaries which would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)    Except for any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, (i) neither the Top Borrower nor any of its Restricted Subsidiaries is subject to or has received notice of any Environmental Claim or Environmental Liability or knows of any basis for any Environmental Liability or Environmental Claim of the Top Borrower or any of its Restricted Subsidiaries and (ii) neither the Top Borrower nor any of its Restricted Subsidiaries has failed to comply with any Environmental Law or to obtain, maintain or comply with any Governmental Authorization, permit, license or other approval required under any Environmental Law.

(c)    Neither the Top Borrower nor any of its Restricted Subsidiaries has treated, stored, transported or Released any Hazardous Materials on, at, under or from any currently or formerly owned, leased or operated real estate or facility in a manner that would reasonably be expected to have a Material Adverse Effect.

Section 3.07.    Compliance with Laws.  Each of Holdings, the Top Borrower and each of its Restricted Subsidiaries is in compliance with all Requirements of Law applicable to it or its property, except, in each case where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; it being understood and agreed that this Section 3.07 shall not apply to the Requirements of Law covered by Section 3.17 below.

Section 3.08.    Investment Company Status.  No Loan Party is an "investment company" as defined in, or is required to be registered under, the Investment Company Act of 1940.

Section 3.09.    Taxes.  Each of Holdings, the Top Borrower and each of its Restricted Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it that are due and payable (including in its capacity as a withholding agent), except (a) Taxes (or any requirement to file Tax returns with respect thereto) that are being contested in good faith by appropriate proceedings and for which the Top Borrower or such Restricted Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.10.    ERISA.

(a)    Each Plan is in compliance in form and operation with its terms and with ERISA and the Code and all other applicable Requirements of Law, except where any failure to comply would not reasonably be expected to result in a Material Adverse Effect.

(b)    In the five-year period prior to the date on which this representation is made or deemed made, no ERISA Event has occurred and is continuing or is reasonably expected to occur that, when taken

85

together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect.

Section 3.11.    <u>Disclosure</u>.

(a)    As of the Closing Date, all written information (other than the Projections, financial estimates, other forward-looking information and/or projected information and information of a general economic or industry-specific nature) concerning the Top Borrower and its subsidiaries that was prepared by or on behalf of the Top Borrower or its subsidiaries or their respective representatives and made available to any Lender or the Administrative Agent in connection with the Transactions (the "<u>Information</u>"), when taken as a whole, did not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time).

(b)    The Projections have been prepared in good faith based upon assumptions believed by the Top Borrower to be reasonable at the time furnished (it being recognized that such Projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond the Top Borrower's control, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material).

Section 3.12.    <u>Solvency</u>.  As of the Closing Date and after giving effect to the Transactions and the incurrence of the Indebtedness and obligations being incurred in connection with this Agreement and the Transactions, (i) the sum of the debt (including contingent liabilities) of the Top Borrower and its subsidiaries, taken as a whole, does not exceed the fair value of the assets of the Top Borrower and its subsidiaries, taken as a whole, (ii) the present fair saleable value of the assets (on a going concern basis) of the Top Borrower and its subsidiaries, taken as a whole, is not less than the amount that will be required to pay the probable liabilities of the Top Borrower and its subsidiaries, taken as a whole, on their debts as they become absolute and matured in accordance with their terms; (iii) the capital of the Top Borrower and its subsidiaries, taken as a whole, is not unreasonably small in relation to the business of the Top Borrower and its subsidiaries, taken as a whole, contemplated as of the Closing Date; and (iv) the Top Borrower and its subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations and contingent liabilities) beyond their ability to pay such debt as they mature in accordance with their terms.

Section 3.13.    <u>Subsidiaries</u>.  <u>Schedule 3.13</u> sets forth, in each case as of the Closing Date, (a) a correct and complete list of the name of each subsidiary of the Top Borrower and the ownership interest therein held by the Top Borrower or its applicable subsidiary, and (b) the jurisdiction of organization and the type of entity of the Top Borrower and each of its subsidiaries.

Section 3.14.    <u>Security Interest in Collateral</u>.  Subject to the Legal Reservations, the Perfection Requirements and the provisions, limitations and/or exceptions set forth in this Agreement and/or any other Loan Document, the Collateral Documents create legal, valid and enforceable Liens on all of the Collateral in favor of the Administrative Agent, for the benefit of itself and the other Secured Parties, and upon the satisfaction of the applicable Perfection Requirements, such Liens constitute perfected Liens (with the priority that such Liens are expressed to have under the relevant Collateral Documents, unless otherwise permitted hereunder or under any Collateral Document) on the Collateral (to the extent such Liens are required to be perfected under the terms of the Loan Documents) securing the Secured Obligations, in each case as and to the extent set forth therein.

For the avoidance of doubt, notwithstanding anything herein or in any other Loan Document to the contrary, neither the Top Borrower nor any other Loan Party makes any representation or warranty as to (A) the effect of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Capital Stock of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, under foreign Requirements of Law, (B) the enforcement of any security interest, or right or remedy with respect to any Collateral that may be limited or restricted by, or require any consent, authorization approval or license under, any Requirement of Law or (C) on the Closing Date and until required pursuant to Section 5.12, the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge of any security interest to the extent the same is not required on the Closing Date pursuant to the terms hereof.

Section 3.15.    Labor Disputes.  Except as individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts or slowdowns against the Top Borrower or any of its Restricted Subsidiaries pending or, to the knowledge of the Top Borrower or any of its Restricted Subsidiaries, threatened and (b) the hours worked by and payments made to employees of the Top Borrower and its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirements of Law dealing with such matters.

Section 3.16.    Federal Reserve Regulations.  No part of the proceeds of any Loan or any Letter of Credit has been used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that results in a violation of the provisions of Regulation U.

Section 3.17.    OFAC; PATRIOT ACT and FCPA.  No Loan Party or any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any Loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including any Lender or other individual or entity participating in any transaction). To the extent applicable, each Loan Party is in compliance, in all material respects, with the USA PATRIOT Act.  As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects

ARTICLE 4

CONDITIONS

Section 4.01.    Closing Date.  The obligations of each Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with Section 9.02):

(a)    Credit Agreement and Loan Documents.  The Administrative Agent (or its counsel) shall have received from each Loan Party, to the extent party thereto, a counterpart signed by such Loan Party (or written evidence reasonably satisfactory to the Administrative Agent (which may include a copy

transmitted by facsimile or other electronic method) that such party has signed a counterpart) of (A) this Agreement, (B) the Security Agreement, (C) any Intellectual Property Security Agreement, (D) the Loan Guaranty, (E) the ABL Intercreditor Agreement and (F) each Promissory Note requested by a Lender at least three Business Days prior to the Closing Date.

(b)    Legal Opinions.  The Administrative Agent (or its counsel) shall have received, on behalf of itself, the Lenders on the Closing Date, (i) a customary written opinion of Weil, Gotshal & Manges LLP, in its capacity as special counsel for the Loan Parties and (ii) customary written opinions of local counsel to the Loan Parties organized in the jurisdictions set forth on Schedule 4.01(b), each dated the Closing Date and addressed to the Administrative Agent and the Lenders.

(c)    Secretary's Certificate and Good Standing Certificates.  The Administrative Agent (or its counsel) shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by a secretary, assistant secretary or other Responsible Officer thereof, which shall (A) certify that (w) attached thereto is a true and complete copy of the certificate or articles of incorporation, formation or organization of such Loan Party, certified by the relevant authority of its jurisdiction of organization, (x) the certificate or articles of incorporation, formation or organization of such Loan Party attached thereto has not been amended (except as attached thereto) since the date reflected thereon, (y) attached thereto is a true and correct copy of the by-laws or operating, management, partnership or similar agreement of such Loan Party, together with all amendments thereto as of the Closing Date and such by-laws or operating, management, partnership or similar agreement are in full force and effect and (z) attached thereto is a true and complete copy of the resolutions or written consent, as applicable, of its board of directors, board of managers, sole member or other applicable governing body authorizing the execution and delivery of the Loan Documents, which resolutions or consent have not been modified, rescinded or amended (other than as attached thereto) and are in full force and effect and (B) identify by name and title and bear the signatures of the officers, managers, directors or other authorized signatories of such Loan Party who are authorized to sign the Loan Documents to which such Loan Party is a party on the Closing Date and (ii) a good standing (or equivalent) certificate for such Loan Party from the relevant authority of its jurisdiction of organization, dated as of a recent date.

(d)    Representations and Warranties.  The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date; provided that to the extent that any representation and warranty specifically refers to a given date or period, such representation and warranty shall be true and correct in all material respects as of such date or for such period.

(e)    No Default.  On the Closing Date and immediately after giving effect to the Credit Extension (or deemed Credit Extension) on the Closing Date and the consummation of the Transactions contemplated to occur on the Closing Date, no Default or Event of Default shall exist.

(f)    Fees, Costs and Expenses.  Prior to or substantially concurrently with the effectiveness of the Commitments, the Administrative Agent shall have received all fees, costs, expenses that are due and payable by any Loan Party to any of the Lenders or the Administrative Agent on or prior to the Closing Date, including, to the extent invoiced two (2) Business Day prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket legal fees and expenses required to be reimbursed or paid by any Loan Party under the Loan Documents or any fee, engagement or similar letter.

(g)    Perfection Certificate.  The Administrative Agent (or its counsel) shall have received a completed Perfection Certificate dated the Closing Date and signed by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby.

(h)     Solvency.  The Administrative Agent (or its counsel) shall have received a certificate in substantially the form of Exhibit P from the chief financial officer (or other officer with reasonably equivalent responsibilities) of the Top Borrower dated as of the Closing Date and certifying as to the matters set forth therein.

(i)     Filings, Registrations and Recordings.  Each document (including any UCC (or similar) financing statement) required by any Collateral Document or under applicable Requirements of Law to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral, required to be delivered on the Closing Date pursuant to such Collateral Document, shall be in proper form for filing, registration or recordation.

(j)     USA PATRIOT Act.  No later than three Business Days in advance of the Closing Date, the Administrative Agent shall have received all documentation and other information reasonably requested with respect to Holdings or any Loan Party in writing by any Initial Term Lender at least ten Business Days in advance of the Closing Date, which documentation or other information is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(k)     Officer's Certificate.  The Administrative Agent shall have received a certificate from a Responsible Officer of the Top Borrower certifying satisfaction of the conditions precedent set forth in Sections 4.01(d), (e), (o) and (p).

(l)     Closing Date Refinancing.  Substantially contemporaneously with the Credit Extensions on the Closing Date, all obligations under the DIP ABL Credit Agreement shall be repaid in full in cash (or, with respect to letters of credit outstanding thereunder, deemed issued hereunder) (the "Closing Date Refinancing").

(m)     Plan Confirmation.  The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, confirming the Plan of Reorganization (which shall be an Approved Plan) including approval of the ABL Facility and the Term Loan Facility and releases and exculpation, and the Confirmation Order shall have become a final order and shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that would reasonably be expected to adversely affect the interests of the Administrative Agent or the Lenders and authorizing the Top Borrower and its Restricted Subsidiaries to execute, deliver and perform under the Loan Documents.

(n)     Plan Effective Date.  The Plan Effective Date and all material transactions contemplated in the Plan of Reorganization or in the Confirmation Order to occur on the Plan Effective Date shall have occurred on the Closing Date (or concurrently with the occurrence of the Closing Date) in accordance with the terms hereof and in compliance with applicable law, the applicable orders of the Bankruptcy Court and material regulatory approvals.

(o)     Third-Party Debt.  The Administrative Agent shall have received satisfactory evidence that immediately after the consummation of the Plan of Reorganization, total outstanding third party debt for borrowed money outstanding (excluding letters of credit or drawn amount hereunder or any capital leases) and net of unrestricted Cash and Cash Equivalents of the Top Borrower and its Restricted Subsidiaries shall not exceed $350,000,000.

(p)     Unrestricted Cash and Cash Equivalents.  The Administrative Agent shall have received satisfactory evidence that immediately after the consummation of the Plan of Reorganization, total

unrestricted Cash and Cash Equivalents of the Top Borrower and its Restricted Subsidiaries shall be no less than $40,000,000.

For purposes of determining whether the conditions specified in this Section 4.01 have been satisfied on the Closing Date, by funding the Loans hereunder, the Administrative Agent and each Lender shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent or such Lender, as the case may be.

ARTICLE 5

AFFIRMATIVE COVENANTS

From the Closing Date until the date on which all Commitments have expired or terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable under any Loan Document (other than contingent indemnification obligations for which no claim or demand has been made) have been paid in full in Cash (such date, the "Termination Date"), Holdings (solely with respect to Sections 5.02, 5.03 and 5.12) and each Borrower hereby covenant and agree with the Lenders that:

Section 5.01.    Financial Statements and Other Reports.  The Top Borrower will deliver to the Administrative Agent for delivery by the Administrative Agent, subject to Section 9.05(f), to each Lender:

(a)    [Reserved];

(b)    Quarterly Financial Statements.  As soon as available, and in any event within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, commencing with the Fiscal Quarter ending on or about [●], the consolidated balance sheet of the Top Borrower as at the end of such Fiscal Quarter and the related consolidated statements of income and cash flows of the Top Borrower for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, and setting forth, in reasonable detail, in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Responsible Officer Certification (which may be included in the applicable Compliance Certificate) with respect thereto;

(c)    Annual Financial Statements.  As soon as available, and in any event within 120 days after the end of each Fiscal Year ending after the Closing Date, (i) the consolidated balance sheet of the Top Borrower as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Top Borrower for such Fiscal Year and setting forth, in reasonable detail, in comparative form the corresponding figures for the previous Fiscal Year and (ii) with respect to such consolidated financial statements, a report thereon of an independent certified public accountant of recognized national standing (which report shall not be subject to a "going concern" explanatory paragraph or like statement (except as resulting from (A) the impending maturity of any Indebtedness within the four full Fiscal Quarter period following the relevant audit date and/or (B) any breach or anticipated breach of any financial covenant)), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Top Borrower as at the dates indicated and its income and cash flows for the periods indicated in conformity with GAAP;

(d)    Compliance Certificate.  Together with each delivery of financial statements of the Top Borrower pursuant to Sections 5.01(b) and (c), (i) a duly executed and completed Compliance Certificate and (ii) a summary of the pro forma adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such financial statements;

(e)     Notice of Default.  Promptly upon any Responsible Officer of the Top Borrower obtaining knowledge of (i) any Default or Event of Default or (ii) the occurrence of any event or change that has caused or evidences or would reasonably be expected to cause or evidence, either individually or in the aggregate, a Material Adverse Effect, a reasonably-detailed notice specifying the nature and period of existence of such condition, event or change and what action the Top Borrower has taken, is taking and proposes to take with respect thereto;

(f)     Notice of Litigation.   Promptly upon any Responsible Officer of the Top Borrower obtaining knowledge of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by the Top Borrower to the Administrative Agent, or (ii) any material development in any Adverse Proceeding that, in the case of either of clauses (i) or (ii), could reasonably be expected to have a Material Adverse Effect, written notice thereof from the Top Borrower together with such other non-privileged information as may be reasonably available to the Loan Parties to enable the Lenders to evaluate such matters;

(g)     ERISA.  Promptly upon any Responsible Officer of the Top Borrower becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof;

(h)     Financial Plan.  As soon as available and in any event no later than 60 days after the beginning of each Fiscal Year, commencing with the Fiscal Year ending on or about December 31, 2024, an annual budget prepared by management of the Top Borrower, consisting of a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of the Top Borrower for such Fiscal Year;

(i)     Information Regarding Collateral.

(i)     Prompt (and, in any event, no later than 10 days after the relevant change) written notice of any change (A) in any U.S. Loan Party's legal name, (B) in any U.S. Loan Party's type of organization, (C) in any U.S. Loan Party's jurisdiction of organization or (D) in any U.S. Loan Party's organizational identification number, together with a certified copy of the applicable Organizational Document reflecting the relevant change;

(ii)     Prompt (and in any event no later than the earlier to occur of (i) the time period required by applicable Requirements of Law and (ii) 10 days after the relevant change) written notice of any change that is analogous to any change described in clause (i) above with respect to any Non-U.S. Loan Party;

(j)     Liquidity.  During the continuance of a Liquidity Reporting Period, within 30 days after the end of each Fiscal Month, the Top Borrower shall deliver a certificate to the Administrative Agent setting forth the Actual Liquidity as of the end of such most recently ended Fiscal Month.

(k)     Certain Reports.  Promptly upon their becoming available and without duplication of any obligations with respect to any such information that is otherwise required to be delivered under the provisions of any Loan Document, copies of (i) following a Qualifying IPO, all financial statements, reports, notices and proxy statements sent or made available generally by the Top Borrower or its applicable Parent Company to its security holders acting in such capacity and (ii) all regular and periodic reports and all registration statements (other than on Form S-8 or a similar form) and prospectuses, if any, filed by the Top Borrower or its applicable Parent Company with any securities exchange or with the SEC or any analogous Governmental Authority or private regulatory authority with jurisdiction over matters relating to securities; and

91

(l)  Other Information.  Such other certificates, reports and information (financial or otherwise) as the Administrative Agent may reasonably request from time to time regarding the financial condition or business of the Top Borrower and its Restricted Subsidiaries; provided, however, that none of Holdings, the Top Borrower nor any Restricted Subsidiary shall be required to disclose or provide any information (a) that constitutes non-financial trade secrets or non-financial proprietary information of Holdings, the Top Borrower or any of its subsidiaries or any of their respective customers and/or suppliers, (b) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives) is prohibited by applicable Requirements of Law, (c) that is subject to attorney-client or similar privilege or constitutes attorney work product or (d) in respect of which Holdings, the Top Borrower or any Restricted Subsidiary owes confidentiality obligations to any third party (provided such confidentiality obligations were not entered into in contemplation of the requirements of this Section 5.01(l)).

Documents required to be delivered pursuant to this Section 5.01 may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Top Borrower (or a representative thereof) (x) posts such documents or (y) provides a link thereto at the website address listed on Schedule 9.01; provided that, other than with respect to items required to be delivered pursuant to Section 5.01(k) above, the Top Borrower shall promptly notify (which notice may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents at the website address listed on Schedule 9.01 and provide to the Administrative Agent by electronic mail electronic versions (i.e., soft copies) of such documents; (ii) on which such documents are delivered by the Top Borrower to the Administrative Agent for posting on behalf of the Top Borrower on IntraLinks/SyndTrak or another relevant website (the "Platform"), if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); (iii) on which such documents are faxed to the Administrative Agent (or electronically mailed to an address provided by the Administrative Agent); or (iv) in respect of the items required to be delivered pursuant to Section 5.01(k) above with respect to information filed by Holdings or its applicable Parent Company with any securities exchange or with the SEC or any analogous governmental or private regulatory authority with jurisdiction over matters relating to securities (other than Form 10-Q Reports and Form 10-K reports described in Section 5.01(b)), on which such items have been made available on the SEC website or the website of the relevant analogous governmental or private regulatory authority or securities exchange.

Notwithstanding the foregoing, the obligations in paragraphs (b), (c) and (h) of this Section 5.01 may instead be satisfied with respect to any financial statements of the Top Borrower by furnishing (A) the applicable financial statements of any Parent Company or (B) any Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC or any securities exchange, in each case, within the time periods specified in such paragraphs and without any requirement to provide notice of such filing to the Administrative Agent or any Lender; provided that, with respect to each of clauses (A) and (B), (i) to the extent (1) such financial statements relate to any Parent Company and (2) either (I) such Parent Company (or any other Parent Company that is a subsidiary of such Parent Company) has any material third party Indebtedness and/or material operations (as determined by the Top Borrower in good faith and other than any operations that are attributable solely to such Parent Company's ownership of the Top Borrower and its subsidiaries) or (II) there are material differences between the financial statements of such Parent Company and its consolidated subsidiaries, on the one hand, and the Top Borrower and its consolidated subsidiaries, on the other hand, such financial statements or Form 10-K or Form 10-Q, as applicable, shall be accompanied by unaudited consolidating information that summarizes in reasonable detail the differences between the information relating to such Parent Company and its consolidated subsidiaries, on the one hand, and the information relating to the Top Borrower and its consolidated subsidiaries on a stand-alone basis, on the other hand, which consolidating information shall be certified by a Responsible Officer of the Top Borrower as having been fairly presented in all material respects and (ii) to the extent such statements are in lieu of statements required to be provided under Section 5.01(b), such statements shall be accompanied by a report

and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall satisfy the applicable requirements set forth in Section 5.01(b).

No financial statement required to be delivered pursuant to Sections 5.01(b) or (c) shall be required to include acquisition accounting adjustments relating to any Investment to the extent it is not practicable to include any such adjustments in such financial statement.

Section 5.02.    Existence.  Except as otherwise permitted under Section 6.07, Holdings and the Top Borrower will, and the Top Borrower will cause each of its Restricted Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights, franchises, licenses and permits material to its business except, other than with respect to the preservation of the existence of the Top Borrower, to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect; provided that neither Holdings nor the Top Borrower nor any of the Top Borrower's Restricted Subsidiaries shall be required to preserve any such existence (other than with respect to the preservation of existence of the Top Borrower), right, franchise, license or permit if a Responsible Officer of such Person or such Person's board of directors (or similar governing body) determines that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lenders (taken as a whole).

Section 5.03.    Payment of Taxes.  Holdings and the Top Borrower will, and the Top Borrower will cause each of its Restricted Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income or businesses or franchises before any penalty or fine accrues thereon; provided, however, that no such Tax need be paid if (a) it is being contested in good faith by appropriate proceedings, so long as (i) adequate reserves or other appropriate provisions, as are required in conformity with GAAP, have been made therefor and (ii) in the case of a Tax which has resulted or may result in the creation of a Lien on any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or (b) failure to pay or discharge the same could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.04.    Maintenance of Properties.  The Top Borrower will, and will cause each of its Restricted Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all property reasonably necessary to the normal conduct of business of the Top Borrower and its Restricted Subsidiaries and from time to time will make or cause to be made all needed and appropriate repairs, renewals and replacements thereof except as expressly permitted by this Agreement or where the failure to maintain such properties or make such repairs, renewals or replacements could not reasonably be expected to have a Material Adverse Effect.

Section 5.05.    Insurance.  Except where the failure to do so would not reasonably be expected to have a Material Adverse Effect, the Top Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, such insurance coverage with respect to liability, loss or damage in respect of the assets, properties and businesses of the Top Borrower and its Restricted Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons, including flood insurance with respect to each Flood Hazard Property, in each case in compliance with the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973 (where applicable).  Each such policy of insurance shall, subject to Section 5.15, (i) name the Administrative Agent on behalf of the Secured Parties as an additional insured thereunder as its interests may appear and (ii) (A) to the extent available from the relevant insurance carrier  in the case of each casualty insurance policy (excluding any business interruption insurance policy), contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties as the loss payee thereunder and (B) to

the extent available from the relevant insurance carrier after submission of a request by the applicable Loan Party to obtain the same, provide for at least 30 days' prior written notice to the Administrative Agent of any modification or cancellation of such policy (or 10 days' prior written notice in the case of the failure to pay any premiums thereunder).

Section 5.06.    Inspections.

(a)    The Top Borrower will, and will cause each of its Restricted Subsidiaries to, permit any authorized representative designated by the Administrative Agent to visit and inspect any of the properties of the Top Borrower and any of its Restricted Subsidiaries at which the principal financial records and executive officers of the applicable Person are located, to inspect, copy and take extracts from its and their respective financial and accounting records, and to discuss its and their respective affairs, finances and accounts with its and their Responsible Officers and independent public accountants (provided that the Top Borrower (or any of its subsidiaries) may, if it so chooses, be present at or participate in any such discussion) at the expense of the Top Borrower, all upon reasonable notice and at reasonable times during normal business hours; provided that (a) only the Administrative Agent on behalf of the Lenders may exercise the rights of the Administrative Agent and the Lenders under this Section 5.06, (b) except as expressly set forth in clause (c) below during the continuance of an Event of Default, the Administrative Agent shall not exercise such rights more often than one time during any calendar year, (c) when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Top Borrower at any time during normal business hours and upon reasonable advance notice and (d) notwithstanding anything to the contrary herein, neither the Top Borrower nor any Restricted Subsidiary shall be required to disclose, permit the inspection, examination or making of copies of or taking abstracts from, or discuss any document, information, or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information of the Top Borrower and its subsidiaries and/or any of its customers and/or suppliers, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives or contractors) is prohibited by applicable Requirements of Law, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which Holdings, the Top Borrower or any Restricted Subsidiary owes confidentiality obligations to any third party (provided that such confidentiality obligations were not entered into in contemplation of the requirements of this Section 5.06).

(b)    [Reserved].

(c)    [Reserved].

Section 5.07.    Maintenance of Book and Records.  The Top Borrower will, and will cause its Restricted Subsidiaries to, maintain proper books of record and account containing entries of all material financial transactions and matters involving the assets and business of the Top Borrower and its Restricted Subsidiaries that are full, true and correct in all material respects and permit the preparation of consolidated financial statements in accordance with GAAP.

Section 5.08.    Compliance with Laws.  The Top Borrower will comply, and will cause each of its Restricted Subsidiaries to comply, with the requirements of all applicable Requirements of Law (including applicable ERISA and all Environmental Laws, OFAC, the USA PATRIOT Act and the FCPA), except to the extent the failure of the Top Borrower or the relevant Restricted Subsidiary to comply could not reasonably be expected to have a Material Adverse Effect; provided that the requirements set forth in this Section 5.08, as they pertain to compliance by any Foreign Subsidiary with OFAC, the USA PATRIOT ACT and the FCPA are subject to and limited by any Requirement of Law applicable to such Foreign Subsidiary in its relevant local jurisdiction.

Section 5.09.    Environmental.

(a)    Environmental Disclosure.  The Top Borrower will deliver to the Administrative Agent as soon as practicable following the sending or receipt thereof by the Top Borrower or any of its Restricted Subsidiaries, a copy of any and all written communications with respect to (A) any Environmental Claim that, individually or in the aggregate, has a reasonable possibility of giving rise to a Material Adverse Effect, (B) any Release required to be reported by the Top Borrower or any of its Restricted Subsidiaries to any federal, state or local governmental or regulatory agency or other Governmental Authority that reasonably could be expected to have a Material Adverse Effect, (C) any request made to the Top Borrower or any of its Restricted Subsidiaries for information from any governmental agency that suggests such agency is investigating whether the Top Borrower or any of its Restricted Subsidiaries may be potentially responsible for any Hazardous Materials Activity which is reasonably expected to have a Material Adverse Effect and (D) subject to the limitations set forth in the proviso to Section 5.01(l), such other documents and information as from time to time may be reasonably requested by the Administrative Agent in relation to any matters disclosed pursuant to this Section 5.09(a);

(b)    Hazardous Materials Activities, Etc.  The Top Borrower shall promptly take, and shall cause each of its Restricted Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by the Top Borrower or its Restricted Subsidiaries, and address with appropriate corrective or remedial action any Release or threatened Release of Hazardous Materials at or from any Facility, in each case, that could reasonably be expected to have a Material Adverse Effect and (ii) make an appropriate response to any Environmental Claim against the Top Borrower or any of its Restricted Subsidiaries and discharge any obligations it may have to any Person thereunder, in each case, where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.10.    Designation of Subsidiaries.  The Top Borrower may at any time after the Closing Date designate (or re-designate) any subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (a) after giving effect to such designation, no Event of Default exists (including after giving effect to the reclassification of Investments in, Indebtedness of and Liens on the assets of, the applicable Restricted Subsidiary or Unrestricted Subsidiary), (b) no subsidiary may be designated as (or become) an Unrestricted Subsidiary if (i) it is a "Restricted Subsidiary" under any ABL Facility, (ii) it owns or is the exclusive licensee of or, immediately after giving effect to such designation, will own or be the exclusive licensee of, any Material Intellectual Property, (iii) it is a Borrower, or (iv) it owns, directly or indirectly, any Capital Stock in a Loan Party or any other Restricted Subsidiary or holds any Indebtedness or any Lien on any property of any Loan Party or any other Restricted Subsidiary.  The designation of any subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Top Borrower (or its applicable Restricted Subsidiary) therein at the date of designation in an amount equal to the portion of the fair market value of the net assets of such subsidiary attributable to the Top Borrower's (or its applicable Restricted Subsidiary's) equity interest therein as reasonably estimated by the Top Borrower (and such designation shall only be permitted to the extent such Investment is permitted under Section 6.06).  The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the making, incurrence or granting, as applicable, at the time of designation of any then-existing Investment, Indebtedness or Lien of such subsidiary, as applicable; provided that upon any re-designation of any Unrestricted Subsidiary as a Restricted Subsidiary, the Top Borrower shall be deemed to continue to have an Investment in the resulting Restricted Subsidiary in an amount (if positive) equal to (a) the Top Borrower's "Investment" in such Restricted Subsidiary at the time of such re-designation, less (b) the portion of the fair market value of the net assets of such Restricted Subsidiary attributable to the Top Borrower's equity therein at the time of such re-designation.

Section 5.11.    Use of Proceeds.  Each Borrower may use the proceeds of any Incremental Loans for any purpose not expressly prohibited by this Agreement.

Section 5.12.    Covenant to Guarantee Obligations and Provide Security.

(a)       Upon (i) the formation or acquisition after the Closing Date of any Restricted Subsidiary that is a Domestic Subsidiary, (ii) the designation of any Unrestricted Subsidiary that is a Domestic Subsidiary as a Restricted Subsidiary, (iii) any Restricted Subsidiary that is a Domestic Subsidiary ceasing to be an Immaterial Subsidiary or (iv) any Restricted Subsidiary that was an Excluded Subsidiary ceasing to be an Excluded Subsidiary, then on or before the date on which financial statements are required to be delivered pursuant to Section 5.01(b) or (c) as applicable for the Fiscal Quarter in which the relevant formation, acquisition, designation or cessation occurred (or such longer period as the Administrative Agent may reasonably agree), the Top Borrower shall (A) cause such Restricted Subsidiary (other than any Excluded Subsidiary) to comply with the requirements set forth in clause (a) of the definition of "Collateral and Guarantee Requirement" and (B) upon the reasonable request of the Administrative Agent, cause the relevant Restricted Subsidiary (other than any Excluded Subsidiary) to deliver to the Administrative Agent a signed copy of a customary opinion of counsel for such Restricted Subsidiary, addressed to the Administrative Agent and the other relevant Secured Parties.

(b)       Within 90 days after the acquisition by any Loan Party of any Material Real Estate Asset other than any Excluded Asset (or such longer period as the Administrative Agent may reasonably agree), the Top Borrower shall cause such Loan Party to comply with the requirements set forth in clause (c) of the definition of "Collateral and Guarantee Requirement"; it being understood and agreed that, with respect to any Material Real Estate Asset owned by any Restricted Subsidiary at the time such Restricted Subsidiary is required to become a Loan Party under Section 5.12(a) above, such Material Real Estate Asset shall be deemed to have been acquired by such Restricted Subsidiary on the first day of the time period within which such Restricted Subsidiary is required to become a Loan Party under Section 5.12(a).

(c)       Concurrently with the designation of any Restricted Subsidiary as a Discretionary Guarantor, cause such Restricted Subsidiary to comply with the requirements set forth in clause (b) of the definition of "Collateral and Guarantee Requirement".

(d)       Notwithstanding anything to the contrary herein or in any other Loan Document, it is understood and agreed that:

(i)       the Administrative Agent may grant extensions of time (including after the expiration of any relevant period, which may apply retroactively) for the creation and perfection of security interests in, or obtaining of title insurance, legal opinions, surveys or other deliverables with respect to, particular assets or the provision of any Loan Guaranty by any Restricted Subsidiary (in connection with assets acquired, or Restricted Subsidiaries formed or acquired, after the Closing Date), and each Lender hereby consents to any such extension of time,

(ii)       any Lien required to be granted from time to time pursuant to the definition of "Collateral and Guarantee Requirement" shall be subject to the exceptions and limitations set forth in the Collateral Documents,

(iii)       except to the extent required by Section 5.13, perfection by control shall not be required with respect to assets requiring perfection through control agreements or other control arrangements (other than control of pledged Capital Stock and/or Material Debt Instruments, in each case to the extent the same otherwise constitute Collateral),

96

(iv)      no Loan Party shall be required to seek any landlord lien waiver, bailee letter, estoppel, warehouseman waiver or other collateral access or similar letter or agreement,

(v)      no Loan Party will be required to (A) take any action (1) outside of the U.S. in order to create or perfect any security interest in any asset located outside of the U.S. in the case of any U.S. Loan Party and/or (2) outside of the U.S. or the jurisdiction of organization of such Non-U.S. Loan Party in order to create or perfect any security interest in any asset located outside of the U.S. or the jurisdiction of organization of such Non-U.S. Loan Party, (B) execute any security agreement, pledge agreement, mortgage, deed, hypothec, charge or other collateral document governed by the laws of any jurisdiction, other than (1) in the case of any U.S. Loan Party, the U.S., any state thereof or the District of Columbia or (2) in the case of any Non-U.S. Loan Party, the U.S. or its jurisdiction of organization or (C) make any intellectual property filing, conduct any intellectual property search or prepare any intellectual property schedule in any jurisdiction, other than (1) in the case of any U.S. Loan Party, the U.S., any state thereof or the District of Columbia or (2) in the case of any Non-U.S. Loan Party, its jurisdiction of organization;

(vi)      in no event will the Collateral include any Excluded Asset and in no event will the Top Borrower or any of its subsidiaries be required to make any Excluded Subsidiary become a Subsidiary Guarantor,

(vii)      no action shall be required to perfect any Lien with respect to (1) any vehicle or other asset subject to a certificate of title, (2) Letter-of-Credit Rights, (3) the Capital Stock of any Immaterial Subsidiary and/or (4) the Capital Stock of any Person that is not a subsidiary, which Person, if a subsidiary, would constitute an Immaterial Subsidiary, in each case except to the extent that a security interest therein can be perfected by filing a Form UCC-1 (or similar) financing statement under the UCC,

(viii)      no action shall be required to perfect a Lien in any asset in respect of which the perfection of a security interest therein would (1) be prohibited by enforceable anti-assignment provisions set forth in any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings), (2) violate the terms of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings), in each case, after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Requirements of Law or (3) trigger termination of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings) pursuant to any "change of control" or similar provision; it being understood that the Collateral shall include any proceeds and/or receivables arising out of any contract described in this clause to the extent the assignment of such proceeds or receivables is expressly deemed effective under the UCC or other applicable Requirements of Law notwithstanding the relevant prohibition, violation or termination right,

(ix)      no Loan Party shall be required to perfect a security interest in any asset to the extent the perfection of a security interest in such asset would be prohibited under any applicable Requirement of Law,

WEIL:\99124112\10\40416.0005

(x)        any joinder or supplement to any Loan Guaranty, any Collateral Document and/or any other Loan Document executed by any Restricted Subsidiary that is required to become (or otherwise becomes) a Loan Party pursuant to <u>Section 5.12(a)</u> above (including any Joinder Agreement) may, with the consent of the Administrative Agent (not to be unreasonably withheld or delayed), include such schedules (or updates to schedules) as may be necessary to qualify any representation or warranty set forth in any Loan Document to the extent necessary to ensure that such representation or warranty is true and correct to the extent required thereby or by the terms of any other Loan Document, and

(xi)        the Administrative Agent shall not require the taking of a Lien on, or require the perfection of any Lien granted in, those assets as to which the cost of obtaining or perfecting such Lien (including any mortgage, stamp, intangibles or other tax or expenses relating to such Lien) is excessive in relation to the benefit to the Lenders of the security afforded thereby as reasonably determined in writing by the Top Borrower and the Administrative Agent.

Section 5.13.    <u>Control Agreements</u>.  The Top Borrower and each Loan Guarantor shall maintain control agreements over all deposit accounts and securities accounts, other than Excluded Accounts; provided that, as long as the ABL Credit Agreement Collateral Agent has control agreements in place in respect of such accounts and such control agreements are subject to the provisions of the ABL Intercreditor Agreement whereby the ABL Credit Agreement Collateral Agent agrees to act as a bailee or agent for perfection, no such control agreements shall be required.

Section 5.14.    <u>Further Assurances</u>.  Promptly upon request of the Administrative Agent and subject to the limitations described in <u>Section 5.12</u>:

(a)        Holdings and the Top Borrower will, and will cause each other Loan Party to, execute and deliver any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions (including the filing and recordation of financing statements, fixture filings, Mortgages, Intellectual Property Security Agreements and/or amendments thereto and other documents), that may be required under any applicable Requirements of Law and which the Administrative Agent may reasonably request to ensure the creation, perfection and priority of the Liens created or intended to be created under the Collateral Documents, all at the expense of the relevant Loan Parties.

(b)        Holdings and the Top Borrower will, and will cause each other Loan Party to, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts (including notices to third parties), deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time to time in order to ensure the creation, perfection and priority of the Liens created or intended to be created under the Collateral Documents.

Section 5.15.    <u>Post-Closing Covenant</u>.  The Top Borrower will satisfy its obligations described on <u>Schedule 5.15</u>, in each case, within the time periods set forth therein with respect to the relevant obligation (or such longer period as the Administrative Agent may reasonably agree).

Section 5.16.    <u>Holdings Joinder</u>.  Concurrently with Holdings becoming a guarantor pursuant to the ABL Facility, the Top Borrower will cause Holdings (which shall be organized as a Delaware corporation or limited liability company, with organizational and governing documents reasonably satisfactory to the Administrative Agent) to deliver or execute and deliver, as applicable, to the Administrative Agent (i) a Holdings Joinder Agreement substantially in form of <u>Exhibit H</u> hereto, (ii) a

completed Perfection Certificate, (iii) UCC financing statements in appropriate form for filing in such jurisdictions as the Administrative Agent may reasonably request, (iv) an executed joinder to the ABL Intercreditor Agreement in substantially the form attached as an exhibit thereto, (v) a joinder to the Intercompany Note (if applicable), (vi) a signed copy of a customary opinion of counsel for Holdings, addressed to the Administrative Agent and the other relevant Secured Parties, (vii) other deliverables of the type described in Sections 4.01(c) and 4.01(j), and (viii) each item of Collateral that Holdings is required to deliver under [Section 4.02 of the Security Agreement].

Section 5.17.    Actual Liquidity.  On the last day of each calendar month, the Top Borrower shall maintain Actual Liquidity of not less than $25,000,000.

ARTICLE 6

NEGATIVE COVENANTS

From the Closing Date and until the Termination Date, Holdings (solely with respect to Section 6.14) and the Top Borrower covenant and agree with the Lenders that:

Section 6.01.    Indebtedness.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or otherwise become or remain liable with respect to any Indebtedness, except:

(a)      the Secured Obligations;

(b)      Indebtedness of the Top Borrower to Holdings and/or any Restricted Subsidiary and/or of any Restricted Subsidiary to Holdings, the Top Borrower and/or any other Restricted Subsidiary; provided that in the case of any Indebtedness of any Restricted Subsidiary that is not a Loan Party owing to any Restricted Subsidiary that is a Loan Party, such Indebtedness shall be permitted as an Investment under Section 6.06; provided, further, that any Indebtedness of any Loan Party to any Restricted Subsidiary that is not a Loan Party must be unsecured and expressly subordinated to the Obligations of such Loan Party on terms that are reasonably acceptable to the Administrative Agent (including pursuant to an Intercompany Note);

(c)      [reserved];

(d)      Indebtedness arising from any agreement providing for indemnification, adjustment of purchase price or similar obligations (including contingent earn-out obligations) incurred in connection with any Disposition permitted hereunder, any acquisition permitted hereunder or consummated prior to the Closing Date or any other purchase of assets or Capital Stock, and Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance of the Top Borrower or any such Restricted Subsidiary pursuant to any such agreement;

(e)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary in respect of Banking Services and/or otherwise in connection with Cash management and Deposit Accounts, including Banking Services Obligations and incentive, supplier finance or similar programs;

99

(g)    (i) guaranties by the Top Borrower and/or any Restricted Subsidiary of the obligations of suppliers, customers and licensees in the ordinary course of business, (ii) Indebtedness incurred in the ordinary course of business in respect of obligations of the Top Borrower and/or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) Indebtedness in respect of letters of credit, bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business;

(h)    Guarantees by the Top Borrower and/or any Restricted Subsidiary of Indebtedness or other obligations of the Top Borrower, any Restricted Subsidiary and/or any joint venture with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.01 or other obligations not prohibited by this Agreement; provided that in the case of any Guarantee by any Loan Party of the obligations of any non-Loan Party, the related Investment is permitted under Section 6.06;

(i)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary existing, or pursuant to commitments existing, on the Closing Date and described on Schedule 6.01;

(j)    Indebtedness of Restricted Subsidiaries that are not Loan Parties; provided that the aggregate outstanding principal amount of such Indebtedness shall not exceed the greater of $93,750,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(k)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary consisting of obligations owing under incentive (including dealer incentive), supply, license or similar agreements entered into in the ordinary course of business;

(l)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary consisting of (i) the financing of insurance premiums, (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (iii) obligations to reacquire assets or inventory in connection with customer financing arrangements in the ordinary course of business;

(m)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary with respect to Capital Leases and purchase money Indebtedness in an aggregate outstanding principal amount not to exceed the greater of $125,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(n)    Indebtedness of any Person that becomes a Restricted Subsidiary or Indebtedness assumed in connection with an acquisition or similar Investment permitted hereunder after the Closing Date; provided that (i) such Indebtedness (A) existed at the time such Person became a Restricted Subsidiary or the assets subject to such Indebtedness were acquired and (B) was not created or incurred in anticipation thereof and (ii) either (A)(I) no Event of Default under Section 7.01(a), (f) or (g) exists and (II) the Top Borrower is in compliance with the leverage or interest coverage, as applicable, test that would have applied to the incurrence of such Indebtedness under Section 6.01(w) if such Indebtedness was incurred to finance the relevant acquisition or similar Investment or (B) such Indebtedness is in an aggregate principal amount outstanding not to exceed the greater of $37,500,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(o)    Indebtedness consisting of promissory notes issued by the Top Borrower or any Restricted Subsidiary to any stockholder of any Parent Company or any current or former director, officer, employee, member of management, manager or consultant of any Parent Company, the Top Borrower or any subsidiary (or their respective Immediate Family Members) to finance the purchase or redemption of Capital Stock of any Parent Company permitted by Section 6.04(a);

(p)     Indebtedness refinancing, refunding or replacing any Indebtedness permitted under <u>clauses (i), (j), (m), (n), (r), (u), (w), (y)</u> and <u>(z)</u> of this <u>Section 6.01</u> (in any case, including any refinancing Indebtedness incurred in respect thereof, "<u>Refinancing Indebtedness</u>") and any subsequent Refinancing Indebtedness in respect thereof; <u>provided</u> that:

(i)      the principal amount of such Indebtedness does not exceed the principal amount of the Indebtedness being refinanced, refunded or replaced, except by (A) an amount equal to unpaid accrued interest, penalties and premiums (including tender premiums) thereon plus underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred in connection with the relevant refinancing, refunding or replacement and the related refinancing transaction, (B) an amount equal to any existing commitments unutilized thereunder and (C) additional amounts permitted to be incurred pursuant to this <u>Section 6.01</u> (<u>provided</u> that (1) any additional Indebtedness referenced in this <u>clause (C)</u> satisfies the other applicable requirements of this definition (with additional amounts incurred in reliance on this <u>clause (C)</u> constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (2) if such additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of <u>Section 6.02</u>),

(ii)     other than in the case of Refinancing Indebtedness with respect to <u>clauses (i), (j), (m), (n), (u)</u> and/or <u>(y)</u> (other than Customary Bridge Loans), such Indebtedness has (A) a final maturity equal to or later than (and, in the case of revolving Indebtedness, does not require mandatory commitment reductions, if any, prior to) the final maturity of the Indebtedness being refinanced, refunded or replaced and (B) other than with respect to revolving Indebtedness, such Indebtedness has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced, refunded or replaced (without giving effect to any prepayment thereof),

(iii)    the terms of any Refinancing Indebtedness with an original principal amount in excess of the Threshold Amount (excluding, to the extent applicable, pricing, fees, premiums, rate floors, optional prepayment, redemption terms or subordination terms), are not, taken as a whole (as reasonably determined by the Top Borrower), more favorable to the lenders providing such Indebtedness than those applicable to the Indebtedness being refinanced, refunded or replaced (other than (A) any covenants or other provisions applicable only to periods after the applicable maturity date of the debt then-being refinanced as of such date, (B) any covenants or provisions which are then-current market terms for the applicable type of Indebtedness or (C) any covenant or other provision which is conformed (or added) to the Loan Documents for the benefit of the Lenders or, as applicable, the Administrative Agent pursuant to an amendment to this Agreement effectuated in reliance on <u>Section 9.02(d)(ii)</u>),

(iv)     in the case of Refinancing Indebtedness with respect to Indebtedness permitted under <u>clauses (j), (m), (n), (r), (u), (w)</u> (solely as it relates to the Non-Loan Party Debt Cap) and <u>(y)</u> of this <u>Section 6.01</u>, the incurrence thereof shall be without duplication of any amounts outstanding in reliance on the relevant clause such that the amount available under the relevant clause shall be reduced by the amount of the applicable Refinancing Indebtedness, and

(v)      (A) such Indebtedness, if secured, is secured only by Permitted Liens at the time of such refinancing, refunding or replacement (it being understood that secured Indebtedness may be refinanced with unsecured Indebtedness); <u>provided</u> that if the Indebtedness being refinanced, refunded or replaced is secured by Liens on the Collateral, then such Refinancing Indebtedness may only be secured by a Lien on the Collateral that has the same or more junior priority as the

Indebtedness being refinanced, refunded or replaced, (B) such Indebtedness is incurred by the obligor or obligors in respect of the Indebtedness being refinanced, refunded or replaced, except to the extent otherwise permitted pursuant to Section 6.01 (it being understood that (1) Holdings may not be the primary obligor in respect of the applicable Refinancing Indebtedness if Holdings was not the primary obligor in respect of the relevant refinanced Indebtedness and (2) any entity that was a guarantor in respect of the relevant refinanced Indebtedness may be the primary obligor in respect of the refinancing Indebtedness, and any entity that was the primary obligor in respect of the relevant refinanced Indebtedness may be a guarantor in respect of the refinancing Indebtedness), (C) if the Indebtedness being refinanced, refunded or replaced was expressly contractually subordinated to the Obligations in right of payment, (1) such Indebtedness is contractually subordinated to the Obligations in right of payment, or (2) if not contractually subordinated to the Obligations in right of payment, the purchase, defeasance, redemption, repurchase, repayment, refinancing or other acquisition or retirement of such Indebtedness is permitted under Section 6.04(b) (other than Section 6.04(b)(i)), and (D) as of the date of the incurrence of such Indebtedness and after giving effect thereto, no Event of Default exists;

(q)      [reserved];

(r)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary in an aggregate outstanding principal amount not to exceed 100% of the amount of Net Proceeds received by the Top Borrower from (i) the issuance or sale of Qualified Capital Stock or (ii) any cash contribution to its common equity with the Net Proceeds from the issuance and sale by any Parent Company of its Qualified Capital Stock or a contribution to the common equity of any Parent Company, in each case, (A) other than any Net Proceeds received from the sale of Capital Stock to, or contributions from, the Top Borrower or any of its Restricted Subsidiaries and (B) to the extent the relevant Net Proceeds have not otherwise been applied to make capital expenditures, Investments, Restricted Payments or Restricted Debt Payments hereunder;

(s)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary under any Derivative Transaction not entered into for speculative purposes;

(t)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary representing (i) deferred compensation to current or former directors, officers, employees, members of management, managers, and consultants of any Parent Company, the Top Borrower and/or any Restricted Subsidiary in the ordinary course of business and (ii) deferred compensation or other similar arrangements in connection with any Investment permitted hereby;

(u)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary in an aggregate outstanding principal amount not to exceed the greater of $120,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(v)      [reserved];

(w)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary so long as, after giving effect thereto, including the application of the proceeds thereof (in each case, without "netting" the cash proceeds of the applicable Indebtedness being incurred), (i) if such Indebtedness is secured by a Lien on the Collateral that is *pari passu* with the Lien on the Collateral securing the Secured Obligations, the First Lien Leverage Ratio does not exceed [●]:1.00[5], (ii) if such Indebtedness is secured by a Lien on the Collateral that is junior to the Lien on the Collateral securing the Secured Obligations, the Secured Leverage

---

[5] NTD:  To be set at closing date leverage.

Ratio does not exceed [●]:1.00[6] and (iii) if such Indebtedness is secured by a Lien on any asset that does not constitute Collateral or is unsecured, at the election of the Top Borrower, either (A) the Total Leverage Ratio does not exceed [●]:1.00[7] or (B) the Interest Coverage Ratio is not less than 2.00:1.00; provided, however, that the aggregate outstanding principal amount of Indebtedness incurred in reliance on this Section 6.01(w) by Restricted Subsidiaries that are not Loan Parties shall not, at any time, exceed the greater of $105,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period (the "Non-Loan Party Debt Cap");

(x)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary incurred in respect of:

(i)      any ABL Facility in an aggregate outstanding principal amount that does not exceed the greater of (A) (1) $200,000,000 and (B) the sum of (1) 90% of the aggregate amount of gross trade receivables, (2) 85% of the aggregate amount of gross inventory and (3) 100% of "qualified cash", in each case, of the Loan Parties, and

(ii)      any refinancing of any ABL Facility after the Closing Date so long as (A) the aggregate principal amount of such Indebtedness does not exceed, without duplication, the amount permitted to be incurred under preceding clause (i), plus (1) the amount of any underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees) incurred in connection with the relevant refinancing and (2) an amount equal to any existing commitments unutilized thereunder and (B) such Indebtedness, if secured, is secured by Liens permitted under Section 6.02;

(y)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary incurred in connection with Sale and Lease-Back Transactions permitted pursuant to Section 6.08;

(z)      [reserved];

(aa)      Indebtedness (including obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness) incurred by the Top Borrower and/or any Restricted Subsidiary in respect of workers compensation claims, unemployment insurance (including premiums related thereto), other types of social security, pension obligations, vacation pay, health, disability or other employee benefits;

(bb)      [reserved];

(cc)      Indebtedness of the Top Borrower and/or any Restricted Subsidiary in respect of and letter of credit or bank guarantee issued in favor of any issuing bank to support any defaulting lender's participation in letters of credit issued under any ABL Facility;

(dd)      Indebtedness of any Borrower or any Restricted Subsidiary supported by (i) any Letter of Credit (as defined in the ABL Credit Agreement) or (ii) any other letter of credit in an aggregate outstanding principal amount not to exceed the greater of $25,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

---

[6] NTD:  To be set at closing date leverage.

[7] NTD:  To be set at 0.50x outside the closing date leverage.

(ee)    unfunded pension fund and other employee benefit plan obligations and liabilities incurred by the Top Borrower and/or any Restricted Subsidiary in the ordinary course of business to the extent that the unfunded amounts would not otherwise cause an Event of Default under Section 7.01(i);

(ff)    customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business; and

(gg)    without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees, expenses and charges with respect to Indebtedness of the Top Borrower and/or any Restricted Subsidiary hereunder.

Section 6.02.    Liens.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, create, incur, assume or permit or suffer to exist any Lien on or with respect to any property of any kind owned by it, whether now owned or hereafter acquired, or any income or profits therefrom, except:

(a)    Liens securing the Secured Obligations created pursuant to the Loan Documents;

(b)    Liens for Taxes which (i) are not then due, (ii) if due, are not at such time required to be paid pursuant to Section 5.03 or (iii) are being contested in accordance with Section 5.03;

(c)    statutory Liens (and rights of set-off) of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by applicable Requirements of Law, in each case incurred in the ordinary course of business (i) for amounts not yet overdue by more than 30 days or (ii) for amounts that are overdue by more than 30 days and that are being contested in good faith by appropriate proceedings, so long as any reserves or other appropriate provisions required by GAAP have been made for any such contested amounts;

(d)    Liens incurred (i) in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security laws and regulations, (ii) in the ordinary course of business to secure the performance of tenders, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) pursuant to pledges and deposits of Cash or Cash Equivalents in the ordinary course of business securing (x) any liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty, liability or other insurance to Holdings, the Top Borrower and its subsidiaries or (y) leases or licenses of property otherwise permitted by this Agreement and (iv) to secure obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments posted with respect to the items described in clauses (i) through (iii) above;

(e)    Liens consisting of easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not, in the aggregate, materially interfere with the ordinary conduct of the business of the Top Borrower and/or its Restricted Subsidiaries, taken as a whole, or the use of the affected property for its intended purpose;

(f)    Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii);

(g)     Liens (i) solely on any Cash earnest money deposits (including as part of any escrow arrangement) made by the Top Borrower and/or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement with respect to any Investment permitted hereunder and (ii) consisting of (A) an agreement to Dispose of any property in a Disposition permitted under Section 6.07 (other than Section 6.07(g)(x)) and/or (B) the pledge of Cash as part of an escrow arrangement required in any Disposition permitted under Section 6.07 (other than Section 6.07(g)(x));

(h)     (i) purported Liens evidenced by the filing of UCC financing statements relating solely to operating leases or consignment or bailee arrangements entered into in the ordinary course of business, and (ii) Liens arising from precautionary UCC financing statements or similar filings;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     Liens in connection with any zoning, building or similar Requirement of Law or right reserved to or vested in any Governmental Authority to control or regulate the use of any or dimensions of real property or the structure thereon, including Liens in connection with any condemnation or eminent domain proceeding or compulsory purchase order;

(k)     Liens securing Indebtedness permitted pursuant to Section 6.01(p) (solely with respect to the permitted refinancing of (x) Indebtedness permitted pursuant to Sections 6.01(i), (j), (m), (n), (u), (w) (y) and (z) and (y) Indebtedness that is secured in reliance on Section 6.02(u) (provided that the granting of the relevant Lien shall be without duplication of any Lien outstanding under Section 6.02(u) such that the amount available under Section 6.02(u) shall be reduced by the amount of the applicable Lien granted in reliance on this clause (y))); provided that (i) no such Lien extends to any asset not covered by the Lien securing the Indebtedness that is being refinanced (it being understood that individual financings of the type permitted under Section 6.01(m) provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates) and (ii) if the Lien securing the Indebtedness being refinanced was subject to intercreditor arrangements, then (A) the Lien securing any refinancing Indebtedness in respect thereof shall be subject to intercreditor arrangements that are not materially less favorable to the Secured Parties, taken as a whole, than the intercreditor arrangements governing the Lien securing the Indebtedness that is refinanced or (B) the intercreditor arrangements governing the Lien securing the relevant refinancing Indebtedness shall be set forth in an Acceptable Intercreditor Agreement;

(l)     Liens described on Schedule 6.02 and any modification, replacement, refinancing, renewal or extension thereof; provided that (i) no such Lien extends to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 6.01 and (B) proceeds and products thereof, replacements, accessions or additions thereto and improvements thereon (it being understood that individual financings of the type permitted under Section 6.01(m) provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates) and (ii) any such modification, replacement, refinancing, renewal or extension of the obligations secured or benefited by such Liens, if constituting Indebtedness, is permitted by Section 6.01;

(m)     Liens arising out of Sale and Lease-Back Transactions permitted under Section 6.08;

(n)     Liens securing Indebtedness permitted pursuant to Section 6.01(m); provided that any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness and proceeds and products thereof, replacements, accessions or additions thereto and improvements thereon (it being

105

understood that individual financings of the type permitted under <u>Section 6.01(m)</u> provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates);

(o)        (i) Liens securing Indebtedness permitted pursuant to <u>Section 6.01(n)</u> on the relevant acquired assets or on the Capital Stock and assets of the relevant newly acquired Restricted Subsidiary; <u>provided</u> that no such Lien (x) extends to or covers any other assets (other than the proceeds or products thereof, replacements, accessions or additions thereto and improvements thereon (it being understood that individual financings of the type permitted under <u>Section 6.01(m)</u> provided by any lender may be cross collateralized to other financings of such type provided by such lender or its affiliates) or (y) was created in contemplation of the applicable acquisition of assets or Capital Stock, and (ii) [reserved];

(p)        (i) Liens that are contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of the Top Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Top Borrower or any Restricted Subsidiary, (C) purchase orders and other agreements entered into with customers of the Top Borrower or any Restricted Subsidiary in the ordinary course of business and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, (iii) bankers Liens and rights and remedies as to Deposit Accounts, (iv) Liens of a collection bank arising under Section 4-208 of the UCC on items in the ordinary course of business, (v) Liens in favor of banking or other financial institutions arising as a matter of law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions and (vi) Liens on the proceeds of any Indebtedness incurred in connection with any transaction permitted hereunder, which proceeds have been deposited into an escrow account on customary terms to secure such Indebtedness pending the application of such proceeds to finance such transaction;

(q)        Liens on assets and Capital Stock of Restricted Subsidiaries that are not Loan Parties (including Capital Stock owned by such Persons) securing Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted pursuant to <u>Section 6.01</u>;

(r)        Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Top Borrower and/or its Restricted Subsidiaries;

(s)        Liens securing Indebtedness incurred in reliance on, and subject to the provisions set forth in, Section 6.01(w); provided that any Lien that is granted in reliance on this clause (s) on the  Collateral shall be subject to an Acceptable Intercreditor Agreement;

(t)        Liens securing Indebtedness incurred pursuant to <u>Section 6.01(x)</u>; <u>provided</u> that (i) any Lien that is granted in reliance on this <u>clause (t)</u> on the ABL Priority Collateral and is senior to, *pari passu* with or junior to the Lien on the ABL Priority Collateral securing the Secured Obligations shall be subject to an Acceptable Intercreditor Agreement and (ii) any Lien on the Term Loan Priority Collateral that is granted in reliance on this <u>clause (t)</u> shall be junior to the Liens on the Term Loan Priority Collateral securing the Secured Obligations pursuant to an Acceptable Intercreditor Agreement;

(u)        (u)        Liens on assets securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed the greater of $120,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period; provided that (i) any Lien that

is granted in reliance on this clause (u) on the Collateral shall be junior to the Lien on the Collateral securing the Secured Obligations pursuant to an Acceptable Intercreditor Agreement;

(v)      (i) Liens on assets securing judgments, awards, attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation being contested in good faith not constituting an Event of Default under <u>Section 7.01(h)</u> and (ii) any pledge and/or deposit securing any settlement of litigation;

(w)      leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not secure any Indebtedness;

(x)      Liens on Securities that are the subject of repurchase agreements constituting Investments permitted under <u>Section 6.06</u> arising out of such repurchase transaction;

(y)      Liens securing obligations in respect letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments permitted under <u>Sections 6.01(d)</u>, <u>(e)</u>, <u>(g)</u>, <u>(aa)</u> and <u>(cc)</u>;

(z)      Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any asset in the ordinary course of business and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar Requirement of Law under any other applicable jurisdiction);

(aa)      Liens (i) in favor of any Loan Party and/or (ii) granted by any non-Loan Party in favor of any Restricted Subsidiary that is not a Loan Party, in the case of <u>clauses (i)</u> and <u>(ii)</u>, securing intercompany Indebtedness permitted (or not restricted) under <u>Section 6.01</u> or <u>Section 6.09</u>;

(bb)      Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(cc)      Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(dd)      Liens securing (i) obligations of the type described in <u>Section 6.01(f)</u> and/or (ii) obligations of the type described in <u>Section 6.01(s)</u>;

(ee)      (i) Liens on Capital Stock of joint ventures or Unrestricted Subsidiaries securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Wholly-Owned Subsidiaries;

(ff)      Liens on cash or Cash Equivalents arising in connection with the defeasance, discharge or redemption of Indebtedness;

(gg)      Liens consisting of the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business; and

(hh)      Liens with respect to Material Real Estate Assets disclosed in any Mortgage Policy delivered pursuant to <u>Section 5.12</u> with respect to any Material Real Estate Asset and any replacement, extension or renewal thereof; <u>provided</u> that no such replacement, extension or renewal shall cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal (and additions thereto, improvements thereon and the proceeds thereof).

Section 6.03.     [Reserved].

Section 6.04.     Restricted Payments; Restricted Debt Payments.

(a)     The Top Borrower shall not pay or make, directly or indirectly, any Restricted Payment, except that:

(i)     the Top Borrower may make Restricted Payments to the extent necessary to permit any Parent Company:

(A)     to pay general administrative costs and expenses (including corporate overhead, legal or similar expenses and customary salary, bonus and other benefits payable to directors, officers, employees, members of management, managers and/or consultants of any Parent Company) and franchise Taxes, and similar fees and expenses, required to maintain the organizational existence of such Parent Company, in each case, which are reasonable and customary and incurred in the ordinary course of business, plus any reasonable and customary indemnification claims made by directors, officers, members of management, managers, employees or consultants of any Parent Company, in each case, to the extent attributable to the ownership or operations of any Parent Company (but excluding, for the avoidance of doubt, the portion of any such amount, if any, that is attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries), and/or its subsidiaries;

(B)     (x) for any taxable period for which the Top Borrower is a member of a consolidated, combined, unitary or similar tax group for U.S. federal and/or applicable state or local tax purposes of which such Parent Company is the common parent, to discharge the consolidated, combined, unitary or similar Tax liabilities of such Parent Company and its subsidiaries when and as due, to the extent such liabilities are attributable to the income of the Top Borrower and/or any subsidiary; provided that the amount of such payments in respect of any taxable year do not exceed the amount of such Tax liabilities that the Top Borrower and/or its applicable subsidiaries would have paid had such Tax liabilities been paid as standalone companies or as a standalone group and (y) for any taxable period for which the Top Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local tax purposes, distributions to any direct or indirect parent of the Top Borrower in an amount not to exceed the amount of any Tax that the Top Borrower and/or its applicable subsidiaries would have paid had such Tax been paid as standalone companies or as a standalone group (and assuming for purposes of such calculation that the Top Borrower is classified as a domestic corporation for U.S. federal income tax purposes);

(C)     to pay audit and other accounting and reporting expenses of any Parent Company to the extent such expenses are attributable to such Parent Company (but excluding, for the avoidance of doubt, the portion of any such expenses, if any, attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries), the Top Borrower and its subsidiaries;

(D)     for the payment of any insurance premiums that is payable by or attributable to any Parent Company (but excluding, for the avoidance of doubt, the portion of any such premiums, if any, attributable to the ownership or operations of any subsidiary

of any Parent Company other than the Top Borrower and/or its subsidiaries), the Top Borrower and its subsidiaries;

(E)     to pay (x) any fee and/or expense related to any debt or equity offering, investment or acquisition (whether or not consummated) and/or any expenses of, or indemnification obligation in favor of, any trustee, agent, arranger, underwriter or similar role, and (y) after the consummation of an initial public offering or the issuance of public debt Securities, Public Company Costs;

(F)     any Investment permitted by Section 6.06 (other than Investments (i) in Cash or Cash Equivalents, (ii) in any Loan Party or (iii) made pursuant to Section 6.06(r)(i)) and/or any Restricted Payment permitted by Section 6.04(a) (other than pursuant to Section 6.04(a)(iii)(A)) and actually made in cash during such Calculation Period or, at the option of the Top Borrower, made prior to the date the Top Borrower is required to make a payment of Excess Cash Flow in respect of such Excess Cash Flow Period, (A) except to the extent the relevant Investment and/or Restricted Payment is financed with the proceeds of long term funded Indebtedness (other than revolving Indebtedness) and (B) without duplication of any amounts deducted from Excess Cash Flow for a prior Calculation Period; and

(G)     to pay customary salary, bonus, severance and other benefits payable to current or former directors, officers, members of management, managers, employees or consultants of any Parent Company (or any Immediate Family Member of any of the foregoing) to the extent such salary, bonuses and other benefits are attributable and reasonably allocated to the operations of the Top Borrower and/or its subsidiaries, in each case, so long as such Parent Company applies the amount of any such Restricted Payment for such purpose;

(ii)     the Top Borrower may pay (or make Restricted Payments to allow any Parent Company) to repurchase, redeem, retire or otherwise acquire or retire for value the Capital Stock of any Parent Company or any subsidiary held by any future, present or former employee, director, member of management, officer, manager or consultant (or any Affiliate or Immediate Family Member thereof) of any Parent Company, the Top Borrower or any subsidiary:

(A)     with Cash and Cash Equivalents (and including, to the extent constituting a Restricted Payment, amounts paid in respect of promissory notes issued to evidence any obligation to repurchase, redeem, retire or otherwise acquire or retire for value the Capital Stock of any Parent Company or any subsidiary held by any future, present or former employee, director, member of management, officer, manager or consultant (or any Affiliate or Immediate Family Member thereof) of any Parent Company, the Top Borrower or any subsidiary) in an amount not to exceed, in any Fiscal Year, the greater of $37,500,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, which, if not used in such Fiscal Year, shall be carried forward to succeeding Fiscal Years;

(B)     with the proceeds of any sale or issuance of, or any capital contribution in respect of, the Capital Stock of the Top Borrower or any Parent Company (to the extent such proceeds (i) are contributed in respect of Qualified Capital Stock to the Top Borrower or any Restricted Subsidiary and (ii) are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount); or

(C)      with the net proceeds of any key-man life insurance policies;

(iii)     the Top Borrower may make Restricted Payments in an amount not to exceed (A) so long as the First Lien Leverage Ratio, calculated on a Pro Forma Basis, would not exceed [●]:1.00[8] as of the last day of the most recently ended Test Period, the portion, if any, of the Available Amount on such date that the Top Borrower elects to apply to this clause (iii)(A) and/or (B) the portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this clause (iii);

(iv)     the Top Borrower may make Restricted Payments (i) to any Parent Company to enable such Parent Company to make Cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of such Parent Company and (ii) consisting of (A) payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former officers, directors, employees, members of management, managers or consultants of the Top Borrower, any Restricted Subsidiary or any Parent Company or any of their respective Immediate Family Members and/or (B) repurchases of Capital Stock in consideration of the payments described in subclause (A) above, including demand repurchases in connection with the exercise of stock options;

(v)     the Top Borrower may repurchase (or make Restricted Payments to any Parent Company to enable it to repurchase) Capital Stock upon the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock if such Capital Stock represents all or a portion of the exercise price of, or tax withholdings with respect to, such warrants, options or other securities convertible into or exchangeable for Capital Stock;

(vi)     [reserved];

(vii)     so long as no Event of Default exists at the time of declaration of such Restricted Payment, following the consummation of the first Qualifying IPO, the Top Borrower may (or may make Restricted Payments to any Parent Company to enable it to) make Restricted Payments with respect to any Capital Stock in an amount not to exceed 6.00% per annum of the net Cash proceeds received by or contributed to the Top Borrower from any Qualifying IPO;

(viii)     the Top Borrower may make Restricted Payments to (i) redeem, repurchase, retire or otherwise acquire any (A) Capital Stock ("Treasury Capital Stock") of the Top Borrower and/or any Restricted Subsidiary or (B) Capital Stock of any Parent Company, in the case of each of subclauses (A) and (B), in exchange for, or out of the proceeds of the substantially concurrent sale (other than to the Top Borrower and/or any Restricted Subsidiary) of, Qualified Capital Stock of the Top Borrower or any Parent Company to the extent any such proceeds are contributed to the capital of the Top Borrower and/or any Restricted Subsidiary in respect of Qualified Capital Stock (and which proceeds are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount) ("Refunding Capital Stock") and (ii) declare and pay dividends on any Treasury Capital Stock out of the proceeds of the substantially concurrent sale (other than to the Top Borrower or a Restricted Subsidiary) of any Refunding Capital Stock;

---

[8] NTD: To be set at closing date leverage.

WEIL:\99124112\10\40416.0005

(ix) to the extent constituting a Restricted Payment, the Top Borrower may consummate any transaction permitted by Section 6.06 (other than Sections 6.06(j) and (t)), Section 6.07 (other than Section 6.07(g)) and Section 6.09 (other than Sections 6.09(d), (j) and (l));

(x) so long as no Specified Default has occurred and is continuing, the Top Borrower may make Restricted Payments in an aggregate amount, when taken together with the aggregate amount of Restricted Debt Payments made in reliance on Section 6.04(b)(iv), not to exceed $10,000,000;

(xi) the Top Borrower may make additional Restricted Payments so long as, after giving effect thereto on a Pro Forma Basis, the First Lien Leverage Ratio is not greater than [●][9]:1.00 and no Event of Default exists or would result therefrom; and

(xii) the Top Borrower may declare and make dividend payments or other Restricted Payments payable solely in the Capital Stock of the Top Borrower or of any Parent Company.

(b) The Top Borrower shall not, nor shall it permit any Restricted Subsidiary to, make any prepayment in Cash in respect of principal of or interest on (x) any Junior Lien Indebtedness or (y) any Junior Indebtedness (the Indebtedness described in clauses (x), and (y), the "Restricted Debt"), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Restricted Debt prior to the scheduled maturity date thereof (collectively, "Restricted Debt Payments"), except:

(i) with respect to any purchase, defeasance, redemption, repurchase, repayment or other acquisition or retirement thereof made by exchange for, or out of the proceeds of, Refinancing Indebtedness permitted by Section 6.01 and/or refinancing Indebtedness permitted by Section 6.01(x);

(ii) as part of an applicable high yield discount obligation catch-up payment;

(iii) payments of regularly scheduled interest (including any penalty interest, if applicable) and payments of fees, expenses and indemnification obligations as and when due (other than payments with respect to Junior Indebtedness that are prohibited by the subordination provisions thereof);

(iv) so long as no Specified Default has occurred and is continuing, Restricted Debt Payments in an aggregate amount, when taken together with the aggregate amount of Restricted Payments made in reliance on Section 6.04(a)(x), not to exceed $10,000,000;

(v) (A) Restricted Debt Payments in exchange for, or with proceeds of any issuance of, Qualified Capital Stock of the Top Borrower and/or any capital contribution in respect of Qualified Capital Stock of the Top Borrower (and which proceeds are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount), (B) Restricted Debt Payments as a result of the conversion of all or any portion of any Restricted Debt into Qualified Capital Stock of the Top Borrower and (C) to the extent constituting a Restricted Debt Payment, payment-in-kind interest with respect to any Restricted Debt that is permitted under Section 6.01;

---

[9] NTD: To be [0.50]x inside closing date level

WEIL:\99124112\10\40416.0005

(vi)     Restricted Debt Payments in an aggregate amount not to exceed (A) so long as the First Lien Leverage Ratio, calculated on a Pro Forma Basis, would not exceed [●]:1.00[10] as of the last day of the most recently ended Test Period, the portion, if any, of the Available Amount on such date that the Top Borrower elects to apply to this clause (vi)(A) and/or (B) the portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this clause (vi);

(vii)     additional Restricted Debt Payments so long as, after giving effect thereto on a Pro Forma Basis, the First Lien Leverage Ratio is not greater than [●][11]:1.00 and no Event of Default exists or would result therefrom;

(viii)     (A) mandatory prepayments of Restricted Debt (and related payments of interest) made with Declined Proceeds; and

(ix)     to the extent constituting a Restricted Debt Payment, the consummation of the Transactions.

Section 6.05.     <u>Burdensome Agreements</u>.     Except as provided herein or in any other Loan Document, the ABL Credit Agreement or any equivalent term under any ABL Facility and/or (y) in any agreement with respect to any refinancing, renewal or replacement of such Indebtedness that is permitted by <u>Section 6.01</u>), the Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into or cause to exist any agreement restricting the ability of (x) any Restricted Subsidiary of the Top Borrower that is not a Loan Party to pay dividends or other distributions to the Top Borrower or any Loan Party, (y) any Restricted Subsidiary that is not a Loan Party to make cash loans or advances to the Top Borrower or any Loan Party or (z) any Loan Party to create, permit or grant a Lien on any of its properties or assets to secure the Secured Obligations, except restrictions:

(a)     set forth in any agreement evidencing (i) Indebtedness of a Restricted Subsidiary that is not a Loan Party permitted by <u>Section 6.01</u>, (ii) Indebtedness permitted by <u>Section 6.01</u> that is secured by a Permitted Lien if the relevant restriction applies only to the Person obligated under such Indebtedness and its Restricted Subsidiaries or the assets intended to secure such Indebtedness and (iii) Indebtedness permitted pursuant to <u>clauses (j)</u>, <u>(m)</u>, <u>(p)</u> (as it relates to Indebtedness in respect of <u>clauses (m)</u>, <u>(r)</u>, <u>(u)</u>, <u>(w)</u> and/or <u>(y)</u> of <u>Section 6.01</u>), <u>(r)</u>, <u>(u)</u>, <u>(w)</u> and/or <u>(y)</u> of <u>Section 6.01</u>;

(b)     arising under customary provisions restricting assignments, subletting or other transfers (including the granting of any Lien) contained in leases, subleases, licenses, sublicenses, joint venture agreements and other agreements entered into in the ordinary course of business;

(c)     that are or were created by virtue of any Lien granted upon, transfer of, agreement to transfer or grant of, any option or right with respect to any assets or Capital Stock not otherwise prohibited under this Agreement;

(d)     that are assumed in connection with any acquisition of property or the Capital Stock of any Person, so long as the relevant encumbrance or restriction relates solely to the Person and its subsidiaries

---

[10] NTD: To be set at closing date level.

[11] NTD: To be [0.50]x inside closing date level.

(including the Capital Stock of the relevant Person or Persons) and/or property so acquired and was not created in connection with or in anticipation of such acquisition;

(e)　　set forth in any agreement for any Disposition of any Restricted Subsidiary (or all or substantially all of the assets thereof) that restricts the payment of dividends or other distributions or the making of cash loans or advances by such Restricted Subsidiary pending such Disposition;

(f)　　set forth in provisions in agreements or instruments which prohibit the payment of dividends or the making of other distributions with respect to any class of Capital Stock of a Person other than on a pro rata basis;

(g)　　imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements;

(h)　　on Cash, other deposits or net worth or similar restrictions imposed by any Person under any contract entered into in the ordinary course of business or for whose benefit such Cash, other deposits or net worth or similar restrictions exist;

(i)　　set forth in documents which exist on the Closing Date and were not created in contemplation thereof;

(j)　　arising pursuant to an agreement or instrument relating to any Indebtedness permitted to be incurred after the Closing Date if the relevant restrictions, taken as a whole, are not materially less favorable to the Lenders than the restrictions contained in this Agreement, taken as a whole (as determined in good faith by the Top Borrower);

(k)　　arising under or as a result of applicable Requirements of Law or the terms of any license, authorization, concession or permit;

(l)　　arising in any Hedge Agreement and/or any agreement or arrangement relating to any Banking Services;

(m)　　relating to any asset (or all of the assets) of and/or the Capital Stock of the Top Borrower and/or any Restricted Subsidiary which is imposed pursuant to an agreement entered into in connection with any Disposition of such asset (or assets) and/or all or a portion of the Capital Stock of the relevant Person that is permitted by this Agreement;

(n)　　set forth in any agreement relating to any Permitted Lien that limit the right of the Top Borrower or any Restricted Subsidiary to Dispose of or encumber the assets subject thereto; and/or

(o)　　imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of any contract, instrument or obligation referred to in clauses (a) through (n) above; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Top Borrower, more restrictive with respect to such restrictions, taken as a whole, than those in existence prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 6.06.　　Investments.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, make or own any Investment in any other Person except:

WEIL:\99124112\10\40416.0005

(a)        Cash or Investments that were Cash Equivalents at the time made;

(b)        (i) Investments existing on the Closing Date in the Top Borrower or in any subsidiary, (ii) Investments made after the Closing Date among the Top Borrower and/or one or more Restricted Subsidiaries that are Loan Parties, (iii) Investments made after the Closing Date by any Loan Party in any Restricted Subsidiary that is not a Loan Party; provided that the aggregate outstanding amount of any such Investment shall not exceed the greater of $80,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, (iv) Investments made by any Restricted Subsidiary that is not a Loan Party in any Loan Party and/or any other Restricted Subsidiary that is not a Loan Party and (v) Investments made by any Loan Party and/or any Restricted Subsidiary that is not a Loan Party in the form of any contribution or Disposition of the Capital Stock of any Person that is not a Loan Party;

(c)        Investments (i) constituting deposits, prepayments and/or other credits to suppliers, (ii) made in connection with obtaining, maintaining or renewing client and customer contracts and/or (iii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case, in the ordinary course of business or, in the case of clause (iii), to the extent necessary to maintain the ordinary course of supplies to the Top Borrower or any Restricted Subsidiary;

(d)        Investments in any Unrestricted Subsidiary and/or any Similar Business (including any joint venture) in an aggregate outstanding amount not to exceed the greater of $60,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(e)        Permitted Acquisitions; provided, that any Permitted Acquisition made by a Loan Party in a Restricted Subsidiary that is not a Loan Party (or a Person that will not become a Loan Party), including assets acquired by a Restricted Subsidiary that is not a Loan Party, shall not exceed the greater of $30,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(f)        Investments (i) existing on, or contractually committed to or contemplated as of, the Closing Date and described on Schedule 6.06 and (ii) any modification, replacement, renewal or extension of any Investment described in clause (i) above so long as no such modification, renewal or extension increases the amount of such Investment except by the terms thereof or as otherwise permitted by this Section 6.06;

(g)        Investments received in lieu of Cash in connection with any Disposition permitted by Section 6.07 or any other disposition of assets not constituting a Disposition;

(h)        loans or advances to present or former employees, directors, members of management, officers, managers or consultants or independent contractors (or their respective Immediate Family Members) of any Parent Company, the Top Borrower, its subsidiaries and/or any joint venture to the extent permitted by Requirements of Law, in connection with such Person's purchase of Capital Stock of any Parent Company, either (i) in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding or (ii) so long as the proceeds of such loan or advance are substantially contemporaneously contributed to the Top Borrower for the purchase of such Capital Stock;

(i)        Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(j)        Investments consisting of (or resulting from) Indebtedness permitted under Section 6.01 (other than Indebtedness permitted under Sections 6.01(b) and (h)), Permitted Liens, Restricted Payments permitted under Section 6.04 (other than Section 6.04(a)(ix)), Restricted Debt Payments permitted by

Section 6.04 and mergers, consolidations, amalgamations, liquidations, windings up, dissolutions or Dispositions permitted by Section 6.07 (other than Section 6.07(a) (if made in reliance on subclause (ii)(B) of the proviso thereto), Section 6.07(b) (if made in reliance on clause (ii) therein), Section 6.07(c)(ii) (if made in reliance on clause (B) therein) and Section 6.07(g));

(k)     Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers;

(l)     Investments (including debt obligations and Capital Stock) received (i) in connection with the bankruptcy or reorganization of any Person, (ii) in settlement of delinquent obligations of, or other disputes with, customers, suppliers and other account debtors arising in the ordinary course of business, (iii) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and/or (iv) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes;

(m)     loans and advances of payroll payments or other compensation to present or former employees, directors, members of management, officers, managers or consultants of any Parent Company (to the extent such payments or other compensation relate to services provided to such Parent Company (but excluding, for the avoidance of doubt, the portion of any such amount, if any, attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries)), the Top Borrower and/or any subsidiary in the ordinary course of business;

(n)     Investments to the extent that payment therefor is made solely with Capital Stock of any Parent Company or Qualified Capital Stock of the Top Borrower or any Restricted Subsidiary, in each case, to the extent not resulting in a Change of Control;

(o)     (i) Investments of any Restricted Subsidiary acquired after the Closing Date, or of any Person acquired by, or merged into or consolidated or amalgamated with, the Top Borrower or any Restricted Subsidiary after the Closing Date, in each case as part of an Investment otherwise permitted by this Section 6.06 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of the relevant acquisition, merger, amalgamation or consolidation and (ii) any modification, replacement, renewal or extension of any Investment permitted under clause (i) of this Section 6.06(o) so long as no such modification, replacement, renewal or extension thereof increases the original amount of such Investment except as otherwise permitted by this Section 6.06;

(p)     Investments made in connection with the Transactions;

(q)     Investments made after the Closing Date by the Top Borrower and/or any of its Restricted Subsidiaries in an aggregate amount at any time outstanding not to exceed:

(i)     (A) the greater of $90,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, plus (B) at the election of the Top Borrower, the amount of Restricted Payments and/or Restricted Debt Payments then permitted to be made by the Top Borrower or any Restricted Subsidiary in reliance on Section 6.04(a)(x) and/or Section 6.04(b)(iv) (it being understood that any amount utilized under this clause (B) to make an Investment shall result in a reduction in availability under Section 6.04(a)(x) and Section 6.04(b)(iv)), plus

(ii)     in the event that (A) the Top Borrower or any of its Restricted Subsidiaries makes any Investment after the Closing Date in any Person that is not a Restricted Subsidiary and (B) such

Person subsequently becomes a Restricted Subsidiary, an amount equal to 100.0% of the fair market value of such Investment as of the date on which such Person becomes a Restricted Subsidiary;

(r)     Investments made after the Closing Date by the Top Borrower and/or any of its Restricted Subsidiaries in an aggregate outstanding amount not to exceed (i) the portion, if any, of the Available Amount on such date that the Top Borrower elects to apply to this clause (r)(i) and/or (ii) the portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this clause (r)(ii);

(s)     (i) Guarantees of leases (other than Capital Leases) or of other obligations not constituting Indebtedness and (ii) Guarantees of the lease obligations of suppliers, customers, franchisees and licensees of the Top Borrower and/or its Restricted Subsidiaries, in each case, in the ordinary course of business;

(t)     Investments in any Parent Company in amounts and for purposes for which Restricted Payments to such Parent Company are permitted under Section 6.04(a); provided that any Investment made as provided above in lieu of any such Restricted Payment shall reduce availability under the applicable Restricted Payment basket under Section 6.04(a);

(u)     [reserved];

(v)     [reserved];

(w)     Investments under any Derivative Transaction of the type permitted under Section 6.01(s);

(x)     Investments consisting of the Disposition of inventory from any Loan Party to any Restricted Subsidiary that is not a Loan Party and which is organized under the laws of Canada in the ordinary course of business in an amount not to exceed in any Fiscal Year the greater of $15,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(y)     Investments made in joint ventures as required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture agreements and similar binding arrangements entered into in the ordinary course of business;

(z)     Investments made in connection with any nonqualified deferred compensation plan or arrangement for any present or former employee, director, member of management, officer, manager or consultant or independent contractor (or any Immediate Family Member thereof) of any Parent Company, the Top Borrower, its subsidiaries and/or any joint venture;

(aa)    Investments in the Top Borrower, any Restricted Subsidiary and/or joint venture in connection with intercompany cash management arrangements and related activities in the ordinary course of business;

(bb)    additional Investments so long as, after giving effect thereto on a Pro Forma Basis, the First Lien Leverage Ratio is not greater than [●][12]:1.00 and no Event of Default exists or would result therefrom;

---

[12] NTD: To be [0.25]x inside closing date level

WEIL:\99124112\10\40416.0005

(cc)     any Investment made by any Unrestricted Subsidiary prior to the date on which such Unrestricted Subsidiary is designated as a Restricted Subsidiary so long as the relevant Investment was not made in contemplation of the designation of such Unrestricted Subsidiary as a Restricted Subsidiary; and

(dd)     Investments consisting of the licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons.

Notwithstanding the foregoing, it is understood and agreed that this Section 6.06 shall not permit (x) an IP Separation Transaction or (y) an Investment by the Top Borrower or any Restricted Subsidiary in the form of a contribution of any Material Intellectual Property to any Unrestricted Subsidiary.

Section 6.07.     Fundamental Changes; Disposition of Assets.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve themselves (or suffer any liquidation or dissolution), or make any Disposition of any assets having a fair market value in excess of $9,000,000 in a single transaction or a series of related transactions, except:

(a)     any Restricted Subsidiary may be merged, consolidated or amalgamated with or into the Top Borrower or any other Restricted Subsidiary; provided that (i) in the case of any such merger, consolidation or amalgamation with or into the Top Borrower, (A) the Top Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is not the Top Borrower (any such Person, the "Successor Borrower"), (x) the Successor Borrower shall be an entity organized or existing under the law of the U.S., any state thereof or the District of Columbia, (y) the Successor Borrower shall expressly assume the Obligations of the Top Borrower in a manner reasonably satisfactory to the Administrative Agent and (z) except as the Administrative Agent may otherwise agree, each Guarantor, unless it is the other party to such merger, consolidation or amalgamation, shall have executed and delivered a reaffirmation agreement with respect to its obligations under the Loan Guaranty and the other Loan Documents; it being understood and agreed that if the foregoing conditions under clauses (x) through (z) are satisfied, the Successor Borrower will succeed to, and be substituted for, the Top Borrower under this Agreement and the other Loan Documents, and (ii) in the case of any such merger, consolidation or amalgamation with or into any Borrower and/or any Subsidiary Guarantor, either (A) a Borrower or a Subsidiary Guarantor shall be the continuing or surviving Person or the continuing or surviving Person (or, in the case of an amalgamation, the Person formed as a result thereof) shall expressly assume the obligations of the relevant Borrower or Subsidiary Guarantor in a manner reasonably satisfactory to the Administrative Agent or (B) the relevant transaction shall be treated as an Investment and shall comply with Section 6.06;

(b)     Dispositions (including of Capital Stock) among the Top Borrower and/or any Restricted Subsidiary (upon voluntary liquidation or otherwise); provided that any such Disposition made by any Loan Party to any Person that is not a Loan Party shall be (i) for fair market value (as reasonably determined by such Person) with at least 75% of the consideration for such Disposition consisting of Cash or Cash Equivalents at the time of such Disposition or (ii) treated as an Investment and otherwise made in compliance with Section 6.06 (other than in reliance on clause (j) thereof);

(c)     (i) the liquidation or dissolution of any Restricted Subsidiary if the Top Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Top Borrower, is not materially disadvantageous to the Lenders (taken as a whole) and the Top Borrower or any Restricted Subsidiary receives the assets (if any) of the relevant dissolved or liquidated Restricted Subsidiary; provided that in the case of any liquidation or dissolution of any Loan Party that results in a distribution of assets to any Restricted Subsidiary that is not a Loan Party, such distribution shall be treated as an Investment and shall comply with Section 6.06 (other than in reliance on clause (j) thereof); (ii) any merger, amalgamation,

dissolution, liquidation or consolidation, the purpose of which is to effect (A) any Disposition otherwise permitted under this Section 6.07 (other than clause (a), clause (b) or this clause (c)) or (B) any Investment permitted under Section 6.06; and (iii) the conversion of the Top Borrower or any Restricted Subsidiary into another form of entity, so long as such conversion does not adversely affect the value of the Loan Guaranty or Collateral, if any;

(d)       (i) Dispositions of inventory or equipment or immaterial assets in the ordinary course of business (including on an intercompany basis) and (ii) the leasing or subleasing of real property in the ordinary course of business;

(e)       Dispositions of surplus, obsolete, used or worn out property or other property that, in the reasonable judgment of the Top Borrower, is (A) no longer useful in its business (or in the business of any Restricted Subsidiary of the Top Borrower) or (B) otherwise economically impracticable to maintain;

(f)       Dispositions of Cash and/or Cash Equivalents and/or other assets that were Cash Equivalents when the relevant original Investment was made;

(g)       Dispositions, mergers, amalgamations, consolidations or conveyances that constitute (i) Investments permitted pursuant to Section 6.06 (other than Section 6.06(j)), (ii) Permitted Liens, (iii) Restricted Payments permitted by Section 6.04(a) (other than Section 6.04(a)(ix)) and (iv) Sale and Lease-Back Transactions permitted by Section 6.08;

(h)       Dispositions for fair market value; provided that with respect to any such Disposition with a purchase price in excess of the greater of $30,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, at least 75% of the consideration for such Disposition shall consist of Cash or Cash Equivalents (provided that for purposes of the 75% Cash consideration requirement, (i) the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Top Borrower or any Restricted Subsidiary) of the Top Borrower or any Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto) that are assumed by the transferee of any such assets (or that are otherwise terminated or cancelled in connection with the transaction with such transferee) and for which the Top Borrower and/or its applicable Restricted Subsidiary have been validly released by all relevant creditors in writing, (ii) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such Disposition, (iii) any Security received by the Top Borrower or any Restricted Subsidiary from such transferee that is converted by such Person into Cash or Cash Equivalents (to the extent of the Cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition and (iv) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (h) and Section 6.08(b)(ii) that is at that time outstanding, not in excess of the greater of $60,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, in each case, shall be deemed to be Cash); provided, further, that immediately prior to and after giving effect to such Disposition, as determined on the date on which the agreement governing such Disposition is executed, no Event of Default exists;

(i)       to the extent that (i) the relevant property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of the relevant Disposition are promptly applied to the purchase price of such replacement property;

(j)       Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, buy/sell arrangements between joint venture or similar parties set forth in the relevant joint venture arrangements and/or similar binding arrangements;

(k)     Dispositions of notes receivable or accounts receivable in the ordinary course of business (including any discount and/or forgiveness thereof) or in connection with the collection or compromise thereof;

(l)     Dispositions and/or terminations of leases, subleases, licenses or sublicenses (including the provision of software under any open source license), (i) the Disposition or termination of which will not materially interfere with the business of the Top Borrower and its Restricted Subsidiaries or (ii) which relate to closed facilities or the discontinuation of any product line;

(m)     (i) any termination of any lease in the ordinary course of business, (ii) any expiration of any option agreement in respect of real or personal property and (iii) any surrender or waiver of contractual rights or the settlement, release or surrender of contractual rights or litigation claims (including in tort) in the ordinary course of business;

(n)     Dispositions of property subject to foreclosure, casualty, eminent domain or condemnation proceedings (including in lieu thereof or any similar proceeding);

(o)     Dispositions or consignments of equipment, inventory or other assets (including leasehold interests in real property) with respect to facilities that are temporarily not in use, held for sale or closed;

(p)     to the extent constituting a Disposition, the consummation of the Transaction;

(q)     Dispositions of non-core assets acquired in connection with any acquisition permitted hereunder and sales of Real Estate Assets acquired in any acquisition permitted hereunder which, within 90 days of the date of such acquisition, are designated in writing to the Administrative Agent as being held for sale and not for the continued operation of the Top Borrower or any of its Restricted Subsidiaries or any of their respective businesses; provided that no Event of Default exists on the date on which the definitive agreement governing the relevant Disposition is executed;

(r)     exchanges or swaps, including transactions covered by Section 1031 of the Code (or any comparable provision of any foreign jurisdiction), of assets so long as any such exchange or swap is made for fair value (as reasonably determined by the Top Borrower) for like assets; provided that upon the consummation of any such exchange or swap by any Loan Party, to the extent the assets received do not constitute an Excluded Asset, the Administrative Agent has a perfected Lien with the same priority as the Lien held on the Real Estate Assets so exchanged or swapped;

(s)     Dispositions of assets that do not constitute Collateral for fair market value;

(t)     (i) licensing and cross-licensing arrangements involving any technology, intellectual property or IP Rights of the Top Borrower or any Restricted Subsidiary in the ordinary course of business and (ii) Dispositions, abandonments, cancellations or lapses of IP Rights, or issuances or registrations, or applications for issuances or registrations, of IP Rights, which, in the reasonable good faith determination of the Top Borrower, are not material to the conduct of the business of the Top Borrower or its Restricted Subsidiaries, or are no longer economical to maintain in light of its use;

(u)     Dispositions in connection with the terminations or unwinds of Derivative Transactions;

(v)     Dispositions of Capital Stock of, or sales of Indebtedness or other Securities of, Unrestricted Subsidiaries;

(w)      Dispositions of Real Estate Assets and related assets in the ordinary course of business in connection with relocation activities for directors, officers, employees, members of management, managers or consultants of any Parent Company, the Top Borrower and/or any Restricted Subsidiary;

(x)      Dispositions made to comply with any order of any Governmental Authority or any applicable Requirement of Law;

(y)      any merger, consolidation, Disposition or conveyance the sole purpose of which is to reincorporate or reorganize (i) any Domestic Subsidiary (other than a Loan Party) in another jurisdiction in the U.S. and/or (ii) any Foreign Subsidiary in the U.S. or any other jurisdiction;

(z)      any sale of motor vehicles and information technology equipment purchased at the end of an operating lease and resold thereafter;

(aa)      Dispositions involving assets having a fair market value (as reasonably determined by the Top Borrower at the time of the relevant Disposition) of not more than the greater of $21,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Fiscal Year in any Fiscal Year, which, if not used in such Fiscal Year, shall be carried forward to succeeding Fiscal Years; and/or

(bb)      Dispositions set forth on Schedule 6.07.

To the extent that any Collateral is Disposed of as expressly permitted by this Section 6.07 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, which Liens shall be automatically released upon the consummation of such Disposition; it being understood and agreed that the Administrative Agent shall be authorized to take, and shall take, any actions reasonably requested by the Top Borrower in order to effect the foregoing in accordance with Article 8 hereof.

Notwithstanding the foregoing provisions of this Section 6.07, (a) this Section 6.07 shall not permit (i) an IP Separation Transaction or (ii) a Disposition by the Top Borrower or any Restricted Subsidiary of any Material Intellectual Property to any Unrestricted Subsidiary and (b) in the event of any Disposition of Material Intellectual Property (other than to a Loan Party), directly or indirectly (including, without limitation, by way of a Restricted Payment or Investment of Material Intellectual Property), the purchaser, assignee or other transferee thereof shall agree in writing to be bound by a non-exclusive, royalty-free worldwide license of such intellectual property in favor of the Administrative Agent for use in connection with the exercise of its rights and remedies under the Loan Documents.

Section 6.08.      Sale and Lease-Back Transactions.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which the Top Borrower or the relevant Restricted Subsidiary (a) has sold or transferred or is to sell or to transfer to any other Person (other than the Top Borrower or any of its Restricted Subsidiaries) and (b) intends to use for substantially the same purpose as the property which has been or is to be sold or transferred by the Top Borrower or such Restricted Subsidiary to any Person (other than the Top Borrower or any of its Restricted Subsidiaries) in connection with such lease (such a transaction, a "Sale and Lease-Back Transaction"); provided that any Sale and Lease-Back Transaction shall be permitted so long as either

(i)      the resulting Indebtedness is permitted by Section 6.01 or

(ii)      (A) the relevant Sale and Lease-Back Transaction is consummated in exchange for cash consideration (provided that for purposes of the foregoing cash consideration requirement, (w) the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Top Borrower or any Restricted Subsidiary) of the Top Borrower or any Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto) that are assumed by the transferee of any such assets and for which the Top Borrower and/or its applicable Restricted Subsidiary have been validly released by all relevant creditors in writing, (x) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such Disposition, (y) any Securities received by the Top Borrower or any Restricted Subsidiary from such transferee that are converted by such Person into Cash or Cash Equivalents (to the extent of the Cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition and (z) any Designated Non-Cash Consideration received in respect of the relevant Sale and Lease-Back Transaction having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (z) and Section 6.07(h) that is at that time outstanding, not in excess of the greater of $60,000,000 and [●]% of Consolidated Adjusted EBITDA Assets as of the last day of the most recently ended Test Period, in each case, shall be deemed to be Cash), (B) the Top Borrower or its applicable Restricted Subsidiary would otherwise be permitted to enter into, and remain liable under, the applicable underlying lease and (C) the aggregate fair market value of the assets sold subject to all Sale and Lease-Back Transactions under this clause (ii) shall not exceed the greater of $30,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period.

Section 6.09.      Transactions with Affiliates.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) involving payments by the Top Borrower or its Restricted Subsidiaries in excess of $12,000,000 with any of their respective Affiliates on terms that are less favorable to the Top Borrower or such Restricted Subsidiary, as the case may be (as reasonably determined by the Top Borrower), than those that might be obtained at the time in a comparable arm's-length transaction from a Person that is not an Affiliate; provided that the foregoing restriction shall not apply to:

(a)      any transaction between or among the Top Borrower and/or one or more Restricted Subsidiaries (or any entity that becomes a Restricted Subsidiary as a result of such transaction) to the extent permitted or not restricted by this Agreement;

(b)      any issuance, sale or grant of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of employment arrangements, stock options and stock ownership plans approved by the board of directors (or equivalent governing body) of any Parent Company or of the Top Borrower or any Restricted Subsidiary;

(c)      (i) any collective bargaining, employment or severance agreement or compensatory (including profit sharing) arrangement entered into by the Top Borrower or any of its Restricted Subsidiaries with their respective current or former officers, directors, members of management, managers, employees, consultants or independent contractors or those of any Parent Company, (ii) any subscription agreement or similar agreement pertaining to the repurchase of Capital Stock pursuant to put/call rights or similar rights with current or former officers, directors, members of management, managers, employees, consultants or independent contractors and (iii) transactions pursuant to any employee compensation, benefit plan, stock option plan or arrangement, any health, disability or similar insurance plan which covers current or former officers, directors, members of management, managers, employees, consultants or independent contractors or any employment contract or arrangement;

121

(d)        (i) transactions permitted by Sections 6.01(d), (o) and (ee), 6.04 and 6.06(h), (m), (o), (t), (v), (y), (z) and (aa) and (ii) issuances of Capital Stock and issuances and incurrences of Indebtedness not restricted by this Agreement;

(e)        [reserved];

(f)        [reserved];

(g)        the Transactions, including the payment of Transaction Costs;

(h)        ordinary course compensation to Affiliates in connection with financial advisory, financing, underwriting or placement services or in respect of other investment banking activities and other transaction fees, which payments are approved by the majority of the members of the board of directors (or similar governing body) or a majority of the disinterested members of the board of directors (or similar governing body) of the Top Borrower in good faith;

(i)        Guarantees permitted by Section 6.01 or Section 6.06;

(j)        transactions among Holdings (at such time as Holdings has executed and delivered the agreements provided for under Section 5.16), the Top Borrower and its Restricted Subsidiaries otherwise permitted (or not restricted) under this Article 6;

(k)        the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the board of directors (or similar governing body), officers, employees, members of management, managers, consultants and independent contractors of the Top Borrower and/or any of its Restricted Subsidiaries in the ordinary course of business and, in the case of payments to such Person in such capacity on behalf of any Parent Company, to the extent attributable to the operations of the Top Borrower or its subsidiaries;

(l)        transactions with customers, clients, suppliers, joint ventures, purchasers or sellers of goods or services or providers of employees or other labor entered into in the ordinary course of business, which are (i) fair to the Top Borrower and/or its applicable Restricted Subsidiary in the good faith determination of the board of directors (or similar governing body) of the Top Borrower or the senior management thereof or (ii) on terms at least as favorable as might reasonably be obtained from a Person other than an Affiliate;

(m)        the payment of reasonable out-of-pocket costs and expenses related to registration rights and customary indemnities provided to shareholders under any shareholder agreement;

(n)        (i) any purchase by Holdings of the Capital Stock of (or contribution to the equity capital of) the Top Borrower and (ii) any intercompany loans made by Holdings to the Top Borrower or any Restricted Subsidiary at such time as Holdings has executed and delivered the agreements provided for under Section 5.16; and/or

(o)        any transaction in respect of which the Top Borrower delivers to the Administrative Agent a letter addressed to the board of directors (or equivalent governing body) of the Top Borrower from an accounting, appraisal or investment banking firm of nationally recognized standing stating that such transaction is on terms that are no less favorable to the Top Borrower or the applicable Restricted Subsidiary than might be obtained at the time in a comparable arm's length transaction from a Person that is not an Affiliate.

Section 6.10.    Conduct of Business.  From and after the Closing Date, the Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, engage in any material line of business other than (a) the businesses engaged in by the Top Borrower or any Restricted Subsidiary on the Closing Date and similar, incidental, complementary, ancillary or related businesses and (b) such other lines of business to which the Administrative Agent may consent.

Section 6.11.    Amendments or Waivers of Organizational Documents.  The Top Borrower shall not, nor shall it permit any Subsidiary Guarantor to, amend or modify their respective Organizational Documents, in each case in a manner that is materially adverse to the Lenders (in their capacities as such), taken as a whole, without obtaining the prior written consent of the Administrative Agent; provided that, for purposes of clarity, it is understood and agreed that the Top Borrower and/or any Subsidiary Guarantor may effect a change to its organizational form and/or consummate any other transaction that is permitted under Section 6.07.

Section 6.12.    Amendments of or Waivers with Respect to Restricted Debt.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, amend or otherwise modify the terms of any Restricted Debt (or the documentation governing any Restricted Debt) (a) if the effect of such amendment or modification, together with all other amendments or modifications made, is materially adverse to the interests of the Lenders (in their capacities as such) or (b) in violation of the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement or the subordination terms set forth in the definitive documentation governing any Restricted Debt; provided that, for purposes of clarity, it is understood and agreed that the foregoing limitation shall not otherwise prohibit any Refinancing Indebtedness or any other replacement, refinancing, amendment, supplement, modification, extension, renewal, restatement or refunding of any Restricted Debt, in each case, that is permitted under this Agreement in respect thereof.

Section 6.13.    Fiscal Year.  The Top Borrower shall not change its Fiscal Year-end to a date other than December 31; provided that the Top Borrower may, upon written notice to the Administrative Agent, change the Fiscal Year-end of the Top Borrower to another date, in which case the Top Borrower and the Administrative Agent will, and are hereby authorized to, make any adjustments to this Agreement that are necessary to reflect such change in Fiscal Year.

Section 6.14.    Permitted Activities of Holdings.  Holdings shall not:

(a)    incur any third party Indebtedness for borrowed money other than (i) the Indebtedness permitted to be incurred by Holdings under the Loan Documents and any ABL Facility and (ii) Guarantees of Indebtedness or other obligations of the Top Borrower and/or any Restricted Subsidiary, which Indebtedness or other obligations are otherwise permitted hereunder;

(b)    create or suffer to exist any Lien on any asset now owned or hereafter acquired by it other than (i) the Liens created under the Collateral Documents and, subject to the Intercreditor Agreements, the collateral documents relating to any Term Loan Facility, in each case, to which it is a party, (ii) Permitted Liens that secure Guarantees permitted under clause (a)(ii) above and the underlying Indebtedness subject to such Guarantee is permitted to be secured on the same basis pursuant to Section 6.02 and (iii) other Permitted Liens (other than in respect of debt for borrowed money);

(c)    consolidate or amalgamate with, or merge with or into, or convey, sell or otherwise transfer all or substantially all of its assets to, any Person; provided that, so long as no Default or Event of Default exists or would result therefrom,

(i)    Holdings may consolidate or amalgamate with, or merge with or into, any other Person (other than the Top Borrower and any of its subsidiaries) so long as (A) Holdings is the

continuing or surviving Person or (B) if the Person formed by or surviving any such consolidation, amalgamation or merger is not Holdings (1) the successor Person (such successor Person, "Successor Holdings") expressly assumes all obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent and such successor Person is organized under the laws of a jurisdiction in the United States, and (2) the Top Borrower delivers a certificate of a Responsible Officer with respect to the satisfaction of the conditions set forth in clause (1) of this clause (i) and

(ii)     Holdings may otherwise convey, sell or otherwise transfer all or substantially all of its assets to any other Person (other than the Top Borrower and any of its subsidiaries) so long as (A) no Change of Control results therefrom, (B) the Person acquiring such assets expressly assumes all of the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent (C) such Person is organized under the laws of a jurisdiction in the United States, and (D) the Top Borrower delivers a certificate of a Responsible Officer with respect to the satisfaction of the conditions under clause (A) set forth in this clause (ii); provided, further, that (1) if the conditions set forth in the preceding proviso are satisfied, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement and (2) it is understood and agreed that Holdings may convert into another form of entity so long as such conversion does not adversely affect the value of the Loan Guaranty or the Collateral; or

(d)     own Capital Stock in any subsidiary other than the Top Borrower.


ARTICLE 7

EVENTS OF DEFAULT

Section 7.01.     Events of Default.  If any of the following events (each, an "Event of Default") shall occur:

(a)     Failure To Make Payments When Due.  Failure by any Borrower to pay (i) any installment of principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder within five Business Days after the date due; or

(b)     Default in Other Agreements.  (i) Failure by the Top Borrower or any of its Restricted Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in clause (a) above) with an aggregate outstanding principal amount exceeding the Threshold Amount, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by the Top Borrower or any of its Restricted Subsidiaries with respect to any other term of (A) one or more items of Indebtedness with an aggregate outstanding principal amount exceeding the Threshold Amount or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness (other than, for the avoidance of doubt, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of the relevant Hedge Agreement which are not the result of any default thereunder by any Loan Party or any Restricted Subsidiary), in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, such Indebtedness to become or be declared

124

due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; provided that clause (ii) of this paragraph (b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; provided, further, that with respect to any default, event or condition referred to in clause (i) or (ii) above with respect to (A) any financial covenant under any other term credit facility or ABL Facility, such default, event or condition shall only constitute an Event of Default if such default, event or condition results in the holders of such Indebtedness demanding repayment thereof or otherwise accelerating such Indebtedness (and terminating the commitments thereunder), which demand or acceleration has not been rescinded prior to any termination of the Commitments or acceleration of the Loans pursuant to this Article 7 and (B) any default, event or condition other than as described in the immediately preceding Clause (A), such default, event or condition is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to this Article 7; or

(c)     Breach of Certain Covenants.  Failure of any Loan Party, as required by the relevant provision, to perform or comply with any term or condition contained in Section 5.01(e)(i) (provided that, the delivery of a notice of Default or Event of Default at any time will cure any Default or Event of Default arising from the failure to timely deliver such notice of Default or Event of Default, as applicable), Section 5.02 (as it applies to the preservation of the existence of any Borrower), 5.15 or 5.16 or Article 6; or

(d)     Breach of Representations, Etc.  Any representation, warranty or certification made or deemed made by any Loan Party in any Loan Document or in any certificate required to be delivered in connection herewith or therewith (including, for the avoidance of doubt, any Perfection Certificate) being untrue in any material respect as of the date made or deemed made; it being understood and agreed that any breach of any representation, warranty or certification resulting from the failure of the Administrative Agent any UCC continuation statement shall not result in an Event of Default under this Section 7.01(d) or any other provision of any Loan Document; or

(e)     Other Defaults Under Loan Documents.  Failure of any Loan Party in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in the foregoing clauses (i) and (ii) or in any other Section of this Article 7, which default has not been remedied or waived within 30 days after receipt by any Borrower of written notice thereof from the Administrative Agent; or

(f)     Involuntary Bankruptcy; Appointment of Receiver, Etc.  (i) The entry by a court of competent jurisdiction of a decree or order for relief in respect of Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) in an involuntary case under any Debtor Relief Law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal, state or local Requirements of Law, which relief is not stayed; or (ii) the commencement of an involuntary case against Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) under any Debtor Relief Law; the entry by a court having jurisdiction in the premises of a decree or order for the appointment of a receiver, receiver and manager, (preliminary) insolvency receiver, liquidator, sequestrator, trustee, administrator, custodian or other officer having similar powers over Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary), or over all or a material part of its property; or the involuntary appointment of an interim receiver, trustee or other custodian of Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) for all or a material part of its property, which remains, in any case under this clause (f), undismissed, unvacated, unbounded or unstayed pending appeal for 60 consecutive days; or

(g)    <u>Voluntary Bankruptcy; Appointment of Receiver, Etc.</u>  (i) The entry against Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) of an order for relief, the commencement by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) of a voluntary case under any Debtor Relief Law, or the consent by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case, under any Debtor Relief Law, or the consent by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) to the appointment of or taking possession by a receiver, receiver and manager, insolvency receiver, liquidator, sequestrator, trustee, administrator, custodian or other like official for or in respect of itself or for all or a material part of its property; (ii) the making by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) of a general assignment for the benefit of creditors; or (iii) the admission by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) in writing of their inability to pay their respective debts as such debts become due; or

(h)    <u>Judgments and Attachments</u>.  The entry or filing of one or more final money judgments, writs or warrants of attachment or similar process against Holdings, the Top Borrower or any of its Restricted Subsidiaries or any of their respective assets involving in the aggregate at any time an amount in excess of the Threshold Amount (in either case to the extent not adequately covered by indemnity from a third party, by self-insurance (if applicable) or by insurance as to which the relevant third party insurance company has been notified and not denied coverage), which judgment, writ, warrant or similar process remains unpaid, undischarged, unvacated, unbonded or unstayed pending appeal for a period of 60 consecutive days; or

(i)    <u>Employee Benefit Plans</u>. The occurrence of one or more ERISA Events, which individually or in the aggregate result in liability of Holdings, the Top Borrower or any of its Restricted Subsidiaries in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(j)    <u>Change of Control</u>.  The occurrence of a Change of Control; or

(k)    <u>Guaranties, Collateral Documents and Other Loan Documents</u>.  At any time after the execution and delivery thereof, (i) any material Loan Guaranty for any reason, other than the occurrence of the Termination Date, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared, by a court of competent jurisdiction, to be null and void or any Loan Guarantor shall repudiate in writing its obligations thereunder (in each case, other than as a result of the discharge of such Loan Guarantor in accordance with the terms thereof and other than as a result of any act or omission by the Administrative Agent or any Lender), (ii) this Agreement or any material Collateral Document ceases to be in full force and effect or shall be declared, by a court of competent jurisdiction, to be null and void or any Lien on Collateral created under any Collateral Document ceases to be perfected with respect to a material portion of the Collateral (other than (A) Collateral consisting of Material Real Estate Assets to the extent that the relevant losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (B) solely by reason of (w) such perfection not being required pursuant to the Collateral and Guarantee Requirement, the Collateral Documents, this Agreement or otherwise, (x) the failure of the Administrative Agent to maintain possession of any Collateral actually delivered to it or the failure of the Administrative Agent to file UCC (or equivalent) continuation statements, (y) a release of Collateral in accordance with the terms hereof or thereof or (z) the occurrence of the Termination Date or any other termination of such Collateral Document in accordance with the terms thereof) or (iii) other than in any bona fide, good faith dispute as to the scope of Collateral or whether any Lien has been, or is required to be released, any Loan Party shall contest in writing, the validity or enforceability of any material provision of any Loan Document (or any Lien purported to be created by the Collateral Documents or any Loan Guaranty) or deny in writing that it has any further liability (other than by reason of the occurrence of the

126

Termination Date or any other termination of any other Loan Document in accordance with the terms thereof), including with respect to future advances by the Lenders, under any Loan Document to which it is a party; it being understood and agreed that the failure of the Administrative Agent to file any UCC continuation statement and/or maintain possession of any physical Collateral shall not result in an Event of Default under this Section 7.01(k) or any other provision of any Loan Document; or

(l)       Subordination.  The Obligations ceasing or the assertion in writing by any Loan Party that the Obligations cease to constitute senior indebtedness under the subordination provisions of any document or instrument evidencing any Junior Indebtedness or Junior Lien Indebtedness or any such subordination provision being invalidated by a court of competent jurisdiction in a final non-appealable order, or otherwise ceasing, for any reason, to be valid, binding and enforceable obligations of the parties thereto; then, during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, take any of the following actions, at the same or different times: (A)(i) terminate the Commitments, and thereupon such Commitments shall terminate immediately and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower and (B) exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under Debtor Relief Laws and the UCC; provided that upon the occurrence of an event with respect to any Borrower described in clauses (f) or (g) of this Article 7, any such Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of any Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower without further action of the Administrative Agent or any Lender.

Without limiting the generality of the foregoing in this Section 7.01, it is understood and agreed that if the Initial Term Loans are accelerated as a result of an Event of Default (including an acceleration upon the occurrence of an Event of Default pursuant to Sections 7.01(f) and (g)), the Prepayment Premium as of such date if such Initial Term Loans were voluntarily prepaid pursuant to Section 2.11(a) on such date shall become immediately due and payable by the Loan parties and shall constitute part of the Secured Obligations as if the Initial Term Loans were being voluntarily prepaid or repaid as of such date, in view of the impracticality and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits and actual damages as a result thereof. The Prepayment Premium shall also be automatically and immediately due and payable if the Initial Term Loans are satisfied or released by foreclosure or by any other means, or if any acceleration of the Secured Obligations is "decelerated" by the Borrowers, or the Borrowers otherwise reinstate the Secured Obligations, including, without limitation, under a plan of reorganization or similar manner in any bankruptcy, insolvency or similar proceeding. The Prepayment Premium payable pursuant to this Agreement shall be presumed to be liquidated damages sustained by each Lender as the result of the early repayment or prepayment of the Initial Term Loans (and not unmatured interest or a penalty) and each of the Borrowers and the other Loan parties agrees that it is reasonable under the circumstances currently existing. EACH OF THE BORROWERS AND THE OTHER LOAN PARTIES EXPRESSLY WAIVE (TO THE FULLEST EXTENT THEY MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE PREPAYMENT PREMIUM IN CONNECTION WITH ANY SUCH ACCELERATION.  Each of the Borrower and the other Loan Parties expressly agree (to the fullest extent they may lawfully do so) that: (A) the Prepayment Premium is reasonable and the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Prepayment

127

Premium shall each be payable notwithstanding the then prevailing market rates at the time payment or redemption is made; (C) there has been a course of conduct between the Lenders, the Borrower and the other Loan Parties giving specific consideration in this transaction for such agreement to pay the Prepayment Premium; (D) any such Loan Party shall not challenge or question, or support any other Person in challenging or questioning, the validity or enforceability of the Prepayment Premium or any similar or comparable prepayment fee, and such Loan Party shall be estopped from raising or relying on any judicial decision or ruling questioning the validity or enforceability of any prepayment fee similar or comparable to the Prepayment Premium, and (E) the Borrower and the other Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph. Each of the Borrower and the other Loan Parties expressly acknowledge that its agreement to pay or guarantee the payment of the Prepayment Premium to the Lenders as herein described are individually and collectively a material inducement to the Lenders to make available (or be deemed to make available) the Initial Term Loans hereunder.

ARTICLE 8

THE ADMINISTRATIVE AGENT

Each of the Lenders hereby irrevocably appoints WSFS (or any successor appointed pursuant hereto) as Administrative Agent and authorizes the Administrative Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Any Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, unless the context otherwise requires or unless such Person is in fact not a Lender, include each Person serving as Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any subsidiary of any Loan Party or other Affiliate thereof as if it were not the Administrative Agent hereunder. The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall not be under any obligation to provide such information to them.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default exists, and the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law; it being understood that such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary power, except discretionary rights and powers that are expressly contemplated by the Loan Documents and which the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the relevant circumstances as provided in Section 9.02); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law, and (c) except as expressly set forth in the Loan Documents, the Administrative

128

Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings, the Top Borrower or any of its subsidiaries that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable to the Lenders or any other Secured Party for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as is necessary, or as the Administrative Agent believes in good faith shall be necessary, under the relevant circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Top Borrower or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any covenant, agreement or other term or condition set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of any Lien on the Collateral or the existence, value or sufficiency of the Collateral or to assure that the Liens granted to the Administrative Agent pursuant to any Loan Document have been or will continue to be properly or sufficiently or lawfully created, perfected or enforced or are entitled to any particular priority, (vi) the satisfaction of any condition set forth in Article 4 or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or (vii) any property, book or record of any Loan Party or any Affiliate thereof.

Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, the Borrowers, the Administrative Agent and each Secured Party agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Loan Guaranty; it being understood that any right to realize upon the Collateral or enforce any Loan Guaranty against any Loan Party pursuant hereto or pursuant to any other Loan Document may be exercised solely by the Administrative Agent on behalf of the Secured Parties in accordance with the terms hereof or thereof, and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or in the event of any other Disposition (including pursuant to Section 363 of the Bankruptcy Code), (A) the Administrative Agent, as agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or other Disposition, to use and apply all or any portion of the Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale or other Disposition and (B) the Administrative Agent or any Lender may be the purchaser or licensor of all or any portion of such Collateral at any such Disposition.

Each Secured Party agrees that the Administrative Agent may in its sole discretion, but is under no obligation to credit bid any part of the Secured Obligations or to purchase or retain or acquire any portion of the Collateral.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) that it believes to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless

the Administrative Agent has received notice to the contrary from such Lender prior to the making of such Loan.  The Administrative Agent may consult with legal counsel (who may be counsel for the Top Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it.  The Administrative Agent and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

The Administrative Agent may resign at any time by giving ten days' written notice to the Lenders and the Top Borrower; provided that if no successor agent is appointed in accordance with the terms set forth below within such 10-day period, the Administrative Agent's resignation shall not be effective until the earlier to occur of (x) the date of the appointment of the successor agent or (y) the date that is twenty (20) days after the last day of such 10-day period.  If the Administrative Agent is a Defaulting Lender or an Affiliate of a Defaulting Lender, either the Required Lenders or the Top Borrower may, upon ten days' notice, remove the Administrative Agent; provided that if no successor agent is appointed in accordance with the terms set forth below within such 10-day period, the Administrative Agent's removal shall, at the option of the Top Borrower, not be effective until the earlier to occur of (x) the date of the appointment of the successor agent or (y) the date that is twenty (20) days after the last day of such 10-day period.  Upon receipt of any such notice of resignation or delivery of any such notice of removal, the Required Lenders shall have the right, with the consent of the Top Borrower (not to be unreasonably withheld or delayed), to appoint a successor Administrative Agent which shall be a commercial bank or trust company with offices in the U.S. having combined capital and surplus in excess of $1,000,000,000; provided that during the existence and continuation of an Event of Default under Section 7.01(a) or, with respect to any Borrower, Sections 7.01(f) or (g), no consent of the Top Borrower shall be required.  If no successor has been appointed as provided above and accepted such appointment within ten days after the retiring Administrative Agent gives notice of its resignation or the Administrative Agent receives notice of removal, then (a) in the case of a retirement, the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above (including, for the avoidance of doubt, the consent of the Top Borrower) or (b) in the case of a removal, the Top Borrower may, after consulting with the Required Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that (x) in the case of a retirement, if the Administrative Agent notifies the Top Borrower and the Lenders that no qualifying Person has accepted such appointment or (y) in the case of a removal, the Top Borrower notifies the Required Lenders that no qualifying Person has accepted such appointment, then, in each case, such resignation or removal shall nonetheless become effective in accordance with the provisos to the first two sentences in this paragraph and (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent in its capacity as collateral agent for the Secured Parties for purposes of maintaining the perfection of the Lien on the Collateral securing the Secured Obligations, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations required to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly (and each Lender will cooperate with the Top Borrower to enable the Top Borrower to take such actions), until such time as the Required Lenders or the Top Borrower, as applicable, appoint a successor Administrative Agent, as provided above in this Article 8.  Upon the acceptance of its appointment as Administrative Agent hereunder as a successor Administrative Agent, the successor Administrative Agent

WEIL:\99124112\10\40416.0005

shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder (other than its obligations under Section 9.13 hereof). The fees payable by the Borrowers to any successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Top Borrower and such successor Administrative Agent. After the Administrative Agent's resignation or removal hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any action taken or omitted to be taken by any of them while the relevant Person was acting as Administrative Agent (including for this purpose holding any collateral security following the retirement or removal of the Administrative Agent). Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate thereof) may be appointed as a successor Administrative Agent.

Each of each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their respective Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder. Except for notices, reports and other documents expressly required to be furnished to the Lenders by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender with any credit or other information concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of the Administrative Agent or any of its Related Parties.

Each Secured Party irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall:

(a)     release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the occurrence of the Termination Date, (ii) that is sold or to be sold or transferred as part of or in connection with any Disposition permitted under the Loan Documents to a Person that is not a Loan Party, (iii) that does not constitute (or ceases to constitute) Collateral, (iv) if the property subject to such Lien is owned by a Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its Loan Guaranty otherwise in accordance with the Loan Documents, (v) as required under clause (d) below or (vi) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 9.02;

(b)     subject to Section 9.22, release any Subsidiary Guarantor from its obligations under the Loan Guaranty (i) if such Person ceases to be a Restricted Subsidiary (or becomes an Excluded Subsidiary as a result of a single transaction or series of related transactions permitted hereunder and consummated for a bona fide business purpose and not in contemplation of adversely affecting the Secured Parties' interests in the Loan Guaranty or the Collateral (as determined by the Administrative Agent in good faith), and the Top Borrower has requested such Excluded Subsidiary cease to be a Subsidiary Guarantor) and/or (ii) in the case of any Discretionary Guarantor, upon notice from the Top Borrower to the Administrative Agent at any time;

(c)     subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Sections 6.02(m),

6.02(n), 6.02(o)(i) (other than any Lien on the Capital Stock of any Subsidiary Guarantor), 6.02(s) (solely with respect to Term Loan Priority Collateral) and/or 6.02(u) (solely with respect to [term loABL Priority Collateral); provided, that the subordination of any Lien on any property granted to or held by the Administrative Agent shall only be required under this clause (c) with respect to any Lien on such property that is permitted by any of the foregoing clauses of Section 6.02 to the extent that the Lien of the Administrative Agent with respect to such property is required to be subordinated to the relevant Permitted Lien in accordance with the documentation governing the Indebtedness that is secured by such Permitted Lien;

(d)      enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the ABL Intercreditor Agreement and any other Acceptable Intercreditor Agreement and/or any amendment to the ABL Intercreditor Agreement and/or any Acceptable Intercreditor Agreement) that is (i) required or permitted to be subordinated hereunder and/or (ii) secured by Liens permitted hereunder, and with respect to which Indebtedness, this Agreement contemplates an intercreditor, subordination, collateral trust or similar agreement [(including, any amendment of the ABL Intercreditor Agreement to provide for Junior ABL Obligations (as defined in the ABL Intercreditor Agreement) as contemplated in Section 8.3 of the ABL Intercreditor Agreement)]; and

(e)      enter into, amend and/or terminate such landlord agreements, control agreements and other third party agreements relating to the Collateral as the Administrative Agent shall deem reasonably appropriate.

Upon the request of the Administrative Agent at any time, the Required Lenders will confirm in writing to the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under the Loan Guaranty or its Lien on any Collateral pursuant to this Article 8.  In each case as specified in this Article 8, the Administrative Agent will (and each Lender hereby authorizes the Administrative Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents, to subordinate its interest therein, or to release such Loan Party from its obligations under the Loan Guaranty, in each case in accordance with the terms of the Loan Documents and this Article 8; provided, that upon the request of the Administrative Agent, the Top Borrower shall deliver a certificate of a Responsible Officer certifying that the relevant transaction has been consummated in compliance with the terms of this Agreement.

The Administrative Agent is authorized by the Lenders and each other Secured Party to enter into the ABL Intercreditor Agreement, any other Acceptable Intercreditor Agreement and any other intercreditor, subordination, collateral trust or similar agreement contemplated hereby with respect to any Indebtedness (i) that is (A) required or permitted hereunder to be subordinated in right of payment or with respect to security and/or (B) secured by any Lien and (ii) which contemplates an intercreditor, subordination, collateral trust or similar agreement (any such other intercreditor, subordination, collateral trust and/or similar agreement an "Additional Agreement"), and the Secured Parties party hereto acknowledge that the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement and any other Additional Agreement is binding upon them.  Each Lender and each other Secured Party party hereto hereby (a) agrees that they will be bound by, and will not take any action contrary to, the provisions of the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement or any other Additional Agreement and (b) authorizes and instructs the Administrative Agent to enter into the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement and/or any other Additional Agreement and to subject the Liens on the Collateral securing the Secured Obligations to the provisions thereof.  The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrowers, and the Secured Parties

are intended third-party beneficiaries of such provisions and the provisions of the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement and/or any other Additional Agreement.

To the extent that the Administrative Agent (or any Affiliate thereof) is not reimbursed and indemnified by the Top Borrower in accordance with and to the extent required by Section 9.03(b) hereof, the Lenders will reimburse and indemnify the Administrative Agent (and any Affiliate thereof) in proportion to their respective Applicable Percentages (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any Affiliate thereof) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

To the extent required by any applicable Requirement of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender under any Loan Document an amount equivalent to any applicable withholding Tax.  Without limiting or expanding the provisions of Section 2.17, each Lender shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within ten days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective).  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph.  The agreements in this paragraph shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

ARTICLE 9

MISCELLANEOUS

Section 9.01.    Notices.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

(i)    if to any Loan Party, to such Loan Party in the care of the Top Borrower at:

Serta Simmons Bedding, LLC
2451 Industry Avenue

133

Doraville, GA 30360
Attention:  Lisa Wynn
Email:  lwynn@SertaSimmons.com
Facsimile:  (770) 206-2669

with copies to (which shall not constitute notice to any Loan Party):

Serta Simmons Bedding, LLC
2451 Industry Avenue
Doraville, GA 30360
Attention:  Kristen McGuffey
Email:  kmcguffey@sertasimmons.com
Facsimile:  (770) 206-2669

and

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention:  Vynessa M. Nemunaitis
Email:  Vynessa.nemunaitis@weil.com
Facsimile:  (214) 746-7851

(ii)      if to the Administrative Agent:

Wilmington Savings Fund Society, FSB
500 Delaware Avenue
Wilmington, Delaware 19801
Attn: Patrick Healy
Telephone: (302) 299-3199
Email: PHealy@wsfsbank.com

With copies by electronic mail (which shall not constitute notice) to:

Wilmer Cutler Pickering Hale and Dorr LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Attn: Andrew Goldman
Telephone: (212) 230-8836
Email: andrew.goldman@wilmerhale.com

(iii)      if to any Lender, to it at its address or facsimile number set forth in its Administrative Questionnaire.

All such notices and other communications (A) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01, (B) sent by facsimile shall be deemed to have been given when sent and when receipt

has been confirmed by telephone; provided that notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient), or (C) sent by email shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that any such notice or communication not given during the normal business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

(b)     The Administrative Agent and each of its Affiliates is authorized to transmit, post or otherwise make or communicate, in its sole discretion (but shall not be required to do so), by [Approved Electronic Communications] in connection with this Agreement or any other Loan Document and the transactions contemplated therein.  The Administrative Agent is hereby authorized to establish procedures to provide access to and to make available or deliver, or to accept, notices, documents and similar items by posting to Approved Electronic Communications.  All uses of Approved Electronic Communications shall be governed by and subject to, in addition to the terms of this Agreement, the separate terms, conditions and privacy policy posted or referenced in such system (or such terms, conditions and privacy policy as may be updated from time to time, including on such system) and any related contractual obligations executed by the Administrative Agent and Loan Parties in connection with the use of such system.  Each of the Loan Parties, the Lenders and the Administrative Agent hereby acknowledges and agrees that the use of Approved Electronic Communications is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the Administrative Agent and each of its Affiliates to transmit Approved Electronic Communications.  All Approved Electronic Communications shall be provided "as is" and "as available".  None of the Administrative Agent or any of its Affiliates or related persons warrants the accuracy, adequacy or completeness of any electronic platform or electronic transmission and disclaims all liability for errors or omissions therein.  No warranty of any kind is made by the Administrative Agent or any of its Affiliates or related persons in connection with any electronic platform or electronic transmission, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects.  Each Loan Party agrees that the Administrative Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Approved Electronic Communication or otherwise required for any Approved Electronic Communication.  No Approved Electronic Communications shall be denied legal effect merely because it is made electronically.  Approved Electronic Communications that are not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such Approved Electronic Communication, an e-signature, upon which the Administrative Agent and the Loan Parties may rely and assume the authenticity thereof.  Each Approved Electronic Communication containing a signature, a reproduction of a signature or an e-signature shall, for all intents and purposes, have the same effect and weight as a signed paper original.  Each e-signature shall be deemed sufficient to satisfy any requirement for a "signature" and each Approved Electronic Communication shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to this Agreement, any other Loan Document, the UCC, the Federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural law governing such subject matter.  Each party or beneficiary hereto agrees not to contest the validity or enforceability of an Approved Electronic Communication or e-signature under the provisions of any applicable law requiring certain documents to be in writing or signed; provided, that nothing herein shall limit such party's or beneficiary's right to contest whether an Approved Electronic Communication or e-signature has been altered after transmission.

(c)       Any party hereto may change its address or facsimile number or other notice information hereunder by notice to the other parties hereto; it being understood and agreed that the Top Borrower may provide any such notice to the Administrative Agent as recipient on behalf of itself and each Lender.

(d)       Each of Holdings and the Top Borrower hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by, or on behalf of, Holdings or the Top Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on the Platform and (b) certain of the Lenders may be "public-side" Lenders (*i.e.*, Lenders that do not wish to receive material nonpublic information within the meaning of the United States federal securities laws with respect to Holdings, the Top Borrower or their respective securities) (each, a "Public Lender").  At the request of the Administrative Agent, each of Holdings and the Top Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC", (ii) by marking Borrower Materials "PUBLIC," Holdings and the Top Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as information of a type that would (A) customarily be made publicly available, as determined in good faith by the Top Borrower, if Holdings or the Top Borrower were to become public reporting companies or (B) would not be material with respect to Holdings, the Top Borrower, their respective subsidiaries, any of their respective securities or the transactions hereunder as determined in good faith by the Top Borrower for purposes of the United States federal securities laws and (iii) the Administrative Agent shall be required to treat Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor."  Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC," unless the Top Borrower notifies the Administrative Agent promptly that any such document contains material nonpublic information (it being understood that the Top Borrower shall have a reasonable opportunity to review the same prior to distribution and comply with SEC or other applicable disclosure obligations): (1) the Loan Documents and (2) any information delivered pursuant to Section 5.01(b) or (c).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Top Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS ON, OR THE ADEQUACY OF, THE PLATFORM, AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN ANY SUCH COMMUNICATION. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL ANY PARTY HERETO OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF

ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR MATERIAL BREACH OF THIS AGREEMENT.

Section 9.02.    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof except as provided herein or in any Loan Document, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any party hereto therefrom shall in any event be effective unless the same is permitted by this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which it is given. Without limiting the generality of the foregoing, to the extent permitted by applicable Requirements of Law, the making of any Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default or Event of Default at the time.

(b)    Subject to this Section 9.02(b) and Sections 9.02(c) and (d) below and to Section 9.05(f), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Top Borrower and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) or (ii) in the case of any other Loan Document (other than any waiver, amendment or modification to effectuate any modification thereto expressly contemplated by the terms of such other Loan Document), pursuant to an agreement or agreements in writing entered into by the Administrative Agent and each Loan Party that is party thereto, with the consent of the Required Lenders; provided that, notwithstanding the foregoing:

(A)    the consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) shall be required for any waiver, amendment or modification that:

(1)    increases the Commitment of such Lender; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall constitute an increase of any Commitment of such Lender;

(2)    reduces the principal amount of any Loan owed to such Lender;

(3)    (x) extends the scheduled final maturity of any Loan or (y) postpones any Interest Payment Date with respect to any Loan held by such Lender or the date of any scheduled payment of any fee or premium payable to such Lender hereunder (in each case, other than any extension for administrative reasons agreed by the Administrative Agent);

(4)    reduces the rate of interest (other than to waive any Default or Event of Default or obligation of the Borrowers to pay interest to such Lender at the default rate of interest under Section 2.13(d), which shall only require the

137

consent of the Required Lenders) or the amount of any fee or premium owed to such Lender; it being understood that no change in the definition of any ratio used in the calculation of the Applicable Rate or in the calculation of any other interest, fee or premium due hereunder (including any component definition thereof) shall constitute a reduction in any rate of interest or fee hereunder;

(5)     extends the expiry date of such Lender's Commitment; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of any Commitment shall constitute an extension of any Commitment of any Lender; and

(6)     waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby;

(B)     no such agreement shall:

(1)     change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of "Required Lenders" to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender directly and adversely affected thereby; and

(2)     release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Article 8 or Section 9.22 hereof), without the prior written consent of each Lender;

(3)     release all or substantially all of the value of the Guarantees under the Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Section 9.22 hereof), without the prior written consent of each Lender; or

(4)     subordinate the Term Loan Facility to any other Indebtedness or subordinate the Lien securing the Term  Loan Facility to any other Lien securing any other Indebtedness, in each case without the prior written consent of Lenders holding at least 75% of outstanding Loans,  except in the case of (i) any Indebtedness that is expressly permitted by the Loan Documents as in effect on the Closing Date to be senior to the Secured Obligations and/or be secured by a Lien that is senior to the Lien securing the Secured Obligations and (ii) any "debtor-in-possession" facility; or

(C)     no agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent;

(c)     [Reserved].

(d)     Notwithstanding anything to the contrary contained in this Section 9.02 or any other provision of this Agreement or any provision of any other Loan Document:

138

(i)        the Top Borrower and the Administrative Agent may, without the input or consent of any Lender, amend, supplement and/or waive any guaranty, collateral security agreement, pledge agreement and/or related document (if any) executed in connection with this Agreement to (A) comply with any Requirement of Law or the advice of counsel or (B) cause any such guaranty, collateral security agreement, pledge agreement or other document to be consistent with this Agreement and/or the relevant other Loan Documents,

(ii)        the Top Borrower and the Administrative Agent may, without the input or consent of any other Lender (other than the relevant Lenders providing Loans and Commitments under such Sections), effect amendments to this Agreement and the other Loan Documents as may be necessary in the reasonable opinion of the Top Borrower and the Administrative Agent to (1) effect the provisions of <u>Sections 5.12</u> and/or <u>6.13</u>, or any other provision specifying that any waiver, amendment or modification may be made with the consent or approval of the Administrative Agent and/or (2) to add terms (including representations and warranties, conditions, prepayments, covenants or events of default), in connection with the addition of any Loan or Commitment hereunder, in a manner favorable to the then-existing Lenders, as reasonably determined by the Administrative Agent,

(iii)        if the Administrative Agent and the Top Borrower have jointly identified any ambiguity, mistake, defect, inconsistency, obvious error or any error or omission of a technical nature or any necessary or desirable technical change, in each case, in any provision of any Loan Document, then the Administrative Agent and the Top Borrower shall be permitted to amend such provision solely to address such matter as reasonably determined by them acting jointly,

(iv)        the Administrative Agent and the Top Borrower may amend, restate, amend and restate or otherwise modify the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement and/or any other Additional Agreement as provided therein,

(v)        the Administrative Agent may amend the Commitment Schedule to reflect assignments entered into pursuant to <u>Section 9.05</u> and Commitment reductions or terminations pursuant to <u>Section 2.09</u>, and

(vi)        no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except as permitted pursuant to <u>Section 2.21(b)</u> and except that the Commitment of any Defaulting Lender may not be increased without the consent of such Defaulting Lender (it being understood that any Commitment or Loan held or deemed held by any Defaulting Lender shall be excluded from any vote hereunder that requires the consent of any Lender, except as expressly provided in <u>Section 2.21(b)</u>).

Section 9.03.        <u>Expenses; Indemnity</u>.

(a)        Subject to <u>Section 9.05(f)</u>, the Borrowers shall jointly and severally pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and the Lenders and their respective Affiliates (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of outside counsel to the Administrative Agent and one separate counsel for the Lenders collectively, and, if necessary, of one local counsel in any relevant jurisdiction to all such Persons, taken as a whole in connection with the syndication and distribution (including via the Internet or through a service such as Intralinks) of the Term Loan Facility, the preparation, execution, delivery and administration of the Loan Documents and any related documentation, including in connection with any amendment, modification or waiver of any provision of any Loan Document (whether or not the transactions contemplated thereby are consummated, but only to

the extent the preparation of any such amendment, modification or waiver was requested by the Top Borrower and except as otherwise provided in a separate writing between the Top Borrower and the Administrative Agent) and (ii) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and the Lenders or any of their respective Affiliates (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of outside counsel the Administrative Agent and one separate counsel for the Lenders collectively, and, if necessary, of one local counsel in any relevant jurisdiction to all such Persons, taken as a whole) in connection with the enforcement, collection or protection of their respective rights in connection with the Loan Documents, including their respective rights under this Section, or in connection with the Loans made hereunder.  Except to the extent required to be paid on the Closing Date, all amounts due under this paragraph (a) shall be payable by any Borrower within 30 days of receipt by the Top Borrower of an invoice setting forth such expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request.

(b)     The Borrowers shall jointly and severally indemnify the Administrative Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages and liabilities (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole, and, if reasonably necessary, one local counsel in any relevant jurisdiction to all Indemnitees, taken as a whole and solely in the case of an actual or perceived conflict of interest, (x) one additional counsel to all affected Indemnitees, taken as a whole, and (y) one additional local counsel to all affected Indemnitees, taken as a whole), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Term Loan Facility or any other transactions contemplated hereby or thereby and/or the enforcement of the Loan Documents, (ii) the use of the proceeds of the Loans, (iii) any actual or alleged Release or presence of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by the Top Borrower, any of its Restricted Subsidiaries or any other Loan Party or any Environmental Liability related to the Top Borrower, any of its Restricted Subsidiaries or any other Loan Party and/or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third party or by the Top Borrower, any other Loan Party or any of their respective Affiliates); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that any such loss, claim, damage, or liability (i) is determined by a final and non-appealable judgment of a court of competent jurisdiction (or documented in any settlement agreement referred to below) to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or, to the extent such judgment finds (or any such settlement agreement acknowledges) that any such loss, claim, damage, or liability has resulted from such Person's material breach of the Loan Documents or (ii) arises out of any claim, litigation, investigation or proceeding brought by such Indemnitee against another Indemnitee (other than any claim, litigation, investigation or proceeding that is brought by or against the Administrative Agent, acting in its capacity as the Administrative Agent) that does not involve any act or omission of Holdings, the Top Borrower or any of its subsidiaries.  Each Indemnitee shall be obligated to refund or return any and all amounts paid by any Borrower pursuant to this Section 9.03(b) to such Indemnitee for any fees, expenses, or damages to the extent such Indemnitee is not entitled to payment thereof in accordance with the terms hereof.  All amounts due under this paragraph (b) shall be payable by any Borrower within 30 days (x) after receipt by the Top Borrower of a written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt by the Top Borrower of an invoice setting forth such costs and expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request.  This Section 9.03(b) shall not apply

to Taxes other than any Taxes that represent losses, claims, damages or liabilities in respect of a non-Tax claim.

(c)     Notwithstanding anything in the Plan of Reorganization (including Section 10.3 thereof), the Borrowers shall jointly and severally indemnify each Lender, who is a Lender on the Closing Date, and each such Lender's Indemnitee Related Parties (each such Lender and applicable Indemnitee Related Party being called an "Initial Lender Indemnitee") against, and hold each Initial Lender Indemnitee harmless from, any and all losses, claims, damages and liabilities (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one counsel to all Initial Lender Indemnitees taken as a whole and, if reasonably necessary, one local counsel in any relevant jurisdiction to all Initial Lender Indemnitees, taken as a whole and solely in the case of an actual or perceived conflict of interest, (x) one additional counsel to all affected Initial Lender Indemnitees, taken as a whole, and (y) one additional local counsel to all affected Initial Lender Indemnitees, taken as a whole), incurred by or asserted against any Initial Lender Indemnitee arising out of, in connection with, or as a result of any actual or prospective claim, litigation, investigation or proceeding relating to, whether based on contract, tort or any other theory and regardless of whether any Initial Lender Indemnitee is a party thereto (and regardless of whether such matter is initiated by or against a third party or by or against the Top Borrower, any other Loan Party or any of their respective Affiliates) or a party to this Agreement at such time, in connection with the Adversary Proceeding (as defined in the Plan of Reorganization), the Prepetition Adversary Actions (as defined in the Plan of Reorganization) and/or any other claims, proceedings, actions, or causes of action in connection with or related to the PTL Credit Agreement, the Exchange Agreement, the Intercreditor Agreements, and/or  the 2020 Transaction (each as defined in the Plan of Reorganization); provided that such indemnity shall not (i) (A) as to any Initial Lender Indemnitee, be available to the extent that any such loss, claim, damage, or liability is determined by a final and non-appealable judgment of a court of competent jurisdiction (or documented in any settlement agreement referred to below) to have resulted from the gross negligence, bad faith or willful misconduct of such Initial Lender Indemnitee or (B) as to any Initial Lender Indemnitee, be available to the extent such judgment finds (or any such settlement agreement acknowledges) that any such loss, claim, damage, or liability has resulted from such Person's material breach of the Loan Documents (as defined in the PTL Credit Agreement)  (excluding, in each case, for the avoidance of doubt, any Initial Lender Indemnitee's participation in the 2020 Transaction) or (ii) as to any Initial Lender Indemnitee, be available to the extent that any such loss, claim, damage, or liability arises out of any claim, litigation, investigation or proceeding brought by such Initial Lender Indemnitee against another Initial Lender Indemnitee (other than any claim, litigation, investigation or proceeding that is brought by or against UBS AG, Stamford Branch or WSFS, acting in its respective capacity as the administrative agent under the PTL Credit Agreement) that does not involve any act or omission of Dawn, the Top Borrower or any of its subsidiaries.  Each Initial Lender Indemnitee shall be obligated to refund or return any and all amounts paid by any Borrower pursuant to this Section 9.03(c) to such Initial Lender Indemnitee for any fees, expenses, or damages to the extent such Initial Lender Indemnitee is not entitled to payment thereof in accordance with the terms hereof.  All amounts due under this paragraph (c) shall be payable by any Borrower within 30 days (x) after receipt by the Top Borrower of a written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt by the Top Borrower of an invoice setting forth such costs and expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request.  This Section 9.03(c) shall not apply to Taxes other than any Taxes that represent losses, claims, damages or liabilities in respect of a non-Tax claim.

(d)     The Top Borrower shall not be liable for any settlement of any proceeding effected without the written consent of the Top Borrower (which consent shall not be unreasonably withheld, delayed or conditioned), but if any proceeding is settled with the written consent of the Top Borrower, or if there is a final judgment against any Indemnitee or any Initial Lender Indemnitee in any such proceeding, the Borrowers agree to indemnify and hold harmless each Indemnitee or any Initial Lender Indemnitee to the

141

extent and in the manner set forth above.  The Top Borrower shall not, without the prior written consent of the affected Indemnitee or any Initial Lender Indemnitee (in each case, which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened proceeding in respect of which indemnity could have been sought hereunder by such Indemnitee or such Initial Lender Indemnitee unless (i) such settlement includes an unconditional release of such Indemnitee from all liability or claims that are the subject matter of such proceeding and (ii) such settlement does not include any statement as to any admission of fault or culpability.

Section 9.04.    Waiver of Claim.  To the extent permitted by applicable Requirements of Law, no party to this Agreement nor any Secured Party shall assert, and each hereby waives, any claim against any other party hereto, any Loan Party and/or any Related Party of any thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, any Loan or the use of the proceeds thereof, except, in the case of any claim by any Indemnitee or any Initial Lender Indemnitee against any Borrower, to the extent such damages would otherwise be subject to indemnification pursuant to, and in accordance with, the terms of Section 9.03.

Section 9.05.    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that (i) except as provided under Section 6.07, the Top Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Top Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with the terms of this Section (any attempted assignment or transfer not complying with the terms of this Section shall be null and void and, with respect to any attempted assignment or transfer to any Disqualified Institution, subject to Section 9.05(f)).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and permitted assigns, to the extent provided in paragraph (e) of this Section, Participants and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of any Loan or Commitment at the time owing to it) with the prior written consent of:

(A)    the Top Borrower (such consent not to be unreasonably withheld, conditioned or delayed); provided, that (x) the consent of the Top Borrower shall not be required for any assignment of Loans or Commitments at any time when an Event of Default under Section 7.01(a) or Sections 7.01(f) or (g) (with respect to the Loan Parties) exists, and (y) the Top Borrower may withhold its consent to any assignment to any Person (other than a Bona Fide Debt Fund) that is not a Disqualified Institution but is known by the Top Borrower to be an Affiliate of a Disqualified Institution regardless of whether such person is identifiable as an Affiliate of a Disqualified Institution on the basis of such Affiliate's name; and

(B)    the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed); provided, that no consent of the Administrative Agent shall be required for any assignment to another Lender, any Affiliate of a Lender or any Approved Fund.

WEIL:\99124112\10\40416.0005

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of any assignment to another Lender, any Affiliate of any Lender or any Approved Fund or any assignment of the entire remaining amount of the relevant assigning Lender's Loans or Commitments, the principal amount of Loans or Commitments of the assigning Lender subject to the relevant assignment (determined as of the date on which the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and determined on an aggregate basis in the event of concurrent assignments to Related Funds or by Related Funds) shall not be less than (x) $5,000,000, unless the Top Borrower and the Administrative Agent otherwise consent;

(B)     any partial assignment shall be made as an assignment of a proportionate part of all the relevant assigning Lender's rights and obligations under this Agreement;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); and

(D)     the relevant Eligible Assignee, if it is not a Lender, shall deliver on or prior to the effective date of such assignment, to the Administrative Agent (1) an Administrative Questionnaire and (2) any Internal Revenue Service form required under Section 2.17.

(iii)     Subject to the acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in any Assignment and Assumption, the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned pursuant to such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be (A) entitled to the benefits of Sections 2.15, 2.17 and 9.03 with respect to facts and circumstances occurring on or prior to the effective date of such assignment and (B) subject to its obligations thereunder and under Section 9.13).  If any assignment by any Lender holding any Promissory Note is made after the issuance of such Promissory Note, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender such Promissory Note to the Administrative Agent for cancellation, and, following such cancellation, if requested by either the assignee or the assigning Lender, the Borrowers shall issue and deliver a new Promissory Note to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(iv)     The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders and their respective successors and assigns, and the applicable commitment of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person

whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Top Borrower and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Eligible Assignee, the Eligible Assignee's completed Administrative Questionnaire and any tax certification required by Section 9.05(b)(ii)(D)(2) (unless the assignee is already a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section, if applicable, and any written consent to the relevant assignment required by paragraph (b) of this Section, the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)    By executing and delivering an Assignment and Assumption, the assigning Lender and the Eligible Assignee thereunder shall be deemed to confirm and agree with each other and the other parties hereto as follows: (A) the assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that the amount of its commitments, and the outstanding balances of its Loans, in each case without giving effect to any assignment thereof which has not become effective, are as set forth in such Assignment and Assumption, (B) except as set forth in clause (A) above, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statement, warranty or representation made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Top Borrower or any Restricted Subsidiary or the performance or observance by the Top Borrower or any Restricted Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (C) the assignee represents and warrants that it is an Eligible Assignee and that it is not a Disqualified Institution, legally authorized to enter into such Assignment and Assumption; (D) the assignee confirms that it has received a copy of this Agreement and each applicable Intercreditor Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (E) the assignee will independently and without reliance upon the Administrative Agent, the assigning Lender or any other Lender and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (F) the assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent, by the terms hereof, together with such powers as are reasonably incidental thereto; and (G) the assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(c)     (i) Any Lender may, without the consent of the Top Borrower, the Administrative Agent or any other Lender, sell participations to any bank or other entity (other than to any Disqualified Institution, any natural person, the Top Borrower or any of its Affiliates) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent and the other Lenders shall continue

to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  Any agreement or instrument pursuant to which any Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the relevant Participant, agree to any amendment, modification or waiver described in (x) clause (A) of the first proviso to Section 9.02(b) that directly and adversely affects the Loans or commitments in which such Participant has an interest and (y) clauses (B)(1), (2) or (3) of the first proviso to Section 9.02(b).  Subject to paragraph (c)(ii) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.15 and 2.17 (subject to the limitations and requirements of such Sections and Section 2.19) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section and it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender, and if additional amounts are required to be paid pursuant to Section 2.17(a) or Section 2.17(c), to the Top Borrower and the Administrative Agent).  To the extent permitted by applicable Requirements of Law, each Participant also shall be entitled to the benefits of Section 9.09 as though it were a Lender; provided that such Participant shall be subject to Section 2.18(c) as though it were a Lender.

(ii)    No Participant shall be entitled to receive any greater payment under Section 2.15 or 2.17 than the participating Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Top Borrower's prior written consent (in its sole discretion), expressly acknowledging that such Participant's entitlement to benefits under Sections 2.15 and 2.17 is not limited to what the participating Lender would have been entitled to receive absent the participation.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and their respective successors and registered assigns, and the principal and interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (a "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of any Participant Register (including the identity of any Participant or any information relating to any Participant's interest in any Commitment, Loan or any other obligation under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) or Proposed Section 1.163-5(b) (and any successor sections).  The entries in the Participant Register shall be conclusive absent manifest error, and each Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    (i) Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to any Disqualified Institution or any natural person) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to any Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section 9.05 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release any Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(ii)    No Lender, acting in its capacity as a Lender (or any Affiliate or other Person acting on such Lender's behalf) may at any time enter into a total return swap, total rate of return swap, credit default swap or other derivative instrument under which any Secured Obligation is a sole reference obligation (or a reference obligation constituting at least 5% of the weight in any

bucket of such derivative instruments) (any such swap or other derivative instrument, an "Obligations Derivative Instrument") with any counterparty that is a Disqualified Institution; provided that, for the avoidance of doubt, nothing in this clause shall prohibit the activities of a Lender (or any Affiliate or other Person acting on such Lender's behalf) that occur on the public side of an information barrier unless such Person is acting in its capacity as a Lender or on behalf of any Person which is acting in its capacity as Lender or on behalf of a Lender; provided further that, (x) notwithstanding the foregoing, in no event shall Confidential Information be shared with any counterparty to an Obligations Derivatives Instrument that is a Disqualified Institution and each Lender shall be required to comply with the provisions of Section 9.13 in connection with any transactions involving Obligations Derivative Instruments and (y) in the event of any Obligations Derivative Instrument in violation of the foregoing, the Top Borrower has the right to require the unwind of the applicable Obligations Derivative Instrument at the sole cost and expense of the applicable Lender.

(e)       Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Top Borrower, the option to provide to any Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to such Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of any Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of such Borrower under this Agreement (including its obligations under Section 2.15 or 2.17) and no SPC shall be entitled to any greater amount under Section 2.15 or 2.17 or any other provision of this Agreement or any other Loan Document that the Granting Lender would have been entitled to receive, unless the grant to such SPC is made with the prior written consent of the Top Borrower (in its sole discretion), expressly acknowledging that such SPC's entitlement to benefits under Sections 2.15 and 2.17 is not limited to what the Granting Lender would have been entitled to receive absent the grant to the SPC, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender) and (iii) the Granting Lender shall for all purposes including approval of any amendment, waiver or other modification of any provision of the Loan Documents, remain the Lender of record hereunder.   In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the Requirements of Law of the U.S. or any State thereof; provided that (i) such SPC's Granting Lender is in compliance in all material respects with its obligations to the Borrowers hereunder and (ii) each Lender designating any SPC hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such SPC during such period of forbearance.   In addition, notwithstanding anything to the contrary contained in this Section 9.05, any SPC may (i) with notice to, but without the prior written consent of, any Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guaranty or credit or liquidity enhancement to such SPC.

(f)       (i) Any assignment or participation or entry into an Obligations Derivative Instrument by a Lender (A) to or with any Disqualified Institution or (B) without the Top Borrower's consent to the extent

the Top Borrower's consent is required under this Section 9.05, to any Person shall be null and void, and the Top Borrower shall be entitled to seek specific performance to unwind any such assignment or participation and/or specifically enforce this Section 9.05(f) in addition to injunctive relief (without posting a bond or presenting evidence of irreparable harm) or any other remedy available to any Borrower at law or in equity; it being understood and agreed that Holdings, the Top Borrower and its subsidiaries will suffer irreparable harm if any Lender breaches any obligation under this Section 9.05 as it relates to any assignment, participation or pledge of any Loan or Commitment to any Person to whom the Top Borrower's consent is required but not obtained. Nothing in this Section 9.05(f) shall be deemed to prejudice any right or remedy that Holdings or the Top Borrower may otherwise have at law or equity. Upon the request of any Lender, the Administrative Agent shall make the list of Disqualified Institutions available to such Lender, and such Lender may provide the list of Disqualified Institutions to any potential assignee or participant or counterparty to any Obligations Derivative Instrument on a confidential basis in accordance with Section 9.13 solely for the purpose of permitting such Person to verify whether such Person (or any Affiliate thereof) constitutes a Disqualified Institution.

(ii)    If any assignment or participation under this Section 9.05 is made to any Disqualified Institution and/or any Affiliate of any Disqualified Institution (other than any Bona Fide Debt Fund) without the Top Borrower's prior written consent (any such person, a "Disqualified Person"), then the Top Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Person and the Administrative Agent, (A) terminate any Commitment of such Disqualified Person and repay all obligations of each Borrower owing to such Disqualified Person (without regard to the pro rata requirements of Section 2.18) and/or (B) require such Disqualified Person to assign, without recourse (in accordance with and subject to the restrictions contained in this Section 9.05), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; provided that (I) [reserved], (II) in the case of clause (B), the relevant assignment shall otherwise comply with this Section 9.05 (except that no registration and processing fee required under this Section 9.05 shall be required with any assignment pursuant to this paragraph) and (III) in no event shall such Disqualified Person be entitled to receive amounts set forth in Section 2.13(d). Further, any Disqualified Person identified by the Top Borrower to the Administrative Agent (A) shall not be permitted to (x) receive information or reporting provided by any Loan Party, the Administrative Agent or any Lender and/or (y) attend and/or participate in conference calls or meetings attended solely by the Lenders and the Administrative Agent, (B) (x) shall not for purposes of determining whether the Required Lenders, the majority of Lenders, each Lender or each affected Lender have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, have a right to consent (or not consent), otherwise act or direct or require the Administrative Agent or any Lender to take (or refrain from taking) any such action; it being understood that all Commitments and Loans held by any Disqualified Person shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders, majority Lenders, each Lender or each affected Lender have taken any action, and (y) shall be deemed to vote in the same proportion as Lenders that are not Disqualified Persons in any proceeding under any Debtor Relief Law commenced by or against the Top Borrower or any other Loan Party and (C) shall not be entitled to receive the benefits of Section 9.03. For the sake of clarity, the provisions in this Section 9.05(f) shall not apply to any Person that is an assignee of any Disqualified Person, if such assignee is not a Disqualified Person.

(iii)    Notwithstanding anything to the contrary herein, each of Holdings, each other Loan Party and the Lenders acknowledges and agrees that the Administrative Agent shall not have

147

any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Person and the Administrative Agent shall have no liabilities with respect to any assignment or participation made to a Disqualified Person.

(g)     Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Loans to Holdings, the Borrowers or any of their Subsidiaries on a non-pro rata basis (A) through Dutch Auctions open to all Lenders holding the relevant Loans on a pro rata basis or (B) through open market purchases, in each case with respect to clauses (A) and (B), solely for cash and without the consent of the Administrative Agent; provided that:

(i)     any Loans acquired by Holdings, the Borrowers or any of their Subsidiaries shall, to the extent permitted by applicable Requirements of Law, be retired and cancelled immediately upon the acquisition thereof; provided that upon any such retirement and cancellation, the aggregate outstanding principal amount of the Loans shall be deemed reduced by the full par value of the aggregate principal amount of the Loans so retired and cancelled, and each principal repayment installment with respect to the Loans pursuant to Section 2.10(a) shall be reduced on a pro rata basis by the full par value of the aggregate principal amount of Loans so cancelled;

(ii)     [reserved];

(iii)     Holdings or the relevant Borrower or Subsidiary and assigning Lender shall have executed an Affiliated Lender Assignment and Assumption;

(iv)     in connection with any assignment effected pursuant to a Dutch Auction and/or open market purchase conducted by Holdings, the Borrowers or any of their Subsidiaries, (A) the relevant Person may not use the proceeds of any ABL Facility to fund such assignment, and (B) no Event of Default shall exist at the time of acceptance of bids for the Dutch Auction or the confirmation of such open market purchase, as applicable; and

(v)     Holdings or the relevant Borrower or Subsidiary shall not be required to represent or warrant that it is not in possession of material non-public information with respect to the Borrowers and/or any Subsidiary thereof and/or their respective securities in connection with any assignment permitted by this Section 9.05(g)

Section 9.06.     Survival.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loan regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Termination Date.  The provisions of Sections 2.15, 2.17, 9.03 and 9.13 and Article 8 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments, the occurrence of the Termination Date or the termination of this Agreement or any provision hereof but in each case, subject to the limitations set forth in this Agreement.

Section 9.07.     Counterparts; Integration; Effectiveness.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement, the other

148

Loan Documents and each Intercreditor Agreement constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  This Agreement shall become effective when it has been executed by the Borrowers and the Administrative Agent and when the Administrative Agent has received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile or by email as a ".pdf" or ".tif" attachment shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.08.    Severability.  To the extent permitted by applicable Requirements of Law, any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.09.    Right of Setoff.  At any time when an Event of Default exists, upon the written consent of the Administrative Agent, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (in any currency) at any time owing by the Administrative Agent or such Lender to or for the credit or the account of any Loan Party against any and all of the Secured Obligations held by the Administrative Agent or such Lender, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch or office of Lender different than the branch or office holding such deposit or obligation on such Indebtedness.  Any applicable Lender shall promptly notify the Top Borrower and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender and the Administrative Agent under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender or the Administrative Agent may have.

Section 9.10.    Governing Law; Jurisdiction; Consent to Service of Process.

(a)    THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN ANY OTHER LOAN DOCUMENT) AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN ANY OTHER LOAN DOCUMENT), SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, FEDERAL COURT.  EACH PARTY HERETO AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR

PROCEEDING BROUGHT IN ANY SUCH COURT. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE REQUIREMENTS OF LAW. EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION SOLELY IN CONNECTION WITH THE EXERCISE OF ITS RIGHTS UNDER ANY COLLATERAL DOCUMENT.

(c)     EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY CLAIM OR DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION, SUIT OR PROCEEDING IN ANY SUCH COURT.

(d)     TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SECTION 9.01. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY LOAN DOCUMENT THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE. NOTHING IN THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW.

Section 9.11.    Waiver of Jury Trial. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.12.    Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.13.    Confidentiality. Each of the Administrative Agent and each Lender agrees (and each Lender agrees to cause its SPC, if any) to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its Affiliates'

directors, officers, managers, employees, independent auditors, or other experts and advisors, including accountants, legal counsel and other advisors (collectively, the "Representatives") on a "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of the Confidential Information and are or have been advised of their obligation to keep the Confidential Information of this type confidential; provided that such Person shall be responsible for its Affiliates' and their Representatives' compliance with this paragraph; provided, further, that unless the Top Borrower otherwise consents, no such disclosure shall be made by the Administrative Agent, any Lender or any Affiliate or Representative thereof to any Affiliate or Representative of the Administrative Agent, or any Lender that is a Disqualified Institution, (b) to the extent compelled by legal process in, or reasonably necessary to, the defense of such legal, judicial or administrative proceeding, in any legal, judicial or administrative proceeding or otherwise as required by applicable Requirements of Law (in which case such Person shall (i) to the extent permitted by applicable Requirements of Law, inform the Top Borrower promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) upon the demand or request of any regulatory or governmental authority (including any self-regulatory body) purporting to have jurisdiction over such Person or its Affiliates (in which case such Person shall, except with respect to any audit or examination conducted by bank accountants or any Governmental Authority or regulatory or self-regulatory authority exercising examination or regulatory authority, to the extent permitted by applicable Requirements of Law, (i) inform the Top Borrower promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any information so disclosed is accorded confidential treatment), (d) to any other party to this Agreement, (e) subject to an acknowledgment and agreement by the relevant recipient that the Confidential Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as otherwise reasonably acceptable to the Top Borrower and the Administrative Agent) in accordance with the standard syndication process of the Arrangers or market standards for dissemination of the relevant type of information, which shall in any event require "click through" or other affirmative action on the part of the recipient to access the Confidential Information and acknowledge its confidentiality obligations in respect thereof, to (i) any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or prospective Participant in, any of its rights or obligations under this Agreement, including any SPC (in each case other than a Disqualified Institution), (ii) any pledgee referred to in Section 9.05, (iii) any actual or prospective, direct or indirect contractual counterparty (or its advisors) to any Derivative Transaction (including any credit default swap) or similar derivative product to which any Loan Party is a party and (iv) subject to the Top Borrower's prior approval of the information to be disclosed, (x) [reserved] or (y) to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the facilities or, on a confidential basis, market data collectors and service providers to the Administrative Agent in connection with the administration and management of this Agreement and the Loan Documents, (f) with the prior written consent of the Top Borrower and (g) to the extent the Confidential Information becomes publicly available other than as a result of a breach of this Section by such Person, its Affiliates or their respective Representatives.  For purposes of this Section, "Confidential Information" means all information relating to Holdings, the Top Borrower and/or any of its subsidiaries and their respective businesses (including any information obtained by the Administrative Agent, any Lender, or any of their respective Affiliates or Representatives, based on a review of any books and records relating to Holdings, the Top Borrower and/or any of its subsidiaries and their respective Affiliates from time to time, including prior to the Closing Date) other than any such information that is publicly available to the Administrative Agent or Lender on a non-confidential basis prior to disclosure by Holdings, the Top Borrower or any of its subsidiaries.  For the avoidance of doubt, in no event shall any disclosure of any Confidential Information be made to Person that is a Disqualified Institution at the time of disclosure.

Section 9.14.    No Fiduciary Duty.  Each of the Administrative Agent, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their respective

affiliates.  Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its respective stockholders or its respective affiliates, on the other. Each Loan Party acknowledges and agrees that:  (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender, in its capacity as such, has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its respective stockholders or its respective affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its respective stockholders or its respective Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender, in its capacity as such, is acting solely as principal and not as the agent or fiduciary of such Loan Party, its respective management, stockholders, creditors or any other Person.  Each Loan Party acknowledges and agrees that such Loan Party has consulted its own legal, tax and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.

Section 9.15.    Several Obligations.   The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.

Section 9.16.    USA PATRIOT Act.  Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

Section 9.17.    Disclosure of Agent Conflicts.   Each Loan Party and each Lender hereby acknowledge and agree that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

Section 9.18.    Appointment for Perfection.  Each Lender hereby appoints each other Lender as its agent for the purpose of perfecting Liens for the benefit of the Administrative Agent and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Requirement of Law can be perfected only by possession.  If any Lender (other than the Administrative Agent) obtains possession of any Collateral, such Lender shall notify the Administrative Agent thereof and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 9.19.    Interest Rate Limitation.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Requirements of Law (collectively the "Charged Amounts"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of such Loan hereunder, together with all Charged Amounts payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charged Amounts that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charged Amounts payable to such Lender in respect of other Loans or periods shall be increased (but not above the

Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, have been received by such Lender.

Section 9.20.  Intercreditor Agreement.  REFERENCE IS MADE TO EACH INTERCREDITOR AGREEMENT. EACH LENDER HEREUNDER AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF ANY INTERCREDITOR AGREEMENT AND AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO EACH INTERCREDITOR AGREEMENT AS "TERM LOAN CREDIT AGREEMENT COLLATERAL AGENT" (OR OTHER APPLICABLE TITLE) AND ON BEHALF OF SUCH LENDER.  THE PROVISIONS OF THIS SECTION 9.20 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF ANY INTERCREDITOR AGREEMENT. REFERENCE MUST BE MADE TO EACH APPLICABLE INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF.  EACH LENDER IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF EACH INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN ANY INTERCREDITOR AGREEMENT.  THIS SECTION 9.20 IS INTENDED AS AN INDUCEMENT TO THE LENDERS UNDER THE ABL CREDIT AGREEMENT AND THE HOLDERS OF ANY OTHER INDEBTEDNESS SUBJECT TO ANY APPLICABLE INTERCREDITOR AGREEMENT TO EXTEND CREDIT IN CONNECTION THEREWITH AND SUCH LENDERS ARE INTENDED THIRD PARTY BENEFICIARIES OF SUCH PROVISIONS AND THE PROVISIONS OF EACH INTERCREDITOR AGREEMENT.

Section 9.21.  Conflicts.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, in the event of any conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall govern and control; provided that in the case of any conflict or inconsistency between any Intercreditor Agreement and any Loan Document, the terms of such Intercreditor Agreement shall govern and control.

Section 9.22.  Release of Guarantors.  Notwithstanding anything in Section 9.02(b) to the contrary, any Subsidiary Guarantor shall be released from its obligations hereunder (and its Loan Guaranty and the Liens granted pursuant to the Collateral Documents shall be released) (i) if such Person ceases to be a Restricted Subsidiary (or becomes an Excluded Subsidiary as a result of a single transaction or series of related transactions permitted hereunder and consummated for a bona fide business purpose and not in contemplation of adversely affecting the Secured Parties' interests in the Loan Guaranty or the Collateral (as determined by the Administrative Agent in good faith), and the Top Borrower has requested such Excluded Subsidiary cease to be a Subsidiary Guarantor), (ii) automatically upon the occurrence of the Termination Date and/or (iii) in the case of any Discretionary Guarantor, upon notice from the Top Borrower to the Administrative Agent at any time.  In connection with any such release, the Administrative Agent shall promptly execute and deliver to the relevant Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence termination or release; provided, that upon the request of the Administrative Agent, the Top Borrower shall deliver a certificate of a Responsible Officer certifying that the relevant transaction has been consummated in compliance with the terms of this Agreement.  Any execution and delivery of any document pursuant to the preceding sentence of this Section 9.22 shall be without recourse to or warranty by the Administrative Agent (other than as to the Administrative Agent's authority to execute and deliver such documents).

Section 9.23.  Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding of the parties hereto, each such party acknowledges that any liability of any Affected

Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)     the effects of any Bail-in Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)     a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability  in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 9.24.     <u>Joint and Several Liability</u>.  Each Borrower is jointly and severally liable for the Obligations as a primary obligor in respect thereof.  The Obligations of each Borrower are independent of the Obligations of each other Borrower, and a separate action or actions may be brought and prosecuted against any Borrower to enforce this Agreement, irrespective of whether any action has been brought against any other Borrower or whether any other Borrower is joined in any such action.

Section 9.25.     <u>Top Borrower</u>.  Each Borrower hereby designates SSB, in its capacity as the Top Borrower, to act as its agent hereunder. The Top Borrower may act as agent on behalf of any Borrower for purposes of making or delivering Borrowing Requests or similar notices, giving instructions with respect to the disbursement of the proceeds of Loans, giving and receiving all other notices and consents hereunder or under any of the other Loan Documents and taking all other actions (including in respect of compliance with covenants) on behalf of any Borrower or the Borrowers under the Loan Documents.  SSB hereby accepts such appointment.  Each Borrower agrees that each notice, election, representation and warranty, covenant, agreement and undertaking made on its behalf by the Top Borrower shall be deemed for all purposes to have been made by such Borrower and shall be binding upon and enforceable against such Borrower to the same extent as if the same had been made directly by such Borrower.

Section 9.26.     [Reserved].

Section 9.27.     <u>Certain ERISA Matters</u>.

(a)     Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers, that at least one of the following is and will be true:

(i)     such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Employee Benefit Plans in connection with the Loans or the Commitments;

(ii)     the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemption have been satisfied, with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(iii)     (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv)     such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion and such Lender.

(b)     In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers, that none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any other Loan Document or any documents related to hereto or thereto).

(c)     The Administrative Agent hereby informs the Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments, this Agreement and any other Loan Documents, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, arrangement fees, agency fees, amendment fees, processing fees, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 9.28.     Recognition of U.S. Special Resolution Regimes.

(a)     To the extent that this Agreement provides support, through a guarantee or otherwise, for swap agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act

155

and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes"), in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that this Agreement and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the U.S. or any other state of the U.S.).

(b)     In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States.  In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, default rights under this Agreement that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and this Agreement were governed by the laws of the U.S. or a state of the U.S.  Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(c)     As used in this Section 9.28, the following terms have the following meanings:

(i)     "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such part.

(ii)     "Covered Entity" means any of the following:

(A)     a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §252.82(b);

(B)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §47.3(b); or

(C)     a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §382.2(b).

(iii)     "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

[Signature Pages Follow]

156

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SERTA SIMMONS BEDDING, LLC,** as the Top Borrower

By: _____
    Name:
    Title:

**NATIONAL BEDDING COMPANY L.L.C.,** as a Borrower

By: _____
    Name:
    Title:

**SSB MANUFACTURING COMPANY**, as a Borrower

By: _____
    Name:
    Title:

[Signature Page to Term Loan Credit Agreement]

**WILMINGTON SAVINGS FUND SOCIETY, FSB**, as
Administrative Agent


By: _____
    Name:
    Title:

[Signature Page to Term Loan Credit Agreement]

[●], as a Lender

By: _____
Name:
Title:

WEIL:\99124112\10\40416.0005

**<u>Exhibit D</u>**

**Exit ABL Facility Agreement**

ABL CREDIT AGREEMENT[1]

Dated as of [●], 2023

among

SERTA SIMMONS BEDDING, LLC,
as the Top Borrower,

THE OTHER BORROWERS PARTY HERETO,

THE FINANCIAL INSTITUTIONS PARTY HERETO,
as Lenders,

and

WELLS FARGO BANK, NATIONAL ASSOCIATION,
as Administrative Agent

---

[1] Subject to review of Term Loan Credit Agreement; provided that the draft of the Term Loan Credit Agreement dated April 21, 2023 is acceptable.

7438295.12
WEIL:\99151587\17\40416.0005

# TABLE OF CONTENTS

**Page**

Article 1 DEFINITIONS ......................................................................................................... 1

    Section 1.01    Defined Terms ......................................................................... 1
    Section 1.02    Classification of Revolving Loans and Borrowings ............ 64
    Section 1.03    Terms Generally ...................................................................... 64
    Section 1.04    Accounting Terms; GAAP ...................................................... 65
    Section 1.05    Emergence Restructuring Transactions ................................ 66
    Section 1.06    Timing of Payment of Performance ...................................... 67
    Section 1.07    Times of Day ........................................................................... 67
    Section 1.08    Currency Equivalents Generally. ........................................... 67
    Section 1.09    [Reserved]. ................................................................................ 68
    Section 1.10    Certain Calculations and Tests. ............................................ 68
    Section 1.11    Guarantees and Collateral ...................................................... 69
    Section 1.12    Divisions ................................................................................... 69

Article 2 THE CREDITS ....................................................................................................... 69

    Section 2.01    Commitments. .......................................................................... 69
    Section 2.02    Loans and Borrowings ............................................................ 70
    Section 2.03    Borrowing Procedures and Settlements Requests for Borrowings ..................... 70
    Section 2.04    Overadvances. .......................................................................... 72
    Section 2.05    Letters of Credit. ..................................................................... 72
    Section 2.06    Protective Advances. ............................................................... 77
    Section 2.07    Settlements. .............................................................................. 78
    Section 2.08    Incremental Facility. ................................................................ 79
    Section 2.09    Termination of Commitments. ............................................... 81
    Section 2.10    Repayment of Loans; Evidence of Debt; Loan Account. .................... 82
    Section 2.11    Prepayment of Loans. ............................................................. 83
    Section 2.12    Fees. .......................................................................................... 84
    Section 2.13    Interest. ..................................................................................... 85
    Section 2.14    Alternate Rate of Interest. ...................................................... 88
    Section 2.15    Increased Costs. ....................................................................... 89
    Section 2.16    [Reserved]. ................................................................................ 90
    Section 2.17    Taxes. ....................................................................................... 91
    Section 2.18    Payments Generally; Allocation of Proceeds; Sharing of Payments. ............. 94
    Section 2.19    Mitigation Obligations; Replacement of Lenders. .............. 97
    Section 2.20    Illegality ................................................................................... 99
    Section 2.21    Defaulting Lenders ................................................................. 99
    Section 2.22    [Reserved]. .............................................................................. 101
    Section 2.23    [Reserved]. .............................................................................. 101
    Section 2.24    Reserves ................................................................................. 101

Article 3 REPRESENTATIONS AND WARRANTIES ..................................................... 102

    Section 3.01    Organization; Powers ............................................................ 102

2

Section 3.02    Authorization; Enforceability ................................................................ 102
Section 3.03    Section 3.03. Governmental Approvals; No Conflicts .................... 102
Section 3.04    Financial Condition; No Material Adverse Effect. .......................... 102
Section 3.05    Properties. ........................................................................................ 103
Section 3.06    Litigation and Environmental Matters. ............................................ 103
Section 3.07    Compliance with Laws .................................................................... 103
Section 3.08    Investment Company Status ............................................................ 104
Section 3.09    Taxes................................................................................................. 104
Section 3.10    ERISA. .............................................................................................. 104
Section 3.11    Disclosure. ........................................................................................ 104
Section 3.12    Solvency ............................................................................................ 104
Section 3.13    Subsidiaries ...................................................................................... 105
Section 3.14    Security Interest in Collateral ........................................................ 105
Section 3.15    Labor Disputes. ................................................................................ 105
Section 3.16    Federal Reserve Regulations .......................................................... 105
Section 3.17    OFAC; PATRIOT ACT and FCPA ................................................ 105
Section 3.18    Borrowing Base Certificate .............................................................. 106

Article 4 CONDITIONS ...................................................................................................... 106

Section 4.01    Closing Date .................................................................................... 106
Section 4.02    Each Credit Extension .................................................................... 109

Article 5 AFFIRMATIVE COVENANTS .......................................................................... 109

Section 5.01    Financial Statements and Other Reports........................................ 109
Section 5.02    Existence. .......................................................................................... 113
Section 5.03    Payment of Taxes. ............................................................................ 113
Section 5.04    Maintenance of Properties .............................................................. 113
Section 5.05    Insurance. .......................................................................................... 114
Section 5.06    Inspections; Field Examinations; Appraisals. ................................ 114
Section 5.07    Maintenance of Book and Records .................................................. 115
Section 5.08    Compliance with Laws .................................................................... 115
Section 5.09    Environmental.................................................................................... 115
Section 5.10    Designation of Subsidiaries ............................................................ 116
Section 5.11    Use of Proceeds. .............................................................................. 116
Section 5.12    Covenant to Guarantee Obligations and Provide Security................ 117
Section 5.13    Cash Management. ............................................................................ 119
Section 5.14    Further Assurances .......................................................................... 121
Section 5.15    Post-Closing Covenant .................................................................... 122
Section 5.16    Holdings Joinder .............................................................................. 122
Section 5.17    OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws....... 122

Article 6 NEGATIVE COVENANTS .................................................................................. 122

Section 6.01    Indebtedness ...................................................................................... 123
Section 6.02    Liens .................................................................................................. 128
Section 6.03    [Reserved]. ........................................................................................ 131
Section 6.04    Restricted Payments; Restricted Debt Payments. .......................... 132
Section 6.05    Burdensome Agreements. ................................................................ 136
Section 6.06    Investments ...................................................................................... 137

Section 6.07    Fundamental Changes; Disposition of Assets.................................................. 140
Section 6.08    Sale and Lease-Back Transactions.................................................................. 144
Section 6.09    Transactions with Affiliates............................................................................ 145
Section 6.10    Conduct of Business ....................................................................................... 146
Section 6.11    Amendments or Waivers of Organizational Documents ................................. 146
Section 6.12    Amendments of or Waivers with Respect to Restricted Debt ......................... 147
Section 6.13    Fiscal Year ..................................................................................................... 147
Section 6.14    Permitted Activities of Holdings .................................................................... 147
Section 6.15    Minimum Excess Availability ......................................................................... 148

Article 7 EVENTS OF DEFAULT ............................................................................................. 148

        Section 7.01    Events of Default ............................................................................... 148

Article 8 THE ADMINISTRATIVE AGENT ............................................................................. 151

Article 9 MISCELLANEOUS ................................................................................................... 157

        Section 9.01    Notices. ............................................................................................. 157
        Section 9.02    Waivers; Amendments........................................................................ 160
        Section 9.03    Expenses; Indemnity.......................................................................... 163
        Section 9.04    Waiver of Claim. ............................................................................... 165
        Section 9.05    Successors and Assigns. ..................................................................... 165
        Section 9.06    Survival. ............................................................................................ 170
        Section 9.07    Counterparts; Integration; Effectiveness............................................ 171
        Section 9.08    Severability ....................................................................................... 171
        Section 9.09    Right of Setoff .................................................................................. 171
        Section 9.10    Governing Law; Jurisdiction; Consent to Service of Process............. 171
        Section 9.11    Waiver of Jury Trial. ......................................................................... 172
        Section 9.12    Headings ........................................................................................... 173
        Section 9.13    Confidentiality .................................................................................. 173
        Section 9.14    No Fiduciary Duty ............................................................................. 174
        Section 9.15    Several Obligations ........................................................................... 174
        Section 9.16    USA PATRIOT Act. .......................................................................... 174
        Section 9.17    Disclosure of Agent Conflicts............................................................ 174
        Section 9.18    Appointment for Perfection .............................................................. 175
        Section 9.19    Interest Rate Limitation .................................................................... 175
        Section 9.20    Intercreditor Agreement ................................................................... 175
        Section 9.21    Conflicts............................................................................................ 175
        Section 9.22    Release of Guarantors ....................................................................... 176
        Section 9.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions.. 176
        Section 9.24    Joint and Several Liability ................................................................. 176
        Section 9.25    Top Borrower..................................................................................... 176
        Section 9.26    Bank Product Providers .................................................................... 177
        Section 9.27    Certain ERISA Matters..................................................................... 178
        Section 9.28    Recognition of U.S. Special Resolution Regimes. ............................. 179
        Section 9.29    Erroneous Payments. ......................................................................... 180

SCHEDULES:

| | | |
|---|---|---|
| Schedule 1.01(a) | – | Commitment Schedule |
| Schedule 1.01(b) | – | Rollover Letters of Credit |
| Schedule 1.01(c) | – | Mortgages |
| Schedule 1.01(d) | – | Closing Date Borrowing Base |
| Schedule 1.05 | – | Emergence Restructuring Transactions |
| Schedule 3.05 | – | Fee Owned Real Estate Assets |
| Schedule 3.13 | – | Subsidiaries |
| Schedule 4.01(b) | – | Local Counsel Opinions |
| Schedule 5.10 | – | Unrestricted Subsidiaries |
| Schedule 5.15 | – | Post-Closing Obligations |
| Schedule 6.01 | – | Existing Indebtedness |
| Schedule 6.02 | – | Existing Liens |
| Schedule 6.06 | – | Existing Investments |
| Schedule 6.07 | – | Specified Dispositions |
| Schedule 6.08 | – | Existing Sale Leasebacks |
| Schedule 9.01 | – | Borrower's Website Address for Electronic Delivery |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit A | – | Form of Assignment and Assumption |
| Exhibit B-1 | – | Form of Borrowing Request |
| Exhibit B-2 | | Form of Interest Election Request |
| Exhibit C | – | Form of Intellectual Property Security Agreement |
| Exhibit D | – | Form of Compliance Certificate |
| Exhibit E | – | Form of Letter of Credit Request |
| Exhibit F | – | Form of Intercompany Note |
| Exhibit G | – | Form of ABL Intercreditor Agreement |
| Exhibit H | – | Form of Holdings Joinder Agreement |
| Exhibit I | – | Form of ABL Loan Guaranty |
| Exhibit J | – | Form of Perfection Certificate |
| Exhibit K | – | Form of Joinder Agreement |
| Exhibit L | – | Form of Promissory Note |
| Exhibit M | – | Form of ABL Pledge and Security Agreement |
| Exhibit N | – | [Reserved] |
| Exhibit O-1 | – | Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Not Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit O-2 | – | Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Not Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit O-3 | – | Form of U.S. Tax Compliance Certificate (For Foreign Lenders That Are Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit O-4 | – | Form of U.S. Tax Compliance Certificate (For Foreign Participants That Are Partnerships for U.S. Federal Income Tax Purposes) |
| Exhibit P | – | Form of Solvency Certificate |
| Exhibit Q | _ | Administrative Agent Payment Account |
| Exhibit R | _ | Form of Borrowing Base Certificate |
| Exhibit S | _ | Designated Account of Borrowers |

7438295.12
WEIL:\99151587\17\40416.0005

ABL CREDIT AGREEMENT

ABL CREDIT AGREEMENT, dated as of [●], 2023 (this "Agreement"), by and among SERTA SIMMONS BEDDING, LLC, a Delaware limited liability company ("SSB" or the "Top Borrower"), NATIONAL BEDDING COMPANY L.L.C., an Illinois limited liability company ("National Bedding"), and SSB MANUFACTURING COMPANY, a Delaware corporation ("SSB Manufacturing"), as borrowers, the Lenders from time to time party hereto, WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association ("Wells Fargo"), in its capacities as administrative agent and collateral agent for the Lenders (in such capacities and together with its successors and assigns, the "Administrative Agent") and WELLS FARGO BANK, NATIONAL ASSOCIATION, a national banking association, as sole lead arranger and bookrunner (in such capacity, together with its successors and assigns in such capacity, the "Arranger").

RECITALS

A.      On January 23, 2023 (the "Petition Date"), the Top Borrower and certain Affiliates of the Top Borrower (in such capacity, each a "Debtor" and collectively, the "Debtors") filed voluntary petitions for relief (the "Chapter 11 Cases") in the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") for relief under Title 11 of the United States Code (the "Bankruptcy Code").

B.      During the pendency of the Chapter 11 Cases, the Debtors continued to operate their businesses and manage their properties as debtors-in-possessions under sections 1107 and 1108 of the Bankruptcy Code.

C.      On the Petition Date, the Debtors, the lenders party thereto (collectively, the "DIP ABL Lenders") and Eclipse Business Capital LLC ("Eclipse") entered into that certain Senior Secured Super-Priority Debtor-In-Possession ABL Credit Agreement (as amended, restated, amended and restated, supplemented or otherwise modified, the "DIP ABL Credit Agreement"), by and among Dawn Intermediate, LLC, a Delaware limited liability company, as holdings, the Borrowers, the DIP ABL Lenders and Eclipse, as administrative agent and collateral agent (in such capacities, the "DIP ABL Agent").

D.      On [●], 2023, the Bankruptcy Court entered an order (the "Confirmation Order") confirming Debtors' Joint Chapter 11 Plan of Reorganization (the "Plan of Reorganization"), which Confirmation Order, inter alia, authorized the Borrowers' entry into and performance under this Agreement and the Term Loan Agreement (as defined below).

E.      Pursuant to and upon the effective date of the Plan of Reorganization and in consideration of the mutual covenants and agreements herein contained and other good and valuable consideration (the receipt and adequacy of which are hereby acknowledged), the Administrative Agent and Lenders have agreed to enter into this Agreement, pursuant to which (i) the Lenders will establish an asset-based revolving credit facility with commitments of $100,000,000 and (ii) the Issuing Banks will issue letters of credit for the account of the Top Borrower and its Restricted Subsidiaries (as defined below), in each case, subject to the terms and conditions of this Agreement.

ARTICLE 1
DEFINITIONS

Section 1.01      Defined Terms. As used in this Agreement, the following terms have the meanings specified below:

"ABL Intercreditor Agreement" means the ABL Intercreditor Agreement dated as of [●], 2023, among, *inter alios*, Wells Fargo, as agent for the ABL Claimholders referred to therein, [●], as agent for the Term Loan Claimholders referred to therein, and the Loan Parties from time to time party thereto.

"ABL Priority Collateral" has the meaning set forth in the ABL Intercreditor Agreement.

"ABR" when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, bear interest at a rate determined by reference to the Alternate Base Rate.

"ABR Term SOFR Determination Day" has the meaning assigned to such term in the definition of the term "Term SOFR".

"Acceptable Intercreditor Agreement" means:

(a)  with respect to any Indebtedness that is secured on a *pari passu* basis with the Liens securing the Term Loan Facilities, (i) if any Term Loan Facility is outstanding on the relevant date of determination, the ABL Intercreditor Agreement or (ii) if a Term Loan Facility is not outstanding on the relevant date of determination, an intercreditor agreement substantially in the form of the ABL Intercreditor Agreement, with any changes thereto as the Top Borrower and the Administrative Agent may agree in their respective reasonable discretion; and/or

(b)  with respect to any Indebtedness, any other intercreditor or subordination agreement or arrangement (which may take the form of a "waterfall" or similar provision), as applicable, the terms of which are (i) consistent with market terms (as determined by the Top Borrower and the Administrative Agent in good faith) governing arrangements for the sharing and/or subordination of liens and/or arrangements relating to the distribution of payments, as applicable, at the time the relevant intercreditor agreement is proposed to be established in light of the type of Indebtedness subject thereto and/or (ii) reasonably acceptable to the Top Borrower and the Administrative Agent.

"Account" has the meaning assigned to such term in the UCC.

"Account Debtor" means any Person obligated on an Account.

"ACH" means automated clearing house transfers.

"Acquired Eligible In-Transit Inventory" has the meaning assigned to such term in the definition of "Borrowing Base".

"Acquired Eligible Inventory" has the meaning assigned to such term in the definition of "Borrowing Base".

"Acquired Eligible Trade Receivables" has the meaning assigned to such term in the definition of "Borrowing Base".

"Acquisition Date" has the meaning assigned to such term in the definition of "Borrowing Base".

"Additional Agreement" has the meaning assigned to such term in Article 8.

"Additional Commitment Lender" has the meaning assigned to such term in Section 2.08(c).

"Adjusted Term SOFR" means, for purposes of any calculation, the higher of (a) the Term SOFR Rate plus the Term SOFR Adjustment and (b) 0.0% per annum.

"Administrative Agent" has the meaning assigned to such term in the preamble to this Agreement.

"Administrative Agent Payment Account" means the Deposit Account of Administrative Agent identified on Exhibit Q to this Agreement (or such other Deposit Account of Administrative Agent that has been designated as such, in writing, by Agent to Borrowers and the Lenders).

"Administrative Questionnaire" means a customary administrative questionnaire in the form provided by the Administrative Agent.

"Adverse Proceeding" means any action, suit, proceeding (whether administrative, judicial or otherwise), governmental investigation or arbitration (whether or not purportedly on behalf of Holdings, the Top Borrower or any of its Restricted Subsidiaries) at law or in equity, or before or by any Governmental Authority, domestic or foreign (including any Environmental Claim), whether pending or, to the knowledge of Holdings, the Top Borrower or any of its Restricted Subsidiaries, threatened in writing, against or affecting Holdings, the Top Borrower or any of its Restricted Subsidiaries or any property of Holdings, the Top Borrower or any of its Restricted Subsidiaries.

"Affected Financial Institution" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

"Affiliate" means, as applied to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with, that Person. None of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings, the Top Borrower or any of its subsidiaries.

"Agent Assignee" has the meaning assigned to such term in Section 9.29.

"Aggregate Commitments" means, at any time, the sum of all Commitments at such time.  As of the Closing Date, the amount of Aggregate Commitments is $100,000,000.

"Agreement" has the meaning assigned to such term in the preamble to this ABL Credit Agreement.

"Alternate Base Rate" means, for any day, the greatest of (a) 0.00%, (b) the Federal Funds Effective Rate in effect on such day plus ½%, (c) Adjusted Term SOFR in effect on such day, plus one percent (1.0%), provided, that this clause (c) shall not be applicable during any period in which Adjusted Term SOFR is unavailable or unascertainable, and (d) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate" in effect on such day, with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate (or, if such rate ceases to be so published, as quoted from such other generally available and recognizable source as the Administrative Agent may select in its reasonable discretion).

"Anti-Corruption Laws" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"Anti-Money Laundering Laws" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business that relates to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Administrative Agent" means, at any time of determination, (i) with respect to ABL Priority Collateral, the Administrative Agent, (ii) with respect to Term Loan Priority Collateral, if the ABL Intercreditor Agreement is in effect at such time, the Term Loan Agreement Collateral Agent (as defined in the ABL Intercreditor Agreement) (or other analogous term in another Acceptable Intercreditor Agreement, as applicable) or (iii) with respect to Term Loan Priority Collateral, if the ABL Intercreditor Agreement is not in effect at such time, the Administrative Agent.

"Applicable Margin" means (i) until [June 30, 2024], (A) with respect to Term SOFR Rate Loans, 2.75% and (B) with respect to ABR Loans, 1.75% and (ii) thereafter, the applicable margin per annum set forth in the pricing grid below:

| Tier | Quarterly Average Excess Availability | Applicable ABR Margin | Applicable SOFR Margin |
|---|---|---|---|
| 1 | Greater than or equal to sixty-six and two-thirds percent (66-2/3%) of the Aggregate Commitments | 1.25% | 2.25% |
| 2 | Greater than or equal to thirty-three and one-third percent (33-1/3%) of the Aggregate Commitments but less than sixty-six and two-thirds percent (66-2/3%) of the Aggregate Commitments | 1.50% | 2.50% |
| 3 | Less than thirty-three and one-third percent (33-1/3%) of the Aggregate Commitments | 1.75% | 2.75% |

Provided, that, on and after [June 30, 2024], (i) the Applicable Margin shall be calculated and established once each calendar quarter and shall remain in effect until adjusted for the next calendar quarter, (ii) each adjustment of the Applicable Margin shall be effective as of the first day of each such calendar quarter based on the Quarterly Average Excess Availability for the immediately preceding calendar quarter, and (iii) in the event that the Top Borrower fails to provide any Borrowing Base Certificate for any period on the date required hereunder, effective as of the date on which such Borrowing Base Certificate was otherwise required, at Administrative Agent's option, the Applicable Margin shall be based on the highest rate above until the next Business Day after a Borrowing Base Certificate is provided for the applicable period at which time the Applicable Margin shall be adjusted as otherwise provided herein.  In the event that at any time after the end of any calendar quarter the Quarterly Average Excess Availability for such calendar quarter used for the determination of the Applicable Margin was greater than the actual amount of the Quarterly Average Excess Availability for such period as a result of the inaccuracy of information provided by or on behalf of any Borrower to Administrative Agent for the calculation of Excess Availability, the Applicable Margin for such period shall be adjusted to the applicable percentage based on such actual Quarterly Average Excess Availability and any additional interest for the applicable period as a result of such recalculation shall be promptly paid to Administrative Agent, provided, that, if in the calendar quarter immediately prior to the calendar quarter that was subject to such recalculation the

Quarterly Average Excess Availability for such prior calendar quarter used for the determination of the Applicable Margin was less than the actual amount of the Quarterly Average Excess Availability for such period as a result of the inaccuracy of information provided by or on behalf of any Borrower to Administrative Agent for the calculation of Excess Availability, the additional interest that would otherwise be payable in the immediately following calendar quarter shall be reduced by the amount of interest that Borrowers paid in such prior period in excess of the amount that would otherwise have been payable based on the actual Quarterly Average Excess Availability (but in no event shall such excess amounts be applied to reduce the interest payable in the calendar quarter below zero). The foregoing shall not be construed to limit the rights of Administrative Agent or Lenders with respect to the amount of interest payable after a Default or Event of Default whether based on such recalculated percentage or otherwise.

"Applicable Percentage" means, with respect to any Lender, the percentage of the Aggregate Commitments of all Lenders represented by such Lender's Commitment; provided that for purposes of Section 2.21 and corresponding provisions of this Agreement, when there is a Defaulting Lender, such Defaulting Lender's Commitment shall be disregarded for any relevant calculation. In the event that any Commitments have expired or been terminated, the Applicable Percentage of a Lender shall be determined on the basis of the Revolving Credit Exposure of such Lender attributable to its Commitment that has expired or terminated, giving effect to any assignment thereof.

"Application Event" means the occurrence of (a) a failure by Borrowers to repay all of the Obligations in full on the Maturity Date, or (b) an Event of Default and the election by Administrative Agent or the Required Lenders to require that payments and proceeds of Collateral be applied pursuant to Section 2.18(b).

"Approved Consultant" means (a) with respect to field examinations and Collateral audits, Richter or any other consultant selected by the Administrative Agent in consultation with the Top Borrower, or (b) with respect to appraisals, B. Riley or any other appraiser selected by the Administrative Agent in consultation with the Top Borrower.

"Approved Electronic Communication" means each notice, demand, communication, information, document and other material transmitted, posted or otherwise made or communicated by e-mail, facsimile, or any other equivalent electronic service, whether owned, operated or hosted by the Administrative Agent, any of its Affiliates or any other Person, that any party is obligated to, or otherwise chooses to, provide to the Administrative Agent pursuant to this Agreement or any other Loan Document, including any financial statement, financial and other report, notice, request, certificate and other information or material; provided, that Approved Electronic Communications shall not include any notice, demand, communication, information, document or other material that the Administrative Agent specifically instructs a Person to deliver in physical form.

"Approved Fund" means, with respect to any Lender, any Person (other than a natural person) that is engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its activities and is administered, advised or managed by (a) such Lender, (b) any Affiliate of such Lender or (c) any entity or any Affiliate of any entity that administers, advises or manages such Lender.

"Approved Plan" means the Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors filed with the Bankruptcy Court on [_____], 2023, with such amendments, supplements or other modifications as are reasonably acceptable to Administrative Agent.

"Arranger" means Wells Fargo in its capacity as Arranger in respect of the Revolving Facility.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an assignee (with the consent of any party whose consent is required by Section 9.05), and accepted by the Administrative Agent in the form of Exhibit A or any other form approved by the Administrative Agent and the Top Borrower.

"Available Amount" means, at any time, an amount equal to, without duplication:

(a)  the sum of:

    (i)  [reserved]; plus

    (ii)  [reserved]; plus

    (iii)  the amount of the Net Proceeds of any capital contribution in respect of Qualified Capital Stock or the proceeds of any issuance of Qualified Capital Stock after the Closing Date (other than any amounts (w) constituting an Available Excluded Contribution Amount, (x) received directly or indirectly from the Top Borrower or any Restricted Subsidiary, (y) consisting of the proceeds of any loan or advance made pursuant to Section 6.06(h)(ii) or (z) otherwise expressly excluded from the calculation of the Available Amount pursuant to the terms of this Agreement or otherwise included in the calculation of amounts of Indebtedness permitted hereunder) received as Cash equity by the Top Borrower or any of its Restricted Subsidiaries, plus the fair market value, as reasonably determined by the Top Borrower, of Cash Equivalents, marketable securities or other property received by the Top Borrower or any Restricted Subsidiary as a capital contribution in respect of Qualified Capital Stock or in return for any issuance of Qualified Capital Stock (other than any amounts (x) constituting an Available Excluded Contribution Amount, (y) received from the Top Borrower or any Restricted Subsidiary or (z) otherwise expressly excluded from the calculation of the Available Amount pursuant to the terms of this Agreement), in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

    (iv)  the Net Proceeds from the aggregate principal amount of any Indebtedness (including any Disqualified Capital Stock) of the Top Borrower or any Restricted Subsidiary incurred or issued after the Closing Date (other than Indebtedness arising from funds provided directly or indirectly by Top Borrower or any Restricted Subsidiary or such Disqualified Capital Stock issued to the Top Borrower or any Restricted Subsidiary), which has been converted into or exchanged for Capital Stock of the Top Borrower, any Restricted Subsidiary or any Parent Company that does not constitute Disqualified Capital Stock, together with the fair market value of any Cash Equivalents and the fair market value (as reasonably determined by the Top Borrower) of any assets received by the Top Borrower or such Restricted Subsidiary upon such exchange or conversion, in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

    (v)  the Net Proceeds received by the Top Borrower or any Restricted Subsidiary during the period from and including the day immediately following the Closing Date through and including such time in connection with the Disposition to any Person (other than the Top Borrower or any Restricted Subsidiary) of any Investment made pursuant to Section 6.06(r)(i); plus

    (vi)  to the extent not already reflected as a return of capital with respect to such Investment for purposes of determining the amount of such Investment (pursuant to the definition thereof), the Net Proceeds received by the Top Borrower or any Restricted Subsidiary during the period from and including the day immediately following the Closing Date through and including such time in connection with cash returns, cash profits, cash distributions and similar cash amounts, including cash principal repayments and

interest payments of loans, in each case received in respect of any Investment made after the Closing Date pursuant to Section 6.06(r)(i); plus

(vii)  an amount equal to the sum of (A) the amount of any Investments by the Top Borrower or any Restricted Subsidiary pursuant to Section 6.06(r)(i) in any Unrestricted Subsidiary (in an amount not to exceed the original amount of such Investment) that has been re-designated as a Restricted Subsidiary or has been merged, consolidated or amalgamated with or into, or is liquidated, wound up or dissolved into, the Top Borrower or any Restricted Subsidiary to the extent of any Net Proceeds received by the Top Borrower or any other Loan Party as a result thereof and (B) the fair market value (as reasonably determined by the Top Borrower) of the assets of any Unrestricted Subsidiary that have been transferred, conveyed or otherwise distributed (in an amount not to exceed the original amount of the Investment in such Unrestricted Subsidiary) to the Top Borrower or any Restricted Subsidiary (less any consideration transferred by Top Borrower or any Restricted Subsidiary in exchange for such assets), in each case, during the period from and including the day immediately following the Closing Date through and including such time; plus

(viii) the amount of any Declined Proceeds (as defined in the Term Loan Agreement as in effect on the date hereof or any equivalent term in any Term Loan Facility); minus

(b)    an amount equal to the sum of (i) Restricted Payments made pursuant to Section 6.04(a)(iii)(A), plus (ii) Restricted Debt Payments made pursuant to Section 6.04(b)(vi)(A), plus (iii) Investments made pursuant to Section 6.06(r)(i), in each case, after the Closing Date and prior to such time or contemporaneously therewith;

provided, that, the "Available Amount" shall not exceed $50,000,000 at any time.

"Available Excluded Contribution Amount" means the aggregate amount of Cash or Cash Equivalents or the fair market value of other assets (as reasonably determined by the Top Borrower) received by the Top Borrower or any of its Restricted Subsidiaries (less any consideration transferred by Top Borrower or any Restricted Subsidiary in exchange for such assets) after the Closing Date from:

(a)    contributions in respect of Qualified Capital Stock of the Top Borrower (other than any amounts (i) received from any Restricted Subsidiary of the Top Borrower or (ii) otherwise expressly excluded from the calculation of the Available Excluded Contribution Amount pursuant to the terms of this Agreement), and

(b)    the sale of Qualified Capital Stock of the Top Borrower (other than (i) to any Restricted Subsidiary of the Top Borrower, (ii) pursuant to any management equity plan or stock option plan or any other management or employee benefit plan, (iii) with the proceeds of any loan or advance made pursuant to Section 6.06(h)(ii) or (iv) as otherwise expressly excluded from the calculation of the Available Excluded Contribution Amount pursuant to the terms of this Agreement), in each case, designated as an Available Excluded Contribution Amount pursuant to a certificate of a Responsible Officer on or promptly after the date on which the relevant capital contribution is made or the relevant proceeds are received, as the case may be, and which are excluded from the calculation of the Available Amount.

"Availability Period" means the period from and including the Closing Date to, but excluding, the earlier of (a) the Maturity Date and (b) the date of termination of all of the Commitments.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"<u>Bank Product</u>" means any one or more of the following financial products or accommodations extended to any Loan Party or any of its Restricted Subsidiaries by a Bank Product Provider:  (a) credit cards (including commercial cards (including so-called "purchase cards", "procurement cards" or "p-cards")), (b) payment card processing services, (c) debit cards, (d) stored value cards, (e) Banking Services, or (f) transactions under Hedge Agreements.

"<u>Bank Product Agreements</u>" means those agreements entered into from time to time by any Loan Party or any of its Restricted Subsidiaries with a Bank Product Provider in connection with the obtaining of any of the Bank Products.

"<u>Bank Product Obligations</u>" means (a) all obligations, liabilities, reimbursement obligations, fees, or expenses owing by each Loan Party to any Bank Product Provider pursuant to or evidenced by a Bank Product Agreement and irrespective of whether for the payment of money, whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, (b) all Hedge Obligations, and (c) all amounts that Administrative Agent or any Lender is obligated to pay to a Bank Product Provider as a result of Administrative Agent or such Lender purchasing participations from, or executing guarantees or indemnities or reimbursement obligations to, a Bank Product Provider with respect to the Bank Products provided by such Bank Product Provider to a Loan Party.

"<u>Bank Product Provider</u>" means any Lender or any of their respective Affiliates, including each of the foregoing in its capacity, if applicable, as a Hedge Provider.

"<u>Bank Product Reserves</u>" means, as of any date of determination, those reserves that Administrative Agent deems necessary or appropriate to establish (based upon the Bank Product Providers' determination of the liabilities and obligations of each Loan Party and its Restricted Subsidiaries in respect of Bank Product Obligations) in respect of Bank Products then provided or outstanding.

"<u>Banking Services</u>" means each and any of the following bank services: commercial credit cards, stored value cards, purchasing cards, treasury management services, netting services, overdraft protections, check drawing services, automated payment services (including depository, overdraft, controlled disbursement, ACH transactions, return items and interstate depository network services), employee credit card programs, cash pooling services and any arrangements or services similar to any of the foregoing and/or otherwise in connection with Cash management and Deposit Accounts.

"<u>Bankruptcy Code</u>" has the meaning assigned to such term in the Recitals.

"<u>Bankruptcy Court</u>" has the meaning assigned to such term in the Recitals.

"<u>Benchmark</u>" means, initially, the Term SOFR Reference Rate; <u>provided</u> that if a Benchmark Transition Event has occurred with respect to the Term SOFR Reference Rate or the then-current Benchmark, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced such prior benchmark rate pursuant to <u>Section 2.14(b)</u>.

"Benchmark Replacement" means, with respect to any Benchmark Transition Event, the sum of (a) the alternate benchmark rate that has been selected by the Administrative Agent and the Top Borrower giving due consideration to (i) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a benchmark rate as a replacement for the then-current Benchmark for Dollar denominated syndicated credit facilities and (b) the related Benchmark Replacement Adjustment; provided that if such Benchmark Replacement as so determined would be less than 1.00%, such Benchmark Replacement shall be deemed to be 1.00% for the purposes of this Agreement and the other Loan Documents.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body on the applicable Benchmark Replacement Date or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement for Dollar denominated syndicated credit facilities at such time.

"Benchmark Replacement Date" means the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of clause (a) or (b) of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b)     in the case of clause (c) of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative or non-compliant with or non-aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks; provided that such non-representativeness, non-compliance or non-alignment will be determined by reference to the most recent statement or publication referenced in such clause

(c)     and even such Benchmark (or such component thereof) continues to be provided on such date.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)     a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b)     a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the FRB,

the NYFRB, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component), which states that the administrator of such Benchmark (or such component) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely; provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) announcing that such Benchmark (or such component thereof) is not, or as of a specified future date will not be, representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks.

"Benchmark Transition Start Date" means, in the case of a Benchmark Transition Event, the earlier of (a) the applicable Benchmark Replacement Date and (b) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication).

"Benchmark Unavailability Period" means, the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14(b) and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.14(b).

"Beneficial Ownership Certification" means a certification regarding beneficial ownership or control as required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. §1010.230.

"Blocked Account Agreement" has the meaning assigned to such term in Section 5.13(a).

"Blocked Accounts" has the meaning assigned to such term in Section 5.13(a).

"Bona Fide Debt Fund" means any debt fund, investment vehicle, regulated bank entity or unregulated lending entity that is primarily engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of business for financial investment purposes which is managed, sponsored or advised by any Person controlling, controlled by or under common control with (a) any competitor of the Top Borrower and/or any of its subsidiaries or (b) any Affiliate of such competitor, but, in each case, with respect to which no personnel involved with any investment in such Person or the management, control or operation of such Person (i) directly or indirectly makes, has the right to make or participates with others in making any investment decisions, or otherwise causing the direction of the investment policies, with respect to such debt fund, investment vehicle, regulated bank entity or unregulated entity or (ii) has access to any information (other than information that is publicly available) relating to Holdings, the Top Borrower or its subsidiaries or any entity that forms a part of any of their respective businesses; it being understood and agreed that the term "Bona Fide Debt Fund" shall not include any Person that is a Disqualified Lending Institution.

"Borrowers" means, collectively, SSB, National Bedding and SSB Manufacturing.

"Borrower Materials" has the meaning assigned to such term in Section 9.01(d).

"Borrowing" means a borrowing consisting of Revolving Loans made on the same day by the Lenders (or Administrative Agent on behalf thereof), or by Swing Lender in the case of a Swing Loan, or by Administrative Agent in the case of an Overadvance or Protective Advance.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a) the sum of:

(i) ninety percent (90%) of Eligible Investment Grade Trade Receivables at such time; plus

(ii) eighty-five percent (85%) of Eligible Non-Investment Grade Trade Receivables at such time; plus

(iii) the least of (i) $30,000,000, (ii) sixty-five percent (65%) multiplied by the Value of Eligible Inventory and Eligible In-Transit Inventory at such time, or (iii) eighty-five percent (85%) of the Net Recovery Percentage of Eligible Inventory and Eligible In-Transit Inventory of the Loan Parties multiplied by the Value of such Eligible Inventory and Eligible In-Transit Inventory at such time, provided, that, the aggregate amount included in the Borrowing Base based on the applicable percentage of the Value of Eligible In-Transit Inventory shall not exceed $7,500,000; plus

(iv) one hundred percent (100%) of Qualified Cash; minus

(b) the aggregate amount of Reserves, if any, established by Administrative Agent from time to time;

provided, that, (i) in the event that as of the Closing Date, Administrative Agent has not received a final report of a current third-party appraisal of the Inventory or a final report from the field examinations of the business and collateral of Borrowers, the Borrowing Base for purposes of the initial Loans and Letters of Credit shall be the Alternative Closing Borrowing Base until the earlier of the date that Administrative Agent shall have received such third-party appraisal and report from the field examination or the sixtieth (60th) day from and including the Closing Date (or such later date as may be agreed by Administrative Agent), (ii) in the event that Administrative Agent has not received such third-party appraisal of the Inventory to be included in the Borrowing Base or a final report from the field examinations with respect to assets to be included in the Borrowing Base on or before such sixtieth (60th) day, the Borrowing Base shall be deemed to be zero on and after such sixtieth (60th) day (or such later date as may be agreed by Administrative Agent) until Administrative Agent's receipt and reasonable opportunity to review the results of such appraisal and final report from the field examination and (iii) on and after the receipt by Administrative Agent of the final report from the field examination of the business and collateral of Borrowers and the appraisal of Inventory of Borrowers, such Borrower's Eligible Trade Receivables, Eligible Inventory and Eligible In-Transit Inventory shall be included in the Borrowing Base as provided above and not the Alternative Closing Borrowing Base.

For purposes hereof, the "Alternative Closing Borrowing Base" means, as of any date of determination, the result of:

(A) twenty-five percent (25%) multiplied by the net book value of Accounts of the Loan Parties, plus

(B)      ten percent (10%) multiplied by the net book value of Inventory of the Loan Parties at such time, minus

(C)      the aggregate amount of Reserves, if any, established by Administrative Agent;

Provided, that, (1) the net book value shall be based on the financial statements received by Administrative Agent with respect to the twelve month period ending April 30, 2023, and consistent with the calculation attached as Schedule 1.01(d) and (2) Administrative Agent will adjust the Alternative Closing Borrowing Base as to Reserves and as to Accounts based on any field examination results at the time that it receives such results (but using the advance rate and terms as to such Eligible Trade Receivables set forth in the definition of Borrowing Base) and as to the Inventory at the time that it receives both the field examination results and the appraisal with respect thereto at the time that it receives both such field examination results and appraisal (but using the advance rate and terms as to such Eligible Inventory set forth in the definition of Borrowing Base).

On and after the effectiveness of the Borrowing Base, the Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate delivered to the Administrative Agent pursuant to Section 5.01(j), as adjusted for Reserves established or modified pursuant to Section 2.24; provided, that, in the event that Administrative Agent notifies Top Borrower that as a result of a change in the rating of an Account Debtor, an Eligible Investment Grade Trade Receivable has become an Eligible Non-Investment Grade Trade Receivable, then the Borrowing Base shall be adjusted in connection with the next delivery of the Borrowing Base Certificate pursuant to Section 5.01(j).

In connection with any Subject Acquisition, the Top Borrower may submit a Borrowing Base Certificate reflecting a calculation of the Borrowing Base that includes the Eligible Trade Receivables, Eligible In-Transit Inventory, and the Eligible Inventory in connection with such Subject Acquisition (the "Acquired Eligible Trade Receivables", the "Acquired Eligible In-Transit Inventory", and the "Acquired Eligible Inventory", respectively) and, from and after the Acquisition Date, the Borrowing Base hereunder shall be calculated giving effect thereto; provided that prior to the completion of a field examination and inventory appraisal with respect to such Acquired Eligible Trade Receivables, Acquired Eligible In-Transit Inventory and Acquired Eligible Inventory, such adjustment to the Borrowing Base shall only be available if a customary desktop field examination and appraisal with respect to such assets reasonably satisfactory to the Administrative Agent in its Permitted Discretion has been completed and shall be limited from the date the Subject Acquisition is consummated (the "Acquisition Date") until the date that is 121 days after the Acquisition Date such that the aggregate amount of availability generated by such Acquired Eligible Trade Receivables, Acquired Eligible In-Transit Inventory and Acquired Eligible Inventory included in the Borrowing Base prior to the completion of a field examination and inventory appraisal with respect thereto (after applying advance rates set forth herein), shall not exceed $5,000,000 at any time. From the 121st day following the Acquisition Date, the Borrowing Base shall be calculated without reference to the Acquired Eligible Trade Receivables, Acquired Eligible In-Transit Inventory and Acquired Eligible Inventory until a field examination and inventory appraisal has been completed with respect to such assets; it being understood and agreed that (x) there shall be no Default or Event of Default solely as a result of a failure to complete and deliver such inventory appraisal and field examination on or prior to the dates indicated above and (y) following the completion of such inventory appraisal and field examination, the Top Borrower may deliver an updated Borrowing Base Certificate reflecting the inclusion of such Acquired Eligible Trade Receivables, Acquired Eligible In-Transit Inventory and Acquired Eligible Inventory.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit R to this Agreement, which such form of Borrowing Base Certificate may be amended, restated, supplemented or otherwise modified from time to time (including without limitation, changes to the format thereof), as approved by Administrative Agent and the Top Borrower.

"Borrowing Request" means a request by any Borrower for a Borrowing in accordance with Section 2.03 and, if required by the Administrative Agent to be in writing, substantially in the form attached hereto as Exhibit B-1 or such other form that is reasonably acceptable to the Administrative Agent and such Borrower.

"Business Day" means any day that is not a Saturday, Sunday or other day that is a legal holiday under the laws of the State of New York or is a day on which banking institutions in such state are authorized or required by law to close.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP as in effect prior to giving effect to the adoption of ASU No. 2016-02 "Leases (Topic 842)" and ASU No. 2018-11 "Leases (Topic 842)" is classified as a "capital lease".

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing, but excluding for the avoidance of doubt any Indebtedness convertible into or exchangeable for any of the foregoing.

"Cash" means money, currency or a credit balance in any Deposit Account, in each case determined in accordance with GAAP.

"Cash Dominion Period" means (a) each period from the date on which Excess Availability is less than the greater of (i) $10,000,000 or (ii) 15.0% of the Loan Cap to the date on which Excess Availability has been at least equal to the greater of such amounts for each day during a period of 20 consecutive calendar days thereafter or (b) each period during which any Specified Default is continuing.

"Cash Equivalents" means, as at any date of determination, (a) readily marketable securities (i) issued or directly and unconditionally guaranteed or insured as to interest and principal by the U.S. government or (ii) issued by any agency or instrumentality of the U.S. the obligations of which are backed by the full faith and credit of the U.S., in each case maturing within one year after such date and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (b) readily marketable direct obligations issued by any state of the U.S. or any political subdivision of any such state or any public instrumentality thereof or by any foreign government, in each case maturing within one year after such date and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency) and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (c) commercial paper maturing no more than one year from the date of creation thereof and having, at the time of the acquisition thereof, a rating of at least A-2 from S&P or at least P-2 from Moody's (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized statistical rating agency); (d) deposits, money market deposits, time deposit accounts, certificates of deposit or bankers' acceptances (or similar instruments) maturing within one year after such date and issued or accepted by any Lender or by any bank organized under, or authorized to operate as a bank under, the laws of the U.S., any state thereof or the District of Columbia or any political subdivision thereof or any foreign bank or its branches or agencies and that has capital and surplus of not less than $100,000,000 and, in each case, repurchase agreements and reverse repurchase agreements relating thereto; (e) securities with maturities of six months or less from the date of acquisition backed by standby letters of credit issued by any commercial bank having capital and surplus of not less than $100,000,000 and (f) shares of any money market mutual fund that has (i) substantially all of its assets invested in the types of investments referred to in clauses (a) through (e) above,

(ii) net assets of not less than $250,000,000 and (iii) a rating of at least A-2 from S&P or at least P-2 from Moody's.

"Cash Equivalents" shall also include (x) Investments of the type and maturity described in clauses (a) through (g) above of foreign obligors, which Investments or obligors (or the parent companies thereof) have the ratings described in such clauses or equivalent ratings from comparable foreign rating agencies and (y) other short-term Investments utilized by Foreign Subsidiaries in accordance with normal investment practices for cash management in Investments that are analogous to the Investments described in clauses (a) through (g) and in this paragraph.

"CFC" means a "controlled foreign corporation" within the meaning of Section 957 of the Code.

"CFC Holdco" means any direct or indirect Domestic Subsidiary that has no material assets other than the Capital Stock or Indebtedness of one or more CFCs or CFC Holdcos.

"Change of Control" means the earliest to occur of:

(a)    any Person or group (within the meaning of Section 13(d)(3) or Section 14(d)(2) of the Exchange Act) becomes the beneficial owner of Capital Stock of Holdings (or prior to the date Holdings becomes a party hereto, the Top Borrower) representing more than 50% of the total voting power of all outstanding voting stock of Holdings (or prior to the date Holdings becomes a party hereto, the Top Borrower); provided that, no Persons will be deemed to be part of a group as a result of any shareholder agreement or similar arrangements in place at the Closing Date, as the same may be amended, restated or otherwise modified from time to time (including the Restructuring Support Agreement);

(b)    there is a "Change of Control" under the Term Loan Agreement or any other Indebtedness of the Top Borrower or its Subsidiaries which such Indebtedness has a principal amount outstanding in excess of the Threshold Amount; and

(c)    on or after the date Holdings becomes a party hereto, the Top Borrower ceasing to be a direct or indirect Wholly-Owned Subsidiary of Holdings.

"Change in Law" means (a) the adoption of any law, treaty, rule or regulation after the Closing Date, (b) any change in any law, treaty, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender or any Issuing Bank (or, for purposes of Section 2.15(b), by any lending office of such Lender or Issuing Bank or by such Lender's or such Issuing Bank's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date (other than any such request, guideline or directive to comply with any law, rule or regulation that was in effect on the Closing Date). For purposes of this definition and Section 2.15, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder or issued in connection therewith or in implementation thereof and (y) all requests, rules, guidelines, requirements or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or US regulatory authorities, in each case pursuant to Basel III, shall in each case described in clauses (a), (b) and (c) above, be deemed to be a Change in Law, regardless of the date enacted, adopted, issued or implemented.

"Chapter 11 Cases" has the meaning assigned to such term in the Recitals.

"Charge" means any fee, loss, charge, expense, cost, accrual or reserve of any kind.

"Charged Amounts" has the meaning assigned to such term in Section 9.19.

"Closing Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived by the initial Lenders).

"Closing Date Refinancing" has the meaning assigned to such term in Section 4.01(l).

"Code" means the Internal Revenue Code of 1986.

"Collateral" means any and all property of any Loan Party subject (or purported to be subject) to a Lien under any Collateral Document and any and all other property of any Loan Party, now existing or hereafter acquired, that is or becomes subject (or purported to be subject) to a Lien pursuant to any Collateral Document to secure the Secured Obligations. For the avoidance of doubt, in no event shall "Collateral" include any Excluded Asset.

"Collateral Access Agreement" means a landlord waiver, bailee letter or acknowledgment agreement of any lessor, warehouseman, processor, consignee, mortgagee, customs broker or other Person (other than any Loan Party) in possession of, having a Lien upon, or having rights or interests in the inventory (or any books or records relating thereto) of any Loan Party, in each case in form and substance reasonably satisfactory to the Administrative Agent.

"Collateral and Guarantee Requirement" means, at any time, subject to (a) the applicable limitations set forth in this Agreement and/or any other Loan Document and (b) the time periods (and extensions thereof) set forth in Section 5.12, the requirement that the Administrative Agent shall have received in the case of any Restricted Subsidiary that is required to become a Loan Party after the Closing Date (including by ceasing to be an Excluded Subsidiary) or otherwise becomes a Loan Party after the Closing Date:

(a)    in the case of any Domestic Subsidiary, (A) (1) a Joinder Agreement, (2) if the respective Restricted Subsidiary required to comply with the requirements set forth in this definition pursuant to Section 5.12 owns registrations of or applications for U.S. Patents, Trademarks and/or Copyrights that constitute Collateral, an Intellectual Property Security Agreement, (3) a completed Perfection Certificate, (4) UCC financing statements in appropriate form for filing in such jurisdictions as the Administrative Agent may reasonably request, (5) an executed joinder to the ABL Intercreditor Agreement in substantially the form attached as an exhibit thereto, (6) a joinder to the Intercompany Note (if applicable), and (7) to the extent required by Section 5.13, a Blocked Account Agreement with respect to each of its Blocked Accounts and (B) each item of Collateral that such Restricted Subsidiary is required to deliver under Section 4.02 of the Security Agreement (which, for the avoidance of doubt, shall be delivered within the time periods set forth in Section 5.12(a));

(b)    in the case of any subsidiary that has been designated as a Discretionary Guarantor, (A) in the case of any Domestic Subsidiary, the documents described in clause (a) above and (B) in the case of any Foreign Subsidiary, (1) a Joinder Agreement, (2) an executed joinder to the ABL Intercreditor Agreement in substantially the form attached as an exhibit thereto, (3) a joinder to the Intercompany Note and (4) such other documentation relating to such categories of assets (other than Excluded Assets) as the Top Borrower and the Administrative Agent may reasonably agree; and

(c)    the Administrative Agent shall have received with respect to any Material Real Estate Assets, a Mortgage and any necessary UCC fixture filing in respect thereof, in each case together with, to the extent customary and appropriate (as reasonably determined by the Administrative Agent and the Top Borrower):

(i)     evidence that (A) counterparts of such Mortgage have been duly executed, acknowledged and delivered and such Mortgage and any corresponding UCC or equivalent fixture filing are in form suitable for filing or recording in all filing or recording offices that the Administrative Agent may deem reasonably necessary in order to create a valid and subsisting Lien on such Material Real Estate Asset in favor of the Administrative Agent for the benefit of the Secured Parties, (B) such Mortgage and any corresponding UCC or equivalent fixture filings have been duly recorded or filed, as applicable, and (C) all filing and recording taxes and fees have been paid or otherwise provided for in a manner reasonably satisfactory to the Administrative Agent;

(ii)     one or more fully paid policies of title insurance (the "Mortgage Policies") in an amount reasonably acceptable to the Administrative Agent (not to exceed the fair market value of the Material Real Estate Asset covered thereby (as reasonably determined by the Top Borrower)) issued by a nationally recognized title insurance company in the applicable jurisdiction that is reasonably acceptable to the Administrative Agent, insuring the relevant Mortgage as having created a valid subsisting Lien on the real property described therein with the ranking or the priority which it is expressed to have in such Mortgage, subject only to Permitted Liens, together with such endorsements, coinsurance and reinsurance as the Administrative Agent may reasonably request to the extent the same are available in the applicable jurisdiction;

(iii)     customary legal opinions of local counsel for the relevant Loan Party in the jurisdiction in which such Material Real Estate Asset is located, and if applicable, in the jurisdiction of formation of the relevant Loan Party, in each case as the Administrative Agent may reasonably request; and

(iv)     surveys and appraisals (if required under the Financial Institutions Reform Recovery and Enforcement Act of 1989, as amended) and "Life-of-Loan" flood certifications and any required borrower notices under Regulation H (together with evidence of federal flood insurance for any such Flood Hazard Property located in a flood hazard area); provided that the Administrative Agent may in its reasonable discretion accept any such existing certificate, appraisal or survey so long as such existing certificate or appraisal satisfies any applicable local law requirements.

Notwithstanding any provision of any Loan Document to the contrary, if any mortgage tax or similar tax or charge is owed on the entire amount of the Obligations evidenced hereby, then, to the extent permitted by, and in accordance with, applicable Requirements of Law, the amount of such mortgage tax or similar tax or charge shall be calculated based on the lesser of (x) the amount of the Obligations allocated to the applicable Material Real Estate Assets and (y) the fair market value of the applicable Material Real Estate Assets at the time the Mortgage is entered into and determined in a manner reasonably acceptable to Administrative Agent and the Top Borrower, which in the case of clause (y) will result in a limitation of the Obligations secured by the Mortgage to such amount.

"Collateral Documents" means, collectively, (i) the Security Agreement, (ii) each Mortgage, (iii) each Intellectual Property Security Agreement, (iv) any supplement to any of the foregoing delivered to the Administrative Agent pursuant to the definition of "Collateral and Guarantee Requirement", (v) any Perfection Certificate and (vi) each of the other instruments and documents pursuant to which any Loan Party grants (or purports to grant) a Lien on any Collateral as security for payment of the Secured Obligations.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by the Top Borrower or any of its subsidiaries in the ordinary course of business of such Person.

"Commercial Tort Claim" has the meaning set forth in Article 9 of the UCC.

"<u>Commitment</u>" means, with respect to each Lender, the commitment of such Lender to make Revolving Loans (and acquire participations in Letters of Credit and Swing Loans) hereunder as set forth on the Commitment Schedule, or in the Assignment and Assumption pursuant to which such Lender assumed its Commitment, as applicable, as the same may be (a) reduced from time to time pursuant to <u>Section 2.09</u> or <u>2.19</u> or (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to <u>Section 9.05</u>. The aggregate amount of the Commitments as of the Closing Date is $100,000,000.

"<u>Commitment Increase</u>" has the meaning assigned to such term in <u>Section 2.08(a)</u>.

"<u>Commitment Schedule</u>" means the Schedule attached hereto as <u>Schedule 1.01(a)</u>.

"<u>Company Competitor</u>" means any competitor of the Top Borrower and/or any of its subsidiaries.

"<u>Compliance Certificate</u>" means a Compliance Certificate substantially in the form of <u>Exhibit D</u>.

"<u>Concentration Account</u>" has the meaning assigned to such term in <u>Section 5.13(a)</u>.

"<u>Confirmation Order</u>" has the meaning assigned to such term in the Recitals.

"<u>Confidential Information</u>" has the meaning assigned to such term in <u>Section 9.13</u>.

"<u>Conforming Changes</u>" means, with respect to either the use or administration of the Term SOFR Rate or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Alternate Base Rate", the definition of "Business Day", the definition of "U.S. Government Securities Business Day" or any similar or analogous definition (or the addition of a concept of "interest period"), timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of <u>Section 2.14(b)</u> and other technical, administrative or operational matters) that the Administrative Agent decides may be appropriate to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of any such rate exists, in such other manner of administration as the Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"<u>Consenting Creditors</u>" means the PTL Lenders (as defined in the Plan of Reorganization) that are party to the Restructuring Support Agreement, together with their respective successors and permitted assigns and any subsequent lender that becomes party to the Restructuring Support Agreement in accordance with the terms of the Restructuring Support Agreement.

"<u>Consenting Equity Holders</u>" mean Dawn Holdings, Inc., as the sole member, and holder of interests in, Dawn Intermediate, LLC; and funds managed by Advent International Corporation, as holder of interests in Dawn Holdings, Inc.

"<u>Consolidated Adjusted EBITDA</u>" means, with respect to any Person on a consolidated basis for any period, the sum of:

(a)     Consolidated Net Income for such period; <u>plus</u>

(b)     to the extent not otherwise included in the determination of Consolidated Net Income for such period, the amount of any proceeds of any business interruption insurance policy in an amount representing the earnings for the applicable period that such proceeds are intended to replace (whether or not then received so long as such Person in good faith expects to receive such proceeds within the next four Fiscal Quarters (it being understood that to the extent such proceeds are not actually received within such Fiscal Quarters, such proceeds shall be deducted in calculating Consolidated Adjusted EBITDA for such Fiscal Quarters)); plus

(c)     without duplication, those amounts which, in the determination of Consolidated Net Income for such period, have been deducted for:

(i)     Consolidated Interest Expense;

(ii)     Charges related to any de novo facility, including any construction, pre- opening and start-up period prior to opening, until such facility has been open and operating for a period of 18 consecutive months;

(iii)     Taxes paid and any provision for Taxes, including income, capital, state, franchise and similar Taxes, property Taxes, foreign withholding Taxes and foreign unreimbursed value added Taxes (including penalties and interest related to any such Tax or arising from any Tax examination, and including pursuant to any Tax sharing arrangement or as a result of any intercompany distribution) of such Person paid or accrued during such period;

(iv)     (A) all depreciation and amortization (including, without limitation, amortization of goodwill, software and other intangible assets), (B) all impairment Charges and (C) all asset write-offs and/or write-downs;

(v)     any earn-out and contingent consideration obligations (including to the extent accounted for as bonuses, compensation or otherwise) incurred in connection with any acquisition and/or other Investment permitted under Section 6.06 which is paid or accrued during such period and in connection with any similar acquisition or other Investment completed prior to the Closing Date and, in each case, adjustments thereof;

(vi)     any non-cash Charge, including the excess of GAAP rent expense over actual cash rent paid during such period due to the use of straight line rent for GAAP purposes (provided that to the extent that any such non-cash Charge represents an accrual or reserve for any potential cash item in any future period, (A) such Person may elect not to add back such non-cash Charge in the current period and (B) to the extent such Person elects to add back such non-cash Charge, the cash payment in respect thereof in such future period shall be subtracted from Consolidated Adjusted EBITDA to such extent);

(vii)     any non-cash compensation Charge and/or any other non-cash Charge arising from the granting of any stock option or similar arrangement (including any profits interest), the granting of any stock appreciation right and/or similar arrangement (including any repricing, amendment, modification, substitution or change of any such stock option, stock appreciation right, profits interest or similar arrangement);

(viii)     (A) Transaction Costs, (B) Charges incurred (1) in connection with any transaction (in each case, regardless of whether consummated, and whether or not permitted under this Agreement), including any incurrence or issuance of Indebtedness and/or any issuance and/or offering of Capital Stock (including, in each case, by any Parent Company), any Investment (including any acquisition), any Disposition, any recapitalization, any merger, consolidation or amalgamation, any option buyout or any

repayment, redemption, refinancing, amendment or modification of Indebtedness (including any amortization or write-off of debt issuance or deferred financing costs, premiums and prepayment penalties) or any similar transaction, and/or (2) in connection with any Qualifying IPO, (C) [reserved] and/or (D) Public Company Costs;

(ix)    any Charge or deduction that is associated with any Restricted Subsidiary and attributable to any non-controlling interest and/or minority interest of any third-party;

(x)    the amount of (A) any Charge to the extent that a corresponding amount is received in cash by such Person from an unaffiliated third-party under any agreement providing for reimbursement of such Charge or (B) any Charge with respect to any liability or casualty event, business interruption or any product recall, (i) so long as such Person has submitted in good faith, and reasonably expects to receive payment in connection with, a claim for reimbursement of such amounts under its relevant insurance policy (with a deduction in the applicable future period for any amount so added back to the extent not so reimbursed within the next four Fiscal Quarters) or (ii) without duplication of amounts included in a prior period under clause (B)(i) above, to the extent such Charge is covered by insurance proceeds received in cash during such period (it being understood that if the amount received in cash under any such agreement in any period exceeds the amount of Charge paid during such period such excess amounts received may be carried forward and applied against any Charge in any future period);

(xi)    the amount of management, monitoring, consulting, transaction and advisory fees and related indemnities and expenses (including reimbursements) pursuant to any sponsor management agreement and payments made to any Investor (and/or its Affiliates or management companies) for any financial advisory, financing, underwriting or placement services or in respect of other investment banking activities and payments to outside directors of a Parent Company, the Top Borrower or any of its Restricted Subsidiaries actually paid by or on behalf of, or accrued by, such Person or any of its subsidiaries; provided that such payment is permitted under this Agreement;

(xii)    any Charge attributable to the undertaking and/or implementation of new initiatives, business optimization activities, cost savings initiatives, cost rationalization programs, operating expense reductions and/or synergies and/or similar initiatives and/or programs (including in connection with any integration, restructuring or transition, any reconstruction, decommissioning, recommissioning or reconfiguration of fixed assets for alternative uses, any facility opening and/or pre-opening, any inventory optimization program and/or any curtailment), any business optimization Charge, any restructuring Charge (including any Charge relating to any tax restructuring), any Charge relating to the closure or consolidation of any facility (including severance, rent termination costs, moving costs and legal costs), any systems implementation Charge, any severance Charge, any Charge relating to entry into a new market, any Charge relating to any strategic initiative, any signing Charge, any retention or completion bonus, any expansion and/or relocation Charge, any Charge associated with any modification to any pension and post-retirement employee benefit plan, any software development Charge, any Charge associated with new systems design, any implementation Charge, any project startup Charge, any Charge in connection with new operations, any Charge in connection with unused warehouse space or manufacturing facilities, any Charge relating to a new contract, any consulting Charge and/or any corporate development Charge; provided, that the amount of Charges added back in reliance on this clause (c)(xii) in any period may not exceed an amount equal to (x) the greater of $[●] and 25.0% of Consolidated Adjusted EBITDA for such period (calculated before giving effect to any add-backs or adjustments pursuant to this clause (c)(xii)) (other than any pro forma adjustment that is consistent with Regulation S-X under the Securities Act (other than add-backs or adjustments that are only permitted under such Regulation S-X as "Management's Adjustments" by virtue of the amendments adopted on May 21, 2020 by the SEC)) plus (y) Charges incurred in connection with the integration of the "Serta" and "Simmons" businesses; plus

(xiii) any Charge incurred or accrued in connection with any single or one-time event, including in connection with (A) any acquisition or similar Investment consummated after the Closing Date and/or (B) the closing, consolidation or reconfiguration of any facility during such period; plus

(d)    [reserved]; plus

(e)    the full pro forma "run rate" cost savings, operating expense reductions, operational improvements and synergies (collectively, "Expected Cost Savings") (net of actual amounts realized) that are reasonably identifiable and factually supportable (in the good faith determination of such Person, as certified by a Responsible Officer of such Person in the Compliance Certificate required by Section 5.01(d) to be delivered in connection with the financial statements for such period) related to (A) the Transactions, (B) the integration of the "Serta" and "Simmons" businesses and (C) any Investment, Disposition, operating improvement, restructuring, cost savings initiative, any similar initiative (including the renegotiation of any contract and/or other arrangement) and/or specified transaction (any such operating improvement, restructuring, cost savings initiative and/or similar initiative or specified transaction, a "Cost Saving Initiative"), in each case, prior to, on or after the Closing Date; provided, that with respect to Cost Saving Initiatives under this sub clause (C) of this clause (e), (1) substantial steps toward the action necessary to realize any such cost savings, operating expense reduction, operating improvement and/or synergy added back in reliance on this clause (e) with respect to any Investment, Disposition, operating improvement, restructuring, cost savings initiative, any similar initiative (including the renegotiation of any contract and/or other arrangement) and/or specified transaction are expected to be taken within 18 months following the date on which the relevant Person determines to take such action and (2) the amount of such Cost Saving Initiatives added back in reliance on this clause (e) in any period shall not exceed an amount equal to (i) the greater of $[●] and 25.0% of Consolidated Adjusted EBITDA for such period (calculated (x) before giving effect to any add-backs or adjustments pursuant to this clause (e), and (y) after giving effect to all other permitted pro forma adjustments), plus (ii) the amount of any pro forma adjustment that is consistent with Regulation S-X under the Securities Act (other than add-backs or adjustments that are only permitted under such Regulation S-X as "Management's Adjustments" by virtue of the amendments adopted on May 21, 2020 by the SEC); plus

(f)    [reserved]; minus

(g)    any amount which, in the determination of Consolidated Net Income for such period, has been added for any non-cash income or non-cash gain, all as determined in accordance with GAAP (provided that if any non-cash income or non-cash gain represents an accrual or deferred income in respect of potential cash items in any future period, such Person may determine not to deduct the relevant non-cash gain or income in the then-current period); minus

(h)    the amount of any cash payment made during such period in respect of any noncash accrual, reserve or other non-cash Charge that is accounted for in a prior period which was added to Consolidated Net Income to determine Consolidated Adjusted EBITDA for such prior period and which does not otherwise reduce Consolidated Net Income for the current period.

It is agreed that Consolidated Adjusted EBITDA for (a) the Fiscal Quarter ended on or about June 30, 2022 shall be $[●], (b) the Fiscal Quarter ended on or about September 30, 2022 shall be $[●], (c) the Fiscal Quarter ended on or about December 31, 2022 shall be $[●] and (d) the Fiscal Quarter ended on or about March 31, 2023 shall be $[●], in each case, as adjusted on a Pro Forma Basis, as applicable.

"Consolidated Capital Expenditures" means, for any period, the aggregate amount of all expenditures of the Top Borrower and its Restricted Subsidiaries during such period determined on a consolidated basis that, in accordance with GAAP, are or should be included as additions to property, plant

and equipment in the consolidated statement of cash flows of the Top Borrower and its Restricted Subsidiaries. Notwithstanding the foregoing, Consolidated Capital Expenditures shall not include:

(a)    the purchase price of property, plant or equipment or software in an amount equal to the proceeds of Dispositions of fixed or capital assets that are not required to be applied to prepay any Indebtedness under any Term Loan Facility,

(b)    expenditures made with tenant allowances received by the Top Borrower or any of its Restricted Subsidiaries from landlords in the ordinary course of business and subsequently capitalized,

(c)    expenditures made to fund the purchase price for assets acquired pursuant to Investments permitted under Section 6.06 (including Permitted Acquisitions),

(d)    expenditures financed with the proceeds of an issuance of Capital Stock of any Parent Company or a capital contribution from any Parent Company to the Top Borrower or any of its Restricted Subsidiaries (and which proceeds are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount),

(e)    expenditures that are accounted for as capital expenditures by the Top Borrower or any of its Restricted Subsidiaries and that actually are paid for by a Person other than the Top Borrower or any of its Restricted Subsidiaries to the extent neither the Top Borrower nor any of its Restricted Subsidiaries has provided or is required to provide or incur, directly or indirectly, any consideration or obligation to such Person or any other Person (whether before, during or after such period),

(f)    any expenditures which are contractually required to be, and are, advanced or reimbursed to the Top Borrower or any of its Restricted Subsidiaries in Cash by a third-party (including landlords) during such period,

(g)    the book value of any asset owned by the Top Borrower or any of its Restricted Subsidiaries prior to or during such period to the extent that such book value is included as a capital expenditure during such period as a result of such Person reusing or beginning to reuse such asset during such period without a corresponding expenditure actually having been made in such period; provided that (i) any expenditure necessary in order to permit such asset to be reused shall be included as a capital expenditure during the period in which such expenditure actually is made and (ii) such book value shall have been included in capital expenditures when such asset was originally acquired,

(h)    that portion of interest on Indebtedness incurred for capital expenditures which is paid in Cash and capitalized in accordance with GAAP,

(i)    expenditures made in connection with the replacement, substitution, restoration, upgrade, development or repair of assets to the extent financed with (x) insurance or settlement proceeds paid on account of the loss of or damage to the assets being replaced, substituted, restored, upgraded, developed or repaired or (y) awards of compensation arising from the taking by eminent domain or condemnation of the assets being replaced,

(j)    in the event that any equipment is purchased simultaneously with the trade-in of existing equipment, the gross amount of the credit granted by the seller of such equipment for the equipment being traded in at such time, or

(k)    expenditures relating to the construction, acquisition, replacement, reconstruction, development, refurbishment, renovation or improvement of any property which has been transferred to a

Person other than the Top Borrower or any of its Restricted Subsidiaries during the same Fiscal Year in which such expenditures were made pursuant to a Sale and Lease-Back Transaction to the extent of the Cash proceeds received by the Top Borrower or any of its Restricted Subsidiaries pursuant to such Sale and Lease-Back Transaction that are not required to prepay funded Indebtedness.

"Consolidated First Lien Debt" means, as to any Person at any date of determination, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a First Priority Lien on the Collateral.

"Consolidated Interest Expense" means, with respect to any Person for any period, the sum of (a) consolidated total interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized (including, without limitation (and without duplication), amortization of any debt issuance cost and/or original issue discount, any premium paid to obtain payment, financial assurance or similar bonds, any interest capitalized during construction, any non-cash interest payment, the interest component of any deferred payment obligation, the interest component of any payment under any Capital Lease (regardless of whether accounted for as interest expense under GAAP), any commission, discount and/or other fee or charge owed with respect to any letter of credit and/or bankers' acceptance, any fee and/or expense paid to the Administrative Agent in connection with its services hereunder, any other bank, administrative agency (or trustee) and/or financing fee and any cost associated with any surety bond in connection with financing activities (whether amortized or immediately expensed)) plus (b) any cash dividend paid or payable in respect of Disqualified Capital Stock during such period other than to such Person or any Loan Party, plus (c) any net losses or obligations arising from any Hedge Agreement and/or other derivative financial instrument issued by such Person for the benefit of such Person or its subsidiaries, in each case determined on a consolidated basis for such period. For purposes of this definition, interest in respect of any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease in accordance with GAAP.

"Consolidated Net Income" means, in respect of any period and as determined for any Person (the "Subject Person") on a consolidated basis, an amount equal to the sum of net income, determined in accordance with GAAP, but excluding:

(a)     the income (or loss) of any Person (other than a Restricted Subsidiary of the Subject Person) accounted for by the equity method of accounting and Unrestricted Subsidiaries, except to the extent of dividends or distributions or other payments that are actually paid in Cash or Cash Equivalents to the Subject Person or a Restricted Subsidiary thereof (or subsequently converted into Cash or Cash Equivalents), whether paid in respect of income, return of capital or dividend for such period or any prior periods,

(b)     any gain or Charge attributable to any asset Disposition (including asset retirement costs and including any abandonments of assets) or of returned surplus assets, in each case, outside the ordinary course of business,

(c)     (i) any gain or Charge from (A) any extraordinary item (as determined in good faith by such Person) and/or (B) any nonrecurring or unusual item (as determined in good faith by such Person) and/or (ii) any Charge associated with and/or payment of any actual or prospective legal settlement, fine, judgment or order,

(d)     any net gain or Charge with respect to (i) any disposed, abandoned, divested and/or discontinued asset, property or operation (other than, at the option of the Top Borrower, any asset, property or operation pending the disposal, abandonment, divestiture and/or termination thereof), (ii) any disposal,

abandonment, divestiture and/or discontinuation of any asset, property or operation (other than, at the option of such Person, relating to assets or properties held for sale or pending the divestiture or termination thereof) and/or (iii) any facility that has been closed during such period,

(e)     any net income or write-off or amortization made of any deferred financing cost and/or premium paid or other Charge, in each case attributable to the early extinguishment of Indebtedness (and the termination of any associated Hedge Agreement),

(f)     (i) any Charge incurred pursuant to any management equity plan, profits interest or stock option plan or any other management or employee benefit plan or agreement, any pension plan (including any post-employment benefit scheme which has been agreed with the relevant pension trustee), any stock subscription or shareholder agreement, any employee benefit trust, any employment benefit scheme or any similar equity plan or agreement (including any deferred compensation arrangement) and (ii) any Charge incurred in connection with the rollover, acceleration or payout of Capital Stock held by management of Holdings (or any other Parent Company), the Top Borrower and/or any Restricted Subsidiary, in each case, to the extent that any cash Charge is funded with net cash proceeds contributed to relevant Person as a capital contribution or as a result of the sale or issuance of Qualified Capital Stock (and which proceeds are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount),

(g)     any Charge that is established, adjusted and/or incurred, as applicable, (i) within 12 months after the Closing Date that is required to be established, adjusted or incurred, as applicable, as a result of the Transactions in accordance with GAAP, (ii) within 12 months after the closing of any other acquisition that is required to be established, adjusted or incurred, as applicable, as a result of such acquisition in accordance with GAAP or (iii) as a result of any change in, or the adoption or modification of, accounting principles and/or policies in accordance with GAAP,

(h)     (i) the effects of adjustments (including the effects of such adjustments pushed down to the relevant Person and its subsidiaries) in component amounts required or permitted by GAAP (including in the inventory, property and equipment, lease, rights fee arrangements, software, goodwill, intangible asset, in-process research and development, deferred revenue, advanced billing and debt line items thereof), resulting from the application of purchase accounting in relation to the Transactions or any consummated acquisition or recapitalization accounting or the amortization or write-off of any amounts thereof, net of Taxes, and (ii) the cumulative effect of changes (effected through cumulative effect adjustment or retroactive application) in, or the adoption or modification of, accounting principles or policies made in such period in accordance with GAAP which affect Consolidated Net Income (except that, if the Top Borrower determines in good faith that the cumulative effects thereof are not material to the interests of the Lenders, the effects of any change, adoption or modification of any such principles or policies may be included in any subsequent period after the Fiscal Quarter in which such change, adoption or modification was made),

(i)     (i) any realized or unrealized gain or loss in respect of (A) any obligation under any Hedge Agreement as determined in accordance with GAAP and/or (B) any other derivative instrument pursuant to, in the case of this <u>clause (B)</u>, Financial Accounting Standards Board's Accounting Standards Codification No. 815-Derivatives and Hedging, and (ii) any realized or unrealized foreign currency exchange gain or loss (including any currency re-measurement of Indebtedness, any net gain or loss resulting from Hedge Agreements for currency exchange risk resulting from any intercompany Indebtedness, any foreign currency translation or transaction or any other currency-related risk), and

(j)     any deferred Tax expense associated with any tax deduction or net operating loss arising as a result of the Transactions, or the release of any valuation allowance related to any such item.

"<u>Consolidated Secured Debt</u>" means, as to any Person at any date of determination, the aggregate principal amount of Consolidated Total Debt outstanding on such date that is secured by a Lien on the Collateral.

"<u>Consolidated Total Assets</u>" means, at any date, all amounts that would, in conformity with GAAP, be set forth opposite the caption "total assets" (or any like caption) on a consolidated balance sheet of the applicable Person at such date.

"<u>Consolidated Total Debt</u>" means, as to any Person at any date of determination, the aggregate principal amount of all third-party debt for borrowed money (including LC Disbursements that have not been reimbursed within three Business Days and the outstanding principal balance of all Indebtedness of such Person represented by notes, bonds and similar instruments and excluding, for the avoidance of doubt, undrawn letters of credit) and Capital Leases and purchase money Indebtedness, as such amount may be adjusted to reflect the effect (as determined by the Top Borrower in good faith) of any Debt FX Hedge; <u>provided</u> that "Consolidated Total Debt" shall be calculated (i) net of the Unrestricted Cash Amount, and (ii) excluding any obligation, liability or indebtedness of such Person if, upon or prior to the maturity thereof, such Person has irrevocably deposited with the proper Person in trust or escrow the necessary funds (or evidences of indebtedness) for the payment, redemption or satisfaction of such obligation, liability or indebtedness, and thereafter such funds and evidences of such obligation, liability or indebtedness or other security so deposited are not included in the calculation of the Unrestricted Cash Amount.

"<u>Contractual Obligation</u>" means, as applied to any Person, any provision of any Security issued by that Person or of any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject.

"<u>Control</u>" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Copyright</u>" means the following: (a) all copyrights, rights and interests in copyrights, works protectable by copyright whether published or unpublished, copyright registrations and copyright applications; (b) all renewals of any of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past or future infringements for any of the foregoing; (d) the right to sue for past, present, and future infringements of any of the foregoing; and (e) all rights corresponding to any of the foregoing.

"<u>Cost</u>" means cost determined according to the accounting policies used in the preparation of the Top Borrower's most recent audited financial statements prior to the Closing Date (pursuant to which the FIFO method of accounting is being used for retail inventories and wholesale inventories) without regard to intercompany profit or increases for currency exchange rates.

"<u>Cost Saving Initiative</u>" has the meaning assigned to such term in the definition of "Consolidated Adjusted EBITDA".

"<u>Covered Entity</u>" has the meaning assigned to such term in <u>Section 9.28(c)(ii)</u>.

"<u>Covered Party</u>" has the meaning assigned to such term in <u>Section 9.28(b)</u>.

"<u>Credit Extension</u>" means each of (a) the making of any Loan or Protective Advance (other than any Letter of Credit Reimbursement Loan or any Revolving Loan resulting from the application of <u>Section</u>

2.06(b)) or (b) the issuance, amendment, modification, renewal or extension of any Letter of Credit (other than any such amendment, modification, renewal or extension that does not increase the stated amount of the relevant Letter of Credit).

"Customary Bridge Loans" means customary bridge loans with a maturity date of not longer than one year; provided that the final maturity date of any loan, note, security or other Indebtedness which is exchanged for or otherwise replaces such bridge loans is not earlier than the Maturity Date on the date of the issuance or incurrence thereof.

"Debt FX Hedge" means any Hedge Agreement entered into for the purpose of hedging currency-related risks in respect of any Indebtedness of the type described in the definition of "Consolidated Total Debt".

"Debtors" has the meaning assigned to such term in the Recitals.

"Debtor Relief Laws" means the Bankruptcy Code of the U.S., and all other liquidation, conservatorship, bankruptcy, general assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization or similar debtor relief laws of the U.S. or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means any event or condition which upon notice, lapse of time or both would become an Event of Default.

"Default Right" has the meaning assigned to such term in Section 9.26(c)(iii).

"Defaulting Lender" means any Person that has (a) defaulted in (or is otherwise unable to perform) its obligations under this Agreement, including (x) to make a Loan within two Business Days of the date required to be made by it hereunder or (y) to fund its participation in a Letter of Credit required to be funded by it hereunder within two Business Days of the date such obligation arose or such Letter of Credit was required to be made or funded, (b) notified the Administrative Agent or the Top Borrower in writing that it does not intend to satisfy or perform any such obligation or has made a public statement to the effect that it does not intend to comply with its funding or other obligations under this Agreement or under agreements in which it commits to extend credit generally (unless such writing indicates that such position is based on such Person's good faith determination that a condition precedent (specifically identified and including the particular default, if any) to funding a Loan cannot be satisfied), (c) failed, within two Business Days after the request of the Administrative Agent or the Top Borrower, to confirm in writing that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans and participations in then outstanding Letters of Credit; provided that such Person shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent, (d) become (or any parent company thereof has become) insolvent or been determined by any Governmental Authority having regulatory authority over such Person or its assets, to be insolvent, or the assets or management of which has been taken over by any Governmental Authority or (e)(i) become (or any parent company thereof has become) the subject of (A) a bankruptcy or insolvency proceeding or (B) a Bail-In Action, (ii) has had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or custodian, appointed for it, or (iii) has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in, any such proceeding or appointment, unless in the case of any Person subject to this clause (e), the Top Borrower and the Administrative Agent have each determined that such Person intends, and has all approvals required to enable it (in form and substance satisfactory to the Top Borrower and the Administrative Agent), to continue to perform its obligations hereunder; provided that no Person shall be deemed to be a Defaulting Lender solely by virtue of the ownership or acquisition of any Capital Stock in such Lender or its parent by any

Governmental Authority; <u>provided</u> that such action does not result in or provide such Lender with immunity from the jurisdiction of courts within the U.S. or from the enforcement of judgments or writs of attachment on its assets or permit such Person (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contract or agreement to which such Person is a party.

"<u>Deposit Account</u>" means a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"<u>Derivative Transaction</u>" means (a) any interest-rate transaction, including any interest-rate swap, basis swap, forward rate agreement, interest rate option (including a cap, collar or floor), and any other instrument linked to interest rates that gives rise to similar credit risks (including when-issued securities and forward deposits accepted), (b) any exchange-rate transaction, including any cross-currency interest-rate swap, any forward foreign-exchange contract, any currency option, and any other instrument linked to exchange rates that gives rise to similar credit risks, (c) any equity derivative transaction, including any equity-linked swap, any equity-linked option, any forward equity-linked contract, and any other instrument linked to equities that gives rise to similar credit risk and (d) any commodity (including precious metal) derivative transaction, including any commodity-linked swap, any commodity-linked option, any forward commodity-linked contract, and any other instrument linked to commodities that gives rise to similar credit risks; <u>provided</u>, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees, members of management, managers or consultants of the Top Borrower or its subsidiaries shall be a Derivative Transaction.

"<u>Designated Account</u>" means the Deposit Account of Top Borrower identified on <u>Exhibit S</u> to this Agreement (or such other Deposit Account of Top Borrower located at Designated Account Bank that has been designated as such, in writing, by Top Borrower to Administrative Agent).

"<u>Designated Account Bank</u>" has the meaning assigned to such term in <u>Exhibit S</u> to this Agreement (or such other bank that is located within the United States that has been designated as such, in writing, by Top Borrower to Administrative Agent).

"<u>Designated Cash Interest Expense</u>" means with respect to any Person for any period, the Ratio Interest Expense of such Person and its Restricted Subsidiaries that is paid or payable currently in Cash.

"<u>Designated Non-Cash Consideration</u>" means the fair market value (as determined by the Top Borrower in good faith) of non-Cash consideration received by the Top Borrower or any Restricted Subsidiary in connection with any Disposition pursuant to <u>Section 6.07(h)</u> and/or <u>Section 6.08</u> that is designated as Designated Non-Cash Consideration pursuant to a certificate of a Responsible Officer of the Top Borrower, setting forth the basis of such valuation (which amount will be reduced by the amount of Cash or Cash Equivalents received in connection with a subsequent sale or conversion of such Designated Non-Cash Consideration to Cash or Cash Equivalents).

"<u>Dilution</u>" means, as determined based upon the results of the most recent field examination, a percentage, based upon the experience of the immediately prior 12 months, that is the result of dividing the Dollar amount of (a) bad debt write-downs, discounts, advertising allowances, credits, or other dilutive items with respect to Borrowers' Accounts during such period, by (b) Borrowers' billings with respect to Accounts during such period, provided, that, upon the occurrence and during the continuance of any Event of Default, Dilution shall be as determined pursuant to Administrative Agent's Permitted Discretion.

"<u>Dilution Reserve</u>" means, as of any date of determination, an amount sufficient to reduce the advance rate against Eligible Trade Receivables by the extent to which Dilution is in excess of 5%.

"DIP ABL Agent" has the meaning assigned to such term in the Recitals.

"DIP ABL Credit Agreement" has the meaning assigned to such term in the Recitals.

"DIP ABL Lenders" has the meaning assigned to such term in the Recitals.

"Discretionary Guarantor" has the meaning assigned to such term in the definition of "Subsidiary Guarantor".

"Disposition" or "Dispose" means the sale, lease, sublease, or other disposition of any property of any Person.

"Disqualified Capital Stock" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable (other than for Qualified Capital Stock), pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued (it being understood that if any such redemption is in part, only such part coming into effect prior to 91 days following the Maturity Date shall constitute Disqualified Capital Stock), (b) is or becomes convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Capital Stock that would constitute Disqualified Capital Stock, in each case at any time on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued, (c) contains any mandatory repurchase obligation or any other repurchase obligation at the option of the holder thereof (other than for Qualified Capital Stock), in whole or in part, which may come into effect prior to 91 days following the Maturity Date at the time such Capital Stock is issued (it being understood that if any such repurchase obligation is in part, only such part coming into effect prior to 91 days following the Maturity Date shall constitute Disqualified Capital Stock) or (d) provides for the scheduled payments of dividends in Cash on or prior to 91 days following the Maturity Date at the time such Capital Stock is issued; provided that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of any change of control or any Disposition occurring prior to 91 days following the Maturity Date at the time such Capital Stock is issued shall not constitute Disqualified Capital Stock if such Capital Stock provides that the issuer thereof will not redeem any such Capital Stock pursuant to such provisions prior to the Termination Date.

Notwithstanding the preceding sentence, (A) if such Capital Stock is issued pursuant to any plan for the benefit of directors, officers, employees, members of management, managers or consultants or by any such plan to such directors, officers, employees, members of management, managers or consultants, in each case in the ordinary course of business of Holdings, the Top Borrower or any Restricted Subsidiary, such Capital Stock shall not constitute Disqualified Capital Stock solely because it may be required to be repurchased by the issuer thereof in order to satisfy applicable statutory or regulatory obligations, and (B) no Capital Stock held by any future, present or former employee, director, officer, manager, member of management or consultant (or their respective Affiliates or Immediate Family Members) of the Top Borrower (or any Parent Company or any subsidiary) shall be considered Disqualified Capital Stock because such stock is redeemable or subject to repurchase pursuant to any management equity subscription agreement, stock option, stock appreciation right or other stock award agreement, stock ownership plan, put agreement, stockholder agreement or similar agreement that may be in effect from time to time.

"Disqualified Institution" means:

(a)    (i) any Person identified in writing to the Administrative Agent on May __, 2023, (ii) any Affiliate of any Person described in <u>clause (i)</u> above that is reasonably identifiable as an Affiliate of such Person on the basis of such Affiliate's name or (iii) any other Affiliate of any Person described in <u>clauses (i)</u> or <u>(ii)</u> above that is identified in a written notice to the Administrative Agent (each such person, a "<u>Disqualified Lending Institution</u>"),

(b)    [reserved], or

(c)    (i) any Person that is or becomes a Company Competitor and is identified as such in writing to the Administrative Agent, (ii) any Affiliate of any Person described in <u>clause (i)</u> above (other than any Affiliate that is a Bona Fide Debt Fund) that is reasonably identifiable as an Affiliate of such person on the basis of such Affiliate's name and (iii) any other Affiliate of any Person described in <u>clauses (i)</u> and/or (ii) above that is identified in a written notice to the Administrative Agent (it being understood and agreed that no Bona Fide Debt Fund may be designated as Disqualified Institution pursuant to this <u>clause (iii)</u>),

it being understood and agreed that no written notice delivered pursuant to <u>clause (a)(ii)</u>, <u>(a)(iii)</u>, <u>(c)(i)</u> and/or <u>(c)(iii)</u> above shall apply retroactively to disqualify any Person that has previously acquired an assignment or participation interest in any Loan; provided that any such assignment or participation shall be subject to the Top Borrower's consent to the extent required under <u>Section 9.05(b)</u>.

"<u>Disqualified Lending Institution</u>" has the meaning assigned to such term in the definition of "Disqualified Institution".

"<u>Disqualified Person</u>" has the meaning assigned to such term in <u>Section 9.05(f)(ii)</u>.

"<u>Document</u>" has the meaning set forth in Article 9 of the UCC.

"<u>Dollars</u>" or "<u>$</u>" refers to lawful money of the U.S.

"<u>Domestic Subsidiary</u>" means any Restricted Subsidiary incorporated or organized under the laws of the U.S., any state thereof or the District of Columbia.

"<u>Eclipse</u>" has the meaning assigned to such term in the recitals to this Agreement.

 "<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described <u>in clauses (a)</u> or <u>(b)</u> of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Eligible Assignee</u>" means (a) any Lender, (b) any commercial bank, insurance company, or finance company, financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), (c) any Affiliate of any Lender and (d) any Approved Fund

of any Lender; provided that in any event, "Eligible Assignee" shall not include (i) any natural person, (ii) any Disqualified Institution, (iii) any Defaulting Lender or (iv) the Top Borrower or any of its Affiliates.

"Eligible In-Transit Inventory" means, at any time, without duplication of other Eligible Inventory, Inventory of the Loan Parties:

(a)    which has been shipped (A) from a foreign location (other than a location in Canada or Mexico) for receipt by any Loan Party at a location within the United States within 60 days of the date of shipment or (B) from a domestic location (or from a location in Canada or Mexico) for receipt by any Loan Party at a location in the United States within 15 days of the date of shipment and, in each case, which has not yet been delivered to such Loan Party;

(b)    for which the purchase order is in the name of a Loan Party and title has passed to such Loan Party and has been fully paid for or are subject to payment terms which are not overdue;

(c)    for which the document of title reflects any Loan Party, as consignee or, if reasonably requested by the Administrative Agent, names the Administrative Agent as consignee, and in each case for Inventory shipped from or held in a foreign location, as to which the Administrative Agent has control over the documents of title which evidence ownership of the subject Inventory (such as, if requested by the Administrative Agent, by the delivery of a Freight Forwarder Agreement);

(d)    for which the document of title, if reasonably requested by the Administrative Agent, is negotiable;

(e)    which is in the possession of a common carrier (including on behalf of any non-vessel operating common carrier) that has issued the bill of lading or other document of title with respect thereto or the Freight Forwarder handling the importing, shipping and delivery of such Inventory;

(f)    such Inventory is insured against types of loss, damage, hazards, and risks, and in amounts, satisfactory to Administrative Agent in its Permitted Discretion, and Administrative Agent shall have received a copy of the certificate of marine cargo insurance in connection therewith in which it has been named as an additional insured and loss payee in a manner acceptable to Administrative Agent; and

(g)    which otherwise is not ineligible pursuant to the definition of "Eligible Inventory" (except to the extent ineligible in accordance with the lead-in to such definition or under clause (f) or (k) of that definition);

provided, that, the Administrative Agent may, in its Permitted Discretion, exclude any particular Inventory from the definition of "Eligible In-Transit Inventory" in the event the Administrative Agent determines in its Permitted Discretion that such Inventory is subject to any Person's right of reclamation, repudiation, stoppage in transit or any event has occurred or is reasonably anticipated by the Administrative Agent to arise which may otherwise adversely impact the value of such Inventory or the ability of the Collateral Agent to realize upon such Inventory.

"Eligible Inventory" means, at any time, all Inventory (excluding Eligible In-Transit Inventory) of the Loan Parties (valued at the lower of cost or market on a basis consistent with such Loan Party's historical accounting practices); provided, that, Eligible Inventory shall not include any Inventory (without duplication of any Reserves established in accordance with Section 2.24):

(a)    which is not subject to a first priority perfected Lien in favor of the Administrative Agent (subject to Landlord Liens (to the extent (i) such Inventory is not located in a Landlord Lien State or (ii)

such Inventory is located in a Landlord Lien State and either a Rent Reserve with respect to such location has been established in accordance with Section 2.24 or the Administrative Agent has declined to establish such a Rent Reserve in its Permitted Discretion) and other Permitted Encumbrances (without limiting the ability of the Administrative Agent to change, establish or eliminate any Reserves in its Permitted Discretion in accordance with Section 2.24 on account of any such Permitted Encumbrances)), or is subject to any Lien that is not a Permitted Lien;

(b)     which is unmerchantable, damaged, defective, obsolete, slow-moving or unfit for sale;

(c)     which does not conform in all material respects to the representations and warranties in respect of Inventory contained in this Agreement or the Security Agreement;

(d)     which is not owned only by one or more Loan Parties;

(e)     which constitutes packaging, spare parts or supplies dedicated for internal use in the Loan Parties' business or bill-and-hold goods;

(f)     which is not located in the U.S. or Canada or is in transit with a common carrier from vendors or suppliers;

(g)     which is located at any Specified Location leased by a Loan Party, unless (i) subject to Section 5.15, the lessor has delivered to the Administrative Agent a Collateral Access Agreement as to such location, (ii) a Rent Reserve with respect to such location has been established in accordance with Section 2.24 or (iii) the Administrative Agent has declined to establish a Rent Reserve;

(h)     which is located in any third-party warehouse or is in the possession of a bailee (other than a third-party processor) at a Specified Location and is not evidenced by a Document, unless (i) subject to Section 5.15, such warehouseman or bailee has delivered to the Administrative Agent a Collateral Access Agreement, (ii) a Rent Reserve has been established in accordance with Section 2.24 or (iii) the Administrative Agent has declined to establish a Rent Reserve;

(i)     which is being processed offsite by a third-party at a third-party location or outside processor;

(j)     which is the subject of a consignment by any Loan Party as consignor or consignee;

(k)     it is the subject of a bill of lading or other document of title;

(l)     which contains or bears any company-specific labels, branded ticks, or intellectual property rights licensed to any Loan Party pursuant to a license with any Person other than a Loan Party unless the Administrative Agent may sell or otherwise dispose of such Inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement relating thereto; or

(m)     which is not reflected in a current Inventory Report (other than Eligible In-Transit Inventory).

"Eligible Investment Grade Trade Receivables" means any Eligible Trade Receivables owing from an Account Debtor that has a corporate family rating of at least Baa3 (or the equivalent) by Moody's and BBB (or the equivalent) by S&P, or an equivalent rating by Fitch, Inc.

"Eligible Non-Investment Grade Trade Receivables" means any Eligible Trade Receivables that are not Eligible Investment Grade Trade Receivables.

"Eligible Trade Receivables" means, at any time, all Accounts due to any Loan Party arising from the sale of goods of such Loan Party or the provision of services by one or more Loan Parties (Eligible Trade Receivables shall be calculated net of unapplied cash, taxes, finance charges, service charges, discounts, credits, allowances, and rebates); provided, that, Eligible Trade Receivables shall not include any Account (without duplication of any Reserves established in accordance with Section 2.24):

(a)     which is not subject to a first priority perfected security interest in favor of the Administrative Agent (subject to Permitted Encumbrances (without limiting the ability of the Administrative Agent to change, establish or eliminate any Reserves in its Permitted Discretion in accordance with Section 2.24 on account of any such Permitted Encumbrances)), or is subject to any Lien that is not a Permitted Lien;

(b)     with respect to which more than 90 days have elapsed from the original invoice date thereof, which is more than 60 days past due, has a selling term of more than 61 days, or which has been written off the books of the Loan Parties or otherwise designated as uncollectible;

(c)     which is owing by an Account Debtor for which more than 50.0% of the Accounts owing from such Account Debtor and its Affiliates are ineligible pursuant to clause (b) above;

(d)     which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to the Loan Parties exceeds 15% of the aggregate Eligible Trade Receivables (or, in the case of (i) Mattress Firm, not to exceed 35% of the aggregate Eligible Trade Receivables, (ii) each Account Debtor with Accounts which owes Eligible Investment Grade Trade Receivables, not to exceed 25% of the aggregate Eligible Trade Receivables and in each case, such percentage, as applied to a particular Account Debtor, being subject to reduction by Administrative Agent in its Permitted Discretion if the creditworthiness of such Account Debtor deteriorates), but only to the extent of the obligations owing by such Account Debtor in excess of such percentage; provided, that, in each case, the amount of Eligible Accounts that are excluded because in excess of the applicable percentage shall be determined by Administrative Agent based on all of the otherwise Eligible Accounts prior to giving effect to eliminations based upon the applicable concentration limit set forth above;

(e)     which does not conform in all material respects to the representations and warranties in respect of Accounts contained in this Agreement or in the Security Agreement;

(f)     which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not invoiced or evidenced by other documentation reasonably satisfactory to the Administrative Agent which has been sent to the Account Debtor or which is a duplicate invoice, (iii) represents a progress billing, (iv) is contingent upon the Loan Parties' completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, Cash-on-delivery or any other repurchase or return basis or (vi) relates to payments of interest;

(g)     for which (i) the goods giving rise to such Account have not been shipped and billed to the Account Debtor (except to the extent the applicable Loan Party has shipped such goods in accordance with the written instructions of such Account Debtor and such Account Debtor has agreed in writing that such shipment constitutes delivery of such goods by such Loan Party, in each case, in form and substance reasonably satisfactory to the Administrative Agent) or (ii) the services giving rise to such Account have not been performed and billed to the Account Debtor;

(h)    which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee or liquidator of its assets, (ii) had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or Federal bankruptcy laws, (iv) admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(i)    which is owed by any Account Debtor which has sold all or substantially all of its assets;

(j)    which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or Canada or (ii) is not organized under applicable law of the U.S. or Canada or any state or province thereof unless, in any case, such Account is (A) backed by a Letter of Credit reasonably acceptable to the Administrative Agent which is in the possession of, has been assigned to and is directly drawable by the Administrative Agent or (B) covered by credit insurance reasonably acceptable to the Administrative Agent;

(k)    which is owed in any currency other than Dollars;

(l)    Accounts in an aggregate amount exceeding $1,000,000 which are owed by (i) the government (or any department, agency, public corporation or instrumentality thereof) of any country other than the U.S. unless such Account is (x) backed by a letter of credit reasonably acceptable to the Administrative Agent and, if requested by the Administrative Agent, which is in the possession of the Administrative Agent or (y) covered by credit insurance reasonably acceptable to the Administrative Agent, or (ii) the government of the U.S., or any department, agency, public corporation or instrumentality thereof, unless the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), has been complied with;

(m)    which is owed by any Affiliate, employee, officer, director, agent or stockholder of any Loan Party;

(n)    which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, including for exclusivity contract payments (but only to the extent of such indebtedness) or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case only to the extent thereof;

(o)    which is subject to any chargeback, counterclaim, deduction, defense, setoff or dispute notice of which is provided to any Loan Party or any of its Subsidiaries but only to the extent of any such counterclaim, deduction, defense, setoff or dispute; provided that no Account that otherwise constitutes an Eligible Trade Receivable shall be rendered ineligible by virtue of this clause (o) to the extent, but only to the extent, that the Account Debtor's right of setoff is limited by an enforceable agreement that is reasonably satisfactory to the Administrative Agent;

(p)    which is evidenced by any promissory note, chattel paper or instrument;

(q)    with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity, or

(r)    which does not comply in all material respects with the requirements of all Requirements of Law, whether Federal, state or local.

"Emergence Restructuring Transactions" means, collectively, (a) the "Restructuring Transactions" made in accordance with (and as defined in) [●] of the Plan of Reorganization (subject to the consent requirements set forth therein) and (b) the transactions set forth on the Schedule attached hereto as Schedule 1.05.[2]

"Employee Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code, or (c) any Person whose assets include (for purposes of the Plan Asset Regulations) the assets of any such "employee benefit plan" or "plan".

"Environment" means ambient air, indoor air, surface water, groundwater, drinking water, land surface and subsurface strata & natural resources such as wetlands, flora and fauna.

"Environmental Claim" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, abatement order or other order or directive (conditional or otherwise), by any Governmental Authority or any other Person, arising (a) pursuant to or in connection with any actual or alleged violation of any Environmental Law; (b) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity; or (c) in connection with any actual or alleged damage, injury, threat or harm to the Environment.

"Environmental Laws" means any and all current or future applicable foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Authorizations, or any other applicable requirements of Governmental Authorities and the common law relating to (a) environmental matters, including those relating to any Hazardous Materials Activity; or (b) the generation, use, storage, transportation or disposal of or exposure to Hazardous Materials, in any manner applicable to the Top Borrower or any of its Restricted Subsidiaries or any Facility.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the Environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with the Top Borrower or any Restricted Subsidiary and is treated as a single employer within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) a withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations at any facility of the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate as described in Section 4062(e) of ERISA, in each case, resulting in liability pursuant to Section 4063 of ERISA; (c) a complete or partial withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from a Multiemployer Plan resulting in the imposition of

---

[2] NTD: Subject to review of schedule.

Withdrawal Liability on the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate, notification of the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate concerning the imposition of Withdrawal Liability or notification that a Multiemployer Plan is "insolvent" within the meaning of Section 4245 of ERISA or is in "reorganization" within the meaning of Section 4241 of ERISA; (d) the filing of a notice of intent to terminate a Pension Plan under Section 4041(c) of ERISA, the treatment of a Pension Plan amendment as a termination under Section 4041(c) of ERISA, the commencement of proceedings by the PBGC to terminate a Pension Plan or the receipt by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate of notice of the treatment of a Multiemployer Plan amendment as a termination under Section 4041A of ERISA or of notice of the commencement of proceedings by the PBGC to terminate a Multiemployer Plan; (e) the occurrence of an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate, with respect to the termination of any Pension Plan; or (g) the conditions for imposition of a Lien under Section 303(k) of ERISA have been met with respect to any Pension Plan.

"Erroneous Payment" has the meaning assigned to such term in Section 9.29.

"Erroneous Payment Deficiency Assignment" has the meaning assigned to such term in Section 9.29.

"Erroneous Payment Impacted Loans" has the meaning assigned to such term in Section 9.29.

"Erroneous Payment Return Deficiency" has the meaning assigned to such term in Section 9.29.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning assigned to such term in Article 7.

"Excess Availability" means, at any time of determination, an amount equal to (a) the Loan Cap minus (b) the Total Revolving Credit Exposures, in each case, at such time.

"Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations of the SEC promulgated thereunder.

"Excluded Accounts" means accounts (a) established (or otherwise maintained) by the Loan Parties that do not have cash balances with an average weekly balance exceeding $5,000,000 in the aggregate for all such accounts, (b) solely containing Cash allocated as proceeds of the sale of Term Loan Priority Collateral in accordance with the ABL Intercreditor Agreement, (c) any Trust Fund Account, (d) disbursement accounts used by the Loan Parties exclusively for payroll or similar payments, (e) that are zero balance accounts or (f) that are located outside of the United States.

"Excluded Assets" means each of the following:

(a)     any asset the grant or perfection of a security interest in which would (i) be prohibited by enforceable anti-assignment provisions set forth in any contract that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than assets subject to Capital Leases and purchase money financings), (ii) violate (after giving effect to applicable anti-assignment provisions of the UCC or other applicable Requirements of Law) the terms of any contract relating to such asset that is permitted or otherwise not

prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of Capital Leases and purchase money financings), or (iii) trigger termination of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement pursuant to any "change of control" or similar provision (to the extent such contract is binding on such asset at the time of its acquisition and not incurred in contemplation thereof); it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any contract described in this clause (a) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or other applicable Requirements of Law notwithstanding the relevant prohibition, violation or termination right,

(b)    the Capital Stock of any (i) Unrestricted Subsidiary, (ii) not-for-profit subsidiary and/or (iii) special purpose entity used for any permitted securitization facility,

(c)    any intent-to-use (or similar) Trademark application prior to the filing and acceptance of a "Statement of Use", "Declaration of Use", "Amendment to Allege Use" or similar filing with respect thereto, only to the extent, if any, that, and solely during the period if any, in which, the grant of a security interest therein may impair the validity or enforceability of such intent-to-use (or similar) Trademark application under applicable federal law,

(d)    any asset (including Capital Stock), the grant or perfection of a security interest in which would (i) be prohibited under applicable Requirements of Law (including rules and regulations of any Governmental Authority) or (ii) require any governmental or regulatory consent, approval, license or authorization, except to the extent such requirement or prohibition would be rendered ineffective under the UCC or other applicable Requirements of Law notwithstanding such requirement or prohibition; it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any asset described in clauses (d)(i) or (d)(ii) to the extent that the assignment of such proceeds or receivables is effective under the UCC or other applicable Requirements of Law notwithstanding the relevant requirement or prohibition or (iii) result in material adverse tax consequences to any Loan Party as reasonably determined by the Top Borrower and the Administrative Agent,

(e)    (i) any leasehold Real Estate Asset, except to the extent a security interest therein can be perfected by the filing of a UCC-1 financing statement, any other leasehold interests and (ii) any owned Real Estate Asset that is not a Material Real Estate Asset,

(f)    the Capital Stock of any Person that is not a Wholly-Owned Subsidiary (other than the Capital Stock of Serta),

(g)    any Margin Stock,

(h)    to the extent such Foreign Subsidiary or CFC Holdco is not a first-tier Subsidiary of, a Loan Party, the Capital Stock of (i) any Foreign Subsidiary and (ii) any CFC Holdco,

(i)    the Capital Stock of any first-tier Foreign Subsidiary or CFC Holdco of a Loan Party, that is formed or acquired after the Closing Date, the grant or perfection of a security interest in which would reasonably be expected to result in material adverse tax consequences to any Loan Party,

(j)    any Commercial Tort Claim with a value (as reasonably estimated by the Top Borrower) of less than $1,000,000,

(k)    any Tax and Trust Funds in an Excluded Account or a Blocked Account,

(l)     any lease, license or agreement, or any property subject to a purchase money security interest, Capital Lease obligations or similar arrangement, in each case, that is permitted or otherwise not prohibited by the terms of this Agreement and to the extent the grant of a security interest therein would violate or invalidate such lease, license or agreement or purchase money or similar arrangement or create a right of termination in favor of any other party thereto (other than Holdings, the Top Borrower or any Subsidiary of the Top Borrower) after giving effect to the applicable anti-assignment provisions of the UCC or other applicable Requirements of Law; it being understood that the term "Excluded Asset" shall not include proceeds or receivables arising out of any asset described in this clause (k) to the extent that the assignment of such proceeds or receivables is expressly deemed to be effective under the UCC or other applicable Requirements of Law notwithstanding the relevant violation or invalidation, and

(m)    any asset with respect to which the Administrative Agent and the Top Borrower have reasonably determined in writing that the cost, burden, difficulty or consequence (including any effect on the ability of the Top Borrower and its subsidiaries to conduct their operations and business in the ordinary course of business) of obtaining or perfecting a security interest therein outweighs, or is excessive in light of, the practical benefit of a security interest to the relevant Secured Parties afforded thereby.

Notwithstanding the foregoing, in no event shall any property included in the Borrowing Base constitute an Excluded Asset.

"Excluded Subsidiary" means:

(a)     any Restricted Subsidiary that is not a Wholly-Owned Subsidiary,

(b)     any Immaterial Subsidiary,

(c)     any Restricted Subsidiary (i) that is prohibited or restricted from providing a Loan Guaranty by (A) any Requirement of Law or (B) any Contractual Obligation that exists on the Closing Date or at the time such Restricted Subsidiary becomes a subsidiary (which Contractual Obligation was not entered into in contemplation of such Restricted Subsidiary becoming a subsidiary (including pursuant to assumed Indebtedness)), (ii) that would require a governmental (including regulatory) or third-party consent, approval, license or authorization (including any regulatory consent, approval, license or authorization) to provide a Loan Guaranty (in each case, at the time such Restricted Subsidiary became a Subsidiary) or (iii) with respect to which the provision of a Loan Guaranty would result in material adverse tax consequences as reasonably determined by the Top Borrower, where the Top Borrower notifies the Administrative Agent in writing of such determination,

(d)     any not-for-profit subsidiary,

(e)     [reserved],

(f)     any special purpose entity used for any permitted securitization or receivables facility or financing,

(g)     any Foreign Subsidiary,

(h)     (i) any CFC Holdco and/or (ii) any Domestic Subsidiary that is a direct or indirect subsidiary of any Foreign Subsidiary that is a CFC,

(i)     any Unrestricted Subsidiary,

(j)     any Restricted Subsidiary acquired by the Top Borrower that, at the time of the relevant acquisition, is an obligor in respect of assumed Indebtedness permitted by Section 6.01 to the extent (and for so long as) the documentation governing the applicable assumed Indebtedness prohibits such subsidiary from providing a Loan Guaranty (which prohibition was not implemented in contemplation of such Restricted Subsidiary becoming a subsidiary in order to avoid the requirement of providing a Loan Guaranty), and/or

(k)     any other Restricted Subsidiary with respect to which, in the reasonable judgment of the Administrative Agent and the Top Borrower, the burden or cost of providing a Loan Guaranty outweighs, or would be excessive in light of, the practical benefits afforded thereby.

"Excluded Swap Obligation" means, with respect to any Loan Party, any Swap Obligation if, and to the extent that, all or a portion of the guaranty of such Loan Party of (including by virtue of the joint and several liability provisions of Section 9.24), or the grant by such Loan Party of a security interest to secure, such Swap Obligation (or any guaranty thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Loan Party's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the guaranty of such Loan Party or the grant of such security interest becomes effective with respect to such Swap Obligation.  If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such guaranty or security interest is or becomes illegal.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or Issuing Bank, or any other recipient of any payment to be made by or on account of any obligation of any Loan Party under any Loan Document, (a) any Taxes imposed on (or measured by) such recipient's net or overall gross income or franchise Taxes, (i) imposed as a result of such recipient being organized or having its principal office located in or, in the case of any Lender, having its applicable lending office located in, the taxing jurisdiction or (ii) that are Other Connection Taxes, (b) any branch profits Taxes imposed under Section 884(a) of the Code, or any similar Tax, imposed by any jurisdiction described in clause (a), (c) any U.S. federal withholding Tax that is imposed on amounts payable to or for the account of such Lender (other than a Lender that became a Lender pursuant to an assignment under Section 2.19) with respect to an applicable interest in a Loan or Commitment pursuant to a Requirement of Law in effect on the date on which such Lender (i) acquires such interest in the applicable Commitment or, if such Lender did not fund the applicable Loan pursuant to a prior Commitment, on the date such Lender acquires its interest in such Loan or (ii) designates a new lending office, except in each case to the extent that, pursuant to Section 2.17, amounts with respect to such Tax were payable either to such Lender's assignor immediately before such Lender acquired the applicable interest in a Loan or Commitment or to such Lender immediately before it designated a new lending office, (d) any Tax imposed as a result of a failure by the Administrative Agent, such Lender to comply with Section 2.17(f) or (j) and (e) any U.S. federal withholding Tax under FATCA and any U.S. federal backup withholding Tax.

"Expected Cost Savings" has the meaning assigned to such term in the definition of "Consolidated Adjusted EBITDA".

"Facility" means any real property (including all buildings, fixtures or other improvements located thereon) now, hereafter or, except with respect to Articles 5 and 6, previously owned, leased, operated or used by the Top Borrower or any of its Restricted Subsidiaries or any of their respective predecessors or Affiliates.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply

with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to current Section 1471(b)(1) of the Code (or any amended or successor version described above) and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"<u>FCPA</u>" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"<u>Federal Funds Effective Rate</u>" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the FRB, as published on the next succeeding Business Day by the FRB of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"<u>Fee Letter</u>" means the Fee Letter, dated as of even date with this Agreement, among Borrowers and Administrative Agent.

"<u>First Lien Leverage Ratio</u>" means the ratio, as of any date of determination, of (a) Consolidated First Lien Debt as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted EBITDA for the Test Period then most recently ended, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"<u>First Priority</u>" means, with respect to any Lien purported to be created in any Collateral pursuant to any Collateral Document, that, subject to any applicable Intercreditor Agreement, such Lien is senior in priority to any other Lien to which such Collateral is subject, other than any Permitted Lien.

"<u>Fiscal Month</u>" means each period ending on the later of (i) the last day of each calendar month and (ii) the last day of each retail month.

"<u>Fiscal Quarter</u>" means a fiscal quarter of any Fiscal Year.

"<u>Fiscal Year</u>" means the fiscal year of the Top Borrower.

"<u>Fixed Amounts</u>" has the meaning assigned to such term in <u>Section 1.10(c)</u>.

"<u>Flood Hazard Property</u>" means any parcel of any Material Real Estate Asset subject to a Mortgage located in the U.S. in an area designated by the Federal Emergency Management Agency as having special flood or mud slide hazards.

"<u>Fixed Charge Coverage Ratio</u>" means as of any date of determination, the ratio for the Test Period most recently ended of (a) Consolidated Adjusted EBITDA for such Test Period <u>minus</u> Consolidated Capital Expenditures (except to the extent financed with the proceeds of long term Indebtedness (other than the Revolving Loans)) during such Test Period, <u>minus</u> the aggregate amount of Taxes paid or payable in Cash during such Test Period to (b) Fixed Charges for such Test Period, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"<u>Fixed Charges</u>" means, with reference to any period, without duplication, the sum of (a) Designated Cash Interest Expense for such period, <u>plus</u> (b) the aggregate amount of scheduled principal payments in respect of Indebtedness for borrowed money paid or payable in Cash during such period (other than payments made by the Top Borrower or any Restricted Subsidiary to the Top Borrower or any

Restricted Subsidiary and in any case, excluding any earn-out obligation or purchase price adjustment and intercompany Indebtedness, but including purchase money Indebtedness), plus (c) scheduled payments in respect of Capital Leases paid or payable in Cash during such period to the extent allocated to principal in accordance with GAAP, plus (d) solely to the extent testing compliance with the Payment Conditions for Restricted Payments, Restricted Payments made in reliance on Section 6.04(a)(xi). For purposes of determining the amount of principal allocated to scheduled payments under Capital Leases under this definition, interest in respect of any Capital Lease of any Person shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease in accordance with GAAP.

"Foreign Lender" means any Lender or Issuing Bank that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"Foreign Subsidiary" means any Restricted Subsidiary that is not a Domestic Subsidiary.

"FRB" means the Board of Governors of the Federal Reserve System of the U.S.

"Freight Forwarder Agreement" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, among any Loan Party, a freight forwarder, customs broker or carrier or other similar third-party, and the Administrative Agent, in which the freight forwarder, customs broker or carrier or other similar third-party acknowledges and agrees, among other things, that it has control over and holds the documents evidencing ownership of the subject Inventory and any Inventory in its control or possession for the benefit of the Administrative Agent and agrees, upon notice from the Administrative Agent (which notice shall only be delivered upon the exercise of remedies during the continuation of an Event of Default and shall be withdrawn upon the cure or waiver of the relevant Event of Default), to hold and dispose of the documents and subject Inventory solely as directed by the Administrative Agent.

"Funding Date" means the date on which a Borrowing occurs.

"Funding Losses" has the meaning assigned to such term in Section 2.13 of this Agreement.

"GAAP" means generally accepted accounting principles in the U.S. in effect and applicable to the accounting period in respect of which reference to GAAP is made.

"General Accounting Liabilities" means general accounting liabilities that are not specific to any Account Debtor, including, without limitation, liabilities in respect of advertising and/or marketing (other than customer-specific co-op advertising), warranties for bedding, selling support, dealer return allowances, authorized returns and/or expected cash discounts.

"Governmental Authority" means any federal, state, municipal, national or other government, governmental department, commission, board, bureau, court, agency or instrumentality or political subdivision thereof or any entity or officer exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case whether associated with the U.S., a foreign government or any political subdivision thereof.

"Governmental Authorization" means any permit, license, authorization, approval, plan, directive, consent order or consent decree of or from any Governmental Authority.

"Granting Lender" has the meaning assigned to such term in Section 9.05(e).

"Guarantee" of or by any Person (the "Guarantor") means any obligation, contingent or otherwise, of the Guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other monetary obligation of any other Person (the "Primary Obligor") in any manner and including any obligation of the Guarantor (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other monetary obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other monetary obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the Primary Obligor so as to enable the Primary Obligor to pay such Indebtedness or other monetary obligation, (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or monetary obligation, (e) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other monetary obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (f) secured by any Lien on any assets of such Guarantor securing any Indebtedness or other monetary obligation of any other Person, whether or not such Indebtedness or monetary other obligation is assumed by such Guarantor (or any right, contingent or otherwise, of any holder of such Indebtedness or other monetary obligation to obtain any such Lien); provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business, or customary and reasonable indemnity obligations in effect on the Closing Date or entered into in connection with any acquisition, Disposition or other transaction permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Hazardous Materials" means any chemical, material, substance or waste, or any constituent thereof, which is prohibited, limited or regulated under any Environmental Law or by any Governmental Authority or which poses a hazard to the Environment or to human health and safety, including without limitation, petroleum and petroleum by-products, asbestos and asbestos-containing materials, polychlorinated biphenyls, medical waste and pharmaceutical waste.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event or occurrence involving any Hazardous Material, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Material, and any corrective action or response action with respect to any of the foregoing.

"Hedge Agreement" means any agreement with respect to any Derivative Transaction between any Loan Party or any Restricted Subsidiary and any other Person.

"Hedging Obligations" means, with respect to any Person, the obligations of such Person under any Hedge Agreement.

"Hedge Provider" means any Lender or any of their respective Affiliates.

"Holdings" shall mean any entity that becomes the direct Parent Company of the Top Borrower and executes and delivers to the Administrative Agent a Holdings Joinder Agreement substantially in form of Exhibit H hereto, and for the avoidance of doubt shall include any Successor Holdings.

"IFRS" means international accounting standards within the meaning of the IAS Regulation 1606/2002, as in effect from time to time (subject to the provisions of Section 1.04), to the extent applicable to the relevant financial statements.

"Immaterial Subsidiary" means, as of any date, any Restricted Subsidiary of the Top Borrower; the assets of which, when taken together with the assets of all other Restricted Subsidiaries that are Immaterial Subsidiaries, do not exceed 5.00% of Consolidated Total Assets of the Top Borrower and its Restricted Subsidiaries and the contribution to Consolidated Adjusted EBITDA of which, when taken together with the contribution to Consolidated Adjusted EBITDA of all other Immaterial Subsidiaries, does not exceed 5.00% of Consolidated Adjusted EBITDA of the Top Borrower and its Restricted Subsidiaries, in each case, as of the last day of the most recently ended Test Period.

"Immediate Family Member" means, with respect to any individual, such individual's child, stepchild, grandchild or more remote descendant, parent, stepparent, grandparent, spouse, former spouse, domestic partner, former domestic partner, sibling, mother-in-law, father-in-law, son-in-law and/or daughter-in-law and/or (including any adoptive relationship), any trust, partnership or other bona fide estate-planning vehicle the only beneficiaries of which are any of the foregoing individuals, such individual's estate (or an executor or administrator acting on its behalf), heirs or legatees or any private foundation or fund that is controlled by any of the foregoing individuals or any donor-advised fund of which any such individual is the donor.

"Increase Effective Date" has the meaning assigned to such term in Section 2.08(d).

"Incurrence-Based Amounts" has the meaning assigned to such term in Section 1.10(c).

"Indebtedness" as applied to any Person means, without duplication:

(a)    all indebtedness for borrowed money;

(b)    that portion of obligations with respect to Capital Leases to the extent recorded as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(c)    all obligations of such Person evidenced by bonds, debentures, notes or similar instruments to the extent the same would appear as a liability on a balance sheet (excluding the footnotes thereto) of such Person prepared in accordance with GAAP;

(d)    any obligation of such Person owed for all or any part of the deferred purchase price of property or services (excluding (i) any earn out obligation or purchase price adjustment until such obligation (A) becomes a liability on the statement of financial position or balance sheet (excluding the footnotes thereto) in accordance with GAAP and (B) has not been paid within 30 days after becoming due and payable, (ii) any such obligations incurred under ERISA, (iii) accrued expenses and trade accounts payable in the ordinary course of business (including on an inter-company basis) and (iv) liabilities associated with customer prepayments and deposits), which purchase price is (A) due more than six months from the date of incurrence of the obligation in respect thereof or (B) evidenced by a note or similar written instrument);

(e)    all Indebtedness of others secured by any Lien on any asset owned or held by such Person regardless of whether the Indebtedness secured thereby have been assumed by such Person or is non-recourse to the credit of such Person;

(f)    the face amount of any letter of credit issued for the account of such Person or as to which such Person is otherwise liable for reimbursement of drawings;

(g)   the Guarantee by such Person of the Indebtedness of another;

(h)   all obligations of such Person in respect of any Disqualified Capital Stock; and

(i)   all net obligations of such Person in respect of any Derivative Transaction, including any Hedge Agreement, whether or not entered into for hedging or speculative purposes;

provided that (i) in no event shall obligations under any Derivative Transaction be deemed "Indebtedness" for any calculation of the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio, the Fixed Charge Coverage Ratio or any other financial ratio under this Agreement, and (ii) the amount of Indebtedness of any Person for purposes of clause (e) that is non-recourse to such Person with the only recourse of the holder of the Lien being to the assets to secure such amounts shall be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any third person (including any partnership in which such Person is a general partner and any unincorporated joint venture in which such Person is a joint venture) to the extent such Person would be liable therefor under applicable Requirements of Law or any agreement or instrument by virtue of such Person's ownership interest in such Person, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor; provided that notwithstanding anything herein to the contrary, the term "Indebtedness" shall not include, and shall be calculated without giving effect to, (x) the effects of Accounting Standards Codification Topic 815 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose hereunder as a result of accounting for any embedded derivatives created by the terms of such Indebtedness (it being understood that any such amounts that would have constituted Indebtedness hereunder but for the application of this proviso shall not be deemed an incurrence of Indebtedness hereunder) and (y) the effects of Statement of Financial Accounting Standards No. 133 and related interpretations to the extent such effects would otherwise increase or decrease an amount of Indebtedness for any purpose under this Agreement as a result of accounting for any embedded derivative created by the terms of such Indebtedness (it being understood that any such amounts that would have constituted Indebtedness under this Agreement but for the application of this sentence shall not be deemed to be an incurrence of Indebtedness under this Agreement).

"Indemnified Taxes" means all Taxes, other than Excluded Taxes or Other Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

"Information" has the meaning assigned to such term in Section 3.11(a).

"Insolvency Proceeding" means any proceeding commenced by or against any Person under any provision of the Bankruptcy Code or under any other Debtor Relief Law, assignments for the benefit of creditors, formal or informal moratoria, compositions, extensions generally with creditors, or proceedings seeking reorganization, arrangement, or other similar relief.

"Intellectual Property Security Agreement" means any agreement, or a supplement thereto, executed on or after the Closing Date confirming or effecting the grant of any Lien on IP Rights owned by any Loan Party to the Administrative Agent, for the benefit of the Secured Parties, in accordance with this Agreement and the Security Agreement, including an Intellectual Property Security Agreement substantially in the form of Exhibit C.

"Intercompany Note" means a promissory note substantially in the form of Exhibit F.

"Intercreditor Agreements" means the ABL Intercreditor Agreement and any Acceptable Intercreditor Agreement.

"Interest Coverage Ratio" means, as of any date of determination, the ratio of (a) Consolidated Adjusted EBITDA for the most recently ended Test Period to (b) Ratio Interest Expense for such Test Period, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"Interest Election Request" means a request by the relevant Borrower in the form of Exhibit B-2 or another form reasonably acceptable to the Administrative Agent to convert or continue a Borrowing in accordance with Section 2.13.

"Interest Period" means, with respect to any SOFR Loan, a period commencing on the date of the making of such SOFR Loan (or the continuation of a SOFR Loan or the conversion of a ABR Loan to a SOFR Loan) and ending 1, 3 or 6 months thereafter; provided, that (a) interest shall accrue at the applicable rate based upon Adjusted Term SOFR from and including the first day of each Interest Period to, but excluding, the day on which any Interest Period expires, (b) any Interest Period that would end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (c) with respect to an Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period), the Interest Period shall end on the last Business Day of the calendar month that is 1, 3 or 6 months after the date on which the Interest Period began, as applicable, (d) Borrowers may not elect an Interest Period which will end after the Maturity Date and (e) no tenor that has been removed from this definition pursuant to Section 2.14(b) shall be available for specification in any Borrowing Request or conversion or continuation notice.

"Inventory" has the meaning assigned to such term in the UCC.

"Inventory Report" means (a) a perpetual inventory report or (b) with respect to Inventory held by a third-party, such other inventory report that includes the price, quantity, item description and location of such Inventory so long as under this clause (b) with respect to each location, (i) title to such Inventory has transferred to a Loan Party, (ii) such Inventory is segregated from any other inventory maintained by such third-party and easily identifiable as the Inventory of a Loan Party and (iii) such third-party has delivered to Administrative Agent a Collateral Access Agreement as to the Inventory at such location.

"Investment" means (a) any purchase or other acquisition by the Top Borrower or any of its Restricted Subsidiaries of any of the Securities of any other Person (other than any Loan Party), (b) the acquisition by purchase or otherwise (other than any purchase or other acquisition of inventory, materials, supplies and/or equipment in the ordinary course of business) of all or a substantial portion of the business, property or fixed assets of any other Person or any division or line of business or other business unit of any other Person and (c) any loan, advance (other than any advance to any current or former employee, officer, director, member of management, manager, consultant or independent contractor of the Top Borrower, any Restricted Subsidiary, or any Parent Company for moving, entertainment and travel expenses, drawing accounts and similar expenditures in the ordinary course of business) or capital contribution by the Top Borrower or any of its Restricted Subsidiaries to any other Person. Subject to Section 5.10, the amount of any Investment shall be the original cost of such Investment, plus the cost of any addition thereto that otherwise constitutes an Investment, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect thereto, but giving effect to any repayments of principal in the case of any Investment in the form of a loan and any return of capital or return on Investment in the case of

any equity Investment (whether as a distribution, dividend, redemption or sale but not in excess of the amount of the relevant initial Investment).

"Investors" means the investors that, directly or indirectly, beneficially own Capital Stock in the Top Borrower on the Closing Date.

"IP Rights" has the meaning assigned to such term in Section 3.05(c).

"IP Separation Transaction" means (a) any Disposition by the Top Borrower or any Restricted Subsidiary of any Material Intellectual Property to any Subsidiary that is not a Loan Party (other than any non-exclusive licenses for legitimate business purposes) and/or (b) any Investment by the Top Borrower or any Restricted Subsidiary in the form of a contribution of Material Intellectual Property to any Subsidiary that is not a Loan Party and/or (c) the designation of a Subsidiary that owns or licenses Material Intellectual Property as an Unrestricted Subsidiary and/or (d) a transaction that results in a Subsidiary that owns Material Intellectual Property being an Excluded Subsidiary.

"IRS" means the U.S. Internal Revenue Service.

"Issuing Bank" means Wells Fargo or such other Issuing Bank designated by the Administrative Agent, in each case in its capacity as an issuer of Letters of Credit hereunder and acceptable to the Top Borrower.

"Joinder Agreement" means a Joinder Agreement substantially in the form of Exhibit K or such other form that is reasonably satisfactory to the Administrative Agent and the Top Borrower.

"Junior Indebtedness" means any Indebtedness (other than Indebtedness among Holdings, the Top Borrower and/or its subsidiaries) of the Top Borrower or any of its Restricted Subsidiaries that is either expressly subordinated in right of payment to the Obligations or is unsecured with an individual outstanding principal amount in excess of the Threshold Amount.

"Junior Lien Indebtedness" means any Indebtedness (other than Indebtedness among Holdings, the Top Borrower and/or its subsidiaries) that is secured by a security interest on the ABL Priority Collateral that is expressly junior or subordinated to the Lien securing the Revolving Facility with respect to the ABL Priority Collateral, with an individual outstanding principal amount in excess of the Threshold Amount. For the avoidance of doubt, Indebtedness outstanding under the Term Loan Agreement that is secured by a Lien that is junior to the Liens securing the Revolving Facility is not Junior Lien Indebtedness.

"Landlord Lien" means any Lien of a landlord, warehousemen or bailee on any Loan Party's property, granted by statute or otherwise that is prior to the Lien securing the Secured Obligations.

"Landlord Lien State" means any state of the U.S. and the District of Columbia in which, at any time, a landlord's claim for rent or the claims of the owner of a warehouse or other storage facility for rent, fees or other charges has priority by operation of law over the Lien of the Administrative Agent in any of the Collateral consisting of Eligible Inventory and, with respect to leased locations, as notified by the Administrative Agent to the Top Borrower in writing (as of the date of this Agreement, each of Alabama, Arizona, Arkansas, the District of Columbia, Florida, Iowa, Kentucky, Louisiana, New Jersey, New Mexico, Oregon, Pennsylvania, Texas, Virginia, Washington and West Virginia is a Landlord Lien State).

"Legal Reservations" means the application of relevant Debtor Relief Laws, general principles of equity and/or principles of good faith and fair dealing.

"LC Collateral Account" has the meaning assigned to such term in Section 2.05(j).

"LC Disbursement" means a payment or disbursement made by an Issuing Bank pursuant to a Letter of Credit.

"LC Exposure" means, at any time, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit at such time and (b) the aggregate principal amount of all LC Disbursements with respect to Letters of Credit that have not yet been reimbursed at such time. The LC Exposure of any Revolving Lender at any time shall equal its Applicable Percentage of the aggregate LC Exposure at such time.

"LLC Division" has the meaning assigned to such term in Section 1.12.

"Lender" means each financial institution listed on Schedule 1.01(a), and shall include Issuing Bank and the Swing Lender, and shall also include any other Person that becomes a "Lender" hereunder.

"Lender Group Expenses" has the meaning assigned to such term in Section 9.03.

"Letter of Credit" means any Standby Letter of Credit or, with the consent of the applicable Issuing Bank, Commercial Letter of Credit, in each case, issued (or, in the case of a Rollover Letter of Credit, deemed to be issued) for the account of any Borrower pursuant to Section 2.05(a)(i).

"Letter of Credit Reimbursement Loan" has the meaning assigned to such term in Section 2.05(e)(i).

"Letter of Credit Request" means any request by any Borrower for a Letter of Credit in accordance with Section 2.05 and substantially in the form attached hereto as Exhibit E or such other form that is reasonably acceptable to the relevant Issuing Bank and such Borrower.

"Letter of Credit Sublimit" means $30,000,000.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any Capital Lease having substantially the same economic effect as any of the foregoing), in each case, in the nature of security; provided that in no event shall an operating lease in and of itself be deemed to constitute a Lien.

"Loan" means any Revolving Loan, Swing Loan, Overadvance and Protective Advance.

"Loan Account" has the meaning assigned to such term in Section 2.10(d).

"Loan Cap" means, at any time of determination, the lower of (a) the Borrowing Base and (b) the Aggregate Commitments, in each case, at such time.

"Loan Documents" means this Agreement, any Promissory Note, the Loan Guaranty, the Collateral Documents, the ABL Intercreditor Agreement, each other Intercreditor Agreement to which the Borrowers are a party, and any other document or instrument designated by the Top Borrower and the Administrative Agent as a "Loan Document." Any reference in this Agreement or any other Loan Document to any Loan Document shall include all appendices, exhibits or schedules thereto.

"Loan Guarantor" means (a) Holdings and (b) any Subsidiary Guarantor.

"Loan Guaranty" means the ABL Loan Guaranty Agreement, substantially in the form of Exhibit I, executed by each Loan Guarantor, each Borrower and the Administrative Agent for the benefit of the Secured Parties, as supplemented in accordance with the terms of Section 5.12.

"Loan Parties" means Holdings, each Borrower and each Subsidiary Guarantor.

"Lockbox" has the meaning assigned to such term in Section 5.13(a).

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, financial condition or results of operations, in each case, of the Top Borrower and its Restricted Subsidiaries, taken as a whole, (b) the rights and remedies (taken as a whole) of the Administrative Agent under the applicable Loan Documents or (c) the ability of the Loan Parties (taken as a whole) to perform their payment obligations under the applicable Loan Documents.

"Material Debt Instrument" means any physical instrument evidencing any Indebtedness for borrowed money which is required to be pledged and delivered to the Administrative Agent (or its bailee) pursuant to the Security Agreement.

"Material Deposit Account" means any Deposit Account of a Loan Party other than any Deposit Account that constitutes an Excluded Account.

"Material Intellectual Property" means any IP Rights of any Loan Party that are material to the business or operations of any Loan Party (including, without limitation, the collection of any Accounts) or the sale or other Disposition of ABL Priority Collateral.

"Material Real Estate Asset" means (a) on the Closing Date, each Real Estate Asset listed on Schedule 1.01(c) and (b) any "fee-owned" Real Estate Asset acquired by any Loan Party after the Closing Date having a fair market value (as reasonably determined by the Top Borrower after taking into account any liabilities with respect thereto that impact such fair market value) in excess of $15,000,000 as of the date of acquisition thereof.

"Maturity Date" means the four-year anniversary of the Closing Date.

"Maximum Rate" has the meaning assigned to such term in Section 9.19.

"Moody's" means Moody's Investors Service, Inc.

"Monthly Payment Date" means the first day of each calendar month.

"Mortgage" means any mortgage, deed of trust or other agreement which conveys or evidences a Lien in favor of the Administrative Agent, for the benefit of the Administrative Agent and the relevant Secured Parties, on any Material Real Estate Asset constituting Collateral, which shall contain such terms as may be necessary under applicable local Requirements of Law to perfect a Lien on the applicable Material Real Estate Asset.

"Mortgage Policies" has the meaning assigned to such term in the definition of Collateral and Guarantee Requirement.

"<u>Multiemployer Plan</u>" means any employee benefit plan which is a "multiemployer plan" as defined in Section 3(37) of ERISA that is subject to the provisions of Title IV of ERISA, and in respect of which the Top Borrower or any of its Restricted Subsidiaries, or any of their respective ERISA Affiliates, makes or is obligated to make contributions or with respect to which any of them has any ongoing obligation or liability, contingent or otherwise.

"<u>National Bedding</u>" has the meaning assigned to such term in the preamble.

"<u>Net Proceeds</u>" means (a) with respect to any Disposition, the Cash proceeds (including Cash Equivalents and Cash proceeds subsequently received (as and when received) in respect of non-cash consideration initially received), net of (i) selling costs and out-of-pocket expenses (including reasonable broker's fees or commissions, legal fees, accountants' fees, investment banking fees, survey costs, title insurance premiums, and related search and recording charges, transfer taxes, deed or mortgage recording taxes, other customary expenses and brokerage, consultant and other customary fees actually incurred in connection therewith and transfer and similar Taxes and the Top Borrower's good faith estimate of income Taxes paid or payable (including pursuant to any Tax sharing arrangement and/or any intercompany distribution) in connection with such Disposition), (ii) amounts provided as a reserve in accordance with GAAP against any liabilities under any indemnification obligation or purchase price adjustment associated with such Disposition (<u>provided</u> that to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Proceeds), (iii) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness (excluding Indebtedness under any Term Loan Facility and any Indebtedness secured by a Lien on the Term Loan Priority Collateral that is *pari passu* with or expressly subordinated to the Lien on the Term Loan Priority Collateral securing any "Secured Obligation" (as defined in the Term Loan Agreement)) which is secured by the asset sold in such Disposition and which is required to be repaid or otherwise comes due or would be in default and is repaid (other than any such Indebtedness that is assumed by the purchaser of such asset), (iv) Cash escrows (until released from escrow to the Top Borrower or any of its Restricted Subsidiaries) from the sale price for such Disposition and (v) in the case of any Disposition by any non-Wholly-Owned Subsidiary, the pro rata portion of the Net Proceeds thereof (calculated without regard to this <u>clause (v)</u>) attributable to any minority interest and not available for distribution to or for the account of the Top Borrower or a Wholly-Owned Subsidiary as a result thereof; and (b) with respect to any issuance or incurrence of Indebtedness or Capital Stock, the Cash proceeds thereof, net of all Taxes and customary fees, commissions, costs, underwriting discounts and other fees and expenses incurred in connection therewith.

"<u>Net Recovery Percentage</u>" means, with respect to Inventory of any Person, the orderly liquidation value thereof, net of all reasonable costs and expenses of liquidation thereof and expressed as a percentage of Cost of such Inventory, as based upon the most recent Inventory appraisal conducted in accordance with this Agreement and in form and substance acceptable to the Administrative Agent.

"<u>Non-Loan Party Debt Cap</u>" has the meaning assigned to such term in <u>Section 6.01(w)</u>.

"<u>Non-U.S. Loan Party</u>" means any other Loan Party other than a U.S. Loan Party.

"<u>NYFRB</u>" means the Federal Reserve Bank of New York.

"<u>Obligations</u>" means all loans (including the Revolving Loans (inclusive of Overadvances, Protective Advances and Swing Loans)), debts, principal, interest (including any interest that accrues after the commencement of an Insolvency Proceeding, regardless of whether allowed or allowable in whole or in part as a claim in any such Insolvency Proceeding) and guaranties, and whether direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, and including all interest not paid

when due and all other expenses or other amounts that any Loan Party is required to pay or reimburse by the Loan Documents or by law or otherwise in connection with the Loan Documents.

"Obligations Derivative Instrument" has the meaning assigned to such term in Section 9.05(d)(ii).

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Organizational Documents" means (a) with respect to any corporation, its certificate or articles of incorporation or organization and its by-laws, (b) with respect to any limited partnership, its certificate of limited partnership and its partnership agreement, (c) with respect to any general partnership, its partnership agreement, (d) with respect to any limited liability company, its articles of organization or certificate of formation, and its operating agreement, and (e) with respect to any other form of entity, such other organizational documents required by local Requirements of Law or customary under such jurisdiction to document the formation and governance principles of such type of entity. In the event that any term or condition of this Agreement or any other Loan Document requires any Organizational Document to be certified by a secretary of state or similar governmental official, the reference to any such "Organizational Document" shall only be to a document of a type customarily certified by such governmental official.

"Other Connection Taxes" means, with respect to any Lender or the Administrative Agent, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising solely from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or other excise or property Taxes arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, but excluding (i) any Excluded Taxes, and (ii) any such Taxes that are Other Connection Taxes imposed with respect to an assignment or participation (other than an assignment made pursuant to Section 2.19).

"Outstanding Amount" means (a) with respect to any Revolving Loan on any date, the amount of the aggregate outstanding principal amount thereof after giving effect to any borrowing and/or prepayment or repayment of such Revolving Loan occurring on such date, (b) with respect to any Letter of Credit, the aggregate amount available to be drawn under such Letter of Credit after giving effect to any change in the aggregate amount available to be drawn under such Letter of Credit or the issuance or expiry of such Letter of Credit, including as a result of any LC Disbursement and (c) with respect to any LC Disbursement on any date, the aggregate outstanding amount of such LC Disbursement on such date after giving effect to any disbursement with respect to any Letter of Credit occurring on such date and any other change in the aggregate amount of such LC Disbursement as of such date, including as a result of any reimbursement by any Borrower of such LC Disbursement.

"Overadvance" has the meaning assigned to such term in Section 2.04(a).

"Parent Company" means (a) Holdings and (b) any other Person of which the Top Borrower is an indirect Wholly-Owned Subsidiary.

"Participant" has the meaning assigned to such term in Section 9.05(c).

"Participant Register" has the meaning assigned to such term in Section 9.05(c).

"Patent" means the following: (a) any and all patents and patent applications; (b) all inventions described and claimed therein; (c) all reissues, divisions, continuations, renewals, extensions and continuations in part thereof; (d) all income, royalties, damages, claims, and payments now or hereafter due or payable under and with respect thereto, including, without limitation, damages and payments for past and future infringements thereof; (e) all rights to sue for past, present, and future infringements thereof; and (f) all rights corresponding to any of the foregoing.

"Payment Conditions" means, at the time of determination with respect to any specified transaction or payment the following:

(a)    as of the date of any such transaction or payment, and after giving effect thereto, no Event of Default shall have occurred and be continuing,

(b)    either:

(i)    as of the date of any such transaction or payment, and after giving effect thereto, (A) using the most recent calculation of the Borrowing Base, in each case immediately prior to any such transaction or payment, on a pro forma basis the Excess Availability for the immediately preceding thirty (30) consecutive day period shall have been not less than the greater of (1) fifteen percent (15.0%) of the Loan Cap or (2) $12,500,000 (or, in the case of an acquisition or other investment, the greater of (1) twelve and one-half percent (12.5%) of the Loan Cap or (2) $10,000,000, (B) on the date of such transaction or payment, and after giving effect thereto, using the most recent calculation of the Borrowing Base immediately prior to any such transaction or payment, on a pro forma basis the Excess Availability shall be not less than such amount, and (C) the Fixed Charge Coverage Ratio, on a pro forma basis, after giving effect to the transaction or payment based on the most recent financial statement received by Administrative Agent prior to the date thereof for the four (4) Fiscal Quarter period prior thereto, shall be not less than 1.00 to 1.00; or

(ii)    as of the date of any such transaction or payment, and after giving effect thereto, (A) using the most recent calculation of the Borrowing Base, in each case immediately prior to any such transaction or payment, on a pro forma basis the Adjusted Excess Availability for the immediately preceding thirty (30) consecutive day period shall have been not less than the greater of (1) twenty percent (20.0%) of the Loan Cap or (2) $17,500,000 (or in the case of an acquisition or other investment, the greater of (1) seventeen and one-half percent (17.50%) of the Loan Cap or (2) $15,000,000) and (B) on the date of such transaction or payment, using the most recent calculation of the Borrowing Base immediately prior to any such transaction or payment, on a pro forma basis the A Excess Availability shall be not less than such amount, and

(c)    Administrative Agent shall have received a certificate of a Responsible Officer of Top Borrower certifying as to compliance with the preceding clauses and demonstrating (in reasonable detail) the calculations required thereby.

"Payment Recipient" has the meaning assigned to such term in Section 9.29.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Plan" means any employee pension benefit plan, as defined in Section 3(2) of ERISA (other than a Multiemployer Plan), that is subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, which the Top Borrower or any of its Restricted Subsidiaries, or any of their respective ERISA Affiliates, maintains or contributes to or has an obligation to contribute to, or otherwise has any liability, contingent or otherwise.

"<u>Periodic Term SOFR Determination Day</u>" has the meaning assigned to such term in the definition of "Term SOFR Rate".

"<u>Perfection Certificate</u>" means a certificate substantially in the form of <u>Exhibit J</u>.

"<u>Perfection Requirements</u>" means (a) with respect to any U.S. Loan Party, the filing of appropriate financing statements with the office of the Secretary of State or other appropriate office of the location (as determined by Section 9-307 of the UCC) of each U.S. Loan Party, the filing of Intellectual Property Security Agreements or other appropriate instruments or notices with the U.S. Patent and Trademark Office and the U.S. Copyright Office, the proper recording or filing, as applicable, of Mortgages and fixture filings with respect to any Material Real Estate Asset constituting Collateral, in each case in favor of the Administrative Agent for the benefit of the Secured Parties, the delivery to the Administrative Agent of any stock certificate, instrument, tangible chattel paper or promissory note, together with instruments of transfer executed in blank, in each case, to the extent required by the applicable Loan Documents and entry into Blocked Account Agreements with respect to each Blocked Account and (b) with respect to any Non-U.S. Loan Party, any recording, filing, registration, notification or other action required to be taken in the applicable jurisdiction, in each case, to the extent required by the applicable Loan Documents.

"<u>Permitted Acquisition</u>" means any acquisition made by the Top Borrower or any of its Restricted Subsidiaries, whether by purchase, merger or otherwise, of all or substantially all of the assets of, or any business line, unit or division or product line (including research and development and related assets in respect of any product) of, any Person or of a majority of the outstanding Capital Stock of any Person that is engaged in a Similar Business (and, in any event, including any Investment in (x) any Restricted Subsidiary the effect of which is to increase the Top Borrower's or any Restricted Subsidiary's equity ownership in such Restricted Subsidiary or (y) any joint venture for the purpose of increasing the Top Borrower's or its relevant Restricted Subsidiary's ownership interest in such joint venture) if (A) such Person becomes a Restricted Subsidiary or (B) such Person, in one transaction or a series of related transaction, is amalgamated, merged or consolidated with or into, or transfers or conveys substantially all of its assets (or such division, business unit or product line) to, or is liquidated into, the Top Borrower or any Restricted Subsidiary as a result of such Investment; provided, that, (x) the proposed acquisition is consensual; and (y) as of the date of the consummation of such acquisition and after giving effect thereto, each of the Payment Conditions is satisfied.

"<u>Permitted Discretion</u>" means the reasonable (from the perspective of a secured asset-based lender) credit judgment exercised in good faith in accordance with customary business practices of the Administrative Agent for comparable asset-based lending transactions.

"<u>Permitted Encumbrances</u>" means Liens permitted to exist as set forth in <u>Section 6.02(b)</u>, <u>Section 6.02(c)</u> and <u>Section 6.02(i)</u>.

"<u>Permitted Liens</u>" means Liens permitted pursuant to <u>Section 6.02</u>.

"<u>Person</u>" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or any other entity.

"<u>Petition Date</u>" has the meaning assigned to such term in the Recitals.

"<u>Plan</u>" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) maintained by the Top Borrower and/or any Restricted Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any of its ERISA Affiliates, other than any Multiemployer Plan.

"Plan Effective Date" means the date the Plan of Reorganization becomes effective pursuant to the Confirmation Order.

"Plan of Reorganization" has the meaning assigned to such term in the Recitals.

"Platform" has the meaning assigned to such term in Section 9.01(d).

"Primary Obligor" has the meaning assigned to such term in the definition of "Guarantee".

"Pro Forma Basis" or "pro forma effect" means, with respect to any determination of the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio, the Fixed Charge Coverage Ratio, Consolidated Adjusted EBITDA or Consolidated Total Assets (including component definitions thereof), that:

(a)    (i) in the case of (A) any Disposition of all or substantially all of the Capital Stock of any Restricted Subsidiary or any division and/or product line of the Top Borrower or any Restricted Subsidiary, (B) any designation of a Restricted Subsidiary as an Unrestricted Subsidiary or (C) the implementation of any Cost Saving Initiative, income statement items (whether positive or negative and including any Expected Cost Savings) attributable to the property or Person subject to such Subject Transaction, shall be excluded as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made and (ii) in the case of any Permitted Acquisition, Investment and/or designation of an Unrestricted Subsidiary as a Restricted Subsidiary described in the definition of the term "Subject Transaction", income statement items (whether positive or negative) attributable to the property or Person subject to such Subject Transaction shall be included as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made,

(b)    any retirement or repayment of Indebtedness shall be deemed to have occurred as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made,

(c)    any Indebtedness incurred by the Top Borrower or any of its Restricted Subsidiaries in connection therewith shall be deemed to have occurred as of the first day of the applicable Test Period with respect to any test or covenant for which the relevant determination is being made; provided that, (x) if such Indebtedness has a floating or formula rate, such Indebtedness shall have an implied rate of interest for the applicable Test Period for purposes of this definition determined by utilizing the rate that is or would be in effect with respect to such Indebtedness at the relevant date of determination (taking into account any interest hedging arrangements applicable to such Indebtedness), (y) interest on any obligation with respect to any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by a Responsible Officer of the Top Borrower to be the rate of interest implicit in such obligation in accordance with GAAP and (z) interest on any Indebtedness that may optionally be determined at an interest rate based upon a factor of a prime or similar rate, a eurocurrency interbank offered rate or other rate shall be determined to have been based upon the rate actually chosen, or if none, then based upon such optional rate chosen by the Top Borrower,

(d)    the acquisition of any asset included in calculating Consolidated Total Assets (including the amount of Cash or Cash Equivalents), whether pursuant to any Subject Transaction or any Person becoming a subsidiary or merging, amalgamating or consolidating with or into the Top Borrower or any of its subsidiaries, or the Disposition of any asset included in calculating Consolidated Total Assets described in the definition of "Subject Transaction" shall be deemed to have occurred as of the last day of the applicable Test Period with respect to any test or covenant for which such calculation is being made; and

(e)    each other Subject Transaction shall be deemed to have occurred as of the first day of the applicable Test Period (or, in the case of Consolidated Total Assets, as of the last day of such Test Period) with respect to any test or covenant for which such calculation is being made.

"Projections" means the financial projections of the Top Borrower and its subsidiaries provided to the Administrative Agent on or prior to the Closing Date.

"Promissory Note" means a promissory note of the Borrowers payable to any Lender or its registered assigns, in substantially the form of Exhibit L, evidencing the aggregate outstanding principal amount of Revolving Loans of the Borrowers to such Lender resulting from the Revolving Loans made by such Lender.

"Protective Advance" has the meaning assigned to such term in Section 2.06(a).

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Company Costs" means Charges associated with, or in anticipation of, or preparation for, compliance with the requirements of the Sarbanes-Oxley Act of 2002 and the rules and regulations promulgated in connection therewith and Charges relating to compliance with the provisions of the Securities Act and the Exchange Act (and, in each case, similar Requirements of Law under other jurisdictions), as applicable to companies with equity or debt securities held by the public, the rules of national securities exchange companies with listed equity or debt securities, directors' or managers' compensation, fees and expense reimbursement, Charges relating to investor relations, shareholder meetings and reports to shareholders or debtholders, directors' and officers' insurance and other executive costs, legal and other professional fees (including auditors' and accounts' fees), listing fees and filing fees associated with being a public company.

"Public Lender" has the meaning assigned to such term in Section 9.01(d).

"QC Blocked Account" means a Deposit Account of the Top Borrower at Wells Fargo that is subject to a first priority perfected Lien in favor of the Administrative Agent free and clear of any pledge or other Lien (other than in favor of Administrative Agent and other than in favor of Wells Fargo as the depository bank for its customary fees and charges) and a Blocked Account Agreement pursuant to which the Administrative Agent is granted sole dominion and control over the applicable account.

"QFC" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"QFC Credit Support" has the meaning assigned to such term in Section 9.28(a).

"Qualified Capital Stock" of any Person means any Capital Stock of such Person that is not Disqualified Capital Stock.

"Qualified Cash" means, at any time of determination, the amount equal to the lesser of (a) $15,000,000 and (b) the aggregate amount of unrestricted Cash of the Top Borrower, which is (i) available for use by Top Borrower, without condition or restriction (other than in favor of Administrative Agent), (ii) free and clear of any pledge or other Lien (other than in favor of Administrative Agent and Wells Fargo as the depository bank for its customary fees and charges), (iii) subject to the first priority perfected security interest of Administrative Agent (subject to the liens of Wells Fargo as depository bank for its customary fees and charges) and (iv) has been deposited in, and is credited to, the QC Blocked Account at such time.

"Qualifying IPO" means (i) the issuance and sale by the Top Borrower or any Parent Company of its common Capital Stock in an underwritten primary public offering (other than a public offering pursuant to a registration statement on Form S-8) pursuant to an effective registration statement filed with the SEC in accordance with the Securities Act (whether alone or in connection with a secondary public offering), (ii) any merger by the Top Borrower or any Parent Company with a publicly traded entity and/or (iii) any other transaction or series of related transactions that results in any of the common Capital Stock of the Top Borrower or any Parent Company (and/or any permitted successor thereto) being publicly traded on any U.S. national securities exchange or over-the-counter market or analogous public exchange in any other jurisdiction.

"Quarterly Average Excess Availability" means, for any calendar quarter commencing on the first day of the quarter of such period, the daily average of the Excess Availability for such period.

"Quarterly Payment Date" means the last day of each of March, June, September and December.

"Ratio Interest Expense" means, with respect to any Person for any period, (a) the sum of consolidated total interest expense of such Person and its Restricted Subsidiaries for such period, whether paid or accrued and whether or not capitalized, (i) including (A) the interest component of any payment under any Capital Lease (regardless of whether accounted for as interest expense under GAAP), (B) amortization of original issue discount resulting from the issuance of Indebtedness at less than par, (C) any commission, discount and/or other fee or charge owed with respect to any letter of credit and/or bankers' acceptance and (D) any net payment arising under any interest rate Hedge Agreement with respect to Indebtedness and (ii) excluding (A) amortization of deferred financing fees, debt issuance costs, discounted liabilities, commissions, fees and expenses, (B) any expense arising from any bridge, commitment and/or other financing fee (including fees and expenses associated with the Transactions and annual agency fees), (C) any expense resulting from the discounting of Indebtedness in connection with the application of recapitalization accounting or, if applicable, acquisition accounting, (D) any fee or expense associated with any Disposition, acquisition, Investment, issuance of Capital Stock or Indebtedness (in each case, whether or not consummated), (E) any cost associated with obtaining, or breakage costs in respect of, any Hedge Agreement or other derivative instrument other than any interest rate Hedge Agreement or interest rate derivative instrument with respect to Indebtedness, (F) any penalty and/or interest relating to Taxes and (G) for the avoidance of doubt, any non-cash interest expense attributable to any movement in the mark to market valuation of any obligation under any Hedge Agreement or any other derivative instrument and/or any payment obligation arising under any Hedge Agreement or derivative instrument other than any interest rate Hedge Agreement or interest rate derivative instrument with respect to Indebtedness minus (b) interest income for such period. For purposes of this definition, interest in respect of any Capital Lease shall be deemed to accrue at an interest rate reasonably determined by such Person to be the rate of interest implicit in such Capital Lease in accordance with GAAP.

Notwithstanding anything in this Agreement to the contrary, (i) for the four fiscal quarters ending on or about [●], Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about [●], on the basis of a 365 day year for the actual days elapsed, (ii) for the four fiscal quarters ending or about [●], Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about [●], on the basis of a 365 day year for the actual days elapsed, (iii) for the four fiscal quarters ending on or about [●], Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about [●], on the basis of a 365 day year for the actual days elapsed and (iv) for the four fiscal quarters ending on or about [●], Ratio Interest Expense of the Top Borrower and its Restricted Subsidiaries shall be annualized for the period starting with the Closing Date and ending on or about [●], on the basis of a 365 day year for the actual days elapsed.

"<u>Real Estate Asset</u>" means, at any time of determination, all right, title and interest (fee, leasehold or otherwise) of any U.S. Loan Party in and to real property (including, but not limited to, land, improvements and fixtures thereon).

"<u>Refinancing Indebtedness</u>" has the meaning assigned to such term in Section 6.01(p).

"<u>Refunding Capital Stocks</u>" has the meaning assigned to such term in <u>Section 6.04(a)(viii)</u>.

"<u>Register</u>" has the meaning assigned to such term in <u>Section 9.05(b)</u>.

"<u>Relevant Governmental Body</u>" means the FRB or the NYFRB, or a committee officially endorsed or convened by the FRB or the NYFRB, or any successor thereto.

"<u>Regulation D</u>" means Regulation D of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation H</u>" means Regulation H of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation U</u>" means Regulation U of the FRB as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Related Funds</u>" means with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the respective directors, managers, officers, trustees, employees, partners, agents, advisors and other representatives of such Person and such Person's Affiliates.

"<u>Release</u>" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the Environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"<u>Rent Reserve</u>" means, with respect to any Inventory located at a Specified Location, an amount equal to up to three month's rent for all of the Loan Parties' Specified Locations that are leased real property or the amount that may be payable for up to three months for any Specified Location that is a third-party warehouse or other storage facility; provided, that no such reserve may be imposed (a) prior to the date that is 120 days after the Closing Date and (b) with respect to any Specified Location with respect to which the Administrative Agent shall have received a Collateral Access Agreement (it being understood and agreed that upon receipt of any such Collateral Access Agreement with respect to any such Specified Location, any Rent Reserve shall be immediately released).

"<u>Report</u>" means reports prepared by the Administrative Agent or an Approved Consultant showing the results of appraisals, field examinations or Collateral audits pertaining to the Loan Parties' assets of the type that could be included in the Borrowing Base from information furnished by or on behalf of the Loan Parties, after the Administrative Agent has exercised its rights of inspection pursuant to this Agreement, which Reports may be distributed to the Lenders by the Administrative Agent, subject to the provisions of <u>Section 9.13</u>.

"Reportable Event" means, with respect to any Pension Plan or Multiemployer Plan, any of the events described in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period is waived under PBGC Reg. Section 4043.

"Representatives" has the meaning assigned to such term in Section 9.13.

"Required Minimum Balance" has the meaning set forth in Section 5.13(a).

"Required Lenders" means, at any time, Lenders having Revolving Credit Exposure and unused Commitments representing more than 50% of the sum of the total Revolving Credit Exposure and such unused Commitments of all Lenders at such time; provided that the Revolving Credit Exposure and unused Commitments of any Defaulting Lender shall be disregarded in the determination of the Required Lenders at any time.

"Requirements of Law" means, with respect to any Person, collectively, the common law and all federal, state, local, foreign, multinational or international laws, statutes, codes, treaties, standards, rules and regulations, guidelines, ordinances, orders, judgments, writs, injunctions, decrees (including administrative or judicial precedents or authorities) and the interpretation or administration thereof by, and other determinations, directives, requirements or requests of any Governmental Authority, in each case whether or not having the force of law and that are applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Reserves" means, without duplication, any Rent Reserves, any Dilution Reserve, any Bank Product Reserve and any and all other reserves established by the Administrative Agent in its Permitted Discretion in accordance with and subject to Section 2.24.

"Resolution Authority" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"Responsible Officer" means, with respect to any Person, the chief executive officer, the president, the chief financial officer, the treasurer, any assistant treasurer, any executive vice president, any senior vice president, any vice president or the chief operating officer of such Person and any other individual or similar official thereof responsible for the administration of the obligations of such Person in respect of this Agreement, and, as to any document delivered on the Closing Date, shall include any secretary or assistant secretary or any other individual or similar official thereof with substantially equivalent responsibilities of a Loan Party and, solely for purposes of notices given pursuant to Article II, any other officer of the applicable Loan Party so designated in writing by the Top Borrower to the Administrative Agent. Any document delivered hereunder that is signed by a Responsible Officer of any Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party, and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Responsible Officer Certification" means, with respect to the financial statements for which such certification is required, the certification of a Responsible Officer of the Top Borrower that such financial statements fairly present, in all material respects, in accordance with GAAP, the consolidated financial condition of the Top Borrower as at the dates indicated and its consolidated income and cash flows for the periods indicated, subject to changes resulting from audit and normal year-end adjustments.

"Restricted Debt" has the meaning set forth in Section 6.04(b).

"Restricted Debt Payments" has the meaning set forth in Section 6.04(b).

"Restricted Payment" means (a) any dividend or other distribution on account of any shares of any class of the Capital Stock of the Top Borrower, except a dividend payable solely in shares of Qualified Capital Stock to the holders of such class; (b) any redemption, retirement, sinking fund or similar payment, purchase or other acquisition for value of any shares of any class of the Capital Stock of the Top Borrower and (c) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options or other rights to acquire shares of any class of the Capital Stock of the Top Borrower now or hereafter outstanding.

"Restricted Subsidiary" means, as to any Person, any subsidiary of such Person that is not an Unrestricted Subsidiary. Unless otherwise specified, "Restricted Subsidiary" shall mean any Restricted Subsidiary of the Top Borrower.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of January 23, 2023, by and among the Debtors, the Consenting Creditors, and the Consenting Equity Holders, including any exhibits attached thereto (as may be amended, supplemented or modified from time to time in accordance with the terms thereof).

"Revolving Credit Exposure" means, with respect to any Lender at any time, the aggregate Outstanding Amount at such time of all Revolving Loans of such Lender, plus the aggregate amount at such time of such Lender's LC Exposure and participation interest in Swing Loans, Protective Advances and Overadvances, in each case, attributable to its Commitment.

"Revolving Facility" means the Commitments and the Revolving Loans and other extensions of credit thereunder.

"Revolving Lender" means any Lender holding Commitments or Revolving Credit Exposure.

"Revolving Loans" means any revolving loan made on account of a Commitment and, to the extent applicable, shall include Overadvances and Protective Advances.

"Rollover Letter of Credit" means each letter of credit listed on Schedule 1.01(b).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of the McGraw-Hill Companies, Inc.

"Sale and Lease-Back Transaction" has the meaning assigned to such term in Section 6.08.

"Sanctioned Entity" means (a) a country or territory or a government of a country or territory, (b) an agency of the government of a country or territory, (c) an organization directly or indirectly controlled by a country or territory or its government, or (d) a Person resident in or determined to be resident in a country or territory, in each case of clauses (a) through (d) that is a target of Sanctions, (as of the date of this Agreement, the Crimea region of Ukraine, the so-called Donetsk People's Republic, the so-called Luhansk People's Republic, Cuba, Iran, North Korea, and Syria).

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC, OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes, including those imposed, administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) His Majesty's Treasury of the United Kingdom, and (e) any other Governmental Authority with jurisdiction over any member of Lender Group or any Loan Party or any of their respective Subsidiaries or Affiliates.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any or all of its functions.

"Secured Leverage Ratio" means the ratio, as of any date of determination, of (a) Consolidated Secured Debt as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted EBITDA for the Test Period then most recently ended, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"Secured Obligations" means all Obligations and all Bank Product Obligations; provided that, anything to the contrary contained in the foregoing notwithstanding, the Secured Obligations shall exclude any Excluded Swap Obligation.

"Secured Parties" means (a) the Lenders, (b) the Administrative Agent, (c) the Issuing Banks and (d) the Bank Product Providers.

"Securities" means any stock, shares, units, partnership interests, voting trust certificates, certificates of interest or participation in any profit-sharing agreement or arrangement, options, warrants, bonds, debentures, notes, or other evidences of indebtedness, secured or unsecured, convertible, subordinated or otherwise, or in general any instruments commonly known as "securities" or any certificates of interest, shares or participations in temporary or interim certificates for the purchase or acquisition of, or any right to subscribe to, purchase or acquire, any of the foregoing; provided that the term "Securities" shall not include any earn-out agreement or obligation or any employee bonus or other incentive compensation plan or agreement.

"Securities Act" means the Securities Act of 1933 and the rules and regulations of the SEC promulgated thereunder.

"Security Agreement" means the ABL Pledge and Security Agreement, substantially in the form of Exhibit M, among the U.S. Loan Parties and the Administrative Agent for the benefit of the Secured Parties.

"Serta" means Serta, Inc., a Delaware corporation and an indirect, non-Wholly-Owned Subsidiary of the Top Borrower.

"Settlement" has the meaning assigned to such term in Section 2.07.

"Settlement Date" has the meaning assigned to such term in Section 2.07.

"Similar Business" means any Person the majority of the revenues of which are derived from a business that would be permitted by Section 6.10 if the references to "Restricted Subsidiaries" in Section 6.10 were read to refer to such Person.

"SOFR" means a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"SOFR Administrator" means the NYFRB (or a successor administrator of the secured overnight financing rate).

"SPC" has the meaning assigned to such term in Section 9.05(e).

"Specified Default" means an Event of Default arising under Section 7.01(a), Section 7.01(c) (solely with respect to a breach of Section 5.13 or Section 6.15), Section 7.01(d) (solely with respect to any Borrowing Base Certificate or provisions relating to cash management), Section 7.01(e) (solely with respect to a breach of Section 5.01(j)(i)), Section 7.01(f) or Section 7.01(g).

"Specified Location" means any leased location, third-party warehouse or other storage facility (a) that is located in a Landlord Lien State or (b) where Inventory at such location has an aggregate value (measured at Cost) that is greater than or equal $1,000,000.

"SSB" has the meaning assigned to such term in the preamble.

"SSB Manufacturing" has the meaning assigned to such term in the preamble.

"Standby Letter of Credit" means any Letter of Credit other than any Commercial Letter of Credit.

"Subject Acquisition" means any Subject Transaction of the type referred to in clause (b) of the definition thereof.

"Subject Person" has the meaning assigned to such term in the definition of "Consolidated Net Income".

"Subject Transaction" means, with respect to any Test Period, (a) the Transactions, (b) any Permitted Acquisition or any other acquisition or similar Investment, whether by purchase, merger or otherwise, of all or substantially all of the assets of, or any business line, unit or division of, any Person or of a majority of the outstanding Capital Stock of any Person (and, in any event, including any Investment in (x) any Restricted Subsidiary the effect of which is to increase the Top Borrower's or any Restricted Subsidiary's respective equity ownership in such Restricted Subsidiary or (y) any joint venture for the purpose of increasing the Top Borrower's or its relevant Restricted Subsidiary's ownership interest in such joint venture), in each case that is permitted by this Agreement, (c) any Disposition of all or substantially all of the assets or Capital Stock of any subsidiary (or any business unit, line of business or division of the Top Borrower or a Restricted Subsidiary) not prohibited by this Agreement, (d) the designation of a Restricted Subsidiary as an Unrestricted Subsidiary or an Unrestricted Subsidiary as a Restricted Subsidiary in accordance with Section 5.10, (e) any incurrence of Indebtedness (other than revolving Indebtedness), (f) any repayment of Indebtedness, (g) any capital contribution in respect of Qualified Capital Stock or any issuance of Qualified Capital Stock, (h) the implementation of any Cost Saving Initiative and/or (i) any other event that by the terms of the Loan Documents requires pro forma compliance with a test or covenant hereunder or requires such test or covenant to be calculated on a pro forma basis.

"subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof

is at the time owned or controlled, directly or indirectly, by such Person or one or more of the other subsidiaries of such Person or a combination thereof, in each case to the extent the relevant entity's financial results are required to be included in such Person's consolidated financial statements under GAAP; provided that in determining the percentage of ownership interests of any Person controlled by another Person, no ownership interests in the nature of a "qualifying share" of the former Person shall be deemed to be outstanding. Unless otherwise specified, "subsidiary" shall mean any subsidiary of the Top Borrower.

"Subsidiary Guarantor" means (a) on the Closing Date, each subsidiary of the Top Borrower that is not a Borrower (other than any such subsidiary that is an Excluded Subsidiary on the Closing Date) and (b) thereafter, each subsidiary of the Top Borrower (or after the execution and delivery of the Holdings Joinder Agreement, each subsidiary of Holdings) that becomes a guarantor of the Secured Obligations pursuant to the terms of this Agreement, in each case, until such time as the relevant subsidiary is released from its obligations under the Loan Guaranty in accordance with the terms and provisions hereof. Notwithstanding the foregoing, the Top Borrower (or after the execution and delivery of the Holdings Joinder Agreement, each subsidiary of Holdings) may, in its sole discretion, elect to cause any Restricted Subsidiary that is not otherwise required to be a Subsidiary Guarantor to provide a Loan Guaranty by causing such Restricted Subsidiary (such Restricted Subsidiary, a "Discretionary Guarantor") to execute a Joinder Agreement, and, upon the execution of such Joinder Agreement, any such Restricted Subsidiary shall be a Loan Party and Subsidiary Guarantor hereunder for all purposes hereunder; provided that no Restricted Subsidiary may become a Discretionary Guarantor without the prior consent of the Administrative Agent.

"Successor Holdings" has the meaning assigned to such term in Section 6.14(c).

"Successor Borrower" has the meaning assigned to such term in Section 6.07(a).

"Supported QFC" has the meaning assigned to such term in Section 9.28(a).

"Super Majority Lenders" means, at any time, Lenders having Revolving Credit Exposure and unused Commitments representing more than 66-2/3% of the sum of the aggregate Revolving Credit Exposure and such unused Commitments of all Lenders at such time; provided that the Revolving Credit Exposure and unused Commitments of any Defaulting Lender shall be disregarded in the determination of the Super Majority Lenders at any time.

"Swap Obligations" means, with respect to any Loan Guarantor (or any Borrower with respect to its guarantee of the Obligations of any other Borrower under the Loan Guaranty), any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of Section 1a(47) of the Commodity Exchange Act.

"Swing Lender" means Wells Fargo or any other Lender that, at the request of Borrowers and with the consent of Administrative Agent agrees, in such Lender's sole discretion, to become the Swing Lender under Section 2.03(b).

"Swing Loan" has the meaning assigned to such term in Section 2.03(b).

"Swing Loan Exposure" means, as of any date of determination with respect to any Lender, such Lender's Applicable Percentage of the Swing Loans on such date.

"Tax and Trust Funds" means Cash, Cash Equivalents or other assets that are comprised solely of (a) funds used for payroll and payroll Taxes and other employee benefit payments to or for the benefit of the employees of Holdings, the Top Borrower and/or any subsidiary, (b) Taxes required to be collected,

remitted or withheld (including, federal and state withholding taxes (including the employer's share thereof)) and (c) other funds which any Loan Party holds in trust or as an escrow or fiduciary for another Person which is not a Loan Party in the ordinary course of business.

"Taxes" means all present and future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan Agreement" means the Term Loan Credit Agreement, dated as of the Closing Date, among, *inter alios*, the Borrowers, [●] as administrative agent and collateral agent and the lenders from time to time party thereto.

"Term Loan Documents" shall have the meaning of the term "Loan Documents" set forth in the Term Loan Agreement.

"Term Loan Facility" means the credit facility governed by the Term Loan Agreement and one or more debt facilities or other financing arrangements (including indentures) providing for loans and/or commitments or other long-term indebtedness that replace or refinance such credit facility, including any such replacement or refinancing facility (including any indenture) that increases or decreases the amount permitted to be borrowed thereunder or alters the maturity thereof and whether by the same or any other agent, trustee, lender or group of lenders, and any amendments, supplements, modifications, extensions, renewals, restatements, amendments and restatements or refundings thereof or any such credit facilities or other debt facilities (including under indentures) that replace or refinance such credit facility (or any subsequent replacement thereof), in each case to the extent permitted or not restricted by this Agreement.

"Term Loan Incremental Debt" means any "Incremental Loans" as defined in the Term Loan Agreement (or any equivalent term under any Term Loan Facility).

"Term Loan Priority Collateral" has the meaning set forth in the ABL Intercreditor Agreement.

"Term SOFR Adjustment" means a percentage equal to 0.11448% (11.448 basis points).

"Term SOFR Administrator" means CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the Term SOFR Reference Rate selected by the Administrative Agent in its reasonable discretion).

"Term SOFR Rate" means,

(a)    for any calculation with respect to a SOFR Loan, the Term SOFR Reference Rate for a tenor comparable to the applicable Interest Period on the day (such day, the "Periodic Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to the first day of such Interest Period, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any Periodic Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Periodic Term SOFR Determination Day, and

(b)    for any calculation with respect to a ABR Loan on any day, the Term SOFR Reference Rate for a tenor of one month on the day (such day, the "ABR Term SOFR Determination Day") that is two (2) U.S. Government Securities Business Days prior to such day, as such rate is published by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on any ABR Term SOFR Determination Day the Term SOFR Reference Rate for the applicable tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to the Term SOFR Reference Rate has not occurred, then Term SOFR will be the Term SOFR Reference Rate for such tenor as published by the Term SOFR Administrator on the first preceding U.S. Government Securities Business Day for which such Term SOFR Reference Rate for such tenor was published by the Term SOFR Administrator so long as such first preceding U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such ABR Term SOFR Determination Day.

"Term SOFR Rate Loan" means any Loan that bears interest at a rate determined by reference to Adjusted Term SOFR (other than pursuant to clause (c) of the definition of "Alternate Base Rate").

"Term SOFR Reference Rate" means the forward-looking term rate based on SOFR.

"Termination Date" has the meaning assigned to such term in Section 1.03.

"Test Period" means, as of any date, the period of four consecutive Fiscal Quarters then most recently ended for which financial statements of the type described in Section 5.01(b) or Section 5.01(c), as applicable, have been delivered (or are required to have been delivered) or, if earlier, are internally available.

"Threshold Amount" means $40,000,000.

"Top Borrower" has the meaning assigned to such term in the preamble.

"Total Leverage Ratio" means the ratio, as of any date of determination, of (a) Consolidated Total Debt outstanding as of the last day of the most recently ended Test Period to (b) Consolidated Adjusted EBITDA for the Test Period then most recently ended, in each case of the Top Borrower and its Restricted Subsidiaries on a consolidated basis.

"Total Revolving Credit Exposure" means, at any time of determination, the sum of (a) the aggregate principal amount of the Revolving Loans, (b) the aggregate amount of LC Exposure and (c) the aggregate principal amount of Overadvances and Protective Advances, in each case, outstanding at such time.

"Trademark" means the following: (a) all trademarks (including service marks), common law marks, trade names, trade dress, and logos, slogans and other indicia of origin under the Requirements of Law of any jurisdiction in the world, and the registrations and applications for registration thereof and the goodwill of the business symbolized by the foregoing; (b) all renewals of the foregoing; (c) all income, royalties, damages, and payments now or hereafter due or payable with respect thereto, including, without limitation, damages, claims, and payments for past and future infringements thereof; (d) all rights to sue for past, present, and future infringements of the foregoing, including the right to settle suits involving claims and demands for royalties owing; and (e) all rights corresponding to any of the foregoing.

"Transaction Costs" means fees, premiums, expenses and other transaction costs (including original issue discount or upfront fees) payable or otherwise borne by any Parent Company and/or its Subsidiaries in connection with the Transactions and the transactions contemplated thereby.

"<u>Transactions</u>" means, collectively, (a) the execution, delivery and performance by the Loan Parties of the Loan Documents to which they are a party and the Borrowing of Revolving Loans hereunder on the Closing Date, (b) the consummation of the Closing Date Refinancing, (c) the consummation of the Plan of Reorganization (including the execution, delivery and performance by the Loan Parties of the Term Loan Documents to which they are a party and the incurrence of Indebtedness thereunder on the Closing Date), (d) the Emergence Restructuring Transactions and (e) the payment of Transaction Costs.

"<u>Treasury Capital Stock</u>" has the meaning assigned to such term in <u>Section 6.04(a)(viii)</u>.

"<u>Treasury Regulations</u>" means the U.S. federal income tax regulations promulgated under the Code.

"<u>Trust Fund Account</u>" means any account containing Cash and Cash Equivalents consisting solely of Tax and Trust Funds.

"<u>Trust Fund Certificate</u>" means a certificate of a Responsible Officer of the Top Borrower certifying the type and amount of any Tax and Trust Funds contained or held in a Blocked Account.

"<u>Type</u>", when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowing, is determined by reference to Adjusted Term SOFR or the Alternate Base Rate.

"<u>UCC</u>" means the Uniform Commercial Code as in effect from time to time in the State of New York or any other state the laws of which are required to be applied in connection with the creation or perfection of security interests.

"<u>UK Financial Institution</u>" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended from time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"<u>UK Resolution Authority</u>" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"<u>Unadjusted Benchmark Replacement</u>" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"<u>Unrestricted Cash Amount</u>" means, as to any Person on any date of determination, the amount of (a) unrestricted Cash and Cash Equivalents of such Person and (b) Cash and Cash Equivalents of such Person that are restricted in favor of the Revolving Facility, the Term Loan Facility and/or other permitted *pari passu* or junior secured Indebtedness (which may also include Cash and Cash Equivalents securing other Indebtedness that is secured by a Lien on Collateral along with the Revolving Facility, the Term Loan Facility and/or other permitted *pari passu* or junior secured indebtedness).

"<u>Unrestricted Subsidiary</u>" means any subsidiary of the Top Borrower designated by the Top Borrower as an Unrestricted Subsidiary after the Closing Date pursuant to <u>Section 5.10</u> and any subsidiary of any Unrestricted Subsidiary.

"<u>Updated BBC Condition</u>" has the meaning assigned to such term in <u>Section 5.01(j)(i)</u>.

"U.S." means the United States of America.

"U.S. Government Securities Business Day" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association (or any successor thereto) recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"U.S. Lender" means any Lender that is a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"U.S. Loan Party" means any Loan Party that is incorporated or organized under the laws of the U.S., any state thereof or the District of Columbia.

"U.S. Special Resolution Regime" has the meaning assigned to such term in Section 9.28(a).

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.17(f).

"USA PATRIOT Act" means The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"Weekly Reporting Period" means (a) each period from the date on which Excess Availability is less than the greater of (i) $12,500,000 or (ii) 17.5% of the Loan Cap to the date on which Excess Availability has been at least equal to the greater of such amounts for each day during a period of 20 consecutive calendar days thereafter or (b) each period during which any Event of Default is continuing.

"Weighted Average Life to Maturity" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required scheduled payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness; provided that the effect of any prepayment made in respect of such Indebtedness shall be disregarded in making such calculation.

"Wells Fargo" means Wells Fargo Bank, N.A.

"Wholly-Owned Subsidiary" of any Person means a subsidiary of such Person, 100% of the Capital Stock of which (other than directors' qualifying shares or shares required by Requirements of Law to be owned by a resident of the relevant jurisdiction) shall be owned by such Person or by one or more Wholly-Owned Subsidiaries of such Person.

"Withdrawal Liability" means the liability to any Multiemployer Plan as the result of a "complete" or "partial" withdrawal by the Top Borrower or any Restricted Subsidiary or any ERISA Affiliate from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability

arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 1.02    <u>Classification of Revolving Loans and Borrowings</u>.    For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Term SOFR Rate Loan"). Borrowings also may be classified and referred to by Type (e.g., a "Term SOFR Rate Borrowing").

Section 1.03    <u>Terms Generally</u>.    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein or in any Loan Document (including any Loan Document and the Term Loan Agreement) shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, amended and restated, supplemented or otherwise modified or extended, replaced or refinanced (subject to any restrictions or qualifications on such amendments, restatements, amendment and restatements, supplements or modifications or extensions, replacements or refinancings set forth herein), (b) any reference to any Requirement of Law in any Loan Document shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such Requirement of Law, (c) any reference herein or in any Loan Document to any Person shall be construed to include such Person's successors and permitted assigns, (d) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import, when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision hereof, (e) all references herein or in any Loan Document to Articles, Sections, clauses, paragraphs, Exhibits and Schedules shall be construed to refer to Articles, Sections, clauses and paragraphs of, and Exhibits and Schedules to, such Loan Document, (f) in the computation of periods of time in any Loan Document from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" mean "to but excluding" and the word "through" means "to and including" and (g) the words "asset" and "property", when used in any Loan Document, shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including Cash, securities, accounts and contract rights. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations or Secured Obligations shall mean (i) the payment or repayment in full in immediately available funds of (A) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (B) all Lender Group Expenses that have accrued and are unpaid regardless of whether demand has been made therefor, and (C) all fees or charges that have accrued hereunder or under any other Loan Document (including the participation fees with respect to Letters of Credit and the commitment fee) and are unpaid, (ii) in the case of contingent reimbursement obligations with respect to Letters of Credit, providing Cash collateral as provided in <u>Section 2.05(j)</u>, (iii) in the case of obligations with respect to Bank Products (other than Hedge Obligations), providing Cash collateral (pursuant to documentation reasonably satisfactory to Administrative Agent) to be held by Administrative Agent for the benefit of the Bank Product Providers (other than the Hedge Providers) in an amount determined by Administrative Agent as sufficient to satisfy the reasonably estimated credit exposure, operational risk or processing risk with respect to the then existing Bank Product Obligations (other than Hedge Obligations), (iv) the receipt by Administrative Agent of Cash collateral in order to secure any other contingent Obligations for which a claim or demand for payment has been made on or prior to such time or in respect of matters or circumstances known to Administrative Agent or a Lender at such time that are reasonably expected to result in any loss, cost, damage, or expense (including attorneys' fees and legal expenses), such Cash collateral to be in such amount as Agent reasonably

determines is appropriate to secure such contingent Obligations, (v) the payment or repayment in full in immediately available funds of all other outstanding Obligations (including the payment of any termination amount then applicable (or which would or could become applicable as a result of the repayment of the other Obligations) under Hedge Agreements provided by Hedge Providers) other than (A) unasserted contingent indemnification Obligations, (B) any Bank Product Obligations (other than Hedge Obligations) that, at such time, are allowed by the applicable Bank Product Provider to remain outstanding without being required to be repaid or cash collateralized, and (C) any Hedge Obligations that, at such time, are allowed by the applicable Hedge Provider to remain outstanding without being required to be repaid, and (vi) the termination or expiration of all of the Commitments of the Lenders (the date of the occurrence of all of the foregoing set forth in clauses (i) through (vi) above, the "Termination Date").  For purposes of determining compliance at any time with Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.07 and 6.09, in the event that any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Investment, Disposition or Affiliate Transaction, as applicable, meets the criteria of more than one of the categories of transactions or items permitted pursuant to any clause of such Sections 6.01 (other than Sections 6.01(a), (x) and (y)), 6.02 (other than Sections 6.02(a) and (t)), 6.04, 6.05, 6.06, 6.07 and 6.09, the Top Borrower, in its sole discretion, may, from time to time, classify or reclassify such transaction or item (or portion thereof) under one or more clauses of each such Section and will only be required to include the amount and type of such transaction (or portion thereof) in any one category; provided that, any transaction or item (or portion thereof) originally permitted by reference to one or more clauses in Section 6.04(a) may not be reclassified across or between other Sections, but, for the avoidance of doubt, may be reclassified within Section 6.04(a); provided further that no such transaction or item (or portion thereof) may, after the initial classification thereof in connection with the incurrence or consummation thereof, be reclassified under Section 6.01(z), 6.04(a)(xi), 6.04(b)(vii) or 6.06(bb) or any other basket or exception requiring the satisfaction of Payment Conditions. It is understood and agreed that any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Burdensome Agreement, Investment, Disposition and/or Affiliate transaction need not be permitted solely by reference to one category of permitted Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Burdensome Agreement, Investment, Disposition and/or Affiliate transaction under Sections 6.01, 6.02, 6.04, 6.05, 6.06, 6.07 or 6.09, respectively, but may instead be permitted in part under any combination thereof; provided that, upon delivery of any financial statements pursuant to Section 5.01(b) or (c) following the initial incurrence of any portion of any Indebtedness incurred under Section 6.01(a) through (gg) (other than Section 6.01(a) or (x)) (such portion of such Indebtedness, the "Subject Indebtedness"), if any such Subject Indebtedness could, based on such financial statements, have been incurred in reliance on Section 6.01(w), such Subject Indebtedness shall automatically be reclassified as having been incurred under the applicable provisions of Section 6.01(w) (in each case, subject to any other applicable provision of Section 6.01(w) and, in the case of any Subject Indebtedness incurred by any Restricted Subsidiary that is not a Loan Party, to availability under the Non-Loan Party Debt Cap).

Section 1.04     Accounting Terms; GAAP.

(a)     All financial statements to be delivered pursuant to this Agreement shall be prepared in accordance with GAAP (including the impact of "fresh start" accounting under Accounting Standards Codification 852) as in effect from time to time and, except as otherwise expressly provided herein, all terms of an accounting nature that are used in calculating the Fixed Charge Coverage Ratio, the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio, Consolidated Adjusted EBITDA or Consolidated Total Assets shall be construed and interpreted in accordance with GAAP, as in effect from time to time; provided that if the Top Borrower notifies the Administrative Agent that the Top Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date of delivery of the financial statements described in Section 3.04(a) in GAAP or in the application thereof (including the conversion to IFRS as described below) on the operation of such provision (or if the Administrative Agent notifies the Top Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such

notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change becomes effective until such notice have been withdrawn or such provision amended in accordance herewith; provided, further, that if such an amendment is requested by the Top Borrower or the Required Lenders, then the Top Borrower and the Administrative Agent shall negotiate in good faith to enter into an amendment of the relevant affected provisions (without the payment of any amendment or similar fee to the Lenders) to preserve the original intent thereof in light of such change in GAAP or the application thereof; provided, further, that all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made without giving effect to (i) any election under Accounting Standards Codification 825-10-25 (previously referred to as Statement of Financial Accounting Standards 159) (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Top Borrower or any subsidiary at "fair value," as defined therein and (ii) any treatment of Indebtedness in respect of convertible debt instruments under Accounting Standards Codification 470-20 (or any other Accounting Standards Codification or Financial Accounting Standard having a similar result or effect) to value any such Indebtedness in a reduced or bifurcated manner as described therein, and such Indebtedness shall at all times be valued at the full stated principal amount thereof. If the Top Borrower notifies the Administrative Agent that the Top Borrower (or its applicable Parent Company) is required to report under IFRS or has elected to do so through an early adoption policy, "GAAP" shall mean international financial reporting standards pursuant to IFRS (provided that after such conversion, the Top Borrower cannot elect to report under GAAP).

(b)     Notwithstanding anything to the contrary herein, but subject to Section 1.10 hereof, all financial ratios and tests (including the Fixed Charge Coverage Ratio, the Total Leverage Ratio, the First Lien Leverage Ratio, the Secured Leverage Ratio, the Interest Coverage Ratio and the amount of Consolidated Total Assets and Consolidated Adjusted EBITDA) contained in this Agreement that are calculated with respect to any Test Period during which any Subject Transaction occurs shall be calculated with respect to such Test Period and such Subject Transaction on a Pro Forma Basis. Further, if since the beginning of any such Test Period and on or prior to the date of any required calculation of any financial ratio or test (x) any Subject Transaction has occurred or (y) any Person that subsequently became a Restricted Subsidiary or was merged, amalgamated or consolidated with or into the Top Borrower or any of its Restricted Subsidiaries or any joint venture since the beginning of such Test Period has consummated any Subject Transaction, then, in each case, any applicable financial ratio or test shall be calculated on a Pro Forma Basis for such Test Period as if such Subject Transaction had occurred at the beginning of the applicable Test Period.

(c)     Notwithstanding anything to the contrary contained in paragraph (a) above or in the definition of "Capital Lease," in the event of an accounting change (whether before or after the Closing Date) requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on November 8, 2016) that would constitute Capital Leases in conformity with GAAP on November 8, 2016 shall be considered Capital Leases, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

Section 1.05     Emergence Restructuring Transactions.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, neither this Agreement nor any other Loan Document shall prohibit the consummation of the Emergence Restructuring Transactions, and no Emergence Restructuring Transaction (or any action or intermediate transaction necessary to implement any such Emergence

Restructuring Transaction) shall constitute a Default or Event of Default under this Agreement or any other Loan Document.[3]

Section 1.06    Timing of Payment of Performance.  When payment of any obligation or the performance of any covenant, duty or obligation is stated to be due or performance required on a day which is not a Business Day, the date of such payment or performance shall extend to the immediately succeeding Business Day, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

Section 1.07    Times of Day.  Unless otherwise specified herein, all references herein to times of day shall be references to New York City time (daylight or standard, as applicable).

Section 1.08    Currency Equivalents Generally.

(a)    For purposes of any determination under Article 5, Article 6 (other than the calculation of compliance with any financial ratio for purposes of taking any action hereunder) or Article 7 with respect to the amount of any Indebtedness, Lien, Restricted Payment, Restricted Debt Payment, Investment, Disposition, Sale and Lease-Back Transaction, affiliate transaction or other transaction, event or circumstance, or any determination under any other provision of this Agreement, (any of the foregoing, a "specified transaction"), in a currency other than Dollars, (i) the Dollar equivalent amount of a specified transaction in a currency other than Dollars shall be calculated based on the rate of exchange quoted by the Bloomberg Foreign Exchange Rates & World Currencies Page (or any successor page thereto, or in the event such rate does not appear on any Bloomberg Page, by reference to such other publicly available service for displaying exchange rates as may be agreed upon by the Administrative Agent and the Top Borrower) for such foreign currency, as in effect at 11:00 a.m. (London time) on the date of such specified transaction (which, in the case of any Restricted Payment, shall be deemed to be the date of the declaration thereof and, in the case of the incurrence of Indebtedness, shall be deemed to be on the date first committed); provided, that if any Indebtedness is incurred (and, if applicable, associated Lien granted) to refinance or replace other Indebtedness denominated in a currency other than Dollars, and the relevant refinancing or replacement would cause the applicable Dollar-denominated restriction to be exceeded if calculated at the relevant currency exchange rate in effect on the date of such refinancing or replacement, such Dollar-denominated restriction shall be deemed not to have been exceeded so long as the principal amount of such refinancing or replacement Indebtedness (and, if applicable, associated Lien granted) does not exceed an amount sufficient to repay the principal amount of such Indebtedness being refinanced or replaced, except by an amount equal to (x) unpaid accrued interest and premiums (including tender premiums) thereon plus other reasonable and customary fees and expenses (including upfront fees and original issue discount) incurred in connection with such refinancing or replacement, (y) any existing commitments unutilized thereunder and (z) additional amounts permitted to be incurred under Section 6.01 and (ii) for the avoidance of doubt, no Default or Event of Default shall be deemed to have occurred solely as a result of a change in the rate of currency exchange occurring after the time of any specified transaction so long as such specified transaction was permitted at the time incurred, made, acquired, committed, entered or declared as set forth in clause (i). For purposes of calculating compliance with any financial ratio for purposes of taking any action hereunder, on any relevant date of determination, amounts denominated in currencies other than Dollars shall be translated into Dollars at the applicable currency exchange rate used in preparing the financial statements delivered pursuant to Sections 5.01(b) or (c), as applicable, for the relevant Test Period and will, with respect to any Indebtedness, reflect the currency translation effects, determined in accordance with GAAP, of any Hedge Agreement permitted hereunder in respect of currency exchange risks with respect to the applicable currency in effect on the date of determination for the Dollar equivalent amount

---

[3] NTD: Subject to review of final schedule.

of such Indebtedness; provided that the amount of any Indebtedness that is subject to a Debt FX Hedge shall be determined in accordance with the definition of "Consolidated Total Debt".

(b)    Each provision of this Agreement shall be subject to such reasonable changes of construction as the Administrative Agent may from time to time specify with the Top Borrower's consent to appropriately reflect a change in currency of any country and any relevant market convention or practice relating to such change in currency.

Section 1.09    [Reserved].

Section 1.10    Certain Calculations and Tests.

(a)    Notwithstanding anything to the contrary herein, to the extent that the terms of this Agreement require (i) compliance with any financial ratio or test (including any Fixed Charge Coverage Ratio test, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and any Interest Coverage Ratio test, but in any event excluding any Excess Availability test) and/or any cap expressed as a percentage of Consolidated Adjusted EBITDA or Consolidated Total Assets and/or (ii) the absence of a Default, Specified Default or Event of Default (or any type of Default, Specified Default or Event of Default) as a condition to the consummation of any transaction in connection with any acquisition or similar Investment (including the assumption or incurrence of Indebtedness), but in any event excluding the making of any Restricted Payment and/or the making of any Restricted Debt Payment, the determination of whether the relevant condition is satisfied may be made, at the election of the Top Borrower, at the time of (or on the basis of the financial statements for the most recently ended Test Period at the time of) either (x) the execution of the definitive agreement with respect to such acquisition or Investment or (y) the consummation of such acquisition or Investment, in each case, after giving effect, on a Pro Forma Basis, to (I) the relevant acquisition, Investment and/or any related Indebtedness (including the intended use of proceeds thereof) and (II) to the extent definitive documents in respect thereof have been executed (which definitive documents have not terminated or expired without the consummation thereof), any additional acquisition, Investment and/or any related Indebtedness (including the intended use of proceeds thereof) that the Top Borrower has elected to be determined as set forth in this clause (a)). Notwithstanding the foregoing, (1) the provisions of this clause (a) shall not apply in respect of the conditions set forth in Section 4.02 as the same apply to the incurrence of any Revolving Loans (or other Credit Extensions hereunder) the proceeds of which will be used to finance any such acquisition or Investment and (2) in connection with any such transaction, the relevant date of determination may be the date described in clause (x) above only if the date of the consummation of such acquisition or other Investment is not more than 120 days after the execution of the definitive agreement with respect to such acquisition or Investment.

(b)    For purposes of determining the permissibility of any action, change, transaction or event that requires a calculation of any financial ratio or test (including, any Fixed Charge Coverage Ratio test, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test, any Payment Condition and/or any Interest Coverage Ratio test and/or the amount of Consolidated Adjusted EBITDA or Consolidated Total Assets and/or Excess Availability), such financial ratio or test shall be calculated at the time such action is taken (subject to clause (a) above), such change is made, such transaction is consummated or such event occurs, as the case may be, and no Default or Event of Default shall be deemed to have occurred solely as a result of a change in such financial ratio or test occurring after such calculation.

(c)    Notwithstanding anything to the contrary herein, with respect to any amount incurred or transaction entered into (or consummated) in reliance on a provision of this Agreement (including Section 6.01(x), as it relates to the incurrence of any "fixed" or similar amount available under any Term Loan Facility) that does not require compliance with a financial ratio or test (including, any Fixed Charge Coverage Ratio, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage

Ratio test and/or any Interest Coverage Ratio) (any such amount, a "Fixed Amount") substantially concurrently with any amount incurred or transaction entered into (or consummated) in reliance on a provision of this Agreement (including Section 6.01(x), as it relates to the incurrence of any "incurrence-based" or similar amount available under any Term Loan Facility) that requires compliance with a financial ratio or test (including, any Fixed Charge Coverage Ratio test, any First Lien Leverage Ratio test, any Secured Leverage Ratio test, any Total Leverage Ratio test and/or any Interest Coverage Ratio) (any such amount, an "Incurrence-Based Amount"), it is understood and agreed that any Fixed Amount shall be disregarded in the calculation of the financial ratio or test applicable to the relevant Incurrence-Based Amount.

(d)    The principal amount of any non-interest bearing Indebtedness or other discount security constituting Indebtedness at any date shall be the principal amount thereof that would be shown on a balance sheet of the Top Borrower dated such date prepared in accordance with GAAP.

(e)    The increase in any amount secured by any Lien by virtue of the accrual of interest, the accretion of accreted value, the payment of interest or a dividend in the form of additional Indebtedness, amortization of original issue discount and/or any increase in the amount of Indebtedness outstanding solely as a result of any fluctuation in the exchange rate of any applicable currency will not be deemed to be the granting of a Lien for purposes of Section 6.02.

Section 1.11    Guarantees and Collateral.  Notwithstanding any provision of any Loan Document to the contrary:

(a)    For purposes of any determination relating to the ABL Priority Collateral as to which the Administrative Agent is granted discretion hereunder or under any other Loan Document (including any determination with respect to any waiver or extension or any opportunity to request that is permitted or required under the definition of "Collateral and Guarantee Requirement," under this Agreement or under any other Loan Document), the Administrative Agent shall be deemed to have agreed and accepted any determination in respect thereof by the Applicable Administrative Agent; it being understood and agreed that as of the Closing Date, the Administrative Agent is the Applicable Administrative Agent with respect to the ABL Priority Collateral; and

(b)    For purposes of any determination relating to the Term Loan Priority Collateral as to which the Administrative Agent is granted discretion hereunder or under any other Loan Document (including any determination with respect to any waiver or extension or any opportunity to request that is permitted or required under the definition of "Collateral and Guarantee Requirement," under this Agreement or under any other Loan Document), the Administrative Agent shall be deemed to have agreed and accepted any determination in respect thereof by the Applicable Administrative Agent.

Section 1.12    Divisions.  For all purposes under the Loan Documents, in connection with any division or plan of division under the Delaware Limited Liability Company Act (each, an "LLC Division"): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its Capital Stock at such time.

ARTICLE 2
THE CREDITS

Section 2.01    Commitments.  Subject to the terms and conditions set forth herein, each Revolving Lender having a Commitment severally, and not jointly, agrees to make loans to the Borrowers

in Dollars, at any time and from time to time during the Availability Period; provided that, after giving effect to any Borrowing by the Borrowers of Revolving Loans, (i) such Revolving Lender's Revolving Credit Exposure shall not exceed such Revolving Lender's Commitment, (ii) the Total Revolving Credit Exposure shall not exceed the Aggregate Commitments and (iii) the Total Revolving Credit Exposure shall not exceed the Loan Cap. Within the foregoing limits and subject to the terms, conditions and limitations set forth herein, the Borrowers may borrow, pay or prepay and re-borrow Revolving Loans.

Section 2.02    Loans and Borrowings.  Each Loan shall be made as part of a Borrowing consisting of Loans of the same Type made by the Lenders ratably in accordance with their respective Commitments. Loans shall be made by each Lender in accordance with its Applicable Percentage.

Section 2.03    Borrowing Procedures and Settlements Requests for Borrowings.

(a)    Procedure for Borrowing Revolving Loans.  Each Borrowing, each conversion of Loans from one Type to the other, and each continuation of SOFR Loans shall be made upon irrevocable notice by the Top Borrower on behalf of the Borrowers to the Administrative Agent (which may be delivered through Administrative Agent's electronic platform or portal) and received by Administrative Agent no later than 11:00 a.m. (i) on the Business Day that is the requested Funding Date in the case of a request for a Swing Loan, (ii) on the Business Day that is one (1) Business Day prior to the requested Funding Date in the case of a request for a ABR Loan, and (iii) on the U.S. Government Securities Business Day that is three (3) U.S. Government Securities Business Days prior to the requested Funding Date in the case of a request for a SOFR Loan, specifying (A) the amount of such Borrowing, and (B) the requested Funding Date (which shall be a Business Day); provided, that Administrative Agent may, in its sole discretion, elect to accept as timely requests that are received later than 11:00 a.m. on the applicable Business Day or U.S. Government Securities Business Day, as applicable.  If no election as to the Type of Borrowing is specified, then the requested Borrowing shall be an ABR Borrowing. All Borrowing requests which are not made on-line via Administrative Agent's electronic platform or portal shall be subject to (and unless Administrative Agent elects otherwise in the exercise of its sole discretion, such Borrowings shall not be made until the completion of) Administrative Agent's authentication process (with results satisfactory to Administrative Agent) prior to the funding of any such requested Revolving Loan.

(b)    Making of Swing Loans.  In the case of a Revolving Loan and so long as any of (i) the aggregate amount of Swing Loans made since the last Settlement Date, minus all payments or other amounts applied to Swing Loans since the last Settlement Date, plus the amount of the requested Swing Loan does not exceed $10,000,000, or (ii) Swing Lender, in its sole discretion, agrees to make a Swing Loan notwithstanding the foregoing limitation, Swing Lender shall make a Revolving Loan (any such Revolving Loan made by Swing Lender pursuant to this Section 2.03(b) being referred to as a "Swing Loan" and all such Revolving Loans being referred to as "Swing Loans") available to Borrowers on the Funding Date applicable thereto by transferring immediately available funds in the amount of such Borrowing to the Designated Account. Each Swing Loan shall be deemed to be a Revolving Loan hereunder and shall be subject to all the terms and conditions (including Section 4) applicable to other Revolving Loans, except that all payments (including interest) on any Swing Loan shall be payable to Swing Lender solely for its own account.  Subject to the provisions of Section 2.03(d)(ii), Swing Lender shall not make and shall not be obligated to make any Swing Loan if Swing Lender has actual knowledge that (i) one or more of the applicable conditions precedent set forth in Section 4 will not be satisfied on the requested Funding Date for the applicable Borrowing, or (ii) the requested Borrowing would exceed the Availability on such Funding Date. Swing Lender shall not otherwise be required to determine whether the applicable conditions precedent set forth in Section 4 have been satisfied on the Funding Date applicable thereto prior to making any Swing Loan.  The Swing Loans shall be secured by the Liens of Administrative Agent, constitute Revolving Loans and Obligations, and bear interest at the rate applicable from time to time to Revolving Loans that are ABR Loans.

(c)     Making of Revolving Loans.

(i)     In the event that Swing Lender is not obligated to make a Swing Loan, then after receipt of a request for a Borrowing pursuant to Section 2.03(a), Administrative Agent shall notify the Lenders by telecopy, telephone, email, or other electronic form of transmission, of the requested Borrowing; such notification to be sent on the Business Day or U.S. Government Securities Business Day, as applicable, that is (A) in the case of a ABR Loan, at least one (1) Business Day prior to the requested Funding Date, or (B) in the case of a SOFR Loan, prior to 11:00 a.m. at least three (3) U.S. Government Securities Business Days prior to the requested Funding Date.  If Administrative Agent has notified the Lenders of a requested Borrowing on the Business Day that is one (1) Business Day prior to the Funding Date, then each Lender shall make the amount of such Lender's Applicable Percentage of the requested Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent Payment Account, not later than 10:00 a.m. on the Business Day that is the requested Funding Date.  After Administrative Agent's receipt of the proceeds of such Revolving Loans from the Lenders, Administrative Agent shall make the proceeds thereof available to Borrowers on the applicable Funding Date by transferring immediately available funds equal to such proceeds received by Administrative Agent to the Designated Account; provided, that subject to the provisions of Section 2.06, no Lender shall have an obligation to make any Revolving Loan, if (1) one or more of the applicable conditions precedent set forth in Section 4 will not be satisfied on the requested Funding Date for the applicable Borrowing unless such condition has been waived, or (2) the requested Borrowing would exceed the Excess Availability on such Funding Date.

(ii)     Unless Administrative Agent receives notice from a Lender prior to 9:30 a.m. on the Business Day that is the requested Funding Date relative to a requested Borrowing as to which Administrative Agent has notified the Lenders of a requested Borrowing that such Lender will not make available as and when required hereunder to Administrative Agent for the account of Borrowers the amount of that Lender's Applicable Percentage of the Borrowing, Administrative Agent may assume that each Lender has made or will make such amount available to Administrative Agent in immediately available funds on the Funding Date and Administrative Agent may (but shall not be so required), in reliance upon such assumption, make available to Borrowers a corresponding amount.  If, on the requested Funding Date, any Lender shall not have remitted the full amount that it is required to make available to Administrative Agent in immediately available funds and if Administrative Agent has made available to Borrowers such amount on the requested Funding Date, then such Lender shall make the amount of such Lender's Applicable Percentage of the requested Borrowing available to Administrative Agent in immediately available funds, to Administrative Agent Payment Account, no later than 10:00 a.m. on the Business Day that is the first Business Day after the requested Funding Date (in which case, the interest accrued on such Lender's portion of such Borrowing for the Funding Date shall be for Administrative Agent's separate account).  If any Lender shall not remit the full amount that it is required to make available to Administrative Agent in immediately available funds as and when required hereby and if Administrative Agent has made available to Borrowers such amount, then that Lender shall be obligated to immediately remit such amount to Administrative Agent, together with interest at the Defaulting Lender Rate for each day until the date on which such amount is so remitted.  A notice submitted by Administrative Agent to any Lender with respect to amounts owing under this Section 2.03(c)(ii) shall be conclusive, absent manifest error.  If the amount that a Lender is required to remit is made available to Administrative Agent, then such payment to Administrative Agent shall constitute such Lender's Revolving Loan for all purposes of this Agreement.  If such amount is not made available to Administrative Agent on the Business Day following the Funding Date, Administrative Agent will notify Top Borrower of such failure to fund and, upon demand by Administrative Agent, Borrowers shall pay such amount to Administrative Agent for Administrative Agent's account, together with interest thereon for each day elapsed since the date of such Borrowing, at a rate per annum equal to the interest rate applicable at the time to the Revolving Loans composing such Borrowing.

(d)    Designated Account.  Administrative Agent is authorized to make the Revolving Loans, and Issuing Bank is authorized to issue the Letters of Credit, under this Agreement based upon telephonic or other instructions received from anyone purporting to be a Responsible Officer or, without instructions, if pursuant to Section 2.12(i) or Section 2.10(d).  Borrowers agree to establish and maintain the Designated Account with the Designated Account Bank for the purpose of receiving the proceeds of the Revolving Loans requested by Borrowers and made by Administrative Agent or the Lenders hereunder.  Unless otherwise agreed by Administrative Agent and Borrowers, any Revolving Loan or Swing Loan requested by Borrowers and made by Administrative Agent or the Lenders hereunder shall be made to the Designated Account.

Section 2.04    Overadvances.

(a)    Notwithstanding any provision of this Agreement to the contrary, at the request of any Borrower (or the Top Borrower on behalf of the relevant Borrower), the Administrative Agent may in its sole discretion, make Revolving Loans to the applicable Borrower, on behalf of the Revolving Lenders, in amounts that would cause the Total Revolving Credit Exposure to exceed the Borrowing Base (any such excess Revolving Loans are herein referred to collectively as "Overadvances"); provided that, (i) no Overadvance shall be made if it would cause any Revolving Lender's Revolving Credit Exposure to exceed its Commitment and (ii) no Overadvance shall result in a Default or Event of Default due to applicable Borrower's failure to comply with Section 2.01 or Section 2.11(b)(i) for so long as such Overadvance remains outstanding in accordance with the terms of this paragraph, but solely with respect to amount of such Overadvance. All Overadvances shall be ABR Borrowings. The authority of the Administrative Agent to make Overadvances is limited to an aggregate amount not to exceed, when taken together with any Protective Advances, ten percent (10%) of the Borrowing Base in effect at such time, each Overadvance shall mature and be due on the earliest of (i) the Maturity Date and (ii) demand by the Administrative Agent.

(b)    Each Overadvance shall be secured by the Liens in favor of the Administrative Agent on the Collateral and shall constitute Obligations hereunder. The Administrative Agent's authorization to make Overadvances may be revoked at any time by the Required Lenders. Any such revocation must be in writing and shall become effective prospectively upon the Administrative Agent's receipt thereof. The making of an Overadvance on any one occasion shall not obligate the Administrative Agent to make any Overadvance on any other occasion.

(c)    Upon the making of an Overadvance by the Administrative Agent, each Revolving Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Overadvance in proportion to its Applicable Percentage and, upon demand by the Administrative Agent, shall fund such participation to the Administrative Agent.

Section 2.05    Letters of Credit.

(a)    General. Subject to the terms and conditions set forth herein, (i) the Administrative Agent shall cause each Issuing Bank, in each case in reliance upon the agreements of the other Revolving Lenders set forth in this Section 2.05, (A) from time to time on any Business Day during the period from the Closing Date to the fifth Business Day prior to the Maturity Date, upon the request of a Borrower (or the Top Borrower on behalf of the relevant Borrower), to issue Letters of Credit denominated in Dollars issued on sight basis only for the account of relevant Borrower and/or any applicable Restricted Subsidiary (provided that a Borrower will be the applicant) and to amend or renew Letters of Credit previously issued by it, in accordance with Section 2.05(b), and (B) to honor drafts under the Letters of Credit and (ii) the Revolving Lenders severally agree to participate in the Letters of Credit issued under this Section 2.05(a) in accordance with the terms of Section 2.05(d). Each Rollover Letter of Credit shall, automatically on and as of the

Closing Date, be deemed to be a Letter of Credit issued hereunder for all purposes of this Agreement and the other Loan Documents. Top Borrower confirms and agrees that it is, and continues to be obligated as the account party with respect to each Rollover Letter of Credit and that its conversion from a Delaware limited liability company to a Delaware corporation does not in any manner limit, impair or otherwise affect any of its obligations or liabilities with respect to any Rollover Letter of Credit.

(b)    <u>Notice of Issuance, Amendment, Renewal, Extension; Certain Conditions</u>. To request the issuance of any Letter of Credit, a Borrower (or the Top Borrower on behalf of the relevant Borrower) shall deliver to the applicable Issuing Bank and the Administrative Agent, at least three (3) Business Days in advance of the requested date of issuance (or such shorter period as is acceptable to the applicable Issuing Bank), a Letter of Credit Request, which shall be irrevocable and specify which Borrower is the applicant in respect of such Letter of Credit. To request an amendment, extension or renewal of an outstanding Letter of Credit, (other than any automatic extension of a Letter of Credit permitted under <u>Section 2.05(c)</u>) a Borrower (or the Top Borrower on behalf of the relevant Borrower) shall submit a Letter of Credit Request to the applicable Issuing Bank (with a copy to the Administrative Agent) at least three Business Days in advance of the requested date of amendment, extension or renewal (or such shorter period as is acceptable to the applicable Issuing Bank), identifying the Letter of Credit to be amended, extended or renewed, and specifying the proposed date (which shall be a Business Day) and other details of the amendment, extension or renewal. If requested by the applicable Issuing Bank in connection with any request for any Letter of Credit, the applicable Borrower also shall submit a letter of credit application on such Issuing Bank's standard form. In the event of any inconsistency between the terms and conditions of this Agreement and the terms and conditions of any form of letter of credit application or other agreement submitted by any Borrower to, or entered into by any Borrower with, the applicable Issuing Bank relating to any Letter of Credit, the terms and conditions of this Agreement shall control. No Letter of Credit, letter of credit application or other document entered into by any Borrower with any Issuing Bank relating to any Letter of Credit shall contain any representation or warranty, covenant or event of default not set forth in this Agreement (and to the extent inconsistent herewith shall be rendered null and void (or reformed automatically without further action by any Person to conform to the terms of this Agreement), and all representations and warranties, covenants and events of default set forth therein shall contain standards, qualifications, thresholds and exceptions for materiality or otherwise consistent with those set forth in this Agreement (and, to the extent inconsistent herewith, shall be deemed to automatically incorporate the applicable standards, qualifications, thresholds and exceptions set forth herein without action by any Person). No Letter of Credit may be issued, amended, extended or renewed unless (and on the issuance, amendment, extension or renewal of each Letter of Credit, the applicable Borrower shall be deemed to represent and warrant that), after giving effect to such issuance, amendment, extension, or renewal (i) the LC Exposure does not exceed the Letter of Credit Sublimit, (ii) the Total Revolving Credit Exposure does not exceed the Loan Cap then in effect, (iii) the Total Revolving Credit Exposure does not exceed the Aggregate Commitments then in effect and (iv) if such Letter of Credit has a term that extends beyond the Maturity Date, the aggregate amount of the LC Exposure attributable to Letters of Credit expiring after such Maturity Date does not exceed the aggregate amount of the Commitments then in effect that are scheduled to remain in effect after such Maturity Date.

(c)    <u>Expiration Date</u>.

(i)    No Standby Letter of Credit shall expire later than the earlier of (A) the date that is one year after the date of the issuance of such Standby Letter of Credit and (B) the date that is five Business Days prior to the Maturity Date; <u>provided</u> that, any Standby Letter of Credit may provide for the automatic extension thereof for any number of additional periods of up to one year in duration (which additional periods shall not extend beyond the date referred to in the preceding subclause (B) unless 103% of the then-available face amount thereof is Cash collateralized or, if satisfactory to the relevant Issuing Bank,

backstopped on or before the date on which such Letter of Credit is extended beyond the date referred to in subclause (B) above pursuant to arrangements reasonably satisfactory to the relevant Issuing Bank).

(ii)   No Commercial Letter of Credit shall expire later than the earlier to occur of (A) 180 days after the issuance thereof (or such later date to which the relevant Issuing Bank may agree) and (B) the date that is five Business Days prior to the Maturity Date.

(d)   Participations. By the issuance of any Letter of Credit (or an amendment to any Letter of Credit increasing the amount thereof) and without any further action on the part of the applicable Issuing Bank or the Revolving Lenders, the applicable Issuing Bank hereby grants to each Revolving Lender, and each such Revolving Lender hereby acquires from such Issuing Bank, a participation in such Letter of Credit equal to such Revolving Lender's Applicable Percentage of the aggregate amount available to be drawn under such Letter of Credit. In consideration and in furtherance of the foregoing, each Revolving Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the applicable Issuing Bank, such Revolving Lender's Applicable Percentage of each LC Disbursement made by such Issuing Bank and not reimbursed by the applicable Borrower on the date due as provided in paragraph (e) of this Section, or of any reimbursement payment that is required to be refunded to the applicable Borrower for any reason. Each Revolving Lender acknowledges and agrees that its obligation to acquire participations pursuant to this paragraph in respect of Letters of Credit is absolute and unconditional and shall not be affected by any circumstance whatsoever, including any amendment, renewal or extension of any Letter of Credit or the occurrence and continuance of any Default or Event of Default or reduction or termination of the Commitments, and that each such payment shall be made without any offset, abatement, withholding or reduction whatsoever.

(e)   Reimbursement.

(i)   If the applicable Issuing Bank makes any LC Disbursement in respect of a Letter of Credit, the applicable Borrower shall reimburse such LC Disbursement by paying to such Issuing Bank an amount equal to the amount of such LC Disbursement not later than 2:00 p.m. one Business Day immediately following the date on which the Top Borrower receives notice of such LC Disbursement under paragraph (g) of this Section; provided, that the applicable Borrower may, without satisfying the conditions to Borrowing set forth herein, request in accordance with Section 2.03 or Section 2.04 that such payment be financed with an ABR Revolving Loan (any such Revolving Loan, a "Letter of Credit Reimbursement Loan") in an equivalent amount and, to the extent so financed, the obligation of the Borrower to make such payment shall be discharged and replaced by the resulting Revolving Loan. The relevant Issuing Bank shall immediately notify the Administrative Agent of any payment made by a Borrower in accordance with the terms of the preceding sentence (without giving effect to the proviso therein). If the applicable Borrower fails to make such payment when due, the Administrative Agent shall notify each Revolving Lender of the applicable LC Disbursement, the payment then due from the applicable Borrower in respect thereof and such Revolving Lender's Applicable Percentage thereof. Promptly following receipt of such notice, each Revolving Lender shall pay to the Administrative Agent its Applicable Percentage of the payment then due from the applicable Borrower, in the same manner as provided in Section 2.07 with respect to Revolving Loans made by such Revolving Lender (and Section 2.07 shall apply, *mutatis mutandis*, to the payment obligations of the Revolving Lenders), and the Administrative Agent shall promptly pay to the applicable Issuing Bank the amounts so received by it from the Revolving Lenders. Promptly following receipt by the Administrative Agent of any payment from any Borrower pursuant to this paragraph, the Administrative Agent shall distribute such payment to the applicable Issuing Bank or, to the extent Revolving Lenders have made payments to the Administrative Agent pursuant to this paragraph to reimburse such Issuing Bank, then to such Revolving Lenders and such Issuing Bank as their interests may appear.

(ii)   If any Revolving Lender fails to make available to the Administrative Agent for the account of the applicable Issuing Bank any amount required to be paid by such Revolving Lender pursuant to the foregoing provisions of this Section 2.05(e) by the time specified therein, such Issuing Bank shall be entitled to recover from such Revolving Lender (acting through the Administrative Agent), on demand, such amount with interest thereon for the period from the date such payment is required to the date on which such payment is immediately available to such Issuing Bank at a rate per annum equal to the greater of the Federal Funds Effective Rate from time to time in effect and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation. A certificate of the applicable Issuing Bank submitted to any Revolving Lender (through the Administrative Agent) with respect to any amounts owing under this clause (ii) shall be conclusive absent manifest error.

(f)   Obligations Absolute. The obligations of each Borrower to reimburse LC Disbursements as provided in paragraph (e) of this Section shall be absolute and unconditional and irrespective of (i) any lack of validity or enforceability of any Letter of Credit or this Agreement, or any term or provision therein, (ii) any draft or other document presented under any Letter of Credit proving to be forged, fraudulent or invalid in any respect or any statement therein being untrue or inaccurate in any respect, (iii) payment by the applicable Issuing Bank under any Letter of Credit against presentation of a draft or other document that does not comply with the terms of such Letter of Credit or (iv) any other event or circumstance whatsoever, whether or not similar to any of the foregoing, that might, but for the provisions of this Section, constitute a legal or equitable discharge of, or provide a right of setoff against, the obligations of the Borrowers hereunder. Neither the Administrative Agent, the Revolving Lenders nor any Issuing Bank, nor any of their respective Related Parties shall have any liability or responsibility by reason of or in connection with the issuance or transfer of any Letter of Credit or any payment or failure to make any payment thereunder (irrespective of any of the circumstances referred to in the preceding sentence), or any error, omission, interruption, loss or delay in transmission or delivery of any draft, notice or other communication under or relating to any Letter of Credit (including any document required to make a drawing thereunder), any error in interpretation of technical terms or any consequence arising from causes beyond the control of such Issuing Bank; provided that the foregoing shall not be construed to excuse such Issuing Bank from liability to any Borrower to the extent of any direct damages (as opposed to consequential damages, claims in respect of which are hereby waived by the Borrowers to the extent permitted by applicable law) suffered by such Borrower that are caused by such Issuing Bank's failure to exercise care when determining whether drafts and other documents presented under a Letter of Credit comply with the terms thereof. The parties hereto expressly agree that, in the absence of gross negligence, bad faith or willful misconduct on the part of applicable Issuing Bank (as finally determined by a court of competent jurisdiction), such Issuing Bank shall be deemed to have exercised care in each such determination. In furtherance of the foregoing and without limiting the generality thereof, the parties agree that, with respect to documents presented which appear on their face to be in substantial compliance with the terms of any Letter of Credit, the applicable Issuing Bank may, in its sole discretion, either accept and make payment upon such documents without responsibility for further investigation, regardless of any notice or information to the contrary, or refuse to accept and make payment upon such documents if such documents are not in strict compliance with the terms of such Letter of Credit.

(g)   Disbursement Procedures. The applicable Issuing Bank shall, promptly following its receipt thereof, examine all documents purporting to represent a demand for payment under a Letter of Credit. Such Issuing Bank shall promptly notify the Administrative Agent and the Top Borrower by telephone (confirmed by electronic means) upon any LC Disbursement thereunder; provided that no failure to give or delay in giving such notice shall relieve the applicable Borrower of its obligation to reimburse such Issuing Bank and the Revolving Lenders with respect to any such LC Disbursement within the time period prescribed in Section 2.05(e).

(h)   Interim Interest. If any Issuing Bank makes any LC Disbursement, unless the applicable Borrower reimburses such LC Disbursement in full on the date such LC Disbursement is made, the unpaid amount thereof shall bear interest, for each day from and including the date such LC Disbursement is made to but excluding the date that such Borrower reimburses such LC Disbursement (or the date on which such LC Disbursement is reimbursed with the proceeds of Revolving Loans, as applicable), at the rate per annum then applicable to Loans that are ABR Loans; provided that if the applicable Borrower fails to reimburse such LC Disbursement when due pursuant to paragraph (e) of this Section, then Section 2.13(d) shall apply. Interest accrued pursuant to this paragraph shall be for the account of the applicable Issuing Bank, except that interest accrued on and after the date of payment by any Revolving Lender pursuant to paragraph (e) of this Section to reimburse such Issuing Bank shall be for the account of such Revolving Lender to the extent of such payment and shall be payable on the date on which the applicable Borrower is required to reimburse the applicable LC Disbursement in full (and, thereafter, on demand).

(i)   Replacement or Resignation of an Issuing Bank or Designation of New Issuing Banks.

(i)   Any Issuing Bank may be replaced with the consent of the Administrative Agent and the Top Borrower at any time by written agreement among the Top Borrower, the Administrative Agent and the successor Issuing Bank. The Administrative Agent shall notify the Revolving Lenders of any such replacement of an Issuing Bank. At the time any such replacement becomes effective, the applicable Borrower shall pay all unpaid fees accrued for the account of the replaced Issuing Bank pursuant to Section 2.12(b)(ii). From and after the effective date of any such replacement, (i) the successor Issuing Bank shall have all the rights and obligations of the replaced Issuing Bank under this Agreement with respect to Letters of Credit to be issued thereafter and (ii) references herein to the term "Issuing Bank" shall be deemed to refer to such successor or to any previous Issuing Bank, or to such successor and all previous Issuing Banks, as the context shall require. After the replacement of any Issuing Bank hereunder, the replaced Issuing Bank shall remain a party hereto and shall continue to have all the rights and obligations of an Issuing Bank under this Agreement with respect to Letters of Credit issued by it prior to such replacement, but shall not be required to issue additional Letters of Credit.

(ii)   [Reserved].

(iii)   Notwithstanding anything to the contrary contained herein, each Issuing Bank may, upon ten days' prior written notice to the Top Borrower, each other Issuing Bank and the Revolving Lenders resign as Issuing Bank which resignation shall be effective as of the later of (x) the appointment of a replacement Issuing Bank and (y) the date referenced in such notice (but in no event less than ten days after the delivery of such written notice); it being understood that in the event of any such resignation, any Letter of Credit issued by such resigning Issuing Bank then outstanding shall remain outstanding (irrespective of whether any amount has been drawn at such time). In the event of any such resignation as an Issuing Bank, the Top Borrower shall be entitled to appoint any Revolving Lender that accepts such appointment in writing as a successor Issuing Bank. Upon the acceptance of any appointment as Issuing Bank hereunder, the successor Issuing Bank shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Issuing Bank, and the retiring Issuing Bank shall be discharged from its duties and obligations in such capacity hereunder.

(j)   Cash Collateralization.

(i)   If (A) an Event of Default has occurred and is continuing under Section 7.01(a), (B) the Revolving Loans have been declared due and payable in accordance with Article 7 and/or (C) the Administrative Agent is otherwise exercising rights and remedies as to Collateral during the occurrence and continuation of an Event of Default, then on the Business Day on which the Top Borrower receives notice from the Administrative Agent at the direction of the Required Lenders demanding the deposit of

Cash collateral pursuant to this paragraph (j), the Borrowers shall deposit, in an interest-bearing account with the Administrative Agent, in the name of the Administrative Agent and for the benefit of the Revolving Lenders and each Issuing Bank (the "LC Collateral Account"), an amount in Cash equal to 103% of the LC Exposure as of such date (minus the amount then on deposit in the LC Collateral Account) provided that the obligation to deposit such Cash collateral shall become effective immediately, and such deposit shall become immediately due and payable, without demand or other notice of any kind, upon the occurrence of any Event of Default with respect to any Borrower described in Section 7.01(f) or (g).

(ii)    Any such deposit in the LC Collateral Account shall be held by the Administrative Agent as collateral for the payment and performance of the Secured Obligations in accordance with the provisions of this paragraph (j). The Administrative Agent shall have exclusive dominion and control, including the exclusive right of withdrawal, over the LC Collateral Account. Each Borrower hereby grants the Administrative Agent, for the benefit of the Secured Parties, a First Priority security interest in the LC Collateral Account. Interest or profits, if any, on such investments shall accumulate in the LC Collateral Account. Moneys in the LC Collateral Account shall be applied by the Administrative Agent to reimburse the applicable Issuing Bank for LC Disbursements for which it has not been reimbursed and, to the extent not so applied, shall be held for the satisfaction of the reimbursement obligations of the Borrowers for the LC Exposure at such time or, subject to the consent of the Required Lenders, applied to satisfy other Secured Obligations. The amount of any Cash posted as Collateral in accordance with the terms of this Section 2.05(j) (together with all interest and other earnings with respect thereto, to the extent not applied as aforesaid) shall be returned to the applicable Borrower promptly but in no event later than three Business Days after the Event of Default giving rise to the obligation to do so has been cured or waived.

Section 2.06    Protective Advances.

(a)    Subject to the limitations set forth below (and notwithstanding anything to the contrary in Section 4.02), the Administrative Agent is authorized by each Borrower and the Revolving Lenders, from time to time in the Administrative Agent's sole discretion to make Revolving Loans to the Borrowers, on behalf of the Revolving Lenders at any time that any condition precedent set forth in Section 4.02 has not been satisfied or waived, which the Administrative Agent, in its Permitted Discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Revolving Loans and other Secured Obligations or (iii) to pay any other amount chargeable to or required to be paid by any Borrower or any other Loan Party pursuant to the terms of this Agreement or any other Loan Document, including payments of reimbursable expenses (including costs, fees, and expenses as described in Section 9.03) and other sums, in each case to the extent due and payable (and not in dispute by any Borrower (acting in good faith)) under the Loan Documents (each such Revolving Loan, a "Protective Advance"). All Protective Advances shall be ABR Borrowings. Any Protective Advance may be made in a principal amount that would cause the Total Revolving Credit Exposure to exceed the Borrowing Base; provided that no Protective Advance may be made to the extent that, after giving effect to such Protective Advance (together with the outstanding principal amount of any outstanding Protective Advances and Overadvances), the aggregate principal amount of Protective Advances outstanding hereunder would exceed ten percent (10%) of the Borrowing Base as determined on the date of such proposed Protective Advance; and provided, further, that the Total Revolving Credit Exposure shall not exceed the Aggregate Commitments.

(b)    Each Protective Advance shall be secured by the Liens in favor of the Administrative Agent on the Collateral and shall constitute Obligations hereunder. Each Protective Advance shall mature and be due and payable on the earliest of (i) the Maturity Date and (ii) demand by the Administrative Agent. The making of a Protective Advance on any one occasion shall not obligate the Administrative Agent to make any Protective Advance on any other occasion. At any time that the conditions precedent set forth in Section 4.02 have

been satisfied or waived, the Administrative Agent may request the Revolving Lenders to make a Revolving Loan to repay any Protective Advance.

(c)     Upon the making of a Protective Advance by the Administrative Agent (whether before or after the occurrence of a Default or Event of Default), each Revolving Lender shall be deemed, without further action by any party hereto, unconditionally and irrevocably to have purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Protective Advance in proportion to its Applicable Percentage, and, upon demand by the Administrative Agent, shall fund such participation to the Administrative Agent.

Section 2.07     Settlements.

(a)     It is agreed that each Lender's funded portion of the Revolving Loans is intended by the Lenders to equal, at all times, such Lender's Applicable Percentage of the outstanding Revolving Loans. Such agreement notwithstanding, Agent, Swing Lender, and the other Lenders agree (which agreement shall not be for the benefit of Loan Parties) that in order to facilitate the administration of this Agreement and the other Loan Documents, settlement among the Lenders as to the Revolving Loans (including Swing Loans, Protective Advances and Overadvances) shall take place on a periodic basis in accordance with the following provisions:

(b)     Agent shall request settlement ("Settlement") with the Lenders on a weekly basis, or on a more frequent basis if so determined by Agent in its sole discretion (1) on behalf of Swing Lender, with respect to the outstanding Swing Loans, (2) for itself, with respect to the outstanding Protective Advances and Overadvances, and (3) with respect to any Loan Party's or any of their Subsidiaries' payments or other amounts received, as to each by notifying the Lenders by telecopy, telephone, or other similar form of transmission, of such requested Settlement, no later than 2:00 p.m. on the Business Day immediately prior to the date of such requested Settlement (the date of such requested Settlement being the "Settlement Date"). Such notice of a Settlement Date shall include a summary statement of the amount of outstanding Revolving Loans (including Swing Loans, Protective Advances and Overadvances) for the period since the prior Settlement Date.  Subject to the terms and conditions contained herein (including Section 2.21):  (i) if the amount of the Revolving Loans (including Swing Loans, Protective Advances and Overadvances) made by a Lender that is not a Defaulting Lender exceeds such Lender's Applicable Percentage of the Revolving Loans (including Swing Loans, Protective Advances and Overadvances) as of a Settlement Date, then Agent shall, by no later than 12:00 p.m. on the Settlement Date, transfer in immediately available funds to a Deposit Account of such Lender (as such Lender may designate), an amount such that each such Lender shall, upon receipt of such amount, have as of the Settlement Date, its Applicable Percentage of the Revolving Loans (including Swing Loans, Protective Advances and Overadvances), and (ii) if the amount of the Revolving Loans (including Swing Loans, Protective Advances and Overadvances) made by a Lender is less than such Lender's Applicable Percentage of the Revolving Loans (including Swing Loans, Protective Advances and Overadvances) as of a Settlement Date, such Lender shall no later than 12:00 p.m. on the Settlement Date transfer in immediately available funds to the Administrative Agent Payment Account, an amount such that each such Lender shall, upon transfer of such amount, have as of the Settlement Date, its Applicable Percentage of the Revolving Loans (including Swing Loans, Protective Advances and Overadvances).  Such amounts made available to Administrative Agent under clause (ii) of the immediately preceding sentence shall be applied against the amounts of the applicable Swing Loans, Protective Advances or Overadvances and, together with the portion of such Swing Loans, Protective Advances or Overadvances representing Swing Lender's Applicable Percentage thereof, shall constitute Revolving Loans of such Lenders.  If any such amount is not made available to Administrative Agent by any Lender on the Settlement Date applicable thereto to the extent required by the terms hereof, Administrative Agent shall be entitled to recover for its account such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate.

(c)     In determining whether a Lender's balance of the Revolving Loans (including Swing Loans, Protective Advances and Overadvances) is less than, equal to, or greater than such Lender's Applicable Percentage of the Revolving Loans (including Swing Loans, Protective Advances and Overadvances) as of a Settlement Date, Administrative Agent shall, as part of the relevant Settlement, apply to such balance the portion of payments actually received in good funds by Administrative Agent with respect to principal, interest, fees payable by Borrowers and allocable to the Lenders hereunder, and proceeds of Collateral.

(d)     Between Settlement Dates, Administrative Agent, to the extent Swing Loans, Protective Advances or Overadvances, are outstanding, may pay over to Administrative Agent or Swing Lender, as applicable, any payments or other amounts received by Administrative Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to the Swing Loans, Protective Advances or Overadvances.  Between Settlement Dates, Administrative Agent, to the extent no Swing Loans, Protective Advances or Overadvances are outstanding, may pay over to Swing Lender any payments or other amounts received by Administrative Agent, that in accordance with the terms of this Agreement would be applied to the reduction of the Revolving Loans, for application to Swing Lender's Applicable Percentage of the Revolving Loans.  If, as of any Settlement Date, payments or other amounts of the Loan Parties or their Subsidiaries received since the then immediately preceding Settlement Date have been applied to Swing Lender's Applicable Percentage of the Revolving Loans other than Swing Loans, as provided for in the previous sentence, Swing Lender shall pay to Administrative Agent for the accounts of the Lenders, and Administrative Agent shall pay to the Lenders (other than a Defaulting Lender if Administrative Agent has implemented the provisions of <u>Section 2.21</u>), to be applied to the outstanding Revolving Loans of such Lenders, an amount such that each such Lender shall, upon receipt of such amount, have, as of such Settlement Date, its Applicable Percentage of the Revolving Loans.  During the period between Settlement Dates, Swing Lender with respect to Swing Loans, Administrative Agent with respect to Protective Advances and Overadvances, and each Lender with respect to the Revolving Loans other than Swing Loans, Swing Loans, Protective Advances and Overadvances, shall be entitled to interest at the applicable rate or rates payable under this Agreement on the daily amount of funds employed by Swing Lender, Administrative Agent, or the Lenders, as applicable.

(e)     Anything in this <u>Section 2.07</u> to the contrary notwithstanding, in the event that a Lender is a Defaulting Lender, Administrative Agent shall be entitled to refrain from remitting settlement amounts to the Defaulting Lender and, instead, shall be entitled to elect to implement the provisions set forth in <u>Section 2.21</u>.

Section 2.08     <u>Incremental Facility</u>.

(a)     <u>Request for Increase</u>.  Upon notice to Administrative Agent (which shall promptly notify the Lenders), the Top Borrower may, from time to time, request an increase in the Aggregate Commitments by an amount (for all such requests) not exceeding $25,000,000 (the "<u>Commitment Increases</u>"); provided, that, (i) any such request for an increase shall be in a minimum amount of $5,000,000, and (ii) the Top Borrower may make a maximum of three such requests.  At the time of sending such notice, the Top Borrower (in consultation with Administrative Agent) shall specify the time period within which each Lender is requested to respond (which shall in no event be less than ten (10) Business Days from the date of delivery of such notice to the Lenders).

(b)     <u>Lender Elections to Increase</u>.  Each Lender shall notify Administrative Agent within such time period whether or not it agrees to increase its Commitment and, if so, whether by an amount equal to, greater than, or less than its Applicable Percentage of such requested increase.  Any Lender not responding within such time period shall be deemed to have declined to increase its Commitment.

(c)    Notification by Administrative Agent; Additional Lenders.  Administrative Agent shall notify Top Borrower and each Lender of the Lenders' responses to each request made hereunder.  To achieve the full amount of a requested increase and subject to the approval of Administrative Agent, Issuing Bank and the Swing Lender (which approvals shall not be unreasonably withheld), to the extent that the existing Lenders decline to increase their Commitments, or decline to increase their Commitments to the amount requested by Top Borrower, Administrative Agent, in consultation with Top Borrower, will use its reasonable efforts to arrange for other Eligible Assignees to become a Lender hereunder and to issue commitments in an amount equal to the amount of the increase in the Aggregate Commitments requested by Top Borrower and not accepted by the existing Lenders (and Top Borrower may also invite additional Eligible Assignees to become Lenders) (each, an "Additional Commitment Lender"), provided, that, without the consent of Administrative Agent, at no time shall the Commitment of any Additional Commitment Lender be less than $10,000,000.

(d)    Effective Date and Allocations.  If the Aggregate Commitments are increased in accordance with this Section, Administrative Agent, in consultation with Top Borrower, shall determine the effective date (the "Increase Effective Date") and the final allocation of such increase.  Administrative Agent shall promptly notify Top Borrower and the Lenders of the final allocation of such increase and the Increase Effective Date and on the Increase Effective Date (i) the Aggregate Commitments under, and for all purposes of, this Agreement shall be increased by the aggregate amount of such Commitment Increases, and (ii) Schedule 1.01(a) shall be deemed modified, without further action, to reflect the revised Commitments and Applicable Percentages of the Lenders.

(e)    Conditions to Effectiveness of Commitment Increase.  As a condition precedent to each Commitment Increase,

(i)    Top Borrower shall deliver to Administrative Agent a certificate of each Loan Party dated as of the Increase Effective Date (in sufficient copies for each Lender) signed by a Responsible Officer of such Loan Party (A) certifying and attaching the resolutions adopted by such Loan Party approving or consenting to such Commitment Increase, and (B) in the case of the Borrowers, certifying that, before and after giving effect to such Commitment Increase, (1) the representations and warranties contained in Article 3 and the other Loan Documents are true and correct on and as of the Increase Effective Date, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct as of such earlier date, and except that for purposes of this Section 2.08, the representations and warranties contained in subsections (a) and (b) of Section 3.01 shall be deemed to refer to the most recent statements furnished pursuant to clauses (a), (b) and (c), respectively, of Section 5.01, and (2) as of the date of any such Commitment Increase, and after giving effect thereto, no Default or Event of Default shall exist or have occurred and be continuing,

(ii)    Borrowers, Administrative Agent, and any Additional Commitment Lender shall have executed and delivered a Joinder to the Loan Documents in such form as Administrative Agent shall reasonably require;

(iii)    Borrowers shall have paid such fees and other compensation to, Lenders and the Additional Commitment Lenders as Top Borrower and Lenders and such Additional Commitment Lenders shall agree;

(iv)    Borrowers shall have paid such arrangement fees to Administrative Agent as Top Borrower and Administrative Agent may agree, if any;

(v)     if requested by Administrative Agent, Borrowers shall deliver to Administrative Agent and the Lenders an opinion or opinions, in form and substance reasonably satisfactory to Administrative Agent, from counsel to the Borrowers reasonably satisfactory to Administrative Agent and dated such date;

(vi)    Borrowers and the Additional Commitment Lender shall have delivered such other instruments, documents and agreements as Administrative Agent may reasonably have requested;

(vii)   no Default or Event of Default exists; and

(viii)  if any Loan Party or any of its Subsidiaries owns any Margin Stock, Borrowers shall deliver to Administrative Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrowers, together with such other documentation as Administrative Agent shall reasonably request, in order to enable Administrative Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the Board of Governors of the Federal Reserve System of the United States.

Borrowers shall prepay any Committed Loans outstanding on the Increase Effective Date (and pay any additional amounts required pursuant to Section 2.11) to the extent necessary to keep the outstanding Loans ratable with any revised Applicable Percentages arising from any non-ratable increase in the Commitments under this Section.  The interest rate margins with respect to the Revolving Loans to be made pursuant to the increased Commitments or additional Commitments shall be the same as the interest rate margin applicable to Revolving Loans hereunder immediately prior to the applicable Increase Effective Date.

(f)     <u>Conflicting Provisions</u>.  This Section shall supersede any provisions in Sections 2.18 or 9.02 to the contrary.

Section 2.09     <u>Termination of Commitments</u>.

(a)     Unless previously terminated, the Commitments shall automatically terminate on the Maturity Date.

(b)     Borrowers may reduce the Commitments to an amount not less than the sum of (A) the Total Revolving Credit Exposure as of such date, plus (B) the principal amount of all Revolving Loans not yet made as to which a request has been given by any Borrower under <u>Section 2.03(a)</u>, plus (C) the amount of all Letters of Credit not yet issued as to which a request has been given by any Borrower pursuant to <u>Section 2.05)</u>.  Each such reduction shall be in an amount which is not less than $10,000,000 (unless the amount of the Commitments in effect immediately prior to such reduction are less than $10,000,000), shall be made by providing not less than ten (10) Business Days prior written notice to Administrative Agent, any such notice may state that it is conditioned upon the effectiveness of other transactions, in which case such notice may be revoked by the Top Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  The Commitments, once reduced, may not be increased.  Each such reduction of the Commitments shall reduce the Commitments of each Lender proportionately in accordance with its Applicable Percentage.  In connection with any reduction in the Commitments prior to the Maturity Date, if any Loan Party or any of its Restricted Subsidiaries owns any Margin Stock, Borrowers shall deliver to Administrative Agent an updated Form U-1 (with sufficient additional originals thereof for each Lender), duly executed and delivered by the Borrowers, together with such other documentation as Administrative Agent shall reasonably request, in order to enable Administrative Agent and the Lenders to comply with any of the requirements under Regulations T, U or X of the Board of Governors.

(c)     The Top Borrower shall notify the Administrative Agent of any election to terminate the Commitments under <u>paragraph (b)</u> of this Section in writing on or prior to the effective date of such

termination, specifying such election and the effective date thereof. Promptly following receipt of any notice, the Administrative Agent shall advise the Lenders of the contents thereof. Each notice delivered by the Top Borrower pursuant to this Section shall be irrevocable; provided that any such notice may state that it is conditioned upon the effectiveness of other transactions, in which case such notice may be revoked by the Top Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Any termination of the Commitments pursuant to this <u>Section 2.09</u> shall be permanent.

Section 2.10   <u>Repayment of Loans; Evidence of Debt; Loan Account</u>.

(a)   The Borrowers hereby jointly and severally unconditionally promise to pay in Dollars to the Administrative Agent for the account of each Revolving Lender, the then-unpaid principal amount of the Revolving Loans of such Revolving Lender on the Maturity Date.

(i)   On the Maturity Date or, if earlier, the termination of the Commitments pursuant to <u>Section 2.07</u> or otherwise, the relevant Borrower shall (A) cancel and return outstanding Letters of Credit (or alternatively, with respect to each outstanding Letter of Credit, furnish to the Administrative Agent a Cash deposit (or if satisfactory to the relevant Issuing Bank, a "backstop" letter of credit) equal to 103% of the LC Exposure (minus any amount then on deposit in any Cash collateral account established for the benefit of the Issuing Banks) as of such date) and (B) make payment in full in Cash of all accrued and unpaid fees and all reimbursable expenses and other Obligations with respect to the Revolving Facility, together with accrued and unpaid interest (if any) thereon.

(b)   [Reserved].

(c)   Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrowers to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)   Administrative Agent shall maintain an account on its books in the name of Borrowers (the "Loan Account") on which Borrowers will be charged all Revolving Loans (including Overadvances, Protective Advances and Swing Loans) made by Administrative Agent, Swing Lender, or the Lenders to Borrowers or for Borrowers' account, the Letters of Credit issued or arranged by Issuing Bank for Borrowers' account, and with all other payment Obligations hereunder or under the other Loan Documents, including, accrued interest, fees and expenses, and Lender Group Expenses.  In accordance with <u>Section 2.10(e)</u>, the Loan Account will be credited with all payments received by Administrative Agent from Borrowers or for Borrowers' account.  Administrative Agent shall make available to Borrowers monthly statements regarding the Loan Account, including the principal amount of the Revolving Loans, interest accrued hereunder, fees accrued or charged hereunder or under the other Loan Documents, and a summary itemization of all charges and expenses constituting Lender Group Expenses accrued hereunder or under the other Loan Documents, and each such statement, absent manifest error, shall be conclusively presumed to be correct and accurate and constitute an account stated between Borrowers and the Lender Group unless, within 30 days after Administrative Agent first makes such a statement available to Top Borrower, Borrowers shall deliver to Administrative Agent written objection thereto describing the error or errors contained in such statement.  However, the Administrative Agent's failure to maintain the Loan Account or to provide any such accounting shall not affect the legality or binding nature of any of the Obligations. Interest, fees and other monetary Obligations due and owing under this Agreement or any other Loan Document or any Bank Product Agreement (including any amounts due and payable to the Bank Product Providers in respect of Bank Products) may, in the Administrative Agent's discretion, be charged to the Loan Account when due, and will thereafter be deemed to be Revolving Loans and will bear interest at the

same rate as then applicable to Revolving Loans that are ABR Loans (unless and until converted into SOFR Loans in accordance with the terms of this Agreement).

(e)     The receipt of any payment item by Administrative Agent shall not be required to be considered a payment on account unless such payment item is a wire transfer of immediately available funds made to Administrative Agent Payment Account or unless and until such payment item is honored when presented for payment.  Should any payment item not be honored when presented for payment, then Borrowers shall be deemed not to have made such payment.  Anything to the contrary contained herein notwithstanding, any payment item shall be deemed received by Administrative Agent only if it is received into the Administrative Agent Payment Account on a Business Day on or before 1:30 p.m.  If any payment item is received into Administrative Agent Payment Account on a non-Business Day or after 1:30 p.m. on a Business Day (unless Administrative Agent, in its sole discretion, elects to credit it on the date received), it shall be deemed to have been received by Administrative Agent as of the opening of business on the immediately following Business Day.

(f)     The entries made in the accounts and Loan Account maintained pursuant to paragraphs (c) or (d) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein (absent manifest error); provided that the failure of any Lender or the Administrative Agent to maintain such accounts or Loan Account or any manifest error therein shall not in any manner affect the obligation of any Loan Party to repay the Loans in accordance with the terms of this Agreement; provided, further, that in the event of any inconsistency between the Loan Account maintained by the Administrative Agent pursuant to paragraph (d) of this Section and any Lender's accounts, the Loan Account shall govern.

(g)     Any Lender may request that any Revolving Loan made by it be evidenced by a Promissory Note. In such event, the relevant Borrower shall prepare, execute and deliver a Promissory Note to such Lender payable to such Lender and its registered permitted assigns; it being understood and agreed that such Lender (and/or its applicable permitted assign) shall be required to return such Promissory Note to the Top Borrower in accordance with Section 9.05(b)(iii) and upon the occurrence of the Termination Date (or as promptly thereafter as practicable). If any Lender loses the original copy of its Promissory Note, it shall execute an affidavit of loss containing an indemnification provision reasonably satisfactory to the Top Borrower.

Section 2.11     Prepayment of Loans.

(a)     Optional Prepayments.

(i)     Upon prior notice in accordance with paragraph (a)(ii) of this Section, each Borrower shall have the right at any time and from time to time to prepay any Borrowing of Revolving Loans.

(ii)     The Top Borrower shall notify the Administrative Agent in writing of any prepayment under this Section 2.11(a) not later than 11:00 a.m. on the day of prepayment (or such later time as to which the Administrative Agent may agree). Each such notice shall be irrevocable (except as set forth in the proviso to this sentence) and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid; provided that any notice of prepayment delivered by the Top Borrower may be conditioned upon the effectiveness of other transactions, in which case such notice may be revoked by the Top Borrower (by notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied. Promptly following receipt of any such notice relating to any Borrowing, the Administrative Agent shall advise the applicable Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount at least equal to the amount that would be permitted in the case of a Borrowing of the same Type as provided in Section 2.02(c), or such lesser amount that is then outstanding with respect to such Borrowing being repaid (and in increments of $100,000 in excess

thereof or such lesser incremental amount that is then outstanding with respect to such Borrowing being repaid).

(iii)    Subject to <u>Section 5.13(g)</u>, at all times after the occurrence and during the continuance of a Cash Dominion Period and notification thereof by the Administrative Agent to the Top Borrower, on each Business Day, at or before 1:00 p.m., the Administrative Agent shall apply all immediately available funds credited to the Administrative Agent Payment Account or otherwise received by Administrative Agent for application to the Secured Obligations in accordance with <u>Sections 2.18(b)</u> and <u>2.18(c)</u>.

(b)    <u>Mandatory Prepayments</u>.

(i)    Except with respect to Overadvances made pursuant to <u>Section 2.04(a)</u>, in the event that the Total Revolving Credit Exposure exceeds the Loan Cap in effect at any time, the Borrowers shall, within one Business Day of receipt of notice from the Administrative Agent, prepay the Revolving Loans (and, if there are no Revolving Loans outstanding at such time, Cash collateralize outstanding Letters of Credit at 103% of the face amount thereof), in an aggregate amount sufficient to reduce such Total Revolving Credit Exposure (calculated, for this purpose, as if any LC Exposure so Cash collateralized is not Total Revolving Credit Exposure) to an amount not to exceed 103% of the Loan Cap then in effect; <u>provided</u> that if the Total Revolving Credit Exposure (calculated in accordance with this <u>clause (i)</u>) exceeds the Loan Cap as a result of the imposition or increase of any Reserve, the Borrowers shall not be required to make such prepayment (or provide such Cash collateral) until the fifth Business Day following receipt of such notice from the Administrative Agent.

(ii)    Each prepayment of any Revolving Loan Borrowing under this <u>Section 2.11(b)</u> shall be paid to the Lenders in accordance with their respective Applicable Percentages.

(iii)    Prepayments made under this <u>Section 2.11(b)</u> shall be accompanied by accrued interest as required by <u>Section 2.13</u>.

Section 2.12    <u>Fees</u>.

(a)    <u>Commitment Fee</u>. The Borrowers jointly and severally agree to pay to the Administrative Agent for the account of each Revolving Lender (other than any Defaulting Lender) a commitment fee, which shall accrue at a rate equal to 0.50% per annum on the average daily amount of the unused Commitment of such Revolving Lender during the period from and including the Closing Date to the date on which such Revolving Lender's Commitment terminates. For purposes of calculating the commitment fee only, the Commitment of any Revolving Lender shall be deemed to be used to the extent of Revolving Loans of such Revolving Lender and the LC Exposure of such Revolving Lender attributable to its Commitment.

(b)    <u>Letter of Credit Fees</u>.

(i)    The Borrowers jointly and severally agree to pay to the Administrative Agent for the account of each Revolving Lender a participation fee with respect to its participations in Letters of Credit, which shall accrue at the Applicable Margin used to determine the interest rate applicable to Revolving Loans that are Term SOFR Rate Revolving Loans on the daily face amount of such Revolving Lender's LC Exposure that is attributable to Letters of Credit (excluding any portion thereof that is attributable to unreimbursed LC Disbursements), during the period from and including the Closing Date to the earlier of (A) the later of the date on which such Revolving Lender's Commitment terminates and the date on which such Revolving Lender ceases to have any LC Exposure and (B) the Termination Date.

(ii)     The Borrowers jointly and severally agree to pay to the Administrative Agent for the account of each Issuing Bank a fronting fee in respect of each Letter of Credit issued by such Issuing Bank for the period from the date of issuance of such Letter of Credit to the earliest of (A) the expiration date of such Letter of Credit, (B) the date on which such Letter of Credit terminates or (C) the Termination Date, computed at a rate equal to the rate agreed by such Issuing Bank and the applicable Borrower (or the Top Borrower on behalf of the relevant Borrower) (which rate shall initially be, and in any event shall not exceed, 0.25% per annum) of the daily face amount of such Letter of Credit. In addition, the Borrowers jointly and severally agree to pay to the Administrative Agent for the account of each Issuing Bank all customary charges associated with the issuance, amending, negotiating, payment, processing, transfer and administration of Letters of Credit.

(c)     [Reserved].

(d)     Fee Letter. The Borrowers jointly and severally agree to pay to Administrative Agent and Arranger, for their own respective accounts, the fees set forth in the Fee Letter in the amounts and at the times specified in the Fee Letter.

(e)     General. All fees payable hereunder shall be paid on the dates due, in Dollars and in immediately available funds, to the Administrative Agent. Fees payable hereunder shall accrue through and including the last day of the month immediately preceding the applicable fee payment date.

(f)     Computation. Unless otherwise indicated herein, all computations of fees shall be made on the basis of a 360-day year and shall be payable for the actual days elapsed (including the first day but excluding the last day). The determination by the Administrative Agent of the amount of any fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

(g)     Payment Dates for Fees, Etc. Accrued commitment fees shall be payable monthly in arrears on each Monthly Payment Date, and on the date on which the Commitments terminate. Accrued participation fees shall be payable monthly in arrears on the first Business Day of each month, and on the Maturity Date.  The letter of credit fees referred to in Section 2.12(b)(i) above shall be payable monthly in arrears on the first Business Day of each month from and including the Closing Date to the earlier of (A) the later of the date on which such Revolving Lender's Commitment terminates and the date on which such Revolving Lender ceases to have any LC Exposure and (B) the Termination Date, and fronting fee and all other fees, commissions and charges of an Issuing Bank shall be paid as and when incurred or as otherwise required by the Issuing Bank.  Borrowers hereby authorize Agent, from time to time, to charge to the Loan Account such fees and amounts when due.

Section 2.13     Interest.

(a)     Interest Rate.

(i)     The Loans (including Overadvances and Protective Advances) comprising each ABR Borrowing shall bear interest at the Alternate Base Rate plus the Applicable Margin.

(ii)     The Loans comprising each Term SOFR Rate Borrowing shall bear interest at Adjusted Term SOFR plus the Applicable Margin.

(b)     [Reserved].

(c)     Default Rate.  Notwithstanding the foregoing but in all cases subject to Section 9.05(f), if an Event of Default has occurred and is continuing, at the election of the Administrative Agent or the direction

of the Required Lenders, any overdue Obligations shall bear interest, to the fullest extent permitted by applicable Requirements of Law, after as well as before judgment, at a rate per annum equal to (i) in the case of principal or interest of any Loan or unreimbursed LC Disbursement, 2.00% plus the rate otherwise applicable to such Loan or LC Disbursement or (ii) in the case of any other overdue amount, 2.00% plus the rate applicable to Loans that are ABR Loans; provided that no amount shall accrue pursuant to this Section 2.13(c) on any amount, reimbursement obligation in respect of any LC Disbursement or other amount that is payable to any Defaulting Lender so long as such Lender is a Defaulting Lender.

(d)     Interest Payment Dates.  Accrued interest on each ABR Loan shall be payable in arrears (i) on each Quarterly Payment Date and accrued interest on each SOFR Loan shall be payable in arrears on the last day of the Interest Period applicable thereto; provided, that subject to the following clauses (ii) and (iii), in the case of any Interest Period greater than three months in duration, interest shall be payable at three month intervals after the commencement of the applicable Interest Period and on the last day of such Interest Period, or in each case as to an ABR Loan or SOFR Loan, the earlier of the date on which all or any portion of the Obligations are accelerated pursuant to the terms hereof,  the date on which this Agreement is terminated pursuant to the terms hereof or the Maturity Date; provided that (A) interest accrued pursuant to Section 2.13(c) shall be payable on demand and (B) in the event of any repayment or prepayment of any Loan (other than an ABR Revolving Loan prior to the termination of the Commitments) or accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment. Borrowers hereby authorize Agent, from time to time, to charge to the Loan Account such interest when due.

(e)     Computation.  All interest hereunder shall be computed on the basis of a year of 360 days, except that interest computed by reference to the Alternate Base Rate at times when the Alternate Base Rate is based on the "prime rate" shall be computed on the basis of a year of 365 days (or 366 days in a leap year), and in each case shall be payable for the actual number of days elapsed (including the first day but excluding the last day). The applicable Alternate Base Rate or Term SOFR Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error. Interest shall accrue on each Loan for the day on which the Loan is made and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall bear interest for one day.

(f)     Term SOFR Conforming Changes.  In connection with the use or administration of the Term SOFR Rate, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document. The Administrative Agent will promptly notify the Top Borrower and the Lenders of the effectiveness of any Conforming Changes in connection with the use or administration of the Term SOFR Rate.

(g)     Rates.  The Administrative Agent does not warrant or accept any responsibility for, and shall not have any liability with respect to, (a) the continuation of, administration of, submission of, calculation of or any other matter related to the Term SOFR Reference Rate, Adjusted Term SOFR, the Term SOFR Rate or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, or with respect to any alternative, successor or replacement rate thereto (including any then-current Benchmark or any Benchmark Replacement), including whether the composition or characteristics of any such alternative, successor or replacement rate (including any Benchmark Replacement), as it may or may not be adjusted pursuant to Section 2.14, will be similar to, or produce the same value or economic equivalence of, or have the same volume or liquidity as, the Term SOFR Reference Rate, Adjusted Term SOFR, the Term SOFR Rate or any other Benchmark, prior to its discontinuance or unavailability, or (b) the effect, implementation or composition of any Conforming Changes. The Administrative Agent and its

affiliates or other related entities may engage in transactions that affect the calculation of the Term SOFR Reference Rate, Adjusted Term SOFR, the Term SOFR Rate, any alternative, successor or replacement rate (including any Benchmark Replacement) or any relevant adjustments thereto and such transactions may be adverse to a Borrower. The Administrative Agent may select information sources or services in its reasonable discretion to ascertain the Term SOFR Reference Rate, Adjusted Term SOFR or the Term SOFR Rate, or any other Benchmark, any component definition thereof or rates referred to in the definition thereof, in each case pursuant to the terms of this Agreement, and shall have no liability to any Borrower, any Lender or any other person or entity for damages of any kind, including direct or indirect, special, punitive, incidental or consequential damages, costs, losses or expenses (whether in tort, contract or otherwise and whether at law or in equity), for any error or calculation of any such rate (or component thereof) provided by any such information source or service.

      (h)   <u>Interest Elections; Prepayment</u>.

      (i)   The Loans comprising each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a SOFR Rate Term Loan Borrowing, shall have the Interest Period specified in such Borrowing Request. Thereafter, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) may elect to convert SOFR Loans to ABR Loans or prepay SOFR Loans at any time; provided, that in the event that SOFR Loans are converted or prepaid on any date that is not the last day of the Interest Period applicable thereto, including as a result of any prepayment through the required application by Administrative Agent of any payments or proceeds of Collateral or for any other reason, including early termination of the term of this Agreement or acceleration of all or any portion of the Obligations pursuant to the terms hereof, each Borrower shall indemnify, defend, and hold Administrative Agent and the Lenders and their Participants harmless against any and all Funding Losses in accordance with <u>Section 2.13(h)(ii)</u>.

      (ii)   Each such election pursuant to this Section shall be made upon the relevant Borrower's (or the Top Borrower's on behalf of the relevant Borrower's) notice to the Administrative Agent. Each such notice shall be irrevocable and binding on Borrowers and in the form of a written Interest Election Request, appropriately completed and signed by a Responsible Officer of the relevant Borrower (which may be delivered through Administrative Agent's electronic platform or portal) and must be received by the Administrative Agent not later than the time that a Borrowing Request would be required under <u>Section 2.03</u> if the relevant Borrower were requesting a Borrowing of the Type resulting from such election to be made on the effective date of such election. Unless the Administrative Agent, in its sole discretion, agrees otherwise, Borrowers may not have more than five (5) SOFR Loans in effect at any given time. Borrowers may only exercise and Interest Election Request for proposed SOFR Loans of at least $1,000,000. In connection with each SOFR Loan, each Borrower shall indemnify, defend, and hold Administrative Agent and the Lenders harmless against any loss, cost, or expense actually incurred by Administrative Agent or any Lender as a result of (i) the payment or required assignment of any principal of any SOFR Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (ii) the conversion of any SOFR Loan other than on the last day of the Interest Period applicable thereto, or (iii) the failure to borrow, convert, continue or prepay any SOFR Loan on the date specified in any Borrowing Request delivered pursuant hereto (such losses, costs, or expenses, "<u>Funding Losses</u>").

      (iii)   If the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) fails to deliver a timely and complete Interest Election Request with respect to a SOFR Rate Term Loan Borrowing prior to the end of the Interest Period therefor, then, unless such SOFR Rate Term Loan Borrowing is repaid as provided herein, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall be deemed to have selected that such SOFR Rate Term Loan Borrowing shall automatically be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an

Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower), then, so long as such Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a SOFR Rate Term Loan Borrowing and (ii) unless repaid as provided herein, each SOFR Rate Term Loan Borrowing shall automatically be converted to an ABR Borrowing at the end of the Interest Period therefor.

Section 2.14    Alternate Rate of Interest.

(a)    Inability to Determine Rate, Etc.  Subject to Section 2.14(b), if:

(i)    the Administrative Agent determines (which determination shall be conclusive absent manifest error) that, by reason of circumstances affecting the interbank market or otherwise, adequate and reasonable means do not exist for ascertaining Adjusted Term SOFR or the Term SOFR Rate (including because the Term SOFR Reference Rate is not available or published on a current basis); or

(ii)    the Administrative Agent is advised by the Required Lenders that Adjusted Term SOFR will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Loans (or its Loan);

then the Administrative Agent shall give notice thereof to the Top Borrower and the Lenders as promptly as practicable thereafter and, so long as such circumstances shall continue, (x) the Administrative Agent and the Lenders shall be under no obligation to make any Term SOFR Rate Loans and (y) on the last day of the current calendar month, each Term SOFR Rate Loan shall, unless repaid in full, automatically convert to an ABR Loan.

(b)    Benchmark Replacement Setting.

(i)    Benchmark Replacement. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event, the Administrative Agent and the Top Borrower may amend this Agreement to replace the then-current Benchmark with a Benchmark Replacement. Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth Business Day after the Administrative Agent has posted such proposed amendment to all affected Lenders and the Top Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders. No replacement of a Benchmark with a Benchmark Replacement pursuant to this Section 2.14(b) will occur prior to the applicable Benchmark Transition Start Date.

(ii)    Benchmark Replacement Conforming Changes. In connection with the use, administration, adoption or implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of any other party to this Agreement or any other Loan Document.

(iii)    Notices; Standards for Decisions and Determinations. The Administrative Agent will promptly notify the Top Borrower and the Lenders of (A) the implementation of any Benchmark Replacement and (B) the effectiveness of any Conforming Changes in connection with the use, administration, adoption or implementation of a Benchmark Replacement. The Administrative Agent will promptly notify the Top Borrower of the removal or reinstatement of any tenor of a Benchmark pursuant to Section 2.14(b)(iv). Any determination, decision or election that may be made by the Administrative

Agent or, if applicable, any Lender (or group of Lenders) pursuant to this Section 2.14(b), including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from any other party to this Agreement or any other Loan Document, except, in each case, as expressly required pursuant to this Section 2.14(b).

        (iv)   Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (A) if the then-current Benchmark is a term rate (including the Term SOFR Reference Rate) and either (1) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Administrative Agent in its reasonable discretion or (2) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks, then the Administrative Agent may modify the definition of "Term SOFR Rate" (or any similar or analogous definition) for any Benchmark settings at or after such time to remove such unavailable, non-representative, non-compliant or non-aligned tenor and (B) if a tenor that was removed pursuant to clause (A) above either (1) is subsequently displayed on a screen or information service for a Benchmark (including a Benchmark Replacement) or (2) is not, or is no longer, subject to an announcement that it is not or will not be representative or in compliance with or aligned with the International Organization of Securities Commissions (IOSCO) Principles for Financial Benchmarks for a Benchmark (including a Benchmark Replacement), then the Administrative Agent may modify the definition of "Term SOFR Rate" (or any similar or analogous definition) for all Benchmark settings at or after such time to reinstate such previously removed tenor.

        (v)   Benchmark Unavailability Period. Upon the Top Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, (A) the Top Borrower may revoke any pending request for a Borrowing of Term SOFR Rate Loans to be made during any Benchmark Unavailability Period and, failing that, the Top Borrower will be deemed to have converted any such request into a request for a borrowing of ABR Loans and (B) any outstanding affected Term SOFR Rate Loans will be deemed to have been converted to ABR Loans at the end of the applicable calendar month. During any Benchmark Unavailability Period or at any time that a tenor for the then-current Benchmark is not an available tenor, the component of the Alternate Base Rate based upon the then-current Benchmark or such tenor for such Benchmark, as applicable, will not be used in any determination of the Alternate Base Rate.

        Section 2.15     Increased Costs.

    (a)   If any Change in Law:

        (i)   imposes, modifies or deems applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or Issuing Bank (except any such reserve requirement reflected in the Term SOFR Rate);

        (ii)   subjects any Lender or any Issuing Bank to any Taxes (other than (A) Indemnified Taxes and Other Taxes indemnifiable under Section 2.17 and (B) Excluded Taxes) on or with respect to its loans, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii)   imposes on any Lender or Issuing Bank any other condition (other than Taxes) affecting this Agreement or Term SOFR Rate Loans made by any Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing is to increase the cost to the relevant Lender of making or maintaining any Term SOFR Rate Loan (or of maintaining its obligation to make any such Loan) or to increase the cost to such Lender or Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount of any sum received or receivable by such Lender or Issuing Bank (whether of principal, interest or otherwise) in respect of any Term SOFR Rate Loan or Letter of Credit in an amount deemed by such Lender or Issuing Bank to be material, then, within 30 days after the Top Borrower's receipt of the certificate contemplated by paragraph (c) of this Section, the Borrowers will pay to such Lender or Issuing Bank, as applicable, such additional amount or amounts as will compensate such Lender or Issuing Bank, as applicable, for such additional costs incurred or reduction suffered; provided that the Borrowers shall not be liable for such compensation if (x) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto, (y) such Lender invokes Section 2.20 or (z) in the case of any request for reimbursement under clause (iii) above resulting from a market disruption, (A) the relevant circumstances do not generally affect the banking market or (B) the applicable request has not been made by Lenders constituting Required Lenders.

(b)   If any Lender or Issuing Bank determines that any Change in Law regarding liquidity or capital requirements has or would have the effect of reducing the rate of return on such Lender's or Issuing Bank's capital or on the capital of such Lender's or Issuing Bank's holding company, if any, as a consequence of this Agreement or the Loans made by, or participations in Letters of Credit held by, such Lender to a level below that which such Lender or Issuing Bank or such Lender's or such Issuing Bank's holding company could have achieved but for such Change in Law other than due to Taxes (taking into consideration such Lender's or Issuing Bank's policies and the policies of such Lender's or such Issuing Bank's holding company with respect to capital adequacy), then within 30 days of receipt by the Top Borrower of the certificate contemplated by paragraph (c) of this Section 2.15 the Borrowers will pay to such Lender or such Issuing Bank, as applicable, such additional amount or amounts as will compensate such Lender or such Issuing Bank or such Lender's or such Issuing Bank's holding company for any such reduction suffered.

(c)   Any Lender or Issuing Bank requesting compensation under this Section 2.15 shall be required to deliver a certificate to the Top Borrower that (i) sets forth the amount or amounts necessary to compensate such Lender or Issuing Bank or the holding company thereof, as applicable, as specified in paragraph (a) of this Section 2.15, (ii) sets forth, in reasonable detail, the manner in which such amount or amounts were determined and (iii) certifies that such Lender or Issuing Bank is generally charging such amounts to similarly situated borrowers, which certificate shall be conclusive absent manifest error.

(d)   Failure or delay on the part of any Lender or Issuing Bank to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's or such Issuing Bank's right to demand such compensation; provided, however that the Borrowers shall not be required to compensate any Lender or any Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 180 days prior to the date that such Lender or Issuing Bank notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's or Issuing Bank's intention to claim compensation therefor; provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 180-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16    [Reserved].

Section 2.17      Taxes.

(a)      Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made free and clear of and without deduction or withholding for any Taxes, except as required by applicable Requirements of Law. If any applicable Requirement of Law (as determined in the good faith discretion of an applicable withholding agent) requires the deduction or withholding of any Tax from any such payment, then (i) if such Tax is an Indemnified Tax and/or Other Tax, the amount payable by the applicable Loan Party shall be increased as necessary so that after all required deductions or withholdings have been made (including deductions or withholdings applicable to additional sums payable under this Section 2.17) each Lender (or, in the case of any payment made to the Administrative Agent for its own account, the Administrative Agent) receives an amount equal to the sum it would have received had no such deductions or withholdings been made, (ii) the applicable withholding agent shall be entitled to make such deductions or withholdings and (iii) the applicable withholding agent shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Requirements of Law.

(b)      The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable Requirements of Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)      The Borrowers shall jointly and severally indemnify the Administrative Agent and each Lender within 30 days after receipt of the certificate described in the succeeding sentence, for the full amount of any Indemnified Taxes or Other Taxes payable or paid by the Administrative Agent or such Lender, as applicable (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.17), other than any penalties determined by a final and non-appealable judgment of a court of competent jurisdiction (or documented in any settlement agreement) to have resulted from the gross negligence, bad faith or willful misconduct of the Administrative Agent or such Lender, and, in each case, any reasonable expenses arising therefrom or with respect thereto, whether or not correctly or legally imposed or asserted; provided that if the Top Borrower reasonably believes that such Taxes were not correctly or legally asserted, the Administrative Agent or such Lender, as applicable, will use reasonable efforts to cooperate with the Top Borrower to obtain a refund of such Taxes (which shall be repaid to the Top Borrower in accordance with Section 2.17(g)) so long as such efforts would not, in the sole determination of the Administrative Agent or such Lender, result in any additional out-of-pocket costs or expenses not reimbursed by such Loan Party or be otherwise materially disadvantageous to the Administrative Agent or such Lender, as applicable. In connection with any request for reimbursement under this Section 2.17(c), the relevant Lender or the Administrative Agent, as applicable, shall deliver a certificate to the Top Borrower setting forth, in reasonable detail, the basis and calculation of the amount of the relevant payment or liability. Notwithstanding anything to the contrary contained in this Section 2.17, no Borrower shall be required to indemnify the Administrative Agent or any Lender pursuant to this Section 2.17 for any amount to the extent the Administrative Agent or such Lender fails to notify the Top Borrower of such possible indemnification claim within 180 days after the Administrative Agent or such Lender receives written notice from the applicable taxing authority of the specific tax assessment giving rise to such indemnification claim.

(d)      [Reserved].

(e)      As soon as practicable after any payment of any Taxes pursuant to this Section 2.17 by any Loan Party to a Governmental Authority, the Top Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued, if any, by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment that is reasonably satisfactory to the Administrative Agent.

(f)    <u>Status of Lenders</u>.

(i)    Any Lender that is entitled to an exemption from or reduction of any withholding Tax with respect to any payments made under any Loan Document shall deliver to the Top Borrower and the Administrative Agent, at the time or times reasonably requested by the Top Borrower or the Administrative Agent, such properly completed and executed documentation as the Top Borrower or the Administrative Agent may reasonably request to permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Top Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable Requirements of Law or reasonably requested by the Top Borrower or the Administrative Agent as will enable the Top Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in paragraphs (A), (B) and (D) of <u>Section 2.17(f)(ii)</u>) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender. Each Lender hereby authorizes the Administrative Agent to deliver to the Top Borrower and to any successor Administrative Agent any documentation provided to the Administrative Agent pursuant to this <u>Section 2.17(f)</u>.

(ii)    Without limiting the generality of the foregoing,

(A)    each U.S. Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), two executed original copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding;

(B)    each Foreign Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), whichever of the following is applicable:

(1)    in the case of any Foreign Lender claiming the benefits of an income tax treaty to which the U.S. is a party, two executed original copies of IRS Form W- 8BEN or W-8BEN-E, as applicable, establishing any available exemption from, or reduction of, U.S. federal withholding Tax;

(2)    two executed original copies of IRS Form W-8ECI or W-EXP (or any successor forms);

(3)    in the case of any Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 871(h) or 881(c) of the Code, (x) two executed original copies of a certificate substantially in the form of <u>Exhibit O-1</u> to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Top Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code, and that no payments payable to such Lender are effectively connected with the conduct of a U.S. trade or business (a "U.S. Tax Compliance Certificate") and (y) two executed original copies of IRS Form W-8BEN or W-8BEN-E, as applicable (or any successor forms); or

(4)    to the extent any Foreign Lender is not the beneficial owner (e.g., where the Foreign Lender is a partnership), two executed original copies of IRS Form W-8IMY (or any successor

forms), accompanied by IRS Form W-8ECI, IRS Form W- 8EXP, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit O-2</u> or <u>Exhibit O-4</u>, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; <u>provided</u> that if such Foreign Lender is a partnership (and not a participating Lender) and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of <u>Exhibit O-3</u> on behalf of each such direct or indirect partner(s);

(C)   each Foreign Lender shall deliver to the Top Borrower and the Administrative Agent on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Top Borrower or the Administrative Agent), two executed original copies of any other form prescribed by applicable Requirements of Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Requirements of Law to permit the Top Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)   if a payment made to any Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Top Borrower and the Administrative Agent at the time or times prescribed by applicable Requirements of Law and at such time or times reasonably requested by the Top Borrower or the Administrative Agent such documentation as is prescribed by applicable Requirements of Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and may be necessary for the Top Borrower and the Administrative Agent to comply with their obligations under FATCA, to determine whether such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

For the avoidance of doubt, if a Lender is an entity disregarded from its owner for U.S. federal income tax purposes, references to the foregoing documentation are intended to refer to documentation with respect to such Lender's owner and, as applicable, such Lender.

Each Lender agrees that if any documentation (including any specific documentation required above in this <u>Section 2.17(f)</u>) it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall deliver to the Top Borrower and the Administrative Agent updated or other appropriate documentation (including any new documentation reasonably requested by the Top Borrower or the Administrative Agent) or promptly notify the Top Borrower and the Administrative Agent in writing of its legal ineligibility to do so.

Notwithstanding anything to the contrary in this <u>Section 2.17(f)</u>, no Lender shall be required to provide any documentation that such Lender is not legally eligible to deliver.

(g)   If the Administrative Agent or any Lender determines, in its sole discretion, that it has received a refund of any Indemnified Taxes or Other Taxes as to which it has been indemnified by any Borrower or with respect to which any Borrower has paid additional amounts pursuant to this <u>Section 2.17</u>, it shall pay over such refund to the Top Borrower (but only to the extent of indemnity payments made, or additional amounts paid, by the relevant Borrower under this <u>Section 2.17</u> with respect to the Indemnified Taxes or Other Taxes giving rise to such refund), net of all out-of- pocket expenses of the Administrative Agent or such Lender (including any Taxes imposed with respect to such refund), and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund); <u>provided</u>

that the Top Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to such Loan Party (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (g), in no event will the Administrative Agent or any Lender be required to pay any amount to the Top Borrower pursuant to this paragraph (g) to the extent that the payment thereof would place the Administrative Agent or such Lender in a less favorable net after-Tax position than the position that the Administrative Agent or such Lender would have been in if the Tax subject to indemnification had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts giving rise to such refund had never been paid. This Section 2.17 shall not be construed to require the Administrative Agent or any Lender to make available its Tax returns (or any other information relating to its Taxes which it deems confidential) to the relevant Loan Party or any other Person.

(h)    Survival. Each party's obligations under this Section 2.17 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, any Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(i)    Definition of Lender. The term "Lender" shall, for all purposes of this Section 2.17, include any Issuing Bank.

(j)    On or before the Closing Date, the Administrative Agent shall confirm to the Top Borrower that whichever of the following is applicable has previously been provided to the Top Borrower and has not expired or become obsolete or invalid: (i) if the Administrative Agent is a United States person (as defined in Section 7701(a)(30) of the Code), two executed copies of IRS Form W-9 certifying that such Administrative Agent is exempt from US federal backup withholding or (ii) if the Administrative Agent is not a United States person (as defined in Section 7701(a)(30) of the Code), (A) with respect to payments received for its own account, two executed copies of IRS Form W-8ECI and (B) with respect to payments received on account of any Lender, two executed copies of IRS Form W-8IMY (together with all required accompanying documentation) certifying that the Administrative Agent is a U.S. branch and may be treated as a United States person for purposes of applicable U.S. federal withholding Tax. At any time thereafter, the Administrative Agent shall provide updated documentation previously provided (or a successor form thereto) when any documentation previously delivered has expired or become obsolete or invalid or otherwise upon the reasonable request of the Top Borrower.

Section 2.18    Payments Generally; Allocation of Proceeds; Sharing of Payments.

(a)    Unless otherwise specified, the relevant Borrower (or the Top Borrower on behalf of the relevant Borrower) shall make each payment required to be made by it hereunder (whether of principal, interest or fees, reimbursements of LC Disbursements or of amounts payable under Section 2.15 or 2.17, or otherwise) prior to 2:00 p.m. on the date when due, in immediately available funds, without set-off or counterclaim. Any amount received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. Each such payment shall be made to the Administrative Agent to the Administrative Agent Payment Account, except that any payment made pursuant to Sections 2.05(e)(i), 2.15, 2.17 or 9.03 shall be made directly to the Person or Persons entitled thereto. The Administrative Agent shall distribute any such payment received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof, subject to the terms for Settlement provided for in Section 2.07. Except as provided in Sections 2.19(b) and 2.20, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest in respect of the Loans and each conversion of any Borrowing to, a Borrowing of any Type shall be allocated pro rata among the Lenders in accordance with their respective

Applicable Percentages. All payments hereunder shall be made in Dollars. Any payment required to be made by the Administrative Agent hereunder shall be deemed to have been made by the time required if the Administrative Agent shall, at or before such time, have taken the necessary steps to make such payment in accordance with the regulations or operating procedures of the clearing or settlement system used by the Administrative Agent to make such payment.

(b)    At any time that an Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders and subject in all respects to the provisions of the ABL Intercreditor Agreement and Section 5.13(g), all payments remitted to Administrative Agent and all proceeds of Collateral received by Administrative Agent shall be applied as follows:

(i)    first, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to Administrative Agent under the Loan Documents, until paid in full,

(ii)    second, to pay any fees or premiums then due to Administrative Agent under the Loan Documents, until paid in full,

(iii)    third, to pay interest due in respect of all Protective Advances, until paid in full,

(iv)    fourth, to pay the principal of all Protective Advances, until paid in full,

(v)    fifth, ratably, to pay any Lender Group Expenses (including cost or expense reimbursements) or indemnities then due to any of the Lenders under the Loan Documents, until paid in full,

(vi)    sixth, ratably, to pay any fees or premiums then due to any of the Lenders under the Loan Documents, until paid in full,

(vii)    seventh, to pay interest accrued in respect of the Swing Loans, until paid in full,

(viii)    eighth, to pay the principal of all Swing Loans, until paid in full,

(ix)    ninth, ratably, to pay interest accrued in respect of the Revolving Loans (other than Protective Advances and Swing Loans), until paid in full,

(x)    tenth, ratably

(A)    ratably, to pay the principal of all Revolving Loans (other than Protective Advances and Swing Loans), until paid in full,

(B)    to Administrative Agent, to be held by Administrative Agent, for the benefit of Issuing Bank (and for the ratable benefit of each of the Lenders that have an obligation to pay to Administrative Agent, for the account of Issuing Bank, a share of each LC Disbursement), as Cash collateral in the LC Collateral Account in an amount up to 103% of the LC Exposure (to the extent permitted by applicable law, such Cash collateral shall be applied to the reimbursement of any LC Disbursement as and when such disbursement occurs and, if a Letter of Credit expires undrawn, the Cash collateral held by Administrative Agent in respect of such Letter of Credit shall, to the extent permitted by applicable law, be reapplied pursuant to this Section 2.18(b), beginning with clause (b)(i) hereof),

(C)    ratably, up to the amount (after taking into account any amounts previously paid pursuant to this clause (C) during the continuation of the applicable Application Event) of the most recently

established Bank Product Reserve, which amount was established prior to the occurrence of, and not in contemplation of, the subject Application Event, to (1) the Bank Product Providers based upon amounts then certified by each applicable Bank Product Provider to Administrative Agent (in form and substance satisfactory to Administrative Agent) to be due and payable to such Bank Product Provider on account of Bank Product Obligations (but not in excess of the Bank Product Reserve established for the Bank Product Obligations of such Bank Product Provider), and (2) with any balance to be paid to Administrative Agent, to be held by Administrative Agent, for the ratable benefit of the Bank Product Providers, as Cash collateral (which Cash collateral may be released by Administrative Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Administrative Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.18(b), beginning with clause (b)(i) hereof,

(xi)    eleventh, to pay any other Obligations other than Obligations owed to Defaulting Lenders (including being paid, ratably, to the Bank Product Providers on account of all amounts then due and payable in respect of Bank Product Obligations, with any balance to be paid to Administrative Agent, to be held by Administrative Agent, for the ratable benefit of the Bank Product Providers, as Cash collateral (which cash collateral may be released by Administrative Agent to the applicable Bank Product Provider and applied by such Bank Product Provider to the payment or reimbursement of any amounts due and payable with respect to Bank Product Obligations owed to the applicable Bank Product Provider as and when such amounts first become due and payable and, if and at such time as all such Bank Product Obligations are paid or otherwise satisfied in full, the cash collateral held by Administrative Agent in respect of such Bank Product Obligations shall be reapplied pursuant to this Section 2.18(b), beginning with clause (b)(i) hereof),

(xii)   twelfth, ratably to pay any Obligations owed to Defaulting Lenders; and

(xiii)  thirteenth, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

Solely for purposes of this Section 2.18(b), "paid in full" of a type of Obligation means payment in cash or immediately available funds of all amounts owing on account of such type of Obligation, including interest accrued after the commencement of any Insolvency Proceeding, default interest, interest on interest, and expense reimbursements, irrespective of whether any of the foregoing would be or is allowed or disallowed in whole or in part in any Insolvency Proceeding.

(c)    So long as no Application Event has occurred and is continuing, Section 2.18(b) shall not apply to any payment made by Borrowers to Administrative Agent and specified by Borrowers to be for the payment of specific Obligations then due and payable (or prepayable) under any provision of this Agreement or any other Loan Document and subject to Section 2.11(b), all payments to be made hereunder by Borrowers shall be remitted to Administrative Agent and all such payments, and all proceeds of Collateral received by Administrative Agent, shall be applied, so long as no Application Event has occurred and is continuing and except as otherwise provided herein with respect to Defaulting Lenders, to reduce the balance of the Loans outstanding and, thereafter, to Borrowers (to be wired to the Designated Account) or such other Person entitled thereto under applicable law.

(d)    If any Lender obtains payment (whether voluntary, involuntary, through the exercise of any right of set-off or otherwise) in respect of any principal of or interest on any of its Loans or participations in LC Disbursements held by it resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans or participations in LC Disbursements and accrued interest thereon than the

proportion received by any other Lender with Loans or participations in LC Disbursements, then the Lender receiving such greater proportion shall purchase (for Cash at face value) participations in the Loans and sub-participations in LC Disbursements of other Lenders at such time outstanding to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and participations in LC Disbursements; <u>provided</u> that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not apply to (A) any payment made by any Borrower pursuant to and in accordance with the express terms of this Agreement or (B) any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with <u>Section 9.05</u>. Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Requirements of Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise rights of set-off and counterclaim against such Borrower with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation. The Administrative Agent will keep records (which shall be conclusive and binding in the absence of manifest error) of participations purchased under this <u>Section 2.18(d)</u> and will, in each case, notify the Lenders following any such purchases or repayments. Each Lender that purchases a participation pursuant to this <u>Section 2.18(d)</u> shall, from and after the date of such purchase, have the right to give all notices, requests, demands, directions and other communications under this Agreement with respect to the portion of the Obligations purchased to the same extent as though the purchasing Lender were the original owner of the Obligations purchased. For purposes of <u>subclause (c)</u> of the definition of "Excluded Taxes", any Lender that acquires a participation pursuant to this <u>Section 2.18(d)</u> shall be treated as having acquired such participation on the earlier date(s) on which such Lender acquired the applicable interest(s) in the Commitment(s) and/or Loan(s) to which such participation relates.

(e)    Unless the Administrative Agent has received notice from the Top Borrower prior to the date on which any payment is due to the Administrative Agent for the account of any Lender or Issuing Bank hereunder that the Top Borrower will not make such payment, the Administrative Agent may assume that the Top Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the applicable Lender or Issuing Bank the amount due. In such event, if the Top Borrower has not in fact made such payment, then each Lender or the applicable Issuing Bank severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

(f)    If any Lender fails to make any payment required to be made by it pursuant to <u>Section 2.07(b)</u> or <u>Section 2.18(e)</u>, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19    <u>Mitigation Obligations; Replacement of Lenders</u>.

(a)    If any Lender requests compensation under <u>Section 2.15</u> or determines it can no longer make or maintain Term SOFR Rate Loans pursuant to <u>Section 2.20</u>, or any Loan Party is required to pay any additional amount to or indemnify any Lender or any Governmental Authority for the account of any Lender pursuant to <u>Section 2.17</u>, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or its participation in any Letter of Credit affected by

such event, or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.15 or 2.17, as applicable, in the future or mitigate the impact of Section 2.20, as the case may be, and (ii) would not subject such Lender to any unreimbursed out-of-pocket cost or expense and would not otherwise be disadvantageous to such Lender in any material respect. The Top Borrower hereby agrees to pay all reasonable out-of-pocket costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)     If (i) any Lender requests compensation under Section 2.15 or determines it can no longer make or maintain Term SOFR Rate Loans pursuant to Section 2.20, (ii) any Loan Party is required to pay any additional amount to or indemnify any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.17, (iii) any Lender is a Defaulting Lender or (iv) in connection with any proposed amendment, waiver or consent requiring the consent of "each Lender" or "each Lender directly affected thereby" (or group of Lenders other than the Required Lenders) with respect to which Required Lender consent (or the consent of Lenders holding loans or commitments or lesser group representing more than 50% of the sum of the total loans and unused commitments or lesser group at such time) has been obtained, as applicable, any Lender is a non-consenting Lender, then the Top Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, (x) terminate the applicable Commitments of such Lender, and repay all Obligations of the relevant Borrower owing to such Lender relating to the applicable Loans and participations held by such Lender as of such termination date (provided that, if, after giving effect to such termination and repayment, the Total Revolving Credit Exposure exceeds the Loan Cap, the Borrowers shall, not later than the next Business Day, prepay one or more Revolving Loans (and if no Revolving Loans are outstanding, deposit Cash collateral in the LC Collateral Account) in an amount necessary to eliminate such excess) or (y) replace such Lender by requiring such Lender to assign and delegate (and such Lender shall be obligated to assign and delegate), without recourse (in accordance with and subject to the restrictions contained in Section 9.05), all of its interests, rights and obligations (other than its existing rights to payments pursuant to Section 2.15 or Section 2.17) under this Agreement to an Eligible Assignee that shall assume such obligations (which Eligible Assignee may be another Lender, if any Lender accepts such assignment); provided that (A) such Lender has received payment of an amount equal to the outstanding principal amount of its Loans and, if applicable, funded participations in LC Disbursements, accrued interest thereon, accrued fees and all other amounts payable to it under any Loan Document with respect to such Loans and/or Commitments, (B) in the case of any assignment resulting from a claim for compensation under Section 2.15 or payment required to be made pursuant to Section 2.17, such assignment would result in a reduction in such compensation or payment and (C) such assignment does not conflict with applicable Requirements of Law. No Lender (other than a Defaulting Lender) shall be required to make any such assignment and delegation, and the Top Borrower may not repay the Obligations of such Lender or terminate its Commitments, in each case, if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Top Borrower to require such assignment and delegation cease to apply. Each Lender agrees that if it is replaced pursuant to this Section 2.19, it shall execute and deliver to the Administrative Agent an Assignment and Assumption to evidence such sale and purchase and deliver to the Administrative Agent any Promissory Note (if the assigning Lender's Loans are evidenced by one or more Promissory Notes) subject to such Assignment and Assumption (provided that the failure of any Lender replaced pursuant to this Section 2.19 to execute an Assignment and Assumption or deliver any such Promissory Note shall not render such sale and purchase (and the corresponding assignment) invalid), such assignment shall be recorded in the Register and any such Promissory Note shall be deemed cancelled. Each Lender hereby irrevocably appoints the Administrative Agent (such appointment being coupled with an interest) as such Lender's attorney-in-fact, with full authority in the place and stead of such Lender and in the name of such Lender, from time to time in the Administrative Agent's discretion, with prior written notice to such Lender, to take any action and to execute any such Assignment and Assumption or other instrument that the Administrative Agent may deem reasonably necessary to carry out the provisions of this clause (b).

Section 2.20    Illegality.  If any Lender reasonably determines that any Change in Law has made it unlawful, or that any Governmental Authority has asserted after the Closing Date that it is unlawful, for such Lender or its applicable lending office to make, maintain or fund Loans whose interest is determined by reference to Adjusted Term SOFR, or to determine or charge interest rates based upon Adjusted Term SOFR, then, on notice thereof by such Lender to the Top Borrower through the Administrative Agent and, so long as such circumstances shall continue, (x) the Administrative Agent and the Lenders shall be under no obligation to make any Term SOFR Rate Loans and (y) on the last day of the current calendar month (or immediately upon demand by such Lender, if necessary to avoid such illegality), each Term SOFR Rate Loan shall, unless repaid in full, automatically convert to an ABR Loan. If such notice asserts the illegality of such Lender making or maintaining ABR Loans the interest rate on which is determined by reference to the Adjusted Term SOFR component of the Alternate Base Rate, the interest rate on all ABR Loans, shall, if necessary to avoid such illegality, be determined by the Administrative Agent without reference to the Adjusted Term SOFR component of the Alternate Base Rate, in each case until such Lender notifies the Administrative Agent and the Top Borrower that the circumstances giving rise to such determination no longer exist (which notice such Lender agrees to give promptly). Each Lender agrees to designate a different lending office if such designation will avoid the need for such notice and will not, in the determination of such Lender, otherwise be materially disadvantageous to such Lender.

Section 2.21    Defaulting Lenders.  Notwithstanding any provision of this Agreement to the contrary, if any Person becomes a Defaulting Lender, then the following provisions shall apply for so long as such Person is a Defaulting Lender:

(a)    Fees shall cease to accrue on the unfunded portion of any Commitment of such Defaulting Lender pursuant to Section 2.12(a) and, subject to clause (d)(iv) below, on the participation of such Defaulting Lender in Letters of Credit pursuant to Section 2.12(b) and Swing Loans pursuant to Section 2.03(b) and pursuant to any other provisions of this Agreement or other Loan Document.

(b)    The Commitments and the Revolving Credit Exposure of such Defaulting Lender shall not be included in determining whether all Lenders, each affected Lender, the Required Lenders, the Super Majority Lenders or such other number of Lenders as may be required hereby or under any other Loan Document have taken or may take any action hereunder (including any consent to any waiver, amendment or modification pursuant to Section 9.02); provided that any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender which affects such Defaulting Lender disproportionately and adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

(c)    Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of any Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 2.11, Section 2.15, Section 2.17, Section 2.18, Article 7, Section 9.05 or otherwise and including any amounts made available to the Administrative Agent by such Defaulting Lender pursuant to Section 9.09), shall be applied at such time or times as may be determined by the Administrative Agent and, where relevant, the Top Borrower as follows: first, to the payment of any amount owing by such Defaulting Lender to the Administrative Agent hereunder; second, to the payment on a pro rata basis of any amounts owing by such Defaulting Lender to any applicable Issuing Bank hereunder; third, if so reasonably determined by the Administrative Agent or reasonably requested by the applicable Issuing Bank, to be held as Cash collateral for future funding obligations of such Defaulting Lender in respect of any participation in any Letter of Credit; fourth, so long as no Default or Event of Default exists, as the Top Borrower may request, to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement; fifth as the Administrative Agent or the Top Borrower may elect, to be held in a deposit account and released in order to satisfy obligations of such Defaulting Lender to fund Loans under this Agreement; sixth, to the payment of any amount owing to the non-Defaulting Lenders, Issuing Banks as a result of any judgment of a court of competent jurisdiction obtained by any non-Defaulting

Lender, any Issuing Bank against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; <u>seventh</u>, to the payment of any amount owing to any Borrower as a result of any judgment of a court of competent jurisdiction obtained by such Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and <u>eighth</u>, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; <u>provided</u> that if (x) such payment is a payment of the principal amount of any Loan or LC Exposure in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loan or LC Exposure was made or created, as applicable, at a time when the conditions set forth in <u>Section 4.02</u> were satisfied or waived, such payment shall be applied solely to pay the Loans of, and LC Exposure owed to, all non- Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of, or LC Exposure owed to, such Defaulting Lender. Any payments, prepayments or other amounts paid or payable to any Defaulting Lender that are applied (or held) to pay amounts owed by any Defaulting Lender or to post Cash collateral pursuant to this <u>Section 2.21(c)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(d)     If any Swing Loan or LC Exposure exists at the time any Lender becomes a Defaulting Lender then:

(i)     the Swing Loan Exposure and LC Exposure of such Defaulting Lender shall be reallocated among the non-Defaulting Lenders in accordance with their respective Applicable Percentages but only to the extent that (A) the sum of the Revolving Credit Exposures of all non-Defaulting Lenders does not exceed the total of the Commitments of all non-Defaulting Lenders and (B) the Revolving Credit Exposure of any non-Defaulting Lender does not exceed such non-Defaulting Lender's Commitment;

(ii)     if the reallocation described in <u>clause (i)</u> above cannot, or can only partially, be effected, the applicable Borrower shall, without prejudice to any other right or remedy available to it hereunder or under applicable Requirements of Law, within two Business Days following notice by the Administrative Agent, (A) first, prepay such Defaulting Lender's Swing Loan Exposure (after giving effect to any partial reallocation pursuant to clause (i) above) and (B) Cash collateralize 103% of such Defaulting Lender's LC Exposure (after giving effect to any partial reallocation pursuant to <u>paragraph (i)</u> above and any Cash collateral provided by such Defaulting Lender or pursuant to <u>Section 2.21(c)</u> above) or make other arrangements reasonably satisfactory to the Administrative Agent and to the applicable Issuing Bank with respect to such LC Exposure and obligations to fund participations. Cash collateral (or the appropriate portion thereof) provided to reduce LC Exposure or other obligations shall be released promptly following (A) the elimination of the applicable LC Exposure or other obligations giving rise thereto (including by the termination of the Defaulting Lender status of the applicable Lender (or, as appropriate, its assignee following compliance with <u>Section 2.19</u>)) or (B) the Administrative Agent's good faith determination that there exists excess Cash collateral (including as a result of any subsequent reallocation of LC Exposure among non-Defaulting Lenders described in <u>clause (i)</u> above);

(iii)     (A) if the LC Exposure of the non-Defaulting Lenders is reallocated pursuant to this <u>Section 2.21(d)</u>, then the fees payable to the Lenders pursuant to <u>Sections 2.12(a)</u> and <u>(b)</u>, as the case may be, shall be adjusted to give effect to such reallocation and (B) if the LC Exposure of any Defaulting Lender is Cash collateralized pursuant to this <u>Section 2.21(d)</u>, then, without prejudice to any rights or remedies of the applicable Issuing Bank, any Lender or any Borrower hereunder, no letter of credit fees shall be payable under <u>Section 2.12(b)</u> with respect to such Defaulting Lender's LC Exposure; and

(iv)     if any Defaulting Lender's LC Exposure is not Cash collateralized, prepaid or reallocated pursuant to this <u>Section 2.21(d)</u>, then, without prejudice to any rights or remedies of the applicable Issuing Bank, any Lender or any Borrower hereunder, all letter of credit fees payable under <u>Section 2.12(b)</u> with

respect to such Defaulting Lender's LC Exposure shall be payable to the applicable Issuing Bank until such Defaulting Lender's LC Exposure is Cash collateralized or reallocated.

(e)    So long as any Lender is a Defaulting Lender, no Issuing Bank shall be required to issue, extend, create, incur, amend or increase any Letter of Credit unless it is reasonably satisfied that the related exposure will be 103% covered by the Commitments of the non-Defaulting Lenders, Cash collateral provided pursuant to Section 2.21(c) and/or Cash collateral provided in accordance with Section 2.21(d), and participating interests in any such or newly issued, extended or created Letter of Credit shall be allocated among non-Defaulting Lenders in a manner consistent with Section 2.21(d)(i) (it being understood that Defaulting Lenders shall not participate therein).  So long as any Lender is a Defaulting Lender, the Swing Lender shall not be required to make any Swing Loan to the extent (x) the Defaulting Lender's Applicable Percentage of such Swing Loans cannot be reallocated pursuant to this this Section 2.21, or (y) the Swing Lender has not otherwise entered into arrangements reasonably satisfactory to the Swing Lender and Borrowers to eliminate the Swing Lender's risk with respect to the Defaulting Lender's participation in Swing Loans.

(f)    In the event that the Administrative Agent and the Top Borrower agree that any Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, then the Applicable Percentage LC Exposure and Swing Loan Exposure of the Lenders shall be readjusted to reflect the inclusion of such Lender's Commitment, and on such date such Lender shall purchase at par such of the Revolving Loans of the other Lenders or participations in Revolving Loans as the Administrative Agent determine as necessary in order for such Lender to hold such Revolving Loans or participations in accordance with its Applicable Percentage. Notwithstanding the fact that any Defaulting Lender has adequately remedied all matters that caused such Lender to be a Defaulting Lender, (x) no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrowers while such Lender was a Defaulting Lender and (y) except to the extent otherwise expressly agreed by the affected parties, no change hereunder from "Defaulting Lender" to "Lender" will constitute a waiver or release of any claim of any party hereunder arising from such Lender's having been a Defaulting Lender.

Section 2.22    [Reserved].

Section 2.23    [Reserved].

Section 2.24    Reserves. The Administrative Agent may, at any time and from time to time in the exercise of its Permitted Discretion, establish or increase or decrease any Reserves upon three (3) Business Days' prior written notice to Top Borrower, which notice shall include a reasonably detailed description of such new category or change in methodology, during which period Administrative Agent shall be available to discuss in good faith any such proposed Reserve with the Top Borrower and the Top Borrower may take such action as may be required so that the event, condition or matter that is the basis for such Reserve or modification no longer exists or exists in a manner that would result in the establishment of a lower Reserve and such new or increased Reserve shall be deemed to be in effect for purposes of determining availability for additional Credit Extensions, provided, that, no such prior notice shall be required (i) for changes to any Reserves resulting solely by virtue of mathematical calculations of the amount of the Reserve in accordance with the methodology of calculation previously utilized (such as, but not limited to, rent and customer credit liabilities), or (ii) if after giving effect to any such new category of Reserves or change in methodology there would be an Overadvance. The establishment or change of any Reserve against the Borrowing Base shall be limited to such Reserves as the Administrative Agent determines in its Permitted Discretion to be necessary to reflect items that could reasonably be expected to adversely affect (i) the value of the applicable Eligible Trade Receivables, Eligible Inventory and/or Eligible In-Transit Inventory or (ii) the applicable ABL Priority Collateral, including without limitation the value, enforceability, perfection or priority of the Administrative Agent's Liens thereon or the Administrative Agent's access thereto or ability to realize

thereon.  Notwithstanding any other provision of this Agreement to the contrary, (a) in no event shall Reserves (or changes in Reserves) with respect to any component of the Borrowing Base duplicate Reserves or adjustments already accounted for in determining eligibility criteria (including collection and/or advance rates), (b) the amount of any such Reserve (or change in Reserve) shall have a reasonable relationship to the event, condition or other matter that is the basis for such Reserve (or change in Reserve), (d) no Reserves shall be imposed with respect to dilution other than the Dilution Reserve and (e) no Reserves shall be imposed in respect of General Accounting Liabilities.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES

On the Closing Date and on the date of each Credit Extension after the Closing Date (or, with respect to Holdings, on the date upon which Holdings becomes a party to this Agreement and on the date of each Credit Extension thereafter), Holdings (solely with respect to Sections 3.01, 3.02, 3.03, 3.07, 3.08, 3.09, 3.13, 3.14, 3.16 and 3.17) and the Borrowers hereby represent and warrant to the Lenders that:

Section 3.01    Organization; Powers.  Holdings, the Top Borrower and each of its Restricted Subsidiaries (a) is (i) duly organized and validly existing and (ii) in good standing (to the extent such concept exists in the relevant jurisdiction) under the Requirements of Law of its jurisdiction of organization, (b) has all requisite organizational power and authority to own its assets and to carry on its business as now conducted and (c) is qualified to do business in, and is in good standing (to the extent such concept exists in the relevant jurisdiction) in, every jurisdiction where the ownership, lease or operation of its properties or conduct of its business requires such qualification, except, in each case referred to in this Section 3.01 (other than clause (a)(i) and clause (b), in each case, with respect to the Top Borrower) where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.02    Authorization; Enforceability.  The execution, delivery and performance by each Loan Party of each Loan Document to which it is a party are within such Loan Party's corporate or other organizational power and have been duly authorized by all necessary corporate or other organizational action of such Loan Party.  Each Loan Document to which any Loan Party is a party has been duly executed and delivered by such Loan Party and is a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to the Legal Reservations.

Section 3.03    Section 3.03. Governmental Approvals; No Conflicts.  The execution and delivery of each Loan Document by each Loan Party thereto and the performance by such Loan Party thereof (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except (i) such as have been obtained or made and are in full force and effect, (ii) in connection with the Perfection Requirements and (iii) such consents, approvals, registrations, filings, or other actions the failure to obtain or make which could not be reasonably expected to have a Material Adverse Effect, (b) will not violate any (i) of such Loan Party's Organizational Documents or (ii) Requirement of Law applicable to such Loan Party which violation, in the case of this clause (b)(ii), could reasonably be expected to have a Material Adverse Effect and (c) will not violate or result in a default under (i) the Term Loan Agreement or (ii) any other material Contractual Obligation to which such Loan Party is a party which violation, in the case of this clause (c), could reasonably be expected to result in a Material Adverse Effect.

Section 3.04    Financial Condition; No Material Adverse Effect.

(a)    The financial statements most recently provided pursuant to Section 5.01(b) or (c), as applicable, present fairly, in all material respects, the financial condition and results of operations and cash flows of the Top Borrower on a consolidated basis as of such dates and for such periods in accordance with

GAAP, (i) except as otherwise expressly noted therein and/or (ii) subject, in the case of quarterly financial statements, to the absence of footnotes and normal year-end adjustments.

(b)     Since the Closing Date, there have been no events, developments or circumstances that have had, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.05     Properties.

(a)     As of the Closing Date, Schedule 3.05 sets forth the address of each Real Estate Asset (or each set of such assets that collectively comprise one operating property) that is owned in fee simple by any Loan Party.

(b)     The Top Borrower and each of its Restricted Subsidiaries have good and valid fee simple title to or rights to purchase, or valid leasehold interests in, or easements or other limited property interests in, all of their respective Real Estate Assets and have good title to their personal property and assets, in each case, except (i) for defects in title that do not materially interfere with their ability to conduct their business as currently conducted or to utilize such properties and assets for their intended purposes or (ii) where the failure to have such title would not reasonably be expected to have a Material Adverse Effect.

(c)     The Top Borrower and its Restricted Subsidiaries own or otherwise have a license or right to use all rights in Patents, Trademarks, Copyrights and other rights in works of authorship (including all copyrights embodied in software) and all other intellectual property rights ("IP Rights") used to conduct their respective businesses as presently conducted (including, without limitation, all Material Intellectual Property), without, to the knowledge of the Top Borrower, any infringement or misappropriation of the IP Rights of third parties, except as to IP Rights other than Material Intellectual Property, to the extent the failure to own or license or have rights to use such IP Rights would not, or where such infringement or misappropriation would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 3.06     Litigation and Environmental Matters.

(a)     There are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of the Top Borrower, threatened in writing against or affecting the Top Borrower or any of its Restricted Subsidiaries which would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)     Except for any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, (i) neither the Top Borrower nor any of its Restricted Subsidiaries is subject to or has received notice of any Environmental Claim or Environmental Liability or knows of any basis for any Environmental Liability or Environmental Claim of the Top Borrower or any of its Restricted Subsidiaries and (ii) neither the Top Borrower nor any of its Restricted Subsidiaries has failed to comply with any Environmental Law or to obtain, maintain or comply with any Governmental Authorization, permit, license or other approval required under any Environmental Law.

(c)     Neither the Top Borrower nor any of its Restricted Subsidiaries has treated, stored, transported or Released any Hazardous Materials on, at, under or from any currently or formerly owned, leased or operated real estate or facility in a manner that would reasonably be expected to have a Material Adverse Effect.

Section 3.07     Compliance with Laws.   Each of Holdings, the Top Borrower and each of its Restricted Subsidiaries is in compliance with all Requirements of Law applicable to it or its property,

except, in each case where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect; it being understood and agreed that this Section 3.07 shall not apply to the Requirements of Law covered by Section 3.17 below.

Section 3.08    Investment Company Status.  No Loan Party is an "investment company" as defined in, or is required to be registered under, the Investment Company Act of 1940.

Section 3.09    Taxes.  Each of Holdings, the Top Borrower and each of its Restricted Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it that are due and payable (including in its capacity as a withholding agent), except (a) Taxes (or any requirement to file Tax returns with respect thereto) that are being contested in good faith by appropriate proceedings and for which the Top Borrower or such Restricted Subsidiary, as applicable, has set aside on its books adequate reserves in accordance with GAAP or (b) to the extent that the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 3.10    ERISA.

(a)    Each Plan is in compliance in form and operation with its terms and with ERISA and the Code and all other applicable Requirements of Law, except where any failure to comply would not reasonably be expected to result in a Material Adverse Effect.

(b)    In the five-year period prior to the date on which this representation is made or deemed made, no ERISA Event has occurred and is continuing or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect.

Section 3.11    Disclosure.

(a)    As of the Closing Date, all written information (other than the Projections, financial estimates, other forward-looking information and/or projected information and information of a general economic and industry-specific nature) concerning the Top Borrower and its subsidiaries that was prepared by or on behalf of the Top Borrower or its subsidiaries or their respective representatives and made available to any Lender or the Administrative Agent in connection with the Transactions (the "Information"), when taken as a whole, did not, when furnished, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements contained therein not materially misleading in light of the circumstances under which such statements are made (after giving effect to all supplements and updates thereto from time to time).

(b)    The Projections have been prepared in good faith based upon assumptions believed by the Top Borrower to be reasonable at the time furnished (it being recognized that such Projections are not to be viewed as facts and are subject to significant uncertainties and contingencies many of which are beyond the Top Borrower's control, that no assurance can be given that any particular financial projections will be realized, that actual results may differ from projected results and that such differences may be material).

Section 3.12    Solvency.  As of the Closing Date and after giving effect to the Transactions and the incurrence of the Indebtedness and obligations being incurred in connection with this Agreement and the Transactions, (i) the sum of the debt (including contingent liabilities) of the Top Borrower and its subsidiaries, taken as a whole, does not exceed the fair value of the assets of the Top Borrower and its subsidiaries, taken as a whole, (ii) the present fair saleable value of the assets (on a going concern basis) of the Top Borrower and its subsidiaries, taken as a whole, is not less than the amount that will be required to

pay the probable liabilities of the Top Borrower and its subsidiaries, taken as a whole, on their debts as they become absolute and matured in accordance with their terms; (iii) the capital of the Top Borrower and its subsidiaries, taken as a whole, is not unreasonably small in relation to the business of the Top Borrower and its subsidiaries, taken as a whole, contemplated as of the Closing Date; and (iv) the Top Borrower and its subsidiaries, taken as a whole, do not intend to incur, or believe that they will incur, debts (including current obligations and contingent liabilities) beyond their ability to pay such debt as they mature in accordance with their terms.

Section 3.13    Subsidiaries.   Schedule 3.13 sets forth, in each case as of the Closing Date, (a) a correct and complete list of the name of each subsidiary of the Top Borrower and the ownership interest therein held by the Top Borrower or its applicable subsidiary, and (b) the jurisdiction of organization and the type of entity of the Top Borrower and each of its subsidiaries.

Section 3.14    Security Interest in Collateral.   Subject to the Legal Reservations, the Perfection Requirements and the provisions, limitations and/or exceptions set forth in this Agreement and/or any other Loan Document, the Collateral Documents create legal, valid and enforceable Liens on all of the Collateral in favor of the Administrative Agent, for the benefit of itself and the other Secured Parties, and upon the satisfaction of the applicable Perfection Requirements, such Liens constitute perfected Liens (with the priority that such Liens are expressed to have under the relevant Collateral Documents, unless otherwise permitted hereunder or under any Collateral Document) on the Collateral (to the extent such Liens are required to be perfected under the terms of the Loan Documents) securing the Secured Obligations, in each case as and to the extent set forth therein.

For the avoidance of doubt, notwithstanding anything herein or in any other Loan Document to the contrary, neither the Top Borrower nor any other Loan Party makes any representation or warranty as to (A) the effect of perfection or non-perfection, the priority or the enforceability of any pledge of or security interest in any Capital Stock of any Foreign Subsidiary, or as to the rights and remedies of the Administrative Agent or any Lender with respect thereto, under foreign Requirements of Law, (B) the enforcement of any security interest, or right or remedy with respect to any Collateral that may be limited or restricted by, or require any consent, authorization approval or license under, any Requirement of Law or (C) on the Closing Date and until required pursuant to Section 5.12, the pledge or creation of any security interest, or the effects of perfection or non-perfection, the priority or enforceability of any pledge or security interest to the extent the same is not required on the Closing Date pursuant to the terms hereof.

Section 3.15    Labor Disputes.   Except as individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect, (a) there are no strikes, lockouts or slowdowns against the Top Borrower or any of its Restricted Subsidiaries pending or, to the knowledge of the Top Borrower or any of its Restricted Subsidiaries, threatened and (b) the hours worked by and payments made to employees of the Top Borrower and its Restricted Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable Requirements of Law dealing with such matters.

Section 3.16    Federal Reserve Regulations.   No part of the proceeds of any Loan or any Letter of Credit has been used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that results in a violation of the provisions of Regulation U.

Section 3.17    OFAC; PATRIOT ACT and FCPA.   No Loan Party or any of its Subsidiaries is in violation of any Sanctions.  No Loan Party nor any of its Subsidiaries nor, to the knowledge of such Loan Party, any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities.  Each of the Loan Parties and its Subsidiaries has implemented and maintains in effect policies and procedures

reasonably designed to ensure compliance with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. Each of the Loan Parties and its Subsidiaries, and to the knowledge of each such Loan Party, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any Loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any Sanction, Anti-Corruption Law or Anti-Money Laundering Law by any Person (including any Lender, Bank Product Provider, or other individual or entity participating in any transaction). To the extent applicable, each Loan Party is in compliance, in all material respects, with the USA PATRIOT Act. As of the Closing Date, the information included in the Beneficial Ownership Certification is true and correct in all respects.

Section 3.18   <u>Borrowing Base Certificate</u>. The information set forth in each Borrowing Base Certificate is true and correct in all material respects and has been prepared in all material respects in the accordance with the requirements of this Agreement. The Accounts that are identified by a Borrower as Eligible Trade Receivables, and the Inventory that is identified by a Borrower as Eligible Inventory and Eligible In-Transit Inventory, in each Borrowing Base Certificate submitted to the Administrative Agent, at the time of submission, comply in all material respects with the criteria (other than any Administrative Agent-discretionary criteria) set forth in the definition of Eligible Trade Receivables, Eligible Inventory, and Eligible In-Transit Inventory, respectively.

ARTICLE 4
CONDITIONS

Section 4.01   <u>Closing Date</u>. The obligations of (i) each Lender to make Revolving Loans and (ii) each Issuing Bank to issue Letters of Credit shall not become effective until the date on which each of the following conditions is satisfied (or waived by the initial Lenders):

(a)   <u>Credit Agreement and Loan Documents</u>. The Administrative Agent (or its counsel) shall have received from each Loan Party, to the extent party thereto, a counterpart signed by such Loan Party (or written evidence reasonably satisfactory to the Administrative Agent (which may include a copy transmitted by facsimile or other electronic method) that such party has signed a counterpart) of (A) this Agreement, (B) the Security Agreement, (C) any Intellectual Property Security Agreement, (D) the Loan Guaranty, (E) the ABL Intercreditor Agreement and (F) each Promissory Note requested by a Lender at least three (3) Business Days prior to the Closing Date.

(b)   <u>Legal Opinions</u>. The Administrative Agent (or its counsel) shall have received, on behalf of itself, the Lenders on the Closing Date, (i) a customary written opinion of Weil, Gotshal & Manges LLP, in its capacity as special counsel for the Loan Parties and (ii) customary written opinions of local counsel to the Loan Parties organized in the jurisdictions set forth on <u>Schedule 4.01(b)</u>, each dated the Closing Date and addressed to the Administrative Agent and the Lenders.

(c)   <u>Secretary's Certificate and Good Standing Certificates</u>. The Administrative Agent (or its counsel) shall have received (i) a certificate of each Loan Party, dated the Closing Date and executed by a secretary, assistant secretary or other Responsible Officer thereof, which shall (A) certify that (w) attached thereto is a true and complete copy of the certificate or articles of incorporation, formation or organization of such Loan Party, certified by the relevant authority of its jurisdiction of organization, (x) the certificate or articles of incorporation, formation or organization of such Loan Party attached thereto has not been amended (except as attached thereto) since the date reflected thereon, (y) attached thereto is a true and correct copy of the by-laws or operating, management, partnership or similar agreement of such Loan Party, together with all amendments thereto as of the Closing Date and such by-laws or operating, management,

partnership or similar agreement are in full force and effect and (z) attached thereto is a true and complete copy of the resolutions or written consent, as applicable, of its board of directors, board of managers, sole member or other applicable governing body authorizing the execution and delivery of the Loan Documents, which resolutions or consent have not been modified, rescinded or amended (other than as attached thereto) and are in full force and effect, and (B) identify by name and title and bear the signatures of the officers, managers, directors or other authorized signatories of such Loan Party who are authorized to sign the Loan Documents to which such Loan Party is a party on the Closing Date and (ii) a good standing (or equivalent) certificate for such Loan Party from the relevant authority of its jurisdiction of organization, dated as of a recent date.

(d)     Representations and Warranties. The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof); provided that to the extent that any representation and warranty specifically refers to a given date or period, such representation and warranty shall be true and correct in all material respects as of such date or for such period.

(e)     No Default. On the Closing Date and immediately after giving effect to the Credit Extensions on the Closing Date and the consummation of the Transactions contemplated to occur on the Closing Date, no Default or Event of Default shall exist.

(f)     Fees, Costs and Expenses. Prior to or substantially concurrently with the effectiveness of the Commitments, the Administrative Agent shall have received all fees, costs, expenses that are due and payable by any Loan Party to any of the Lenders or the Administrative Agent on or prior to the Closing Date, including, to the extent invoiced two (2) Business Day prior to the Closing Date, reimbursement or payment of all reasonable and documented out-of-pocket legal fees and expenses required to be reimbursed or paid by any Loan Party under the Loan Documents or any fee, engagement or similar letter.

(g)     Perfection Certificate. The Administrative Agent (or its counsel) shall have received a completed Perfection Certificate dated the Closing Date and signed by a Responsible Officer of each Loan Party, together with all attachments contemplated thereby.

(h)     Solvency. The Administrative Agent (or its counsel) shall have received a certificate in substantially the form of Exhibit P from the chief financial officer (or other officer with reasonably equivalent responsibilities) of the Top Borrower dated as of the Closing Date and certifying as to the matters set forth therein.

(i)     Filings Registrations and Recordings. Each document (including any UCC (or similar) financing statement) required by any Collateral Document or under applicable Requirements of Law to be filed, registered or recorded in order to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a perfected Lien on the Collateral, required to be delivered on the Closing Date pursuant to such Collateral Document, shall be in proper form for filing, registration or recordation.

(j)     USA PATRIOT Act. No later than three (3) Business Days in advance of the Closing Date, the Administrative Agent shall have received all documentation and other information reasonably requested with respect to Holdings or any Loan Party in writing by any Lender at least ten Business Days in advance of the Closing Date, which documentation or other information is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(k)     Officer's Certificate. The Administrative Agent shall have received a certificate from a Responsible Officer of the Top Borrower certifying satisfaction of the conditions precedent set forth in Sections 4.01(d), (e), (o), and (p).

(l)     Closing Date Refinancing. Substantially contemporaneously with the Credit Extensions on the Closing Date, all obligations under the DIP ABL Credit Agreement shall be repaid in full in cash (or, with respect to letters of credit outstanding thereunder, deemed issued hereunder) (the "Closing Date Refinancing").   Administrative Agent (or its counsel) shall have received a payoff letter, in form and substance reasonably satisfactory to Administrative Agent, providing for the payment in full of all obligations under the DIP ABL Credit Agreement and the termination and release of all Liens securing any obligations thereunder or related thereto and releasing Borrowers and Guarantors thereunder, duly authorized, executed and delivered by Borrowers, Guarantors, the DIP ABL Agent and the DIP ABL Lenders.

(m)     Plan Confirmation. The Bankruptcy Court shall have entered the Confirmation Order, in form and substance reasonably satisfactory to the Administrative Agent and the Lenders, confirming the Plan of Reorganization (which shall be an Approved Plan) including approval of the Revolving Facility and the Term Loan Facility and releases and exculpation, and the Confirmation Order shall have become a final order and shall not have been reversed, vacated, amended, supplemented or otherwise modified in any manner that would reasonably be expected to adversely affect the interests of the Administrative Agent or the Lenders and authorizing the Top Borrower and its Restricted Subsidiaries to execute, deliver and perform under the Loan Documents.

(n)     Plan Effective Date. The Plan Effective Date and all material transactions contemplated in the Plan of Reorganization or in the Confirmation Order to occur on the Plan Effective Date shall have occurred on the Closing Date (or concurrently with the occurrence of the Closing Date) in accordance with the terms hereof and in compliance with applicable law, the applicable orders of the Bankruptcy Court and material regulatory approvals.

(o)     Third-Party Debt. The Administrative Agent shall have received satisfactory evidence that immediately after the consummation of the Plan of Reorganization, total outstanding third-party debt for borrowed money outstanding (excluding letters of credit or drawn amount hereunder or any capital leases) and net of unrestricted Cash and Cash Equivalents of the Top Borrower and its Restricted Subsidiaries shall not exceed $350,000,000.

(p)     Unrestricted Cash and Cash Equivalents. The Administrative Agent shall have received satisfactory evidence that immediately after the consummation of the Plan of Reorganization, total unrestricted Cash and Cash Equivalents of the Top Borrower and its Restricted Subsidiaries shall be no less than $40,000,000.

(q)     Closing Excess Availability.  Excess Availability as of the Closing Date, after giving effect to the Transactions occurring on the Closing Date, shall be not less than $15,000,000.

(r)     Borrowing Base Certificate. The Administrative Agent shall have received a Borrowing Base Certificate as of a recent date acceptable to the Administrative Agent.

(s)     Insurance. The Administrative Agent shall have received evidence that all insurance required to be maintained pursuant to the Loan Documents as of the Closing Date, has been obtained and is in effect [and that the Administrative Agent has been named as lender's loss payee and/or additional insured, as

applicable, under each insurance policy with respect to such insurance as to which the Administrative Agent shall have reasonably requested to be so named.][4]

For purposes of determining whether the conditions specified in this Section 4.01 have been satisfied on the Closing Date, by funding the Revolving Loans hereunder, the Administrative Agent and each Lender shall be deemed to have consented to, approved or accepted, or to be satisfied with, each document or other matter required hereunder to be consented to or approved by or acceptable or satisfactory to the Administrative Agent or such Lender, as the case may be.

Section 4.02    Each Credit Extension.  On and after the Closing Date, the obligation of each Revolving Lender to make any Credit Extension is subject to the satisfaction of the following conditions:

(a)    (i) In the case of any Borrowing, the Administrative Agent shall have received a Borrowing Request as required by Section 2.03 or (ii) in the case of the issuance of any Letter of Credit, the applicable Issuing Bank and the Administrative Agent shall have received a Letter of Credit Request as required by Section 2.05(b).

(b)    The representations and warranties of the Loan Parties set forth in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the date of any such Credit Extension with the same effect as though such representations and warranties had been made on and as of the date of such Credit Extension (except that such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof; provided that to the extent that any representation and warranty specifically refers to a given date or period, it shall be true and correct in all material respects as of such date or for such period.

(c)    At the time of and immediately after giving effect to the applicable Credit Extension, no Default or Event of Default has occurred and is continuing.

(d)    At the time of and immediately after giving effect to the applicable Credit Extension, the Total Revolving Credit Exposure does not exceed the Loan Cap then in effect.

Each Credit Extension on and after the Closing Date shall be deemed to constitute a representation and warranty by the applicable Borrower on the date thereof as to the matters specified in paragraphs (b), (c) and (d) of this Section.

ARTICLE 5
AFFIRMATIVE COVENANTS

From the Closing Date until the Termination Date, Holdings (solely with respect to Sections 5.02, 5.03 and 5.12) and each Borrower hereby covenants and agrees with Agent and the Lenders that:

Section 5.01    Financial Statements and Other Reports.  The Top Borrower will deliver to the Administrative Agent for delivery by the Administrative Agent, subject to Section 9.05(f), to each Lender:

(a)    Monthly Reports. Within 30 days after the end of each Fiscal Month, commencing with the Fiscal Month ending on or about [●], the consolidated balance sheet of the Top Borrower as at the end of such Fiscal Month and the related consolidated statements of income of the Top Borrower for such Fiscal Month and for the period from the beginning of the then-current Fiscal Year to the end of such Fiscal

---

[4] NTD to the extent not available at closing, we shall move to Schedule 5.15 and provide for a 30 day period to obtain with Agent's discretion to extend the delivery date beyond such time in its discretion.

Month, setting forth in each case in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, to the extent the corresponding figures for the corresponding periods of the previous Fiscal Year are available, all in reasonable detail, together with a Responsible Officer Certification with respect thereto;

(b)     Quarterly Financial Statements. As soon as available, and in any event within 60 days after the end of each of the first three Fiscal Quarters of each Fiscal Year, commencing with the Fiscal Quarter ending on or about [●], the consolidated balance sheet of the Top Borrower as at the end of such Fiscal Quarter and the related consolidated statements of income and cash flows of the Top Borrower for such Fiscal Quarter and for the period from the beginning of the then current Fiscal Year to the end of such Fiscal Quarter, and setting forth, in reasonable detail, in comparative form the corresponding figures for the corresponding periods of the previous Fiscal Year, all in reasonable detail, together with a Responsible Officer Certification (which may be included in the applicable Compliance Certificate) with respect thereto;

(c)     Annual Financial Statements. As soon as available, and in any event within 120 days after the end of each Fiscal Year ending after the Closing Date, (i) the consolidated balance sheet of the Top Borrower as at the end of such Fiscal Year and the related consolidated statements of income, stockholders' equity and cash flows of the Top Borrower for such Fiscal Year and setting forth, in reasonable detail, in comparative form the corresponding figures for the previous Fiscal Year and (ii) with respect to such consolidated financial statements, a report thereon of an independent certified public accountant of recognized national standing (which report shall not be subject to a "going concern" explanatory paragraph or like statement (except as resulting from (A) the impending maturity of any Indebtedness within the four full Fiscal Quarter period following the relevant audit date and/or (B) any breach or anticipated breach of any financial covenant)), and shall state that such consolidated financial statements fairly present, in all material respects, the consolidated financial position of the Top Borrower as at the dates indicated and its income and cash flows for the periods indicated in conformity with GAAP;

(d)     Compliance Certificate. Together with each delivery of financial statements of the Top Borrower pursuant to Sections 5.01(b) and (c), (i) a duly executed and completed Compliance Certificate and (ii) a summary of the pro forma adjustments necessary to eliminate the accounts of Unrestricted Subsidiaries (if any) from such financial statements;

(e)     Notice of Default. Promptly upon any Responsible Officer of the Top Borrower obtaining knowledge of (i) any Default or Event of Default or (ii) the occurrence of any event or change that has caused or evidences or would reasonably be expected to cause or evidence, either individually or in the aggregate, a Material Adverse Effect, a reasonably-detailed notice specifying the nature and period of existence of such condition, event or change and what action the Top Borrower has taken, is taking and proposes to take with respect thereto;

(f)     Notice of Litigation. Promptly upon any Responsible Officer of the Top Borrower obtaining knowledge of (i) the institution of, or threat of, any Adverse Proceeding not previously disclosed in writing by the Top Borrower to the Administrative Agent, or (ii) any material development in any Adverse Proceeding that, in the case of either of clauses (i) or (ii), could reasonably be expected to have a Material Adverse Effect, written notice thereof from the Top Borrower together with such other non-privileged information as may be reasonably available to the Loan Parties to enable the Lenders to evaluate such matters;

(g)     ERISA. Promptly upon any Responsible Officer of the Top Borrower becoming aware of the occurrence of any ERISA Event that could reasonably be expected to have a Material Adverse Effect, a written notice specifying the nature thereof;

(h)  <u>Financial Plan</u>. As soon as available and in any event no later than 60 days after the beginning of each Fiscal Year, commencing with the Fiscal Year ending on or about December 31, 2024, an annual budget prepared by management of the Top Borrower, consisting of a forecasted consolidated balance sheet and forecasted consolidated statements of income and cash flows of the Top Borrower for such Fiscal Year;

(i)  <u>Information Regarding Collateral</u>.

(i)  Prompt (and, in any event, no later than 10 days after the relevant change) written notice of any change (A) in any U.S. Loan Party's legal name, (B) in any U.S. Loan Party's type of organization (provided, that, such U.S. Loan Party shall execute and deliver such agreements confirming the continuation of its obligations hereunder and under the other Loan Documents as Administrative Agent may reasonably request in connection with such change), (C) in any U.S. Loan Party's jurisdiction of organization or (D) in any U.S. Loan Party's organizational identification number, together with a certified copy of the applicable Organizational Document reflecting the relevant change;

(ii)  Prompt (and in any event no later than the earlier to occur of (i) the time period required by applicable Requirements of Law and (ii) 10 days after the relevant change) written notice of any change that is analogous to any change described in clause (i) above with respect to any Non-U.S. Loan Party;

(j)  <u>Borrowing Base Certificates</u>.

(i)  As soon as available but in any event on or prior to the 20th calendar day after the last day of each Fiscal Month (commencing with the [●], 2023 Fiscal Month), a Borrowing Base Certificate as of the close of business on the last day of such Fiscal Month; <u>provided</u> that, during the continuance of a Weekly Reporting Period, the Top Borrower shall deliver a Borrowing Base Certificate on a weekly basis on or before the close of business of the third Business Day after the end of each week; <u>provided</u> <u>further</u> that (1) notwithstanding anything to the contrary contain in this Agreement or any other Loan Document, in the event that, since the most recent delivery of a Borrowing Base Certificate, the Loan Parties (or any of them) consummate any transaction (including, without limitation, any Investment, Restricted Payment or other Disposition, or any designation of a Restricted Subsidiary as an Unrestricted Subsidiary, but excluding Dispositions in the ordinary course of business or to a Loan Party) that result in the direct or indirect Disposition of, subordination of the Administrative Agent's Liens on, or release of a Loan Party owning, ABL Priority Collateral (whether as part of a sale of Capital Stock or otherwise) with a value (as reasonably determined by the Top Borrower), individually for such transaction or in the aggregate for all such transactions since the most recent delivery of a Borrowing Base Certificate, in excess of the lesser of $5,000,000 and 5% of the Borrowing Base at such time, as a condition to the permissibility of the consummation of such transaction pursuant to any provision of this Agreement or any other Loan Document, (x) the Top Borrower shall have provided to the Administrative Agent an updated Borrowing Base Certificate (giving pro forma effect to such transaction), together with such supporting information as may be reasonably requested by the Administrative Agent, prior to the consummation of such transaction and (y) no Overadvance shall exist after giving effect to such transaction (the foregoing requirements of this <u>clause (1)</u>, the "<u>Updated BBC Condition</u>"), and (2) in the event that any Loan Party consummates a Subject Acquisition, the Top Borrower may deliver an updated Borrowing Base Certificate (giving pro forma effect to such transaction) prior to the consummation of such Subject Acquisition, which shall be effective as of the date of consummation of such Subject Acquisition, subject to the limitations set forth in the definitions of "Borrowing Base";

(ii)  [Reserved];

(iii)   All calculations of Excess Availability in any Borrowing Base Certificate shall, upon delivery to Administrative Agent, whether by any Approved Electronic Communication or otherwise, be deemed to be made by the Borrowers and certified by a Responsible Officer;

(k)   <u>Certain Reports</u>. Promptly upon their becoming available and without duplication of any obligations with respect to any such information that is otherwise required to be delivered under the provisions of any Loan Document, copies of (i) following a Qualifying IPO, all financial statements, reports, notices and proxy statements sent or made available generally by the Top Borrower or its applicable Parent Company to its security holders acting in such capacity and (ii) all regular and periodic reports and all registration statements (other than on Form S-8 or a similar form) and prospectuses, if any, filed by the Top Borrower or its applicable Parent Company with any securities exchange or with the SEC or any analogous Governmental Authority or private regulatory authority with jurisdiction over matters relating to securities; and

(l)   <u>Other Information</u>. Such other certificates, reports and information (financial or otherwise) as the Administrative Agent may reasonably request from time to time regarding the financial condition or business of the Top Borrower and its Restricted Subsidiaries; <u>provided</u>, <u>however</u>, that none of Holdings, the Top Borrower nor any Restricted Subsidiary shall be required to disclose or provide any information (a) that constitutes non-financial trade secrets or non-financial proprietary information of Holdings, the Top Borrower or any of its subsidiaries or any of their respective customers and/or suppliers, (b) in respect of which disclosure to the Administrative Agent, any Issuing Bank or any Lender (or any of their respective representatives) is prohibited by applicable Requirements of Law, (c) that is subject to attorney-client or similar privilege or constitutes attorney work product or (d) in respect of which Holdings, the Top Borrower or any Restricted Subsidiary owes confidentiality obligations to any third-party (<u>provided</u> such confidentiality obligations were not entered into in contemplation of the requirements of this <u>Section 5.01(l)</u>).

Documents required to be delivered pursuant to this <u>Section 5.01</u> may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date (i) on which the Top Borrower (or a representative thereof) (x) posts such documents or (y) provides a link thereto at the website address listed on <u>Schedule 9.01</u>; <u>provided</u> that, other than with respect to items required to be delivered pursuant to <u>Section 5.01(k)</u> above, the Top Borrower shall promptly notify (which notice may be by facsimile or electronic mail) the Administrative Agent of the posting of any such documents at the website address listed on <u>Schedule 9.01</u> and provide to the Administrative Agent by electronic mail electronic versions (*i.e.*, soft copies) of such documents; (ii) on which such documents are delivered by the Top Borrower to the Administrative Agent for posting on behalf of the Top Borrower on IntraLinks/SyndTrak or another relevant website (the "<u>Platform</u>"), if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); (iii) on which such documents are faxed to the Administrative Agent (or electronically mailed to an address provided by the Administrative Agent); or (iv) in respect of the items required to be delivered pursuant to <u>Section 5.01(k)</u> above with respect to information filed by Holdings or its applicable Parent Company with any securities exchange or with the SEC or any analogous governmental or private regulatory authority with jurisdiction over matters relating to securities (other than Form 10-Q Reports and Form 10-K reports described in <u>Sections 5.01(a)</u> and <u>(b)</u>, respectively), on which such items have been made available on the SEC website or the website of the relevant analogous governmental or private regulatory authority or securities exchange.

Notwithstanding the foregoing, the obligations in <u>paragraphs (a)</u>, <u>(b)</u>, <u>(c)</u> and <u>(h)</u> of this <u>Section 5.01</u> may instead be satisfied with respect to any financial statements of the Top Borrower by furnishing (A) the applicable financial statements of any Parent Company or (B) any Parent Company's Form 10-K or 10-Q, as applicable, filed with the SEC or any securities exchange, in each case, within the time periods specified

in such paragraphs and without any requirement to provide notice of such filing to the Administrative Agent or any Lender; provided that, with respect to each of clauses (A) and (B), (i) to the extent (1) such financial statements relate to any Parent Company and (2) either (I) such Parent Company (or any other Parent Company that is a subsidiary of such Parent Company) has any material third-party Indebtedness and/or material operations (as determined by the Top Borrower in good faith and other than any operations that are attributable solely to such Parent Company's ownership of the Top Borrower and its subsidiaries) or (II) there are material differences between the financial statements of such Parent Company and its consolidated subsidiaries, on the one hand, and the Top Borrower and its consolidated subsidiaries, on the other hand, such financial statements or Form 10-K or Form 10-Q, as applicable, shall be accompanied by unaudited consolidating information that summarizes in reasonable detail the differences between the information relating to such Parent Company and its consolidated subsidiaries, on the one hand, and the information relating to the Top Borrower and its consolidated subsidiaries on a stand-alone basis, on the other hand, which consolidating information shall be certified by a Responsible Officer of the Top Borrower as having been fairly presented in all material respects and (ii) to the extent such statements are in lieu of statements required to be provided under Section 5.01(b), such statements shall be accompanied by a report and opinion of an independent registered public accounting firm of nationally recognized standing, which report and opinion shall satisfy the applicable requirements set forth in Section 5.01(b).

No financial statement required to be delivered pursuant to Section 5.01(a), (b) or (c) shall be required to include acquisition accounting adjustments relating to any Investment to the extent it is not practicable to include any such adjustments in such financial statement.

Section 5.02    Existence.  Except as otherwise permitted under Section 6.07, Holdings and the Top Borrower will, and the Top Borrower will cause each of its Restricted Subsidiaries to, at all times preserve and keep in full force and effect its existence and all rights, franchises, licenses and permits material to its business except, other than with respect to the preservation of the existence of the Top Borrower, to the extent that the failure to do so could not reasonably be expected to result in a Material Adverse Effect; provided that neither Holdings nor the Top Borrower nor any of the Top Borrower's Restricted Subsidiaries shall be required to preserve any such existence (other than with respect to the preservation of existence of the Top Borrower), right, franchise, license or permit if a Responsible Officer of such Person or such Person's board of directors (or similar governing body) determines that the preservation thereof is no longer desirable in the conduct of the business of such Person, and that the loss thereof is not disadvantageous in any material respect to such Person or to the Lenders (taken as a whole).

Section 5.03    Payment of Taxes.  Holdings and the Top Borrower will, and the Top Borrower will cause each of its Restricted Subsidiaries to, pay all Taxes imposed upon it or any of its properties or assets or in respect of any of its income or businesses or franchises before any penalty or fine accrues thereon; provided, however, that no such Tax need be paid if (a) it is being contested in good faith by appropriate proceedings, so long as (i) adequate reserves or other appropriate provisions, as are required in conformity with GAAP, have been made therefor and (ii) in the case of a Tax which has resulted or may result in the creation of a Lien on any of the Collateral, such contest proceedings conclusively operate to stay the sale of any portion of the Collateral to satisfy such Tax or (b) failure to pay or discharge the same could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

Section 5.04    Maintenance of Properties.  The Top Borrower will, and will cause each of its Restricted Subsidiaries to, maintain or cause to be maintained in good repair, working order and condition, ordinary wear and tear and casualty and condemnation excepted, all property reasonably necessary to the normal conduct of business of the Top Borrower and its Restricted Subsidiaries and from time to time will make or cause to be made all needed and appropriate repairs, renewals and replacements thereof except as expressly permitted by this Agreement or where the failure to maintain such properties or make such repairs, renewals or replacements could not reasonably be expected to have a Material Adverse Effect.

Section 5.05    <u>Insurance</u>.  The Top Borrower will maintain or cause to be maintained, with financially sound and reputable insurers, such insurance coverage with respect to liability, loss or damage in respect of the assets, properties and businesses of the Top Borrower and its Restricted Subsidiaries as may customarily be carried or maintained under similar circumstances by Persons of established reputation engaged in similar businesses, in each case in such amounts (giving effect to self-insurance), with such deductibles, covering such risks and otherwise on such terms and conditions as shall be customary for such Persons, including flood insurance with respect to each Flood Hazard Property, in each case in compliance with the National Flood Insurance Act of 1968 and the Flood Disaster Protection Act of 1973 (where applicable). Each such policy of insurance shall, subject to <u>Section 5.15</u>, (i) name the Administrative Agent on behalf of the Secured Parties as an additional insured thereunder as its interests may appear and (ii) (A) to the extent available from the relevant insurance carrier in the case of each casualty insurance policy (excluding any business interruption insurance policy), contain a loss payable clause or endorsement that names the Administrative Agent, on behalf of the Secured Parties as the loss payee thereunder and (B) to the extent available from the relevant insurance carrier after submission of a request by the applicable Loan Party to obtain the same, provide for at least 30 days' prior written notice to the Administrative Agent of any modification or cancellation of such policy (or 10 days' prior written notice in the case of the failure to pay any premiums thereunder).  All certificates of property and general liability insurance are to be delivered to Administrative Agent, with the lender's loss payable and additional insured endorsements in favor of Administrative Agent.

Section 5.06    <u>Inspections; Field Examinations; Appraisals</u>.

(a)    The Top Borrower will, and will cause each of its Restricted Subsidiaries to, permit any authorized representative designated by the Administrative Agent to visit and inspect any of the properties of the Top Borrower and any of its Restricted Subsidiaries at which the principal financial records and executive officers of the applicable Person are located, to inspect, copy and take extracts from its and their respective financial and accounting records, and to discuss its and their respective affairs, finances and accounts with its and their Responsible Officers and independent public accountants (<u>provided</u> that the Top Borrower (or any of its subsidiaries) may, if it so chooses, be present at or participate in any such discussion) at the expense of the Top Borrower, all upon reasonable notice and at reasonable times during normal business hours; <u>provided</u> that (a) only the Administrative Agent on behalf of the Lenders may exercise the rights of the Administrative Agent and the Lenders under this <u>Section 5.06</u>, (b) except as expressly set forth in <u>clause (c)</u> below during the continuance of an Event of Default, the Administrative Agent shall not exercise such rights more often than one time during any calendar year, (c) when an Event of Default exists, the Administrative Agent (or any of its representatives or independent contractors) may do any of the foregoing at the expense of the Top Borrower at any time during normal business hours and upon reasonable advance notice and (d) notwithstanding anything to the contrary herein, neither the Top Borrower nor any Restricted Subsidiary shall be required to disclose, permit the inspection, examination or making of copies of or taking abstracts from, or discuss any document, information, or other matter (i) that constitutes non-financial trade secrets or non-financial proprietary information of the Top Borrower and its subsidiaries and/or any of its customers and/or suppliers, (ii) in respect of which disclosure to the Administrative Agent or any Lender (or any of their respective representatives or contractors) is prohibited by applicable Requirements of Law, (iii) that is subject to attorney-client or similar privilege or constitutes attorney work product or (iv) in respect of which Holdings, the Top Borrower or any Restricted Subsidiary owes confidentiality obligations to any third-party (<u>provided</u> that such confidentiality obligations were not entered into in contemplation of the requirements of this <u>Section 5.06</u>).

(b)    Upon the request of Administrative Agent after reasonable prior notice, during normal business hours and with reasonable coordination and subject to the following sentence, permit Administrative Agent or the applicable Approved Consultant to conduct verifications and evaluations inventory appraisals, commercial finance examinations as the Administrative Agent may deem necessary

or appropriate including, without limitation, of (i) each Borrower's practices in the computation of the Borrowing Base and (ii) the assets included in the Borrowing Base and related financial information such as, but not limited to, sales, gross margins, payables, accruals and reserves.  The Loan Parties shall pay the fees and expenses of Administrative Agent and such professionals with respect to such verifications and evaluations inventory appraisals and commercial finance examinations, provided, that, Administrative Agent may conduct, or cause to be conducted, commencing after the Closing Date, (A) no more than one (1) appraisal or field examination in any twelve (12) month period at the expense of Borrowers so long as Excess Availability is not less than the greater of seventeen and one-half percent (17.5%) of the Loan Cap or $12,500,000 at any time during such period, or (B) no more than two (2) appraisals or field examinations in any twelve (12) month period at the expense of Borrowers if Excess Availability is less than the greater of such amounts during such period.  Notwithstanding the foregoing, Administrative Agent may cause additional appraisals or field examinations to be undertaken (i) as it deems necessary or appropriate in its discretion, at its own expense or (ii) if an Event of Default shall have occurred and be continuing, at the expense of the Loan Parties and without the requirements of advance notice or coordination.

(c)    The Loan Parties acknowledge that the Administrative Agent that after exercising its rights of inspection, (i) may prepare and distribute to the Lenders certain Reports pertaining to the Loan Parties' assets for internal use by the Administrative Agent and the Lenders, subject to the provisions of Section 9.13 and (ii) shall promptly distribute copies of any final reports from a third-party appraiser or third-party consultant delivered in connection with any field exam or appraisal to the Lenders.

Section 5.07    Maintenance of Book and Records.  The Top Borrower will, and will cause its Restricted Subsidiaries to, maintain proper books of record and account containing entries of all material financial transactions and matters involving the assets and business of the Top Borrower and its Restricted Subsidiaries that are full, true and correct in all material respects and permit the preparation of consolidated financial statements in accordance with GAAP.

Section 5.08    Compliance with Laws. The Top Borrower will comply, and will cause each of its Restricted Subsidiaries to comply, with the requirements of all applicable Requirements of Law (including applicable ERISA and all Environmental Laws, OFAC, the USA PATRIOT Act and the FCPA), except to the extent the failure of the Top Borrower or the relevant Restricted Subsidiary to comply could not reasonably be expected to have a Material Adverse Effect; provided that the requirements set forth in this Section 5.08, as they pertain to compliance by any Foreign Subsidiary with OFAC, the USA PATRIOT ACT and the FCPA are subject to and limited by any Requirement of Law applicable to such Foreign Subsidiary in its relevant local jurisdiction.

Section 5.09    Environmental.

(a)    Environmental Disclosure. The Top Borrower will deliver to the Administrative Agent as soon as practicable following the sending or receipt thereof by the Top Borrower or any of its Restricted Subsidiaries, a copy of any and all written communications with respect to (A) any Environmental Claim that, individually or in the aggregate, has a reasonable possibility of giving rise to a Material Adverse Effect, (B) any Release required to be reported by the Top Borrower or any of its Restricted Subsidiaries to any federal, state or local governmental or regulatory agency or other Governmental Authority that reasonably could be expected to have a Material Adverse Effect, (C) any request made to the Top Borrower or any of its Restricted Subsidiaries for information from any governmental agency that suggests such agency is investigating whether the Top Borrower or any of its Restricted Subsidiaries may be potentially responsible for any Hazardous Materials Activity which is reasonably expected to have a Material Adverse Effect and (D) subject to the limitations set forth in the proviso to Section 5.01(l), such other documents and information as from time to time may be reasonably requested by the Administrative Agent in relation to any matters disclosed pursuant to this Section 5.09(a);

(b)     Hazardous Materials Activities, Etc. The Top Borrower shall promptly take, and shall cause each of its Restricted Subsidiaries promptly to take, any and all actions necessary to (i) cure any violation of applicable Environmental Laws by the Top Borrower or its Restricted Subsidiaries, and address with appropriate corrective or remedial action any Release or threatened Release of Hazardous Materials at or from any Facility, in each case, that could reasonably be expected to have a Material Adverse Effect and (ii) make an appropriate response to any Environmental Claim against the Top Borrower or any of its Restricted Subsidiaries and discharge any obligations it may have to any Person thereunder, in each case, where failure to do so could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

Section 5.10     Designation of Subsidiaries. The Top Borrower may at any time after the Closing Date designate (or re-designate) any subsidiary as an Unrestricted Subsidiary or any Unrestricted Subsidiary as a Restricted Subsidiary; provided that (a) after giving effect to such designation, no Event of Default exists (including after giving effect to the reclassification of Investments in, Indebtedness of and Liens on the assets of, the applicable Restricted Subsidiary or Unrestricted Subsidiary), (b) no subsidiary may be designated as (or become) an Unrestricted Subsidiary if (i) it is a "Restricted Subsidiary" under any Term Loan Facility, (ii) it owns or is the exclusive licensee of or, immediately after giving effect to such designation, will own or be the exclusive licensee of, any Material Intellectual Property, (iii) it is a Borrower, or (iv) it owns, directly or indirectly, any Capital Stock in a Loan Party or any other Restricted Subsidiary or holds any Indebtedness or any Lien on any property of any Loan Party or any other Restricted Subsidiary. The designation of any subsidiary as an Unrestricted Subsidiary shall constitute an Investment by the Top Borrower (or its applicable Restricted Subsidiary) therein at the date of designation in an amount equal to the portion of the fair market value of the net assets of such subsidiary attributable to the Top Borrower's (or its applicable Restricted Subsidiary's) equity interest therein as reasonably estimated by the Top Borrower (and such designation shall only be permitted to the extent such Investment is permitted under Section 6.06). The designation of any Unrestricted Subsidiary as a Restricted Subsidiary shall constitute the making, incurrence or granting, as applicable, at the time of designation of any then-existing Investment, Indebtedness or Lien of such subsidiary, as applicable; provided that upon any re-designation of any Unrestricted Subsidiary as a Restricted Subsidiary, the Top Borrower shall be deemed to continue to have an Investment in the resulting Restricted Subsidiary in an amount (if positive) equal to (a) the Top Borrower's "Investment" in such Restricted Subsidiary at the time of such re-designation, less (b) the portion of the fair market value of the net assets of such Restricted Subsidiary attributable to the Top Borrower's equity therein at the time of such re-designation.

Section 5.11     Use of Proceeds.

(a)     Each Borrower shall use the proceeds of the Revolving Loans (including Protective Advances and Overadvances) (i) on the Closing Date to (A) refinance all outstanding obligations and replace commitments under the DIP ABL Credit Agreement, including rolling the letters of credit outstanding thereunder, (B) to pay the fees, costs and expenses incurred in connection with the transactions contemplated hereby (including fees and expenses related to the Loan Parties' emergence from the Chapter 11 Cases), and (C) to pay the fees, costs and expenses incurred in connection with the Transactions and (ii) on and/or after the Closing Date (A) for the Loan Parties' and their Subsidiaries' working capital requirements and for general corporate purposes, (B) payment of all reasonable and documented out-of-pocket costs, fees and expenses required by the Loan Documents, and, in each case of (i) and (ii) above, in accordance with the terms of the Loan Documents.  No part of the proceeds of the Loans will be used to purchase or carry any Margin Stock or to extend credit to others for the purpose of purchasing or carrying any Margin Stock or for any purpose that violates the provisions of Regulation T, U or X of the Board of Governors.  No part of the proceeds of any Loan or Letter of Credit will be used, directly or indirectly, to make any payments to a Sanctioned Entity or a Sanctioned Person, to fund any investments, loans or contributions in, or otherwise make such proceeds available to, a Sanctioned Entity or a Sanctioned Person,

to fund any operations, activities or business of a Sanctioned Entity or a Sanctioned Person, or in any other manner that would result in a violation of Sanctions by any Person. No part of the proceeds of any Loan or Letter of Credit will be used, directly or indirectly, in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws.

(b)     Letters of Credit may be issued for general corporate purposes of Holdings (or prior to the date Holdings becomes a party hereto, the Top Borrower) and its Subsidiaries and any other purpose not prohibited by the terms of the Loan Documents.

Section 5.12     Covenant to Guarantee Obligations and Provide Security.

(a)     Upon (i) the formation or acquisition after the Closing Date of any Restricted Subsidiary that is a Domestic Subsidiary, (ii) the designation of any Unrestricted Subsidiary that is a Domestic Subsidiary as a Restricted Subsidiary, (iii) any Restricted Subsidiary that is a Domestic Subsidiary ceasing to be an Immaterial Subsidiary or (iv) any Restricted Subsidiary that was an Excluded Subsidiary ceasing to be an Excluded Subsidiary, then on or before the date on which financial statements are required to be delivered pursuant to Section 5.01(b) or (c), as applicable, for the Fiscal Quarter in which the relevant formation, acquisition, designation or cessation occurred (or such longer period as the Administrative Agent may reasonably agree), the Top Borrower shall (A) cause such Restricted Subsidiary (other than any Excluded Subsidiary) to comply with the requirements set forth in clause (a) of the definition of "Collateral and Guarantee Requirement" and (B) upon the reasonable request of the Administrative Agent, cause the relevant Restricted Subsidiary (other than any Excluded Subsidiary) to deliver to the Administrative Agent a signed copy of a customary opinion of counsel for such Restricted Subsidiary, addressed to the Administrative Agent and the other relevant Secured Parties.  Agent shall not accept delivery of any joinder to any Loan Document with respect to any Subsidiary of any Loan Party that is not a Loan Party, if such Subsidiary that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation unless such Subsidiary has delivered a Beneficial Ownership Certification in relation to such Subsidiary and Agent has completed its Patriot Act searches, OFAC/PEP searches and customary individual background checks for such Subsidiary, the results of which shall be satisfactory to Agent.

(b)     Within 90 days after the acquisition by any Loan Party of any Material Real Estate Asset other than any Excluded Asset (or such longer period as the Administrative Agent may reasonably agree), the Top Borrower shall cause such Loan Party to comply with the requirements set forth in clause (c) of the definition of "Collateral and Guarantee Requirement"; it being understood and agreed that, with respect to any Material Real Estate Asset owned by any Restricted Subsidiary at the time such Restricted Subsidiary is required to become a Loan Party under Section 5.12(a) above, such Material Real Estate Asset shall be deemed to have been acquired by such Restricted Subsidiary on the first day of the time period within which such Restricted Subsidiary is required to become a Loan Party under Section 5.12(a). Agent shall not accept delivery of any Mortgage from any Loan Party unless each of the Lenders has received 45 days prior written notice thereof and Agent has received confirmation from each Lender that such Lender has completed its flood insurance diligence, has received copies of all flood insurance documentation and has confirmed that flood insurance compliance has been completed as required by the Flood Laws or as otherwise satisfactory to such Lender.

(c)     Concurrently with the designation of any Restricted Subsidiary as a Discretionary Guarantor, cause such Restricted Subsidiary to comply with the requirements set forth in clause (b) of the definition of "Collateral and Guarantee Requirement".

(d)     Notwithstanding anything to the contrary herein or in any other Loan Document, it is understood and agreed that:

(i)      the Administrative Agent may grant extensions of time (including after the expiration of any relevant period, which may apply retroactively) for the creation and perfection of security interests in, or obtaining of title insurance, legal opinions, surveys or other deliverables with respect to, particular assets or the provision of any Loan Guaranty by any Restricted Subsidiary (in connection with assets acquired, or Restricted Subsidiaries formed or acquired, after the Closing Date), and each Lender hereby consents to any such extension of time,

(ii)     any Lien required to be granted from time to time pursuant to the definition of "Collateral and Guarantee Requirement" shall be subject to the exceptions and limitations set forth in the Collateral Documents,

(iii)    except to the extent required by Section 5.13, perfection by control shall not be required with respect to assets requiring perfection through control agreements or other control arrangements (other than control of pledged Capital Stock and/or Material Debt Instruments, in each case to the extent the same otherwise constitute Collateral),

(iv)    no Loan Party shall be required to seek any landlord lien waiver, bailee letter, estoppel, warehouseman waiver or other collateral access or similar letter or agreement (except to the extent otherwise provided in Section 5.15); provided a Rent Reserve may be imposed in the Permitted Discretion of the Administrative Agent as described in the definition of "Eligible Inventory",

(v)     no Loan Party will be required to (A) take any action (1) outside of the U.S. in order to create or perfect any security interest in any asset located outside of the U.S. in the case of any U.S. Loan Party and/or (2) outside of the U.S. or the jurisdiction of organization of such Non-U.S. Loan Party in order to create or perfect any security interest in any asset located outside of the U.S. or the jurisdiction of organization of such Non-U.S. Loan Party, (B) execute any security agreement, pledge agreement, mortgage, deed, hypothec, charge or other collateral document governed by the laws of any jurisdiction, other than (1) in the case of any U.S. Loan Party, the U.S., any state thereof or the District of Columbia or (2) in the case of any Non-U.S. Loan Party, the U.S. or its jurisdiction of organization or (C) make any intellectual property filing, conduct any intellectual property search or prepare any intellectual property schedule in any jurisdiction, other than (1) in the case of any U.S. Loan Party, the U.S., any state thereof or the District of Columbia or (2) in the case of any Non-U.S. Loan Party, its jurisdiction of organization,

(vi)    in no event will the Collateral include any Excluded Asset and in no event will the Top Borrower or any of its subsidiaries be required to make any Excluded Subsidiary become a Subsidiary Guarantor,

(vii)   no action shall be required to perfect any Lien with respect to (1) any vehicle or other asset subject to a certificate of title, (2) Letter-of-Credit Rights, (3) the Capital Stock of any Immaterial Subsidiary and/or (4) the Capital Stock of any Person that is not a subsidiary, which Person, if a subsidiary, would constitute an Immaterial Subsidiary, in each case except to the extent that a security interest therein can be perfected by filing a Form UCC-1 (or similar) financing statement under the UCC,

(viii) no action shall be required to perfect a Lien in any asset in respect of which the perfection of a security interest therein would (1) be prohibited by enforceable anti-assignment provisions set forth in any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings), (2) violate the terms of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings), in each case, after

giving effect to the applicable anti-assignment provisions of the UCC or other applicable Requirements of Law or (3) trigger termination of any contract relating to such asset that is permitted or otherwise not prohibited by the terms of this Agreement and is binding on such asset at the time of its acquisition and not incurred in contemplation thereof (other than in the case of capital leases, purchase money and similar financings) pursuant to any "change of control" or similar provision; it being understood that the Collateral shall include any proceeds and/or receivables arising out of any contract described in this clause to the extent the assignment of such proceeds or receivables is expressly deemed effective under the UCC or other applicable Requirements of Law notwithstanding the relevant prohibition, violation or termination right,

(ix)   no Loan Party shall be required to perfect a security interest in any asset to the extent the perfection of a security interest in such asset would be prohibited under any applicable Requirement of Law,

(x)   any joinder or supplement to any Loan Guaranty, any Collateral Document and/or any other Loan Document executed by any Restricted Subsidiary that is required to become (or otherwise becomes) a Loan Party pursuant to Section 5.12(a) above (including any Joinder Agreement) may, with the consent of the Administrative Agent (not to be unreasonably withheld or delayed), include such schedules (or updates to schedules) as may be necessary to qualify any representation or warranty set forth in any Loan Document to the extent necessary to ensure that such representation or warranty is true and correct to the extent required thereby or by the terms of any other Loan Document, and

(xi)   the Administrative Agent shall not require the taking of a Lien on, or require the perfection of any Lien granted in, those assets as to which the cost of obtaining or perfecting such Lien (including any mortgage, stamp, intangibles or other tax or expenses relating to such Lien) is excessive in relation to the benefit to the Lenders of the security afforded thereby as reasonably determined in writing by the Top Borrower and the Administrative Agent.

Section 5.13   Cash Management.

(a)   Each Loan Party shall (i) require that all cash payments of Accounts owed to any Loan Party or otherwise relating to ABL Priority Collateral be remitted to a lockbox in the United States maintained by a Loan Party (each, a "Lockbox") or a Material Deposit Account in the United States of a Loan Party, (ii) instruct each financial institution maintaining a Lockbox existing on the Closing Date to cause all amounts on deposit and available at the close of each Business Day in such Lockbox (net of any Required Minimum Balance), to be swept to one of the Loan Parties' concentration accounts in the United States (each, a "Concentration Account") no less frequently than on a daily basis and (iii) within 30 days following the Closing Date (or such longer period as the Administrative Agent may reasonably agree), enter into a blocked account agreement (each, a "Blocked Account Agreement"), in form reasonably satisfactory to the Administrative Agent, with the Administrative Agent and any financial institution with which such Loan Party maintains a Concentration Account or Material Deposit Account (collectively, the "Blocked Accounts"). In the event that (x) any Loan Party acquires or establishes any Concentration Account or Material Deposit Account after the Closing Date or (y) any Restricted Subsidiary becomes a Subsidiary Guarantor in accordance with Section 5.12 and as of such date such Restricted Subsidiary maintains any Concentration Account or Material Deposit Account, such Loan Party shall enter into a Blocked Account Agreement with respect to such Concentration Account or Material Deposit Account within 30 days following the establishment of such Deposit Account, or within 30 days following the date such Deposit Account is acquired or such Loan Party became a Subsidiary Guarantor or in the case of Holdings, the execution and delivery of the Holdings Joinder Agreement, as applicable (or, in each case, such longer period as the Administrative Agent may reasonably agree). With respect to any Cash maintained in the QC Blocked Account, the withdrawal of such Cash from the QC Blocked Account shall be subject to the conditions that as of the date of any such withdrawal and after giving effect thereto, (A) Administrative

Agent shall have received three (3) days (or such shorter period as the Administrative Agent may agree) prior written notice of any such proposed withdrawal, (B) no Event of Default shall exist or have occurred and be continuing, (C) no Overadvance will result, and (D) no Cash Dominion Period will be in effect, in each case after giving pro forma effect to the requested withdrawal from the QC Blocked Account (resulting in an immediate dollar-for-dollar reduction in the Qualified Cash included in the Borrowing Base), and the Top Borrower shall deliver to the Administrative Agent and the bank maintaining such QC Blocked Account a written withdrawal request (together with an updated pro forma Borrowing Base Certificate reflecting such reduction in the Qualified Cash in the Borrowing Base) that includes a representation as to the satisfaction of such conditions.

(b)     Each Blocked Account Agreement relating to any Concentration Account shall require, after the delivery of notice of a Cash Dominion Period from the Administrative Agent to the Top Borrower and the other parties to such Blocked Account Agreement (which the Administrative Agent may, or upon the request of the Required Lenders shall, provide upon its becoming aware of such Cash Dominion Period), by ACH or wire transfer no less frequently than once per Business Day (unless the Termination Date shall have occurred), of all available Cash balances, Cash receipts and Cash Equivalents, including the then contents or then entire ledger balance of each Blocked Account (net of such minimum balance, not to exceed $350,000 per account or $2,000,000 in the aggregate for all such accounts, as may be required to be maintained in the subject Blocked Account by the bank at which such Blocked Account is maintained (the "Required Minimum Balances")), to the Administrative Agent Payment Account.. All amounts received in the Administrative Agent Payment Account shall be applied (and allocated) by the Administrative Agent in accordance with Sections 2.11(a)(iii) and 2.18(c); provided that if the circumstances described in Sections 2.18(b) are applicable, all such amounts shall be applied in accordance with such Sections 2.18(b). Each Loan Party agrees that it will not cause any proceeds of any Blocked Account to be otherwise redirected.

(c)     The Loan Parties may close any then-existing Deposit Accounts and/or open new Deposit Accounts, subject in the case of opening new Deposit Accounts by such Loan Parties, to the execution and delivery to the Administrative Agent of a Blocked Account Agreement consistent with the provisions of this Section 5.13 and otherwise reasonably satisfactory to the Administrative Agent within 30 days following the opening thereof (or such longer period as the Administrative Agent may reasonably agree).

(d)     The Administrative Agent Account shall at all times be under the sole dominion and control of the Administrative Agent. Each Loan Party hereby acknowledges and agrees that (i) such Loan Party has no right of withdrawal from the Administrative Agent Payment Account, (ii) the funds on deposit in the Administrative Agent Payment Account shall at all times be collateral security for all of the applicable Secured Obligations and (iii) the funds on deposit in the Administrative Agent Payment Account shall be applied as provided in this Agreement and, to the extent such funds constitutes Collateral, the ABL Intercreditor Agreement. In the event that, notwithstanding the provisions of this Section 5.13, any Loan Party receives or otherwise has dominion and control of any proceeds or collections required to be transferred to the Administrative Agent Payment Account pursuant to Section 5.13(b), such proceeds and collections shall be held in trust by such Loan Party for the Administrative Agent, and shall promptly be deposited into the Administrative Agent Payment Account or dealt with in such other fashion as such Loan Party may be instructed by the Administrative Agent.

(e)     Upon the commencement of a Cash Dominion Period and for so long as the same is continuing, upon delivery of notice thereof to the Top Borrower from the Administrative Agent, the Administrative Agent may (and if so directed by the Required Lenders, shall) direct that all amounts in the Blocked Accounts be paid to the Administrative Agent Payment Account in accordance with Section 5.13(b). So long as no Cash Dominion Period has commenced and is continuing in respect of which the Administrative Agent has delivered a notice thereof as contemplated by this Section 5.13, the Borrowers

may direct, and shall have sole control over, the manner of disposition of funds in the Blocked Accounts, subject to compliance with Section 5.13(b). Upon the termination of any Cash Dominion Period, the Administrative Agent shall permit the Borrowers to direct, and have sole control over, the manner of disposition of funds in the Blocked Accounts, subject to compliance with Section 5.13(b).

(f)     Any amounts held or received in the Administrative Agent Account (including all interest and other earnings with respect thereto, if any) at any time (i) when the Termination Date has occurred or (ii) no Cash Dominion Period exists, shall (subject, in the case of clause (i), to the provisions of any Acceptable Intercreditor Agreement) be remitted to an account of the applicable Borrower (or if requested by any Borrower, to the Top Borrower on its behalf), subject to compliance with Section 5.13(b).

(g)     Following the commencement of a Cash Dominion Period (other than by reason of an Event of Default pursuant to Sections 7.01(a), 7.01(f) or 7.01(g), except to the extent necessary for one or more officers or directors of Holdings, the Top Borrower or any of its subsidiaries to avoid personal or criminal liability under applicable law as certified in the applicable Trust Fund Certificate), in the event that a Blocked Account contains identifiable Tax and Trust Funds (other than payroll and employee benefit payments, in each case, in the nature of discretionary contributions), the Top Borrower (acting in good faith) may, within 30 days after such Tax and Trust Funds are received in such Blocked Account, deliver to the Administrative Agent a Trust Fund Certificate. Notwithstanding anything to the contrary herein or in any other Loan Document, within five Business Days following receipt of a Trust Fund Certificate, the Administrative Agent shall permit funds from such Blocked Account (in each case excluding, for the avoidance of doubt, amounts previously deposited to cash collateralize Letters of Credit or Bank Products hereunder), as applicable, the lowest of (a) such Tax and Trust Funds specified in the Trust Fund Certificate, (b) the Excess Availability on the date of such remittance and (c) the amount on deposit in such Blocked Account on the date of delivery of such Trust Fund Certificate, as applicable, at the option of the Administrative Agent, (x) to the applicable Loan Party or (y) on behalf of the applicable Loan Party directly to the Person entitled to such Tax and Trust Funds as specified in the Trust Fund Certificate; provided that in no event shall the Administrative Agent be required to permit any amounts pursuant to this Section 5.13(g) to the extent that such amounts were previously distributed in accordance with Section 2.11(a)(iii) (or otherwise applied in accordance with Section 2.18(b)). If any such amounts are remitted to a Loan Party, such Loan Party shall apply all such funds solely for the purposes set forth in the applicable Trust Fund Certificate; provided, further, that the Administrative Agent shall not apply any such amounts consisting of identifiable Tax and Trust Funds pursuant to Section 2.11(a)(iii) (or otherwise applied in accordance with Section 2.18(b)) following its receipt of a Trust Fund Certificate.

(h)     On or before the date that is ninety (90) days after the Closing Date (or such longer period as Agent may agree), establish its primary depository and treasury management relationships with Wells Fargo or one or more of its Affiliates and will maintain such depository and treasury management relationships at all times during the term of this Agreement, except as Agent may otherwise hereafter specifically agree in writing.

Section 5.14     Further Assurances.  Promptly upon request of the Administrative Agent and subject to the limitations described in Section 5.12:

(a)     Holdings and the Top Borrower will, and will cause each other Loan Party to, execute and deliver any and all further documents, financing statements, agreements, instruments, certificates, notices and acknowledgments and take all such further actions (including the filing and recordation of financing statements, fixture filings, Mortgages, Intellectual Property Security Agreements and/or amendments thereto and other documents), that may be required under any applicable Requirements of Law and which the Administrative Agent may reasonably request to ensure the creation, perfection and priority of the Liens

created or intended to be created under the Collateral Documents, all at the expense of the relevant Loan Parties.

(b)     Holdings and the Top Borrower will, and will cause each other Loan Party to, (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Collateral Document or other document or instrument relating to any Collateral and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts (including notices to third parties), deeds, certificates, assurances and other instruments as the Administrative Agent may reasonably request from time to time in order to ensure the creation, perfection and priority of the Liens created or intended to be created under the Collateral Documents.

(c)     Holdings and the Top Borrower will, and will cause each other Loan Party to, promptly following any request therefor, provide information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with applicable "know your customer" and applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws, including, without limitation, the USA PATRIOT Act and the Beneficial Ownership Regulation.

Section 5.15     <u>Post-Closing Covenant</u>.  The Top Borrower will satisfy its obligations described on <u>Schedule 5.15</u>, in each case, within the time periods set forth therein with respect to the relevant obligation (or such longer period as the Administrative Agent may reasonably agree).[5]

Section 5.16     <u>Holdings Joinder</u>.  Within 45 days after any request made by the Administrative Agent (or such longer time as the Administrative Agent may agree) to the Top Borrower for the joinder of Holdings as a Loan Party, the Top Borrower will cause Holdings (which shall be organized as a Delaware corporation or limited liability company, with organizational and governing documents reasonably satisfactory to the Administrative Agent) to deliver or execute and deliver, as applicable, to the Administrative Agent (i) a Holdings Joinder Agreement substantially in form of Exhibit H hereto, (ii) a completed Perfection Certificate, (iii) UCC financing statements in appropriate form for filing in such jurisdictions as the Administrative Agent may reasonably request, (iv) an executed joinder to the ABL Intercreditor Agreement in substantially the form attached as an exhibit thereto, (v) a joinder to the Intercompany Note (if applicable), (vi) a signed copy of a customary opinion of counsel for Holdings, addressed to the Administrative Agent and the other relevant Secured Parties, (vii) other deliverables of the type described in <u>Sections 4.01(c)</u> and <u>4.01(j)</u>, and (viii) each item of Collateral that Holdings is required to deliver under Section 4.02 of the Security Agreement.

Section 5.17     <u>OFAC; Sanctions; Anti-Corruption Laws; Anti-Money Laundering Laws</u>.  Each Loan Party will, and will cause each of its Subsidiaries to, comply with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.  Each of the Loan Parties and its Subsidiaries shall implement and maintain in effect policies and procedures reasonably designed to ensure compliance by the Loan Parties and their Subsidiaries and their respective directors, officers, employees, agents and Affiliates with Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

ARTICLE 6
NEGATIVE COVENANTS

From the Closing Date and until the Termination Date, Holdings (solely with respect to <u>Section 6.14</u>) and the Top Borrower each covenant and agree with Agent and the Lenders that:

---

[5] NTD: To include commercially reasonable efforts to obtain Collateral Access Agreements for Specified Locations (including all manufacturing facilities).

Section 6.01    Indebtedness.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, create, incur, assume or otherwise become or remain liable with respect to any Indebtedness, except:

(a)    the Secured Obligations;

(b)    Indebtedness of the Top Borrower to Holdings and/or any Restricted Subsidiary and/or of any Restricted Subsidiary to Holdings, the Top Borrower and/or any other Restricted Subsidiary; provided that in the case of any Indebtedness of any Restricted Subsidiary that is not a Loan Party owing to any Restricted Subsidiary that is a Loan Party, such Indebtedness shall be permitted as an Investment under Section 6.06; provided, further, that any Indebtedness of any Loan Party to any Restricted Subsidiary that is not a Loan Party must be unsecured and expressly subordinated to the Obligations of such Loan Party on terms that are reasonably acceptable to the Administrative Agent (including pursuant to an Intercompany Note);

(c)    [reserved];

(d)    Indebtedness arising from any agreement providing for indemnification, adjustment of purchase price or similar obligations (including contingent earn-out obligations) incurred in connection with any Disposition permitted hereunder, any acquisition permitted hereunder or consummated prior to the Closing Date or any other purchase of assets or Capital Stock, and Indebtedness arising from guaranties, letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments securing the performance of the Top Borrower or any such Restricted Subsidiary pursuant to any such agreement;

(e)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary (i) pursuant to tenders, statutory obligations, bids, leases, governmental contracts, trade contracts, surety, stay, customs, appeal, performance and/or return of money bonds or other similar obligations incurred in the ordinary course of business and (ii) in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments to support any of the foregoing items;

(f)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary in respect of Banking Services and/or otherwise in connection with Cash management and Deposit Accounts, including incentive, supplier finance or similar programs, in the ordinary course of business;

(g)    (i) guaranties by the Top Borrower and/or any Restricted Subsidiary of the obligations of suppliers, customers and licensees in the ordinary course of business, (ii) Indebtedness incurred in the ordinary course of business in respect of obligations of the Top Borrower and/or any Restricted Subsidiary to pay the deferred purchase price of goods or services or progress payments in connection with such goods and services and (iii) Indebtedness in respect of letters of credit, bankers' acceptances, bank guaranties or similar instruments supporting trade payables, warehouse receipts or similar facilities entered into in the ordinary course of business;

(h)    Guarantees by the Top Borrower and/or any Restricted Subsidiary of Indebtedness or other obligations of the Top Borrower, any Restricted Subsidiary and/or any joint venture with respect to Indebtedness otherwise permitted to be incurred pursuant to this Section 6.01 or other obligations not prohibited by this Agreement; provided that in the case of any Guarantee by any Loan Party of the obligations of any non-Loan Party, the related Investment is permitted under Section 6.06;

(i)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary existing, or pursuant to commitments existing, on the Closing Date and described on Schedule 6.01;

(j)    Indebtedness of Restricted Subsidiaries that are not Loan Parties; provided that the aggregate outstanding principal amount of such Indebtedness shall not exceed the greater of $93,750,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(k)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary consisting of obligations owing under incentive (including dealer incentive), supply, license or similar agreements entered into in the ordinary course of business;

(l)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary consisting of (i) the financing of insurance premiums, (ii) take-or-pay obligations contained in supply arrangements, in each case, in the ordinary course of business and/or (iii) obligations to reacquire assets or inventory in connection with customer financing arrangements in the ordinary course of business;

(m)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary with respect to Capital Leases and purchase money Indebtedness in an aggregate outstanding principal amount not to exceed the greater of $125,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(n)    Indebtedness of any Person that becomes a Restricted Subsidiary or Indebtedness assumed in connection with an acquisition or similar Investment permitted hereunder after the Closing Date; provided that (i) such Indebtedness (A) existed at the time such Person became a Restricted Subsidiary or the assets subject to such Indebtedness were acquired and (B) was not created or incurred in anticipation thereof and (ii) either (A)(I) no Event of Default under Section 7.01(a), (f) or (g) exists and (II) the Top Borrower is in compliance with the leverage or interest coverage, as applicable, test that would have applied to the incurrence of such Indebtedness under Section 6.01(q) if such Indebtedness was incurred to finance the relevant acquisition or similar Investment or (B) such Indebtedness is in an aggregate principal amount outstanding not to exceed the greater of $37,500,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(o)    Indebtedness consisting of promissory notes issued by the Top Borrower or any Restricted Subsidiary to any stockholder of any Parent Company or any current or former director, officer, employee, member of management, manager or consultant of any Parent Company, the Top Borrower or any subsidiary (or their respective Immediate Family Members) to finance the purchase or redemption of Capital Stock of any Parent Company permitted by Section 6.04(a);

(p)    Indebtedness refinancing, refunding or replacing any Indebtedness permitted under clauses (i), (j), (m), (n), (r), (u), (w), (x), (y) and (z) of this Section 6.01 (in any case, including any refinancing Indebtedness incurred in respect thereof, "Refinancing Indebtedness") and any subsequent Refinancing Indebtedness in respect thereof; provided that:

(i)    the principal amount of such Indebtedness does not exceed the principal amount of the Indebtedness being refinanced, refunded or replaced, except by (A) an amount equal to unpaid accrued interest, penalties and premiums (including tender premiums) thereon plus underwriting discounts, other reasonable and customary fees, commissions and expenses (including upfront fees, original issue discount or initial yield payments) incurred in connection with the relevant refinancing, refunding or replacement and the related refinancing transaction, (B) an amount equal to any existing commitments unutilized thereunder and (C) additional amounts permitted to be incurred pursuant to this Section 6.01 (provided that (1) any additional Indebtedness referenced in this clause (C) satisfies the other applicable requirements of this definition (with additional amounts incurred in reliance on this clause (C) constituting a utilization of the relevant basket or exception pursuant to which such additional amount is permitted) and (2) if such

additional Indebtedness is secured, the Lien securing such Indebtedness satisfies the applicable requirements of <u>Section 6.02</u>),

(ii)   other than in the case of Refinancing Indebtedness with respect to <u>clauses (i)</u>, <u>(j)</u>, <u>(m)</u>, <u>(n)</u>, <u>(u)</u> and/or <u>(y)</u> (other than Customary Bridge Loans), such Indebtedness has (A) a final maturity equal to or later than (and, in the case of revolving Indebtedness, does not require mandatory commitment reductions, if any, prior to) the final maturity of the Indebtedness being refinanced, refunded or replaced and (B) other than with respect to revolving Indebtedness, such Indebtedness has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of the Indebtedness being refinanced, refunded or replaced (without giving effect to any prepayment thereof),

(iii)   the terms of any Refinancing Indebtedness with an original principal amount in excess of the Threshold Amount (excluding, to the extent applicable, pricing, fees, premiums, rate floors, optional prepayment, redemption terms or subordination terms), are not, taken as a whole (as reasonably determined by the Top Borrower), more favorable to the lenders providing such Indebtedness than those applicable to the Indebtedness being refinanced, refunded or replaced (other than (A) any covenants or other provisions applicable only to periods after the applicable maturity date of the debt then-being refinanced as of such date, (B) any covenants or provisions which are then-current market terms for the applicable type of Indebtedness or (C) any covenant or other provision which is conformed (or added) to the Loan Documents for the benefit of the Lenders or, as applicable, the Administrative Agent pursuant to an amendment to this Agreement effectuated in reliance on <u>Section 9.02(d)(ii)</u>),

(iv)   in the case of Refinancing Indebtedness with respect to Indebtedness permitted under <u>clauses (j)</u>, <u>(m)</u>, <u>(n)</u>, <u>(r)</u>, <u>(u)</u>, <u>(w)</u> (solely as it relates to the Non-Loan Party Debt Cap), <u>(x)</u> and <u>(y)</u> of this Section 6.01, the incurrence thereof shall be without duplication of any amounts outstanding in reliance on the relevant clause such that the amount available under the relevant clause shall be reduced by the amount of the applicable Refinancing Indebtedness, and

(v)   (A) such Indebtedness, if secured, is secured only by Permitted Liens at the time of such refinancing, refunding or replacement (it being understood that secured Indebtedness may be refinanced with unsecured Indebtedness); <u>provided</u> that if the Indebtedness being refinanced, refunded or replaced is secured by Liens on the ABL Priority Collateral, then such Refinancing Indebtedness may only be secured by a Lien on the ABL Priority Collateral that has the same or more junior priority as the Indebtedness being refinanced, refunded or replaced, (B) such Indebtedness is incurred by the obligor or obligors in respect of the Indebtedness being refinanced, refunded or replaced, except to the extent otherwise permitted pursuant to <u>Section 6.01</u> (it being understood that (1) Holdings may not be the primary obligor in respect of the applicable Refinancing Indebtedness if Holdings was not the primary obligor in respect of the relevant refinanced Indebtedness and (2) any entity that was a guarantor in respect of the relevant refinanced Indebtedness may be the primary obligor in respect of the refinancing Indebtedness, and any entity that was the primary obligor in respect of the relevant refinanced Indebtedness may be a guarantor in respect of the refinancing Indebtedness), (C) if the Indebtedness being refinanced, refunded or replaced was expressly contractually subordinated to the Obligations in right of payment, (1) such Indebtedness is contractually subordinated to the Obligations in right of payment, or (2) if not contractually subordinated to the Obligations in right of payment, the purchase, defeasance, redemption, repurchase, repayment, refinancing or other acquisition or retirement of such Indebtedness is permitted under <u>Section 6.04(b)</u> (other than <u>Section 6.04(b)(i)</u>), and (D) as of the date of the incurrence of such Indebtedness and after giving effect thereto, no Event of Default exists;

(q)   [reserved];

(r)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary in an aggregate outstanding principal amount not to exceed 100% of the amount of Net Proceeds received by the Top Borrower from (i) the issuance or sale of Qualified Capital Stock or (ii) any cash contribution to its common equity with the Net Proceeds from the issuance and sale by any Parent Company of its Qualified Capital Stock or a contribution to the common equity of any Parent Company, in each case, (A) other than any Net Proceeds received from the sale of Capital Stock to, or contributions from, the Top Borrower or any of its Restricted Subsidiaries and (B) to the extent the relevant Net Proceeds have not otherwise been applied to make capital expenditures, Investments, Restricted Payments or Restricted Debt Payments hereunder;

(s)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary under any Derivative Transaction not entered into for speculative purposes;

(t)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary representing (i) deferred compensation to current or former directors, officers, employees, members of management, managers, and consultants of any Parent Company, the Top Borrower and/or any Restricted Subsidiary in the ordinary course of business and (ii) deferred compensation or other similar arrangements in connection with any Investment permitted hereby;

(u)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary in an aggregate outstanding principal amount not to exceed the greater of $75,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, provided, that, in the case of Indebtedness in the principal amount equal to or greater than $10,000,000, either singly or in the aggregate, such Indebtedness shall have a final maturity not less than 90 days after the Maturity Date and provided, that, the aggregate outstanding principal amount of secured Indebtedness incurred in reliance on this Section 6.01(u) shall not, at any time, exceed when taken together with the outstanding principal amount of secured Indebtedness incurred pursuant to Section 6.01(w) below shall not exceed $75,000,000 in the aggregate;

(v)    [reserved];

(w)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary so long as, after giving effect thereto, including the application of the proceeds thereof (in each case, without "netting" the cash proceeds of the applicable Indebtedness being incurred), (i) if such Indebtedness is secured by a Lien on the Term Loan Priority Collateral that is *pari passu* with the Lien on the Term Loan Priority Collateral securing the "Secured Obligations" (as defined in the Term Loan Agreement as in effect on the date hereof) that are secured on a first lien basis, the First Lien Leverage Ratio does not exceed [●]:1.00[6], (ii) if such Indebtedness is secured by a Lien on the Term Loan Priority Collateral that is junior to the Lien on the Term Loan Priority Collateral securing the "Secured Obligations" (as defined in the Term Loan Agreement as in effect on the date hereof) that are secured on a first lien basis, the Secured Leverage Ratio does not exceed [●]:1.00[7], (iii) if such Indebtedness is secured by a Lien on any asset that does not constitute Collateral or is unsecured, at the election of the Top Borrower, either (A) the Total Leverage Ratio does not exceed [●]:1.00[8] or (B) the Interest Coverage Ratio is not less than 2.00:1.00; provided, however, that (x) the aggregate outstanding principal amount of Indebtedness incurred in reliance on this Section 6.01(w) by Restricted Subsidiaries that are not Loan Parties shall not, at any time, exceed the greater of $105,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period (the "Non-Loan Party Debt Cap"), (y) the aggregate outstanding principal amount of secured Indebtedness incurred in reliance on this Section 6.01(w) shall not, at any time, exceed when taken together with the outstanding principal amount of secured Indebtedness incurred pursuant to Section 6.01(u) above

---

[6] NTD: To be set at closing date leverage.
[7] NTD: To be set at closing date leverage.
[8] NTD: To be set at 0.50x outside the closing date leverage.

shall not exceed $75,000,000 in the aggregate, and (z) such Indebtedness shall have a final maturity not less than 90 days after the Maturity Date;

(x)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary incurred in respect of:

(i)    any Term Loan Facility and any Term Loan Incremental Debt in an aggregate outstanding principal amount that does not exceed (A) $[315,000,000] plus (B) the aggregate principal amount of such Term Loan Incremental Debt so long as the sum of the aggregate outstanding principal amount of any such Term Loan Incremental Debt does not exceed the Incremental Cap[9] (as defined in the Term Loan Agreement as in effect on the Closing Date), so long as such Indebtedness has a final maturity not less than 90 days after the Maturity Date, and

(ii)    [reserved],

(y)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary incurred in connection with Sale and Lease-Back Transactions permitted pursuant to Section 6.08;

(z)    unsecured Indebtedness of the Top Borrower and/or any Restricted Subsidiary so long as, after giving effect thereto on a Pro Forma Basis, the Payment Conditions applicable to the incurrence of Indebtedness have been satisfied;

(aa)    Indebtedness (including obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments with respect to such Indebtedness) incurred by the Top Borrower and/or any Restricted Subsidiary in respect of workers compensation claims, unemployment insurance (including premiums related thereto), other types of social security, pension obligations, vacation pay, health, disability or other employee benefits;

(bb)    [reserved];

(cc)    Indebtedness of the Top Borrower and/or any Restricted Subsidiary in respect of any letter of credit or bank guarantee issued in favor of any Issuing Bank to support any Defaulting Lender's participation in Letters of Credit issued;

(dd)    Indebtedness of any Borrower or any Restricted Subsidiary supported by (i) any Letter of Credit or (ii) any other letter of credit in an aggregate outstanding principal amount not to exceed the greater of $25,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(ee)    unfunded pension fund and other employee benefit plan obligations and liabilities incurred by the Top Borrower and/or any Restricted Subsidiary in the ordinary course of business to the extent that the unfunded amounts would not otherwise cause an Event of Default under Section 7.01(i);

(ff)    customer deposits and advance payments received in the ordinary course of business from customers for goods and services purchased in the ordinary course of business; and

(gg)    without duplication of any other Indebtedness, all premiums (if any), interest (including post-petition interest and payment in kind interest), accretion or amortization of original issue discount, fees,

---

[9] NTD: Subject to ongoing review of Term Loan Agreement.

WEIL:\99151587\17\40416.0005

expenses and charges with respect to Indebtedness of the Top Borrower and/or any Restricted Subsidiary hereunder.

Section 6.02    Liens.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, create, incur, assume or permit or suffer to exist any Lien on or with respect to any property of any kind owned by it, whether now owned or hereafter acquired, or any income or profits therefrom, except:

(a)    Liens securing the Secured Obligations created pursuant to the Loan Documents;

(b)    Liens for Taxes which (i) are not then due, (ii) if due, are not at such time required to be paid pursuant to Section 5.03 or (iii) are being contested in accordance with Section 5.03 (excluding any Liens for Taxes on ABL Priority Collateral);

(c)    statutory Liens (and rights of set-off) of landlords, banks, carriers, warehousemen, mechanics, repairmen, workmen and materialmen, and other Liens imposed by applicable Requirements of Law, in each case incurred in the ordinary course of business (i) for amounts not yet overdue by more than 30 days or (ii) for amounts that are overdue by more than 30 days and that are being contested in good faith by appropriate proceedings, so long as any reserves or other appropriate provisions required by GAAP have been made for any such contested amounts;

(d)    Liens incurred (i) in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security laws and regulations, (ii) in the ordinary course of business to secure the performance of tenders, statutory obligations, surety, stay, customs and appeal bonds, bids, leases, government contracts, trade contracts, performance and return-of-money bonds and other similar obligations (exclusive of obligations for the payment of borrowed money), (iii) pursuant to pledges and deposits of Cash or Cash Equivalents in the ordinary course of business securing (x) any liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty, liability or other insurance to Holdings, the Top Borrower and its subsidiaries or (y) leases or licenses of property otherwise permitted by this Agreement and (iv) to secure obligations in respect of letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments posted with respect to the items described in clauses (i) through (iii) above;

(e)    Liens consisting of easements, rights-of-way, restrictions, encroachments, and other minor defects or irregularities in title, in each case which do not, in the aggregate, materially interfere with the ordinary conduct of the business of the Top Borrower and/or its Restricted Subsidiaries, taken as a whole, or the use of the affected property for its intended purpose;

(f)    Liens consisting of any (i) interest or title of a lessor or sub-lessor under any lease of real estate permitted hereunder, (ii) landlord lien permitted by the terms of any lease, (iii) restriction or encumbrance to which the interest or title of such lessor or sub-lessor may be subject or (iv) subordination of the interest of the lessee or sub-lessee under such lease to any restriction or encumbrance referred to in the preceding clause (iii);

(g)    Liens (i) solely on any Cash earnest money deposits (including as part of any escrow arrangement) made by the Top Borrower and/or any of its Restricted Subsidiaries in connection with any letter of intent or purchase agreement with respect to any Investment permitted hereunder and (ii) consisting of (A) an agreement to Dispose of any property in a Disposition permitted under Section 6.07 (other than Section 6.07(g)(x)) and/or (B) the pledge of Cash as part of an escrow arrangement required in any Disposition permitted under Section 6.07 (other than Section 6.07(g)(x));

(h)     (i) purported Liens evidenced by the filing of UCC financing statements relating solely to operating leases or consignment or bailee arrangements entered into in the ordinary course of business, and (ii) Liens arising from precautionary UCC financing statements or similar filings;

(i)     Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(j)     Liens in connection with any zoning, building or similar Requirement of Law or right reserved to or vested in any Governmental Authority to control or regulate the use of any or dimensions of real property or the structure thereon, including Liens in connection with any condemnation or eminent domain proceeding or compulsory purchase order;

(k)     Liens securing Indebtedness permitted pursuant to Section 6.01(p) (solely with respect to the permitted refinancing of (x) Indebtedness permitted pursuant to Sections 6.01(i), (j), (m), (n), (u), (w), (x), and (y) and (y) Indebtedness that is secured in reliance on Section 6.02(u) (provided that the granting of the relevant Lien shall be without duplication of any Lien outstanding under Section 6.02(u) such that the amount available under Section 6.02(u) shall be reduced by the amount of the applicable Lien granted in reliance on this clause (y))); provided that (i) no such Lien extends to any asset not covered by the Lien securing the Indebtedness that is being refinanced (it being understood that individual financings of the type permitted under Section 6.01(m) provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates) and (ii) if the Lien securing the Indebtedness being refinanced was subject to intercreditor arrangements, then (A) the Lien securing any refinancing Indebtedness in respect thereof shall be subject to intercreditor arrangements that are not materially less favorable to the Secured Parties, taken as a whole, than the intercreditor arrangements governing the Lien securing the Indebtedness that is refinanced or (B) the intercreditor arrangements governing the Lien securing the relevant refinancing Indebtedness shall be set forth in an Acceptable Intercreditor Agreement;

(l)     Liens described on Schedule 6.02 and any modification, replacement, refinancing, renewal or extension thereof; provided that (i) no such Lien extends to any additional property other than (A) after-acquired property that is affixed or incorporated into the property covered by such Lien or financed by Indebtedness permitted under Section 6.01 and (B) proceeds and products thereof, replacements, accessions or additions thereto and improvements thereon (it being understood that individual financings of the type permitted under Section 6.01(m) provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates), and (ii) any such modification, replacement, refinancing, renewal or extension of the obligations secured or benefited by such Liens, if constituting Indebtedness shall be Refinancing Indebtedness;

(m)    Liens arising out of Sale and Lease-Back Transactions permitted under Section 6.08;

(n)     Liens securing Indebtedness permitted pursuant to Section 6.01(m); provided that any such Lien shall encumber only the asset acquired with the proceeds of such Indebtedness and proceeds and products thereof, replacements, accessions or additions thereto and improvements thereon (it being understood that individual financings of the type permitted under Section 6.01(m) provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its affiliates);

(o)     Liens securing Indebtedness permitted pursuant to Section 6.01(n) on the relevant acquired assets or on the Capital Stock and assets of the relevant newly acquired Restricted Subsidiary; provided that no such Lien (x) extends to or covers any other assets (other than the proceeds or products thereof, replacements, accessions or additions thereto and improvements thereon (it being understood that individual financings of the type permitted under Section 6.01(m) provided by any lender may be cross collateralized

to other financings of such type provided by such lender or its affiliates), (y) was created in contemplation of the applicable acquisition of assets or Capital Stock or (z) applies to any ABL Priority Collateral;

(p)    (i) Liens that are contractual rights of setoff or netting relating to (A) the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness, (B) pooled deposit or sweep accounts of the Top Borrower or any Restricted Subsidiary to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of the Top Borrower or any Restricted Subsidiary, (C) purchase orders and other agreements entered into with customers of the Top Borrower or any Restricted Subsidiary in the ordinary course of business and (D) commodity trading or other brokerage accounts incurred in the ordinary course of business, (ii) Liens encumbering reasonable customary initial deposits and margin deposits, (iii) bankers Liens and rights and remedies as to Deposit Accounts, (iv) Liens of a collection bank arising under Section 4-208 of the UCC on items in the ordinary course of business, (v) Liens in favor of banking or other financial institutions arising as a matter of law or under customary general terms and conditions encumbering deposits or other funds maintained with a financial institution and that are within the general parameters customary in the banking industry or arising pursuant to such banking institution's general terms and conditions and (vi) Liens on the proceeds of any Indebtedness incurred in connection with any transaction permitted hereunder, which proceeds have been deposited into an escrow account on customary terms to secure such Indebtedness pending the application of such proceeds to finance such transaction;

(q)    Liens on assets and Capital Stock of Restricted Subsidiaries that are not Loan Parties (including Capital Stock owned by such Persons) securing Indebtedness of Restricted Subsidiaries that are not Loan Parties permitted pursuant to Section 6.01;

(r)    Liens securing obligations (other than obligations representing Indebtedness for borrowed money) under operating, reciprocal easement or similar agreements entered into in the ordinary course of business of the Top Borrower and/or its Restricted Subsidiaries;

(s)    Liens securing Indebtedness incurred in reliance on, and subject to the provisions set forth in, Section 6.01(w); provided that (i) any Lien that is granted in reliance on this clause (s) on the Term Loan Priority Collateral and is senior to, pari passu with or junior to the Lien on the Term Loan Priority Collateral securing the Secured Obligations shall be subject to an Acceptable Intercreditor Agreement and (ii) any Lien on the ABL Priority Collateral that is granted in reliance on this clause (s) shall be junior to the Liens on the ABL Priority Collateral securing the Secured Obligations pursuant to an Acceptable Intercreditor Agreement;

(t)    Liens securing Indebtedness incurred pursuant to Section 6.01(x); provided that (i) any Lien that is granted in reliance on this clause (t) on the Term Loan Priority Collateral and is senior to, pari passu with or junior to the Lien on the Term Loan Priority Collateral securing the Secured Obligations shall be subject to an Acceptable Intercreditor Agreement and (ii) any Lien on the ABL Priority Collateral that is granted in reliance on this clause (t) shall be junior to the Liens on the ABL Priority Collateral securing the Secured Obligations pursuant to an Acceptable Intercreditor Agreement;

(u)    Liens on assets securing Indebtedness or other obligations in an aggregate principal amount at any time outstanding not to exceed the greater of $120,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period; provided that (i) any Lien that is granted in reliance on this clause (u) on the Term Loan Priority Collateral that is senior to, pari passu with or junior to the Lien on the Term Loan Priority Collateral securing the Secured Obligations shall be subject to an Acceptable Intercreditor Agreement and (ii) any Lien on the ABL Priority Collateral that is granted in reliance on this clause (u) shall be junior to the Liens on the ABL Priority Collateral securing the Secured Obligations pursuant to an Acceptable Intercreditor Agreement;

(v)    (i) Liens on assets securing judgments, awards, attachments and/or decrees and notices of *lis pendens* and associated rights relating to litigation being contested in good faith not constituting an Event of Default under Section 7.01(h) and (ii) any pledge and/or deposit of Cash or Cash Equivalents securing any settlement of litigation;

(w)    leases, licenses, subleases or sublicenses granted to others in the ordinary course of business which do not secure any Indebtedness;

(x)    Liens on Securities that are the subject of repurchase agreements constituting Investments permitted under Section 6.06 arising out of such repurchase transaction;

(y)    Liens securing obligations in respect letters of credit, bank guaranties, surety bonds, performance bonds or similar instruments permitted under Sections 6.01(d), (e), (g), (aa) and (cc);

(z)    Liens arising (i) out of conditional sale, title retention, consignment or similar arrangements for the sale of any asset in the ordinary course of business and permitted by this Agreement or (ii) by operation of law under Article 2 of the UCC (or similar Requirement of Law under any other applicable jurisdiction);

(aa)    Liens (i) in favor of any Loan Party and/or (ii) granted by any non-Loan Party in favor of any Restricted Subsidiary that is not a Loan Party, in the case of clauses (i) and (ii), securing intercompany Indebtedness permitted (or not restricted) under Section 6.01 or Section 6.09;

(bb)    Liens on insurance policies and the proceeds thereof securing the financing of the premiums with respect thereto;

(cc)    Liens on specific items of inventory or other goods and the proceeds thereof securing the relevant Person's obligations in respect of documentary letters of credit or banker's acceptances issued or created for the account of such Person to facilitate the purchase, shipment or storage of such inventory or goods;

(dd)    Liens securing (i) obligations of the type described in Section 6.01(f) and/or (ii) obligations of the type described in Section 6.01(s);

(ee)    (i) Liens on Capital Stock of joint ventures or Unrestricted Subsidiaries securing capital contributions to, or obligations of, such Persons and (ii) customary rights of first refusal and tag, drag and similar rights in joint venture agreements and agreements with respect to non-Wholly-Owned Subsidiaries;

(ff)    Liens on Cash or Cash Equivalents arising in connection with the defeasance, discharge or redemption of Indebtedness permitted hereunder;

(gg)    Liens consisting of the prior rights of consignees and their lenders under consignment arrangements entered into in the ordinary course of business; and

(hh)    Liens with respect to Material Real Estate Assets disclosed in any Mortgage Policy delivered pursuant to Section 5.12 with respect to any Material Real Estate Asset and any replacement, extension or renewal thereof; provided that no such replacement, extension or renewal shall cover any property other than the property that was subject to such Lien prior to such replacement, extension or renewal (and additions thereto, improvements thereon and the proceeds thereof).

Section 6.03    [Reserved].

Section 6.04      Restricted Payments; Restricted Debt Payments.

(a)    The Top Borrower shall not pay or make, directly or indirectly, any Restricted Payment, except that:

(i)    the Top Borrower may make Restricted Payments to the extent necessary to permit any Parent Company:

(A)  to pay general administrative costs and expenses (including corporate overhead, legal or similar expenses and customary salary, bonus and other benefits payable to directors, officers, employees, members of management, managers and/or consultants of any Parent Company) and franchise Taxes, and similar fees and expenses, required to maintain the organizational existence of such Parent Company, in each case, which are reasonable and customary and incurred in the ordinary course of business, plus any reasonable and customary indemnification claims made by directors, officers, members of management, managers, employees or consultants of any Parent Company, in each case, to the extent attributable to the ownership or operations of any Parent Company (but excluding, for the avoidance of doubt, the portion of any such amount, if any, that is attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries), and/or its subsidiaries;

(B)  (1) for any taxable period for which the Top Borrower is a member of a consolidated, combined, unitary or similar tax group for U.S. federal and/or applicable state or local tax purposes of which such Parent Company is the common parent, to discharge the consolidated, combined, unitary or similar Tax liabilities of such Parent Company and its subsidiaries when and as due, to the extent such liabilities are attributable to the income of the Top Borrower and/or any subsidiary; provided that (x) the amount of such payments with respect to Taxes related to income of an Unrestricted Subsidiary will be limited to the amount actually paid with respect to such period by such Unrestricted Subsidiary to the Top Borrower or any of its Restricted Subsidiaries, and (y) the amount of such payments in respect of any taxable year will not exceed the amount of such Tax liabilities that the Top Borrower and/or its applicable subsidiaries would have paid had such Tax liabilities been paid as standalone companies or as a standalone group and (2) for any taxable period for which the Top Borrower is a partnership or disregarded entity for U.S. federal income tax purposes that is wholly-owned (directly or indirectly) by a C corporation for U.S. federal and/or applicable state or local tax purposes, distributions to any direct or indirect parent of the Top Borrower in an amount not to exceed the amount of any Tax that the Top Borrower and/or its applicable subsidiaries would have paid had such Tax been paid as standalone companies or as a standalone group (and assuming for purposes of such calculation that the Top Borrower is classified as a domestic corporation for U.S. federal income tax purposes);

(C)  to pay audit and other accounting and reporting expenses of any Parent Company to the extent such expenses are attributable to such Parent Company (but excluding, for the avoidance of doubt, the portion of any such expenses, if any, attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries), the Top Borrower and its subsidiaries;

(D)  for the payment of any insurance premiums that is payable by or attributable to any Parent Company (but excluding, for the avoidance of doubt, the portion of any such premiums, if any, attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its subsidiaries), the Top Borrower and its subsidiaries;

(E)  to pay (x) any fee and/or expense related to any debt or equity offering, investment or acquisition (whether or not consummated) and/or any expenses of, or indemnification obligation in favor

of, any trustee, agent, arranger, underwriter or similar role, and (y) after the consummation of an initial public offering or the issuance of public debt Securities, Public Company Costs;

(F)   to finance any Investment permitted under <u>Section 6.06</u> (<u>provided</u> that (x) any Restricted Payment under this <u>clause (a)(i)(F)</u> shall be made substantially concurrently with the making of such Investment and (y) the relevant Parent Company shall, promptly following the making thereof, cause (I) all property acquired to be contributed to the Top Borrower or one or more of its Restricted Subsidiaries that is a Loan Party, or (II) the merger, consolidation or amalgamation of the Person formed or acquired into the Top Borrower or one or more of its Restricted Subsidiaries that is a Loan Party, in order to consummate such Investment in compliance with the applicable requirements of <u>Section 6.06</u> as if undertaken as a direct Investment by the Top Borrower or the relevant Restricted Subsidiary); and

(G)   to pay customary salary, bonus, severance and other benefits payable to current or former directors, officers, members of management, managers, employees or consultants of any Parent Company (or any Immediate Family Member of any of the foregoing) to the extent such salary, bonuses and other benefits are attributable and reasonably allocated to the operations of the Top Borrower and/or its Restricted Subsidiaries, in each case, so long as such Parent Company applies the amount of any such Restricted Payment for such purpose;

(ii)   the Top Borrower may pay (or make Restricted Payments to allow any Parent Company) to repurchase, redeem, retire or otherwise acquire or retire for value the Capital Stock of any Parent Company or any Restricted Subsidiary held by any future, present or former employee, director, member of management, officer, manager or consultant (or any Affiliate or Immediate Family Member thereof) of any Parent Company, the Top Borrower or any subsidiary:

(A)   with Cash and Cash Equivalents (and including, to the extent constituting a Restricted Payment, amounts paid in respect of promissory notes issued to evidence any obligation to repurchase, redeem, retire or otherwise acquire or retire for value the Capital Stock of any Parent Company or any subsidiary held by any future, present or former employee, director, member of management, officer, manager or consultant (or any Affiliate or Immediate Family Member thereof) of any Parent Company, the Top Borrower or any subsidiary) in an amount not to exceed, in any Fiscal Year, [the greater of $37,500,000 and [●]% of Consolidated Adjusted EBITDA] as of the last day of the most recently ended Test Period, which, if not used in such Fiscal Year, shall be carried forward to succeeding Fiscal Years;

(B)   with the proceeds of any sale or issuance of, or any capital contribution in respect of, the Capital Stock of the Top Borrower or any Parent Company (to the extent such proceeds (i) are contributed in respect of Qualified Capital Stock to the Top Borrower or any Restricted Subsidiary, (ii) are not directly or indirectly from funds provided by Top Borrower or any other Loan Party, and (iii) are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount); or

(C)   with the net proceeds of any key-man life insurance policies;

(iii)   the Top Borrower may make Restricted Payments with Cash or Cash Equivalents in an amount not to exceed (A) so long as the Total Leverage Ratio, calculated on a Pro Forma Basis, would not exceed [●][10]:1.00 as of the last day of the most recently ended Test Period, the portion, if any, of the Available Amount on such date that the Top Borrower elects to apply to this <u>clause (iii)(A)</u> and/or (B) the

---

[10] NTD: To be 1.50x inside Closing Date level.

portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this clause (iii)(B);

(iv)   the Top Borrower may make Restricted Payments (i) to any Parent Company to enable such Parent Company to make Cash payments in lieu of the issuance of fractional shares in connection with the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock of such Parent Company and (ii) consisting of (A) payments made or expected to be made in respect of withholding or similar Taxes payable by any future, present or former officers, directors, employees, members of management, managers or consultants of the Top Borrower, any Restricted Subsidiary or any Parent Company or any of their respective Immediate Family Members and/or (B) repurchases of Capital Stock in consideration of the payments described in subclause (A) above, including demand repurchases in connection with the exercise of stock options;

(v)   the Top Borrower may repurchase (or make Restricted Payments to any Parent Company to enable it to repurchase) Capital Stock upon the exercise of warrants, options or other securities convertible into or exchangeable for Capital Stock if such Capital Stock represents all or a portion of the exercise price of, or tax withholdings with respect to, such warrants, options or other securities convertible into or exchangeable for Capital Stock;

(vi)   [reserved];

(vii)   so long as no Event of Default exists at the time of declaration of such Restricted Payment, following the consummation of the first Qualifying IPO, the Top Borrower may (or may make Restricted Payments to any Parent Company to enable it to) make Restricted Payments with respect to any Capital Stock in an amount not to exceed 6.00% per annum of the net Cash proceeds received by or contributed to the Top Borrower from any Qualifying IPO;

(viii)   the Top Borrower may make Restricted Payments to (i) redeem, repurchase, retire or otherwise acquire any (A) Capital Stock ("Treasury Capital Stock") of the Top Borrower and/or any Restricted Subsidiary or (B) Capital Stock of any Parent Company, in the case of each of subclauses (A) and (B), in exchange for, or out of the proceeds of the substantially concurrent sale (other than to the Top Borrower and/or any Restricted Subsidiary) of, Qualified Capital Stock of the Top Borrower or any Parent Company to the extent any such proceeds are contributed to the capital of the Top Borrower and/or any Restricted Subsidiary in respect of Qualified Capital Stock (and which proceeds are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount) ("Refunding Capital Stock") and (ii) declare and pay dividends on any Treasury Capital Stock out of the proceeds of the substantially concurrent sale (other than to the Top Borrower or a Restricted Subsidiary) of any Refunding Capital Stock;

(ix)   to the extent constituting a Restricted Payment, the Top Borrower may consummate any transaction permitted by Section 6.06 (other than Sections 6.06(j) and (t)), Section 6.07 (other than Section 6.07(g)) and Section 6.09 (other than Sections 6.09(d), (j) and (l));

(x)   so long as no Specified Default has occurred and is continuing, the Top Borrower may make Restricted Payments in an aggregate amount, when taken together with the aggregate amount of Restricted Debt Payments made in reliance on Section 6.04(b)(iv), not to exceed $10,000,000;

(xi)   the Top Borrower may make additional Restricted Payments with cash or Cash Equivalents so long as, after giving effect thereto on a Pro Forma Basis, the Payment Conditions applicable to Restricted Payments have been satisfied; and

(xii)  the Top Borrower may declare and make dividend payments or other Restricted Payments payable solely in the Capital Stock of the Top Borrower or of any Parent Company.

Notwithstanding the foregoing, it is understood and agreed that this Section 6.04 shall not permit (x) an IP Separation Transaction or (y) a Restricted Payment in the form of a transfer of any Material Intellectual Property to any Person that is not a Loan Party.

(b)    The Top Borrower shall not, nor shall it permit any Restricted Subsidiary to, make any prepayment in Cash in respect of principal of or interest in respect of, (x) any Junior Lien Indebtedness or (y) any Junior Indebtedness (the Indebtedness described in clauses (x) and (y), the "Restricted Debt"), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Restricted Debt prior to the scheduled maturity date thereof (collectively, "Restricted Debt Payments"), except:

(i)     with respect to any purchase, defeasance, redemption, repurchase, repayment or other acquisition or retirement thereof made by exchange for, or out of the proceeds of, Refinancing Indebtedness permitted by Section 6.01 and/or refinancing Indebtedness permitted by Section 6.01(x);

(ii)    as part of an applicable high yield discount obligation catch-up payment;

(iii)   payments of regularly scheduled interest (including any penalty interest, if applicable) and payments of fees, expenses and indemnification obligations as and when due (other than payments with respect to Junior Indebtedness that are prohibited by the subordination provisions thereof);

(iv)    so long as no Specified Default has occurred and is continuing, Restricted Debt Payments in an aggregate amount, when taken together with the aggregate amount of Restricted Payments made in reliance on Section 6.04(a)(x), not to exceed $10,000,000;

(v)    (A) Restricted Debt Payments in exchange for, or with proceeds of any issuance of, Qualified Capital Stock of the Top Borrower and/or any capital contribution in respect of Qualified Capital Stock of the Top Borrower in each case received substantially contemporaneously with the making of such Restricted Debt Payments (and which proceeds are excluded from the calculations of the Available Amount and the Available Excluded Contribution Amount and which proceeds are from Persons other than Top Borrower or any of its Restricted Subsidiaries), (B) Restricted Debt Payments as a result of the conversion of all or any portion of any Restricted Debt into Qualified Capital Stock of the Top Borrower and (C) to the extent constituting a Restricted Debt Payment, payment-in-kind interest with respect to any Restricted Debt that is permitted under Section 6.01;

(vi)    Restricted Debt Payments in an aggregate amount not to exceed (A) so long as the Total Leverage Ratio, calculated on a Pro Forma Basis, would not exceed [●][11]:1.00 as of the last day of the most recently ended Test Period, the portion, if any, of the Available Amount on such date that the Top Borrower elects to apply to this clause (vi)(A) and/or (B) the portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this clause (vi)(B);

(vii)   additional Restricted Debt Payments so long as, after giving effect thereto on a Pro Forma Basis, the Payment Conditions applicable to Restricted Debt Payments have been satisfied;

---

[11] NTD: To be 1.25x inside Closing Date level.

7438295.12

135

(viii) (A) mandatory prepayments of Restricted Debt (and related payments of interest) made with Declined Proceeds (as defined in the Term Loan Agreement as in effect on the date hereof) (or any equivalent term in any Term Loan Facility); and

(ix) to the extent constituting a Restricted Debt Payment, the consummation of the Transactions.

Section 6.05   Burdensome Agreements. Except as provided herein or in any other Loan Document, the Term Loan Agreement, any document with respect to any Incremental Equivalent Debt (as defined in (x) the Term Loan Agreement or any equivalent term under any Term Loan Facility and/or (y) in any agreement with respect to any refinancing, renewal or replacement of such Indebtedness that is permitted by Section 6.01), the Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into or cause to exist any agreement restricting the ability of (x) any Restricted Subsidiary of the Top Borrower that is not a Loan Party to pay dividends or other distributions to the Top Borrower or any Loan Party, (y) any Restricted Subsidiary that is not a Loan Party to make cash loans or advances to the Top Borrower or any Loan Party or (z) any Loan Party to create, permit or grant a Lien on any of its properties or assets to secure the Secured Obligations, except restrictions:

(a)   set forth in any agreement evidencing (i) Indebtedness of a Restricted Subsidiary that is not a Loan Party permitted by Section 6.01, (ii) Indebtedness permitted by Section 6.01 that is secured by a Permitted Lien if the relevant restriction applies only to the Person obligated under such Indebtedness and its Restricted Subsidiaries or the assets intended to secure such Indebtedness and (iii) Indebtedness permitted pursuant to clauses (j), (m), (p) (as it relates to Indebtedness in respect of clauses (m), (r), (u), (w) and/or (y) of Section 6.01), (r), (u), (w) and/or (y) of Section 6.01;

(b)   arising under customary provisions restricting assignments, subletting or other transfers (including the granting of any Lien) contained in leases, subleases, licenses, sublicenses, joint venture agreements and other agreements entered into in the ordinary course of business;

(c)   that are or were created by virtue of any Lien granted upon, transfer of, agreement to transfer or grant of, any option or right with respect to any assets or Capital Stock not otherwise prohibited under this Agreement;

(d)   that are assumed in connection with any acquisition of property or the Capital Stock of any Person, so long as the relevant encumbrance or restriction relates solely to the Person and its subsidiaries (including the Capital Stock of the relevant Person or Persons) and/or property so acquired and was not created in connection with or in anticipation of such acquisition;

(e)   set forth in any agreement for any Disposition of any Restricted Subsidiary (or all or substantially all of the assets thereof) that restricts the payment of dividends or other distributions or the making of cash loans or advances by such Restricted Subsidiary pending such Disposition;

(f)   set forth in provisions in agreements or instruments which prohibit the payment of dividends or the making of other distributions with respect to any class of Capital Stock of a Person other than on a pro rata basis;

(g)   imposed by customary provisions in partnership agreements, limited liability company organizational governance documents, joint venture agreements and other similar agreements;

(h)   on Cash, other deposits or net worth or similar restrictions imposed by any Person under any contract entered into in the ordinary course of business or for whose benefit such Cash, other deposits or net worth or similar restrictions exist;

(i)    set forth in documents which exist on the Closing Date and were not created in contemplation thereof;

(j)    arising pursuant to an agreement or instrument relating to any Indebtedness permitted to be incurred after the Closing Date if the relevant restrictions, taken as a whole, are not materially less favorable to the Lenders than the restrictions contained in this Agreement, taken as a whole (as determined in good faith by the Top Borrower);

(k)    arising under or as a result of applicable Requirements of Law or the terms of any license, authorization, concession or permit;

(l)    arising in any Hedge Agreement and/or any agreement or arrangement relating to any Banking Services;

(m)    relating to any asset (or all of the assets) of and/or the Capital Stock of the Top Borrower and/or any Restricted Subsidiary which is imposed pursuant to an agreement entered into in connection with any Disposition of such asset (or assets) and/or all or a portion of the Capital Stock of the relevant Person that is permitted by this Agreement;

(n)    set forth in any agreement relating to any Permitted Lien that limit the right of the Top Borrower or any Restricted Subsidiary to Dispose of or encumber the assets subject thereto; and/or

(o)    imposed by any amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing of any contract, instrument or obligation referred to in clauses (a) through (n) above; provided that no such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing is, in the good faith judgment of the Top Borrower, more restrictive with respect to such restrictions, taken as a whole, than those in existence prior to such amendment, modification, restatement, renewal, increase, supplement, refunding, replacement or refinancing.

Section 6.06    Investments.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, make or own any Investment in any other Person except:

(a)    Cash or Investments that were Cash Equivalents at the time made;

(b)    (i) Investments existing on the Closing Date in the Top Borrower or in any subsidiary, (ii) Investments made after the Closing Date among the Top Borrower and/or one or more Restricted Subsidiaries that are Loan Parties, (iii) Investments made after the Closing Date by any Loan Party in any Restricted Subsidiary that is not a Loan Party, provided that the aggregate outstanding amount of all such Investments, together with the aggregate amount of all Investments made in reliance on clauses (d) and (q)(i) below, shall not exceed the greater of $60,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, (iv) ordinary course Investments made after the Closing Date in SSH Canada Holding Co. LLC, (the "Canadian Subsidiary") not to exceed $10,000,000 (the "Canadian Investment Limit") in the aggregate during each calendar year, provided, further, that, if at the end of any year, the amount invested in the Canadian Subsidiary is less than $10,000,000, the Canadian Investment Limit shall be increased by such unused amount for the immediately succeeding year, (v) Investments made by any Restricted Subsidiary that is not a Loan Party in any Loan Party and/or any other Restricted Subsidiary that is not a Loan Party and (vi) Investments made by any Loan Party and/or any Restricted Subsidiary that is not a Loan Party in the form of any contribution or Disposition of the Capital Stock of any Person that is not a Loan Party;

(c)     Investments (i) constituting deposits, prepayments and/or other credits to suppliers, (ii) made in connection with obtaining, maintaining or renewing client and customer contracts and/or (iii) in the form of advances made to distributors, suppliers, licensors and licensees, in each case of clause (i), (ii) and (iii), in the ordinary course of business and, in the case of clause (iii), to the extent necessary to maintain the ordinary course of supplies to the Top Borrower or any Restricted Subsidiary;

(d)     Investments in any Unrestricted Subsidiary and/or any Similar Business (including any joint venture), provided that the aggregate outstanding amount of all such Investments, together with the aggregate amount of all Investments made in reliance on clause (b) above and clause (q)(i) below, shall not exceed the greater of $60,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(e)     Permitted Acquisitions; provided, that any Permitted Acquisition made by a Loan Party in a Restricted Subsidiary that is not a Loan Party (or a Person that will not become a Loan Party), including assets acquired by a Restricted Subsidiary that is not a Loan Party, shall not exceed the greater of $30,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(f)     Investments (i) existing on, or contractually committed to or contemplated as of, the Closing Date and described on Schedule 6.06 and (ii) any modification, replacement, renewal or extension of any Investment described in clause (i) above so long as no such modification, renewal or extension increases the amount of such Investment except by the terms thereof as in effect on the date hereof or as otherwise permitted by this Section 6.06;

(g)     Investments received in lieu of Cash in connection with any Disposition permitted by Section 6.07 or any other disposition of assets not constituting a Disposition;

(h)     loans or advances to present or former employees, directors, members of management, officers, managers or consultants or independent contractors (or their respective Immediate Family Members) of any Parent Company, the Top Borrower, its subsidiaries and/or any joint venture to the extent permitted by Requirements of Law, in connection with such Person's purchase of Capital Stock of any Parent Company, either (i) in an aggregate principal amount not to exceed $1,000,000 at any one time outstanding or (ii) so long as the proceeds of such loan or advance are substantially contemporaneously contributed to the Top Borrower for the purchase of such Capital Stock;

(i)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business;

(j)     Investments consisting of (or resulting from) Indebtedness permitted under Section 6.01 (other than Indebtedness permitted under Sections 6.01(b) and (h)), Permitted Liens, Restricted Payments permitted under Section 6.04 (other than Section 6.04(a)(ix)), Restricted Debt Payments permitted by Section 6.04 and mergers, consolidations, amalgamations, liquidations, windings up, dissolutions or Dispositions permitted by Section 6.07 (other than Section 6.07(a) (if made in reliance on subclause (ii)(B) of the proviso thereto), Section 6.07(b) (if made in reliance on clause (ii) therein), Section 6.07(c)(ii) (if made in reliance on clause (B) therein) and Section 6.07(g));

(k)     Investments in the ordinary course of business consisting of endorsements for collection or deposit and customary trade arrangements with customers;

(l)     Investments (including debt obligations and Capital Stock) received (i) in connection with the bankruptcy or reorganization of any Person, (ii) in settlement of delinquent obligations of, or other

disputes with, customers, suppliers and other account debtors arising in the ordinary course of business, (iii) upon foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment and/or (iv) as a result of the settlement, compromise, resolution of litigation, arbitration or other disputes;

(m)   loans and advances of payroll payments or other compensation to present or former employees, directors, members of management, officers, managers or consultants of any Parent Company (to the extent such payments or other compensation relate to services provided to such Parent Company (but excluding, for the avoidance of doubt, the portion of any such amount, if any, attributable to the ownership or operations of any subsidiary of any Parent Company other than the Top Borrower and/or its Restricted Subsidiaries)), the Top Borrower and/or any subsidiary in the ordinary course of business;

(n)   Investments to the extent that payment therefor is made solely with Capital Stock of any Parent Company or Qualified Capital Stock of the Top Borrower or any Restricted Subsidiary, in each case, to the extent not resulting in a Change of Control;

(o)   (i) Investments of any Restricted Subsidiary acquired after the Closing Date, or of any Person acquired by, or merged into or consolidated or amalgamated with, the Top Borrower or any Restricted Subsidiary after the Closing Date, in each case as part of an Investment otherwise permitted by this Section 6.06 to the extent that such Investments were not made in contemplation of or in connection with such acquisition, merger, amalgamation or consolidation and were in existence on the date of the relevant acquisition, merger, amalgamation or consolidation and (ii) any modification, replacement, renewal or extension of any Investment permitted under clause (i) of this Section 6.06(o) so long as no such modification, replacement, renewal or extension thereof increases the original amount of such Investment except as otherwise permitted by this Section 6.06;

(p)   Investments made in connection with the Transactions;

(q)   Investments made after the Closing Date by the Top Borrower and/or any of its Restricted Subsidiaries in an aggregate amount at any time outstanding not to exceed:

(i)   together with the aggregate amount of all Investments made in reliance on clauses (b) and (d) above, (A) the greater of $60,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, plus (B) at the election of the Top Borrower, the amount of Restricted Payments and/or Restricted Debt Payments then permitted to be made by the Top Borrower or any Restricted Subsidiary in reliance on Section 6.04(a)(x) and/or Section 6.04(b)(iv) (it being understood that any amount utilized under this clause (B) to make an Investment shall result in a reduction in availability under Section 6.04(a)(x) and Section 6.04(b)(iv)), plus

(ii)   in the event that (A) the Top Borrower or any of its Restricted Subsidiaries makes any Investment after the Closing Date in any Person that is not a Restricted Subsidiary and (B) such Person subsequently becomes a Restricted Subsidiary, an amount equal to 100.0% of the fair market value of such Investment as of the date on which such Person becomes a Restricted Subsidiary;

(r)   Investments made after the Closing Date by the Top Borrower and/or any of its Restricted Subsidiaries in an aggregate outstanding amount not to exceed (i) the portion, if any, of the Available Amount on such date that the Top Borrower elects to apply to this clause (r)(i) and/or (ii) the portion, if any, of the Available Excluded Contribution Amount on such date that the Top Borrower elects to apply to this clause (r)(ii);

(s)    (i) Guarantees of leases (other than Capital Leases) or of other obligations not constituting Indebtedness and (ii) Guarantees of the lease obligations of suppliers, customers, franchisees and licensees of the Top Borrower and/or its Restricted Subsidiaries, in each case, in the ordinary course of business;

(t)    Investments with cash or Cash Equivalents in any Parent Company in amounts and for purposes for which Restricted Payments to such Parent Company are permitted under Section 6.04(a); provided that any Investment made as provided above in lieu of any such Restricted Payment shall reduce availability under the applicable Restricted Payment basket under Section 6.04(a);

(u)    [reserved];

(v)    [reserved];

(w)    Investments under any Derivative Transaction of the type permitted under Section 6.01(s);

(x)    Investments consisting of the Disposition of inventory from any Loan Party to any Restricted Subsidiary that is not a Loan Party and which is organized under the laws of Canada in the ordinary course of business in an amount not to exceed in any Fiscal Year the greater of $15,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period;

(y)    Investments made in joint ventures as required by, or made pursuant to, customary buy/sell arrangements between the joint venture parties set forth in joint venture agreements and similar binding arrangements entered into in the ordinary course of business;

(z)    Investments made in connection with any nonqualified deferred compensation plan or arrangement for any present or former employee, director, member of management, officer, manager or consultant or independent contractor (or any Immediate Family Member thereof) of any Parent Company, the Top Borrower, its subsidiaries and/or any joint venture;

(aa)   Investments in the Top Borrower, any Restricted Subsidiary and/or joint venture in connection with intercompany cash management arrangements and related activities in the ordinary course of business;

(bb)   additional Investments with Cash or Cash Equivalents (other than Permitted Acquisitions) so long as, after giving effect thereto on a Pro Forma Basis, the Payment Conditions applicable to Investments shall have been satisfied;

(cc)   any Investment made by any Unrestricted Subsidiary prior to the date on which such Unrestricted Subsidiary is designated as a Restricted Subsidiary so long as the relevant Investment was not made in contemplation of the designation of such Unrestricted Subsidiary as a Restricted Subsidiary; and

(dd)   Investments consisting of the non-exclusive licensing or contribution of IP Rights pursuant to joint marketing arrangements with other Persons.

Notwithstanding the foregoing, it is understood and agreed that this Section 6.06 shall not permit (x) an IP Separation Transaction or (y) an Investment by the Top Borrower or any Restricted Subsidiary in the form of a contribution of any Material Intellectual Property to any Person that is not a Loan Party.

Section 6.07    Fundamental Changes; Disposition of Assets.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into any transaction of merger, consolidation or amalgamation, or liquidate, wind up or dissolve themselves (or suffer any liquidation or dissolution), or

make any Disposition of any assets having a fair market value in excess of $9,000,000 in a single transaction or a series of related transactions (other than ABL Priority Collateral), or of any ABL Priority Collateral in excess of $1,000,000 in a single transaction or a series of related transactions, except:

(a)    any Restricted Subsidiary may be merged, consolidated or amalgamated with or into the Top Borrower or any other Restricted Subsidiary; provided that (i) in the case of any such merger, consolidation or amalgamation with or into the Top Borrower, (A) the Top Borrower shall be the continuing or surviving Person or (B) if the Person formed by or surviving any such merger, consolidation or amalgamation is not the Top Borrower (any such Person, the "Successor Borrower"), (x) the Successor Borrower shall be an entity organized or existing under the law of the U.S., any state thereof or the District of Columbia, (y) the Successor Borrower shall expressly assume the Secured Obligations of the Top Borrower in a manner reasonably satisfactory to the Administrative Agent and (z) except as the Administrative Agent may otherwise agree, each Guarantor, unless it is the other party to such merger, consolidation or amalgamation, shall have executed and delivered a reaffirmation agreement with respect to its obligations under the Loan Guaranty and the other Loan Documents; it being understood and agreed that if the foregoing conditions under clauses (x) through (z) are satisfied, the Successor Borrower will succeed to, and be substituted for, the Top Borrower under this Agreement and the other Loan Documents, and (ii) in the case of any such merger, consolidation or amalgamation with or into any Borrower and/or any Subsidiary Guarantor, either (A) a Borrower or a Subsidiary Guarantor shall be the continuing or surviving Person or the continuing or surviving Person (or, in the case of an amalgamation, the Person formed as a result thereof) shall expressly assume the obligations of the relevant Borrower or Subsidiary Guarantor in a manner reasonably satisfactory to the Administrative Agent or (B) the relevant transaction shall be treated as an Investment and shall comply with Section 6.06 (other than in reliance on clause (j) thereof);

(b)    Dispositions (including of Capital Stock) among the Top Borrower and/or any Restricted Subsidiary (upon voluntary liquidation or otherwise); provided that any such Disposition made by any Loan Party to any Person that is not a Loan Party shall be (i) for fair market value (as reasonably determined by such Person) with at least 75% of the consideration for such Disposition consisting of Cash or Cash Equivalents at the time of such Disposition or (ii) treated as an Investment and otherwise made in compliance with Section 6.06 (other than in reliance on clause (j) thereof);

(c)    (i) the liquidation or dissolution of any Restricted Subsidiary if the Top Borrower determines in good faith that such liquidation or dissolution is in the best interests of the Top Borrower, is not materially disadvantageous to the Lenders (taken as a whole) and the Top Borrower or any Restricted Subsidiary receives the assets (if any) of the relevant dissolved or liquidated Restricted Subsidiary; provided that in the case of any liquidation or dissolution of any Loan Party that results in a distribution of assets to any Restricted Subsidiary that is not a Loan Party, such distribution shall be treated as an Investment and shall comply with Section 6.06 (other than in reliance on clause (j) thereof); (ii) any merger, amalgamation, dissolution, liquidation or consolidation, the purpose of which is to effect (A) any Disposition otherwise permitted under this Section 6.07 (other than clause (a), clause (b) or this clause (c)) or (B) any Investment permitted under Section 6.06; and (iii) the conversion of the Top Borrower or any Restricted Subsidiary into another form of entity, so long as such conversion does not adversely affect the value of the Loan Guaranty or Collateral, if any;

(d)    (i) Dispositions of inventory or equipment or immaterial assets in the ordinary course of business (including on an intercompany basis) and (ii) the leasing or subleasing of real property in the ordinary course of business;

(e)    Dispositions of surplus, obsolete, used or worn out property or other property that, in the reasonable judgment of the Top Borrower, is (A) no longer useful in its business (or in the business of any Restricted Subsidiary of the Top Borrower) or (B) otherwise economically impracticable to maintain;

(f)     Dispositions of Cash and/or Cash Equivalents and/or other assets that were Cash Equivalents when the relevant original Investment was made in a manner that is not prohibited by the terms of this Agreement or the other Loan Documents;

(g)     Dispositions, mergers, amalgamations, consolidations or conveyances that constitute (i) Investments permitted pursuant to Section 6.06 (other than Section 6.06(j)), (ii) Permitted Liens, (iii) Restricted Payments permitted by Section 6.04(a) (other than Section 6.04(a)(ix)) and (iv) Sale and Lease-Back Transactions permitted by Section 6.08;

(h)     Dispositions for fair market value; provided that with respect to any such Disposition with a purchase price in excess of the greater of $30,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, at least 75% of the consideration for such Disposition shall consist of Cash or Cash Equivalents (provided that for purposes of the 75% Cash consideration requirement, (i) the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Top Borrower or any Restricted Subsidiary) of the Top Borrower or any Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto) that are assumed by the transferee of any such assets (or that are otherwise terminated or cancelled in connection with the transaction with such transferee) and for which the Top Borrower and/or its applicable Restricted Subsidiary have been validly released by all relevant creditors in writing, (ii) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such Disposition, (iii) any Security received by the Top Borrower or any Restricted Subsidiary from such transferee that is converted by such Person into Cash or Cash Equivalents (to the extent of the Cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition and (iv) any Designated Non-Cash Consideration received in respect of such Disposition having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (h) and Section 6.08(b)(ii) that is at that time outstanding, not in excess of the greater of $60,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, in each case, shall be deemed to be Cash); provided, further, that immediately prior to and after giving effect to such Disposition, as determined on the date on which the agreement governing such Disposition is executed, no Event of Default exists;

(i)     to the extent that (i) the relevant property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of the relevant Disposition are promptly applied to the purchase price of such replacement property;

(j)     Dispositions of Investments in joint ventures to the extent required by, or made pursuant to, buy/sell arrangements between joint venture or similar parties set forth in the relevant joint venture arrangements and/or similar binding arrangements;

(k)     Dispositions of notes receivable or accounts receivable in the ordinary course of business (including any discount and/or forgiveness thereof) or in connection with the collection or compromise thereof;

(l)     Dispositions and/or terminations of leases, subleases, licenses or sublicenses (including the provision of software under any open source license), (i) the Disposition or termination of which will not materially interfere with the business of the Top Borrower and its Restricted Subsidiaries or (ii) which relate to closed facilities or the discontinuation of any product line;

(m)     (i) any termination of any lease in the ordinary course of business, (ii) any expiration of any option agreement in respect of real or personal property and (iii) any surrender or waiver of contractual

142

rights or the settlement, release or surrender of contractual rights or litigation claims (including in tort) in the ordinary course of business;

(n)     Dispositions of property subject to foreclosure, casualty, eminent domain or condemnation proceedings (including in lieu thereof or any similar proceeding);

(o)     Dispositions or consignments of equipment, inventory or other assets (including leasehold interests in real property) with respect to facilities that are temporarily not in use, held for sale or closed;

(p)     to the extent constituting a Disposition, the consummation of the Transaction;

(q)     Dispositions of non-core assets (other than assets of the type included in the Borrowing Base) acquired in connection with any acquisition permitted hereunder and sales of Real Estate Assets acquired in any acquisition permitted hereunder which, within 90 days of the date of such acquisition, are designated in writing to the Administrative Agent as being held for sale and not for the continued operation of the Top Borrower or any of its Restricted Subsidiaries or any of their respective businesses; provided that no Event of Default exists on the date on which the definitive agreement governing the relevant Disposition is executed;

(r)     exchanges or swaps, including transactions covered by Section 1031 of the Code (or any comparable provision of any foreign jurisdiction), of assets so long as any such exchange or swap is made for fair value (as reasonably determined by the Top Borrower) for like assets; provided that upon the consummation of any such exchange or swap by any Loan Party, to the extent the assets received do not constitute an Excluded Asset, the Administrative Agent has a perfected Lien with the same priority as the Lien held on the Real Estate Assets so exchanged or swapped;

(s)     Dispositions of assets that do not constitute Collateral for fair market value;

(t)     (i) non-exclusive licensing and cross-licensing arrangements involving any technology, intellectual property or IP Rights of the Top Borrower or any Restricted Subsidiary in the ordinary course of business and (ii) Dispositions, abandonments, cancellations or lapses of IP Rights, or issuances or registrations, or applications for issuances or registrations, of IP Rights, which, in the reasonable good faith determination of the Top Borrower, are not material to the conduct of the business of the Top Borrower or its Restricted Subsidiaries, or are no longer economical to maintain in light of its use and the loss thereof will not affect the ability of Administrative Agent to exercise its rights and remedies with respect to any Collateral (for the avoidance of doubt, no Material Intellectual Property may be disposed of, abandoned, cancelled or allowed to lapse pursuant to this clause (t)(ii));

(u)     Dispositions in connection with the terminations or unwinds of Derivative Transactions;

(v)     Dispositions of Capital Stock of, or sales of Indebtedness or other Securities of, Unrestricted Subsidiaries;

(w)     Dispositions of Real Estate Assets and related assets in the ordinary course of business in connection with relocation activities for directors, officers, employees, members of management, managers or consultants of any Parent Company, the Top Borrower and/or any Restricted Subsidiary;

(x)     Dispositions made to comply with any order of any Governmental Authority or any applicable Requirement of Law;

(y)   any merger, consolidation, Disposition or conveyance the sole purpose of which is to reincorporate or reorganize (i) any Domestic Subsidiary (other than a Loan Party) in another jurisdiction in the U.S. and/or (ii) any Foreign Subsidiary in the U.S. or any other jurisdiction;

(z)   any sale of motor vehicles and information technology equipment purchased at the end of an operating lease and resold thereafter;

(aa)   Dispositions involving assets having a fair market value (as reasonably determined by the Top Borrower at the time of the relevant Disposition) of not more than the greater of $21,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Fiscal Year in any Fiscal Year, which, if not used in such Fiscal Year, shall be carried forward to succeeding Fiscal Years; and/or

(bb)   Dispositions set forth on Schedule 6.07.[12]

To the extent that any Collateral is Disposed of as expressly permitted by this Section 6.07 to any Person other than a Loan Party, such Collateral shall be sold free and clear of the Liens created by the Loan Documents, which Liens shall be automatically released upon the consummation of such Disposition and the satisfaction of the applicable conditions to such Disposition provided for in this Section 6.07; it being understood and agreed that the Administrative Agent shall be authorized to take, and shall take, any actions reasonably requested by the Top Borrower in order to effect the foregoing in accordance with Article 8 hereof.   All references in this Section 6.07 to a transaction complying with Section 6.06 shall include, without limitation, the satisfaction of the Updated BBC Condition for such transaction.

Notwithstanding the foregoing provisions of this Section 6.07, it is understood and agreed that this Section 6.07 shall not permit (i) an IP Separation Transaction or (ii) a Disposition by the Top Borrower or any Restricted Subsidiary of any Material Intellectual Property to any Person that is not a Loan Party.

Section 6.08    Sale and Lease-Back Transactions.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, directly or indirectly, become or remain liable as lessee or as a guarantor or other surety with respect to any lease of any property (whether real, personal or mixed), whether now owned or hereafter acquired, which the Top Borrower or the relevant Restricted Subsidiary (a) has sold or transferred or is to sell or to transfer to any other Person (other than the Top Borrower or any of its Restricted Subsidiaries) and (b) intends to use for substantially the same purpose as the property which has been or is to be sold or transferred by the Top Borrower or such Restricted Subsidiary to any Person (other than the Top Borrower or any of its Restricted Subsidiaries) in connection with such lease (such a transaction, a "Sale and Lease-Back Transaction"); provided that any Sale and Lease-Back Transaction shall be permitted so long as either

(i)   the resulting Indebtedness is permitted by Section 6.01 or

(ii)   (A) the relevant Sale and Lease-Back Transaction is consummated in exchange for cash consideration (provided that for purposes of the foregoing cash consideration requirement, (w) the amount of any Indebtedness or other liabilities (other than Indebtedness or other liabilities that are subordinated to the Obligations or that are owed to the Top Borrower or any Restricted Subsidiary) of the Top Borrower or any Restricted Subsidiary (as shown on such Person's most recent balance sheet or statement of financial position (or in the notes thereto) that are assumed by the transferee of any such assets and for which the Top Borrower and/or its applicable Restricted Subsidiary have been validly released by all relevant creditors in writing, (x) the amount of any trade-in value applied to the purchase price of any replacement assets acquired in connection with such Disposition, (y) any Securities received by the Top Borrower or

---

[12] NTD: Subject to review of schedule.

any Restricted Subsidiary from such transferee that are converted by such Person into Cash or Cash Equivalents (to the extent of the Cash or Cash Equivalents received) within 180 days following the closing of the applicable Disposition and (z) any Designated Non-Cash Consideration received in respect of the relevant Sale and Lease-Back Transaction having an aggregate fair market value, taken together with all other Designated Non-Cash Consideration received pursuant to this clause (z) and Section 6.07(h) that is at that time outstanding, not in excess of the greater of $60,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period, in each case, shall be deemed to be Cash), (B) the Top Borrower or its applicable Restricted Subsidiary would otherwise be permitted to enter into, and remain liable under, the applicable underlying lease and (C) the aggregate fair market value of the assets sold subject to all Sale and Lease-Back Transactions under this clause (ii) shall not exceed the greater of $30,000,000 and [●]% of Consolidated Adjusted EBITDA as of the last day of the most recently ended Test Period.

Section 6.09    Transactions with Affiliates.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, enter into any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) involving payments by the Top Borrower or its Restricted Subsidiaries in excess of $12,000,000 with any of their respective Affiliates on terms that are less favorable to the Top Borrower or such Restricted Subsidiary, as the case may be (as reasonably determined by the Top Borrower), than those that might be obtained at the time in a comparable arm's-length transaction from a Person that is not an Affiliate; provided that the foregoing restriction shall not apply to:

(a)    any transaction between or among the Top Borrower and/or one or more Restricted Subsidiaries (or any entity that becomes a Restricted Subsidiary as a result of such transaction) to the extent permitted or not restricted by this Agreement;

(b)    any issuance, sale or grant of securities or other payments, awards or grants in cash, securities or otherwise pursuant to, or the funding of employment arrangements, stock options and stock ownership plans approved by the board of directors (or equivalent governing body) of any Parent Company or of the Top Borrower or any Restricted Subsidiary;

(c)    (i) any collective bargaining, employment or severance agreement or compensatory (including profit sharing) arrangement entered into by the Top Borrower or any of its Restricted Subsidiaries with their respective current or former officers, directors, members of management, managers, employees, consultants or independent contractors or those of any Parent Company, (ii) any subscription agreement or similar agreement pertaining to the repurchase of Capital Stock pursuant to put/call rights or similar rights with current or former officers, directors, members of management, managers, employees, consultants or independent contractors and (iii) transactions pursuant to any employee compensation, benefit plan, stock option plan or arrangement, any health, disability or similar insurance plan which covers current or former officers, directors, members of management, managers, employees, consultants or independent contractors or any employment contract or arrangement;

(d)    (i) transactions permitted by Sections 6.01, (o) and (ee), 6.04 and 6.06(h), (m), (o), (t), (z) and (aa) and (ii) issuances of Capital Stock and issuances and incurrences of Indebtedness not restricted by this Agreement;

(e)    [reserved];

(f)    the execution, delivery and performance by the Loan Parties of the Term Loan Documents to which they are a party (including any amendments, modifications, waivers or supplements thereto, subject to Section 6.12) and the incurrence of Indebtedness thereunder;

(g)    the Transactions, including the payment of Transaction Costs;

(h)    ordinary course compensation to Affiliates in connection with financial advisory, financing, underwriting or placement services or in respect of other investment banking activities and other transaction fees, which payments are approved by the majority of the members of the board of directors (or similar governing body) or a majority of the disinterested members of the board of directors (or similar governing body) of the Top Borrower in good faith;

(i)    Guarantees permitted by Section 6.01 or Section 6.06;

(j)    transactions among Holdings (at such time as Holdings has executed and delivered the agreements provided for under Section 5.16), the Top Borrower and its Restricted Subsidiaries otherwise permitted (or not restricted) under this Article 6;

(k)    the payment of customary fees and reasonable out-of-pocket costs to, and indemnities provided on behalf of, members of the board of directors (or similar governing body), officers, employees, members of management, managers, consultants and independent contractors of the Top Borrower and/or any of its Restricted Subsidiaries in the ordinary course of business and, in the case of payments to such Person in such capacity on behalf of any Parent Company, to the extent attributable to the operations of the Top Borrower or its subsidiaries;

(l)    transactions with customers, clients, suppliers, joint ventures, purchasers or sellers of goods or services or providers of employees or other labor entered into in the ordinary course of business, which are (i) fair to the Top Borrower and/or its applicable Restricted Subsidiary in the good faith determination of the board of directors (or similar governing body) of the Top Borrower or the senior management thereof or (ii) on terms at least as favorable as might reasonably be obtained from a Person other than an Affiliate;

(m)    the payment of reasonable out-of-pocket costs and expenses related to registration rights and customary indemnities provided to shareholders under any shareholder agreement;

(n)    (i) any purchase by Holdings of the Capital Stock of (or contribution to the equity capital of) the Top Borrower and (ii) any intercompany loans made by Holdings to the Top Borrower or any Restricted Subsidiary at such time as Holdings has executed and delivered the agreements provided for under Section 5.16; and/or

(o)    any transaction in respect of which the Top Borrower delivers to the Administrative Agent a letter addressed to the board of directors (or equivalent governing body) of the Top Borrower from an accounting, appraisal or investment banking firm of nationally recognized standing stating that such transaction is on terms that are no less favorable to the Top Borrower or the applicable Restricted Subsidiary than might be obtained at the time in a comparable arm's length transaction from a Person that is not an Affiliate.

Section 6.10    Conduct of Business.  From and after the Closing Date, the Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, engage in any material line of business other than (a) the businesses engaged in by the Top Borrower or any Restricted Subsidiary on the Closing Date and similar, incidental, complementary, ancillary or related businesses and (b) such other lines of business to which the Administrative Agent may consent.

Section 6.11    Amendments or Waivers of Organizational Documents.  The Top Borrower shall not, nor shall it permit any Subsidiary Guarantor to, amend or modify their respective Organizational Documents, in each case in a manner that is materially adverse to the Lenders (in their capacities as such),

taken as a whole, without obtaining the prior written consent of the Administrative Agent; provided that, for purposes of clarity, it is understood and agreed that the Top Borrower and/or any Subsidiary Guarantor may effect a change to its organizational form and/or consummate any other transaction that is permitted under Section 6.07.

Section 6.12    Amendments of or Waivers with Respect to Restricted Debt.  The Top Borrower shall not, nor shall it permit any of its Restricted Subsidiaries to, amend or otherwise modify the terms of any Restricted Debt (or the documentation governing any Restricted Debt) (a) if the effect of such amendment or modification, together with all other amendments or modifications made, is materially adverse to the interests of the Lenders (in their capacities as such) or (b) in violation of the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement or the subordination terms set forth in the definitive documentation governing any Restricted Debt; provided that, for purposes of clarity, it is understood and agreed that the foregoing limitation shall not otherwise prohibit any Refinancing Indebtedness or any other replacement, refinancing, amendment, supplement, modification, extension, renewal, restatement or refunding of any Restricted Debt, in each case, that is permitted under this Agreement in respect thereof.

Section 6.13    Fiscal Year.  The Top Borrower shall not change its Fiscal Year-end to a date other than December 31; provided that the Top Borrower may, upon written notice to the Administrative Agent, change the Fiscal Year-end of the Top Borrower to another date, in which case the Top Borrower and the Administrative Agent will, and are hereby authorized to, make any adjustments to this Agreement that are necessary to reflect such change in Fiscal Year.

Section 6.14    Permitted Activities of Holdings. Holdings shall not:

(a)    incur any third-party Indebtedness for borrowed money other than (i) the Indebtedness permitted to be incurred by Holdings under the Loan Documents and any Term Loan Facility and (ii) Guarantees of Indebtedness or other obligations of the Top Borrower and/or any Restricted Subsidiary, which Indebtedness or other obligations are otherwise permitted hereunder;

(b)    create or suffer to exist any Lien on any asset now owned or hereafter acquired by it other than (i) the Liens created under the Collateral Documents and, subject to the Intercreditor Agreements, the collateral documents relating to any Term Loan Facility, in each case, to which it is a party, (ii) Permitted Liens that secure Guarantees permitted under clause (a)(ii) above and the underlying Indebtedness subject to such Guarantee is permitted to be secured on the same basis pursuant to Section 6.02 and (iii) other Permitted Liens (other than in respect of debt for borrowed money);

(c)    consolidate or amalgamate with, or merge with or into, or convey, sell or otherwise transfer all or substantially all of its assets to, any Person; provided that, so long as no Default or Event of Default exists or would result therefrom,

(i)    Holdings may consolidate or amalgamate with, or merge with or into, any other Person (other than the Top Borrower and any of its subsidiaries) so long as (A) Holdings is the continuing or surviving Person or (B) if the Person formed by or surviving any such consolidation, amalgamation or merger is not Holdings (1) the successor Person (such successor Person, "Successor Holdings") expressly assumes all obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent and such successor Person is organized under the laws of a jurisdiction in the United States, and (2) the Top Borrower delivers a certificate of a Responsible Officer with respect to the satisfaction of the conditions set forth in clause (1) of this clause (i) and

(ii)    Holdings may otherwise convey, sell or otherwise transfer all or substantially all of its assets to any other Person (other than the Top Borrower and any of its subsidiaries) so long as (A) no Change of Control results therefrom, (B) the Person acquiring such assets expressly assumes all of the obligations of Holdings under this Agreement and the other Loan Documents to which Holdings is a party pursuant to a supplement hereto and/or thereto in a form reasonably satisfactory to the Administrative Agent, (C) such Person is organized under the laws of a jurisdiction in the United States, (D) as of the date thereof, and after giving effect thereto, no Default or Event of Default shall exist or occur and be continuing and (E) the Top Borrower delivers a certificate of a Responsible Officer with respect to the satisfaction of the conditions under clause (A) set forth in this clause (ii); provided, further, that (1) if the conditions set forth in the preceding proviso are satisfied, Successor Holdings will succeed to, and be substituted for, Holdings under this Agreement and (2) it is understood and agreed that Holdings may convert into another form of entity so long as such conversion does not adversely affect the value of the Loan Guaranty or the Collateral and such entity is organized under the laws of a jurisdiction in the United States; or

(d)    own Capital Stock in any subsidiary other than the Top Borrower.

Section 6.15    Minimum Excess Availability.  The Top Borrower shall not permit Excess Availability at any time to be less than the greater of (a) ten percent (10.0%) of the Loan Cap or (b) $7,500,000.

## ARTICLE 7
## EVENTS OF DEFAULT

Section 7.01    Events of Default.  If any of the following events (each, an "Event of Default") shall occur:

(a)    Failure To Make Payments When Due. Failure by any Borrower to pay (i) any installment of principal of any Loan when due, whether at stated maturity, by acceleration, by notice of voluntary prepayment, by mandatory prepayment or otherwise; or (ii) any interest on any Loan or any fee or any other amount due hereunder within five Business Days after the date due; or

(b)    Default in Other Agreements. (i) Failure by the Top Borrower or any of its Restricted Subsidiaries to pay when due any principal of or interest on or any other amount payable in respect of one or more items of Indebtedness (other than Indebtedness referred to in clause (a) above) with an aggregate outstanding principal amount exceeding the Threshold Amount, in each case beyond the grace period, if any, provided therefor; or (ii) breach or default by the Top Borrower or any of its Restricted Subsidiaries with respect to any other term of (A) one or more items of Indebtedness with an aggregate outstanding principal amount exceeding the Threshold Amount or (B) any loan agreement, mortgage, indenture or other agreement relating to such item(s) of Indebtedness (other than, for the avoidance of doubt, with respect to Indebtedness consisting of Hedging Obligations, termination events or equivalent events pursuant to the terms of the relevant Hedge Agreement which are not the result of any default thereunder by any Loan Party or any Restricted Subsidiary), in each case beyond the grace period, if any, provided therefor, if the effect of such breach or default is to cause, or to permit the holder or holders of such Indebtedness (or a trustee or agent on behalf of such holder or holders) to cause, such Indebtedness to become or be declared due and payable (or redeemable) prior to its stated maturity or the stated maturity of any underlying obligation, as the case may be; provided that clause (ii) of this paragraph (b) shall not apply to secured Indebtedness that becomes due as a result of the voluntary sale or transfer of the property securing such Indebtedness if such sale or transfer is permitted hereunder; provided, further, that with respect to any default, event or condition referred to in clause (i) or (ii) above with respect to (A) any financial covenant under any other revolving credit facility or the Term Loan Facility, such default, event or condition shall only constitute an Event of Default if such default, event or condition results in the holders of such

Indebtedness (x) demanding repayment thereof or otherwise accelerating such Indebtedness (and terminating the commitments thereunder), which demand or acceleration has not been rescinded prior to any termination of the Commitments or acceleration of the Loans pursuant to this Article 7 or (y) commencing the exercise of any rights or remedies and (B) any default, event or condition other than as described in the immediately preceding Clause (A), such default, event or condition is unremedied and is not waived by the holders of such Indebtedness prior to any termination of the Commitments or acceleration of the Loans pursuant to this Article 7; or

(c)     Breach of Certain Covenants. Failure of any Loan Party, as required by the relevant provision, to perform or comply with any term or condition contained in Section 5.01(e)(i) (provided that, the delivery of a notice of Default or Event of Default at any time will cure any Default or Event of Default arising from the failure to timely deliver such notice of Default or Event of Default, as applicable), Section 5.02 (as it applies to the preservation of the existence of any Borrower), 5.11, 5.13, 5.15 or 5.16 or Article 6; or

(d)     Breach of Representations, Etc. Any representation, warranty or certification made or deemed made by any Loan Party in any Loan Document or in any certificate required to be delivered in connection herewith or therewith (including, for the avoidance of doubt, any Perfection Certificate) being untrue in any material respect as of the date made or deemed made; it being understood and agreed that any breach of any representation, warranty or certification resulting from the failure of the Administrative Agent to file any UCC continuation statement shall not result in an Event of Default under this Section 7.01(d) or any other provision of any Loan Document; or

(e)     Other Defaults Under Loan Documents. Failure of any Loan Party (i) to comply with any term or condition contained in Section 5.01(j)(i) for a period of five consecutive Business Days (or three consecutive Business Days when delivery of weekly Borrowing Base Certificates is in effect); (ii) to comply with any term or condition contained in Section 5.01(j)(ii) for a period of five consecutive Business Days after receipt by any Borrower of written notice thereof from the Administrative Agent or (iii) in the performance of or compliance with any term contained herein or any of the other Loan Documents, other than any such term referred to in the foregoing clauses (i) and (ii) or in any other Section of this Article 7, which default has not been remedied or waived within 30 days after receipt by any Borrower of written notice thereof from the Administrative Agent; or

(f)     Involuntary Bankruptcy; Appointment of Receiver, Etc. (i) The entry by a court of competent jurisdiction of a decree or order for relief in respect of Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) in an involuntary case under any Debtor Relief Law now or hereafter in effect, which decree or order is not stayed; or any other similar relief shall be granted under any applicable federal, state or local Requirements of Law, which relief is not stayed; or (ii) the commencement of an involuntary case against Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) under any Debtor Relief Law; the entry by a court having jurisdiction in the premises of a decree or order for the appointment of a receiver, receiver and manager, (preliminary) insolvency receiver, liquidator, sequestrator, trustee, administrator, custodian or other officer having similar powers over Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary), or over all or a material part of its property; or the involuntary appointment of an interim receiver, trustee or other custodian of Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) for all or a material part of its property, which remains, in any case under this clause (f), undismissed, unvacated, unbounded or unstayed pending appeal for 60 consecutive days; or

(g)     Voluntary Bankruptcy; Appointment of Receiver, Etc. (i) The entry against Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) of an order for relief, the commencement by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any

Immaterial Subsidiary) of a voluntary case under any Debtor Relief Law, or the consent by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case, under any Debtor Relief Law, or the consent by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) to the appointment of or taking possession by a receiver, receiver and manager, insolvency receiver, liquidator, sequestrator, trustee, administrator, custodian or other like official for or in respect of itself or for all or a material part of its property; (ii) the making by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) of a general assignment for the benefit of creditors; or (iii) the admission by Holdings, the Top Borrower or any of its Restricted Subsidiaries (other than any Immaterial Subsidiary) in writing of their inability to pay their respective debts as such debts become due; or

(h)     Judgments and Attachments. The entry or filing of one or more final money judgments, writs or warrants of attachment or similar process against Holdings, the Top Borrower or any of its Restricted Subsidiaries or any of their respective assets involving in the aggregate at any time an amount in excess of the Threshold Amount (in either case to the extent not adequately covered by indemnity from a third-party, by self-insurance (if applicable) or by insurance as to which the relevant third-party insurance company has been notified and not denied coverage), which judgment, writ, warrant or similar process remains unpaid, undischarged, unvacated, unbonded or unstayed pending appeal for a period of 60 consecutive days; or

(i)     Employee Benefit Plans. The occurrence of one or more ERISA Events, which individually or in the aggregate result in liability of Holdings, the Top Borrower or any of its Restricted Subsidiaries in an aggregate amount which would reasonably be expected to result in a Material Adverse Effect; or

(j)     Change of Control. The occurrence of a Change of Control; or

(k)     Guaranties, Collateral Documents and Other Loan Documents. At any time after the execution and delivery thereof, (i) any material Loan Guaranty for any reason, other than the occurrence of the Termination Date, shall cease to be in full force and effect (other than in accordance with its terms) or shall be declared, by a court of competent jurisdiction, to be null and void or any Loan Guarantor (or any Borrower as to the guarantee of the Obligations of the other Borrowers under the terms of the Loan Guaranty) shall repudiate in writing its obligations thereunder (in each case, other than as a result of the discharge of such Loan Guarantor (or such Borrower as to the guarantee of the Obligations of the other Borrowers under the Loan Guaranty) in accordance with the terms thereof and other than as a result of any act or omission by the Administrative Agent or any Lender), (ii) this Agreement or any material Collateral Document ceases to be in full force and effect or shall be declared, by a court of competent jurisdiction, to be null and void or any Lien on Collateral created under any Collateral Document ceases to be perfected with respect to a material portion of the Collateral (other than (A) Collateral consisting of Material Real Estate Assets to the extent that the relevant losses are covered by a lender's title insurance policy and such insurer has not denied coverage or (B) solely by reason of (w) such perfection not being required pursuant to the Collateral and Guarantee Requirement, the Collateral Documents, this Agreement or otherwise, (x) the failure of the Administrative Agent to maintain possession of any Collateral actually delivered to it or the failure of the Administrative Agent to file UCC (or equivalent) continuation statements, (y) a release of Collateral in accordance with the terms hereof or thereof or (z) the occurrence of the Termination Date or any other termination of such Collateral Document in accordance with the terms thereof) or (iii) other than in any bona fide, good faith dispute as to the scope of Collateral or whether any Lien has been, or is required to be released, any Loan Party shall contest in writing, the validity or enforceability of any material provision of any Loan Document (or any Lien purported to be created by the Collateral Documents or any Loan Guaranty) or deny in writing that it has any further liability (other than by reason of the occurrence of the Termination Date or any other termination of any other Loan Document in accordance with the terms thereof), including with respect to future advances by the Lenders, under any Loan Document to which it

is a party; it being understood and agreed that the failure of the Administrative Agent to file any UCC continuation statement and/or maintain possession of any physical Collateral shall not result in an Event of Default under this Section 7.01(k) or any other provision of any Loan Document; or

(l)     Subordination. The Obligations ceasing or the assertion in writing by any Loan Party that the Obligations cease to constitute senior indebtedness under the subordination provisions of any document or instrument evidencing any Junior Indebtedness or Junior Lien Indebtedness or any such subordination provision being invalidated by a court of competent jurisdiction in a final non-appealable order, or otherwise ceasing, for any reason, to be valid, binding and enforceable obligations of the parties thereto;

then, during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, take any of the following actions, at the same or different times: (A)(i) terminate the Commitments, and thereupon such Commitments shall terminate immediately, together with any obligation of any Revolving Lender to make Revolving Loans, the obligation of the Swing Lender to make Swing Loans, and the obligation of Issuing Bank to issue Letters of Credit; (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Borrowers accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower, (iii) require that the Borrowers deposit in the LC Collateral Account an additional amount in Cash as reasonably requested by the Issuing Banks (not to exceed 103% of the relevant face amount) of the then outstanding LC Exposure (minus the amount then on deposit in the LC Collateral Account) and (B) exercise any rights and remedies provided to the Administrative Agent under the Loan Documents or at law or equity, including all remedies provided under Debtor Relief Laws and the UCC; provided that upon the occurrence of an event with respect to any Borrower described in clauses (f) or (g) of this Article 7, any such Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees and other obligations of any Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Borrower, and the obligation of each Borrower to Cash collateralize the outstanding Letters of Credit as aforesaid shall automatically become effective, and Borrowers shall deposit Cash in the Administrative Agent Payment Account to be held by the Administrative Agent for the benefit of the Bank Product Providers (other than the Hedge Providers) in an amount determined by the Administrative Agent as sufficient to satisfy the reasonably estimated credit exposure, operational risk or processing risk with respect to the then existing Bank Product Obligations (other than Hedge Obligations).

ARTICLE 8
THE ADMINISTRATIVE AGENT

Each of the Lenders and the Issuing Banks hereby irrevocably appoints Wells Fargo (or any successor appointed pursuant hereto) as Administrative Agent and authorizes the Administrative Agent to take such actions on its behalf, including execution of the other Loan Documents, and to exercise such powers as are delegated to the Administrative Agent by the terms of the Loan Documents, together with such actions and powers as are reasonably incidental thereto.

Any Person serving as Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated, unless the context otherwise requires or unless such Person is in fact not a Lender, include each Person serving as Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and

generally engage in any kind of business with any Loan Party or any subsidiary of any Loan Party or other Affiliate thereof as if it were not the Administrative Agent hereunder. The Lenders acknowledge that, pursuant to such activities, the Administrative Agent or its Affiliates may receive information regarding any Loan Party or any of its Affiliates (including information that may be subject to confidentiality obligations in favor of such Loan Party or such Affiliate) and acknowledge that the Administrative Agent shall not be under any obligation to provide such information to them.

The Administrative Agent shall not have any duties or obligations except those expressly set forth in the Loan Documents. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default or Event of Default exists, and the use of the term "agent" herein and in the other Loan Documents with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Requirements of Law; it being understood that such term is used merely as a matter of market custom, and is intended to create or reflect only an administrative relationship between independent contracting parties, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary power, except discretionary rights and powers that are expressly contemplated by the Loan Documents and which the Administrative Agent is required to exercise in writing as directed by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the relevant circumstances as provided in <u>Section 9.02</u>); <u>provided</u> that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Requirements of Law, and (c) except as expressly set forth in the Loan Documents, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to Holdings, the Top Borrower or any of its subsidiaries that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable to the Lenders or any other Secured Party for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as is necessary, or as the Administrative Agent believes in good faith shall be necessary, under the relevant circumstances as provided in <u>Section 9.02</u>) or in the absence of its own gross negligence or willful misconduct, as determined by the final judgment of a court of competent jurisdiction, in connection with its duties expressly set forth herein. The Administrative Agent shall not be deemed to have knowledge of any Default or Event of Default unless and until written notice thereof is given to the Administrative Agent by the Top Borrower or any Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or in connection with any Loan Document, (iii) the performance or observance of any covenant, agreement or other term or condition set forth in any Loan Document or the occurrence of any Default or Event of Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the creation, perfection or priority of any Lien on the Collateral or the existence, value or sufficiency of the Collateral or to assure that the Liens granted to the Administrative Agent pursuant to any Loan Document have been or will continue to be properly or sufficiently or lawfully created, perfected or enforced or are entitled to any particular priority, (vi) the satisfaction of any condition set forth in <u>Article 4</u> or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent or (vii) any property, book or record of any Loan Party or any Affiliate thereof.

Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, the Borrowers, the Administrative Agent and each Secured Party agree that (i) no Secured Party shall have any right individually to realize upon any of the Collateral or to enforce the Loan Guaranty; it being understood that any right to realize upon the Collateral or enforce any Loan Guaranty against any Loan Party pursuant hereto or pursuant to any other Loan Document may be exercised solely by the

Administrative Agent on behalf of the Secured Parties in accordance with the terms hereof or thereof , and (ii) in the event of a foreclosure by the Administrative Agent on any of the Collateral pursuant to a public or private sale or in the event of any other Disposition (including pursuant to Section 363 of the Bankruptcy Code), (A) the Administrative Agent, as agent for and representative of the Secured Parties, shall be entitled, for the purpose of bidding and making settlement or payment of the purchase price for all or any portion of the Collateral sold at any such sale or other Disposition, to use and apply all or any portion of the Secured Obligations as a credit on account of the purchase price for any Collateral payable by the Administrative Agent at such sale or other Disposition and (B) the Administrative Agent or any Lender may be the purchaser or licensor of all or any portion of such Collateral at any such Disposition.

Each Secured Party agrees that the Administrative Agent may in its sole discretion, but is under no obligation to credit bid any part of the Secured Obligations or to purchase or retain or acquire any portion of the Collateral.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) that it believes to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan or the issuance of a Letter of Credit that by its terms must be fulfilled to the satisfaction of a Lender or the applicable Issuing Bank, the Administrative Agent may presume that such condition is satisfactory to such Lender or the applicable Issuing Bank unless the Administrative Agent has received notice to the contrary from such Lender or the applicable Issuing Bank prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Top Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all of its duties and exercise its rights and powers by or through any one or more sub-agents appointed by it. The Administrative Agent and any such sub-agent may perform any and all of their respective duties and exercise their respective rights and powers through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as the Administrative Agent.

The Administrative Agent may resign at any time by giving ten days' written notice to the Lenders and the Top Borrower; provided that if no successor agent is appointed in accordance with the terms set forth below within such 10-day period, the Administrative Agent's resignation shall not be effective until the earlier to occur of (x) the date of the appointment of the successor agent or (y) the date that is twenty (20) days after the last day of such 10-day period. Resignation of Wells Fargo, in its capacity as Administrative Agent, shall constitute resignation of Wells Fargo in its capacity as an Issuing Bank (subject to the provisions of Section 2.05(i)(iii)). If the Administrative Agent is a Defaulting Lender or an Affiliate of a Defaulting Lender, either the Required Lenders or the Top Borrower may, upon ten days' notice, remove the Administrative Agent; provided that if no successor agent is appointed in accordance with the terms set forth below within such 10-day period, the Administrative Agent's removal shall, at the option of the Top Borrower, not be effective until the earlier to occur of (x) the date of the appointment of the successor agent or (y) the date that is twenty (20) days after the last day of such 10-day period. Upon receipt of any such notice of resignation or delivery of any such notice of removal, the Required Lenders shall have the right, with the consent of the Top Borrower (not to be unreasonably withheld or delayed), to appoint a

successor Administrative Agent which shall be a commercial bank or trust company with offices in the U.S. having combined capital and surplus in excess of $1,000,000,000; provided that during the existence and continuation of an Event of Default under Section 7.01(a) or, with respect to any Borrower, Sections 7.01(f) or (g), no consent of the Top Borrower shall be required. If no successor has been appointed as provided above and accepted such appointment within ten days after the retiring Administrative Agent gives notice of its resignation or the Administrative Agent receives notice of removal, then (a) in the case of a retirement, the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders and the Issuing Banks, appoint a successor Administrative Agent meeting the qualifications set forth above (including, for the avoidance of doubt, the consent of the Top Borrower) or (b) in the case of a removal, the Top Borrower may, after consulting with the Required Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that (x) in the case of a retirement, if the Administrative Agent notifies the Top Borrower and the Lenders and the Issuing Banks that no qualifying Person has accepted such appointment or (y) in the case of a removal, the Top Borrower notifies the Required Lenders that no qualifying Person has accepted such appointment, then, in each case, such resignation or removal shall nonetheless become effective in accordance with the provisos to the first two sentences in this paragraph and (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent in its capacity as collateral agent for the Secured Parties for purposes of maintaining the perfection of the Lien on the Collateral securing the Secured Obligations, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) all payments, communications and determinations required to be made by, to or through the Administrative Agent shall instead be made by or to each Lender and each Issuing Bank directly (and each Lender and each Issuing Bank will cooperate with the Top Borrower to enable the Top Borrower to take such actions), until such time as the Required Lenders or the Top Borrower, as applicable, appoint a successor Administrative Agent, as provided above in this Article 8. Upon the acceptance of its appointment as Administrative Agent hereunder as a successor Administrative Agent, the successor Administrative Agent shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent (other than any rights to indemnity payments owed to the retiring Administrative Agent), and the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder (other than its obligations under Section 9.13 hereof). The fees payable by the Borrowers to any successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Top Borrower and such successor Administrative Agent. After the Administrative Agent's resignation or removal hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any action taken or omitted to be taken by any of them while the relevant Person was acting as Administrative Agent (including for this purpose holding any collateral security following the retirement or removal of the Administrative Agent). Notwithstanding anything to the contrary herein, no Disqualified Institution (nor any Affiliate thereof) may be appointed as a successor Administrative Agent.

Each of each Lender and each Issuing Bank acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each of each Lender and each Issuing Bank also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their respective Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or related agreement or any document furnished hereunder or thereunder. Except for notices, reports and other documents expressly required to be furnished to the Lenders and the Issuing Banks by the Administrative Agent herein, the Administrative Agent shall not have any duty or responsibility to provide any Lender or any Issuing Bank with any credit or other information

concerning the business, prospects, operations, property, financial and other condition or creditworthiness of any of the Loan Parties or any of their respective Affiliates which may come into the possession of the Administrative Agent or any of its Related Parties.

Each Secured Party irrevocably authorizes and instructs the Administrative Agent to, and the Administrative Agent shall:

(a)    subject to the Updated BBC Condition, if applicable, release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (i) upon the occurrence of the Termination Date, (ii) that is sold or to be sold or transferred as part of or in connection with any Disposition permitted under the Loan Documents to a Person that is not a Loan Party, (iii) that does not constitute (or ceases to constitute) Collateral, (iv) if the property subject to such Lien is owned by a Subsidiary Guarantor, upon the release of such Subsidiary Guarantor from its Loan Guaranty otherwise in accordance with the Loan Documents, (v) as required under clause (d) below or (vi) if approved, authorized or ratified in writing by the Required Lenders in accordance with Section 9.02;

(b)    subject to Section 9.22 and the Updated BBC Condition, if applicable, release any Subsidiary Guarantor from its obligations under the Loan Guaranty (i) if such Person ceases to be a Restricted Subsidiary (or becomes an Excluded Subsidiary as a result of a single transaction or series of related transactions permitted hereunder and consummated for a bona fide business purpose and not in contemplation of adversely affecting the Secured Parties' interests in the Loan Guaranty or the Collateral (as determined by the Administrative Agent in good faith), and the Top Borrower has requested such Excluded Subsidiary cease to be a Subsidiary Guarantor) and/or (ii) in the case of any Discretionary Guarantor, upon notice from the Top Borrower to the Administrative Agent at any time;

(c)    subject to the Updated BBC Condition, if applicable, subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Sections 6.02(m), 6.02(n), 6.02(o)(i) (other than any Lien on the Capital Stock of any Subsidiary Guarantor), 6.02(s) (solely with respect to Term Loan Priority Collateral) and/or 6.02(u) (solely with respect to Term Loan Priority Collateral); provided, that the subordination of any Lien on any property granted to or held by the Administrative Agent shall only be required under this clause (c) with respect to any Lien on such property that is permitted by any of the foregoing clauses of Section 6.02 to the extent that the Lien of the Administrative Agent with respect to such property is required to be subordinated to the relevant Permitted Lien in accordance with the documentation governing the Indebtedness that is secured by such Permitted Lien;

(d)    enter into subordination, intercreditor, collateral trust and/or similar agreements with respect to Indebtedness (including the ABL Intercreditor Agreement and any other Acceptable Intercreditor Agreement and/or any amendment to the ABL Intercreditor Agreement and/or any Acceptable Intercreditor Agreement) that is (i) required or permitted to be subordinated hereunder and/or (ii) secured by Liens permitted hereunder, and with respect to which Indebtedness, this Agreement contemplates an intercreditor, subordination, collateral trust or similar agreement; and

(e)    enter into, amend and/or terminate such Collateral Access Agreements, Blocked Account Agreements, control agreements and other third-party agreements relating to the Collateral as the Administrative Agent shall deem reasonably appropriate.

Upon the request of the Administrative Agent at any time, the Required Lenders will confirm in writing to the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Loan Party from its obligations under the Loan Guaranty or its Lien on any Collateral pursuant to this Article 8. In each case as specified in this Article 8, the Administrative Agent

will (and each Lender and each Issuing Bank hereby authorizes the Administrative Agent to), at the Borrowers' expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to evidence the release of such item of Collateral from the assignment and security interest granted under the Collateral Documents, to subordinate its interest therein, or to release such Loan Party from its obligations under the Loan Guaranty, in each case in accordance with the terms of the Loan Documents and this Article 8; provided, that upon the request of the Administrative Agent, the Top Borrower shall deliver a certificate of a Responsible Officer certifying that the relevant transaction has been consummated in compliance with the terms of this Agreement.

The Administrative Agent is authorized by the Lenders and each other Secured Party to enter into the ABL Intercreditor Agreement, any other Acceptable Intercreditor Agreement and any other intercreditor, subordination, collateral trust or similar agreement contemplated hereby with respect to any Indebtedness (i) that is (A) required or permitted hereunder to be subordinated in right of payment or with respect to security and/or (B) secured by any Lien and (ii) which contemplates an intercreditor, subordination, collateral trust or similar agreement (any such other intercreditor, subordination, collateral trust and/or similar agreement an "Additional Agreement"), and the Secured Parties party hereto acknowledge that the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement and any other Additional Agreement is binding upon them. Each Lender and each other Secured Party party hereto hereby (a) agrees that they will be bound by, and will not take any action contrary to, the provisions of the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement or any other Additional Agreement and (b) authorizes and instructs the Administrative Agent to enter into the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement and/or any other Additional Agreement and to subject the Liens on the Collateral securing the Secured Obligations to the provisions thereof. The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrowers, and the Secured Parties are intended third-party beneficiaries of such provisions and the provisions of the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement and/or any other Additional Agreement.

To the extent that the Administrative Agent (or any Affiliate thereof) is not reimbursed and indemnified by the Top Borrower in accordance with and to the extent required by Section 9.03(b) hereof, the Lenders will reimburse and indemnify the Administrative Agent (and any Affiliate thereof) in proportion to their respective Applicable Percentages (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any Affiliate thereof) in performing its duties hereunder or under any other Loan Document or in any way relating to or arising out of this Agreement or any other Loan Document; provided that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

To the extent required by any applicable Requirement of Law (as determined in good faith by the Administrative Agent), the Administrative Agent may withhold from any payment to any Lender or any Issuing Bank under any Loan Document an amount equivalent to any applicable withholding Tax. Without limiting or expanding the provisions of Section 2.17, each Lender and each Issuing Bank shall indemnify and hold harmless the Administrative Agent against, and shall make payable in respect thereof within ten days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the IRS or any other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold Tax from amounts paid to or for the account of such Lender or such Issuing Bank for any reason (including because the appropriate form was not delivered or not properly executed, or because such Lender or such Issuing Bank failed to notify the

Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender or any Issuing Bank by the Administrative Agent shall be conclusive absent manifest error. Each Lender and each Issuing Bank hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender or such Issuing Bank under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, any Lender or any Issuing Bank, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

ARTICLE 9
MISCELLANEOUS

Section 9.01     Notices.

(a)     Except in the case of notices and other communications expressly permitted to be given by telephone (and subject to paragraph (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile or email, as follows:

(i)     if to any Loan Party, to such Loan Party in the care of the Top Borrower at:

Serta Simmons Bedding, LLC.
2451 Industry Avenue
Doraville, GA 30360 Attention: Lisa Wynn
Email: lwynn@SertaSimmons.com
Facsimile: (770) 206-2669

with copies to (which shall not constitute notice to any Loan Party):

Serta Simmons Bedding, LLC
2451 Industry Avenue
Doraville, GA 30360 Attention: Kristen McGuffey
Email: kmcguffey@sertasimmons.com
Facsimile: (770) 206-2669

and

Weil, Gotshal & Manges LLP
200 Crescent Court, Suite 300
Dallas, Texas 75201
Attention: Vynessa M. Nemunaitis
Email: Vynessa.nemunaitis@weil.com
Facsimile: (214) 746-7851

(ii)     if to the Administrative Agent:

Wells Fargo Bank, National Association
150 East 42nd Street, 40th Floor
New York, New York 10017
Attention: Portfolio Manager--Serta
Email: stephanie.allegra@wellsfargo.com; marc.breier@wellsfargo.com

with a copy to (which shall not constitute notice to the Administrative Agent):

Otterbourg P.C.
230 Park Avenue
New York, New York 10169
Attention: David W. Morse
Email: dmorse@otterbourg.com
Facsimile: (212) 682-6104

(iii)    if to any Lender, to it at its address or facsimile number set forth in its Administrative Questionnaire.

All such notices and other communications (A) sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when delivered in person or by courier service and signed for against receipt thereof or three Business Days after dispatch if sent by certified or registered mail, in each case, delivered, sent or mailed (properly addressed) to the relevant party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01, (B) sent by facsimile shall be deemed to have been given when sent and when receipt has been confirmed by telephone; provided that notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, such notices or other communications shall be deemed to have been given at the opening of business on the next Business Day for the recipient), or (C) sent by email shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); provided that any such notice or communication not given during the normal business hours of the recipient shall be deemed to have been given at the opening of business on the next Business Day for the recipient.

(b)    The Administrative Agent and each of its Affiliates is authorized to transmit, post or otherwise make or communicate, in its sole discretion (but shall not be required to do so), by Approved Electronic Communications in connection with this Agreement or any other Loan Document and the transactions contemplated therein. The Administrative Agent is hereby authorized to establish procedures to provide access to and to make available or deliver, or to accept, notices, documents and similar items by posting to the Platform. All uses of the Platform and other Approved Electronic Communications shall be governed by and subject to, in addition to the terms of this Agreement, the separate terms, conditions and privacy policy posted or referenced in such system (or such terms, conditions and privacy policy as may be updated from time to time, including on such system) and any related contractual obligations executed by the Administrative Agent and Loan Parties in connection with the use of such system. Each of the Loan Parties, the Lenders and the Administrative Agent hereby acknowledges and agrees that the use of the Platform and other Approved Electronic Communications is not necessarily secure and that there are risks associated with such use, including risks of interception, disclosure and abuse and each indicates it assumes and accepts such risks by hereby authorizing the Administrative Agent and each of its Affiliates to transmit Approved Electronic Communications.  The Platform and all Approved Electronic Communications shall be provided "as is" and "as available". None of the Administrative Agent or any of its Affiliates or related persons warrants the accuracy, adequacy or completeness of any other electronic platform or electronic transmission and disclaims all liability for errors or omissions therein. No warranty of any kind is made by the Administrative Agent or any of its Affiliates or related persons in connection with the Platform or any other electronic platform or electronic transmission, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects. Each Loan Party agrees that the Administrative Agent has no responsibility for maintaining or providing any equipment, software, services or any testing required in connection with any Approved Electronic Communication or otherwise required for any Approved Electronic Communication. No Approved

Electronic Communications shall be denied legal effect merely because it is made electronically. Approved Electronic Communications that are not readily capable of bearing either a signature or a reproduction of a signature may be signed, and shall be deemed signed, by attaching to, or logically associating with such Approved Electronic Communication, an e-signature, upon which the Administrative Agent and the Loan Parties may rely and assume the authenticity thereof. Each Approved Electronic Communication containing a signature, a reproduction of a signature or an e-signature shall, for all intents and purposes, have the same effect and weight as a signed paper original. Each e-signature shall be deemed sufficient to satisfy any requirement for a "signature" and each Approved Electronic Communication shall be deemed sufficient to satisfy any requirement for a "writing", in each case including pursuant to this Agreement, any other Loan Document, the UCC, the Federal Uniform Electronic Transactions Act, the Electronic Signatures in Global and National Commerce Act and any substantive or procedural law governing such subject matter. Each party or beneficiary hereto agrees not to contest the validity or enforceability of an Approved Electronic Communication or e-signature under the provisions of any applicable law requiring certain documents to be in writing or signed; provided, that nothing herein shall limit such party's or beneficiary's right to contest whether an Approved Electronic Communication or e-signature has been altered after transmission.

(c)    Any party hereto may change its address or facsimile number or other notice information hereunder by notice to the other parties hereto; it being understood and agreed that the Top Borrower may provide any such notice to the Administrative Agent as recipient on behalf of itself, each Issuing Bank and each Lender.

(d)    Holdings and each Loan Party hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by, or on behalf of, Holdings or the Top Borrower hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on IntraLinks, SyndTrak or a substantially similar secure electronic transmission system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material nonpublic information within the meaning of the United States federal securities laws with respect to Holdings, the Top Borrower or their respective securities) (each, a "Public Lender"). At the request of the Administrative Agent, each of Holdings and the Top Borrower hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC", (ii) by marking Borrower Materials "PUBLIC," Holdings and the Top Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as information of a type that would (A) customarily be made publicly available, as determined in good faith by the Top Borrower, if Holdings or the Top Borrower were to become public reporting companies or (B) would not be material with respect to Holdings, the Top Borrower, their respective subsidiaries, any of their respective securities or the transactions hereunder as determined in good faith by the Top Borrower for purposes of the United States federal securities laws and (iii) the Administrative Agent shall be required to treat Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC," unless the Top Borrower notifies the Administrative Agent promptly that any such document contains material nonpublic information (it being understood that the Top Borrower shall have a reasonable opportunity to review the same prior to distribution and comply with SEC or other applicable disclosure obligations): (1) the Loan Documents and (2) any information delivered pursuant to Section 5.01(b) or (c).

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to communications that are not made available through the "Public Side

Information" portion of the Platform and that may contain material non-public information with respect to the Top Borrower or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS ON, OR THE ADEQUACY OF, THE PLATFORM, AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN ANY SUCH COMMUNICATION. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM. IN NO EVENT SHALL ANY PARTY HERETO OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY OTHER PARTY HERETO OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OR MATERIAL BREACH OF THIS AGREEMENT.

Section 9.02    Waivers; Amendments.

(a)    No failure or delay by the Administrative Agent, any Issuing Bank or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof except as provided herein or in any Loan Document, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent, the Issuing Banks and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any party hereto therefrom shall in any event be effective unless the same is permitted by this Section 9.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which it is given. Without limiting the generality of the foregoing, to the extent permitted by applicable Requirements of Law, neither the making of any Loan nor the issuance of any Letter of Credit shall be construed as a waiver of any Default or Event of Default, regardless of whether the Administrative Agent, any Lender or any Issuing Bank may have had notice or knowledge of such Default or Event of Default at the time.

(b)    Subject to this Section 9.02(b) and Sections 9.02(c) and (d) below and to Section 9.05(f), neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Top Borrower and the Required Lenders (or the Administrative Agent with the consent of the Required Lenders) or (ii) in the case of any other Loan Document (other than any waiver, amendment or modification to effectuate any modification thereto expressly contemplated by the terms of such other Loan Document), pursuant to an agreement or agreements in writing entered into by the Administrative Agent and each Loan Party that is party thereto, with the consent of the Required Lenders; provided that, notwithstanding the foregoing:

(A)   the consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) shall be required for any waiver, amendment or modification that:

(1) increases the Commitment of such Lender; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of the Commitments shall constitute an increase of any Commitment of such Lender;

(2) reduces the principal amount of any Loan owed to such Lender;

(3) (x) extends the scheduled final maturity of any Loan or (y) postpones any Monthly Payment Date or Quarterly Payment Date with respect to any Loan held by such Lender or the date of any scheduled payment of any fee or premium payable to such Lender hereunder (in each case, other than any extension for administrative reasons agreed by the Administrative Agent);

(4) reduces the rate of interest (other than to waive any Default or Event of Default or obligation of the Borrowers to pay interest to such Lender at the default rate of interest under Section 2.13(d), which shall only require the consent of the Required Lenders) or the amount of any fee or premium owed to such Lender; it being understood that no change in the definition of "Fixed Charge Coverage Ratio" or any other ratio used in the calculation of the Applicable Margin or in the calculation of any other interest, fee or premium due hereunder (including any component definition thereof) shall constitute a reduction in any rate of interest or fee hereunder;

(5) extends the expiry date of such Lender's Commitment; it being understood that no amendment, modification or waiver of, or consent to departure from, any condition precedent, representation, warranty, covenant, Default, Event of Default, mandatory prepayment or mandatory reduction of any Commitment shall constitute an extension of any Commitment of any Lender; and

(6) waives, amends or modifies the provisions of Sections 2.18(b) or (c) of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby;

(B)   no such agreement shall:

(1) change any of the provisions of Section 9.02(a) or Section 9.02(b) or the definition of "Required Lenders" or "Super Majority Lenders" to reduce any voting percentage required to waive, amend or modify any right thereunder or make any determination or grant any consent thereunder, without the prior written consent of each Lender;

(2) release all or substantially all of the Collateral from the Lien granted pursuant to the Loan Documents (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Article 8 or Section 9.22 hereof), without the prior written consent of each Lender;

(3) release all or substantially all of the value of the Guarantees under the Loan Guaranty (except as otherwise permitted herein or in the other Loan Documents, including pursuant to Section 9.22 hereof), without the prior written consent of each Lender; or

(4) subordinate, or have the effect of subordinating, the Obligations to any other Indebtedness, or subordinate, or have the effect of subordinating, the Liens securing the Obligations to any other Liens securing any other Indebtedness, in each case, without the prior written consent of each Lender; except in the case of (i) any Liens that are expressly permitted by the Loan Documents as in effect on the Closing Date to be senior to the Liens securing the Obligations and (ii) any Liens solely with respect to the

Term Loan Priority Collateral subject to an Acceptable Intercreditor Agreement that secure Indebtedness permitted herein (as the same now exists or as the same may hereafter be amended as to the amount of such Indebtedness with the consent of Required Lenders);

(C)   no agreement shall amend, modify or otherwise affect the rights or duties of the Administrative Agent or any Issuing Bank hereunder without the prior written consent of the Administrative Agent or such Issuing Bank, as the case may be;

(D)   solely with the consent of the relevant Issuing Bank and, in the case of <u>clause (x)</u>, the Administrative Agent and the applicable Issuing Bank, any such agreement may (x) increase or decrease the Letter of Credit Sublimit or (y) waive, amend or modify any condition precedent set forth in <u>Section 4.02</u> as it pertains to the issuance of any Letter of Credit;

(E)   enter into an amendment or waiver the effect of which would be to increase the percentages used in the definition of the term "Borrowing Base" applicable to Eligible Trade Receivables, Eligible Inventory or Eligible In-Transit Inventory, without the consent of the Super Majority Lenders; or

(F)   change the definition of the term "Borrowing Base", or any component definition thereof (including the definitions of "Eligible Trade Receivables", "Eligible Inventory" or "Eligible In-Transit Inventory"), the effect of which would be to increase amounts available to be borrowed, without the consent of the Super Majority Lenders.

(c)   Notwithstanding anything to the contrary contained in this <u>Section 9.02</u> or any other provision of this Agreement or any provision of any other Loan Document:

(i)   the Top Borrower and the Administrative Agent may, without the input or consent of any Lender, amend, supplement and/or waive any guaranty, collateral security agreement, pledge agreement and/or related document (if any) executed in connection with this Agreement to (A) comply with any Requirement of Law or the advice of counsel or (B) cause any such guaranty, collateral security agreement, pledge agreement or other document to be consistent with this Agreement and/or the relevant other Loan Documents,

(ii)   the Top Borrower and the Administrative Agent may, without the input or consent of any other Lender (other than the relevant Lenders providing Loans and Commitments under such Sections), effect amendments to this Agreement and the other Loan Documents as may be necessary in the reasonable opinion of the Top Borrower and the Administrative Agent to (1) effect the provisions of <u>Sections 5.12</u> and/or <u>6.13</u>, or any other provision specifying that any waiver, amendment or modification may be made with the consent or approval of the Administrative Agent and/or (2) to add terms (including representations and warranties, conditions, prepayments, covenants or events of default), in connection with the addition of any Loan or Commitment hereunder, in a manner favorable to the then-existing Lenders, as reasonably determined by the Administrative Agent,

(iii)   if the Administrative Agent and the Top Borrower have jointly identified any ambiguity, mistake, defect, inconsistency, obvious error or any error or omission of a technical nature or any necessary or desirable technical change, in each case, in any provision of any Loan Document, then the Administrative Agent and the Top Borrower shall be permitted to amend such provision solely to address such matter as reasonably determined by them acting jointly,

(iv)   the Administrative Agent and the Top Borrower may amend, restate, amend and restate or otherwise modify the ABL Intercreditor Agreement, any Acceptable Intercreditor Agreement and/or any other Additional Agreement as provided therein,

(v)     the Administrative Agent may amend the Commitment Schedule to reflect assignments entered into pursuant to <u>Section 9.05</u> and Commitment reductions or terminations pursuant to <u>Section 2.09</u>, and

(vi)    no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder, except as permitted pursuant to <u>Section 2.21(b)</u> and except that the Commitment of any Defaulting Lender may not be increased without the consent of such Defaulting Lender (it being understood that any Commitment or Loan held or deemed held by any Defaulting Lender shall be excluded from any vote hereunder that requires the consent of any Lender, except as expressly provided in <u>Section 2.21(b)</u>).

Section 9.03     <u>Expenses; Indemnity</u>.

(a)     Subject to <u>Section 9.05(f)</u>, the Borrowers shall jointly and severally pay (i) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent and their respective Affiliates (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of outside counsel to all such Persons taken as a whole, and, if necessary, of one local counsel in any relevant jurisdiction to all such Persons, taken as a whole) in connection with the syndication and distribution (including via the Internet or through a service such as Intralinks) of the Revolving Facility, the preparation, execution, delivery and administration of the Loan Documents and any related documentation, including in connection with any amendment, modification or waiver of any provision of any Loan Document (whether or not the transactions contemplated thereby are consummated, but only to the extent the preparation of any such amendment, modification or waiver was requested by the Top Borrower and except as otherwise provided in a separate writing between the Top Borrower and the Administrative Agent), (ii) Agent's customary fees and charges imposed or incurred in connection with any background checks or OFAC/PEP searches related to any Loan Party or its Subsidiaries, (iii) Agent's customary fees and charges (as adjusted from time to time) with respect to the disbursement of funds (or the receipt of funds) to or for the account of any Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith, (iv) customary charges imposed or incurred by Agent resulting from the dishonor of checks payable by or to any Loan Party, (v) field examination, appraisal, and valuation fees and expenses of Administrative Agent related to any field examinations, appraisals, or valuation to the extent of the fees and charges (and up to the amount of any limitation) provided in <u>Section 5.06</u> of this Agreement, as and when incurred or chargeable, as follows (A) the per diem charge at Administrative Agent's then standard rate for examiners in the field and office, plus out-of-pocket expenses (including travel, meals, and lodging) for each field examination of any Loan Party or its Subsidiaries performed by or on behalf of Administrative Agent, and (B) the fees, charges or expenses paid or incurred by Administrative Agent if it elects to employ the services of one or more third Persons to conduct a field examination or appraise the Collateral, or any portion thereof, (vi) all reasonable and documented out-of-pocket expenses incurred by the Administrative Agent, the Issuing Banks and the Lenders or any of their respective Affiliates (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of-pocket fees, disbursements and other charges of one firm of outside counsel to all such Persons taken as a whole and, if necessary, of one local counsel in any relevant jurisdiction to all such Persons, taken as a whole) in connection with terminating, enforcing (including attorneys, accountants, consultants, and other advisors fees and expenses incurred in connection with a workout, a restructuring, or an Insolvency Proceeding concerning any Loan Party or any of its Subsidiaries) or in exercising rights or remedies or protecting their respective rights in connection with the Loan Documents, including their respective rights under this Section, or in connection with the Revolving Loans made and/or Letters of Credit issued hereunder, irrespective of whether a lawsuit or other adverse proceeding is brought. All of the foregoing may be referred to herein as "Lender Group Expenses".  Except to the extent required to be paid on the Closing Date, all amounts due under this <u>paragraph (a)</u> shall be payable by any Borrower within 30 days of receipt by the Top Borrower of an invoice setting forth such

expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request.

(b)    The Borrowers shall jointly and severally indemnify the Administrative Agent, each Issuing Bank and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages and liabilities (but limited, in the case of legal fees and expenses, to the actual reasonable and documented out-of- pocket fees, disbursements and other charges of one counsel to all Indemnitees taken as a whole and, if reasonably necessary, one local counsel in any relevant jurisdiction to all Indemnitees, taken as a whole and solely in the case of an actual or perceived conflict of interest, (x) one additional counsel to all affected Indemnitees, taken as a whole, and (y) one additional local counsel to all affected Indemnitees, taken as a whole), incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Revolving Facility or any other transactions contemplated hereby or thereby and/or the enforcement of the Loan Documents, (ii) the use of the proceeds of the Loans or any Letter of Credit, (iii) any actual or alleged Release or presence of Hazardous Materials on, at, under or from any property currently or formerly owned or operated by the Top Borrower, any of its Restricted Subsidiaries or any other Loan Party or any Environmental Liability related to the Top Borrower, any of its Restricted Subsidiaries or any other Loan Party and/or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto (and regardless of whether such matter is initiated by a third-party or by the Top Borrower, any other Loan Party or any of their respective Affiliates); provided that such indemnity shall not, as to any Indemnitee, be available to the extent that any such loss, claim, damage, or liability (i) is determined by a final and non-appealable judgment of a court of competent jurisdiction (or documented in any settlement agreement referred to below) to have resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or, to the extent such judgment finds (or any such settlement agreement acknowledges) that any such loss, claim, damage, or liability has resulted from such Person's material breach of the Loan Documents or (ii) arises out of any claim, litigation, investigation or proceeding brought by such Indemnitee against another Indemnitee (other than any claim, litigation, investigation or proceeding that is brought by or against the Administrative Agent, acting in its capacity as the Administrative Agent) that does not involve any act or omission of Holdings, the Top Borrower or any of its subsidiaries. Each Indemnitee shall be obligated to refund or return any and all amounts paid by any Borrower pursuant to this Section 9.03(b) to such Indemnitee for any fees, expenses, or damages to the extent such Indemnitee is not entitled to payment thereof in accordance with the terms hereof. All amounts due under this paragraph (b) shall be payable by any Borrower within 30 days (x) after receipt by the Top Borrower of a written demand therefor, in the case of any indemnification obligations and (y) in the case of reimbursement of costs and expenses, after receipt by the Top Borrower of an invoice setting forth such costs and expenses in reasonable detail, together with backup documentation supporting the relevant reimbursement request. This Section 9.03(b) shall not apply to Taxes other than any Taxes that represent losses, claims, damages or liabilities in respect of a non-Tax claim.

(c)    The Top Borrower shall not be liable for any settlement of any proceeding effected without the written consent of the Top Borrower (which consent shall not be unreasonably withheld, delayed or conditioned), but if any proceeding is settled with the written consent of the Top Borrower, or if there is a final judgment against any Indemnitee in any such proceeding, the Borrowers agree to indemnify and hold harmless each Indemnitee to the extent and in the manner set forth above. The Top Borrower shall not, without the prior written consent of the affected Indemnitee (which consent shall not be unreasonably withheld, conditioned or delayed), effect any settlement of any pending or threatened proceeding in respect of which indemnity could have been sought hereunder by such Indemnitee unless (i) such settlement includes an unconditional release of such Indemnitee from all liability or claims that are the subject matter

of such proceeding and (ii) such settlement does not include any statement as to any admission of fault or culpability.

Section 9.04    Waiver of Claim.  To the extent permitted by applicable Requirements of Law, no party to this Agreement nor any Secured Party shall assert, and each hereby waives, any claim against any other party hereto, any Loan Party and/or any Related Party of any thereof, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, any Loan or any Letter of Credit or the use of the proceeds thereof, except, in the case of any claim by any Indemnitee against any Borrower, to the extent such damages would otherwise be subject to indemnification pursuant to, and in accordance with, the terms of Section 9.03.

Section 9.05    Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns; provided that (i) except as provided under Section 6.07, the Top Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Top Borrower without such consent shall be null and void) and (ii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with the terms of this Section (any attempted assignment or transfer not complying with the terms of this Section shall be null and void and, with respect to any attempted assignment or transfer to any Disqualified Institution, subject to Section 9.05(f)). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and permitted assigns, to the extent provided in paragraph (e) of this Section, Participants and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    (i) Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of any Loan or Commitment at the time owing to it) with the prior written consent of:

(A)  the Top Borrower (such consent not to be unreasonably withheld, conditioned or delayed); provided, that (x) the consent of the Top Borrower shall not be required for any assignment of Loans or Commitments at any time when an Event of Default under Section 7.01(a) or Sections 7.01(f) or (g) (with respect to the Loan Parties) exists, and (y) the Top Borrower may withhold its consent to any assignment to any Person (other than a Bona Fide Debt Fund) that is not a Disqualified Institution but is known by the Top Borrower to be an Affiliate of a Disqualified Institution regardless of whether such person is identifiable as an Affiliate of a Disqualified Institution on the basis of such Affiliate's name; and

(B)  the Administrative Agent (such consent not to be unreasonably withheld, conditioned or delayed); provided, that no consent of the Administrative Agent shall be required for any assignment to another Lender, any Affiliate of a Lender or any Approved Fund; and

(C)  in the case of any Commitment, each Issuing Bank not to be unreasonably withheld or delayed.

(ii)    Assignments shall be subject to the following additional conditions:

(A)  except in the case of any assignment to another Lender, any Affiliate of any Lender or any Approved Fund or any assignment of the entire remaining amount of the relevant assigning Lender's

Loans or Commitments, the principal amount of Loans or Commitments of the assigning Lender subject to the relevant assignment (determined as of the date on which the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and determined on an aggregate basis in the event of concurrent assignments to Related Funds or by Related Funds) shall not be less than (x) $5,000,000, unless the Top Borrower and the Administrative Agent otherwise consent;

(B)   any partial assignment shall be made as an assignment of a proportionate part of all the relevant assigning Lender's rights and obligations under this Agreement;

(C)   the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually), and shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced in the sole discretion of the Administrative Agent); and

(D)   the relevant Eligible Assignee, if it is not a Lender, shall deliver on or prior to the effective date of such assignment, to the Administrative Agent (1) an Administrative Questionnaire and (2) any Internal Revenue Service form required under Section 2.17.

(iii)   Subject to the acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in any Assignment and Assumption, the Eligible Assignee thereunder shall be a party hereto and, to the extent of the interest assigned pursuant to such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be (A) entitled to the benefits of Sections 2.15, 2.17 and 9.03 with respect to facts and circumstances occurring on or prior to the effective date of such assignment and (B) subject to its obligations thereunder and under Section 9.13). If any assignment by any Lender holding any Promissory Note is made after the issuance of such Promissory Note, the assigning Lender shall, upon the effectiveness of such assignment or as promptly thereafter as practicable, surrender such Promissory Note to the Administrative Agent for cancellation, and, following such cancellation, if requested by either the assignee or the assigning Lender, the Borrowers shall issue and deliver a new Promissory Note to such assignee and/or to such assigning Lender, with appropriate insertions, to reflect the new commitments and/or outstanding Loans of the assignee and/or the assigning Lender.

(iv)   The Administrative Agent, acting for this purpose as an agent of the Borrowers, shall maintain at one of its offices in the United States a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders and their respective successors and assigns, and the commitment of, and principal amount of and interest on the Loans and LC Disbursements owing to, each Lender or Issuing Bank pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive, absent manifest error, and the Borrowers, the Administrative Agent, the Issuing Banks and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. The Register shall be available for inspection by the Top Borrower, each Issuing Bank and each Lender (but only as to its own holdings), at any reasonable time and from time to time upon reasonable prior notice.

(v)   Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an Eligible Assignee, the Eligible Assignee's completed Administrative Questionnaire and any tax certification required by Section 9.05(b)(ii)(D)(2) (unless the assignee is already

a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section, if applicable, and any written consent to the relevant assignment required by paragraph (b) of this Section, the Administrative Agent shall promptly accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)  By executing and delivering an Assignment and Assumption, the assigning Lender and the Eligible Assignee thereunder shall be deemed to confirm and agree with each other and the other parties hereto as follows: (A) the assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim and that the amount of its commitments, and the outstanding balances of its Loans, in each case without giving effect to any assignment thereof which has not become effective, are as set forth in such Assignment and Assumption, (B) except as set forth in clause (A) above, the assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statement, warranty or representation made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of the Top Borrower or any Restricted Subsidiary or the performance or observance by the Top Borrower or any Restricted Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (C) the assignee represents and warrants that it is an Eligible Assignee and that it is not a Disqualified Institution, legally authorized to enter into such Assignment and Assumption; (D) the assignee confirms that it has received a copy of this Agreement and each applicable Intercreditor Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Assumption; (E) the assignee will independently and without reliance upon the Administrative Agent, the assigning Lender or any other Lender and based on such documents and information as it deems appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (F) the assignee appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers under this Agreement as are delegated to the Administrative Agent, by the terms hereof, together with such powers as are reasonably incidental thereto; and (G) the assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(c)     Any Lender may, without the consent of the Top Borrower, the Administrative Agent, any Issuing Bank or any other Lender, sell participations to any bank or other entity (other than to any Disqualified Institution, any natural person, the Top Borrower or any of its Affiliates) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its commitments and the Loans owing to it); provided that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) the Borrowers, the Administrative Agent, the Issuing Banks and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which any Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the relevant Participant, agree to any amendment, modification or waiver described in (x) clause (A) of the first proviso to Section 9.02(b) that directly and adversely affects the Loans or commitments in which such Participant has an interest and (y) clauses (B)(1), (2) or (3) of the first proviso to Section 9.02(b). Subject to paragraph (c)(ii) of this Section, the Borrowers agree that each Participant shall be entitled to the benefits of Sections 2.15 and 2.17 (subject to the limitations and requirements of such Sections and Section 2.19) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b)

of this Section and it being understood that the documentation required under Section 2.17(f) shall be delivered to the participating Lender, and if additional amounts are required to be paid pursuant to Section 2.17(a) or Section 2.17(c), to the Top Borrower and the Administrative Agent). To the extent permitted by applicable Requirements of Law, each Participant also shall be entitled to the benefits of Section 9.09 as though it were a Lender; provided that such Participant shall be subject to Section 2.18(c) as though it were a Lender.

(i)    No Participant shall be entitled to receive any greater payment under Section 2.15 or 2.17 than the participating Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Top Borrower's prior written consent (in its sole discretion), expressly acknowledging that such Participant's entitlement to benefits under Sections 2.15 and 2.17 is not limited to what the participating Lender would have been entitled to receive absent the participation.

Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and their respective successors and registered assigns, and the principal and interest amounts of each Participant's interest in the Loans or other obligations under the Loan Documents (a "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of any Participant Register (including the identity of any Participant or any information relating to any Participant's interest in any Commitment, Loan or any other obligation under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Commitment, Loan or other obligation is in registered form under Section 5f.103-1(c) or Proposed Section 1.163-5(b) (and any successor sections). The entries in the Participant Register shall be conclusive absent manifest error, and each Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)    Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to any Disqualified Institution or any natural person) to secure obligations of such Lender, including without limitation any pledge or assignment to secure obligations to any Federal Reserve Bank or other central bank having jurisdiction over such Lender, and this Section 9.05 shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release any Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(i)    No Lender, acting in its capacity as a Lender (or any Affiliate or other Person acting on such Lender's behalf) may at any time enter into a total return swap, total rate of return swap, credit default swap or other derivative instrument under which any Secured Obligation is a sole reference obligation (or a reference obligation constituting at least 5% of the weight in any bucket of such derivative instruments) (any such swap or other derivative instrument, an "Obligations Derivative Instrument") with any counterparty that is a Disqualified Institution; provided that, for the avoidance of doubt, nothing in this clause shall prohibit the activities of a Lender (or any Affiliate or other Person acting on such Lender's behalf) that occur on the public side of an information barrier unless such Person is acting in its capacity as a Lender or on behalf of any Person which is acting in its capacity as Lender or on behalf of a Lender; provided further that, (x) notwithstanding the foregoing, in no event shall Confidential Information be shared with any counterparty to an Obligations Derivatives Instrument that is a Disqualified Institution and each Lender shall be required to comply with the provisions of Section 9.13 in connection with any transactions involving Obligations Derivative Instruments and (y) in the event of any Obligations

Derivative Instrument in violation of the foregoing, the Top Borrower has the right to require the unwind of the applicable Obligations Derivative Instrument at the sole cost and expense of the applicable Lender.

(e)      Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Top Borrower, the option to provide to any Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to such Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof. The making of any Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that (i) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of such Borrower under this Agreement (including its obligations under Section 2.15 or 2.17) and no SPC shall be entitled to any greater amount under Section 2.15 or 2.17 or any other provision of this Agreement or any other Loan Document that the Granting Lender would have been entitled to receive, unless the grant to such SPC is made with the prior written consent of the Top Borrower (in its sole discretion), expressly acknowledging that such SPC's entitlement to benefits under Sections 2.15 and 2.17 is not limited to what the Granting Lender would have been entitled to receive absent the grant to the SPC, (ii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender) and (iii) the Granting Lender shall for all purposes including approval of any amendment, waiver or other modification of any provision of the Loan Documents, remain the Lender of record hereunder. In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the Requirements of Law of the U.S. or any State thereof; provided that (i) such SPC's Granting Lender is in compliance in all material respects with its obligations to the Borrowers hereunder and (ii) each Lender designating any SPC hereby agrees to indemnify, save and hold harmless each other party hereto for any loss, cost, damage or expense arising out of its inability to institute such a proceeding against such SPC during such period of forbearance. In addition, notwithstanding anything to the contrary contained in this Section 9.05, any SPC may (i) with notice to, but without the prior written consent of, any Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loan to the Granting Lender and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guaranty or credit or liquidity enhancement to such SPC.

(f)      Any assignment or participation or entry into an Obligations Derivative Instrument by a Lender (A) to or with any Disqualified Institution or (B) without the Top Borrower's consent to the extent the Top Borrower's consent is required under this Section 9.05, to any Person shall be null and void, and the Top Borrower shall be entitled to seek specific performance to unwind any such assignment or participation and/or specifically enforce this Section 9.05(f) in addition to injunctive relief (without posting a bond or presenting evidence of irreparable harm) or any other remedy available to any Borrower at law or in equity; it being understood and agreed that Holdings, the Top Borrower and its subsidiaries will suffer irreparable harm if any Lender breaches any obligation under this Section 9.05 as it relates to any assignment, participation or pledge of any Loan or Commitment to any Person to whom the Top Borrower's consent is required but not obtained. Nothing in this Section 9.05(f) shall be deemed to prejudice any right or remedy that Holdings or the Top Borrower may otherwise have at law or equity. Upon the request of any Lender, the Administrative Agent shall make the list of Disqualified Institutions available to such Lender, and such Lender may provide the list of Disqualified Institutions to any potential assignee or participant or

counterparty to any Obligations Derivative Instrument on a confidential basis in accordance with <u>Section 9.13</u> solely for the purpose of permitting such Person to verify whether such Person (or any Affiliate thereof) constitutes a Disqualified Institution.

(i)     If any assignment or participation under this <u>Section 9.05</u> is made to any Disqualified Institution and/or any Affiliate of any Disqualified Institution (other than any Bona Fide Debt Fund) without the Top Borrower's prior written consent (any such person, a "<u>Disqualified Person</u>"), then the Top Borrower may, at its sole expense and effort, upon notice to the applicable Disqualified Person and the Administrative Agent, (A) terminate any Commitment of such Disqualified Person and repay all obligations of each Borrower owing to such Disqualified Person (without regard to the pro rata requirements of <u>Section 2.18</u>) and/or (B) require such Disqualified Person to assign, without recourse (in accordance with and subject to the restrictions contained in this <u>Section 9.05</u>), all of its interests, rights and obligations under this Agreement to one or more Eligible Assignees; <u>provided</u> that (I) [reserved], (II) in the case of <u>clause (B)</u>, the relevant assignment shall otherwise comply with this <u>Section 9.05</u> (except that no registration and processing fee required under this <u>Section 9.05</u> shall be required with any assignment pursuant to this paragraph) and (III) in no event shall such Disqualified Person be entitled to receive amounts set forth in <u>Section 2.13(d)</u>. Further, any Disqualified Person identified by the Top Borrower to the Administrative Agent (A) shall not be permitted to (x) receive information or reporting provided by any Loan Party, the Administrative Agent or any Lender and/or (y) attend and/or participate in conference calls or meetings attended solely by the Lenders and the Administrative Agent, (B) (x) shall not for purposes of determining whether the Required Lenders, Super Majority Lenders, the majority of Lenders, each Lender or each affected Lender have (i) consented (or not consented) to any amendment, modification, waiver, consent or other action with respect to any of the terms of any Loan Document or any departure by any Loan Party therefrom, (ii) otherwise acted on any matter related to any Loan Document, or (iii) directed or required the Administrative Agent or any Lender to undertake any action (or refrain from taking any action) with respect to or under any Loan Document, have a right to consent (or not consent), otherwise act or direct or require the Administrative Agent or any Lender to take (or refrain from taking) any such action; it being understood that all Commitments and Loans held by any Disqualified Person shall be deemed to be not outstanding for all purposes of calculating whether the Required Lenders, majority Lenders, each Lender or each affected Lender have taken any action, and (y) shall be deemed to vote in the same proportion as Lenders that are not Disqualified Persons in any proceeding under any Debtor Relief Law commenced by or against the Top Borrower or any other Loan Party and (C) shall not be entitled to receive the benefits of <u>Section 9.03</u>. For the sake of clarity, the provisions in this <u>Section 9.05(f)</u> shall not apply to any Person that is an assignee of any Disqualified Person, if such assignee is not a Disqualified Person.

(ii)     Notwithstanding anything to the contrary herein, each of Holdings, each other Loan Party and the Lenders acknowledges and agrees that the Administrative Agent shall not have any responsibility or obligation to determine whether any Lender or potential Lender is a Disqualified Person and the Administrative Agent shall have no liabilities with respect to any assignment or participation made to a Disqualified Person.

Section 9.06     <u>Survival</u>.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loan and issuance of any Letter of Credit regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until the Termination Date. The provisions of <u>Sections 2.15</u>, <u>2.17</u>, <u>9.03</u> and <u>9.13</u> and Article 8 shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration

or termination of the Letters of Credit and the Commitments, the occurrence of the Termination Date or the termination of this Agreement or any provision hereof but in each case, subject to the limitations set forth in this Agreement.

Section 9.07    Counterparts; Integration; Effectiveness.    This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and each Intercreditor Agreement constitute the entire agreement among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. This Agreement shall become effective when it has been executed by the Borrowers and the Administrative Agent and when the Administrative Agent has received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Execution of any such counterpart may be by means of (a) an electronic signature that complies with the federal Electronic Signatures in Global and National Commerce Act, as in effect from time to time, state enactments of the Uniform Electronic Transactions Act, as in effect from time to time, or any other relevant and applicable electronic signatures law; (b) an original manual signature; or (c) a faxed, scanned, or photocopied manual signature. Each electronic signature or faxed, scanned, or photocopied manual signature shall for all purposes have the same validity, legal effect, and admissibility in evidence as an original manual signature.  Agent reserves the right, in its discretion, to accept, deny, or condition acceptance of any electronic signature on this Agreement.  Any party delivering an executed counterpart of this Agreement by faxed, scanned or photocopied manual signature shall also deliver an original manually executed counterpart, but the failure to deliver an original manually executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.  The foregoing shall apply to each other Loan Document, and any notice delivered hereunder or thereunder, mutatis mutandis.

Section 9.08    Severability.    To the extent permitted by applicable Requirements of Law, any provision of any Loan Document held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions thereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.09    Right of Setoff.    At any time when an Event of Default exists, upon the written consent of the Administrative Agent, each Issuing Bank, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable Requirements of Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other obligations (in any currency) at any time owing by the Administrative Agent, such Issuing Bank or such Lender to or for the credit or the account of any Loan Party against any and all of the Secured Obligations held by the Administrative Agent, such Issuing Bank or such Lender, irrespective of whether or not the Administrative Agent, such Issuing Bank or such Lender shall have made any demand under the Loan Documents and although such obligations may be contingent or unmatured or are owed to a branch or office of such Issuing Bank or such Lender different than the branch or office holding such deposit or obligation on such Indebtedness. Any applicable Lender shall promptly notify the Top Borrower and the Administrative Agent of such set-off or application; provided that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section. The rights of each Lender, each Issuing Bank and the Administrative Agent under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender, such Issuing Bank or the Administrative Agent may have.

Section 9.10    Governing Law; Jurisdiction; Consent to Service of Process.

(a)   THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN ANY OTHER LOAN DOCUMENT) AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN ANY OTHER LOAN DOCUMENT), SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)   EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF ANY U.S. FEDERAL OR NEW YORK STATE COURT SITTING IN THE BOROUGH OF MANHATTAN, IN THE CITY OF NEW YORK (OR ANY APPELLATE COURT THEREFROM) OVER ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT AND AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL (EXCEPT AS PERMITTED BELOW) BE HEARD AND DETERMINED IN SUCH NEW YORK STATE OR, TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, FEDERAL COURT. EACH PARTY HERETO AGREES THAT SERVICE OF ANY PROCESS, SUMMONS, NOTICE OR DOCUMENT BY REGISTERED MAIL ADDRESSED TO SUCH PERSON SHALL BE EFFECTIVE SERVICE OF PROCESS AGAINST SUCH PERSON FOR ANY SUIT, ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT. EACH PARTY HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY APPLICABLE REQUIREMENTS OF LAW. EACH PARTY HERETO AGREES THAT THE ADMINISTRATIVE AGENT RETAINS THE RIGHT TO BRING PROCEEDINGS AGAINST ANY LOAN PARTY IN THE COURTS OF ANY OTHER JURISDICTION SOLELY IN CONNECTION WITH THE EXERCISE OF ITS RIGHTS UNDER ANY COLLATERAL DOCUMENT.

(c)   EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT IN ANY COURT REFERRED TO IN PARAGRAPH (B) OF THIS SECTION. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, ANY CLAIM OR DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION, SUIT OR PROCEEDING IN ANY SUCH COURT.

(d)   TO THE EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS UPON IT AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE BY REGISTERED MAIL (OR ANY SUBSTANTIALLY SIMILAR FORM OF MAIL) DIRECTED TO IT AT ITS ADDRESS FOR NOTICES AS PROVIDED FOR IN SECTION 9.01. EACH PARTY HERETO HEREBY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY LOAN DOCUMENT THAT SERVICE OF PROCESS WAS INVALID AND INEFFECTIVE. NOTHING IN THIS AGREEMENT AND ANY OTHER LOAN DOCUMENT WILL AFFECT THE RIGHT OF ANY PARTY TO THIS AGREEMENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE REQUIREMENTS OF LAW.

Section 9.11    Waiver of Jury Trial.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE REQUIREMENTS OF LAW,

ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY SUIT, ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HERETO HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.12    <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.13    <u>Confidentiality</u>.  Each of the Administrative Agent, each Issuing Bank and each Lender agrees (and each Lender agrees to cause its SPC, if any) to maintain the confidentiality of the Confidential Information (as defined below), except that Confidential Information may be disclosed (a) to its and its Affiliates' directors, officers, managers, employees, independent auditors, or other experts and advisors, including accountants, legal counsel and other advisors (collectively, the "<u>Representatives</u>") on a "need to know" basis solely in connection with the transactions contemplated hereby and who are informed of the confidential nature of the Confidential Information and are or have been advised of their obligation to keep the Confidential Information of this type confidential; <u>provided</u> that such Person shall be responsible for its Affiliates' and their Representatives' compliance with this paragraph; <u>provided</u>, <u>further</u>, that unless the Top Borrower otherwise consents, no such disclosure shall be made by the Administrative Agent, any Issuing Bank, any Lender or any Affiliate or Representative thereof to any Affiliate or Representative of the Administrative Agent, or any Lender that is a Disqualified Institution, (b) to the extent compelled by legal process in, or reasonably necessary to, the defense of such legal, judicial or administrative proceeding, in any legal, judicial or administrative proceeding or otherwise as required by applicable Requirements of Law (in which case such Person shall (i) to the extent permitted by applicable Requirements of Law, inform the Top Borrower promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any such information so disclosed is accorded confidential treatment), (c) upon the demand or request of any regulatory or governmental authority (including any self-regulatory body) purporting to have jurisdiction over such Person or its Affiliates (in which case such Person shall, except with respect to any audit or examination conducted by bank accountants or any Governmental Authority or regulatory or self-regulatory authority exercising examination or regulatory authority, to the extent permitted by applicable Requirements of Law, (i) inform the Top Borrower promptly in advance thereof and (ii) use commercially reasonable efforts to ensure that any information so disclosed is accorded confidential treatment), (d) to any other party to this Agreement, (e) subject to an acknowledgment and agreement by the relevant recipient that the Confidential Information is being disseminated on a confidential basis (on substantially the terms set forth in this paragraph or as otherwise reasonably acceptable to the Top Borrower and the Administrative Agent) in accordance with the standard syndication process of the Arranger or market standards for dissemination of the relevant type of information, which shall in any event require "<u>click through</u>" or other affirmative action on the part of the recipient to access the Confidential Information and acknowledge its confidentiality obligations in respect thereof, to (i) any Eligible Assignee of or Participant in, or any prospective Eligible Assignee of or prospective Participant in, any of its rights or obligations under this Agreement, including any SPC (in each case other than a Disqualified Institution), (ii) any pledgee referred to in <u>Section 9.05</u>, (iii) any actual or prospective, direct or indirect contractual counterparty (or its advisors) to any Derivative Transaction (including any credit default swap) or similar derivative product to which any Loan Party is a party and (iv) subject to the Top Borrower's prior approval of the information to be disclosed, (x) [reserved], or (y) to the CUSIP Service Bureau or any similar agency in connection with the

issuance and monitoring of CUSIP numbers with respect to the facilities or, on a confidential basis, market data collectors and service providers to the Administrative Agent in connection with the administration and management of this Agreement and the Loan Documents, (f) with the prior written consent of the Top Borrower and (g) to the extent the Confidential Information becomes publicly available other than as a result of a breach of this Section by such Person, its Affiliates or their respective Representatives. For purposes of this Section, "Confidential Information" means all information relating to Holdings, the Top Borrower and/or any of its subsidiaries and their respective businesses (including any information obtained by the Administrative Agent, any Lender, or any of their respective Affiliates or Representatives, based on a review of any books and records relating to Holdings, the Top Borrower and/or any of its subsidiaries and their respective Affiliates from time to time, including prior to the Closing Date) other than any such information that is publicly available to the Administrative Agent or Lender on a non-confidential basis prior to disclosure by Holdings, the Top Borrower or any of its subsidiaries. For the avoidance of doubt, in no event shall any disclosure of any Confidential Information be made to Person that is a Disqualified Institution at the time of disclosure.

Section 9.14    No Fiduciary Duty.  Each of the Administrative Agent, each Issuing Bank, each Lender and their respective Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Loan Parties, their stockholders and/or their respective affiliates. Each Loan Party agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Loan Party, its respective stockholders or its respective affiliates, on the other. Each Loan Party acknowledges and agrees that: (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Loan Parties, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender, in its capacity as such, has assumed an advisory or fiduciary responsibility in favor of any Loan Party, its respective stockholders or its respective affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Loan Party, its respective stockholders or its respective Affiliates on other matters) or any other obligation to any Loan Party except the obligations expressly set forth in the Loan Documents and (y) each Lender, in its capacity as such, is acting solely as principal and not as the agent or fiduciary of such Loan Party, its respective management, stockholders, creditors or any other Person. Each Loan Party acknowledges and agrees that such Loan Party has consulted its own legal, tax and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto.

Section 9.15    Several Obligations.  The respective obligations of the Lenders hereunder are several and not joint and the failure of any Lender to make any Loan or perform any of its obligations hereunder shall not relieve any other Lender from any of its obligations hereunder.

Section 9.16    USA PATRIOT Act.  Each Lender that is subject to the requirements of the USA PATRIOT Act hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of such Loan Party and other information that will allow such Lender to identify such Loan Party in accordance with the USA PATRIOT Act.

Section 9.17    Disclosure of Agent Conflicts.  Each Loan Party, each Issuing Bank and each Lender hereby acknowledge and agree that the Administrative Agent and/or its Affiliates from time to time may hold investments in, make other loans to or have other relationships with any of the Loan Parties and their respective Affiliates.

Section 9.18    _Appointment for Perfection_.  Each Lender hereby appoints each other Lender and each Issuing Bank as its agent for the purpose of perfecting Liens for the benefit of the Administrative Agent, the Issuing Banks and the Lenders, in assets which, in accordance with Article 9 of the UCC or any other applicable Requirement of Law can be perfected only by possession.  If any Lender or Issuing Bank (other than the Administrative Agent) obtains possession of any Collateral, such Lender or Issuing Bank shall notify the Administrative Agent thereof and, promptly upon the Administrative Agent's request therefor shall deliver such Collateral to the Administrative Agent or otherwise deal with such Collateral in accordance with the Administrative Agent's instructions.

Section 9.19    _Interest Rate Limitation_.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable Requirements of Law (collectively the "Charged Amounts"), shall exceed the maximum lawful rate (the "Maximum Rate") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with applicable Requirements of Law, the rate of interest payable in respect of such Loan hereunder, together with all Charged Amounts payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charged Amounts that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charged Amounts payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, have been received by such Lender.

Section 9.20    _Intercreditor Agreement_.    REFERENCE IS MADE TO EACH INTERCREDITOR AGREEMENT. EACH LENDER AND ISSUING BANK HEREUNDER AGREES THAT IT WILL BE BOUND BY AND WILL TAKE NO ACTIONS CONTRARY TO THE PROVISIONS OF ANY INTERCREDITOR AGREEMENT AND AUTHORIZES AND INSTRUCTS THE ADMINISTRATIVE AGENT TO ENTER INTO EACH INTERCREDITOR AGREEMENT AS "ABL CREDIT AGREEMENT COLLATERAL AGENT" (OR OTHER APPLICABLE TITLE) AND ON BEHALF OF SUCH LENDER OR ISSUING BANK. THE PROVISIONS OF THIS SECTION 9.20 ARE NOT INTENDED TO SUMMARIZE ALL RELEVANT PROVISIONS OF ANY INTERCREDITOR AGREEMENT. REFERENCE MUST BE MADE TO EACH APPLICABLE INTERCREDITOR AGREEMENT ITSELF TO UNDERSTAND ALL TERMS AND CONDITIONS THEREOF. EACH LENDER AND ISSUING BANK IS RESPONSIBLE FOR MAKING ITS OWN ANALYSIS AND REVIEW OF EACH INTERCREDITOR AGREEMENT AND THE TERMS AND PROVISIONS THEREOF, AND NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS AFFILIATES MAKES ANY REPRESENTATION TO ANY LENDER OR ANY ISSUING BANK AS TO THE SUFFICIENCY OR ADVISABILITY OF THE PROVISIONS CONTAINED IN ANY INTERCREDITOR AGREEMENT. THIS SECTION 9.20 IS INTENDED AS AN INDUCEMENT TO THE LENDERS UNDER THE TERM LOAN AGREEMENT AND THE HOLDERS OF ANY OTHER INDEBTEDNESS SUBJECT TO ANY APPLICABLE INTERCREDITOR AGREEMENT TO EXTEND CREDIT IN CONNECTION THEREWITH AND SUCH LENDERS ARE INTENDED THIRD PARTY BENEFICIARIES OF SUCH PROVISIONS AND THE PROVISIONS OF EACH INTERCREDITOR AGREEMENT.

Section 9.21    _Conflicts_.  Notwithstanding anything to the contrary contained herein or in any other Loan Document, in the event of any conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall govern and control; provided that in the case of any conflict or inconsistency between any Intercreditor Agreement and any Loan Document, the terms of such Intercreditor Agreement shall govern and control.

Section 9.22    Release of Guarantors.    Notwithstanding anything in Section 9.02(b) to the contrary, but subject to the Updated BBC Condition, if applicable, any Subsidiary Guarantor shall be released from its obligations hereunder (and its Loan Guaranty and the Liens granted pursuant to the Collateral Documents shall be released) (i) if such Person ceases to be a Restricted Subsidiary (or becomes an Excluded Subsidiary as a result of a single transaction or series of related transactions permitted hereunder and consummated for a bona fide business purpose and not in contemplation of adversely affecting the Secured Parties' interests in the Loan Guaranty or the Collateral (as determined by the Administrative Agent in good faith), and the Top Borrower has requested such Excluded Subsidiary cease to be a Subsidiary Guarantor), (ii) automatically upon the occurrence of the Termination Date and/or (iii) in the case of any Discretionary Guarantor, upon notice from the Top Borrower to the Administrative Agent at any time. In connection with any such release, the Administrative Agent shall promptly execute and deliver to the relevant Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence termination or release; provided, that upon the request of the Administrative Agent, the Top Borrower shall deliver a certificate of a Responsible Officer certifying that the relevant transaction has been consummated in compliance with the terms of this Agreement. Any execution and delivery of any document pursuant to the preceding sentence of this Section 9.22 shall be without recourse to or warranty by the Administrative Agent (other than as to the Administrative Agent's authority to execute and deliver such documents).

Section 9.23    Acknowledgement and Consent to Bail-In of Affected Financial Institutions. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding of the parties hereto, each such party acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)    the effects of any Bail-in Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

Section 9.24    Joint and Several Liability.    Each Borrower is jointly and severally liable for the Obligations as a primary obligor in respect thereof. The Obligations of each Borrower are independent of the Obligations of each other Borrower, and a separate action or actions may be brought and prosecuted against any Borrower to enforce this Agreement, irrespective of whether any action has been brought against any other Borrower or whether any other Borrower is joined in any such action.

Section 9.25    Top Borrower as Agent for Loan Parties.    Each Loan Party hereby irrevocably appoints SSB, in its capacity as the Top Borrower, as the borrowing agent and attorney-in-fact for all Loan

Parties (the "Top Borrower") which appointment shall remain in full force and effect unless and until Administrative Agent shall have received prior written notice signed by each Loan Party that such appointment has been revoked and that another Borrower has been appointed Top Borrower.  Each Loan Party hereby irrevocably appoints and authorizes Top Borrower (a) to provide Administrative Agent with all notices with respect to Revolving Loans and Letters of Credit obtained for the benefit of any Loan Party and all other notices and instructions under this Agreement and the other Loan Documents (and any notice or instruction provided by Top Borrower shall be deemed to be given by Loan Parties hereunder and shall bind each Borrower), (b) to receive notices and instructions from Administrative Agent, any Lender, Issuing Bank or Bank Product Provider (and any notice or instruction provided by Administrative Agent, any Lender, Issuing Bank or Bank Product Provider to Top Borrower in accordance with the terms hereof shall be deemed to have been given to each Loan Party), and (c) to enter into Bank Product Agreements on behalf of Loan Parties and their Subsidiaries, and (d) to take such action as Top Borrower deems appropriate on its behalf to obtain Revolving Loans and Letters of Credit and to exercise such other powers as are reasonably incidental thereto to carry out the purposes of this Agreement.  It is understood that the handling of the Loan Account and Collateral in a combined fashion, as more fully set forth herein, is done solely as an accommodation to Loan Parties in order to utilize the collective borrowing powers of Borrowers in the most efficient and economical manner and at their request, and that Administrative Agent, any Lender, Issuing Bank or Bank Product Provider shall not incur liability to any Loan Party as a result hereof. Each Loan Party expects to derive benefit, directly or indirectly, from the handling of the Loan Account and the Collateral in a combined fashion since the successful operation of each Loan Party is dependent on the continued successful performance of the integrated group.   To induce Administrative Agent, any Lender, Issuing Bank or Bank Product Provider to do so, and in consideration thereof, each Loan Party hereby jointly and severally agrees to indemnify Administrative Agent, any Lender, Issuing Bank or Bank Product Provider and hold each of them harmless against any and all liability, expense, loss or claim of damage or injury, made against any of them by any Loan Party or by any third-party whosoever, arising from or incurred by reason of (i) the handling of the Loan Account and Collateral of Loan Parties as herein provided, or (ii) Administrative Agent, any Lender, Issuing Bank or Bank Product Provider relying on any instructions of Top Borrower, except that Borrowers will have no liability to the applicable party under this Section 9.25 with respect to any liability that has been finally determined by a court of competent jurisdiction to have resulted solely from the gross negligence or willful misconduct of such party.

Section 9.26    Bank Product Providers.  Each Bank Product Provider in its capacity as such shall be deemed a third-party beneficiary hereof and of the provisions of the other Loan Documents for purposes of any reference in a Loan Document to the parties for whom Administrative Agent is acting. Administrative Agent hereby agrees to act as agent for such Bank Product Providers and, by virtue of entering into a Bank Product Agreement, the applicable Bank Product Provider shall be automatically deemed to have appointed Administrative Agent as its agent and to have accepted the benefits of the Loan Documents.  It is understood and agreed that the rights and benefits of each Bank Product Provider under the Loan Documents consist exclusively of such Bank Product Provider's being a beneficiary of the Liens and security interests (and, if applicable, guarantees) granted to Administrative Agent and the right to share in payments and collections out of the Collateral as more fully set forth herein. In addition, each Bank Product Provider, by virtue of entering into a Bank Product Agreement, shall be automatically deemed to have agreed that Administrative Agent shall have the right, but shall have no obligation, to establish, maintain, relax, or release reserves in respect of the Bank Product Obligations and that if reserves are established there is no obligation on the part of Administrative Agent to determine or insure whether the amount of any such reserve is appropriate or not.  In connection with any such distribution of payments or proceeds of Collateral, Administrative Agent shall be entitled to assume no amounts are due or owing to any Bank Product Provider unless such Bank Product Provider has provided a written certification (setting forth a reasonably detailed calculation) to Administrative Agent as to the amounts that are due and owing to it and such written certification is received by Administrative Agent a reasonable period of time prior to the making of such distribution.  Administrative Agent shall have no obligation to calculate the amount due

and payable with respect to any Bank Products, but may rely upon the written certification of the amount due and payable from the applicable Bank Product Provider.  In the absence of an updated certification, Administrative Agent shall be entitled to assume that the amount due and payable to the applicable Bank Product Provider is the amount last certified to Administrative Agent by such Bank Product Provider as being due and payable (less any distributions made to such Bank Product Provider on account thereof).  Borrowers may obtain Bank Products from any Bank Product Provider, although Borrowers are not required to do so.  Each Borrower acknowledges and agrees that no Bank Product Provider has committed to provide any Bank Products and that the providing of Bank Products by any Bank Product Provider is in the sole and absolute discretion of such Bank Product Provider.  Notwithstanding anything to the contrary in this Agreement or any other Loan Document, no provider or holder of any Bank Product shall have any voting or approval rights hereunder (or be deemed a Lender) solely by virtue of its status as the provider or holder of such agreements or products or the Obligations owing thereunder, nor shall the consent of any such provider or holder be required (other than in their capacities as Lenders, to the extent applicable) for any matter hereunder or under any of the other Loan Documents, including as to any matter relating to the Collateral or the release of Collateral or Guarantors.

Section 9.27    Certain ERISA Matters.

(a)    Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers, that at least one of the following is and will be true:

(i)    such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Employee Benefit Plans in connection with the Term Loans or the Commitments;

(ii)    the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable, and the conditions of such exemption have been satisfied, with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Commitments and this Agreement;

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Term Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Term Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Term Loans, the Commitments and this Agreement; or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion and such Lender.

(b)     In addition, unless sub-clause (i) in the immediately preceding clause (a) is true with respect to a Lender or such Lender has provided another representation, warranty and covenant as provided in sub-clause (iv) in the immediately preceding clause (a), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and its Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrowers, that none of the Administrative Agent or any of its Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any other Loan Document or any documents related to hereto or thereto).

(c)     The Administrative Agent hereby informs the Lenders that each such Person is not undertaking to provide investment advice or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Term Loans, the Commitments, this Agreement and any other Loan Documents, (ii) may recognize a gain if it extended the Term Loans or the Commitments for an amount less than the amount being paid for an interest in the Term Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, arrangement fees, agency fees, amendment fees, processing fees, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

Section 9.28     Recognition of U.S. Special Resolution Regimes.

(a)     To the extent that this Agreement provides support, through a guarantee or otherwise, for swap agreements or any other agreement or instrument that is a QFC (such support, "QFC Credit Support" and each such QFC, a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes"), in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that this Agreement and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the U.S. or any other state of the U.S.).

(b)     In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States or a state of the United States. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, default rights under this Agreement that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and this Agreement were governed by the laws of the U.S. or a state of the U.S.. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

(c)     As used in this Section 9.28, the following terms have the following meanings:

(i)    "BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such part.

(ii)    "Covered Entity" means any of the following:

(A)  a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §252.82(b);

(B)  a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §47.3(b); or

(C)  a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. §382.2(b).

(iii)    "Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

Section 9.29    Erroneous Payments.

(a)    Each Lender, each Issuing Bank, each other Bank Product Provider and any other party hereto hereby severally agrees that if (i) Administrative Agent notifies (which such notice shall be conclusive absent manifest error) such Lender or Issuing Bank or any Bank Product Provider (or the Lender which is an Affiliate of a Lender, Issuing Bank or Bank Product Provider) or any other Person that has received funds from Administrative Agent or any of its Affiliates, either for its own account or on behalf of a Lender, Issuing Bank or Bank Product Provider (each such recipient, a "Payment Recipient") that Administrative Agent has determined in its sole discretion that any funds received by such Payment Recipient were erroneously transmitted to, or otherwise erroneously or mistakenly received by, such Payment Recipient (whether or not known to such Payment Recipient) or (ii) any Payment Recipient receives any payment from Administrative Agent (or any of its Affiliates) (x) that is in a different amount than, or on a different date from, that specified in a notice of payment, prepayment or repayment sent by Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, (y) that was not preceded or accompanied by a notice of payment, prepayment or repayment sent by Administrative Agent (or any of its Affiliates) with respect to such payment, prepayment or repayment, as applicable, or (z) that such Payment Recipient otherwise becomes aware was transmitted or received in error or by mistake (in whole or in part) then, in each case, an error in payment shall be presumed to have been made (any such amounts specified in clauses (i) or (ii) of this Section 9.29(a), whether received as a payment, prepayment or repayment of principal, interest, fees, distribution or otherwise; individually and collectively, an "Erroneous Payment"), then, in each case, such Payment Recipient is deemed to have knowledge of such error at the time of its receipt of such Erroneous Payment; provided that nothing in this Section shall require Administrative Agent to provide any of the notices specified in clauses (i) or (ii) above. Each Payment Recipient agrees that it shall not assert any right or claim to any Erroneous Payment, and hereby waives any claim, counterclaim, defense or right of set-off or recoupment with respect to any demand, claim or counterclaim by Administrative Agent for the return of any Erroneous Payments, including without limitation waiver of any defense based on "discharge for value" or any similar doctrine.

(b)    Without limiting the immediately preceding clause (a), each Payment Recipient agrees that, in the case of clause (a)(ii) above, it shall promptly notify Administrative Agent in writing of such occurrence.

(c)    In the case of either clause (a)(i) or (a)(ii) above, such Erroneous Payment shall at all times remain the property of Administrative Agent and shall be segregated by the Payment Recipient and held in

trust for the benefit of Administrative Agent, and upon demand from Administrative Agent such Payment Recipient shall (or, shall cause any Person who received any portion of an Erroneous Payment on its behalf to), promptly, but in all events no later than one Business Day thereafter, return to Administrative Agent the amount of any such Erroneous Payment (or portion thereof) as to which such a demand was made in same day funds and in the currency so received, together with interest thereon in respect of each day from and including the date such Erroneous Payment (or portion thereof) was received by such Payment Recipient to the date such amount is repaid to Administrative Agent at the greater of the Federal Funds Rate and a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation from time to time in effect.

(d)     In the event that an Erroneous Payment (or portion thereof) is not recovered by Administrative Agent for any reason, after demand therefor by Administrative Agent in accordance with immediately preceding clause (c), from any Lender that is a Payment Recipient or an Affiliate of a Payment Recipient (such unrecovered amount as to such Lender, an "Erroneous Payment Return Deficiency"), then at the sole discretion of Administrative Agent and upon Administrative Agent's written notice to such Lender (i) such Lender shall be deemed to have made a cashless assignment of the full face amount of the portion of its Loans (but not its Commitments) with respect to which such Erroneous Payment was made (the "Erroneous Payment Impacted Loans") to Administrative Agent or, at the option of Administrative Agent, Administrative Agent's applicable lending affiliate (such assignee, the "Agent Assignee") in an amount that is equal to the Erroneous Payment Return Deficiency (or such lesser amount as Administrative Agent may specify) (such assignment of the Loans (but not Commitments) of the Erroneous Payment Impacted Loans, the "Erroneous Payment Deficiency Assignment") plus any accrued and unpaid interest on such assigned amount, without further consent or approval of any party hereto and without any payment by Agent Assignee as the assignee of such Erroneous Payment Deficiency Assignment.  Without limitation of its rights hereunder, following the effectiveness of the Erroneous Payment Deficiency Assignment, Administrative Agent may make a cashless reassignment to the applicable assigning Lender of any Erroneous Payment Deficiency Assignment at any time by written notice to the applicable assigning Lender and upon such reassignment all of the Loans assigned pursuant to such Erroneous Payment Deficiency Assignment shall be reassigned to such Lender without any requirement for payment or other consideration. The parties hereto acknowledge and agree that (1) any assignment contemplated in this clause (d) shall be made without any requirement for any payment or other consideration paid by the applicable assignee or received by the assignor, (2) the provisions of this clause (d) shall govern in the event of any conflict with the terms and conditions of Section 9.05 and (3) Administrative Agent may reflect such assignments in the Register without further consent or action by any other Person.

(e)     Each party hereto hereby agrees that (x) in the event an Erroneous Payment (or portion thereof) is not recovered from any Payment Recipient that has received such Erroneous Payment (or portion thereof) for any reason, Administrative Agent (1) shall be subrogated to all the rights of such Payment Recipient and (2) is authorized to set off, net and apply any and all amounts at any time owing to such Payment Recipient under any Loan Document, or otherwise payable or distributable by Administrative Agent to such Payment Recipient from any source, against any amount due to Administrative Agent under this Section 9.29 or under the indemnification provisions of this Agreement, (y) the receipt of an Erroneous Payment by a Payment Recipient shall not for the purpose of this Agreement be treated as a payment, prepayment, repayment, discharge or other satisfaction of any Obligations owed by the Borrowers or any other Loan Party, except, in each case, to the extent such Erroneous Payment is, and solely with respect to the amount of such Erroneous Payment that is, comprised of funds received by Administrative Agent from the Borrowers or any other Loan Party for the purpose of making for a payment on the Obligations and (z) to the extent that an Erroneous Payment was in any way or at any time credited as payment or satisfaction of any of the Obligations, the Obligations or any part thereof that were so credited, and all rights of the Payment Recipient, as the case may be, shall be reinstated and continue in full force and effect as if such payment or satisfaction had never been received.

(f)     Each party's obligations under this <u>Section 9.29</u> shall survive the resignation or replacement of Administrative Agent or any transfer of right or obligations by, or the replacement of, a Lender, the termination of the Commitments or the repayment, satisfaction or discharge of all Obligations (or any portion thereof) under any Loan Document.

(g)     The provisions of this <u>Section 9.29</u> to the contrary notwithstanding, (i) nothing in this Section 9.29 will constitute a waiver or release of any claim of any party hereunder arising from any Payment Recipient's receipt of an Erroneous Payment and (ii) there will only be deemed to be a recovery of the Erroneous Payment to the extent that Administrative Agent has received payment from the Payment Recipient in immediately available funds the Erroneous Payment Return, whether directly from the Payment Recipient, as a result of the exercise by Administrative Agent of its rights of subrogation or set off as set forth above in clause (e) or as a result of the receipt by Agent Assignee of a payment of the outstanding principal balance of the Loans assigned to Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment, but excluding any other amounts in respect thereof (it being agreed that any payments of interest, fees, expenses or other amounts (other than principal) received by Agent Assignee in respect of the Loans assigned to Agent Assignee pursuant to an Erroneous Payment Deficiency Assignment shall be the sole property of Agent Assignee and shall not constitute a recovery of the Erroneous Payment).

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SERTA SIMMONS BEDDING, LLC,** as the Top Borrower

By:_____
    Name:
    Title:

**NATIONAL BEDDING COMPANY L.L.C.,** as a Borrower

By:_____
    Name:
    Title:

**SSB MANUFACTURING COMPANY**, as a Borrower

By:_____
    Name:
    Title:

[Signature Page to ABL Credit Agreement]

**WELLS FARGO BANK, NATIONAL ASSOCIATION,** as Administrative Agent

By:_____
    Name: _____
    Title:  Authorized Signatory

[Signature Page to ABL Credit Agreement]

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as a Lender, Swing Lender and Issuing Bank

By:_____
    Name:
    Title: Authorized Signatory

## **Exhibit I**

### **Schedule of Assumed Contracts**

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1 | TUFT & NEEDLE, LLC | 119 LEAWOOD LLC | LEASE MODIFICATION AGREEMENT #1 DTD 5/3/2018 FOR ROOM A133 AT TOWN CENTER CROSSING 5000 W 119TH ST, LEAWOOD, KS 66209 | REAL ESTATE |
| 2 | TUFT & NEEDLE, LLC | 119 LEAWOOD LLC | LEASE AGREEMENT DTD 3/23/2018 FOR ROOM A133 AT TOWN CENTER CROSSING 5000 W 119TH ST, LEAWOOD, KS 66209 | REAL ESTATE |
| 3 | SSB MANUFACTURING COMPANY | 1222 SCHODACK LLC | ASSIGNMENT OF LEASES AND RENTS DTD 12/24/2019 FOR 1210 ROUTE 9, SCHODACK NY | REAL ESTATE LEASES |
| 4 | SERTA SIMMONS BEDDING, LLC | 1915 SOUTH TURNER GROUP (DBA) ASHLEY | SALES/RETAILER AGREEMENT DTD 10/10/2022 | SALES/RETAILER AGREEMENTS |
| 5 | SERTA SIMMONS BEDDING, LLC | 416 OUTLET INC | CO-OP ADVERTISING AGREEMENT DTD 11/12/2020 | SALES AGREEMENTS |
| 6 | SERTA SIMMONS BEDDING, LLC | 416 OUTLET INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 7 | SERTA SIMMONS BEDDING, LLC | 50 BYRLA HPFVIII URBAN RENEWAL LLC | GUARANTY OF ASSIGNMENT OF LEASE DTD 11/20/2015 FOR FOR 50 BRYLA ST, CARTERET, NJ | REAL ESTATE LEASES |
| 8 | SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | 50 BYRLA HPFVIII URBAN RENEWAL LLC | ASSIGNMENT AND ASSUMPTION OF LEASE AND CONSENT OF LANDLORD DTD 12/6/2017 FOR 50 BRYLA ST, CARTERET, NJ | REAL ESTATE LEASES |
| 9 | SSB MANUFACTURING COMPANY | 63 GREEN MOUNTAIN LLC | AGREEMENT OF LEASE DTD 5/19/2022 FOR 63 GREEN MOUNTAIN ROAD, HUMBOLDT INDUSTRIAL PARK,  PA | REAL ESTATE LEASES |
| 10 | SSB MANUFACTURING COMPANY | 63 GREEN MOUNTAIN LLC | AGREEMENT OF LEASE DTD 5/5/2017 FOR 63 GREEN MOUNTAIN ROAD, HUMBOLDT INDUSTRIAL PARK, EAST UNION TOWNSHIP PA | REAL ESTATE LEASES |
| 11 | SERTA SIMMONS BEDDING, LLC | A LAVA & SON CO | SUPPLY/PURCHASE AGREEMENT DTD 3/1/2016 | SUPPLY/PURCHASE AGREEMENT |
| 12 | SERTA SIMMONS BEDDING, LLC | A LAVA & SON CO | SUPPLY AGREEMENT 03/01/2016 | DIRECT SUPPLIER |
| 13 | SERTA SIMMONS BEDDING, LLC | A PLUS FURNITURE & MATTRESSES INC | CO-OP ADVERTISING AGREEMENT DTD 8/4/2022 | SALES AGREEMENTS |
| 14 | SERTA SIMMONS BEDDING, LLC | A PLUS FURNITURE & MATTRESSES INC | AUTHORIZED DEALER AGREEMENT DTD 8/4/2022 | SALES AGREEMENTS |
| 15 | SERTA SIMMONS BEDDING, LLC | A&M FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 7/11/2022 | SALES AGREEMENTS |
| 16 | SERTA SIMMONS BEDDING, LLC | A&M FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 7/11/2022 | SALES AGREEMENTS |
| 17 | SIMMONS BEDDING COMPANY, LLC | AARON'S INC | MASTER SUPPLY AGREEMENT  08/01/2016 | CUSTOMER CONTRACT |
| 18 | SIMMONS BEDDING COMPANY, LLC | AARON'S INC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 8/1/2016 | DEALER/RETAILER/HOSPITALITY AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 19 | SERTA SIMMONS BEDDING, LLC | AARON'S LOGISTICS LLC | COOPERATIVE ADVERTISING PROGRAM DTD 3/9/2021 | CUSTOMER CONTRACT |
| 20 | SERTA SIMMONS BEDDING, LLC | AARON'S LOGISTICS, LLC | SALES/RETAILER AGREEMENT DTD 3/9/2021 | SALES/RETAILER AGREEMENTS |
| 21 | SERTA SIMMONS BEDDING, LLC | ABM INDUSTRY GROUPS, LLC | COMPANY WIDE AGREEMENT DTD 1/30/2019 | COMPANY WIDE AGREEMENT |
| 22 | SSB MANUFACTURING COMPANY | ABP KOMOHANA LLC | INDUSTRIAL SPACE LEASE DTD 8/11/2011 FOR UNIT A IN BUILDING C AT 91-489 KOMOHANA STREET, KAPOLEI HI | REAL ESTATE LEASES |
| 23 | SERTA SIMMONS BEDDING, LLC | ABSOLUTE DISCOUNT MATTRESS LLC | CO-OP ADVERTISING AGREEMENT DTD 7/7/2022 | SALES AGREEMENTS |
| 24 | SERTA SIMMONS BEDDING, LLC | ABSOLUTE DISCOUNT MATTRESS LLC | AUTHORIZED DEALER AGREEMENT DTD 7/7/2022 | SALES AGREEMENTS |
| 25 | DAWN INTERMEDIATE, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 26 | DAWN INTERMEDIATE, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 27 | DAWN INTERMEDIATE, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 28 | DREAMWELL, LTD. | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 29 | DREAMWELL, LTD. | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 30 | DREAMWELL, LTD. | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 31 | NATIONAL BEDDING COMPANY L.L.C. | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 32 | NATIONAL BEDDING COMPANY L.L.C. | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 33 | NATIONAL BEDDING COMPANY L.L.C. | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 34 | SERTA INTERNATIONAL HOLDCO, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 35 | SERTA INTERNATIONAL HOLDCO, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 36 | SERTA INTERNATIONAL HOLDCO, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 37 | SERTA SIMMONS BEDDING, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 38 | SERTA SIMMONS BEDDING, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 39 | SERTA SIMMONS BEDDING, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 40 | SIMMONS BEDDING COMPANY, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 41 | SIMMONS BEDDING COMPANY, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 42 | SIMMONS BEDDING COMPANY, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 43 | SSB HOSPITALITY, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 44 | SSB HOSPITALITY, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 45 | SSB HOSPITALITY, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 46 | SSB LOGISTICS, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 47 | SSB LOGISTICS, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 48 | SSB LOGISTICS, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 49 | SSB MANUFACTURING COMPANY | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 50 | SSB MANUFACTURING COMPANY | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 51 | SSB MANUFACTURING COMPANY | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 52 | SSB RETAIL, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 53 | SSB RETAIL, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 54 | SSB RETAIL, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|----------------------|---------------|
| 55 THE SIMMONS MANUFACTURING CO., LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 56 THE SIMMONS MANUFACTURING CO., LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 57 THE SIMMONS MANUFACTURING CO., LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 58 TOMORROW SLEEP LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 59 TOMORROW SLEEP LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 60 TOMORROW SLEEP LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 61 TUFT & NEEDLE, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 62 TUFT & NEEDLE, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 63 TUFT & NEEDLE, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 64 WORLD OF SLEEP OUTLETS, LLC | ACE AMERICAN INSURANCE COMPANY | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: G7016145A 002) | INSURANCE |
| 65 WORLD OF SLEEP OUTLETS, LLC | ACE AMERICAN INSURANCE COMPANY | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: G25111266 008) | INSURANCE |
| 66 WORLD OF SLEEP OUTLETS, LLC | ACE AMERICAN INSURANCE COMPANY | FOREIGN LIABILITY INSURANCE AGREEMENT (POLICY#: PHF D38414215 008) | INSURANCE |
| 67 SERTA SIMMONS BEDDING, LLC | ACE CONSULTING & MARKETING LLC | CO-OP ADVERTISING AGREEMENT DTD 1/6/2023 | SALES AGREEMENTS |
| 68 SERTA SIMMONS BEDDING, LLC | ACE CONSULTING & MARKETING LLC | AUTHORIZED DEALER AGREEMENT DTD 1/6/2023 | SALES AGREEMENTS |
| 69 SERTA SIMMONS BEDDING, LLC | ACE MATTRESS STORE | AUTHORIZED DEALER AGREEMENT DTD 7/27/2022 | SALES AGREEMENTS |
| 70 SERTA SIMMONS BEDDING, LLC | ACE MATTRESS STORE | CO-OP ADVERTISING AGREEMENT DTD 7/27/2022 | SALES AGREEMENTS |
| 71 SERTA SIMMONS BEDDING, LLC | ACTIONLINK (ACOSTA) | OUTSOURCING AGREEMENT DTD 8/18/2021 | OUTSOURCING AGREEMENT |
| 72 SERTA SIMMONS BEDDING, LLC | ACTIV TECHNOLOGIES, INC | IT AGREEMENT DTD 6/19/2017 | IT AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 73 | SERTA SIMMONS BEDDING, LLC | ADAPTIVE3D LLC | DEVELOPMENT AND SUPPLY AGREEMENT DTD 11/19/2021 | INNOVATION-TRANSFORMATION |
| 74 | SERTA SIMMONS BEDDING, LLC | ADAPTIVE3D LLC | DEVELOPMENT AND SUPPLY AGREEMENT DTD 11/19/2021 | INNOVATION-TRANSFORMATION |
| 75 | SERTA SIMMONS BEDDING, LLC | ADP CANADA CO | GLOBAL MASTER SERVICES AGREEMENT DTD 4/28/2021 | HUMAN RESOURCES |
| 76 | SERTA SIMMONS BEDDING, LLC | ADP, INC. | HR SUPPLIER AGREEMENT DTD 4/28/2021 | HR SUPPLIER AGREEMENT |
| 77 | SERTA SIMMONS BEDDING, LLC | ADP, INC. | GLOBAL MASTER SERVICES AGREEMENT DTD 4/28/2021 | HUMAN RESOURCES |
| 78 | SERTA SIMMONS BEDDING, LLC | ADP, INC. | HR SUPPLIER AGREEMENT DTD 4/28/2021 | HR SUPPLIER AGREEMENT |
| 79 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | ADVANCED FOAM LTD | TRADEMARK LICENSE AGREEMENT DTD 8/1/2022 | TRADEMARK LICENSE AGREEMENT |
| 80 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | ADVANCED FOAM LTD | TRADEMARK LICENSE AGREEMENT DTD 8/1/2022 | TRADEMARK LICENSE AGREEMENT |
| 81 | SSB MANUFACTURING COMPANY | ADVANCED FOAM RECYCLING | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 2/18/2022 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |
| 82 | SERTA SIMMONS BEDDING, LLC | INSIGHT DIRECT USA INC | JOINDER TO MULTI-COUNTRY SALES AGREEMENT DTD 11/17/2020 | IT AGREEMENT |
| 83 | SERTA SIMMONS BEDDING, LLC | AEP ENERGY, INC. | OPERATIONS/PLANT AGREEMENT DTD 1/27/2022 | STRATEGIC SOURCING |
| 84 | TUFT & NEEDLE, LLC | AES DIRECT EXPRESS LLC | MASTER SERVICES AGREEMENT DTD 10/22/2020 | LOGISTICS CONTRACT |
| 85 | TUFT & NEEDLE, LLC | AFFIRM, INC. | IT AGREEMENT DTD 9/9/2020 | IT AGREEMENT |
| 86 | SERTA SIMMONS BEDDING, LLC | AFFORDABLE MATTRESS APPLETON | CO-OP ADVERTISING AGREEMENT DTD 11/1/2022 | SALES AGREEMENTS |
| 87 | SERTA SIMMONS BEDDING, LLC | AFFORDABLE MATTRESS APPLETON | AUTHORIZED DEALER AGREEMENT DTD 11/1/2022 | SALES AGREEMENTS |
| 88 | SIMMONS BEDDING COMPANY, LLC | AFTERBURNER | CONSULTANT AGREEMENT DTD 10/19/2017 | CONSULTANT AGREEMENT |
| 89 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | AI DREAM 1 (CAYMAN) LIMITED | LICENSE AGREEMENT DTD 10/23/2018 | LICENSE AGREEMENT |
| 90 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | AI DREAM 1 (CAYMAN) LIMITED | LICENSE AGREEMENT DTD 10/23/2018 | LICENSE AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 91 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | AI DREAM 1 (CAYMAN) LIMITED | LICENSE AGREEMENT DTD 10/23/2018 | LICENSE AGREEMENT |
| 92 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | AI DREAM 1 (CAYMAN) LIMITED | LICENSE AGREEMENT DTD 10/23/2018 | LICENSE AGREEMENT |
| 93 | DAWN INTERMEDIATE, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 94 | DREAMWELL, LTD. | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 95 | NATIONAL BEDDING COMPANY L.L.C. | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 96 | SERTA INTERNATIONAL HOLDCO, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 97 | SERTA SIMMONS BEDDING, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 98 | SIMMONS BEDDING COMPANY, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 99 | SSB HOSPITALITY, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 100 | SSB LOGISTICS, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 101 | SSB MANUFACTURING COMPANY | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 102 | SSB RETAIL, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 103 | THE SIMMONS MANUFACTURING CO., LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 104 | TOMORROW SLEEP LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 105 | TUFT & NEEDLE, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 106 | WORLD OF SLEEP OUTLETS, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 107 | DAWN INTERMEDIATE, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 108 | DREAMWELL, LTD. | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 109  NATIONAL BEDDING COMPANY L.L.C. | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 110  SERTA INTERNATIONAL HOLDCO, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 111  SERTA SIMMONS BEDDING, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 112  SIMMONS BEDDING COMPANY, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 113  SSB HOSPITALITY, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 114  SSB LOGISTICS, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 115  SSB MANUFACTURING COMPANY | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 116  SSB RETAIL, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 117  THE SIMMONS MANUFACTURING CO., LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 118  TOMORROW SLEEP LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 119  TUFT & NEEDLE, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 120  WORLD OF SLEEP OUTLETS, LLC | AIG SPECIALTY INSURANCE COMPANY | CYBER LIABILITY INSURANCE AGREEMENT (POLICY#: 01-593-22-46) | INSURANCE |
| 121  DAWN INTERMEDIATE, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 122  DREAMWELL, LTD. | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 123  NATIONAL BEDDING COMPANY L.L.C. | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 124  SERTA INTERNATIONAL HOLDCO, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 125  SERTA SIMMONS BEDDING, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 126  SIMMONS BEDDING COMPANY, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 127  SSB HOSPITALITY, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 128  SSB LOGISTICS, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 129  SSB MANUFACTURING COMPANY | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 130  SSB RETAIL, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 131  THE SIMMONS MANUFACTURING CO., LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 132  TOMORROW SLEEP LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 133  TUFT & NEEDLE, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 134  WORLD OF SLEEP OUTLETS, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 135  DAWN INTERMEDIATE, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 136  DREAMWELL, LTD. | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 137  NATIONAL BEDDING COMPANY L.L.C. | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 138  SERTA INTERNATIONAL HOLDCO, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 139  SERTA SIMMONS BEDDING, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 140  SIMMONS BEDDING COMPANY, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 141  SSB HOSPITALITY, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 142  SSB LOGISTICS, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 143  SSB MANUFACTURING COMPANY | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 144  SSB RETAIL, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 145 | THE SIMMONS MANUFACTURING CO., LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 146 | TOMORROW SLEEP LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 147 | TUFT & NEEDLE, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 148 | WORLD OF SLEEP OUTLETS, LLC | AIG SPECIALTY INSURANCE COMPANY – 25032716 | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 149 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | ALA MODE FURNITURE & MATTRESS LLC | LICENSE AND SUPPLY AGREEMENT DTD 11/30/2022 | SALES AGREEMENTS |
| 150 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | ALA MODE FURNITURE & MATTRESS LLC | LICENSE AND SUPPLY AGREEMENT DTD 11/30/2022 | SALES AGREEMENTS |
| 151 | SERTA SIMMONS BEDDING, LLC | ALABAMA DEPT OF REVENUE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 152 | SERTA SIMMONS BEDDING, LLC | ALEXIUM, INC. | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 153 | SERTA SIMMONS BEDDING, LLC | ALEXIUM, INC. | SUPPLY/PURCHASE AGREEMENT DTD 11/14/2021 | SUPPLY/PURCHASE AGREEMENT |
| 154 | SIMMONS BEDDING COMPANY, LLC | ALFASID SA DE CV | PATENT AND TECHNOLOGY LICENSE AGREEMENT DTD 5/21/1990 | LICENSE |
| 155 | SERTA SIMMONS BEDDING, LLC | ALIGHT SOLUTIONS LLC | CLOUD-SUPPORT PROJECT AGREEMENT DTD 7/1/2022 | IT AGREEMENT |
| 156 | SERTA SIMMONS BEDDING, LLC | A-LIGN COMPLIANCE AND SECURITY INC | ENGAGEMENT AGREEMENT DTD 10/20/2021 | IT AGREEMENT |
| 157 | SERTA SIMMONS BEDDING, LLC | A-LIGN COMPLIANCE AND SECURITY INC | MASTER SERVICES AGREEMENT DTD 12/3/2021 | IT AGREEMENT |
| 158 | SERTA SIMMONS BEDDING, LLC | ALK TECHNOLOGIES INC | PC*MILLER PRODUCT LINE SUPPLEMENTAL LICENSE AGREEMENT | IT AGREEMENT |
| 159 | SERTA SIMMONS BEDDING, LLC | ALL BRANDS FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 3/20/2022 | SALES AGREEMENTS |
| 160 | SERTA SIMMONS BEDDING, LLC | ALLIANT INSURANCE SERVICES INC | CONSULTING SRVICES AGREEMENT DTD 9/1/2020 | HUMAN RESOURCES |
| 161 | SERTA SIMMONS BEDDING, LLC | ALLIANT INSURANCE SERVICES INC | CONSULTING SRVICES AGREEMENT DTD 9/1/2020 | HUMAN RESOURCES |
| 162 | SERTA SIMMONS BEDDING, LLC | ALLIANT INSURANCE SERVICES INC | CONSULTING SRVICES AGREEMENT DTD 9/1/2020 | HUMAN RESOURCES |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 163 | DREAMWELL, LTD. | ALLIED HOME LLC | TRADEMARK LICENSE AGREEMENT 06/01/2021 | LICENSE |
| 164 | DAWN INTERMEDIATE, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 165 | DREAMWELL, LTD. | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 166 | NATIONAL BEDDING COMPANY L.L.C. | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 167 | SERTA INTERNATIONAL HOLDCO, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 168 | SERTA SIMMONS BEDDING, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 169 | SIMMONS BEDDING COMPANY, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 170 | SSB HOSPITALITY, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 171 | SSB LOGISTICS, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 172 | SSB MANUFACTURING COMPANY | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 173 | SSB RETAIL, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 174 | THE SIMMONS MANUFACTURING CO., LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 175 | TOMORROW SLEEP LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 176 | TUFT & NEEDLE, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 177 | WORLD OF SLEEP OUTLETS, LLC | ALLIED WORLD ASSURANCE COMPANY, LTD | PROPERTY INSURANCE AGREEMENT (P074001/002) | INSURANCE |
| 178 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | AMARE LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 5/28/2021 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 179 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | AMARE LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 5/28/2021 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 180 | NATIONAL BEDDING COMPANY L.L.C. | AMATTRESS INC | SUPPLY AGREEMENT DTD 2/1/2007 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 181 NATIONAL BEDDING COMPANY L.L.C. | AMATTRESS INC | SECURITY AGREEMENT DTD 2/1/2007 | SALES AGREEMENTS |
| 182 SERTA SIMMONS BEDDING, LLC | AMAZON.COM | HOSPITALITY/INSTITUTIONAL AGREEMENT DTD 3/6/2017 | HOSPITALITY/INSTITUTIONAL AGREEMENT |
| 183 TUFT & NEEDLE, LLC | AMAZON.COM SERVICES LLC | MDF/COOP AGREEMENT #52973185 | CUSTOMER CONTRACT |
| 184 TUFT & NEEDLE, LLC | AMAZON.COM SERVICES LLC | FREIGHT ALLOWANCE AGREEMENT #52973175 | CUSTOMER CONTRACT |
| 185 TUFT & NEEDLE, LLC | AMAZON.COM SERVICES LLC | MDF/COOP AGREEMENT #52973180 | CUSTOMER CONTRACT |
| 186 SERTA SIMMONS BEDDING, LLC | AMERICAN EXPRESS - CANADA | INDIRECT SPEND AGREEMENT DTD 8/22/2018 | INDIRECT SPEND AGREEMENT |
| 187 SERTA SIMMONS BEDDING, LLC | AMERICAN EXPRESS - US | COMPANY WIDE AGREEMENT DTD 11/18/2016 | COMPANY WIDE AGREEMENT |
| 188 SERTA SIMMONS BEDDING, LLC | AMERICAN EXPRESS - US | COMPANY WIDE AGREEMENT DTD 11/18/2016 | COMPANY WIDE AGREEMENT |
| 189 SERTA SIMMONS BEDDING, LLC | AMERICAN EXPRESS (CORETRUST) | COMPANY WIDE AGREEMENT DTD 2/19/2015 | COMPANY WIDE AGREEMENT |
| 190 SERTA SIMMONS BEDDING, LLC | AMERICAN FURNITURE WAREHOUSE | DEALER AGREEMENT 01/25/2019 | CUSTOMER CONTRACT |
| 191 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | AMERICAN MATTRESS INC. (AMI) | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 11/19/2014 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 192 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | AMERICAN MATTRESS INC. (AMI) | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 11/19/2014 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 193 SERTA SIMMONS BEDDING, LLC | AMERICAN NAT'L STANDARDS INSTITUTE INC | NETWORK LICENSE AGREEMENT DTD 9/13/2021 | IT AGREEMENT |
| 194 SERTA SIMMONS BEDDING, LLC | AMERICAN REGISTRY FOR INTERNET NUMBERS, LTD | IT AGREEMENT DTD 6/13/2016 | IT AGREEMENT |
| 195 NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS | SECURITY AGREEMENT DTD 2/13/2002 | SALES AGREEMENTS |
| 196 NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS | SUPPLY AGREEMENT DTD 2/13/2002 | SALES AGREEMENTS |
| 197 NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS | SECURITY AGREEMENT DTD 11/26/2003 | SALES AGREEMENTS |
| 198 NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS | SECURITY AGREEMENT DTD 6/5/2002 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 199 | NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS | SUPPLY AGREEMENT DTD 2/13/2002 | SALES AGREEMENTS |
| 200 | NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS | SUPPLY AGREEMENT DTD 1/5/2002 | SALES AGREEMENTS |
| 201 | NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS | SUPPLY AGREEMENT  DTD 11/26/2003 | SALES AGREEMENTS |
| 202 | NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS | SUPPLY AGREEMENT  DTD 11/26/2003 | SALES AGREEMENTS |
| 203 | NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS GRAND JUNCTION | SECURITY AGREEMENT DTD 9/24/2004 | SALES AGREEMENTS |
| 204 | NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS GRAND JUNCTION | SUPPLY AGREEMENT  DTD 9/24/2004 | SALES AGREEMENTS |
| 205 | NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS OF NEW MEXICO LLC | SECURITY AGREEMENT DTD 12/16/2008 | SALES AGREEMENTS |
| 206 | NATIONAL BEDDING COMPANY L.L.C. | AMERICA'S MATTRESS OF NEW MEXICO LLC | SUPPLY AGREEMENT  DTD 12/16/2008 | SALES AGREEMENTS |
| 207 | SERTA SIMMONS BEDDING, LLC | AMI BUYING GROUP | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |
| 208 | SERTA SIMMONS BEDDING, LLC | AMINI'S GALLERIA INC | AUTHORIZED DEALER AGREEMENT DTD 2/11/2020 | SALES AGREEMENTS |
| 209 | SERTA SIMMONS BEDDING, LLC | AMINI'S GALLERIA INC | CO-OP ADVERTISING AGREEMENT DTD 2/11/2020 | SALES AGREEMENTS |
| 210 | DAWN INTERMEDIATE, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 211 | DREAMWELL, LTD. | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 212 | NATIONAL BEDDING COMPANY L.L.C. | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 213 | SERTA INTERNATIONAL HOLDCO, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 214 | SERTA SIMMONS BEDDING, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 215 | SIMMONS BEDDING COMPANY, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 216 | SSB HOSPITALITY, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 217 SSB LOGISTICS, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 218 SSB MANUFACTURING COMPANY | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 219 SSB RETAIL, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 220 THE SIMMONS MANUFACTURING CO., LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 221 TOMORROW SLEEP LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 222 TUFT & NEEDLE, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 223 WORLD OF SLEEP OUTLETS, LLC | AMTRUST | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: EUW1843288 01) | INSURANCE |
| 224 SERTA SIMMONS BEDDING, LLC | AMY FLOORING INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 225 SERTA SIMMONS BEDDING, LLC | ANDERSON'S FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 3/29/2022 | SALES AGREEMENTS |
| 226 SERTA SIMMONS BEDDING, LLC | ANDERSON'S FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 3/29/2022 | SALES AGREEMENTS |
| 227 SERTA SIMMONS BEDDING, LLC | ANSI | SERVICES AGREEMENT | IT AGREEMENT |
| 228 SERTA SIMMONS BEDDING, LLC | ANSIRA PARTNERS, INC | STATEMENT OF WORK DTD 11/1/2022 | ADVERTISING/MARKETING (NON-SALES & NON-DTC) |
| 229 SERTA SIMMONS BEDDING, LLC | ANSIRA PARTNERS, INC | MASTER SERVICES AGREEMENT 06/01/2018 | INDIRECT SUPPLIER |
| 230 SERTA SIMMONS BEDDING, LLC | ANSIRA PARTNERS, INC | CONSULTANT AGREEMENT DTD 6/1/2018 | CONSULTANT AGREEMENT |
| 231 SERTA SIMMONS BEDDING, LLC | ANTHEM BLUE CROSS BLUE SHIELD OF GA | ADMINISTRATIVE SERVICES FEES AGREEMENT DTD 1/1/2023 | HUMAN RESOURCES |
| 232 SERTA SIMMONS BEDDING, LLC | ANTHEM BLUE CROSS BLUE SHIELD OF GA | 2022 RENEWAL CONFIRMATION LETTER DTD 8/30/2021 | INDIRECT SUPPLIER |
| 233 DAWN INTERMEDIATE, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 234 DAWN INTERMEDIATE, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 235  DAWN INTERMEDIATE, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 236  DREAMWELL, LTD. | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 237  DREAMWELL, LTD. | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 238  DREAMWELL, LTD. | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 239  NATIONAL BEDDING COMPANY L.L.C. | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 240  NATIONAL BEDDING COMPANY L.L.C. | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 241  NATIONAL BEDDING COMPANY L.L.C. | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 242  SERTA INTERNATIONAL HOLDCO, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 243  SERTA INTERNATIONAL HOLDCO, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 244  SERTA INTERNATIONAL HOLDCO, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 245  SERTA SIMMONS BEDDING, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 246  SERTA SIMMONS BEDDING, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 247  SERTA SIMMONS BEDDING, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 248  SIMMONS BEDDING COMPANY, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 249  SIMMONS BEDDING COMPANY, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 250  SIMMONS BEDDING COMPANY, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 251  SSB HOSPITALITY, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 252  SSB HOSPITALITY, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 253  SSB HOSPITALITY, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 254  SSB LOGISTICS, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 255  SSB LOGISTICS, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 256  SSB LOGISTICS, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 257  SSB MANUFACTURING COMPANY | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 258  SSB MANUFACTURING COMPANY | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 259  SSB MANUFACTURING COMPANY | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 260  SSB RETAIL, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 261  SSB RETAIL, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 262  SSB RETAIL, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 263  THE SIMMONS MANUFACTURING CO., LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 264  THE SIMMONS MANUFACTURING CO., LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 265  THE SIMMONS MANUFACTURING CO., LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 266  TOMORROW SLEEP LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 267  TOMORROW SLEEP LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 268  TOMORROW SLEEP LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 269  TUFT & NEEDLE, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 270  TUFT & NEEDLE, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 271  TUFT & NEEDLE, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 272  WORLD OF SLEEP OUTLETS, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 273  WORLD OF SLEEP OUTLETS, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 274  WORLD OF SLEEP OUTLETS, LLC | AON/LLOYDS OF LONDON | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 275  TUFT & NEEDLE, LLC | APARTMENT THERAPY | ADVERTISING/MARKETING AGREEMENT DTD 2/26/2021 | ADVERTISING/MARKETING AGREEMENT |
| 276  SERTA SIMMONS BEDDING, LLC | APERIO INSIGHTS LLC | MASTER SERVICES AGREEMENT FOR RESEARCH SERVICES DTD 6/1/2022 | CONSUMER INSIGHT |
| 277  SERTA SIMMONS BEDDING, LLC | APPLIANCE HOUSE INC | AUTHORIZED DEALER AGREEMENT DTD 9/27/2021 | SALES AGREEMENTS |
| 278  SERTA SIMMONS BEDDING, LLC | APPLIANCE HOUSE INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 279  SERTA SIMMONS BEDDING, LLC | APPLIANCE HOUSE INC | CO-OP ADVERTISING AGREEMENT DTD 9/27/2021 | SALES AGREEMENTS |
| 280  SERTA SIMMONS BEDDING, LLC | APPLICATIONS SOFTWARE TECHNOLOGY LLC | STATEMENT OF WORK DTD 1/29/2021 | IT AGREEMENT |
| 281  SERTA SIMMONS BEDDING, LLC | AREOTEK | CONTINGENCY RECRUITING AGREEMENT DTD 8/5/2016 | HR AGREEMENT |
| 282  SERTA SIMMONS BEDDING, LLC | ARES MANAGEMENT LLC | AMENDED AND RESTATED MASTER REFERRAL AGREEMENT DTD 2/1/2017 | CAPITAL LEASES |
| 283  SERTA SIMMONS BEDDING, LLC | ARETE MATTRESS PARTNERS | AUTHORIZED DEALER AGREEMENT DTD 2/13/2020 | SALES AGREEMENTS |
| 284  SERTA SIMMONS BEDDING, LLC | ARETE MATTRESS PARTNERS | CO-OP ADVERTISING AGREEMENT DTD 2/13/2020 | SALES AGREEMENTS |
| 285  SERTA SIMMONS BEDDING, LLC | ARETE MATTRESS PARTNERS | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 286  SERTA SIMMONS BEDDING, LLC | ARETE MATTRESS PARTNERS | CO-OP ADVERTISING AGREEMENT DTD 2/13/2020 | SALES AGREEMENTS |
| 287  SERTA SIMMONS BEDDING, LLC | A'S FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 3/27/2022 | SALES AGREEMENTS |
| 288  SERTA SIMMONS BEDDING, LLC | A'S FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 3/27/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 289 | SERTA SIMMONS BEDDING, LLC | ASHLEY - BRYANT | SALES/RETAILER AGREEMENT DTD 9/2/2022 | SALES/RETAILER AGREEMENTS |
| 290 | SERTA SIMMONS BEDDING, LLC | ASHLEY - KINGSWERE FURNITURE LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 7/1/2019 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 291 | SIMMONS BEDDING COMPANY, LLC | ASHLEY FURNITURE INDUSTRIES LLC | LICENSE AGREEMENT 01/01/2022 | CUSTOMER CONTRACT |
| 292 | SIMMONS BEDDING COMPANY, LLC | ASHLEY FURNITURE INDUSTRIES LLC | LICENSE AGREEMENT 01/01/2022 | CUSTOMER CONTRACT |
| 293 | SERTA SIMMONS BEDDING, LLC | ASHLEY/TURNER FURNITURE | SALES/RETAILER AGREEMENT DTD 8/1/2018 | SALES/RETAILER AGREEMENTS |
| 294 | SERTA INTERNATIONAL HOLDCO, LLC | ASHWOOD COMPUTER CO INC | SALES AGREEMENT CUSTOMER #220505A DTD 10/2/2015 | IT AGREEMENT |
| 295 | SERTA SIMMONS BEDDING, LLC | ASHWOOD COMPUTER INC | AGREEMENT FOR PROFESSIONAL SERVICES DTD 6/10/2016 | IT AGREEMENT |
| 296 | SERTA SIMMONS BEDDING, LLC | ASHWOOD COMPUTER INC | AGREEMENT FOR PROFESSIONAL SERVICES DTD 7/21/2022 | IT AGREEMENT |
| 297 | SERTA SIMMONS BEDDING, LLC | AT&T | CORPORATE DIGITAL ADVANTAGE AGREEMENT VERSION 13-A DTD 3/17/2021 | IT AGREEMENT |
| 298 | SERTA SIMMONS BEDDING, LLC | AT&T | IT AGREEMENT DTD 3/17/2021 | IT AGREEMENT |
| 299 | SIMMONS BEDDING COMPANY, LLC | AT&T SERVICES INC | PRIMARY RATE ISDN SERVICE AGREEMENT DTD 6/10/2016 | IT AGREEMENT |
| 300 | SIMMONS BEDDING COMPANY, LLC | AT&T SERVICES INC | PRIMARY RATE ISDN SERVICE AGREEMENT DTD 6/10/2016 | IT AGREEMENT |
| 301 | SERTA SIMMONS BEDDING, LLC | ATD-AMERICAN CO. (DBA) AMERICAN BLOSSOM LINENS | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 302 | DAWN INTERMEDIATE, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 303 | DREAMWELL, LTD. | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 304 | NATIONAL BEDDING COMPANY L.L.C. | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 305 | SERTA INTERNATIONAL HOLDCO, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 306 | SERTA SIMMONS BEDDING, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 307 | SIMMONS BEDDING COMPANY, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 308 | SSB HOSPITALITY, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 309 | SSB LOGISTICS, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 310 | SSB MANUFACTURING COMPANY | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 311 | SSB RETAIL, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 312 | THE SIMMONS MANUFACTURING CO., LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 313 | TOMORROW SLEEP LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 314 | TUFT & NEEDLE, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 315 | WORLD OF SLEEP OUTLETS, LLC | ATEGRITY SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT | INSURANCE |
| 316 | SERTA SIMMONS BEDDING, LLC | ATLANTA ATTACHMENT COMPANY | EQUIPMENT PURCHASE/LEASE AGREEMENT DTD 2/1/2015 | EQUIPMENT PURCHASE/LEASE AGREEMENT |
| 317 | SERTA SIMMONS BEDDING, LLC | ATS LEAN SCHEDULING INT'L LLC | MASTER SERVICE AGREEMENT #60053654 | IT AGREEMENT |
| 318 | SSB MANUFACTURING COMPANY | ATS LEAN SCHEDULING INT'L LLC | TRADE-IN FORM LICENSED SOFTWARE DESIGNATION AGREEMENT #1433213 | IT AGREEMENT |
| 319 | SSB MANUFACTURING COMPANY | ATS LEAN SCHEDULING INT'L LLC | TRADE-IN FORM LICENSED SOFTWARE DESIGNATION AGREEMENT #1433214 | IT AGREEMENT |
| 320 | SSB MANUFACTURING COMPANY | ATS LEAN SCHEDULING INT'L LLC | TRADE-IN FORM LICENSED SOFTWARE DESIGNATION AGREEMENT #1433210 | IT AGREEMENT |
| 321 | SERTA SIMMONS BEDDING, LLC | ATTICA FURNITURE INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 322 | SERTA SIMMONS BEDDING, LLC | ATTICA FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 3/4/2022 | SALES AGREEMENTS |
| 323 | SERTA SIMMONS BEDDING, LLC | ATTICA FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 3/4/2022 | SALES AGREEMENTS |
| 324 | DREAMWELL, LTD. | AUSTRALIAN COMFORT GROUP PTY LTD | PATENT AND TRADEMARK LICENSE AGREEMENT 03/31/2021 | LICENSE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 325 | SSB MANUFACTURING COMPANY | AUSTRALIAN COMFORT GROUP PTY LTD | TECHNICAL SERVICES AGREEMENT 03/31/2021 | LICENSE |
| 326 | DREAMWELL, LTD. | AUSTRALIAN COMFORT GROUP PTY LTD | TECHNICAL SERVICES AGREEMENT 03/31/2021 | LICENSE |
| 327 | TUFT & NEEDLE, LLC | AVALARA SERVICES | TAX MANAGEMENT PROPOSAL DTD 5/15/2015 | INDIRECT SUPPLIER |
| 328 | TUFT & NEEDLE, LLC | AVALARA, INC. | SUBSCRIPTION AGREEMENT DTD 6/28/2021 | TAX AGREEMENT |
| 329 | SERTA SIMMONS BEDDING, LLC | AVERITT EXPRESS INC | DEDICATED CONTRACT SERVICES CARRIER AGREEMENT DTD 4/3/2017 | INDIRECT SUPPLIER |
| 330 | SERTA SIMMONS BEDDING, LLC | AVEX DESIGNS LLC | ADVERTISING/MARKETING AGREEMENT DTD 8/26/2020 | ADVERTISING/MARKETING AGREEMENT |
| 331 | SERTA SIMMONS BEDDING, LLC | AVEX DESIGNS LLC | MASTER SERVICES AGREEMEMNT DTD 2/14/2020 | IT AGREEMENT |
| 332 | SERTA SIMMONS BEDDING, LLC | AVEX DESIGNS LLC | IT AGREEMENT DTD 5/9/2022 | IT |
| 333 | SERTA SIMMONS BEDDING, LLC | AVEX DESIGNS LLC | SCOPE OF WORK DTD 5/9/2022 | ADVERTISING/MARKETING AGREEMENT |
| 334 | DAWN INTERMEDIATE, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 335 | DREAMWELL, LTD. | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 336 | NATIONAL BEDDING COMPANY L.L.C. | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 337 | SERTA INTERNATIONAL HOLDCO, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 338 | SERTA SIMMONS BEDDING, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 339 | SIMMONS BEDDING COMPANY, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 340 | SSB HOSPITALITY, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 341 | SSB LOGISTICS, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 342 | SSB MANUFACTURING COMPANY | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 343  SSB RETAIL, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 344  THE SIMMONS MANUFACTURING CO., LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 345  TOMORROW SLEEP LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 346  TUFT & NEEDLE, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 347  WORLD OF SLEEP OUTLETS, LLC | AVIVA INSURANCE LIMITED | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 348  DAWN INTERMEDIATE, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 349  DREAMWELL, LTD. | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 350  NATIONAL BEDDING COMPANY L.L.C. | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 351  SERTA INTERNATIONAL HOLDCO, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 352  SERTA SIMMONS BEDDING, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 353  SIMMONS BEDDING COMPANY, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 354  SSB HOSPITALITY, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 355  SSB LOGISTICS, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 356  SSB MANUFACTURING COMPANY | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 357  SSB RETAIL, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 358  THE SIMMONS MANUFACTURING CO., LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 359  TOMORROW SLEEP LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 360  TUFT & NEEDLE, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 361  WORLD OF SLEEP OUTLETS, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 362  DAWN INTERMEDIATE, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 363  DREAMWELL, LTD. | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 364  NATIONAL BEDDING COMPANY L.L.C. | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 365  SERTA INTERNATIONAL HOLDCO, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 366  SERTA SIMMONS BEDDING, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 367  SIMMONS BEDDING COMPANY, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 368  SSB HOSPITALITY, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 369  SSB LOGISTICS, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 370  SSB MANUFACTURING COMPANY | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 371  SSB RETAIL, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 372  THE SIMMONS MANUFACTURING CO., LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 373  TOMORROW SLEEP LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 374  TUFT & NEEDLE, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 375  WORLD OF SLEEP OUTLETS, LLC | AWAC | UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 0312-0387) | INSURANCE |
| 376  DAWN INTERMEDIATE, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 377  DREAMWELL, LTD. | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 378  NATIONAL BEDDING COMPANY L.L.C. | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 379 | SERTA INTERNATIONAL HOLDCO, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 380 | SERTA SIMMONS BEDDING, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 381 | SIMMONS BEDDING COMPANY, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 382 | SSB HOSPITALITY, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 383 | SSB LOGISTICS, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 384 | SSB MANUFACTURING COMPANY | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 385 | SSB RETAIL, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 386 | THE SIMMONS MANUFACTURING CO., LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 387 | TOMORROW SLEEP LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 388 | TUFT & NEEDLE, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 389 | WORLD OF SLEEP OUTLETS, LLC | AXIS INSURANCE | SIDE 'A' DIC INSURANCE AGREEMENT (POLICY #: P-001-000657726-01) | INSURANCE |
| 390 | SERTA SIMMONS BEDDING, LLC | BABCO INTERNATIONAL, INC. | SERVICE AGREEMENT | OTHER |
| 391 | SERTA SIMMONS BEDDING, LLC | BAIN & COMPANY, INC. | CONSULTANT AGREEMENT DTD 2/15/2022 | CONSULTANT AGREEMENT |
| 392 | SERTA SIMMONS BEDDING, LLC | BALANCE & DESIGN INTERIORS | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 393 | SERTA SIMMONS BEDDING, LLC | BANK OF AMERICA NA | BENEFIT SOLUTIONS SERVICES AGREEMENT | HUMAN RESOURCES |
| 394 | SERTA SIMMONS BEDDING, LLC | BARRETTEWOOD USA INC | SUPPLY/PURCHASE AGREEMENT DTD 12/15/2022 | SUPPLY/PURCHASE AGREEMENT |
| 395 | SERTA SIMMONS BEDDING, LLC | BARRETTEWOOD USA INC | SUPPLY AGREEMENT  01/01/2020 | DIRECT SUPPLIER |
| 396 | SERTA SIMMONS BEDDING, LLC | BARRETTEWOOD USA INC | SUPPLY AGREEMENT DTD 1/1/2020 | SUPPLY-PURCHASE AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 397 | SERTA SIMMONS BEDDING, LLC | BARRY-WEHMILLER INTERNATIONAL RESOURCES | CONSULTANT AGREEMENT DTD 11/1/2013 | CONSULTANT AGREEMENT |
| 398 | SERTA SIMMONS BEDDING, LLC | BAZAARVOICE INC | SERVICE ORDER #00076743 DTD 4/21/2021 | INNOVATION-TRANSFORMATION |
| 399 | SERTA SIMMONS BEDDING, LLC | BAZAARVOICE INC | MASTER AGREEMENT EFF 3/20/2017 AND SERVICE ORDER #00068605 DTD 1/31/2021 | INNOVATION-TRANSFORMATION |
| 400 | SERTA SIMMONS BEDDING, LLC | BEACH HOME INTERIORS LLC | CO-OP ADVERTISING AGREEMENT DTD 8/10/2020 | SALES AGREEMENTS |
| 401 | SERTA SIMMONS BEDDING, LLC | BEACH HOME INTERIORS LLC | AUTHORIZED DEALER AGREEMENT DTD 8/10/2020 | SALES AGREEMENTS |
| 402 | DAWN INTERMEDIATE, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 403 | DREAMWELL, LTD. | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 404 | NATIONAL BEDDING COMPANY L.L.C. | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 405 | SERTA INTERNATIONAL HOLDCO, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 406 | SERTA SIMMONS BEDDING, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 407 | SIMMONS BEDDING COMPANY, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 408 | SSB HOSPITALITY, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 409 | SSB LOGISTICS, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 410 | SSB MANUFACTURING COMPANY | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 411 | SSB RETAIL, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 412 | THE SIMMONS MANUFACTURING CO., LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 413 | TOMORROW SLEEP LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 414 | TUFT & NEEDLE, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 415 | WORLD OF SLEEP OUTLETS, LLC | BEAZLEY INSURANCE COMPANY | EXCESS CRIME INSURANCE AGREEMENT (POLICY #: V205D0220601) | INSURANCE |
| 416 | SERTA SIMMONS BEDDING, LLC | BED SHED, THE | CO-OP ADVERTISING AGREEMENT DTD 6/1/2022 | SALES AGREEMENTS |
| 417 | SERTA SIMMONS BEDDING, LLC | BED SHED, THE | AUTHORIZED DEALER AGREEMENT DTD 5/22/2022 | SALES AGREEMENTS |
| 418 | SIMMONS BEDDING COMPANY, LLC | BEDDING PLUS MATTRESS CO. | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 5/1/2015 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 419 | SERTA SIMMONS BEDDING, LLC | BEDDING PROS LLC (DBA) US MATTRESS | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 6/6/2018 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 420 | SERTA SIMMONS BEDDING, LLC | BED'R MATTRESS | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 421 | SERTA SIMMONS BEDDING, LLC | BEDS N THINGS | CO-OP ADVERTISING AGREEMENT DTD 9/30/2021 | SALES AGREEMENTS |
| 422 | SERTA SIMMONS BEDDING, LLC | BEDS N THINGS | AUTHORIZED DEALER AGREEMENT DTD 9/30/2021 | SALES AGREEMENTS |
| 423 | SERTA SIMMONS BEDDING, LLC | BEDS TO GO INC | AUTHORIZED DEALER AGREEMENT DTD 7/1/2022 | SALES AGREEMENTS |
| 424 | SERTA SIMMONS BEDDING, LLC | BEDS TO GO INC | CO-OP ADVERTISING AGREEMENT DTD 7/1/2022 | SALES AGREEMENTS |
| 425 | SERTA SIMMONS BEDDING, LLC | BEDS TO GO INC | SALES/RETAILER AGREEMENT DTD 10/6/2022 | SALES |
| 426 | SERTA SIMMONS BEDDING, LLC | BEDS TO GO LLC | CO-OP ADVERTISING AGREEMENT DTD 2/16/2022 | SALES AGREEMENTS |
| 427 | SERTA SIMMONS BEDDING, LLC | BEDS TO GO LLC | AUTHORIZED DEALER AGREEMENT DTD 2/16/2022 | SALES AGREEMENTS |
| 428 | SERTA SIMMONS BEDDING, LLC | BEECHER CARLSON INSURANCE SERVICES, LLC | HR AGREEMENT DTD 6/14/2018 | HR AGREEMENT |
| 429 | SERTA SIMMONS BEDDING, LLC | BEKAERTDESLEE USA INC | SUPPLY AGREEMENT 12/31/2018 | DIRECT SUPPLIER |
| 430 | SERTA SIMMONS BEDDING, LLC | BEKAERTDESLEE USA INC | SUPPLY/PURCHASE AGREEMENT DTD 12/31/2018 | SUPPLY/PURCHASE AGREEMENT |
| 431 | SERTA SIMMONS BEDDING, LLC | BEKAERTDESLEE USA INC | DIRECT SOURCING DTD 2/7/2020 | DIRECT SOURCING |
| 432 | SERTA SIMMONS BEDDING, LLC | BELISSI FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 6/28/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 433 | SERTA SIMMONS BEDDING, LLC | BELISSI FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 6/28/2022 | SALES AGREEMENTS |
| 434 | SERTA SIMMONS BEDDING, LLC | BELLA SLEEP INC | CO-OP ADVERTISING AGREEMENT DTD 9/12/2022 | SALES AGREEMENTS |
| 435 | SERTA SIMMONS BEDDING, LLC | BELLA SLEEP INC | AUTHORIZED DEALER AGREEMENT DTD 9/12/2022 | SALES AGREEMENTS |
| 436 | SERTA SIMMONS BEDDING, LLC | BENCHMARK PAYMENT NETWORKS, INC. | INDEPENDENT CONTRACTOR AGREEMENT DTD 11/4/2021 | SALES |
| 437 | SERTA SIMMONS BEDDING, LLC | BERGEN FURNITURE & DESIGN | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 438 | SERTA SIMMONS BEDDING, LLC | BERGEN FURNITURE & DESIGN INC. | SALES/RETAILER AGREEMENT DTD 11/8/2022 | SALES/RETAILER AGREEMENTS |
| 439 | SERTA SIMMONS BEDDING, LLC | BERKELEY RESEARCH GROUP, LLC | CONSULTANT AGREEMENT DTD 2/18/2022 | CONSULTANT AGREEMENT |
| 440 | DAWN INTERMEDIATE, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 441 | DREAMWELL, LTD. | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 442 | NATIONAL BEDDING COMPANY L.L.C. | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 443 | SERTA INTERNATIONAL HOLDCO, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 444 | SERTA SIMMONS BEDDING, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 445 | SIMMONS BEDDING COMPANY, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 446 | SSB HOSPITALITY, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 447 | SSB LOGISTICS, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 448 | SSB MANUFACTURING COMPANY | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 449 | SSB RETAIL, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 450 | THE SIMMONS MANUFACTURING CO., LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 451  TOMORROW SLEEP LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 452  TUFT & NEEDLE, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 453  WORLD OF SLEEP OUTLETS, LLC | BERKLEY | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: BPRO8067125) | INSURANCE |
| 454  DAWN INTERMEDIATE, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 455  DREAMWELL, LTD. | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 456  NATIONAL BEDDING COMPANY L.L.C. | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 457  SERTA INTERNATIONAL HOLDCO, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 458  SERTA SIMMONS BEDDING, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 459  SIMMONS BEDDING COMPANY, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 460  SSB HOSPITALITY, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 461  SSB LOGISTICS, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 462  SSB MANUFACTURING COMPANY | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 463  SSB RETAIL, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 464  THE SIMMONS MANUFACTURING CO., LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 465  TOMORROW SLEEP LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 466  TUFT & NEEDLE, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 467  WORLD OF SLEEP OUTLETS, LLC | BERKSHIRE | AUTO BUFFER INSURANCE AGREEMENT (POLICY #: 42-XSF-304247-06) | INSURANCE |
| 468  SERTA SIMMONS BEDDING, LLC | BEST PRICE FURNITURE & MATTRESS | AUTHORIZED DEALER AGREEMENT DTD 4/22/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 469 | SERTA SIMMONS BEDDING, LLC | BEST PRICE FURNITURE & MATTRESS | CO-OP ADVERTISING AGREEMENT DTD 4/22/2022 | SALES AGREEMENTS |
| 470 | NATIONAL BEDDING COMPANY L.L.C. | BEST REST LLC | SUPPLY AGREEMENT DTD 6/30/2012 | SALES AGREEMENTS |
| 471 | NATIONAL BEDDING COMPANY L.L.C. | BEST REST LLC | SUPPLY AGREEMENT DTD 6/30/2012 | SALES AGREEMENTS |
| 472 | SERTA SIMMONS BEDDING, LLC | BETHPAGE PROPERTIES SOUTH INC | LEASE GUARANTEE | REAL ESTATE LEASES |
| 473 | SERTA SIMMONS BEDDING, LLC | BEYOND TRUST CORPORATION | RENEWAL NOTICE #Q-667192-2 DTD 12/18/2022 | IT AGREEMENT |
| 474 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | BIG LOTS ECOMMERCE LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 6/26/2017 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 475 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | BIG LOTS ECOMMERCE LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 6/26/2017 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 476 | SERTA SIMMONS BEDDING, LLC | BIG LOTS STORE INC | DEALER INCENTIVE AGREEMENT 09/01/2021 | CUSTOMER CONTRACT |
| 477 | SERTA SIMMONS BEDDING, LLC | BIG REDZZZ MARKETING | CO-OP ADVERTISING AGREEMENT DTD 5/6/2020 | SALES AGREEMENTS |
| 478 | SERTA SIMMONS BEDDING, LLC | BIG REDZZZ MARKETING | AUTHORIZED DEALER AGREEMENT DTD 5/6/2020 | SALES AGREEMENTS |
| 479 | SERTA SIMMONS BEDDING, LLC | BIG SANDY FURNITURE, INC. | SALES/RETAILER AGREEMENT DTD 9/1/2020 | SALES/RETAILER AGREEMENTS |
| 480 | SERTA SIMMONS BEDDING, LLC | BIG SKY MATTRESS (DBA) MATTRESS FIRM | SALES/RETAILER AGREEMENT DTD 4/1/2021 | SALES/RETAILER AGREEMENTS |
| 481 | SERTA SIMMONS BEDDING, LLC | BIG SKY MATTRESS LLC | CO-OP ADVERTISING AGREEMENT DTD 6/19/2020 | SALES AGREEMENTS |
| 482 | SERTA SIMMONS BEDDING, LLC | BIG SKY MATTRESS LLC | AUTHORIZED DEALER AGREEMENT DTD 6/19/2020 | SALES AGREEMENTS |
| 483 | NATIONAL BEDDING COMPANY L.L.C. | BIGTIME RENTALS OF STUTTGART INC | SUPPLY AGREEMENT DTD 5/28/2015 | SALES AGREEMENTS |
| 484 | NATIONAL BEDDING COMPANY L.L.C. | BIGTIME RENTALS OF STUTTGART INC | SUPPLY AGREEMENT DTD 5/28/2015 | SALES AGREEMENTS |
| 485 | NATIONAL BEDDING COMPANY L.L.C. | BILLMAN'S HOME DECOR LLP | SUPPLY AGREEMENT  DTD 6/1/2014 | SALES AGREEMENTS |
| 486 | SERTA SIMMONS BEDDING, LLC | BILL'S BEDS AND APPLIANCES LLC | SALES/RETAILER AGREEMENT DTD 3/4/2022 | SALES/RETAILER AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 487 WORLD OF SLEEP OUTLETS, LLC | BIRCH LLC | LEASE AGREEMENT DTD 3/19/2018 FOR SPACE AT 3728 MARKET ST, ST. LOUIS, MI | REAL ESTATE LEASES |
| 488 SERTA SIMMONS BEDDING, LLC | BI-RITE FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 2/17/2022 | SALES AGREEMENTS |
| 489 SERTA SIMMONS BEDDING, LLC | BI-RITE FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 2/17/2022 | SALES AGREEMENTS |
| 490 SERTA SIMMONS BEDDING, LLC | BJ'S WHOLESALE | SALES/RETAILER AGREEMENT | SALES/RETAILER AGREEMENTS |
| 491 SERTA SIMMONS BEDDING, LLC | BLOOMBERG BNA | SUBSCRIPTION AGREEMENT | TAX AGREEMENT |
| 492 SIMMONS BEDDING COMPANY, LLC | BLUCCI LLC | CO-OP ADVERTISING AGREEMENT DTD 4/22/2022 | SALES AGREEMENTS |
| 493 SIMMONS BEDDING COMPANY, LLC | BLUCCI LLC | AUTHORIZED DEALER AGREEMENT DTD 4/22/2022 | SALES AGREEMENTS |
| 494 SERTA SIMMONS BEDDING, LLC | BLUE RIDGE | TRADEMARK LICENSE AGREEMENT DTD 6/1/2022 | TRADEMARK LICENSE AGREEMENT |
| 495 SERTA SIMMONS BEDDING, LLC | BLUE RIDGE HOME FASHIONS | LICENSE AGREEMENT DTD 4/1/2021 | LICENSE AGREEMENT |
| 496 DREAMWELL, LTD. | BLUE RIDGE HOME FASHIONS INC | TRADEMARK LICENSE AGREEMENT 04/01/2021 | LICENSE |
| 497 SERTA SIMMONS BEDDING, LLC | BLUE YONDER INC | IT AGREEMENT DTD 3/26/2020 | MARKETING |
| 498 SERTA SIMMONS BEDDING, LLC | BLUE YONDER INC | SAAS AND PROFESSIONAL AGREEMENT DTD 3/30/2022 | IT AGREEMENT |
| 499 SERTA SIMMONS BEDDING, LLC | BLUE YONDER INC | IT AGREEMENT DTD 3/28/2022 | IT AGREEMENT |
| 500 SERTA SIMMONS BEDDING, LLC | BLUE YONDER INC | IT AGREEMENT DTD 7/21/2022 | IT AGREEMENT |
| 501 NATIONAL BEDDING COMPANY L.L.C. | BLUEGRASS BUSINESS VENTURES LLC | SUPPLY AGREEMENT  DTD 1/13/2009 | SALES AGREEMENTS |
| 502 NATIONAL BEDDING COMPANY L.L.C. | BLUEGRASS BUSINESS VENTURES LLC | SECURITY AGREEMENT DTD 1/13/2009 | SALES AGREEMENTS |
| 503 SERTA SIMMONS BEDDING, LLC | BLUEJAY SOLUTIONS CO | SERVIES AGREEMENT DTD 4/1/2017 | IT AGREEMENT |
| 504 SERTA SIMMONS BEDDING, LLC | BLUEJAY SOLUTIONS INC | ADDENDUM #040122 TO SOFTWARE LICENSEE & SERVICES AGREEMENT DTD 4/1/2022 | IT AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 505 | TUFT & NEEDLE, LLC | BLUESHIFT INC | PLATFROM ORDER FORM DTD 3/21/2019 | INDIRECT SUPPLIER |
| 506 | TUFT & NEEDLE, LLC | BLUESHIFT LABS INC | ADVERTISING/MARKETING AGREEMENT DTD 12/1/2019 | MARKETING |
| 507 | TUFT & NEEDLE, LLC | BLUESHIFT LABS INC | PLATFORM SUBSCRIPTION | INDIRECT SUPPLIER |
| 508 | SERTA SIMMONS BEDDING, LLC | BLUJAY SOLUTIONS, INC | TRANSPORTATION/LOGISTICS AGREEMENT DTD 4/1/2022 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 509 | SERTA SIMMONS BEDDING, LLC | BONDAREK, NICK | AUTHORIZED DEALER AGREEMENT DTD 12/17/2022 | SALES AGREEMENTS |
| 510 | SIMMONS BEDDING COMPANY, LLC | BONDAREK, NICK | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 511 | SERTA SIMMONS BEDDING, LLC | BOOMERANG COMMERCE INC | SUBSCRIPTION MASTER SERVICE AGREEMENT DTD 12/15/2021 | IT AGREEMENT |
| 512 | SERTA SIMMONS BEDDING, LLC | BOOTSTRAP SOFTWARE PARTNERS LLC | MASTER SUBSCRIPTION LICENSE AGREEMENT DTD 4/15/2022 | COMMUNICATION |
| 513 | SERTA SIMMONS BEDDING, LLC | BOSLER INVESTMENT GROUP, LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/14/2022 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 514 | DREAMWELL, LTD. | BOYD FLOTATION | TRADEMARK LICENSE AGREEMENT  DTD 1/1/2023 | LICENSE |
| 515 | SERTA SIMMONS BEDDING, LLC | BOYD FLOTATION | TRADEMARK LICENSE AGREEMENT DTD 1/1/2024 | TRADEMARK LICENSE AGREEMENT |
| 516 | SERTA SIMMONS BEDDING, LLC | BOYD FLOTATION | LICENSE AGREEMENT DTD 11/1/2020 | LICENSE AGREEMENT |
| 517 | NATIONAL BEDDING COMPANY L.L.C. | BOZEMAN TV AND APPLIANCE INC | SUPPLY AGREEMENT DTD 3/25/2013 | SALES AGREEMENTS |
| 518 | SERTA SIMMONS BEDDING, LLC | BRAND UNION COMPANY INC. | CONSULTANT AGREEMENT DTD 3/28/2016 | CONSULTANT AGREEMENT |
| 519 | SERTA SIMMONS BEDDING, LLC | BRIDGETT ARIENO | CONSULTANT AGREEMENT DTD 10/21/2019 | CONSULTANT AGREEMENT |
| 520 | SERTA SIMMONS BEDDING, LLC | BRIGHTON HOME FURNITURE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 521 | SERTA SIMMONS BEDDING, LLC | BRIGHTON HOME FURNITURE | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 522 | SERTA SIMMONS BEDDING, LLC | BROADLINE SERVICES LLC | AUTHORIZED DEALER AGREEMENT DTD 11/29/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 523 | SERTA SIMMONS BEDDING, LLC | BROADLINE SERVICES LLC | CO-OP ADVERTISING AGREEMENT DTD 11/29/2022 | SALES AGREEMENTS |
| 524 | NATIONAL BEDDING COMPANY L.L.C. | BROADWAY HOME CENTER INC | SUPPLY AGREEMENT DTD 9/12/2019 | SALES AGREEMENTS |
| 525 | SERTA SIMMONS BEDDING, LLC | BROADWAY VIDEO | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 526 | SERTA SIMMONS BEDDING, LLC | BROWN'S FURNITURE & APPLIANCE LLC | CO-OP ADVERTISING AGREEMENT DTD 3/9/2022 | SALES AGREEMENTS |
| 527 | SERTA SIMMONS BEDDING, LLC | BROWN'S FURNITURE & APPLIANCE LLC | AUTHORIZED DEALER AGREEMENT DTD 3/9/2022 | SALES AGREEMENTS |
| 528 | SERTA SIMMONS BEDDING, LLC | BURK, DENNIS | AUTHORIZED DEALER AGREEMENT DTD 12/17/2022 | SALES AGREEMENTS |
| 529 | SIMMONS BEDDING COMPANY, LLC | BURK, DENNIS | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 530 | SERTA SIMMONS BEDDING, LLC | BURNS GROUP NYC, LLC | ADVERTISING/MARKETING AGREEMENT DTD 5/11/2018 | ADVERTISING/MARKETING AGREEMENT |
| 531 | SERTA SIMMONS BEDDING, LLC | BUSINESS WIRE | ADVERTISING/MARKETING (NON-SALES & NON-DTC) DTD 4/27/2022 | ADVERTISING |
| 532 | SERTA SIMMONS BEDDING, LLC | BUSINESSOLVER.COM INC | SOFTWARE & SERVICES AGREEMENT DTD 12/21/2018 | HUMAN RESOURCES |
| 533 | SERTA SIMMONS BEDDING, LLC | BUSINESSWIRE | SECIAL PRICING AGREEMENT DTD 4/27/2022 | MARKETING |
| 534 | SERTA SIMMONS BEDDING, LLC | BUSINESSWIRE | BUSINESS WIRE SPECIAL PRICING AGREEMENT DTD 4/27/2022 | HUMAN RESOURCES |
| 535 | SERTA SIMMONS BEDDING, LLC | BUZZBACK LLC | CONSULTANT AGREEMENT DTD 10/29/2019 | CONSULTANT AGREEMENT |
| 536 | SERTA SIMMONS BEDDING, LLC | BUZZBACK LLC | MASTER SERVICES AGREEMENT FOR RESEARCH SERVICES DTD 10/29/2019 | CONSUMER INSIGHT AGR |
| 537 | SERTA SIMMONS BEDDING, LLC | BUZZBACK LLC | MASTER SERVICES AGREEMENT RENEWAL DTD 11/7/2022 | CONSUMER INSIGHTS |
| 538 | SERTA SIMMONS BEDDING, LLC | BUZZBACK LLC | MASTER SERVICES AGREEMENT FOR RESEARCH SERVICES DTD 10/29/2019 | CONSUMER INSIGHT AGR |
| 539 | TUFT & NEEDLE, LLC | BYNDER LLC | EQUIPMENT PURCHASE/LEASE AGREEMENT DTD 11/30/2021 | EQUIPMENT PURCHASE/LEASE AGREEMENT |
| 540 | TUFT & NEEDLE, LLC | BYNDER LLC | BYNDER DIGITAL ASSET MANAGEMENT | T&N AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 541 | TUFT & NEEDLE, LLC | BYNDER LLC | BYNDER DIGITAL ASSET MANAGEMENT | T&N AGREEMENTS |
| 542 | TUFT & NEEDLE, LLC | BYNDER LLC | ORDER FORM DTD 11/15/2021 | MARKETING AGREEMENTS |
| 543 | TUFT & NEEDLE, LLC | BYNDER LLC | ORDER FORM DTD 11/15/2021 | MARKETING AGREEMENTS |
| 544 | NATIONAL BEDDING COMPANY L.L.C. | C GRACE CORPORATION | SUPPLY AGREEMENT DTD 10/1/2009 | SALES AGREEMENTS |
| 545 | NATIONAL BEDDING COMPANY L.L.C. | C GRACE CORPORATION | SECURITY AGREEMENT DTD 10/1/2009 | SALES AGREEMENTS |
| 546 | NATIONAL BEDDING COMPANY L.L.C. | C GRACE CORPORATION | LICENSE AGREEMENT LETTER DTD 9/9/2009 | SALES AGREEMENTS |
| 547 | SERTA SIMMONS BEDDING, LLC | C&C TV INC | AUTHORIZED DEALER AGREEMENT DTD 3/18/2021 | SALES AGREEMENTS |
| 548 | SERTA SIMMONS BEDDING, LLC | C&C TV INC | CO-OP ADVERTISING AGREEMENT DTD 3/18/2021 | SALES AGREEMENTS |
| 549 | SERTA SIMMONS BEDDING, LLC | C&C TV INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 550 | SERTA SIMMONS BEDDING, LLC | C&C WHOLESALE | CO-OP ADVERTISING AGREEMENT DTD 6/29/2022 | SALES AGREEMENTS |
| 551 | SERTA SIMMONS BEDDING, LLC | C&C WHOLESALE | AUTHORIZED DEALER AGREEMENT DTD 6/29/2022 | SALES AGREEMENTS |
| 552 | NATIONAL BEDDING COMPANY L.L.C. | CAJUN ENTERPRISES INC | SUPPLY AGREEMENT DTD 9/20/2012 | SALES AGREEMENTS |
| 553 | SERTA SIMMONS BEDDING, LLC | CANON SOLUTIONS AMERICA INC | UNIFIED LEASE AGREEMENT# S0808799.01 DTD 3/26/2018 | CAPITAL LEASES |
| 554 | SERTA SIMMONS BEDDING, LLC | CANON SOLUTIONS AMERICA INC | UNIFIED LEASE AGREEMENT# S0897964.09 DTD 2/21/2019 | CAPITAL LEASES |
| 555 | SERTA SIMMONS BEDDING, LLC | CANON SOLUTIONS AMERICA INC | UNIFIED LEASE AGREEMENT# S09903607.02 DTD 11/29/2018 | CAPITAL LEASES |
| 556 | SERTA SIMMONS BEDDING, LLC | CANON SOLUTIONS AMERICA INC | UNIFIED LEASE AGREEMENT# S0897964.09 DTD 2/21/2019 | CAPITAL LEASES |
| 557 | SERTA SIMMONS BEDDING, LLC | CANON SOLUTIONS AMERICA INC | UNIFIED LEASE AGREEMENT# S0808799.01 DTD 3/26/2018 | CAPITAL LEASES |
| 558 | SERTA SIMMONS BEDDING, LLC | CANON SOLUTIONS AMERICA INC | MASTER SALES & SERVICES AGREEMENT #MA1881 DTD 8/31/2020 | IT AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 559 | SERTA SIMMONS BEDDING, LLC | CANON SOLUTIONS AMERICA INC | UNIFIED LEASE AGREEMENT# S0903607.02 DTD 11/29/2018 | CAPITAL LEASES |
| 560 | SIMMONS BEDDING COMPANY, LLC | CANON SOLUTIONS AMERICA INC | PURCHASE AND MAINTENANCE AGREEMENT #S0 169059.03 DTD 6/2/2013 | IT AGREEMENT |
| 561 | SSB MANUFACTURING COMPANY | CANON SOLUTIONS AMERICA INC | MASTER SALES & SERVICES AGREEMENT #MA1881 DTD 8/31/2020 | IT AGREEMENT |
| 562 | SERTA SIMMONS BEDDING, LLC | CAPGEMINI AMERICA, INC. | IT AGREEMENT DTD 5/12/2015 | IT AGREEMENT |
| 563 | SERTA SIMMONS BEDDING, LLC | CAPGEMINI U.S., LLC | CONSULTANT AGREEMENT DTD 5/12/2015 | CONSULTANT AGREEMENT |
| 564 | SERTA SIMMONS BEDDING, LLC | CAREAR INC | SERVICES AGREEMENT | IT AGREEMENT |
| 565 | SERTA SIMMONS BEDDING, LLC | CARLYJOE LLC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 566 | SERTA SIMMONS BEDDING, LLC | CAROLINA SLEEP SHOPPE LLC | SUBSIDY AGREEMENT | SALES AGREEMENTS |
| 567 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | CAROLINA SLEEP SHOPPE LLC | LICENSE AND SUPPLY AGREEMENT DTD 8/4/2021 | SALES AGREEMENTS |
| 568 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | CAROLINA SLEEP SHOPPE LLC | LICENSE AND SUPPLY AGREEMENT DTD 8/4/2021 | SALES AGREEMENTS |
| 569 | SERTA SIMMONS BEDDING, LLC | CARPENTER CO | SUPPLY AGREEMENT DTD 5/11/2022 | DIRECT SUPPLIER |
| 570 | SERTA SIMMONS BEDDING, LLC | CARPET ONE - CCA GLOBAL PARTNERS (HAMILTON) | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 3/13/2017 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 571 | SERTA SIMMONS BEDDING, LLC | CASTLEGATE LOGISITICS INC. | TRANSPORTATION/LOGISTICS AGREEMENT DTD 3/1/2020 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 572 | SSB MANUFACTURING COMPANY | CASTLEGATE LOGISITICS INC. | SERVICES AGREEMENT 03/01/2020 | 3PL CONTRACT |
| 573 | SERTA SIMMONS BEDDING, LLC | CATAPULT HEALTH, LLC | HR AGREEMENT DTD 5/21/2018 | HR AGREEMENT |
| 574 | SERTA SIMMONS BEDDING, LLC | CELONIS | IT AGREEMENT DTD 5/5/2022 | IT AGREEMENT |
| 575 | SERTA SIMMONS BEDDING, LLC | CEMKCO INC | AUTHORIZED DEALER AGREEMENT DTD 2/14/2023 | SALES AGREEMENTS |
| 576 | SERTA SIMMONS BEDDING, LLC | CEMKCO INC | CO-OP ADVERTISING AGREEMENT DTD 2/14/2023 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 577 | TUFT & NEEDLE, LLC | CENTER DEVELOPMENTS OREG II LLC | SHOPPING CENTER RETAIL NET LEASE BASIC LEASE INFORMATION DTD 6/8/2018 FOR 2725 SW CEDAR HILLS, STE 115, BEAVERTON OR | REAL ESTATE LEASES |
| 578 | SERTA SIMMONS BEDDING, LLC | CENTRAL FURNITURE | SALES/RETAILER AGREEMENT DTD 9/1/2021 | SALES/RETAILER AGREEMENTS |
| 579 | SERTA SIMMONS BEDDING, LLC | CENTRAL HARDWARE & FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 11/4/2022 | SALES AGREEMENTS |
| 580 | SERTA SIMMONS BEDDING, LLC | CENTRAL HARDWARE & FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 11/4/2022 | SALES AGREEMENTS |
| 581 | SERTA SIMMONS BEDDING, LLC | CENTRAL INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 582 | NATIONAL BEDDING COMPANY L.L.C. | CENTRAL RADIO APPLIANCE & BEDDING INC | SUPPLY AGREEMENT  DTD 6/9/2014 | SALES AGREEMENTS |
| 583 | SERTA SIMMONS BEDDING, LLC | CENTRICS IT, LLC | MASTER SERVICES AGREEMENT DTD 2/24/2022 | IT AGREEMENT |
| 584 | SERTA SIMMONS BEDDING, LLC | CENTRICS IT, LLC | IT AGREEMENT DTD 5/24/2022 | IT AGREEMENT |
| 585 | SERTA SIMMONS BEDDING, LLC | CENTRIFY CORPORATION | IT AGREEMENT DTD 6/30/2016 | IT AGREEMENT |
| 586 | TUFT & NEEDLE, LLC | CEVA FREIGHT LLC | MASTER WAREHOUSE AGREEMENT DTD 11/1/2021 | LOGISTICS CONTRACT |
| 587 | SERTA SIMMONS BEDDING, LLC | CFS-DFW LLC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 588 | THE SIMMONS MANUFACTURING CO., LLC | CH ROBINSON WORLDWIDE INC | BROKER TRANSPORTATION SERVICES AGREEMENT 10/22/2010 | INDIRECT SUPPLIER |
| 589 | SERTA SIMMONS BEDDING, LLC | CH ROBINSON WORLDWIDE INC | SERVICES AGREEMENT DTD 7/4/2020 | INDIRECT SUPPLIER |
| 590 | THE SIMMONS MANUFACTURING CO., LLC | CH ROBINSON WORLDWIDE INC | BROKER TRANSPORTATION SERVICES AGREEMENT 10/22/2010 | INDIRECT SUPPLIER |
| 591 | SERTA SIMMONS BEDDING, LLC | CHAINALYTICS LLC OF NTT DATA, INC. | CONSULTANT AGREEMENT DTD 4/15/2022 | CONSULTANT AGREEMENT |
| 592 | SERTA SIMMONS BEDDING, LLC | CHAINALYTICS LLC OF NTT DATA, INC. | CONSULTANT AGREEMENT DTD 4/15/2022 | CONSULTANT AGREEMENT |
| 593 | SERTA SIMMONS BEDDING, LLC | CHANNEL ASSIST INC. | SALES/RETAILER AGREEMENT DTD 3/7/2021 | SALES/RETAILER AGREEMENTS |
| 594 | SERTA SIMMONS BEDDING, LLC | CHARLES FALUGO (DBA) THE BEDDING CENTER | SALES/RETAILER AGREEMENT DTD 8/11/2022 | SALES/RETAILER AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 595 | NATIONAL BEDDING COMPANY L.L.C. | CHARLEY'S APPLIANCE INC | SUPPLY AGREEMENT DTD 8/11/2016 | SALES AGREEMENTS |
| 596 | SERTA SIMMONS BEDDING, LLC | CHARLI D'AMELIO LLC | LICENSE AND PROMOTION AGREEMENT 06/22/2020 | LICENSE |
| 597 | SERTA SIMMONS BEDDING, LLC | CHARLI D'AMELIO LLC | LICENSE AND PROMOTION AGREEMENT 06/22/2020 | LICENSE |
| 598 | SERTA SIMMONS BEDDING, LLC | CHARLI D'AMELIO LLC | LICENSE AND PROMOTION AGREEMENT 06/22/2020 | LICENSE |
| 599 | SERTA SIMMONS BEDDING, LLC | CHEMICAL DATA L.P. | SUPPLY/PURCHASE AGREEMENT DTD 3/1/2019 | SUPPLY/PURCHASE AGREEMENT |
| 600 | SERTA SIMMONS BEDDING, LLC | CHEP USA | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 2/7/2022 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |
| 601 | SERTA INTERNATIONAL HOLDCO, LLC | CHICAGO OFFICE TECHNOLOGY GROUP | ANNUAL MAINTENANCE AGREEMENT | IT AGREEMENT |
| 602 | SERTA INTERNATIONAL HOLDCO, LLC | CHICAGO OFFICE TECHNOLOGY GROUP | COST PER COPY AGREEMENT #148148000 | IT AGREEMENT |
| 603 | DREAMWELL, LTD. | CHILDREN'S PRODUCT LLC | TRADEMARK & TECHNOLOGY LICENSE AGREEMENT 04/07/2011 | LICENSE |
| 604 | DREAMWELL, LTD. | CIA INDUSTRIAL CONTINENTAL SRL | TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT 01/01/2015 | LICENSE |
| 605 | SIMMONS BEDDING COMPANY, LLC | CIA INDUSTRIAL CONTINENTAL SRL | TECHNICAL SERVICES AGREEMENT 01/01/2015 | LICENSE |
| 606 | SERTA SIMMONS BEDDING, LLC | CISCO CAPITAL | MASTER LEASE AND FINANCING AGREEMENT #US-59160-MILFA-9995 | IT AGREEMENT |
| 607 | SERTA SIMMONS BEDDING, LLC | CISCO CAPITAL | MASTER LEASE AGMT# US-59610-MLFA-9995 | CAPITAL LEASES |
| 608 | SERTA SIMMONS BEDDING, LLC | CISCO SYSTEMS INC | ENTERPRISE AGREEMENT DTD 12/4/2020 | IT AGREEMENT |
| 609 | SERTA SIMMONS BEDDING, LLC | CISCO SYSTEMS INC | UNIVERSAL CLOUD AGREEMENT | IT AGREEMENT |
| 610 | SERTA SIMMONS BEDDING, LLC | CISCO SYSTEMS INC | END USER LICENSE AGREEMENT DTD 5/22/2017 | IT AGREEMENT |
| 611 | SERTA SIMMONS BEDDING, LLC | CISCO WEBEX LLC | SOFTWARE AS A SERVICE AGREEMENT DTD 4/28/2016 | IT AGREEMENT |
| 612 | SERTA SIMMONS BEDDING, LLC | CITRIX SYSTEMS INC | SERVICE RENEWAL QUOTE #Q-02562919 DTD 5/19/2022 | IT AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 613 | SERTA SIMMONS BEDDING, LLC | CITY FURNITURE INC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 5/1/2015 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 614 | SERTA SIMMONS BEDDING, LLC | CITY FURNITURE INC | DEALER INCENTIVE AGREEMENT DTD 5/1/2021 | SALES/RETAILER AGREEMENTS |
| 615 | SERTA SIMMONS BEDDING, LLC | CITY FURNITURE INC | DEALER INCENTIVE AGREEMENT 05/01/2021 | CUSTOMER CONTRACT |
| 616 | SSB MANUFACTURING COMPANY | CITY OF JANESVILLE, WI | THE DEVELOPMENT AGREEMENT DTD 4/26/2022 FOR JOBS JOBS ASSOCIATED WITH MANUFACTURING FACILITY LOCATED 200 INNOVATION DRIVE, JANESVILLE, WI | REAL ESTATE LEASES |
| 617 | SIMMONS BEDDING COMPANY, LLC | CK-CHILDRESS KLEIN #8 LP | STANDARD WAREHOUSE LEASE AGREEMENT FOR 5100 W WT HARRIS BLVD, CHARLOTTE, NC | REAL ESTATE LEASES |
| 618 | SIMMONS BEDDING COMPANY, LLC ; THE SIMMONS MANUFACTURING CO., LLC | CK-CHILDRESS KLEIN #8 LP | ASSIGNMENT OF LEASE 12/29/2001 FOR 5100 W WT HARRIS BLVD, CHARLOTTE, NC | REAL ESTATE LEASES |
| 619 | SIMMONS BEDDING COMPANY, LLC ; THE SIMMONS MANUFACTURING CO., LLC | CK-CHILDRESS KLEIN #8 LP | ASSIGNMENT OF LEASE 12/29/2001 FOR 5100 W WT HARRIS BLVD, CHARLOTTE, NC | REAL ESTATE LEASES |
| 620 | SERTA SIMMONS BEDDING, LLC | CLEARSTAR, INC. | HR SUPPLIER AGREEMENT DTD 2/5/2021 | HR SUPPLIER AGREEMENT |
| 621 | SERTA SIMMONS BEDDING, LLC | CLEO COMMUNICATIONS US LLC | MASTER RELATIONSHIP AGREEMENT #SER-231-19MRA DTD 8/19/2019 | IT AGREEMENT |
| 622 | SERTA SIMMONS BEDDING, LLC | CLEO COMMUNICATIONS US LLC | CLEO INTEGRATION CLOUD ADDENDUM DTD 2/18/2022 | IT AGREEMENT |
| 623 | SERTA SIMMONS BEDDING, LLC | CLEO COMMUNICATIONS US LLC | PURCHASE AGREEMENT #SER09252019V13 DTD 9/25/2019 DTD 9/26/2019 | IT AGREEMENT |
| 624 | SERTA SIMMONS BEDDING, LLC | CLEO COMMUNICATIONS US LLC | IT AGREEMENT DTD 2/18/2022 | IT AGREEMENT |
| 625 | SERTA SIMMONS BEDDING, LLC | CLEO COMMUNICATIONS US LLC | PROFESSIONAL SERVICES TIME & MATERIAL SOW #SER-20220608-000 DTD 6/10/2022 | IT AGREEMENT |
| 626 | SERTA SIMMONS BEDDING, LLC | CLEO COMMUNICATIONS US LLC | PROFESSIONAL SERVICES TIME & MATERIAL SOW #SER-20220216-000 DTD 3/31/2022 | IT AGREEMENT |
| 627 | SERTA SIMMONS BEDDING, LLC | CLEO COMMUNICATIONS US LLC | IT AGREEMENT DTD 4/7/2022 | IT AGREEMENT |
| 628 | SERTA SIMMONS BEDDING, LLC | CLOSET & STORAGE CONCEPTS | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 7/24/2019 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 629 | SERTA SIMMONS BEDDING, LLC | CLOUDCRAZE SOFTWARE LLC | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 630 | TUFT & NEEDLE, LLC | CLYDE TECHNOLOGIES - ORDER FORM 1 | ORDER FORM DTD  6/1/2021 | DTC CONTRACTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 631 | TUFT & NEEDLE, LLC | CLYDE TECHNOLOGIES, INC. - 2021 MASTER | MASTER AGREEMENT DTD 5/13/2021 | DTC CONTRACTS |
| 632 | SERTA SIMMONS BEDDING, LLC | CODIGO LLC | IT AGREEMENT DTD 02/11/2019 | IT AGREEMENT |
| 633 | SERTA SIMMONS BEDDING, LLC | CODIGO LLC | SOFTWARE LICENSING AND ON DEMAND MEDIA DISTRIBUTION AGREEMENT DTD 2/11/2019 | HUMAN RESOURCES |
| 634 | SERTA SIMMONS BEDDING, LLC | CODIGO LLC | SOFTWARE LICENSING AND ON DEMAND MEDIA DISTRIBUTION AGREEMENT DTD 2/11/2019 | IT AGREEMENT |
| 635 | SERTA SIMMONS BEDDING, LLC | CODILITY LIMITED | MASTER SUBSCRIPTION AGREEMENT | HUMAN RESOURCES |
| 636 | SERTA SIMMONS BEDDING, LLC | CODILITY LIMITED | MASTER SUBSCRIPTION AGREEMENT | HUMAN RESOURCES |
| 637 | SERTA SIMMONS BEDDING, LLC | COFENSE INC. (FKA) PHISHME, INC. | IT AGREEMENT DTD 9/22/2020 | IT AGREEMENT |
| 638 | SERTA SIMMONS BEDDING, LLC | COGNIZANT TECHNOLOGY SOLUTIONS | IT AGREEMENT DTD 9/16/2016 | IT AGREEMENT |
| 639 | TOMORROW SLEEP LLC | COGNIZANT TECHNOLOGY SOLUTIONS | IT AGREEMENT DTD 01/01/2017 | IT AGREEMENT |
| 640 | SERTA SIMMONS BEDDING, LLC | COGNIZANT WORLDWIDE | IT AGREEMENT DTD 11/7/2016 | IT AGREEMENT |
| 641 | DREAMWELL, LTD. | COLCHONERIA Y MUEBELERIA LA NACIONAL | AGREEMENT CONFIRMATION DTD 10/22/2015 | LICENSE |
| 642 | DREAMWELL, LTD. | COLCHONERIA Y MUEBELERIA LA NACIONAL | AGREEMENT CONFIRMATION DTD 10/25/2010 | LICENSE |
| 643 | DREAMWELL, LTD. | COLCHONERIA Y MUEBELERIA LA NACIONAL | AMENDED AND RESTATED TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT 09/01/2007 | LICENSE |
| 644 | SIMMONS BEDDING COMPANY, LLC | COLCHONERIA Y MUEBELERIA LA NACIONAL | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 645 | SIMMONS BEDDING COMPANY, LLC | COLCHONERIA Y MUEBELERIA LA NACIONAL | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 646 | DREAMWELL, LTD. | COLCHONES DEL MUNDO SPA | TRADEMARK LICENSE AGREEMENT 01/01/2021 | LICENSE |
| 647 | SERTA SIMMONS BEDDING, LLC | COLCHONES WENDY, S.A. | LICENSE AGREEMENT DTD 11/1/2021 | LICENSE AGREEMENT |
| 648 | SERTA SIMMONS BEDDING, LLC | COLORADO COUNTRY STYLE LTD | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 649 | SIMMONS BEDDING COMPANY, LLC | COMERCIALIZADORA SIMMONS SA DE CV | PATENT AND TECHNOLOGY LICENSE AGREEMENT DTD 5/21/1990 | LICENSE |
| 650 | SERTA SIMMONS BEDDING, LLC | COMFORT COLLECTIVE LLC | CO-OP ADVERTISING AGREEMENT DTD 1/31/2023 | SALES AGREEMENTS |
| 651 | SERTA SIMMONS BEDDING, LLC | COMFORT COLLECTIVE LLC | AUTHORIZED DEALER AGREEMENT DTD 1/31/2023 | SALES AGREEMENTS |
| 652 | SERTA SIMMONS BEDDING, LLC | COMFORT SYSTEMS (2007) LTD | MEMORANDUM OF UNDERSTANDING DTD 11/16/2018 | LICENSE |
| 653 | DREAMWELL, LTD. | COMFORT SYSTEMS (2007) LTD | TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT 08/01/2007 | LICENSE |
| 654 | SIMMONS BEDDING COMPANY, LLC | COMFORT SYSTEMS (2007) LTD | TECHNICAL SERVICES AGREEMENT 08/01/2007 | LICENSE |
| 655 | SIMMONS BEDDING COMPANY, LLC | COMFORT SYSTEMS (2007) LTD | SALE AND SECURITY AGREEMENT DTD 12/15/2008 | LICENSE |
| 656 | SIMMONS BEDDING COMPANY, LLC | COMFORT SYSTEMS LTD. | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 657 | SERTA SIMMONS BEDDING, LLC | COMFORT WORLD INTERNATIONAL | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 658 | SSB MANUFACTURING COMPANY | COMPANIA INDUSTRIAL CONTINENTAL SAC | TECHNICAL SERVICES AGREEMENT  01/01/2022 | LICENSE |
| 659 | DREAMWELL, LTD. | COMPANIA INDUSTRIAL CONTINENTAL SAC | PATENT AND TRADEMARK LICENSE AGREEMENT 01/01/2022 | LICENSE |
| 660 | SSB MANUFACTURING COMPANY | COMPANIA INDUSTRIAL CONTINENTAL SAC | TECHNICAL SERVICES AGREEMENT 01/01/2022 | LICENSE |
| 661 | SIMMONS BEDDING COMPANY, LLC | COMPANIA SIMMONS SA DE CV | TRADEMARK LICENSE AGREEMENT 05/21/1990 | LICENSE |
| 662 | SIMMONS BEDDING COMPANY, LLC | COMPANIA SIMMONS SA DE CV | PATENT AND TRADEMARK LICENSE AGREEMENT 05/21/1990 | LICENSE |
| 663 | SIMMONS BEDDING COMPANY, LLC | COMPANIA SIMMONS SA DE CV | PATENT AND TRADEMARK LICENSE AGREEMENT 05/21/1990 | LICENSE |
| 664 | SIMMONS BEDDING COMPANY, LLC | COMPANIA SIMMONS SA DE CV | TRADEMARK LICENSE AGREEMENT 05/21/1990 | LICENSE |
| 665 | SERTA SIMMONS BEDDING, LLC | COMPUTER AID INC | SERVICENOW IMPLEMENTATION | IT AGREEMENT |
| 666 | SERTA SIMMONS BEDDING, LLC | CONCUR TECHNOLOGIES INC | ORDER FORM #2021-1214446 5 DTD 10/22/2021 | FINANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 667 | SERTA SIMMONS BEDDING, LLC | CONCUR TECHNOLOGIES INC | IT AGREEMENT DTD 9/25/2014 | IT AGREEMENT |
| 668 | SERTA SIMMONS BEDDING, LLC | CONCUR TECHNOLOGIES INC | ORDER FORM  DTD 1/13/2023 | FINANCE |
| 669 | SERTA SIMMONS BEDDING, LLC | CONCUR TECHNOLOGIES INC | ORDER FORM #2022-1383046 3 DTD 10/5/2022 | FINANCE |
| 670 | SERTA SIMMONS BEDDING, LLC | CONCUR TECHNOLOGIES INC | ORDER FORM #2022-1380363 3 DTD 10/1/2022 | FINANCE |
| 671 | SERTA SIMMONS BEDDING, LLC | CONCUR TECHNOLOGIES INC | ORDER FORM #2021-1221731 10 DTD 11/1/2021 | FINANCE |
| 672 | SERTA SIMMONS BEDDING, LLC | CONFIGURE TEK, INC. | IT AGREEMENT DTD 11/17/2017 | IT AGREEMENT |
| 673 | SERTA SIMMONS BEDDING, LLC | CONNECTICUT MATTRESS (AKA) CT MATTRESS | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/1/2020 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 674 | SERTA SIMMONS BEDDING, LLC | CONNS APPLIANCES INC | SALES/RETAILER AGREEMENT DTD 6/30/2022 | SALES/RETAILER AGREEMENTS |
| 675 | SERTA SIMMONS BEDDING, LLC | CONN'S HOMEPLUS | SALES/RETAILER AGREEMENT DTD 1/1/2021 | SALES/RETAILER AGREEMENTS |
| 676 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | CONSUMERS DIGEST | ADVERTISING/MARKETING AGREEMENT DTD 2/24/2018 | ADVERTISING/MARKETING AGREEMENT |
| 677 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | CONSUMERS DIGEST | ADVERTISING/MARKETING AGREEMENT DTD 2/24/2018 | ADVERTISING/MARKETING AGREEMENT |
| 678 | SERTA SIMMONS BEDDING, LLC | CONTEMPORARY ENERGY SOLUTIONS (CES) | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 11/3/2021 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |
| 679 | SERTA SIMMONS BEDDING, LLC | CONTINUUM MARKETING SERVICES LLC | SOW POP & MARKETING PRINT MANAGED SERVICES DTD 12/17/2021 | INDIRECT SUPPLIER |
| 680 | SERTA SIMMONS BEDDING, LLC | CONTINUUM MARKETING SERVICES LLC | MASTER SERVICES AGREEMENT 12/17/2021 | INDIRECT SUPPLIER |
| 681 | SERTA SIMMONS BEDDING, LLC | CONTRACTOR EXTENSION- MOUNZER | CONSULTANT AGREEMENT | CONSULTANT AGREEMENT |
| 682 | SIMMONS BEDDING COMPANY, LLC | CONVERGENCE CONSULTING GROUP INC | END CUSTOMER FUNDS STATEMENT OF WORK DTD 4/17/2020 | CONSULTING |
| 683 | SERTA SIMMONS BEDDING, LLC | COOK'S HOME FURNITURE & BEDDING INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 684 | SERTA SIMMONS BEDDING, LLC | COOK'S HOME FURNITURE & BEDDING INC | CO-OP ADVERTISING AGREEMENT DTD 7/7/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 685  SERTA SIMMONS BEDDING, LLC | COOK'S HOME FURNITURE & BEDDING INC | AUTHORIZED DEALER AGREEMENT DTD 7/7/2022 | SALES AGREEMENTS |
| 686  SERTA SIMMONS BEDDING, LLC | CORBAN CONSULTING LLC | CONSULTING AGREEEMNT DTD 1/1/2016 | CONSULTING |
| 687  SERTA SIMMONS BEDDING, LLC | CORBAN CONSULTING LLC | CONSULTING AGREEEMNT DTD 6/1/2015 | CONSULTING |
| 688  SERTA SIMMONS BEDDING, LLC | CORPORACION DREAM REST DE VENEZUELA, CA | TRADEMARK LICENSE AGREEMENT DTD 1/1/2019 | TRADEMARK LICENSE AGREEMENT |
| 689  DREAMWELL, LTD. | CORPORACION SICORPMATTRESS SA | TECHNOLOGY & TRADEMARK LICENSE AGREEMENT 10/23/2018 | LICENSE |
| 690  SSB MANUFACTURING COMPANY | CORPORACION SICORPMATTRESS SA | TECHNICAL SERVICES AGREEMENT 10/23/2018 | LICENSE |
| 691  SERTA SIMMONS BEDDING, LLC | CORPORATE RISK SOLUTIONS LLC | ENGAGEMENT LETTER DTD 10/29/2022 DTD 10/29/2022 | INSURANCE |
| 692  SERTA SIMMONS BEDDING, LLC | COSERVE GLOBAL SOLUTIONS | IT AGREEMENT DTD 2/12/2018 | IT AGREEMENT |
| 693  SIMMONS BEDDING COMPANY, LLC | COSTCO (US) | SALES/RETAILER AGREEMENT DTD 10/1/2022 | SALES/RETAILER AGREEMENTS |
| 694  SERTA SIMMONS BEDDING, LLC | COSTCO WHOLESALE CORPORATION | BASIC SUPPLIER AGREEMENT DTD 9/25/2019 | CUSTOMER CONTRACT |
| 695  SERTA SIMMONS BEDDING, LLC | COUNTRY PLACE MINISTRIES | AUTHORIZED DEALER AGREEMENT DTD 10/30/2022 | SALES AGREEMENTS |
| 696  SERTA SIMMONS BEDDING, LLC | COUNTRY PLACE MINISTRIES | CO-OP ADVERTISING AGREEMENT DTD 10/30/2022 | SALES AGREEMENTS |
| 697  SERTA SIMMONS BEDDING, LLC | COZY HOME FURNITURE (AKA) MSH NY, LLC | SALES/RETAILER AGREEMENT DTD 10/27/2022 | SALES/RETAILER AGREEMENTS |
| 698  SSB MANUFACTURING COMPANY | CP RYAN WINDSOR LOCKS LLC | INDUSTRIAL LEASE DTD 11/24/2015 FOR 140 OLD COUNTY CIRCLE, WINDSOR LOCKS, CT | REAL ESTATE LEASES |
| 699  SERTA SIMMONS BEDDING, LLC | CP RYAN WINDSOR LOCKS LLC | GUARANTY FOR FOR 140 OLD COUNTY CIRCLE, WINDSOR LOCKS, CT | REAL ESTATE LEASES |
| 700  SIMMONS BEDDING COMPANY, LLC | CREATIVE CIRCLE | RECRUITMENT AGREEMENT | HUMAN RESOURCES |
| 701  SERTA SIMMONS BEDDING, LLC | CREG DAMRON FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 10/10/2022 | SALES AGREEMENTS |
| 702  SERTA SIMMONS BEDDING, LLC | CREG DAMRON FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 10/10/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 703 | SERTA SIMMONS BEDDING, LLC | CROWN EQUIPMENT CORPORATION | EQUIPMENT PURCHASE/MASTER LEASE AGREEMENT DTD 7/1/2016 | EQUIPMENT PURCHASE/LEASE AGREEMENT |
| 704 | SERTA SIMMONS BEDDING, LLC | CROWN PACKAGING CORP | SUPPLY AGREEMENT  12/15/2020 | DIRECT SUPPLIER |
| 705 | SERTA SIMMONS BEDDING, LLC | CROWN PACKAGING CORP | SUPPLY/PURCHASE AGREEMENT DTD 12/15/2020 | SUPPLY/PURCHASE AGREEMENT |
| 706 | SSB MANUFACTURING COMPANY | CRP/TCC TOLLESON OWNER LLC | MULTI-TENANT TRIPLE NET LEASE AGREEMENT AT 200 N 99TH AVE, TOLLESON AZ | REAL ESTATE LEASES |
| 707 | SSB MANUFACTURING COMPANY | CRP/TCC TOLLESON OWNER LLC | MULTI-TENANT TRIPLE NET LEASE AGREEMENT AT 200 N 99TH AVE, TOLLESON AZ | REAL ESTATE LEASES |
| 708 | SERTA SIMMONS BEDDING, LLC | CSC NAVIGATOR CORPORATE ENTITY MGMT TOOL | IT AGREEMENT DTD 9/27/2019 | IT AGREEMENT |
| 709 | SERTA SIMMONS BEDDING, LLC | CT-NASSAU CORPORATION | SUPPLY/PURCHASE AGREEMENT DTD 1/24/2019 | SUPPLY/PURCHASE AGREEMENT |
| 710 | NATIONAL BEDDING COMPANY L.L.C. | CULLEN'S HOME CENTER | SUPPLY AGREEMENT DTD 10/31/2007 | SALES AGREEMENTS |
| 711 | NATIONAL BEDDING COMPANY L.L.C. | CULLEN'S HOME CENTER | SUPPLY AGREEMENT DTD 10/31/2007 | SALES AGREEMENTS |
| 712 | SERTA SIMMONS BEDDING, LLC | CULP INC | SUPPLY/PURCHASE AGREEMENT DTD 3/13/2018 | SUPPLY/PURCHASE AGREEMENT |
| 713 | SERTA SIMMONS BEDDING, LLC | CULP INC | SUPPLY AGREEMENT  04/15/2022 | DIRECT SUPPLIER |
| 714 | SERTA SIMMONS BEDDING, LLC | CULP INC | LIVEFURNISH SOFTWARE AMENDMENT DTD 12/15/2022 | OPERATIONS/PLANT AGREEMENT |
| 715 | SERTA SIMMONS BEDDING, LLC | CUMBERLAND GROUP | SERVICES AGREEMENT | IT AGREEMENT |
| 716 | SERTA SIMMONS BEDDING, LLC | CUMBERLAND GROUP | IT AGREEMENT DTD 6/29/2020 | IT AGREEMENT |
| 717 | SERTA SIMMONS BEDDING, LLC | CUMBERLAND MATTRESS OUTLET | CO-OP ADVERTISING AGREEMENT DTD 2/15/2023 | SALES AGREEMENTS |
| 718 | SERTA SIMMONS BEDDING, LLC | CUMBERLAND MATTRESS OUTLET | AUTHORIZED DEALER AGREEMENT DTD 2/15/2023 | SALES AGREEMENTS |
| 719 | SERTA SIMMONS BEDDING, LLC | CUSTOM FUNDRAISING SOLS OF MIDDLE TN | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 720 | SERTA SIMMONS BEDDING, LLC | CUSTOM FUNDRAISING SOLS OF MIDDLE TN | AUTHORIZED DEALER AGREEMENT DTD 4/11/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 721 | SERTA SIMMONS BEDDING, LLC | CYBERGRX, INC. | IT AGREEMENT DTD 2/12/2019 | IT AGREEMENT |
| 722 | NATIONAL BEDDING COMPANY L.L.C. | D L & L ENTERPRISES INC | SUPPLY AGREEMENT DTD 10/3/2016 | SALES AGREEMENTS |
| 723 | NATIONAL BEDDING COMPANY L.L.C. | DANA FLETCHER LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/9/2016 | SALES AGREEMENTS |
| 724 | NATIONAL BEDDING COMPANY L.L.C. | DANA FLETCHER LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/9/2016 | SALES AGREEMENTS |
| 725 | SERTA SIMMONS BEDDING, LLC | DANCO MODERN INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 726 | SERTA SIMMONS BEDDING, LLC | DANCO MODERN INC | CO-OP ADVERTISING AGREEMENT DTD 6/23/2022 | SALES AGREEMENTS |
| 727 | SERTA SIMMONS BEDDING, LLC | DARVIN FURNITURE | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |
| 728 | SERTA SIMMONS BEDDING, LLC | DASSAULT SYSTEMS SOLIDWORKS CORP | IT AGREEMENT DTD 4/23/2021 | RESEARCH AND INNOVATION |
| 729 | SERTA SIMMONS BEDDING, LLC | DASSAULT SYSTEMS SOLIDWORKS CORP | AGREEMENT TO CONVERT SINGLE-USER LICENSES TO SOLIDNETWORK LICENSES DTD 4/23/2021 | INNOVATION-TRANSFORMATION |
| 730 | SERTA SIMMONS BEDDING, LLC | DAUGHERTY BUSINESS SOLUTIONS | CONSULTANT AGREEMENT DTD 2/1/2017 | CONSULTANT AGREEMENT |
| 731 | SERTA SIMMONS BEDDING, LLC | DAUGHERTY BUSINESS SOLUTIONS | CONSULTANT AGREEMENT DTD 11/7/2017 | CONSULTANT AGREEMENT |
| 732 | SERTA SIMMONS BEDDING, LLC | DAUGHERTY BUSINESS SOLUTIONS | IT AGREEMENT DTD 2/1/2017 | IT AGREEMENT |
| 733 | SERTA SIMMONS BEDDING, LLC | DAUGHERTY SYSTEMS, INC. | IT AGREEMENT DTD 02/01/2017 | IT AGREEMENT |
| 734 | SERTA SIMMONS BEDDING, LLC | DAYSPRING INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 735 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | DEEP SLEEP INC DBA AMERICAS MATTRESS | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 9/1/2020 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 736 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | DEEP SLEEP INC DBA AMERICAS MATTRESS | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 9/1/2020 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 737 | SERTA SIMMONS BEDDING, LLC | DEETS FURNITURE INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 738 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | DEETS FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 2/8/2020 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 739 | SERTA SIMMONS BEDDING, LLC | DELL SECUREWORKS, INC. | IT AGREEMENT DTD 7/7/2015 | IT AGREEMENT |
| 740 | SERTA SIMMONS BEDDING, LLC | DELOITTE CONSULTING LLP | CONSULTANT AGREEMENT DTD 2/9/2015 | CONSULTANT AGREEMENT |
| 741 | SERTA SIMMONS BEDDING, LLC | DELTA - KLM - AIRFRANCE AIRLINES | COMPANY WIDE AGREEMENT DTD 9/1/2016 | COMPANY WIDE AGREEMENT |
| 742 | SERTA SIMMONS BEDDING, LLC | DELTA BUILDING SUPPLY | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 743 | DREAMWELL, LTD. | DELTA ENTERPRISE CORP | TRADEMARK LICENSE AGREEMENT 12/23/2004 | LICENSE |
| 744 | SERTA SIMMONS BEDDING, LLC | DEMANDWARE LLC | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 745 | SERTA SIMMONS BEDDING, LLC | DESIGN FURNITURE & LAB SYSTEMS INC | AUTHORIZED DEALER AGREEMENT DTD 1/25/2023 | SALES AGREEMENTS |
| 746 | SERTA SIMMONS BEDDING, LLC | DIRECT LINE TELE RESPONSE | HR AGREEMENT DTD 2/21/2017 | HR AGREEMENT |
| 747 | NATIONAL BEDDING COMPANY L.L.C. | DIRECT MATAG INC | SUPPLY AGREEMENT  DTD 5/20/2013 | SALES AGREEMENTS |
| 748 | SERTA SIMMONS BEDDING, LLC | DIRECTIONS RESEARCH INC | CONSUMER INSIGHTS AGREEMENT | CONSUMER INSIGHTS |
| 749 | SERTA SIMMONS BEDDING, LLC | DIVERSIFIED | MASTER SERVICE AGREEMENT DTD 10/24/2018 | IT AGREEMENT |
| 750 | SERTA SIMMONS BEDDING, LLC | DIXIE D'AMELIO LLC | LICENSE AND PROMOTION AGREEMENT 6/22/2020 | LICENSE |
| 751 | SERTA SIMMONS BEDDING, LLC | DIXON & DIXON AUCTION SERVICES LLC | CO-OP ADVERTISING AGREEMENT DTD 12/14/2022 | SALES AGREEMENTS |
| 752 | SERTA SIMMONS BEDDING, LLC | DIXON & DIXON AUCTION SERVICES LLC | AUTHORIZED DEALER AGREEMENT DTD 12/14/2022 | SALES AGREEMENTS |
| 753 | SERTA SIMMONS BEDDING, LLC | DIZMOND BIZ INC | AUTHORIZED DEALER AGREEMENT DTD 2/24/2022 | SALES AGREEMENTS |
| 754 | SERTA SIMMONS BEDDING, LLC | DIZMOND BIZ INC | AUTHORIZED DEALER AGREEMENT DTD 2/24/2022 | SALES AGREEMENTS |
| 755 | SERTA SIMMONS BEDDING, LLC | DIZMOND BIZ INC | CO-OP ADVERTISING AGREEMENT DTD 2/24/2022 | SALES AGREEMENTS |
| 756 | SERTA SIMMONS BEDDING, LLC | DMS SALES INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 757 | SERTA SIMMONS BEDDING, LLC | DOCUSIGN INC | QUOTE #00833658 | IT AGREEMENT |
| 758 | NATIONAL BEDDING COMPANY L.L.C. | DOOR COUNTY COOP | SUPPLY AGREEMENT  DTD 4/2/2013 | SALES AGREEMENTS |
| 759 | SERTA SIMMONS BEDDING, LLC | DORAVILLE SIXTY LLC | LETTER OF UNDERSTANDING DTD 6/16/2017 | REAL ESTATE LEASES |
| 760 | SERTA SIMMONS BEDDING, LLC | DORAVILLE SIXTY LLC | LETTER OF UNDERSTANDING DTD 6/16/2017 | REAL ESTATE LEASES |
| 761 | NATIONAL BEDDING COMPANY L.L.C. | DOUBLE EAGLE RETAIL PARTNERS | SUPPLY AGREEMENT DTD 3/30/2010 | SALES AGREEMENTS |
| 762 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | DREAM HAVEN GALLERY | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 6/7/2016 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 763 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | DREAM HAVEN GALLERY | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 6/7/2016 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 764 | SIMMONS BEDDING COMPANY, LLC | DREAMWELL LTD | RESEARCH AND DEVELOPMENT AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 765 | SIMMONS BEDDING COMPANY, LLC | DREAMWELL LTD | RESEARCH AND DEVELOPMENT AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 766 | THE SIMMONS MANUFACTURING CO., LLC | DREAMWELL LTD | SIMMONS US LICENSE AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 767 | THE SIMMONS MANUFACTURING CO., LLC | DREAMWELL LTD | LICENSE AGREEMENT DTD 1/29/2007 | INTERCOMPANY AGREEMENT |
| 768 | THE SIMMONS MANUFACTURING CO., LLC | DREAMWELL LTD | SIMMONS US LICENSE AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 769 | THE SIMMONS MANUFACTURING CO., LLC | DREAMWELL LTD | LICENSE AGREEMENT DTD  12/29/2001SIMMONS US LICENSE AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 770 | SERTA SIMMONS BEDDING, LLC | DREES ELECTRIC INC | CO-OP ADVERTISING AGREEMENT DTD 10/3/2022 | SALES AGREEMENTS |
| 771 | SERTA SIMMONS BEDDING, LLC | DREES ELECTRIC INC | AUTHORIZED DEALER AGREEMENT DTD 10/3/2022 | SALES AGREEMENTS |
| 772 | TUFT & NEEDLE, LLC | DROPBOX | ORDER FORM  DTD 5/2/2022 | IT AGREEMENT |
| 773 | SERTA SIMMONS BEDDING, LLC | DUCHARME MCMILLEN & ASSOCIATES INC | CONSULTANT AGREEMENT DTD 5/20/2022 | CONSULTANT AGREEMENT |
| 774 | SERTA SIMMONS BEDDING, LLC | DUCHARME MCMILLEN & ASSOCIATES INC | MASTER PROFESSIONAL SERVICES AGREEMENT DTD 7/21/2022 | TAX - VENDOR |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 775 | SERTA SIMMONS BEDDING, LLC | DUCHARME MCMILLEN & ASSOCIATES INC | CONSULTANT AGREEMENT DTD 7/21/2022 | CONSULTANT AGREEMENT |
| 776 | SERTA SIMMONS BEDDING, LLC | DUNNETT INC | AUTHORIZED DEALER AGREEMENT DTD 9/30/2022 | SALES AGREEMENTS |
| 777 | SERTA SIMMONS BEDDING, LLC | DUNNETT INC | CO-OP ADVERTISING AGREEMENT DTD 9/30/2022 | SALES AGREEMENTS |
| 778 | SERTA SIMMONS BEDDING, LLC | DUROCHER, FRANCOIS | CONSULTING AGREEMENT DTD 9/9/2022 | CUSTOMER OPS AND OPERATIONS |
| 779 | NATIONAL BEDDING COMPANY L.L.C. | DUSTIN SCHIDT CORPORATION | SUPPLY AGREEMENT  DTD 11/12/2007 | SALES AGREEMENTS |
| 780 | NATIONAL BEDDING COMPANY L.L.C. | DUSTIN SCHIDT CORPORATION | SECURITY AGREEMENT DTD 11/12/2007 | SALES AGREEMENTS |
| 781 | SERTA SIMMONS BEDDING, LLC | DYNATA LLC | MASTER SERVICES AGREEMENT FOR RESEARCH SERVICES DTD 6/29/2022 | CONSUMER INSIGHT |
| 782 | SERTA SIMMONS BEDDING, LLC | E MILLER LLC | AUTHORIZED DEALER AGREEMENT DTD 2/2/2022 | SALES AGREEMENTS |
| 783 | SERTA SIMMONS BEDDING, LLC | E MILLER LLC | CO-OP ADVERTISING AGREEMENT DTD 2/2/2022 | SALES AGREEMENTS |
| 784 | SERTA SIMMONS BEDDING, LLC | E&E CO LTD | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 785 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | E&E CO. LTD. D/B/A/ JLA HOME | LICENSE AGREEMENT DTD 1/1/2023 | LICENSE AGREEMENT |
| 786 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | E&E CO. LTD. D/B/A/ JLA HOME | LICENSE AGREEMENT DTD 1/1/2023 | LICENSE AGREEMENT |
| 787 | SERTA SIMMONS BEDDING, LLC | EBCO TRENDS LLC | CONSUMER INSIGHTS AGREEMENT | CONSUMER INSIGHTS |
| 788 | SERTA SIMMONS BEDDING, LLC | EBCO TRENDS LLC | STATEMENT OF WORK DTD 12/1/2022 | CONSUMER INSIGHTS |
| 789 | SERTA SIMMONS BEDDING, LLC | ECHO GLOBAL LOGISTICS | TRANSPORTATION/LOGISTICS AGREEMENT DTD 1/4/2017 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 790 | SERTA SIMMONS BEDDING, LLC | ECOVA, INC. | INDIRECT SPEND AGREEMENT DTD 12/20/2017 | INDIRECT SPEND AGREEMENT |
| 791 | SERTA SIMMONS BEDDING, LLC | EDDIE'S FURNITURE & APPLIANCE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 792 | SERTA SIMMONS BEDDING, LLC | EGON ZEHNDER INTERNATIONAL INC | PROPOSAL DTD 11/21/2022 | HUMAN RESOURCES |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 793 | TUFT & NEEDLE, LLC | EHOUSE STUDIO LLC | OUTSOURCING AGREEMENT DTD 2/10/2022 | IT |
| 794 | SERTA SIMMONS BEDDING, LLC | EKAHAU INC | RENEWAL QUOTE #00046521 DTD 4/27/2022 | IT AGREEMENT |
| 795 | SERTA SIMMONS BEDDING, LLC | ELEGANT FURNITURE INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 796 | SERTA SIMMONS BEDDING, LLC | ELEGANT FURNITURE INC | AUTHORIZED DEALER AGREEMENT | SALES AGREEMENTS |
| 797 | TUFT & NEEDLE, LLC | ELEVAR | ADVERTISING/MARKETING - DTC DTD 1/15/2023 | MARKETING |
| 798 | SERTA SIMMONS BEDDING, LLC | ELITE COMFORT SOLUTIONS LLC | LICENSE AGREEMENT DTD 1/1/2023 | LICENSE AGREEMENT |
| 799 | DREAMWELL, LTD. | ELITE COMFORT SOLUTIONS LLC | TRADEMARK LICENSE AGREEMENT 06/01/2020 | LICENSE |
| 800 | SERTA SIMMONS BEDDING, LLC | ELITE HOME FURNISHINGS & DECOR | CO-OP ADVERTISING AGREEMENT DTD 2/9/2023 | SALES AGREEMENTS |
| 801 | SERTA SIMMONS BEDDING, LLC | ELITE HOME FURNISHINGS & DECOR | AUTHORIZED DEALER AGREEMENT DTD 2/9/2023 | SALES AGREEMENTS |
| 802 | SERTA SIMMONS BEDDING, LLC | EMC2 CORPORATION | IT AGREEMENT | IT AGREEMENT |
| 803 | DAWN INTERMEDIATE, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 804 | DREAMWELL, LTD. | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 805 | NATIONAL BEDDING COMPANY L.L.C. | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 806 | SERTA INTERNATIONAL HOLDCO, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 807 | SERTA SIMMONS BEDDING, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 808 | SIMMONS BEDDING COMPANY, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 809 | SSB HOSPITALITY, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 810 | SSB LOGISTICS, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 811  SSB MANUFACTURING COMPANY | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 812  SSB RETAIL, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 813  THE SIMMONS MANUFACTURING CO., LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 814  TOMORROW SLEEP LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 815  TUFT & NEEDLE, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 816  WORLD OF SLEEP OUTLETS, LLC | ENDURANCE AMERICAN SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (ARP30025827000) | INSURANCE |
| 817  DAWN INTERMEDIATE, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 818  DREAMWELL, LTD. | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 819  NATIONAL BEDDING COMPANY L.L.C. | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 820  SERTA INTERNATIONAL HOLDCO, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 821  SERTA SIMMONS BEDDING, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 822  SIMMONS BEDDING COMPANY, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 823  SSB HOSPITALITY, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 824  SSB LOGISTICS, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 825  SSB MANUFACTURING COMPANY | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 826  SSB RETAIL, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 827  THE SIMMONS MANUFACTURING CO., LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 828  TOMORROW SLEEP LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 829 TUFT & NEEDLE, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 830 WORLD OF SLEEP OUTLETS, LLC | ENDURANCE SPECIALTY INSURANCE LTD. | PROPERTY INSURANCE AGREEMENT (BPD3000037550) | INSURANCE |
| 831 NATIONAL BEDDING COMPANY L.L.C. | ENERGY CENTER INC, THE | SUPPLY AGREEMENT DTD 3/25/2013 | SALES AGREEMENTS |
| 832 SERTA SIMMONS BEDDING, LLC | ENVIRONMENTAL COMFORT LLC | PROPOSAL DTD 2/3/2023 | IT AGREEMENT |
| 833 SERTA SIMMONS BEDDING, LLC | ERGOMOTION INC | SUPPLY AGREEMENT  09/01/2015 | DIRECT SUPPLIER |
| 834 SERTA SIMMONS BEDDING, LLC | ERI ECONOMIC RESEARCH INSTITUTE INC | SERVICES AGREEMENT | HUMAN RESOURCES |
| 835 SERTA SIMMONS BEDDING, LLC | ERNST & YOUNG LLP | IT AGREEMENT DTD 09/05/2019 | IT AGREEMENT |
| 836 SERTA SIMMONS BEDDING, LLC | ERNST & YOUNG LLP | LETTER OF AGREEMENT AND TERMS LETTER DTD 10/3/2018 | INDIRECT SUPPLIER |
| 837 SERTA SIMMONS BEDDING, LLC | ERNST & YOUNG LLP | IT AGREEMENT DTD 1/31/2022 | IT AGREEMENT |
| 838 SERTA SIMMONS BEDDING, LLC | ERNST & YOUNG LLP | STATEMENT OF WORK DTD 1/29/2022 | CONSULTING |
| 839 SERTA SIMMONS BEDDING, LLC | ERNST & YOUNG LLP | CONSULTANT AGREEMENT DTD 09/01/2019 | CONSULTANT AGREEMENT |
| 840 SERTA SIMMONS BEDDING, LLC | ETQ LLC | MASTER SUBSCRIPTION AGREEMENT | IT AGREEMENT |
| 841 SERTA SIMMONS BEDDING, LLC | ETQ MANAGEMENT CONSULTANTS INC | SUBSCRIPTION AGREEMENT | MARKETING |
| 842 SERTA SIMMONS BEDDING, LLC | EVERCORE GROUP, LLC | CONSULTANT AGREEMENT DTD 4/20/2020 | CONSULTANT AGREEMENT |
| 843 SERTA SIMMONS BEDDING, LLC | EVERGAGE LLC | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 844 SSB MANUFACTURING COMPANY | EVERSOURCE | PLANT/SERVICES AGREEMENT DTD 2/3/2021 | PLANT/SERVICES AGREEMENTS |
| 845 SSB MANUFACTURING COMPANY | EVERSOURCE | PLANT/SERVICES AGREEMENT DTD 2/3/2021 | PLANT/SERVICES AGREEMENTS |
| 846 NATIONAL BEDDING COMPANY L.L.C. | EVERYDAY MATTRESS LLC | SUPPLY AGREEMENT DTD 7/15/2016 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 847 | SERTA SIMMONS BEDDING, LLC | EXCLUSIVE FURNITURE | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |
| 848 | SERTA SIMMONS BEDDING, LLC | EXPRESS HOME DIRECT | AUTHORIZED DEALER AGREEMENT DTD 1/3/2023 | SALES AGREEMENTS |
| 849 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | EXXEL OUTDOOR, LLC | LICENSE AGREEMENT DTD 1/1/2023 | LICENSE AGREEMENT |
| 850 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | EXXEL OUTDOOR, LLC | LICENSE AGREEMENT DTD 1/1/2023 | LICENSE AGREEMENT |
| 851 | SERTA SIMMONS BEDDING, LLC | FABRICTECH 2000, LLC (DBA) PURECARE | SUPPLY/PURCHASE AGREEMENT DTD 4/26/2021 | SUPPLY/PURCHASE AGREEMENT |
| 852 | SERTA SIMMONS BEDDING, LLC | FAIRCHILD CONSULTING SERVICES LLC | MASTER ORDERING AGREEMENT DTD 11/3/2017 | CONSULTING |
| 853 | SSB MANUFACTURING COMPANY | FALLBROOK PINES PHASE I LLC | LEASE AGREEMENT DTD 2/17/2016 FOR BUILDING 3, FALLBROOK PINES BUSINESS PARK, HARRIS COUNTY TX | REAL ESTATE LEASES |
| 854 | SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | FALLBROOK PINES PHASE I LLC | GUARANTY DTD 2/8/2016 FOR BUILDING 3, FALLBROOK PINES BUSINESS PARK, HARRIS COUNTY TX | REAL ESTATE LEASES |
| 855 | SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | FALLBROOK PINES PHASE I LLC | GUARANTY DTD 2/8/2016 FOR BUILDING 3, FALLBROOK PINES BUSINESS PARK, HARRIS COUNTY TX | REAL ESTATE LEASES |
| 856 | SSB MANUFACTURING COMPANY | FALLBROOK PINES PHASE I LLC | LEASE AGREEMENT DTD 2/17/2016 FOR BUILDING 3, FALLBROOK PINES BUSINESS PARK, HARRIS COUNTY TX | REAL ESTATE LEASES |
| 857 | NATIONAL BEDDING COMPANY L.L.C. | FALLER, GREGORY A | SUPPLY AGREEMENT  DTD 4/1/2015 | SALES AGREEMENTS |
| 858 | SERTA SIMMONS BEDDING, LLC | FDMS/CLOVER | IT AGREEMENT DTD 7/16/2022 | IT AGREEMENT |
| 859 | SIMMONS BEDDING COMPANY, LLC | FEDERAL EXPRESS CORPORATION | FEDEX PRICING AGREEMENT #2178971 | INDIRECT SUPPLIER |
| 860 | DAWN INTERMEDIATE, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 861 | DREAMWELL, LTD. | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 862 | NATIONAL BEDDING COMPANY L.L.C. | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 863 | SERTA INTERNATIONAL HOLDCO, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 864 | SERTA SIMMONS BEDDING, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 865  SIMMONS BEDDING COMPANY, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 866  SSB HOSPITALITY, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 867  SSB LOGISTICS, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 868  SSB MANUFACTURING COMPANY | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 869  SSB RETAIL, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 870  THE SIMMONS MANUFACTURING CO., LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 871  TOMORROW SLEEP LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 872  TUFT & NEEDLE, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 873  WORLD OF SLEEP OUTLETS, LLC | FEDERAL INSURANCE COMPANY | PROFESSIONAL LIABILITY INSURANCE AGREEMENT (POLICY #: 8260-2383) | INSURANCE |
| 874  SIMMONS BEDDING COMPANY, LLC | FEDEX FREIGHT WEST INC | TRANSPORATION CONTRACT 03/01/2004 | INDIRECT SUPPLIER |
| 875  SIMMONS BEDDING COMPANY, LLC | FEDEX GROUND PACKAGE SYSTEM INC | FEDEX AGREEMENT #2178971 | INDIRECT SUPPLIER |
| 876  NATIONAL BEDDING COMPANY L.L.C. | FEEL GOOD FLOORZ INC | SUPPLY AGREEMENT DTD 2/23/2015 | SALES AGREEMENTS |
| 877  NATIONAL BEDDING COMPANY L.L.C. | FELDKAMP'S HOME FURNISHINGS INC | SUPPLY AGREEMENT  DTD 8/6/2014 | SALES AGREEMENTS |
| 878  SERTA SIMMONS BEDDING, LLC | FERGUSON, BLAKE | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 879  SERTA SIMMONS BEDDING, LLC | FIBER SOLUTIONS | MASTER SERVICE AGREEMENT DTD 9/2/2015 | IT AGREEMENT |
| 880  SERTA SIMMONS BEDDING, LLC | FIBER SOLUTIONS | IT AGREEMENT DTD 9/2/2015 | IT AGREEMENT |
| 881  SERTA SIMMONS BEDDING, LLC | FIBER SOLUTIONS | MASTER SERVICE AGREEMENT DTD 9/2/2015 | IT AGREEMENT |
| 882  SERTA SIMMONS BEDDING, LLC | FIBER SOLUTIONS | MASTER SERVICE AGREEMENT DTD 9/2/2015 | IT AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 883 | SERTA SIMMONS BEDDING, LLC | FIBER SOLUTIONS | MASTER SERVICE AGREEMENT DTD 9/2/2015 | IT AGREEMENT |
| 884 | SERTA SIMMONS BEDDING, LLC | FIBER SOLUTIONS | MASTER SERVICE AGREEMENT DTD 9/2/2015 | IT AGREEMENT |
| 885 | SERTA SIMMONS BEDDING, LLC | FIBER SOLUTIONS | MASTER SERVICE AGREEMENT DTD 9/2/2015 | IT AGREEMENT |
| 886 | SERTA SIMMONS BEDDING, LLC | FIELDS TEXAS LTD. HOLDINGS, LLC | CONSULTANT AGREEMENT DTD 5/11/2018 | CONSULTANT AGREEMENT |
| 887 | SERTA SIMMONS BEDDING, LLC | FIGMA INC | ORDER FORM | MARKETING AGREEMENTS |
| 888 | SERTA SIMMONS BEDDING, LLC | FINNICUM'S FURNITURE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 889 | SERTA SIMMONS BEDDING, LLC | FINNICUM'S FURNITURE | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 890 | SERTA SIMMONS BEDDING, LLC | FINNICUM'S FURNITURE | AUTHORIZED DEALER AGREEMENT | SALES AGREEMENTS |
| 891 | SERTA SIMMONS BEDDING, LLC | FIRE STARTER MEDIA GROUP LLC | MASTER SERVICES AGREEMENT 01/01/2022 | INDIRECT SUPPLIER |
| 892 | SERTA SIMMONS BEDDING, LLC | FIRST DATA MERCHANT SERVICES LLC | SAAS SERVICES AGREEMENT DTD 6/27/2020 | FINANCE |
| 893 | SERTA SIMMONS BEDDING, LLC | FIRST DATA MERCHANT SERVICES LLC | INFORMATION SHARING AGREEMENT | FINANCE |
| 894 | SERTA SIMMONS BEDDING, LLC | FIRST DATA MERCHANT SERVICES LLC | SAAS SERVICES AGREEMENT DTD 6/27/2020 | FINANCE |
| 895 | SERTA SIMMONS BEDDING, LLC | FIRSTPRO INC | RECRUITING SERVICES AGREEMENT DTD 2/15/2016 | HUMAN RESOURCES |
| 896 | SERTA SIMMONS BEDDING, LLC | FIRSTPRO RECRUITMENT | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 1/26/2023 | HR VENDOR AGREEMENT/STAFFING AGREEMENT |
| 897 | SERTA SIMMONS BEDDING, LLC | FIRSTPRO, INC. | HR AGREEMENT DTD 2/15/2016 | HR AGREEMENT |
| 898 | SERTA SIMMONS BEDDING, LLC | FISERV | IT AGREEMENT DTD 06/27/2020 | IT AGREEMENT |
| 899 | DREAMWELL, LTD. | FLEX DO BRASIL LTDA | LETTER AGREEMENT DTD 5/6/2022 | LICENSE |
| 900 | DREAMWELL, LTD. | FLEX DO BRASIL LTDA | LETTER AGREEMENT DTD 8/4/2021 | LICENSE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 901 DREAMWELL, LTD. | FLEX DO BRASIL LTDA | TRADEMARK LICENSE TECHNICAL ASSITANCE & MARKETING AGREEMENT DTD 9/5/2000 | LICENSE |
| 902 DREAMWELL, LTD. | FLEX EQUIPOS DE DESCANSO SA | TRADEMARK LICENSE TECHNICAL ASSITANCE & MARKETING AGREEMENT 09/05/2000 | LICENSE |
| 903 DREAMWELL, LTD. | FLEX EQUIPOS DE DESCANSO SA | TRADEMARK LICENSE TECHNICAL ASSITANCE & MARKETING AGREEMENT 09/05/2000 | LICENSE |
| 904 TUFT & NEEDLE, LLC | FLUENT LLC | ADVERTISING/MARKETING - DTC AGREEMENT | ADVERTISING/MARKETING - DTC |
| 905 SERTA SIMMONS BEDDING, LLC | FOLTZ, DANIEL | AUTHORIZED DEALER AGREEMENT DTD 12/19/2022 | SALES AGREEMENTS |
| 906 SERTA SIMMONS BEDDING, LLC | FOODA, INC. | PLANT/SERVICES AGREEMENT DTD 4/22/2019 | PLANT/SERVICES AGREEMENTS |
| 907 NATIONAL BEDDING COMPANY L.L.C. | FORREST HOME FURNISHINGS INC | SUPPLY AGREEMENT DTD 9/28/2012 | SALES AGREEMENTS |
| 908 SERTA SIMMONS BEDDING, LLC | FORUM GROUP, THE | RECRUITING SERVICES AGREEEMNT DTD 8/29/2022 | IT AGREEMENT |
| 909 SERTA SIMMONS BEDDING, LLC | FOURKITES | TRANSPORTATION/LOGISTICS AGREEMENT DTD 10/30/2022 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 910 SSB LOGISTICS, LLC | FOURKITES INC | TRANSPORTATION/LOGISTICS AGREEMENT DTD 10/3/2019 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 911 DREAMWELL, LTD. | FRANCE BEDDING GROUP | TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT DTD 9/30/2016 | LICENSE |
| 912 SERTA SIMMONS BEDDING, LLC | FRANCOIS DUROCHER | EMPLOYMENT MATTERS AGREEMENT | EMPLOYMENT MATTERS |
| 913 SERTA SIMMONS BEDDING, LLC | FRANKLIN COVEY | CONSULTANT AGREEMENT DTD 10/17/2022 | CONSULTANT AGREEMENT |
| 914 NATIONAL BEDDING COMPANY L.L.C. | FRED LAFERRIERE'S HOME DECORATING INC | SUPPLY AGREEMENT DTD 4/22/2015 | SALES AGREEMENTS |
| 915 SERTA SIMMONS BEDDING, LLC | FRONT RANGE UNIQUE FUNDRAISING | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 916 SERTA SIMMONS BEDDING, LLC | FRUGAL FURNITURE | AUTHORIZED DEALER AGREEMNT DTD 5/17/2022 | SALES AGREEMENTS |
| 917 SERTA SIMMONS BEDDING, LLC | FRUGAL FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 5/16/2022 | SALES AGREEMENTS |
| 918 SERTA SIMMONS BEDDING, LLC | FUELCOMM INC | ORDER FORM DTD 12/20/2022 | SALES |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 919 | SERTA SIMMONS BEDDING, LLC | FUELCOMM INC | DTC CONTRACTS AGREEMENT | DTC CONTRACTS |
| 920 | TUFT & NEEDLE, LLC | FUNNEL INC | PURCHASE ORDER | INDIRECT SUPPLIER |
| 921 | TUFT & NEEDLE, LLC | FUNNEL INC | ADVERTISING/MARKETING AGREEMENT DTD 4/15/2021 | ADVERTISING/MARKETING AGREEMENT |
| 922 | SERTA SIMMONS BEDDING, LLC | FURNITURE & DECOR LLC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 923 | SERTA SIMMONS BEDDING, LLC | FURNITURE & DECOR LLC | AUTHORIZED DEALER AGREEMENT DTD 5/17/2022 | SALES AGREEMENTS |
| 924 | SERTA SIMMONS BEDDING, LLC | FURNITURE & MATTRESS WHOLESALER PLUS | CO-OP ADVERTISING AGREEMENT DTD 5/6/2022 | SALES AGREEMENTS |
| 925 | SERTA SIMMONS BEDDING, LLC | FURNITURE & MATTRESS WHOLESALER PLUS | AUTHORIZED DEALER AGREEMENT DTD 5/6/2022 | SALES AGREEMENTS |
| 926 | SERTA SIMMONS BEDDING, LLC | FURNITURE CITY PARAMUS CORP | AUTHORIZED DEALER AGREEMENT DTD 3/2/2020 | SALES AGREEMENTS |
| 927 | SERTA SIMMONS BEDDING, LLC | FURNITURE CITY PARAMUS CORP | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 928 | SERTA SIMMONS BEDDING, LLC | FURNITURE FACTORY | AUTHORIZED DEALER AGREEMENT DTD 2/17/2022 | SALES AGREEMENTS |
| 929 | SERTA SIMMONS BEDDING, LLC | FURNITURE FACTORY | CO-OP ADVERTISING AGREEMENT DTD 2/17/2022 | SALES AGREEMENTS |
| 930 | SERTA SIMMONS BEDDING, LLC | FURNITURE FIRST | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |
| 931 | SERTA SIMMONS BEDDING, LLC | FURNITURE FREAKS, LLC (DBA) BEDS FOR LESS | SALES/RETAILER AGREEMENT DTD 7/10/2022 | SALES/RETAILER AGREEMENTS |
| 932 | NATIONAL BEDDING COMPANY L.L.C. | FURNITURE GALLERY INC | SUPPLY AGREEMENT  DTD 9/25/2014 | SALES AGREEMENTS |
| 933 | SERTA SIMMONS BEDDING, LLC | FURNITURE INNOVATION INC | CO-OP ADVERTISING AGREEMENT DTD 11/16/2022 | SALES AGREEMENTS |
| 934 | SERTA SIMMONS BEDDING, LLC | FURNITURE INNOVATION INC | AUTHORIZED DEALER AGREEMENT DTD 11/16/2022 | SALES AGREEMENTS |
| 935 | SERTA SIMMONS BEDDING, LLC | FURNITURE INNOVATION INC | CO-OP ADVERTISING AGREEMENT DTD 11/16/2022 | SALES AGREEMENTS |
| 936 | SERTA SIMMONS BEDDING, LLC | FURNITURE INNOVATION INC | AUTHORIZED DEALER AGREEMENT DTD 11/16/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 937  NATIONAL BEDDING COMPANY L.L.C. | FURNITURE MART OF ROXBORO INC | SECURITY AGREEMENT DTD 12/29/2008 | SALES AGREEMENTS |
| 938  NATIONAL BEDDING COMPANY L.L.C. | FURNITURE MART OF ROXBORO INC | SUPPLY AGREEMENT DTD 12/29/2008 | SALES AGREEMENTS |
| 939  NATIONAL BEDDING COMPANY L.L.C. | FURNITURE MART OF ROXBORO INC | LICENSE AGREEMENT LETTER DTD 11/17/2008 | SALES AGREEMENTS |
| 940  SERTA SIMMONS BEDDING, LLC | FURNITURE R US, LLC | SALES/RETAILER AGREEMENT DTD 3/24/2022 | SALES/RETAILER AGREEMENTS |
| 941  THE SIMMONS MANUFACTURING CO., LLC | FURNITURE TRANSPORTATION SYSTEMS | MASTER SERVICES TRANSPORTATION AGREEMENT 04/19/2010 | INDIRECT SUPPLIER |
| 942  THE SIMMONS MANUFACTURING CO., LLC | FURNITURE TRANSPORTATION SYSTEMS | TRANSPORTATION AGREEMENT 03/12/2006 | INDIRECT SUPPLIER |
| 943  NATIONAL BEDDING COMPANY L.L.C. | FURNITURE WEEKEND OF MALONE LLC | SUPPLY AGREEMENT | SALES AGREEMENTS |
| 944  NATIONAL BEDDING COMPANY L.L.C. | FURNITURE WEEKEND OF MALONE LLC | SECURITY AGREEMENT DTD 11/25/2003 | SALES AGREEMENTS |
| 945  NATIONAL BEDDING COMPANY L.L.C. | FURNITURE WEEKEND OF MALONE LLC | LETTER AGREEMENT DTD 7/29/2003 | SALES AGREEMENTS |
| 946  NATIONAL BEDDING COMPANY L.L.C. | FURNITURE WEEKEND OF MALONE LLC | SUPPLY AGREEMENT | SALES AGREEMENTS |
| 947  SERTA SIMMONS BEDDING, LLC | FUTURE FOAM INC | DROP TRAILER AGREEMENT | DIRECT SUPPLIER |
| 948  DREAMWELL, LTD. | FUTURE FOAM INC | TRADEMARK LICENSE AGREEMENT 01/01/2023 | LICENSE |
| 949  DREAMWELL, LTD. | FUTURE FOAM INC | TRADEMARK LICENSE AGREEMENT 11/01/2012 | LICENSE |
| 950  SERTA SIMMONS BEDDING, LLC | FUTURE FOAM INC | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 951  SERTA SIMMONS BEDDING, LLC | FUTURE FOAM INC | SUPPLY AGREEMENT DTD 8/12/2022 | DIRECT SUPPLIER |
| 952  SIMMONS BEDDING COMPANY, LLC | FUTURE FOAM INC | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 953  SERTA SIMMONS BEDDING, LLC | FXI INC | SUPPLY AGREEMENT 10/15/2022 | DIRECT SUPPLIER |
| 954  SERTA SIMMONS BEDDING, LLC | FXI INC | TRANSPORTATION/LOGISTICS AGREEMENT DTD 10/15/2021 | TRANSPORTATION/LOGISTICS AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 955 | SERTA SIMMONS BEDDING, LLC | FXI INC | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 956 | SERTA SIMMONS BEDDING, LLC | FXI INC | LETTER AGREEMENT REGARDING HYBRID FOAMS EXCLUSIVITY DTD 3/5/2021 | DIRECT SUPPLIER |
| 957 | SERTA SIMMONS BEDDING, LLC | FXI INC | SURFACE MODIFICATION TECHNOLOGY LETTER AGREEMENT DTD 3/2/2020 | DIRECT SUPPLIER |
| 958 | SERTA SIMMONS BEDDING, LLC | FXI INC | SURFACE MODIFICATION TECHNOLOGY LETTER AGREEMENT DTD 1/24/2020 | DIRECT SUPPLIER |
| 959 | SERTA SIMMONS BEDDING, LLC | FXI INC | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 960 | SERTA SIMMONS BEDDING, LLC | G.H.SMART & COMPANY INC. | CONSULTANT AGREEMENT DTD 11/23/2015 | CONSULTANT AGREEMENT |
| 961 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | G6 HOSPITALITY | HOSPITALITY/INSTITUTIONAL AGREEMENT DTD 9/30/2015 | HOSPITALITY/INSTITUTIONAL AGREEMENT |
| 962 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | G6 HOSPITALITY | HOSPITALITY/INSTITUTIONAL AGREEMENT DTD 9/30/2015 | HOSPITALITY/INSTITUTIONAL AGREEMENT |
| 963 | NATIONAL BEDDING COMPANY L.L.C. | GAMBLE AMERICA'S MATTRESS LLC | SUPPLY AGREEMENT DTD 3/16/2011 | SALES AGREEMENTS |
| 964 | NATIONAL BEDDING COMPANY L.L.C. | GARNER TV & APPLIANCES INC | SUPPLY AGREEMENT  DTD 7/28/2014 | SALES AGREEMENTS |
| 965 | SERTA SIMMONS BEDDING, LLC | GARRYS ULTIMATE FLOORING & DESIGN INC | AUTHORIZED DEALER AGREEMENT DTD 6/14/2022 | SALES AGREEMENTS |
| 966 | SERTA SIMMONS BEDDING, LLC | GARRYS ULTIMATE FLOORING & DESIGN INC | CO-OP ADVERTISING AGREEMENT DTD 6/14/2022 | SALES AGREEMENTS |
| 967 | SERTA SIMMONS BEDDING, LLC | GARRYS ULTIMATE FLOORING & DESIGN INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 968 | SSB MANUFACTURING COMPANY | GATEWAY INDUSTRIAL TEN LLC | BUILDING LEASE DTD 10/18/1997 AT 17850 E 32ND, AURORA CO | REAL ESTATE LEASES |
| 969 | THE SIMMONS MANUFACTURING CO., LLC | GATEWAY INDUSTRIAL TEN LLC | BUILDING LEASE DTD 10/18/1997 AT 17850 E 32ND, AURORA CO | REAL ESTATE LEASES |
| 970 | THE SIMMONS MANUFACTURING CO., LLC | GATEWAY INDUSTRIAL TEN LLC | BUILDING LEASE DTD 10/18/1997 AT 17850 E 32ND, AURORA CO | REAL ESTATE LEASES |
| 971 | SSB MANUFACTURING COMPANY | GATEWAY INDUSTRIAL TEN LLC | BUILDING LEASE DTD 10/18/1997 AT 17850 E 32ND, AURORA CO | REAL ESTATE LEASES |
| 972 | SIMMONS BEDDING COMPANY, LLC | GATEWAY PARK II LLC | BUILDING LEASE DTD 10/18/1997 AT 17850 E 32ND, AURORA CO | REAL ESTATE LEASES |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 973 | SIMMONS BEDDING COMPANY, LLC | GATEWAY PARK II LLC | BUILDING LEASE DTD 10/18/1997 AT 17850 E 32ND, AURORA CO | REAL ESTATE LEASES |
| 974 | SERTA SIMMONS BEDDING, LLC | GATEWOOD CONSULTING SERVICES LLC | MASTER SERVICES AGREEMENT DTD 6/28/2017 | CONSULTING |
| 975 | SIMMONS BEDDING COMPANY, LLC | GATEWOOD CONSULTING SERVICES LLC | MASTER CONSULTING SERVICES AGREEMENT | CONSULTING |
| 976 | SERTA SIMMONS BEDDING, LLC | GC HOMESTORE LLC | AUTHORIZED DEALER AGREEMENT DTD 6/23/2022 | SALES AGREEMENTS |
| 977 | SERTA SIMMONS BEDDING, LLC | GC HOMESTORE LLC | CO-OP ADVERTISING AGREEMENT DTD 6/23/2022 | SALES AGREEMENTS |
| 978 | NATIONAL BEDDING COMPANY L.L.C. | GEORGE STEELE CO | SUPPLY AGREEMENT DTD 8/15/2013 | SALES AGREEMENTS |
| 979 | NATIONAL BEDDING COMPANY L.L.C. | GEORGE STEELE CO | ADDENDUM TO SUPPLY AGREEMENT | SALES AGREEMENTS |
| 980 | SERTA SIMMONS BEDDING, LLC | GEORGIA TECH HOTEL AND CONF CTR | HOSPITALITY/INSTITUTIONAL AGREEMENT DTD 6/15/2017 | HOSPITALITY/INSTITUTIONAL AGREEMENT |
| 981 | NATIONAL BEDDING COMPANY L.L.C. | GILES COUNTY FURNITURE COMPANY | SUPPLY AGREEMENT DTD 1/22/2015 | SALES AGREEMENTS |
| 982 | SERTA SIMMONS BEDDING, LLC | GLENVILLE WESTERN AUTO INC | CO-OP ADVERTISING AGREEMENT DTD 5/2/2022 | SALES AGREEMENTS |
| 983 | SERTA SIMMONS BEDDING, LLC | GLENVILLE WESTERN AUTO INC | AUTHORIZED DEALER AGREEMENT DTD 5/2/2022 | SALES AGREEMENTS |
| 984 | SERTA SIMMONS BEDDING, LLC | GLIMPSE GROUP INC, THE | ADVERTISING/MARKETING DTD 12/1/2022 | MARKETING |
| 985 | NATIONAL BEDDING COMPANY L.L.C. | GLOBAL COMPLIANCE SERVICES INC | MASTER SERVICES AGREEMENT DTD 9/26/2011 | HUMAN RESOURCES |
| 986 | NATIONAL BEDDING COMPANY L.L.C. | GLOBAL LLC | MASTER SERVICES AGREEMENT FOR PLACEMENT OF STAFFING PERSONNEL DTD 1/17/2013 | CONSULTING |
| 987 | SERTA SIMMONS BEDDING, LLC | GLOBAL POST AUDITING SOLUTIONS | TRANSPORTATION/LOGISTICS AGREEMENT DTD 4/25/2022 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 988 | SERTA SIMMONS BEDDING, LLC | GLOBAL TEXTILE ALLIANCE INC | SUPPLY/PURCHASE AGREEMENT DTD 12/1/2016 | SUPPLY/PURCHASE AGREEMENT |
| 989 | SSB MANUFACTURING COMPANY | GLOBAL TEXTILE ALLIANCE INC | SUPPLY AGREEMENT EFFECTIVE 12/1/2016 | SUPPLY-PURCHASE AGREEMENT |
| 990 | SERTA SIMMONS BEDDING, LLC | GLOBL CONSULTING | PROPOSAL FOR SCCM/IMAGE TESTING & DEPLOYMENT/MDM DEPLOYMENT/ANTI-VIRUS CONSOLIDATION DTD 4/17/2015 | CONSULTING |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 991  DREAMWELL, LTD. | GLORIOUS INNOVATION CO LTD | CONSENT TO ASSIGNMENT OF LICENSE AGREEMENT 03/02/2020 | LICENSE |
| 992  SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | GLORIOUS INNOVATION CO LTD | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 993  SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | GLORIOUS INNOVATION CO LTD | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 994  NATIONAL BEDDING COMPANY L.L.C. | GM3 INC | SUPPLY AGREEMENT  DTD 4/15/2004 | SALES AGREEMENTS |
| 995  NATIONAL BEDDING COMPANY L.L.C. | GM3 INC | SECURITY AGREEMENT DTD 4/15/2004 | SALES AGREEMENTS |
| 996  NATIONAL BEDDING COMPANY L.L.C. | GO TO SLEETP LLC | SUPPLY AGREEMENT DTD 5/29/2014 | SALES AGREEMENTS |
| 997  NATIONAL BEDDING COMPANY L.L.C. | GO TO SLEETP LLC | SUPPLY AGREEMENT DTD 5/29/2014 | SALES AGREEMENTS |
| 998  SERTA SIMMONS BEDDING, LLC | GOODWIN EASTERSEALS MIAMI VALLEY | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 999  SERTA SIMMONS BEDDING, LLC | GOODWIN EASTERSEALS MIAMI VALLEY | CO-OP ADVERTISING AGREEMENT DTD 6/22/2022 | SALES AGREEMENTS |
| 1000  SERTA SIMMONS BEDDING, LLC | GOODWIN EASTERSEALS MIAMI VALLEY | AUTHORIZED DEALER AGREEMENT DTD 6/22/2022 | SALES AGREEMENTS |
| 1001  TUFT & NEEDLE, LLC | GOOGLE 360 | ADVERTISING/MARKETING AGREEMENT DTD 4/1/2021 | ADVERTISING/MARKETING AGREEMENT |
| 1002  SERTA SIMMONS BEDDING, LLC | GOOGLE LLC | GOOGLE MARKETING PLATFORM SERVICES AGREEMENT | INDIRECT SUPPLIER |
| 1003  SERTA SIMMONS BEDDING, LLC | GRANITE (PARK NORTH 4) | REAL ESTATE AGREEMENT | REAL ESTATE |
| 1004  SERTA SIMMONS BEDDING, LLC | GRANITE TELECOMMUNICATION, LLC | IT AGREEMENT DTD 8/5/2020 | IT AGREEMENT |
| 1005  DAWN INTERMEDIATE, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1006  DREAMWELL, LTD. | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1007  NATIONAL BEDDING COMPANY L.L.C. | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1008  SERTA INTERNATIONAL HOLDCO, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 1009  SERTA SIMMONS BEDDING, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1010  SIMMONS BEDDING COMPANY, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1011  SSB HOSPITALITY, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1012  SSB LOGISTICS, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1013  SSB MANUFACTURING COMPANY | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1014  SSB RETAIL, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1015  THE SIMMONS MANUFACTURING CO., LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1016  TOMORROW SLEEP LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1017  TUFT & NEEDLE, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1018  WORLD OF SLEEP OUTLETS, LLC | GREAT AMERICAN INSURANCE COMPANY | CRIME/ERISA INSURANCE AGREEMENT (POLICY#: SAA-E502923-03-00) | INSURANCE |
| 1019  DAWN INTERMEDIATE, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1020  DREAMWELL, LTD. | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1021  NATIONAL BEDDING COMPANY L.L.C. | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1022  SERTA INTERNATIONAL HOLDCO, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1023  SERTA SIMMONS BEDDING, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1024  SIMMONS BEDDING COMPANY, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1025  SSB HOSPITALITY, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1026  SSB LOGISTICS, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1027  SSB MANUFACTURING COMPANY | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1028  SSB RETAIL, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1029  THE SIMMONS MANUFACTURING CO., LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1030  TOMORROW SLEEP LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1031  TUFT & NEEDLE, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1032  WORLD OF SLEEP OUTLETS, LLC | GREAT AMERICAN SPIRIT INS. COMPANY | THIRD EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: EXC 4455179) | INSURANCE |
| 1033  SERTA SIMMONS BEDDING, LLC | GREERS INC. (AKA) GREERS HOME FURNITURE | SALES/RETAILER AGREEMENT DTD 10/17/2022 | SALES/RETAILER AGREEMENTS |
| 1034  SERTA SIMMONS BEDDING, LLC | GREVIOR FURNITURE INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1035  SERTA SIMMONS BEDDING, LLC | GREVIOR FURNITURE INC | AUTHORIZED DEALER AGREEMENT | SALES AGREEMENTS |
| 1036  SSB MANUFACTURING COMPANY | GROVETOWN RENTAL LLLP | LEASE DTD 12/14/2020 FOR 6015 HORIZON W, PKWY., GROVETOWN, GA | REAL ESTATE LEASES |
| 1037  SERTA SIMMONS BEDDING, LLC | GT DANNER CORP | AUTHORIZED DEALER AGREEMENT DTD 11/3/2022 | SALES AGREEMENTS |
| 1038  SERTA SIMMONS BEDDING, LLC | GT DANNER CORP | CO-OP ADVERTISING AGREEMENT DTD 11/3/2022 | SALES AGREEMENTS |
| 1039  SERTA SIMMONS BEDDING, LLC | GULER APPLIANCE CO | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1040  SERTA SIMMONS BEDDING, LLC | GXS INC | VAN SERVICES SCHEDULE DTD 3/13/2019 | IT AGREEMENT |
| 1041  DAWN INTERMEDIATE, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1042  DREAMWELL, LTD. | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1043  NATIONAL BEDDING COMPANY L.L.C. | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1044  SERTA INTERNATIONAL HOLDCO, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1045  SERTA SIMMONS BEDDING, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1046  SIMMONS BEDDING COMPANY, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1047  SSB HOSPITALITY, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1048  SSB LOGISTICS, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1049  SSB MANUFACTURING COMPANY | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1050  SSB RETAIL, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1051  THE SIMMONS MANUFACTURING CO., LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1052  TOMORROW SLEEP LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1053  TUFT & NEEDLE, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1054  WORLD OF SLEEP OUTLETS, LLC | HALLMARK SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (73PRX22AFF7) | INSURANCE |
| 1055  SERTA SIMMONS BEDDING, LLC | HALO GROUP (HG ATLANTA CONSULTING, LLC) | IT AGREEMENT DTD 2/20/2017 | IT AGREEMENT |
| 1056  SERTA SIMMONS BEDDING, LLC | HALUM ASSOCIATES INC | CO-OP ADVERTISING AGREEMENT DTD 2/14/2022 | SALES AGREEMENTS |
| 1057  SERTA SIMMONS BEDDING, LLC | HALUM ASSOCIATES INC | AUTHORIZED DEALER AGREEMENT DTD 2/14/2022 | SALES AGREEMENTS |
| 1058  NATIONAL BEDDING COMPANY L.L.C. | HAMILTON AND HAMILTON ENTERPRISES INC | SUPPLY AGREEMENT DTD 5/26/2004 | SALES AGREEMENTS |
| 1059  NATIONAL BEDDING COMPANY L.L.C. | HAMILTON AND HAMILTON ENTERPRISES INC | SECURITY AGREEMENT DTD 5/26/2004 | SALES AGREEMENTS |
| 1060  SERTA SIMMONS BEDDING, LLC | HAPPY'S HOME CENTERS | AUTHORIZED DEALER AGREEMENT DTD 1/29/2020 | SALES AGREEMENTS |
| 1061  SERTA SIMMONS BEDDING, LLC | HARLAN, DANIEL RAY | CO-OP ADVERTISING AGREEMENT DTD 6/18/2022 | SALES AGREEMENTS |
| 1062  SERTA SIMMONS BEDDING, LLC | HARLAN, DANIEL RAY | AUTHORIZED DEALER AGREEMENT DTD 6/18/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1063 SERTA SIMMONS BEDDING, LLC | HAVERTYS | SUPPLY/PURCHASE AGREEMENT DTD 1/20/2016 | SUPPLY/PURCHASE AGREEMENT |
| 1064 SSB MANUFACTURING COMPANY | HAWAII TEAMSTERS & ALLIED WORKERS LOCAL 996 | LABOR AGREEMENT FOR PERIOD 12/3/2019 THROUGH 1/31/2025 | UNION CONTRACT |
| 1065 SERTA SIMMONS BEDDING, LLC | HCI CONSERVATION, INC. | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 1066 DAWN INTERMEDIATE, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1067 DREAMWELL, LTD. | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1068 NATIONAL BEDDING COMPANY L.L.C. | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1069 SERTA INTERNATIONAL HOLDCO, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1070 SERTA SIMMONS BEDDING, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1071 SIMMONS BEDDING COMPANY, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1072 SSB HOSPITALITY, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1073 SSB LOGISTICS, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1074 SSB MANUFACTURING COMPANY | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1075 SSB RETAIL, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1076 THE SIMMONS MANUFACTURING CO., LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1077 TOMORROW SLEEP LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1078 TUFT & NEEDLE, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1079 WORLD OF SLEEP OUTLETS, LLC | HDI GLOBAL SPECIALTY SE (HANNOVER RE) | PROPERTY INSURANCE AGREEMENT (PTNAM2207451) | INSURANCE |
| 1080 WORLD OF SLEEP OUTLETS, LLC | HEARTLAND REALTY LLC | LEASE DTD 7/1/2015 FOR 4201 POTTSVILLE PIKE, BLD 1, READING PA | REAL ESTATE LEASES |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1081  WORLD OF SLEEP OUTLETS, LLC | HEARTLAND REALTY LLC | LEASE DTD 7/1/2015 FOR 4201 POTTSVILLE PIKE, BLD 1, READING PA | REAL ESTATE LEASES |
| 1082  WORLD OF SLEEP OUTLETS, LLC | HEARTLAND REALTY LLC | LEASE DTD 7/1/2015 FOR 4201 POTTSVILLE PIKE, BLD 1, READING PA | REAL ESTATE LEASES |
| 1083  NATIONAL BEDDING COMPANY L.L.C. | HEATON INDUSTRIES INC | SUPPLY AGREEMENT DTD 8/4/2017 | SALES AGREEMENTS |
| 1084  SERTA SIMMONS BEDDING, LLC | HEIDRICK & STRUGGLES INTERNATIONAL INC | ENGAGEMENT LETTER DTD 9/28/2020 | HUMAN RESOURCES |
| 1085  SERTA SIMMONS BEDDING, LLC | HENKEL CORPORATION | COMPANY WIDE AGREEMENT DTD 3/3/2017 | COMPANY WIDE AGREEMENT |
| 1086  NATIONAL BEDDING COMPANY L.L.C. | HENRY FURNITURE & APPLIANCE LLC | SUPPLY AGREEMENT  DTD 10/14/2014 | SALES AGREEMENTS |
| 1087  SERTA SIMMONS BEDDING, LLC | HEROKU INC | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 1088  SERTA SIMMONS BEDDING, LLC | HERSHEY PROPERTY HOLDINGS/SOUNDSLEEP | CO-OP ADVERTISING AGREEMENT DTD 4/22/2022 | SALES AGREEMENTS |
| 1089  SERTA SIMMONS BEDDING, LLC | HERSHEY PROPERTY HOLDINGS/SOUNDSLEEP | AUTHORIZED DEALER AGREEMENT DTD 4/22/2022 | SALES AGREEMENTS |
| 1090  SERTA SIMMONS BEDDING, LLC | HG ROYALE | CO-OP ADVERTISING AGREEMENT DTD 10/2/2022 | SALES AGREEMENTS |
| 1091  SERTA SIMMONS BEDDING, LLC | HG ROYALE | AUTHORIZED DEALER AGREEMENT DTD 10/2/2022 | SALES AGREEMENTS |
| 1092  SERTA SIMMONS BEDDING, LLC | HG ROYALE KY | CO-OP ADVERTISING AGREEMENT DTD 2/9/2023 | SALES AGREEMENTS |
| 1093  SERTA SIMMONS BEDDING, LLC | HG ROYALE KY | CO-OP ADVERTISING AGREEMENT DTD 2/9/2023 | SALES AGREEMENTS |
| 1094  SERTA SIMMONS BEDDING, LLC | HG ROYALE KY | AUTHORIZED DEALER AGREEMENT DTD 2/9/2023 | SALES AGREEMENTS |
| 1095  SERTA SIMMONS BEDDING, LLC | HG ROYALE KY | AUTHORIZED DEALER AGREEMENT DTD 2/9/2023 | SALES AGREEMENTS |
| 1096  SERTA SIMMONS BEDDING, LLC | HIBERNATION MATTRESS | AUTHORIZED DEALER AGREEMENT DTD 10/28/2022 | SALES AGREEMENTS |
| 1097  SERTA SIMMONS BEDDING, LLC | HIBERNATION MATTRESS | CO-OP ADVERTISING AGREEMENT DTD 10/28/2022 | SALES AGREEMENTS |
| 1098  SERTA SIMMONS BEDDING, LLC | HIGH COUNTRY FURNITURE & DESIGN, INC. | SALES/RETAILER AGREEMENT DTD 10/17/2022 | SALES/RETAILER AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1099 | SIMMONS BEDDING COMPANY, LLC | HIGHEST CONFORT CO SA DE CV | TRADEMARK LICENSE AGREEMENT DTD 5/21/1990 | LICENSE |
| 1100 | SERTA SIMMONS BEDDING, LLC | HILL COUNTRY - ASHLEY | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/1/2015 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1101 | SERTA SIMMONS BEDDING, LLC | HILTON SUPPLY MANAGEMENT | HOSPITALITY AGREEMENT DTD 1/1/2022 | HOSPITALITY AGREEMENT |
| 1102 | SERTA SIMMONS BEDDING, LLC | HILTON SUPPLY MANAGEMENT | HOSPITALITY AGREEMENT DTD 1/1/2020 | HOSPITALITY AGREEMENT |
| 1103 | SERTA SIMMONS BEDDING, LLC | HOLLANDER SLEEP PRODUCTS, LLC | SUPPLY/PURCHASE AGREEMENT DTD 3/1/2016 | SUPPLY/PURCHASE AGREEMENT |
| 1104 | SERTA SIMMONS BEDDING, LLC | HOLLYWOOD BED & SPRING MFG. CO., INC. | SUPPLY/PURCHASE AGREEMENT DTD 7/17/2020 | SUPPLY/PURCHASE AGREEMENT |
| 1105 | SERTA SIMMONS BEDDING, LLC | HOLLYWOOD FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 6/7/2022 | SALES AGREEMENTS |
| 1106 | SERTA SIMMONS BEDDING, LLC | HOLLYWOOD FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 6/7/2022 | SALES AGREEMENTS |
| 1107 | SERTA SIMMONS BEDDING, LLC | HOM FURNITURE INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1108 | SERTA SIMMONS BEDDING, LLC | HOME CONNECTION LLC | CO-OP ADVERTISING AGREEMENT DTD 5/26/2020 | SALES AGREEMENTS |
| 1109 | SERTA SIMMONS BEDDING, LLC | HOME CONNECTION LLC | AUTHORIZED DEALER AGREEMENT DTD 5/26/2020 | SALES AGREEMENTS |
| 1110 | SERTA SIMMONS BEDDING, LLC | HOME CONSIGNMENT & AUCTIONS | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 7/9/2020 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1111 | SERTA SIMMONS BEDDING, LLC | HOME DEPO | AUTHORIZED DEALER AGREEMENT DTD 5/14/2022 | SALES AGREEMENTS |
| 1112 | SERTA SIMMONS BEDDING, LLC | HOME DEPO | CO-OP ADVERTISING AGREEMENT DTD 5/14/2022 | SALES AGREEMENTS |
| 1113 | SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | HOMEGOODS INC | ASSIGNMENT AND ASSUMPTION OF LEASE AND CONSENT OF LANDLORD DTD 12/6/2017 FOR 50 BRYLA ST, CARTERET, NJ | REAL ESTATE LEASES |
| 1114 | SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | HOMEGOODS INC | ASSIGNMENT AND ASSUMPTION OF LEASE AND CONSENT OF LANDLORD DTD 12/6/2017 FOR 50 BRYLA ST, CARTERET, NJ | REAL ESTATE LEASES |
| 1115 | NATIONAL BEDDING COMPANY L.L.C. | HOMESTUFF INC | SUPPLY AGREEMENT DTD 9/24/2015 | SALES AGREEMENTS |
| 1116 | SERTA SIMMONS BEDDING, LLC | HOMETIME SOLUTIONS MONTG | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1117 | SERTA SIMMONS BEDDING, LLC | HOULIHAN LOKEY FINANCIAL ADVISORS, INC. | CONSULTANT AGREEMENT DTD 4/3/2013 | CONSULTANT AGREEMENT |
| 1118 | SERTA SIMMONS BEDDING, LLC | HUBLEY CONSULTING (ROGUE SERVICES AND SOLUTIONS, LLC) | CONSULTANT AGREEMENT DTD 7/7/2021 | CONSULTANT AGREEMENT |
| 1119 | SERTA SIMMONS BEDDING, LLC | HUBLEY CONSULTING (ROGUE SERVICES AND SOLUTIONS, LLC) | CONSULTANT AGREEMENT DTD 7/7/2021 | CONSULTANT AGREEMENT |
| 1120 | SERTA SIMMONS BEDDING, LLC | HYATT LEGAL PLANS, INC. | HR AGREEMENT DTD 1/1/2017 | HR AGREEMENT |
| 1121 | SERTA SIMMONS BEDDING, LLC | HYATT REGENCY MIAMI | EVENT SALES AGREEMENT DTD 9/19/2022 | SALES AGREEMENTS |
| 1122 | SSB MANUFACTURING COMPANY | HYG FINANCIAL SVCS. - BOX CLAMP LEASE | TRANSPORTATION/LOGISTICS AGREEMENT | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1123 | SERTA SIMMONS BEDDING, LLC | IAC PORT 167 LLC | GUARANTY DTD 11/24/2015 FOR 1414 VALLEY AVENUE NW, PUYALLUP, WA | REAL ESTATE LEASES |
| 1124 | SSB MANUFACTURING COMPANY | IAC PORT 167 LLC | INDUSTRIAL LEASE DTD 11/24/2015 AT 1414 VALLEY AVENUE NW, PUYALLUP, WA | REAL ESTATE LEASES |
| 1125 | SERTA SIMMONS BEDDING, LLC | IANS | MASTER SERVICES AGREEMENT DTD 4/6/2022 | IT AGREEMENT |
| 1126 | SERTA SIMMONS BEDDING, LLC | ICR, LLC | CONSULTANT AGREEMENT DTD 8/21/2017 | CONSULTANT AGREEMENT |
| 1127 | SERTA SIMMONS BEDDING, LLC | IDEALBUY LLC | AUTHORIZED DEALER AGREEMENT DTD 11/11/2020 | SALES AGREEMENTS |
| 1128 | SERTA SIMMONS BEDDING, LLC | IDOM, INC. | IT AGREEMENT DTD 8/5/2020 | IT AGREEMENT |
| 1129 | SERTA SIMMONS BEDDING, LLC | IIT INLAND EMPIRE LOGISTICS CENTER LP | LEASE GUARANTY FOR 23700 CACTUS AVE, BDG 6, MORENO VALLEY, CA | REAL ESTATE LEASES |
| 1130 | SSB MANUFACTURING COMPANY | IIT INLAND EMPIRE LOGISTICS CENTER LP | LEASE AGREEMENT DTD 4/9/2015 FOR 23700 CACTUS AVE, BDG 6, MORENO VALLEY, CA | REAL ESTATE LEASES |
| 1131 | SERTA SIMMONS BEDDING, LLC | IMAGING OFFICE SYSTEMS (HYLAND) | IT AGREEMENT DTD 6/23/2017 | IT AGREEMENT |
| 1132 | SERTA SIMMONS BEDDING, LLC | IMAGING OFFICE SYSTEMS INC | SERVICES AGREEMENT | IT AGREEMENT |
| 1133 | SERTA SIMMONS BEDDING, LLC | IMPACT TECH INC | ADVERTISING/MARKETING AGREEMENT DTD 10/1/2022 | MARKETING |
| 1134 | TUFT & NEEDLE, LLC | IMPACT TECH INC | MASTER SUBSCRIPTION & SERVICES AGREEMENT 08/16/2019 | INDIRECT SUPPLIER |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1135 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | INCI MOBILYA MALZ | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1136 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | INCI MOBILYA MALZ | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1137 | SERTA SIMMONS BEDDING, LLC | INCI MOBILYA MALZ | LICENSE AGREEMENT DTD 8/18/2021 | LICENSE AGREEMENT |
| 1138 | DREAMWELL, LTD. | INDUFOAM SA DE CV | TRADEMARK & TECHNOLOGY LICENSE AGREEMENT 01/01/2005 | LICENSE |
| 1139 | SIMMONS BEDDING COMPANY, LLC | INDUFOAM SA DE CV | TECHNICAL SERVICES AGREEMENT 01/01/2005 | LICENSE |
| 1140 | SIMMONS BEDDING COMPANY, LLC | INDUFOAM SA DE CV | SALES & SECURITY AGREEMENT DTD 9/8/2008 | LICENSE |
| 1141 | DREAMWELL, LTD. | INDUSTRIA AMERICANA DE COLCHONES SAS | PATENT & TRADEMARK LICENSE AGREEMENT 01/01/2022 | LICENSE |
| 1142 | DREAMWELL, LTD. | INDUSTRIA AMERICANA DE COLCHONES SAS | TECHNOLOGY & TRADEMARK LICENSE AGREEMENT 03/01/2014 | LICENSE |
| 1143 | SIMMONS BEDDING COMPANY, LLC | INDUSTRIA AMERICANA DE COLCHONES SAS | TECHNICAL SERVICES AGREEMENT 03/01/2014 | LICENSE |
| 1144 | SERTA SIMMONS BEDDING, LLC | INFINITE ENERGY, LLC – OHIO NATURAL GAS | INDEPENDENT CONTRACTOR AGREEMENT DTD 11/1/2022 | INDEPENDENT CONTRACTOR AGREEMENT |
| 1145 | SERTA SIMMONS BEDDING, LLC | INFORMATICA | IT AGREEMENT DTD 5/5/2022 | IT AGREEMENT |
| 1146 | SERTA SIMMONS BEDDING, LLC | INNOVIEN SOLUTIONS | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 2/3/2023 | HR VENDOR AGREEMENT/STAFFING AGREEMENT |
| 1147 | SERTA SIMMONS BEDDING, LLC | INOVA LLC | CO-OP ADVERTISING AGREEMENT DTD 10/24/2022 | SALES AGREEMENTS |
| 1148 | SERTA SIMMONS BEDDING, LLC | INOVA LLC | AUTHORIZED DEALER AGREEMENT DTD 10/24/2022 | SALES AGREEMENTS |
| 1149 | SERTA SIMMONS BEDDING, LLC | INSIDE COACH INC, THE | CONSULTING AGREEMENT DTD 11/10/2022 | HUMAN RESOURCES |
| 1150 | SERTA SIMMONS BEDDING, LLC | INSIGHT DIRECT USA INC | US PRODUCTS & SERVICES MASTER AGREEMENT DTD 11/17/2015 | IT AGREEMENT |
| 1151 | SERTA SIMMONS BEDDING, LLC | INSIGHT DIRECT USA INC | IT AGREEMENT DTD 12/1/2015 | IT AGREEMENT |
| 1152 | SERTA SIMMONS BEDDING, LLC | INSIGHT DIRECT USA INC | US PRODUCTS & SERVICES MASTER AGREEMENT DTD 11/17/2015 | IT AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1153 SERTA SIMMONS BEDDING, LLC | INSPIRATION INTERIORS | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1154 SERTA SIMMONS BEDDING, LLC | INSPIRED ELEARNING | AGREEMENT FOR TRAINING SOLUTIONS QUOTATION #Q-10163 DTD 11/12/20202 | IT AGREEMENT |
| 1155 SERTA SIMMONS BEDDING, LLC | INSPIRED ELEARNING | AGREEMENT FOR TRAINING SOLUTIONS QUOTATION #Q-10163 DTD 11/12/20202 | IT AGREEMENT |
| 1156 SERTA SIMMONS BEDDING, LLC | INTERCOIL (UAE) | LICENSE AGREEMENT DTD 2/15/2022 | LICENSE AGREEMENT |
| 1157 DREAMWELL, LTD. | INTERCOIL INTERNATIONAL CO LLC | TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT 01/01/2010 | LICENSE |
| 1158 SIMMONS BEDDING COMPANY, LLC | INTERCOIL INTERNATIONAL CO LLC | TECHNICAL SERVICES AGREEMENT  01/01/2010 | LICENSE |
| 1159 DREAMWELL, LTD. | INTERCOIL INTERNATIONAL CO LLC | PATENT & TRADEMARK LICENSE AGREEMENT 02/15/2022 | LICENSE |
| 1160 SSB MANUFACTURING COMPANY | INTERCOIL INTERNATIONAL CO LLC | TECHNICAL SERVICES AGREEMENT  02/15/2022 | LICENSE |
| 1161 SERTA SIMMONS BEDDING, LLC | INTERIORS | SALES/RETAILER AGREEMENT DTD 1/1/2023 | SALES/RETAILER AGREEMENTS |
| 1162 DREAMWELL, LTD.;SIMMONS BEDDING COMPANY, LLC | INTERNATIONAL MATTRESSES CO SA DE CV | ADDENDUM TO TRADEMARK LICENSE AGREEMENT DTD 7/17/2011 | LICENSE |
| 1163 DREAMWELL, LTD.;SIMMONS BEDDING COMPANY, LLC | INTERNATIONAL MATTRESSES CO SA DE CV | ADDENDUM TO TRADEMARK LICENSE AGREEMENT DTD 7/17/2011 | LICENSE |
| 1164 SERTA SIMMONS BEDDING, LLC | IPSOS AMERICA, INC. | CONSULTANT AGREEMENT DTD 9/21/2020 | CONSULTANT AGREEMENT |
| 1165 SERTA SIMMONS BEDDING, LLC | IRI WORLDWIDE | SALES/RETAILER AGREEMENT | SALES/RETAILER AGREEMENTS |
| 1166 SIMMONS BEDDING COMPANY, LLC | ISPOT.TV | ADVERTISING/MARKETING AGREEMENT DTD 10/31/2015 | ADVERTISING/MARKETING AGREEMENT |
| 1167 SERTA SIMMONS BEDDING, LLC | ISTAFF INC | RECRUITING SERVICES AGREEMENT DTD 10/19/2022 | HUMAN RESOURCES |
| 1168 TUFT & NEEDLE, LLC | IVT RENAISSANCE CENTER DURHAM II LLC | SHOPPING CENTER LEASE AGREEMENT 07/17/2022 FOR 7001 FAYETTEVILLE ROAD, SUITE 101, DURHAM, NC | REAL ESTATE LEASES |
| 1169 SSB LOGISTICS, LLC | IWS | 3PL WAREHOUSING COST SCHEDULE DTD 8/1/2022 | LOGISTICS CONTRACT |
| 1170 SERTA SIMMONS BEDDING, LLC | J&N TEJANO INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1171 SERTA SIMMONS BEDDING, LLC | J&N TEJANO INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1172 SERTA SIMMONS BEDDING, LLC | J.B. HUNT TRANSPORT, INC. | TRANSPORTATION/LOGISTICS AGREEMENT DTD 6/27/2016 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1173 SERTA SIMMONS BEDDING, LLC | J.C. PENNEY CORPORATION INC | TRADING PARTNER AGREEMENT FOR US MERCHANDISE VENDORS DTD 8/29/2016 | CUSTOMER CONTRACT |
| 1174 SERTA SIMMONS BEDDING, LLC | J.C. PENNEY CORPORATION INC | DEALER AGREEMENT DTD 8/29/2016 | CUSTOMER CONTRACT |
| 1175 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | J.J. KELLER & ASSOCIATES, INC. | TRANSPORTATION/LOGISTICS AGREEMENT DTD 10/15/2015 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1176 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | J.J. KELLER & ASSOCIATES, INC. | TRANSPORTATION/LOGISTICS AGREEMENT DTD 10/15/2015 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1177 SERTA SIMMONS BEDDING, LLC | JB HUNT TRANSPORT INC | DEDICATED CONTRACT SERVICES CARRIER AGREEMENT DTD 6/27/2016 | INDIRECT SUPPLIER |
| 1178 NATIONAL BEDDING COMPANY L.L.C. | JENSEN FURNITURE INC | SUPPLY AGREEMENT DTD 2/13/2015 | SALES AGREEMENTS |
| 1179 SERTA SIMMONS BEDDING, LLC | JERNIGAN FURNITURE INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1180 NATIONAL BEDDING COMPANY L.L.C. | JETSON TV & APPLIANCES CENTERS INC | SUPPLY AGREEMENT DTD 10/15/2012 | SALES AGREEMENTS |
| 1181 SERTA SIMMONS BEDDING, LLC | JJ KELLER & ASSOCIATES | SERVICE AGREEMENT | OTHER |
| 1182 SERTA SIMMONS BEDDING, LLC | JMK SALES LLC | AUTHORIZED DEALER AGREEMENT DTD 6/29/2022 | SALES AGREEMENTS |
| 1183 SERTA SIMMONS BEDDING, LLC | JMK SALES LLC | CO-OP ADVERTISING AGREEMENT DTD 6/29/2022 | SALES AGREEMENTS |
| 1184 TUFT & NEEDLE, LLC | JOBOT CONSULTING, LLC | CONSULTANT AGREEMENT DTD 6/9/2022 | CONSULTANT AGREEMENT |
| 1185 NATIONAL BEDDING COMPANY L.L.C. | JONES APPLIANCE & TV INC | SUPPLY AGREEMENT DTD 2/5/2016 | SALES AGREEMENTS |
| 1186 SERTA SIMMONS BEDDING, LLC | JONES LANG LASALLE BROKERAGE INC | EXCLUSIVE RIGHT TO SUBLEASE AGREEMENT DTD 3/30/2022 | REAL ESTATE LEASES |
| 1187 SERTA SIMMONS BEDDING, LLC | JORDAN'S FURNITURE INC | DEALER LETTER AGREEMENT 01/01/2022 | CUSTOMER CONTRACT |
| 1188 NATIONAL BEDDING COMPANY L.L.C. | JUST BEDS | LICENSE AGREEMENT LETTER DTD 11/28/2007 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1189 NATIONAL BEDDING COMPANY L.L.C. | JUST BEDS | SECURITY AGREEMENT DTD 1/21/2009 | SALES AGREEMENTS |
| 1190 NATIONAL BEDDING COMPANY L.L.C. | JUST BEDS | SUPPLY AGREEMENT DTD 1/21/2008 | SALES AGREEMENTS |
| 1191 SERTA SIMMONS BEDDING, LLC | K4INVENTION LLC | CONSULTANT AGREEMENT DTD 5/1/2015 | CONSULTANT AGREEMENT |
| 1192 SERTA SIMMONS BEDDING, LLC | KAI MOVIING | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1193 SERTA SIMMONS BEDDING, LLC | KANTAR AND PRO RELEVANT | LICENSE AGREEMENT DTD 3/1/2021 | LICENSE AGREEMENT |
| 1194 SERTA SIMMONS BEDDING, LLC | KARL'S FURNITURE | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |
| 1195 SERTA SIMMONS BEDDING, LLC | KARLS TV & APPLIANCE INC | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |
| 1196 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | KEECO, LLC | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1197 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | KEECO, LLC | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1198 SERTA SIMMONS BEDDING, LLC | KEECO, LLC | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | LICENSE |
| 1199 SERTA SIMMONS BEDDING, LLC | KEESON TECHNOLOGY CORPORATION LTD | SUPPLY AGREEMENTT DTD 9/1/2015 | DIRECT SUPPLIER |
| 1200 SERTA SIMMONS BEDDING, LLC | KELLY BROTHERS FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 4/14/2022 | SALES AGREEMENTS |
| 1201 SERTA SIMMONS BEDDING, LLC | KELLY BROTHERS FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 4/14/2022 | SALES AGREEMENTS |
| 1202 SERTA SIMMONS BEDDING, LLC | KEMPER TV & APPLIANCE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1203 NATIONAL BEDDING COMPANY L.L.C. | KEN'S APPLIANCE INC | SUPPLY AGREEMENT  DTD 8/1/2014 | SALES AGREEMENTS |
| 1204 SERTA SIMMONS BEDDING, LLC | KENTUCKY FLOORING WAREHOUSE | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1205 SERTA SIMMONS BEDDING, LLC | KENTUCKY FLOORING WAREHOUSE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1206 SERTA SIMMONS BEDDING, LLC | KFORCE, INC | CONSULTANT AGREEMENT DTD 4/3/2018 | CONSULTANT AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1207 | NATIONAL BEDDING COMPANY L.L.C. | KIM'S FINE FURNITURE INC | LICENSE AND SUPPLY AGREEMENT DTD 3/22/2016 | SALES AGREEMENTS |
| 1208 | TOMORROW SLEEP LLC | KLARNA INC. | COMPANY WIDE AGREEMENT DTD 4/19/2018 | COMPANY WIDE AGREEMENT |
| 1209 | NATIONAL BEDDING COMPANY L.L.C. | K-MAC INC | SUPPLY AGREEMENT DTD 5/5/2015 | SALES AGREEMENTS |
| 1210 | SERTA SIMMONS BEDDING, LLC | KOLB, MICHAEL | AUTHORIZED DEALER AGREEMENT DTD 8/18/2022 | SALES AGREEMENTS |
| 1211 | SERTA SIMMONS BEDDING, LLC | KORN/FERRY INTERNATIONAL | ENGAGEMENT LETTER | HUMAN RESOURCES |
| 1212 | SERTA SIMMONS BEDDING, LLC | KOSTERMAN INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1213 | SERTA SIMMONS BEDDING, LLC | KREBER GRAPHICS INC. | IT AGREEMENT DTD 10/24/2016 | IT AGREEMENT |
| 1214 | SERTA SIMMONS BEDDING, LLC | KROLL, LLC | ENGAGEMENT LETTER DTD 4/30/2022 | TAX AGREEMENT |
| 1215 | SERTA SIMMONS BEDDING, LLC | KRONOS INCORPORATED | IMPLEMENTATION SERVICES AND EQUIPMENT AGREEMENT | HUMAN RESOURCES |
| 1216 | SERTA SIMMONS BEDDING, LLC | KRUX DIGITAL LLC | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 1217 | SERTA SIMMONS BEDDING, LLC | L BARTELS CONSULTING GROUP LLC | EXECUTIVE LEADERSHIP TEAM OFFSITE OCTOBER 24-25, 2022 PROPOSAL DTD 9/9/2022 | HUMAN RESOURCES |
| 1218 | SERTA SIMMONS BEDDING, LLC | L&L FURNITURE MATTRESS SHOPPE (AKA) WALTON & KAYLA SHEPHERD | SALES/RETAILER AGREEMENT DTD 4/1/2022 | SALES/RETAILER AGREEMENTS |
| 1219 | SERTA SIMMONS BEDDING, LLC | LA ECONOMICA FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 3/21/2022 | SALES AGREEMENTS |
| 1220 | SERTA SIMMONS BEDDING, LLC | LA ECONOMICA FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 3/21/2022 | SALES AGREEMENTS |
| 1221 | DREAMWELL, LTD. | LA NACIONAL C/A | AGREEMENT CONFIRMATION DTD 10/25/2010 | LICENSE |
| 1222 | SERTA SIMMONS BEDDING, LLC | LA ROSE FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 10/17/2022 | SALES AGREEMENTS |
| 1223 | SERTA SIMMONS BEDDING, LLC | LA ROSE FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 10/17/2022 | SALES AGREEMENTS |
| 1224 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | LACASA & DESIGN, INC. (AMERICA'S MATTRESS) | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 9/23/2020 | DEALER/RETAILER/HOSPITALITY AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1225 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | LACASA & DESIGN, INC. (AMERICA'S MATTRESS) | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 9/23/2020 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1226 DAWN INTERMEDIATE, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1227 DAWN INTERMEDIATE, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1228 DREAMWELL, LTD. | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1229 DREAMWELL, LTD. | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1230 NATIONAL BEDDING COMPANY L.L.C. | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1231 NATIONAL BEDDING COMPANY L.L.C. | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1232 SERTA INTERNATIONAL HOLDCO, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1233 SERTA INTERNATIONAL HOLDCO, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1234 SERTA SIMMONS BEDDING, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1235 SERTA SIMMONS BEDDING, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1236 SIMMONS BEDDING COMPANY, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1237 SIMMONS BEDDING COMPANY, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1238 SSB HOSPITALITY, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1239 SSB HOSPITALITY, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1240 SSB LOGISTICS, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1241 SSB LOGISTICS, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1242 SSB MANUFACTURING COMPANY | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 1243 SSB MANUFACTURING COMPANY | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1244 SSB RETAIL, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1245 SSB RETAIL, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1246 THE SIMMONS MANUFACTURING CO., LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1247 THE SIMMONS MANUFACTURING CO., LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1248 TOMORROW SLEEP LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1249 TOMORROW SLEEP LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1250 TUFT & NEEDLE, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1251 TUFT & NEEDLE, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1252 WORLD OF SLEEP OUTLETS, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927401) | INSURANCE |
| 1253 WORLD OF SLEEP OUTLETS, LLC | LANDMARK AMERICAN INSURANCE COMPANY (RSUI) | PROPERTY INSURANCE AGREEMENT (LHD927357) | INSURANCE |
| 1254 SSB LOGISTICS, LLC | LANDSTAR RANGER INC | CONFIDENTIAL TRANSPORTATION AGREEMENT | INDIRECT SUPPLIER |
| 1255 SERTA SIMMONS BEDDING, LLC | LARKSPUR GROUP | CONSULTANT AGREEMENT DTD 5/25/2022 | CONSULTANT AGREEMENT |
| 1256 SERTA SIMMONS BEDDING, LLC | LARRY SEARES ENTERPRISE INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1257 SERTA SIMMONS BEDDING, LLC | LARRY SEARES ENTERPRISE INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1258 NATIONAL BEDDING COMPANY L.L.C. | LASSITER & RUMCIK LLC | SUPPLY AGREEMENT DTD 12/7/2012 | SALES AGREEMENTS |
| 1259 SERTA SIMMONS BEDDING, LLC | LAURA DUFFEK | CONSULTANT AGREEMENT DTD 5/1/2016 | CONSULTANT AGREEMENT |
| 1260 SERTA SIMMONS BEDDING, LLC | LAURA FOX, LINKEDIN FOX LTD | CONSULTANT AGREEMENT DTD 9/5/2022 | CONSULTANT AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1261 SERTA SIMMONS BEDDING, LLC | LAURA KEHOE DESIGN | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1262 SERTA SIMMONS BEDDING, LLC | LAVA USA | SUPPLY/PURCHASE AGREEMENT DTD 4/15/2016 | SUPPLY/PURCHASE AGREEMENT |
| 1263 SERTA SIMMONS BEDDING, LLC | LAYER3 COMMUNICATIONS, LLC | IT AGREEMENT DTD 6/21/2019 | IT AGREEMENT |
| 1264 TUFT & NEEDLE, LLC | LEAF GROUP LTD. | ADVERTISING/MARKETING - DTC AGREEMENT | ADVERTISING/MARKETING - DTC |
| 1265 SERTA SIMMONS BEDDING, LLC | LEAN LOGISTICS | TRANSPORTATION/LOGISTICS AGREEMENT DTD 4/1/2017 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1266 SERTA SIMMONS BEDDING, LLC | LEAN SCHEDULING INTERNATIONAL (VIA) | IT AGREEMENT DTD 7/11/2022 | IT |
| 1267 SERTA SIMMONS BEDDING, LLC | LEGGETT & PLATT INCORPORATED | AMENDED AND RESTATED SUPPLY AGREEMENT 08/16/2018 | DIRECT SUPPLIER |
| 1268 NATIONAL BEDDING COMPANY L.L.C. | LEON PLUMBING WORKS LC | SUPPLY AGREEMENT  DTD 8/14/2014 | SALES AGREEMENTS |
| 1269 SERTA SIMMONS BEDDING, LLC | LEXISNEXIS RISK SOLUTIONS FL INC | APPLICATION & AGREEMENT | IT AGREEMENT |
| 1270 SERTA SIMMONS BEDDING, LLC | LEXISNEXIS RISK SOLUTIONS FL INC | MASTER TERMS & CONDITIONS DTD 12/17/2019 | IT AGREEMENT |
| 1271 DREAMWELL, LTD. | LF CENTENNIAL LTD | TRADEMARK LICENSE AGREEMENT 07/01/2017 | LICENSE |
| 1272 DREAMWELL, LTD. | LF CENTENNIAL LTD | NOVATION AGREEMENT 04/03/2018 | LICENSE |
| 1273 DREAMWELL, LTD. | LF CENTENNIAL LTD | NOVATION AGREEMENT 04/03/2018 | LICENSE |
| 1274 DREAMWELL, LTD. | LF CENTENNIAL LTD | TRADEMARK LICENSE AGREEMENT 07/01/2017 | LICENSE |
| 1275 DREAMWELL, LTD. | LF CENTENNIAL LTD | TRADEMARK LICENSE AGREEMENT DTD 8/31/2017 | LICENSE |
| 1276 SERTA SIMMONS BEDDING, LLC | LFS SC LLC | AUTHORIZED DEALER AGREEMENT DTD 2/18/2022 | SALES AGREEMENTS |
| 1277 DAWN INTERMEDIATE, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1278 DAWN INTERMEDIATE, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 1279 DREAMWELL, LTD. | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1280 DREAMWELL, LTD. | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1281 NATIONAL BEDDING COMPANY L.L.C. | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1282 NATIONAL BEDDING COMPANY L.L.C. | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1283 SERTA INTERNATIONAL HOLDCO, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1284 SERTA INTERNATIONAL HOLDCO, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1285 SERTA SIMMONS BEDDING, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1286 SERTA SIMMONS BEDDING, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1287 SIMMONS BEDDING COMPANY, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1288 SIMMONS BEDDING COMPANY, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1289 SSB HOSPITALITY, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1290 SSB HOSPITALITY, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1291 SSB LOGISTICS, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1292 SSB LOGISTICS, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1293 SSB MANUFACTURING COMPANY | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1294 SSB MANUFACTURING COMPANY | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1295 SSB RETAIL, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1296 SSB RETAIL, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1297 THE SIMMONS MANUFACTURING CO., LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1298 THE SIMMONS MANUFACTURING CO., LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1299 TOMORROW SLEEP LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1300 TOMORROW SLEEP LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1301 TUFT & NEEDLE, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1302 TUFT & NEEDLE, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1303 WORLD OF SLEEP OUTLETS, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY#: AFT-ABO6TU-0522) | INSURANCE |
| 1304 WORLD OF SLEEP OUTLETS, LLC | LIBERTY MUTUAL INSURANCE COMPANY | CANADIAN PLACEMENT GENERAL LIABILITY INSURANCE AGREEMENT (POLICY #:1000315512-05) | INSURANCE |
| 1305 DAWN INTERMEDIATE, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1306 DREAMWELL, LTD. | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1307 NATIONAL BEDDING COMPANY L.L.C. | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1308 SERTA INTERNATIONAL HOLDCO, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1309 SERTA SIMMONS BEDDING, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1310 SIMMONS BEDDING COMPANY, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1311 SSB HOSPITALITY, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1312 SSB LOGISTICS, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1313 SSB MANUFACTURING COMPANY | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1314 SSB RETAIL, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1315 THE SIMMONS MANUFACTURING CO., LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1316 TOMORROW SLEEP LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1317 TUFT & NEEDLE, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1318 WORLD OF SLEEP OUTLETS, LLC | LIBERTY SPECIALTY MARKETS BERMUDA LIMITED / OIL CASUALTY INSURANCE, LTD. | PROPERTY INSURANCE AGREEMENT (LSMAPR256914A) | INSURANCE |
| 1319 SERTA SIMMONS BEDDING, LLC | LIFESTYLE SOLUTIONS | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1320 SERTA SIMMONS BEDDING, LLC | LIFESTYLE SOLUTIONS | LICENSE AGREEMENT DTD 12/19/2020 | LICENSE AGREEMENT |
| 1321 SERTA SIMMONS BEDDING, LLC | LIGHTSOURCE | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 7/12/2022 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |
| 1322 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | LIMANSKY S.A. | LICENSE AGREEMENT DTD 1/1/2016 | LICENSE AGREEMENT |
| 1323 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | LIMANSKY S.A. | LICENSE AGREEMENT DTD 1/1/2016 | LICENSE AGREEMENT |
| 1324 SERTA SIMMONS BEDDING, LLC | LION TOTS & TEENS INC | CO-OP ADVERTISING AGREEMENT DTD 2/14/2022 | SALES AGREEMENTS |
| 1325 SERTA SIMMONS BEDDING, LLC | LION TOTS & TEENS INC | AUTHORIZED DEALER AGREEMENT DTD 2/14/2022 | SALES AGREEMENTS |
| 1326 SERTA SIMMONS BEDDING, LLC | LIPPE TAYLOR LLC | ADVERTISING/MARKETING AGREEMENT | ADVERTISING/MARKETING AGREEMENT |
| 1327 SERTA SIMMONS BEDDING, LLC | LIPPE TAYLOR LLC | AGENCY AGREEMENT 01/06/2022 | INDIRECT SUPPLIER |
| 1328 DREAMWELL, LTD. | LIPPERT COMPONENTS INC | TRADEMARK LICENSE AGREEMENT 10/01/2020 | LICENSE |
| 1329 SERTA SIMMONS BEDDING, LLC | LISA DIBENEDETTO COMMUNICATIONS, INC. | INDEPENDENT CONTRACTOR AGREEMENT DTD 2/21/2022 | INDEPENDENT CONTRACTOR AGREEMENT |
| 1330 SERTA SIMMONS BEDDING, LLC | LISA DIBENEDETTO COMMUNICATIONS, INC. | INDEPENDENT CONTRACTOR AGREEMENT DTD 2/21/2022 | INDEPENDENT CONTRACTOR AGREEMENT |
| 1331 SSB MANUFACTURING COMPANY | LIT GATEWAY PORTFOLIO LLC | LEASE AGREEMENT (COLORADO NET LEASE) DTD 7/1/2020 FOR 17800 E 32ND AVE, AURORA CA | REAL ESTATE LEASES |
| 1332 DREAMWELL, LTD. | LIVING STYLE (BVI) LIMITED | NOVATION AGREEMENT 04/03/2018 | LICENSE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1333 DREAMWELL, LTD. | LIVING STYLE (BVI) LIMITED | TRADEMARK LICENSE AGREEMENT | LICENSE |
| 1334 SERTA SIMMONS BEDDING, LLC | LIVONGO HEALTH INC | REQUEST FOR RELEASE AGREEMENT INDENTIFIABLE INFORMATION | HUMAN RESOURCES |
| 1335 SERTA SIMMONS BEDDING, LLC | LIVONGO HEALTH INC | REQUEST FOR RELEASE AGREEMENT IDENTIFIABLE INFORMATION DTD 11/9/2021 | HUMAN RESOURCES |
| 1336 DAWN INTERMEDIATE, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1337 DREAMWELL, LTD. | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1338 NATIONAL BEDDING COMPANY L.L.C. | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1339 SERTA INTERNATIONAL HOLDCO, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1340 SERTA SIMMONS BEDDING, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1341 SIMMONS BEDDING COMPANY, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1342 SSB HOSPITALITY, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1343 SSB LOGISTICS, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1344 SSB MANUFACTURING COMPANY | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1345 SSB RETAIL, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1346 THE SIMMONS MANUFACTURING CO., LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1347 TOMORROW SLEEP LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1348 TUFT & NEEDLE, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1349 WORLD OF SLEEP OUTLETS, LLC | LLOYD'S SYNDICATE 4444 | PROPERTY INSURANCE AGREEMENT (B72577BAA) | INSURANCE |
| 1350 DAWN INTERMEDIATE, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1351  DREAMWELL, LTD. | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1352  NATIONAL BEDDING COMPANY L.L.C. | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1353  SERTA INTERNATIONAL HOLDCO, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1354  SERTA SIMMONS BEDDING, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1355  SIMMONS BEDDING COMPANY, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1356  SSB HOSPITALITY, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1357  SSB LOGISTICS, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1358  SSB MANUFACTURING COMPANY | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1359  SSB RETAIL, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1360  THE SIMMONS MANUFACTURING CO., LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1361  TOMORROW SLEEP LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1362  TUFT & NEEDLE, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1363  WORLD OF SLEEP OUTLETS, LLC | LLOYD'S SYNDICATE NO. 1618 KII | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1364  DAWN INTERMEDIATE, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1365  DREAMWELL, LTD. | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1366  NATIONAL BEDDING COMPANY L.L.C. | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1367  SERTA INTERNATIONAL HOLDCO, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1368  SERTA SIMMONS BEDDING, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 1369  SIMMONS BEDDING COMPANY, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1370  SSB HOSPITALITY, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1371  SSB LOGISTICS, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1372  SSB MANUFACTURING COMPANY | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1373  SSB RETAIL, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1374  THE SIMMONS MANUFACTURING CO., LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1375  TOMORROW SLEEP LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1376  TUFT & NEEDLE, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1377  WORLD OF SLEEP OUTLETS, LLC | LLOYD'S SYNDICATE NO. 318 CIN | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1378  DAWN INTERMEDIATE, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1379  DREAMWELL, LTD. | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1380  NATIONAL BEDDING COMPANY L.L.C. | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1381  SERTA INTERNATIONAL HOLDCO, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1382  SERTA SIMMONS BEDDING, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1383  SIMMONS BEDDING COMPANY, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1384  SSB HOSPITALITY, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1385  SSB LOGISTICS, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1386  SSB MANUFACTURING COMPANY | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1387 SSB RETAIL, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1388 THE SIMMONS MANUFACTURING CO., LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1389 TOMORROW SLEEP LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1390 TUFT & NEEDLE, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1391 WORLD OF SLEEP OUTLETS, LLC | LLOYD'S SYNDICATE NO. 33 HISCOX | PROPERTY INSURANCE AGREEMENT (PTNAM2209133) | INSURANCE |
| 1392 DAWN INTERMEDIATE, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1393 DREAMWELL, LTD. | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1394 NATIONAL BEDDING COMPANY L.L.C. | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1395 SERTA INTERNATIONAL HOLDCO, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1396 SERTA SIMMONS BEDDING, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1397 SIMMONS BEDDING COMPANY, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1398 SSB HOSPITALITY, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1399 SSB LOGISTICS, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1400 SSB MANUFACTURING COMPANY | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1401 SSB RETAIL, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1402 THE SIMMONS MANUFACTURING CO., LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1403 TOMORROW SLEEP LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1404 TUFT & NEEDLE, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1405 WORLD OF SLEEP OUTLETS, LLC | LLOYD'S SYNDICATE NO.1414 ASCOT | PROPERTY INSURANCE AGREEMENT (PTNAM2204286) | INSURANCE |
| 1406 SERTA SIMMONS BEDDING, LLC | LOFTWARE INC | SOFTWARE SUPPORT SERVICES AGREEMENT | IT AGREEMENT |
| 1407 SERTA SIMMONS BEDDING, LLC | LOFTWARE INC | IT AGREEMENT DTD 9/23/2015 | IT AGREEMENT |
| 1408 NATIONAL BEDDING COMPANY L.L.C. | LOUISIANA WHOLESALE FURNITURE INC | SUPPLY AGREEMENT DTD 7/1/2015 | SALES AGREEMENTS |
| 1409 SERTA SIMMONS BEDDING, LLC | LOUISVILLE BEDDING COMPANY | SUPPLY AND SERVICES AGREEMENT 05/14/2018 | DIRECT SUPPLIER |
| 1410 SERTA SIMMONS BEDDING, LLC | LOUISVILLE BEDDING COMPANY | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 1411 SERTA SIMMONS BEDDING, LLC | LOWE'S COMPANIES INC | BUYING AGREEMENT 09/10/2018 | CUSTOMER CONTRACT |
| 1412 TUFT & NEEDLE, LLC | LOWE'S COMPANIES INC | EXCLUSIVITY AGREEMENT 12/11/2017 | CUSTOMER CONTRACT |
| 1413 SERTA SIMMONS BEDDING, LLC | LTF CLUB OPERATIONS COMPANY, INC. | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 7/14/2021 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1414 SIMMONS BEDDING COMPANY, LLC | LTF CLUB OPERATIONS COMPANY, INC. | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 7/14/2021 | SALES/RETAILER AGREEMENTS |
| 1415 SERTA SIMMONS BEDDING, LLC | LUBINSKI FURNITUTRE SALES | AUTHORIZED DEALER AGREEMENT DTD 7/12/2022 | SALES AGREEMENTS |
| 1416 SERTA SIMMONS BEDDING, LLC | LUBINSKI FURNITUTRE SALES | CO-OP ADVERTISING AGREEMENT DTD 7/12/2022 | SALES AGREEMENTS |
| 1417 SERTA SIMMONS BEDDING, LLC | LUCAS ASSOCIATES INC | RETAINED SEARCH AGREEMENT | HUMAN RESOURCES |
| 1418 SERTA SIMMONS BEDDING, LLC | LUCAS ASSOCIATES, INC. DBA LUCAS GROUP | CONSULTANT AGREEMENT DTD 6/10/2015 | CONSULTANT AGREEMENT |
| 1419 SERTA SIMMONS BEDDING, LLC | LUCAS ASSOCIATES, INC. DBA LUCAS GROUP | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 6/18/2021 | STRATEGIC SOURCING |
| 1420 SERTA SIMMONS BEDDING, LLC | LUCAS GROUP (DIV OF KORN FERRY) | HR, RECRUITING, BENEFITS & LOGISTICS DTD 12/1/2022 | HR |
| 1421 SERTA SIMMONS BEDDING, LLC | LUCAS GROUP HUMAN RESOURCES DIVISION | HR, RECRUITING, BENEFITS & LOGISTICS DTD 5/20/2020 | HUMAN RESOURCES |
| 1422 SERTA SIMMONS BEDDING, LLC | LUXURY 4 LESS NYC | AUTHORIZED DEALER AGREEMENT DTD 8/25/2020 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1423 | SERTA SIMMONS BEDDING, LLC | LUXURY 4 LESS NYC | CO-OP ADVERTISING AGREEMENT DTD 8/25/2020 | SALES AGREEMENTS |
| 1424 | SERTA SIMMONS BEDDING, LLC | LUXURY 4 LESS NYC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1425 | SERTA SIMMONS BEDDING, LLC | LYNDEN INCORPORATED | TRANSPORTATION/LOGISTICS AGREEMENT DTD 5/1/2017 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1426 | NATIONAL BEDDING COMPANY L.L.C. | M&I MATTRESS LLC | LICENSE AND SUPPLY AGREEMENT DTD 3/31/2015 | SALES AGREEMENTS |
| 1427 | SERTA SIMMONS BEDDING, LLC | M.O.E LLC | AUTHORIZED DEALER AGREEMENT DTD 1/24/2023 | SALES AGREEMENTS |
| 1428 | SERTA SIMMONS BEDDING, LLC | M.O.E LLC | CO-OP ADVERTISING AGREEMENT DTD 1/24/2023 | SALES AGREEMENTS |
| 1429 | SERTA SIMMONS BEDDING, LLC | MACYS MEDIA MARKETING | ADVERTISING/MARKETING AGREEMENT | ADVERTISING/MARKETING AGREEMENT |
| 1430 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | MAGAZINE GOLD (INSTANT RETAIL SOLUTIONS, LLC) | ADVERTISING/MARKETING AGREEMENT DTD 1/24/2017 | ADVERTISING/MARKETING AGREEMENT |
| 1431 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | MAGAZINE GOLD (INSTANT RETAIL SOLUTIONS, LLC) | ADVERTISING/MARKETING AGREEMENT DTD 1/24/2017 | ADVERTISING/MARKETING AGREEMENT |
| 1432 | NATIONAL BEDDING COMPANY L.L.C. | MAHOWALD MATTRESS CORPORATION | SUPPLY AGREEMENT  DTD 9/20/2006 | SALES AGREEMENTS |
| 1433 | NATIONAL BEDDING COMPANY L.L.C. | MAHOWALD MATTRESS CORPORATION | SECURITY AGREEMENT DTD 9/20/2006 | SALES AGREEMENTS |
| 1434 | SERTA SIMMONS BEDDING, LLC | MAINLINE INFORMATION SYSTEMS | IT AGREEMENT DTD 8/30/2016 | IT AGREEMENT |
| 1435 | SERTA SIMMONS BEDDING, LLC | MANASRA INC | AUTHORIZED DEALER AGREEMENT DTD 7/4/2022 | SALES AGREEMENTS |
| 1436 | SERTA SIMMONS BEDDING, LLC | MANASRA INC | CO-OP ADVERTISING AGREEMENT DTD 7/4/2022 | SALES AGREEMENTS |
| 1437 | SERTA SIMMONS BEDDING, LLC | MANESS FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 12/17/2022 | SALES AGREEMENTS |
| 1438 | SIMMONS BEDDING COMPANY, LLC | MANESS FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 12/17/2022 | SALES AGREEMENTS |
| 1439 | SERTA SIMMONS BEDDING, LLC | MANY BLESSINGS INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1440 | SIMMONS BEDDING COMPANY, LLC | MANY BLESSINGS INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1441  SERTA SIMMONS BEDDING, LLC | MAR LO SALES, INC. (DBA) MARKETING PLUS | CONSULTANT AGREEMENT DTD 1/25/2021 | CONSULTANT AGREEMENT |
| 1442  DAWN INTERMEDIATE, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1443  DREAMWELL, LTD. | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1444  NATIONAL BEDDING COMPANY L.L.C. | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1445  SERTA INTERNATIONAL HOLDCO, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1446  SERTA SIMMONS BEDDING, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1447  SIMMONS BEDDING COMPANY, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1448  SSB HOSPITALITY, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1449  SSB LOGISTICS, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1450  SSB MANUFACTURING COMPANY | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1451  SSB RETAIL, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1452  THE SIMMONS MANUFACTURING CO., LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1453  TOMORROW SLEEP LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1454  TUFT & NEEDLE, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1455  WORLD OF SLEEP OUTLETS, LLC | MARKEL | MARINE CARGO INSURANCE AGREEMENT (POLICY #: MKLM60MC0003173/MKLM60MC003173W) | INSURANCE |
| 1456  SERTA SIMMONS BEDDING, LLC | MARKET TRACK LLC | MASTER SERVICES AGREEMENT FOR RESEARCH SERVICES DTD 11/1/2020 | CONSUMER INSIGHT AGR |
| 1457  SERTA SIMMONS BEDDING, LLC | MARKET TRACK LLC | CONSULTANT AGREEMENT DTD 11/1/2020 | CONSULTANT AGREEMENT |
| 1458  SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | MARRIOTT HOTEL HOLDING GMBH | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/1/2016 | DEALER/RETAILER/HOSPITALITY AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1459 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | MARRIOTT HOTEL HOLDING GMBH | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/1/2016 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1460 | SERTA SIMMONS BEDDING, LLC | MASERGY COMMUNICATIONS INC | IT AGREEMENT DTD 6/30/2021 | IT AGREEMENT |
| 1461 | SERTA SIMMONS BEDDING, LLC | MASERGY COMMUNICATIONS INC | MASTER SERVICE AGREEMENT #SSB-01 DTD 6/30/2021 | IT AGREEMENT |
| 1462 | SERTA SIMMONS BEDDING, LLC | MATERIAL CONNEXION LLC | ORDER FORM #MC-002856 | INNOVATION-TRANSFORMATION |
| 1463 | SERTA SIMMONS BEDDING, LLC | MATERIAL CONNEXION LLC | RESEARCH & INNOVATION AGREEMENT DTD 8/1/2022 | RESEARCH AND INNOVATION |
| 1464 | SERTA SIMMONS BEDDING, LLC | MATTRESS & BEYOND CORP | SALES/RETAILER AGREEMENT DTD 12/11/2022 | SALES/RETAILER AGREEMENTS |
| 1465 | SERTA SIMMONS BEDDING, LLC | MATTRESS & BEYOND CORP | CO-OP ADVERTISING AGREEMENT DTD 12/12/2022 | SALES AGREEMENTS |
| 1466 | SERTA SIMMONS BEDDING, LLC | MATTRESS & BEYOND CORP | AUTHORIZED DEALER AGREEMENT DTD 12/12/2022 | SALES AGREEMENTS |
| 1467 | SERTA SIMMONS BEDDING, LLC | MATTRESS & MORE | CO-OP ADVERTISING AGREEMENT DTD 11/9/2022 | SALES AGREEMENTS |
| 1468 | SERTA SIMMONS BEDDING, LLC | MATTRESS & MORE | AUTHORIZED DEALER AGREEMENT DTD 11/9/2022 | SALES AGREEMENTS |
| 1469 | SERTA SIMMONS BEDDING, LLC | MATTRESS & MORE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1470 | NATIONAL BEDDING COMPANY L.L.C. | MATTRESS & SPRINGS | SUPPLY AGREEMENT DTD 1/25/2005 | SALES AGREEMENTS |
| 1471 | NATIONAL BEDDING COMPANY L.L.C. | MATTRESS & SPRINGS | SUPPLY AGREEMENT AMENDMENT LETTER DTD 1/24/2005 | SALES AGREEMENTS |
| 1472 | NATIONAL BEDDING COMPANY L.L.C. | MATTRESS & SPRINGS | SECURITY AGREEMENT DTD 1/25/2005 | SALES AGREEMENTS |
| 1473 | SERTA SIMMONS BEDDING, LLC | MATTRESS CENTRAL LLC | CO-OP ADVERTISING AGREEMENT DTD 2/8/2022 | SALES AGREEMENTS |
| 1474 | SERTA SIMMONS BEDDING, LLC | MATTRESS CENTRAL LLC | AUTHORIZED DEALER AGREEMENT DTD 2/8/2022 | SALES AGREEMENTS |
| 1475 | SERTA SIMMONS BEDDING, LLC | MATTRESS DISCOUNT KING LLC | AUTHORIZED DEALER AGREEMENT DTD 9/14/2022 | SALES AGREEMENTS |
| 1476 | SERTA SIMMONS BEDDING, LLC | MATTRESS DISCOUNT KING LLC | CO-OP ADVERTISING AGREEMENT DTD 9/14/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1477 SERTA SIMMONS BEDDING, LLC | MATTRESS DISCOUNTERS #1 | CO-OP ADVERTISING AGREEMENT DTD 9/29/2022 | SALES AGREEMENTS |
| 1478 SERTA SIMMONS BEDDING, LLC | MATTRESS DISCOUNTERS #1 | AUTHORIZED DEALER AGREEMENT DTD 9/29/2022 | SALES AGREEMENTS |
| 1479 SERTA SIMMONS BEDDING, LLC | MATTRESS DREAMZZZ LLC | CO-OP ADVERTISING AGREEMENT DTD 11/3/2022 | SALES AGREEMENTS |
| 1480 SERTA SIMMONS BEDDING, LLC | MATTRESS DREAMZZZ LLC | AUTHORIZED DEALER AGREEMENT DTD 11/3/2022 | SALES AGREEMENTS |
| 1481 SERTA SIMMONS BEDDING, LLC | MATTRESS EXPRESS | CO-OP ADVERTISING AGREEMENT DTD 11/1/2022 | SALES AGREEMENTS |
| 1482 SERTA SIMMONS BEDDING, LLC | MATTRESS EXPRESS | AUTHORIZED DEALER AGREEMENT DTD 11/1/2022 | SALES AGREEMENTS |
| 1483 SERTA SIMMONS BEDDING, LLC | MATTRESS FIRM INC | SSB HEADBOARD PROGRAM AGREEMENT 09/07/2021 | CUSTOMER CONTRACT |
| 1484 SERTA SIMMONS BEDDING, LLC | MATTRESS FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 5/10/2022 | SALES AGREEMENTS |
| 1485 SERTA SIMMONS BEDDING, LLC | MATTRESS FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 5/10/2022 | SALES AGREEMENTS |
| 1486 SERTA SIMMONS BEDDING, LLC | MATTRESS KING LLC, THE | CO-OP ADVERTISING AGREEMENT DTD 7/14/2020 | SALES AGREEMENTS |
| 1487 SERTA SIMMONS BEDDING, LLC | MATTRESS KING LLC, THE | AUTHORIZED DEALER AGREEMENT DTD 7/14/2020 | SALES AGREEMENTS |
| 1488 SERTA SIMMONS BEDDING, LLC | MATTRESS MAN OF MAINE LLC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1489 SERTA SIMMONS BEDDING, LLC | MATTRESS OUTLET | CO-OP ADVERTISING AGREEMENT DTD 11/28/2022 | SALES AGREEMENTS |
| 1490 SERTA SIMMONS BEDDING, LLC | MATTRESS SPECIALISTS | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1491 NATIONAL BEDDING COMPANY L.L.C. | MATTRESS SUPERSTORE LLC | SUPPLY AGREEMENT  DTD 6/15/2005 | SALES AGREEMENTS |
| 1492 NATIONAL BEDDING COMPANY L.L.C. | MATTRESS SUPERSTORE LLC | SECURITY AGREEMENT DTD 6/15/2005 | SALES AGREEMENTS |
| 1493 NATIONAL BEDDING COMPANY L.L.C. | MATTRESS SUPERSTORE LLC | SUPPLY AGREEMENT  DTD 6/15/2005 | SALES AGREEMENTS |
| 1494 SERTA SIMMONS BEDDING, LLC | MATTRESS TOWN | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1495 | SIMMONS BEDDING COMPANY, LLC | MATTRESS TOWN | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1496 | SERTA SIMMONS BEDDING, LLC | MAX TRANS LOGISTICS OF CATTANOOGA LLC | BROKER TRANSPORTATION SERVICES AGREEMENT 02/08/2022 | INDIRECT SUPPLIER |
| 1497 | SERTA SIMMONS BEDDING, LLC; SIMMONS BEDDING COMPANY, LLC | MAY RIVER MATTRESS COMPANY | CO-OP AMENDMENT DTD 7/14/2022 | SALES AGREEMENTS |
| 1498 | SERTA SIMMONS BEDDING, LLC; SIMMONS BEDDING COMPANY, LLC | MAY RIVER MATTRESS COMPANY | CO-OP AMENDMENT DTD 7/14/2022 | SALES AGREEMENTS |
| 1499 | SERTA SIMMONS BEDDING, LLC | MBA WAUSAU LLC | AUTHORIZED DEALER AGREEMENT DTD 6/21/2022 | SALES AGREEMENTS |
| 1500 | SERTA SIMMONS BEDDING, LLC | MBA WAUSAU LLC | CO-OP ADVERTISING AGREEMENT DTD 6/21/2022 | SALES AGREEMENTS |
| 1501 | TUFT & NEEDLE, LLC | MD HERITAGE LLC | LEASE AGREEMENT DTD 10/13/2015 FOR HERITAGE MARKETPLACE - BDG 5, 350 N GILBERT RD, GILBERT AZ | REAL ESTATE LEASES |
| 1502 | SERTA SIMMONS BEDDING, LLC | MEDALLIA | CONSUMER INSIGHTS AGREEMENT | CONSUMER INSIGHTS |
| 1503 | TUFT & NEEDLE, LLC | MELTWATER NEWS US INC | ORDER CONFIRMATION | HUMAN RESOURCES |
| 1504 | SERTA SIMMONS BEDDING, LLC | MERCER | NORTH AMERICA DATA AGREEMENT | HUMAN RESOURCES |
| 1505 | SERTA SIMMONS BEDDING, LLC | MERCER (US) INC | INTERNATIONAL POSITION EVALUATION METHODOLOGY LICENSE AGREEMENT DTD 10/3/2022 | HUMAN RESOURCES |
| 1506 | SERTA SIMMONS BEDDING, LLC | MERCER HEALTH & BENEFITS LLC | ENGAGEMENT LETTER AND STATEMENT OF WORK DTD 9/3/2013 | HUMAN RESOURCES |
| 1507 | THE SIMMONS MANUFACTURING CO., LLC | MERICLE 580 OAK RIDGE LLC | INDUSTRIAL / OFFICE NNN LEASE DTD 8/25/2003 FOR 580 OAKRIDGE RD, HAZLE TOWNSHIP, LUZERNE COUNTY, PA | REAL ESTATE LEASES |
| 1508 | THE SIMMONS MANUFACTURING CO., LLC | MERICLE 580 OAK RIDGE LLC | GUARANTY AND SURETYSHIP AGREEMENT DTD 8/25/2003 | REAL ESTATE LEASES |
| 1509 | SERTA SIMMONS BEDDING, LLC | METROPOLITAN LIFE INSURANCE COMPANY | CUSTOMER AGREEMENT DTD 6/15/2021 | HUMAN RESOURCES |
| 1510 | SERTA SIMMONS BEDDING, LLC | METROPOLITAN LIFE INSURANCE COMPANY | CUSTOMER AGREEMENT DTD 6/15/2021 | HUMAN RESOURCES |
| 1511 | SERTA SIMMONS BEDDING, LLC | MGL PARTNERS INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1512 | SERTA SIMMONS BEDDING, LLC | MICROSOFT CORPORATION | IT AGREEMENT DTD 06/01/2017 | IT AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1513 | SIMMONS BEDDING COMPANY, LLC | MICROSOFT CORPORATION | END CUSTOMER FUNDS STATEMENT OF WORK DTD 4/17/2020 | CONSULTING |
| 1514 | SERTA SIMMONS BEDDING, LLC | MICROSOFT CORPORATION | VOLUME LICENSING AGREEMENT #7-WXAMTKQIZ DTD 6/1/2021 | IT AGREEMENT |
| 1515 | SERTA SIMMONS BEDDING, LLC | MICROSOFT CORPORATION | VOLUME LICENSING AGREEMENT #1079912.003 DTD 6/1/2021 | IT AGREEMENT |
| 1516 | SERTA SIMMONS BEDDING, LLC | MID SOUTH EXTRUSION | SUPPLY AGREEMENT 05/25/2022 | DIRECT SUPPLIER |
| 1517 | SERTA SIMMONS BEDDING, LLC | MID SOUTH EXTRUSION | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 5/25/2022 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |
| 1518 | SERTA SIMMONS BEDDING, LLC | MID-SOUTH FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 12/15/2022 | SALES AGREEMENTS |
| 1519 | SERTA SIMMONS BEDDING, LLC | MID-SOUTH FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 12/15/2022 | SALES AGREEMENTS |
| 1520 | SERTA SIMMONS BEDDING, LLC | MID-SOUTH FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 12/15/2022 | SALES AGREEMENTS |
| 1521 | SERTA SIMMONS BEDDING, LLC | MID-SOUTH FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 12/15/2022 | SALES AGREEMENTS |
| 1522 | SERTA SIMMONS BEDDING, LLC | MIDWEST CLEARANCE CENTERS LLC | CO-OP ADVERTISING AGREEMENT DTD 9/5/2022 | SALES AGREEMENTS |
| 1523 | SERTA SIMMONS BEDDING, LLC | MIDWEST CLEARANCE CENTERS LLC | AUTHORIZED DEALER AGREEMENT DTD 9/5/2022 | SALES AGREEMENTS |
| 1524 | SERTA SIMMONS BEDDING, LLC | MIGHTYHIVE INC | PLATFORM AND SERVICE AGREEMENT | INDIRECT SUPPLIER |
| 1525 | SERTA SIMMONS BEDDING, LLC | MIGHTYHIVE INC | ADVERTISING/MARKETING AGREEMENT DTD 1/23/2019 | ADVERTISING/MARKETING AGREEMENT |
| 1526 | SERTA SIMMONS BEDDING, LLC | MIKE RACKLEY FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 2/17/2022 | SALES AGREEMENTS |
| 1527 | SERTA SIMMONS BEDDING, LLC | MIKE RACKLEY FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 2/17/2022 | SALES AGREEMENTS |
| 1528 | SERTA SIMMONS BEDDING, LLC | MIKIRTYCHEV, NICK | CO-OP ADVERTISING AGREEMENT DTD 9/20/2022 | SALES AGREEMENTS |
| 1529 | SERTA SIMMONS BEDDING, LLC | MIKIRTYCHEV, NICK | AUTHORIZED DEALER AGREEMENT DTD 9/20/2022 | SALES AGREEMENTS |
| 1530 | SERTA SIMMONS BEDDING, LLC | MILLER'S OF CLAFLIN INC | CO-OP ADVERTISING AGREEMENT DTD 11/10/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1531 SERTA SIMMONS BEDDING, LLC | MILLER'S OF CLAFLIN INC | AUTHORIZED DEALER AGREEMENT DTD 11/10/2022 | SALES AGREEMENTS |
| 1532 SERTA SIMMONS BEDDING, LLC | MILLIKEN NONWOVENS LLC | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 1533 SSB MANUFACTURING COMPANY | MILLIKEN NONWOVENS LLC | SUPPLY AGREEMENT DTD 1/23/2023 | SUPPLY-PURCHASE AGREEMENT |
| 1534 SERTA SIMMONS BEDDING, LLC | MIMECAST NORTH AMERICA, INC. | IT AGREEMENT DTD 8/14/2019 | IT AGREEMENT |
| 1535 NATIONAL BEDDING COMPANY L.L.C. | MISSOURI FURNITURE INC | SUPPLY AGREEMENT  DTD 12/2/2014 | SALES AGREEMENTS |
| 1536 NATIONAL BEDDING COMPANY L.L.C. | MISSOURI FURNITURE INC | SUPPLY AGREEMENT  DTD 12/2/2014 | SALES AGREEMENTS |
| 1537 SERTA SIMMONS BEDDING, LLC | MLC CAD SYSTEMS LLC | SERVICES AGREEMENT | IT AGREEMENT |
| 1538 SERTA SIMMONS BEDDING, LLC | MODE A VISUAL AGENCY LLC | MASTER SERVICES AGREEMENT 03/20/2017 | INDIRECT SUPPLIER |
| 1539 SERTA SIMMONS BEDDING, LLC | MODE A VISUAL AGENCY LLC | SCOPE OF WORK ADDENDUM DTD 10/01/2022 | HUMAN RESOURCES |
| 1540 SERTA SIMMONS BEDDING, LLC | MODERN MARKETING CONCEPTS INC | STATEMENT OF WORK #002 DTD 4/1/2019 AS AMENDED 4/1/2020 | SALES |
| 1541 SERTA SIMMONS BEDDING, LLC | MODERN MARKETING CONCEPTS INC | ADVERTISING/MARKETING AGREEMENT DTD 12/1/2015 | ADVERTISING/MARKETING AGREEMENT |
| 1542 SERTA SIMMONS BEDDING, LLC | MODERN MARKETING CONCEPTS INC | MASTER AGREEMENT DTD 12/1/2015 | ADVERTISING/MARKETING (NON-SALES & NON-DTC) |
| 1543 SERTA SIMMONS BEDDING, LLC | MODERN MATTRESS LLC | CO-OP ADVERTISING AGREEMENT DTD 7/14/2022 | SALES AGREEMENTS |
| 1544 SERTA SIMMONS BEDDING, LLC | MOORE COLSON & COMPANY | CONSULTING AGREEEMNT DTD 6/19/2015 | CONSULTING |
| 1545 SERTA SIMMONS BEDDING, LLC | MOORE COLSON & COMPANY | CONSULTANT AGREEMENT DTD 10/16/2019 | CONSULTANT AGREEMENT |
| 1546 NATIONAL BEDDING COMPANY L.L.C. | MORGAN FURNITURE CENTER LLC | SUPPLY AGREEMENT  DTD 2/27/2015 | SALES AGREEMENTS |
| 1547 SERTA SIMMONS BEDDING, LLC | MORONES, JOHNNY | AUTHORIZED DEALER AGREEMENT DTD 12/28/2022 | SALES AGREEMENTS |
| 1548 SIMMONS BEDDING COMPANY, LLC | MORONES, JOHNNY | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1549 | SERTA SIMMONS BEDDING, LLC | MOSAIC SALES SOLUTIONS US OPERATING CO., LLC (ACOSTA) | CONSULTANT AGREEMENT DTD 7/14/2021 | CONSULTANT AGREEMENT |
| 1550 | SERTA SIMMONS BEDDING, LLC | MOSAIC SALES SOLUTIONS US OPERATING CO., LLC (ACOSTA) | CONSULTANT AGREEMENT DTD 7/14/2021 | CONSULTANT AGREEMENT |
| 1551 | SERTA SIMMONS BEDDING, LLC | MOSSHOLDERS FURNITURE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1552 | SERTA SIMMONS BEDDING, LLC | MOUNTAIN HOME FURNITURE LTD (AMERICA'S MATTRESS) | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 12/22/2021 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1553 | SERTA SIMMONS BEDDING, LLC | MR BEES FURNITURE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1554 | DREAMWELL, LTD. | MUEBLES Y ESPEJOS SA | TRADEMARK AND TECHNOLOGY LICENSE AGREEMENT 09/01/2004 | LICENSE |
| 1555 | SIMMONS BEDDING COMPANY, LLC | MUEBLES Y ESPEJOS SA | LICENSE & TECHNICAL ASSISTANCE AGREEMENT 03/01/1996 | LICENSE |
| 1556 | SIMMONS BEDDING COMPANY, LLC | MUEBLES Y ESPEJOS SA | TECHNICAL SERVICES AGREEMENT  09/01/2004 | LICENSE |
| 1557 | SERTA SIMMONS BEDDING, LLC | MULESOFT LLC | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 1558 | TUFT & NEEDLE, LLC | MUSIC LANE OWNER LLC | LEASE AGREMENT 07/03/2019FOR 1011 SOUTH CONGRESS AVE., AUSTIN TX | REAL ESTATE LEASES |
| 1559 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | MY MATTRESS STORE LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/6/2020 | SALES AGREEMENTS |
| 1560 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | MY MATTRESS STORE LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/6/2020 | SALES AGREEMENTS |
| 1561 | SERTA SIMMONS BEDDING, LLC | MYERS FLOOR COVERING & FURNITURE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1562 | SERTA SIMMONS BEDDING, LLC | NACOGDOCHES FURNITURE WAREHOUSE LLC | CO-OP ADVERTISING AGREEMENT DTD 7/1/2020 | SALES AGREEMENTS |
| 1563 | SERTA SIMMONS BEDDING, LLC | NACOGDOCHES FURNITURE WAREHOUSE LLC | AUTHORIZED DEALER AGREEMENT DTD 7/1/2020 | SALES AGREEMENTS |
| 1564 | SERTA SIMMONS BEDDING, LLC | NADEEN INC | CO-OP ADVERTISING AGREEMENT DTD 12/5/2022 | SALES AGREEMENTS |
| 1565 | SERTA SIMMONS BEDDING, LLC | NADEEN INC | AUTHORIZED DEALER AGREEMENT DTD 12/5/2022 | SALES AGREEMENTS |
| 1566 | SERTA SIMMONS BEDDING, LLC | NASHVILLE FURNITURE TRADING INC | CO-OP ADVERTISING AGREEMENT DTD 10/12/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1567 SERTA SIMMONS BEDDING, LLC | NASHVILLE FURNITURE TRADING INC | AUTHORIZED DEALER AGREEMENT DTD 10/12/2022 | SALES AGREEMENTS |
| 1568 SERTA SIMMONS BEDDING, LLC | NATE BERKUS ENTERTAINMENT INC | LICENSE, DESIGN AND PROMOTION AGREEMENT 07/30/2021 | LICENSE |
| 1569 SERTA SIMMONS BEDDING, LLC | NATE BERKUS ENTERTAINMENT INC | LICENSE, DESIGN AND PROMOTION AGREEMENT 07/30/2021 | LICENSE |
| 1570 DAWN INTERMEDIATE, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1571 DREAMWELL, LTD. | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1572 NATIONAL BEDDING COMPANY L.L.C. | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1573 SERTA INTERNATIONAL HOLDCO, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1574 SERTA SIMMONS BEDDING, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1575 SIMMONS BEDDING COMPANY, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1576 SSB HOSPITALITY, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1577 SSB LOGISTICS, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1578 SSB MANUFACTURING COMPANY | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1579 SSB RETAIL, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1580 THE SIMMONS MANUFACTURING CO., LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1581 TOMORROW SLEEP LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1582 TUFT & NEEDLE, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1583 WORLD OF SLEEP OUTLETS, LLC | NATIONAL UNION FIRE INSURANCE COMPANY | BUSINESS TRAVEL ACCIDENT INSURANCE AGREEMENT (POLICY #: GTP 0009137187) | INSURANCE |
| 1584 DAWN INTERMEDIATE, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1585  DREAMWELL, LTD. | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1586  NATIONAL BEDDING COMPANY L.L.C. | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1587  SERTA INTERNATIONAL HOLDCO, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1588  SERTA SIMMONS BEDDING, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1589  SIMMONS BEDDING COMPANY, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1590  SSB HOSPITALITY, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1591  SSB LOGISTICS, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1592  SSB MANUFACTURING COMPANY | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1593  SSB RETAIL, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1594  THE SIMMONS MANUFACTURING CO., LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1595  TOMORROW SLEEP LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1596  TUFT & NEEDLE, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1597  WORLD OF SLEEP OUTLETS, LLC | NATIONWIDE | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: XMF2103601) | INSURANCE |
| 1598  SERTA SIMMONS BEDDING, LLC | NAVEX GLOBAL, INC. | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 12/22/2021 | HUMAN RESOURCES |
| 1599  SERTA SIMMONS BEDDING, LLC | NAVEX GLOBAL, INC. | MASTER SERVICES AGREEMENT DTD 9/26/2011, AND SUBSEQUENT AMENDMENTS | HUMAN RESOURCES |
| 1600  SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | NAVEX GLOBAL, INC. | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 12/22/2021 | HUMAN RESOURCES |
| 1601  SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | NAVEX GLOBAL, INC. | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 12/22/2021 | HUMAN RESOURCES |
| 1602  SERTA SIMMONS BEDDING, LLC | NEBRASKA FURNITURE MART INC | DEALER INCENTIVE AGREEMENT 01/01/2022 | CUSTOMER CONTRACT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1603 | SERTA SIMMONS BEDDING, LLC | NEBRASKA FURNITURE MART INC | DEALER INCENTIVE AGREEMENT 01/01/2022 | CUSTOMER CONTRACT |
| 1604 | SERTA SIMMONS BEDDING, LLC | NETSERTIVE, INC. | ADVERTISING/MARKETING (NON-SALES & NON-DTC) DTD 2/5/2021 | SALES |
| 1605 | SERTA SIMMONS BEDDING, LLC | NETWORK DATA SYSTEM | IT AGREEMENT DTD 9/8/2016 | IT AGREEMENT |
| 1606 | SERTA SIMMONS BEDDING, LLC | NETWORK SOLUTIONS OF AMERICA INC | MASTER SERVICES AGREEMENT DTD 9/2/2015 | IT AGREEMENT |
| 1607 | SERTA SIMMONS BEDDING, LLC | NEW SIGNATURE (INFRASCIENCE) | IT AGREEMENT DTD 6/16/2016 | IT AGREEMENT |
| 1608 | DREAMWELL, LTD. | NEW ZEALAND COMFORT GROUP LTD | PATENT AND TRADEMARK LICENSE AGREEMENT 03/31/2021 | LICENSE |
| 1609 | SIMMONS BEDDING COMPANY, LLC | NEW ZEALAND COMFORT GROUP LTD | TECHNICAL SERVICES AGREEMENT DTD 7/29/2011 | LICENSE |
| 1610 | SSB MANUFACTURING COMPANY | NEW ZEALAND COMFORT GROUP LTD | TECHNICAL SERVICES AGREEMENT 03/31/2021 | LICENSE |
| 1611 | SERTA SIMMONS BEDDING, LLC | NEWELL HUNT FURNITURE INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1612 | NATIONAL BEDDING COMPANY L.L.C. | NEWPORT CARPET INC | SUPPLY AGREEMENT  DTD 5/20/2013 | SALES AGREEMENTS |
| 1613 | SERTA SIMMONS BEDDING, LLC | NEX MATRIX CORP | SUPPLY AGREEMENT 03/29/2021 | DIRECT SUPPLIER |
| 1614 | SERTA SIMMONS BEDDING, LLC | NEX MATRIX CORP | SUPPLY/PURCHASE AGREEMENT DTD 3/29/2021 | SUPPLY/PURCHASE AGREEMENT |
| 1615 | TUFT & NEEDLE, LLC | NEXTDOOR | INSERTION ORDER DTD 8/11/2022 | ADVERTISING/MARKETING - DTC |
| 1616 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | NHF-AMMAT LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/1/2018 | SALES AGREEMENTS |
| 1617 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | NHF-AMMAT LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/1/2018 | SALES AGREEMENTS |
| 1618 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | NHF-AMMAT LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/1/2018 | SALES AGREEMENTS |
| 1619 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | NHF-AMMAT LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/1/2018 | SALES AGREEMENTS |
| 1620 | NATIONAL BEDDING COMPANY L.L.C. | NIELSON ELECTRIC INC | SUPPLY AGREEMENT DTD 9/23/2015 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 1621 TUFT & NEEDLE, LLC | NON-STOP DELIVERY INC | TRANSPORTATION/LOGISTICS AGREEMENT DTD 8/12/2021 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1622 SERTA SIMMONS BEDDING, LLC | NORTH AMERICAN SPRING ENTERPRISES CO LLC | PROGRAM PRODUCT/LICENSE AGREEMENT #S11607-02 DTD 8/8/2011 | IT AGREEMENT |
| 1623 SERTA SIMMONS BEDDING, LLC | NUMERATOR | ADVERTISING/MARKETING (NON-SALES) DTD 10/1/2021 | MARKETING |
| 1624 DREAMWELL, LTD. | NVISION MARKETING LLC | TRADEMARK LICENSE AGREEMENT 1/1/2016 | LICENSE |
| 1625 SIMMONS BEDDING COMPANY, LLC | NVISION MARKETING LLC | LICENSE AGREEMENT DTD 1/1/2019 | LICENSE AGREEMENT |
| 1626 SERTA SIMMONS BEDDING, LLC | OBERTS FURNITURE OF REPUBLIC LLC | CO-OP ADVERTISING AGREEMENT DTD 1/28/2022 | SALES AGREEMENTS |
| 1627 SERTA SIMMONS BEDDING, LLC | OBERTS FURNITURE OF REPUBLIC LLC | AUTHORIZED DEALER AGREEMENT DTD 1/28/2022 | SALES AGREEMENTS |
| 1628 SERTA SIMMONS BEDDING, LLC | OC MATTRESS & FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 10/3/2022 | SALES AGREEMENTS |
| 1629 SERTA SIMMONS BEDDING, LLC | OC MATTRESS & FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 10/3/2022 | SALES AGREEMENTS |
| 1630 SERTA SIMMONS BEDDING, LLC | OCTILLION MEDIA LLC | MASTER DEMAND PARTNER AGREEMENT  09/30/2022 | INDIRECT SUPPLIER |
| 1631 NATIONAL BEDDING COMPANY L.L.C. | ODDEN & ZIMBELMAN TV & APPLIANCE | SUPPLY AGREEMENT DTD 3/18/2016 | SALES AGREEMENTS |
| 1632 SERTA SIMMONS BEDDING, LLC | OHM SYSTEMS INC | MASTER SERVICES AGREEMENT DTD 11/21/2011 | IT AGREEMENT |
| 1633 SERTA SIMMONS BEDDING, LLC | OHM SYSTEMS INC | PROGRAM PRODUCT/LICENSE AGREEMENT #S11607-02 DTD 8/8/2011 | IT AGREEMENT |
| 1634 SERTA SIMMONS BEDDING, LLC | OHM SYSTEMS INC | PROGRAM PRODUCT/LICENSE AGREEMENT #S11607-02 DTD 8/8/2011 | IT AGREEMENT |
| 1635 SERTA SIMMONS BEDDING, LLC | OHM SYSTEMS INC | PROGRAM PRODUCT/LICENSE AGREEMENT #S11607-02 DTD 8/8/2011 | IT AGREEMENT |
| 1636 DAWN INTERMEDIATE, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1637 DREAMWELL, LTD. | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1638 NATIONAL BEDDING COMPANY L.L.C. | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|----------------------|---------------|
| 1639  SERTA INTERNATIONAL HOLDCO, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1640  SERTA SIMMONS BEDDING, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1641  SIMMONS BEDDING COMPANY, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1642  SSB HOSPITALITY, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1643  SSB LOGISTICS, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1644  SSB MANUFACTURING COMPANY | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1645  SSB RETAIL, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1646  THE SIMMONS MANUFACTURING CO., LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1647  TOMORROW SLEEP LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1648  TUFT & NEEDLE, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1649  WORLD OF SLEEP OUTLETS, LLC | ONE ALLIANCE | PUERTO RICO PLACEMENT AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: 75-30-000002043-1) | INSURANCE |
| 1650  TUFT & NEEDLE, LLC | ONE CARE MEDIA, LLC | ADVERTISING/MARKETING AGREEMENT DTD 5/18/2021 | ADVERTISING/MARKETING AGREEMENT |
| 1651  SERTA SIMMONS BEDDING, LLC | ONE DIVERSIFIED LLC | ZOOM ANNUAL SERVICES LICENSING PROPOSAL #QUO-70274-L2C4X5DTD 2/20/2023 | IT AGREEMENT |
| 1652  SSB MANUFACTURING COMPANY | ONE REYNOLDS DRIVE LLC | LEASE DTD 11/16/2016 FOR ("BUILDING 30") AT ONE REYNOLDS DRIVE, ROCK COUNTY WI | REAL ESTATE LEASES |
| 1653  SSB MANUFACTURING COMPANY | ONE REYNOLDS DRIVE LLC | LEASE DTD 11/16/2016 FOR ("BUILDING 30") AT ONE REYNOLDS DRIVE, ROCK COUNTY WI | REAL ESTATE LEASES |
| 1654  SERTA SIMMONS BEDDING, LLC | ONETRUST LLC | RENEWAL ORDER FORM #Q-328726 DTD 1/3/2023 | IT AGREEMENT |
| 1655  SERTA SIMMONS BEDDING, LLC | ONETRUST LLC | RENEWAL ORDER FORM #Q-203881 DTD 3/15/2022 | IT AGREEMENT |
| 1656  SERTA SIMMONS BEDDING, LLC | ONIT INC | SUBSCRIPTION AGREEMENT DTD 6/28/2021 | Uncategorized |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1657 | SERTA SIMMONS BEDDING, LLC | ONIT INC | SUBSCRIPTION AGREEMENT DTD 6/28/2021 | IT AGREEMENT |
| 1658 | SERTA SIMMONS BEDDING, LLC | OPENSESAME INC | IT AGREEMENT DTD 8/31/2021 | IT AGREEMENT |
| 1659 | SERTA SIMMONS BEDDING, LLC | OPENSESAME INC | MASTER CONTENT SUBSCRIPTION AGREEMENT DTD 8/31/2021 | HUMAN RESOURCES |
| 1660 | TOMORROW SLEEP LLC | OPTAROS, INC. | IT AGREEMENT DTD 3/14/2017 | IT AGREEMENT |
| 1661 | SERTA SIMMONS BEDDING, LLC | OPTUMRX INC | COMMITMENT AGREEMENT 01/01/2021 | INDIRECT SUPPLIER |
| 1662 | SERTA SIMMONS BEDDING, LLC | ORACLE AMERICA, INC. | IT AGREEMENT DTD 05/15/2015 | IT AGREEMENT |
| 1663 | SERTA SIMMONS BEDDING, LLC | ORACLE AMERICA, INC. | SERVICES AGREEMENT DTD 9/6/2022 | IT AGREEMENT |
| 1664 | SERTA SIMMONS BEDDING, LLC | ORACLE AMERICA, INC. | IT AGREEMENT DTD 05/15/2015 | IT AGREEMENT |
| 1665 | SERTA SIMMONS BEDDING, LLC | ORACLE AMERICA, INC. | SERVICES AGREEMENT DTD 9/6/2022 | IT AGREEMENT |
| 1666 | SERTA SIMMONS BEDDING, LLC | ORACLE AMERICA, INC. | SALES/RETAILER AGREEMENT DTD 7/29/2022 | SALES/RETAILER AGREEMENTS |
| 1667 | SERTA SIMMONS BEDDING, LLC | OVERSIGHT SYSTEMS, INC. | IT AGREEMENT DTD 9/2/2022 | IT AGREEMENT |
| 1668 | SERTA SIMMONS BEDDING, LLC | OVERSTOCK OUTLET LLC | CO-OP ADVERTISING AGREEMENT DTD 2/25/2020 | SALES AGREEMENTS |
| 1669 | SERTA SIMMONS BEDDING, LLC | OVERSTOCK OUTLET LLC | AUTHORIZED DEALER AGREEMENT DTD 2/25/2020 | SALES AGREEMENTS |
| 1670 | SERTA SIMMONS BEDDING, LLC | OVERSTOCK.COM | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1671 | SERTA SIMMONS BEDDING, LLC | OWENS WHOLESALE FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 10/27/2022 | SALES AGREEMENTS |
| 1672 | SERTA SIMMONS BEDDING, LLC | OWENS WHOLESALE FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 10/27/2022 | SALES AGREEMENTS |
| 1673 | TUFT & NEEDLE, LLC | PAC-FUNG FEATHER CO. LTD. | SUPPLY/PURCHASE AGREEMENT DTD 3/3/2021 | SUPPLY/PURCHASE AGREEMENT |
| 1674 | DREAMWELL, LTD. | PACIFIC BRANDS HOLDINGS PTY LTD | TECHNICAL SERVICES AND TRADEMARK LICENSE AGREEMENT DTD 3/30/2011 | LICENSE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1675  SIMMONS BEDDING COMPANY, LLC | PACIFIC BRANDS HOUSEHOLD PRODUCTS PTY LTD | TECHNICAL SERVICES AGREEMENT DTD 3/30/2011 | LICENSE |
| 1676  SERTA SIMMONS BEDDING, LLC | PACKSIZE | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 1677  TUFT & NEEDLE, LLC | PACVUE CORPORATION | STATEMENT OF WORK DTD 7/8/2021 | SALES |
| 1678  TUFT & NEEDLE, LLC | PACVUE CORPORATION | STATEMENT OF WORK M-TO-M FLAT FEE SAAS SOW DTD 6/1/2020 | SALES |
| 1679  SERTA SIMMONS BEDDING, LLC | PALO ALTO NETWORKS, INC. | IT AGREEMENT DTD 8/29/2019 | IT AGREEMENT |
| 1680  SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | PARK NORTH 4 LLC | GUARANTY DTD 2/23/2015 FOR LEASE AT 601 GATEWAY BLVD, MONROE, OH | REAL ESTATE LEASES |
| 1681  SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | PARK NORTH 4 LLC | GUARANTY DTD 2/23/2015 FOR LEASE AT 601 GATEWAY BLVD, MONROE, OH | REAL ESTATE LEASES |
| 1682  SSB MANUFACTURING COMPANY | PARK NORTH 4 LLC | INDUSTRIAL LEASE DTD 5/1/2015 AT 601 GATEWAY BLVD, MONROE, OH | REAL ESTATE LEASES |
| 1683  SERTA SIMMONS BEDDING, LLC | PARK PLACE TECHNOLOGIES LLC | MAINTENANCE AGREEMENT #D101497M DTD 10/16/2022 | IT AGREEMENT |
| 1684  SERTA SIMMONS BEDDING, LLC | PARKER AVERY GROUP, THE | RECRUITING/STAFFING AGREEMENT DTD 8/26/2020 | RECRUITING/STAFFING AGREEMENT |
| 1685  SERTA SIMMONS BEDDING, LLC | PARKER AVERY GROUP, THE | STATEMENT OF WORK DTD 10/4/2021 | CONSULTING |
| 1686  SERTA SIMMONS BEDDING, LLC | PATSNAP | IT AGREEMENT DTD 1/2/2017 | IT AGREEMENT |
| 1687  SERTA SIMMONS BEDDING, LLC | PATTERSONS INC | AUTHORIZED DEALER AGREEMENT DTD 10/31/2022 | SALES AGREEMENTS |
| 1688  SERTA SIMMONS BEDDING, LLC | PATTERSONS INC | CO-OP ADVERTISING AGREEMENT DTD 10/31/2022 | SALES AGREEMENTS |
| 1689  NATIONAL BEDDING COMPANY L.L.C. | PAUL L REED FURNITURE COMPANY | SUPPLY AGREEMENT DTD 11/10/2015 | SALES AGREEMENTS |
| 1690  TOMORROW SLEEP LLC | PAYPAL, INC./BRAINTREE PAYMENT SVCS. | COMPANY WIDE AGREEMENT DTD 12/5/2017 | COMPANY WIDE AGREEMENT |
| 1691  TOMORROW SLEEP LLC | PAYPAL, INC./BRAINTREE PAYMENT SVCS. | COMPANY WIDE AGREEMENT DTD 4/20/2017 | COMPANY WIDE AGREEMENT |
| 1692  SERTA SIMMONS BEDDING, LLC | PAYSCALE, INC. | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 3/31/2022 | HR VENDOR AGREEMENT/STAFFING AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1693 SERTA SIMMONS BEDDING, LLC | PCA | SUPPLY/PURCHASE AGREEMENT | SUPPLY/PURCHASE AGREEMENT |
| 1694 SERTA SIMMONS BEDDING, LLC | PEAK TECHNOLOGIES INC | MASTER SERVICES AGREEMENT DTD 11/3/2016, AND SUBSEQUENT AMENDEMENTS | IT AGREEMENT |
| 1695 SERTA SIMMONS BEDDING, LLC | PEAK-RYZEX INC | MASTER SERVICES AGREEMENT DTD 11/3/2016 | IT AGREEMENT |
| 1696 DREAMWELL, LTD. | PEGASUS HOME FASHIONS | TRADEMARK LICENSE AGREEMENT 06/01/2020 | LICENSE |
| 1697 SERTA SIMMONS BEDDING, LLC | PEGASUS HOME FASHIONS | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1698 SERTA SIMMONS BEDDING, LLC | PEGASUS HOME FASHIONS | LICENSE AGREEMENT DTD 6/1/2021 | LICENSE AGREEMENT |
| 1699 TUFT & NEEDLE, LLC | PELOTON PROPERTIES LLC | RETAIL LEASE DTD 1/21/2017 FOR 2030 FIRST AVE, SEATTLE, WA | REAL ESTATE LEASES |
| 1700 SERTA SIMMONS BEDDING, LLC | PEM | TRADEMARK LICENSE AGREEMENT DTD 9/1/2022 | TRADEMARK LICENSE AGREEMENT |
| 1701 SERTA SIMMONS BEDDING, LLC | PEOPLESCOUT MSP, LLC | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 12/31/2021 | HR VENDOR AGREEMENT/STAFFING AGREEMENT |
| 1702 SERTA SIMMONS BEDDING, LLC | PEOPLESCOUT MSP, LLC | HR SUPPLIER AGREEMENT DTD 11/1/2020 | HR SUPPLIER AGREEMENT |
| 1703 SERTA SIMMONS BEDDING, LLC | PEOPLESCOUT MSP, LLC | MASTER SERVICES AGREEMENT DTD 5/14/2015, AND SUBSEQUENT AMENDMENTS | HUMAN RESOURCES |
| 1704 TUFT & NEEDLE, LLC | PEPPERJAM, LLC | ADVERTISING/MARKETING AGREEMENT DTD 8/31/2018 | ADVERTISING/MARKETING AGREEMENT |
| 1705 SERTA SIMMONS BEDDING, LLC | PERCEY'S OF WORCHESTER INC | CO-OP ADVERTISING AGREEMENT DTD 12/15/2022 | SALES AGREEMENTS |
| 1706 SERTA SIMMONS BEDDING, LLC | PERCEY'S OF WORCHESTER INC | AUTHORIZED DEALER AGREEMENT DTD 12/15/2022 | SALES AGREEMENTS |
| 1707 SERTA SIMMONS BEDDING, LLC | PERFORMANCE IMPROVEMENT PARTNERS (PIP) | IT AGREEMENT DTD 6/15/2016 | IT AGREEMENT |
| 1708 SERTA SIMMONS BEDDING, LLC | PERKSPOT | HR AGREEMENT DTD 10/3/2016 | HR AGREEMENT |
| 1709 SERTA SIMMONS BEDDING, LLC | PERSIANO RUG, INC. | SALES/RETAILER AGREEMENT DTD 1/11/2023 | SALES/RETAILER AGREEMENTS |
| 1710 SERTA SIMMONS BEDDING, LLC | PHELPS DIGITAL, LLC | INDEPENDENT CONTRACTOR AGREEMENT DTD 10/2/2020 | SALES |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1711 SERTA SIMMONS BEDDING, LLC | PHILLIPIANS 4 MATTRESS SALES, LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/21/2022 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1712 SERTA SIMMONS BEDDING, LLC | PHISHME, INC. | IT AGREEMENT DTD 11/15/2016 | IT AGREEMENT |
| 1713 SSB MANUFACTURING COMPANY | PHOENIX BELOIT INDUSTRIAL INVESTORS LLC | LEASE AGREEMENT DTD 11/16/2016 FOR ONE REYNOLDS DRIVE, BELOIT, WISCONSIN | REAL ESTATE LEASES |
| 1714 TUFT & NEEDLE, LLC | PHOENIX GATEWAY PARTNERS LLC | MULTI-TENANT MODIFIED INDUSTRIAL GROSS LEASE DTD 2/16/2021 FOR METROBUSINESS PARK - BDG B, AT 2320 WEST PEORIA AVE, PHOENIX, AZ | REAL ESTATE LEASES |
| 1715 SERTA SIMMONS BEDDING, LLC | PIANA NONWOVENS | DIRECT SOURCING & OEM (NON-DTC) AGREEMENT | DIRECT SOURCING & OEM (NON-DTC) |
| 1716 SERTA SIMMONS BEDDING, LLC | PIANA NONWOVENS | SUPPLY AGREEMENT 11/07/2022 | DIRECT SUPPLIER |
| 1717 SERTA SIMMONS BEDDING, LLC | PINTEREST INC | PERPETUAL INSERTION ORDER DTD 8/18/2022 | INDIRECT SUPPLIER |
| 1718 SERTA SIMMONS BEDDING, LLC | PLACER LABS, INC | ADVERTISING/MARKETING (NON-SALES) AGREEMENT | ADVERTISING/MARKETING (NON-SALES) |
| 1719 DREAMWELL, LTD. | PLASTIFOAM S.A. | PATENT AND TRADEMARK LICENSE AGREEMENT 01/01/2023 | LICENSE |
| 1720 SSB MANUFACTURING COMPANY | PLASTIFOAM S.A. | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1721 SSB MANUFACTURING COMPANY | PLASTIFOAM S.A. | TECHNICAL SERVICES AGREEMENT 01/01/2023 | LICENSE |
| 1722 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | PLASTIFOAM S.A. | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1723 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | PLASTIFOAM S.A. | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 1724 SERTA SIMMONS BEDDING, LLC | POLITEMAIL SOFTWARE | IT AGREEMENT DTD 4/15/2022 | IT AGREEMENT |
| 1725 SERTA SIMMONS BEDDING, LLC | POMEROY IT SOLUTIONS SALES CO INC | MASTER SERVICES AGREEMENT DTD 2/6/2018 | IT AGREEMENT |
| 1726 SERTA SIMMONS BEDDING, LLC | POMEROY TECHNOLOGIES LLC | STATEMENT OF WORK CMDB TRUE-UP | IT AGREEMENT |
| 1727 SERTA SIMMONS BEDDING, LLC | POUND LLC | CO-OP ADVERTISING AGREEMENT DTD 6/24/2022 | SALES AGREEMENTS |
| 1728 SERTA SIMMONS BEDDING, LLC | POUND LLC | AUTHORIZED DEALER AGREEMENT DTD 6/24/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1729 | SSB LOGISTICS, LLC | POWER LOGISTICS LLC | TRANSPORTATION/LOGISTICS AGREEMENT DTD 9/23/2016 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1730 | SERTA SIMMONS BEDDING, LLC | POWERING VALUE GROUP, LLC (AKA) BRIAN POESCHEL | CONSULTANT AGREEMENT DTD 2/22/2022 | CONSULTANT AGREEMENT |
| 1731 | SERTA SIMMONS BEDDING, LLC | PREMIER RESPONSE, LLC | OUTSOURCING AGREEMENT DTD 1/1/2021 | MARKETING |
| 1732 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | PREMIER RESPONSE, LLC | IT AGREEMENT DTD 9/11/2015 | IT AGREEMENT |
| 1733 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | PREMIER RESPONSE, LLC | IT AGREEMENT DTD 1/1/2018 | IT AGREEMENT |
| 1734 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | PREMIER RESPONSE, LLC | IT AGREEMENT DTD 1/1/2018 | IT AGREEMENT |
| 1735 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | PREMIER RESPONSE, LLC | IT AGREEMENT DTD 9/11/2015 | IT AGREEMENT |
| 1736 | SERTA SIMMONS BEDDING, LLC | PREMISE DATA CORPORATION | MASTER SERVICES AGREEMENT FOR RESEARCH SERVICES (CONSUMER INSIGHTS) DTD 11/18/2020 | CONSUMER INSIGHT |
| 1737 | SERTA SIMMONS BEDDING, LLC | PREMISE DATA CORPORATION | CONSUMER INSIGHTS DTD 11/20/2022 | CONSUMER INSIGHTS |
| 1738 | SERTA SIMMONS BEDDING, LLC | PRESIDIO NETWORKED SOLUTIONS INC | MANAGED SERVICES CONTRACT DTD 8/3/2015 DTD 9/1/2015 | IT AGREEMENT |
| 1739 | SERTA SIMMONS BEDDING, LLC | PRESIDIO NETWORKED SOLUTIONS INC | IT AGREEMENT DTD 3/31/2022 | IT AGREEMENT |
| 1740 | SERTA SIMMONS BEDDING, LLC | PRESIDIO NETWORKED SOLUTIONS INC | CONSULTANT AGREEMENT DTD 7/28/2015 | CONSULTANT AGREEMENT |
| 1741 | SERTA SIMMONS BEDDING, LLC | PRESIDIO NETWORKED SOLUTIONS INC | MASTER SERVICES AGREEMENT DTD 6/28/2017 | IT AGREEMENT |
| 1742 | SERTA SIMMONS BEDDING, LLC | PRESIDIO NETWORKED SOLUTIONS INC | MASTER SERVICES AGREEMENT DTD 6/28/2017 | IT AGREEMENT |
| 1743 | SERTA SIMMONS BEDDING, LLC | PRESTIGE FURNITURE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1744 | SERTA SIMMONS BEDDING, LLC | PRESTIGE FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 12/4/2022 | SALES AGREEMENTS |
| 1745 | SERTA SIMMONS BEDDING, LLC | PRESTIGE FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 12/4/2022 | SALES AGREEMENTS |
| 1746 | SERTA SIMMONS BEDDING, LLC | PRESTIGE FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 12/4/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1747 | SERTA SIMMONS BEDDING, LLC | PRESTIGE FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 12/4/2022 | SALES AGREEMENTS |
| 1748 | SERTA SIMMONS BEDDING, LLC | PRICEWATERHOUSECOOPERS LLP | ENGAGEMENT LETTER DTD 12/20/2022 | TAX AGREEMENT |
| 1749 | SERTA SIMMONS BEDDING, LLC | PRICEWATERHOUSECOOPERS LLP | CONSULTANT AGREEMENT DTD 9/13/2022 | CONSULTANT AGREEMENT |
| 1750 | NATIONAL BEDDING COMPANY L.L.C. | PRINCE, TONY | SUPPLY AGREEMENT DTD 7/15/2011 | SALES AGREEMENTS |
| 1751 | TUFT & NEEDLE, LLC | PRO RELEVANT MEDIA MIX MODELING | ADVERTISING/MARKETING - DTC AGREEMENT | ADVERTISING/MARKETING - DTC |
| 1752 | SSB MANUFACTURING COMPANY | PROCUREMENT ADVISORS LLC | AGREEMENT FOR THE PROCURSEMENT OF PRODUCTS DTD 1/17/2019 | SUPPLY AGREEMENT |
| 1753 | SSB MANUFACTURING COMPANY | PROCUREMENT ADVISORS LLC | AFFILIATION AGREEMENT DTD 12/19/2019 | SUPPLY AGREEMENT |
| 1754 | SERTA SIMMONS BEDDING, LLC | PROFISEE GROUP INC | SOW DTD 12/18/2019 AND SUBSEQUENT CHANGE ORDERS | IT AGREEMENT |
| 1755 | SERTA SIMMONS BEDDING, LLC | PROFISEE GROUP INC | SOFTWARE LICENSE AGREEMENT DTD 9/16/2019 | IT AGREEMENT |
| 1756 | SSB MANUFACTURING COMPANY | PROPERTY DEVELOPERS & CONSULTANTS LLC | COMMERCIAL LEASE DTD 4/17/2017 AT 420 INDUSTRIAL PARK RD, CULLMAN AL | REAL ESTATE LEASES |
| 1757 | SERTA SIMMONS BEDDING, LLC | PTV AMERICA INC. | IT AGREEMENT DTD 6/14/2016 | IT AGREEMENT |
| 1758 | SERTA SIMMONS BEDDING, LLC | PUGH FURNITURE CO | CO-OP ADVERTISING AGREEMENT DTD 4/22/2022 | SALES AGREEMENTS |
| 1759 | SERTA SIMMONS BEDDING, LLC | PUGH FURNITURE CO | AUTHORIZED DEALER AGREEMENT DTD 4/22/2022 | SALES AGREEMENTS |
| 1760 | SERTA SIMMONS BEDDING, LLC | QTS DATA CENTER COLOCATION | IT AGREEMENTS DTD 2/18/2016, renewed 10/31/2022 | IT AGREEMENT |
| 1761 | SERTA SIMMONS BEDDING, LLC | QUALITY FURNITURE NY LLC | SALES/RETAILER AGREEMENT DTD 10/19/2021 | SALES/RETAILER AGREEMENTS |
| 1762 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | QUALITY FURNITURE NY LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/19/2021 | SALES AGREEMENTS |
| 1763 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | QUALITY FURNITURE NY LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/19/2021 | SALES AGREEMENTS |
| 1764 | SERTA SIMMONS BEDDING, LLC | QUALITY HOME FURNISHINGS OF NC LLC | CO-OP ADVERTISING AGREEMENT DTD 1/4/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1765 | SERTA SIMMONS BEDDING, LLC | QUALITY HOME FURNISHINGS OF NC LLC | AUTHORIZED DEALER AGREEMENT DTD 1/4/2022 | SALES AGREEMENTS |
| 1766 | SERTA SIMMONS BEDDING, LLC | QUALTRICS (SAP AMERICA, INC) | OUTSOURCING AGREEMENT DTD 7/26/2020 | OUTSOURCING AGREEMENT |
| 1767 | SERTA SIMMONS BEDDING, LLC | QUALTRICS LLC | GENERAL TERMS & CONDITIONS FOR CLOUD SERVICES DTD 6/30/2022 | CUSTOMER OPS AND OPERATIONS |
| 1768 | SERTA SIMMONS BEDDING, LLC | QUALTRICS, LLC (FORMERLY CLARABRIDGE) | IT AGREEMENT DTD 6/30/2022 | IT AGREEMENT |
| 1769 | SERTA SIMMONS BEDDING, LLC | QVC, INC. | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 5/12/2011 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1770 | SERTA SIMMONS BEDDING, LLC | R.W. WATT & COMPANY LLC | IT AGREEMENT DTD 11/8/2017 | IT AGREEMENT |
| 1771 | SERTA SIMMONS BEDDING, LLC | RABON SERVICES GROUP LLC | CO-OP ADVERTISING AGREEMENT DTD 4/27/2022 | SALES AGREEMENTS |
| 1772 | SERTA SIMMONS BEDDING, LLC | RABON SERVICES GROUP LLC | AUTHORIZED DEALER AGREEMENT DTD 4/27/2022 | SALES AGREEMENTS |
| 1773 | SERTA SIMMONS BEDDING, LLC | RAPID 7 | IT AGREEMENT DTD 3/2/2020 | IT AGREEMENT |
| 1774 | SSB MANUFACTURING COMPANY | RATZON REALTY (INTERSTATE PK LOGISTICS CTR FL) LP | LEASE AGREEMENT-INDUSTRIAL (TRIPLE NET) 07/17/2020 FOR 3774 INTERSTATE PARK ROAD N, RIVIERA BEACH FL | REAL ESTATE LEASES |
| 1775 | SERTA SIMMONS BEDDING, LLC | RAYMOUR & FLANIGAN FURNITURE | DEALER INCENTIVE AGREEMENT 01/01/2021 | CUSTOMER CONTRACT |
| 1776 | TUFT & NEEDLE, LLC | RAYMOUR AND FLANIGAN | SALES/RETAILER AGREEMENT DTD 1/28/2022 | SALES/RETAILER AGREEMENTS |
| 1777 | SIMMONS BEDDING COMPANY, LLC | RAYMOURS FURNITURE COMPANY INC | AUTHORIZED DEALER AGREEMENT 06/19/2009 | CUSTOMER CONTRACT |
| 1778 | THE SIMMONS MANUFACTURING CO., LLC; TUFT & NEEDLE, LLC | RAYMOURS FURNITURE COMPANY INC | VENDOR AGREEMENT DTD 4/15/2010 | CUSTOMER CONTRACT |
| 1779 | NATIONAL BEDDING COMPANY L.L.C. | REEVES, JIM | SUPPLY AGREEMENT DTD 12/10/2014 | SALES AGREEMENTS |
| 1780 | TUFT & NEEDLE, LLC | REN USA, INC. DBA REN SKINCARE | DTC CONTRACTS AGREEMENT | DTC CONTRACTS |
| 1781 | SERTA SIMMONS BEDDING, LLC | REPUBLIC SERVICES NATIONAL ACCOUNTS, LLC | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 1/1/2022 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |
| 1782 | SERTA SIMMONS BEDDING, LLC | REPUBLIC SERVICES NATIONAL ACCOUNTS, LLC | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 1/1/2022 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1783 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | RESPONSIVE SURFACE TECHNOLOGY, LLC (REST) | IT AGREEMENT DTD 6/24/2015 | IT AGREEMENT |
| 1784 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | RESPONSIVE SURFACE TECHNOLOGY, LLC (REST) | IT AGREEMENT DTD 6/24/2015 | IT AGREEMENT |
| 1785 | DREAMWELL, LTD.;SIMMONS BEDDING COMPANY, LLC | REVEZBIEN ESTABLISHMENT | AMENDED AND RESTATED TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT 09/01/2007 | LICENSE |
| 1786 | DREAMWELL, LTD.;SIMMONS BEDDING COMPANY, LLC | REVEZBIEN ESTABLISHMENT | AMENDED AND RESTATED TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT 09/01/2007 | LICENSE |
| 1787 | DREAMWELL, LTD. | REVEZBIEN ESTABLISHMENT | AMENDED & RESTATED PATENT & TRADEMARK LICENSE AGREEMENT 01/01/2011 | LICENSE |
| 1788 | TUFT & NEEDLE, LLC | REWARDSTYLE, INC. | ADVERTISING/MARKETING AGREEMENT DTD 4/27/2021 | ADVERTISING/MARKETING AGREEMENT |
| 1789 | SERTA SIMMONS BEDDING, LLC | RIGHT MANAGEMENT | ENGAGEMENT SCOPING LETTER DTD 5/20/2014 DTD 7/23/2014 | HUMAN RESOURCES |
| 1790 | SERTA SIMMONS BEDDING, LLC | RIMINI STREET | IT AGREEMENT DTD 3/14/2022 | IT AGREEMENT |
| 1791 | SERTA SIMMONS BEDDING, LLC | RIMINI STREET INC | MASTER SERVICES AGREEMENT DTD 5/16/2019 | CONSULTING |
| 1792 | SERTA SIMMONS BEDDING, LLC | RIMINI STREET INC. | IT AGREEMENT DTD 5/16/2019 | IT AGREEMENT |
| 1793 | SERTA SIMMONS BEDDING, LLC | RM2 USA INC. | SUPPLY/PURCHASE AGREEMENT DTD 8/30/2021 | SUPPLY/PURCHASE AGREEMENT |
| 1794 | SERTA SIMMONS BEDDING, LLC | RM2 USA INC. | SUPPLY/PURCHASE AGREEMENT DTD 8/30/2021 | SUPPLY/PURCHASE AGREEMENT |
| 1795 | SERTA SIMMONS BEDDING, LLC | ROBERT HALF INTERNATIONAL INC. | HR SUPPLIER AGREEMENT DTD 9/25/2020 | HR SUPPLIER AGREEMENT |
| 1796 | SERTA SIMMONS BEDDING, LLC | ROBERT HALF INTERNATIONAL INC. | HR AGREEMENT DTD 6/1/2015 | HR AGREEMENT |
| 1797 | SERTA SIMMONS BEDDING, LLC | ROBERTS, WAYNE, JR | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1798 | SERTA SIMMONS BEDDING, LLC | ROBY'S FURNITURE  & APPLIANCE | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/4/2022 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1799 | SERTA SIMMONS BEDDING, LLC | ROCK & ROLL CITY MATTRESS CO | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1800 | SERTA SIMMONS BEDDING, LLC | ROCKERBOX, INC. | MASTER SUBSCRIPTION AGREEMENT DTD 12/30/2022, AND SUBSEQUENT AGREEMENT | T&N AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1801 SERTA SIMMONS BEDDING, LLC | ROCKERBOX, INC. | ADVERTISING/MARKETING (NON-SALES & NON-DTC) AGREEMENT | ADVERTISING/MARKETING (NON-SALES & NON-DTC) |
| 1802 SERTA SIMMONS BEDDING, LLC | ROOMS TO GO | SALES/RETAILER AGREEMENT DTD 12/31/2022 | SALES/RETAILER AGREEMENTS |
| 1803 SERTA SIMMONS BEDDING, LLC | ROOMS TO GO (RTG FURNITURE CORP.) | SALES/RETAILER AGREEMENT DTD 12/31/2022 | SALES/RETAILER AGREEMENTS |
| 1804 SERTA SIMMONS BEDDING, LLC | ROSE BROTHERS OF GOLDSBORO INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1805 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | ROTHER PROPERTIES (AM'S MATTRESS) | SALES/RETAILER AGREEMENT DTD 5/23/2022 | SALES/RETAILER AGREEMENTS |
| 1806 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | ROTHER PROPERTIES (AM'S MATTRESS) | SALES/RETAILER AGREEMENT DTD 5/23/2022 | SALES/RETAILER AGREEMENTS |
| 1807 SERTA SIMMONS BEDDING, LLC | ROTHER PROPERTIES LLC | AUTHORIZED DEALER AGREEMENT DTD 4/17/2022 | SALES AGREEMENTS |
| 1808 SERTA SIMMONS BEDDING, LLC | ROTHER PROPERTIES LLC | CO-OP ADVERTISING AGREEMENT DTD 4/17/2022 | SALES AGREEMENTS |
| 1809 DAWN INTERMEDIATE, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1810 DREAMWELL, LTD. | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1811 NATIONAL BEDDING COMPANY L.L.C. | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1812 SERTA INTERNATIONAL HOLDCO, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1813 SERTA SIMMONS BEDDING, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1814 SIMMONS BEDDING COMPANY, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1815 SSB HOSPITALITY, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1816 SSB LOGISTICS, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1817 SSB MANUFACTURING COMPANY | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1818 SSB RETAIL, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1819 | THE SIMMONS MANUFACTURING CO., LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1820 | TOMORROW SLEEP LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1821 | TUFT & NEEDLE, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1822 | WORLD OF SLEEP OUTLETS, LLC | RSUI GROUP, INC. | DIRECTORS & OFFICERS LIABILITY INSURANCE AGREEMENT (POLICY #: NHS695050) | INSURANCE |
| 1823 | SERTA SIMMONS BEDDING, LLC | RT&T LOGISTICS INC | BROKER TRANSPORTATION SERVICES AGREEMENT 05/28/2019 | INDIRECT SUPPLIER |
| 1824 | SERTA SIMMONS BEDDING, LLC | RTG FURNITURE CORP | MASTER PURCHASE AGREEMENT FOR THE PURCHASE OF MERCHANDISE 01/01/2022 | CUSTOMER CONTRACT |
| 1825 | SERTA SIMMONS BEDDING, LLC | RTG FURNITURE CORP | DEALER INCENTIVE & SUPPLY AGREEMENT 01/01/2022 | CUSTOMER CONTRACT |
| 1826 | NATIONAL BEDDING COMPANY L.L.C. | R-TWO-C'S LLC | LICENSE AND SUPPLY AGREEMENT DTD 10/14/2016 | SALES AGREEMENTS |
| 1827 | SERTA SIMMONS BEDDING, LLC | RUBY & QUIRI INC | CO-OP ADVERTISING AGREEMENT DTD 1/23/2023 | SALES AGREEMENTS |
| 1828 | SERTA SIMMONS BEDDING, LLC | RUBY & QUIRI INC | AUTHORIZED DEALER AGREEMENT DTD 1/23/2013 | SALES AGREEMENTS |
| 1829 | NATIONAL BEDDING COMPANY L.L.C.;SSB LOGISTICS, LLC | RYDER TRUCK RENTAL INC | ASSIGMENT OF TRUCK LEASE AND SERVICE AGREEMENT | CAPITAL LEASES |
| 1830 | NATIONAL BEDDING COMPANY L.L.C.;SSB LOGISTICS, LLC | RYDER TRUCK RENTAL INC | ASSIGMENT OF TRUCK LEASE AND SERVICE AGREEMENT | CAPITAL LEASES |
| 1831 | SSB LOGISTICS, LLC | RYDER TRUCK RENTAL INC | GENERAL GUARANTY AGREEMENT DTD 4/18/2016 | CAPITAL LEASES |
| 1832 | TUFT & NEEDLE, LLC | S&P GLOBAL MARKET INTELLIGENCE | MASTER SERVICES AGREEMENT DTD 9/30/2022 | DTC CONTRACTS |
| 1833 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | S&S PLUMBING, HEATING (DBA) S&S APPLIANCE | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/30/2017 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1834 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | S&S PLUMBING, HEATING (DBA) S&S APPLIANCE | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/30/2017 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1835 | DAWN INTERMEDIATE, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1836 | DREAMWELL, LTD. | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1837  NATIONAL BEDDING COMPANY L.L.C. | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1838  SERTA INTERNATIONAL HOLDCO, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1839  SERTA SIMMONS BEDDING, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1840  SIMMONS BEDDING COMPANY, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1841  SSB HOSPITALITY, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1842  SSB LOGISTICS, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1843  SSB MANUFACTURING COMPANY | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1844  SSB RETAIL, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1845  THE SIMMONS MANUFACTURING CO., LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1846  TOMORROW SLEEP LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1847  TUFT & NEEDLE, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1848  WORLD OF SLEEP OUTLETS, LLC | SAFETY NATIONAL | WORKERS COMPENSATION AND EMPLOYEES LIABILITY INSURANCE AGREEMENT (WC DED: LDS4048533) | INSURANCE |
| 1849  DAWN INTERMEDIATE, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1850  DREAMWELL, LTD. | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1851  NATIONAL BEDDING COMPANY L.L.C. | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1852  SERTA INTERNATIONAL HOLDCO, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1853  SERTA SIMMONS BEDDING, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1854  SIMMONS BEDDING COMPANY, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1855  SSB HOSPITALITY, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1856  SSB LOGISTICS, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1857  SSB MANUFACTURING COMPANY | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1858  SSB RETAIL, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1859  THE SIMMONS MANUFACTURING CO., LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1860  TOMORROW SLEEP LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1861  TUFT & NEEDLE, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1862  WORLD OF SLEEP OUTLETS, LLC | SAFETY NATIONAL "ALL STATES" | AUTOMOBILE LIABILITY INSURANCE AGREEMENT (POLICY #: CA 6675798) | INSURANCE |
| 1863  DAWN INTERMEDIATE, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1864  DREAMWELL, LTD. | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1865  NATIONAL BEDDING COMPANY L.L.C. | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1866  SERTA INTERNATIONAL HOLDCO, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1867  SERTA SIMMONS BEDDING, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1868  SIMMONS BEDDING COMPANY, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1869  SSB HOSPITALITY, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1870  SSB LOGISTICS, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1871  SSB MANUFACTURING COMPANY | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1872  SSB RETAIL, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1873 THE SIMMONS MANUFACTURING CO., LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1874 TOMORROW SLEEP LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1875 TUFT & NEEDLE, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1876 WORLD OF SLEEP OUTLETS, LLC | SAFETY NATIONAL CASUALTY CORPORATION | COMMERCIAL GENERAL LIABILITY/PRODUCTS INSURANCE AGREEMENT (POLICY # GL 4048535) | INSURANCE |
| 1877 SERTA SIMMONS BEDDING, LLC | SAFETY NATIONAL | Retrospective Worker's Compensation Coverage (Wisconsin) (PS4048534) | INSURANCE |
| 1878 SERTA SIMMONS BEDDING, LLC | SALEM BUILDING SPECIALTIES INC | CO-OP ADVERTISING AGREEMENT DTD 6/28/2021 | SALES AGREEMENTS |
| 1879 SERTA SIMMONS BEDDING, LLC | SALEM BUILDING SPECIALTIES INC | CO-OP ADVERTISING AGREEMENT DTD 6/28/2021 | SALES AGREEMENTS |
| 1880 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | SALEM BUILDING SPECIALTIES INC | SUPPLY AGREEMENT DTD 9/23/2022 | SALES AGREEMENTS |
| 1881 SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | SALEM BUILDING SPECIALTIES INC | SUPPLY AGREEMENT DTD 9/23/2022 | SALES AGREEMENTS |
| 1882 Serta Simmons Bedding, LLC | Salesforce, Inc. | Professional Services Agreement dated 1/31/22 | IT AGREEMENT |
| 1883 Serta Simmons Bedding, LLC | Salesforce, Inc. | SOW-0001-2022 dated 1/31/22 | IT AGREEMENT |
| 1884 Serta Simmons Bedding, LLC | Salesforce, Inc. | SOW#-2022-001 dated 12/29/22 | IT AGREEMENT |
| 1885 Serta Simmons Bedding, LLC | Salesforce, Inc. | Sow001-2023-CO2 dated 1/31/23 | IT AGREEMENT |
| 1886 Serta Simmons Bedding, LLC | Salesforce, Inc. | Master Subscription Agreement dated 7/24/14 | IT AGREEMENT |
| 1887 Serta Simmons Bedding, LLC | Salesforce, Inc. | Order Form Q-06383734 dated 10/27/22 | IT AGREEMENT |
| 1888 Serta Simmons Bedding, LLC | Salesforce, Inc. | Order Form Q-06193213 dated 12/29/22 | IT AGREEMENT |
| 1889 Serta Simmons Bedding, LLC | Salesforce, Inc. | Order Form Q-06808632 dated 1/24/23 | IT AGREEMENT |
| 1890 SERTA SIMMONS BEDDING, LLC | SALSIFY INC | DATA PROCESSING AGREEMENT | SALES |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1891 SERTA SIMMONS BEDDING, LLC | SAM'S CLUB WEST, INC. | ADVERTISING/MARKETING (NON-SALES) DTD 2/1/2023 | MARKETING |
| 1892 SIMMONS BEDDING COMPANY, LLC | SAM'S EAST INC | SUPPLIER AGREEMENT | CUSTOMER CONTRACT |
| 1893 SIMMONS BEDDING COMPANY, LLC | SAM'S WEST INC | SUPPLIER AGREEMENT | CUSTOMER CONTRACT |
| 1894 SERTA SIMMONS BEDDING, LLC | SAM'S WEST, INC. | DEALER/RETAILER AGREEMENT DTD 2/10/2020 | DEALER/RETAILER AGREEMENT |
| 1895 SERTA SIMMONS BEDDING, LLC | SAP AMERICA INC | ORDER FORM FOR CLOUD SERVICES REF #0220908003 DTD 6/29/2018 | FINANCE |
| 1896 SERTA SIMMONS BEDDING, LLC | SAP AMERICA, INC. | IT AGREEMENT DTD 09/30/2018 | IT AGREEMENT |
| 1897 SERTA SIMMONS BEDDING, LLC | SAP CLOUD SERVICES | HR VENDOR AGREEMENT/STAFFING AGREEMENT DTD 3/17/2022 | HR VENDOR AGREEMENT/STAFFING AGREEMENT |
| 1898 SERTA SIMMONS BEDDING, LLC | SAP SE | MUTUAL NON-DISCLOSURE AGREEMENT DTD 2/23/2022 | IT |
| 1899 SERTA SIMMONS BEDDING, LLC | SCG GLOBAL HOLDINGS (STARWOOD CAPITAL) | DEALER/RETAILER/HOSPITALITY AGREEMENT | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 1900 SSB LOGISTICS, LLC | SCHNEIDER NATIONAL CARRIERS, INC. | TRANSPORTATION/LOGISTICS AGREEMENT DTD 10/27/2016 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 1901 SERTA SIMMONS BEDDING, LLC | SCHROEDERS CORPORATION | AUTHORIZED DEALER AGREEMENT DTD 12/28/2022 | SALES AGREEMENTS |
| 1902 SERTA SIMMONS BEDDING, LLC | SCHROEDERS CORPORATION | CO-OP ADVERTISING AGREEMENT DTD 12/28/2022 | SALES AGREEMENTS |
| 1903 SERTA SIMMONS BEDDING, LLC | SCHROEDERS CORPORATION | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1904 SERTA SIMMONS BEDDING, LLC | SCINTEL TECHNOLOGIES | IT AGREEMENT DTD 2/16/2017 | IT AGREEMENT |
| 1905 SERTA SIMMONS BEDDING, LLC | SCINTEL TECHNOLOGIES INC | PROFESSIONAL SERVICES AGREEMENT DTD 2/16/2017 | CONSULTING |
| 1906 SERTA SIMMONS BEDDING, LLC | SCINTEL TECHNOLOGIES INC | PROFESSIONAL SERVICES AGREEMENT DTD 2/16/2017 | CONSULTING |
| 1907 SERTA SIMMONS BEDDING, LLC | SECURE EDUCATION CONSULTANTS (SEC) | PLANT/SERVICES AGREEMENT DTD 1/30/2020 | PLANT/SERVICES AGREEMENTS |
| 1908 SERTA SIMMONS BEDDING, LLC | SEDGWICK CLAIMS MANAGEMENT SERVICES INC | SERVICE AND PAYMENT AGREEMENT DTD 5/1/2013 | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1909 | SERTA SIMMONS BEDDING, LLC | SEDGWICK CLAIMS MANAGEMENT SVCS INC | OSHA DATABASE SERVICES \ AGREEMENT DTD 6/15/2022 | IT AGREEMENT |
| 1910 | SERTA SIMMONS BEDDING, LLC | SELLUP, INC. (DBA) ALCHEMY WORX | ADVERTISING/MARKETING AGREEMENT DTD 3/1/2021 | MARKETING |
| 1911 | DREAMWELL, LTD. | SELTHER MANUFACTURING SA DE CV | AGREEMENT RENEWAL LETTER DTD 4/20/2010 | LICENSE |
| 1912 | SERTA SIMMONS BEDDING, LLC | SENSOR TOWER | CONSUMER INSIGHTS AGREEMENT | CONSUMER INSIGHTS |
| 1913 | SERTA SIMMONS BEDDING, LLC | SENSORTOWER INC | LICENSE & MASTER SERVICES AGREEMENT DTD 4/1/2022 | CONSUMER INSIGHT |
| 1914 | SERTA SIMMONS BEDDING, LLC | SENSORTOWER, INC. | IT AGREEMENT DTD 4/1/2022 | CONSUMER INSIGHTS |
| 1915 | SERTA SIMMONS BEDDING, LLC | SERRANO DISTRIBUTORS LLC | CO-OP ADVERTISING AGREEMENT DTD 1/23/2023 | SALES AGREEMENTS |
| 1916 | SERTA SIMMONS BEDDING, LLC | SERRANO DISTRIBUTORS LLC | AUTHORIZED DEALER AGREEMENT DTD 1/23/2023 | SALES AGREEMENTS |
| 1917 | SSB MANUFACTURING COMPANY | SERTA INC | AFFILIATE LICENSE AGREEMENT | INTERCOMPANY AGREEMENT |
| 1918 | NATIONAL BEDDING COMPANY L.L.C. | SERTA INC | EXCHANGE AGREEMENT DTD 2/8/2019 | INTERCOMPANY AGREEMENT |
| 1919 | NATIONAL BEDDING COMPANY L.L.C. | SERTA INC | Standard License Agreement, dated August 2005 | INTERCOMPANY AGREEMENT |
| 1920 | NATIONAL BEDDING COMPANY L.L.C. | SERTA INC | Standard License Agreement, dated June 19, 2012 | INTERCOMPANY AGREEMENT |
| 1921 | NATIONAL BEDDING COMPANY L.L.C. | SERTA MONTREAL INC | MEMORANDUM OF AGREEMENT DTD 6/11/2007 | INTERCOMPANY AGREEMENT |
| 1922 | SERTA SIMMONS BEDDING, LLC | SERVICENOW | IT AGREEMENT DTD 06/24/2020 | IT AGREEMENT |
| 1923 | SERTA SIMMONS BEDDING, LLC | SERVICENOW INC | MASTER ORDERING AGREEMENT DTD 12/6/2017, AND SUBSEQUENT AMENDMENTS | IT AGREEMENT |
| 1924 | SERTA SIMMONS BEDDING, LLC | SERVICENOW, INC. | IT AGREEMENT DTD 12/6/2017 | IT AGREEMENT |
| 1925 | SERTA SIMMONS BEDDING, LLC | SFDC AUSTRALIA PTY LTD | DATA PROCESSING AGREEMENT DTD 10/27/2022 | IT AGREEMENT |
| 1926 | SERTA SIMMONS BEDDING, LLC | SFDC IRELAND AND LIMITED | DATA PROCESSING AGREEMENT DTD 10/27/2022 | IT AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1927 SERTA SIMMONS BEDDING, LLC | SHADOW BRANDING GROUP | CONSULTANT AGREEMENT DTD 5/19/2016 | CONSULTANT AGREEMENT |
| 1928 SERTA SIMMONS BEDDING, LLC | SHAKAOPEE MDEWAKANTON SIOUX COMMUNITY | SERVICE AGREEMENT DTD 11/1/2022 | SALES |
| 1929 NATIONAL BEDDING COMPANY L.L.C. | SHARON COMPANIES LLC, THE | SUPPLY AGREEMENT DTD 11/15/2012 | SALES AGREEMENTS |
| 1930 SERTA SIMMONS BEDDING, LLC | SHERRI'S MATTRESSES & MORE INC | AUTHORIZED DEALER AGREEMENT DTD 4/18/2022 | SALES AGREEMENTS |
| 1931 SERTA SIMMONS BEDDING, LLC | SHI INTERNATIONAL CORP | IT AGREEMENT DTD 4/29/2022 AND SUBSEQUENT QUOTES AND ADDENDUMS | IT AGREEMENT |
| 1932 SERTA SIMMONS BEDDING, LLC | SHI INTERNATIONAL CORP | MASTER SERVICES AGREEMENT DTD 8/29/2018 | IT AGREEMENT |
| 1933 SERTA SIMMONS BEDDING, LLC | SHI INTERNATIONAL CORP | IT AGREEMENT DTD 4/29/2022 AND SUBSEQUENT QUOTES AND ADDENDUMS | IT AGREEMENT |
| 1934 SERTA SIMMONS BEDDING, LLC | SHI INTERNATIONAL CORP | IT AGREEMENT DTD 4/29/2022 AND SUBSEQUENT QUOTES AND ADDENDUMS | IT AGREEMENT |
| 1935 SERTA SIMMONS BEDDING, LLC | SHI INTERNATIONAL CORP. | INDIRECT SPEND AGREEMENT DTD 8/28/2018 | INDIRECT SPEND AGREEMENT |
| 1936 SERTA SIMMONS BEDDING, LLC | SHOPIFY INC | PLUS AGREEMENT  DTD 9/6/2022 | IT AGREEMENT |
| 1937 SERTA SIMMONS BEDDING, LLC | SHOPIFY INC | PLUS AGREEMENT  DTD 9/6/2022 | IT AGREEMENT |
| 1938 SERTA SIMMONS BEDDING, LLC | SHOPIFY PLUS | IT AGREEMENT DTD 6/6/2022 | IT AGREEMENT |
| 1939 SIMMONS BEDDING COMPANY, LLC | SHUTTLEROCK | QUOTE 20220321 - 130608406 DTD 3/21/2022 | INDIRECT SUPPLIER |
| 1940 SERTA SIMMONS BEDDING, LLC | SIEMENS | IT AGREEMENT DTD 4/28/2022 | IT AGREEMENT |
| 1941 SERTA SIMMONS BEDDING, LLC | SIEMENS INDUSTRY SOFTWARE INC | MAINTENANCE SPECIFICATION CONTRACT #1391795-6 DTD 4/18/2022 | IT AGREEMENT |
| 1942 SSB MANUFACTURING COMPANY | SIEMENS INDUSTRY SOFTWARE INC | MAINTENANCE SPECIFICATION CONTRACT #1404372 DTD 5/6/2022 | IT AGREEMENT |
| 1943 SERTA SIMMONS BEDDING, LLC | SIERA.AI | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 9/2/2022 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |
| 1944 SERTA SIMMONS BEDDING, LLC | SILVER COMET FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 10/4/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 1945 SERTA SIMMONS BEDDING, LLC | SILVER COMET FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 10/4/2022 | SALES AGREEMENTS |
| 1946 SERTA SIMMONS BEDDING, LLC | SILVER COMET FURNITURE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1947 SERTA SIMMONS BEDDING, LLC | SILVERMAN WHOLESALE | CO-OP ADVERTISING AGREEMENT DTD 12/13/2022 | SALES AGREEMENTS |
| 1948 SERTA SIMMONS BEDDING, LLC | SILVERMAN WHOLESALE | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 1949 SERTA SIMMONS BEDDING, LLC | SILVERMAN WHOLESALE | AUTHORIZED DEALER AGREEMENT DTD 12/9/2022 | SALES AGREEMENTS |
| 1950 TUFT & NEEDLE, LLC | SILVERWARE INC | SERVICES AGREEMENT | T&N AGREEMENTS |
| 1951 DREAMWELL, LTD. | SIMMONS (SOUTHEAST ASIA) PRIVATE LTD | SUB-LICENSE AGREEMENT  07/01/2008 | LICENSE |
| 1952 SIMMONS BEDDING COMPANY, LLC | SIMMONS ASIA LTD | SUBLICENSE AGREEMENT DTD 10/1/1994 | LICENSE |
| 1953 SIMMONS BEDDING COMPANY, LLC | SIMMONS ASIA LTD | SUBLICENSE AGREEMENT DTD 10/1/1994 | LICENSE |
| 1954 DREAMWELL, LTD. | SIMMONS BEDDING & FURNITURE (HK) LTD | SUB-LICENSE AGREEMENT  07/01/2008 | LICENSE |
| 1955 DREAMWELL, LTD. | SIMMONS BEDDING COMPANY | ONGOING ASSET CONTRIBUTION AGREEMENT  DTD 1/1/2010 | INTERCOMPANY AGREEMENT |
| 1956 DREAMWELL, LTD. | SIMMONS CANADA INC | TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT DTD 11/15/2006 | INTERCOMPANY AGREEMENT |
| 1957 DREAMWELL, LTD. | SIMMONS CANADA INC | TECHNOLOGY AND TRADEMARK LICENSE AGREEMENT DTD 11/15/2006 | INTERCOMPANY AGREEMENT |
| 1958 DREAMWELL, LTD. | SIMMONS CANADA INC | LICENSE AGREEMENT DTD 11/15/2006 | INTERCOMPANY AGREEMENT |
| 1959 DREAMWELL, LTD. | SIMMONS CARRIBEEAN BEDDING INC | LICENSE AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 1960 DREAMWELL, LTD. | SIMMONS CARRIBEEAN BEDDING INC | LICENSE AGREEMENT DTD 1/29/2007 | INTERCOMPANY AGREEMENT |
| 1961 DREAMWELL, LTD. | SIMMONS CARRIBEEAN BEDDING INC | LICENSE AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 1962 DREAMWELL, LTD. | SIMMONS CO LTD | EXISTING TERRITORY LICENSE AGREEMENT AMENDMENT #2 12/31/2009 | LICENSE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 1963 DREAMWELL, LTD. | SIMMONS CO LTD | SUB-LICENSE AGREEMENT  07/01/2008 | LICENSE |
| 1964 DREAMWELL, LTD. | SIMMONS COMPANY | RESEARCH AND DEVELOPMENT AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 1965 DREAMWELL, LTD. | SIMMONS COMPANY | RESEARCH AND DEVELOPMENT AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 1966 DREAMWELL, LTD. | SIMMONS DE ARGENTINA SAIC | TRADEMARK LICENSE AGREEMENT DTD 10/10/1984 | LICENSE |
| 1967 SIMMONS BEDDING COMPANY, LLC | SIMMONS DE ARGENTINA SAIC | TECHNICAL SERVICES AGREEMENT 01/01/2006 | LICENSE |
| 1968 SIMMONS BEDDING COMPANY, LLC | SIMMONS DE ARGENTINA SAIC | INSTALLMENT SALE & SECURITY AGREEMENT DTD 7/31/2008 | LICENSE |
| 1969 SIMMONS BEDDING COMPANY, LLC | SIMMONS DE ARGENTINA SAIC | TECHNICAL SERVICE AGREEMENT DTD 9/1/1992 | LICENSE |
| 1970 SIMMONS BEDDING COMPANY, LLC | SIMMONS DE ARGENTINA SAIC | AGREEMENT FOR LEASE OF EQUIPMENT DTD 1/4/1993 | LICENSE |
| 1971 SIMMONS BEDDING COMPANY, LLC | SIMMONS DE ARGENTINA SAIC | AGREEMENT FOR LEASE OF EQUIPMENT DTD 1/1/1998 | LICENSE |
| 1972 SIMMONS BEDDING COMPANY, LLC | SIMMONS DE ARGENTINA SAIC | LETTER OF AUTHORIZATION DTD 4/29/1997 | LICENSE |
| 1973 DREAMWELL, LTD. | SIMMONS DE ARGENTINA SAIC | TRADEMARK LICENSE AGREEMENT DTD 10/10/1984 | LICENSE |
| 1974 SIMMONS BEDDING COMPANY, LLC | SIMMONS KABUSHIKI KAISHA | EXCLUSIVE LICENSE AND LETTER OF CONSENT DTD 10/2/2001 | LICENSE |
| 1975 SERTA SIMMONS BEDDING, LLC | SIMMONS MOROCCO / SOCIETE MAROCAINE SIMMONS | TRADEMARK LICENSE AGREEMENT DTD 7/1/2022 | TRADEMARK LICENSE AGREEMENT |
| 1976 DREAMWELL, LTD. | SIMMONS SOUTH AFRICA PTY LTD | ROYALTY UNDERPAYMENT AGREEMENT 11/15/2011 | LICENSE |
| 1977 DREAMWELL, LTD. | SIMMONS SOUTH AFRICA PTY LTD | PATENT AND TRADEMARK LICENSE AGREEMENT 01/01/2008 | LICENSE |
| 1978 SIMMONS BEDDING COMPANY, LLC | SIMMONS SOUTH AFRICA PTY LTD | TECHNICAL SERVICES AGREEMENT  01/01/2008 | LICENSE |
| 1979 DREAMWELL, LTD. | SIMMONS SOUTH EAST ASIA PRIVATE LTD | SEVERAL AMENDMENTS TO NEW TERRITORY LICENSE AGREEMENT DTD 6/30/1987 | LICENSE |
| 1980 DREAMWELL, LTD. | SIMMONS SOUTH EAST ASIA PRIVATE LTD | SUBLICENSE AGREEMENT DTD 10/1/1994 | LICENSE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 1981 SIMMONS BEDDING COMPANY, LLC | SIMMONS-K CO LTD | SUBLICENSE AGREEMENT DTD 10/1/1994 | LICENSE |
| 1982 SIMMONS BEDDING COMPANY, LLC | SIMMONS-K CO LTD | SUBLICENSE AGREEMENT DTD 10/1/1994 | LICENSE |
| 1983 TUFT & NEEDLE, LLC | SIMONCRE ASHFORD IV LLC | LEASE AGREEMENT  11/16/2015 FOR 2730 & 2802 N SCOTTSDALE RD, SCOTTSDALE AZ | REAL ESTATE LEASES |
| 1984 SERTA SIMMONS BEDDING, LLC | SINOMAX USA INC | SUPPLY AGREEMENT 03/16/2021 | DIRECT SUPPLIER |
| 1985 SERTA SIMMONS BEDDING, LLC | SINOMAX USA INC | EQUIPMENT AGREEMENT 03/16/2021 | DIRECT SUPPLIER |
| 1986 SERTA SIMMONS BEDDING, LLC | SIX CONTINENTS HOTELS, INC. AN IHG COMPANY | HOSPITALITY AGREEMENT DTD 1/26/2021 | HOSPITALITY AGREEMENT |
| 1987 SERTA SIMMONS BEDDING, LLC | SKIM ANALYTICAL | MASTER SERVICES AGREEMENT FOR RESEARCH SERVICES DTD 4/1/2020 | CONSUMER INSIGHT |
| 1988 SERTA SIMMONS BEDDING, LLC | SKYBOX COMMUNICATIONS LLC | IT AGREEMENT | IT AGREEMENT |
| 1989 SERTA SIMMONS BEDDING, LLC | SKYBOX COMMUNICATIONS LLC | IT AGREEMENT DTD 12/4/2015 | IT AGREEMENT |
| 1990 SERTA SIMMONS BEDDING, LLC | SKYHIGH NETWORKS | IT AGREEMENT DTD 12/21/2016 | IT AGREEMENT |
| 1991 SERTA SIMMONS BEDDING, LLC | SLACK TECHNOLOGIES LIMITED | DATA PROCESSING AGREEMENT DTD 10/27/2022 | IT AGREEMENT |
| 1992 SERTA SIMMONS BEDDING, LLC | SLACK TECHNOLOGIES, INC. | IT AGREEMENT DTD 01/29/2020 | IT AGREEMENT |
| 1993 SERTA SIMMONS BEDDING, LLC | SLACK TECHNOLOGIES, LLC | IT AGREEMENT DTD 01/29/2022 | IT AGREEMENT |
| 1994 SERTA SIMMONS BEDDING, LLC | SLACK TECHNOLOGIES, LLC | DATA PROCESSING AGREEMENT DTD 10/27/2022 | IT AGREEMENT |
| 1995 SERTA SIMMONS BEDDING, LLC | SLEEP BEDDER LLC | CO-OP ADVERTISING AGREEMENT DTD 1/13/2023 | SALES AGREEMENTS |
| 1996 SERTA SIMMONS BEDDING, LLC | SLEEP BEDDER LLC | AUTHORIZED DEALER AGREEMENT DTD 1/13/2023 | SALES AGREEMENTS |
| 1997 SIMMONS BEDDING COMPANY, LLC | SLEEP BEDR MATTRESS | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 1998 SERTA SIMMONS BEDDING, LLC | SLEEP WELL MATTRESS LLC | CO-OP ADVERTISING AGREEMENT DTD 6/20/2022 | SALES AGREEMENTS |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 1999 | SERTA SIMMONS BEDDING, LLC | SLEEP WELL MATTRESS LLC | AUTHORIZED DEALER AGREEMENT DTD 6/20/2022 | SALES AGREEMENTS |
| 2000 | SERTA SIMMONS BEDDING, LLC | SLEEP WELL MATTRESS LLC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 2001 | NATIONAL BEDDING COMPANY L.L.C. | SLEEPY TIME INC | SECURITY AGREEMENT DTD 10/20/2006 | SALES AGREEMENTS |
| 2002 | NATIONAL BEDDING COMPANY L.L.C. | SLEEPY TIME INC | LICENSE AGREEMENT LETTER DTD 10/16/2006 | SALES AGREEMENTS |
| 2003 | NATIONAL BEDDING COMPANY L.L.C. | SLEEPY TIME INC | SUPPLY AGREEMENT DTD 10/20/2006 | SALES AGREEMENTS |
| 2004 | SERTA SIMMONS BEDDING, LLC | SMARTSHEET | ORDER #Q-1782708 | INNOVATION-TRANSFORMATION |
| 2005 | SERTA SIMMONS BEDDING, LLC | SMITH FURNITURE AND MORE LLC | CO-OP ADVERTISING AGREEMENT DTD 2/10/2022 | SALES AGREEMENTS |
| 2006 | SERTA SIMMONS BEDDING, LLC | SMITH FURNITURE AND MORE LLC | AUTHORIZED DEALER AGREEMENT DTD 2/10/2022 | SALES AGREEMENTS |
| 2007 | SERTA SIMMONS BEDDING, LLC | SMITH'S HOME FURNISHINGS | CO-OP ADVERTISING AGREEMENT DTD 5/10/2022 | SALES AGREEMENTS |
| 2008 | SERTA SIMMONS BEDDING, LLC | SMITH'S HOME FURNISHINGS | CO-OP ADVERTISING AGREEMENT DTD 5/10/2022 | SALES AGREEMENTS |
| 2009 | SERTA SIMMONS BEDDING, LLC | SMITH'S HOME FURNISHINGS | AUTHORIZED DEALER AGREEMENT DTD 5/10/2022 | SALES AGREEMENTS |
| 2010 | SERTA SIMMONS BEDDING, LLC | SMITH'S HOME FURNISHINGS | AUTHORIZED DEALER AGREEMENT DTD 5/10/2022 | SALES AGREEMENTS |
| 2011 | TUFT & NEEDLE, LLC | SOCIALEDGE, INC. (DBA) CREATORIQ | ADVERTISING/MARKETING AGREEMENT DTD 4/30/2021 | MARKETING |
| 2012 | DREAMWELL, LTD. | SOCIETE ANONYME MAROCAINE SIMMONS | AMENDED & RESTATED PATENT & TRADEMARK LICENSE AGREEMENT 01/01/2011 | LICENSE |
| 2013 | DREAMWELL, LTD. | SOCIETE ANONYME MAROCAINE SIMMONS | PATENT AND TRADEMARK LICENSE AGREEMENT DTD 3/24/2022 | LICENSE |
| 2014 | SIMMONS BEDDING COMPANY, LLC | SOCIETE ANONYME MAROCAINE SIMMONS | AMENDED & RESTATED PATENT & TRADEMARK LICENSE AGREEMENT 01/01/2011 | LICENSE |
| 2015 | SSB MANUFACTURING COMPANY | SOCIETE ANONYME MAROCAINE SIMMONS | TECHNICAL SERVICES AGREEMENT DTD 3/24/2022 | LICENSE |
| 2016 | SIMMONS BEDDING COMPANY, LLC | SOCIETE ANONYME MAROCAINE SIMMONS | AMENDED & RESTATED PATENT & TRADEMARK LICENSE AGREEMENT 01/01/2011 | LICENSE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2017  DREAMWELL, LTD. | SOCIETE ANONYME MAROCAINE SIMMONS | AMENDED & RESTATED PATENT & TRADEMARK LICENSE AGREEMENT 01/01/2011 | LICENSE |
| 2018  DAWN INTERMEDIATE, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2019  DREAMWELL, LTD. | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2020  NATIONAL BEDDING COMPANY L.L.C. | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2021  SERTA INTERNATIONAL HOLDCO, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2022  SERTA SIMMONS BEDDING, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2023  SIMMONS BEDDING COMPANY, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2024  SSB HOSPITALITY, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2025  SSB LOGISTICS, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2026  SSB MANUFACTURING COMPANY | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2027  SSB RETAIL, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2028  THE SIMMONS MANUFACTURING CO., LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2029  TOMORROW SLEEP LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2030  TUFT & NEEDLE, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2031  WORLD OF SLEEP OUTLETS, LLC | SOMPO | D&O/EPLI/FID INSURANCE AGREEMENT (POLICY #: MAP30001203702) | INSURANCE |
| 2032  SERTA SIMMONS BEDDING, LLC | SONOMA HOME GOODS, LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 1/11/2022 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 2033  SERTA SIMMONS BEDDING, LLC | SOUTHERN STYLE INTERIORS LLC | AUTHORIZED DEALER AGREEMENT DTD 11/25/2022 | SALES AGREEMENTS |
| 2034  SERTA SIMMONS BEDDING, LLC | SOUTHERN STYLE INTERIORS LLC | CO-OP ADVERTISING AGREEMENT DTD 11/25/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2035  SERTA SIMMONS BEDDING, LLC | SPAR MARKETING FORCE, INC. | ADVERTISING/MARKETING AGREEMENT DTD 5/15/2019 | ADVERTISING/MARKETING AGREEMENT |
| 2036  SERTA SIMMONS BEDDING, LLC | SPARTA CONSULTING, INC. (DBA) KPIT | IT AGREEMENT DTD 10/23/2018 | IT AGREEMENT |
| 2037  SERTA SIMMONS BEDDING, LLC | SPENCERSTUART | WORKING ARRANGEMENTS CONFIRMATION LETTER DTD 11/12/2019 | HUMAN RESOURCES |
| 2038  SERTA SIMMONS BEDDING, LLC | SPENO MACLEOD, PLL | ENGAGEMENT LETTER DTD 7/27/2022 | TAX AGREEMENT |
| 2039  SERTA SIMMONS BEDDING, LLC | SPOIL ME BABY PICCOLINO | AUTHORIZED DEALER AGREEMENT DTD 10/27/2022 | SALES AGREEMENTS |
| 2040  SERTA SIMMONS BEDDING, LLC | SPOIL ME BABY PICCOLINO | CO-OP ADVERTISING AGREEMENT DTD 10/27/2022 | SALES AGREEMENTS |
| 2041  SERTA SIMMONS BEDDING, LLC | SPRING RIVER FINE FURNITURE LLC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 2042  SERTA SIMMONS BEDDING, LLC | SPRING RIVER FINE FURNITURE LLC | AUTHORIZED DEALER AGREEMENT | SALES AGREEMENTS |
| 2043  SERTA SIMMONS BEDDING, LLC | SPRING RIVER FINE FURNITURE LLC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 2044  SERTA SIMMONS BEDDING, LLC | SSH BEDDING CANADA CO | MANAGEMENT FEE AGREEMENT DTD 1/15/2021 | INTERCOMPANY AGREEMENT |
| 2045  SERTA SIMMONS BEDDING, LLC | STAFF MANAGEMENT SOLUTIONS LLC | MASTER SERVICES AGREEMENT  DTD 5/14/2015 | HUMAN RESOURCES |
| 2046  SERTA SIMMONS BEDDING, LLC | STAFF MANAGEMENT SOLUTIONS LLC | HR AGREEMENT DTD 5/14/2015 | HR AGREEMENT |
| 2047  SERTA SIMMONS BEDDING, LLC | STAFF MANAGEMENT SOLUTIONS LLC | MASTER SERVICES AGREEMENT  DTD 5/14/2015 | HUMAN RESOURCES |
| 2048  SERTA SIMMONS BEDDING, LLC | STAPLES | INDIRECT SPEND AGREEMENT DTD 3/15/2020 | INDIRECT SPEND AGREEMENT |
| 2049  SERTA INTERNATIONAL HOLDCO, LLC | STAR BEDDING PRODUCTS CO | MEMORANDUM OF AGREEMENT DTD 8/31/2005 | INTERCOMPANY AGREEMENT |
| 2050  SERTA SIMMONS BEDDING, LLC | STAR BEDDING PRODUCTS CO | LEASE GUARANTEE | REAL ESTATE LEASES |
| 2051  DAWN INTERMEDIATE, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2052  DREAMWELL, LTD. | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2053  NATIONAL BEDDING COMPANY L.L.C. | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2054  SERTA INTERNATIONAL HOLDCO, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2055  SERTA SIMMONS BEDDING, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2056  SIMMONS BEDDING COMPANY, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2057  SSB HOSPITALITY, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2058  SSB LOGISTICS, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2059  SSB MANUFACTURING COMPANY | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2060  SSB RETAIL, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2061  THE SIMMONS MANUFACTURING CO., LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2062  TOMORROW SLEEP LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2063  TUFT & NEEDLE, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2064  WORLD OF SLEEP OUTLETS, LLC | STARSTONE SPECIALTY INSURANCE COMPANY | PROPERTY INSURANCE AGREEMENT (O83131220CSP) | INSURANCE |
| 2065  SERTA SIMMONS BEDDING, LLC | STATISTA INC | SERVICES AGREEMENT DTD 9/6/2019 | CONSUMER INSIGHT |
| 2066  SERTA SIMMONS BEDDING, LLC | STEEPLE FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 3/17/2022 | SALES AGREEMENTS |
| 2067  SERTA SIMMONS BEDDING, LLC | STEEPLE FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 3/17/2022 | SALES AGREEMENTS |
| 2068  SERTA SIMMONS BEDDING, LLC | STEINHAFELS, INC. | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 11/20/2017 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 2069  SERTA SIMMONS BEDDING, LLC | STEVENSON COMPANY, THE | TRAQLINE US & CANADA SUBSCRIPTION AGREEMENT DTD 3/18/2015 | CONSUMER INSIGHT |
| 2070  SSB LOGISTICS, LLC | STG LOGISTICS INC | LOGISTICS SERVICES AGREEMENT 04/15/2022 | 3PL CONTRACT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 2071 | SSB LOGISTICS, LLC | STG LOGISTICS INC | LOGISTICS SERVICES AGREEMENT DTD 4/15/2022 | LOGISTICS CONTRACT |
| 2072 | NATIONAL BEDDING COMPANY L.L.C. | STRASSNER FURNITURE & UPHOLSTERY INC | SUPPLY AGREEMENT DTD 3/21/2013 | SALES AGREEMENTS |
| 2073 | NATIONAL BEDDING COMPANY L.L.C. | SUMMIT SLEEP LLC | LICENSE AND SUPPLY AGREEMENT DTD 3/3/2017 | SALES AGREEMENTS |
| 2074 | SERTA SIMMONS BEDDING, LLC | SUNTRUST MERCHANT SERVICES LLC | MASTER SERVICES AGREEMENT DTD 3/18/2011 | FINANCE |
| 2075 | SERTA SIMMONS BEDDING, LLC | SUPER DISCOUNT MATTRESS WAREHOUSE LLC | CO-OP ADVERTISING AGREEMENT DTD 2/10/2023 | SALES AGREEMENTS |
| 2076 | SERTA SIMMONS BEDDING, LLC | SUPER DISCOUNT MATTRESS WAREHOUSE LLC | AUTHORIZED DEALER AGREEMENT DTD 2/10/2023 | SALES AGREEMENTS |
| 2077 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | SYNCHRONY BANK (FKA) GE MONEY BANK | SALES/RETAILER AGREEMENT DTD 7/1/2021 | SALES OPS/SOURCING |
| 2078 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | SYNCHRONY BANK (FKA) GE MONEY BANK | SALES/RETAILER AGREEMENT DTD 7/1/2021 | SALES OPS/SOURCING |
| 2079 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | SYNCHRONY BANK (FKA) GE MONEY BANK | SALES/RETAILER AGREEMENT DTD 7/1/2021 | SALES OPS/SOURCING |
| 2080 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | SYNCHRONY BANK (FKA) GE MONEY BANK | SALES/RETAILER AGREEMENT DTD 7/1/2021 | SALES OPS/SOURCING |
| 2081 | DAWN INTERMEDIATE, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2082 | DAWN INTERMEDIATE, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2083 | DREAMWELL, LTD. | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2084 | DREAMWELL, LTD. | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2085 | NATIONAL BEDDING COMPANY L.L.C. | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2086 | NATIONAL BEDDING COMPANY L.L.C. | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2087 | SERTA INTERNATIONAL HOLDCO, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2088 | SERTA INTERNATIONAL HOLDCO, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2089 SERTA SIMMONS BEDDING, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2090 SERTA SIMMONS BEDDING, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2091 SIMMONS BEDDING COMPANY, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2092 SIMMONS BEDDING COMPANY, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2093 SSB HOSPITALITY, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2094 SSB HOSPITALITY, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2095 SSB LOGISTICS, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2096 SSB LOGISTICS, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2097 SSB MANUFACTURING COMPANY | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2098 SSB MANUFACTURING COMPANY | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2099 SSB RETAIL, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2100 SSB RETAIL, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2101 THE SIMMONS MANUFACTURING CO., LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2102 THE SIMMONS MANUFACTURING CO., LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2103 TOMORROW SLEEP LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2104 TOMORROW SLEEP LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2105 TUFT & NEEDLE, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2106 TUFT & NEEDLE, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 2107 | WORLD OF SLEEP OUTLETS, LLC | SYNDICATE 2623/623 AT LLOYD'S | TERRORISM COVERAGE INSURANCE AGREEMENT (POLICY #W25957220501) | INSURANCE |
| 2108 | WORLD OF SLEEP OUTLETS, LLC | SYNDICATE 2623/623 AT LLOYD'S | EXCESS CYBER INSURANCE AGREEMENT (POLICY #: W30808220201) | INSURANCE |
| 2109 | SERTA SIMMONS BEDDING, LLC | SYNDIGO LLC | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 5/1/2019 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 2110 | SERTA SIMMONS BEDDING, LLC | SYNDIGO LLC | MASTER CLIENT AGREEMENT | SALES |
| 2111 | SERTA SIMMONS BEDDING, LLC | SYNDIGO LLC | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |
| 2112 | SIMMONS BEDDING COMPANY, LLC | TA INSTRUMENTS - WATERS LLC | LIFETIME SUPPORT PLAN | INNOVATION-TRANSFORMATION |
| 2113 | SIMMONS BEDDING COMPANY, LLC | TA INSTRUMENTS - WATERS LLC | ADVANTAGE SUPPORT CONTRACT #40480363 DTD 3/28/2022 DTD 4/25/2022 | INNOVATION-TRANSFORMATION |
| 2114 | SERTA SIMMONS BEDDING, LLC | TABLEAU INTERNATIONAL UNLIMITED CO | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 2115 | SERTA SIMMONS BEDDING, LLC | TABLEAU SOFTWARE LLC | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 2116 | SERTA SIMMONS BEDDING, LLC | TALKDESK INC | MASTER SUBSCRIPTION AND IT AGREEMENT DTD 1/25/2023 | LOGISTICS CONTRACT |
| 2117 | SERTA SIMMONS BEDDING, LLC | TARGET CORPORATION | CONDITIONS OF CONTRACT DTD 3/24/2021 | CUSTOMER CONTRACT |
| 2118 | SERTA SIMMONS BEDDING, LLC | TAUBENSEE STEEL & WIRE COMPANY | SUPPLY AGREEMENT 07/01/2020 | DIRECT SUPPLIER |
| 2119 | SERTA SIMMONS BEDDING, LLC | TAVANT TECHNOLOGIES INC | CONSULTANT AGREEMENT DTD 1/1/2019 | IT |
| 2120 | SERTA SIMMONS BEDDING, LLC | TAVANT TECHNOLOGIES INC | MASTER DATA MANAGEMENT DTD 1/1/2023 | CONSULTING |
| 2121 | SERTA SIMMONS BEDDING, LLC | TAVANT TECHNOLOGIES INC | CONSULTANT AGREEMENT DTD 7/9/2014 | CONSULTANT AGREEMENT |
| 2122 | SERTA SIMMONS BEDDING, LLC | TBDP, LLC | REAL ESTATE AGREEMENT | REAL ESTATE |
| 2123 | SERTA SIMMONS BEDDING, LLC | TCG CONSULTING PARTNERS LLC | CONSULTANT AGREEMENT DTD 6/23/2022 | IT |
| 2124 | SERTA SIMMONS BEDDING, LLC | TCG CONSULTING PARTNERS LLC | STATEMENT OF WORK DTD 6/23/2022 | CONSULTING AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2125  SERTA SIMMONS BEDDING, LLC | TCG CONSULTING PARTNERS LLC | MASTER SERVICES AGREEMENT DTD 6/23/2022 | CONSULTING |
| 2126  SSB MANUFACTURING COMPANY | TEAMSTERS LOCAL 986 | COLLECTIVE BARGAINING AGREEMENT DTD 11/16/2021 | UNION CONTRACT |
| 2127  SERTA SIMMONS BEDDING, LLC | TECHORCHARD LLC | CONSULTANT AGREEMENT DTD 9/24/2015 | CONSULTANT AGREEMENT |
| 2128  SERTA SIMMONS BEDDING, LLC | TELECOM INNOVATIONS LLC | MASTER SERVICES AGREEMENT DTD 3/1/2016 | IT AGREEMENT |
| 2129  SERTA SIMMONS BEDDING, LLC | TEXAS MATTRESS HEADQUARTERS LLC | AUTHORIZED DEALER AGREEMENT DTD 6/22/2020 | SALES AGREEMENTS |
| 2130  SERTA SIMMONS BEDDING, LLC | TEXAS MATTRESS HEADQUARTERS LLC | CO-OP ADVERTISING AGREEMENT DTD 6/22/2020 | SALES AGREEMENTS |
| 2131  SERTA SIMMONS BEDDING, LLC | TEXAS POCKET SPRINGS CORP | DIRECT SOURCING DTD 4/6/2021 | DIRECT SOURCING |
| 2132  SERTA SIMMONS BEDDING, LLC | THE APPLIANCE OUTLET (DBA) CALDWELL FURNITURE | SALES/RETAILER AGREEMENT DTD 10/28/2022 | SALES/RETAILER AGREEMENTS |
| 2133  DAWN INTERMEDIATE, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2134  DREAMWELL, LTD. | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2135  NATIONAL BEDDING COMPANY L.L.C. | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2136  SERTA INTERNATIONAL HOLDCO, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2137  SERTA SIMMONS BEDDING, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2138  SIMMONS BEDDING COMPANY, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2139  SSB HOSPITALITY, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2140  SSB LOGISTICS, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2141  SSB MANUFACTURING COMPANY | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2142  SSB RETAIL, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 2143  THE SIMMONS MANUFACTURING CO., LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2144  TOMORROW SLEEP LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2145  TUFT & NEEDLE, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2146  WORLD OF SLEEP OUTLETS, LLC | THE CONTINENTAL INSURANCE COMPANY (CNA) | SECOND EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: 4031580331) | INSURANCE |
| 2147  SERTA SIMMONS BEDDING, LLC | THE INSIDE COACH, INC. | CONSULTANT AGREEMENT DTD 11/10/2022 | CONSULTANT |
| 2148  SERTA SIMMONS BEDDING, LLC | THE KNOT WORLD WIDE, INC. | SALES/RETAILER AGREEMENT DTD 10/6/2022 | SALES/RETAILER AGREEMENTS |
| 2149  SERTA SIMMONS BEDDING, LLC | THE PARTNERING GROUP | CONSULTANT AGREEMENT DTD 7/1/2021 | CONSULTANT AGREEMENT |
| 2150  SERTA SIMMONS BEDDING, LLC | THE PARTNERING GROUP | INDIRECT SPEND/COMPANYWIDE AGREEMENT DTD 9/21/2021 | INDIRECT SPEND/COMPANYWIDE AGREEMENT |
| 2151  DREAMWELL, LTD. | THE SIMMONS MANUFACTURING CO LLC | SIMMONS US LICENSE AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 2152  DREAMWELL, LTD. | THE SIMMONS MANUFACTURING CO LLC | SIMMONS US LICENSE AGREEMENT DTD 12/29/2001 | INTERCOMPANY AGREEMENT |
| 2153  DREAMWELL, LTD. | THE SIMMONS MANUFACTURING CO LLC | LICENSE AGREEMENT DTD  12/29/2001 | INTERCOMPANY AGREEMENT |
| 2154  DREAMWELL, LTD. | THE SIMMONS MANUFACTURING CO LLC | LICENSE AGREEMENT DTD 1/29/2007 | INTERCOMPANY AGREEMENT |
| 2155  SERTA SIMMONS BEDDING, LLC | THOMSON REUTERS | IT AGREEMENT DTD 8/7/2020 | IT AGREEMENT |
| 2156  SERTA SIMMONS BEDDING, LLC | THOMSON REUTERS | IT AGREEMENT DTD 4/4/2017 | IT AGREEMENT |
| 2157  SERTA SIMMONS BEDDING, LLC | THOMSON REUTERS (TAX & ACCOUNTING) INC | MASTER TERMS AGREEMENT DTD 4/4/2017 | TAX - VENDOR |
| 2158  WORLD OF SLEEP OUTLETS, LLC | THRIFT BROTHERS INC | LEASE AGREEMENT DTD 9/4/2018 FOR 367 MARKET ST, SENECA, SC | REAL ESTATE LEASES |
| 2159  SERTA SIMMONS BEDDING, LLC | THYCOTIC SOFTWARE, LLC | IT AGREEMENT DTD 07/31/2020 | IT AGREEMENT |
| 2160  SSB MANUFACTURING COMPANY | TI JANESVILLE X LLC | LEASE AGREEMENT 06/28/2022 FOR 200 INNOVATION DRIVE, JANESVILLE, WI | REAL ESTATE LEASES |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 2161 | SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | TI JANESVILLE X LLC | LEASE GUARANTY AGREEMENT  06/28/2022 FOR 200 INNOVATION DRIVE, JANESVILLE, WI | REAL ESTATE LEASES |
| 2162 | SERTA SIMMONS BEDDING, LLC;SSB MANUFACTURING COMPANY | TI JANESVILLE X LLC | LEASE GUARANTY AGREEMENT  06/28/2022 FOR 200 INNOVATION DRIVE, JANESVILLE, WI | REAL ESTATE LEASES |
| 2163 | SSB MANUFACTURING COMPANY | TI JANESVILLE X LLC | LEASE AGREEMENT 06/28/2022 FOR 200 INNOVATION DRIVE, JANESVILLE, WI | REAL ESTATE LEASES |
| 2164 | SERTA SIMMONS BEDDING, LLC | TIGER NATURAL GAS, INC. | PLANT/SERVICES AGREEMENT DTD 2/3/2021 | PLANT/SERVICES AGREEMENTS |
| 2165 | NATIONAL BEDDING COMPANY L.L.C. | TIP TOP FLOOR COVERING & APPLIANCE INC | LICENSE AGREEMENT LETTER DTD 8/17/2009 | SALES AGREEMENTS |
| 2166 | NATIONAL BEDDING COMPANY L.L.C. | TIP TOP FLOOR COVERING & APPLIANCE INC | SUPPLY AGREEMENT DTD 8/19/2009 | SALES AGREEMENTS |
| 2167 | NATIONAL BEDDING COMPANY L.L.C. | TIP TOP FLOOR COVERING & APPLIANCE INC | SECURITY AGREEMENT DTD 8/19/2009 | SALES AGREEMENTS |
| 2168 | SSB MANUFACTURING COMPANY | TJX COMPANIES INC | GUARANTY OF ASSIGNMENT OF LEASE DTD 11/20/2015 FOR FOR 50 BRYLA ST, CARTERET, NJ | REAL ESTATE LEASES |
| 2169 | SERTA SIMMONS BEDDING, LLC | TOMS PRICE HOME | CO-OP ADVERTISING AGREEMENT DTD 7/19/2022 | SALES AGREEMENTS |
| 2170 | SERTA SIMMONS BEDDING, LLC | TOMS-PRICE COMPANY | AUTHORIZED DEALER AGREEMENT DTD 7/19/2022 | SALES AGREEMENTS |
| 2171 | SERTA SIMMONS BEDDING, LLC | TONONI, TODD | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 2172 | SERTA SIMMONS BEDDING, LLC | TOP CHOICE MOVERS INC | AUTHORIZED DEALER AGREEMENT DTD 1/1/2023 | SALES AGREEMENTS |
| 2173 | SERTA SIMMONS BEDDING, LLC | TOP CHOICE MOVERS INC | CO-OP ADVERTISING AGREEMENT DTD 1/1/2023 | SALES AGREEMENTS |
| 2174 | THE SIMMONS MANUFACTURING CO., LLC | TOTAL QUALITY LOGISTICS LLC | BROKER TRANSPORTATION SERVICES AGREEMENT 07/28/2011 | INDIRECT SUPPLIER |
| 2175 | THE SIMMONS MANUFACTURING CO., LLC | TOTAL QUALITY LOGISTICS LLC | BROKER TRANSPORTATION SERVICES AGREEMENT 07/28/2011 | INDIRECT SUPPLIER |
| 2176 | SERTA SIMMONS BEDDING, LLC | TRANSPLACE-LANEHUB | TRANSPORTATION/LOGISTICS AGREEMENT DTD 8/24/2021 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 2177 | SERTA SIMMONS BEDDING, LLC | TRAVEL INCORPORATED | INDIRECT SPEND AGREEMENT DTD 5/20/2019 | INDIRECT SPEND AGREEMENT |
| 2178 | DAWN INTERMEDIATE, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2179  DREAMWELL, LTD. | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2180  NATIONAL BEDDING COMPANY L.L.C. | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2181  SERTA INTERNATIONAL HOLDCO, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2182  SERTA SIMMONS BEDDING, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2183  SIMMONS BEDDING COMPANY, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2184  SSB HOSPITALITY, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2185  SSB LOGISTICS, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2186  SSB MANUFACTURING COMPANY | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2187  SSB RETAIL, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2188  THE SIMMONS MANUFACTURING CO., LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2189  TOMORROW SLEEP LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2190  TUFT & NEEDLE, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2191  WORLD OF SLEEP OUTLETS, LLC | TRAVELERS | FOURTH EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY#: EX-9T02126A-22-NF) | INSURANCE |
| 2192  SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | TRENDS FURNITURE - AMERICA'S MATTRESS | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 2/8/2017 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 2193  SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | TRENDS FURNITURE - AMERICA'S MATTRESS | DEALER/RETAILER/HOSPITALITY AGREEMENT DTD 2/8/2017 | DEALER/RETAILER/HOSPITALITY AGREEMENT |
| 2194  DAWN INTERMEDIATE, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2195  DREAMWELL, LTD. | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2196  NATIONAL BEDDING COMPANY L.L.C. | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|----------------------|---------------|
| 2197  SERTA INTERNATIONAL HOLDCO, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2198  SERTA SIMMONS BEDDING, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2199  SIMMONS BEDDING COMPANY, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2200  SSB HOSPITALITY, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2201  SSB LOGISTICS, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2202  SSB MANUFACTURING COMPANY | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2203  SSB RETAIL, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2204  THE SIMMONS MANUFACTURING CO., LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2205  TOMORROW SLEEP LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2206  TUFT & NEEDLE, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2207  WORLD OF SLEEP OUTLETS, LLC | TRIPLE S PROPIEDAD | PUERTO RICO PLACEMENT PACKAGE INSURANCE AGREEMENT (POLICY#: 30-CP-81086834-6) | INSURANCE |
| 2208  SERTA SIMMONS BEDDING, LLC | TRP ACQUISITION,INC DBA THE ROOMPLACE | SALES/RETAILER AGREEMENT DTD 1/1/2021 | SALES/RETAILER AGREEMENTS |
| 2209  SERTA SIMMONS BEDDING, LLC | TRUIST BANK | MASTER SERVICES AGREEMENT DTD 3/18/2011, AND SUBSEQUENT AMENDMENTS | FINANCE |
| 2210  NATIONAL BEDDING COMPANY L.L.C. | TWOBOND SERVICES LLC | SUPPLY AGREEMENT DTD 7/26/2007 | SALES AGREEMENTS |
| 2211  SERTA SIMMONS BEDDING, LLC | UD FREAMTABLE INC | AUTHORIZED DEALER AGREEMENT DTD 10/22/2020 | SALES AGREEMENTS |
| 2212  NATIONAL BEDDING COMPANY L.L.C. | ULTIMATE SLEEP INC | LICENSE AND SUPPLY AGREEMENT DTD 12/15/2014 | SALES AGREEMENTS |
| 2213  SERTA SIMMONS BEDDING, LLC | UNITED DOLLAR PLUS FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 5/10/2022 | SALES AGREEMENTS |
| 2214  SERTA SIMMONS BEDDING, LLC | UNITED DOLLAR PLUS FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 5/10/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2215 SSB MANUFACTURING COMPANY | UNITED STEELWORKERS LOCAL UNION 156-U | COLLECTIVE BARGAINING AGREEMENT DTD 12/12/2019 | UNION CONTRACT |
| 2216 SSB MANUFACTURING COMPANY | UNITED STEELWORKERS LOCAL UNION 156-U-07 | COLLECTIVE BARGAINING AGREEMENT DTD 12/13/2020 | UNION CONTRACT |
| 2217 SSB MANUFACTURING COMPANY | UNITED STEELWORKERS LOCAL UNION 675 | COLLECTIVE BARGAINING AGREEMENT DTD 11/16/2020 | UNION CONTRACT |
| 2218 SERTA SIMMONS BEDDING, LLC | UPTOWN FURNISHINGS LLC | AUTHORIZED DEALER AGREEMENT DTD 8/2/2022 | SALES AGREEMENTS |
| 2219 SERTA SIMMONS BEDDING, LLC | UPTOWN FURNISHINGS LLC | AUTHORIZED DEALER AGREEMENT DTD 8/2/2022 | SALES AGREEMENTS |
| 2220 SERTA SIMMONS BEDDING, LLC | UPTOWN FURNISHINGS LLC | CO-OP ADVERTISING AGREEMENT DTD 8/2/2022 | SALES AGREEMENTS |
| 2221 SERTA SIMMONS BEDDING, LLC | UPTOWN FURNISHINGS LLC | CO-OP ADVERTISING AGREEMENT DTD 8/2/2022 | SALES AGREEMENTS |
| 2222 SERTA INTERNATIONAL HOLDCO, LLC | US BANCORP BUSINESS EQUIPMENT FINANCE | VALUE LEASE AGREEMENT #293983 DTD 7/25/2011 | IT AGREEMENT |
| 2223 SERTA SIMMONS BEDDING, LLC | USA IMPORT & EXPORT INC | AUTHORIZED DEALER AGREEMENT DTD 5/19/2022 | SALES AGREEMENTS |
| 2224 SERTA SIMMONS BEDDING, LLC | USA IMPORT & EXPORT INC | CO-OP ADVERTISING AGREEMENT DTD 5/19/2022 | SALES AGREEMENTS |
| 2225 SSB MANUFACTURING COMPANY | USW LOCAL 156-U | MEMORANDUM OF AGREEMENT  09/30/2021 | UNION CONTRACT |
| 2226 SERTA SIMMONS BEDDING, LLC | VALUE HOME FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 5/5/2022 | SALES AGREEMENTS |
| 2227 SERTA SIMMONS BEDDING, LLC | VALUE HOME FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 5/5/2022 | SALES AGREEMENTS |
| 2228 SERTA SIMMONS BEDDING, LLC | VARAHAMURTI FLEXIRUB INDUSTRIES | TRADEMARK LICENSE AGREEMENT DTD 1/1/2023 | TRADEMARK LICENSE AGREEMENT |
| 2229 DREAMWELL, LTD. | VARAHAMURTI FLEXIRUB INDUSTRIES PVT LTD | PATENT AND TRADEMARK LICENSE AGREEMENT 01/01/2022 | LICENSE |
| 2230 SERTA SIMMONS BEDDING, LLC | VARAHAMURTI FLEXIRUB INDUSTRIES PVT LTD | LICENSE AGREEMENT DTD 1/1/2022 | LICENSE AGREEMENT |
| 2231 SSB MANUFACTURING COMPANY | VARAHAMURTI FLEXIRUB INDUSTRIES PVT LTD | TECHNICAL SERVICES AGREEMENT  01/01/2022 | LICENSE |
| 2232 SERTA SIMMONS BEDDING, LLC | VAUGHNS HOME FURNISHINGS | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2233 SERTA SIMMONS BEDDING, LLC | VAUGHNS TV & APPLIANCE INC | AUTHORIZED DEALER AGREEMENT DTD 4/20/2022 | SALES AGREEMENTS |
| 2234 SERTA SIMMONS BEDDING, LLC | VAUGHNS TV & APPLIANCE INC | CO-OP ADVERTISING AGREEMENT DTD 4/20/2022 | SALES AGREEMENTS |
| 2235 SERTA SIMMONS BEDDING, LLC | VELOCITYEHS HOLDINGS, INC. | COMPANY WIDE AGREEMENT DTD 3/24/2021 | COMPANY WIDE AGREEMENT |
| 2236 TUFT & NEEDLE, LLC | VENDOR TEAM SERVICES INC | SERVICES CONTRACT DTD 9/19/2017 | CUSTOMER CONTRACT |
| 2237 SERTA SIMMONS BEDDING, LLC | VERCEL INC | ADDENDUM DTD 5/2/2022 | DTC CONTRACTS |
| 2238 TUFT & NEEDLE, LLC | VERCEL INC | ENTERPRISE SERVICES AGREEMENT DTD 5/2/2022 | T&N AGREEMENTS |
| 2239 SERTA SIMMONS BEDDING, LLC | VERIZON | IT AGREEMENT DTD 06/30/2020 | IT AGREEMENT |
| 2240 SERTA SIMMONS BEDDING, LLC | VERSE SOLUTIONS | SERVICES AGREEMENT | IT AGREEMENT |
| 2241 SERTA SIMMONS BEDDING, LLC | VERSPRITE | IT AGREEMENT DTD 10/10/2016 | IT AGREEMENT |
| 2242 SERTA SIMMONS BEDDING, LLC | VERTEX INC | SOFTWARE LICENSE AGREEMENT DTD 3/30/2006 | IT AGREEMENT |
| 2243 SERTA SIMMONS BEDDING, LLC | VERTEX INC | VERTEX, INC. SOFTWARE LICENSE AGREEMENT | LICENSE |
| 2244 SERTA SIMMONS BEDDING, LLC | VERTEX INC | SOFTWARE LICENSE AGREEMENT DTD 6/28/2012 | IT AGREEMENT |
| 2245 SERTA SIMMONS BEDDING, LLC | VICTORY FURNISHINGS LLC | AUTHORIZED DEALER AGREEMENT DTD 6/29/2022 | SALES AGREEMENTS |
| 2246 SERTA SIMMONS BEDDING, LLC | VICTORY FURNISHINGS LLC | CO-OP ADVERTISING AGREEMENT DTD 6/29/2022 | SALES AGREEMENTS |
| 2247 SERTA SIMMONS BEDDING, LLC | VICTORY FURNISHINGS LLC | CO-OP ADVERTISING AGREEMENT DTD 6/29/2022 | SALES AGREEMENTS |
| 2248 SERTA SIMMONS BEDDING, LLC | VICTORY FURNISHINGS LLC | AUTHORIZED DEALER AGREEMENT DTD 6/29/2022 | SALES AGREEMENTS |
| 2249 SIMMONS BEDDING COMPANY, LLC | VIKING FREIGHT INC | TRANSPORTATION CONTRACT# 96-223 10/14/1996 | INDIRECT SUPPLIER |
| 2250 SERTA SIMMONS BEDDING, LLC | VISTEX | IT AGREEMENT DTD 7/16/2018 | IT AGREEMENT |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 2251 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | VISUAL GRAPHICS SYSTEMS, INC. (VGS) | SUPPLY/PURCHASE AGREEMENT DTD 4/15/2015 | SUPPLY/PURCHASE AGREEMENT |
| 2252 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | VISUAL GRAPHICS SYSTEMS, INC. (VGS) | SUPPLY/PURCHASE AGREEMENT DTD 4/15/2015 | SUPPLY/PURCHASE AGREEMENT |
| 2253 | SERTA SIMMONS BEDDING, LLC | VITAFOAM INC | SUPPLY AGREEMENT  06/24/2022 | DIRECT SUPPLIER |
| 2254 | SERTA SIMMONS BEDDING, LLC | VITALYST | IT AGREEMENT DTD 11/14/2018 | IT AGREEMENT |
| 2255 | SERTA SIMMONS BEDDING, LLC | VLOCITY LLC | DATA PROCESSING AGREEMENT | IT AGREEMENT |
| 2256 | SERTA SIMMONS BEDDING, LLC | WACHTER INC | MASTER SERVICES AGREEMENT DTD 8/23/2021 | IT AGREEMENT |
| 2257 | SIMMONS BEDDING COMPANY, LLC | WAL-MART STORES EAST INC | SUPPLIER AGREEMENT | CUSTOMER CONTRACT |
| 2258 | SIMMONS BEDDING COMPANY, LLC | WAL-MART STORES EAST LP | SUPPLIER AGREEMENT | CUSTOMER CONTRACT |
| 2259 | SIMMONS BEDDING COMPANY, LLC | WAL-MART STORES INC | SUPPLIER AGREEMENT | CUSTOMER CONTRACT |
| 2260 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | WALMART STORES INC. | SALES/RETAILER AGREEMENT | SALES/RETAILER AGREEMENTS |
| 2261 | SERTA SIMMONS BEDDING, LLC; NATIONAL BEDDING COMPANY L.L.C. | WALMART STORES INC. | SALES/RETAILER AGREEMENT | SALES/RETAILER AGREEMENTS |
| 2262 | SIMMONS BEDDING COMPANY, LLC | WAL-MART STORES TEXAS LP | SUPPLIER AGREEMENT | CUSTOMER CONTRACT |
| 2263 | SERTA SIMMONS BEDDING, LLC | WAYFAIR LLC | ADVERTISING/MARKETING AGREEMENT DTD 3/31/2020 | ADVERTISING/MARKETING AGREEMENT |
| 2264 | SERTA SIMMONS BEDDING, LLC | WAYFAIR LLC | 3D MEDIA ASSETS MASTER PURCHASE AGREEMENT 03/31/2020 | CUSTOMER CONTRACT |
| 2265 | NATIONAL BEDDING COMPANY L.L.C. | WAYNE AUCTION CO INC | SUPPLY AGREEMENT  DTD 12/2/2014 | SALES AGREEMENTS |
| 2266 | SSB MANUFACTURING COMPANY | WDCI KOMOHANA LLC | INDUSTRIAL SPACE LEASE AGREEMENT DTD 8/11/2011 | REAL ESTATE LEASES |
| 2267 | NATIONAL BEDDING COMPANY L.L.C. | WEBER-KNAPP COMPANY | LEASE AGREEMENT 04/27/2012 FOR 2019 ALLEN STREET, FALCONER, NEW YORK | REAL ESTATE LEASES |
| 2268 | SSB MANUFACTURING COMPANY | WEBER-KNAPP COMPANY | REAL ESTATE AGREEMENT | REAL ESTATE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2269 SERTA SIMMONS BEDDING, LLC | WEICHERT WORKFORCE MOBILITY INC | HR SUPPLIER AGREEMENT DTD 4/1/2021 | DIRECT SOURCING |
| 2270 SERTA SIMMONS BEDDING, LLC | WEST EDMOND ROAD OPERATING LLC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 2271 SERTA SIMMONS BEDDING, LLC | WEST ELM | SALES/RETAILER AGREEMENT DTD 8/8/2022 | SALES/RETAILER AGREEMENTS |
| 2272 SERTA SIMMONS BEDDING, LLC | WESTERN AUTO OF BENTON INC | CO-OP ADVERTISING AGREEMENT DTD 7/12/2022 | SALES AGREEMENTS |
| 2273 SERTA SIMMONS BEDDING, LLC | WESTERN AUTO OF BENTON INC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 2274 SERTA SIMMONS BEDDING, LLC | WESTERN AUTO OF BENTON INC | AUTHORIZED DEALER AGREEMENT DTD 7/12/2022 | SALES AGREEMENTS |
| 2275 SERTA SIMMONS BEDDING, LLC | WESTIN ATLANTA PERIMETER NORTH HOTEL | HOSPITALITY AGREEMENT DTD 9/9/2022 | HOSPITALITY AGREEMENT |
| 2276 DAWN INTERMEDIATE, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2277 DREAMWELL, LTD. | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2278 NATIONAL BEDDING COMPANY L.L.C. | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2279 SERTA INTERNATIONAL HOLDCO, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2280 SERTA SIMMONS BEDDING, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2281 SIMMONS BEDDING COMPANY, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2282 SSB HOSPITALITY, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2283 SSB LOGISTICS, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2284 SSB MANUFACTURING COMPANY | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2285 SSB RETAIL, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2286 THE SIMMONS MANUFACTURING CO., LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |

| | Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|---|
| 2287 | TOMORROW SLEEP LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2288 | TUFT & NEEDLE, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2289 | WORLD OF SLEEP OUTLETS, LLC | WESTPORT INSURANCE CORPORATION | PROPERTY INSURANCE AGREEMENT (NAO200083208) | INSURANCE |
| 2290 | SERTA SIMMONS BEDDING, LLC | WHAT A ROOM FURNITURE INC | AUTHORIZED DEALER AGREEMENT | AUTHORIZED DEALER AGREEMENT |
| 2291 | SERTA SIMMONS BEDDING, LLC | WHAT A ROOM FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 10/30/2012 | SALES AGREEMENTS |
| 2292 | SERTA SIMMONS BEDDING, LLC | WHAT A ROOM FURNITURE INC | CO-OP ADVERTISING AGREEMENT DTD 10/30/2012 | SALES AGREEMENTS |
| 2293 | SERTA SIMMONS BEDDING, LLC | WILKE GLOBAL INC. | IT AGREEMENT DTD 11/08/2017 | IT AGREEMENT |
| 2294 | NATIONAL BEDDING COMPANY L.L.C. | WILLIAMS FURNITURE LLC | SUPPLY AGREEMENT DTD 7/16/2010 | SALES AGREEMENTS |
| 2295 | NATIONAL BEDDING COMPANY L.L.C. | WILLIAMS FURNITURE LLC | SUPPLY AGREEMENT DTD 7/16/2010 | SALES AGREEMENTS |
| 2296 | SERTA SIMMONS BEDDING, LLC | WILLIAMSPORT WHOLESALE FURNITURE INC | AUTHORIZED DEALER AGREEMENT DTD 6/14/2021 | SALES AGREEMENTS |
| 2297 | SERTA SIMMONS BEDDING, LLC | WILLIAMSPORT WHOLESALE FURNITURE LLC | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 2298 | SIMMONS BEDDING COMPANY, LLC | WILSON HOLDINGS & INVESTMENT | CO-OP ADVERTISING AGREEMENT | SALES AGREEMENTS |
| 2299 | SERTA SIMMONS BEDDING, LLC | WILSON, ANTWAIN | AUTHORIZED DEALER AGREEMENT DTD 12/15/2022 | SALES AGREEMENTS |
| 2300 | TUFT & NEEDLE, LLC | WINDHAM BRANNON LLC | CONSULTANT AGREEMENT/CONTRACT 38952 DTD 3/29/2022 | CONSULTANT AGREEMENT |
| 2301 | SERTA SIMMONS BEDDING, LLC | WINE COUNTRY FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 9/9/2020 | SALES AGREEMENTS |
| 2302 | SERTA SIMMONS BEDDING, LLC | WISCONSIN BEDDING COMPANY | CO-OP ADVERTISING AGREEMENT DTD 8/5/2022 | SALES AGREEMENTS |
| 2303 | SERTA SIMMONS BEDDING, LLC | WISCONSIN BEDDING COMPANY | AUTHORIZED DEALER AGREEMENT DTD 8/5/2022 | SALES AGREEMENTS |
| 2304 | SERTA SIMMONS BEDDING, LLC | WISER (TRANSITION OF ANSIRA FOR BPA) | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|---------------------|---------------|
| 2305 SERTA SIMMONS BEDDING, LLC | WISER SOLUTIONS INC | MASTER SERVICES AGREEMENT 01/01/2022 | INDIRECT SUPPLIER |
| 2306 NATIONAL BEDDING COMPANY L.L.C. | WM KROTTER CO | SUPPLY AGREEMENT DTD 8/4/2015 | SALES AGREEMENTS |
| 2307 SERTA SIMMONS BEDDING, LLC | WOODLAND HILLS FIREPLACE SHOP INC | AUTHORIZED DEALER AGREEMENT DTD 1/11/2023 | SALES AGREEMENTS |
| 2308 SERTA SIMMONS BEDDING, LLC | WOODLAND HILLS FIREPLACE SHOP INC | CO-OP ADVERTISING AGREEMENT DTD 1/11/2023 | SALES AGREEMENTS |
| 2309 SERTA SIMMONS BEDDING, LLC | WORKFORCE SCIENCE ASSOCIATES LLC | STATEMENT OF WORK DTD 7/7/2019 | HUMAN RESOURCES |
| 2310 SERTA SIMMONS BEDDING, LLC | WORKFRONT INC | SALES ORDER #209996-1 | MARKETING AGREEMENTS |
| 2311 SERTA SIMMONS BEDDING, LLC | WORKFRONT INC | SALES ORDER #Q-185193-2 | MARKETING |
| 2312 SERTA SIMMONS BEDDING, LLC | WORKFRONT INC | MASTER SUBSCRIPTOIN AGREEMENT | IT AGREEMENT |
| 2313 SERTA SIMMONS BEDDING, LLC | WORKIVA INC. | IT AGREEMENT DTD 5/25/2016 | IT AGREEMENT |
| 2314 SERTA SIMMONS BEDDING, LLC | WOW FURNITURE | CO-OP ADVERTISING AGREEMENT DTD 5/5/2022 | SALES AGREEMENTS |
| 2315 SERTA SIMMONS BEDDING, LLC | WOW FURNITURE | AUTHORIZED DEALER AGREEMENT DTD 5/5/2022 | SALES AGREEMENTS |
| 2316 SERTA SIMMONS BEDDING, LLC | WRIGHT'S FURNITURE | SALES/RETAILER AGREEMENT DTD 1/1/2022 | SALES/RETAILER AGREEMENTS |
| 2317 SERTA SIMMONS BEDDING, LLC | WRIGHT'S MEDIA | ADVERTISING/MARKETING AGREEMENT DTD 4/12/2021 | ADVERTISING/MARKETING AGREEMENT |
| 2318 SERTA SIMMONS BEDDING, LLC | WW INTERNATIONAL, INC | SERVICE AGREEMENT | OTHER |
| 2319 SIMMONS BEDDING COMPANY, LLC | XEROX CORPORATION | LEASE AGREEMENT | IT AGREEMENT |
| 2320 SSB MANUFACTURING COMPANY | XEROX CORPORATION | PURCHASE ORDER #RITM0012259 DTD 2/14/2017 | IT AGREEMENT |
| 2321 DAWN INTERMEDIATE, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2322 DREAMWELL, LTD. | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|--------|----------|----------------------|---------------|
| 2323  NATIONAL BEDDING COMPANY L.L.C. | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2324  SERTA INTERNATIONAL HOLDCO, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2325  SERTA SIMMONS BEDDING, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2326  SIMMONS BEDDING COMPANY, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2327  SSB HOSPITALITY, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2328  SSB LOGISTICS, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2329  SSB MANUFACTURING COMPANY | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2330  SSB RETAIL, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2331  THE SIMMONS MANUFACTURING CO., LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2332  TOMORROW SLEEP LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2333  TUFT & NEEDLE, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2334  WORLD OF SLEEP OUTLETS, LLC | XL INSURANCE AMERICA | FIRST EXCESS UMBRELLA LIABILITY INSURANCE AGREEMENT (POLICY #: US00094718LI21A) | INSURANCE |
| 2335  DAWN INTERMEDIATE, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2336  DREAMWELL, LTD. | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2337  NATIONAL BEDDING COMPANY L.L.C. | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2338  SERTA INTERNATIONAL HOLDCO, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2339  SERTA SIMMONS BEDDING, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2340  SIMMONS BEDDING COMPANY, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2341 SSB HOSPITALITY, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2342 SSB LOGISTICS, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2343 SSB MANUFACTURING COMPANY | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2344 SSB RETAIL, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2345 THE SIMMONS MANUFACTURING CO., LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2346 TOMORROW SLEEP LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2347 TUFT & NEEDLE, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2348 WORLD OF SLEEP OUTLETS, LLC | XL SPECIALTY INSURANCE COMPANY | SPECAIL CRIME INSURANCE AGREEMENT (POLICY#: UM00050522SP22A) | INSURANCE |
| 2349 SERTA SIMMONS BEDDING, LLC | XMATTERS, INC. | IT AGREEMENT DTD 7/20/2018 | IT AGREEMENT |
| 2350 SSB LOGISTICS, LLC | XPO LAST MILE INC | HOME DELIVERY SERVICES AGREEMENT  DTD 7/21/2017 | LOGISTICS CONTRACT |
| 2351 SSB LOGISTICS, LLC | XPO LAST MILE INC | HOME DELIVERY SERVICES AGREEMENT 07/21/2017 | 3PL CONTRACT |
| 2352 SERTA SIMMONS BEDDING, LLC | YARAGHI, DARIOUSH | AUTHORIZED DEALER AGREEMENT DTD 12/5/2022 | SALES AGREEMENTS |
| 2353 SERTA SIMMONS BEDDING, LLC | YEAR UP, INC. | RECRUITING/STAFFING AGREEMENT DTD 08/17/2020 | RECRUITING/STAFFING AGREEMENT |
| 2354 SERTA SIMMONS BEDDING, LLC | YOUGOV AMERICA | MASTER SERVICES AGREEMENT  DTD 12/3/2019 | CONSUMER INSIGHT |
| 2355 SERTA SIMMONS BEDDING, LLC | YOUGOV AMERICA | FIRST AMENDMENT RENEWAL DTD 11/17/2022 | CONSUMER INSIGHTS |
| 2356 SERTA SIMMONS BEDDING, LLC | ZAIRA MATTRESS & FURNITURE LLC | AUTHORIZED DEALER AGREEMENT DTD 9/8/2022 | SALES AGREEMENTS |
| 2357 SERTA SIMMONS BEDDING, LLC | ZAIRA MATTRESS & FURNITURE LLC | CO-OP ADVERTISING AGREEMENT DTD 9/8/2022 | SALES AGREEMENTS |
| 2358 SERTA SIMMONS BEDDING, LLC | ZAK'S INC | AUTHORIZED DEALER AGREEMENT DTD 2/23/2022 | SALES AGREEMENTS |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2359 SERTA SIMMONS BEDDING, LLC | ZAK'S INC | CO-OP ADVERTISING AGREEMENT DTD 2/23/2022 | SALES AGREEMENTS |
| 2360 NATIONAL BEDDING COMPANY L.L.C. | ZONE HOME ENTERTAINMENT LLC | SUPPLY AGREEMENT DTD 3/22/2016 | SALES AGREEMENTS |
| 2361 SERTA SIMMONS BEDDING, LLC | ZONKD INC | SUPPLY AGREEMENT DTD 9/1/2022 | DIRECT SUPPLIER |
| 2362 SERTA SIMMONS BEDDING, LLC | ZONKD INC | DIRECT SOURCING AGREEMENT | DIRECT SOURCING |
| 2363 SERTA SIMMONS BEDDING, LLC | ZOOM VIDEO COMMUNICATIONS | IT AGREEMENT DTD 10/13/2020 | IT AGREEMENT |
| 2364 SERTA SIMMONS BEDDING, LLC | ZOOM VIDEO COMMUNICATIONS | IT AGREEMENT DTD 09/14/2020 | IT AGREEMENT |
| 2365 SERTA SIMMONS BEDDING, LLC | PECO PALLET INC. | AGREEMENT FOR RENTAL OF PECO PALLETS | SERVICE |
| 2366 SERTA SIMMONS BEDDING, LLC | STAPLES ENTERPRISE ACCOUNT | SUPPLIER AGREEMENT DTD 3/15/2020 | SERVICE |
| 2367 TUFT & NEEDLE, LLC | FRIENDBUY, INC | Master SaaS Agreement DTD 3/4/2021 | SERVICE |
| 2368 SERTA SIMMONS BEDDING, LLC | THE STABLE GROUP HOLDINGS, LLC | MASTER SERVICES AGREEMENT DTD 7/28/2020 | SERVICE |
| 2369 SERTA SIMMONS BEDDING, LLC | TRANE US INC. | PURCHASE OF COMMERCIAL EQUIPMENT | PURCHASE |
| 2370 SERTA SIMMONS BEDDING, LLC | TRANE US INC. | INSTALLATION AGREEMENT DTD 10/24/2022 | SERVICE |
| 2371 SERTA SIMMONS BEDDING, LLC | TOTAL RETAIL GROUP, INC. | SALES/SERVICES AGREEMENT (LOWE'S) DTD 5/1/2018 | Uncategorized |
| 2372 SSB MANUFACTURING COMPANY | Tacoma Millimen's Pension Plan and Trust - Pension Withdrawal Obligation | Pension Withdrawal Obligation | Pension Withdrawal Liability |
| 2373 SSB MANUFACTURING COMPANY | United Furniture Workers Pension Fund A - Pension Withdrawal Obligation | Pension Withdrawal Obligation | Pension Withdrawal Liability |
| 2374 SSB MANUFACTURING COMPANY | Steelworkers Pension Trust - Pension Withdrawal Obligation | Pension Withdrawal Obligation | Pension Withdrawal Liability |
| 2375 DAWN INTERMEDIATE, LLC | WILLIS TOWERS WATSON US LLC | Advisor Statement of Work | EMPLOYMENT MATTERS |
| 2376 SERTA SIMMONS BEDDING, LLC | Healthcare SC, LLC | Eqipment Agreement March 11, 2022 | EQUIPMENT PURCHASE/LEASE AGREEMENT |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2377 SERTA SIMMONS BEDDING, LLC | Premier Trailers, LLC | Master Lease Agreement | EQUIPMENT PURCHASE/LEASE AGREEMENT |
| 2378 SERTA SIMMONS BEDDING, LLC | Crown Equipment Corporation | Equipment Lease Agreement May 1, 2017 | EQUIPMENT PURCHASE/LEASE AGREEMENT |
| 2379 SERTA SIMMONS BEDDING, LLC | Crown Equipment Corporation | Master Referral Agreement January 1, 2016 | EQUIPMENT PURCHASE/LEASE AGREEMENT |
| 2380 SSB Manufacturing Company | Crown Equipment Corporation | Master Referral Agreement November 4, 2020 | EQUIPMENT PURCHASE/LEASE AGREEMENT |
| 2381 SERTA SIMMONS BEDDING, LLC | Blackline Systems | Order Form Dated December 5, 2019 | CONSULTANT AGREEMENT |
| 2382 TUFT & NEEDLE, LLC | SHEERID, INC. | Verification Services Agreement Dated July 11, 2019 | CONSULTANT AGREEMENT |
| 2383 SERTA SIMMONS BEDDING, LLC | HP ASSEMBLY I, LLC | Lease Agreement dated June 16, 2017 | REAL ESTATE LEASES |
| 2384 SERTA SIMMONS BEDDING, LLC | HP ASSEMBLY I, LLC | Letter Agreement dated June 16, 2017 | REAL ESTATE LEASES |
| 2385 SERTA SIMMONS BEDDING, LLC | DOWNTOWN DEVELOPMENT AUTHORITY OF THE CITY OF DORAVILLE AND HP ASSEMBLY I, LLC | Economic Development Agreement dated June 1, 2017 | REAL ESTATE LEASES |
| 2386 SERTA SIMMONS BEDDING, LLC | Xtra Lease LLC | National Account Agreement and related Lease Schedules and Equipment Rental Agreements | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 2387 NATIONAL BEDDING COMPANY L.L.C. | Xtra Lease LLC | Schedule A-42 of Equipment Lease Agreement No. 093L143 | TRANSPORTATION/LOGISTICS AGREEMENTS |
| 2388 SERTA SIMMONS BEDDING, LLC | META PLATFORMS, INC. | MASTER TERMS AND CONDITIONS | MARKETING |
| 2389 SSB MANUFACTURING COMPANY | RFIF RIVIERA BEACH SPE, LLC | Lease Agreement dated November 5, 2014 | REAL ESTATE LEASES |
| 2390 TUFT & NEEDLE, LLC | PHOENIX GATEWAY PARTNERS LLC | First Addendum to Lease dated April 25, 2023 | REAL ESTATE LEASES |
| 2391 SSB LOGISTICS, LLC | RXO Last Mile, Inc. | Amendment to Home Delivery Services Agreement dated 4/10/2023 | LOGISTICS CONTRACT |
| 2392 SERTA SIMMONS BEDDING, LLC | GARTNER INC | AMENDED SERVICES AGREEMENT DTD 05/01/2023 | IT AGREEMENT |
| 2393 SSB MANUFACTURING COMPANY | WMCV PHASE 1 SPE, LLC | INTERNATIONAL MARKET CENTERS LEASE AGREEMENT SHOWROOM B1260 DTD 9/22/2022 | REAL ESTATE LEASES |
| 2394 SERTA SIMMONS BEDDING, LLC | WMCV PHASE 1 SPE, LLC | INTERNATIONAL MARKET CENTERS LEASE AGREEMENT SHOWROOM B1440 DTD 12/13/2022 | REAL ESTATE LEASES |

| Debtor | Creditor | Contract Description | Contract Type |
|---|---|---|---|
| 2395 SSB MANUFACTURING COMPANY | WMCV PHASE 1 SPE, LLC | INTERNATIONAL MARKET CENTERS LEASE AGREEMENT SHOWROOM B1265 DTD 9/22/2022 | REAL ESTATE LEASES |
| 2396 SSB MANUFACTURING COMPANY | Towne Realty, Inc. | Purchase Agreement for the Beloit Property and Janesville Property dated June 28, 2022 | REAL ESTATE |
| 2397 THE SIMMONS MANUFACTURING CO., LLC | Towne Realty, Inc. | Purchase Agreement for the Beloit Property and Janesville Property dated June 28, 2022 | REAL ESTATE |
| 2398 SERTA SIMMONS BEDDING, LLC | Life Insurance Company of North America | Basic and Voluntary Accidental Death & Dismemberment (OK-09802379), effective 1/1/2015; including all amendment and certificates | INSURANCE |
| 2399 SERTA SIMMONS BEDDING, LLC | Life Insurance Company of North America | Life Insurance (FLX 0980362) effective 1/1/2015; including all amendment and certificates | INSURANCE |
| 2400 SERTA SIMMONS BEDDING, LLC | Life Insurance Company of North America | Long Term Disability (FLK0980189) effective 1/1/2015; including all amendment and certificates | INSURANCE |
| 2401 SERTA SIMMONS BEDDING, LLC | Life Insurance Company of North America | Statutory Short Term Disability under New Jersey (SDJ0980094) effective 1/1/2015; including all amendment and riders | INSURANCE |
| 2402 SERTA SIMMONS BEDDING, LLC | Life Insurance Company of North America | Group Temporary Short Term Disability Hawaii (TDI0980119) effective 1/1/2015; including all amendments and riders | INSURANCE |
| 2403 SERTA SIMMONS BEDDING, LLC | Life Insurance Company of North America | Statutory Short Term Disability- New York (NYD0075293) effective 1/1/2015; including all amendments and riders | INSURANCE |
| 2404 SERTA SIMMONS BEDDING, LLC | Life Insurance Company of North America | Administrative Services Agreement (FML 985290) effective 5/1/2017; including all amendments | INSURANCE |
| 2405 SERTA SIMMONS BEDDING, LLC | Life Insurance Company of North America | Agreement for Administrative Services Only (SHD 985290), effective 1/1/2015, including all amendments and riders | INSURANCE |
| 2406 TUFT & NEEDLE, LLC | NORTH MASONIC, LLC | Retail Center Lease Agreement dated August 16, 2019 | REAL ESTATE LEASES |
| 2407 SERTA SIMMONS BEDDING, LLC | MATTRESS FIRM INC | AMENDED AND RESTATED MASTER RETAILER AGREEMENT  05/08/2023 | CUSTOMER CONTRACT |
| 2408 SERTA SIMMONS BEDDING, LLC | MATTRESS FIRM INC | 2023-2026 MERCHANDISING PROGRAM  05/08/2023 | CUSTOMER CONTRACT |
| 2409 NATIONAL BEDDING CO., LLC | Penske Truck Leasing Co., L.P. | Penske Logistics Lease Amendment DTD 2/27/2003 | EQUIPMENT PURCHASE/LEASE AGREEMENT |
| 2410 SSB MANUFACTURING COMPANY | RATZON REALTY (INTERSTATE PK LOGISTICS CTR FL) LP | First Amendment to Lease | REAL ESTATE LEASES |