United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 06, 2023

Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-90020** |
| **SERTA SIMMONS BEDDING, LLC**, *et al.*, | § | **CHAPTER 11** |
| | § | **David R. Jones** |
| Debtors. | § | **Jointly Administered** |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-90020** |
| **SERTA SIMMONS BEDDING, LLC**, *et al.*, | § | |
| | § | **CHAPTER 11** |
| Debtors. | § | |
| | § | |
| **SERTA SIMMONS BEDDING LLC**, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | **ADVERSARY NO. 23-9001** |
| | § | |
| **AG CENTRE STREET PARTNERSHIP**, *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

Before the Court for consideration are (i) confirmation of Debtors' Second Amended Joint Chapter 11 Plan, as supplemented and amended; and (ii) adjudication of the remaining unresolved claims, counterclaims, and crossclaims in Adversary No. 23-9001. Due to the interrelationship between the proceedings, the Court conducted a joint trial on all matters. After considering the evidence adduced and arguments made over five days, the Court grants relief as set forth below. A copy of this memorandum opinion will be entered in both the main bankruptcy case and the adversary proceeding. The Court understands that the proposed confirmation order submitted by the Debtors at Docket No. 1016 contains agreements and modified language that resolved many of the outstanding confirmation objections which the Court does not wish to disturb. Accordingly, the Debtors are instructed to conform their proposed order and judgment to reflect this memorandum opinion and submit revised versions as soon as possible. The Debtors may include (i) additional proposed findings of fact and conclusions of law for the Court's review that are not inconsistent with this memorandum opinion; and (ii) additional language necessary for the efficient implementation of the Plan.

## Background

### The Debtors

The Debtors are one of the largest bedding manufacturers and distributors in North America. [Debtor Ex. 77, Docket No. 862-21 at 7]. For the ten years prior to 2020, the Debtors held the largest percentage of industry market share. [Docket No. 967, Tr. at pg. 12:24-13:5, *Kwon*]. The Debtors' main operating entity was formed in 2010 following the combination of the Serta® and Simmons® brands. [Docket No. 529 at 18]. Today, the Debtors employ approximately 3,600 employees and operate 21 bedding manufacturing facilities across the United States and Canada. [Docket No. 529 at 17-18]. Included within the Debtors' product umbrella are iconic brands such as Serta®, icomfort®, Beautyrest®, Simmons®, and Tuft & Needle®. [Debtor Ex. 77, Docket No. 862-21 at 10]. The Debtors distribute their products through national, regional, and independent retail channels, as well as through direct-to-consumer channels. [Debtor Ex. 77, Docket No. 862-21]. The Debtors also license their intellectual property to third-party manufacturers of bedding products. [Docket No. 529 at 18].

### The Post-2008 Credit Market and the 2016 Credit Agreement

The syndicated commercial loan market is a 1.4 trillion-dollar business. [Docket No. 964, Tr. at pg. 90:24-91:16, *Sveen*]. Following the 2008 financial crisis, commercial borrowers were able to negotiate more flexibility in their loan documents. [Docket No. 964, Tr. at pg. 96:16-97:2, *Sveen*; Docket No. 966, Tr. at pg. 103:15-22, *Yarrow*]. This flexibility or "looseness," provides less protection for lenders and more opportunity for borrowers to manage their capital structure. [Docket No. 964, Tr. at pg. 94:16-95:8, *Sveen*; Docket No. 966, Tr. at pg. 103:8-22, *Yarrow*]. A typical example of "looseness" evaluated by lenders is the degree to which the borrower can subsequently take on additional debt on a priority basis. [Docket No. 964, Tr. at pg. 94:18-24, *Sveen*].

In November 2016, certain of the Debtors entered into three credit facilities which provided for (i) $1.95 billion in first lien term loans (the "2016 Credit Agreement"); (ii) $450 million in second lien term loans; and (iii) a $225 million asset-based revolving loan. [Debtor Ex. 6, Docket No. 853-6 at 6; Adversary Docket No. 148 at 19]. The 2016 Credit Agreement is a "loose" document. [Docket No. 964, Tr. at pg. 96:12-15, *Sveen*; Docket No. 966, Tr. at pg. 32:10-15, *Searles*; Docket No. 966, Tr. at pg. 103:6-13, *Yarrow*; Docket No. 967, Tr. at pg. 56:23-25, *Kwon*]. The 2016 Credit Agreement contains multiple provisions providing the Debtors, as borrowers, a great deal of flexibility to engage in liability management transactions. [Docket No. 967, Tr. at pg. 57:1-4, *Kwon*].

Section 9.05(g) of the 2016 Credit Agreement addresses the assignment of loans to "Affiliated Lenders" and the Debtors (defined in the 2016 Credit Agreement as the "Top Borrower"). [Debtor Ex. 6 at §1.01, Docket No. 853-6 at 6, 58]. Section 9.05(g) states, in relevant part, that:

> Notwithstanding anything to the contrary contained herein, any Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement in respect of its Term Loans to any Affiliated Lender on a non-pro rata basis (A) **through Dutch Auctions open to all Lenders holding the relevant Term Loans**

**on a pro rata basis or (B) through open market purchases**, in each case with respect to clauses (A) and (B), without the consent of the Administrative Agent;

[Debtor Ex. 6 at § 9.05(g), Docket No. 853-6 (emphasis added)]. Thus, the 2016 Credit Agreement expressly permitted the Debtors to repurchase their debt from their Lenders on a non-pro rata basis through either a Dutch auction open to all Lenders or through open market purchases involving fewer than all Lenders.

Section 2.18 of the 2016 Credit Agreement provides that the agreement's pro rata sharing rights are "[s]ubject in all respects to the provisions of each applicable Intercreditor Agreement." [Debtor Ex. 6 at § 2.18(b), Docket No. 853-6 at 81]. The section also provides that the pro rata sharing does not apply to "any payment obtained by any Lender as consideration for the assignment of or sale of a participation in any of its Loans to any permitted assignee or participant, including any payment made or deemed made in connection with <u>Sections 2.22</u>, <u>2.23</u>, <u>9.02(c)</u> and/or <u>Section 9.05</u>." [Debtor Ex. 6 at § 2.18(c), Docket No. 853-6]. These exceptions were generally known to all lenders. [*See* Docket No. 967, Tr. at pg. 83:12-85:24, *Kwon*].

The 2016 Credit Agreement also provides great flexibility for future amendments. Section 9.02(b) provides that "neither this Agreement nor any other Loan Document or any provision hereof or thereof may be waived, amended or modified, except (i) in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Top Borrower and the Required Lenders[1] . . . ." [Debtor Ex. 6 at § 9.02(b), Docket No. 853-6 at 142 (footnote added)]. Amendments could therefore be freely made with the consent of only a simple majority of the Lenders unless the amendment involved a so-called "sacred right." Sacred rights, however, were subject to an express exception for purchases under § 9.05(g):

> [T]he consent of each Lender directly and adversely affected thereby (but not the consent of the Required Lenders) shall be required for any waiver, amendment or modification that: . . . waives, amends or modifies the provisions of Sections <u>2.18(b)</u> or <u>(c)</u> of this Agreement in a manner that would by its terms alter the pro rata sharing of payments required thereby **(except in connection with any transaction permitted under <u>Sections 2.22</u>, <u>2.23</u>, <u>9.02(c)</u> and/or <u>9.05(g)</u> or as otherwise provided in this <u>Section 9.02</u>)**.

[Debtor Ex. 6 at § 9.02(b)(A)(6), Docket No. 853-6 at 142-43 (emphasis added); *see* Docket No. 967, Tr. at pg. 92:15-25, *Kwon*].

## The Debtor Faces Financial Challenges in 2019-2020

The Debtors began to experience financial challenges even prior to the onset of the COVID-19 public health emergency in March 2020. [Docket No. 957, Tr. at pg. 15:24-16:13, *Tepner*; Docket No. 964, Tr. at pg. 97:14-98:19, *Sveen*]. Direct-to-consumer sales competition and wholesale customer demands for more favorable payment terms placed increased pressure on the Debtors' liquidity. [Docket No. 957, Tr. at pg. 16:1-10, *Tepner*]. Mandated closures of over half of the Debtors' manufacturing facilities caused by governmental responses to the COVID-19

---

[1]   "'Required Lenders' means, at any time, Lenders having Loans or unused Commitments representing more than 50% of the sum of the total Loans and such unused commitments at such time." [Debtor Ex. 6 at § 9.02(b), Docket No. 853-6].

pandemic caused additional strain on the Debtors' liquidity. [Docket No. 957, Tr. at pg. 16:18-17:1, *Tepner*]. Further, the Debtors faced an upcoming maturity date on its ABL credit facility in 2021. [Docket No. 957, Tr. at pg. 14:4-9, *Tepner*; Debtor Ex. 51, Docket No. 861-45 at 43]. The Debtors forecasted a sales to budget shortfall of $50 million for the month of March 2020 alone. [Debtor Ex. 51, Docket No. 861-45 at 8]. The Debtors' March 31, 2020, forecast reflected a total lack of liquidity by early July. [Debtor Ex. 51, Docket No. 861-45 at 8; Docket No. 938, Tr. at pg. 10:9-11, *Shah*].

Faced with those uncertainties, the Debtors engaged Evercore, Inc. ("Evercore"), an investment bank, in late 2019 "to evaluate both liquidity enhancement alternatives and liability management alternatives designed to capture, discount, or otherwise manage their liabilities." [Docket No. 938, Tr. at pg. 9:17-23, *Shah*]. The Debtors also engaged FTI Consulting, Inc. ("FTI") to provide forecasting and cash management support. [Debtor Ex. 51, Docket No. 861-45 at 8]. At the time, the Debtors had outstanding approximately $1.9 billion of first lien debt, $420 million of second lien debt, $225 million of ABL facility debt and $80 million in capital lease obligations. [Docket No. 957, Tr. at pg. 13:6-10, *Tepner*]. The Debtors' "objective was to raise new liquidity in order to make sure that the company could survive, as well as potentially right-size the balance sheet through achieving discount." [Docket No. 938, Tr. at pg. 133:23-134:4, *Prince*]. The failure to obtain relief by June 2020 meant that the company "might have been forced to file for bankruptcy or, worse, liquidate." [Docket No. 957, Tr. at pg. 41:12-19, *Tepner*].

Evercore immediately contacted eleven different lending groups regarding financing opportunities with seven expressing an interest. [Debtor Ex. 51, Docket No. 861-45 at 17]. The Debtor also established a Finance Committee on March 11, 2020, consisting of two independent managers to:

> (i) consider, evaluate, and recommend to the Board to pursue a restructuring transaction on behalf of the Company, and (ii) oversee discussions with the Company's stakeholders and the implementation and execution of any transaction that has been approved by the Board. On June 3, 2020, the Board delegated additional transaction authority to the Finance Committee with respect to a restructuring transaction process, including with respect to: (i) approval of any transaction, action or agreement or transaction in furtherance thereof on behalf of the Board; (ii) discussions and negotiations with stakeholders of Dawn Intermediate and its subsidiaries in respect of a transaction; (iii) implementation and execution of a transaction and all related documentation thereto, including with respect to the marketing of Dawn Intermediate's assets and any bids or proposals submitted in connection with the transaction; (iv) analysis and, if applicable, resolution of claims or causes of action in favor of Dawn Intermediate in connection with a transaction; (v) authorizing or instructing the Company's advisors to discuss and negotiate the terms of a transaction with potential counterparties and Dawn Intermediate's stakeholders; and (vi) such other actions as the Finance Committee considers necessary or desirable in order to carry out its mandate.

[Docket No. 545 at 22, 28].

**The 2020 Transaction**

The Debtors' increased leverage, unmet expectations and profitability shortfalls as well as the bankruptcy of a major customer and the ongoing uncertainty caused by the COVID-19 public health emergency motivated a group of the Debtors' lenders to form an ad hoc group (the "PTL Lenders") and contact the Debtors on April 7, 2020, to discuss ongoing liquidity needs and potential options.  [Docket No. 964, Tr. at pg. 97:14-100:25, *Sveen*; Docket No. 966, Tr. at pg. 33:14-34:24, *Searles*; Docket No. 966, Tr. at pg. 105:3-6, *Yarrow*; Debtor No. Ex. 59, Docket No. 862-3 at 3].  When they received no response, the PTL Lenders sent a second communication on April 24, 2020, along with the outline of a priority financing proposal that allowed for participation by all the Debtors' first and second lien lenders. [Docket No. 964, Tr. at pg. 101:17-105:11, *Sveen*; Docket No. 966, Tr. at pg. 106:1-5, *Yarrow*; Debtor Ex. 87, Docket No. 862-31 at 3].  The Debtors again failed to respond. [Docket No. 964, Tr. at pg. 105:12-106:8, *Sveen*].

Approximately a week later, the PTL Lenders learned for the first time that at least one other group of first lien lenders (the "Objecting Lenders") had presented the Debtors with a proposed financing alternative using a "drop-down" structure in early March 2020.  [Docket No. 964, Tr. at pg. 105:24-106:15, *Sveen*; Docket No. 941, Depo. at pg. 63:3-66:24, *Gladstone*].  This group consisted of Angelo Gordon Management LLC ("Angelo Gordon"), Gamut Capital Management LP ("Gamut") and Apollo Management Holdings, L.P. ("Apollo").  [Docket No. 966, Tr. at pg. 84:1-3, *Meiering*].  The Objecting Lenders recognized that the "looseness" of the 2016 Credit Agreement allowed for (i) a liability management solution; and (ii) the stripping of first lien lender protections. [Debtor Ex. 8, Docket No. 861-3 at 6; Debtor Ex. 43, Docket No. 861-37 at 1].  Angelo Gordon had been working on crafting a proposed structure for the Debtors since January 2020.  [Debtor Ex. 8, Docket No. 861-3 at 2-3, 12].  Under a drop-down structure, a borrower moves its most valuable assets to a new unrestricted subsidiary.  [Docket No. 964, Tr. at pg. 106:16-107:3, *Sveen*].  The participating lenders then advance new money secured by the assets and provide a discount on existing debt that is then repurchased. [Docket No. 964, Tr. at pg. 106:16-107:4, *Sveen*].  The effect of a drop-down is to remove a borrower's most valuable assets from the non-participating lenders' collateral base.  [Docket No. 964, Tr. at pg. 109:11-110:15, *Sveen*].  In their proposal, the Objecting Lenders utilized the open market provision under § 9.05(g) for the Debtors to repurchase their loans. [Debtor Ex. 65, Docket No. 862-9 at 6; Docket No. 966, Tr. at pg. 79:20-80:16, *Meiering*].  In anticipation of implementing this structure, the Objecting Lenders acquired approximately $575 million of the Debtors' first lien debt at substantial discounts.  [Debtor Ex. 94, Docket No. 862-38 at 1].

One original member of the PTL Lender group, Barings, LLC ("Barings"), withdrew from the group to propose its own transaction with the Debtors. [Docket No. 966, Tr. at pg. 34:25-35:2, *Searles*].  At the time, Barings knew that the process would be competitive and that the credit agreement had "significant flexibility with respect to a liability management transaction." [Docket No. 966, Tr. at pg. 35:2-36:1, *Searles*].  Barings submitted its initial proposal to the Debtors on or about May 8, 2020. [Debtor Ex. 116, Docket No. 863-9 at 1].  The proposal utilized a drop-down of all the Debtors' intellectual property rights, involved new financing of $390-450 million and the repurchase of Barings' existing debt at a discount. [Docket No. 966, Tr. at pg. 39:1-11, *Searles*; Debtor Ex. 116, Docket No. 863-9 at 4-5].  The ensuing negotiations between the parties were characterized "as being fairly typical for any competitive process, auction or competitive financing." [Docket No. 966, Tr. at pg. 39:20-21, *Searles*]. Barings submitted its last proposal on June 4, 2020.  [Debtor Ex. 195, Docket No. 864-38 at 1].

—

The Debtors invited the PTL Lender group to submit a competing proposal using a set of general guidelines. [Docket No. 964, Tr. at pg. 107:14-23, *Sveen*]. After unsuccessfully attempting to get the Objecting Lenders to work together to submit a joint proposal, the PTL Lenders submitted their own proposal to the Debtors on May 26, 2020. [Docket No. 964, Tr. at pg. 111:22-114:1, *Sveen*]. Multiple negotiations occurred with the primary focus on the amount of discount to be applied to the existing first and second lien debt. [Docket No. 964, Tr. at pg. 116:1-6, *Sveen*]. On June 5, 2020, the Debtors accepted the PTL Lenders' final proposal (the "2020 Transaction"). [Docket No. 964, Tr. at pg. 118:4-13, *Sveen*]. The 2020 Transaction involved the creation of a priority tranche of debt consisting of $200 million of new money plus $875 million of exchanged loans with the first lien loans exchanged at 74% and the second lien loans exchanged at 39%.[2] [Debtor Ex. 210, Docket No. 865-3 at 1]. When Barings learned that the Debtors had accepted the PTL Lenders' proposal, Barings analyzed the 2020 Transaction and agreed to participate. [Docket No. 966, Tr. at pg. 40:21-42:18, *Searles*]. In agreeing to participate, Barings noted that the economic effects of the 2020 Transaction were similar to the drop-down structure that it had proposed but was "a cleaner more efficient transaction." [Docket No. 966, Tr. at pg. 42:6-16, *Searles*]. Barings noted that its analysis determined that the 2016 Credit Agreement allowed for the 2020 Transaction and that it participated in the 2020 Transaction in good faith. [Docket No. 966, Tr. at pg. 48:2-7, *Searles*].

Immediately after learning that the Debtors had accepted the PTL Lenders' proposal, the Objecting Lenders circulated the following internal email:

1. Advent[3] has played our two groups off of each other and continues to do so

a. We concede that the Gibson/Centerview[4] group has outmaneuvered our group

b. However, we don't want to let Advent be the winners

c. We are concerned about two outcomes:

  i. [Race to the bottom - while we would rather not, we are being encouraged/are being forced to underbid you]

---

[2] The parties refer to the 2020 Transaction as an "uptier transaction." Generally, an uptier transaction involves the issuance of new debt by a borrower that is secured by a priming lien on the borrower's assets with the existing debt of the participating lenders purchased at a discount with a portion of the proceeds. As with a drop-down, the effect of an uptier transaction is to effectively remove a borrower's most valuable assets from the non-participating lenders' collateral base until the participating lenders are paid in full. As discussed on the record by the Court, the names ascribed to these transactions have no legal significance. They are just words. [Docket No. 968, Tr. at pg. 47:24-48:3, *J. Jones*]. The Court is more concerned with the effects of these transactions and whether the undertaken actions were permitted under the 2016 Credit Agreement. The fact that one person says they know drop-downs but not uptiers is to suggest that financial transactions fit nicely into static "buckets." In the modern world of commercial finance, they simply do not. The Court has referred to these transactions in the aggregate as "Position Enhancement Transactions" ("PETs") between lenders.

[3] Advent was the Debtor's equity sponsor.

[4] Gibson/Centerview refers to the PTL Lenders' retained professionals.

      ii.   Litigation - risk that any transaction will result in significant litigation for all parties involved

[Debtor Ex. 212, Docket No. 865-5 at 1].    The email then outlines a proposed offer to the PTL Lenders:

  2.  Outline of offer

  a.  We will sign a lock-up that ties us all together that Gibson can draft

      i.   The group will only pursue transactions that treat all parties the same and are supported by the group

      ii.   We wait to properly restructure this business

  b.  Payment to Gibson/Centerview Group. Option:

      i.   Ad Hoc Group purchase of $200mm of face value at 65 cents, or

      ii.   $30 million fee paid directly to ad hoc group members

[Debtor Ex. 212, Docket No. 865-5 at 1-2].  Angelo Gordon also contacted other lenders to garner support to stop the PTL Lenders' transaction. [Docket No. 941, Depo. at pg. 176:21-177:3, *Gladstone*].  When those efforts proved unsuccessful, the Objecting Lenders and LCM—first lien loan holders—filed lawsuits in New York state court to enjoin the transaction. *See N. Star Debt Holdings L.P. v. Serta Simmons Bedding LLC*, No. 652243/2020, 2020 WL3411267 (N.Y. Sup. Ct. June 19, 2020); *LCM Asset Mgmt. LLC v. Serta Simmons Bedding, LLC*, No. 652555/2020 (N.Y. Sup. Ct. 2020).  The New York state court denied the Objecting Lenders' request for a preliminary injunction based on their failure to establish a likelihood of success on the merits. *North Star*, 2020 WL3411267, at *5.  After abandoning the lawsuit, the Objecting Lenders filed a second almost identical lawsuit two years later. *AG Ctr. St. P'ship L.P. v. Serta Simmons Bedding, LLC*, No. 654181/2022, NYSCEF 11 (N.Y. Sup. Ct. Nov. 16, 2022).

    The Court finds the foregoing to be reflective of the true motives of the Objecting Lenders in these proceedings, including an objective lack of good faith.

**<u>The Bankruptcy Case</u>**

    Prior to filing these chapter 11 cases, the Debtors entered into a Restructuring Support Agreement ("RSA") supported by a majority of the Debtors' lenders. [Docket No. 545 at 133]. Under the RSA, the Debtors' balance sheet liabilities would decrease from approximately $1.9 billion to $315 million.  [Docket No. 545 at 11, 56].

    The Debtors filed voluntary chapter 11 cases on January 23, 2023. [Docket No. 1].  The Court entered an order for joint administration on January 24, 2023. [Docket No. 46].  The United States Trustee appointed an official committee of unsecured creditors on February 9, 2023. [Docket No. 274].

The Debtors filed their Disclosure Statement for Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors on March 23, 2023. [Docket No. 545]. The Debtors filed their Second Amended Joint Chapter 11 Plan of Serta Simmons Bedding LLC and its Affiliated Debtors (the "Plan") on May 23, 2023.[5] [Docket No. 977].

Under the Plan, the PTL Lenders agreed to equitize their first lien debt thereby deleveraging the reorganized debtors by almost $1.6 billion. [Docket Nos. 454, 977]. In addition, the PTL Lenders agreed to provide exit financing to enable the Debtors to emerge from bankruptcy and operate with sufficient liquidity. [Docket No. 977 at 14, 35]. In exchange, the PTL Lenders received a basket of consideration, including a new indemnity from the Reorganized Debtors against any liability in connection with the 2020 Transaction.

By notice filed May 9, 2023, the Debtors and the Unsecured Creditors' Committee reached a global settlement of all issues. [Docket No. 797]. Under the proposed settlement embodied in the Plan, Class 6A general unsecured creditors are paid in full. [Docket No. 977 at 29-30]. Class 6B claims share pro-rata in a cash pool of $5.75 million and certain litigation proceeds. [Docket No. 977 at 8-9, 30]. The Committee supports the Plan. [Docket No. 832 at 4].

## Adversary Proceeding No. 23-9001 (the "Adversary")

On January 24, 2023, Serta Simmons Bedding, LLC ("SSB"), Barings, Credit Suisse Asset Management, LLC ("Credit Suisse"), and Invesco Senior Secured Management, Inc. ("Invesco") filed their original complaint against certain lenders, including the Objecting Lenders, seeking a determination that (i) the 2020 Transaction was permitted under the 2016 Credit Agreement; (ii) the plaintiffs did not violate the implied covenant of good faith and fair dealing under the 2016 Credit Agreement by entering into the 2020 Transaction; and (iii) Apollo is a disqualified institution under the 2016 Credit Agreement. [Adversary Docket No. 1]. The plaintiffs filed an amended complaint on February 14, 2023, adding Boston Management and Research ("BMR") and Eaton Vance Management ("Eaton" as plaintiffs and together with BMR, SSB, Barings, Credit Suisse and Invesco, the "Adversary Plaintiffs"). [Adversary Docket No. 38].

The Excluded Lenders[6] filed their answer, counterclaims and third-party claims on February 23, 2023. [Adversary Docket No. 66]. A corrected answer, counterclaims and third-party claims was filed on February 24, 2023. [Adversary Docket No. 68]. In their counterclaims and third-party claims, the Excluded Lenders seek (i) a determination that the 2020 Transaction violates the 2016 Credit Agreement and is *void ab initio* or voidable and rescinded; (ii) money damages for breach of the 2016 Credit Agreement; (iii) money damages for breach of the implied covenant of good faith and fair dealing under the 2016 Credit Agreement; and (iv) a determination that Apollo is not a disqualified institution and its purchases of Serta loans were valid. [Adversary Docket No. 68].

On February 24, 2023, SSB filed its motion for summary judgment [Adversary Docket No. 69] and statement of uncontroverted facts [Adversary Docket No. 70]. Also on February 24, 2023,

---

[5] At the Court's request, the Debtors removed the "deathtrap provision" in the Plan for Class 5. While such provisions are appropriate in some cases and in accord with the Bankruptcy Code, the Court made the request to avoid any distraction in the subsequent review of the Plan.

[6] This term refers to the parties identified in Adversary No. 23-9001, Docket No. 66 at 48.

the Adversary Lenders filed their own motion for summary judgment.  [Adversary Docket No. 73].  The Adversary Lenders filed their amended motion for summary judgment on March 15, 2023. [Adversary Docket No. 77].  Multiple responses, briefs, statements and declarations were filed in opposition on March 16, 2023, and March 17, 2023.  [Adversary Docket Nos. 79, 80, 81, 82, 83, 84, 86, 87, 88, 89, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102 and 103].

SSB filed its answer to the Excluded Lenders' counterclaims on March 16, 2023 [Adversary Docket No. 85] and its reply to the opposition responses to its summary judgment motion on March 24, 2023.  [Adversary Docket No. 110].  The Adversary Lenders likewise filed their reply on March 24, 2023.  [Docket No. 114].

The Court conducted a hearing on the summary judgment motions on March 28, 2023.  At the conclusion of the hearing, the Court granted partial summary judgment declaring that the term "open market purchase" in Section 9.05(g) of the 2016 Credit Agreement was clear and unambiguous, and that the 2020 Transaction constituted an "open market purchase" under Section 9.05(g) of the 2016 Credit Agreement.  The Court denied the balance of the requested relief.  A written order was entered on April 6, 2023. [Adversary Docket No. 142].  The summary judgment order is currently before the Fifth Circuit Court of Appeals on direct appeal pursuant to 28 U.S.C. § 158(d). [Adversary Docket No. 262].

On April 8, 2023, LCM XXII Ltd., LCM XXIII Ltd., LCM XXIV Ltd., LCM XXV Ltd., LCM 26 Ltd., LCM 27 Ltd. and LCM 28 Ltd. (the "LCM Defendants"), filed their answer and counterclaims. [Adversary Docket No. 146].  In their counterclaims, the LCM Defendants assert that the 2020 Transaction is not an "open market purchase" and seek money damages for (i) breach of contract; and (ii) breach of the implied covenant of good faith and fair dealing. [Docket No. 146].

**The Trial**

On May 15, 2023, the Court commenced a joint trial to consider confirmation of the Plan and to resolve the remaining claims in the Adversary.  Throughout the trial, the Debtors announced the resolution of multiple confirmation objections by agreeing to certain language changes in the proposed confirmation order.  The Court accepts and incorporates those resolutions.  At the beginning of the afternoon session on May 17, 2023, Debtors' counsel announced an agreement with Apollo[7] resolving the disqualification count in the Adversary.  [Docket No. 966, Tr. at pg. 5:14-107:8].  The Court entered a Stipulation and Agreed Order embodying the agreement on May 18, 2023.  [Docket No. 945].

The Court closed the evidentiary record on May 18, 2023.  The parties made closing arguments on May 25, 2023.

**Jurisdiction and Authority**

The Court has jurisdiction over both confirmation and the Adversary pursuant to 28 U.S.C. § 1334(b).  Confirmation is a core proceeding under 11 U.S.C. § 157(b)(2)(L).  The Adversary is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (I), (K), (L) and (O) as its resolution is

---

[7]  The actual entity is North Star Debt Holdings, L.P.

integral to the claims adjudication process, inextricably intertwined with the Plan and significantly impacts property of the estate. The Court has constitutional authority to enter final orders and judgments in these proceedings. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). To the extent necessary, the parties have impliedly consented to the entry of a final order by the Court with respect to confirmation of the Debtors' proposed plan. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683-85 (2015) (holding that a party impliedly consents to adjudication when the party "voluntarily appear[s] to try the case" with knowledge of the need for consent and without affirmatively refusing to provide it. (citing *Roell v. Withrow*, 538 U.S. 580, 588 (2003))). The Excluded Lenders have also impliedly consented to this Court's authority to enter final judgment in the Adversary Proceeding by requesting summary judgment from this Court. *See, e.g.*, *Haley v. Barclays Bank Del. (In re Carter)*, 506 B.R. 83, 88 (Bankr. D. Ariz. 2014). The Court questions the Excluded Lenders' lack of consent arguments regarding the Adversary when (i) no objection was made at the summary judgment stage; (ii) the parties proceeded to trial while voicing no objection; and (iii) the only basis for nonconsent is found in a pleading filed prior to one or both of the foregoing.[8]

Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The Debtors are eligible debtors under 11 U.S.C. § 109 and are proper plan proponents under 11 U.S.C. § 1121(a) of the Bankruptcy Code.

To the extent that the Court does not have the requisite constitutional authority to enter either a final order on confirmation of the Debtors' proposed plan of reorganization or a final judgment in the Adversary, then this Memorandum Opinion and all associated orders and judgments shall constitute the Court's report and recommendation to the District Court.

## **Confirmation**

In considering a request to confirm a plan, the Court must undertake an independent analysis that the Plan meets the requirements of 11 U.S.C. § 1123(a). The Court must also ensure that the requirements of 11 U.S.C. § 1129 are satisfied.

Based on the record, the Court finds that the solicitation and voting process (i) was conducted in good faith, (ii) complied with the Bankruptcy Code, the Bankruptcy Rules, the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas,

---

[8] As explained by the *Carter* court:

> One of the underlying reasons for the doctrine of waiver or forfeiture by litigation conduct is to prevent litigation conduct that would be described as sandbagging, "heads I win; tails you lose," or second bite at the apple strategy. If a *Stern* objection were not deemed waived by the party making it seeking summary judgment, then the party could seek or permit a substantive ruling by the Bankruptcy Court, and then waive that objection if the ruling is favorable but insist on it if unfavorable, and get a second bit at the apple. To avoid the possibility of that kind of litigation conduct by virtually any defendant in a bankruptcy adversary proceeding or contested matter, the Court must conclude that [*Executive Benefits Ins. Agency v. Arkison*, 573 U.S. 25 (2013)] necessarily implies that a *Stern* objection is waived or forfeited whenever the party making it requests a substantive ruling from the Bankruptcy Court.

506 B.R. at 88 (citations omitted).

the Disclosure Statement Order, and all other applicable non-bankruptcy rules, laws, and regulations, (iii) was open, transparent and inclusive; and (iv) was appropriate and satisfactory based upon the circumstances of these chapter 11 cases.  All parties received adequate notice of the proceedings and had an opportunity to be heard at their election in person or by video.

Under the Plan, the holders of Claims in Class 3, Class 4, Class 5, Class 6A and Class 6B are impaired and entitled to vote on the Plan.  [Docket No. 977 at 27].  The Voting Tabulation reflects the following vote:

| Class | Number Accepting | Number Rejecting | Amount Accepting | Amount Rejecting | Result |
|-------|------------------|------------------|------------------|------------------|--------|
| 3 | 73<br>98.65% | 1<br>1.35% | $182,468,961.96<br>99.99% | $23,505.83<br>.01% | Accept |
| 4 | 145<br>97.97% | 3<br>2.03% | $764,341,349.88<br>95.63% | $34,947,213.22<br>4.37% | Accept |
| 5 | 33<br>37.93% | 54<br>62.07% | $100,283,720.58<br>11.77% | $751,876,332.45<br>88.23% | Reject |
| 6A | 112<br>100% | 0<br>0% | $117,121,370.76<br>100% | 0<br>0% | Accept |
| 6B | 10<br>31.25% | 22<br>68.75% | $954,082.87<br>20.07% | $3,799,524.23<br>79.93% | Reject |

The holders of Claims in Class 3, Class 4 and Class 6A voted to accept the Plan in the numbers and amounts required by 11 U.S.C. § 1126.  Classes 5 and 6B voted to reject the Plan.

In connection with confirmation, the Debtors received several formal objections to the Plan.  The majority of these objections were resolved by the Debtors before and during the confirmation hearing.  The following table represents the status of the filed objections:

| Docket No. | Objecting Party(ies) | Status/Docket |
|------------|----------------------|---------------|
| 617 | Maricopa County Treasurer | WD - 817 |
| 676 | Microsoft Corporation | WD - 719 |
| 702 | RLIF Riviera Beach SPE, LLC | WD - 757 |
| 718<br>788 | LIT Gateway Portfolio LLC | WD - 815 |
| 721 | WPG Legacy, LLC | WD - 897 |
| 726 | Safety National Casualty Corp. | Cure - adjourned |
| 739 | Salesforce, Inc. | Cure - adjourned |
| 742 | Cisco Systems Capital Corp. | WD - 956 |
| 743 | Six Continents Hotels, Inc. | WD - 814 |
| 746 | XTRA Lease, LLC | Cure - adjourned |
| 751 | Mattress Firm | WD - 872 |
| 752 | Ratzon Realty Limited Partnership | WD - Record |
| 753 | HP Assembly I, LLC | WD - 794 |
| 754 | Continuum Marketing Services LLC | WD - Record |
| 810 | Citadel Equity Fund Ltd. | Outstanding |
| 820 | United States Trustee | Outstanding |
| 821 | Texas Comptroller of Public Accounts | WD - Record |

| Docket No. | Objecting Party(ies) | Status/Docket |
|---|---|---|
| 823 | Cypress-Fairbanks ISD, Dallas Country, Harris Country | WD - 895 |
| 824 | Objecting Lenders | Outstanding |
| 825 | LCM Defendants (joinder to 824) | Outstanding |
| 826 891 | Cameron Thierry | Outstanding |
| 827 | Dormae Products, Inc., Serta Restokraft Mattress Company Inc.; Palu Bedding Co., Inc., Salt Lake Mattress & Mfg. Co.; AW Industries, Inc. | WD - Record |
| 829 | Alan and Ruth Humphries | WD - 896 |
| 830 | The Secretary of the Louisiana Depart. of Rev. | WD - 894 |
| 917 | State of CT | WD - Record |

**Legend**
WD – Withdrawn.
WD-Record – Withdrawn by announcement.
Cure-adjourned – Objection to contract cure amount only.  Objection adjourned.
Outstanding – Objection unresolved.

Each of the outstanding objections is addressed below.

## The Objection of the United States Trustee (Docket No. 820).

The United States Trustee asserts that the Plan violates the Fifth Circuit's decision in *Highland Capital Management* by providing for a broad exculpation of the Debtors' independent directors/managers with their inclusion in the definition of "Exculpated Parties." [Docket No. 820 at 5; *see NexPoint Advisors, L.P. v. Highland Capital Management L.P. (In re Highland Capital Management, L.P.)*, 48 F.4th 419, 437-38 (5th Cir. 2022)].  Upon review of the Plan, the Court notes that total relief provided to "Exculpated Parties" encompasses multiple paragraphs of the Plan but is limited "in each case, to the maximum extent permitted by law."  [Docket No. 977]. Given that the scope of exculpation remains a much discussed and developing topic, the Court finds this limitation appropriate, and that the exculpation provision does not technically violate *Highland*.  For purposes of clarity, however, the Court agrees that, under *Highland*, independent directors not appointed by the Court cannot receive a nonconsensual, third-party exculpation.  To that end, the United States' Trustee is sustained.

Based, however, on the Court's review of the record in this case and the specific evidence adduced at trial, the Court makes the following findings of fact and conclusions of law.  The Court finds that Harvey Tepner and Joan Hilson exhibited the highest standards of professionalism and due diligence in the performance of their roles as independent directors and managers in these cases.  The Court further finds that Mr. Tepner and Ms. Hilson exercised the highest level of prudent business judgment after exhaustive diligence in their decision making.  The Court further finds that Mr. Tepner and Ms. Hilson owed duties only to the bankruptcy estates, the Court and the debtors in possession in their roles as independent directors and managers and that such duties have been fully, completely, professionally and admirably satisfied.  No party may assert a claim on any basis against either Mr. Tepner or Ms. Hilson arising out of or related to their roles in these

cases without first seeking authority from this Court. Any such request shall be made in writing with notice to all affected parties and shall include a proposed complaint setting forth any alleged claims and the detailed factual basis in support of such claims. Further, any such request shall include a proposed attorney fee reserve, subject to court modification, that will be deposited to the Court's registry to indemnify Mr. Tepner and Ms. Hilson against costs associated with the successful defense of any claim that is allowed to proceed. The Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by applicable law.

## The Objections of the Objecting Lenders (Docket No. 824) and the Joinder of the LCM Defendants (Docket No. 825)

The Objecting Lenders raise two objections. First, the Objecting Lenders assert that the Plan impermissibly allows the Debtors' pre-petition indemnity in favor of the PTL Lenders to pass through the Plan unaffected in violation of 11 U.S.C. §§ 502 (e)(1)(B) and 509(c). [Docket No. 824]. Second, the Objecting Lenders assert that the Plan violates the absolute priority rule by allowing a $1.5 million payment to equity prior to their claims being paid in full. The Court finds no merit in either objection.

Although the Plan has changed several times in its implementation of the post-confirmation indemnity granted to the PTL Lenders, the Objecting Lenders misconstrue the Plan currently before the Court. Under the current Plan, the PTL Lenders agreed to equitize almost a billion dollars in secured claims plus provide the Reorganized Debtors with financing on a go-forward basis. In return, the PTL Lenders received a basket of consideration, including an indemnification, from the Reorganized Debtors for any liability related to the 2020 Transaction. This indemnity replaced the pre-petition indemnity lost due to the bankruptcy filing. Indeed, when asked by the Court, counsel for the PTL Lenders and the Debtors affirmed the disallowance of the pre-petition indemnity. [Docket No. 1019, Tr. at pg. 176:11-177:11]. The Objecting Lenders appropriately admit that if the plan indemnity is a new indemnity, their argument fails. [Docket No. 1019, Tr. at pg. 178:6-22]. In support of their objection that no new indemnity exists, however, the Objecting Lenders point to multiple modifications in the Plan to the indemnity implementation and that the final language is virtually identical to the pre-petition indemnity. Given that the potential liability from the 2020 Transaction remains the same, the Court would expect the new indemnity language to be identical. With respect to the multiple changes regarding the implementation of the indemnity, the Court finds that the Plan is extraordinarily complex and required multiple modifications along the way to reach the version currently before the Court. While history is certainly relevant, making something better or correcting an error should never be discouraged.

The Court views the fundamental issue as the Debtors' application of its business judgment. A proposed plan may contain one or more settlements. 11 U.S.C. § 1123(b)(3). Such settlements are evaluated under the same criteria as settlements under Bankruptcy Rule 9019. *In re Bigler LP*, 442 B.R. 537, 543 n.6 (Bankr. S.D. Tex. 2010). The evidence adduced at trial reflects the Debtors applied their independent business judgment within the bounds of reason and made an informed decision that results in a properly capitalized company exiting from bankruptcy that has a chance of success. *See Conn. Gen. Life Ins. Co. v. United Companies Fin. Corp. (In re Foster Mort. Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995); *Am. Can Co. v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 605, 609 (5th Cir. 1980). The compromise between the Debtors and the PTL Lenders is fair, equitable, and in the best interests of the estates. The fact that the Debtors' decision interferes with the Objecting Lenders' litigation strategy is irrelevant. The objection is overruled.

The Objecting Lenders' second objection is that a $1.5 million dollar payment is being made to equity solely because of their status as equity in violation of 11 U.S.C. § 1129(b)(2). The Debtors represent that the payment is being made in exchange for a potential $54 million tax benefit held by equity. The Objecting Lenders acknowledge that if sufficient new value is being provided in exchange for the payment, the objection has no merit. [Docket No. 1019, Tr. at pg. 179:10-181:13]. Again, the issue examined by the Court is the proper exercise of the Debtors' business judgment. The Debtors agreed to pay $1.5 million to certain existing equity holders to try and preserve a $54 million tax benefit. Based on the available record and the confirmation of Debtors' counsel of new value, the Court finds this decision to be in the range of reasonable business judgment. [*See* Docket No. 1019, Tr. at pg. 181:14-21; *Foster Mort.*, 68 F.3d at 917; *Jackson Brewing*, 624 at 609]. The objection is overruled.

Although not formally asserted, the LCM Defendants spent the majority of their time at the lectern eliciting testimony that no one formally asked them to join the PTL Lender group. Each witness that was questioned confirmed that the LCM Defendants were not asked to participate in the 2020 Transaction. Accepting these statements at face value, the Court finds the issue to be irrelevant. Absent a contractual or legal duty to do so, the failure of the LCM Defendants to receive an invitation is just a fact of commercial life. The LCM Defendants adduced no evidence that established an obligation that such an invitation was required. To the extent that this area of inquiry is the basis of an informal objection, it is overruled.

## The Objection of Citadel Equity Fund Ltd. ("Citadel") (Docket No. 810)

Citadel raised the same objection as the Objecting Lenders regarding the Plan indemnity in favor of the PTL Lenders. The objection is overruled for the reasons set forth above. Citadel also asserts that because the Debtors failed to value the indemnity, the Debtors failed to establish feasibility of the Plan pursuant to 11 U.S.C. § 1129(a)(11). While purporting not to criticize the Court's ruling in the Adversary, Citadel's argument is based solely on the fact that the Court's summary judgment was incorrect.

The 2016 Credit Agreement is governed by New York law. [Debtors' Ex. 6, Docket No. 853-6, § 9.10(a)]. In granting summary judgment, the Court found that the term "open market purchase" was not ambiguous and that the 2020 Transaction fell within the parameters of an open market purchase. The Court must therefore enforce the 2016 Credit Agreement according to the plain meaning of its terms. *See Greenfield v Philles Recs.*, 98 N.Y.2d 562, 569 (N.Y. 2002). If the parties omit terms in one place of a contract and not in others, the rule of contract interpretation *expressio unius est exclusio alterius* suggests that the omission was intentional. *Quadrant Structured Prods. Co. v. Vertin*, 23 N.Y.3d 549, 560 (2014). A common sense reading of § 9.05(g) of the 2016 Credit Agreement leads to the same conclusion. The paragraph deals with two different sales processes: first, the Dutch Auction with its pages of implementation rules open to all lenders; and second, an open market purchase between a buyer and a seller.

The parties do not genuinely dispute what a "purchase" means. Merriam-Webster defines a purchase as "something obtained especially for a price in money or its equivalent." *Purchase*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/purchase (last visited June 5, 2023). Merriam-Webster likewise defines "open market" as an economic market in which prices are based on competition among private businesses and not controlled by a government.

*Open Market*, MERRIAM-WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/open%20market (last visited June 5, 2023). An open market purchase is therefore defined as something obtained for value in competition among private parties. The 2016 Credit Agreement defines the scope of the market as it limits buyers to existing holders of the Debtors' loans. The process utilized by Evercore to solicit interest from these existing lenders, the receipt and negotiation of multiple offers by the Debtors to achieve the greatest benefit for the Debtors, the attempts by various lenders to "outmaneuver" one other with an ultimate winner announced, and the Objecting Lenders subsequent attempts to undermine the announced winning deal is the quintessential "Wall Street" open market purchase.

The Court finds that based on the overwhelming evidence adduced at trial, the 2020 Transaction was the result of good-faith, arm's length negotiations by economic actors acting in accordance with the duties owed to their respective creditors, investors and owners. The Court further finds that the 2020 Transaction is binding and enforceable in all respects.

Citadel's complaint that the indemnity wasn't valued finds no traction in the feasibility analysis. The unrefuted testimony is that the Debtors' projections are realistic and feasible. [Docket No. 966, Tr. at pg. 137:3-142:7, *Linker*]. Citadel's objection is overruled.

## The Objection of Cameron Thierry (Docket No. 826)

Cameron Thierry filed an objection pro se asserting that (i) the Plan treated his general unsecured claim in the same manner as other unsecured creditors; and (ii) the Plan bars him from continuing his employment discrimination lawsuit against the Debtors. [Docket No. 826]. The Court agrees that the Plan does exactly what Mr. Thierry asserts. Mr. Thierry's claim is treated the same as other unsecured claims as required by 11 U.S.C. § 1123(a)(4). Further, the Plan implements an injunction against further collection efforts by holders of pre-petition claims in accordance with 11 U.S.C. §§ 524 and 1141. Mr. Thierry's objection is overruled.

The Court finds that the Plan satisfied the mandatory requirements of 11 U.S.C. § 1123(a). The Plan does not violate any of the permissive requirements of 11 U.S.C. § 1123(b) or other applicable law.

With respect to confirmation of the Plan, the court finds that the Plan satisfied the requirements of 11 U.S.C. § 1129(a)(1), (a)(2), (a)(3), (a)(4), (a)(5), (a)(7), (a)(9), (a)(10), (a)(11), (a)(12), (a)(13) and (a)(16). The Court finds that the requirements of 11 U.S.C. § 1129(a)(6), (a)(14) and (a)(15) are inapplicable in these cases. As the Court finds that all the requirements of 11 U.S.C. § 1129(a) have been satisfied or are inapplicable other than 11 U.S.C. § 1129(a)(8), the Court finds pursuant to 11 U.S.C. § 1129(b) that the Plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. The Court finds that the Plan satisfies the requirements of 11 U.S.C. §§ 1129(c) and (d). The Court finds that the requirements of 11 U.S.C. § 1129(e) are inapplicable to these cases.

Subject to the submission of a conforming order, the Court confirms the Plan.

**Partial Waiver of Stay**

The requirement under Bankruptcy Rule 3020(e) that an order confirming a plan is stayed until the expiration of fourteen days after entry of the order is hereby modified for cause to shorten the time to seven days. The Court stands ready to conduct a hearing on an emergency basis to consider any motion to stay and to establish an appropriate bond. Unless otherwise stayed, the Court's confirmation order shall take effect seven days after entry and shall not be stayed pursuant to the Bankruptcy Code, Bankruptcy Rules 3020(e), 6004(h), 6006(d), 7062, or otherwise.

**The Adversary Proceeding**

New York law implies a covenant of good faith and fair dealing in the performance of every contract. *See Cordero v. Transamerica Annuity Serv. Corp.*, -- N.E.3d --, 2023 WL 3061503, at *5 (N.Y. Apr. 25, 2023) (citing *511 W. 232nd Owners Corp. v. Jennifer Realty Co.*, 773 N.E.2d 496, 500 (2002)). "[T]he implied duty must arise from the contract and the promisee's reasonable expectations," at the time of the transaction. *Id.* (citing *Jennifer Realty*, 773 N.E.2d at 501). "[T]o plead a valid cause of action for breach of the covenant of good faith, a plaintiff must allege facts sufficient to demonstrate that the plaintiff reasonably understood the contract or contractual provision at issue to state a duty to take or refrain from taking a particular action." *Id.* (internal quotations omitted). One party's assertion that the counter-party's actions "drastically undermined a fundamental objective of the parties' contract" is insufficient. *Id.* (citing *Cordero v. Transamerica Annuity Serv. Corp.*, 34 F.4th 994, 1001 (11th Cir. 2022), *certified question accepted*, 38 N.Y.3d 1050, 190 N.E.3d 1173 (2022) *and certified question answered*, No. 21, 2023 WL 3061503 (N.Y. Apr. 25, 2023)).

The Court's inquiry is an objective one focused on the plaintiff's reasonable expectations at the time of entry into the agreement. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F.Supp. 3d 430, 605 (S.D.N.Y. 2018); *Cordero*, 2023 WL 3061503, at *5. Courts should provide a level of deference in reviewing agreements negotiated and executed by sophisticated parties. *ELBT Realty, LLC v. Mineola Garden City Co., Ltd.*, 144 A.D.3d 1083, 1084 (N.Y. App. Div. 2016) (quoting *S. Rd. Assoc., LLC v Int'l Bus. Machs. Corp.*, 4 N.Y.3d 272, 277 (N.Y. 2005)). The Court may not insert contractual terms where none exist. *Wilmington Tr. Co. v. Solutia, Inc. (In re Solutia, Inc.)*, No. 03-17949 PCB, 2007 WL 1302609, at *10 (Bankr. S.D.N.Y. May 1, 2007) ("Nothing in the doctrine of good faith and fair dealing allows a court to create contract terms that the parties have not negotiated for.").

The Court's inquiry is further constrained by the entirety of the terms in the agreement. *Singh v. City of New York*, --- N.E.3d ----, 2023 WL 3098734, at *2 (N.Y. Apr. 27, 2023) (quoting *Murphy v. Am. Home Prods. Corp.*, 448 N.E.2d 86, 91 (N.Y. 1983)). Conduct that is expressly permitted under an agreement does not violate the implied covenant. *Ability Ins. Co. v. ST Paper, LLC*, 2022 WL 912927, at *6 (S.D.N.Y. Mar. 29, 2022); *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 507 F. Supp. 3d 490, 505 (S.D.N.Y. 2020). Finally, actions taken for a "legitimate business purpose," even if self-interested, do not violate the covenant of good faith and fair dealing. *See Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 817 (2d Cir. 2014); *State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 170 (2d Cir. 2004); *Lykins v. IMPCO Tech., Inc.*, 2018 WL 3231542, at *11 (S.D.N.Y. Mar. 6, 2018); *Bonady Apartments Inc. v. Columbia Banking Fed. Sav. & Loan Ass'n*, 119 Misc.2d 923, 928 (N.Y. Sup. Ct. 1983). Signing a contract does not "oblige [one] to become an altruist towards the other party." *Fasolino Foods*

*Co. v. Banca Nazionale del Lavaro*, 961 F.2d 1052, 1057 (2d Cir. 1992) (quoting *Mkt. St. Assocs. Ltd. P'ship v. Frey*, 941 F.2d 588, 594 (7th Cir.1991)).

   The evidence adduced at trial is undeniable.  The parties were keenly aware that the 2016 Credit Agreement was a "loose document" and understood the implications of that looseness.  The Objecting Lenders acquired the majority of their loan holdings long after the original issuance and in anticipation of negotiating and executing a PET to the exclusion of the PTL Lenders—exactly what they complain was done to them using the same provisions of the 2016 Credit Agreement.  No evidence of an improper motive on behalf of either the Debtors or the PTL Lenders was presented.  The Debtors always remained transparent in their goals.  Likewise, the PTL Lenders acted defensively and in good faith.  On the scale of equity, it is the conduct of the Objecting Lenders that raises an eyebrow.  There is no evidence of a breach of the implied duty of good faith and fair dealing by either the Debtors, the PTL Lenders or any of the other counter-defendants.  There is no evidence of a breach of the 2016 Credit Agreement.  The parties could have easily avoided this entire situation with the addition of a sentence or two to the 2016 Credit Agreement.  They did not.  And this litigation ends with each party receiving the bargain they struck—not the one they hoped to get.  *See Lehman Bros. Holdings Inc. v. JPMorgan Chase Bank, N.A. (In re Lehman Bros. Holdings Inc.)*, 541 B.R. 551, 570 (S.D.N.Y. 2015) ("The Court will not now rewrite the parties' contractual text—with express or implied terms—to provide Lehman with language more beneficial than what it negotiated.").

   PETs may or may not be a good thing.  Lender exposure to these types of transactions can be easily minimized with careful drafting of lending documents.  While the result may seem harsh, there is no equity to achieve in this case.  Sophisticated financial titans engaged in a winner-take-all battle.  There was a winner and a loser.  Such an outcome was not only foreseeable, it is the only correct  result.  The risk of loss is a check on unrestrained behavior.  As set forth above in connection with confirmation of the Plan, the Court finds that based on the overwhelming evidence adduced at trial, the 2020 Transaction was the result of good-faith, arm's length negotiations by economic actors acting in accordance with the duties owed to their respective creditors, investors and owners. The Court further finds that the 2020 Transaction was not prohibited by the 2016 Credit Agreement.  The Court further finds that the 2020 Transaction is binding and enforceable in all respects. All claims for breach of the implied duty of good faith and fair dealing are denied. All claims for breach of the 2016 Credit Agreement are denied.  All other requested relief is denied.

   The Debtors are instructed to submit a proposed form of judgment consistent with this Memorandum Opinion.  The proposed judgment may also be accompanied by proposed findings of fact and conclusions of law for the Court's review that are not inconsistent with this Memorandum Opinion.

   **SIGNED: June 6, 2023.**

**DAVID R. JONES**
**UNITED STATES BANKRUPTCY JUDGE**

17 / 17