# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| SERTA SIMMONS BEDDING, LLC, *et al.*,[1] | Case No. 23-90020 (DRJ) |
| Debtors. | (Jointly Administered) |

## APPELLANT CITADEL EQUITY FUND LTD.'S
## OPPOSED EMERGENCY MOTION TO STAY ORDER CONFIRMING
## DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF REORGANIZATION
## PENDING APPEAL

---

[1] The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Dawn Intermediate, LLC (6123); Serta Simmons Bedding, LLC (1874); Serta International Holdco, LLC (6101); National Bedding Company L.L.C. (0695); SSB Manufacturing Company (5743); The Simmons Manufacturing Co., LLC (0960); Dreamwell, Ltd. (2419); SSB Hospitality, LLC (2016); SSB Logistics, LLC (6691); Simmons Bedding Company, LLC (2552); Tuft & Needle, LLC (6215); Tomorrow Sleep LLC (0678); SSB Retail, LLC (9245); and World of Sleep Outlets, LLC (0957).  The Debtors' corporate headquarters and service address for these chapter 11 cases is 2451 Industry Avenue, Doraville, Georgia 30360.

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     FACTUAL & PROCEDURAL BACKGROUND .............................................. 4

    A.   The Debtors obtain financing through the Non-PTL Term Loan
        Agreement. ............................................................................................... 4

    B.   The Debtors consummate the 2020 Transaction. ..................................... 4

    C.   The Debtors seek bankruptcy protection and Citadel objects to the
        Debtors' plan of reorganization. ............................................................. 5

    D.   The Debtors modify the Plan on the eve of the Confirmation Hearing. ................. 8

    E.   The Debtors' representatives reveal that they did not value the Plan
        Indemnity at all. ...................................................................................... 9

    F.   After the close of witness testimony, the Debtors change the plan yet
        again. ...................................................................................................... 11

    G.   The Court confirms the Plan. ................................................................. 11

    H.   The pending appeal regarding the 2020 Transaction. ............................ 12

III.    ARGUMENT & AUTHORITIES ..................................................................... 13

    A.   Citadel is likely to succeed in showing the Plan should not have been
        confirmed on account of the Plan Indemnity. ....................................... 14

          i.    The Prepetition Indemnity Claims were not allowable under
              Section 502(e)(1)(B). ................................................................. 16

              (a)   The Debtors and the PTL Lender Defendants are co-liable. ........ 17

              (b)   The Prepetition Indemnity Claims are claims for
                    reimbursement or contribution. ................................................... 21

              (c)   The Prepetition Indemnity Claims are contingent claims. ........... 22

              (d)   The Court erred in allowing the Prepetition Indemnity
                    Claims to ride through the bankruptcy. ....................................... 22

          ii.   The Court should not have approved the Plan because the Debtors
              did not show that it is feasible. ................................................... 24

          iii.  The Debtors failed to show their "settlement" with the PTL
              Lenders was in the best interest of the estate. .......................... 30

          iv.   The Plan does not satisfy section 1123(a)(4) of the Bankruptcy
              Code. ........................................................................................ 33

          v.    Citadel's due process rights were violated by the Plan's
              confirmation. ............................................................................. 34

    B.   Citadel will be irreparably harmed if the Confirmation Order is not stayed
        and its appellate rights are mooted. ....................................................... 35

i

C.      A stay will benefit—not harm—other parties.......................................... 39

D.      The public interest favors a stay of the Confirmation Order. .............................. 39

E.      The Court should exercise its discretion to grant a stay without a bond. ............. 40

IV.   PRAYER........................................................................................................... 41

US.357891120.01

# INDEX OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*ACC Bondholder Gp. v. Adelphia Commc'ns Corp (In re Adelphia Commc'ns Corp.),*
  361 B.R. 350 (S.D.N.Y. 2007) ...............................................................................40

*In re Alper Holdings USA,*
  No. 07-12148 (BRL), 2008 WL 4186333 (Bankr. S.D.N.Y. Sept. 10, 2008) .................22, 23

*In re Alta Mesa Res.,*
  No. 19-35133, 2022 WL 17984306 (Bankr. S.D. Tex. Dec. 28, 2022).......................... *passim*

*In re Amatex Corp.,*
  110 B.R. 168 (Bankr. E.D. Pa. 1990) ....................................................................17

*Arnold v. Garlock Inc.,*
  278 F.3d 426 (5th Cir. 2001) ...............................................................................14

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,*
  875 F.2d 1174 (5th Cir. 1989) .............................................................................36

*Matter of AWECO, Inc.,*
  725 F.2d 293 (5th Cir. 1984) ...............................................................................31

*In re Baldwin-United Corp.,*
  55 B.R. 885 (S.D. Ohio 1985) .........................................................................19, 23

*In re Bivens,*
  No. 08-31447, 2009 WL 9121302 (Bankr. S.D. Ohio Sept. 30, 2009) ................................35

*BVS Constr. Inc. v. Prosperity Bank,*
  No. 6:20-CV-261-ADA, 2021 WL 2678203 (W.D. Tex. March 19, 2021) ...........................14

*In re Cantu,*
  398 Fed. Appx. 76 (5th Cir. 2010)........................................................................24

*In re Caribbean Petroleum Corp.,*
  No. 10-12553 KG, 2012 WL 1899322 (Bankr. D. Del. May 24, 2012), *aff'd,*
  566 Fed. Appx. 169 (3d Cir. 2014).................................................................17, 21, 22

*Chicago Cable Commc'ns v. Chicago Cable Comm'n,*
  879 F.2d 1540 (7th Cir. 1989) .............................................................................35

*Czyzewski v. Jevic Holding Corp.,*
  137 S.Ct. 973 (2017).....................................................................................24, 30

*In re Diruzzo*,
    527 B.R. 800 (B.A.P. 1st Cir. 2015) ..................................................................23

*In re Dow Corning Corp.*,
    244 B.R. 705 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich.
    2000), *aff'd and remanded,* 280 F.3d 648 (6th Cir. 2002) ......................................18

*In re Drexel Burnham Lambert Gp. Inc.*,
    148 B.R. 982 (Bankr. S.D.N.Y. 1992) ....................................................19, 20, 23

*Excluded Lenders v. Serta Simmons Bedding, LLC*,
    Case No. 23-90012 (5th Cir. Apr. 26, 2023) ........................................................13

*In re Fiesta Inn & Suites, LP*,
    2009 WL 5195961 (Bankr. W.D. Tex. Dec. 21, 2009) ...........................................40

*In the Matter of Foster Mort. Corp.*,
    68 F.3d 914 (5th Cir. 1995) ..........................................................................30, 31

*In re Friendship Diaries*,
    No. 12–20405, 2014 WL 527232 (Bankr. N.D. Tex. Feb. 10, 2014) .....................14

*In re Fuel Barons, Inc.*,
    488 B.R. 783 (Bankr. N.D. Ga. 2013) .......................................................17, 21, 23

*In re Genesis Health Ventures, Inc.*,
    367 B.R. 516 (Bankr. D. Del. 2007) ....................................................................14

*In re Gleasman*,
    111 B.R. 595 (Bankr. W.D. Tex. 1990) ...........................................................14, 40

*In re Harbin*,
    486 F.3d 510 (9th Cir. 2007) .............................................................................25

*In re Holly Knoll P'ship*,
    167 B.R. 381 (Bankr. E.D. Pa. 1994) ...................................................................33

*Jiao v. Xu*,
    28 F.4th 591 (5th Cir. 2022) ..............................................................................36

*LaChance v. Erickson*,
    522 U.S. 262 (1998)...........................................................................................34

*In re Lahijani*,
    325 282, 289 (B.A.P 9th Cir. 2005)......................................................................31

*In re Landau Boat Co.*,
    8 B.R. 432 (Bankr. W.D. Mo.1981).......................................................................33

iv

*In re Landing Assocs., Ltd.*,
    157 B.R. 791 (Bankr. W.D. Tex. 1993) ...................................................................33

*LCM XXII Ltd. v. Serta Simmons Bedding, LLC*,
    No. 21 CIV 3987 (KPF), 2022 WL 953109 (S.D.N.Y. March 29, 2022)....................20, 27, 28

*Miraj & Sons*,
    201 B.R. .........................................................................................................14, 15

*In re Pacific Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) .............................................................................39

*In re Paige*,
    685 F.3d 1160 (10th Cir. 2012) ..........................................................................25

*Parkcrest Builders, LLC v. Liberty Mut. Ins. Co.*,
    26 F.4th 691 (5th Cir. 2022) .............................................................................26

*In re Pick & Save, Inc.*
    478 B.R. 110 (Bankr. D.P.R. 2012) ....................................................................23

*Matter of Pizza of Hawaii, Inc.*,
    761 F.2d 1374 (9th Cir. 1985) ..........................................................................25

*In re Porter*,
    511 B.R. 785 (Bankr. E.D. La. 2014) .................................................................15

*In re Premier Entm't Biloxi, L.L.C.*,
    No. 08-60349, 2009 WL 1616681 (5th Cir. June 9, 2009)......................................14

*In re Public Serv. Co.*,
    116 B.R. 347 (Bankr. D.N.H. 1996) ...................................................................14

*In re Robinson*,
    225 B.R. 228 (Bankr. N.D. Okla. 1998) ..............................................................23

*Route 21 Assocs. of Belleville, Inc.* 486 B.R. 75 (S.D.N.Y. 2012), *aff'd sub nom.*,
    *In re Lyondell Chem. Co.*, 542 Fed. Appx. 41 (2d Cir. 2013) ....................................17, 18, 21

*In re Save*
    *our Springs (S.O.S. Alliance, Inc*, 632 B.R. 168 (5th Cir. 2011) ...........................................25

*Serta Simmons Bedding, LLC v. AG Centre St. P'ship L.P. (In re Serta Simmons
    Bedding, LLC)*, Ch. 11 Case No. 23-90020, Adv. No. 23-09001 (Bankr. S.D.
    Tex. Jan. 24, 2023)............................................................................................. *passim*

*In re Sphere Holding Corp.*,
    162 B.R. 639 (E.D.N.Y. 1994) ..........................................................................40

v

*In re St. Johnsbury Trucking Co.*,
  185 B.R. 687 (S.D.N.Y. 1995) ........................................................................15

*In re Suprema Specialties, Inc.*,
  330 B.R. 93 (S.D.N.Y. 2005) ..........................................................................40

*In re Tex. Equip. Co.*,
  283 B.R. 222 (Bankr. N.D. Tex. 2002) ...........................................................14

*Texas v. U.S. Envtl. Prot. Agency*,
  829 F.3d 405 (5th Cir. 2016) ...........................................................................36

*In the Matter of Thru Inc.*,
  782 Fed. Appx. 339 (5th Cir. 2019) .................................................................37

*In re Venoco LLC*,
  998 F.3d 94 (3d Cir. 2021) ...............................................................................27

*In re Voluntary Purchasing Gps., Inc.*,
  196 F.3d 1258 (5th Cir. 1999) .........................................................................38

*Wages and White Lion Investments, L.L.C. v. U.S. Food and Drug Admin.*,
  16 F.4th 1130 (5th Cir. 2021) ..........................................................................36

*In re Walker*,
  149 B.R. 511 (Bankr. N.D. Ill. 1992) ..............................................................35

*In re Wedtech*,
  85 B.R. 285 (Bankr. S.D.N.Y. 1988) ...............................................................19

*In re Wiley*,
  No. BKR 7-07-13053 SL, 2010 WL 964082 (Bankr. D.N.M. Mar. 11, 2010) ......31

**Statutes, Rules & Regulations**

11 U.S.C. App. Rule 2002(b) ..................................................................................34

11 U.S.C. § 502(e) ...................................................................................................19

11 U.S.C. § 502(e)(1)(B) .................................................................................. *passim*

11 U.S.C. § 506(a) ...................................................................................................35

11 U.S.C. § 509(b) .....................................................................................................7

11 U.S.C. § 1123(a)(4) .................................................................................15, 33, 34

11 U.S.C. § 1126(e) ..................................................................................................33

US.357891120.01

11 U.S.C. § 1129 ................................................................................................12, 15, 39

11 U.S.C. § 1129(a) ....................................................................................................16

11 U.S.C. § 1129(a)(1) ............................................................................................2, 16

11 U.S.C. § 1129(a)(11) ..........................................................................................24, 25

Fed. R. Bankr. P. 8007(c) ...........................................................................................40

Fed. R. Bankr. P. 9019 ............................................................................24, 30, 31, 35

**Other Authorities**

*Black's Law Dictionary* 1339 (9th ed. 2009) .............................................................21

U.S. Const. amend. V ..................................................................................................35

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Appellant Citadel Equity Fund Ltd. ("Citadel") files this motion to stay the order (the "Confirmation Order") confirming the Second Amended Joint Chapter 11 Plan of Reorganization [Docket No. 977] (the "Plan") of Debtors-Appellees Serta Simmons Bedding, LLC, et al. (the "Debtors") pending the outcome of its appeal from the Confirmation Order and the Court's Memorandum Decision (the "Memorandum Decision") regarding confirmation entered on June 6, 2023 [Docket No. 1045] (the "Appeal").[2]  A stay should be granted because (1) there is a substantial likelihood that Citadel will prevail on appeal in arguing that the Plan should not have been confirmed owing to its provision of a potentially massive indemnity (the "Plan Indemnity") arising from claims that should have been disallowed; (2) Citadel will be irreparably harmed if its appellate rights are impaired owing to the Debtors' stated ambition of invoking "equitable mootness" upon substantial consummation of the Plan; (3) the Debtors will be irreparably harmed—and, by their own admission, may have to file for bankruptcy yet again—if the Plan Indemnity is not eliminated and the related liability is subsequently triggered; (4) the Debtors will not be irreparably harmed if a stay is granted but rather will actually benefit if Citadel prevails; and (5) the public interest lies in the correct determination and application of the relevant legal principles at issue.

## I.  INTRODUCTION

1.      Under section 502(e)(1)(B) of the Bankruptcy Code, the prepetition indemnity claims arising under the PTL Credit Agreement in connection with the 2020 Transaction must be disallowed, and distribution on account of those claims is thus prohibited.  The Plan, however, turns the required disallowance of those claims on its head by purporting to convert them into a

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the Plan.

fully enforceable go-forward obligation of the Reorganized Debtors via the Plan Indemnity. The Plan thereby unnecessarily and illegitimately saddles the Reorganized Debtors with a massive potential liability. If the Plan Indemnity matures into a fixed liability, it may well render the Debtors' reorganization entirely for naught, requiring a subsequent bankruptcy filing—a nightmare that the Debtors themselves have foreshadowed. Accordingly, the Plan fails to meet multiple confirmation requirements—including section 1129(a)(1)'s mandate that the Plan comply with the applicable provisions of the Bankruptcy Code—and should not have been confirmed.

2.      Citadel is a creditor of the Debtors, holding FLSO Claims arising under the PTL Credit Agreement as well as Non-PTL Claims. Under the Plan, Citadel will receive debt and equity in the Reorganized Debtors in lieu of repayment and has not objected to this treatment. Because Citadel will be among the largest shareholders of the Reorganized Debtors, it has a vested interest in the Reorganized Debtors' future success. However, the impermissible assumption of prepetition indemnification obligations under the Plan—which benefit only the original lenders under the PTL Credit Agreement that are defendants in ongoing litigation (the "PTL Lender Defendants") and not other PTL Lenders such as Citadel that acquired their claims after the 2020 Transaction—threatens the Reorganized Debtors' success and creates a genuine and substantial threat to their post-emergence viability. In fact, the indemnity obligations could mature in the very near future depending on the outcome of an appeal that is currently pending in the Fifth Circuit. If the indemnification obligations materialize, the Reorganized Debtors will be harmed and may even be unable to foot the bill, creating a material risk of a second Chapter 11 bankruptcy filing that will harm their employees, suppliers, customers, and financial

US.357891120.01

stakeholders, including Citadel. To avoid this disastrous and entirely unnecessary potential outcome, Citadel was compelled to appeal the Confirmation Order.

3.       Absent a stay of the Confirmation Order, the Debtors will seek to quickly consummate the Plan and will argue that such consummation creates a Gordian knot that cannot be untied without jeopardizing the interests of third parties who have acted in reliance on the Plan's consummation. On that basis, the Debtors will contend that under the doctrine of equitable mootness, the appellate courts should abstain from exercising jurisdiction to review the Confirmation Order. Indeed, the Debtors have strongly intimated that they had precisely this outcome in mind when they designed the Plan. The Debtors' consummation of a Plan that is decidedly bad for Citadel, similarly-situated creditors, and the Reorganized Debtors themselves would cause substantial, and irreparable, harm. Although Citadel disagrees that the Appeal would be equitably moot, there is a risk that the appellate courts might rule that it is, thereby making such harm irreparable. Thus, the Court should preserve the status quo and stay the effectiveness of the Confirmation Order pending the outcome of the Appeal.

4.       For reasons of judicial economy, including to avoid the possibility of piecemeal litigation and alleviate the impact of any stay on the Debtors' eventual reorganization, Citadel also intends to (1) ask that this matter be certified for direct appeal to the Fifth Circuit and (2) request that the Fifth Circuit consolidate the Appeal with the related and already-pending appeal regarding the propriety of the transaction that is at the heart of the prepetition indemnity claims at issue. But a stay of the Confirmation Order is a necessary first step and thus, as a preliminary matter, the Court should issue an order staying the Confirmation Order.

## II. FACTUAL & PROCEDURAL BACKGROUND

**A.    The Debtors obtain financing through the Non-PTL Term Loan Agreement.**

5.      In 2016, the Debtors entered into a First Lien Term Loan Agreement (the "Non-PTL Term Loan Agreement") with a variety of lenders (collectively, the "Non-PTL Lenders") as part of a larger refinancing effort.[3]  The Non-PTL Term Loan Agreement provided for $1.95 billion in term loans.[4]  As of the date on which the Debtors filed their voluntary petition, approximately $862 million was still owed under the Non-PTL Term Loan Agreement as reflected by the claims of the Non-PTL Lenders filed in the Debtors' bankruptcy cases.[5]

6.      Pertinent here, the Non-PTL Term Loan Agreement requires that, absent an exception, payments must be shared pro rata among the Non-PTL Lenders.[6]  In the event that one of the Non-PTL Lenders "obtains payment . . . resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans ... than the proportion received by any other Lender," then the overpaid Non-PTL Lenders must pay the other Non-PTL Lenders "so that the benefit of all such payments shall be shared ... ratably."[7]

**B.    The Debtors consummate the 2020 Transaction.[8]**

7.      Four years after entering into the Non-PTL Term Loan Agreement, the Debtors restructured their existing debt through a transaction (the "2020 Transaction") with certain of

---

[3] Dkt. No. 1-2.  All of the Loan Parties as defined under the Non-PTL Term Loan Agreement and the PTL Credit Agreement are Debtors (and vice versa), so for simplicity, the term Debtors is used herein.

[4] *Id.*

[5] Disclosure Statement for Joint Chapter 11 Plan of Serta Simons Bedding, LLC and its Affiliated Debtors at 1 (Dkt. 29).

[6] Non-PTL Term Loan Agreement, *Serta Simmons Bedding, LLC v. AG Centre St. P'ship L.P. (In re Serta Simmons Bedding, LLC)*, Ch. 11 Case No. 23-90020, Adv. No. 23-09001 (Bankr. S.D. Tex. Jan. 24, 2023) [Dkt. No. 1-2 at § 2.18(a)].

[7] *Id.*

[8] For the avoidance of doubt, Citadel has taken no position in the Chapter 11 Cases, and takes no position herein, as to the propriety of the 2020 Transaction.  However, Citadel has repeatedly argued, and the Debtors have not disagreed, that if this Court's March 28th ruling on the 2020 Transaction is overturned, the consequences could be disastrous for the Reorganized Debtors on account of the indemnity obligations that they are purporting to assume through the Plan.

their existing creditors, including certain Non-PTL Lenders, that resulted in $200 million of super-priority "first-out" debt ("FLFO") and approximately $850 million of super-priority "second-out" debt ("FLSO").[9]  Each of these instruments was issued under a Super-Priority Term Loan Agreement (the "PTL Credit Agreement").  As a consequence of the 2020 Transaction, the PTL Lenders' new first-out debt and second-out debt ranked ahead of the debt held by the Non-PTL Lenders who were not parties to the PTL Credit Agreement (collectively, the "Excluded Lenders").

8.      The PTL Credit Agreement also includes a provision (the "Indemnity Provision") under which the Debtors agreed to indemnify the PTL Lenders for, *inter alia*,

> any and all losses, claims, damages and liabilities … arising out of, in connection with, or as a result of … (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto..., including in connection with any action, litigation or other dispute or proceeding related to the Exchange Transactions [the 2020 Transaction]….[10]

## C.   The Debtors seek bankruptcy protection and Citadel objects to the Debtors' plan of reorganization.

9.      On January 23, 2023, the Debtors filed their voluntary petition seeking to reorganize under Chapter 11 of the United States Bankruptcy Code.[11]

10.     One day later, on January 24, 2023, the Debtors filed the *Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors*[12] (the "Original Plan") and the *Disclosure Statement for Joint Chapter 11 Plan of Serta Simmons Bedding, LLC and its Affiliated Debtors*[13] (the "Original Disclosure Statement").  Attached to the Original Disclosure Statement and the subsequently revised disclosure statement that was approved by the Court on

---

[9] PTL Credit Agreement, *Serta*, Adv. No. 23-9001 (Bankr. S.D. Tex. Mar. 24, 2023) [Dkt. No. 70-5].
[10] *Id.* at Section 9.03(b).
[11] Dkt. No. 1.
[12] Dkt. No. 28.
[13] Dkt. No. 29.

US.357891120.01

March 23, 2023 (the "Revised Disclosure Statement")[14] were, among other things, the Restructuring Support Agreement, dated as of January 23, 2023, by and among the Debtors, an ad hoc group of PTL Lenders, and consenting equity holders (the "RSA"), and a term sheet for a New Term Loan to be issued to the PTL Lenders (the "New Term Loan Term Sheet").

11.     Setting forth the first version of the Plan Indemnity, Section 8.5(b) of the Original Plan provided that the PTL Lender Defendants' claims under the Indemnity Provision (the "Prepetition Indemnity Claims") would survive the bankruptcy unimpaired, would not be discharged, and would be deemed and treated as executory contracts to be assumed by the Debtors and continue as obligations of the Reorganized Debtors.[15]  Accordingly, the New Term Loan Term Sheet did not mention any purportedly "new" indemnity to be granted to the PTL Lenders.[16]  Further, the Original Plan also provided that the Prepetition Indemnity Claims (1) could not be categorized as "Disputed Claims" as defined in the Plan and (2) were not subject to any objection.[17]  The impact of the Plan Indemnity is material and potentially devastating due to ongoing litigation brought by the Excluded Lenders against the Debtors and PTL Lender Defendants discussed in further detail below.

12.     On April 10, 2023, an ad hoc group of Non-PTL Lenders (the "Non-PTL AHG") filed *The Ad Hoc Group of First Lien Lenders' (I) Statement and Reservation of Rights with Respect to the Challenge Deadline and (II) Objection to Favored Lenders' Indemnity Claims*[18] (the "Non-PTL AHG Claim Objection") pursuant to which the Non-PTL AHG, among other things, objected to the Prepetition Indemnity Claims as contingent reimbursement or contribution

---

[14] Dkt Nos. 540, 545.
[15] Dkt. No. 28 at 38.
[16] *See* Dkt No. 545 at Exhibit C.
[17] Dkt. No. 28 at 38.
[18] Dkt. No. 656.

US.357891120.01

claims that must be disallowed under section 502(e)(1)(B) of the Bankruptcy Code or, in the alternative, subordinated under section 509(b) of the Bankruptcy Code.  Also on April 10, 2023, Citadel filed a joinder to the Non-PTL AHG Claim Objection to the extent it sought disallowance or subordination of the Prepetition Indemnity Claims.[19]

13.    On May 9, 2023, the Debtors filed their First Amended Joint Chapter 11 Plan of Reorganization (the "First Amended Plan").  The First Amended Plan made no change to the Plan Indemnity.[20]

14.    On May 9, 2023, Citadel filed *Citadel's (A) Supplemental Brief in Support of Limited Joinder to Claim Objection to Favored Lenders' Indemnity Claims and (B) Objection to Debtors' First Amended Joint Chapter 11 Plan of Reorganization* (the "Objections").[21]  In the Objections, Citadel further substantiated its argument that the Court was required to disallow the Prepetition Indemnity Claims under section 502(e)(1)(B) of the Bankruptcy Code since they constitute contingent claims for reimbursement or contribution for which the Debtors are co-liable with the PTL Lenders.[22]  Citadel also objected to the Debtors' attempt to treat the Prepetition Indemnity Claims as a partly assumable executory contract.  In this regard, Citadel noted that the Bankruptcy Code expressly prohibits the assumption of credit agreements and requires that any executory contract assumed by the debtor be assumed in its entirety.[23] Moreover, quoting the Debtors themselves, Citadel argued that assumption of the Prepetition Indemnity Claims could pose an existential threat to the Debtors given "the risk of landing back

---

[19] Dkt. No. 661.
[20] Dkt. No. 796 at 47.
[21] Dkt. No. 810.
[22] Dkt. No. 810 at ¶¶ 2, 10-11, 28-42, 46-48.
[23] Dkt. No. 810 at ¶¶ 48-50

US.357891120.01

in bankruptcy in the event of an adverse decision [regarding the 2020 Transaction]."[24]  In light of this risk—and the Debtors' deliberate choice to wholly exclude the Prepetition Indemnity Claims from their appraisal of their post-reorganization liabilities—Citadel also challenged the plan as infeasible.[25]

**D.    The Debtors modify the Plan on the eve of the Confirmation Hearing.**

15.    Beginning on May 15, 2023, the Court conducted an evidentiary hearing for the purposes of considering whether to confirm the Plan (the "Confirmation Hearing").  On the eve of that hearing, the Debtors filed a new "modified" version of the First Amended Plan (the "Modified First Amended Plan").[26]  The Modified First Amended Plan did not alter the treatment of the Prepetition Indemnity Claims, except to delete language providing that the claims would survive as continuing legal obligations of the Reorganized Debtors stemming from the PTL Credit Agreement and be assumed as deemed executory contracts.[27]

16.    Together with their Modified First Amended Plan, the Debtors also filed a Memorandum of Law arguing for its confirmation.[28]  Among other things, the Debtors responded to Citadel's Objections by asserting that the Debtors were "party to a comprehensive settlement"[29] with the PTL Lenders under the RSA and were "providing a new, go-forward indemnity under the New Term Loan as an essential part of 9019 settlements with the PTL Lender Group."[30]  Notably, however, this "essential" component of the New Term Loan is

---

[24] Dkt. No. 810 at ¶¶ 7, 12, 51-56 (quoting Debtors' Omnibus Reply to Objections to Debtors' Emergency Mot. for an Order, *Serta Simmons Bedding, LLC v. Those Parties Listed in Appendix A to Complaint* (*In re Serta Simmons Bedding, LLC*), Ch. 11 Case No. 23-90020, Adv. No. 23-03007 (S.D. Tex. Mar. 6, 2023) [Dkt. No. 104 at 10]).
[25] *Id.*  After the filing of two further amendments to the Plan, Citadel filed a supplemental objection, raising additional arguments in response to those amendments.  *See* Dkt. No. 998.
[26] Dkt. No. 874.
[27] *Id.* at § 8.5(b).
[28] Dkt. No. 879.
[29] *Id.* at ¶ 3.
[30] *Id.* at ¶ 188.

nowhere to be found in the New Term Loan Term Sheet, nothing regarding indemnification appears in the text of the RSA, and despite certain references to negotiations and settlements in the Original Disclosure Statement and the Revised Disclosure Statement, neither mention indemnification at all, let alone discuss it as a critical condition to the restructuring. And the concept of the Plan Indemnity being a "new, go-forward indemnity" did not surface until the Modified First Amended Plan was filed nearly five months after the Plan Indemnity provision appeared in the Original Plan.

17. Despite the Debtors' attempt to sidestep clear legal defects with language changes and a post hoc "settlement" rationale, the substance of the Modified First Amended Plan's indemnity provision remained exactly the same: the Debtors' obligations under the Prepetition Indemnity Claims would become post-emergence obligations of the Reorganized Debtors.

**E.      The Debtors' representatives reveal that they did not value the Plan Indemnity at all.**

18. The confirmation hearing lasted several days, during which time a number of witnesses testified, including Harvey Tepner, a member of the Debtors' finance committee;[31] John Linker, the Debtors' chief financial officer;[32] and Roopesh Shah, the Debtors' investment banker.[33]   Among other things, it became evident through the testimony that the Debtors had not valued the Plan Indemnity at all or accounted for its impact on the feasibility of the Modified First Amended Plan.

19. Shah, for example, testified:  "We did not undertake, if you will, an evaluation of the indemnity.  That would have been affecting the enterprise valuation.  That was not included

---

[31] Tr. H'rg 5/16/2023 at 385:24-386:18, 387:16-18.
[32] Tr. H'rg 5/17/2023 at 887:17-25.
[33] Tr. H'rg 5/15/2023 at 137:23-138:11, 139:19-140:3.

US.357891120.01

in the enterprise valuation."[34]  Because the Plan Indemnity represents a contingent, unliquidated liability, the Debtors' approach, Shah explained, was "not to value it."[35]  When asked if he had "run any sort of sensitivity analysis or anything" to ascertain "what that does to feasibility, or [the Reorganized Debtors'] balance sheet" if the indemnity obligation were to be triggered, Shah answered simply: "We did not."[36]

20.     Linker agreed, testifying that the Debtors' financial "projections do not include an estimate for any indemnity cash payments."[37]

21.     In similar fashion, when asked whether he had any valuation for the Plan Indemnity, Tepner answered: "I don't have a numerical valuation of any specificity."[38] According to Tepner, neither the Debtors' finance committee nor the Debtors' advisors "have ever valued" the Plan Indemnity.[39]  This in spite of Tepner's candid admission that if the Reorganized Debtors' indemnity obligation were to be triggered, the amount "would be very, very large and [the PTL Lenders] would come back to the company for payment under that."[40] This potential turn of events, in Tepner's own words, "could clearly imperil the company."[41]  In fact, Tepner testified that the amount of the claims under the Plan Indemnity could "possibly approach[ ] a billion dollars."[42]  Leaving no doubt, when asked by the Court to clarify that he meant "a billion" and not "a million," Mr. Tepner reiterated: "I meant a billion, right.  Correct. Right.  Yes, a billion dollars."[43]

---

[34] Tr. H'rg 5/15/2023 at 254:20-255:6.
[35] Tr. H'rg 5/15/2023 at 255:7-256:6.
[36] Tr. H'rg 5/15/2023 at 256:14-24.
[37] Tr. H'rg 5/17/2023 at 898:14-899:10.
[38] Tr. H'rg 5/16/2023 at 519:14-19.
[39] Tr. H'rg 5/16/2023 at 506:5-19.
[40] Tr. H'rg 5/16/2023 at 506:20-507:8.
[41] Tr. H'rg 5/16/2023 at 520:2-23.
[42] Tr. H'rg 5/16/2023 at 521:4-524:2.
[43] Tr. H'rg 5/16/2023 at 521:4-524:2.

US.357891120.01

22.     Witness testimony concluded on May 18, 2023, at which time the confirmation hearing adjourned until summations on May 25, 2023.[44]

**F.     After the close of witness testimony, the Debtors change the plan yet again.**

23.     On May 23, 2023, the Debtors filed a new Second Amended Joint Chapter 11 Plan of Reorganization.[45]  Belatedly realizing (after Citadel's filing of the Objections) that the previous plans would result in the Reorganized Debtors' indemnifying PTL Lenders that had sold their debt and therefore could not have provided any benefit to the Debtors in the restructuring—a truly nonsensical and unreasonable result—the Plan eliminated the Plan Indemnity as to *certain* of the PTL Lenders.  Specifically, the Plan provided that the Reorganized Debtors would be obligated to indemnify only creditors holding FLFO Claims or FLSO Claims as of the Effective Date of the Plan.[46]  For reasons set forth in a supplemental objection following this last-minute change, Citadel argued that this amendment did not suffice, might produce undesirable consequences and further illustrated the shortcomings of the Debtors' process.[47]

**G.     The Court confirms the Plan.**

24.     On June 6, 2023, the Court entered the Memorandum Decision.  As set forth in the decision, the Court overruled Citadel's objection to the Plan Indemnity "for the reasons set forth above" regarding certain objections filed by the Non-PTL Lenders.[48] The Court further

---

[44] During the summations held on May 25, 2023, the Court asked counsel for Citadel if he had "a problem with the indemnity in its entirety?"  Tr. H'rg 5/25/2023 at 1365:22-23.  Counsel responded: "I have a problem with any indemnity that allows the favored holders to come back against the company."  *Id*. at 1365:24-1366:1.  Counsel likewise later explained: "They can't have the indemnity as they originally drafted the plan . . . And they can't call it something different and get the same thing."  *Id*. at 1384:2-7.
[45] Dkt. No. 977.
[46] *Id*. at § 8.5(b).
[47] Dkt. No. 998.
[48] Dkt. 1045 at 13-14.

US.357891120.01

overruled Citadel's feasibility objection.[49]  *Id*. at 14-15.  The Court concluded that the Plan complies with all requirements of 11 U.S.C. § 1129.[50]

## H.     The pending appeal regarding the 2020 Transaction.

25.     The proverbial "elephant in the room" throughout the Debtors' bankruptcy has been the potential fallout from the 2020 Transaction and the liability that may ultimately result.

26.     The 2020 Transaction has been the subject of litigation since it was announced nearly three years ago.  Most recently, the Excluded Lenders filed an adversary proceeding in this Court arguing that the consideration provided to the PTL Lender Defendants in the 2020 Transaction constituted an impermissible, non-pro rata payment (the "Adversary Proceeding").[51] The Excluded Lenders contended that (1) the 2020 Transaction therefore violated the terms of the Non-PTL Term Loan Agreement and (2) the PTL Lender Defendants and Debtors violated the implied covenant of good faith and fair dealing by entering into that transaction.[52]  While the Non-PTL Term Loan Agreement allows for certain exceptions to the pro rata payment requirement, the Excluded Lenders asserted that the 2020 Transaction did not fit any of those exceptions.[53]  If the Excluded Lenders were to succeed in the Adversary Proceeding, the PTL Lender Defendants could be called upon to make substantial payments to the Excluded Lenders and, under the Plan, the Reorganized Debtors' indemnity obligation would be triggered.

27.     The Court, though, disagreed with the Excluded Lenders' interpretation of the Non-PTL Term Loan Agreement.  It found that the 2020 Transaction did fit within one of the exceptions to the pro rata payment requirement in the Non-PTL Term Loan Agreement because

---

[49] *Id*. at 14-15.
[50] Regarding the Plan Indemnity, the Court further determined that, "when asked by the Court, counsel for the PTL Lenders and the Debtors affirmed the disallowance of the pre-petition indemnity."  Mem. Op. at 13.
[51] Opposition Br., *Serta Simmons Bedding, LLC v. AG Centre St. P'ship L.P. (In re Serta Simmons Bedding, LLC)*, Ch. 11 Case No. 23-90020, Adv. No. 23-09001 (Bankr. S.D. Tex. Mar. 17, 2023) [Dkt. No. 86 at 22].
[52] *Id*. at 21-22.
[53] *Id*. at 41-42.

US.357891120.01

it constituted an "open market purchase," so the court entered partial summary judgment[54] in favor of the Debtors and the PTL Lenders.[55]

28.    The Excluded Lenders sought permission to appeal the Court's partial summary judgment directly to the Fifth Circuit, which the Court granted.[56]  The Excluded Lenders then filed a petition in the Fifth Circuit seeking permission for the direct appeal and asking the court to issue an expedited briefing schedule.[57]  The Fifth Circuit granted permission for a direct appeal but declined to order an expedited briefing schedule.[58]  As a result, the Excluded Lenders' appeal could not be adjudicated before the Confirmation Order was entered on June 6, 2023. The Excluded Lenders' appeal remains pending in the Fifth Circuit.[59]

## III.  ARGUMENT & AUTHORITIES

29.    The Court should issue an order staying the Confirmation Order pending the outcome of the Appeal because the Court erred in confirming the Plan and its error stands to cause irreparable harm to Citadel that, in the absence of a stay, may be unremedied by appellate review.

30.    A party seeking a stay of a bankruptcy court's order confirming a debtor's plan of reorganization must demonstrate:

> (1) a likelihood of success on the merits;
> (2) irreparable injury if the stay is not granted;
> (3) absence of substantial harm to other parties from granting the stay; and
> (4) granting the stay is in the public interest.

---

[54] The Court declined to grant summary judgment on the Excluded Lenders' claim that the Debtors and the PTL Lenders violated the implied covenant of good faith and fair dealing in connection with the 2020 Transaction.
[55] Bench Order, *Serta Simmons Bedding, LLC v. AG Centre St. P'ship L.P. (In re Serta Simmons Bedding, LLC)*, Ch. 11 Case No. 23-90020, Adv. No. 23-9001 (Bankr. S.D. Tex. Mar. 28, 2023) [Dkt. No. 141].
[56] *Serta Simmons Bedding, LLC v. AG Centre St. P'ship L.P. (In re Serta Simmons Bedding, LLC)*, Ch. 11 Case No. 23-90020, Adv. No. 23-09001 (Bankr. S.D. Tex. Mar. 17, 2023) [Dkt. No. 141 at ¶ 4].
[57] *Excluded Lenders v. Serta Simmons Bedding, LLC*, Case No. 23-90012 (5th Cir. Apr. 26, 2023) [Dkt. No. 3].
[58] *Excluded Lenders v. Serta Simmons Bedding, LLC*, Case No. 23-90012 (5th Cir. Apr. 26, 2023) [Dkt. No. 60-2].
[59] Fifth Circuit Case No. 23-90012.

US.357891120.01

*In re Premier Entm't Biloxi, L.L.C.*, No. 08-60349, 2009 WL 1616681, *2 (5th Cir. June 9, 2009) (per curiam) (dictum); *BVS Constr. Inc. v. Prosperity Bank*, No. 6:20-CV-261-ADA, 2021 WL 2678203, at *1 (W.D. Tex. March 19, 2021).  The first factor is afforded the greatest weight, though "the absence of any one factor is not fatal to a successful motion for stay ...."  *BVS*, 2021 WL 2678203, at *1.  Each of the four factors is met here.

A.    **Citadel is likely to succeed in showing the Plan should not have been confirmed on account of the Plan Indemnity.**

31.    Because the first factor—likelihood of success on the merits—would require this Court to opine on the chances of its own reversal on appeal, courts have adopted a less stringent test.  *See In re Public Serv. Co.,* 116 B.R. 347, 348-49 (Bankr. D.N.H. 1996); *see also In re Genesis Health Ventures, Inc.,* 367 B.R. 516, 521 (Bankr. D. Del. 2007) ("a court may grant a motion for a stay pending appeal even when it has confidence in the rectitude of its decision").  To satisfy the first factor, bankruptcy courts, including in this Circuit, have required only that the movant demonstrate that it will present a "substantial case" or a "strong case on appeal."  *In re Tex. Equip. Co.,* 283 B.R. 222, 227 (Bankr. N.D. Tex. 2002) (citing *Arnold v. Garlock Inc.,* 278 F.3d 426, 439 (5th Cir. 2001)); *In re Friendship Diaries,* No. 12–20405, 2014 WL 527232, at *2 (Bankr. N.D. Tex. Feb. 10, 2014) (requiring only that "the movant need only present a substantial case on the merits"); *see also Miraj & Sons,* 201 B.R. at 26-27; *Public Service Co.,* 116 B.R. at 348-49.

32.    A movant presents a "substantial case" where the appeal raises a question that involves the application of law for which there is no definitive authority.  So, for example, the first factor is satisfied when there is no binding authority directly on point requiring the outcome the court has reached.  *See Texas Equip. Co.,* 283 B.R. at 227; *Genesis Health Ventures,* 367 B.R. at 521; *In re Gleasman,* 111 B.R. 595, 601-02 (Bankr. W.D. Tex. 1990).  Indeed, the factor

14

may be satisfied even if the law merely fails to *conclusively* establish the propriety of the court's decision, *see In re St. Johnsbury Trucking Co.,* 185 B.R. 687, 689 (S.D.N.Y. 1995), or when the court has had to rely on law that is in flux and subject to varying interpretations, *In re Porter,* 511 B.R. 785, 811 (Bankr. E.D. La. 2014). The first factor is also satisfied when the facts are disputed and complex—which, when the law is unsettled, renders the application of law to facts difficult and uncertain. *See Miraj & Sons,* 201 B.R. at 26.

33.     The Court should not have entered the Confirmation Order for five reasons.  First, because section 502(e)(1)(B) of the Bankruptcy Code obligated the Court to disallow the Prepetition Indemnity Claims, the Court committed error by confirming the Plan that allowed those claims to ride through the bankruptcy as post-emergence obligations of the Reorganized Debtors.  Second, the Plan should not have been confirmed because it was not feasible within the meaning of section 1129 of the Bankruptcy Code.  Third, there is no basis in law or fact for the Debtors' post hoc recasting of the Plan Indemnity on the eve of the confirmation hearing as a "new, go-forward indemnity" that was "an essential part of 9019 settlements" with the PTL Lenders and Debtors' Creditors' Committee.[60]  Among other things, the record contains no evidence that the Debtors considered the Plan Indemnity at all prior to entering into the RSA or New Term Loan Term Sheet, and even if they had, there is no evidence they exercised reasonable business judgment in negotiating and agreeing to the "settlement."  They therefore failed to show the "settlement" was in the best interest of the bankruptcy estate as required for approval.  Fourth, the Plan runs afoul of section 1123(a)(4) of the Bankruptcy Code—which bars differing treatment for claims or interests within the same class—because certain holders of FLSO Claims (*i.e.*, those who participated in the 2020 Transaction) stand to benefit from the

---

[60] Dkt. No. 879 at ¶ 188.

Plan Indemnity, whereas other holders of FLSO Claims receive no cognizable benefit from the Plan Indemnity.  Fifth, the Court's confirmation of the Plan violated Citadel's fundamental due process rights because Citadel was denied any opportunity prior to the Confirmation Hearing to investigate the purported basis for the revised treatment of the Plan Indemnity.

> **i.      The Prepetition Indemnity Claims were not allowable under Section 502(e)(1)(B).**

34.      To be confirmed, a Chapter 11 plan must meet all the requirements set forth in section 1129(a) of the Bankruptcy Code.  11 U.S.C. § 1129(a).  The first requirement is that the plan complies with "the applicable provisions of" the Bankruptcy Code.  11 U.S.C. § 1129(a)(1).  The Plan runs afoul of section 502(e)(1)(B) of the Bankruptcy Code, which is an "applicable provision," and thus should not have been confirmed.

35.      Section 502(e)(1)(B) requires a bankruptcy court to "disallow any claim for reimbursement or contribution of an entity that is liable with the debtor on or has secured the claim of a creditor, to the extent that . . . such claim for reimbursement or contribution is contingent as of the time of allowance or disallowance of such claim for reimbursement or contribution."  "Embedded in this language are three elements necessary for a claim against the Debtors to be disallowed under this provision: (i) the debtor is co-liable with the claimant; (ii) the claim is contingent; and (iii) the claim is for reimbursement or contribution."  *In re Alta Mesa Res.*, No. 19-35133, 2022 WL 17984306, *3 (Bankr. S.D. Tex. Dec. 28, 2022).  The Prepetition Indemnity Claims satisfy all three elements, and the Court was therefore required to disallow them.[61]

---

[61] Based on statements made by counsel to the Debtors and the Ad Hoc Group of PTL Lenders at the Confirmation Hearing and as set forth in the Memorandum Decision, it appears that those parties may have stipulated that the Prepetition Indemnity Claims are disallowed.  Tr. H'rg 5/25/2023 at 1356: 8-18, 1409:21-24; Mem. Op. at 13.  However, to the extent any such stipulation is unclear or ineffective, Citadel addresses the legal points with respect to disallowance here.

US.357891120.01

(a)       **The Debtors and the PTL Lender Defendants are co-liable.**

36.       First, the Debtors and the PTL Lender Defendants are co-liable on the Prepetition

Indemnity Claims under the applicable case law and the plain terms of the Non-PTL Term Loan

Agreement.

37.       Courts interpret co-liability broadly.  *See* 4 Collier on Bankr. ¶ 502.06(b) ("Under

Section 502, codebtor status is broadly interpreted, and a claim for reimbursement has been held

to presuppose a codebtor relationship."); *In re Amatex Corp.*, 110 B.R. 168, 171 (Bankr. E.D. Pa.

1990) ("Congress clearly meant to include all situations wherein indemnitors or contributors

could be liable with the debtor within the scope of § 502(e)(1)(B)."); *Fuel Barons*, 488 B.R. at

787 (stating that "'an entity that is liable with the debtor' is broad enough to encompass any type

of liability shared with the debtor, whatever its basis.") (quotations omitted); *In re Caribbean

Petroleum Corp.,* No. 10-12553 KG, 2012 WL 1899322, *3 (Bankr. D. Del. May 24, 2012)

("Co-liability . . . is a broad concept that includes all situations wherein indemnitors or

contributors could be liable with the debtor.") (quotations and citation omitted), *aff'd,* 566 Fed.

Appx. 169 (3d Cir. 2014).

38.       Here, as a matter of basic finance, the Debtors and the PTL Lender Defendants

are co-liable to the Excluded Lenders.  It is undisputed that the Debtors owe all of the Non-PTL

Lenders the full amount of their outstanding principal and interest.  In the event the Fifth Circuit

rules in favor of the Excluded Lenders and the PTL Lender Defendants are required to pay some

amount to the Excluded Lenders under Section 2.18(c) of the Non-PTL Term Loan Agreement,

that payment would reduce the amount of the Excluded Lenders' claim against the Debtors.  In

other words, every dollar that is paid by the PTL Lender Defendants to the Excluded Lenders

will reduce the Excluded Lenders' claim against the Debtors by the same amount.  That is the

"essence of co-liability."  *Route 21 Assocs. of Belleville, Inc.* 486 B.R. 75, 97 (S.D.N.Y. 2012)

17

(describing the "essence of co-liability" as "the more debtors pay, the less [Claimant] is exposed."), *aff'd sub nom., In re Lyondell Chem. Co.*, 542 Fed. Appx. 41 (2d Cir. 2013).

39.     In point of fact, that is precisely how Section 2.18(c) of the Non-PTL Term Loan Agreement works.  Should the Excluded Lenders succeed in their appeal currently pending in the Fifth Circuit, the PTL Lender Defendants will be required, under Section 2.18(c) to "purchase (for Cash at face value) participations in the Loans."[62]  In other words, if the Excluded Lenders demonstrate liability against the PTL Lender Defendants, the PTL Lender Defendants, instead of the Debtors, will pay the Excluded Lenders on a portion of the Non-PTL Term Loan Agreement.  That is co-liability, plain and simple.  "Co-liability exists when each party is obligated to pay the same person [the Non-PTL Lenders] for the same benefits [payment under the Non-PTL Term Loan] even if the obligations of each party arise from a different source." *In re Dow Corning Corp.*, 244 B.R. 705, 715 (Bankr. E.D. Mich. 1999), *aff'd*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded,* 280 F.3d 648 (6th Cir. 2002) (citations and quotations omitted).  Here, the co-liability of the PTL Lender Defendants and the Debtors results from the **same** source—the Non-PTL Term Loan Agreement.

40.     Moreover, allowing the Prepetition Indemnity Claims results in double counting of allowed claims against the Debtors.  The Debtors owe the Non-PTL Lenders in full for principal and interest.  The Debtors also owe contingent Prepetition Indemnity Claims to the PTL Lenders for any amounts that the PTL Lenders might ultimately pay to the Excluded Lenders.  That constitutes double counting in the total amount of allowed claims—the exact risk that Congress sought to eliminate through section 502(e)(1)(B).  *See, e.g.*, *Route 21 Assocs.,* 486

---

[62] Non-PTL Term Loan Agreement, *Serta Simmons Bedding, LLC v. AG Centre St. P'ship L.P. (In re Serta Simmons Bedding, LLC)*, Ch. 11 Case No. 23-90020, Adv. No. 23-09001 (Bankr. S.D. Tex. Jan. 24, 2023) [Dkt. No. 1-2 at § 2.18(a)].

US.357891120.01

B.R. at 94-95 ("[A] reading of the terms 'reimbursement or contribution' that includes indemnity comports with the goal of section 502(e)(1)(B)—avoiding double liability.") (quotations omitted); *In re Alta Mesa*, 2022 WL 17984306, at *4 (stating Congress wrote Section 502(e) to avoid double counting by a debtor); *In re Baldwin-United Corp.*, 55 B.R. at 895 ("[T]his statutory scheme thus protects the debtor's estate from making multiple payments on a single claim."); *see also, e.g.*, 4 Collier on Bankruptcy ¶ 502.06 ("Section 502(e)(1)(B) ensures that the estate will not at the same time be liable to the primary obligor and a guarantor for the same debt.").

41.    Additionally, regardless of whether there is an actual risk of double recovery against the estate, co-liability exists.  Courts have found that section 502(e)(1)(B) requires the disallowance of claims even where double recovery against the estate is not possible.  *In re Wedtech*, 85 B.R. 285, 289-90 (Bankr. S.D.N.Y. 1988); *In re Drexel Burnham Lambert Gp. Inc.*, 148 B.R. 982, 988 (Bankr. S.D.N.Y. 1992).  Double counting is not a prerequisite to co-liability and is certainly not a prerequisite to disallowance under section 502(e)(1)(B).

42.    Review of the Non-PTL Term Loan Agreement further supports the co-liability of the Debtors with the PTL Lender Defendants if the Excluded Lenders' appeal is successful.  As noted, section 2.18 of the Non-PTL Term Loan Agreement provides a remedy directly against the PTL Lender Defendants for a non-pro rata payment—*i.e.*, they can recover the overpayment directly.  This provision, however, does not prevent the Excluded Lenders from seeking to recover their total claims directly from the Debtors.  If the Debtors made an improper non-pro rata distribution to the PTL Lender Defendants as part of the 2020 Transaction, they breached sections 2.18(a) and 2.18(b) of the Non-PTL Term Loan Agreement.  Under section 7.01(e) of

the agreement, a failure to comply with any term of the contract constitutes an event of default

by the loan parties (*i.e.*, Debtors), resulting in the acceleration of the entire amount due.

43.      As one court has explained, "[t]he proper standard for determining if the claimant

is liable with the debtor is whether 'the causes of action in the underlying lawsuit assert claims

upon which, if proven, the debtor could be liable but for the automatic stay.'"  *In re Drexel*

*Burnham Lambert Gp.*, 148 B.R. at 986 (quotations omitted).  That is plainly the case here, not

only because the Debtors are, in the multiple ways illustrated above, contractually liable for

whatever amounts the PTL Lenders may have to pay the Excluded Lenders arising from the 2020

Transaction, but also because the Debtors have essentially admitted as much.  To begin with,

prior to the bankruptcy filing, Serta Simmons Bedding (the Debtors' chief operating company)

was a named defendant in the litigation between the Excluded Lenders and the PTL Lenders.[63]

At no point did the parties contend that Serta Simmons Bedding was not a proper party.

44.      On the contrary, in three separate filings, the Debtors acknowledged that they are

co-liable with the PTL Lender Defendants in connection with the 2020 Transaction.  In their

Adversary Complaint, Emergency Motion, and Reply in furtherance of the extension of the

automatic stay, the Debtors stated unequivocally that co-liability exists:

> Indeed, a judgment against the Non-Debtor Parties concerning the priority of the
> 2020 Transaction would necessarily be a finding that the Debtors also breached
> the Non-PTL Term Loan Agreement.[64]

Thus, by the Debtors' own admission, they and the PTL Lender Defendants face the same

liability in the same underlying litigation, and "if proven," the Debtors would be liable with the

PTL Lender Defendants.

---

[63] *LCM XXII Ltd. v. Serta Simmons Bedding, LLC*, No. 21 CIV 3987 (KPF), 2022 WL 953109 (S.D.N.Y. March 29, 2022).
[64] *Serta,* Adv. No. 23-03007 (emphasis added) [Dkt. No. 1, Dkt. No. 3, Dkt. No. 104].

45.     This Court likewise appeared to acknowledge the Debtors' co-liability with respect to Prepetition Indemnity Claims during a March 13, 2023 hearing on the extension of the automatic stay.  Specifically, the Court reasoned that

> at the core of [this entire litigation], is the debtor's conduct and whether it be a
> direct claim, whether it be an indemnity claim or whether it be something else that
> I haven't yet seen . . . we're talking about the debtor's conduct and a finding that
> would get made would have a negative finding that could get made would have a
> negative impact on the debtor, and so I do conclude that there is an identity of
> interests effectively.[65]

46.     Co-liability plainly exists between the Debtors and the PTL Lender Defendants such that the Plan Indemnity, which allows the Prepetition Indemnity Claims to ride through the bankruptcy, has resulted in impermissible, duplicate claims against the Debtors' bankruptcy estate that threaten the viability of the Reorganized Debtors.  *See In re Caribbean Petroleum*, 566 Fed. Appx. at 174 (affirming district court and bankruptcy court decision disallowing claims, stating that "a purpose of Section 502(e)(1)(B) is to enable distribution to unsecured creditors without a reserve for . . . contingent claims when the contingency may not occur until after the several years it often takes to litigate the underlying lawsuit." (quotations and citations omitted)).

### (b)     The Prepetition Indemnity Claims are claims for reimbursement or contribution.

47.     Courts routinely interpret a claim for indemnity to be a claim for "reimbursement or contribution" under section 502(e)(1)(B).  *In re Alta Mesa,* 2022 WL 17984306, at *4 (citation omitted); *Route 21 Assocs.*, 486 B.R. at 94  ("[T]he concept of reimbursement includes indemnity, and claims for indemnification fall within the scope of this prong of section 502(e)(1)(B).") (citing *Black's Law Dictionary* 1339 (9th ed. 2009)).  In short, "[i]t is well settled that 'the concept of reimbursement includes indemnity.'"  *Fuel Barons*, 488 B.R. at 787

---

[65] *Serta,* Adv. No. 23-03007 [Dkt. No. 118].

(quoting I*n re Alper Holdings, USA*, 2008 WL 4186333, at *5)).  The Debtors agree, and no party disputes, that the Prepetition Indemnity Claims meet this element of the relevant analysis under section 502(e)(1)(B).[66]

(c)     **The Prepetition Indemnity Claims are contingent claims.**

48.     In the context of section 502(e)(1)(B), a claim is contingent until the time at which the claimant pays the relevant third party (here the PTL Lender Defendants pay the Excluded Lenders).  *In re Alta Mesa*, 2022 WL 17984306, at *3 ("A claim for indemnification is generally considered contingent unless the claimant has actually paid the third party."); *In re Caribbean Petroleum Corp.*, 2012 WL 1899322, at *3 ("A claim is contingent until the claimant has both incurred liability and made payment on that liability.") (internal citations omitted).  It is undisputed that no payment has been made to the Excluded Lenders or the broader group of Non-PTL Lenders by either the Debtors or the PTL Lenders in connection with the 2020 Transaction.   The Prepetition Indemnity Claims are thus clearly contingent.  Again, it is undisputed that the Prepetition Indemnity Claims meet this element of the analysis under section 502(e)(1)(B).[67]

(d)     **The Court erred in allowing the Prepetition Indemnity Claims to ride through the bankruptcy.**

49.     Accordingly, because Citadel has shown that (1) the Debtors and the PTL Lender Defendants are co-liable on the Prepetition Indemnity Claims, (2) the Prepetition Indemnity Claims are claims for reimbursement or contribution, and (3) the Prepetition Indemnity Claims were contingent claims at the time that the Court entered the Confirmation Order, Citadel has demonstrated that the Prepetition Indemnity Claims must be disallowed under section

---

[66] Dkt. 879 at ¶ 198.
[67] Dkt. 879 at ¶ 198.

US.357891120.01

502(e)(1)(B).  Courts have consistently disallowed indemnity claims like those asserted by the PTL Lenders.  *See, e.g., In re Drexel Burnham Lambert Gp.*, 148 B.R. at 985 (disallowing indemnity claim, stating "courts have always recognized the application of § 502(e)(1)(B) to contractual claims for reimbursement which remain contingent"); *In re Alta Mesa Res.*, 2022 WL 17984306, at *3 (disallowing surety claim "as a contingent claim for indemnification" under Section 502(e)(1)(B)); *In re Fuel Barons, Inc.*, 488 B.R. 783, 787 (Bankr. N.D. Ga. 2013) (disallowing contingent indemnity claim); *In re Baldwin-United Corp.*, 55 B.R. 885, 895 (S.D. Ohio 1985) (disallowing claims for contribution and indemnity under Section 502(e)(1)(B)); *In re Alper Holdings USA*, No. 07-12148 (BRL), 2008 WL 4186333, *7 (Bankr. S.D.N.Y. Sept. 10, 2008) (disallowing indemnity claim).

50.     Courts have likewise routinely recognized that "[a] disallowed claim will not participate in the case, vote on Chapter 11 plans or receive any payment with regards to that claim." *In re Pick & Save, Inc.* 478 B.R. 110, 121 (Bankr. D.P.R. 2012); *see also In re Robinson*, 225 B.R. 228, 234 (Bankr. N.D. Okla. 1998) ("A plan which proposes to pay a disallowed claim does not comply with the operative provisions of the Bankruptcy Code and may not be confirmed."); *In re Diruzzo*, 527 B.R. 800, 804 (B.A.P. 1st Cir. 2015) ("Disallowed claims will not participate in the case or receive any payment with regards to that claim.") (citations omitted).  Even though the Prepetition Indemnity Claims should have been disallowed and, therefore, their holders cannot receive any distributions under the Plan on account of such claims, the Plan nonetheless provides exactly the opposite.[68]  Rather than permit these contingent claims to ride through the bankruptcy unscathed, the Court should have denied confirmation of the Plan.

---

[68] Dkt No. 28 at 38; Dkt. No. 796 at § 8.5(b).

US.357891120.01

51.     While the Debtors have recently recast the Plan Indemnity as the product of a Bankruptcy Rule 9019 settlement, it fundamentally arises from, and with respect to the PTL Lender Defendants holding FLFO and FLSO Claims as of the Effective Date, is identical to, the Prepetition Indemnity Claims.  The Plan explicitly provides the Plan Indemnity will apply "on the same terms and limitations as afforded under the PTL Credit Agreement and New Term Loan Credit Facility."[69]  The Debtors' attempts to re-fashion the Plan Indemnity as part of a settlement divorced from the prepetition claims themselves elevates newly-contrived form over actual substance.[70]  It likewise runs afoul of relevant Supreme Court precedent holding that a Bankruptcy Rule 9019 settlement may not be used as a vehicle to treat claims in a manner that contravenes governing provisions of the Bankruptcy Code.  *See Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973 (2017) (debtor may not through the vehicle of a settlement and structured dismissal provide for the payment of claims in violation of the Bankruptcy Code's priority provisions).

52.     Citadel has therefore shown a likelihood of success on the merits of its argument that the Prepetition Indemnity Claims should have been disallowed and not treated as an ongoing obligation of the Reorganized Debtors.

    **ii.     The Court should not have approved the Plan because the Debtors did not show that it is feasible.**

53.     A bankruptcy court may confirm a plan of reorganization only if the debtor shows the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor (unless such liquidation or reorganization is proposed in the plan).  11 U.S.C. § 1129(a)(11); *In re Cantu*, 398 Fed. Appx. 76, 78 (5th Cir.

---

[69] Dkt. No. 977 at § 8.5(b).

[70] Betraying the true nature of the Plan Indemnity, the Debtors continue to title Section 8.5 of the Plan: "Survival of the Debtors' Indemnification Obligation."  Dkt. No. 977 at § 8.5(b)

2010).  On the contrary, a feasible plan is one that allows the reorganized debtor to emerge from bankruptcy as a viable operating entity.  As in this case, the debtor fails to show a plan's feasibility if the debtor fails to account for the possibility of uncertain and potentially sizable future claims.  *See Matter of Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985) (upholding decision to vacate plan that was not feasible because the debtor failed to estimate the amount of a contingent claim arising out of an adversary proceeding filed against the debtor); *see also In re Harbin*, 486 F.3d 510, 514 (9th Cir. 2007) (holding that "a bankruptcy court considering the feasibility of a plan of reorganization under 11 U.S.C. § 1129(a)(11) must evaluate the possible effect of a debtor's ongoing civil case with a potential creditor, whether that litigation is pending at the trial level or on appeal"); *In re Paige*, 685 F.3d 1160, 1188 (10th Cir. 2012) (upholding district court finding that plan was not feasible where it failed to provide sufficient funding to satisfy a potential judgment).

54.     The debtor bears the burden of establishing feasibility.  *In re Save our Springs (S.O.S. Alliance, Inc.*, 632 F.3d 168, 172 (5th Cir. 2011).  Given their failure to properly evaluate and account for a potential adverse outcome in the Adversary Proceeding and the resultant claims the Reorganized Debtors would be obligated to satisfy under the Plan Indemnity in that scenario, the Debtors clearly did not meet this burden.  In fact, their Disclosure Statement, which purported to demonstrate feasibility, did not consider the Plan Indemnity at all.[71]  Indeed, the potential effect of the Plan Indemnity on the Reorganized Debtors was not discussed in the feasibility section,[72] the risk factors relevant to the Debtors and the Reorganized Debtors,[73] or the

---

[71] Dkt. No. 545.
[72] *Id.* at 53-54.
[73] *Id.* at 42-49.

25

Debtors' financial projections.[74]  As the Debtors' representatives acknowledged at the confirmation hearing, the Debtors did not assign any value to the Plan Indemnity.[75]

55.     The Debtors' failure to value and otherwise account for the Plan Indemnity cannot reasonably be attributed to some legitimate perception that the Prepetition Indemnity Claims lack value.  After all, the Debtors agree that, if the indemnity obligation were to mature, the resulting liability  "would be very, very large ... possibly approaching a billion dollars."[76]  And with an appeal pending in the Fifth Circuit on an issue for which no controlling case law exists, it defies credibility for the Debtors to assert that, under the Plan, the Reorganized Debtors bear no economic risk as to the Plan Indemnity.  And yet, that is exactly what the Debtors have asked the court to assume, asserting that there is a "substantial probability" that they and the PTL Lenders will prevail in the Adversary Proceeding because this Court already granted a partial summary judgment in their favor.[77]

56.     There are at least two problems with the Debtors' position.  The first is its circularity.  The mere fact that this Court has ruled in the Debtors' favor on the construction of the Non-PTL Term Loan Agreement says nothing about what the Fifth Circuit (which is now considering that same question on direct appeal) will conclude in its *de novo* review of that question.[78]  In fact, at the confirmation hearing, the Court acknowledged the possibility that the Fifth Circuit could reverse the partial summary judgment in the Adversary Proceeding and recognized the concomitant risk of a successive bankruptcy filing if that occurs:

---

[74] *Id.* at Exhibit H.
[75] Tr. H'rg 5/15/2023 at 254:20-255:6; Tr. H'rg 5/15/2023 at 255:7-256:6; Tr. H'rg 5/15/2023 at 256:14-24; Tr. H'rg 5/17/2023 at 898:14-899:10; Tr. H'rg 5/16/2023 at 519:14-19; Tr. H'rg 5/16/2023 at 506:5-19.
[76] Tr. H'rg 5/16/2023 at 506:20-507:8; Tr. H'rg 5/16/2023 at 521:4-524:2.
[77] Dkt. 879 at ¶ 207.
[78] *Parkcrest Builders, LLC v. Liberty Mut. Ins. Co.*, 26 F.4th 691, 695 (5th Cir. 2022) ("The court reviews legal issues, including issues of contract interpretation, *de novo*.").

26

MR. MILLAR: Yeah. See, Your Honor, you may be asking the question -- or you asked the question of other parties, and maybe it's obvious with me standing here, why do we care about the indemnity so much?

And I will tell you why we care. Because if they, the company, ever has to pay out on that indemnity, as they have said and as we believe, that's going to be a Chapter 22.[79]

THE COURT: At best.

MR. MILLAR: At best.

THE COURT: Yeah.

MR. MILLAR: And that means all the equity that we're getting goes to zero, and that's a bad result. And we want to have it dealt with here and now to the extent possible.

And the other thing is, you know, I heard a little bit of commentary this morning about how in this bankruptcy we're dealing with the litigation. And we are, right -- I mean, they are, I'm not -- in front of you, but Your Honor knows that the Fifth Circuit took that appeal.  They accepted that appeal.

And those are three appellate judges, I don't know what they are going to do.

THE COURT: Especially since I didn't give them a definition.[80]

57.    The Court further acknowledged that it is a "likely outcome" that the Fifth Circuit will at least remand the partial summary judgment to this Court based on a lack of findings and conclusions.[81]

58.    The Debtors also failed to address the fact that at least one other federal court has found that a contrary interpretation of the Non-PTL Term Loan Agreement is, at a bare minimum, plausible.  In a case challenging the 2020 Transaction filed by certain of the Excluded Lenders before the Debtors initiated their Chapter 11 bankruptcy case, the U.S. District Court for the Southern District of New York, denying a motion to dismiss, found that, at best, the "open market purchase" exception on which this court relied is ambiguous.  *LCM XXII Ltd. v. Serta*

---

[79] "Chapter 22" is a colloquial term used to describe a situation in which an entity twice seeks protection under Chapter 11 of the Bankruptcy Code.  *In re Venoco LLC*, 998 F.3d 94, 99 (3d Cir. 2021).
[80] Tr. H'rg 5/15/2023 at 130:25-131:25.
[81] Tr. H'rg 5/25/2023 at 1376:2-9.

US.357891120.01

*Simmons Bedding, LLC*, No. 21 Civ. 3987 (KPF), 2022 WL 953109, *7 (S.D.N.Y. March 29, 2022).  As the District Court found:

> On a plain reading of the term, the [2020] Transaction ... did not take place in what is conventionally understood as an "open market." Significantly, the [2020] Transaction was closed to a swath of possible participants (i.e., those lenders who did not participate in the [2020] Transaction), and rather than agreeing on a price set by market forces, Defendant and the [PTL] Lenders are alleged to have engaged in secretive discussions to arrive at a price for the loan repurchases that necessitated both intricate amendments to the [Non-PTL Term Loan] Agreement and additional agreements, the terms of which were withheld from Plaintiffs until they were publicly announced.  The Court appreciates the distinction highlighted by Defendant between open-market purchases for a private company's loans and open-market transactions for public stock and admits of the possibility that in the context of the [Non-PTL Term Loan] Agreement, the open-market provision may contemplate loan-repurchase transactions that involve fewer than all lenders in any given class of debt. That said, the Court cannot conclude based on the contractual context, the plain meaning of the words "open market," and the materials cited by the parties that Defendant has proffered the "definite and precise meaning" of the term "open market purchase" about "which there is no reasonable basis for a difference of opinion.

*Id.* at *8 (citations and record reference citations omitted).

59.     In short, contrary to the Debtors' suggestion, the Debtors failed to show it is a probability—much less a "substantial probability"—that they and the PTL Lenders will emerge victorious in the Excluded Lenders' appeal of the Court's partial summary judgment in the Adversary Proceeding.

60.     The second problem with the Debtors' argument is a pragmatic one.  *Even if* the Debtors could show a "substantial probability" that they will prevail on appeal, that still does not excuse them from valuing the Plan Indemnity *at all*.  Put differently, their odds of success may (and should) affect what value they assign to the liability.  But unless those odds approach a slam-dunk certainty—and the Debtors do not even argue that they do—it is inexcusable (and, more importantly, contrary to law) for them to simply ignore a potentially enterprise-destroying contingent liability.

61.     In its Objections, Citadel hypothesized that, based on theories of recovery asserted in the Excluded Lenders' complaint, damages might approach $350 million.[82]  Under the Debtors' own financial projections, the Reorganized Debtors would not have the liquidity to pay this amount or even half of it.[83]  This liability would also likely wipe out, or at least substantially reduce, the Reorganized Debtors' equity based on the values set forth in the Disclosure Statement.[84]

62.     In this Court, the Debtors challenged Citadel's projection regarding the prospective amount of the liability under the Plan Indemnity as

> speculative given that the Debtors' ability to pay the Indemnity Claim[s] will depend on a variety of contingencies including, among other things: (i) the quantum of any liquidated Indemnity Claim, the timing at which payment of such claims would be required; (ii) the Reorganized Debtors' future financial performance; and (iii) the Reorganized Debtors' potential sources of additional capital and the parties' willingness to settle on a lower sum or deferred payment or note.[85]

This objection misses the point entirely since it was not Citadel's burden to calculate the liability associated with the Plan Indemnity.  Rather, it was the Debtors' burden to prove feasibility, which necessarily included the responsibility to fully and fairly value the Plan Indemnity and account for it in their projections.  Because the Debtors failed to do this, and because the Plan Indemnity is potentially life threatening, it was not possible to conclude that the Plan is feasible.

63.     Further, the Debtors do not even contest that the Plan Indemnity may be life threatening.  Quite the opposite, the Debtors readily admitted in this Court that the Reorganized Debtors "face the risk of landing back in bankruptcy in the event of an adverse decision" by the

---

[82] Dkt. No. 810 at ¶ 54.  For the Excluded Lenders' theories of recovery, see, for example, *Amended Answering Defendants' Answer to the Amended Adversary Complaint, Counterclaims and Third-Party Claims* ¶¶ 340, 362 [Adv. Proc. Dkt. No. 148].
[83] *See* Dkt. No. 545 at Exhibit H.
[84] *See id.* at Exhibit F.
[85] Dkt. No. 879 at ¶ 209.

US.357891120.01

Fifth Circuit,[86] and the Court agreed.[87]  Moreover, the Debtors' own board member suggested that, if anything, Citadel's hypothetical figure was far too low of an estimate of damages, which, according to him, could "possibly approach[] a billion dollars."[88]  Given these admissions, the Debtors' complaints about the supposedly "speculative" nature of Citadel's potential damage estimate ring particularly hollow.

64.     Suffice it to say, if the PTL Lender Defendants are ultimately held liable in connection with the 2020 Transaction, the likelihood of the Reorganized Debtors continuing as a viable operation outside of bankruptcy is in serious jeopardy.  And the Debtors have not shown, or even attempted to show, otherwise.  Consequently, the Plan is not feasible .

### iii.     The Debtors failed to show their "settlement" with the PTL Lenders was in the best interest of the estate.

65.     The Debtors' ploy to recast the Plan Indemnity as a "new, go-forward indemnity" that was "an essential part of 9019 settlements" rather than a continuation of the Debtors' prepetition indemnity obligation under the PTL Credit Agreement did not magically transform the Plan into something that could be confirmed.

66.     As a preliminary issue, a Bankruptcy Rule 9019 settlement may not be used as a vehicle to treat claims in a manner that the Bankruptcy Code does not permit.  *See, e.g., Czyzewski*, 137 S.Ct. at 983-86.

67.     Additionally, for a bankruptcy court to approve a settlement under Bankruptcy Rule 9019, the settlement must be fair and equitable and in the best interest of the estate.  *See In the Matter of Foster Mortg. Corp.*, 68 F.3d 914, 917 (5th Cir. 1995).  To make that assessment,

---

[86] Debtors' Omnibus Reply to Objections to Debtors' Emergency Mot. for an Order, *Serta Simmons Bedding, LLC v. Those Parties Listed in Appendix A to Complaint (In re Serta Simmons Bedding, LLC)*, Ch. 11 Case No. 23-90020, Adv. No. 23-03007 (S.D. Tex. Mar. 6, 2023) [Dkt. No. 104 at 5].
[87] Tr. H'rg 5/15/2023 at 130:25-131:25.
[88] Tr. H'rg 5/16/2023 at 521:4-524:2.

US.357891120.01

courts evaluate certain "factors bearing on the wisdom of the compromise," including the likely outcome of the litigation at issue and its duration and costs, the interests of the creditors, the extent to which the settlement is the product of arms-length bargaining, and the business judgment of the debtors.  *See id.*  The debtor bears the burden of showing that the settlement meets this test, and a failure to sufficiently address these factors precludes approval.  *In re Wiley*, No. BKR 7-07-13053 SL, 2010 WL 964082, *4-5 (Bankr. D.N.M. Mar. 11, 2010) (denying motion to approve Bankruptcy Rule 9019 compromise where Trustee failed to place a value on several claims and "testified that the overall expected success of the case was 'ambiguous'); *see also In re Lahijani*, 325 282, 289 (B.A.P 9th Cir. 2005) ("The trustee's zero valuation does not inspire confidence in his business judgment.")  And "[a]n approval of a compromise, absent a sufficient factual foundation, inherently constitutes an abuse of discretion."  *Matter of AWECO, Inc.*, 725 F.2d 293, 299 (5th Cir. 1984).  The Debtors failed to meet their burden.

68.    First, it defies credulity to suggest that saddling the Reorganized Debtors with a potentially devastating liability that the Bankruptcy Code expressly disallows is in any sense in the best interest of the estate.  Quite the contrary, what the Bankruptcy Code disallows— particularly if in the form of a potentially crippling liability—cannot be in the estate's best interest.

69.    Second, there is no evidence that the Debtors engaged in any kind of settlement activity regarding the Plan Indemnity, as opposed to simply giving it away as a gift.  For example, there is no evidence that the Debtors considered the Plan Indemnity's impact on the feasibility of their reorganization prior to entering into the RSA.  To the contrary, the Debtors' representatives unabashedly testified at the confirmation hearing that they never assigned any

value to the Plan Indemnity.[89]  Nor is there any indication in the record that the Debtors attempted to limit the potential impact of the Plan Indemnity on the Reorganized Debtors or propose to the PTL Lender Defendants something less than a full, 100% indemnity.  There is no viable argument that the Plan Indemnity is worthless.  Thus, because the Debtors failed to account for or value the Plan Indemnity at all and, by the Debtors' own admissions, those claims could reflect a massive—indeed, potentially crippling—liability for the Reorganized Debtors, the Debtors failed to show the purported "settlement" was in the best interest of the estate.[90]

70.     Third, despite their impassioned plea that "no rational party would agree to equitize claims without an indemnity,"[91] that still does not demonstrate that granting the Plan Indemnity is in the best interest of the estate where, as here, the Code directs otherwise.  Again, there is no evidence that the Debtors negotiated to not provide the Plan Indemnity, nor any evidence that the Debtors or any party attempted to put a value on the equitization of debt that could be compared with the potentially massive liability that it was assuming under the Plan Indemnity.  Accordingly, there was no evidence on which the Court could base a finding that the consideration given by the Debtors was reasonable.

71.     Fourth, the Debtors' plea aside, it is economically and legally unreasonable to believe that the Plan without the Plan Indemnity would not have obtained requisite support.  Under the Plan, holders of FLFO Claims and FLSO Claims are obtaining essentially all the consideration that they could have received and thus have not given anything of substance to obtain the Plan Indemnity.  While the Debtors emphasize that holders agreed to equitize their

---

[89] Tr. H'rg 5/15/2023 at 254:20-255:6; Tr. H'rg 5/15/2023 at 255:7-256:6; Tr. H'rg 5/15/2023 at 256:14-24; Tr. H'rg 5/17/2023 at 898:14-899:10; Tr. H'rg 5/16/2023 at 519:14-19; Tr. H'rg 5/16/2023 at 506:5-19.
[90] The Debtors' admissions regarding the dire consequences that would result if the Plan Indemnity were triggered and this Court's common sense acknowledgment that in that scenario, the Debtors would "at best" end up back in bankruptcy tend to support the conclusion that the settlement to which the Debtors agreed was actually contrary to the best interest of the estate.
[91] Dkt. No. 879 at ¶ 3.

US.357891120.01

claims as part of a reorganization, they fail to acknowledge the practical reality that there was no economic or legal alternative. As an economic matter, if holders instead declined to equitize and therefore precipitated a liquidation, the Debtors' own analysis underscores that creditors would have been materially worse off on account of their existing FLSO Claims (and not received any value on account of the Plan Indemnity, to boot).[92] As a legal matter, if holders declined to support a plan on account of an indemnity to which they are not legally entitled, their votes could be subject to designation. *See* 11 U.S.C. § 1126(e); *In re Landing Assocs., Ltd.*, 157 B.R. 791, 802-03 (Bankr. W.D. Tex. 1993) ("The history of this provision makes clear that it was intended to apply to those [creditors] whose selfish purpose was to obstruct a fair and feasible reorganization in the hope that someone would pay them more than the ratable equivalent of their proportionate part of the bankrupt's assets." (quoting *In re Landau Boat Co.*, 8 B.R. 432, 434 (Bankr. W.D. Mo.1981))); *In re Holly Knoll P'ship*, 167 B.R. 381, 389 (Bankr. E.D. Pa. 1994) (finding a vote should be disqualified where creditor was pursuing an interest in addition to its interest as a creditor). The testimony of certain holders in the PTL Group does not change the foregoing.

### iv.   The Plan does not satisfy section 1123(a)(4) of the Bankruptcy Code.

72.     Under section 1123(a)(4) of the Bankruptcy Code, a plan of reorganization cannot provide different treatment for claims or interests within the same class. In this instance, however, the Plan does exactly that.

73.     Under the Plan, holders of claims in the FLSO Class (Class 4) who participated in the 2020 Transaction, and are thus defendants in the Adversary Proceeding, stand to benefit from the Plan Indemnity, potentially to the tune of hundreds of millions of dollars. Conversely,

---

[92] *See* Dkt. No. 545 at Exhibit E (setting forth a liquidation analysis wherein holders of FLSO Claims are projected to receive a recovery of between 7.2% and 17.3%).

US.357891120.01

holders of claims in the FLSO Class (Class 4) who did not participate in the 2020 Transaction, and are thus not defendants in the Adversary Proceeding and lack direct liability as to the 2020 Transaction, will receive no benefit at all.  Quite the opposite, because the Plan Indemnity burdens the Reorganized Debtors with a significant and potentially devasting contingent liability, it materially reduces the value of what non-participating holders like Citadel will receive under the Plan.  Thus, different claims within the FLSO Class receive different treatment under the Plan in violation of section 1123(a)(4).  In addition, because different claims within the FLSO Class receive different treatment under the Plan, these claims should have been classified separately and entitled to separate voting.  To the extent one of these classes were to reject the Plan, the Debtors would be required to demonstrate that the Plan complies with the requirements of section 1129(b), which the Debtors have not done.

> **v.**    **Citadel's due process rights were violated by the Plan's confirmation.**

74.    The Debtors' filing of a "modified" version of the Plan on the day preceding the first day of the Confirmation Hearing and an "amended" plan after the close of witness testimony at the Confirmation Hearing deprived Citadel of reasonable notice sufficient to allow it an opportunity to be heard in a meaningful manner on the modifications and amendments to the Plan. *See LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard.").  Rule 2002(b) of the Federal Rules of Bankruptcy Procedure requires 21 days' notice of both a confirmation hearing and the date by which objections must be filed.  Compliance with the notice requirements of the rule, however, does not necessarily dispose of due process issues.

75.    Citadel was prejudiced by the late modifications to the Plan because, among other infirmities, it had no opportunity in advance of the Confirmation Hearing to consider or investigate the purported basis for the Debtors' contention that the Plan Indemnity is part of a

settlement governed by Bankruptcy Rule 9019 or to adequately prepare for examinations of

Debtors' witnesses at the Confirmation Hearing on that issue.  *See, e.g., In re Bivens*, No. 08-

31447, 2009 WL 9121302, *8 (Bankr. S.D. Ohio Sept. 30, 2009) (finding creditor "did not

receive sufficient due process notice that the [Chapter 13 plan] confirmation hearing would serve

as a valuation hearing ..." under Section 506(a) of the Bankruptcy Code); *see In re Walker*, 149

B.R. 511, 514 (Bankr. N.D. Ill. 1992) ("'Adequate notice both apprises the individual of the

hearing and permits adequate preparation to present objections.'") (parenthetically quoting

*Chicago Cable Commc'ns v. Chicago Cable Comm'n*, 879 F.2d 1540, 1549 (7th Cir. 1989)).

Consequently, the confirmation of the Plan violated Citadel's due process rights under the Fifth

Amendment to the Constitution of the United States.

76.     For all of the above reasons, as well as others contained in Citadel's objections

and other filings in this Court, Citadel is likely to succeed on the merits of its Appeal, and at the

very least has made a substantial case entitling it to a stay pending appeal.

**B.     Citadel will be irreparably harmed if the Confirmation Order is not stayed and its appellate rights are mooted.**

77.     Absent a stay, Citadel stands to suffer irreparable harm because if the

Reorganized Debtors' Plan Indemnity is triggered, the Reorganized Debtors will face a massive

liability.  "At best,"[93] this could push the Reorganized Debtors back into bankruptcy, wiping out

Citadel's equity stake.  The Debtors did not challenge the plausibility of this outcome.  Instead,

they implicitly ask the Court to simply ignore it, and they banked on the hope they might later

convince any appellate court to abstain from doing so under the doctrine of equitable mootness.

78.     If the Fifth Circuit agrees with the Excluded Lenders that the 2020 Transaction

did not meet the "open market purchase" exception to the pro rata repayment requirement in the

---

[93] Tr. H'rg 5/15/2023 at 130:25-131:25.

US.357891120.01

Non-PTL Term Loan Agreement, then the PTL Lender Defendants will be faced with a potentially large liability.[94]  Under the confirmed Plan, the Reorganized Debtors will then be subject to satisfying that liability pursuant to the Plan Indemnity.[95]  The Debtors readily admit that the Reorganized Debtors will be ill-equipped to answer for that debt, potentially throwing them back into bankruptcy and in any event, imperiling the stake in the Reorganized Debtors held by Citadel and other similarly situated pre-petition creditors—to say nothing of the jobs of the Reorganized Debtors' employees and all of the other stakeholders who would be harmed by such an outcome.

79.     Because Citadel's interest in the Reorganized Debtors could be substantially harmed, if not destroyed, and there would be no party to which Citadel could look to compensate it for that loss, the Confirmation Order, if not stayed, stands to irreparably harm Citadel.  *See Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174, 1179 (5th Cir. 1989) (commenting that irreparable harm may exist "where the potential economic loss is so great as to threaten the existence of the movant's business") (collecting cases); *Jiao v. Xu*, 28 F.4th 591, 598 (5th Cir. 2022) (affirming the district court's temporary injunction where the plaintiffs "established a substantial threat they would suffer irreparable injury" based on the loss of the franchise for their hotel and even the hotel itself); *Wages and White Lion Investments, L.L.C. v. U.S. Food and Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021) (explaining that "substantial financial injury may be sufficient to show irreparable injury" where the injury "threatens the very existence of [the movant's] business") (quotation marks and citation omitted); *Texas v. U.S. Envtl. Prot. Agency*, 829 F.3d 405, 433 (5th Cir. 2016) (finding that "nonrecoverable compliance

---

[94] Non-PTL Term Loan Agreement, *Serta Simmons Bedding, LLC v. AG Centre St. P'ship L.P. (In re Serta Simmons Bedding, LLC)*, Ch. 11 Case No. 23-90020, Adv. No. 23-09001 (Bankr. S.D. Tex. Jan. 24, 2023), [Dkt. No. 1-2 at § 2.18(a)].
[95] Dkt No. 977 at ¶ 8.5(b).

US.357891120.01

costs" with a federal agency rule constituted an irreparable injury, noting that "[n]o mechanism exist[ed] for the power companies to recover the compliance costs they [would] incur if the Final Rule [were] invalidated on the merits").

80.     What is more, if this Court does not stay the Confirmation Order, Citadel may be deprived of any opportunity to seek redress for this harm.  Absent a stay, the Debtors will proceed with consummating the Plan.  Payments will be made to various creditors and the Reorganized Debtors will begin entering into new contracts with third parties and otherwise carrying on with their business operations.  Once that occurs, they will no doubt argue that the any legal error is not subject to correction and Citadel's appeal regarding those errors is equitably moot.  *See In the Matter of Thru Inc.*, 782 Fed. Appx. 339, 340 (5th Cir. 2019) (per curiam).

81.     Indeed, it appears that the Debtors structured their Plan with the doctrine of equitable mootness in mind in the hopes of shielding any errors in its prospective confirmation from appellate review.  To that end, the Debtors argued in response to Citadel's objections that "appeal(s) of the Adversary Proceeding may ultimately be barred as equitably moot."[96]

82.     Equitable mootness was developed as a way to shield *innocent* third parties who rely *in good faith* on the continued operation of a reorganized entity as a going concern.  But the Debtors seek here to weaponize the doctrine, converting that shield into a sword that may be used to preclude meritorious appellate challenges and insulate a deeply flawed plan from ever facing appellate review.  Granting a stay would obviate the possibility that the federal courts could be used to facilitate such a circumvention.

---

[96] Dkt. No. 879 at ¶ 208.

83.     In addition, even taken on its own terms, the justifications for equitable mootness are diminished here because the objection the Debtors are trying to paper over is one *that raises concerns regarding the Reorganized Debtors' ability to continue operating as a going concern*. Said otherwise, the policy goals of equitable mootness (protecting the reliance interests of innocent third parties) would in this case be best served by staying this case and allowing Citadel's objection to be aired, because (if Citadel is correct) the Reorganized Debtors are likely to betray those third parties' reliance interests by once again filing for Chapter 11 protection—or, worse, liquidation under Chapter 7.

84.     Also, the Debtors contended in this Court that "they are party to a comprehensive settlement with the [PTL Lenders] and, given all the litigation that has been brought by the [Excluded Lenders] to date, there simply would be no Plan, no equitization of claims, no reorganization, without an indemnity moving forward relating to this litigation."[97]  Stated more plainly, the Debtors insinuated that the only possible reorganization hinged on the Court's willingness to embrace the potentially cataclysmic risk the Plan Indemnity implicates.  They will no doubt argue in any appeal that the relief Citadel seeks cannot be granted without unwinding the entire Plan.

85.     Accordingly, a stay of the Confirmation Order is warranted so that there is a meaningful opportunity for appellate review.  *In re Voluntary Purchasing Gps., Inc*., 196 F.3d 1258 (5th Cir. 1999) (per curiam) (reversing the district court's decision to deny a stay, noting that in view of the doctrine of equitable mootness, "[a]bsent a stay, the [appellants'] right to contest the confirmation order could be thwarted" and finding that "the balance of hardships clearly weighed in favor of granting a stay rather than permitting a procedurally flawed, and

---

[97] Dk. No. 879 at ¶ 3.

therefore incomplete, plan to be confirmed and consummated"); *see In re Pacific Lumber Co.*, 584 F.3d 229, 243 (5th Cir. 2009) (commenting that "simply denying a stay seems to have been, and often will be, too simplistic a response" and cautioning that "substantial legal issues can and out to be preserved for review").

**C.     A stay will benefit—not harm—other parties.**

86.     The consequences that will ensue if the Fifth Circuit rules in favor of the Excluded Lenders are not limited to the potential destruction of Citadel's equity stake.  To the contrary, if the Reorganized Debtors are forced to seek bankruptcy protection yet again, the repercussions will be felt by all of the Reorganized Debtors' constituencies, including their employees, customers, suppliers, creditors, and other equity stakeholders, each of which stands to be negatively impacted if, in a few short months, the Reorganized Debtors are staring down the barrel of hundreds of millions of dollars in indemnity claims they cannot possibly pay. Staying the Confirmation Order pending the outcome of this appeal will inure to the benefit of all of these groups by removing the cloud of uncertainty that currently surrounds the Indemnity Claims and the feasibility of the Plan.

**D.     The public interest favors a stay of the Confirmation Order.**

87.     In enacting section 1129 of the Bankruptcy Code, Congress necessarily determined that the proper and consistent application of its standards for confirmation of Chapter 11 plans is in the public interest.  Because Citadel has made a substantial case that those standards were not properly applied to the Plan, the public interest favors the ability to seek appellate review, which may be possible only if a stay is granted.

88.     Further, the public does not stand to be negatively affected by a short delay in the Debtors' ultimate reorganization.  To the contrary, the public interest and markets are best served by ensuring that the Reorganized Debtors emerge from bankruptcy in as strong a financial

position as possible, so that their business is well-situated to thrive and serve their employees and the public well in the years to come.  On the other hand, the public interest is not at all served if the Reorganized Debtors are unable to pay their bills and quickly find themselves back in bankruptcy court.

**E.      The Court should exercise its discretion to grant a stay without a bond.**

89.      The posting of a bond is "discretionary and is not a prerequisite to obtain a stay pending appeal."  *In re Suprema Specialties, Inc.*, 330 B.R. 93, 95 (S.D.N.Y. 2005) (quoting *In re Sphere Holding Corp.*, 162 B.R. 639, 644 (E.D.N.Y. 1994)).[98]  A bankruptcy court may determine the "form, the amount and the sufficiency of that security[.]"  *In re Gleasman*, 111 B.R. 595, 602 (Bankr. W.D. Tex. 1990).  The only reason to require a bond in these cases is to protect the Debtors against losses they may suffer while Citadel's appeal is pending.[99]

90.      As discussed above, however, any harm that may come to the Debtors while Citadel pursues an expedited appeal is insignificant and pales in comparison to the losses that the Reorganized Debtors would suffer if the Plan Indemnity is triggered.  Further, because all losses the Debtors stand to incur are those of their own creation, the Court should, in its "substantial discretion [,]" determine that no bond is necessary.  *See In re Fiesta Inn & Suites, LP*, 2009 WL 5195961, at *2 (Bankr. W.D. Tex. Dec. 21, 2009) ("when no supersedeas bond is obtained, a court has substantial discretion under Rule 8005 to grant (or deny) a stay pending appeal on such terms as it may deem appropriate . . . .").

---

[98] *See also* Fed. R. Bankr. P. 8007(c) ("The district court, BAP, or court of appeals *may condition* relief on filing a bond or other security with the bankruptcy court") (emphasis added).

[99] *See ACC Bondholder Gp. v. Adelphia Commc'ns Corp (In re Adelphia Commc'ns Corp.)*, 361 B.R. 350 (S.D.N.Y. 2007) ("In determining whether a bond should be ordered, the court looks to whether the bond would be necessary to protect against diminution in the value of property pending appeal and to secure the prevailing party against any loss that might be sustained as a result of an ineffectual appeal.") (internal quotations omitted).

US.357891120.01

## IV.  PRAYER

For the reasons stated, Appellee Citadel Equity Fund Ltd. respectfully requests that the

Court issue an order staying the Confirmation Order pending the outcome of the Appeal.

Respectfully Submitted,


 */s/ Kristen L. Perry*
Vincent P. Slusher
State Bar No. 00785480)
vince.slusher@faegredrinker.com
Kristen L. Perry
State Bar No. 24090015
kristen.perry@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
1717 Main Street, Suite 5400
Dallas, TX 75201
(469) 357-2500
(469) 327-0860 (Facsimile)

James H. Millar
james.millar@faegredrinker.com
(*admitted pro hac vice*)
Laura E. Appleby
laura.appleby@faegredrinker.com
FAEGRE DRINKER BIDDLE & REATH LLP
1177 Avenue of the Americas
41st Floor
New York, New York 10036-2714
(212) 248-3140
(212) 248-3141 (Facsimile)

**ATTORNEYS FOR
CITADEL EQUITY FUND LTD.**

US.357891120.01

## CERTIFICATE OF CONFERENCE

I certify that on June 7, 2023, I conferred with Luna Barrington, one of the attorneys representing Debtors-Appellees, regarding the foregoing motion and Citadel's request that the Court grant a stay without a bond.  Ms. Barrington represented to me that Debtors-Appellees are opposed.  Accordingly, the motion is presented to the Court for disposition.

 */s/ Kristen L. Perry*
KRISTEN L. PERRY

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing pleading was served by electronic delivery on all persons and entities receiving ECF notice in this case on June 7, 2023.

 */s/ Kristen L. Perry*
KRISTEN L. PERRY

US.357891120.01